ORIGINAL

FILED
JUL 2 2 2015
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**ACLR, LLC**
38705 Seven Mile Road
Suite 251
Livonia, Michigan 48152

Plaintiff

v.

**THE UNITED STATES**

Defendant

No. 15-767 C

**COMPLAINT**

Plaintiff ACLR, LLC ("ACLR"), by and through undersigned counsel, hereby files its Complaint against Defendant the United States of America and states as follows:

PARTIES

1. ACLR is a Michigan limited liability company with a principal place of business at 38705 Seven Mile Road, Suite 251, Livonia, Michigan 48152.

2. Defendant is the United States of America acting by and through the United States Department of Health & Human Services, Center for Medicare & Medicaid Services ("CMS").

JURISDICTION

3. This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. 1491 and the Contract Disputes Act ("CDA"), 41 U.S.C. 7101-7109.

## BACKGROUND

4. Title I of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA") was signed into law on December 3, 2003. The MMA established a new voluntary outpatient prescription drug benefit under Part D of Title XVIII of the Social Security Act ("SSA"). Coverage for the drug benefit is provided by private prescription drug plans that offer drug-only coverage or through Medicare Advantage ("MA") plans that offer both prescription drug and health care coverage.

5. Section 6411(b) of the Affordable Care Act ("ACA") expanded the use of the statutory 1893 Recovery Audit Contract provisions to utilize Recovery Audit Contracts under the Medicare Integrity Program to identify underpayments and overpayments and recoup overpayments under the Medicare program associated with medications for which payment is made under Part D of Title XVIII of the SSA.

6. Section 6411(b) of the ACA required that CMS enter into contracts to conduct recovery audits "no later than December 31, 2010" and that such contracts include, *inter alia*, the requirement that recovery audit contractors: (a) ensure prescription drug plans implemented anti-fraud plans and review the effectiveness of such plans; (b) examine claims for reinsurance payments to ascertain whether incurred costs were in excess of allowable costs; and (c) review estimates pertaining to the enrollment of high cost beneficiaries against actual beneficiaries enrolled.

7. On December 2, 2010, CMS requested a quote for the Recovery Audit Contractor Services in Support of a Medicare Part D contract and represented that CMS intended to award a firm-fixed price contingency fee task order for the work.

8. The purpose of the Medicare Part D contract was to obtain contractor support for CMS in the identification of improper payments and the recoupment of overpayments in Medicare Part D. The Medicare Part D contractor would be responsible for the identification and recovery of improper payments on a national scale.

9. On December 14, 2010, ACLR submitted a technical proposal to CMS outlining the processes ACLR would use to identify and recover improper payments made in the prescription drug benefit program of Medicare Part D to CMS's Request for Proposal ("RFP") for the Medicare Part D contract.

10. ACLR also submitted to CMS a Performance Work Statement ("PWS") that provided audit processes and issues, collection protocols, and appeal processes for the unrestricted review and collection of Part D improper payments.

11. ACLR submitted a subsequent addendum to CMS on December 15, 2011, incorporating CMS's responses to RFP questions asked by ACLR.

12. On January 13, 2011, CMS awarded Contract No. GS-23F-0074W/Task Order No. HHSM-500-2011-00006G to ACLR ("Part D RAC").

13. The Part D RAC incorporated, in its entirety, ACLR's PWS which limited CMS activities to listed administrative requirements, providing feedback on ACLR's Project Work Plan and appeal processes, approving ACLR outreach to plan sponsors, and developing a Data Storage System ("DSS") to transmit and receive Part D payment data to ACLR.

14. A Part D RAC Kick-Off Meeting was held on February 23, 2011.

15. At the Part D RAC Kick-Off Meeting, CMS provided ACLR "Authority to Proceed."

16. CMS personnel disclosed to ACLR that CMS wanted to "minimize the impact on plan sponsors" and did not want to recover "too much money."

17. During this meeting, CMS personnel also informed ACLR that CMS would not develop a DSS, shifting the responsibility for its development to ACLR, and that CMS had separately contracted with Booz Allen Hamilton ("BAH") to "assist in what the Part D RAC program would look like."

18. During a March 2, 2011 conference call scheduled to discuss ACLR contractual concerns and CMS security accreditation delays, Contracting Officer ("CO") Debra Stidham reiterated CMS's intention to "minimize the impact on the Part D sponsors" and acknowledged the "current PWS" did not "reflect what reality is" and that CMS was not "crystal clear on what the reality is." CO Stidham did not dispute that ACLR had complied with all contractual requirements and again reiterated the authority to proceed. No contract modification was issued as a result of CO Stidham's statements.

19. During the initial base period of the Part D RAC (January 13, 2011- January 12, 2012), CMS failed to timely comply with contract deadlines for the issuance of ACLR's Authorization to Operate ("ATO"), the transmission of Part D payment data, and various administrative requirements. CMS made no contract modifications or offers of equitable relief for the increased delay costs incurred by ACLR.

20. On August 30, 2011, CO Desiree Wheeler informed ACLR that it "was not executing the process defined in the current PWS" and that ACLR's performance was in violation of its contract. During subsequent communications with CO Wheeler, ACLR provided evidentiary support of CMS violations of its contract and ACLR's inability to proceed with contract execution until CMS compliance had been achieved. These communications culminated

in CO Wheeler's November 7, 2011 assertion that the "PWS was proceeding as plan planned and that there were no issues related to why ACLR "could not execute" its contract. This assertion was disputed by ACLR and a conference call between CMS contract and program personnel and ACLR was scheduled for November 30, 2011.

21. CMS began transmitting Part D claims to ACLR on November 17, 2011 and ACLR commenced recovery audit activities in accordance with the Part D RAC.

22. During the November 30, 2011 conference call, ACLR informed CMS that ACLR had identified improper payments and was going to commence the recovery of improper payments by issuing demand letters to plan sponsors in accordance with the Part D RAC. CO Wheeler concurred with this action. In response, Contracting Officer Technical Representative ("COTR") Marnie Dorsey stated the contracted PWS was "just a proposal" and that they had not approved of the contracted processes.

23. Contract Specialist Sanders informed the COTR and CMS/CPI Downs that the PWS was an executable document and that CMS was obligated to comply with the legal requirements of the contract.

24. CMS/CPI Tanette Downs informed CO Wheeler the Program Office did not concur with PWS requirements and that ACLR could not continue its recovery efforts.

25. Upon ACLR's subsequent assertion that it would immediately begin recovery efforts, CO Wheeler stated "I think we all know it's not in your best interest" to proceed and ordered ACLR to cease all efforts pertaining to the issuance of demand letters to plan sponsors.

26. CO Wheeler's order was confirmed via email on December 1, 2011. No contract modification was issued as a result of CO Wheeler's statements.

27. Improper payment amounts identified by ACLR and held in abeyance by CO Wheeler's order totaled $313,808,241.

28. On December 14, 2011, ACLR filed a claim seeking recovery of $662,972.83 based on delay costs incurred by ACLR with base year contract delays. ACLR did not request amounts owed pursuant to contractual requirements.

29. CMS denied ACLR claim on April 26, 2012. No language pertaining to ACLR's rights to appeal were provided in the CMS claim denial.

30. On January 31, 2012, CMS executed a contract modification ("MOD 000003") authorizing ACLR to identify and recover improper payments associated with excluded providers for 2007 payment data. This modification retained ACLR fees associated with collection but eliminated the immediate calculation of the risk sharing portion in improper payment amounts reported to plan sponsors thereby delaying recovery of improper payments pertaining to same until reopening of final reconciliation. Fees associated with subsequent collections of these amounts were ultimately denied by CMS and fees totaling $134,405.24 arising from the CMS risk sharing collections of $1,111,098.98 through 2014 were not paid to ACLR

31. On February 13, 2012, ACLR submitted $27.9 million excluded provider improper payments to CMS's Data Validation Contractor ("DVC") in accordance with MOD 000003.

32. On March 23, 2012, CMS Contracting Officer Representative ("COR") Frank Chartier directed ACLR to eliminate recoveries of $19.2 million in improper payments associated with excluded provider pharmacists and pharmacy owners. The lack of contractual

authority for such an act was reported to CO Theresa Schultz for resolution who directed ACLR to eliminate identified improper payments and resubmit netted amounts to the DVC.

33. CMS made no contract modifications or offers of equitable relief for the loss of ACLR revenues associated with the elimination of recoverable amounts or the increased costs of resubmission incurred by ACLR arising from CO Schultz's direction.

34. Subsequent contract modifications and CMS actions associated with the 2007 excluded provider improper payments extended the MOD 000003 audit cycle timelines of 182 days to 436 days, eliminated recoveries of improper payments associated with inactive contracts and plan-to-plan payments, and suspended the recoupment of improper payments from contracts that did not appeal ACLR findings until the completion of all appeal activities; no contract modifications or offers of equitable relief were made to ACLR for reduced recoveries and additional costs incurred as a result of these modifications and actions.

35. On September 1, 2011, ACLR was provided a copy of BAH's Business Process Model ("BPM") and an overview of the Payment Recovery Information System ("PRIS") and was subsequently informed on January 3, 2012 the BPM and PRIS would replace contracted Part D RAC audit processes and that PRIS would be the sole method by which improper payments would be submitted and tracked.

36. On July 17, 2012, and in breach of the Part D RAC, CMS directed ACLR to "begin testing" an interim version of PRIS. No contract modification, offer of equitable relief, or reimbursement of the significant expenses incurred by ACLR to execute PRIS testing were made by CMS.

37. On February 13, 2013, CMS executed a contract modification requiring the submission of all improper payments via PRIS. However, PRIS did not become operational until September 2014.

38. BAH's BPM was incorporated into Rule CMS–4159–F, Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs ("4159F") issued March 23, 2014. A contract modification incorporating 4159F requirements was executed on December 31, 2014.

39. On December 9, 2011, ACLR was informed that its duplicate payment audit review protocols, initially submitted to CMS on August 29, 2011 and used to identify improper payments totaling $313,808,241, had been modified by CMS's ("Modified DP Protocol").

40. On July 15, 2013, CMS executed a contract modification ("MOD 000008") authorizing ACLR to identify and recover improper payments associated with duplicate payments for 2009 payments for three contracts in accordance with CMS' Modified DP Protocol.

41. ACLR completed its review and notified CMS of the findings on August 29, 2013. CMS made no attempt to recover amounts identified by ACLR in accordance with MOD 000008 requirements.

42. On November 13, 2013 and in accordance with the Part D RAC and utilizing active recovery audit protocols, ACLR prepared and submitted improper payments totaling $1,050,170,811 in illegally dispensed and legally recoverable improper payments to CMS and informed CMS that ACLR intended to commence the immediate recovery of same.

43. On November 22, 2013, CO Nicole Hoey issued a stop work order and CMS continued delaying execution of Part D RAC contract requirements.

44. During the month of December 2013, OAGM CO Nicole Hoey, previous CO Schultz, and ACLR Contract Compliance Officer ("CCO") Gil Mucke worked to finalize recovery audit requirements for upcoming Option Year 1 contractual requirements.

45. On December 13, 2013, in a conference call scheduled to discuss equitable adjustment, CO Nicole Hoey informed CCO Mucke that CMS was rescinding previous Base Period extensions and eliminating two option-year periods. As consideration for this decision, and to address equitable adjustments related to past losses, CO Hoey and previous CO Schultz agreed to engage in Alternative Dispute Resolution ("ADR").

46. CMS and ACLR finalized remaining contractual issues on December 31, 2014, the last day of the Part D RAC. They agreed to all language incorporated therein and CMS informed ACLR that CMS would submit a final copy, as agreed to by all parties, to ACLR for signature.

47. Upon review of the finalized document and without previous discussions pertaining to same, ACLR noted that CMS had added language pertaining to a "Contractor's Statement of Release" that would have relieved CMS from any future requests for equitable adjustment. CCO Mucke contacted CO Hoey and Ms. Schultz noting that the inclusion of this language "contradicted OAGM assurances to work in good faith." In response, Ms. Schultz informed CCO Mucke that CMS would not execute any agreement unless the release language was included and the matter was referred to ACLR's Managing Principal.

48. ACLR's Managing Principal contacted CO Nicole Hoey and Ms. Schultz and informed them that ACLR would not execute the contract in its current form and insisted that the release language be removed. Ms. Schultz reiterated CMS's commitment to ADR.

49. On December 31, 2013, CMS executed Contract Modification 000013 ("OY1 SOW"), which replaced the Part D RAC PWS and eliminated previous base period extensions and removed two option years from the Part D RAC.

50. On March 23, 2014, CMS issued 4159F and ACLR contacted CO Hoey and Ms. Schultz to discuss the significant impact on the OY1 SOW and Part D RAC program.

51. On April 18, 2014, Ms. Schultz informed CCO Mucke that CMS had rescinded its earlier commitment to participate in ADR and that CMS was not interested in addressing any additional aspects pertaining to delays or increased delay costs to ACLR.

52. On May 28, 2014, CMS approved a duplicate payment audit associated with 2010, 2011, and 2012 payment data in accordance with its Modified DP Protocol. On June 9, 2014, ACLR completed its initial review and commenced notification of plan sponsors of initial amounts identified. On June 10, 2014, in breach of contracted processes, CMS delayed submission of amounts to plan sponsors and commenced an internal review of amounts identified.

53. On July 8, 2014, CMS notified ACLR that CMS "rescinded" its approval of duplicate payments associated with 2011 and 2012 payment data, representing $52,643,882 in improper payments, and authorized audit commencement for "CY 2010 only". The Part D RAC did not authorize CMS to cancel, mitigate, or otherwise alter an approved CMS audit protocol and no contract modification, offer of equitable relief, or reimbursement of additional costs incurred by ACLR to incorporate CMS revisions were made.

54. On July 9, 2014, ACLR commenced recovery audit efforts for CY 2010 duplicate payments and submitted requests for additional information to plan sponsors.

55. On September 3, 2014, CMS notified ACLR that CMS had been in contact with a pharmacy benefit manager ("PBM") who had expressed concerns that the "RAC identified records in error". Ensuing conversations regarding PBM concerns culminated in CMS attempting to further reduce 2010 Duplicate Payment findings by targeting approved audit processes and directing ACLR to implement an "edit check" that would reduce improper payment findings by over 64% ("Revised DP Protocol").

56. On December 5, 2014, CMS Investigations and Audits Group Director Mark Majestic informed plan sponsors that "as a result of further analysis and a review of the supporting documentation submitted by plan sponsors, most plan sponsors should expect to see reduction in the number of PDE records that were identified as improper payments in the Duplicate Payment Exception Report that accompanied the RFI".

57. On December 24, 2014, and after considerable ACLR review efforts of plan sponsor data submissions, ACLR submitted $15,909,552 in duplicate payments associated with 2010 payment data to CMS. With this submission, ACLR notified CMS that its "edit check" did not match plan sponsor evidentiary submissions and was in error in "73.3%" of all instances in which it was applied. Citing the large error rate of CMS's proposed "edit check" and the lack of contractual authority or approved contract modification by CO Hoey incorporating revisions to approved audit protocols, ACLR did not implement CMS's proposed "edit check".

58. On April 24, 2015 and citing ACLR's failure to implement CMS' "edit check" as well as acknowledging the Data Validation Contractor implementation of the revised methodology and reduction of duplicate records, CMS rescinded its prior approval stating "Although the revised methodology used by CMS was able to reduce the number of PDE records identified as improper submissions, CMS continues to have concerns with the validity of the

overall audit results" No contract modification, offer of equitable relief, or reimbursement of additional costs incurred by ACLR to address this breach of OY1 SOW contract requirements was made by CMS.

59. On March 10, 2014, CMS approved a review of improper payments arising from violations of the Controlled Substances Act ("CSA") for 2009-2010 payments.

60. On March 17, 2014, ACLR commenced recovery audit efforts for 2010-2011 CSA violations and submitted requests for information for prescription dispensing events ("PDEs") to plan sponsors.

61. On July 1, 2014, ACLR was informed that CMS personnel had been in contact with the PBM pertaining to concerns regarding the submission of evidentiary support for PDEs identified by ACLR and that CMS had relaxed specifically enumerated CSA documentation requirements on evidentiary submissions from this PBM.

62. On July 17, 2014 and after subsequent discussions with CMS personnel pertaining to the permissibility of such an action, CMS personnel confirmed its July 1, 2014 direction and directed ACLR to "disregard" CSA documentation requirements on evidentiary submissions pertaining to refill by refill documentation requirements of the CSA upon the receipt of "a valid prescription".

63. CMS's revision to the approved audit protocols eliminated $1,693,106 in CSA violations and revenues to ACLR in amounts totaling $474,070. No contract modification, offer of equitable relief, or reimbursement of additional costs incurred with modifying its review protocols by ACLR to address this breach of OY1 SOW contract requirements were made by CMS.

64. ACLR reported this issue to the Government Accountability Office via its online reporting service FraudNet on July 17, 2014 and to the HHS Office of Inspector General on May 13, 2015.

65. CMS 2014 delays associated with the 2010-2011 violations of the Controlled Substances Act ("CSA") review totaled 240 days requiring completion of the review in 2015 under Rule 4159F.

66. During 2014, ACLR submitted eight New Audit Issue Review Packages ("NAIRPs") for improper payments totaling $549,481,424. Each package, submitted in accordance with OY1 SOW requirements, outlined ACLR's recovery audit processes and included evidence demonstrating that payments had been made for claims dispensed and/or submitted in violation of federal and state law, concomitant regulations, and published CMS guidance.

67. Six of the NAIRPs were denied on the basis that CMS had updated, was in the process of updating, or had not previously issued plan sponsor guidance pertaining to the issues identified by ACLR and one NAIRP, approved for duplicate payments, was ultimately terminated upon completion of ACLR recovery audit efforts.

68. ACLR was not provided with a legal analysis outlining CMS's authority to deny issues dispensed or submitted in violation of federal and state law.

69. In one case pertaining to the dispensing of drugs on prescriptions known to have expired in violation of state law, which was denied on February 17, 2014, CMS informed ACLR that subsequent revisions of the NAIRP "did not completely address the requested changes" made by CMS. Subsequent attempts to ascertain how ACLR did not "address the requested changes" were ignored by CMS.

70. ACLR reported this issue to the HHS Office of Inspector General on May 25, 2015.

71. Part D RAC and OY1 SOW contract delays by CMS total 2,123 days and CMS has failed to execute 34 expressly required contracted processes and deadlines.

72. ACLR submitted a certified claim under the CDA to CMS on March 12, 2015 in an amount of $28,506,591.

73. CMS denied ACLR's CDA claims in a letter dated June 5, 2015.

**Count I:**
**Breach of Contract**

74. ACLR incorporates and restates here the allegations set forth in Paragraphs 1 through 73 of the Complaint.

75. ACLR and CMS had a contract for ACLR to perform certain work for CMS.

76. CMC breached the contract by, among other things, the following:

a. failing to permit ACLR to recover improper payments identified during the base period of the contract;

b. failing to execute contracted activities and timely completing these activities within contract deadlines;

c. contracting with other contractors to implement recovery audit processes; and

d. mitigating the impact of the Part D RAC program on plan sponsors by impeding the execution of recovery audit activities by ACLR.

77. As a direct and proximate result of the CMS's actions, ACLR has suffered, and will suffer, substantial losses and damages.

**Count II:**
**Breach of Duty of Good Faith and Fair Dealing**

78. ACLR incorporates and restates here the allegations set forth in Paragraphs 1 through 77 of the Complaint.

79. CMS owed ACLR a fiduciary duty based upon their relationship.

80. CMS breached its duty of good faith and fair dealing to ACLR by, among other things, the following:

a. committing actions that unreasonably caused delay or hindrance of contract performance;

b. negotiating equitable relief with ACLR in contract modifications and then reducing such relief upon modification execution;

c. committing CMS to ADR at Part D RAC OY1 signing and subsequently denying ADR; and

d. specifically targeted the Part D RAC through a staggered implementation of BAH BPM requirements and delays of audit issues until the final Rule CMS–4159–F implementation date.

81. As a direct and proximate result of CMS's breach of its duty of good faith and fair dealing, ACLR has suffered, and will suffer, substantial losses and damages.

WHEREFORE, Plaintiff ACLR prays for judgment against Defendant as follows:

1. Damages in the amount of not less than$28,506,591;
2. The costs of pursuing the relief sought herein, including, but not limited to, attorney's fees and costs pursuant to the Equal Access to Justice Act; and
3. Additional relief as the Court deems just and proper.

Dated: July 21, 2015

Respectfully submitted,

DAVID, BRODY & DONDERSHINE, LLP

Thomas K. David, Esq.
John A. Bonello, Esq.
12355 Sunrise Valley Drive, Suite 650
Reston, VA 20191
Phone: 703-264-2220
Fax: 703-264-2226

Attorneys for Plaintiff ACLR, LLC