## IN THE UNITED STATES COURT
## OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **ACLR, LLC** | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **Civil Action No. 15-767 and 16-309** |
| | ) | (Judge Campbell-Smith) |
| **THE UNITED STATES** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## PLAINTIFF ACLR, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION
## FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................v

QUESTIONS PRESENTED...................................................................1

STATEMENT OF THE CASE...............................................................1

STATEMENT OF FACTS....................................................................1

PROCEDURAL HISTORY ................................................................22

SUMMARY JUDGMENT STANDARD..........................................23

ARGUMENT.....................................................................................24

    I.    This Court Should Grant Summary Judgment to ACLR
        On Counts I and II in ACLR I.................................................24

        A.    CMS Breached The Part D RAC Contract....................24

              1.    ACLR Had A Valid Contract With CMS To
                    Recover Improper Payments...............................24

              2.    CMS Had A Contractual Obligation To Allow
                    ACLR To Recover PY 2007 And PY 2010
                    Duplicative Payments .......................................25

                      a.    PY 2007 Duplicate Payment Audit......................25

                      b.    PY 2010 Duplicate Payment Audit......................26

               3.    CMS Breached The Part D RAC Contract Regarding
                    Duplicate Payments...........................................27

                      a.    CMS Breached The Part D RAC Contract
                          Regarding The PY 2007 Duplicate
                          Payment Audit .......................................27

                      b.    CMS Breached The Part D RAC Contract
                          Regarding The PY 2010 Duplicate
                          Payment Audit.......................................28

               4.    ACLR Was Damaged By CMS's Breaches
                      Related To The PY 2007 And PY 2010
                      Duplicate Payment Audits ...............................30

B.     CMS Violated The Implied Covenant Of Good Faith And Fair Dealing.................................................31

      1.     ACLR Reasonably Expected To Pursue The PY 2007 and PY 2010 Duplicate Payment Audits .................................................32

      2.     CMS Breached Its Duty Of Good Faith And Fair Dealing In Connection With The 2007 And 2010 Duplicate Payment Audits..............................35

          a.     2007 Duplicate Payment Audit.............................35

          b.     2010 Duplicate Payment Audit.............................37

C.     ACLR's Damage For CMS' Breach Of Contract And Breach Of Its Duty Of Good Faith And Fair Dealing In Connection With The PY 2007 And PY 2010 Duplicate Payment Audits.....................................41

II.     This Court Should Grant Partial Summary Judgment To ACLR On Counts I And II In ACLR II..................................................44

A.     CMS Breached The RAC Contract..................................................44

      1.     ACLR's Sales Tax NAIRP Submission............................44

      2.     CMS Had An Obligation To Follow The NAIRP Approval Process In The SOW.............................45

      3.     CMS's Actions In Connection With The Sales Tax NAIRP Were A Breach Of The Part D RAC Contract...................................46

          a.     CMS's Failure To Follow The SOW For The NAIRP Process Was A Breach Of The Part D RAC Contract................................47

          b.     CMS's Denial Of ACLR's NAIRP Was A Breach Of The Part D RAC Contract................47

             i.     ACLR's Sales Tax NAIRP Issues Were Not Open And Active..........48

             ii.     ACLR's Sales Tax NAIRP Was

Not Duplicative And Did Not
Focus On Improper Payments
That Are Already Identified,
Being Audited, And Have Been
Corrected/Reimbursed Elsewhere
In CMS For The Same Audit Issue............49

    a.    The Sales Tax NAIRP
Was Not Duplicative..........50

    b.    The Improper Payments
In ACLR's Sales Tax
NAIRP Were Not
Already Identified.............51

    c.    The Improper Payments In
ACLR's Sales Tax
NAIRP Were Not Being
Audited..............................52

    d.    The Improper Payments
In ACLR's Sales Tax
NAIRP Were Not
Corrected/Reimbursed.......53

    4.    CMS' Breach Of Contract Caused ACLR
To Incur Damages.................................................53

    B.    CMS Violated The Implied Covenant Of Good
Faith And Fair Dealing In Connection With ACLR's
Sales Tax NAIRP..........................................................54

    1.    ACLR Reasonably Expected To Recover
Improper Payments Based on Sales Tax Charges.............54

    2.    CMS Breached Its Duty Of Good Faith
And Fair Dealing In Connection With The
Sales Tax NAIRP..............................................55

    C.    ACLR's Damages........................................................58

CONCLUSION....................................................................60

CERTIFICATE OF SERVICE..............................................61

APPENDIX ...........................................................(A1- A790)

iv

# TABLE OF AUTHORITIES

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................................................23

*Bell/Heery,*
  739 F.3d.................................................................................................................32

*Bluebonnet Sav. Bank, F.S.,*
  266 F.3d .................................................................................................43, 45, 46, 48

*Boston Edison Co. v. United States,*
  80 Fed. Cl. 468 ..............................................................................................41, 58

*California Fed. Bank v. United States,*
  395 F.3d 1263 (Fed. Cir. 2005) ...............................41, 48, 49, 58, 59, 64

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................................................23

*Centex Corp. v. United States,*
  395 F.3d 1283 (Fed. Cir. 2005) ..............................................................................31

*Century Expl. New Orleans, LLC v. United States,*
  110 Fed. Cl. 148 (2013) ...............................................................................24, 25

*Cudahy Packing Co. v. United States,*
  75 F. Supp. 239 (Ct. Cl. 1948) ...............................................................................50

*Dotcom Assocs. I, LLC v. United States,*
  112 Fed. Cl. 594 (2013) ...........................................................................................31

*Fin. & Realty Servs., LLC v. United States,*
  128 Fed. Cl. 770 (2016)............................................................................................41

*First Nat'l Bank of Ariz. v. Cities Serv. Co.,*
  391 U.S. 253 (1968) ................................................................................................24

*Glendale Federal Bank, FSB v. United States,*
  239 F.3d 1374 (Fed. Cir. 2001) ..............................................................41, 58

*Horn & Assocs., Inc. v. United States,*
  2017 WL 2303513 (Fed. Cl. May 25, 2017) .........................................................40

*Mansoor Int'l Dev. Servs., Inc. v. United States,*
  121 Fed. Cl. 1 (2015)....................................................................................31, 34

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ........................................................................................23, 24

*Metcalf Const. Co. v. United States,*
  742 F.3d 984 (Fed. Cir. 2014) ....................................................................31, 55

*MW Builders, Inc. v. United States,*
  134 Fed. Cl. 469 (2017)..................................................................................32, 33

*Precision Pine & Timber, Inc. v. United States,*
  596 F.3d 817, (Fed. Cir. 2010) ....................................................................31,32

*SGS-92-X003 v. United States,*
  85 Fed. Cl. 678 (2009)....................................................................................42, 59

*Sonoma Apartment Assocs. v. United States,*
  134 Fed. Cl. 90 (2017)..............................................................................................43

*Supplycore Inc.*, B-411015.8,
  2016 WL 3136469 (May 27, 2016) ...................................................................51, 52
*United States v. Diebold, Inc.*,
  369 U.S. 654 (1962) ...........................................................................................23
*Valix Fed. P'ship I*,
  93-2 B.C.A. (CCH) ¶ 25587, GSBCA No. 12109-P (Nov. 3, 1992) .........................51
*Winter v. Cath-dr/Balti Joint Venture*,
  497 F.3d 1339 (Fed. Cir. 2007) .........................................................................39

## Statutes

28 U.S.C. 1491 .......................................................................................................23
41 U.S.C. 7101-7109 ...............................................................................................23
42 U.S.C. 1395 .........................................................................................................2
MINN STAT. § 297A.67(7) (2012) ...........................................................................45
MINN STAT. § 297A.99(7) (2012) ...........................................................................45

## Rules

RCFC 56(c)(1)(A) .....................................................................................................24
Rule 56(a) of the Rules of the Court of Federal Claims ...............................................23

## Regulations

42 CFR 423.505(h)(2) ..............................................................................................44
42 CFR 423.505(k)(3) ..............................................................................................44
48 C.F.R. § 1.601(a) .................................................................................................39
48 C.F.R. § 43.102 ...................................................................................................39

## Other Authorities

Restatement (Second) of Contracts § 344(a) (1981)  41

## QUESTIONS PRESENTED

1.      Whether Defendant the United States of America ("Defendant") breached its contract with Plaintiff ACLR, LLC ("ACLR") and the duty of good faith and fair dealing in connection with ACLR's plan year 2007 duplicate payment audit.

2.      Whether Defendant breached its contract with ACLR and the duty of good faith and fair dealing in connection with ACLR's plan year 2010 duplicate payment audit.

3.      Whether Defendant breached its contract with ACLR and the duty of good faith and fair dealing in connection with ACLR's plan year 2012 and 2013 sales tax proposed audit.

## STATEMENT OF THE CASE

ACLR seeks a ruling in its favor from this Court on ACLR's Motion for Partial Summary Judgment for Defendant's breach of contract and breach of the duty of good faith and fair dealing arising from the contract between ACLR and the Centers for Medicare & Medicaid Services ("CMS").   The contract at issue in this case involved recovery audit contractor services to recover Medicare Part D program improper payments for CMS.

## STATEMENT OF FACTS

### The Medicare Part D Program

Title I of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA") was signed into law on December 3, 2003.  The MMA established a new voluntary outpatient prescription drug benefit under Part D of Title XVIII of the Social

1

Security Act ("SSA").  Part D is a drug reimbursement program designed to subsidize the cost of prescription drugs for Medicare beneficiaries who receive coverage by enrolling in health plans offered by plan sponsors.

The Part D Recovery Audit Contractor

Section 6411(b) of the Affordable Care Act ("ACA") expanded the use of the statutory 1893 Recovery Audit Contract provisions to utilize Recovery Audit Contracts under the Medicare Integrity Program to identify underpayments and overpayments and recoup overpayments under the Medicare program associated with medications for which payment is made under Part D.  Section 1893(h) of the Social Security Act, 42 U.S.C. 1395 ddd (h).  As a result, CMS was required by law to establish a Part D recovery audit contract for the recovery of improper payments.  App. at Ex. 1, excerpts from deposition of Cynthia Moreno ("Moreno Dep.") at 31:14-32:4; App. at Ex. 2, excerpts from deposition of Camille Brown ("C. Brown Dep.") at 79:11-20.

On December 2, 2010, CMS submitted a Request for Quote ("RFQ") to ACLR for the Recovery Audit Contractor Services in Support of Medicare Part D contract ("Part D RAC") and represented that CMS intended to award a firm-fixed price contingency fee task order for the work such that the recovery audit contractor would be paid a percentage of the total Part D improper payment amounts recovered from plan sponsors.  App. at Ex. 3, RFQ for Part D RAC.  The purpose of Part D RAC was to obtain contractor support for CMS in the identification of improper payments and the recoupment of overpayments in Medicare Part D on a national scale.  App. at Ex. 4, Statement of Objectives.

On December 14, 2010, in response to the RFQ, ACLR submitted its technical proposal and Performance Work Statement ("PWS") to CMS.  App. at Ex. 5, ACLR

Technical Proposal.  The PWS established the audit types and associated processes, including the methodologies to be used by ACLR to identify and recover Part D improper payments arising from duplicative payments, direct and indirect remuneration, and improper plan sponsor prescription drug event data submission audit issues.  *Id.*; App. at Ex. 6, excerpts from 30(b)(6) deposition of  CMS in ACLR I ("CMS 30(b)(6) Dep.") at 15:20-16:2.

The Part D RAC Contract

On January 13, 2011, CMS awarded Contract No. GS-23F-0074W/Task Order No. HHSM-500-2011-00006G ("Part D RAC Contract") to ACLR, which incorporated ACLR's PWS in its entirety, including a base period and four 12-month option periods to be executed at CMS's discretion.  App. at Ex. 7, Part D RAC Contract.  The primary purpose of the Part D RAC Contract was to identify and collect improper payments. App. at Ex. 6, CMS 30(b)(6) Dep. at 14:15-18; 163:3-6; App. at Ex. 8, excerpts from deposition of Theresa Schultz ("Schultz Dep.") at 44:10-16; App. at Ex. 9, excerpts from deposition of Nicole Hoey ("Hoey Dep.) at 110:16-18.  At the outset of the Part D RAC Contract, ACLR was to collect the Part D overpayments.  App. at Ex. 7, Part D RAC Contract at section 5; App. at Ex. 6, CMS 30(b)(6) Dep. at 19:1-11; 28:4-14; App. at Ex. 10, excerpts from the deposition of Tanette Downs ("Downs Dep.") at 57:9-20.  Section 5 of the Part D RAC Contract provided in pertinent part:

> The contingency fee shall be paid once the recovery audit contractor collects the Medicare overpayments.   The recovery audit contractor shall be paid a percentage of the amount that is collected through their recovery efforts. . . . If the provider files an appeal disputing the overpayment determination and the appeal is adjudicated in the provider's favor at the first level, the recovery audit

3

> contractor shall repay Medicare the contingency payment
> for that recovery.

App. at Ex. 7, Part D RAC Contract at section 5.  Given the contingency structure of the

Part D RAC Contract, if ACLR was not allowed to pursue the recovery of improper

payments, ACLR would not be paid under the Part D RAC Contract. App. at Ex. 11,

excerpts from deposition of Desiree Wheeler ("Wheeler Dep.") at 35:10-36:3.

Section 17 of the Part D RAC Contract provided in pertinent part:

> In addition to the performance requirements of this contract
> as set forth under Performance Work Statement, the
> Contractor may be required to comply with the
> requirements of any revisions in legislation or regulations
> which may be enacted or implemented during the period of
> performance of this contract, and are directly applicable to
> the performance requirements of this contract.

App. at Ex. 7, Part D RAC Contract at section 17.  As of the date the Part D RAC

Contract was awarded, there were no rules or regulations that governed ACLR's Part D

efforts.  App. at Ex. 1, Moreno Dep. at 36:11-37:15.

In January 2011, CMS Director Cynthia Moreno, responsible for the overall

implementation of the Part D RAC program, tasked a separate contractor Booz Allen

Hamilton, Inc. ("BAH") to develop the Part D RAC program and a corresponding

statement of work.  *See* App. at Ex. 1, Moreno Dep. at 58:17-60:19.  Moreno determined

that ACLR would be unable to recover improper payments or collect fees until the

program had been implemented in a manner that was satisfactory to CMS but made no

attempt to notify ACLR that CMS would not execute the Part D RAC Contract or modify

it so that ACLR could be compensated for its work efforts prior to an implementation of

the program.  *See* App. at Ex. 1, Moreno Dep. at 69:12-71:8; 74:3-76:1; App. at Ex. 8,

Schultz Dep. at 64:22-65:20; App. at Ex. 12, July 8, 2011 CMS emails.

During 2011, CMS did not meet PWS requirements to establish a data store and did not complete the security audits necessary for ACLR to timely receive and commence reviewing Part D prescription drug events ("PDEs").   App. at Ex. 13, excerpts from deposition of Marnie Dorsey ("Dorsey Dep.") at 29:5-10; 109:3-22; App. at Ex. 7, Part D RAC Contract; App. at Ex. 14, October 7, 2011 Authorization Decision.   CMS also ignored PWS appeal processes and other task order requirements regarding ACLR's collection of improper payments.   App. at Ex. 6, CMS 30(b)(6) Dep. at 40:20-42:15; App. at Ex. 10, Downs Dep. at 124:8-17; App. at Ex. 7, Part D RAC Contract at section 5.   CMS even conceded that it did not follow PWS requirements.   App. at Ex. 13, Dorsey Dep. at 132:20-135:7; App. at Ex. 15, GAO Report "MEDICARE PART D: Changes Needed to Improve CMS's Recovery Audit Program Operations and Contractor Oversight" ("GAO Report") at page 17; App. at Ex. 16, December 17, 2013 CMS email; App. at Ex. 17, December 2014 emails.  Former Part D RAC CO Schultz acknowledged that CMS did not act in accordance with PWS requirements and testified that CMS "had a contract with the PWS in it that we weren't agreeing with . . . . which is why we were doing the statement of work."  App. at Ex. 8, Schultz Dep. at 151:10-22.  In an August 2015 GAO report, GAO stated that "CMS officials said they proposed that the RAC perform work and follow processes that were not in the performance work statement . . . ."  App. at Ex. 15, GAO Report at page 17.

<u>Part D Improper Payments</u>

The Office of Management & Budget ("OMB"), responsible for establishing improper payment guidance, defines an improper payment as:

> An improper payment is any payment that should not have been made or that was made in an incorrect amount under

> statutory, contractual, administrative, or other legally applicable requirements. Incorrect amounts are overpayments and underpayments (including inappropriate denials of payment or service). An improper payment includes any payment that was made to an ineligible recipient or for an ineligible service, duplicate payments, payments for services not received, and payments that are for the incorrect amount. In addition, when an agency's review is unable to discern whether a payment was proper as a result of insufficient or lack of documentation, this payment must also be considered an error.

App. at Ex. 18, excerpts of Part III to OMB Circular A-123, Appendix C. The OMB definition of an improper payment was included in the Part D RAC Contract PWS and was the improper payment definition used by CMS. App. at Ex. 7, Part D RAC Contract, PWS at 38; App. at Ex. 6, CMS 30(b)(6) dep. at 56:21-57:8; 84:3-85:20; App. at Ex. 19, CMS Part D RAC Overview at page 21.

ACLR reviews final reconciliation PDEs to make determinations of payment veracity and to identify and recover Part D improper payments. App. at Ex. 20, Affidavit of Christopher Mucke in Support of Motion for Partial Summary Judgment ("Mucke Aff.") at ¶ 13. ACLR is not responsible for reviewing any PDE changes occurring after final reconciliation as this information constitutes "new payment information" that would only be included in any "subsequent reopening of the final reconciliation." App. at Ex. 21, Part D RAC Contract, OY1 SOW, Appendix C; App. at Ex. 22, OY2 SOW, Appendix C; *See* App. at Ex. 23, October 4, 2011 email. In its evaluation of PDE records, ACLR relied on three components of the PDE records: fields which identified a unique prescription, fields pertaining to individual dispensing events for each prescription, and financial fields used to calculate the Part D payment for each improper PDE claim. App. at Ex. 20, Mucke Aff. at ¶ 14.

To uniquely identify each prescription, ACLR relied on concatenating the health insurance claim number ("HICN"), which uniquely identifies each Part D beneficiary; the prescription/service reference number ("SRN"), which is a unique number assigned by the pharmacy for each prescription within any particular plan year; and the service provider and prescriber field, which consists of a unique number assigned to the pharmacy location that dispensed the drug and the prescriber that wrote the prescription. *Id*. at ¶ 15.   To identify individual dispensing event information for each prescription, ACLR relied on the product service identification field, which used a National Drug Code ("NDC") to identify the drug dispensed; the dispensing status field, which identifies a partial fill as "P" and the final fill of a partial fill as "C"; and the fill number, which identifies an original fill as "0," the first refill as "1," second refill as "2," and so on.  *Id*. at ¶ 16.

To calculate Part D improper payment amounts, ACLR sums applicable cost and payment fields associated with improper payment PDEs and recalculates final reconciliation by calculating the difference between amounts paid for reinsurance, LICs, and risk sharing during final reconciliation and amounts that would have been paid had the improper payments not occurred.  *Id*. at ¶ 17.  The sum of these amounts constitutes total improper payment amounts owing.  *Id*.

CMS was reimbursed for improper payments through the use of an "interim adjustment" process whereby amounts associated with the reinsurance and low income cost subsidies are removed from current plan year subsidy payments.  *Id*. at ¶ 18.  CMS was reimbursed for risk sharing improper payments during the reopening process.  *Id*.

CMS began transmitting Part D payment data to ACLR on November 17, 2011, 200 days past PWS requirements. App. at Ex. 6, CMS 30(b)(6) Dep. at 49:11-52:7; App. at Ex. 13, Dorsey Dep. at 109:3-7, 109:10-22; App. at Ex. 24, November 2011 email thread.

2007 Duplicate Payment Audit Attempt

The Part D RAC Contract PWS authorized ACLR's recovery of duplicate payments. *See* App. at Ex. 6, CMS 30(b)(6) Dep. at 57:9-58:6. Specifically, the PWS provided "Once we have received a complete set of data, we will conduct duplicate payment reviews. The primary focus of these reviews will be to identify duplicate payments across Plan Sponsors and PDPs." App. at Ex. 7, Part D RAC Contract, PWS at 36. One of the primary focuses of ACLR's review under the Part D RAC Contract was the duplicate payment review. App. at Ex. 6, CMS 30(b)(6) Dep. at 55:11-20. In addition to its approval of duplicate payment recoveries in the PWS, CMS separately approved the duplicate payment audit issue. *Id.* at 174:13-176:3; App. at Ex. 23, October 4, 2011 email; App. at Ex. 10, Downs Dep. at 76:12-77:12; App. at Ex. 19, CMS Part D RAC Overview at page 9.

To conduct the PY 2007 duplicate payment audit, ACLR relied on plan sponsor certifications that PDE records had been accurate, complete, and truthful and that the data was in compliance with HIPAA simplification rules and matched PDE records containing the same HICN, SRN, pharmacy, and fill number to identify individual prescriptions and eliminate duplicates arising from permissible dosage changes by contract. App. at Ex. 20, Mucke Aff. at ¶ 19. ACLR did not include duplicates arising from PDE records where the fill number was equal to zero. *Id.* To eliminate permissible partial fills, ACLR

8

reviewed the dispensing status field on each PDE to determine whether duplicative fill numbers arose as the result of a partial fill and eliminated those partial fills from further review. *Id.* at ¶ 20. Upon elimination of permissible partial fills, ACLR sorted the remaining prescriptions by the date the PDE was filled by the pharmacy ("Date of Service") and identified the earliest PDE Date of Service as the original payment and subsequent PDEs with the same Date of Service as duplicate improper payments. *Id.* at ¶ 21. Using this methodology, ACLR identified PY 2007 Part D duplicate payment amounts totaling $313,808,241. *Id.* at ¶ 22. As of November 3, 2011, ACLR's duplicate payment audit methodology was technically acceptable. App. at Ex. 1, Moreno Dep. at 87:1-8; App. at Ex. 25, November 3, 2011 email at page 8. ACLR's 7.5% contingency fees on the $313,808,241 of PY 2007 duplicate payments identified by ACLR amounts to a contingency fee payment under the Part D RAC Contract of $23,628,892. App. at Ex. 7, Part D RAC Contract at section 2.

In a November 30, 2011 conference call, ACLR Managing Principal Christopher Mucke, notified CMS Contracting Officer ("CO") Desiree Wheeler and CMS Program Integrity Director Tanette Downs that ACLR would commence issuing notification of improper payment letters ("NIPs") to plan sponsors and begin recouping amounts associated with 2007 Part D duplicate payments in accordance with the PWS. App. at Ex. 10, Downs Dep. at 56:13-57:8. During this call, CMS Contracting Officer Representative ("COR") Marnie Dorsey told ACLR her position that the PWS was simply a proposal and was not approved by CMS. App. at Ex. 13, Dorsey Dep. at 133:4-15; 134:12-19; 135:3-7; 181:4-182:5. CO Wheeler then advised ACLR to not issue the NIP demand letters to recover PY 2007 duplicate payments even though the right to issue

the demand letters was in ACLR's PWS.  App. at Ex. 11, Wheeler Dep. at 86:6-88:11; 89:13-18; 100:10-21; App. at Ex. 10, Downs Dep. at 58:7-10.

While the Part D RAC Contract required that ACLR collect Part D overpayments, ACLR was directed to not pursue its recovery efforts for 2007 duplicate payments, in part, because CMS had not developed its preferred payment collection processes.  App. at Ex. 7, Part D RAC Contract at section 5; App. at Ex. 6, CMS 30(b)(6) Dep. at 58:7-13; 176:4-6; App. at Ex. 10, Downs Dep. 56:13-57:8; 58:11-59:5; 128:15-18.  For CMS to instruct ACLR to take action inconsistent with the Part D RAC Contract, CMS should have followed-up immediately with a contractual document.  App. at Ex. 11, Wheeler Dep. at 72:6-73:4.  On December 9, 2011, CMS submitted a draft statement of work to ACLR, which outlined a revised Part D RAC recovery processes.  App. at Ex. 26, December 9, 2011 email.  After some revisions, ACLR's approval of the statement of work was communicated to CMS on April 20, 2012.  App. at Ex. 6, CMS 30(b)(6) Dep. at 114:10-22; App. at Ex. 27, April 20, 2012 email approving draft SOW.

<u>Part D RAC Contract - Base Year Period Extensions</u>

CMS executed Modification 3 on January 30, 2012 authorizing ACLR to conduct a special study recovery audit related to excluded providers for PY 2007.  App. at Ex. 28, Part D RAC Contract, Modification 3.  In early 2012, CMS refused to allow ACLR to conduct a PY 2007 duplicate payments audit special study similar to that approved for the PY 2007 excluded provider audit. App. at Ex. 20, Mucke Aff. at ¶ 23.  On February 15, 2012, ACLR submitted its PY 2007 excluded provider improper payment findings to CMS for amounts totaling $27.9 million.  App. at Ex. 29, PY 2007 Excluded Provider Audit Submission.  On March 13, 2012, CMS COR Frank Chartier informed ACLR that

CMS was eliminating $16.2 million of ACLR's PY 2007 excluded provider findings associated with excluded pharmacists and would only permit improper payments associated with excluded prescribers and pharmacies. App. at Ex. 30, March 13, 2012 email; App. at Ex. 6, 30(b)(6) Dep. at 69:6-18.

In April of 2012, ACLR raised concerns with CMS regarding scope reductions and delays in meeting Modification 3 deadlines. *See* App. at Ex. 31, April 2012 email thread. CO Schultz informed ACLR that CMS would not consider financial restitution for delays, additional appeals, and review requirements unless ACLR removed the base year contract request for equitable adjustment, which ACLR refused to do. App. at Ex. 20, Mucke Aff. at ¶ 24. Up until that time, ACLR had not received any payment under the Part D RAC Contract as ACLR had not been allowed to pursue the recovery of any improper payments. *Id*. at ¶ 25. CO Schultz subsequently denied ACLR's request for equitable adjustment citing statutory requirements for contingency fee contracts and task order requirements that did not permit contract dispute payments from anything other than amounts collected from ACLR's identification of underpayments and overpayments and issued Modification 4, which removed timetable deadlines and added additional appeal and review requirements. App. at Ex. 32, April 26, 2012 letter denying REA; App. at Ex. 33, Part D RAC Contract, Modification 4.

On July 9, 2012, CMS COR Chartier informed ACLR that CMS was eliminating an additional $3.2 million of the PY 2007 excluded provider special study by permitting the evidentiary support submitted by one plan's appeal to be applied to all other plans regardless of whether the other plans had even filed appeals. *See* App. at Ex. 34, July 19,

2012 email; App. at Ex. 29, PY 2007 excluded provider audit submission; App. at Ex. 6, CMS 30(b)(6) Dep. at 92:22-93:8.

On October 1, 2012, Sonja Brown was assigned as the COR and received an appointment letter from CMS on October 17, 2014. App. at Ex. 54, Part D RAC Contract, Modification 5; App. at Ex. 55, Memorandum appointing COR Brown. As part of her appointment, COR Brown was advised that she was not authorized to direct ACLR "in any way that could change the terms and conditions of the contractual instrument." App. at Ex. 55, Memorandum appointing COR Brown at page 2.

CMS subsequently executed additional modifications to extend the base period and the PY 2007 excluded provider special study timetables, which resulted in final payment for the audit being made to ACLR on April 26, 2013, which was 254 days after the initial Modification 3 contracted deadline, 451 days after Modification 3 execution, and 834 days after Part D RAC Contract award.  *See* App. at Ex. 29, PY excluded provider audit submission; App. at Ex. 35, Process Delay Chart.

On February 6, 2013, CMS executed Modification 6 authorizing ACLR to conduct a recovery audit of PY 2008-2011 Part D payments associated with excluded pharmacies and prescribers.  App. at Ex. 36, Part D RAC Contract, Modification 6. During the PY 2008-2011 excluded provider audit, CMS extended established process deadlines for other contractors tasked with reviewing ACLR findings and issued multiple appeal findings, which resulted in additional work efforts by ACLR.  *See* App. at Ex. 37, 2013 Annual Report; App. at Ex. 38, April 2013 email thread; App. at Ex. 39, June 7, 2013 email; App. at Ex. 40, June 12, 2013 email; App. at Ex. 41, December 27, 2013

12

email.  Final payment to ACLR for the PY 2008-2011 excluded provider audit was made 455 days after modification execution.  App. at Ex. 42, Audit Cycle Time Calendar.

On November 13, 2013, ACLR submitted improper payments to CMS totaling $1.05 billion and informed CMS that ACLR would commence recoveries in accordance with its PWS. App. at Ex. 43, November 17, 2013 email.  CO Hoey directed ACLR to not send NIP demand letters to plan sponsors.  App. at Ex. 44, November 22, 2013 email.

Despite ACLR having agreed to a prior version of a statement of work, CMS did not execute a statement of work to replace the PWS until December 31, 2013, because CMS claimed it was waiting for issues in the processes to be resolved.  App. at Ex. 6, 30(b)(6) Dep. at 115:15-116:8; App. at Ex. 10, Downs Dep. at 63:5-20, 69:10-12.  Delay in CMS's approval of recovery audits limited the years that could be reviewed by ACLR and, as a result, the amounts ACLR could recover because of existing statute of limitation periods and appeal timeline constraints.  App. at Ex. 10, Downs Dep. at 74:5-17; App. at Ex. 6, CMS 30(b)(6) Dep. at 199:6-15.  ACLR estimated costs associated with CMS delays during the 2012-2013 period amounted to $2,668,553.  App. at Ex. 20, Mucke Aff. at ¶ 26.

<u>Statement of Work</u>

On December 31, 2013, CMS executed Modification 13 to the Part D RAC ("OY1 SOW"), which replaced the PWS with a statement of work containing, among other things, a New Audit Issue Review Package ("NAIRP") process for submitting improper payment audit issues for CMS review and approval and an Improper Payment Review Package ("IPRP") process used by ACLR to submit improper payment PDEs from approved NAIRPs via CMS's payment recovery information system to a data

validation contractor ("DVC") responsible for validating ACLR findings in accordance with the approved NAIRP audit methodology. App. at Ex. 21,  Part D RAC Contract, OY1 SOW; App. at Ex. 8, Schultz Dep. at 33:19-34:2.  At the request of ACLR, the OY1 SOW also incorporated a Part D RAC Activities Timeline, Appendix E, to provide individual tasks, deadlines and responsible parties for "New Issues Submission and Approval Process," and the complex and automated review processes and procedures from initial IPRP submission through RAC payment.  App. at Ex. 21, OY1 SOW at Appendix E; App. at Ex. 9, Hoey Dep at 29:20-32:14.

According to the OY1 SOW, once the NAIRP is approved, "the RAC begins recovery audit activities."  App. at Ex. 21, Part D RAC Contract, OY1 SOW at section 2.1.1.  The OY1 SOW provided that "CMS's approved methodology, for each audit issue, must be used by the RAC to determine the improper payment amount."  App. at Ex. 21, Part D RAC, OY1 SOW at section 2.1.2.

<u>Plan Year 2010 Duplicate Payments</u>

On January 2, 2014, ACLR submitted its NAIRP for PY 2009-2012 duplicate payments.  App. at Ex. 20, Mucke Aff. at ¶ 27.  After multiple revisions, which also eliminated a review of the 2009 plan year, CMS approved ACLR's review of 2010-2012 duplicate payments NAIRP on May 28, 2014, 42 days after contracted deadlines.  App. at Ex. 6, CMS 30(b)(6) Dep. at 224:2-225:2;  App. at Ex. 45, May 28, 2014 revised NAIRP approval.  CMS acknowledged that it did not always meet the deadlines set forth in Appendix E concerning NAIRPs. App. at Ex. 6, CMS 30(b)(6) Dep. at 197:18-198:2.

Under the approved methodology in the NAIRP, ACLR identified duplicate payments using CMS's Uniform Examination Program ("UEP") duplicate payment

protocol whereby potential duplicate payments are identified as "PDEs submitted to the same beneficiary, for the same medication, and on the same/very close dates."  App. at Ex. 20, Mucke Aff. at ¶ 28.  To match individual PDE fields, ACLR matched PDE records containing the same contract and prescription drug plan, HICN, NDC, and fill number fields.  *Id*. at ¶ 29.

To determine the "same/very close dates," the NAIRP contained an early refill methodology, which consisted of comparing the days' supply of the originating PDE record to the days elapsed between the originating PDE and subsequent matching PDE record and calculating the days between each PDE's respective Date of Service.  *Id*. at ¶ 30.  Potential duplicate payments were identified when the days elapsed were less than 50% of the days' supply of the originating PDE record.  *Id.*

The approved NAIRP audit methodology precluded the review of PDEs associated with long term care facilities and mail order pharmacies and these records were eliminated from ACLR's audit.  *Id*. at ¶ 31.  The NAIRP also required that the audit be conducted as a complex review, which required that ACLR obtain evidentiary support such as copies of prescriptions and prescription fill histories for improper payment PDEs via a Request for Information ("RFI") to plan sponsors. App. at Ex. 46, May 6, 2014 email; App. at Ex. 47, Request for Information letter.

After ACLR had completed its initial audit and was preparing to issue RFIs to plan sponsors, CMS, noting that "this piece of the process is not in the current contract," informed ACLR that it could not send RFIs to plan sponsors until the DVC, using "the approved methodology," had reviewed the RFIs and that the DVC's validation process "should be no longer than a week."  App. at Ex. 48, June 2014 email thread; *See* App. at

15

Ex. 49, excerpts from the deposition of Sonja Brown ("S. Brown Dep.") at 34:21-35:15.

ACLR submitted its RFI findings to CMS on June 10, 2014.  App. at Ex. 20, Mucke Aff.

at ¶ 32.   On June 25, 2014, the DVC found that ACLR's PY 2010-2012 duplicate

payment RFIs only generated a nominal 0.0065 in false positives.   App. at Ex. 50,

October 2014 email thread.

In addition to its validation work for the Duplicate Payment RFI Report, the DVC

deviated from the methodology approved in the NAIRP and applied a "dosage increase"

percentage to identify possible permissible dosage changes.   *See* App. at Ex. 51,

Duplicate Payment Report; App. at Ex. 20, Mucke Aff. at ¶ 33.  By applying a revised

methodology that was not part of the approved NAIRP, the DVC reviewed PDE data

fields not contained within CMS data submissions to ACLR for the 2011 and 2012 plan

years duplicate payment audit causing CMS to only approve the release of plan year 2010

duplicate payment RFIs.  *Id*. at ¶ 34; *See* App. at Ex. 52, July 8, 2014 email.

On July 8, 2014, ACLR submitted the RFIs for improper 2010 duplicate payments

to plan sponsors requiring, in accordance with the OY1 SOW, that evidentiary support be

submitted within 60 days.   App. at Ex. 20, Mucke Aff. at ¶ 35.   CMS unilaterally

extended the evidentiary support deadline for plan sponsors an additional 60 days.  App.

at Ex. 6, CMS 30(b)(6) Dep. at 209:1-11; App. at Ex. 53, October 1, 2014 CMS email

extension.  CMS's extension to the plan sponsors was inconsistent with the timeline set

forth in the OY1 SOW.  App. at Ex. 6, CMS 30(b)(6) Dep. at 209:12-210:1.

On October 22, 2014, CMS instructed ACLR to apply a revised CMS

methodology, based on CMS's interpretation of the DVC report, to the 2010 duplicate

payment RFI PDEs to eliminate possible permissible dosage changes and to submit new

RFI IPRPs to CMS for subsequent resubmission to plan sponsors.  App. at Ex. 6, CMS 30(b)(6) Dep. at 236:6-20;   App. at Ex. 56, October 22, 2014 email regarding PDE adjustments; App. at Ex. 20, Mucke Aff. at ¶ 36.  Under the Part D RAC Contract, CMS did not have a right to modify the approved methodology during the audit process.  App. at Ex. 6, CMS 30(b)(6) deposition at 249:13-250:22.   On December 24, 2014, after completing its review of evidentiary support submitted in response to the RFIs, ACLR submitted IPRPs to CMS for improper PY 2010 duplicate payment amounts totaling $15,909,552, in accordance with OY1 SOW requirements.  App. at Ex. 57, December 24, 2014 letter; App. at Ex. 20, Mucke Aff. at ¶ 38.  ACLR's contingency fee rates for the $15,909,552 PY 2010 duplicate payments identified by ACLR was $2,209,146.  App. at Ex. 20,  Mucke Aff. at ¶ 38.  On January 8, 2015, ACLR was directed by CMS to resubmit ACLR's IPRPs in accordance with CMS's revised methodology.  App. at Ex. 58, January 8, 2015 email.  Based upon ACLR's belief that CMS's direction was an additional Part D RAC Contract deviation, ACLR referred the matter to CO Hoey.  App. at Ex. 20, Mucke Aff. at ¶ 37.

On April 24, 2015, COR Brown terminated the 2010 duplicate payment audit through a "Technical Direction Letter."  App. at Ex. 59, April 24, 2015 email.  The justification for terminating the 2010 duplicate payment audit was that "although the revised methodology used by CMS was able to reduce the number of PDE records identified as improper submissions, CMS continued to have concerns with the validity of overall results."  *Id*.; *See* App. at Ex. 60, CMS 30(b)(6) Dep. at 237:19-238:16.  There was no language in the Part D RAC Contract that allowed CMS to terminate an approved audit.  App. at Ex. 6, CMS 30(b)(6) at 248:18-250:22; App. at Ex. 60, December 11,

2014 email regarding potential SOW changes.  There was no language in the Part D RAC Contract that allowed CMS to apply a revised methodology to perform 2010 duplicate payment reviews.  *See* App. at Ex. 6, CMS 30(b)(6) Dep. at 173:3-174:9.

Option Year 2 Statement of Work

On December 31, 2014, the Part D RAC OY2 SOW was executed under Modification 16. App. at Ex. 22, Part D RAC Contract, OY2 SOW.  The OY2 SOW modified OY1 SOW language by, in part, incorporating new regulation requirements for a plan sponsor third level appeal of RAC findings and modifying concomitant Part D RAC activity timelines in Appendix E.  *Id.* Contractual language associated with approved audit issues remained unchanged with the exercising of the second option period of the Part D RAC Contract ("OY2 SOW") on December 31, 2014.  App. at Ex. 21, Part D RAC Contract OY1 SOW; App. at Ex. 22, Part D RAC Contract, OY2 SOW. In addition, OY2 SOW language pertaining to CMS's promulgation that PDEs submitted by the plan sponsor subsequent to the final reconciliation of the plan year being reviewed constituted new payment information remained unchanged from the OY1 SOW. App. at Ex. 22, Part D RAC Contract, OY2 SOW, Appendix C; App. at Ex. 23, October 4, 2011 email.  Appendix E of the OY2 SOW outlined the NAIRP submission process, which consisted of the NAIRP submission, a walk-though meeting, the provision of CMS feedback and the submission of a revised NAIRP based on the feedback, and the approval, conditional approval, or the denial of the NAIRP.  App. at Ex. 22, Part D RAC Contract, OY2 SOW at Appendix E.

<u>ACLR's Sales Tax  NAIRP Submission</u>

ACLR reviewed reconciled PDE records for PY 2012-2013 and identified all PDE records containing sales tax amounts greater than $0.00. App. at Ex. 20, Mucke Aff. at ¶ 40; App. at Ex. 61, ACLR sales tax NAIRP.  ACLR then identified the addresses for all pharmacies and reviewed applicable state and local tax laws to identify pertinent sales tax laws and their application to the sales tax PDEs ACLR had identified. App. at Ex. 20, Mucke Aff. at ¶ 41; App. at Ex. 61, ACLR sales tax NAIRP.  During this review, ACLR identified sales taxes that were billed on PDEs from five states that did not impose sales taxes, sales taxes that were billed in the states of Louisiana and Minnesota that exempted PDEs where such taxes were statutorily exempt, and sales tax charges billed at impermissible tax rates exceeding 50% of PDE drug costs. App. at Ex. 20,  Mucke Aff. at ¶ 42; App. at Ex. 61, ACLR sales tax NAIRP.  On August 21, 2015, ACLR submitted its sales tax NAIRP for PY 2012 and 2013 to CMS. App. at Ex. 61, ACLR sales tax NAIRP.

<u>CMS denies ACLR's sales tax NAIRP</u>

Once a NAIRP is received by CMS, CMS should collaborate with ACLR to determine whether to refine or revise the NAIRP.  App. at Ex. 2, C. Brown Dep. at 67:12-16.  However, on September 3, 2015, CMS denied ACLR's sales tax NAIRP without scheduling a walk-through meeting as required by OY2 SOW Appendix E or collaborating with ACLR to determine whether to refine or revise the NAIRP as required by OY2 SOW section 2.1.1. App. at Ex. 62, CMS denial of sales tax NAIRP; App. at Ex. 63, excerpts from CMS 30(b)(6) Deposition in ACLR II ("CMS 30(b)(6) II Dep.") at 49:3-6; App. at Ex. 49, S. Brown Dep at 42:6-43:22.

19

The approval process in Appendix E of the OY2 SOW was not utilized for ACLR's sales tax NAIRP. App. at Ex. 49, S. Brown Dep. at 43:19-22.  The OY2 SOW does not provide that CMS has the unilateral authority to deny an issue without collaborating with ACLR to refine or revise the NAIRP.  App. at Ex. 63, CMS 30(b)(6) II Dep. at 50:6-12.

CMS's denial was solely predicated on its position that "this audit issue is currently open and active with another CMS contractor" and cited OY2 SOW section 1.2.3 stating that "CMS/CPI consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue." App. at Ex. 63, CMS 30(b)(6) II Dep. at 55:1-22; 56:9-57:4; 196:9-21; App. at Ex. 49, S. Brown Dep at 42:9-12; App. at Ex. 62, CMS denial of sales tax NAIRP.  The concept of "open and active" does not appear anywhere in the Part D RAC Contract.  App. at Ex. 63, CMS 30(b)(6) II at 60:14-16; App. at Ex. 49, S. Brown Dep at 44:1-4.

On January 15, 2016, in its denial of ACLR's claim filed on September 10, 2015, CMS informed ACLR that "the NBI MEDIC[1] had commenced fraud and abuse work with respect to the Sales Tax Error Audit in October 30, 2014. Thus, in accordance with Section 1.2.3 of the SOW, ACLR could not also perform what would be duplicative audits on this same topic." App. at Ex. 64, CMS claim denial.  ACLR identifies improper payments while the NBI MEDIC combats waste fraud and abuse and their processes would be entirely different.  App. at Ex. 2, C. Brown Dep at 70:2-18; 92:13-16; App. at

---

[1] The NBI MEDIC acronym stands for the National Benefit Integrity Medicare Drug Integrity Contractor and that contractor for the relevant time periods for CMS was Health Integrity, LLC.  *See* App. at Ex. 65, excerpts of deposition of Matthew Farabaugh as corporate representative for Health Integrity, LLC ("NBI MEDIC 30(b)(6) Dep.") at 10:2-11.

Ex. 9, Hoey Dep. at 58:16-59:2.  The NBI MEDIC does not recover improper payments that are identified.  App. at Ex. 63, CMS 30(b)(6) II Dep. at 95:2-7.

When ACLR submitted its sales tax NAIRP, the NBI MEDIC wasn't doing any more sales tax reviews.  App. at Ex. 66, excerpts from deposition of Rosalind Abankwah ("Abankwah Dep.") at 57:16-58:1.  After July 2015, the NBI MEDIC did no further work on PDE records and improper sales taxes with respect to the no sales tax states of Delaware, Alaska, Alabama, New Hampshire, Montana, and Oregon.  App. at Ex. 65, NBI MEDIC 30(b)(6) Dep. at 249:6-22.  After August 10, 2015, the NBI MEDIC did not conduct any further analysis of any of the Minnesota PDE records identified in ACLR's sales tax NAIRP.  App. at Ex. 63, CMS 30(b)(6) II Dep. at 179:22-180:5; *See* App. at Ex. 65, NBI MEDIC 30(b)(6) Dep. at 127:1-5; App. at Ex. 66, Abankwah Dep. at 58:7-10.

ACLR identified improper payments related to sales tax in amounts totaling (i) $5,518,803 in states that did not impose a sales tax; (ii) $1,623,530 for excessive tax rates; and (iii) $32,028,178 and $619,184,285 in the states of Louisiana and Minnesota respectively, which exempt such transactions.  App. at Ex. 61, ACLR sales tax NAIRP. ACLR's contingency fee was $75,459,194 based upon improper payments of $626,326,618 on the PY 2012 and 2013 sales tax NAIRP for Minnesota, the five states that do not charge sales taxes, and sales tax charges billed at impermissible tax rates exceeding 50% of PDE drug costs.  App. at Ex. 20, Mucke Aff. at ¶ 45.

<u>CMS fails to seek the recovery of billions of dollars of improper payments</u>

In November 2010, Department of Health and Human Services ("HHS") released the Fiscal Year 2010 Agency Financial Report which identified invalid and/or inaccurate PDE records under the Part D program at an estimated error rate of 12.7 percent for

payments from January 1, 2007 through December 31, 2007 and estimated a gross amount of payment error totaling $5.4 billion.   App. at Ex. 67, HHS 2010 Financial Report excerpts at section 10:10(2).   The Medicare Part D payment errors for 2010 were estimated to be $5.3 billion.   App. Ex. 68, Medicare Part C and D FY 2011 Payment Error Reporting, March 23, 2012 at page 9.   The Medicare Part D error rate for 2012 was $1.6 billion and the estimated loss was $1.1 billion.   App. at Ex. 69, HHS FY 2012 Agency Financial Report excerpts at page 173; App. at Ex. 6, CMS 30(b)(6) Dep. at 151:1-7; 157:13-16.   The Medicare Part D payment error estimate for fiscal year 2013 was $2.1 billion.   App. Ex. 70, September 29, 2014 email at page 335.

In 2014, the federal government spent $58 billion on Medicare Part D and an estimated $1.9 billion of this was improper payments due to errors such as the submission of duplicate claims for the same service.   App. at Ex. 15, GAO Report at page 2; *See* App. at Ex. 6, CMS 30(b)(6) Dep. at 145:15-146:15; 147:17-148:11.   During the course of the Part D RAC Contract, ACLR identified and submitted to CMS Part D improper payments totaling $3 billion.   App. at Ex. 71, November 13, 2013 email; App. at Ex. 20, Mucke Aff. at ¶ 46.   As of August 2015, CMS had approved 1 of the 15 audit proposals from ACLR since the beginning of the Part D RAC.   App. at Ex. 15, GAO Report at page 2.   As of May 2015, CMS had collected less than $10 million in Part D improper payments.   *Id.* Through the date of this filing, CMS Part D improper payment collections, upon which ACLR was paid totaled $11.9 million.   App. at Ex. 20, Mucke Aff. at ¶ 47.

## PROCEDURAL HISTORY

*ACLR, LLC v. United States*, Case No. 15-767C ("ACLR I") and *ACLR, LLC v. United States*, Case No. 16-309C ("ACLR II") were consolidated on February 8, 2018 to

aid the Court in resolving summary judgment motions in these two cases.  ACLR filed its

Complaint in ACLR I on July 22, 2015.  (ACLR I Docket No. 1).  ACLR filed its

Complaint in ACLR II on March 9, 2016. (ACLR II Docket No. 1).

This Court has jurisdiction over the subject matter of this action pursuant to the

Tucker Act, 28 U.S.C. 1491 and the Contract Disputes Act ("CDA"), 41 U.S.C. 7101-

7109.  In connection with ACLR I, ACLR submitted a certified claim under the CDA to

CMS on March 12, 2015.  CMS denied ACLR's CDA claim in a letter dated June 5,

2015.   In connection with ACLR II, ACLR submitted a claim under the CDA on

September 10, 2015. CMS denied ACLR's claim on January 15, 2016.   Having the

jurisdictional prerequisites, jurisdiction is proper in this Court.

## SUMMARY JUDGMENT STANDARD

A grant of summary judgment is appropriate if the pleadings, affidavits, and

evidentiary materials filed in a case reveal that "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the

Rules of the Court of Federal Claims ("RCFC").  A material fact is one "that might affect

the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A

genuine dispute exists when the finder of fact may reasonably resolve the dispute in favor

of either party. *Id.* at 250.   The moving party bears the burden of demonstrating the

absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).  "The inferences to be drawn from the underlying facts ... must be viewed in

the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (alteration in original) (quoting *United*

*States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). To establish "that a fact cannot be or is

genuinely disputed," a party must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A). If the record taken as a whole "could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

## ARGUMENT

I. **THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO ACLR ON COUNTS I AND II IN ACLR I.**

As explained below, CMS breached the Part D RAC Contract by refusing to allow ACLR to proceed with its PY 2007 duplicate payment audit and terminating ACLR's PY 2010 duplicate payment audit. In the alternative, CMS breached the implied covenant of good faith and fair dealing by its actions relating to ACLR's PY 2007 and PY 2010 duplicate payment audits.

### A. CMS breached the Part D RAC Contract.

To prove a breach of contract, a plaintiff must establish "(1) a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by the breach." *Century Expl. New Orleans, LLC v. United States*, 110 Fed. Cl. 148, 163 (2013).

1. ACLR had a valid contract with CMS to recover improper payments.

There is no dispute that there was a valid contract between CMS and ACLR under which ACLR was to recover Part D improper payments. The Part D RAC Contract was awarded to ACLR to be CMS's Part D RAC and pursue the recovery of improper

payments for CMS.  App. at Ex. 7, Part D Part D RAC Contract; App. at Ex. 6, CMS 30(b)(6) Dep. at 14:15-18; 163:3-6; App. at Ex. 8, Schultz Dep. at 44:10-16; App. at Ex. 9, Hoey Dep. at 110:16-18.  CMS was required under the ACA to have a recovery audit contractor and recover Part D improper payments from plan sponsors.  App. at Ex. 1, Moreno Dep. at 31:14-32:4; App. at Ex. 2, C. Brown Dep. at 79:11-20.  When the Part D RAC Contract was awarded to ACLR on January 13, 2011, the PWS was part of the Part D RAC Contract.  App. at Ex. 7, Part D Part D RAC Contract.  The PWS was part of a binding contract between CMS and ACLR until the PWS was replaced by the OY1 SOW almost three years later on December 31, 2013.  *Id.*; App. at Ex. 21, Part D RAC Contract, OY1 SOW.  On December 31, 2014, the parties executed the OY2 SOW.  App. at Ex. 22, Part D Part D RAC Contract, OY2 SOW.

    2.  <u>CMS had a contractual obligation to allow ACLR to recover PY 2007 and PY 2010 duplicative payments.</u>

    *a.  PY 2007 duplicate payment audit*

The Part D RAC Contract PWS authorized ACLR's recovery of duplicate payments and was one of the primary focuses of the Part D RAC Contract.  App. at Ex.7, Part D RAC Contract, PWS; App. at Ex. 6, CMS 30(b)(6) Dep. at 55:11-20.  The PWS provided that "[o]nce we have received a complete set of data, we will conduct duplicate payment reviews" and "the primary focus of these reviews will be to identify duplicate payments across Plan Sponsors and PDPs." App. at Ex. 7, Part D RAC Contract, PWS at 36. A listing of duplicate payments was to be documented by ACLR on "workpapers and provided to Plan Sponsors for review." *Id.* at 38.

To conduct the PY 2007 duplicate payment audit, ACLR analyzed the plan sponsors' Part D PDE records and devised a thorough methodology to identify duplicate

payments, including eliminating duplicate PDE records from permissible dosage changes and permissible partial fills.  App. at Ex. 20, Mucke Aff. at ¶¶ 19-21.  CMS approved the PY 2007 duplicate payment audit and the methodology by which the PY 2007 duplicate payment audit would be conducted.  App. at Ex. 6, CMS 30(b)(6) Dep. at 174:13-176:4; App. at Ex. 23, October 4, 2011 email; App. at Ex. 10, Downs Dep. at 76:12-77:12; App. at Ex. 19, CMS Part D RAC Overview at page 9; App. at Ex. 1, Moreno Dep. at 87:1-8; App. at Ex. 25, November 3, 2011 email.  Based upon its PY 2007 duplicate payment analysis, ACLR identified duplicate payment amounts totaling $313,808,241 and was prepared to issue NIPs to plan sponsors and begin recouping those PY 2007 Part D duplicate payments.  App. at Ex. 20, Mucke Aff. at ¶22; App. at Ex. 10, Downs Dep. at 56:13-57:8.

> *b.  PY 2010 duplicate payment audit*

ACLR's PY 2010 duplicate payment audit was governed by the OY1 and OY2 SOWs. (OY1 and OY2 SOWs collectively referred to as "SOWs").  The OY1 SOW replaced the PWS on December 31, 2013.  App. at Ex. 21, Part D RAC Contract, OY1 SOW.  The OY2 SOW was executed one year later on December 31, 2014.  App. at Ex. 22, Part D RAC Contract, OY2 SOW.  The OY1 SOW set forth a specific process for the approval of proposed audit issues and the audit process.  App. at Ex. 21, Part D RAC Contract, OY1 SOW.

ACLR's NAIRP that included the PY 2010 duplicate payment audit was approved by CMS on May 28, 2014.  App. at Ex. 6, CMS 30(b)(6) Dep. at 224:2-225:2;  App. at Ex. 45, May 28, 2014 revised NAIRP approval.  Once approved, ACLR had a contractual right to conduct the PY 2010 duplicate payment audit and recover duplicate payments

from plan sponsors.  *See* App. at Ex. 7, Part D RAC Contract.  According to OY1 SOW, once the NAIRP is approved, "The RAC begins recovery audit activities."  App. at Ex. 21, Part D RAC Contract, OY1 SOW at section 2.1.1.  On December 24, 2014, ACLR submitted IPRPs for PY 2010 duplicate payment amounts totaling $15,909,552 to CMS as required under the Part D RAC Contract.  App. at Ex. 57, December 24, 2014 letter.

3.  <u>CMS breached the Part D RAC Contract regarding duplicate payments.</u>

a.  *CMS breached the Part D RAC Contract regarding the PY 2007 duplicate payment audit*

CMS breached the Part D RAC Contract in connection with the PY 2007 duplicate payment audit by precluding ACLR from pursuing the 2007 duplicate payment audit.  In a November 30, 2011 conference call, CO Wheeler advised ACLR to not issue the NIP demand letters to recover 2007 duplicate payments, even though the right to issue the demand letters was in the PWS. App. at Ex. 11, Wheeler Dep,  at 86:6-88:11; 89:13-18; 100:10-21; App. at Ex. 10, Downs Dep. at 58:7-10.  On occasions thereafter, CMS continued to direct ACLR to not pursue the recovery of PY 2007 duplicate payments.  App. at Ex. 6, CMS 30(b)(6) Dep. at 58:7-13; 176:4-6; App. at Ex. 10, Downs Dep. 56:13-57:8; 58:11-59:5; 128:15-18; App. at Ex. 20,  Mucke Aff. at ¶ 23.   For CMS to instruct ACLR to take action inconsistent with the Part D RAC Contract, CMS should have followed-up immediately with a contractual document.  App. at Ex. 11, Wheeler Dep. at 72:6-73:4.  However, no such contractual document follow-up occurred.

The Part D RAC Contract was explicit that the only additional requirements that ACLR was obligated to comply with were "the requirements of any revisions in legislation or regulations which may be enacted or implemented during the period of performance of this contract, and are directly applicable to the performance requirements

27

of this contract." App. at Ex. 7, Part D RAC Contract at section 17. As of the date the Part D RAC Contract was awarded, there were no rules or regulations that governed ACLR's Part D efforts. App. at Ex. 1, Moreno Dep. at 36:11-37:15. A GAO report confirmed that CMS "proposed that the RAC perform work and follow processes that were not in the performance work statement . . . ." App. at Ex. 15, GAO Report at page 17.

CMS even acknowledged that it did not follow PWS requirements. App. at Ex. 13, Dorsey Dep. at 132:20-135:7; App. at Ex. 15, GAO Report at page 17; App. at Ex. 16, December 17, 2013 email; App. at Ex. 17, December 2014 emails. Former Part D RAC CO Schultz acknowledged that CMS did not act in accordance with PWS requirements and testified that CMS "had a contract with the PWS in it that we weren't agreeing with . . . . which is why we were doing the statement of work." App. at Ex. 8, Schultz Dep. at 151:10-22. By the time OY1 SOW was executed on December 31, 2013, almost six years had passed since the conclusion of PY 2007 and the window had expired for ACLR to pursue the PY 2007 duplicate payments under the new framework of the OY1 SOW because of statute of limitation periods and appeal timeline constraints. App. at Ex. 10, Downs Dep. at 74:5-12; App. at Ex. 6, CMS 30(b)(6) Dep. at 199:6-15.

   b. *CMS breached the Part D RAC Contract regarding the PY 2010 duplicate payment audit*

Despite CMS's approval of ACLR's NAIRP covering PY 2010 duplicate payments, CMS breached the Part D RAC Contract by improperly terminating the approved PY 2010 duplicate payment audit. On April 24, 2015, COR Brown terminated the 2010 duplicate payment audit. App. at Ex.59, April 24, 2015 email. There was no language in the Part D RAC Contract that allowed CMS to terminate an approved audit.

28

App. at Ex. 7, Part D RAC Contract; App. at Ex. 6, CMS 30(b)(6) at 248:18-250:22; App. at Ex. 60, December 11, 2014 email regarding potential SOW changes. ACLR should have been allowed to pursue and recover the PY 2010 duplicate payments.

The justification in Brown's letter for terminating the 2010 duplicate payment audit was that "although the revised methodology used by CMS was able to reduce the number of PDE records identified as improper submissions, CMS continues to have concerns with the validity of overall results." App. at Ex. 59, April 24, 2015 email; *See* App. at Ex. 6, CMS 30(b)(6) Dep. at 237:19-238:16. Even if CMS had concerns with the validity of the overall results, CMS did not have a contractual right to terminate the PY 2010 duplicate payment audit and ACLR's results were generated from CMS's own methodology. CMS had approved ACLR's NAIRP to audit PY 2010 duplicate payments. Despite the Part D RAC Contract not providing CMS with a right to modify the approved methodology during the audit process, CMS instructed ACLR to apply a revised CMS methodology to the 2010 duplicate payment RFIs to plan sponsors during the audit process. *See* App. at Ex. 6, CMS 30(b)(6) Dep. at 173:3-174:9; App. at Ex. 58, January 8, 2015 email. ACLR then submitted IPRPs to CMS for improper PY 2010 duplicate payment amounts totaling $15,909,552. App. at Ex. 57, December 24, 2014 letter; App. at Ex. 20, Mucke Aff. at ¶ 38. On January 8, 2015, ACLR was directed by CMS to resubmit ACLR's IPRPs. App. at Ex. 58, January 8, 2015 email. Based upon ACLR's belief that CMS's direction was an additional contract deviation, ACLR referred the matter to CO Hoey. App. at Ex. 20, Mucke Aff. at ¶ 37.

To the extent CMS had an issue with ACLR's audit findings, there was a specific process outlined in the SOWs that was to be followed to resolve any such issues.

29

Termination of the audit was not one of CMS's options.  Instead, there was a process to validate ACLR's audit findings.  App. at Ex. 21, Part D RAC Contract, OY 1 SOW at section 2.2; App. at Ex. 22, Part D RAC Contract, OY 2 SOW at section 2.2.  Any preemption of the validation process by terminating the PY 2010 duplicate payment audit was also a breach of the Part D RAC Contract.

Even if the validation process had been applied prior to CMS's termination of the PY 2010 duplicate payment audit, ACLR had a contractual right to have its finding go through the validation process and either accept or reject those validation findings.  *Id.* Then, to the extent ACLR disagreed with the validation findings, ACLR was to collaborate with the DVC in an attempt to resolve any disputes.  *Id.*  If ACLR and the DVC could not resolve their dispute, CMS could make a final decision on the audit findings.  *Id.*  After CMS's decision, ACLR was allowed to submit a new package to the DVC and/or CMS.  *Id.*  CMS's refusal to follow the process set forth in the SOW was also a breach of the Part D RAC Contract.

### 4. ACLR was damaged by CMS's breaches related to the PY 2007 and PY 2010 duplicate payment audits.

CMS's breaches of the Part D RAC Contract in connection with the PY 2007 and PY 2010 duplicate payments audits caused loss and damages to ACLR.  Because the Part D RAC Contract was a contingency fee contract, ACLR had to be allowed to recover improper payments through audits of plan sponsors' PDE records to be paid under the Part D RAC Contract.  By denying ACLR's right to proceed with the PY 2007 duplicate payment audit, ACLR was unable to recover PY 2007 duplicate payments and be paid its contingency fee under the Part D RAC Contract.  As a result of CMS's termination of the PY 2010 duplicate payment audit and refusal to follow the audit process outlined in the

Part D RAC Contract, ACLR was unable to recover PY 2010 duplicate payments and be

paid its contingency fee under the Part D RAC Contract.[2]

### B. **CMS violated the implied covenant of good faith and fair dealing**.

In the alternative, this Court should grant summary judgment to ACLR in

connection with the PY 2007 and 2010 duplicate payment audits, because CMS violated

the covenant of good faith and fair dealing, which "is an implied duty that each party to a

contract owes to its contracting partner." *Centex Corp. v. United States*, 395 F.3d 1283,

1304 (Fed. Cir. 2005). "The covenant of good faith and fair dealing . . . imposes

obligations on both contracting parties that include the duty not to interfere with the other

party's *performance* and not to act so as to destroy *the reasonable expectations* of the

other party regarding the *fruits of the contract*." *Metcalf Const. Co. v. United States*, 742

F.3d 984, 991 (Fed. Cir. 2014) (quoting *Centex Corp. v. United States*, 395 F.3d 1283,

1304 (Fed. Cir. 2005). "Both the duty not to hinder and the duty to cooperate are aspects

of the implied duty of good faith and fair dealing." *Precision Pine & Timber, Inc. v.

United States*, 596 F.3d 817, 820 n.1 (Fed. Cir. 2010). "The implied duty stems from the

consensual terms reflected in an express contract, but it addresses the parties' reasonable

expectations that may not have been embodied in explicit contractual language."

*Mansoor Int'l Dev. Servs., Inc. v. United States*, 121 Fed. Cl. 1, 6 (2015).

"A breach of the implied covenant of good faith and fair dealing may be found

when the government undertakes a sovereign action 'specifically designed to

reappropriate the benefits the other party expected to obtain' under a contract." *Dotcom

Assocs. I, LLC v. United States*, 112 Fed. Cl. 594, 599-600 (2013) (citation omitted).

---

[2] The amount of ACLR's damages is discussed below in section I.C.

"Moreover, government action that is designed specifically to "eliminat[e] a material part of the consideration" to which a contractor is entitled is a breach of the implied duty of good faith and fair dealing. *Precision Pine*, 596 F.3d at 829; see also *Bell/Heery*, 739 F.3d at 1335 (stating that the implied duty of good faith and fair dealing "guarantees that the government will not eliminate or rescind contractual benefits through action that is specifically designed to reappropriate the benefits and thereby abrogate the government's obligations under the [lease]"). "[T]he relevant standard is whether the Government *willfully* or *negligently* interfered with a contractor's performance and reasonable expectations." *MW Builders, Inc. v. United States*, 134 Fed. Cl. 469, 505 (2017), *reconsideration denied*, No. 13-1023C, 2018 WL 1150729 (Fed. Cl. Mar. 5, 2018).

   1. ACLR reasonably expected to pursue the PY 2007 and PY 2010 duplicate payment audits

ACLR had a reasonable expectation that it could pursue the recovery of duplicate payments under the Part D RAC Contract. Under section 6411(b) of the ACA, CMS was required by law to establish a Part D recovery audit contract for the recovery of improper payments. App. at Ex. 1, Moreno Dep. at 31:14-32:4; App. at Ex. 2, C. Brown Dep. at 79:11-20. CMS submitted a Request for Quote ("RFQ") to ACLR for the Recovery Audit Contractor Services in Support of the Medicare Part D contract ("Part D RAC") and represented that CMS intended to award a firm-fixed price contingency fee task order for such work. App. at Ex. 3, RFQ for Part D RAC. The purpose of Part D RAC was to obtain contractor support for CMS in the identification of improper payments and the recoupment of overpayments in Medicare Part D. App. at Ex. 4, Statement of Objectives,

Part D RAC.  The Part D RAC contractor was to be responsible for the identification and recovery of improper payments on a national scale.  *Id.*

ACLR was awarded the Part D RAC Contract and the primary purpose of the Part D RAC Contract was to identify and collect improper payments.  App. at Ex. 7, Part D RAC Contract; App. at Ex. 6, CMS 30(b)(6) Dep. at 14:15-18; 163:3-6; App. at Ex.8, Schultz Dep.") at 44:10-16; App. at Ex. 9, Hoey Dep. at 110:16-18.  CMS itself had estimated that there were a significant amount of improper payments under the Part D program.  For example, HHS's Fiscal Year 2010 Agency Financial Report estimated an error rate of 12.7 percent for Part D payments from January 1, 2007 through December 31, 2007 and estimated a gross amount of payment errors totaling $5.4 billion.  App. at Ex. 67, HHS Fiscal Year 2010 Agency Financial Report excerpts at section 10:10(c).  Similarly, the Medicare Part D payment errors for 2010 were estimated to be $5.3 billion.  App. Ex. 68, Medicare Part C and D FY 2011 Payment Error Reporting, March 23, 2012 at page 9.

As the RAC contractor and given the large amount of estimated improper payments under Part D, ACLR had a reasonable expectation that it would be able to recover improper payments under the Part D program and be paid a sizeable contingency fee payment for those recoveries.   Part of the subset of improper payments ACLR reasonably expected to recover for CMS was Part D duplicate payments.

Duplicate payments are identified as improper payments under The Office of Management & Budget ("OMB") definition of improper payments:   "An improper payment includes any payment that was made to an ineligible recipient or for an ineligible service, duplicate payments, payments for services not received, and payments

that are for the incorrect amount."   App. at Ex. 18, excerpts of Part III to OMB Circular A-123, Appendix C. The definition of improper payments in the Part D RAC Contract PWS included that same definition.   App. at Ex. 7, Part D RAC Contract, PWS at 38. The Part D RAC Contract PWS authorized ACLR's recovery of duplicate payments and was one of the primary focuses of the Part D RAC Contract.   App. at Ex. 7, Part D RAC Contract, PWS at 36; App. at Ex. 6, CMS 30(b)(6) Dep. at 55:11-20; 57:9-58:6.   The duplicate payment audit issue had even been approved by CMS as had ACLR's duplicate payment audit methodology.   App. at Ex. 6, CMS 30(b)(6) Dep. at 174:13-176:3; App. at Ex. 23, October 4, 2011 email; App. at Ex. 10, Downs Dep. at 76:12-77:12; App. at Ex. 19, CMS Part D RAC Overview at page 9; App. at Ex.1, Moreno Dep. at 87:1-8; App. at Ex. 25, November 3, 2011 email.   The PWS provided that "[o]nce we have received a complete set of data, we will conduct duplicate payment reviews.   The primary focus of these reviews will be to identify duplicate payments across Plan Sponsors and PDPs." App. at Ex. 7, Part D RAC Contract, PWS at 36.   A listing of duplicate payments was to be documented on "workpapers and provided to Plan Sponsors for review.   Any remaining unresolved amounts [would] be identified as improper, recovered, and removed from further review."   *Id.* at 38.   As a result, ACLR identified PY 2007 Part D duplicate payment amounts totaling $313,808,241. App. at Ex. 20, Mucke Aff. at ¶ 22.

Similarly, ACLR's NAIRP to audit PY 2010 duplicate payments was approved by CMS on May 28, 2014.   App. at Ex. 45, May 28, 2014 revised NAIRP approval. According to OY1 SOW, once the NAIRP is approved, "The RAC begins recovery audit activities."   App. at Ex. 21, Part D RAC Contract, OY1 SOW at 2.1.1.   There is nothing in the Part D RAC Contract that allowed CMS to terminate an approved audit.   App. at

Ex. 6, CMS 30(b)(6) at 248:18-250:22; App. at Ex. 60, December 11, 2014 email regarding potential SOW changes.  On December 23, 2014, ACLR submitted IPRPs for improper PY 2010 duplicate payment amounts totaling $15,909,552 to CMS as required under the Part D RAC Contract.    App. at Ex. 57, December 24, 2014 letter; App. at Ex. 20, Mucke Aff. at ¶ 38.

> 2. <u>CMS breached its duty of good faith and fair dealing in connection with the 2007 and 2010 duplicate payment audits</u>

> *a.  2007 duplicate payment audit*

CMS breached its duty of good faith and fair dealing with respect to the PY 2007 duplicate payment audit.  CMS was obligated not to interfere with ACLR's performance under the Part D RAC Contract if CMS's actions would harm ACLR's reasonable expectation regarding compensation under the Part D RAC Contract.  CMS's actions with respect to the PY 2007 duplicate payment audit delayed and ultimately eliminated ACLR's ability to recover PY 2007 duplicate payments.  First, during 2011, CMS did not meet PWS timing requirements to establish a data store and complete the security audits necessary for ACLR to receive and review Part D PDEs. App. at Ex. 13, excerpts from deposition of Marnie Dorsey ("Dorsey Dep.") at 29:5-10; 109:3-22; App. at Ex. 7, Part D RAC Contract; App. at Ex. 14, October 7, 2011 Authorization Decision.  Second, despite ACLR having finally been given access to CMS's PDE record data and identifying PY 2007 Part D duplicate payments, CMS advised ACLR not to issue the NIP demand letters to recover the PY 2007 duplicate payments from plan sponsors.  App. at Ex. 11, Wheeler Dep. at 86:6-88:11; 89:13-18; 100:10-21; App. at Ex. 10, Downs Dep. at 58:7-10.  Third, ACLR was directed by CMS not pursue its recovery efforts for 2007 duplicate payments.

CMS 30(b)(6) Dep. at 58:7-13; 176:4-6; App. at Ex. 10, Downs Dep. 56:13-57:8; 58:11-59:5; 128:15-18.   Fourth, in early 2012, CMS refused to allow ACLR to conduct a PY 2007 duplicate payments audit special study similar to that approved for the PY 2007 excluded provider audit. App. at Ex. 20, Mucke Aff. at ¶ 23.

Apparently, some individuals at CMS believed the PWS was just a proposal and not a contractual document that CMS needed to comply with.   App. at Ex. 13, Dorsey Dep. at 133:4-15; 134:12-19; 135:3-7; 181:4-182:5.   Even though the Part D RAC Contract had been awarded to ACLR, CMS's position was that CMS was still in the process of implementing the Part D RAC program and ACLR could not perform any audit activities until the program had been fully implemented.   *See* App. at Ex. 1, Moreno Dep. at 69:12-71:8; 74:3-76:1; App. at Ex. 8, Schultz Dep. at 64:22-65:20; App. at Ex. 12, July 8, 2011 CMS emails.   Nevertheless, the PWS provided for the recovery of duplicate payments and detailed the process by which that would occur.   App. at Ex. 7, Part D RAC Contract, PWS at 35-38.   Section 5 of the Part D RAC Contract allowed ACLR to collect the Part D overpayments from the plan sponsors.   *Id.* at section 5.

At the very least, CMS delayed and hindered ACLR's opportunity to recover PY 2007 duplicate payments through CMS's insistence that the PY 2007 duplicate payment audit could not proceed under the PWS.   App. at Ex. 11, Wheeler Dep,  at 86:6-88:11; 89:13-18; 100:10-21; App. at Ex. 10, Downs Dep. at 58:7-10.   CMS's delay and hindering ultimately precluded ACLR from recovering the PY 2007 duplicate payments because by the time the OY1 SOW became part of the Part D RAC Contract, the ability to recover PY 2007 duplicate payments had been lost as a result of existing statute of

limitation periods and appeal timeline constraints.  App. at Ex. 10, Downs Dep. at 74:5-12; App. at Ex. 6, CMS 30(b)(6) Dep. at 199:6-15.

       *b.  2010 duplicate payment audit*

CMS also breached its duty of good faith and fair dealing with respect to the PY 2010 duplicate payment audit.  CMS was obligated not to interfere with ACLR's performance under the Part D RAC Contract if CMS's actions would harm ACLR's reasonable expectation regarding compensation under the Part D RAC Contract.  CMS's actions in connection with the PY 2010 duplicate payment audit were not consistent with the duty of good faith and fair dealing.

On May 28, 2014, forty-two days after the Part D RAC Contract deadline, CMS approved ACLR's NAIRP for a PY 2010-2012 duplicate payment audit.  App. at Ex. 6, CMS 30(b)(6) Dep. at 224:2-225:2;  App. at Ex. 45, May 28, 2014 revised NAIRP approval.  Rather than allowing the audit to proceed in accordance with the Part D RAC Contract, CMS took steps to narrow, impede, and finally terminate the audit.  After ACLR had completed its initial audit and was preparing to issue RFIs to plan sponsors, CMS, noting that "this piece of the process is not in the current contract," informed ACLR that it could not send RFIs to plan sponsors until the DVC, using "the approved methodology," had reviewed the RFIs and that the DVC's validation process "should be no longer than a week."  App. at Ex. 48, June 2014 email thread; *See* App. at Ex. 49, S. Brown Dep. at 34:21-35:15.  In accordance with CMS's directive, ACLR submitted its RFI findings to CMS on June 10, 2014. App. at Ex. 20, Mucke Aff. at ¶ 32.

On June 25, 2014, the DVC found that ACLR's PY 2010-2012 duplicate payment RFIs only generated a nominal .0065 in false positives.  App. at Ex. 50, October 2014

email thread.   Nevertheless, CMS only approved the release of PY 2010 duplicate payment RFIs.  App. at Ex. 52, July 8, 2014 email.

On July 8, 2014, ACLR submitted the RFIs for improper 2010 duplicate payments to plan sponsors requiring, in accordance with the OY1 SOW, that evidentiary support be submitted within 60 days.   App. at Ex. 20, Mucke Aff. at ¶ 35.   CMS unilaterally extended the evidentiary support deadline for plan sponsors an additional 60 days.  App. at Ex. 6, CMS 30(b)(6) Dep. at 209:1-11; App. at Ex. 53, October 1, 2014 CMS email extension. CMS granted this extension to plan sponsors despite the fact the extension was inconsistent with the timeline set forth in the OY1 SOW.  App. at Ex. 6, CMS 30(b)(6) Dep. at 209:12-210:1.  On October 22, 2014, CMS instructed ACLR to apply a revised CMS methodology to the 2010 duplicate payment RFI PDEs to eliminate possible permissible dosage changes and to submit new RFI IPRPs to CMS for subsequent resubmission to plan sponsors App. at Ex. 6, CMS 30(b)(6) Dep. at 236:6-20;  App. at Ex. 56, October 22, 2014 email regarding PDE adjustments; App. at Ex. 20, Mucke Aff. at ¶ 36.  The Part D RAC Contract did not provide CMS with the right to modify the approved NAIRP methodology during the audit process. App. at Ex. 6, CMS 30(b)(6) deposition at 249:13-250:22.

On December 23, 2014, after completing its review of evidentiary support submitted in response to the RFIs, ACLR submitted IPRPs for improper PY 2010 duplicate payment amounts totaling $15,909,552 to CMS.  App. at Ex. 57, December 24, 2014 letter; App. at Ex. 20, Mucke Aff. at ¶ 38.  On January 8, 2015, ACLR was directed by CMS to resubmit ACLR's IPRPs in accordance with CMS's revised methodology. App. at Ex. 58, January 8, 2015 email. Based upon ACLR's belief that CMS's direction

was an additional contract deviation, ACLR referred the matter to CO Hoey.  App. at Ex. 20, Mucke Aff. at ¶ 37.  On April 24, 2015, COR Brown terminated the 2010 duplicate payment audit.  App. at Ex. 59, April 24, 2015 email.

There was no legitimate basis for CMS's actions with respect to the PY 2010 duplicate payment audit.  ACLR's PY 2010 duplicate payment audit used CMS's methodology.  *See* App. at Ex. 45, May 28, 2014 revised NAIRP approval.  There was no language in the Part D RAC Contract that allowed CMS to apply a revised methodology to the PY 2010 duplicate payment audit.  *See* App. at Ex. 6, CMS 30(b)(6) Dep. at 173:3-174:9.  Moreover, there was no language in the Part D RAC Contract that allowed CMS to terminate an approved audit.  *See* App. at Ex. 6, CMS 30(b)(6) at 248:18-250:22; App. at Ex.60, December 11, 2014 email regarding potential SOW changes.

COR Brown's termination of ACLR's PY 2010 duplicate payment audit was also unjustified as she had no authority to terminate the PY 2010 duplicate payment audit. The ability of an agency to award, modify, or rescind a contract resides solely with a contracting officer and not a COR.  With respect to contracts for supplies and services, the federal government has given the authority to enter into and modify contracts to only a limited class of government employees: contracting officers.  *See* 48 C.F.R. § 1.601(a) (vesting agency heads with authority to contract for supplies and services and mandates that "[c]ontracts may be entered into and signed on behalf of the Government only by contracting officers"); 48 C.F.R. § 43.102 ("Only contracting officers acting within the scope of their authority are empowered to execute contract modifications on behalf of the Government.").  *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1344 (Fed. Cir. 2007). COR Brown was expressly prohibited from changing the terms and conditions of

39

the Part D RAC Contract.  App. at Ex. 55, Memorandum appointing COR Brown at page 2.

COR Brown's rescission of the on-going audit exclusively impacted the Part D RAC Contract and interfered with ACLR's right to any financial consideration for the PY 2010 duplicate payment audit.  Hence, the price or sum to be provided to ACLR was not only diminished but it became a nullity. There was only one means to obtain payment for ACLR's PY 2010 duplicate payment audit work which had been progressing over at least a one year time period and COR Brown nullified that avenue when she terminated the PY 2010 duplicative payment audit.

The Court recently examined a similar claim for breach of duty of good faith and fair dealing in connection with a RAC contract in the case of *Horn & Assocs., Inc. v. United States*, No. 8-415C, 2017 WL 2303513 (Fed. Cl. May 25, 2017). There, the Court found that there had been a breach and noted that the agency thwarted the contractor's ability to obtain the consideration set forth in the contract.  Specifically, the Court found that the agency's had:

> . . .worked against the ability of the plaintiff to perform and ran counter to Horn & Associates' reasonable expectations of NASA's cooperation during contract performance . . . . Taking the performance under the contract as a whole, however, plaintiff's performance was severely impaired, and defendant's conduct including lack of cooperation, prevented plaintiff's ability to complete the totality of the contract requirements. Defendant's conduct demonstrates a breach on defendant's part.

*Id*. at *33.  Here, as in *Horn*, a RAC was severely impaired by CMS's actions such that ACLR was not allowed to pursue the recovery of duplicative payments that would have

triggered ACLR's right to contingency fee payments for the recovery of those duplicate payments.

### C. ACLR's damages for CMS's breach of contract and breach of its duty of good faith and fair dealing in connection with the PY 2007 and PY 2010 duplicate payment audits.

ACLR is entitled to damages for CMS's breach of contract, or alternatively, CMS's breach of its duty of good faith and fair dealing in connection with the PY 2007 and 2010 duplicate payment audits.   Under either claim, ACLR should be awarded damages that place ACLR in as good a position as ACLR would have been in if CMS had performed in accordance with the Part D RAC Contract or had complied with its duty of good faith and fair dealing.  "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Glendale Federal Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed. Cir. 2001) (citing Restatement (Second) of Contracts § 344(a) (1981)).  "Contract remedies are designed to make the nonbreaching party whole."  *California Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005).  *See Fin. & Realty Servs., LLC v. United States*, 128 Fed. Cl. 770, 776 (2016) ("Damages are awarded in breach-of-contract cases in an amount 'sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed.'") (citations omitted).

To recover damages, ACLR must show (i) the damages were reasonably foreseeable by CMS at the time of contracting, (ii) the breach was a substantial causal factor in the damages, and (iii) the measure of damages can be shown with reasonable certainty.  *See Boston Edison Co. v. United States*, 80 Fed. Cl. 468, 483, *appeal dismissed*

*and remanded*, 299 F. App'x 956 (Fed. Cir. 2008); *California Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005).  Here, ACLR's damages were reasonably foreseeable by CMS at the time of contracting.  The Part D RAC Contract provided that ACLR would be awarded contingency fee payments as a percentage of the recovered improper payments.  App. Ex. 7, Part D RAC Contract at section 5.  CMS had also estimated the amount of improper payments for plan years 2007 and 2010 as being approximately $5.4 billion and $5.3 billion respectively so CMS was well aware that if it breached the Part D RAC Contract or CMS's duty of good faith and fair dealing, CMS may be responsible for paying ACLR some percentage of the billions of dollars of Part D improper payments during the plan years covered by the Part D RAC Contract.  App. at Ex.67, HHS 2010 Financial Report excerpts at section 10:10(2); App. Ex. 68, Medicare Part C and D FY 2011 Payment Error Reporting, March 23, 2012.

CMS's breach was also a substantial factor in causing ACLR's damages.  As discussed above, ACLR performed extensive work in connection with the PY 2007 and PY 2010 duplicate payment audits but CMS's actions precluded ACLR from recovering any PY 2007 and 2010 duplicate payments.  As a result, ACLR could not obtain its Part D RAC Contract contingency fee for the PY 2007 and PY 2010 duplicate payments.  See *SGS-92-X003 v. United States*, 85 Fed. Cl. 678, 709 (2009) ("If a plaintiff has successfully stated a claim for breach of the implied covenant of good faith and fair dealing by the Government, he has also stated a legitimate claim for damages that ensued as a result of the breach.").  CMS's actions were the cause of ACLR's damages.

42

Finally, ACLR's measure of damages is reasonably certain.  ACLR's measure of damages is the amount of the duplicate payments identified by ACLR multiplied by ACLR's contingency fee applicable to those duplicate payments.  "[T]he measure of damages must be reasonably certain, although if 'a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.'" *California Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005); *See Sonoma Apartment Assocs. v. United States*, 134 Fed. Cl. 90, 106–07 (2017) ("We [have] interpreted the 'reasonable certainty' standard to apply only to the <u>fact</u> of damages, after which the court may 'make a fair and reasonable approximation of the damages.'") (quoting *Bluebonnet Sav. Bank, F.S.B*, 266 F.3d at 1357).

ACLR's 2007 duplicate payment audit identified $313,808,241 in PY 2007 duplicate payments.  App. Ex. 20, Mucke Aff. at ¶ 22.   ACLR was to be paid a contingency fee of 7.5% on the 2007 duplicate payments.  App. Ex. 7, Part D RAC Contract at section 5.  Consequently, by denying ACLR's right to recover PY 2007 duplicate payments, CMS caused ACLR to incur damages of $23,535,618.

ACLR's PY 2010 duplicate payment audit, as approved by CMS, identified $15,909,552 in PY 2010 duplicate payment.  App. at Ex. 45, December 24, 2014 letter.  ACLR was to be paid a contingency fee of 15% for recoveries up to $10 million and 12% for recoveries after the first $10 million for the PY 2010 duplicate payments.  App. Ex. 21, Part D RAC Contract, OY1 SOW at page 129.  Consequently, by denying ACLR's right to recover PY 2010 duplicate payments, CMS caused ACLR to incur damages of $2,209,146.

## II.     THIS COURT SHOULD GRANT PARTIAL SUMMARY JUDGMENT TO ACLR ON COUNTS I AND II IN ACLR II.

As explained below, CMS breached the Part D RAC Contract by denying ACLR's PY 2012 and 2013 sales tax NAIRP.[3]   In the alternative, CMS breached the implied covenant of good faith and fair dealing by its actions relating to ACLR's PY 2012 and 2013 sales tax NAIRP.

### A.  CMS breached the Part D RAC Contract.

1.  ACLR's sales tax NAIRP submission

In evaluating the sales tax issue, ACLR reviewed reconciled PDE submissions for PY 2012-2013 and identified all PDE records containing sales tax amounts greater than $0.00. App. at Ex. 20, Mucke Aff. at ¶ 40; App. at Ex. 61, CMS sales tax NAIRP.  The PDE record contains three detailed cost fields: ingredient cost paid, dispensing fee paid, and total amount attributed to sales tax.  App. at Ex. 72, Excerpts of 2007 Prescription Drug Event Data Training Participant Guide; App. at Ex. 20, Mucke Aff. at ¶ 39.  Plan sponsors certify that PDE records are accurate, complete, truthful, and that the data is in compliance with HIPAA simplification rules.   42 CFR 423.505(k)(3); 42 CFR 423.505(h)(2).

ACLR then identified the addresses for all pharmacies and identified pertinent sales tax laws and their application to the PDE records ACLR had identified. App. at Ex. 20, Mucke Aff. at ¶ 41.  During this process, ACLR identified sales taxes that were billed on PDE records from pharmacies located in the states of Alaska, Delaware, Montana,

---

[3] ACLR is not seeking summary judgment on the sales tax NAIRP with respect to the Louisiana sales tax issues.

New Hampshire, and Oregon, which do not impose sales taxes;[4] sales taxes that were billed on PDE records in the state of Minnesota where such taxes were statutorily exempt;[5] and sales tax charges billed at impermissible tax rates exceeding 50% of PDE drug costs.[6]  *Id* at ¶ 42; App. at Ex. 61, ACLR sales tax NAIRP.

On August 21, 2015, ACLR submitted its sales tax NAIRP for PY 2012 and 2013 to CMS. App. at Ex. 61, ACLR sales tax NAIRP.   In its sales tax NAIRP, ACLR identified improper payments related to sales tax included in PDE records in amounts totaling $5,518,803 in states that did not impose a sales tax; $1,623,530 for excessive tax rates; and $32,028,178 and $619,184,285 in the states of Louisiana and Minnesota respectively, which exempt such transactions.  *Id.*

2.  CMS had an obligation to follow the NAIRP approval process in the SOW.[7]

After OY1 and OY2 SOWs became effective, there was a specific process for the approval or denial of an ACLR NAIRP.  App. at Ex. 6, CMS 30(b)(6) II Dep. at 265:18-266:6.   Section 2.1.1 of OY2 SOW describes the "New Audit Issue Approval Process." App. at Ex. 22, Part D RAC Contract, OY 2 SOW at section 2.1.1.  Specifically, the OY2 SOW provides as follows: "[O]nce submitted, the RAC works with CMS/CPI to refine and approve or deny the NAIRP."  *Id.*  A specific timeline was included as Appendix E to

---

[4] App. at Ex. 20, Mucke Aff. at ¶ 43.

[5] The State of Minnesota imposes a state sales tax but provides an exemption for sales of "drugs and medical devices for human use." MINN STAT. § 297A.67(7) (2012). Similarly, local jurisdictions are prohibited from imposing a sales tax on prescription drugs because "goods or services that are otherwise exempt from taxation under this chapter are exempt from a political subdivision's tax."  at MINN STAT. § 297A.99(7) (2012).

[6] There are no taxing jurisdictions that impose sales taxes at rates exceeding 50% of the actual drug costs in Part D PDEs submitted to CMS for payment. App. at 20, Mucke Aff. at ¶ 44.

[7] As discussed above, there is a contract between CMS and ACLR to recover Part D improper payments.

the OY2 SOW that described the new issue submission and approval process that afforded collaboration and refinement of the sales tax NAIRP.  *Id.* at Appendix E.

Once ACLR submitted its sales tax NAIRP, ACLR was allowed to conduct a "walk-thru of the new issue at the next scheduled CMS/RAC Operations Meeting."  *Id.* This "walk-thru" meeting was to occur fourteen days after ACLR submitted its sales tax NAIRP.  *Id.*  Within thirty days of the "walk-thru" meeting, CMS was to provide its NAIRP feedback verbally and in writing to ACLR.  *Id.*  Within thirty days of receiving the required initial feedback from CMS, ACLR should have been allowed the opportunity to "abandon the original NAIRP or revise it."  *Id.*  Within thirty days of receiving a revised NAIRP, CMS was to provide "complete approval, conditional approval, or denial of the NAIRP."  *Id.*  If CMS denied the revised NAIRP, CMS was to "provide the RAC with a written explanation as to the reasons for the denial."  *Id.*

3.  CMS's actions in connection with the sales tax NAIRP were a breach of the Part D RAC Contract.

On September 3, 2015 without complying with the contractually agreed upon process for evaluating ACLR's sales tax NAIRP, CMS, by email, denied ACLR's sales tax NAIRP.  App. at Ex. 62, CMS denial of sales tax NAIRP.  In the email, CMS represented that the "audit issue is currently open and active with another CMS contractor" and referenced section 1.2.3 of the RAC contract.  *Id.*  Section 1.2.3 of the RAC contract provides that "CMS/CPI consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue." App. at Ex. 22, Part D RAC Contract, OY2 SOW at section 1.2.3.  CMS's actions in connection with ACLR's sales tax NAIRP were a breach of the Part D RAC Contract.

a.   *CMS's failure to follow the SOW for the NAIRP process was a breach of the Part D RAC Contract.*

There is no dispute that CMS did not comply with the NAIRP process agreed to by the parties in the Part D RAC Contract as it related to ACLR's sales tax NAIRP. Approving or denying a NAIRP has to be in accordance with the Part D RAC Contract. App. at Ex. 6, CMS 30(b)(6) II Dep. at 265:18-266:6.  The approval process in Appendix E of the SOW was not utilized for ACLR's sales tax NAIRP.  App. at Ex. 49, S. Brown Dep at 43:19-22.  CMS denied ACLR's sales tax NAIRP without a required "walk-thru." CMS never provided feedback to ACLR on its sales tax NAIRP.  ACLR was never given the required opportunity to revise its sales tax NAIRP.  To the extent CMS had concerns about ACLR's sales tax NAIRP, ACLR had a contractual right to have CMS's concerns addressed through the process outlined in the Part D RAC Contract.  At the very least, ACLR could have refined its sales tax NAIRP to address CMS's concerns.  Because CMS did not follow the NAIRP process as set forth in the Part D RAC Contract, CMS breached the Part D RAC Contract.  To the extent CMS argues that following the NAIRP process in the Part D RAC Contract was unnecessary because CMS could simply deny ACLR's sales tax NAIRP under section 1.2.3 of the SOW, the facts do not support a finding that there was a basis to deny ACLR's sales NAIRP under section 1.2.3.  Because CMS denied ACLR's sales tax NAIRP contrary to the Part D RAC Contract, CMS breached the Part D RAC Contract.

b.   *CMS's denial of ACLR's NAIRP was a breach of the Part D RAC Contract.*

In its denial of ACLR's sales tax NAIRP, CMS stated that "this audit issue is currently open and active with another CMS contractor."  App. at Ex. 62, CMS denial of

47

sales tax NAIRP.  CMS then quoted section 1.2.3 of the SOW.  *Id.*  It appears that the aforementioned was the justification for CMS's denial of ACLR's sales tax NAIRP. CMS did not have a contractual basis to deny ACLR's NAIRP because it was "open and active."  The phrase "open and active" does not exist in the Part D RAC Contract.  App. at Ex. 6, CMS 30(b)(6) II at 60:14-16; App. at Ex. 49, S. Brown Dep at 44:1-4.  Even if CMS had a contractual right to deny ACLR's sales tax NAIRP because the issues were open and active, the sales tax issues in ACLR's sales tax NAIRP were not open and active.  Moreover, ACLR's sales tax NAIRP was not duplicative and did "not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue."

    (i)  ACLR's sales tax NAIRP issues were not open and active.

 ACLR's sales tax NAIRP was not open and active with another CMS contractor at the time ACLR's sales tax NAIRP was submitted and then denied.  CMS interprets the phrase "open and active" to mean an audit issue "on which work is actively being done." App. at Ex. 73, Defendant's Responses to Plaintiff's First Set of Interrogatories ("Interrogatory Responses"), response to interrogatory number 3.  ACLR's sales tax NAIRP identified four categories of improper PDE records:  (i) sales taxes that were billed on PDEs from five states that did not impose sales taxes, (ii) sales taxes that were billed in the state of Louisiana, (iii) sales taxes that were billed in the state of Minnesota, and (iv) sales tax charges billed at impermissible tax rates exceeding 50% of PDE drug costs.  App. at Ex. 61, ACLR sales tax NAIRP.  There is no evidence that all of the categories in ACLR's sales tax NAIRP were open and active during the time ACLR submitted its sales tax NAIRP and CMS issued its denial.  There is no evidence that NBI

MEDIC, the contractor identified by CMS as having "commenced fraud and abuse work with respect to the Sales Tax Error Audit in October 30, 2014," was actively working on all of the categories of improper PDE records during the time ACLR submitted its sales tax NAIRP and CMS issued its denial.  *See* App. at Ex. 64, CMS claim denial.  After July 2015, the NBI MEDIC did no further work on PDE records and improper sales taxes with respect to the states of Delaware, Alaska, Alabama, New Hampshire, Montana, and Oregon that do not impose a sales tax. App. at Ex. 65, NBI MEDIC 30(b)(6) Dep. at 249:6-22. When ACLR submitted its sales tax NAIRP, the NBI MEDIC wasn't doing any more sales tax reviews.  App. at Ex. 66, Abankwah Dep at 57:16-58:1.  After August 10, 2015, the NBI MEDIC did not conduct any further analysis for any PDE records identified by ACLR on its PY 2012 and 2013 sales tax NAIRP for the state of Minnesota. App. at Ex. 63, CMS 30(b)(6) II Dep. at 179:22-180:5; *See* App. at Ex. 65, NBI MEDIC 30(b)(6) Dep. at 127:1-5; App. at Ex. 66, Abankwah Dep. at 58:7-10.

      (ii)    ACLR's sales tax NAIRP was not duplicative and did not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue.

CMS appears to have relied on Section 1.2.3 of the SOW as part of CMS's justification to deny ACLR's sales tax NAIRP.  To the extent CMS could rely on section 1.2.3 of the OY2 SOW to deny ACLR's sales tax NAIRP,[8] all four of the conditions identified in section 1.2.3 of the OY2 SOW would have had to exist to be a legitimate basis to deny ACLR's sales tax NAIRP.  App. at Ex. 63, CMS 30(b)(6) II Dep. at 32:11-18.  Specifically, ACLR's sales tax NAIRP would have had to have been duplicative and the sales tax NAIRP would have had to have focused on improper payments that were

---

[8] ACLR does not concede the fact that CMS can rely on section 1.2.3 of the SOW to deny ACLR's sales tax NAIRP as that section was only intended to apply to duplicative ACLR audits on the same PDE record.

"already identified, being audited, **and** have been corrected/reimbursed elsewhere in CMS for the same audit issue."  App. at Ex. 22, Part D RAC Contract, OY2 SOW at section 1.2.3 (emphasis added).  *See Cudahy Packing Co. v. United States*, 75 F. Supp. 239, 243 (Ct. Cl. 1948) (the court may not substitute 'and' for 'or,' or vice versa, where the intention of the parties to use the connective word actually employed is apparent). All four conditions did not exist as a basis to deny ACLR's sales tax NAIRP.

(a) The sales tax NAIRP was not duplicative.

CMS appears to have taken the position that ACLR's sales tax NAIRP was "duplicative" of the work performed by the NBI MEDIC.  *See* App. at Ex. 73, Interrogatory Responses, response to interrogatory number 17.  The term duplicative means "being the same as another."  *Merriam-Webster*.  ACLR's sales tax NAIRP was not duplicative of the NBI MEDIC's work.  ACLR and the NBI MEDIC are government contractors that perform different functions for CMS with different processes.  App. at Ex. 2, C. Brown Dep at 70:2-18; 92:13-16; App. at Ex. 9, Hoey Dep. at 58:16-59:2. ACLR was CMS's recovery audit contractor.  The NBI MEDIC is a fraud, waste, and abuse contractor for CMS.  *See id.*  The NBI MEDIC does not have the contractual authority to issue letters to plan sponsors and then recoup Part D improper payments on behalf of CMS.  App. at Ex. 63, CMS 30(b)(6) II Dep. at 95:2-7.  For the most part, the NBI MEDIC merely engaged in a review of the state tax laws and evaluated the amount of PDE records' billing amounts in the sales tax column on PDE records.  ACLR's sales tax NAIRP proposed to have ACLR recover improper payments from plan sponsors on PDE records that unlawfully billed amounts in the PDE records' sales tax column.  App.

at Ex. 61, ACLR sales tax NAIRP.  ACLR's proposed recoveries did not utilize and went well beyond any work the NBI MEDIC had done.

The Court should not presume that government contractors engage in duplicative work.  Multiple awards do "not authorize duplicate awards of the entirety of the goods or services described in the solicitation." *Valix Fed. P'ship I*, GSBCA No. 12109-P, 93-2 B.C.A. (CCH) ¶ 25587 (Nov. 3, 1992). "We have previously recognized that avoiding procuring duplicative services may reasonably support a decision to cancel a solicitation." *Matter of: Supplycore Inc.*, B-411015.8, 2016 WL 3136469 (May 27, 2016).

> (b) The improper payments in ACLR's sales tax NAIRP were not already
>     identified.

The improper payments identified in ACLR's sales tax NAIRP were not already identified at the time ACLR submitted its sales tax NAIRP.  The term "identified" is not defined in the Part D RAC Contract.  However, CMS documentation reflects the circumstances when CMS considered amounts to be "identified" under the Part D RAC Contract.  App. at Ex. 74, December 28, 2015 email.  "[A]mounts are considered identified on the date of the original NIP and for the data analysis projects amounts are identified at the date of the original memo to the plans." *Id.*  There were no NIPs sent to plan sponsors by the NBI MEDIC or CMS for at least three of the categories of improper payments identified in ACLR's sales tax NAIRP, including Minnesota.  Therefore, the improper payments in ACLR's sales tax NAIRP were not already identified as of the dates of the submission and denial of ACLR's sales tax NAIRP.

(c) The improper payments in ACLR's sales tax NAIRP were not being audited.

The PDE records in ACLR's sales tax NAIRP were not "being audited" by the NBI MEDIC.  The NBI MEDIC does not conduct improper payment audits.  App. at Ex. 63, CMS 30(b)(6) II Dep. at 95:2-7.  ACLR was CMS's recovery audit contractor tasked with recovering improper payments through the audit process in the Part D RAC Contract.  The concept of an audit as contemplated by the Part D RAC Contract and referenced in section 1.2.3 of the Part D RAC Contract must be interpreted as mirroring the work that ACLR would be undertaking in connection with PDE record improper payments.  An audit cannot be interpreted as the equivalent of the study or review conducted by the NBI MEDIC.

Even if the NBI MEDIC's actions were the equivalent of an "audit" under section 1.2.3 of the Part D RAC Contract, the phrase "being audited" means the audit of improper payments was occurring at the time ACLR submitted its sales tax NAIRP or at the time of CMS's denial.  App. at Ex. 22, Part D RAC Contract, OY2 SOW at section 1.2.3.  On the date ACLR submitted its sales tax NAIRP, the NBI MEDIC was not performing any work on at least three of the four audit categories in ACLR's sales tax NAIRP.  *See supra* at II.A.3.b.(i).  There is also no evidence that the NBI MEDIC performed any work on any of the states mentioned in ACLR's sales tax NAIRP, except for perhaps Louisiana, after ACLR had submitted its sales tax NAIRP.  *Id.* Consequently, there were no activities at the time of the submission of ACLR's sales tax NAIRP or its denial that could be construed as an active audit for all of the categories identified in ACLR's sales tax NAIRP.

(d) The improper payments in ACLR's sales tax NAIRP were not corrected/reimbursed.

At the time CMS denied ACLR's sales tax NAIRP, the improper payments in ACLR's sales tax NAIRP had not been corrected/reimbursed elsewhere in CMS for the same audit issue. According to CMS, an improper payment is "considered 'corrected/reimbursed' when the corresponding improper Prescription Drug Event (PDE) record has been deleted by the Medicare Advantage Prescription Drug Plan (MA-PD) or stand-alone Prescription Drug Plan (PDP) sponsor from the CMS Integrated Data Repository (IDR), and is no longer considered improper." App. at Ex. 73, Interrogatory Responses, response to interrogatory No. 3. There is no evidence to show that any more than a small percentage of the improper sales tax charges identified in ACLR's sales tax NAIRP have been reimbursed elsewhere in CMS for the same audit issue. *See* App. at Ex. 75, Defendant's Response to Plaintiff's First Requests for Admission, responses Nos. 46-49. Moreover, ACLR is not responsible for reviewing any PDE changes occurring after final reconciliation as this information constitutes "new payment information" that would only be included in any "subsequent reopening of the final reconciliation." App. at Ex. 21, Part D RAC Contract, OY1 SOW, Appendix C; App. at Ex. 22, OY2 SOW, Appendix C; *See* App. at Ex. 23, October 4, 2011 email.

4.   CMS's breach of contract caused ACLR to incur damages.

CMS's failure to follow the NAIRP approval process and CMS's unjustified denial of ACLR's sales tax NAIRP caused ACLR to incur damages. Because the Part D RAC Contract is a contingency fee contract, ACLR is only paid when it recovers Part D improper payments for CMS. Under the SOWs, ACLR could only pursue improper payments pursuant to an approved NAIRP. App. at Ex. 22, Part D RAC Contract, OY2

53

SOW at section 2.1.1.  CMS's unjustified denial of ACLR's sales tax NAIRP and failure to follow the NAIRP approval process denied ACLR the opportunity to recover improper payments in its sales tax NAIRP and be paid the corresponding contingency fee on those improper payments.

B. **CMS violated the implied covenant of good faith and fair dealing in connection with ACLR's sales tax NAIRP.**

In the alternative, this Court should grant summary judgment to ACLR because CMS violated the covenant of good faith and fair dealing in connection with ACLR's sales tax NAIRP.

1. ACLR reasonably expected to recover improper payments based on sales tax charges.

As discussed above, ACLR had a reasonable expectation to pursue the recovery of improper payments under the Part D RAC Contract.  ACLR also had a reasonable expectation to pursue the recovery of improper payments consisting of payments from PDE records where sales taxes were improperly billed on those Part D PDE records.  A PDE record containing amounts billed in the sales tax column of the PDE record in a state where sales taxes cannot be charged on Part D prescriptions would render the PDE record an improper payment.   The Office of Management & Budget ("OMB"), responsible for establishing improper payment guidance, defines an improper payment as "any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements." App. at Ex. 18, excerpts of Part III to OMB Circular A-123, Appendix C.  The OMB definition of an improper payment is consistent with CMS's definition of an improper payment.  App. at Ex.6, CMS 30(b)(6) dep. at 56:21-57:8; 84:3-85:20; App. at Ex. 19,

CMS Part D RAC Overview at page 21.  CMS has also acknowledged that PDE records containing improperly billed sales taxes were improper payments.  CMS's sales tax NAIRP denial letter characterized ACLR's efforts as focusing on "improper payments" that were "already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the **same** audit issue."  App. at Ex. 61, ACLR sales tax NAIRP.  If, as CMS appears to contend in its denial of ACLR's sales tax NAIRP, the NBI MEDIC had reviewed "improper payments" arising from the billing of sales tax on PDE records then ACLR's sales tax NAIRP also identified improper payments.  As a result of ACLR's identification of improper payments based upon the billing of sales taxes on PDE records, ACLR submitted its sales tax NAIRP with the reasonable expectation that ACLR could pursue the recovery of those improper payments.

2.  CMS breached its duty of good faith and fair dealing in connection with the sales tax NAIRP.

CMS had an obligation to not interfere with ACLR's performance and destroy ACLR's reasonable expectation to recover improper payments, including improper payments from PDE records containing sales taxes that should not have been billed.  *See Metcalf Const. Co.*, 742 F. 3d at 991.  ACLR relied upon CMS to act in good faith and deal fairly with ACLR in evaluating ACLR's sales tax NAIRP.

In denying ACLR's sales tax NAIRP, CMS completely ignored the "New Issues Submission and Approval Process" agreed to by the parties in Appendix E of the OY2 SOW.  The failure by CMS to adhere to the very process that CMS insisted on for the SOWs demonstrates a significant lack of cooperation by CMS.  The NAIRP approval process was by its very nature designed to address misunderstandings or differences of opinions that may have existed with a NAIRP.  *See* App. at Ex. 22, Part D RAC Contract,

OY2 SOW at section 2.1.1.  To the extent the decision makers at CMS had inaccurate information in denying ACLR's NAIRP, CMS's adherence to the NAIRP approval process could have resulted in CMS approving ACLR's sales tax NAIRP.  CMS's disregard of the NAIRP approval process hindered ACLR's Part D RAC Contract performance and foreclosed the possibility of any refinement or revision of ACLR's sales tax NAIRP.

Moreover, CMS's denial of ACLR's NAIRP destroyed ACLR's reasonable expectation regarding the fruits of the Part D RAC Contract as it related to the recovery of improper payments for improper sales taxes.  CMS's denial was a breach of its duty of good faith and fair dealing especially given that the factual premise for the denial did not exist.  As discussed above, the sales tax audit issue was not "currently open and active with another CMS contractor" and the sales tax NAIRP were "not duplicative" and "did not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue."  *See supra* at II.A.3.b.(i)-(ii).  By denying ACLR's sales tax NAIRP on grounds that factually did not exist, CMS continued with its consistent pattern of improperly denying ACLR the right to recover improper payments and avoiding CMS's legal obligation to recover improper payments.

HHS estimated billions of dollars of improper payments for plan years contractually reviewable by ACLR.  For example, the Medicare Part D error rate for 2012 was $1.6 billion and the estimated loss was $1.1 billion.  App. at Ex. 69,  HHS FY 2012 Agency Financial Report excerpts at page 173; App. at Ex. 6, CMS 30(b)(6) Dep. at 151:1-7; 157:13-16.  The Medicare Part D payment error estimate for fiscal year 2013

was $2.1 billion.  App. at Ex. 70, September 29, 2014 email at page 335.   Nevertheless, CMS constantly rejected ACLR's improper payment audit attempts or narrowed the scope of ACLR's improper payment audits.  For example, on November 13, 2013, ACLR submitted improper payments to CMS totaling $1.05 billion and informed CMS that ACLR would commence recoveries in accordance with its PWS. App. at Ex. 43, November 17, 2013 email.  However, CO Hoey directed ACLR to not send NIP demand letters to plan sponsors.  App. at Ex. 44, November 22, 2013 email.  ACLR I and ACLR II pertain to just three of ACLR's attempted audits.  *ACLR, LLC v. The United States*, Case No. 17-627 outlines multiple other instances of the CMS's unjustified denials of ACLR's NAIRPs.  As of August 2015, CMS had approved just 1 of the 15 audit proposals from ACLR since the beginning of the Part D RAC.  App. at Ex. 15, GAO Report at page 2.

During the course of the Part D RAC Contract, ACLR identified and submitted to CMS Part D improper payments totaling $3 billion.  App. at Ex. 71, November 13, 2013 email; App. at Ex. 20, Mucke Aff. at ¶ 46.  As of May 2015, CMS had collected less than $10 million in Part D improper payments.  *See* App. at Ex.15, GAO Report at page 2. Through CMS's rejection of ACLR's proposed audits, narrowing of ACLR's audits, and deference to plan sponsors, CMS Part D improper payment collections were limited to a total of $11.9 million.  App. at Ex. 20, Mucke Aff. at ¶ 47.

CMS's denial of ACLR's sales tax NAIRP was inconsistent with the Part D RAC Contract's fundamental purpose and deprived ACLR of the vast majority of the contemplated value of the Part D RAC Contract.  Without the sales tax NAIRP being approved, ACLR could not pursue the recovery of improper payments arising from

improperly billed sales taxes on Part D PDE records.  ACLR's sales tax NAIRP should have been approved and ACLR should have been allowed to recover the sales tax improper payments. CMS breached its duty of good faith and fair dealing through its actions relating to ACLR's sales tax NAIRP.

### C.  ACLR's damages

ACLR is entitled to damages for CMS's breach of contract in connection with ACLR's sales tax NAIRP or, in the alternative, CMS's breach of its duty of good faith and fair dealing regarding the sales tax NAIRP.  Under either claim, ACLR should be awarded damages that place ACLR in as good a position as ACLR would have been in if CMS had performed the Part D RAC Contract or had complied with its duty of good faith and fair dealing.  *See Glendale Federal Bank, FSB,* 239 F.3d at 1380; *California Fed. Bank,* 395 F.3d at 1267.

To recover damages, ACLR must show (i) the damages were reasonably foreseeable by CMS at the time of contracting, (ii) the breach was a substantial causal factor in the damages, and (iii) the measure of damages can be shown with reasonable certainty.  *See Boston Edison Co.,* 80 Fed. Cl. at 483; *California Fed. Bank,* 395 F.3d at 1267.  As was the case with ACLR's duplicate payment audits, ACLR's damages in connection with a breach of contract or the duty of good faith and fair dealing related to ACLR's sales tax NAIRP were reasonably foreseeable by CMS at the time of contracting.  The Part D RAC Contract provided that ACLR would be awarded contingency fee payments as a percentage of the recovered improper payments.  CMS was well aware of the large amount of Part D improper payments as CMS's estimated loss from improper payments in 2012 and 2013 was $3.2 billion.  App. at Ex. 69, HHS

58

FY 2012 Agency Financial Report excerpts at page 173; App. at Ex. 6, CMS 30(b)(6) Dep. at 151:1-7; 157:13-16; App. Ex. 70, September 29, 2014 email at page 335. Moreover, CMS had been advised by the NBI MEDIC as to the issue of improper payments arising from the inappropriate billing of sales tax on Part D PDE records.  App. at Ex. 64, CMS claim denial.

 CMS's breach was also a substantial factor in causing ACLR's damages.  As discussed above, CMS's actions precluded ACLR from pursuing the PY 2012 and PY 2013 sales tax audits.  Consequently, ACLR could not recover PY 2012 and PY 2013 improper payments on which ACLR could be paid its contingency fee.  *See SGS-92-X003,* 85 Fed. Cl. at 709.

Finally, ACLR's measure of damages in connection with its sales tax audit is reasonably certain.  ACLR's measure of damages is the amount of the PDE records billing improper sales taxes identified by ACLR in its sales tax NAIRP multiplied by ACLR's contingency fee.  "[T]he measure of damages must be reasonably certain, although if 'a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.'"  *California Fed. Bank,* 395 F.3d at 1267 (Fed. Cir. 2005).  At the time ACLR submitted its sales tax NAIRP, ACLR was to be paid a contingency fee of 15% for recoveries up to $10 million and 12% for recoveries after the first $10 million for the PY 2010 duplicate payments.  App. at Ex. 21, Part D RAC, OY1 SOW at page 129.  For states that did not impose a sales tax, ACLR identified $5,518,803 in improper payments on its sales tax NAIRP.  App. at Ex. 61, ACLR sales tax NAIRP. For the state of Minnesota, ACLR identified $619,184,285 in improper payments on its sales tax NAIRP.  *Id*.  For excessive tax rates, ACLR identified $1,623,530 in improper

payments on its sales tax NAIRP.  *Id*.  Accordingly, ACLR should be awarded damages in connection with its PY 2012 and 2013 sales tax NAIRP in the amount of $75,459,194.[9] App. at Ex. 20, Mucke Aff. at ¶ 45; App. at Ex. 21, Part D RAC, OY1 SOW.

## **CONCLUSION**

There are no disputed issues of material facts and ACLR as a matter of law to partial summary judgment on its claims of breach of contract and breach of duty of good faith and fair dealing in ACLR I and ACLR II.

Dated:  April 26, 2018

DAVID, BRODY &
DONDERSHINE, LLP


_____/s/_____
Thomas K. David
John A. Bonello
12355 Sunrise Valley Drive
Suite 650
Reston, VA 20191
Phone:  703-264-2220
Fax: 703-264-2226
tdavid@dbd-law.com
jbonello@dbd-law.com

Attorneys      for      Plaintiff
ACLR, LLC

---

[9] ACLR is not seeking to recover its portion of risk sharing payments in this Motion.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26 day of April 2017, I caused a copy of the foregoing

document to be emailed via the ECF system to the following:

Mark E. Porada
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street NW
Room 11020
Washington, DC 20005

_____/s/_____
Thomas K. David

61