Excerpts from the Deposition of Cynthia Moreno

CONFIDENTIAL
(pages 58-60)

EXHIBIT 1

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

---------------------x

ACLR, LLC

       Plaintiff,

-vs-               Civil Action No. 15-767

THE UNITED STATES     (Judge Campbell-Smith)

       Defendant.

---------------------x

              Tuesday, October 3, 2017

              Baltimore, Maryland

    THE DEPOSITION OF CYNTHIA EILEEN MORENO

  (Pages 44 through 65 -- Marked CONFIDENTIAL)

1  part to determine what audits to approve for

2  ACLR, correct?

3      A.   I can't say that.

4      Q.   Is $5.4 billion in improper payments a

5  significant amount on a yearly basis?

6      A.   In comparison to what?  There are --

7  well, on its own?  Compared to the rest of

8  Medicare?

9      Q.   Yes.  Why don't you answer both, on

10  its own and in comparison to Medicare.

11      A.   It seems a lot of money, yes.  In

12  comparison to the rest of Medicare, it's not as

13  much.

14      Q.   So as a division director of DPOA, if

15  the, say, yearly estimated improper payments

16  under Part D were in the range of a billion

17  dollars, do you think that's something that CMS

18  should have pursued the recovery of?

19      A.   CMS was required by law to establish a

20  Part D RAC contract.

21      Q.   Should they have been pursuing the

22  recovery of improper payments?

Cynthia Eileen Moreno                    ACLR, LLC v. United States of America
Case No. 15-767                                        October 03, 2017

1        A.    CMS was required by law to do that.

2        Q.    To pursue the recovery of improper

3   payments, correct?

4        A.    Per the law, yes.

5              (Moreno Exhibit No. 50 was marked for

6   identification.)

7   BY MR. BONELLO:

8        Q.    I'm showing you what's been marked as

9   Exhibit 50.

10             MR. LYONS:   John, for the record,

11  there's some highlighting that is appearing on

12  my copy at least.   Is that in the document as it

13  was produced, or is that highlighting that's

14  been added?

15             MR. BONELLO:   I think we've added

16  that.

17  BY MR. BONELLO:

18       Q.    Can you identify this document for me?

19       A.    You just want to know what it is?

20  It's an email between -- let me just make sure I

21  get an answer to that question.   Is that -- you

22  just want me to state what this document is?

Cynthia Eileen Moreno                ACLR, LLC v. United States of America
Case No. 15-767                              October 03, 2017

1       A.    Yes.

2       Q.    And this was written by people in your

3   office?

4       A.    Yes.   There was somebody from -- it

5   was actually in the Program Integrity Group

6   front office.   There was an analyst there who

7   wrote it.

8       Q.    Do you know what the analyst's name

9   was?

10      A.    Lynn Merritt-Nixon.

11      Q.    As of the end of December 2010, had

12  CMS established any Part D RAC regulations?

13      A.    No.

14      Q.    What about Part D RAC rules?

15      A.    No.

16      Q.    What about Part D RAC guidance?

17      A.    No.   No.

18      Q.    When did CMS establish any regs

19  associated with the Part D RAC?

20      A.    I think -- not during the time that I

21  was in program integrity.

22      Q.    And when did you leave program

Cynthia Eileen Moreno                    ACLR, LLC v. United States of America
Case No. 15-767                          October 03, 2017

```
 1   integrity?
 2        A.    In -- around December of 2012.
 3        Q.    So you're not aware prior to December
 4   of '12 of any -- let me ask a different
 5   question.
 6             When did CMS establish any rules
 7   associated with the Part D RAC?
 8        A.    I don't know.
 9        Q.    Were there any rules established with
10   respect to the Part D RAC prior to the time you
11   left the division?
12        A.    No.
13        Q.    So there would have been none prior to
14   December 2012, correct?
15        A.    Correct.
16        Q.    When did CMS establish any guidance
17   associated with the Part D RAC?
18        A.    I don't -- I don't know.  And when you
19   say guidance, guidance to -- to whom or to what?
20        Q.    I'm just asking you.  Are you familiar
21   with the term guidance?
22        A.    Yes.
```

Cynthia Eileen Moreno                ACLR, LLC v. United States of America
Case No. 15-767                              October 03, 2017



Cynthia Eileen Moreno
Case No. 15-767

ACLR, LLC v. United States of America
October 03, 2017





Cynthia Eileen Moreno                    ACLR, LLC v. United States of America
Case No. 15-767                          October 03, 2017

1   in 2011 and 2012 according to this document?

2       A.   I don't know.

3       Q.   Is that consistent with what your

4   understanding was of what the Part D RAC's

5   recoveries would be in 2011 and 2012?

6       A.   I don't know.

7       Q.   By the end of 2011 how many program

8   years would have been available for review?

9       A.   In the Part D payments?

10      Q.   Yes.

11      A.   I don't know that.

12      Q.   Did you notify ACLR -- or OAGM that

13  ACLR would not be able to execute its contract

14  to recover improper payments and get paid under

15  the contract during 2011?

16      A.   No.  I did not.

17      Q.   Why not?

18      A.   I just -- I did not.

19      Q.   And, again, you were the person in

20  charge of overseeing the Part D RAC program,

21  correct?

22      A.   Yes.

1      Q.    Were you concerned at all that ACLR

2  had a contingency fee contract with CMS and

3  CMS's expectation was that ACLR wasn't going to

4  recover any improper payments in 2011?

5      A.    No.

6      Q.    That didn't concern you?

7      A.    No.

8      Q.    Do you think it would have concerned

9  ACLR?

10     A.    I can't say that.

11          MR. LYONS:  Objection, calls for

12  speculation.

13          THE WITNESS:  I can't say that.

14  BY MR. BONELLO:

15     Q.    Did you think as director of DPOA that

16  that may have been a concern by ACLR?

17          MR. LYONS:  Same objection.

18          THE WITNESS:  I don't know that --

19  yeah.  I don't know.

20  BY MR. BONELLO:

21     Q.    Did you make any requests that the

22  contract be modified so that ACLR could be

Cynthia Eileen Moreno                    ACLR, LLC v. United States of America
Case No. 15-767                                    October 03, 2017

1   remunerated for the time it was spending on the

2   ACLR Part D RAC contract?

3          A.    Can you repeat the question?

4          Q.    Sure.   Did you notify anybody within

5   CMS that the Part D RAC contract should be

6   modified so that ACLR could receive some

7   compensation for its work?

8          A.    No.

9                (Moreno Exhibit No. 54 was marked for

10  identification.)

11  BY MR. BONELLO:

12         Q.    I'm showing you what's been marked as

13  Exhibit 54.   This is a chain of emails with an

14  attachment.

15               Do you recall this exchange of emails?

16         A.    I don't recall the exchange.

17         Q.    What's the document attached to the

18  emails?

19         A.    It says:   Expansion of RACs to

20  Medicare's Parts C and D, July 5th, 2011.

21         Q.    Was that proposed testimony at a

22  congressional hearing?

Cynthia Eileen Moreno                    ACLR, LLC v. United States of America
Case No. 15-767                          October 03, 2017

1  political appointee in charge of the Center for

2  Program Integrity.

3      Q.    The last sentence in the email that I

4  was just reading from says:  We just need a few

5  sentences describing what the RAC is doing this

6  first year without highlighting too much the

7  fact that recoupments are being delayed.

8           What was your understanding as to why

9  they didn't want to highlight too much the fact

10 that recoupments were being delayed?

11          MR. LYONS:  Objection, lack of

12 foundation.

13          THE WITNESS:  I don't know.

14 BY MR. BONELLO:

15     Q.    Why were recoupments being delayed?

16     A.    I don't know.

17     Q.    Well, you were the DPOA program

18 director in charge of the Part D RAC program.

19 You don't have any recollection as to why

20 recoupments were being delayed?

21     A.    We were working to implement the

22 program.  That was the instruction that we were

Cynthia Eileen Moreno                 ACLR, LLC v. United States of America
Case No. 15-767                       October 03, 2017

 1  working under.

 2       Q.    And whose instruction was that from?

 3       A.    From the agency.  From our management.

 4       Q.    And who in management said that you

 5  need to -- when the contract had been awarded --

 6  the Part D RAC contract, the program hadn't been

 7  yet implemented?

 8       A.    It was in the process of being

 9  implemented.  Yes.

10       Q.    And ACLR couldn't perform any audit

11  activities until the program had been

12  implemented.  Is that correct?

13       A.    Yes.

14       Q.    And part of the delay in

15  implementation was that Booz Allen was

16  developing the business process model, correct?

17       A.    I don't recall that.

18       Q.    Okay.  What do you recall with respect

19  to what was delaying CMS's implementation of the

20  Part D RAC program?

21       A.    CMS was developing the processes that

22  the RAC would use.  I wouldn't say that it was

 1   delaying.

 2        Q.   If you look at the third page of that

 3   on the outline of the testimony, under the

 4   Question 1 answer, the second sentence says:

 5   Since contract award, CMS has directed its

 6   efforts at ensuring the RAC understands the

 7   Part D program, the CMS data security

 8   requirements and the prescription event drug

 9   data.

10             Do you see that?

11        A.   No.  I'm not sure where you are.

12        Q.   It's the second sentence.

13        A.   Oh, there.  Okay.

14        Q.   What efforts was CMS engaging that

15   supported what was said here that I just read?

16        A.   Well, there was the IT security work

17   that was going on.  And staff was also working

18   with ACLR on understanding the Part D payment

19   structure.

20        Q.   What was the issue with the Part D

21   payment structure that the staff was working on

22   with ACLR with?

Cynthia Eileen Moreno                    ACLR, LLC v. United States of America
Case No. 15-767                               October 03, 2017

1      Q.    And you see under No. 9, Part D Audit

2   Scope, it says:  Duplicate Payments.  Proposed

3   ACLR methodology technically acceptable.

4          Do you see that?

5      A.    Yes.

6      Q.    And is that consistent with your

7   understanding?

8      A.    Yes.

9      Q.    Look at, under B, Excluded Providers.

10  It says:  Proposed ACLR methodology technically

11  acceptable.

12     A.    Yes.

13     Q.    Is that consistent with your

14  understanding?

15     A.    Yes.

16     Q.    Did CMS work with ACLR for additional

17  audit issues while you were director of DPOA?

18     A.    Not that I can recall.

19     Q.    And why not?

20     A.    I mean, we just -- these are the

21  one -- the two that we landed on.  That's all I

22  can recall.

**Excerpts from the Deposition of Camille Brown**

**EXHIBIT 2**

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

----------------------x

ACLR, LLC

        Plaintiff,

-vs-                    Civil Action No. 16-309

THE UNITED STATES

        Defendant.

----------------------x

               Thursday, August 10, 2017

               Baltimore, Maryland


     THE DEPOSITION OF CAMILLE BROWN


        The deposition of CAMILLE BROWN was

taken on Thursday, August 10, 2017, commencing

at 9:56 a.m., at the Department of Health and

Human services, Office of General Counsel, 7500

Security Boulevard, Central Building, Baltimore,

Maryland, before CHERYL NICHOLSON, CCR, CLR,

Stenotype Reporter and Notary Public in and for

the State of Maryland.

Camille Brown                    ACLR, LLC v. THE UNITED STATES
Case No. 16-309                              August 10, 2017

1        Q.    From the time that you received the

2   NAIRP -- from the time CMS received the NAIRP

3   and the time that CMS denied the NAIRP, was

4   there any communications with ACLR about the

5   NAIRP?

6        A.    I can't remember if there were -- what

7   communications may have transpired during that

8   time frame.

9        Q.    You don't recall if any occurred?

10       A.    I can't say that -- you know, if they

11   did or didn't.

12       Q.    Do you have an understanding that once

13   a NAIRP is received from ACLR then CMS should

14   engage in collaboration with the RAC to

15   determine whether to refine or revise the NAIRP?

16       A.    Yes.

17       Q.    CMS is supposed to do that.  Isn't

18   that true?

19            MR. PORADA:  Objection.

20            THE WITNESS:  I believe in this

21   instance because they submitted an audit issue

22   that was already with CMS by another contractor

Camille Brown                    ACLR, LLC v. THE UNITED STATES
Case No. 16-309                           August 10, 2017

1   us for projects.

2       Q.   What types of contractors does DPOA

3   use to combat waste, fraud and abuse?

4       A.   Currently we have a -- the MEDIC

5   contractor.

6       Q.   And what was the role of the Part D

7   RAC?  Are they a waste, fraud and abuse

8   contractor?

9       A.   They're a contractor that identified

10  inappropriate payments.

11      Q.   Are they a waste, fraud and abuse

12  contractor?

13      A.   My understanding from when I worked

14  with the RAC was that they identified mostly

15  inappropriate payments.

16      Q.   So those are separate from waste,

17  fraud and abuse, correct?

18      A.   I would -- to me they're separate.

19      Q.   So an improper payment, in your

20  opinion, would be fraud?

21      A.   It could potentially be fraud.  It

22  depends.  It could be something improperly

Camille Brown                    ACLR, LLC v. THE UNITED STATES
Case No. 16-309                              August 10, 2017

1   issue, you investigate whether it's waste,

2   fraud --

3        A.   No.  We don't investigate those.

4   That's -- because they are proposing an audit

5   issue to us.  So if you're proposing something

6   to us, it's separate and different, but if it's

7   coming from an outside entity, we need to know

8   where it's -- what's the cause of it.  It's just

9   not that easy to assign it to a particular

10  contractor.

11       Q.   Are you familiar with the Affordable

12  Care Act's requirement that CMS contract with a

13  recovery auditor to recover Part D improper

14  payments?

15       A.   Yes.

16       Q.   Okay.  What's your understanding of

17  that?

18       A.   That CMS must have a Part D contractor

19  in place to recover inappropriate payments under

20  the Part D program.

21       Q.   And during your time as the director

22  of DPOA, how many Part D RAC audit issues did

Camille Brown                           ACLR, LLC v. THE UNITED STATES
Case No. 16-309                                      August 10, 2017

1        A.    If a MEDIC is working on a specific

2   audit issue and it's deemed as inappropriate,

3   there's recovery.

4        Q.    And how is recovery accomplished?

5        A.    For?

6        Q.    For a MEDIC issue.

7        A.    For the MEDIC issue it's PDE -- it

8   would be a PDE deletion.  The MEDIC uses -- when

9   they're looking at data or evaluating PDE

10  records, PDE records they look at real time, and

11  some of those records can be reconciled data.

12  So it varies.

13       Q.    Again, you're not familiar with the

14  interim adjustment?

15       A.    No.  Their -- the MEDIC's process

16  could be entirely different from the RAC's.

17       Q.    When does the MEDIC recovered improper

18  payments on PDE records?

19       A.    If they submit an audit proposal and

20  we decide to move forward with it, then there

21  would be recovery for that particular audit

22  issue.

**RFQ for Part D RAC**

**EXHIBIT 3**

A00022



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Centers for Medicare & Medicaid Services
Office of Acquisition and Grants Management
Division of Support Contracts
7500 Security Boulevard
Baltimore, Maryland 21244

DATE:        December 2, 2010

TO:          Selected FABS Schedule Holders

SUBJECT:     Request for Quote (RFQ) Recovery Audit Services in Support of
             Medicare Part D; CMS-RFQ-2011-110462

You are invited to submit a proposal/quotation in response to this RFQ.

The Centers for Medicare & Medicaid Services (CMS) intends to award a Firm-Fixed
Price Contingency Fee Task Order for the subject work in accordance with the terms
and conditions of your GSA FINANCIAL AND BUSINESS SOLUTIONS (FABS)
Federal Supply Schedule and the terms and conditions in the attached Sample Task
Order Terms and Conditions. The period of performance for the resulting task order
shall a 12 month base period commencing at the date of award. The task order will
also include four (4) 12-month option periods.

In order to receive a task order award resulting from this RFQ, your FABS schedule
must include Contingency Fee Percentage pricing/ceiling.

Please be advised that this RFQ does not commit the Government to pay any cost
for the preparation and submission of a quotation. In addition, the Contracting
Officer is the only individual who can legally commit the Government to the
expenditure of public funds in connection with this procurement. CMS anticipates
making awards without discussions.

Thank you in advance for your interest.

Sincerely,


Debra Stidham
Contracting Officer


Attachments

  (1) Attachment A: Statement of Objectives/Schedule of Deliverables
  (2) Attachment B: Quotation Submission Instructions
  (3) Attachment C: Evaluation Criteria for Award
  (4) Attachment D: Draft Task Order Terms and Conditions
  (5) Attachment E: Past Performance Questionnaire

**Statement of Objectives**

**EXHIBIT 4**



# Statement of Objectives
# Centers for Medicare & Medicaid Services
# Part D Recovery Audit Contractor (RAC)

## 1.0 Background

Title I of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA) (P.L. 108-173) was signed into law on December 8, 2003. The MMA established a new voluntary outpatient prescription drug benefit under Part D of Title XVIII of the Social Security Act (the Act). The prescription drug benefit, referred to as Medicare Part D, as well as an employer subsidy for qualified retiree health plans, began on January 1, 2006. Coverage for the drug benefit will be provided by private prescription drug plans (PDPs) that offer drug-only coverage or through Medicare Advantage (MA) plans that offer both prescription drug and health care coverage (known as MA-PD plans). These plans must offer a standard drug benefit, but will have the flexibility to vary the drug benefit within certain parameters. The Centers for Medicare & Medicaid Services (CMS) has identified 26 MA Regions and 34 PDP Regions, not including territories, each of which is its own PDP region.

Section 6411(b) of the Affordable Care Act expanded the use of the statutory 1893 Recovery Audit Contract provisions to utilize RACs under the Medicare Integrity Program to identify underpayments and overpayments and recoup overpayments under the Medicare program associated with medications for which payment is made under Part D of Title XVIII of the Social Security Act. The effective date for this provision is December 31, 2010.

To gain additional knowledge, potential bidders may research the following documents:

- The Debt Collection Improvement Act of 1996
- The Federal Claims Collection Act, as amended and related regulations found in 42 CFR;
- CMS Financial Report
  http://www.cms.gov/CFOReport/Downloads/2009_CMS_Financial_Report.pdf
- The Medicare Prescription Drug Benefit Manual:
  http://www.cms.gov/Manuals/IOM/itemdetail.asp?filterType=none&filterByDID=-99&sortByDID=1&sortOrder=ascending&itemID=CMS050485&intNumPerPage=10
- Part D Claims Data:
  http://www.cms.gov/PrescriptionDrugCovGenIn/08_PartDData.asp#TopOfPage
- Part D Program Analysis:
  http://www.cms.gov/PrescriptionDrugCovGenIn/09_ProgramReports.asp#TopOfPage
- Part D Regulations:
  http://www.cms.gov/PrescriptionDrugCovGenIn/PDR/list.asp#TopOfPage
- Plan Communication Guide:
  http://www.cms.gov/MAPDHelpDesk/02_Plan_Communications_User_Guide.asp
- Part D Reporting Requirements:
  http://www.cms.gov/PrescriptionDrugCovContra/08_RxContracting_ReportingOversight.asp

1

## 2.0 Overall Objectives

The RAC for the Medicare Part D Program mission is to reduce Medicare improper payments through the efficient detection and collection of overpayments, the identification of underpayments, and the implementation of actions that will prevent future improper payments.

## 3.0 Purpose

The purpose of this contract is to obtain contractor support for the Centers for Medicare & Medicaid Services (CMS) in the identification of improper payments and the recoupment of overpayments in Medicare Part D. The Part D RAC will be responsible for identification and recovery of improper payments on a national scale. The Part D RAC will be paid only from amounts recovered and on a contingent basis consistent with Section 1893(h)(1) of the Social Security Act. Throughout this document the term "improper payment" is used to refer collectively to overpayments and underpayments.

## 4.0 Contract Objectives

The contractor shall identify and recover improper payments made under Medicare Part D. Independently, and not as an agent of the Government. the Contractor shall furnish all the necessary services. qualified personnel, material, equipment, and facilities, not otherwise provided by the Government, as needed to meet the objectives below:

**4.1 – METHODOLOGY**: Establish and follow a methodology for identifying Medicare improper payments under Part D of Title XVIII of the Social Security Act.

**4.1.1** Develop innovative methodologies to determine Part D improper payments utilizing resources such as the Office of Inspector General and Government Accountability Office reports, the Part D reporting requirements as described at the CMS.gov Prescription Drug Coverage Contracting webpage (see web address above) and the Part D error rate information in the annual CFO reports. The methodology shall be efficient and maximize recoveries as well as meet all regulatory and security requirements. The methodology should include a detailed description of **data sources**, scope of analysis. anticipated outcomes, and analysis time frame.

**4.1.2** Develop methodologies and techniques, such as data analysis tools. to identify and /or target areas *most likely to contain improper payments* tools associated with each type of data identified. A specific Part D claim may not be targeted solely because it is a high dollar claim. but a claim may be targeted if it contains other information that leads the RAC to believe it is likely to contain an improper payment. Attempting to identify improper payments arising from any program other than Part D; this includes Medicare Advantage. and the Medicare Fee-For-Service program is strictly prohibited.

2

A31

**4.1.3** The RAC shall develop a recovery methodology for investigating Direct and Indirect Remuneration (DIR) under the Medicare Part D program. Identify and investigate sources of underreported and/or unreported DIR, which may include:

- DIR amounts retained by PBM's and not reported by Plan Sponsors.

- Price concessions received by manufacturers and not reported by Plan Sponsors.

- Any other source constituting DIR.

**4.1.4** CMS plans to establish an oversight board to govern the Part D RAC. Develop a plan/process for interacting with the board; the interaction will require presenting issues, and proposing future action(s). New approaches or changes in approaches developed after contract award shall require preapproval by CMS.

**4.2 - DATA STORE.** In order to meet the objective of ensuring the RAC and entities, such as, Medicare audit contractors or law enforcement, are not simultaneously working on the same payment data, CMS will establish a Data Storage System to support recovery audits for Medicare Part D. The Data Storage System shall be used by the RAC for the identification of payment information. The Data Storage System will include a master table of data with action specific identifiers.

**4.2.1** Establish a methodology to securely transmit and interface with the Data Storage System. The methodology shall also provide for updating the master table. [Securely transmit means sent in accordance with the CMS business systems security manual – e.g., mailed CD, MDCN line, through a clearinghouse.] Consideration should be made for the inclusion of various types and sources of data. Provide technical parameters such as potential size, housing (e.g. web-based), and access limitations.

**4.3 - COMMUNICATIONS.** Establish a communication plan for Part D Sponsor outreach and education. The plan shall ensure that processes and procedures are in place to notify Plan Sponsors of the RAC's purpose and direction.

**4.4 – APPEALS.** CMS anticipates an appeals process requirement once the Part D RAC is operational. Establish an appeals assistance process for any RAC-identified improper payment that is appealed by the Sponsor, and any subsequent support required by CMS throughout the process, including Federal Court cases.

**4.5 – ANNUAL REPORT.** CMS is required to submit an annual report to Congress on the use of RACs. Develop an approach for providing input to this report.

**4.6 – ADMINISTRATION.** Develop an overall project plan, implementation schedule(s), organizational charts, and monthly reports that account for all work accomplished during the previous month. Monthly reports shall include, at a minimum, vulnerability reports, progress reports and financial reports. The project plan shall include methodologies for responding to CMS requests for input.

3

A32

**5.0  Schedule of Deliverables.** Establish a schedule of deliverables necessary to meet the objectives listed above as well as program initiatives. The deliverables schedule below is provided as a template only and may be revised/tailored to correspond with the performance work statement.

| Deliverable | Schedule |
| --- | --- |
| Kick-Off Meeting | 14 days post contract award date or earlier |
| Base Year Project Plan | 14 days post contract award date |
| Annual Report Input | TBD |
| Implementation Schedule | 14 days post contract award date |
| Organizational Charts | 14 days post contract award date |
| Monthly Vulnerability Report | TBD |
| Monthly Progress Report | TBD |
| Monthly Financial Report | TBD |

## 6.0 Constraints and Assumptions

**6.1    Information Security.** The Part D RAC shall be required to comply with system security guidelines. Information regarding system security requirements is available at the following links:
http://www.cms.gov/manuals/downloads/117_systems_security.pdf
http://www.cms.gov/InformationSecurity/01_Overview.asp#TopOfPage.

The Federal Information Security Management Act of 2002 (P.L. 107-347) (FISMA) requires each agency to develop, document, and implement an agency-wide information security program to safeguard information and information systems that support the operations and assets of the agency, including those provided or managed by another agency, contractor (including subcontractor), or other source on behalf of an agency. That is, agency information security programs apply to all organizations (sources) which possess or use Federal information – or which operate, use, or have access to Federal information systems (whether automated or manual) – on behalf of a Federal agency. This includes services which are either fully or partially provided; including other agency hosted, outsourced, and cloud computing solutions. The Centers for Medicare & Medicaid Services (CMS) and the National Institute of Standards and Technology (NIST) have issued a number of publications that provide guidance in the establishment of minimum security controls for management, operational and technical safeguards needed to protect the confidentiality, integrity and availability of a CMS system and its information.

If the Statement of Objectives (SOO) requires the successful offeror to (1) process, (2) store, (3) facilitate transport of, or (4) host/maintain Federal information; pursuant to Federal, HHS, and CMS Information Security Program Policies the following requirements apply:

4

A33

## INFORMATION SECURITY RESPONSIBILITIES

The Contractor/Subcontractor shall appoint a Systems Security Officer (SSO) as a full-time position to oversee its compliance with the CMS security requirements.

The offeror shall include in the "Information Security" portion of its Technical Proposal the name, title, and professional credentials of its official who shall be responsible for all information security requirements should the offeror be selected for an award. Those responsibilities shall include implementation and oversight of the following:

### 6.1.1   System Security Level

For solicitations requiring the Contractor/Subcontract to (1) process, (2) store, (3) facilitate transport of, or (4) host/maintain Federal information, either at the Contractor/Subcontractor site, or at a Federal hosting facility, the offeror shall develop appropriate security controls for CMS security requirements (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity) in accordance with the below-listed parameters:

    (a)    Information Type (as defined on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).

    (b)    Systems Security Level (Low, Moderate, or High as defined on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).

    (c)    E-Authentication level (Level 1, 2, 3, 4, or N/A as applicable by NIST 800-53 controls IA-2 and IA-8 and as defined on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).

The offeror must coordinate with CMS to develop and/or clarify the above listed criteria within 30 days of contract award or when a major modification has been made to its internal system, as defined by the CMS CISO.

### 6.1.2   Security Services

The Contractor/Subcontractor shall provide security services in support of CMS, which shall include coordination among the CMS CISO, business owners, and other stakeholders. The sites and related infrastructure services shall have policies and procedures and implement controls or plans that fulfill the CMS Information Security Policy requirements, including all applicable CMS standards and procedures. The collection of CMS policies, procedures, standards, and guidelines are located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity.

### 6.1.3   Tracking and Correcting Security Deficiencies

The Contractor/Subcontractor shall track and correct any applicable security deficiencies, conditions, weaknesses, findings, and gaps identified by audits, reviews, Security Assessments, and tests, including those identified in Chief Financial Officer (CFO) Audits, FISMA Audits, Statement on Auditing Standards (SAS) 70 reviews, MMA Section 912 evaluations and tests,

5

Inspector General Audits, A-123 audits. other applicable reviews and audits, and CMS Security Operations Center (SOC) continuous monitoring activities such as, but not limited to, vulnerability and compliance scanning of all the CMS information systems, in a timely manner.

### 6.1.4   Incident Response

A security incident is a violation, or an imminent threat of a violation, of an explicit or implied security policy, acceptable use policies, or standard security practices.  While certain adverse events, (e.g., floods, fires, electrical outages, and excessive heat) can cause system crashes, they are not considered computer-security incidents.  A security incident becomes a breach when the incident involves the suspected or actual loss of personally identifiable information.  CMS information and information system security related incidents should be reported using the Computer Security Incident Report (CSIR) form.  Incidents that concern PII should be reported using the CSIR form set forth in the CMS Incident Handling procedures available at the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity

### 6.1.5   Information Security Awareness Training

CMS policy requires Contractors/Subcontractors receive security training commensurate with their responsibilities for performing work under the terms and conditions of their contractual agreements.

Contractor shall retain the results of security awareness and role-based information security technical training.  CMS requires basic security awareness training for employees and contractors that support the operation of the Contractor/Subcontractor system.  CMS requires information security technical training to information system security roles.  Training shall be consistent with the requirements contained in C.F.R. Part 5 Subpart C (5 C.F.R. 930.301) and conducted at least annually.

### 6.1.6   Privacy Documentation

Contractor shall be responsible for coordinating with the CMS Privacy Office (http://www.cms.gov/PrivacyOffice/) in preparing and maintaining current all documentation including but not limited to System of Records Notification (SORN) and Privacy Impact Assessments (PIA) which directly and indirectly relating to its program(s) designed to ensure the confidentiality, integrity, and availability of Federal Information and Federal Information System, and its assets that enable its possession or control.

### 6.1.7   System Authorization and Assessment

The implementation of a Federal Government IT system requires a formal Government Authorization to Operate (ATO), formerly certification and accreditation, of infrastructure systems and/or all application systems developed. hosted and/or maintained on behalf of CMS. NIST Special Publication 800-37, (hereafter described as NIST 800-37) and CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity) give guidelines for performing the system ATO process.  The system/application must have a valid ATO (conveyed through the CMS CIO

6

authorization decision process) before going into operation and processing CMS information. The failure to obtain and maintain a valid ATO may be grounds for termination of the contract.

1) The Contractor shall comply with Authorization to Operate (ATO) requirements as mandated by Federal laws and policies, including making available any documentation, physical access, and logical access needed to support this requirement. The Level of Effort for the ATO is based on the System's NIST Federal Information Processing Standard (FIPS) Publication 199 categorization and CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity). The contractor shall coordinate with the CMS business owner to create, maintain and update all applicable ATO documentation as defined by CMS Information Security procedures.

2) At the Moderate and High impact levels, all CMS systems and infrastructures must obtain an independent Security Assessment in accordance with CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity). The Contractor shall allow CMS employees (or CMS designated third-party contractors) to conduct Security Assessment activities to include control reviews in accordance with NIST 800-53/NIST 800-53A and CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity). This includes the general support system infrastructure.

3) Identified gaps between required controls and the Contractor's implementation as documented in the Security Assessment report shall be tracked for mitigation in a Plan of Action and Milestones (POA&M) document completed in accordance with CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity). Depending on the severity of the gaps, the Government may require them to be remediated before an Authorization to Operate is issued.

4) The Contractor shall be responsible for mitigating all applicable security risks found during the ATO process and continuous monitoring activities. All high-risk vulnerabilities must be mitigated within 30 days and all moderate risk vulnerabilities must be mitigated within 90 days from the date vulnerabilities are formally identified. The Government will determine the risk rating of vulnerabilities.

### 6.1.8   Continuous Monitoring

CMS has the right to perform manual or automated audits, scans, reviews, or other inspections of the Contractor's/Subcontractor's IT environment being used to provide or facilitate services for CMS in support of the Federal requirements to perform continuous monitoring.

Automated scans can be performed by Government personnel, or agents acting on behalf of the Government, using Government operated equipment, and Government specified tools.

CMS established a centralized Security Operations Center (SOC) to provide a robust enterprise continuous monitoring program to improve situational awareness and provide near real-time risk management. The SOC provides information security oversight and monitoring of security events across all information systems that support the operations and assets of CMS, and will notify the appropriate security operations staff of potentially malicious traffic.

7

In addition to the requirements to meet all of the CMS Information Security requirements documented in the http://www.cms.gov/InformationSecurity Web site, the Contractor/Subcontractor shall work closely with the SOC to undertake security related activities including but not limited to the following:

1) Contractor/Subcontractor shall be responsible for supporting the CMS continuous monitoring program by providing automated data feeds to the SOC as required by the CMS CISO. The SOC will supplement this by conducting independent oversight continuous monitoring activities such as, but not limited to, vulnerability and compliance scanning as well as other network monitoring related activities of all the CMS information systems.
2) Contractor/Subcontractor shall provide updated network architecture, IP address ranges, and security points of contact information for the systems they operate on behalf of CMS to the SOC on a quarterly basis (Jan 1, April 1, July 1, and Oct 1).
3) Contractor/Subcontractor shall maintain and provide changes to the system accounts needed for the SOC credentialed scanning two weeks before the passwords expire or when other changes to the accounts are needed.
4) Contractor/Subcontractor shall provide rack space, cabling, connectivity, and appropriate environmental support for SOC-managed systems/appliances as required by the CMS CISO.

### 6.1.9   Federal Desktop Core Configuration (as applicable)

The Contractor shall certify applications are fully functional and operate correctly as intended on systems using the Federal Desktop Core Configuration (FDCC). This includes Internet Explorer 7 configured to operate on Windows. The standard installation, operation, maintenance, updates, and/or patching of software shall not alter the configuration settings from the approved FDCC configuration. The information technology should also use the Windows Installer Service for installation to the default "program files" directory and should be able to silently install and uninstall. Applications designed for normal end users shall run in the standard user context without elevated system administration privileges. The contractor shall use Security Content Automation Protocol (SCAP) validated tools with FDCC Scanner capability to certify their products operate correctly with FDCC configurations and do not alter FDCC settings. Deviations must be approved by the CMS CISO.

### 6.1.10  Security Planning

**If the Statement of Objectives (SOO) requires the successful offeror to develop, host and/or maintain a Federal information system(s)**, the following requirements apply:

(1)   Draft Information System Security Plan - The offeror shall include a draft System Security Plan (SSP) using the current template available at the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity. The details contained in the offeror's draft SSP shall be commensurate with the size and complexity of the requirements of the SOW based on the System Categorization determined elsewhere in the document.

(2)   Subcontracts: The offeror shall include similar information for any proposed subcontractor that shall perform under the SOW with the offeror whenever the submission of an SSP is required.

8

A37

(3)     Note to Offerer: The resultant contract shall require the draft SSP to be finalized in coordination with the Project Officer no later than 90 calendar days after contract award. Also, a contractor shall be required to update and resubmit its SSP to CMS every three years (at a minimum) following award or when a major modification has been made to its internal system, as defined by the CMS CISO.

## REQUIRED POLICIES AND REGULATIONS

The CMS Information Technology (IT) Security program was developed in accordance with applicable Federal mandates and CMS requirements for the handling and processing of CMS' information and information systems.  The CMS Information Security Web site at http://www.cms.gov/InformationSecurity provides a list of applicable security policies and procedures across the program.  Some applicable references are provided below:

- *CMS Policy for information Security* (As amended) – The high level CMS policy for the CMS Information Security Program.
- *CMS Policy for the Information Security Program (PISP)* (As amended) - Sets the ground rules under which CMS shall operate and safeguard its information and information systems to reduce the risk and minimize the effect of security incidents.  This document will subsequently reference Contractors/Subcontractors applicable CMS security Standards and procedure.
- *CMS Policy for Investment Management and Governance* (As amended) - Establishes the policy for systematic review, selection/reselection, implementation/control, and continual evaluation of IT investments at CMS.

Contractors/Subcontractors are also required to comply with Federal Information Processing Standards (FIPS), the "Special Publications 800 series" guidelines published by NIST and other Government-wide laws and regulations for protection and security of CMS Information and information technology:

- Federal Information Security Management Act (FISMA) of 2002.
- HIPAA, 1996, P.L. 104-191
- Medicare Modernization Act of 2003, P.L. 108-173
- American Recovery and Reinvestment Act of 2009
- Health Information Technology for Economic and Clinical Health (HITECH) Act (part of the American Recovery and Reinvestment Act of 2009)
- Clinger-Cohen Act of 1996 also known as the "Information Technology Management Reform Act of 1996."
- Privacy Act of 1974 (5 U.S.C. § 552a).
- Homeland Security Presidential Directive (HSPD-12), "Policy for a Common Identification Standard for Federal Employees and Contractors" (as amended).
- Office of Management and Budget (OMB) Circular A-130, "Management of Federal Information Resources", and Appendix III, "Security of Federal Automated Information Systems" (as amended).
- OMB Memorandum M-04-04, "E-Authentication Guidance for Federal Agencies."

9

A38

- FIPS PUB 199, "Standards for Security Categorization of Federal Information and Information Systems."
- FIPS PUB 200, "Minimum Security Requirements for Federal Information and Information Systems" (as amended).
- FIPS PUB 140-2, "Security Requirements for Cryptographic Modules"
- NIST Special Publication 800-18 (as amended), "Guide for Developing Security Plans for Federal Information Systems."
- NIST Special Publication 800-30 (as amended), "Risk Management Guide for Information Technology Security Risk Assessment Procedures for Information Technology Systems."
- NIST Special Publication 800-34 (as amended), "Contingency Planning Guide for Information Technology Systems."
- NIST SP 800-37, (as amended), "Guide for the Security Certification and Accreditation of Federal Information Systems."
- NIST Special Publication 800-47 (as amended), "Security Guide for Interconnecting Information Technology Systems."
- NIST Special Publication 800-53 (as amended), "Recommended Security Controls for Federal Information Systems."
- NIST Special Publication 800-53A (as amended), "Guide for Assessing the Security Controls in Federal Information Systems."

Additional CMS documents were used as references in the development of this manual. The CMS Information Security "Virtual Handbook" Web site at http://www.cms.gov/InformationSecurity provides a list of additional applicable documents across the Information Security program.

**6.2    Data Use Agreement.** A data use agreement will be required for the execution of this work.
http://www.cms.gov/PrivProtectedData/01_Overview.asp#TopOfPage

**6.3    Conflict of Interest.  Real, perceived, or potential significant Conflicts of Interests arising as a result of an entity performing as the RAC for Medicare Part D shall be avoided, neutralized or mitigated to prevent an unfair competitive advantage or the existence of conflicting roles that might impair a contractor's objectivity.** Establish a process for ensuring conflicts of interests are avoided, neutralized or mitigated. Additionally the process shall include a methodology for determining if an organizational conflict of interest exists with subcontractors and in subcontracts and for ensuring that the subcontractor has mitigated any conflict or potential conflict prior to the award of any subcontract for furnishing supplies or services under the prime contract.

**6.4    Background Investigation.**   Contractor personnel performing services for CMS under this contract shall be required to undergo a background investigation. CMS will initiate and pay for any required background investigation(s). (See clause included in task order template).

**6.5    Payment Methodology.** Assume payment will be made after validation of recoveries and in accordance with the terms and conditions of the GSA Schedule Contract and RAC Part D Task order.

10

A39

Assume the agreed to contingency fee may be reduced if a recovery is the result of an external referral, e.g. CMS audit findings. Reference Payment Methodology provided in task order template.

A40

# ACLR Technical Proposal

# EXHIBIT 5

Recovery Audit Services In Support of Medicare Part D

Volume I:
Technical Proposal - Original

RFQ #: RFQ532801
REF #: CMS-RFQ-2011-110462

Due Date: December 16, 2010
11:00 AM EST

*Submitted to:*

Centers for Medicare & Medicaid Services
OAGM/Division of Support Contracts
7500 Security Blvd., M/S C2-21-1S
Baltimore, MD 21244-1850

ATTN: Jessica Sanders, Contract Specialist
PHONE: (410) 786-1076

*Submitted by:*

ACLR, LLC
550 Forest Avenue, Suite 15-2
Plymouth, MI 48170
P: 734.207.0404 F: 734.207.0410
E-MAIL: cmucke@aclrsbs.com
www.aclrsbs.com

AUTHORIZED CORPORATE OFFICER

CHRISTOPHER MUCKE, CPA
MANAGING PRINCIPAL

137

A42

A00138

December 14, 2010

Jessica Sanders
Contract Specialist
Centers for Medicare & Medicaid Services
Mail Stop C2-21-1S
7S00 Security Boulevard
Baltimore, MD 21244-18S0

Re:     Volume I - Technical Proposal
        Recovery Audit Services in Support of Medicare Part D
        CMS-RFQ-2011-110462

Dear Ms. Sanders:

Please find enclosed the ACLR Technical Proposal for Recovery Audit Services in Medicare Part D.  ACLR is staffed with highly qualified recovery audit professionals with experience in many types of improper payments and industries, including industry, government, and the Medicare Program Safeguard Contractor program.  We offer a fresh perspective and stringent audit guidelines designed to maximize the identification and recovery of improper payments.

We believe that we offer the Centers for Medicare & Medicaid Services superior recovery audit services at a highly competitive rate.  Numbered copies of our Technical Proposal have been included, as outlined in the Request for Quote, on each of the enclosed CDs.  Each CD was examined for viruses.  AVP Anti-Virus SBS Edition Version 8.5.449 was utilized to check each CD and we certify that they are virus free.

If you have any questions regarding this proposal or our team's capabilities, please contact me at 734-207-0404.  Thank you for your consideration.

Very truly yours,

Christopher A. Mucke, CPA
Managing Principal

A43

# TABLE OF CONTENTS

**PAGE**

VOLUME 1 - TECHNICAL PROPOSAL ................................................................... 1

Chapter 1    Performance Work Statement ........................................................ 1

   1.1    Background & Understanding ................................................................ 1
   1.2    Methodology ...................................................................................... 1
           1.2.1    Focusing Recovery Efforts ................................................ 2
           1.2.2    Targeting Improper Payments ............................................. 13
           1.2.3    DIR Recovery Methodology ............................................... 16
           1.2.4    Oversight Board Interaction ............................................... 17
   1.3    Data Storage Interface........................................................................ 19
   1.4    Communications ................................................................................ 20
   1.5    Appeals ............................................................................................ 22
   1.6    Annual Report ................................................................................... 24
   1.7    Administration .................................................................................. 24
   1.8    Schedule of Deliverables .................................................................... 27
   1.9    Constraints & Assumptions ................................................................ 28

Chapter 2    Past Performance ....................................................................... 29

Chapter 3    Task Order Management/Staffing .................................................. 30

   3.1    Providing Skilled Personnel ................................................................ 30
   3.2    Implementing the Statement of Objectives ............................................. 31
   3.3    Medicare Part D RAC Personnel .......................................................... 32
   3.4    Labor Categories .............................................................................. 32
   3.5    Professional Experience & Qualifications Summary ................................ 34

Attachment A - Corporate Experience
Attachment B - Key Personnel Resumes
Attachment C - Key Personnel Letters of Commitment

## LIST OF EXHIBITS

Exhibit 1-1: Audit Process .................................................................................... 4
Exhibit 1-2: Duplicate Payment Review and Data Work Plan ......................................... 6
Exhibit 1-3: Data Audit ........................................................................................ 7
Exhibit 1-4: Documentation Audit ........................................................................... 10
Exhibit 1-5: Post-Audit ......................................................................................... 12
Exhibit 1-6: Prescription Drug Event Data Elements ..................................................... 14
Exhibit 1-7: Sample Audit Tracking Database ............................................................. 16
Exhibit 1-8: Sample Audit Metrics Reports ................................................................. 19
Exhibit 1-9: Appeals Assistance Process ..................................................................... 23
Exhibit 1-10: Report Types .................................................................................... 26
Exhibit 1-11: Schedule of Deliverables ...................................................................... 27
Exhibit 2-1: Past Performance Evaluations ................................................................. 29
Exhibit 3-1: RAC Medicare Part D Organizational Chart ................................................ 32
Exhibit 3-2: Labor Categories ................................................................................. 33
Exhibit 3-3: Professional Experience & Qualification Summaries ..................................... 34

A45

A00141

## CHAPTER 1 - PERFORMANCE WORK STATEMENT

**1.1   BACKGROUND & UNDERSTANDING:**

Medicare Part D is a federal program designed to provide prescription drug cost assistance for Medicare beneficiaries.  This program is predicated on the use of Plan Sponsors who pay prescription drug costs on behalf of these beneficiaries and who are compensated by Medicare beneficiaries through premiums and by the federal government.  Federal government payments to Plan Sponsors consist of monthly estimated payments and an annual reconciling payment designed to match estimated payments to actual costs.  The annual reconciling payment is based on an offset of estimated payments, and actual plan expenses including drug expenditures and true out of pocket (TrOOP) expenditures of beneficiaries and is net of administration costs and Direct and Indirect remuneration (DIR), which includes any discounts, rebates, and other price concessions that Plan Sponsors may receive from drug manufacturers or other sources.  Federal law requires that all government agencies identify and recover improper payments that may occur whenever federal monies are expended. Ultimately, Medicare Part D improper payments occur when the annual reconciling payment process is not reflective of actual plan expenses.  Ensuring the accurate reflection of actual plan expenses is cumbersome due to the volume of prescriptions processed, currently estimated at 1.2 billion annually, the current lack of access to point-of-sale and other plan data, the number of plans, the complexity of plan changes by beneficiaries, and the lack of complete DIR data, currently not required except on a voluntary basis by Plan Sponsors.

ACLR is experienced at working with similarly complex datasets and devising audit strategies that will maximize the identification and recovery of improper payments in a manner that ensures consistent application amongst all Plan Sponsors and which also supplies The Centers for Medicare and Medicaid Services (CMS) with sufficient information to use in future bid and financial audits to ensure that greater accuracy of plan cost and monthly payment estimation may be achieved.  The ACLR Team's experience in conducting national and individual recovery audits, summarized in Attachment A, has served to assist us in developing an audit program that achieves these goals.  Based on our experience and understanding of these types of audits, the Medicare Part D program, CMS policies and procedures, and the Medicare Program Integrity Manual, we have constructed an audit approach that encompasses each of these elements.  We believe this approach maximizes recoveries while minimizing Plan Sponsor and CMS audit administrative burdens.  It is our practice to work in a cooperative, coordinated, and communicative manner and we believe CMS, Plan Sponsors, and other related stakeholders will benefit from our expertise.  The paragraphs below provide the basis of our proposal.

**1.2   METHODOLOGY**

The Medicare Part D program encompasses 1,500 - 1,900 Plan Sponsors and billions of Prescription Drug Event (PDE) data elements, outlined in Exhibit 1-6; including Plan Sponsor and beneficiary information, prescribed drug related data, out of pocket expenses, and DIR data.

These data elements also contain additional data that serves to quantify and monitor the overall Medicare Part D program as well as provide a mechanism whereby audits to ensure payment veracity may be achieved. The quantity and complexity of these data, the number of stakeholders, as well as the visibility of the Medicare Part D program require the development of a strong overall recovery audit process that encompasses all Plan Sponsors, maximizes the identification and recovery of improper payments, and provides prompt and effective feedback of results to CMS, Plan Sponsors, and other stakeholders. In addition, this process will provide measureable results that demonstrate the efficacy of the recovery audit program and the effect it is having on the mitigation of future improper payments.

### 1.2.1   FOCUSING RECOVERY EFFORTS

ACLR has reviewed numerous reports related to the Medicare Recovery Audit Contractor (RAC) program including, findings resulting from improper payment audits conducted by the General Accounting Office (GAO) and the Office of Inspector General (OIG) on behalf of Medicare, Medicaid, and Medicare Part D as well as the reports resulting from the Comprehensive Error Rate Testing (CERT) program for Medicare and the Payment Error Rate Measurement (PERM) program for Medicaid. We have also reviewed testimony given by CMS and representatives of the RACs to Congress. We conclude that the current economic environment will result in increasing pressure to demonstrate more tangible results. Our analysis is best represented by reviewing the results of the RAC Demonstration Project. This project consisted of a three year review of $317 million in claims occurring in six states. During the review period, RACs recovered $1.03 billion out of an estimated $21 billion in overpayments, when applying CERT calculated improper payment error rates to total claims paid during the period. This represents a success rate of 4.86%. Since the conclusion of the demonstration project, the RAC program has been implemented nationwide. While it is still too early to measure the results of the nationwide program it is apparent that challenges remain, particularly when considering the limitations placed on the amount of documentation that RACs may request from Medicare providers as announced by CMS in response to provider objections to cumbersome documentation requests[1].

The issue faced by CMS is not a new one. For decades, 46 states and the District of Columbia have struggled to increase sales tax compliance by taxpayers. The parallels between claims processing by CMS and sales taxes are nearly exact. Sales taxes are imposed at the point of sale and occur on an item by item basis. Stated differently, taxpayers must make an informed tax decision, based on varying state laws and regulations for every item sold and/or purchased. In other words, state governments are faced with reviewing tens of billions of items sold and purchased each day to ensure proper compliance; a monumental task.

> Experience has shown that recovery audits require an average of 15 minutes per transaction reviewed.

---

[1] Sources derived from numerous CMS announcements such as "*Additional Documentation Limits for FY 2011 for Durable Medical Equipment (DME) Suppliers*", October 20, 2010.

During the recession of the 1980s, individual states looked increasingly to sales tax revenues and increased audits of same.  Their initial audits consisted of detailed reviews of fixed asset purchases and monthly block sample reviews of expense purchases typically numbering in the tens of thousands.  Taxpayers responded, with some success, by implementing stronger internal controls and working with automated systems to mitigate rising liabilities.  In the 1990s, states turned increasingly to statistical sampling methodologies, which significantly reduced the number of transactions reviewed, and the administrative burden of collecting source documentation such as invoices and purchase orders by taxpayers.  When this happened, items sampled were reduced by a factor of ten and audit cycle times by a factor of three.  Finally, in the late 1990s and early 2000s, states and taxpayers began entering into agreements whereby taxpayers reported their taxes on an "effective tax rate" or average basis.  These effective rates are calculated from previous audits and are applied to purchases in prospective periods.  At the end of a pre-defined period, an audit occurs and a tax liability for the period is calculated.  Taxes paid during the period are subtracted from this liability and a reconciling payment, or refund, not unlike the reconciling final payment made in the Medicare Part D program, is made.  Our experience in assisting states and taxpayers in designing and implementing effective recovery audit and improper payment mitigation strategies throughout the evolution of their processes makes us uniquely aware of the problems facing CMS and its efforts to implement similar methodologies.  We anticipate that some of our recommendations, such as those mentioned under *Alternative Methodologies* below, will require numerous discussions and considerable analysis by ACLR, CMS, Plan Sponsors, as well as other stakeholders.  To that end, and by utilizing the best practices developed by the nation's largest and most respected companies and government agencies throughout the country, as well as initiatives employed in the CMS recovery audit program, we believe that our proposed Audit Methodology offers a proven, efficient, and sustainable recovery audit methodology whereby 98% of improper payments occurring within Medicare Part D program may be identified and recovered.

**Audit Methodology:**

As experienced recovery auditors we recognize that there are three objectives we control that will assist CMS in meeting its goals:

1. Identifying & Recovering Improper Payments
2. Reducing Plan Sponsor/CMS Administrative Burden of Recovery Compliance, and
3. Mitigating Future Improper Payments

To meet this first objective, we have designed an audit process that methodically reviews Medicare Part D data from varying and differing perspectives to ensure a thorough review.  To meet this second objective, we place the bulk of the review process upon our audit teams and strive to limit CMS review involvement to providing data (and related procedural approvals) and Plan Sponsor involvement to providing source documentation to carefully selected PDE and

DIR data.  And finally, we take what we have learned from these previous activities and identify specific action plans that may be implemented by Plan Sponsors and CMS to mitigate the recurrence of errors we have identified to meet the third objective.  Due to our familiarity with conducting multiple national recovery audits and the relatively small base of Plan Sponsors, we anticipate conducting audits of all Plan Sponsors through inception of the Medicare Part D program.  While we recognize that the likelihood of meeting the deadline for reopening reconciliation for the initial Medicare Part D Prescription Drug Plan (PDP) period is low, as quantified by the four year limitation provision under 42 CFR Part §423.346, we will make every effort to meet this deadline as well.

This Audit Process is demonstrated in Exhibit 1-1 below:



This process has been designed to ensure a methodical and thorough approach to capturing improper payments while reducing the burden of administering a recovery audit program by CMS and Plan Sponsors.  It has also been designed with the primary objectives of this program in mind; identify and recover improper payments.  At each stage during this process we analyze the data to identify errors.  The first three stages of this process are designed to identify the types of issues causing improper payments that may occur across Plan Sponsor and PDP submissions due to transfers, improper data submissions, and data input errors arising at the point of sale or source documentation level.  The final stage is designed to support the recovery and appeals process, enable us to be more focused in our future audit efforts, and to provide CMS and Plan Sponsors with the information they need to mitigate future improper payments.

In the Duplicate Payment Review & Data Work Plan process, we prepare Information Data Requests (IDRs) and obtain needed data from the Data Storage System, or as may otherwise be required by CMS.  We review this data for completeness, conduct duplicate payment reviews, and assign Plan Sponsors and applicable PDPs to audit team members.  During the Data Audit stage we conduct audits of PDE and available DIR data and prepare Plan Sponsors for documentation audits.  During the third stage of the audit process we conduct a

Documentation Audit. These audits verify the veracity of PDE data submissions and reconcile DIR estimates by reviewing source documentation such as prescriptions and sales invoices to ensure they match the data submitted. During the Post-Audit stage we support recovery and appeal efforts as well as conduct trend analyses to enable us to more effectively target our recovery efforts and identify and propose process improvements and assist us in our outreach and education efforts. Each of these stages is discussed in greater detail below.

We anticipate a significant amount of work upon contract award. In addition to developing and proposing specific Medicare Part D procedures and policies to CMS we will be assigning personnel as well as addressing administrative items such as background checks, obtaining access to systems, as well as meeting CMS personnel. During this implementation phase, discussed in greater detail under *Project Plan* below, we will also be obtaining lists of Plan Sponsor contact information and PDPs, copies of approved plans, and available databases for PDE data element field values, which we will use to verify PDE data submissions to CMS required formats. Once complete, we will analyze this information and incorporated it into our automated review process and prepare for the Duplicate Payment Review and Data Work Plan stage of the Audit Process.

*Duplicate Payment Review and Data Work Plan:* We understand the process of facilitating Medicare Part D beneficiary transfers between plans by the TrOOP Facilitator Contractor and have reviewed the results of the OIG audit on accurate plan transfers. We recognize the concerns with duplicate payments occurring across Plan Sponsor and PDP data submissions. For this reason, we have modified our existing Data Work Plan process to include a duplicate payment review. This has been done

> 0.1% of all payments are duplicates as estimated by The International Accounts Payable Professionals and The Institute of Management & Administration

so that we can review payments across Plan Sponsor and PDP lines prior to segregating data submissions by Plan Sponsor and PDP for audit. The Duplicate Payment Review and Data Work Plan is the first step in building a strong foundation for our later recovery efforts. During this process we obtain as much information about individual PDPs and related PDE data as possible. This will be a recurring process throughout the duration of the contract. However, as several years have passed since the inception of Medicare Part D, we anticipate obtaining copious amounts of data early in the beginning of the project.

The work we conduct during this stage of the Audit Process is summarized in Exhibit 1-2:

| Exhibit 1-2 Duplicate Payment Review & Data Work Plan | | |
|---|---|---|
| Prepare and provide PDE & DIR data requests (or obtain through DSS) | Review data for completeness and resolve issues. | Generate duplicate payments and forward to assigned Audit Teams. |
| Prepare & provide plan enrollment and payment data requests | Conduct duplicate payment audits across Plan Sponsor PDE | Generate Plan Sponsor data populations and provide to assigned Audit Teams. |
| Store original data in secure location and generate copies. | Assign Plan Sponsors to Audit Teams | |

While we anticipate CMS revisions to our process, we typically prepare IDRs, which are standardized forms outlining requested data as well as the desired format(s) for information we need to conduct our recovery audit efforts. The information requested will consist of contact information for all program stakeholders and holders of data. We will also request available information from the DSS and prepare IDRs for all other available PDE, DIR, and approved plans. Upon receipt of electronically transmitted data, we will store in a secure location and make copies of the original data. Typically, our experience is that the initial data we receive are incomplete so we review the data for completeness and make additional requests as necessary. Once we have received a complete set of data, we will conduct duplicate payment reviews. The primary focus of these reviews will be to identify duplicate payments across Plan Sponsors and PDPs. From these reviews, we will segregate and generate reports of these errors. Once complete, data populations will be separated by Plan Sponsor and PDP and entered into the Audit Tracking Database for further review. During this process, we will also assign Plan Sponsors and PDPs to individual audit teams. Each team will be made up of an Audit Team Leader and Audit Support personnel. We anticipate that audit support personnel will consist of experienced Medicare Part D professionals and recovery auditors, data mining analysts, and the Lead Statistician. We currently anticipate that audit teams will be formed by region and that 15 - 20 teams will be required for full program implementation. Once formed, these audit teams will receive PDP, PDE and available DIR data as well as the results of the initial duplicate payment reviews for their assigned Plan Sponsors and their audits will commence.

*Data Audit:* Upon commencement of this process, an Audit Notification Letter will be prepared by the Audit Team Manager and forwarded to the Plan Sponsor. This letter will outline the recovery audit process and expectations and provide contact information for assigned team members. The Audit Team will also review the Data Storage System to ensure that there is no duplication of effort with other Medicare audit contractors or law enforcement. Once complete, an Audit File will be opened and entered into the Audit Tracking Database, which will be discussed in greater detail below. The Audit File is a secured, standardized, hard document file that contains ACLR, Plan Sponsor, and related CMS communications for each audit and includes such information as contact lists, the

A00147

Audit Notification Letter, sampling methodologies employed, PDE data, and workpaper documents discussed in greater detail below. The Audit Tracking Database is a key data processing location used to track audit metrics and auditor findings also discussed in greater detail below. Once complete, auditors will review available information for their assigned Plan Sponsors. This will consist of reviews of desk audit findings, approved plans, and other related documentation such as GAO, OIG and other similar reports. These reviews will be conducted to familiarize each auditor with the specifics of individual PDPs and to prioritize issues to be reviewed in the audit that may arise from reviews conducted by other Medicare Part D program stakeholders. Due to the varying terms and conditions of approved plans, ACLR audit team members will review individual plans to familiarize themselves with plan characteristics for such items as plan formularies and estimated DIR amounts.

During this process, ACLR audit teams will conduct exhaustive analysis of PDE data submissions to identify anomalies. This process is designed to verify the veracity of PDE data submissions and to ensure that PDE data submissions comply with CMS requirements and approved plans and is outlined in Exhibit A-3 below.

| Exhibit 1-3 Data Audit | | |
|---|---|---|
| Notify Plan Sponsor of Audit | Conduct Data Audit of PDE Data & DIR | Prepare audit package and schedule Documentation Audit Conference. |
| Create an Open Audit File & enter into the Audit Tracking Database | Generate Improper Payment Reports, Provide to Plan Sponsor & CMS. Select Plan Sponsor for Documentation Audit. | Outline audit expectations and negotiate parameters with Plan Sponsor. |
| Review Approved Plan(s), PDE Data, & Quarterly DIR Submissions | Discuss Findings with CMS & Reopen Reconciliation as Required | Complete MOU and provide to Plan Sponsors. |

ACLR audit teams will utilize our data analysis tools to validate and match individual PDE data fields against CMS defined field values to identify anomalies and generate initial workpapers, or schedules containing listings of all improper payments that can be provided to Plan Sponsors for resolution. For example, auditors will match Product/Service Identifier codes against National Drug Code (NDC) databases to ensure they were submitted in the proper NDC11 format. During this process, ACLR auditors will also identify potential improper payments arising from matching PDE data submissions to plan requirements, inconsistencies in drug PDE submissions, and duplicate payments. These auditors will ensure that CMS or plan formulary excluded drugs were properly excluded, that beneficiary TrOOP expenses were accurately calculated according to CMS and plan requirements, and

that the PDE data submissions do not include allowable costs for drugs not listed on the plan formulary, foreign sourced drugs, over the counter drugs, or similar items.

ACLR auditors will also ensure that beneficiary payments are commensurate with plan requirements and have been properly netted against Plan Sponsor costs, identify duplicate capitation payments and beneficiary and prescription data occurring within and across Plan Sponsor PDE submissions and capitation payments.  Once this stage has been completed, listings of these payments will be documented on the workpapers and provided to Plan Sponsors for review.  Any remaining unresolved amounts will be identified as improper, recovered, and removed from further review.

As the Medicare Part D program has only been recently implemented and this will be the first recovery audit program enacted, we anticipate that significant amounts of improper payments will be generated during this review.  As such, we anticipate that resolving these scheduled improper payments will be burdensome for many Plan Sponsors to resolve.  Their inexperience with improper payment audits under the Medicare Part D program coupled with the likelihood that internal control procedures and audit protocols have yet to be devised lead us to believe that typical industry error rate averages of 2% - 3% will exceed

> "An improper payment is any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements. Incorrect amounts are overpayments and underpayments... An improper payment includes any payment that was made to an ineligible recipient or for an ineligible service, duplicate payments, payments for services not received, and payments that are for the incorrect amount.  In addition, when an agency's review is unable to discern whether a payment was proper as a result of insufficient or lack of documentation, this payment must also be considered an error." *OMB Circular A-123, Appendix C.*

5% - 7%.  We also anticipate that our findings will establish good cause sufficient to warrant reopening reconciliation as required under - 42 CFR Part §423.346.  Once the Data Audit has been complete we will discuss our findings with CMS.  It has been our experience that data submission errors are indicative of poorly constructed internal control processes.  While we anticipate performing a Documentation Audit on all Plan Sponsors, we will utilize these initial reports to identify those Plan Sponsors with the most egregious errors and recommend them, and solicit CMS' approval for, conducting documentation audits.

Once the Plan Sponsor has been approved for a Documentation Audit, the Audit Team Leader will prepare an audit package and forward to the Plan Sponsor.  The audit package will describe the purpose of the audit, an explanation of the audit scope and methodologies, audit expectations and documents to be reviewed.   The package will also contain a request for a Pre-Audit Conference with the Plan Sponsor, which will also be scheduled.

During the Pre-Audit Conference, the Audit Team Leader will discuss the Documentation Audit process and outline audit expectations. The focus of this review will be to audit source documentation and compare it to Plan Sponsor data submissions. Our recommended course of action to accomplish this is to statistically sample individual Plan Sponsor or PDP PDE data. We recognize that CMS is familiar with these processes from our experience with the Medicare PSC program and anticipate that CMS will want to discuss and approve this methodology. If approved, we will negotiate the details of our sampling methodology with the Plan Sponsor. While we anticipate resistance to this approach from some Plan Sponsors it is likely that many, if not all, of them will have undergone similar audits of

> **Best Practice**
>
> Experience has shown that negotiating audit parameters on such matters as sampling methodologies, sample sizes, and acceptable documentation significantly reduces appeals.

their accounts payable data for sales and use tax audits as outlined above. In such cases we will point out the consequences of having to locate and generate sufficient source documentation to comply with our request if 100% of all the documents were to be audited. It has been our experience that most companies prefer sampling methodologies as they save time and generate accurate and measurable results. ACLR auditors have considerable experience in designing sampling methodologies and generating statistical samples and each negotiation will ensure that generally accepted sampling principles, CMS, and OMB regulations are met. To ensure mutual understanding and mitigate future appeals, we will negotiate all sampling methodologies in good faith and will carefully educate Plan Sponsors as to the statistical sampling process so that they may make informed decisions. These discussions will include such topics as sample sizes and their effect on extrapolated results and audit efficiencies versus accuracy. These discussions will also include the source documentation, such as point of sale, TrOOP, and accounting data that are needed to validate PDE submissions. Once the Pre-Audit Conference is complete, the assigned auditor will complete a Memorandum of Understanding (MOU) to document the audit scope, sampling methodology, and documentation requirements, and the field audit commencement date, and provide to applicable Plan Sponsors. The MOU will also consist of the anticipated timing of each event and include a specific date for the field audit to begin. Once complete, the Documentation Audit will commence.

As outlined under our Project Plan and Deliverables Schedule in greater detail below, we anticipate generating improper payment workpapers within one month of data receipt. However, due to implementation issues that may arise and problems experienced by Recovery Audit Contractors (RACs) and Program Safeguard Contractors (PSCs) in the Medicare program as well as complaints by Medicare Providers regarding documentation requests, we anticipate discussing our results with CMS prior to taking any action with Plan Sponsors. We anticipate that this process will be finalized within 3 - 6 months of contract award.

*Documentation Audit:* During the Documentation Audit stage, ACLR auditors will review source documentation for PDE and DIR data as shown in Exhibit A-4.

| Exhibit 1-4 Documentation Audit | | |
|---|---|---|
| Generate sample and IDRs based on MOU | Audit point-of-sale, plan data, and other source documentation to verify veracity of PDE data. | Generate Improper Payment Reports & Provide to Plan Sponsor & CMS |
| Obtain requested data from Plan Sponsors | Reconcile DIR submissions to actual data. | Exit Conference & Generate Report of Findings |

The Documentation Audit process consists of all of the activities necessary to ensure that data submitted by Plan Sponsors to CMS is accurate. Due to the nature of the Medicare Part D program and its use of capitation payments derived from actual plan costs, considerable attention will be paid to the review of source documentation and actual cost data. As such, ACLR auditors will review Plan Sponsor ledger and source documentation to support PDE submissions and DIR estimates as well as review other plan requirements. All information related to Plan Sponsor audits will be maintained in an Audit Tracking Database. During the Data Audit process, the Audit Team and Plan Sponsor negotiated the sampling methodologies to be employed for our review of PDE data source documentation. As discussed above, upon CMS approval of this approach, the Lead Statistician will be responsible for documenting the methodology employed and generating the sample for each Plan Sponsor or Plan Sponsor PDP. Each sample will be drawn in accordance with the sampling principles as outlined in the Medicare Program Integrity Manual. Once sample PDE items have been generated they will be incorporated into IDRs and provided to Plan Sponsors so that the source documentation may be obtained. Once obtained, ACLR auditors will review source documentation to verify that it matches PDE submissions.

---

**Best Practice**

Providing Plan Sponsor representatives with feedback throughout the field audit process provides opportunities for immediate resolution of questioned items and the elimination, additional review time for Plan Sponsors to resolve the discrepancy, and the mitigation of subsequent appeal efforts.

---

Source documentation will consist of such items necessary to validate cardholder information to verify Medicare and timely plan enrollment; prescriptions necessary to ensure the accuracy of drug information provided as well as determining whether the proper substitution of generic brands and the inclusion of reported drugs in plan formularies; and verifying such items as the calculation of TrOOP expenses and the proper representation of 3rd party payments. During this process, auditors will provide Plan Sponsors with identified improper payments so that they may attempt to gain additional information to resolve the error. For example, PDE submission errors may have been identified and reversed in subsequent

submissions or Plan Sponsors may be provided the opportunity to replace illegible documents with legible ones. Once every effort has been made to resolve questioned items by the Audit Team, the Plan Sponsor will be provided with workpapers that document improper payments so that they may attempt to resolve remaining questions. During this process, ACLR auditors will also request and review Plan Sponsor ledger information. These reviews will be focused on reviewing PDE data submissions for completeness and accuracy. Any unreasonable variances between estimated and actual amounts will be provided to Plan Sponsors for resolution. As noted under our DIR Recovery Methodology below, we will also audit DIR data and unexplained variances will be documented on the workpapers. Once these reviews have been completed, a finalized set of audit workpapers detailing all improper payments will be provided to the Plan Sponsor at the Exit Conference. We will also present the results of our audit findings and discuss with the Plan Sponsor. This discussion will take place in the context of provider education and outreach and, to the extent possible, include recommended corrective action plans. It has been our experience that the Exit Conference also quantifies acceptable and disputed findings as well as negotiations regarding same. In each case we will discuss with and utilize our expertise and the experience gained during the audit to make recommendations to CMS to resolve disputes.

ACLR recognizes that the ultimate goal of the recovery audit process is to mitigate future improper payments. To that end we will make every effort to provide CMS, Plan Sponsors, and other program stakeholders with the information necessary to accomplish this mitigation. At the conclusion of each audit, the ACLR Audit Team will summarize issues related to the audit. These issues will include such items as synopses of the problems encountered during the audit and recommended courses of action for the Plan Sponsor. As an addendum to this report and provided only to CMS, we will also include a summary of specific audit metrics. Audit Metrics will consist of audit cycle times, defined as the period between Audit Notification and the issuance of the Audit Report; listings of improper payment types and attendant liabilities; as well as other CMS related items such as issues related to reporting infrastructures. These reports will serve as the foundation of our monthly reporting and inputs to the annual report. As will be discussed in greater detail under the Communication Plan section below, Audit Team members will also document best practices/lessons learned developed as a result of each audit to ensure that identified efficiencies have been implemented and to ensure that mistakes are not repeated. These best practices will be shared with other ACLR Team members and reported to the Oversight Board in the monthly, quarterly, and annual reports as discussed or upon CMS request.

*Post-Audit:*

As detailed below in Exhibit 1-5, the Post-Audit process consists of securing audit results and supporting recovery and appeal efforts.

| Exhibit 1-5 Post-Audit | | |
|---|---|---|
| Archive Audit Documentation | Support Recovery Efforts | Support Appeal Efforts |

Once Plan Sponsor PDP audits have been completed, all final documentation including the Report of Findings and Audit Report will be entered into the Audit File and the Audit Tracking Database will mark the audit as closed. The Audit Team Leader is responsible for completing this task. We recognize the importance of maintaining secure archived information. The Audit Team Leader is responsible for ensuring that the audit file is properly completed and, according to protocols laid out by the System Security Officer (SSO), secured, as well as ensuring that the Audit Tracking Database has been populated.

At the Exit Conference, Plan Sponsors will receive a final assessment, which details the totals of all improper payments remaining as unresolved on the audit workpapers, and can anticipate that net overpayments will be recovered via check, payment offsets to monthly payments, or during the final determination process in accordance with the Medicare Integrity Program or as otherwise required by CMS. We will also assist in the Appeals Process as necessary. ACLR auditors will treat Plan Sponsors fairly and equitably and make every effort to document adverse audit findings in a clear, concise, and indisputable manner. Fortunately, we do not anticipate many appeals. Unlike the national Medicare recovery audit process, Medicare Part D recovery audits will not consist of medical necessity determinations. While drug abuse patterns and trends analysis will be conducted, the vast majority of the Medicare Part D process will be to verify PDE submissions and DIR assertions against source documentation and accounting data. Even issues related to plan interpretations are likely to be much more straightforward than that regarding determinations of medical necessity. We do anticipate; however, that many disputes that arise will be outside the realm of our control. In such a case, we will discuss the parameters of the dispute, the reasons for our findings, and our recommendations with CMS to identify possible solutions. As will be discussed in greater detail under the *Appeals* section below, we understand the necessity of fully documenting all adverse audit findings as well as the audit and sampling methodologies employed. All improper payment determinations made by the audit team will be documented in the Audit Tracking Database. In addition, we maintain detailed audit files for each Plan Sponsor. These audit files contain the sampling methodologies and protocols employed to select the Plan Sponsor and conduct the audit as well as detailed communications between audit team members and Plan Sponsors. Finally, the audit tracking database and audit files will contain records quantifying efforts undertaken by the team to resolve the improper payment as well as an analysis of each payment's determination as improper. This information will be made available to CMS at all times and to administrative law judges or in court as required. In addition, ACLR audit professionals are experienced at providing testimony and litigation support and have

successfully defended our findings in protests and appeals to Administrative Law Judges and in courts throughout the country and are prepared to assist CMS upon request.

Upon contract award we will standardize all CMS approved activities and the administration of our processes in accordance with CMS guidance and policies and modify them as requested.

***Alternative Methodologies:***

During the course of our work, we anticipate that alternative audit methodologies, which will enhance recoveries and efficiencies, will present themselves. The small Plan Sponsor base and the relative ease of these audits suggest several possibilities. Some of these possibilities have proven effective in state sales and use tax audits and have application in the Medicare Part D recovery audit program. These possibilities include managed audit processes where Plan Sponsors are provided samples generated from their respective PDE data submissions and they conduct their audits. These types of audits permit companies the opportunity to complete audits without the "intrusive" element of a RAC audit. Another possibility is a modified voluntary disclosure program similar to tax amnesties offered by state taxing jurisdictions throughout the country. This type of initiative could be offered to Plan Sponsors under controlled conditions and could possibly significantly increase recoveries and reduce recovery cycle times. If a common ground may be identified and appropriate incentives offered, these as well as other audit methodologies may prove very effective. We will make every effort to document these opportunities and offer alternative solutions whenever opportunities such as these present themselves.

### 1.2.2   TARGETING IMPROPER PAYMENTS

As identified under Methodology above, we conduct numerous analyses of the data to identify and target improper payments. The first, conducted upon data receipt, is a review to identify potential duplicate payments that may arise across Plan Sponsors and PDPs. The second review is a Data Audit that validates the accuracy of PDE submissions to required field values and pre-defined edit checks. The Documentation Audit consists of a source documentation audit that matches point of sale, TrOOP expenses, and other plan data to PDE and DIR submissions. Our most important assets in identifying improper payments are our audit team members. These personnel are highly trained in recovery audits and skilled at identifying anomalies and they undergo and provide numerous training sessions to ensure they remain at the height of their profession. Assisting them in these processes are several proprietary data analysis and tracking tools developed through years of recovery audit experience. We also utilize several canned off the shelf software applications that contain modifications/macros that enable us to complete are tasks more accurately and efficiently.

As shown in Exhibit 1-6 below, PDE data elements consist of:

| Exhibit 1-6 Prescription Drug Event Data Elements | | | |
|---|---|---|---|
| Contract Number | Service Provider ID | Dispensing Status | GDCA |
| PBP Identifier | Prescriber ID Qualifier | Drug Coverage Status Code | Patient Pay Amount |
| Claim Control Number | Prescriber ID | Adjustment/Deletion Code | Other TrOOP Amount |
| HICN | Prescription/Service  # | Non-Standard Format Code | LICS Subsidy Amount |
| Cardholder Identifier | Product/Service ID | Pricing Exception Code | PLPRO |
| Patient DOB | Compound Code | Catastrophic Coverage Code | CPP Amount |
| Patient Gender | Product Selection Code | Ingredient Cost Paid | NPP Amounts |
| Date of Service | Quantity Dispensed | Dispensing Fee Paid | |
| Paid Date | Days Supply | Total Amount Attributed to | |
| Service Provider ID Qualifier | Fill Number | GDCB | |

We use a variety of techniques and tools to analyze these types of data.  Each of these tools is capable of performing analyses enabling ACLR Audit Team members and data analysts to identify anomalies, analyze trends, and to sort and manipulate the data as required during the auditors review.  Over time, as we gain a greater understanding of recurring and changing data anomalies, each of these tools is capable of being adapted and modified over time to streamline processes and maximize recoveries.

*Statistical Sampling:*  Plan Sponsor PDE data for any given year can exceed one million records.  While our automated systems can manipulate all of this data to identify improperly submitted records and conduct a myriad of edit checks that can compare approved plan requirements to the data submissions so that improper payments may be identified, the reviews are limited.  The technology necessary to review source documentation, such as individual prescriptions and other point of sale documentation does not exist.  As such; a detailed review is required to identify the existence of improper payments arising from invalid PDE data entries at the source or point of sale level; a highly inefficient and costly task.  To address this issue, we employ statistical sampling methodologies to select representative samples of PDE data.  These samples represent a much smaller subset of the entire population but which may be reviewed on a much more efficient basis.  Plan Sponsors obtain source documentation from these sampled items, which are then reviewed by our audit teams to ensure they match the PDE submissions.  Any errors are extrapolated, or projected, across the population and an estimated improper payment liability is calculated.  This process significantly reduces the amount of time Plan Sponsor personnel must expend obtaining documentation for audit while providing an accurate estimate of liability.  It also enables our audit teams to efficiently review audit records and to accurately quantify amounts owing by individual Plan Sponsors.  In short, this enables CMS to obtain a reasonable assurance that, within acceptable tolerances, all improper payments have been identified and recovered.

*Audits:* As detailed under *Methodology* above, we use the duplicate payment reviews and data and documentation audits to identify and recover improper payments. While important, errors serve other purposes as well. Namely, these errors assist us in identifying internal control issues that we can use to provide Plan Sponsor outreach and education. It has been our experience that many errors occur as the result of improper training or weak, and easily remedied, internal control processes. This can occur anywhere in Plan Sponsor processes. By identifying specific errors and the recurrence of those errors we can more effectively pinpoint internal control process deficiencies enabling Plan Sponsors to more effectively target problem areas. These errors also serve to make recovery audits more efficient and accurate. By identifying recurring issues experienced by Plan Sponsors and PDPs, our audit teams can more accurately focus their efforts on payment areas more likely to be improper. It is in this same area that we conduct trend analyses. While our audit teams gain experience in identifying specific problem areas, trend analysis utilizes mathematical probabilities and scoring models to identify payment errors that may otherwise be missed, even to the trained observer.

*Trend Analysis:* Our trends analyses expertise is the most important tool in our arsenal for more specifically targeting improper payments and providing CMS with the capability to stop likely errors before they occur. During this analysis we identify specific characteristics about the improper payments identified through the course of our audits. From this, we develop a scoring system whereby payments more likely to be improper are scored high while those that are less likely to be improper receive lower scores. We then apply these scores to incoming data to target those records more likely to be in error. This capability enables us to provide more timely feedback to Plan Sponsors on the efficacy of their data submission improvements as well as to provide CMS with the capability to stop improper payments before they occur.

*Audit Tracking Database:* The Audit Tracking Database is a proprietary database developed by ACLR auditors to track all information related to their audits and improper payments. The database tracks all data sources and data collection methodologies and ensures that audit trails are maintained. This database also contains improper payments and related auditor conclusions about their disposition as well as imaged documents supporting their findings. The importance of this tool is that we can run reports on a variety of data which assists us in our trend analysis and which can be disseminated to the audit teams so that their efforts are more focused. Over time and upon CMS approval, we anticipate making the Audit Tracking Database available via the web for use by CMS so that they monitor our activities and generate reports at will. It is also possible that the Audit Tracking Database may also be utilized by Plan Sponsors to monitor the results of their audits as well provide requested documentation. An example of this database is provided as Exhibit 1-7 below:



Exhibit 1-7 Sample Audit Tracking Database

Our personnel and the data analysis tools we employ enable us to efficiently and effectively perform complex in-depth analyses for large datasets to identify payment anomalies and trends.

### 1.2.3 DIR RECOVERY METHODOLOGY:

ACLR recognizes that a key concern in the determination of payment accuracy for payments made under the Medicare Part D program is ensuring that estimated DIR costs match actual amounts. This is a real concern as the timing of the annual reconciliation process occurs when the books and records of Plan Sponsors have yet to be finalized; Plan Sponsors may not even know total actual amounts. As there has been no subsequent requirement to submit these amounts, Plan Sponsors have likely not engaged in reconciling any variances. As estimates are likely derived from previous periods, errors are compounded over time. To address these issues, we will audit actual Plan Sponsor DIR amounts and document errors as they are identified.

Initially, we will review submissions from Plan Sponsors that voluntarily submit total annual DIR amounts received. We have noted that CMS utilizes total drug costs in flagging questionable DIR submissions. We will engage in these evaluations and review financial statement filings of these Plan Sponsors for comparison purposes and to identify anomalies. As noted in our Audit Methodology above, we anticipate conducting DIR audits during the Data Audit and Documentation Audit processes. During these efforts, we will review monthly DIR submissions and compare them across periods as well as across Plan Sponsors and Plan Sponsor PDPs. We will use these reviews to identify outliers and to focus our efforts. We will also request and review source documentation such as worksheets, budgets, accounts, and other accounting

data to understand how Plan Sponsors estimated DIR amounts and the assumptions made during the estimation process. We will carefully monitor and note all objections to these reviews and discuss with CMS to identify possible courses of action. We will also request and review source documentation related to the calculation of actual amounts. These requests will consist of ledger, journal entry, and other relevant accounting documentation so that DIR submissions may be verified for accuracy and completeness against the Plan Sponsor's own books and records. To the extent possible, we will also seek alternative information from Pharmacy Benefit Managers and manufacturers. Once we have obtained this information, ACLR auditors will reconcile actual DIR amounts against estimated amounts and provide identified discrepancies to the Plan Sponsor for review and explanation. Any amounts unresolved after this process will be scheduled on the audit workpapers and provided to the Plan Sponsor and CMS for review and unresolved amounts will be recovered from Plan Sponsors. As we continue to audit this data, gather new information, and obtain additional knowledge from Plan Sponsor practices, we anticipate modifying and improving our processes to supply CMS with targeted and timely data so that Plan Sponsor negotiations of future PDPs may be more accurate.

### 1.2.4   OVERSIGHT BOARD INTERACTION

We recognize the importance of communications and our goal is to develop a mutual and rewarding relationship that achieves CMS objectives. We understand the increasing scrutiny placed on improper payments and the need for CMS to stay informed on all current activities and events occurring within the Medicare Part D Recovery Audit Program. Our goal is to ensure that CMS is provided with the information it needs to make business decisions in a timely and efficient manner.

Once developed, ACLR will obtain contact information for all Oversight Board members (Board). The Project Director will serve as the primary point of contact for the Board and the Audit Director will be assigned as an alternative contact. All ACLR Team members will be available to address any questions or issues for the Board and updated contact lists will be provided to the Board. It is our intention that ACLR Medicare Part D recovery audit operations remain open and transparent and all ACLR personnel will comport themselves accordingly.

Once established, we will schedule a meeting with the Board. The primary purpose of this meeting will be to establish relations and obtain a greater understanding of Board needs and desires. To accomplish this, ACLR will develop an agenda that outlines our company, introduces the project and audit directors, and which provides a synopsis of our recovery audit philosophy, methodologies, and approach to future improper payment mitigation. This agenda will also address obtaining Board expectations regarding future meetings, outlining status report topics, audit metrics, and concomitant delivery schedules. Ultimately, we intend this meeting to establish the foundation for future Board interactions.

We anticipate that the Board will want to meet regularly to discuss recovery audit activities. To that end, we will schedule monthly conference calls. Schedules permitting, these conference calls will be attended by all ACLR Key Personnel as required by CMS. The Project Director will develop an agenda for these calls as required by CMS prior to the call and provide to all participants. This agenda will be based on a standard format as developed from the initial meeting and subsequently adjusted. During the call and throughout the month, the Project Director will add agenda items and discussion topics as obtained from Board members. We will schedule meetings at the end of each quarter and the end of the year. To the extent possible, we anticipate that these meetings will be conducted at a CMS designated location and will be attended by the Board and the ACLR project and audit directors. Similar to the monthly conference call, a meeting agenda will be forwarded to all participants no later than 3 days prior to the quarterly meetings and one week before the annual meeting. At any time during the course of this project, ACLR will make the Board and CMS immediately aware of any issues requiring urgent action.

> **BOARD INTERACTION SUMMARY**
> - Participate in Monthly Conference Calls
> - Attend Quarterly & Annual Meetings
> - Provide Monthly, Quarterly, & Annual Status Reports
> - Provide Audit Metrics

We will provide the Board with monthly and quarterly status reports. These reports can be separate or inclusive of the Monthly Progress Reports as required. These status reports will highlight issues we have encountered throughout the month and topics may range from data availability and systems interface issues to infrastructure concerns. We anticipate providing feedback regarding Plan Sponsor outreach and education efforts conducted during the month as well as sharing Plan Sponsor concerns related to the Medicare Part D program. Additionally, the Board will be provided with the results of our recovery efforts including worksheets and graphs listing improper payments by type and amounts. We also anticipate that our processes will evolve over time and as needs become apparent, we will inform the Board of our concerns and recommendations and request approval for implementation. We will also submit any referrals of potential fraud and abuse we identify during the course of our recovery efforts. In addition to these status reports we will also supply the Board with quarterly reports on audit metrics. These metrics are essential because they give tangible, measureable feedback regarding our recovery efforts. Among the items reported include audit cycle times. This metric is defined as the period between the issuance of the Notification of Audit through the issuance of the Audit Report and demonstrated efficiencies gained in the auditing process over time. Audit metric reports will also document average recoveries per audit and time period; initial improper payments identified versus approved improper payments; list the number of Plan Sponsors currently being audited; and will include any other measureable information desired by the Board and captured in our Audit Tracking Database. A sample of information provided on the Audit Metric Report is shown in Exhibit 1-8.

**Exhibit 1-8 Sample Audit Metrics Report**

| Types of Errors | Recoveries | % |
|---|---|---|
| Data Submission Errors | 44,047,500 | 25.17% |
| Missing Items | 5,600,000 | 3.20% |
| Excluded Drugs | 9,187,500 | 5.25% |
| DIR Submission Errors | 36,715,000 | 20.98% |
| Documentation Support Errors | 78,750,000 | 45.00% |
| Fraud & Abuse | 700,000 | 0.40% |
| Medicare Part D | 175,000,000 | 100.00% |



| Measurable | 2011 | 2012 |
|---|---|---|
| Audit Cycle Times (Months) | 8 | 5 |
| Number of IP Determinations: | | |
|    Overpayments | 187,500,000 | 234,375,000 |
|    Underpayments | 12,500,000 | 15,625,000 |
|    Totals | 200,000,000 | 250,000,000 |
| Appeals | | |
|    Number of Appeals | 1,973 | 1,428 |
|    Resolved in Plan Sponsor Favor | 110 | 30 |
|    Percentage in Plan Sponsor Favor | 5.60% | 2.10% |

At the end of each annual reporting period, ACLR will provide an annual report of our activities. This report will consolidate the issues and audit metrics reported throughout the year and will serve as the foundation for our input to the CMS' annual report submission to Congress.

## 1.3   DATA STORAGE INTERFACE

ACLR is experienced in the handling of medical data and maintains HIPAA compliance and maintains adequate safeguards that protect this information.  ACLR utilizes routers and firewalls configured for data transmission security, VPN, traffic management functionality, denial of service, and distributed denial of service protection and our security systems conform to Level 3 e-Authentication requirements.  To the extent necessary, ACLR will extend its infrastructure and telecommunications security controls to the level necessary as requested by CMS or identified by the SSO.

> ACLR security systems conform to Level 3 e-Authentication requirements.

Upon contract award, the ACLR SSO will work with CMS technical personnel to discuss the Data Storage System (DSS) as well as access and encryption requirements, transmission rates, peak operating times, as well as numerous other system protocols necessary for ACLR to retrieve and transmit data in an effective and efficient manner.  While we will adopt a methodology more suitable for CMS, we will likely host PDE and similar data on a dedicated server.  This process will provide us with an additional layer of security.  As the data files we will be working with are large, this process will also allow us greater speed enhancing our efficiencies.  The SSO will also

discuss preferred data transfer methodologies with CMS technical staff. Currently, ACLR utilizes PHP to transmit secure data. While this has the capability of encrypting data before it is sent, we can modify our processes to match CMS security requirements as identified by our SSO. As noted in the Statement of Objectives, the DSS is to be established to ensure that the "RAC and entities, such as, Medicare audit contractors or law enforcement, are not simultaneously working on the same payment data". To the extent that non-sensitive data fields, such as randomly assigned reference numbers, are utilized to identify claim data and as the DSS is likely secured, we believe that we may obtain and transmit the assigned reference numbers and action specific identifiers with minimal effort. In the event that CMS anticipates that PDE data submissions will be transmitted through the DSS or that claim specific information such as auditor notes or imaged documents are necessary, then additional efforts will be required. If we are transmitting standard PDE data elements and attendant action identifiers, we anticipate that ACLR will transfer approximately 1 to 2 GB per day. If imaged documents are to be transmitted, we anticipate that data will be transferred at a rate of 40 - 60 GB per day. In such a case, the SSO will discuss storage and bandwidth requirements with CMS technical personnel and we will modify our systems accordingly.

Once identified, the SSO will determine, propose, and upon approval from CMS, will implement data transmission protocols to ensure data are securely and properly transmitted and the Master Table is updated according to the action specific identifiers as determined by CMS.

**1.4    COMMUNICATIONS:**

ACLR recognizes that communication is the key to the successful implementation of any project. Considering the infancy of the Medicare Part D program, lack of mature auditable data processes, and the predicted impact of financial recovery efforts on sponsors; the importance of proactive communications with Plan Sponsors will be ACLR's goal from the start. Medicare Part D RAC purpose and direction to feedback and training to improve the overall effectiveness of data veracity to governing directives will be the focus of our relationship with all stakeholders.

*Initial Introduction:* During the implementation phase of this project, ACLR will design an introduction brochure detailing the Part D RAC project purpose and direction and provide to all program sponsors as approved by CMS. This brochure will include ACLR contact information, program purpose and direction for each phase of the project, communication process maps for direct Plan Sponsor interaction, and a request for Plan Sponsor point of contact information to ensure efficient two-way communication. As each element of the initial introduction brochure will be vetted through CMS, the key points of each element are provided as follows:

- **_ACLR Contact Information:_** Direct access numbers assigned to recovery auditors with a detailed response protocol to mitigate the variety of requests from sponsor, official, or media interests.

- **_Part D RAC Purpose and Direction:_** Detailed purpose identifying governing directives and including an overarching plan which highlights key data review points and anticipated exit points where Plan Sponsor training and trend information is provided.

| **COMMUNICATION ELEMENTS** |
| --- |
| - Initial Introduction<br>- Contact Information Exchange<br>- Communication Tracking<br>- Continuous Results Feedback<br>- National and Sponsor Trend Metrics |

- **_Communication Process Maps:_** Chart providing CMS approved direct sponsor to ACLR interaction and indentified avenues through CMS to resolve other than approved communication requests.

- **_Plan Sponsor Contact Requests:_** ACLR contact information for sponsors to provide internal communication points for ACLR to sponsor interaction on Part D clarification items approved through CMS.

_Communication Tracking:_  To minimize duplication of effort, maximize efficiencies, and ensure accountability, this type of project requires standardized communication parameters and a method to document, track, and report communications. The Audit Tracking Database will be used to track the status of all Plan Sponsor communication tasking including communications encountered related to improper payments, process resolutions, follow-up response requirements and corrective actions. The Audit Tracking Database will evolve with the project to meet ACLR and CMS needs and will have a preliminary baseline of fields covering requester, issue identified, action assignment, priority for resolution, current status of each communication, as well as all other information tracked as a part of our recovery efforts. The Audit Tracking Database will also have the ability to sort and track issues identified to determine feasibility of process improvement implementation and will connect directly to the audit tracking database as further resolution is required.

_Results Feedback/Trending Reports:_  In order for the Part D program to successfully evolve through internal and external process improvements and to ensure future improper payment risks are continuously mitigated; monthly and quarterly status' reports will be designed to focus on key error indicators (improper payment areas/relationship to governing requirements).  These error indicator areas will be provided a statistical comparison to total review and submission population and further broken down to individual Plan Sponsors to provide all stakeholders visibility to key areas of interest for future improper payment risk mitigation. Additionally, these charts will also provide ACLR and CMS the ability to understand and further define target populations throughout the entire Medicare Part D data population to mitigate impact risk.

A66

*CMS Process Recommendations:* ACLR recognizes the importance of cohesive relationship with CMS and the unique importance of maintaining a strong relationship with Plan Sponsors. We believe that our pro-active approach and constant feedback with all stakeholders will provide for a strong relationship throughout the Medicare Part D RAC project and also provide for key program improvements through sponsor education, refined process mapping, and a continuous integration of lessons learned. As detailed in section 1.2.4, ACLR Audit Team members will document best practices/lessons learned developed as a result of each audit to ensure that identified efficiencies have been implemented internally to ensure that mistakes are not repeated. These internal process improvements will be shared with the CMS Oversight Board in the monthly, quarterly, and annual reports. All ACLR recommended external process improvements as well as CMS directed process improvements will be vetted and implemented as required in the best interest of a successful Part D RAC project.

## 1.5   APPEALS

ACLR recognizes the importance of a strong appeals process and works to ensure that all decisions regarding identified improper payments contain the requisite supporting documentation and auditor conclusions regarding their findings. We also recognize that resolving disputes early in the process significantly decreases the administrative burdens of substantiating them upon appeal. To that end, our evidentiary support process begins almost immediately upon data receipt. At each stage of the auditing process, we note our analysis and attach all applicable supporting documentation to each questioned improper payment in the Audit Tracking Database. In addition, creating an audit trail for others to follow this process enables us to quickly review appealed items and to evaluate the merits of any appeal.

All verbal communications relating to improper payment determinations will be directed to the appropriate personnel upon receipt through the Audit Tracking Database. Any additional information received at this time will be reviewed, evaluated, and addressed accordingly. As necessary, ACLR personnel will advise parties making verbal appeals of the established appeals process. While changes will occur once the appeals process requirement has been established and approved by CMS, we anticipate that our appeals assistance process relating to all written appeals, will function as summarized in Exhibit 1-9 below.



All written appeals will be entered into the Audit Tracking Database upon receipt. This process is completed by well trained ACLR administrative staff that recognizes the importance of documenting formal appeals. Once entered, appeals will be forwarded to the Audit Team assigned to the Plan Sponsor. Once received, members of the audit team will research and document any changes to statutory or administrative appeal processes and establish a timeline of due dates/deadlines and enter into their respective calendars to ensure timely responses to appeal process requirements. The Audit Team will review the appeal and any additional supporting documentation provided. The appeal will then be evaluated and a determination will be made as to its merit. Once complete, we will engage in candid discussions with CMS regarding the likelihood of success of the appeal as well as any cost-benefit analysis that may have bearing on denying or approving the appeal. If a decision regarding a refund is made, we will document the finding in the Audit Tracking Database and return related contingency fees to CMS if required. Once the conclusion to dispute filed appeals has been made, the Audit Team will develop a technical memorandum outlining all facts including amounts involved, issues being contested, our analysis supporting our contentions and a summary of our conclusions.

To ensure simplicity and efficiencies in the upcoming appeals process, we will also assemble and attach exhibits containing copies of all supporting documentation, affidavits, as well as other information needed to support our position.

As seasoned recovery auditors, ACLR has provided testimony and litigation support in numerous administrative appeals and, when necessary, testified in court; we will provide this

assistance to CMS throughout the appeals process for any disputed amounts if required. We will monitor deadlines and administrative remedies to ensure appeals process compliance by the Plan Sponsor and attend meetings and hearings as necessary. As applicable, we will also review decisions made upon redetermination and reconsideration and at each level of the process, will evaluate the findings/decisions and re-evaluate the merits of continuing disputing and will discuss with and make recommendations to CMS. Upon final resolution of appeals, we will document all findings in the Audit Tracking Database and prepare an addendum to the Audit Report. This addendum will outline appeal findings, discuss action items, and document lessons learned. Any action items requiring a change to ACLR recovery audit processes will be discussed with CMS and implemented as necessary.

## 1.6   Annual Report

During the annual report preparation process we will meet with CMS to discuss specific topics necessary for inclusion into this report. We anticipate that much of the information needed will have been provided to the Oversight Board throughout the course of the year. As we discussed in greater detail above, we will provide the Board with monthly, quarterly, and annual status reports designed to convey the results of our efforts, problems encountered, best practices initiatives, and lessons learned. These reports will also detail our efforts with respect to Plan Sponsor outreach and education, which is essential to mitigating future improper payments. The Board will also receive audit metrics noting the measureable and quantifiable results of our efforts that document the success of the Medicare Part D recovery audit program. These results will demonstrate recoveries and their characteristics as well as a wealth of information related to audit activities and measurable efficiency gains. These reports and metrics should provide a good foundation for CMS to meet its congressional annual report submission requirements.

We also anticipate that during the course of the recovery audit we will identify legislative and regulatory issues and opportunities that may enhance the Medicare Part D program. We will also document feedback we receive from Plan Sponsors regarding these issues as well. During the annual report preparation discussions, we will share these thoughts with CMS and provide necessary assistance required to determine feasibility of inclusion in the annual report. In addition, ACLR personnel shall stay apprised of new developments relating to improper payments. We will continually monitor the political environment for new initiatives so that we may recommend modification of our tracking and reporting processes to ensure CMS receives accurate and current information at all times.

## 1.7   Administration

We will schedule the Kick-Off meeting with the Contracting Officer (CO), Contracting Officer Technical Representative (COTR), and other authorized CMS personnel upon contract award. In preparation for this meeting, we will develop an agenda that addresses the overall approach, work breakdown structure, points of contact, reporting formats, scheduling future meetings.

A00165

We will solicit feedback from CMS regarding their list of action items for inclusion into the meeting agenda and prepare as requested. We anticipate that the primary goal of this meeting will be to establish overall project guidelines and set CMS and ACLR project expectations. We anticipate that this initial meeting, as permitted by CMS, will consist of the ACLR project and audit directors and the SSO. These personnel have intimate knowledge of the ACLR, its recovery audit processes and procedures, as well as its data capabilities and requirements and will be in a position to provide or obtain answers to CMS inquiries. These personnel will also solicit information regarding CMS project and project implementation requirements and discuss potential issues associated with each. During this meeting, ACLR will request contact information for all appropriate personnel as well as obtain an understanding of their roles and responsibilities. ACLR will also request CMS established milestones and determine whether our initial work efforts should be focused in one direction or another or if we have a blank slate upon which to implement our processes. At the Kick-Off meeting, we will also discuss aspects of our project plan so that we may further refine it based on CMS expectations.

*Project Plan:* Upon contract award, ACLR personnel will begin developing our project plan. This plan will define the project scope and milestones and will lay the groundwork for the development of our Medicare Part D specific recovery audit processes and procedures. Our project plan will likely contain numerous administrative items such as completing background checks, identifying appropriate points of contact, ensuring adequate system security levels, obtaining access to systems, and any training required by CMS. The project plan will also memorialize ACLR communication processes for CMS and will include items ranging from identifying activities requiring CO and COTR intervention to formalized response times to verbal and written inquiries. As data plays such an important role in the course of our recovery efforts, our project plan will also address the various systems utilized by CMS and the need to obtain system instruction manuals and attend available training. We will also outline the methodologies to be used in communication with Plan Sponsors. The project plan will outline such items as scheduling web-based presentations to introduce ACLR and outline expectations as well as discuss our anticipated outreach and education efforts. As the work commences the project plan will also include the development of formalized recovery audit processes and procedures according to CMS guideline as well address the recovery of improper payments.

*Implementation Schedule:* A key component of our project plan will be our implementation schedule. [We recognize that deadlines for recoveries for some periods are approaching and our initial implementation schedule will consider this carefully.] The implementation schedule will outline our Work Breakdown Structure, which will contain a summarized listing of the projected activities required to ensure successful completion of the project, anticipated duration of the activities, and the estimated start and finish dates. Due to the sensitive nature of program data much of our initial efforts will be expended on ensuring that our Information Technology (IT) systems are secure, in accordance with CMS guidelines and as outlined in the Task Order. This will include completing the IT Security Plan, IT Risk Assessment, and FIPS 199 Assessment within 30 days of contract award and the IT Security

Classification and Accreditation within 3 months of contract award.  While this document will be modified as work progresses, we anticipate that our initial efforts will be to lay the foundation for our future recovery audit processes and will focus primarily on familiarizing ourselves with CMS operations.

Monthly Status Reports:  As identified in Oversight Board Interaction above, we will develop monthly status reports.  These reports will contain information related to current work efforts, issues encountered, and lessons learned.  These reports will also contain information related to improper payments identified and amounts submitted and recovered.  We will also develop audit metrics that measure efficiencies gained in auditing processes as time progresses.  These reports are shown in Exhibit 1.10 below:

| Exhibit 1-10 Report Types | |
|---|---|
| **Deliverable** | **Approach** |
| Audit Metrics Report | Provide all results related information derived from audit metrics such as, recoveries, improper payment types, and audit cycle times. |
| Monthly Vulnerability Report | Discuss vulnerability inputs, outputs, and corrective action recommendations with CMS and integrate with audit databases, develop standardized reports to meet CMS needs, and provide to CMS. |
| Monthly Progress Report | Provide ongoing reviews of all tasks, meetings, identify issues and concerns (including recommendations), document status of audits, report status of claim issues, update status of outreach efforts, provide information on workloads |
| Monthly Financial Report | Develop web-based system to track identified improper payments, payments reviewed, recoveries identified, plan sponsors audited.  Also provide data related to types of improper payments identified and attendant amounts. |
| Annual Report Input | Discuss and identify reportable items with CMS, utilize information from monthly reports, highlight federal requirements (amount of recoveries, amounts identified, specific statistical parameters). |
| *Note: All reports are baselined and are anticipated to evolve with approval and direction of CMS.* | |

Throughout the development of the project plan, implementation schedule, and monthly reporting development process, we will solicit CMS feedback and incorporate recommendations as applicable.

## 1.8 SCHEDULE OF DELIVERABLES

We anticipate that this Schedule of Deliverables will be modified as work progresses and upon feedback received from CMS and subsequent modification and approval.

| Exhibit 1-11 Schedule of Deliverables | | |
|---|---|---|
| **Deliverable** | **Schedule** | **Approach** |
| Kick-Off Meeting | Within 14 days of contract award (Per CMS availability) | Prepare briefing covering overall approach, Organization Chart, preliminary Project Plan and Implementation Schedule, reporting formats, and suggested regular meeting/conference call times as required.  Hold kick-off meeting to discuss CMS expectations, objectives, critical areas of concern, and requirements.  Coordinate IT requirements between CMS CISO and ACLR SSO.  Generate meeting minutes within 3 business days. |
| Organization Charts | Within 14 days of contract award | Provide Organization Chart to CMS identifying baseline key and support personnel including reporting relationships for communication structure and IT access requirements. |
| Base Year Project Plan | Within 7 days of Kick-Off Meeting completion | Finalize Project Plan for management and support structure for the contract, including our high-level technical approach for conducting all phases of the audit process, collecting lessons learned, coordinating and communicating with stakeholders including outreach plans, and updating our Information Technology Plan. |
| Implementation Schedule | Within 7 days of Kick-Off Meeting completion | Develop schedule outlining plan sponsor notifications, data receipt and review, initial findings to plan sponsors, comprehensive data reviews, identifying audit targets, requesting waivers, conducting and finalizing audits, obtaining recoveries, reporting results, education. |
| Personnel IT Security and Privacy training completion certs | Within 10 days of position sensitivity assignment | Complete as Required by Systems Security Officer. |
| FIPS 199 Assessment | Within 30 days of contract award | The SSO will maintain and update all applicable Authorization to Operate documentation requirements as required by CMS Information Security procedures. |
| IT Security Plan (IT-SP) | Within 30 days of contract award | The SSO will draft a System Security Plan utilizing templates avalable ar the CMS Information Security "Virtual Handbook" Web site. |
| IT Risk Assessment (IT-RA) | Within 30 days of contract award | The SSO will complete all the IT risk assessment as required by CMS. |
| IT Security Classification and Accreditation (IT-SC&A) | Within 3 months of contract award | The SSO will coordinate with CMS to develop/clarify system security level requirements; current ACLR parameters - e-Authentication level 3. |
| Training on RAC Data Warehouse | TBD | Complete as Required by CMS for all applicable personnel. |

| Exhibit 1-11 Schedule of Deliverables Continued | | |
|---|---|---|
| **Recurring Reports/Requirements** | | |
| **Deliverable** | **Schedule** | Approach |
| Audit Metrics Report | Quarterly | Provide all results related information derived from audit metrics such as, recoveries, improper payment types, and audit cycle times. |
| Vulnerability Report | Monthly | Discuss vulnerability inputs, outputs, and corrective action recommendations with CMS and integrate with audit databases, develop standardized reports to meet CMS needs, and provide to CMS. |
| Progress Report | Monthly | Provide ongoing reviews of all tasks, meetings, identify issues and concerns (including recommendations), document status of audits, report status of claim issues, update status of outreach efforts, provide information on workloads |
| Financial Report | Monthly | Develop web-based system to track identified improper payments, payments reviewed, recoveries identified, plan sponsors audited. Also provide data related to types of improper payments identified and attendant amounts. |
| Payment Vouchers | Monthly as required | Prepare in accordance with Task Order and recoveries. |
| Oversight Board Input Report | TBD | Prepare and provide reports as required by Oversight Board. |
| Annual Report Input | TBD | Discuss and identify reportable items with CMS, utilize information from monthly reports, highlight federal requirements (amount of recoveries, amounts identified, specific statistical parameters). |
| Key Personnel New Approval Requests | TBD | Provide to CMS upon identification of personnel. |
| Organizational Chart Updates | TBD | Update as required by CMS. |
| IT Security Plan (IT-SP) review/update | Annually | SSO to complete as specified by CMS guidelines. |
| IT Risk Assessment (IT-RA) review/update | Annually | SSO to complete as specified by CMS guidelines. |
| IT Security Classification and Accreditation (IT-SC&A) review/update | Annually | SSO to complete as specified by CMS guidelines. |

## 1.9    CONSTRAINTS & ASSUMPTIONS

As detailed in section 1.3 above, ACLR is experienced in the handling of medical data and maintains HIPAA compliance and our security systems conform to Level 3 e-Authentication requirements.  ACLR has identified a SSO as a key personnel position and the related name, title and credential information is provided in Chapter 3 Staffing Plan.  The ACLR SSO will coordinate directly with CMS CISO to develop FIPS 199 Assessment, IT Security Plan, and IT Risk Assessment within 30 days of contract award and the IT Security Classification & Accreditation within 3 months of contract award as well as all other Information Security requirements identified in the Task Order terms and conditions.

## CHAPTER 2 - PAST PERFORMANCE (QUALITY OF SERVICES ON RELEVANT WORK)

### PAST PERFORMANCE REFERENCES

Contact and requested information for Past Performance Evaluations are provided below as listed in Exhibit 2-1.

**Exhibit 2-1 Past Performance Evaluations**

| ACLR | |
|---|---|
| **Contact Information** | |
| Name | Sean Donaghy |
| Title | Financial Controller |
| Company/Agency | Ebix |
| Contract Name/# | National Recovery Audit Services |
| Address | 5 Concourse Pkwy, Suite 3200 |
| City/State/Zip | Atlanta, GA 30328-7106 |
| Phone | 678-281-2034 |
| E-Mail | sdonaghy@ebix.com |

| | |
|---|---|
| Name | Patrick McWilliams |
| Title | Tax Director |
| Company/Agency | General Electric Company |
| Contract Name/# | Payment Recovery Audit |
| Address | 19602 Auburn Meadows Drive |
| City/State/Zip | Houston, TX 77094 |
| Phone | 281-224-9152 |
| E-Mail | McWilliams.Patrick@corp.sysco.com |

| | |
|---|---|
| Name | Thais Thompson |
| Title | Senior Analyst |
| Company/Agency | General Electric Company |
| Contract Name/# | National Recovery Audit |
| Address | 4200 Wildwood Pkwy |
| City/State/Zip | Atlanta, GA 30339 |
| Phone | 678-844-5446 |
| E-Mail | thais.thompson@ge.com |

| Allpro/Staffnet | |
|---|---|
| **Contact Information** | |
| Name | Diana Dilkes |
| Title | EEO Manager |
| Company/Agency | Dept of Veteran Affairs - Nashville |
| Contract Name/# | Staffing |
| Address | 1310 24th Avenue South |
| City/State/Zip | Nashville, TN 37212 |
| Phone | 615-873-7892 |
| E-Mail | Diana.Dilkes2@va.gov |

A74

## CHAPTER 3 - TASK ORDER MANAGEMENT/STAFFING PLAN:

We recognize that developing and implementing a recovery audit program is challenging and our approach has been to develop a team derived from experienced recovery auditors and personnel experienced in Medicare Part D, its billing practices, benefit verification processes, and payment error tracking and resolution procedures. The team's recovery auditors are well trained in the management of large datasets and are intimately familiar with the internal control issues that give rise to improper payments. The team's Medicare Part D personnel are intimately familiar with all aspects of the integrated PDE submission process and have worked as pharmacy technicians and administrators and consultants to Plan Sponsor PDPs. We believe this initial team approach provides CMS with the experience needed to successfully implement a Medicare Part D recovery audit program. It is our practice to provide our clients with the most experienced personnel available and we are not in the habit of substituting less experienced personnel once a project is up and running; our key personnel will be assigned 100% to these recovery efforts throughout the duration of the project. In the event of employee attrition, CMS can rest assured knowing that we will replace lost personnel with comparably experienced and able personnel.

The key personnel selected for this project were chosen for their experience in their respective fields and their ability to implement national recovery audit programs and effectively lead and mentor assigned personnel. We anticipate that approved key personnel will be responsible for designing the project plan, implementation schedule, initial recovery audit processes and procedures; systems security plans, reporting methodologies, as well as all other program requirements during the implementation phase of this project. As the project progresses and we begin receiving data we anticipate immediately assigning experienced personnel to individual audits. These initial non-key personnel have already been identified and have committed to the project; they are discussed in greater detail under *Professional Experience & Qualification Summaries* below. As the project progresses we will locate and hire similarly capable personnel as necessary for full project implementation.

This chapter discusses our key personnel, our subcontractor teaming arrangement, anticipated contract execution, labor categories, and the professional qualifications of key and non-key personnel.

### 3.1   PROVIDING SKILLED PERSONNEL

ACLR has teamed with Allpro/Staffnet (Allpro) to meet the needs of the Medicare Part D recovery audit program. This pairing provides CMS with highly trained recovery audit specialists and a healthcare staffing service provider experienced at identifying and providing highly qualified Medicare and Medicare Part D personnel.

> ACLR: We are a firm employing recovery audit professionals with decades of varied and layered improper payment experience. ACLR professionals have extensive experience in

numerous areas of recovery audits including duplicate payments and its heavy reliance on detailed reviews, unclaimed property and the legal issues associated with sampling for improper payments; sales taxation and its reliance on statistical sampling protocols to quantify liabilities arising from billions of transactions; and litigation support in the Medicare PSC program and issues arising from poorly constructed and improperly documented statistical sampling protocols. ACLR Audit Team members remain current on evolving accounting and legal matters affecting the industry and are adept at identifying internal control deficiencies that are the root cause of improper payments.

Allpro: Allpro is a healthcare staffing service provider with access to physicians, nurses, and other qualified medical personnel including Medicare Part D benefit plan actuaries, medical coders and billers, and pharmaceutical personnel to the healthcare industry and the federal government. With 15 years of experience, Allpro is a proven and reliable company that can quickly and efficiently identify and obtain highly qualified personnel throughout the country.

**3.2    IMPLEMENTING THE STATEMENT OF OBJECTIVES:**

Our key personnel will be responsible for implementing the Statement of Objectives as outlined in Attachment A of the RFQ. Upon contract award, key personnel will be responsible for drafting all aspects of our project plan, security and risk management plans, implementation schedule, and all other processes and procedures related to implementing a successful and secure recovery audit program. Key personnel will also be responsible for interacting with CMS personnel to obtain approval for our proposed plans and procedures and ensuring that they are implemented in accordance with CMS regulations and statutory requirements affecting the Medicare Part D program. During this implementation phase, key and non-key personnel will also be preparing our automated processes for PDE data receipt and conducting initial recovery audits. As outlined in *Administration* and *Schedule of Deliverables* above, we anticipate the implementation phase to be completed within 3 months. Once complete we will then begin to establish additional audit teams. We anticipate the establishment of 3 - 4 audit teams during the next 3 month period with additional teams being integrated into the team on a quarterly basis thereafter until the program is fully staff. There are several variables that will influence the total number of audit teams to be utilized on this project. The chief variable is determining how the Plan Sponsor documentation audits, as described under *Methodology* above, will be implemented. From our experience, 15 minutes are required to properly examine payments to determine accuracy. Reliant as documentation audits are on statistical samples, obtaining approval for this process will be a key component of determining the number of audit teams that will be required. Currently, we anticipate that 20 - 25 audit teams will be required for full implementation of our proposed recovery audit program. These audit teams will be responsible for completing recovery audits of Plan Sponsor PDPs as outlined under *Methodology* above.

A76

Upon completion of the initial implementation phase and throughout the duration of the contract, key personnel and ACLR Audit Team members will be responsible for maintaining and proposing changes to recovery audit processes and procedures according to changing CMS guidelines and lessons learned from our recovery audit program efforts and implementing these changes upon CMS approval.

### 3.3 MEDICARE PART D RAC PERSONNEL

Management for this contract will reside with the Project Director and Audit Director as documented in the organization chart shown in Exhibit 3-1.



Exhibit 3-1 RAC Medicare Part D Organizational Chart

### 3.4 LABOR CATEGORIES

As highlighted in Exhibit 3-1 above; personnel and description have been identified for anticipated roles and responsibilities. These responsibilities are segregated into specific labor

A77

categories as they appear on our GSA Financial and Business Solutions (FABS) schedule and are shown in Exhibit 3-2 below:

| Exhibit 3-2 Labor Categories | | | | | |
|---|---|---|---|---|---|
| GSA Title | Project Title | Roles & Responsibilities | Years of Experience | | |
| | | | Grad | Undergrad | HS |
| Managing Principal | Project Director | Primary responsible for task order and project plan implementation and management and quality control.  Will interact daily with team members to provide assistance, mentoring, and overall guidance in recovery audit management.  Will act as primary point of contact for CMS and joint responsibility for Plan Sponsor outreach and education.  Will assist CMS in regulatory and legislative endeavors, testify as required at congressional hearings, and provide litigation support services as necessary. | N/A | 20 | |
| Senior Manager | Audit Director | Primarily responsible for managing all recovery audit activities and implementing task order and project plan requirements.  Will interact daily with team members to provide recovery audit assistance, mentoring, and overall guidance in recovery audit management.  Will act as secondary point of contact for CMS and has primary responsibility for the development of status reports and audit metrics.  Is also responsible for the development and modification of recovery audit processes and interacting with CMS regarding same.  The position reports to the Project Director. | 6 | 7 | |
| Director | Lead Statistician | Primarily responsible for generating statistical samples for audit and extrapolating errors across attendant populations.  Is also responsible for developing Medicare PIM compliant (or utilizing similar protocols) sampling methodologies and documenting same.  Is responsible for reviewing the audit results achieved over time and generating predictive models to score ongoing payments for likelihood of improper payment on a real (or current) time basis. | 10 | 12 | |
| Senior Manager | SSO | Primarily responsible for overseeing ACLR compliance with CMS security requirements. | 6 | 7 | |
| Manager | PDP Review Director | Direct experience in financial management with demonstrated management capability ability to supervise or lead audit management teams. Executive experience in Medicare and/or pharmaceutical field, or the field of financial management, business and contract accounts management, and forensic and recovery audits. In-depth working experience throughout corporate budget analysis for statutory and regulatory compliance. Comprehensive knowledge of new and legacy accounting software applications. | 5 | 6 | N/A |
| Senior Associate | PDE & DIR Analysis Supervisors | Primarily responsible for the day to day management of assigned audits and audit tasks.  Personnel we will responsible for ensuring audit support staff are managing daily activities in an efficient and effective manner, providing PDP, PDE, and DIT expertise as assigned, and monitoring the Audit Tracking Database to ensure that proper and accurate data are entered and maintained in the system.  Personnel will also be responsible for daily recovery audit activities and reporting feedback to the Audit Director for issues encountered, lessons learned and proposed process modifications.  Personnel will also act as Audit Leader for all assigned audits. | 4 | 5 | N/A |
| Associate | PDP, PDE, & DIR Audit Support | Primarily responsible for conducting recovery audit activities and interacting with Plan Sponsors to resolve improper payment issues commensurate with their experience.  Reports directly to audit management. | 2 - 3 | 1 - 3 | N/A |

| Exhibit 3-2 Labor Categories Continued | | | Years of Experience | | |
| GSA Title | Project Title | Roles & Responsibilities | Grad | Undergrad | HS |
|---|---|---|---|---|---|
| Junior Associate | PDP, PDE, & DIR Audit Support | Primarily responsible for conducting recovery audit activities and interacting with Plan Sponsors to resolve improper payment issues commensurate with their experience.  Reports directly to audit management. | N/A | 0 | 4 |
| Admin. Assistant | PDP, PDE, & DIR Audit Support | Personnel will be primarily responsible for assisting audit team members in completing administrative tasks that may arise, documenting results of internal meetings, and generating monthly status reports for dissemination amongst team members and CMS. | N/A | N/A | N/A |

## 3.5 PROFESSIONAL EXPERIENCE & QUALIFICATIONS SUMMARIES

A summary of the ACLR Recovery Audit Team Members is provided in Exhibit 3-3 below.  Copies of resumes all key personnel have been provided in Attachment B; and commitment letters are provided in Attachment C.  All other non-key personnel have verbally committed to participate in this recovery audit.  Any personnel listed on Exhibit 3-3 that are unavailable to participate in this contract will be replaced by personnel with commensurate experience and provided to CMS for review and approval.

| Exhibit 3-3 Professional Experience & Qualification Summaries | | | | IT Systems & Security | | | | | | | | | |
| | | | | Insurance & Benefit Plans | | | | | | | | | |
| | | | | Statutory & Regulatory Compliance | | | | | | | | | |
| | | | | Data Analysis | | | | | | | | | |
| | | | | Sampling & Modeling | | | | | | | | | |
| | | | | Pharmacy Audits & Understanding | | | | | | | | | |
| | | | | Medicare Part D Payment Structure & Systems | | | | | | | | | |
| | | | | Medicare & Part D Understanding | | | | | | | | | |
| Name | Key | Usage | Qualifications | Recovery Audit | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Christopher Mucke, CPA | Y | 100% | In excess of 20 years national recovery audit experience, statutory & regulatory compliance, data analysis, sampling and modeling, and auditing including expert witness litigation support services in Medicare PSC program. | x | x | | x | x | x | x | x | | |
| Jason Barnes | Y | 100% | Excess of 8 years recovery audit experience.  An experienced audit team leader responsible for managing mulitple audit teams and recovery audits.  Adept in statistical sampling design, project management, data analysis, and database development.  Extensive experience in numerous financial accounting systems. | x | | | x | x | x | x | x | x | x |
| Bruce Dixon | Y | 100% | Extensive project management experience in DART, metric reporting, SAS 70, and claims repricing including coordination of benefits data from CMS for Plan Sponsor. | | x | x | | | | x | x | x | |
| Deanna Minges | Y | 100% | In excess of 10 years billing experience with extensive knowledge of Medicare, Medicare Advantage, Medicare D, and Medicaid; including Home infusion, nursing, DMS, and pharmacy. | | x | x | x | | x | | x | | |

174

| | | | | IT Systems & Security | Insurance & Benefit Plans | Statutory & Regulatory Compliance | Data Analysis | Sampling & Modeling | Pharmacy Audits & Understanding | Medicare Part D Payment Structure & Systems | Medicare & Part D Understanding | Recovery Audit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Name** | **Key** | **Usage** | **Qualifications** | | | | | | | | | |
| Raymond Falk, PhD | Y | 75% | Ph.D. Biostatistics; M.S. Biostatistics; Lead Statistician and predictive modeling expert with over 25 years experience including; healthcare, pharmaceutical, and | | | | x | x | | | x | x |
| Louis Tapia | N | 5% | Experienced healthcare staffing professional and business owner providing qualified healthcare professionals to industry and the federal government. | | | | | | | | | |
| Venita Washington | N | 100% | Medical biller with 12 years Plan Sponsor and Pharmacy Benefit Manager experience in Medicare parts A & D, and Medicaid. | | x | x | | | x | | x | |
| Adam Smalley | N | 100% | Recovery auditor with 3 years large data file management, analysis, and improper payment identification, recovery, and mitigation experience. | x | | | | | x | x | x | |
| Joe Teschke | N | 100% | Recovery auditor with 5 years large data file management, analysis, and improper payment identification, recovery, and mitigation experience. | x | | | | x | x | x | | |
| Geoff Bauer | N | 100% | Experienced recovery auditor with specific aptitude in reconciling large data populations to company financial | x | | | | | x | x | x | |
| Lewaren Wilson | N | 100% | In excess of 11 years auditing and recovery audit experience including HMO, Family Health Plus, Medicaid Managed Care, Medicare Part D, and fraud detection. | x | x | x | | | x | | x | |
| Gary Sinning | N | 100% | In excess of 25 years Plan Sponsor experience including submission of Part C and Part D reports to CMS for Medicare Advantage and Plan Sponsor operations. Experienced in ensuring compliance of CMS reporting requirments with actuarial services, pharmacy administration and systems. | | x | x | | | | x | x | x |
| Cynthia Schilling | N | 100% | Over 25 years of experience in healthcare with extensive operations and project management expertise including including pharmacy and Medicare Advantage. | | x | x | | | | x | x | |
| Laura Lowman | N | 100% | Over 23 years experience in medical reimbursement and collection with Pharmacy Benefit Managers and providers. Extensive Medicare and Medicare appeals experience. | | x | x | | | | x | x | |
| Donald Rockey | N | 100% | Over 4 years experience as Pharmacy Technician/Billing Manager working with all insurances including Medicare parts B and D. | | x | x | | | | | x | |
| Angela Bowen | N | 100% | Registered nurse with over 15 years experience in medication, pain, and symptom management and reading and interpreting medical data for specific quality indicators. | | x | x | | | | | | |

**Exhibit 3-3 Professional Experience & Qualification Summaries Continued**

175

A80

# ATTACHMENT A

# CORPORATE EXPERIENCE

| Attachment A - Corporate Experience Summaries | IT Systems & Security | Statutory & Regulatory Compliance | Fraud, Litigation Support, & Medicare PSC | Internal Controls -Design & Implementation | Sampling & Predictive Modeling | Data Analysis | Recovery Audit Services |
|---|---|---|---|---|---|---|---|
| **PROJECT DESCRIPTION** | | | | | | | |
| **Airline Software Supplier;** *Fraud Review Services*<br>*Project Term: 08/2008 - 01/2010; Value: $.1 million* | x | x | | | x | x | x |
| **Ebix:** *Recovery Audit Services:*<br>*Project Term: 04/2009 - Present; Value: $.45 Million* | x | x | x | | | x | x |
| **Ford Motor Company;** *Recovery Audit Services*<br>*Project Term: 03/2005 - 08/2010; Value $5.25 Million* | x | x | x | x | | x | x |
| **Ford Motor Credit Company;** *Recovery Audit Services:*<br>*Project Term: 04/2005 - 03/2010; Value $425,000* | x | x | x | x | x | x | x |
| **General Electric Company;** *Internal Control Design & Implementation:*<br>*Project Term: 03/2005 - 01/2010; Value: $0.1 Million* | x | | | x | | | x |

**Airline Software Supplier;** *Fraud Review Services*
*Project Term: 08/2008 - 01/2010; Value: $.1 million*
Provided fraud review services to identify improper collections and remittances. Developed evidence and worked with supplier to identify responsible parties, and negotiate settlements with state officials. Specifically, ACLR obtained evidentiary documentation including sales and purchase invoices, journal entries and supporting detail, and detailed transactional tax information to support tax collections not remitted to state taxing jurisdictions. ACLR also researched applicable law and accounting processes to enable client to be in compliance with state and federal law.

**Ebix:** *Recovery Audit Services:*
*Project Term: 04/2009 - Present; Value: $.45 Million*
Throughout the term of the contract, company personnel were required to obtain supporting documentation including sales and purchase invoices, journal entries and supporting detail, and detailed transactional tax information. ACLR personnel were also required to research applicable law and accounting processes to ensure that client was in compliance with state and local law.

**Ford Motor Company;** *Recovery Audit Services*
*Project Term: 03/2005 - 08/2010; Value $5.25 Million*
Provided national recovery audit services including the design of statistical sampling methodologies based on federal and varying state laws and developed predictive models to identify high incidences of improper payments and to mitigate future improper payments. These services required the review of hundreds of millions of transactions to identify and recover improper payments, developing and implementing comprehensive transaction auditing and sampling methodologies, and developing innovative solutions to resolve issues related to limited company resources.

**Ford Motor Credit Company;** *Recovery Audit Services:*
*Project Term: 04/2005 - 03/2010; Value $425,000*
ACLR provided detailed national recovery audit services associated with financial contact bad debt write-offs, which included forensic accounting, evidentiary development, payment process enhancements, and payment recovery. Specifically, ACLR reviewed the bad debts of Ford's financial services operations. These reviews consisted of a transactional analysis of each bad debt to determine the situs of the bad debt and the applicability of refunds as well as the collection and analysis of supporting documentation to obtain refunds of sales tax written off as a result of the bad debt. In addition, ACLR reconciled transactional data through contract receivables, and company ledger totals to verify completeness and accuracy of transactional data.

**General Electric Company;** *Internal Control Design & Implementation:*
*Project Term: 03/2005 - 01/2010; Value: $0.1 Million*
ACLR designed Sarbanes-Oxley compliant process mapping and recovery audit procedures, developed training manuals, and trained internal accounting personnel in recovery audits. ACLR also mapped pre-payment audit processes and developed matrices to enhance identification and recovery of errors.

| | IT Systems & Security | | | | | |
|---|---|---|---|---|---|---|
| | Statutory & Regulatory Compliance | | | | | |
| | Fraud, Litigation Support, & Medicare PSC | | | | | |
| | Internal Controls -Design & Implementation | | | | | |
| | Sampling & Predictive Modeling | | | | | |
| **PROJECT DESCRIPTION** | Data Analysis | | | | | |
| | Recovery Audit Services | | | | | |

**Attachment A - Corporate Experience Summaries Continued**

**General Electric Company;** *Recovery Audit Services:*
*Project Term: 01/2009 - 11/2009; Value: $100,000*                    x  x  x    x  x  x
Conduct recovery audit and evidentiary support for use on appeals in state assessment of sales tax liabilities owed.  ACLR personnel were also required to research statutory and regulatory promulgations to ensure that client was in compliance with state and local law.

**Will Yancey;** *Recovery Audit & Statistical Sampling Services*
*This company has since been acquired by ALCR.*                       x  x  x    x  x  x
ACLR analyzed improper payment audits conducted by Program Safeguard Contractors/Zone Program Integrity Contractors for the Centers for Medicare and Medicaid Services on behalf of Medicare Providers. These reviews consisted of ensuring auditors were complying with the Medicare Program Integrity Manual, CMS policies and policy changes, and generally accepted statistical sampling audit procedures.  Specifically, ACLR identified anomalies associated with not meeting pre-defined precision and confidence intervals; not verifying payment of claims and the lack of recoupment offset; not identifying and analyzing outliers for possible extrapolation distortion; failing to document non-sampling errors, and quantifying the lack of complete evidentiary consideration for medical review decisions.

**Ford Motor Company;** *Internal Control Design & Implementation:*
*Project Term: 04/2005 - 03/2010; Value $1.5 Million*                 x        x    x  x
ACLR designed and implemented Sarbannes-Oxley compliant internal controls to enhance payment accuracy in pre-payment processes and to recover and mitigate improper payments in post-payment processes including the development of process flow charts and associated accounting matrices.  In addition, ACLR developed and implemented internal control procedures for audits including the development of their audit process that addressed the various audit stages (such as, pre-audit planning and conference, audit commencement, data gathering, post-audit reviews, and corrective action development and implementation) as well as all activities occurring within each.  The project also included recovery audit analysis, processing, and summarizing of transactions, resolving accounting issues, classifying accounting transactions, developing and implementing new or revised accounting policies and procedures, enhancing accounting internal controls and improving operating efficiency and effectiveness.

**Koch Industries;** *Internal Control Design & Training Services*
*Project Term: 03/2007 - 08/2008; Value: $30,000*                          x     x
ACLR reviewed state and local laws to determine the proper treatment of insurance premium payments in applicable states, provided legal memorandums and developed tax matrices to ensure proper invoice payment. ACLR also developed flow charts and Sarbanes-Oxley compliant internal control procedures and provided training to internal accounting personnel.

# ATTACHMENT B

# KEY PERSONNEL RESUMES

A00180

**NAME:**   Christopher Mucke, CPA

**PROJECT ROLE:**   Project Director

**EDUCATION:**   University of Tennessee; Chattanooga, TN
B.S. Accounting
Certified Public Accountant, Licensed in Maryland

**EXPERIENCE:**

*ACLR; Plymouth, MI; 2002-Present*
*Managing Principal*

- *Managing Principal responsible for the management of a multi-million dollar firm specializing in a wide range of business solutions from recovery and forensic auditing, accounting, regulatory compliance, and management consulting.*
- *Responsible for representing clients at trial in recovery audit appeals and providing litigation support services regarding Medicare Program Safeguard Contractor statistically sampled audits.*
- *Responsible for drafting legislation and testifying at legislative hearings in support of client lobbying efforts. Developed Sarbanes-Oxley compliant internal controls to assist clients in improper payment mitigation efforts and statistical sampling protocols in accordance with generally accepted statistical sampling priniciples.*
- *Assist accounting and sampling procedures and designed and implemented improper payment reduction processes for Fortune 10 client businesses.*
- *Contributor to industry white papers and frequent speaker for industry association on recovery audits, document management and statistical sampling.*

*BDO Seidman & PriceWaterhouseCoopers; Atlanta, GA; 1997-2002*
*Senior Manager, SW Practice Leader - Recovery Audits*

- *Responsible for building southeast recovery audit practice for multi-national accounting and consulting firms.*
- *Achieved recoveries of improper payments and cost mitigation in excess of $250 million for client businesses.*

*General Electric Company; Fort Myers, Florida; 1990-1997*
*Manager Recovery Audits*

- *Provided recovery auditing and accounting services to multiple industries including healthcare, manufacturing, construction, government contracting, distribution, financial services, retail, wholesale, transportation, and research & development.*
- *Developed and implemented initial statistical sampling protocols used by industry in recovery audits and achieved recoveries and cost reductions in excess of $250 million.*

**Name:** Jason Barnes

**Project Role:** Audit Director

**Education:** Oakland University; Rochester Hills, MI
B.S. Accounting

**Experience:**

*ACLR; Plymouth, MI; 2005- Present*
*Manager, Recovery Audits*

- Managed team of recovery auditors responsible for identifying and recovering improper payments and mitigating state assessments arising from internal control deficiencies in Ford Motor Company accounting processes and procedures. Responsible for ensuring compliance with numerous contractual and tax statutory and regulatory requirements in states throughout the country, developing position papers for appeal, negotiating assessments, and defending company position in audit.
- Developed Sarbanes-Oxley compliant internal control procedures for a myriad of deficient accounting, recovery, and collection activities for General Electric Company and Koch Industries.
- Reviewed accounting systems of airline software manufacturer to identify fraud and the attendant liabilities associated with improper collections, researching state statutory and regulatory requirements for mitigation of fines and penalties, and developed position papers for each.
- Responsible for designing and documenting state approved statistical sampling methodologies and parameters for use in recovery audits. Assisted in the development of detailed recovery audit manual and audit tracking databases to track audit workpapers, results, and appeal efforts.
- Identified, designed, and implemented best practices for numerous businesses including the retrieval of over $100 million dollars in improper payments and mitigation.

*JohnBernard, LLC; Detroit, MI; 2002-2005*
*Analyst, Database Management*

- Assisted in the implementation of a company-wide accounting system implementation.
- Responsible for representing clients in state and local tax matters, process and procedure implementation, and taxpayer advocacy.
- Designed and implemented client databases and provided administrator client support and testing services as well as supplier and customer support services.

A86

A00182

**Name:** Bruce Dixon

**Project Role:** Systems Security Officer

**Education:**   Purdue University; West Lafayette, IN
B.S. Accounting

**Experience:**

*Jawood Management Associates; Troy, MI; 11/2005 - 09/2008*

- In charge of the implementation of Health Data Management Solutions DART web-based health care analytical system for Blue Cross Blue Shield of Michigan. Ran the project and put over 200 customers up on the system. Handled all administration and provided over 70 training sessions on the DART system to both internal and external customers.
- Project Manager for the Medicare Advantage division of Blue Cross Blue Shield of Michigan for 3 projects.  Developed and implemented a metrics reporting system to measure the productivity of the production support department; managed the update of BCBSM's systems to handle modified Coordination of Benefits data from the Center for Medicare and Medicaid Services (CMS).
- Managed a SAS 70 audit project in addition to handling the administration of Peregrine Service Center, the premier IT incident reporting data base.

*V2Soft; Bingham Farms, MI; 05/2004 - 10/2005*

Project Manager with the PC/LAN team. Responsibilities included the replacement and installation of 40,000 new PCs with XP operating system for Chrysler Corp. Utilized BlueCurrent software to manage the installation of all PC based application software.

*Jawood Management Associates; Troy, MI; 12/1999 - 12/2003*

Project manager for 3 projects at Blue Cross Blue Shield of MI, Blue Care Network, and NASCO. The first project was a claims repricing project, the second was a capitation improvement project which changed the way BCN pays providers from paper checks to EFT and electronic sending of reports to providers and the third was the implementation of ANSI 834 enrollment files for a FACETS computer system. BCN installed a client/server based computer system to replace mainframe legacy systems and as project manager I handled the systems conversion for the membership and billing departments and the rating and underwriting department.

**Comspec Intl Inc.; Bingham Farms, MI; 06/1997 - 09/1999**

In charge of certifying all PC/LAN software for year 2000 compliance along with installation of 9,000 new PCs for Blue Cross Blue Shield of MI.

**Phoenix Consulting; Bloomfield , MI; 09/1996 - 05/1997**
Consultant in charge of the sales and implementation of Macola software in the S.E. Michigan area.

**ITR, Ltd.; Bloomfield, MI; 02/1994 - 09/1996**
Owned a company that installs computer hardware and software for small to medium sized manufacturing companies. Representative for Macola software for the S.E. Michigan region.

**NAME:** Deanna Minges

**PROJECT ROLE:** Medicare Part D Team Leader

**QUALIFICATIONS:** Experienced leader with extensive knowledge of Medicare, Medicare Advantage, Medicare Part D, Medicaid, commercial carrier policies, guidelines and criteria to qualify therapy based on diagnosis, and effective with all forms of billing formats to include NCPDP. Has strong background in billing claims for primary, secondary, and billing Medicare for denial appropriately and strong pharmacy background for billing medical claim copays to drug riders. An active member of NHIA and speaker at NHIA seminars for Medicare Part D.

**EXPERIENCE:**

*Advanced Care Infusion, Shelby Township, MI*
Director of Reimbursement, 02/2000 -09/2010

Hire, retain, and manage well qualified staff. Ensure daily departmental functions are timely and efficient. Play a key role in the intake process. Prepare primary, secondary, and billing for denial claims for submission in electronic format to include pharmacy claims in NCPDP format. Obtain and review supportive documentation for medical necessity and insurance criteria. Monitor and resolve denials and software issues and denial tracking. Manage A/R and set goals to maintain a low DSO. Set up pricing to assure correct reimbursement from payers. Identify problems and take appropriate action. Optimize the use of available resources such as time, supplies, finances, equipment, and people. Negotiate contracts and payment agreements with insurance carriers as well as HHA, SNF, Hospitals, and other lines of business. Contribute effectively to meetings, committees and other work groups. Complete financial reports and identify trends. *Internal auditor for HIPAA compliance, payer guidelines, Federal and State government, accreditation, Fraud Waste and Abuse, and quality assurance.*

- Proficient in Medical Insurance Billing/Terminology to include Medicare, Medicaid and commercial carriers with demonstrated ability to analyze Home Infusion, Specialty Pharmacy, and DME in Medicare and Medicaid appeals.
- Participated in the policy and procedure process for compliance with HIPAA, Acreditation, CMS, Federal/State regulations, and insurance contractual obligations. Participated in management/QA meetings.
- Proudly established a working structure to maintain a DSO of 60 days or less.

*Previous Work History:*

1996 - 2000:   Pharmacy technician and biller.
1992 - 1995:   Skilled Nursing Home medical records specialist
1983 - 1992:   Bookkeeper

A00185

NAME: Dr. Raymond Falk

PROJECT ROLE: Lead Statistician

EDUCATION: University of North Carolina, Chapel Hill
Ph.D. Biostatistics; M.S. Biostatistics; B.S. Zoology

EXPERIENCE:

### Royal Bank of Scotland Card Services; Bridgeport, CT; 2005-2009

- Gamma Regression Modeling: Introduced general methodology for Gamma regression models for heavy-tailed time-to-event and dollar-amount data; developed routines for automated modeling and deployment.
- Data Preparation: Developed systematic scripts for comprehensive processing of improper payment predictive data for general modeling purposes, including: conversion of ordinal codes and numeric symbols, detection and correction of special missing value codes, summarization of historical time series, detection and elimination of excessively small categories, detection of sources of multicollinearity, identification of representative and non-representative members of factor-analytic variable clusters, and automatic nonlinear transformation of predictors via preliminary modeling.
- Validation: Developed systems for comprehensive detection of defects and assessment of distributional change in monthly syndicated data sources.
- Integration: Unified workflow to build and deploy rafts of Logistic and Gamma regression models of high quality (%Error<0.6; KS>0.5) in parallel in record time under harrowing accelerating deadlines.

### RedShirtImaging, LLC; Fairfield, CT; 2001-2005

- Spatial Filtering: Introduced general parameterized kernels for spatial filtering.
- CardioCCD: Designed and adapted methodology and software for analysis of optical images of heart surfaces and developed user interface for specifying and navigating among electrophysiological endpoints.

### RxRemedy, Inc.; Westport, CT; 1999-2001

- Weight-ratio Estimation: Introduced unsaturated log-linear modeling for estimation of post-stratification weights relative to U.S. Census Bureau CPS data.  Automated production and validation procedures.
- Comorbidity Clustering: Clustering of patterns of combinations of concurrent health conditions; profiling of the database with respect to condition combinations, and identification of representative syndromes.
- Persistence Analysis: Episoding of product use histories based on compliance rates, followed by formal survival analysis (eliminating negative bias) in the modeling of the

persistence of individual and combination product use, transitions in product use, and evaluation of product use status at selected times.

### Metropolitan Life Insurance Company; New York, NY; 1997-1999

- Institutional Business: Validation of segmentations, with detailed attention to quality of discrimination; modeling transitions in roles and providers of financial services to institutional clients; clustering of preferred product combinations; and analysis of long term disability sales as a function of size of corporate customer and attitude toward price. (Syndicated data sources included SRI MacroMonitor and MoneyMarketDirectory surveys.)
- Auditing: Applied digit distribution analysis to dental claims data, testing deviations against both theoretical (Benford's Law) and empirical distributions, adapting commercially available SAS routines.
- Year 2000 Compliance: Evaluations of SAS, S-Plus, Model 1/PRW, KnowledgeSEEKER, MS-Excel.

### Statistical Consulting / SAS Programming; Stamford CT; 1996-1997

- Business Applications Programming: SAS programming against Sybase RDBMS on a Sun (Solaris) Workstation in a UNIX environment.
- Credit Risk Analysis: Logistic regression modeling of account delinquency as a function of credit bureau data with imputation of responses for rejected applications based on preliminary modeling. Analyses were conducted using SAS in IBM-Mainframe (VM/CMS,ISPS) and networked PC environments.

### Bayer Corporation; West Haven CT; 1987-1995

- Cerebrovascular Indications: Critical influence on successful NDA in subarachnoid hemorrhage.
- Cardiovascular Indications: Analysis of clinical trial for anti-anginal indication.
- Anti-infective Indications: Methodological research into testing specified differences between proportions for purposes of establishing equivalence to an active control.
- Pharmacodynamics: Nonlinear mixed effects analyses (implemented via iterative application of the SAS/MIXED procedure) of a composite pharmacodynamic model. Dual vertical axis graphs of successive responses against time proved highly effective in depicting cascade of physiological/biochemical effects.

### G.D. Searle & Company; Skokie IL; 1985 -1987

- Radioimmunoassay: Comparison of inhibition curves using standard logistic multiple regression analysis implemented using the SAS/NLIN procedure.
- Genetic Toxicology: Development of screening protocol for the UDS assay.

A91

- Drug Design: Identification of sequences of compounds representing progressive improvement simultaneously across multiple criteria; reprogrammed PL/I routine in SAS.

*Publications:*

- Falk, R.W. (1985) "L'-Superadditive Function and Concepts of Multivariate Dependence" (Doctoral dissertation written under Prof. P.K. Sen).
- Oshiro, Y., Balwierz, P.S., Falk, R.W., and Piper, C.E. (1987) Decision criteria for the in-vitro rat hepatocyte UDS assay" J. Applied Toxicology 7(6): 379-385.
- Falk, R.W. (1989) "Hommel's Bonferroni-type inequality for unequally spaced levels" Biometrika 76(1): 189-191.
- Falk, R.W. (1990) "Basic guidelines for inference from clinical trial data" Drug Information Journal 24: 507-512.
- Falk, R.W. and Koch, G.G. (1998) "Testing a specified difference between proportions" Biometrics S4(4): 1602-1614.
- Falk, R.W. "The General Hommel-Rüger Inequality" (Submitted 1996)

A92

# ATTACHMENT  C

# KEY PERSONNEL
# LETTERS OF COMMITMENT

**ACLR** *Strategic Business Solutions*

529 Forest Avenue
Suite 15-2
Plymouth Michigan 48170
Ph 734.207.0404   Fx 734.207.0408

December 13, 2010

Re:   Employee Commitment Letter
      CMS-RFQ-2011-110462
      Recovery Audit Services in Support of Medicare Part D

I acknowledge my commitment to complete recovery audit services in support of the
Medicare Part D upon award of the contract and that my commitment is binding for a
period not to exceed 120 days.

_____   12-13-2010

A94


**ACLR** *Strategic Business Solutions*

320 Forest Avenue
Suite 15-2
Plymouth, Michigan 44170
Ph. 734 207 0404   Fx. 734 207 6410

December 13, 2010

Re:   Employee Commitment Letter
      CMS-RFQ-2011-110462
      Recovery Audit Services in Support of Medicare Part D

I acknowledge my commitment to complete recovery audit services in support of the
Medicare Part D upon award of the contract and that my commitment is binding for a
period not to exceed 120 days.

_____ 12-13-2010
Jason Barnes

A95

A00191



**ALLPRO/staffnet**  100% Service-Disabled Veteran Owned Small Disadvantaged

2010

December 13, 2011 ~2010~

Bruce C. Dixon
1932 W Spinningwheel Ln
Bloomfield, MI 48304-1066

Re:     Employee Commitment Letter
        CMS-RFQ-2011-110462
        Recovery Audit Services in Support of Medicare Part D

Dear Mr. Dixon:

By signing this form you acknowledge your commitment to join our firm to complete recovery audit services in support of Medicare Part D upon award of the contract and that our offer of employment for this contract and your commitment is binding for a period not to exceed 14 days.

Very truly yours,

Louis Tapia,
CEO, AllPro/Staffnet

_Bruce Dixon_          12-13-2010

Bruce Dixon

295 Plus Park Boulevard, Suite 108 • Nashville, TN 37217 • 615-216-0356 • Fax 615-848-1899
www.allprostaffnet.com

 100% Service-Disabled Veteran Owned Small Disadvantaged    2010

December 13, 2011

Deanna D. Minges
4343 Lubahn Road
Casco, MI 48064

Re:     Employee Commitment Letter
        CMS-RFQ-2011-110462
        Recovery Audit Services in Support of Medicare Part D

Dear Ms. Minges:

By signing this form you acknowledge your commitment to join our firm to complete recovery
audit services in support of Medicare Part D upon award of the contract and that our offer of
employment for this contract and your commitment is binding for a period not to exceed 120
days.

Very truly yours,

Louis Tapia,
CEO, AllPro/Staffnet

Electronically signed by me 12/12/10 3:39pm
*Deanna Minges*
_____
Deanna Minges

295 Plus Park Boulevard, Suite 108 ⬧ Nashville, TN 37217 ⬧ 615-216-0356 ⬧ Fax 615-848-1899
www.allprostaffnet.com

**Excerpts from CMS 30(b)(6) Deposition
in ACLR I**

**EXHIBIT 6**

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

--------------------x

ACLR, LLC

      Plaintiff,

-vs-            Civil Action No. 15-767

THE UNITED STATES

      Defendant.

--------------------x

           Thursday, October 19, , 2017

           Baltimore, Maryland


THE DEPOSITION OF SONJA JEFFERSON BROWN as

Corporate Representative for the Department of

Health and Human Services 30(b)(6)


Volume 1

A99

Sonja Jefferson Brown As  ACLR, LLC v. THE UNITED STATES
Case No. 15-767     October 19, 2017

1    Q.  I'll also represent that attached to

2 it are various modifications to the contract as

3 well.

4        Do you see those as you flip through

5 the document?

6    A.  Yes.

7    Q.  What were CMS's obligations under the

8 contract -- the Part D RAC contract?

9    A.  To ensure the objectives of the

10 contract were executed.

11    Q.  And what were those objectives?

12    A.  Basically to come up with a

13 methodology to identify improper payments in the

14 Part D program.

15    Q.  Wasn't the primary purpose of the

16 Part D RAC contract to collect improper

17 payments?

18    A.  To identify and collect, yes.

19    Q.  And you had testified that it was to

20 come up with a methodology to identify --

21    A.  Well, that was part of the contract,

22 that the contractor would come up with a

1  methodology to identify improper payments, yes.

2       Q.    And where is that specified in the

3  contract?

4       A.    It starts on 33.

5       Q.    Okay.

6       A.    And also on 34 at the bottom of the

7  page.

8       Q.    And what specifically are you

9  referring to there on page 33 and 34?

10      A.    Under the chart there under 34 it

11  starts with:  This process has been designed to

12  ensure a methodical and thorough approach to

13  capturing improper payments.

14      Q.    And what you're reading from is part

15  of the performance work statement --

16      A.    Yes.

17      Q.    -- that was part of ACLR's Part D RAC

18  contract, correct?

19      A.    Correct.

20      Q.    And in the performance work statement

21  ACLR had set forth the process that it was going

22  to follow to identify and help recover the

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                              October 19, 2017

1  improper payments, correct?

2      A.    Correct.

3             (Brown Exhibit No. 62 was marked for

4  identification.)

5  BY MR. BONELLO:

6      Q.    I think we noted while you were

7  looking at the document you made a notation on

8  the document?

9      A.    Yes.  On page 33.

10     Q.    Okay.  And so the marking on page 33,

11  that's your marking, correct?

12     A.    Yes.

13     Q.    On Exhibit 61?

14     A.    61.

15     Q.    Okay.  I'm showing you what's been

16  marked as Exhibit 62.

17             Could you identify this document for

18  me?

19     A.    It's an email from Nathan Anthony.

20     Q.    And what's attached to the email?

21     A.    Please find the attached final version

22  of the concept of operations for the Part D RAC

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                              October 19, 2017

1        Q.    If you look at the sentence after the

2   7.5 percent, why don't you read that sentence.

3        A.    The contingency fees shall be paid

4   once the recovery audit contractor collects

5   Medicare overpayments.

6        Q.    So would it be --

7        A.    Okay.  So here it says the recovery

8   audit contractor.

9        Q.    Is to collect the overpayments,

10  correct?

11       A.    Yes.

12       Q.    And attached to the contract terms is

13  the performance work statement, correct?

14       A.    Yes.

15       Q.    And that's part of the Part D RAC

16  contract, correct?

17       A.    Yes.

18       Q.    And who developed the performance work

19  statement?

20       A.    That I don't know.  I'm sure it was

21  the team of folks that -- whoever worked on the

22  Part D RAC at that time.

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                              October 19, 2017

1  was determined that they didn't have the

2  authority to collect overpayments and only the

3  agency would perform that.

4       Q.   So how do you explain the decision by

5  CMS to collect payments even though the Part D

6  RAC contract says the contingency fees shall be

7  paid once the recovery audit contractor collects

8  the Medicare overpayments?

9       A.   It was just the change -- I guess this

10  program was new, it was evolving and I think

11  everybody knew that.  And so at some point -- I

12  don't know which point that was, but it was

13  determined that CMS would make the recoupments

14  and not the Part D RAC.

15       Q.   And where is that set forth within the

16  Part D RAC contract that allowed CMS to collect

17  the Medicare overpayments?

18       A.   I don't think it's specifically stated

19  in the contract that CMS would perform the

20  recoupment.

21       Q.   But that's what CMS stated it was

22  going to do with respect to the Part D RAC

1    A.    Yes.

2    Q.    And what is that?

3    A.    The impact to the government.

4    Q.    In what context is the impact

5  calculation used?

6    A.    In -- I'm sorry.  Repeat your

7  question.

8    Q.    I asked you what the definition of

9  impact calculation was.

10    A.    Well, we can go back to the section on

11  impact calculation, and it will explain it.

12    Q.    Okay.  And what section would that be?

13    A.    Exhibit 61, page 158.

14    Q.    Okay.  That's the improper payment

15  impact calculation methodology?

16    A.    Yes.

17    Q.    And that's only referenced in the

18  statement of work, correct?

19    A.    Yes.

20    Q.    If we look back at Section 5 of

21  Exhibit 61, ACLR never collected Medicare

22  overpayments, did it?

Sonja Jefferson Brown As                 ACLR, LLC v. THE UNITED STATES
Case No. 15-767                          October 19, 2017

1       A.    Correct.

2       Q.    And CMS didn't allow ACLR to collect

3    Medicare overpayments, correct?

4       A.    Correct.

5       Q.    Let's look at Section 5 again.   The

6    second paragraph says:   If the provider files an

7    appeal disputing the overpayment determination

8    and the appeal is adjudicated in the provider's

9    favor at the first level, the recovery audit

10   contractor shall repay Medicare the contingency

11   payment for that recovery.

12            Do you see that?

13      A.    Yes.

14      Q.    So what was contemplated in the

15   contract then is that ACLR would be paid before

16   any appeals, correct?

17      A.    Well, it doesn't specifically say that

18   they would be paid before the appeals.

19      Q.    Well, explain to me how the recovery

20   audit contractor would repay Medicare the

21   contingency fee payments for the recovery if the

22   appeal is adjudicated in the provider's favor at

Sonja Jefferson Brown As           ACLR, LLC v. THE UNITED STATES
Case No. 15-767                    October 19, 2017

1   the first level?

2        A.   Okay.  Yeah.  I guess it is implied

3   that they would have been paid before this

4   process took place -- the first level appeal.

5        Q.   And it says at the bottom:  Subsequent

6   appeals, after the first level of appeal, will

7   not affect the recovery audit contractor's

8   ability to retain the contingency payment.

9             Do you see that?

10       A.   I see it.

11       Q.   So after the first appeal, any

12   subsequent appeals should not impact ACLR in

13   terms of its ability to repay or not repay a

14   contingency fee payment, correct?

15       A.   That's what it says here, yes.

16       Q.   Was there anything that changed the

17   contract -- that modified the contract in that

18   regard that you're aware of?

19       A.   There may have been.  I know it was

20   some -- there were several modifications to the

21   base year.  So it could have been in one of

22   those modifications.

1          MR. CARNEY:  Objection, argumentative.

2          THE WITNESS:  I wouldn't say ignore.

3   It didn't happen, and I'm not sure why other

4   than they were still not operational at the

5   time.

6   BY MR. BONELLO:

7      Q.    Your contention is that in the first

8   three years ACLR was not operational?

9      A.    At least the first year, the base

10  year.

11     Q.    How was ACLR not operational during

12  the base year?

13     A.    I don't think it had any CMS data to

14  evaluate at that time.

15     Q.    Had ACLR requested CMS data?

16     A.    To my knowledge, yes.

17     Q.    But CMS didn't provide the data for

18  ACLR to start evaluating --

19     A.    That's correct.

20     Q.    And why didn't CMS provide the data

21  for ACLR to evaluate during the base year?

22     A.    In order for the information to -- I

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                                    October 19, 2017

1   guess, in order for ACLR to start evaluation of

2   any of CMS's data on their systems, they had to

3   go through what we call an authority to operate.

4        Q.   That's an ATO?

5        A.   Yes.

6        Q.   And what needs to be done to go

7   through an ATO?

8        A.   Well, basically it's the testing of

9   the contractor systems to ensure that they're

10  secure enough.

11       Q.   And who performs that testing?

12       A.   Normally the Office of Information

13  Systems.

14       Q.   And did ACLR indicate that it was

15  ready for the testing to proceed during the base

16  year?

17       A.   I'm not certain if they did or not.

18       Q.   When did the government offer to

19  conduct the testing which would be necessary to

20  issue the ATO?

21       A.   I would think those activities would

22  start right away once ACLR submitted the proper

1 documentation to initiate the actual testing of

2 the systems.

3     Q.   So once ACLR submits the necessary

4 documentation, then the government should

5 proceed with testing?

6     A.   It would schedule -- yes.

7     Q.   And the schedule should be shortly

8 after the submission by ACLR that its systems

9 are ready for testing, correct?

10     A.   "Shortly after" I'm not sure.

11     Q.   Would it be a month later?

12     A.   That I do not know.

13     Q.   Would it be appropriate for the

14 government to wait four months after ACLR says

15 its systems are ready to be tested in order for

16 the government to commence testing?

17     A.   I can't say what's appropriate, you

18 know, for that area that conducts the testing.

19 I know it's based on schedule.  They're testing

20 a lot of contractors at one time.  So each

21 testing has to be scheduled.

22     Q.   Do you know when the testing was

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                              October 19, 2017

1    scheduled in this case based upon when ACLR had

2    said it was ready to have its systems tested?

3          A.    I mean, from what I gather, to my

4    knowledge, the ATO was given in October of 2011.

5    So it was shortly after, I'm sure, that ACLR

6    submitted the required documentation to initiate

7    the testing.

8          Q.    Do you know the time frame between

9    when the documentation was submitted and when

10   the testing began?

11         A.    I think, if I recall, documentation

12   for testing has to be submitted after the

13   kickoff -- maybe 90 days after the kickoff

14   meeting.

15         Q.    Okay.  And then when was the testing

16   conducted?

17         A.    I guess it was sometime after that.  I

18   don't have the actual date that the testing

19   actually started.  I just know that they

20   received their ATO in October of 2011.

21         Q.    If you look on page 34 of Exhibit 61.

22   And that outlines ACLR's audit process.

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                              October 19, 2017

1  I don't know if that was stated specifically in

2  the objectives.

3      Q.   Well, this was part of the contract,

4  correct?

5      A.   It is.  Initially, yes.

6      Q.   Did CMS contract with Booz Allen to

7  propose Medicare Part D procedures and policies

8  to CMS?

9      A.   Not that I'm aware of.  Procedures, I

10 don't know.  Policies, I don't know.

11     Q.   If you look at page 35 on

12 Exhibit 62 -- or 61, what was the primary focus

13 of ACLR's review?

14     A.   Duplicate payment -- are you referring

15 to the --

16     Q.   Yes.

17     A.   -- last paragraph?

18     Q.   Yes.

19     A.   Duplicate payment review and data work

20 plan.

21     Q.   And when were they going to conduct

22 this review?

Sonja Jefferson Brown As                ACLR, LLC v. THE UNITED STATES
Case No. 15-767                                    October 19, 2017

1  I don't know if that was stated specifically in

2  the objectives.

3        Q.   Well, this was part of the contract,

4  correct?

5        A.   It is.  Initially, yes.

6        Q.   Did CMS contract with Booz Allen to

7  propose Medicare Part D procedures and policies

8  to CMS?

9        A.   Not that I'm aware of.  Procedures, I

10  don't know.  Policies, I don't know.

11       Q.   If you look at page 35 on

12  Exhibit 62 -- or 61, what was the primary focus

13  of ACLR's review?

14       A.   Duplicate payment -- are you referring

15  to the --

16       Q.   Yes.

17       A.   -- last paragraph?

18       Q.   Yes.

19       A.   Duplicate payment review and data work

20  plan.

21       Q.   And when were they going to conduct

22  this review?

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                   October 19, 2017

1          A.   Once, I guess, they were able to start

2     their review with the data received.

3          Q.   And did ACLR conduct its duplicative

4     payment review in 2011?

5          A.   I'm not sure for 2011.

6          Q.   And then turn to the next page.  And

7     if you look in the middle of that first

8     paragraph, it states:  Once we have received a

9     complete set of data, we will conduct duplicate

10    payment reviews.

11               Do you see that?

12         A.   Yes.

13         Q.   And then it goes on to talk about how

14    they will conduct that duplicate payment review?

15         A.   Yes.  Uh-huh.

16         Q.   And the performance work statement

17    sets forth the methodology that ACLR will use in

18    connection with the duplicate payment review?

19         A.   Somewhat.  I wouldn't say it's a

20    complete methodology.

21         Q.   And if you look at page 38, there's a

22    reference to what an improper payment is.

Sonja Jefferson Brown As                ACLR, LLC v. THE UNITED STATES
Case No. 15-767                         October 19, 2017

1              Do you see that in the box?

2       A.    Yes.

3       Q.    Okay.  And is that definition of

4  improper payment consistent with CMS's

5  definition of an improper payment?

6       A.    For the most part, yes.

7       Q.    It is?

8       A.    Yeah.

9       Q.    If you look at the top of page 38, it

10  states:  ACLR auditors will also ensure that

11  beneficiary payments are commensurate with plan

12  requirements and have been properly netted

13  against plan sponsor costs, identify duplicate

14  capitation payments and beneficiary and

15  prescription data occurring within and across

16  plan sponsor PDE submissions and capitation

17  payments.  Once this stage has been completed,

18  listings of these payments will be documented on

19  the workpapers and provided to plan sponsors for

20  review.  Any remaining unresolved amounts will

21  be identified as improper, recovered and removed

22  from further review.

Sonja Jefferson Brown As            ACLR, LLC v. THE UNITED STATES
Case No. 15-767                                October 19, 2017

1          Do you see that in the box?

2     A.    Yes.

3     Q.    Okay.  And is that definition of

4  improper payment consistent with CMS's

5  definition of an improper payment?

6     A.    For the most part, yes.

7     Q.    It is?

8     A.    Yeah.

9     Q.    If you look at the top of page 38, it

10  states:  ACLR auditors will also ensure that

11  beneficiary payments are commensurate with plan

12  requirements and have been properly netted

13  against plan sponsor costs, identify duplicate

14  capitation payments and beneficiary and

15  prescription data occurring within and across

16  plan sponsor PDE submissions and capitation

17  payments.  Once this stage has been completed,

18  listings of these payments will be documented on

19  the workpapers and provided to plan sponsors for

20  review.  Any remaining unresolved amounts will

21  be identified as improper, recovered and removed

22  from further review.

Sonja Jefferson Brown As               ACLR, LLC v. THE UNITED STATES
Case No. 15-767                        October 19, 2017

1              Do you see that?

2        A.    Yes.

3        Q.    And that's a description of what ACLR

4  was going to do under the Part D RAC contract,

5  correct?

6        A.    Yes.  For duplicate payments, yes.

7        Q.    Did ACLR submit any improper payment

8  workpapers to plan sponsors in 2011?

9        A.    No.  Not to my knowledge.

10       Q.    And why not?

11       A.    Most likely CMS didn't approve

12  anything to be submitted -- to be submitted to

13  plan sponsors.

14       Q.    And why didn't CMS approve anything to

15  be submitted to plan sponsors in 2011?

16       A.    I'm not sure.

17       Q.    Were there any issues with ACLR's

18  expertise in the base year of the contract?

19       A.    Not that I'm aware of for the base

20  contract.

21       Q.    Were there any issues with ACLR's

22  quality in the base year of the contract?

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                   October 19, 2017

1          Do you see that?

2      A.   Yes.

3      Q.   And that's a description of what ACLR

4  was going to do under the Part D RAC contract,

5  correct?

6      A.   Yes.  For duplicate payments, yes.

7      Q.   Did ACLR submit any improper payment

8  workpapers to plan sponsors in 2011?

9      A.   No.  Not to my knowledge.

10     Q.   And why not?

11     A.   Most likely CMS didn't approve

12  anything to be submitted -- to be submitted to

13  plan sponsors.

14     Q.   And why didn't CMS approve anything to

15  be submitted to plan sponsors in 2011?

16     A.   I'm not sure.

17     Q.   Were there any issues with ACLR's

18  expertise in the base year of the contract?

19     A.   Not that I'm aware of for the base

20  contract.

21     Q.   Were there any issues with ACLR's

22  quality in the base year of the contract?

Sonja Jefferson Brown As        ACLR, LLC v. THE UNITED STATES
Case No. 15-767                            October 19, 2017

1   where an excluded pharmacist is working for or

2   an owner of a pharmacy should not be considered

3   excluded for the scope of this review.

4           Do you see that?

5       A.   Yes.

6       Q.   What was the contractual authority for

7   CMS to eliminate those pharmacists from the

8   review?

9       A.   Again, I think CMS just has the

10  discretion to make any changes necessary in the

11  process as they see fit.

12      Q.   And where is that set forth in the

13  contract?

14      A.   Well, I think throughout the whole

15  performance work statement it says that it works

16  with CMS, it gets approval, you know, changes

17  will be made -- I mean, you know, not specific

18  to this audit issue but, you know, in general.

19      Q.   And you can't point to anything in

20  particular that states that, can you?

21          MR. CARNEY:  Objection, asked and

22  answered, mischaracterizes.

1   identification.)

2   BY MR. BONELLO:

3       Q.   I'm showing you what's been marked as

4   Exhibit 68.

5            Do you know what this document is?

6       A.   It's Issuance of Part III to OMB

7   Circular A-123.

8       Q.   Turn to page 2 after the Table of

9   Contents.  And it says:  What is an erroneous or

10  improper payment?

11           And then under A it provides a

12  definition, in the first paragraph, of an

13  improper payment.

14           Is that CMS's definition of improper

15  payment?

16      A.   Yes, pretty much.

17      Q.   When you say pretty much, is there

18  anything that's not within the scope of the

19  definition of an improper payment that's set

20  forth in that first paragraph under Section A,

21  what is an erroneous or improper payment?

22      A.   Yeah.  As it applies to the Part D

1    RAC, the documentation piece of it may not apply

2    specifically.

3         Q.   And why is that?

4         A.   In addition, when an agency's review

5    is unable to discern whether a payment was

6    proper as a result of insufficient or lack of

7    documentation, this payment must also be

8    considered an error.

9         Q.   And what's your testimony with respect

10   to that?

11        A.   I guess this could apply to the RAC as

12   well.

13        Q.   And, in fact, that was included in

14   the -- that definition was included in the

15   performance work statement, correct?

16        A.   I don't know without going back and

17   looking.

18        Q.   If you look at page 38 of Exhibit 61.

19        A.   Okay.  Yeah.  This was just copied

20   from this document here.

21        Q.   Did ACLR have access to plan sponsor

22   systems as part of its audits?

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                                October 19, 2017

1    sponsors.

2         Q.    Did CMS provide ACLR any equitable

3    adjustment as a result of this modification?

4         A.    No.

5         Q.    Did CMS reduce improper payment

6    amounts for contracts that didn't supply any

7    evidence supporting their appeal contentions?

8         A.    Repeat it --

9         Q.    Sure.

10        A.    -- one more time, please.

11        Q.    Didn't CMS reduce improper payment

12   amounts for contracts that didn't supply any

13   evidence supporting their appeal contentions?

14             MR. CARNEY:  Objection, vague.  What

15   do you mean reduce improper payment --

16   BY MR. BONELLO:

17        Q.    Well, there were appeal processes,

18   right, where a plan sponsor could appeal --

19        A.    Yes.

20        Q.    -- an audit finding?

21        A.    Yes.

22        Q.    And could CMS reduce improper payment

Sonja Jefferson Brown As         ACLR, LLC v. THE UNITED STATES
Case No. 15-767                  October 19, 2017

1   amounts for other plan sponsors who didn't

2   appeal based upon findings on the appeal of

3   another plan sponsor?

4       A.    What specific audit issue are you

5   referring to?

6       Q.    Any of the ones that ACLR completed.

7       A.    For excluded provider, I believe those

8   improper payments were reduced.

9       Q.    Anything else other than excluded

10  providers?

11      A.    Not that I'm aware of, no.

12      Q.    And why was it reduced on excluded

13  providers for plan sponsors that didn't appeal?

14      A.    Because here we're talking about

15  providers that are excluded from doing work with

16  the federal government.  And if we find it in

17  any documentation or any appeal under another

18  contractor, it was our duty to alert the other

19  plan sponsors that that provider was incorrectly

20  identified as excluded.

21      Q.    Is there anything in the Part D RAC

22  contract that allows an improper payment finding

1      A.    To put it -- I mean, to my knowledge,

2   there were no submissions that were approved.

3   What was outlined in the performance work

4   statement apparently is not something that they

5   were -- could do at the time for whatever

6   reason.

7           (Brown Exhibit No. 73 was marked for

8   identification.)

9   BY MR. BONELLO:

10     Q.    I'm showing you what's been marked as

11  Exhibit 73.  This is the response to Jessica

12  Sanders' email to Gil Mucke and Chris Mucke.

13          And Gil Mucke indicates that they've

14  reviewed the draft statement of work with no

15  issues as written.  We will probably need some

16  direction from the program office on sequencing

17  of the issue reviews, and we are more than able

18  to support their direction.

19          So was it CMS's understanding that

20  ACLR was comfortable with the statement of work

21  as of April 20th, 2012?

22     A.    According to this email, yes.

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                   October 19, 2017

1            (Brown Exhibit No. 74 was marked for

2    identification.)

3    BY MR. BONELLO:

4        Q.    I'm showing you what's been marked as

5    Exhibit 74.  And that's an email from Frank --

6    the top email is an email from Frank Chartier to

7    Tanette Downs on May 10th.

8            It says in the second paragraph:

9    Also, I contacted OAGM regarding the SOW and

10   received an interesting forward from Gil Mucke.

11   It stated they have no problem with any of the

12   SOW changes.

13           Do you see that?

14       A.    I see it, yes.

15       Q.    At that time since ACLR had indicated

16   that they were fine with the draft statement of

17   work, why wasn't it executed by CMS?

18       A.    To my knowledge, again, they -- there

19   were still processes and issues that they were

20   working out.

21       Q.    And what were those processes and

22   issues that were being worked out?

1      A.   Well, I know it's still -- you know,

2   there were issues for the payment process that

3   was still being worked out.  I believe the

4   appeals as well.  I'm not certain.

5      Q.   Anything else?

6      A.   No.  I just think that, you know, CMS

7   was covering all of their bases before

8   implementing the new statement of work.

9      Q.   What do you mean covering all of their

10   bases?

11      A.   Making sure all of the processes that

12   would be implemented would work.

13      Q.   And the two processes you're talking

14   about are the payment process and the appeals

15   process?

16      A.   Yes.  That's just two I can think of

17   right now.  There could have been other issues.

18      Q.   You're not aware of any other issues

19   other than the payment --

20      A.   I'm not aware of it.

21      Q.   -- processes or appeals?

22      A.   I'm not aware of it.

Sonja Jefferson Brown As     ACLR, LLC v. THE UNITED STATES
Case No. 15-767             October 19, 2017

```
 1          MR. CARNEY:  I want to make sure you
 2   get the information you're looking for.  So if
 3   you can give us like a two-minute break, keeping
 4   in mind she's a 30(b)(6) witness --
 5          MR. BONELLO:  That's fine.  Yeah.  You
 6   can take a break.  That's fine.
 7          (Recess.)
 8   BY MR. BONELLO:
 9      Q.   You've had a chance to confer with
10   counsel.  Do you have a response to the previous
11   question?
12          MR. CARNEY:  Do you mind re-asking it?
13          MR. BONELLO:  Sure.
14   BY MR. BONELLO:
15      Q.   Can you tell me the method and
16   calculation for the estimate of 1.9 billion
17   improper payments for Medicare Part D in 2014?
18      A.   Okay.  The 1.9 billion is
19   representative of the improper payments.
20   However, that also includes underpayments as
21   well as overpayments.  So I don't have the
22   breakdown of that.
```

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                   October 19, 2017

1          But when looking into the improper

2     payments, a sample of the PDE records is taken.

3     And plan sponsors from that sample, plan

4     sponsors are required to submit information on

5     their claims processing system information as

6     well as prescription -- hard copies of

7     prescriptions.

8          Q.    And that estimate is calculated by

9     CMS, correct?

10         A.    Yes.

11         Q.    And so that's something that CMS

12    believes it was in 2014.  It estimates that

13    there is 1.9 billion in improper payments for

14    Medicare Part D?

15         A.    Correct.

16             (Brown Exhibit No. 76 was marked for

17    identification.)

18    BY MR. BONELLO:

19         Q.    On that same topic, in terms of the

20    method and calculation of the improper payments,

21    what type of improper payments were identified

22    in that estimate?

1      A.    Again, it's based on information or

2   drug costs submitted to CMS, and it's basically

3   a validation of that information.

4      Q.    And you do a calculation, and you find

5   that there's improper payments, correct?

6      A.    Yes.   Based on the sample that's taken

7   and the differences in the gross drug costs that

8   are submitted.

9      Q.    What do you mean the gross drug costs

10  based on --

11     A.    Well, plan sponsors submit their drug

12  costs to CMS for payment.  And so, you know,

13  when sampling the PDE records when they request

14  the information from the plan sponsors, that

15  validates whether or not those submissions were

16  accurate.

17     Q.    And when there was an improper

18  payment, what category of improper payments were

19  identified?

20     A.    I don't have that breakdown.

21     Q.    There would be a breakdown, though,

22  correct, as to the type of improper payments?

1    A.   Well, we're looking at inaccuracy

2  reporting of drug costs.

3    Q.   What do you mean?  You mean based upon

4  PDE records --

5    A.   Yes.

6    Q.   -- correct?

7    A.   Yes.

8    Q.   So it could be a duplicative payment?

9    A.   Yes, it could be.

10   Q.   Could be one of the categories?

11   A.   Yes.

12   Q.   Excluded provider could be one of the

13  categories?

14   A.   Well, it's not that type of audit.

15  Excluded providers would not be looked at.

16  Again, this is the submission of actual drug

17  costs compared to what they submitted to CMS.

18   Q.   But one of those categories could be

19  duplicative payments?

20   A.   It could be.

21   Q.   What other categories could it be?

22   A.   I don't have a breakdown of the

1      Q.    And if you look at the highlighted

2  sections, the second one says:  The Medicare

3  Part D error rate for FY 2012 is 3.1 percent or

4  1.6 billion.

5      A.    Okay.

6      Q.    Is that a correct statement?

7      A.    It's in the report.  Yes.

8      Q.    And if you look above that, there's

9  five component payment error measures.  Do you

10 see that?

11     A.    Yes.

12     Q.    Which of the five component error

13 measures applies to the Part D program?

14     A.    For this report, all of them.

15     Q.    What does PEPV stand for?

16     A.    Prescription drug event data

17 validation.

18     Q.    Which of these error rate measures

19 apply to improper payments that would be

20 reviewed by the Part D RAC?

21     A.    Can you repeat the question, please?

22     Q.    Sure.  Which of these payment error

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                          October 19, 2017

1   reading -- the following sentence says:  The net

2   error rate for FY 2012 is 2.2 percent or

3   1.1 billion.  The net error rate is calculated

4   by subtracting the sample's underpayments from

5   overpayments and dividing by the total dollar

6   value of the sample, thus reflecting the overall

7   estimated monetary loss to the program.

8           So here in this document, what's the

9   estimated loss to the program for the Part D

10  improper payments?  It's 1.1 billion, isn't it?

11      A.    The net error rate, that's what it's

12  saying, 2.2 percent or 1.1 billion.

13      Q.    And that would mean then that the

14  estimate is that the plan sponsors have been

15  overpaid by 1.1 billion for FY 2012, correct?

16      A.    Correct.

17      Q.    Turn back over to 7229.  Actually

18  let's just go to the top of that page 7229.  It

19  says:  The Part D PEPV estimate captures errors

20  in payment due to invalid and/or inaccurate PDE

21  records.

22          And that's consistent then -- that's

1        Q.    Is that true?

2        A.    Yes.

3        Q.    Okay.  And the RAC is engaged under

4    the contract to recover improper payments.

5    Isn't that true?

6        A.    Correct.

7        Q.    And the RAC, as part of its

8    responsibilities, can recover improper payments

9    that may be encompassed by the PEPV rates or

10   analysis, correct?

11       A.    Yeah.  It may be, yes.

12       Q.    What's this next error rate, the PEDIR

13   rate?

14       A.    I'm not familiar with the PEDIR, but,

15   again -- I don't know.  I guess it's

16   submitted -- this here is talking about

17   administrative errors in DIR information -- the

18   DIR reporting, direct and indirect remuneration.

19       Q.    So CMS would have been interested in

20   recovering the estimated amount of the improper

21   payments under Part D, correct?

22       A.    Yes.  I believe so.  And, again, all

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                             October 19, 2017

1  Does that help at all if I ask for either one?

2      A.   No.

3      Q.   What was CMS's contractual basis to

4  instruct ACLR to use and apply a revised

5  methodology to perform the plan year 2010

6  duplicative payment review?

7      A.   It's part of the methodology in the

8  statement of work.

9      Q.   Can you refer me to anywhere in

10 particular?

11     A.   I think Appendix E -- let me find it

12 again.  Appendix E starting on page 160.

13     Q.   And what specifically are you

14 referring to?

15     A.   Step 4, I guess, the collaboration to

16 revise -- with CMS to revise the NAIRP, which

17 would include the methodology as well.

18     Q.   Now, that's for new issue submissions,

19 correct?

20     A.   Yes.

21     Q.   What about once an audit issue has

22 been approved?

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                          October 19, 2017

1       A.    Okay.  I guess you can -- it doesn't

2    specifically say in these steps, but under -- it

3    would happen under, I guess, the data validation

4    contractor review.

5       Q.    Under the data validation contractor

6    review, where does it allow CMS to instruct ACLR

7    to use and apply a revised methodology for

8    duplicative --

9       A.    It doesn't explicitly say in here.

10              (Brown Exhibit No. 78 was marked for

11    identification.)

12    BY MR. BONELLO:

13       Q.    I'm showing you what's been marked as

14    Exhibit 78.  This is an email string from

15    October/September of 2011.

16              If you look in the upper right-hand

17    corner, the Bates stamp A02180, there's an email

18    from Merri-Ellen James to Chris Mucke.  And it

19    says:  You will review that data for improper

20    payments for approved audit scope issues, so far

21    excluded providers and duplicative -- duplicate

22    payments.

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                             October 19, 2017

1           That's a correct statement that --

2      A.    Okay.  Where were you?  I'm sorry.

3      Q.    Sure.  I'm at the top email on A02180.

4      A.    Uh-huh.

5      Q.    And it's the third sentence I'm

6  reading from:  You will review that data for

7  improper payments for approved audit scope

8  issues, so far excluded providers and duplicate

9  payments.

10     A.    Uh-huh.

11     Q.    So as of October 4th, 2011, CMS had

12  approved the audit issues of excluded providers

13  and duplicate payments, correct?

14     A.    I don't see where it says approved.

15  It said you will review --

16     Q.    That data --

17     A.    -- that data --

18     Q.    -- for improper payments.

19     A.    After -- oh, wait a minute.  I'm

20  running into -- for improper payments for

21  approved audit scopes, so far excluded provider.

22     Q.    And those two, excluded providers and

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                          October 19, 2017

1  duplicate payments, have been approved as of

2  October 4th, 2011, correct?

3       A.   It sounds like it in this email.

4       Q.   Did CMS allow ACLR to audit the

5  duplicate payments at this time?

6       A.   I don't believe so.

7       Q.   Why not?

8       A.   I don't know why that one didn't move

9  forward until later.

10      Q.   Did ACLR use an exact match

11 methodology for identifying duplicate payments?

12      A.   Do you have something I can point to

13 that says they use an exact match?

14      Q.   Turn to the last page.

15      A.   Okay.

16      Q.   You see this, it says flow chart?

17      A.   Yes.

18      Q.   And it has in the box under the chart

19 match unique PDE records?

20      A.   Yes.

21      Q.   So ACLR was using an exact match

22 methodology in connection with its duplicate

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                   October 19, 2017

1    BY MR. BONELLO:

2        Q.    Proposed ACLR audit methodology under

3    review with Booz Allen.  Proposed ACLR audit

4    methodology technically acceptable.

5             Is the statement the proposed ACLR

6    methodology was technically acceptable a correct

7    statement as of November 3rd, 2011?

8        A.    Without knowing the result of the

9    review by Booz Allen, I don't know if it was

10   considered technically acceptable.

11       Q.    So whether ACLR's methodology for

12   duplicate payments was acceptable or not would

13   be based upon the conclusions of Booz Allen?

14       A.    Well, it says it's under review here.

15   Again, there's nowhere in here that said after

16   that review it was acceptable.

17       Q.    Well, you're the witness for the

18   duplicate payment methodology and the changes

19   and how those evolved.

20             So what I'm asking for is:  As of

21   November 3rd, 2011, was ACLR's duplicate

22   payments methodology technically acceptable?

Sonja Jefferson Brown As        ACLR, LLC v. THE UNITED STATES
Case No. 15-767                         October 19, 2017

1        A.    According to this document, it appears

2   as though it was.

3              MR. CARNEY:  And just can you clarify

4   what you mean by technically acceptable?

5              MR. BONELLO:  Well, that's what the

6   document says, and I've asked the question is it

7   technically acceptable.

8              MR. CARNEY:  I mean, other than it

9   says technically acceptable in this document, do

10  you have a use of the term technically

11  acceptable that has a particular meaning in this

12  context?  I mean, technically acceptable as

13  opposed to acceptable generally, or do you

14  mean --

15             MR. BONELLO:  Let me ask the witness.

16  BY MR. BONELLO:

17       Q.    What does it mean for a methodology to

18  be technically acceptable?

19       A.    I have -- I don't know.  I mean,

20  aspects of the methodology, what they're looking

21  at.  I don't know in this context what they were

22  referring to.

1     Q.    So you're telling me if this is a --

2  this is a CMS document that was sent by

3  Merri-Ellen James to Cynthia Moreno, and you

4  don't know what they're referring to when they

5  say ACLR's methodology is technically

6  acceptable?

7     A.    I can assume, yes.  Without discussing

8  this document with somebody, I can only assume

9  that it means that aspects of the methodology

10  and the information that they were reviewing or

11  identifying through this methodology was

12  acceptable.

13     Q.    And ACLR's excluded provider

14  methodology was also technically acceptable as

15  of November 3rd, 2011?

16     A.    That's what it says here.

17     Q.    If you recall back on the GAO report

18  where there's a reference that ACLR needed

19  significant assistance in developing its audit

20  methodologies, that didn't apply to duplicative

21  payments or excluded providers, did it?

22     A.    I don't know.

1   with the audit in 2011, correct?

2       A.   Again, I'm not certain for 2011.

3       Q.   What about for 2012?

4       A.   To my knowledge, they were not looking

5   at it in 2012.

6       Q.   And why not?

7       A.   I don't know the specific reasons

8   around why they weren't looking at it.

9       Q.   In the statement of work, can you

10  explain in Section 2.1.1 the new audit issue

11  approval process?

12      A.   Okay.  According to the statement of

13  work, the RAC must receive approval from CMS

14  prior to commencing recovery audit activities.

15  And in this section it outlines or comment for

16  the RAC to submit a New Audit Issue Review

17  Package for review.

18      Q.   And then Appendix E sets forth the

19  timeline, then, as to what happens once the

20  NAIRP is submitted, correct?

21      A.   Yes.

22      Q.   Did CMS always meet the deadlines set

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                        October 19, 2017

1   forth in Appendix E?

2       A.    No.

3             (Brown Exhibit No. 82 was marked for

4   identification.)

5   BY MR. BONELLO:

6       Q.    I'm showing you what's been mark as

7   Exhibit 82.

8             Can you identify this document for me?

9       A.    Yes.   It's a NAIRP submission for the

10  duplicate payment issue.

11      Q.    And when was this submitted?

12      A.    January 2nd, 2014.

13      Q.    Do you know when the NAIRP was

14  approved?

15      A.    I do not.   It looks like on May 13th.

16      Q.    What happened on May 13th?

17      A.    There was an email from India Thomas

18  from Christopher Mucke approving the duplicate

19  payment revised NAIRP --

20      Q.    So how long was --

21      A.    -- submitted on May 13th.

22      Q.    So how long was the time frame from

1   the submission of the revised duplicate payment

2   NAIRP to the --

3       A.    Just about five months.

4       Q.    And what plan years were approved?

5       A.    I believe 2010 and '11.

6       Q.    Why was plan year 2009 eliminated?

7       A.    I think by the time CMS and ACLR would

8   have gotten through the audit process that year

9   would have been closed.

10      Q.    How long would it take to get through

11  the audit process?

12      A.    It's take over a year, I think.

13  According to this -- the process outline, it was

14  over a year or more -- close to two years, I

15  believe.

16      Q.    Do you know how much money was

17  identified as being recoverable by ACLR?

18          MR. CARNEY:  Objection, vague.

19  BY MR. BONELLO:

20      Q.    In connection with its duplicative

21  payments NAIRP?

22      A.    The initial submission?

Sonja Jefferson Brown As            ACLR, LLC v. THE UNITED STATES
Case No. 15-767                                 October 19, 2017

1    Q.    Then turn to A02280.  And can you tell

2    me what this document is?

3    A.    It's a duplicate payment RFI

4    extension.

5    Q.    And what's the purpose of this?  What

6    does it do?

7    A.    It extends the deadline for the plan

8    sponsors to submit information associated with

9    the duplicate payment audit.

10    Q.    And what extension was granted?

11    A.    In this email, a 60-day extension.

12    Q.    And what contractual authority did CMS

13    have to extend the timeline for submitting this

14    information by plan sponsors in connection with

15    the Part D RAC contract?

16    A.    Plan sponsors, because of the volume

17    that was identified, they did not have enough

18    time to submit the information requested.  So it

19    was CMS's discretion to extend the timeline.

20    Q.    That was inconsistent with the

21    timeline set forth in the Part D RAC contract,

22    correct?

Sonja Jefferson Brown As            ACLR, LLC v. THE UNITED STATES
Case No. 15-767                     October 19, 2017

1       A.    In the statement of work, correct.

2       Q.    Turn to A02284.  Can you identify this

3  document for me?

4       A.    It's an email from myself to Chris

5  Mucke, Thais Thompson and Gil Mucke regarding

6  duplicate payment PDE adjustments.

7       Q.    And this was a revision to ACLR's

8  NAIRP -- or to the audit that was approved in

9  the NAIRP?

10      A.    Yes.  This was another revision to the

11 protocol.

12      Q.    And why was the revision to the

13 protocol made?

14      A.    We received, I guess, concerns from

15 several plan sponsors that the -- that these

16 were not duplicate payments, and they provided

17 information to CMS to support their argument

18 that they weren't duplicate payments, which

19 prompted CMS to look at the methodology again

20 and revise accordingly.

21      Q.    So CMS didn't conclude that the

22 improper payments were, in fact, proper, did it?

1     A.    Right.

2     Q.    And that methodology was used for the

3  duplicative payment NAIRP that was approved in

4  2014, correct?

5     A.    Yeah.  Used in the revised NAIRP.

6     Q.    The 2014 revised NAIRP?

7     A.    Yes.

8     Q.    And that was approved.  And then we've

9  got what we were just talking about where there

10  were issues --

11     A.    Right.  So after the NAIRP came in,

12  the initial methodology was revised.  The DVC

13  looked at it.  The request for information went

14  out to the plan sponsors.  Then that's when the

15  issues were identified, and we went back to

16  revising the methodology again.

17     Q.    So the initial methodology that ACLR

18  had was revised pursuant to CMS's request,

19  correct?

20     A.    Yes.

21     Q.    And that was what was used in the

22  NAIRP that was approved for duplicative

1  payments, correct?

2      A.   Right.

3           (Brown Exhibit No. 84 was marked for

4  identification.)

5  BY MR. BONELLO:

6      Q.   Okay.  I'm showing you what's been

7  marked as Exhibit 84.  And this refers to error

8  rates, and this is from Jamie Scott to you.

9           Do you recall this document?

10     A.   I'd have to look through it.  It's

11  been a while.  Okay.  Hold on.  Okay.

12     Q.   Taken look at the last page.  Who

13  generated this report?

14     A.   It looks like Livanta did.

15     Q.   What was ACLR's error rate for

16  duplicate payments?

17     A.   .65.

18     Q.   .65 percent?

19     A.   Uh-huh.  Yes.

20     Q.   And was that a significant error?

21     A.   Yes.

22     Q.   .65 percent was a significant error?

Sonja Jefferson Brown As                    ACLR, LLC v. THE UNITED STATES
Case No. 15-767                             October 19, 2017

1   include enough PDE records.

2          MR. CARNEY:  Well, record fields,

3   right?

4          THE WITNESS:  Fields, yeah.  Uh-huh.

5   BY MR. BONELLO:

6      Q.   And why wasn't the recommended

7   protocol -- why didn't CMS allow the recommended

8   protocol to move -- ACLR to move forward with

9   the recommended protocol?

10         MR. CARNEY:  Objection, foundation.

11         THE WITNESS:  So move forward...

12  BY MR. BONELLO:

13     Q.   Let me rephrase it then.  Let's look

14  at the next exhibit.

15         (Brown Exhibit No. 85 was marked for

16  identification.)

17  BY MR. BONELLO:

18     Q.   I'll hand you what's been marked as

19  Exhibit 85.

20         Can you identify this document for me?

21     A.   Yes.  It's a technical direction

22  letter for the duplicate payment audit review.

Sonja Jefferson Brown As                 ACLR, LLC v. THE UNITED STATES
Case No. 15-767                                    October 19, 2017

1      Q.   Other than those two factors, you

2   can't tell me anything else?

3      A.   That was some time ago.  So, I mean, I

4   don't have the meeting minutes or anything from

5   that walk-through of the plans' documentation.

6      Q.   Then it says:  CMS developed a revised

7   methodology that would remove PDE records that

8   were incorrectly identified by the original

9   methodology and provided that revised

10  methodology to ACLR on October 22nd, 2014.

11           What happened then as a result that

12  led to a termination of the duplicate payment

13  audit?

14     A.   If you read further, it says that CMS

15  instructed ACLR to use and apply the revised

16  methodology to perform its RFI review and

17  prepare the improper payment packages.  However,

18  when ACLR submitted the IPRPs for validation,

19  CMS determined that ACLR did not use the revised

20  methodology.

21     Q.   And how did CMS determine that ACLR

22  did not use the revised methodology?

1          A.    The data validation contractor said

2    that the approved methodology or the new

3    protocol was not used.

4          Q.    What was used?

5          A.    I'm not sure what was used unless I go

6    back to the DVC's summary report or something

7    that says what they actually used.  But it was

8    determined, as it said in this letter, that it

9    was not used.

10         Q.    And then what happened next?

11         A.    I know there was an email somewhere to

12   Gil Mucke, I guess, pretty much saying that the

13   revised methodology was not used as instructed.

14         Q.    So if I read on, you said that CMS

15   tasked the DVC with using the IPRPs ACLR

16   provided and applying the revised methodology so

17   the audit process could continue?

18         A.    Uh-huh.

19         Q.    Why was a technical direction letter

20   issued to terminate the audit?

21         A.    Because once the DVC used the

22   methodology, it reduced the number, but as the

Sonja Jefferson Brown As            ACLR, LLC v. THE UNITED STATES
Case No. 15-767                     October 19, 2017

1   technical direction letter said that CMS still

2   had concerns with releasing anything related to

3   this audit.

4        Q.   What were the other concerns that CMS

5   had with releasing the audit?

6        A.   I just think, you know, the

7   information from the plan sponsors, the

8   changes -- the several attempts to change the

9   methodology, I think, you know, leadership just

10  made a decision not to move forward with it.

11       Q.   Why did CMS continue to have concerns

12  with the validity of the overall audit results?

13       A.   As I just said, CMS believed that it

14  could still be false positives.  We tried to

15  revise it several times.  We weren't getting a

16  lot of cooperation from ACLR, and so --

17       Q.   Well, let me ask you this.  From the

18  time --

19            MR. CARNEY:  Would you let her finish?

20            MR. BONELLO:  I'd like to try and get

21  finished.  So I want to break it down.  It will

22  be easier for me.

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                   October 19, 2017

1   what were CMS's communications with the plan

2   sponsors pertaining to the duplicate payment

3   audit methodologies.

4       A.    Initially there was a request for

5   information that went out to the plan sponsors.

6   There was also email sent to the plan sponsors

7   extending the deadline to submit documentation.

8           As I mentioned earlier, there were

9   meetings with plan sponsors to go over the

10  documentation to support that the records

11  identified by the RAC were not improper.

12          And I think the last communication to

13  the plan sponsors was informing them that the

14  audit issue was being terminated.

15          (Brown Exhibit No. 86 was marked for

16  identification.)

17  BY MR. BONELLO:

18      Q.    I'm showing you what's been marked as

19  Exhibit 86.  This is an email from you to

20  Tanette Downs in December of 2014, and it shows

21  the current language, then the proposed change.

22          Is what's going on, you're comparing

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                   October 19, 2017

1   the current language in the contract to the

2   proposed change?

3       A.    This looks like it was time to enter

4   into the next option year.  So this is the time

5   to make any changes to the statement of work.

6       Q.    Was the statement of work already in

7   place at this point on December 11th, 2014?

8       A.    Yes.

9       Q.    And on the left column under Current

10  Language, that's the current language of the

11  statement of work, correct?

12      A.    Yes.

13      Q.    And if you look over at the Proposed

14  Change column, that's things that CMS was

15  considering making changes to with respect to

16  the existing contract as of December 11th, 2014,

17  correct?

18      A.    Yes.

19      Q.    And under the second proposed change

20  under the second box, it says:  CMS may modify

21  the approved methodology at any time during the

22  audit process.

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                          October 19, 2017

1           Do you see that language?

2      A.    Yes.

3      Q.    Okay.  And that was a change that CMS

4  was considering on December 11th, 2014?

5      A.    Yes.

6      Q.    So as of that time, there was no right

7  under the contract to modify the approved

8  methodology during the audit process.  Isn't

9  that true?

10     A.    There was not a right.

11     Q.    To modify the approved methodology at

12  any time during the contract audit process?

13     A.    It didn't explicitly say.

14     Q.    And that was a change, then, that CMS

15  was considering?

16     A.    Yes.  Given lessons learned, yeah.

17     Q.    Was that change ever made to the

18  contract to include -- to give CMS the ability

19  to modify the approved methodology at any time

20  during the audit process?

21     A.    I don't think any changes were made to

22  the next option year.

**Part D RAC Contract**

**EXHIBIT 7**

A00352

# MEDICARE PART D
# RECOVERY AUDIT SERVICES

### CONTRACT NO GS-23F-0074W
### TASK ORDER NO: HHSM-500-2011-00006G

### ORIGINAL CONTRACT AWARD
### AWARD DATE - 01.13.11

1

A00353

| ORDER FOR SUPPLIES OR SERVICES | | | PAGE | OF PAGES |
|---|---|---|---|---|
| | | | 1 | 29 |

IMPORTANT: Mark all packages and papers with contract and/or order numbers.

| 1. DATE OF ORDER | 2. CONTRACT NO. (If any) | | 6. SHIP TO: | | |
|---|---|---|---|---|---|
| 01/13/2011 | GS-23F-0074W | | | | |

| 3. ORDER NO. | 4. REQUISITION/REFERENCE NO. | a. NAME OF CONSIGNEE |
|---|---|---|
| HHSM-500-2011-00006G | | |

**5. ISSUING OFFICE** (Address correspondence to)
CMS, OAGM, ASG, DPIFMC

7500 SECURITY BLVD., MS: C2-21-15
BALTIMORE MD 21244-1850

**b. STREET ADDRESS**

| c. CITY | | d. STATE | e. ZIP CODE |
|---|---|---|---|

**7. TO:** CHRIS MUCKE

**a. NAME OF CONTRACTOR**
ACLR, LLC

**f. SHIP VIA**

**b. COMPANY NAME**

**c. STREET ADDRESS**
550 FOREST AVENUE
SUITE 15-2

**8. TYPE OF ORDER**

| [ ] a. PURCHASE | [X] b. DELIVERY |
|---|---|
| REFERENCE YOUR: | Except for billing instructions on the reverse, this delivery order is subject to instructions contained on this side only of this form and is issued subject to the terms and conditions of the above-numbered contract. |
| Please furnish the following on the terms and conditions specified on both sides of this order and on the attached sheet, if any, including delivery as indicated. | |

| d. CITY | e. STATE | f. ZIP CODE |
|---|---|---|
| PLYMOUTH | MI | 481703793 |

**9. ACCOUNTING AND APPROPRIATION DATA**

**10. REQUISITIONING OFFICE**
Medicare Program Integrity

**11. BUSINESS CLASSIFICATION** (Check appropriate box(es))

| [ ] a. SMALL | [ ] b. OTHER THAN SMALL | [X] c. DISADVANTAGED | [ ] g. SERVICE-DISABLED VETERAN-OWNED | **12. F.O.B. POINT** |
|---|---|---|---|---|
| [ ] d. WOMEN-OWNED | [ ] e. HUBZone | [ ] f. EMERGING SMALL BUSINESS | | Various |

| 13. PLACE OF | | 14. GOVERNMENT B/L NO. | 15. DELIVER TO F.O.B. POINT ON OR BEFORE (Date) | 16. DISCOUNT TERMS |
|---|---|---|---|---|
| a. INSPECTION | b. ACCEPTANCE | | Multiple | |
| Destination | Destination | | | |

**17. SCHEDULE** (See reverse for Rejections)

| ITEM NO. (a) | SUPPLIES OR SERVICES (b) | QUANTITY ORDERED (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) | QUANTITY ACCEPTED (g) |
|---|---|---|---|---|---|---|
| | Tax ID Number:  20-2662374 DUNS Number:  780272873 RECOVERY AUDIT SERVICES IN SUPPORT OF MEDICARE PART D Period of Performance: 01/13/2011 to 01/12/2016 | | | | | |

| 18. SHIPPING POINT | 19. GROSS SHIPPING WEIGHT | 20. INVOICE NO. | | 17(h) TOTAL (Cont. pages) |
|---|---|---|---|---|

**21. MAIL INVOICE TO:**

SEE BILLING INSTRUCTIONS ON REVERSE

| a. NAME | DHHS, CMS, OFM, AMG | $0.00 | |
|---|---|---|---|
| b. STREET ADDRESS (or P.O. Box) | Div. of Financial Operations P.O. Box 7520 | | 17(i) GRAND TOTAL |
| c. CITY | Baltimore | d. STATE MD | e. ZIP CODE 21207-0520 | $0.00 |

| 22. UNITED STATES OF AMERICA BY (Signature) | 23. NAME (Typed) |
|---|---|
| ▶ *Debra Stidham* | DEBRA STIDHAM TITLE: CONTRACTING/ORDERING OFFICER |

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION NOT USABLE

OPTIONAL FORM 347 (Rev. 4/2006)
Prescribed by GSA/FAR 48 CFR 53.213(e)

2

A157

A00354

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

Pursuant to the terms and conditions of Contract No. GS-23F-0074W and this task order, the contractor shall perform the work required in accordance with the attached Performance Work Statement (PWS) entitled "**Recovery Audit Services in Support of Medicare Part D**".

Signature of the Contractor represents acceptance of this task order.

Christopher Mucke/Managing Principal    01/13/11

Signature                        Print Name/Title                        Date

NOTE: Only those contract sections which differ from General Services Administration (GSA) Contract Number GS-23F-0074W under FABS Schedule 520 – 9 for Recovery Audit Services terms and conditions, or provide more detailed information specific to this particular Task Order, are provided below. For those contract sections not identified below, all terms and conditions of the contract remain in effect.

## 1.    TASK ORDER SUPPORT:

This task order is issued under General Services Administration (GSA) Contract Number GS-23F-0074W to perform the work required in accordance with the attached performance work statement (PWS) and deliverable schedule entitled, "Medicare Part D Recovery Audit Contractor." This task order shall be performed in accordance with the terms and conditions of the GSA contract under the FABS Schedule and the terms and conditions contained herein. Only those contract sections, which differ from the GSA schedule contract terms and conditions, or provide more detailed information specific to this particular task order, are provided below. For those contract sections not identified below, all terms and conditions of the GSA contract remain in effect.

## 2.    TYPE OF TASK ORDER:

This is a Firm-Fixed Price Contingency Fee task order. The Contingency Fee is 7.5%.

## 3.    PERIOD OF PERFORMANCE

The 12 month base period of the task order is from January 13, 2011 through January 12, 2012. The task order also includes four (4) 12-month optional periods. No contingency fees shall be paid after the end of the period of performance.

Page 2 of 29

3

A158

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

## 4.   PERFORMANCE WORK STATEMENT (PWS)

Independently, and not as an agent of the Government, the Contractor shall furnish all
necessary services, qualified personnel, material, equipment, and facilities, not otherwise
provided by the Government, as needed to perform the requirements set forth in Section
J.1, "Performance Work Statement (PWS)".

## 5.   TASK ORDER PRICE SUMMARY

All payments shall be paid only on a contingency basis. The recovery audit contractor will
receive 7.5% of all amounts collected. The contingency fees shall be paid once the recovery
audit contractor collects the Medicare overpayments. The recovery audit contractor shall be paid
a percentage of the amount that is collected through their recovery efforts. The recovery audit
contractor shall not receive any payments for the identification of the underpayments or
overpayments not recovered/collected. The recovery audit contractor shall submit vouchers on a
monthly basis (see Attachment 2) with supporting documentation of the recovery. Once verified,
CMS shall pay the voucher pursuant to the Prompt Payment Provisions.

If the provider files an appeal disputing the overpayment determination and the appeal is
adjudicated in the provider's favor at the first level, the recovery audit contractor shall repay
Medicare the contingency payment for that recovery. If the appeal is adjudicated in the agency's
favor at the first level, the recovery audit contractor shall retain the contingency payment for that
recovery. Subsequent appeals, after the first level of appeal, will not affect the recovery audit
contractor's ability to retain the contingency payment.

## 6.   OMB A-130 INFORMATION RESOURCE POLICY

Each RAC is required to follow the established comprehensive approach to improve the
acquisition and management of their information resources in accordance with this OMB
Circular. This circular is issued pursuant to the Paperwork Reduction Act (PRA) of 1980, as
amended by the PRA of 1995, the Clinger-Cohen Act of 1996, et al. The PRA establishes a
broad mandate to perform information resources management activities in an efficient, effective,
and economical manner.

## 7.1   HHSAR 352.242-70 KEY PERSONNEL (January 2006)

The key personnel specified in this contract are considered to be essential to work performance.
At least 30 days prior to diverting any of the specified individuals to other programs or contracts
(or as soon as possible, if an individual must be replaced, for example, as a result of leaving the
employ of the Contractor), the Contractor shall notify the Contracting Officer and shall submit
comprehensive justification for the diversion or replacement request (including proposed
substitutions for key personnel) to permit evaluation by the Government of the impact on
performance under this contract. The Contractor shall not divert or otherwise replace any key

Page 3 of 29

A00356

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

personnel without the written consent of the Contracting Officer. The Government may modify the contract to add or delete key personnel at the request of the contractor or Government.

(End of clause)

7.2     The following are designated Key Personnel Positions

PROJECT DIRECTOR
Christopher A Mucke, CPA
550 Forest Avenue, Suite 15-2
Plymouth, MI 48170
P 734-207-0404
cmucke@aclrsbs.com

AUDIT DIRECTOR
Jason Barnes
550 Forest Avenue, Suite 15-2
Plymouth, MI 48170
P 770-857-1029
jbarnes@aclrsbs.com

LEAD STATISTICIAN
Raymond Falk, Ph.D.
212 Andrews Lane
Chapel Hill, North Carolina 27516-2201
(203) 520-3793
rfalk@aclrsbs.com

SYSTEMS SECURITY OFFICER
Bruce Dixon
550 Forest Avenue, Suite 15-2
Plymouth, MI 48170
P 734-207-0400
bdixon@aclrsbs.com

MANAGER, MEDICARE PART D
Deanna Minges
550 Forest Avenue, Suite 15-2
P 734-207-0400
dminges@aclrsbs.com

8.     SUBCONTRACT CONSENT

To facilitate the review of a proposed subcontract by the Contracting Officer Technical Representative and the Contracting Officer, the Contractor shall submit the information required by the FAR clause 52.244-2 entitled, SUBCONTRACTS, to the COTR who shall in turn forward the information with his/her recommendation to the Contracting Officer. The Contracting Officer shall review the request for subcontract approval and the COTR's recommendation and advise the Contractor of his/her decision to consent to or dissent from the proposed subcontract, in writing. Consent is hereby given to issue the following subcontract(s):

        Allpro/Staffnet, LLC (Allpro)

1. In accordance with the Health and Human Services Supplemental Acquisition Regulation (HHSAR) and FAR _52.202–1(a)(1)_, substitute the following as paragraph (a) of 52.202-1(a)(1) with :

"(a) The term "Secretary" or "Head of the Agency" (also called "Agency Head") means the Secretary, Deputy Secretary, or any Assistant Secretary, Administrator or

Page 4 of 29

A160

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

Commissioner of the Department of Health and Human Services; and the term "his/her duly authorized representative" means any person, persons, or board authorized to act for the Secretary."

Add the following paragraph 'h' to 52.202-1

"(h) The term "Contracting Officer's Technical Representative" means the person who monitors the technical aspects of contract performance. The Contracting Officer's Technical Representative is not authorized to issue any instructions or directions which cause any increase or decrease in the Statement of Work/Performance Work Statement/Specifications which would result in the increase or decrease in the price of this contract, or changes in the delivery schedule or period of performance of this contract. If applicable, the Contracting Officer's Technical Representative is not authorized to receive or act upon any notification or revised cost estimate provided by the Contractor in accordance with the Limitation of Cost or Limitation of Funds clauses of this contract."

9.    Contracting Officer's Technical Representative (COTR) and/CONTRACT SPECIALIST:

Marnie Dorsey is designated as the COTR for this order.  Marnie's address is:

> Ms. Marnie Dorsey
> Centers for Medicare and Medicaid Services
> OFM/CPI/MPIG/DMI
> 7500 Security Boulevard
> Phone: (410)786-4462
> Email: Marnie.dorsey@CMS.HHS.Gov

All technical correspondence should be directed to the COTR with a copy to the Contract Specialist.

The responsibilities and duties of the COTR include:

a) Provide technical direction as needed to the contractor as long as the terms and conditions of the contract are not changed.
b) Monitor contractor's ongoing efforts.
c) Serve as liaison between the contractor, Project Officer and project team.
d) Review deliverables and advise Contracting Officer of the contractor's performance.
e) Advise the Contracting Officer on the contractor's compliance with technical performance requirements.
f) Ensures that the contractor input and/or recommendations are considered by CMS project management.

Page 5 of 29

A00358

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

The Contract Specialist for this task order is Ms. Jessica Sanders.  Her address is:

> Centers for Medicare and Medicaid Services
> 7500 Security Blvd.
> ATTN: Ms. Jessica Sanders
> Mailstop:  C2-21-15
> Baltimore, MD  21244-1850
> (410) 786-1076

The Contracting Officer for this task order is Ms. Debra Stidham.  Her address is:

> Centers for Medicare and Medicaid Services
> 7500 Security Blvd.
> ATTN:  Ms. Debra Stidham
> Mailstop:  C2-21-15
> Baltimore, MD  21244-1850
> (410) 786-5129

## 10.   CONFIDENTIALITY

As a result of this task order, the GSA Schedule Contractor may have access to confidential information (i.e., information considered proprietary as well as information that may fall under the Privacy Act).  The GSA Schedule Contractor shall not disclose any such information or findings to any parties other than the Project Officer and staff assigned to this effort. Appropriate administrative, technical, procedural and physical safeguards shall be established by the GSA Schedule Contractor to protect the confidentiality of the data and to prevent unauthorized access to such data.

## 11.   DESIGNATION OF PROPERTY ADMINSTRATOR AND PROPERTY ADMINISTRATION

   a.   The CMS Property Administrator, Administrative Services Group, Office of Property and Space Management at (410) 786-3346, is hereby designated the property administration function for this contract.   The Contractor agrees to furnish information regarding Government Property to the Property Administrator in the manner and to the extent required by the Property Administrator, his duly designated successors, and in accordance with FAR Part 45 and DHHS Manual entitled, Contractor's Guide for Control of Government Property (1990).

   b.   The contractor is responsible for an annual physical inventory accounting for all Government property under this contract.  The inventory must be conducted by September 30th and the form 565, Report of Accountable Personal Property (J-15) submitted by October 31st of each year.

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

c. The inventory report shall include all items acquired, furnished, rented or leased under the contract. Employees who conduct the inventories should not be the same individuals who maintain the property records. Following the physical inventory, the contractor shall prepare an inventory report and submit the report to the CMS Property Administrator at the following address:

> Centers for Medicare & Medicaid Services
> OICS, Administrative Services Group
> Division of Property and Space management
> 7500 Security Blvd., Mailstop: SLL-14-06
> Baltimore, MD 21244-1850

d. Commercially leased software is subject to these reporting requirements.

e. The RAC shall submit a consolidated report of all accountable Government property under this contract, including subcontractor inventory information.

f. The final inventory report shall indicate that all items required for continued contract performance are acceptable and free from contamination. Property that is no longer usable or required shall be reported and disposition requested.

## 12. INVOICING AND PAYMENT

Invoicing and Payment

a. Submission of Invoices and Place of Payment

(i) No more than once each month following the effective date of this contract, the Contractor may submit to the Government an invoice (or public voucher) for payment, in accordance with FAR Clause 52.216-7 "Allowable Cost & Payment." Invoices shall be prepared in accordance with this contract. All invoices shall be reconciled against the RAC Database (40700NMSPB) or other documentation as appropriate to ensure collection has been made and funds recouped deposited prior to any invoice being paid.

(ii) To expedite payment, invoices shall be sent, as follows:

> Monthly invoices (original and four copies) shall be sent directly to the address below (where applicable, the Contractor shall submit the invoice to said office via the cognizant government auditor):
>
> Department of Health and Human Services
> Centers for Medicare & Medicaid Services
> P.O. BOX 7520

Page 7 of 29

8

A163

A00360

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

7500 Security Boulevard
Baltimore, Maryland 21207-0520

(iii) Content of Invoice (If Applicable):

Contractor's name and invoice date;
Contract number of other authorization for delivery of
  property and/or services;
Description, cost or price, and quantity of property
  and/or services actually delivered or rendered;
Shipping and payment terms;
Other substantiating documentation or information as
  required by the contract; and
Name (where practicable), title, phone number, and complete
  mailing address of responsible official to whom payment is
  to be sent.

b. Invoice Payment

(i)   In accordance with FAR 52.232-33, the Centers for Medicare and Medicaid Services
      (CMS) shall only make an electronic reimbursement/payment.

      In accordance with FAR 52.204-7, the contractor must register in the Central Contractor
      Registration (CCR) database.  Failure to register in CCR may prohibit CMS from
      making awards to your organization.
      The contractor shall notify CMS' Division of Accounting Operations of all EFT and
      address changes in CCR via the following email address:  CCRChanges@cms.hhs.gov

(ii)  The target date for payment pursuant to the provision of FAR Clause, 52.216-7
      "Allowable Cost and Payment" of this contract shall be 30 calendar days after an invoice
      containing the information set forth in Paragraph "a" of this article is received in the7
      payment office designated herein.

(iii) Upon receipt of the Contractor's "completion invoice" in the payment office designated
      in Paragraph "a" of this article, payment of any remaining cost and fee determined to be
      allowable pursuant to the provisions of FAR Clause, 52.216-7 "Allowable Cost and
      Payment" of this contract shall be due 30 calendar days after the Contracting Officer
      approves the "completion invoice" for payment.

(iv)  Payment shall be authorized after the Division of Accounting has audited the invoice in
      accordance with Federal Regulations.  This audit includes verification that the invoice
      contains the rates/unit prices, those indicated in the contract or purchase order.  Any
      discrepancies determined as a result of the audit, could delay the processing of the
      invoice and may result in the invoice being returned to the vendor for correction.

Page 8 of 29

9

A164

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

Inquiries relating to payments should be directed to Jean Katzen on (410) 786-5423 or Suzanne Turgeon on (410) 786-1924.

c. See Attachment 2 for additional information on the MSP RAC Payment Voucher Process.

13. **PAYMENT BY ELECTRONIC FUNDS TRANSFER – CENTRAL CONTRACTOR REGISTRATION**

a. *Method of payment.* (1) All payments by the Government under this contract shall be made by electronic funds transfer (EFT), except as provided in paragraph (a)(2) of this clause. As used in this clause, the term "EFT" refers to the funds transfer and may also include the payment information transfer.  (2) In the event the Government is unable to release one or more payments by EFT, the Contractor agrees to either –

(i) Accept payment by check or some other mutually agreeable method of payment; or

(ii) Request the Government to extend the payment due date until such time as the Government can make payment by EFT (but see paragraph (d) of this clause).

b. *Contractor's EFT information.* The Government shall make payment to the Contractor using the EFT information contained in the Central Contractor Registration (CCR) database. In the event that the EFT information changes, the Contractor shall be responsible for providing the updated information to the CCR database.

c. *Mechanisms for EFT payment.* The Government may make payment by EFT through either the Automated Clearing House (ACH) network, subject to the rules of the National Automated Clearing House Association, or the Fedwire Transfer System. The rules governing Federal payments through the ACH are contained in 31 CFR part 210.

d. *Suspension of payment.* If the Contractor's EFT information in the CCR database is incorrect, then the Government need not make payment to the Contractor under this contract until correct EFT information is entered into the CCR database; and any invoice or contract-financing request shall be deemed not to be a proper invoice for the purpose of prompt payment under this contract. The prompt payment terms of the contract regarding notice of an improper invoice and delays in accrual of interest penalties apply.

e. *Liability for uncompleted or erroneous transfers.* (1) If an uncompleted or erroneous transfer occurs because the Government used the Contractor's EFT information incorrectly, the Government remains responsible for –

(i) Making a correct payment;

(ii) Paying any prompt payment penalty due; and

Page 9 of 29

A165

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

(iii) Recovering any erroneously directed funds.

If an uncompleted or erroneous transfer occurs because the Contractor's EFT information was incorrect, or was revised within 30 days of Government release of the EFT payment transaction instruction to the Federal Reserve System, and -

(iv) If the funds are no longer under the control of the payment office, the Government is deemed to have made payment and the Contractor is responsible for recovery of any erroneously directed funds; or

(v) If the funds remain under the control of the payment office, the Government shall not make payment, and the provisions of paragraph (d) of this clause shall apply.

f. *EFT and prompt payment*. A payment shall be deemed to have been made in a timely manner in accordance with the prompt payment terms of this contract if, in the EFT payment transaction instruction released to the Federal Reserve System, the date specified for settlement of the payment is on or before the prompt payment due date, provided the specified payment date is a valid date under the rules of the Federal Reserve System.

g. EFT and assignment of claims. If the Contractor assigns the proceeds of this contract as provided for in the assignment of claims terms of this contract, the Contractor shall require as a condition of any such assignment, that the assignee shall register separately in the CCR database and shall be paid by EFT in accordance with the terms of this clause. Notwithstanding any other requirement of this contract, payment to an ultimate recipient other than the Contractor, or a financial institution properly recognized under an assignment of claims pursuant to subpart 32.8, is not permitted. In all respects, the requirements of this clause shall apply to the assignee as if it were the Contractor. EFT information that shows the ultimate recipient of the transfer to be other than the Contractor, in the absence of a proper assignment of claims acceptable to the Government, is incorrect EFT information within the meaning of paragraph (d) of this clause.

h. Liability for change of EFT information by financial agent. The Government is not liable for errors resulting from changes to EFT information made by the Contractor's financial agent.

i. *Payment information*. The payment or disbursing office shall forward to the Contractor available payment information that is suitable for transmission as of the date of release of the EFT instruction to the Federal Reserve System. The Government may request the Contractor to designate a desired format and method(s) for delivery of payment information from a list of formats and methods the payment office is capable of executing. However, the Government does not guarantee that any particular format or

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

method of delivery is available at any particular payment office and retains the latitude to use the format and delivery method most convenient to the Government. If the Government makes payment by check in accordance with paragraph (a) of this clause, the Government shall mail the payment information to the remittance address contained in the CCR database.

## 14.    DELIVERABLES/INTERNET – INTRANET APPLICATIONS

If applicable, all written deliverables will include a version in HyperText Mark-Up Language (HTML) formatted according to Centers for Medicare and Medicaid (CMS) Internet, Intranet, and Extranet Standards; available online at http:www.cms.gov/about/web/inetspecx.htm.

All websites, Internet applications, and content developed by Contractor shall reside on CMS servers, follow CMS Standards and Guidelines, and filter through the standard agency Internet Clearance process.

If CMS agents or Contractor include information that appears on www.cms.gov or www.medicare.gov as part of their websites, they must link directly to these sites to ensure the validity and timeliness of the information.  Duplication of content is not permitted.

Contractor performing work on projects that include the development of Internet, Intranet, or Extranet applications, shall schedule and meet with CMS's Web Support Team for guidance before they begin to develop the project.

## 15.    HHSAR 352.224-70 PRIVACY ACT (January 2006)

This contract requires the Contractor to perform one or more of the following: (a) Design; (b) develop; or (c) operate a Federal agency system of records to accomplish an agency function in accordance with the Privacy Act of 1974 (Act) (5 U.S.C. 552a(m)(1)) and applicable agency regulations. The term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual. Violations of the Act by the Contractor and/or its employees may result in the imposition of criminal penalties (5 U.S.C. 552a(i)). The Contractor shall ensure that each of its employees knows the prescribed rules of conduct and that each employee is aware that he/she is subject to criminal penalties for violation of the Act to the same extent as Department of Health and Human Services employees. These provisions also apply to all subcontracts the Contractor awards under this contract which require the design, development or operation of the designated system(s) of records [5 U.S.C. 552a(m)(1)]. The contract work statement: (a) identifies the system(s) of records and the design, development, or operation work the Contractor is to perform; and (b) specifies the disposition to be made of such records upon completion of contract performance.

Page 11 of 29

A167

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

(End of clause)


16.   **ORGANIZATIONAL CONFLICTS OF INTEREST**

"Organizational conflict of interest" as defined per FAR 2.101, "means that because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage."

(A) Purpose:  The purpose of this clause is to ensure that the Contractor (1) is not biased because of its financial, contractual, organizational, or other interests which relate to the work under this contract, and (2) does not obtain any unfair competitive advantage over other parties by virtue of its performance of this contract. This clause has been created to implement the organizational conflict of interest requirements of FAR 9.5.

(B) Scope:  The restrictions described herein shall apply to performance or participation by the Contractor and any of its affiliates or their successors in interest (hereinafter collectively referred to as "Contractor") in the activities covered by this clause as a prime contractor, subcontractor, co-sponsor, joint venture, consultant, or in any similar capacity. For the purpose of this clause, affiliation occurs when a business concern is controlled by or has the power to control another or when a third party has the power to control both.

(C) Use of Contractor's Work Product:  If the Contractor performs advisory, consulting, analytical, evaluation, study, or similar work under this contract, it shall be ineligible thereafter to participate in any capacity in Government contractual efforts (solicited or unsolicited) which stem directly from such work, and the Contractor agrees not to perform similar work for prospective Offeror's with respect to any such contractual efforts. The Contractor shall be ineligible to participate in any contracts, subcontracts, or proposals (solicited and unsolicited) which stem directly from the Contractor's performance of work under this contract for a period of <u>one (1) year</u> after the completion of this contract. Furthermore, unless so directed in writing by the Contracting Officer, the Contractor shall not perform any system engineering or technical direction support work under this contract on any of its products or services or the products or services of another firm if the Contractor is or has been substantially involved in their development or marketing. Nothing in this subparagraph shall preclude the Contractor from competing for follow-on contracts or subcontracts for advisory and assistance services.

(D) If, under this contract, the Contractor prepares a complete or essentially complete statement of work or specifications to be used in competitive acquisitions, the Contractor shall be ineligible to perform or participate in any capacity in any contractual effort which is based on such statement of work or specifications. The Contractor shall not incorporate its products or services in such statement of work or specifications unless so

Page 12 of 29

A168

A00365

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

directed in writing by the Contracting Officer, in which case the restriction in this subparagraph shall not apply.

(E) Access to and use of information:

(1) If the Contractor, in the performance of this contract, obtains access to information, such as Government plans, policies, reports, studies, financial plans, internal data protected by the Privacy Act of 1974 (5 U.S.C. 552a), or data which has not been released or otherwise made available to the public, the Contractor agrees that it shall not:

(a) Use such information for any private purpose unless the information has been released or otherwise made available to the public;

(b) Compete for work based on such information for a period of <u>one (1) year</u> after either the completion of this contract, or until such information is released or otherwise made available to the public, whichever is first;

(c) Submit an unsolicited proposal which is based on such information until <u>six (6) months</u> after such information is released or otherwise made available to the public; and,

(d) Release such information unless such information has previously been released or otherwise made available to the public by the Government.

(2) In addition, the Contractor agrees that to the extent it receives or is given access to proprietary data, data protected by the Privacy Act of 1974 (5 U.S.C. 552a), or other confidential or privileged technical, business, or financial information under this contract, it shall treat such information in accordance with any restrictions imposed on such information.

(F) Disclosure after award:

(1) The Contractor agrees that, if changes, including additions, to the facts disclosed by it prior to award of this Contract, occur during the performance of this Contract, it shall make an immediate and full disclosure of such changes in writing to the Contracting Officer. Such disclosure shall include a description of any action which the Contractor has taken or proposes to take to avoid, neutralize, or mitigate any resulting conflict of interest. The Government may, however, terminate for convenience if it deems such termination to be in the best interest of the Government.

(2) In the event that the Contractor was aware of facts required to be disclosed or the existence of an actual or potential organizational conflict of interest and did

Page 13 of 29

A00366

not disclose such facts or such conflict of interest to the Contracting Officer, the Contracting Officer may terminate for default.

(G) Remedies:  For breach of any of the above restrictions or for nondisclosure or misrepresentation of any facts required to be disclosed concerning this contract, including the existence of an actual or potential organizational conflict of interest at the time of or after award, the Government may terminate for default, and pursue such other remedies as may be permitted by law.

(H) Waiver:  In accordance with FAR 9.503, any request for waiver must be in writing, shall set forth the extent of the conflict, and requires approval by the agency head or a designee. Agency heads shall not delegate waiver authority below the level of head of a contracting activity.   The agency head or a designee may waive any general rule or procedure of this subpart by determining that its application in a particular situation would not be in the Government's interest.

(I) Subcontracts:  This Organizational Conflict of Interest clause shall flow down to all subcontractors unless an exemption is specifically approved by Contracting Officer, CMS.

## 17.    CONDITIONS FOR PERFORMANCE

In addition to the performance requirement of this contract as set forth under Performance Work Statement, the Contractor may be required to comply with the requirements of any revisions in legislation or regulations which may be enacted or implemented during the period of performance of this contract, and are directly applicable to the performance requirements of this contract.

In the event new legislation or regulations impacting the Contract require immediate implementation, the Contracting Officer shall issue a change order pursuant to FAR Clause 52.243-1, entitled Changes – Fixed-Price.

## 18.    CONFLICT OF INTEREST

The Contractor shall disclose any known or potential conflicts of interest, in accordance with FAR Part 9.5, for the purpose of meeting the requirements of this contract.  The Contractor agrees that if an actual or potential organizational conflict of interest is discovered after an award of a task order, the Contractor shall make full disclosure in writing to the Contracting Officer. This disclosure shall include a description of actions that the Contractor has taken or proposes to take to mitigate the actual or potential conflict. The Contracting Officer shall determine whether a conflict of interest disclosed after award has been adequately resolved.

## 19.   CONTRACTOR PERFORMANCE EVALUATION(S)

Page 14 of 29

A00367

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

In accordance with Federal Acquisition Regulation (FAR) 42.15, CMS will complete annual and final contractor performance evaluations. Annual evaluations will be prepared to coincide with the anniversary date of the contract. Additional interim performance evaluations may be prepared at Contracting Officer discretion, as necessary. Final performance evaluations will be completed upon contract expiration.

CMS will utilize the Contractor Performance Assessment Reporting System (CPARS) in order to execute annual and final contractor performance evaluations. CPARS is a secure Internet website located at http://www.cpars.csd.disa.mil/cparsmain.htm. CMS will register the contractor in CPARS upon receipt of the name and email address of two (2) individuals who will be responsible for serving as the Contractor's primary and alternate CPARS contacts. Once CMS registers the contractor in CPARS, the Contractor will receive an automated CPARS email message that contains User IDs and instructions for creating a password.

Once a performance evaluation is issued, the Contractor's primary and alternate CPARS contact will receive an email instructing them to logon to CPARS in order to review the performance evaluation. The Contractor has 30 days from the date of performance evaluation issuance in which to review the evaluation. If the Contractor is in agreement with the performance evaluation outcome, the evaluation becomes final. Should the Contractor be in disagreement with the performance evaluation outcome, rebuttal comments must be submitted via the CPARS within 30 days from date the evaluation was issued by CMS. Any disagreement between the Contracting Officer and the Contractor will be referred to the Deputy Director, CMS Office of Acquisition and Grants Management, whose decision will be final.

Copies of each performance evaluation and contractor responses, if any, will be retained as part of the official contract file and will be used to support future award decisions. Evaluations will also be stored for a 3-year period in the Past Performance Information Retrieval System (PPIRS) at www.ppirs.gov.

Contractors may obtain CPARS training material and register for on-line training at http://www.cpars.csd.disa.mil/allapps/cpcbtdlf.htm. There is no fee for registration or use of the CPARS.

## 20.    DISPOSAL OF IMAGED MEDICAL RECORDS

Imaged medical records must be disposed of in a manner than leaves no trace of data. The RAC shall use a method compliant with CMS operating procedures and standards. In addition, a log of all disposed records shall be maintained by the RAC.

## 21.    HIPAA BUSINESS ASSOCIATE PROVISION

**HIPAA Business Associate Provision II**

**Definitions:**

Page 15 of 29

16

A171

A00368

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

All terms used herein and not otherwise defined shall have the same meaning as in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA," 42 U.S.C. sec. 1320d) and the corresponding implementing regulations.  Provisions governing the Contractor's duties and obligations under the Privacy Act (including data use agreements) are covered elsewhere in the contract.

"Business Associate" shall mean the Contractor.

"Covered Entity" shall mean CMS' Medicare Fee for Service program and/or Medicare's Prescription Drug Discount Care and Transitional Assistance Programs.
"Secretary" shall mean the Secretary of the Department of Health and Human Services or the Secretary's designee.

**Obligations and Activities of Business Associate**

(a) Business Associate agrees to not use or disclose Protected Health Information ("PHI"), as defined in 45 C.F.R. § 160.103, created or received by Business Associate from or on behalf of Covered Entity other than as permitted or required by this Contract or as required by law.

(b) Business Associate agrees to use safeguards to prevent use or disclosure of PHI created or received by Business Associate from or on behalf of Covered Entity other than as provided for by this Contract.  Furthermore, Business Associate agrees to use appropriate administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the electronic protected health information ("EPHI"), as defined in 45 C.F.R. 160.103, it creates, receives, maintains or transmits on behalf of the Covered Entity to prevent use or disclosure of such EPHI.

(c) Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Contract.

(d) Business Associate agrees to report to Covered Entity any use or disclosure involving PHI it receives/maintains from/on behalf of the Covered Entity that is not provided for by this Contract of which it becomes aware.  Furthermore, Business Associate agrees to report to Covered Entity any security incident involving EPHI of which it becomes aware.

(e) Business Associate agrees to ensure that any agent, including a subcontractor, to whom it provides PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity, agrees to the same restrictions and conditions that apply through this Contract to Business Associate with respect to such information.  Furthermore, Business Associate agrees to ensure that its agents and subcontractors implement reasonable and appropriate safeguards for the PHI received from or on behalf of the Business Associate.

(f) Business Associate agrees to provide access, at the request of Covered Entity, to PHI received by Business Associate in the course of contract performance, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 CFR § 164.524.

Page 16 of 29

A00369

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

(g) Business Associate agrees to make any amendment(s) to PHI in a Designated Record Set that Covered Entity directs or agrees to pursuant to 45 CFR § 164.526 upon request of Covered Entity.

(h) Business Associate agrees to make internal practices, books, and records, including policies and procedures and PHI, relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of Covered Entity, available to Covered Entity, or to the Secretary for purposes of the Secretary determining Covered Entity's compliance with the various rules implementing the HIPAA.

(i) Business Associate agrees to document such disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR § 164.528.

(j) Business Associate agrees to provide to Covered Entity, or an individual identified by the Covered Entity, information collected under this Contract, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR § 164.528.

**Permitted Uses and Disclosures by Business Associate**

Except as otherwise limited in this Contract, Business Associate may use or disclose PHI on behalf of, or to provide services to, Covered Entity for purposes of the performance of this Contract, if such use or disclosure of PHI would not violate the HIPAA Privacy or Security Rules if done by Covered Entity or the minimum necessary policies and procedures of Covered Entity.

**Obligations of Covered Entity**

(a) Covered Entity shall notify Business Associate of any limitation(s) in its notice of privacy practices of Covered Entity in accordance with 45 CFR § 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.

(b) Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by Individual to use or disclose PHI, to the extent that such changes may affect Business Associate's use or disclosure of PHI.

(c) Covered Entity shall notify Business Associate of any restriction to the use or disclosure of PHI that Covered Entity has agreed to in accordance with 45 CFR § 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

**Permissible Requests by Covered Entity**

Covered Entity shall not request Business Associate to use or disclose PHI in any manner that would not be permissible under the HIPAA Privacy or Security Rules.

**Term of Provision**

Page 17 of 29

A00370

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

(a) The term of this Provision shall be effective as of March 10, 2005, and shall terminate when all of the PHI provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy PHI, protections are extended to such information, in accordance with the termination provisions in this Section.

(b) Upon Covered Entity's knowledge of a material breach by Business Associate, Covered Entity shall either:

    (1) Provide an opportunity for Business Associate to cure the breach or end the violation consistent with the termination terms of this Contract. Covered Entity may terminate this Contract for default if the Business Associate does not cure the breach or end the violation within the time specified by Covered Entity; or

    (2) Consistent with the terms of this Contract, terminate this Contract for default if Business Associate has breached a material term of this Contract and cure is not possible; or

    (3) If neither termination nor cure is feasible, Covered Entity shall report the violation to the Secretary.

(c) Effect of Termination.

    (1) Except as provided in paragraph (2) of this section, upon termination of this Contract, for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to PHI that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the PHI.

    (2) In the event that Business Associate determines that returning or destroying the PHI is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon such notice that return or destruction of PHI is infeasible, Business Associate shall extend the protections of this Contract to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

**Miscellaneous**

(a) A reference in this Contract to a section in the Rules issued under HIPAA means the section as in effect or as amended.

(b) The Parties agree to take such action as is necessary to amend this Contract from time to time as is necessary for Covered Entity to comply with the requirements of the Rules issued under HIPAA.

(c) The respective rights and obligations of Business Associate under paragraph (c) of the section entitled "term of Provision" shall survive the termination of this Contract.

(d) Any ambiguity in this Contract shall be resolved to permit Covered Entity to comply with the Rules implemented under HIPAA.

**22. COPYRIGHTS**

Page 18 of 29

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

    a. Data first produced in the performance of this contract.

        (i) The contractor agrees not to assert, establish, or authorize others to assert or establish, any claim to copyright subsisting in any data first produced in the performance of this contract without prior written permission of the contracting officer. When claim to copyright is made, the contractor shall affix the appropriate copyright notice of 17 U.S.C. 401 or 402 and acknowledgment of government sponsorship (including contract number) to such data when delivered to the government, as well as when the data are published or deposited for registration as a published work in the U.S. Copyright Office. The contractor grants to the government, and others acting on its behalf, a paid-up nonexclusive, irrevocable, worldwide license for all such data to reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, by or on behalf of the government.

        (ii) If the government desires to obtain copyright in data first produced in the performance of this contract and permission has not been granted as set forth above, the contracting officer may direct the contractor to establish, or authorize the establishment of, claim to copyright in such data and to assign, or obtain the assignment of, such copyright to the government or its designated assignee.

    b. Data not first produced in the performance of this contract.

    The contractor shall not, without prior written permission of the contracting officer, incorporate in data delivered under this contract any data not first produced in the performance of this contract and which contain the copyright notice of 17 U.S.C. 401 or 402, unless the contractor identifies such data and grants to the government a claim to

## 23. DISSEMINATION, PUBLICATION AND DISTRIBUTION OF INFORMATION

    a. Subject to Section H.8, data and information either provided to the contractor or any subcontractor generated by activities under this contract or derived from research or studies supported by this contract shall be used only for purposes of this contract.

    b. Data and information either provided to the contractor, or to any subcontractor, generated by activities under this contract, or derived from research or studies supported by this contract, shall be used only for the purposes of the contract. It shall not e duplicated, used or disclosed for any purpose other than the fulfillment of the requirements set forth in this contract. This restriction does not limit the contractor's right to use data or information obtained from a non-restrictive source. Any questions concerning "privileged information" shall be referred to the contracting officer.

    c. Some data or information may require special consideration with regard to the timing of its disclosure. Also, some data or information, which relate to policy matters under consideration by the government, may also require special consideration with regard to

Page 19 of 29

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

the timing of its disclosure so that the open and vigorous debate, within the government, of possible policy options is not damaged.

d. Any requests for or questions about use or release of the data or information or handling of material under this contract shall be referred to the contracting officer who must render a written determination. The contracting officer's determinations will reflect the results of internal coordination with appropriate program and legal officials.

e. The contractor agrees not to release Medicare data and information either provided to the contractor, generated by activities under contract, or derived from research or studies supported by this contract without the prior permission of the contracting officer.

f. Any presentation of any report, statistical or analytical material based on information obtained from this contract which requires special consideration with regard to the protection of the privacy of individuals or of trade secrets or privileged or confidential commercial information shall be subject to review by the contracting officer before dissemination, publication, or distribution. Presentation includes, but is not limited to, papers, articles, professional publications, speeches, testimony or interviews with public print or broadcast media.

g. Written advance notice of at least forty-five (45) days shall be provided to the contracting officer of the contractor's desire to release information where there may be a question of the protection of the privacy of individuals or of trade secrets or privileged or confidential commercial information.

h. The contracting officer's review shall cover confidentiality issues and the protection of the privacy of individuals. If the review reveals that the privacy of individuals, trade secrets or privileged or confidential commercial information is, or may be violated, the release/use of the presentation shall be denied until the offending material is removed or until the contracting officer makes a formal determination, in writing, that confidentiality provisions, the privacy of individuals, trade secrets or privileged or confidential commercial information is not being violated.

i. The contractor agrees to acknowledge support by CMS whenever reports of projects funding, in whole or in part, by this contract are published in any medium. The contractor shall include in any publication resulting from work under this contract, an acknowledgment substantially, as follows:

"The analyses upon which this publication is based were performed under contract number HHSM-500-2005-00002I, entitled, "MMA Section 306 Recovery Audit Demonstration," sponsored by the Centers for Medicare and Medicaid Services, Department of Health and Human Services." The conclusions and opinions expressed, and methods used herein are those of the author. They do not necessarily reflect CMS policy. The author assumes full responsibility for the accuracy and completeness of the

Page 20 of 29

21

A176

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

ideas presented. Ideas and contributions to the author concerning experience in engaging with issues presented are welcomed. Any deviation from the above legend shall be approved, in writing, by the contracting officer.

## 24.  CODE OF CONDUCT

### SMOKING

Effective June 2004, smoking is not permitted anywhere on the CMS single site campus. This includes all areas outside the building, such as off-site facility, entranceways, sidewalks and parking areas. Smoking will not be permitted anywhere in Regional Offices or Washington, DC office locations unless permitted by GSA guidelines or local landlord requirements. Contractor employees are subject to the same restrictions as government personnel. Fines up to $50 per occurrence will be issued and enforced by the Federal Protective Service.

### DRESS

The preferred dress codes at CMS facilities are professional attire, business attire, or business casual attire.

## 25.  ATTACHMENTS

The following attachments are incorporated in this task order:
(1) Statement of Objectives and Schedule of Deliveries

## 26.  HHSAR 352.203-70 ANTI-LOBBYING (January 2006)

Pursuant to the current HHS annual appropriations act, except for normal and recognized executive-legislative relationships, the Contractor shall not use any HHS contract funds for (i) publicity or propaganda purposes; (ii) the preparation, distribution, or use of any kit, pamphlet, booklet, publication, radio, television or video presentation designed to support or defeat legislation pending before the Congress or any State legislature, except in presentation to the Congress or any State legislature itself; or (iii) payment of salary or expenses of the Contractor, or any agent acting for the Contractor, related to any activity designed to influence legislation or appropriations pending before the Congress or any State legislature.

(End of clause)

## 27.  HHSAR 352.222-70 CONTRACTOR COOPERATION IN EQUAL EMPLOYMENT OPPORTUNITY INVESTIGATIONS.

Contractor Cooperation in Equal Employment Opportunity Investigations (January 2010)

(a) In addition to complying with the clause in FAR 52.222–26, Equal Opportunity, the Contractor shall, in good faith, cooperate with the Department of Health and Human Services

Page 21 of 29

A00374

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

(Agency) in investigations of Equal Employment Opportunity (EEO) complaints processed pursuant to 29 CFR Part 1614. For purposes of this clause, the following definitions apply:

(1) "Complaint" means a formal or informal complaint that has been lodged with Agency management, Agency EEO officials, the Equal Employment Opportunity Commission (EEOC), or a court of competent jurisdiction.

(2) "Contractor employee" means all current Contractor employees who work or worked under this contract. The term also includes current employees of subcontractors who work or worked under this contract. In the case of Contractor and subcontractor employees, who worked under this contract, but who are no longer employed by the Contractor or subcontractor, or who have been assigned to another entity within the Contractor's or subcontractor's organization, the Contractor shall provide the Agency with that employee's last known mailing address, e-mail address, and telephone number, if that employee has been identified as a witness in an EEO complaint or investigation.

(3) "Good faith cooperation" cited in paragraph (a) includes, but is not limited to, making Contractor employees available for: (i) Formal and informal interviews by EEO counselors or other Agency officials processing EEO complaints; (ii) formal or informal interviews by EEO investigators charged with investigating complaints of unlawful discrimination filed by Federal employees; (iii) reviewing and signing appropriate affidavits or declarations summarizing statements provided by such Contractor employees during the course of EEO investigations; (iv) producing documents requested by EEO counselors, EEO investigators, Agency employees, or the EEOC in connection with a pending EEO complaint; and (v) preparing for and providing testimony in hearings before the EEOC and U.S. District Court.

(b) The Contractor shall include the provisions of this clause in all subcontract solicitations and subcontracts awarded at any tier under this contract.

(c) Failure on the part of the Contractor or its subcontractors to comply with the terms of this clause may be grounds for the Contracting Officer to terminate this contract for default.

(End of clause)


## 28. HHSAR 352.227-70 PUBLICATIONS AND PUBLICITY.

Publications and Publicity (January 2006)

(a) Unless otherwise specified in this contract, the Government encourages the Contractor to publish the results of its work under this contract. A copy of each article the Contractor submits for publication shall be promptly sent to the Contracting Officer's Technical Representative. The Contractor shall also inform the Contracting Officer's Technical Representative when the article or other publication is published, and furnish a copy of it as finally published.

(b) Unless authorized by the Contracting Officer's Technical Representative, the Contractor shall not display the HHS logo on any publications.

(End of clause)


Page 22 of 29

A00375

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

29.     **HHSAR 30. 352.231-71 PRICING OF ADJUSTMENTS** (January 2001)

When costs are a factor in determination of a contract price adjustment pursuant to the
"Changes" clause or any provision of this contract, the applicable cost principles and procedures
set forth below shall form the basis for determining such costs:

| Principles | Types of organizations |
|---|---|
| (a) Subpart 31.2 of the Federal Acquisition Regulation | Commercial. |
| (b) Subpart 31.3 of the Federal Acquisition Regulation | Educational. |
| (c) Subpart 31.6 of the Federal Acquisition Regulation | State, local, and Federally recognized Indian Tribal governments. |
| (d) 45 CFR Part 74 Appendix E | Hospitals (performing research and development contracts only). |
| (e) Subpart 31.7 of the Federal Acquisition Regulation | Other nonprofit organizations. |

(End of clause)

30.     **FAR 52.223-18, Contractor Policy to Ban Text Messaging While Driving** (Sep 2010)

(a) Definitions. As used in this clause--

"Driving"—

(1) Means operating a motor vehicle on an active roadway with the motor running, including
while temporarily stationary because of traffic, a traffic light, stop sign, or otherwise.

(2) Does not include operating a motor vehicle with or without the motor running when one has
pulled over to the side of, or off, an active roadway and has halted in a location where one can
safely remain stationary.

"Text messaging" means reading from or entering data into any handheld or other electronic
device, including for the purpose of short message service texting, e-mailing, instant messaging,
obtaining navigational information, or engaging in any other form of electronic data retrieval or
electronic data communication. The term does not include glancing at or listening to a
navigational device that is secured in a commercially designed holder affixed to the vehicle,
provided that the destination and route are programmed into the device either before driving or
while stopped in a location off the roadway where it is safe and legal to park.

Page 23 of 29

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

(b) This clause implements Executive Order 13513, Federal Leadership on Reducing Text Messaging while Driving, dated October 1, 2009.

(c) The Contractor should—

(1) Adopt and enforce policies that ban text messaging while driving—

(i) Company-owned or -rented vehicles or Government-owned vehicles; or

(ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.

(2) Conduct initiatives in a manner commensurate with the size of the business, such as—

(i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

(ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

(d) Subcontracts. The Contractor shall insert the substance of this clause, including this paragraph (d), in all subcontracts that exceed the micro-purchase threshold.

(End of clause)

## 31.   HHSAR 352.239-70, STANDARD FOR SECURITY CONFIGURATIONS

(a) The Contractor shall configure its computers that contain HHS data with the applicable Federal Desktop Core Configuration (FDCC) (see **http://nvd.nist.gov/fdcc/index.cfm**) and ensure that its computers have and maintain the latest operating system patch level and anti-virus software level. (Note: FDCC is applicable to all computing systems using Windows XP™ and Windows Vista™, including desktops and laptops—regardless of function—but not including servers.)

(b) The Contractor shall apply approved security configurations to information technology (IT) that is used to process information on behalf of HHS. The following security configuration requirements apply:

(NOTE: The Contracting Officer shall specify applicable security configuration requirements in solicitations and contracts based on information provided by the Project Officer, who shall consult with the OPDIV/STAFFDIV Chief Information Security Officer.)

(c) The Contractor shall ensure IT applications operated on behalf of HHS are fully functional and operate correctly on systems configured in accordance with the above configuration requirements. The Contractor shall use Security Content Automation Protocol (SCAP)-validated tools with FDCC Scanner capability to ensure its products operate correctly with FDCC configurations and do not alter FDCC settings – see **http://scap.nist.gov/validation/**. The Contractor shall test applicable product versions with all relevant and current updates and

Page 24 of 29

A180

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

patches installed. The Contractor shall ensure currently supported versions of information technology products meet the latest FDCC major version and subsequent major versions.

(d) The Contractor shall ensure IT applications designed for end users run in the standard user context without requiring elevated administrative privileges.

(e) The Contractor shall ensure hardware and software installation, operation, maintenance, update, and patching will not alter the configuration settings or requirements specified above.

(f) The Contractor shall (1) include Federal Information Processing Standard (FIPS) 201-compliant (see http://csrc.nist.gov/publications/fips/fips201-1/FIPS-201-1-chng1.pdf), Homeland Security Presidential Directive 12 (HSPD-12) card readers with the purchase of servers, desktops, and laptops; and (2) comply with **FAR Subpart 4.13**, Personal Identity Verification.

(g) The Contractor shall ensure that its subcontractors (at all tiers) which perform work under this contract comply with the requirements contained in this clause.

(End of clause)

## 32.    HHSAR 352.239-72, SECURITY REQUIREMENTS FOR FEDERAL INFORMATION TECHNOLOGY RESOURCES

(a) Applicability. This clause applies whether the entire contract or order (hereafter "contract"), or portion thereof, includes information technology resources or services in which the Contractor has physical or logical (electronic) access to, or operates a Department of Health and Human Services (HHS) system containing, information that directly supports HHS' mission. The term "information technology (IT)", as used in this clause, includes computers, ancillary equipment (including imaging peripherals, input, output, and storage devices necessary for security and surveillance), peripheral equipment designed to be controlled by the central processing unit of a computer, software, firmware and similar procedures, services (including support services) and related resources. This clause does not apply to national security systems as defined in FISMA.

(b) Contractor responsibilities. The Contractor is responsible for the following:

    (1) Protecting federal information and federal information systems in order to ensure their—

    (i) Integrity, which means guarding against improper information modification or destruction, and includes ensuring information non-repudiation and authenticity;

    (ii) Confidentiality, which means preserving authorized restrictions on access and disclosure, including means for protecting personal privacy and proprietary information; and.

    (iii) Availability, which means ensuring timely and reliable access to and use of information.

**Page 25 of 29**

A181

A00378

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

(2) Providing security of any Contractor systems, and information contained therein, connected to an HHS network or operated by the Contractor, regardless of location, on behalf of HHS.

(3) Adopting, and implementing, at a minimum, the policies, procedures, controls, and standards of the HHS Information Security Program to ensure the integrity, confidentiality, and availability of federal information and federal information systems for which the Contractor is responsible under this contract or to which it may otherwise have access under this contract. The HHS Information Security Program is outlined in the HHS Information Security Program Policy, which is available on the HHS Office of the Chief Information Officer's (OCIO) website.

(c) Contractor security deliverables. In accordance with the timeframes specified, the Contractor shall prepare and submit the following security documents to the Contracting Officer for review, comment, and acceptance:

(1) IT Security Plan (IT-SP) – due within 30 days after contract award. The IT-SP shall be consistent with, and further detail the approach to, IT security contained in the Contractor's bid or proposal that resulted in the award of this contract. The IT-SP shall describe the processes and procedures that the Contractor will follow to ensure appropriate security of IT resources that are developed, processed, or used under this contract. If the IT-SP only applies to a portion of the contract, the Contractor shall specify those parts of the contract to which the IT-SP applies.

(i) The Contractor's IT-SP shall comply with applicable federal laws that include, but are not limited to, the **Federal Information Security Management Act (FISMA) of 2002** (PDF) (Title III of the E-Government Act of 2002, Public Law 107-347), and the following federal and HHS policies and procedures:

(A) Office of Management and Budget **(OMB) Circular A-130**, Management of Federal Information Resources, Appendix III, Security of Federal Automated Information Resources.

(B) National Institute of Standards and Technology (NIST) **Special Publication (SP) 800-18** (PDF), Guide for Developing Security Plans for Federal Information Systems, in form and content, and with any pertinent contract Statement of Work/Performance Work Statement (SOW/PWS) requirements. The IT-SP shall identify and document appropriate IT security controls consistent with the sensitivity of the information and the requirements of **Federal Information Processing Standard (FIPS) 200**, Recommended Security Controls for Federal Information Systems. The Contractor shall review and update the IT-SP in accordance with **NIST SP 800-26**, Security Self-Assessment Guide for Information Technology Systems and FIPS 200, on an annual basis.

(C) **HHS-OCIO Information Systems Security and Privacy Policy.**

(ii) After resolution of any comments provided by the Government on the draft IT-SP, the Contracting Officer shall accept the IT-SP and incorporate the Contractor's final version into the

Page 26 of 29

A182

A00379

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

contract for Contractor implementation and maintenance. On an annual basis, the Contractor shall provide to the Contracting Officer verification that the IT-SP remains valid.

(2) IT Risk Assessment (IT-RA) – due within 30 days after contract award. The IT-RA shall be consistent, in form and content, with NIST SP 800-30, Risk Management Guide for Information Technology Systems, and any additions or augmentations described in the HHS-OCIO Information Systems Security and Privacy Policy. After resolution of any comments provided by the Government on the draft IT-RA, the Contracting Officer shall accept the IT-RA and incorporate the Contractor's final version into the contract for Contractor implementation and maintenance. The Contractor shall update the IT-RA on an annual basis.

(3) FIPS 199 Standards for Security Categorization of Federal Information and Information Systems Assessment (FIPS 199 Assessment) – due within 30 days after contract award. The FIPS 199 Assessment shall be consistent with the cited NIST standard. After resolution of any comments by the Government on the draft FIPS 199 Assessment, the Contracting Officer shall accept the FIPS 199 Assessment and incorporate the Contractor's final version into the contract.

(4) IT Security Certification and Accreditation (IT-SC&A) – due within 3 months after contract award. The Contractor shall submit written proof to the Contracting Officer that an IT-SC&A was performed for applicable information systems – see paragraph (a) of this clause. The Contractor shall perform the IT-SC&A in accordance with the HHS Chief Information Security Officer's Certification and Accreditation Checklist; NIST SP 800-37, Guide for the Security Certification and Accreditation of Federal Information Systems; and NIST SP 800-53, Recommended Security Controls for Federal Information Systems. An authorized senior management official shall sign the draft IT-SC&A and provide it to the Contracting Officer for review, comment, and acceptance.

(i) After resolution of any comments provided by the Government on the draft IT-SC&A, the Contracting Officer shall accept the IT-SC&A and incorporate the Contractor's final version into the contract as a compliance requirement.

(ii) The Contractor shall also perform an annual security control assessment and provide to the Contracting Officer verification that the IT-SC&A remains valid. Evidence of a valid system accreditation includes written results of (A) annual testing of the system contingency plan and (B) the performance of security control testing and evaluation.

(d) Personal identity verification. The Contractor shall identify its employees with access to systems operated by the Contractor for HHS or connected to HHS systems and networks. The Contracting Officer's Technical Representative (COTR) shall identify, for those identified employees,  position sensitivity levels that are commensurate with the responsibilities and risks associated with their assigned positions. The Contractor shall comply with the HSPD-12 requirements contained in "HHS-Controlled Facilities and Information Systems Security" requirements specified in the SOW/PWS of this contract.

(e) Contractor and subcontractor employee training. The Contractor shall ensure that its employees, and those of its subcontractors, performing under this contract complete HHS-

Page 27 of 29

A00380

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

furnished initial and refresher security and privacy education and awareness training before being granted access to systems operated by the Contractor on behalf of HHS or access to HHS systems and networks. The Contractor shall provide documentation to the COTR evidencing that Contractor employees have completed the required training.

(f) Government access for IT inspection. The Contractor shall afford the Government access to the Contractor's and subcontractors' facilities, installations, operations, documentation, databases, and personnel used in performance of this contract to the extent required to carry out a program of IT inspection (to include vulnerability testing), investigation, and audit to safeguard against threats and hazards to the integrity, confidentiality, and availability, of HHS data or to the protection of information systems operated on behalf of HHS.

(g) Subcontracts. The Contractor shall incorporate the substance of this clause in all subcontracts that require protection of federal information and federal information systems as described in paragraph (a) of this clause, including those subcontracts that—

(1) Have physical or electronic access to HHS' computer systems, networks, or IT infrastructure; or

(2) Use information systems to generate, store, process, or exchange data with HHS or on behalf of HHS, regardless of whether the data resides on a HHS or the Contractor's information system.

(h) Contractor employment notice. The Contractor shall immediately notify the Contracting Officer when an employee either begins or terminates employment (or is no longer assigned to the HHS project under this contract), if that employee has, or had, access to HHS information systems or data.

(i) Document information. The Contractor shall contact the Contracting Officer for any documents, information, or forms necessary to comply with the requirements of this clause.

(j) Contractor responsibilities upon physical completion of the contract. The Contractor shall return all HHS information and IT resources provided to the Contractor during contract performance and certify that all HHS information has been purged from Contractor-owned systems used in contract performance .

(k) Failure to comply. Failure on the part of the Contractor or its subcontractors to comply with the terms of this clause shall be grounds for the Contracting Officer to terminate this contract.

(End of clause)


33.    HHSAR 352.239–73, ELECTRONIC AND INFORMATION TECHNOLOGY ACCESSIBILITY.


Page 28 of 29

A00381

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Recovery Audit Services in Support of Medicare Part D
Task Order Terms and Conditions

(a) Section 508 of the Rehabilitation Act of 1973 (**29 U.S.C. 794d**), as amended by the Workforce Investment Act of 1998, and the Architectural and Transportation Barriers Compliance Board Electronic and Information (EIT) Accessibility Standards (**36 CFR Part 1194**), require that, unless an exception applies, all EIT products and services developed, acquired, maintained, or used by any federal department or agency permit—

   (1) Federal employees with disabilities to have access to and use information and data that is comparable to the access and use of information and data by federal employees who are not individuals with disabilities; and

   (2) Members of the public with disabilities seeking information or services from a federal agency to have access to and use of information and data that is comparable to the access and use of information and data by members of the public who are not individuals with disabilities.

(b) Accordingly, any vendor submitting a proposal/quotation/bid in response to this solicitation must demonstrate compliance with the established EIT accessibility standards. Information about Section 508 is available at **http://www.section508.gov/**. The complete text of Section 508 Final Provisions can be accessed at **http://www.access-board.gov/sec508/standards.htm**.

(c) The Section 508 accessibility standards applicable to this solicitation are identified in the Statement of Work/Specification/Performance Work Statement. In order to facilitate the Government's evaluation to determine whether EIT products and services proposed meet applicable Section 508 accessibility standards, offerors must prepare an HHS Section 508 Product Assessment Template, in accordance with its completion instructions, and provide a binding statement of conformance. The purpose of the template is to assist HHS acquisition and program officials in determining that EIT products and services proposed support applicable Section 508 accessibility standards. The template allows vendors or developers to self-evaluate their products or services and document in detail how they do or do not conform to a specific Section 508 accessibility standard. Instructions for preparing the HHS Section 508 Evaluation Template may be found under Section 508 policy on the HHS Office on Disability website (**http://www.hhs.gov/od/**).

(d) Respondents to this solicitation must also provide any additional detailed information necessary for determining applicable Section 508 accessibility standards conformance, as well as for documenting EIT products or services that are incidental to the project, which would constitute an exception to Section 508 requirements. If a vendor claims its products or services, including EIT deliverables such as electronic documents and reports, meet applicable Section 508 accessibility standards in its completed HHS Section 508 Product Assessment Template, and it is later determined by the Government – i.e., after award of a contract/order, that products or services delivered do not conform to the described accessibility standards in the Product Assessment Template, remediation of the products or services to the level of conformance specified in the vendor's Product Assessment Template will be the responsibility of the Contractor and at its expense.

(End of provision)

Page 29 of 29

## PERFORMANCE WORK STATEMENT

### 1.1   BACKGROUND & UNDERSTANDING:

Medicare Part D is a federal program designed to provide prescription drug cost assistance for Medicare beneficiaries.  This program is predicated on the use of Plan Sponsors who pay prescription drug costs on behalf of these beneficiaries and who are compensated by Medicare beneficiaries through premiums and by the federal government.  Federal government payments to Plan Sponsors consist of monthly estimated payments and an annual reconciling payment designed to match estimated payments to actual costs.  The annual reconciling payment is based on an offset of estimated payments, and actual plan expenses including drug expenditures and true out of pocket (TrOOP) expenditures of beneficiaries and is net of administration costs and Direct and Indirect remuneration (DIR), which includes any discounts, rebates, and other price concessions that Plan Sponsors may receive from drug manufacturers or other sources.  Federal law requires that all government agencies identify and recover improper payments that may occur whenever federal monies are expended.  Ultimately, Medicare Part D improper payments occur when the annual reconciling payment process is not reflective of actual plan expenses. Ensuring the accurate reflection of actual plan expenses is cumbersome due to the volume of prescriptions processed, currently estimated at 1.2 billion annually, the current lack of access to point-of-sale and other plan data, the number of plans, the complexity of plan changes by beneficiaries, and the lack of complete DIR data, currently not required except on a voluntary basis by Plan Sponsors.

ACLR is experienced at working with similarly complex datasets and devising audit strategies that will maximize the identification and recovery of improper payments in a manner that ensures consistent application amongst all Plan Sponsors and which also supplies The Centers for Medicare and Medicaid Services (CMS) with sufficient information to use in future bid and financial audits to ensure that greater accuracy of plan cost and monthly payment estimation may be achieved.  The ACLR Team's experience in conducting national and individual recovery audits, summarized in Attachment A, has served to assist us in developing an audit program that achieves these goals.  Based on our experience and understanding of these types of audits, the Medicare Part D program, CMS policies and procedures, and the Medicare Program Integrity Manual, we have constructed an audit approach that encompasses each of these elements.  We believe this approach maximizes recoveries while minimizing Plan Sponsor and CMS audit administrative burdens.  It is our practice to work in a cooperative, coordinated, and communicative manner and we believe CMS, Plan Sponsors, and other related stakeholders will benefit from our expertise.  The paragraphs below provide the basis of our proposal.

### 1.2   METHODOLOGY

The Medicare Part D program encompasses 1,500 - 1,900 Plan Sponsors and billions of Prescription Drug Event (PDE) data elements, outlined in Exhibit 1-6; including Plan Sponsor and beneficiary information, prescribed drug related data, out of pocket expenses, and DIR data. These data elements also contain additional data that serves to quantify and monitor the overall

Medicare Part D program as well as provide a mechanism whereby audits to ensure payment veracity may be achieved. The quantity and complexity of these data, the number of stakeholders, as well as the visibility of the Medicare Part D program require the development of a strong overall recovery audit process that encompasses all Plan Sponsors, maximizes the identification and recovery of improper payments, and provides prompt and effective feedback of results to CMS, Plan Sponsors, and other stakeholders. In addition, this process will provide measureable results that demonstrate the efficacy of the recovery audit program and the effect it is having on the mitigation of future improper payments.

### 1.2.1 FOCUSING RECOVERY EFFORTS

ACLR has reviewed numerous reports related to the Medicare Recovery Audit Contractor (RAC) program including, findings resulting from improper payment audits conducted by the General Accounting Office (GAO) and the Office of Inspector General (OIG) on behalf of Medicare, Medicaid, and Medicare Part D as well as the reports resulting from the Comprehensive Error Rate Testing (CERT) program for Medicare and the Payment Error Rate Measurement (PERM) program for Medicaid. We have also reviewed testimony given by CMS and representatives of the RACs to Congress. We conclude that the current economic environment will result in increasing pressure to demonstrate more tangible results. Our analysis is best represented by reviewing the results of the RAC Demonstration Project. This project consisted of a three year review of $317 million in claims occurring in six states. During the review period, RACs recovered $1.03 billion out of an estimated $21 billion in overpayments, when applying CERT calculated improper payment error rates to total claims paid during the period. This represents a success rate of 4.86%. Since the conclusion of the demonstration project, the RAC program has been implemented nationwide. While it is still too early to measure the results of the nationwide program it is apparent that challenges remain, particularly when considering the limitations placed on the amount of documentation that RACs may request from Medicare providers as announced by CMS in response to provider objections to cumbersome documentation requests[1].

The issue faced by CMS is not a new one. For decades, 46 states and the District of Columbia have struggled to increase sales tax compliance by taxpayers. The parallels between claims processing by CMS and sales taxes are nearly exact. Sales taxes are imposed at the point of sale and occur on an item by item basis. Stated differently, taxpayers must make an informed tax decision, based on varying state laws and regulations for every item sold and/or purchased. In other words, state governments are faced with reviewing tens of billions of items sold and purchased each day to ensure proper compliance; a monumental task.

> Experience has shown that recovery audits require an average of 15 minutes per transaction reviewed.

During the recession of the 1980s, individual states looked increasingly to sales tax revenues and increased audits of same. Their initial audits consisted of detailed reviews of fixed asset

---

[1] Sources derived from numerous CMS announcements such as *"Additional Documentation Limits for FY 2011 for Durable Medical Equipment (DME) Suppliers"*, October 20, 2010.

purchases and monthly block sample reviews of expense purchases typically numbering in the tens of thousands. Taxpayers responded, with some success, by implementing stronger internal controls and working with automated systems to mitigate rising liabilities. In the 1990s, states turned increasingly to statistical sampling methodologies, which significantly reduced the number of transactions reviewed, and the administrative burden of collecting source documentation such as invoices and purchase orders by taxpayers. When this happened, items sampled were reduced by a factor of ten and audit cycle times by a factor of three. Finally, in the late 1990s and early 2000s, states and taxpayers began entering into agreements whereby taxpayers reported their taxes on an "effective tax rate" or average basis. These effective rates are calculated from previous audits and are applied to purchases in prospective periods. At the end of a pre-defined period, an audit occurs and a tax liability for the period is calculated. Taxes paid during the period are subtracted from this liability and a reconciling payment, or refund, not unlike the reconciling final payment made in the Medicare Part D program, is made. Our experience in assisting states and taxpayers in designing and implementing effective recovery audit and improper payment mitigation strategies throughout the evolution of their processes makes us uniquely aware of the problems facing CMS and its efforts to implement similar methodologies. We anticipate that some of our recommendations, such as those mentioned under *Alternative Methodologies* below, will require numerous discussions and considerable analysis by ACLR, CMS, Plan Sponsors, as well as other stakeholders. To that end, and by utilizing the best practices developed by the nation's largest and most respected companies and government agencies throughout the country, as well as initiatives employed in the CMS recovery audit program, we believe that our proposed Audit Methodology offers a proven, efficient, and sustainable recovery audit methodology whereby 98% of improper payments occurring within Medicare Part D program may be identified and recovered.

*Audit Methodology:*

As experienced recovery auditors we recognize that there are three objectives we control that will assist CMS in meeting its goals:

1. Identifying & Recovering Improper Payments
2. Reducing Plan Sponsor/CMS Administrative Burden of Recovery Compliance, and
3. Mitigating Future Improper Payments

To meet this first objective, we have designed an audit process that methodically reviews Medicare Part D data from varying and differing perspectives to ensure a thorough review. To meet this second objective, we place the bulk of the review process upon our audit teams and strive to limit CMS review involvement to providing data (and related procedural approvals) and Plan Sponsor involvement to providing source documentation to carefully selected PDE and DIR data. And finally, we take what we have learned from these previous activities and identify specific action plans that may be implemented by Plan Sponsors and CMS to mitigate the recurrence of errors we have identified to meet the third objective. Due to our familiarity with conducting multiple national recovery audits and the relatively small base of Plan Sponsors, we anticipate conducting audits of all Plan Sponsors through inception of the Medicare Part D

program. While we recognize that the likelihood of meeting the deadline for reopening reconciliation for the initial Medicare Part D Prescription Drug Plan (PDP) period is low, as quantified by the four year limitation provision under 42 CFR Part §423.346, we will make every effort to meet this deadline as well.

This Audit Process is demonstrated in Exhibit 1-1 below:



This process has been designed to ensure a methodical and thorough approach to capturing improper payments while reducing the burden of administering a recovery audit program by CMS and Plan Sponsors. It has also been designed with the primary objectives of this program in mind; identify and recover improper payments. At each stage during this process we analyze the data to identify errors. The first three stages of this process are designed to identify the types of issues causing improper payments that may occur across Plan Sponsor and PDP submissions due to transfers, improper data submissions, and data input errors arising at the point of sale or source documentation level. The final stage is designed to support the recovery and appeals process, enable us to be more focused in our future audit efforts, and to provide CMS and Plan Sponsors with the information they need to mitigate future improper payments.

In the Duplicate Payment Review & Data Work Plan process, we prepare Information Data Requests (IDRs) and obtain needed data from the Data Storage System, or as may otherwise be required by CMS. We review this data for completeness, conduct duplicate payment reviews, and assign Plan Sponsors and applicable PDPs to audit team members. During the Data Audit stage we conduct audits of PDE and available DIR data and prepare Plan Sponsors for documentation audits. During the third stage of the audit process we conduct a Documentation Audit. These audits verify the veracity of PDE data submissions and reconcile DIR estimates by reviewing source documentation such as prescriptions and sales invoices to ensure they match the data submitted. During the Post-Audit stage we support recovery and appeal efforts as well as conduct trend analyses to enable us to more effectively target our recovery efforts and identify

and propose process improvements and assist us in our outreach and education efforts. Each of these stages is discussed in greater detail below.

.

We anticipate a significant amount of work upon contract award. In addition to developing and proposing specific Medicare Part D procedures and policies to CMS we will be assigning personnel as well as addressing administrative items such as background checks, obtaining access to systems, as well as meeting CMS personnel. During this implementation phase, discussed in greater detail under *Project Plan* below, we will also be obtaining lists of Plan Sponsor contact information and PDPs, copies of approved plans, and available databases for PDE data element field values, which we will use to verify PDE data submissions to CMS required formats. Once complete, we will analyze this information and incorporated it into our automated review process and prepare for the Duplicate Payment Review and Data Work Plan stage of the Audit Process.

> *Duplicate Payment Review and Data Work Plan:* We understand the process of facilitating Medicare Part D beneficiary transfers between plans by the TrOOP Facilitator Contractor and have reviewed the results of the OIG audit on accurate plan transfers. We recognize the concerns with duplicate payments occurring across Plan Sponsor and PDP data submissions. For this reason, we have modified our existing Data Work Plan process to include a duplicate payment review. This has been done so

| 0.1% of all payments are duplicates as estimated by The International Accounts Payable Professionals and The Institute of Management & Administration |
| --- |

that we can review payments across Plan Sponsor and PDP lines prior to segregating data submissions by Plan Sponsor and PDP for audit. The Duplicate Payment Review and Data Work Plan is the first step in building a strong foundation for our later recovery efforts. During this process we obtain as much information about individual PDPs and related PDE data as possible. This will be a recurring process throughout the duration of the contract. However, as several years have passed since the inception of Medicare Part D, we anticipate obtaining copious amounts of data early in the beginning of the project.

The work we conduct during this stage of the Audit Process is summarized in Exhibit 1-2:

A190

| Exhibit 1-2 Duplicate Payment Review & Data Work Plan | | |
|---|---|---|
| Prepare and provide PDE & DIR data requests (or obtain through DSS) | Review data for completeness and resolve issues. | Generate duplicate payments and forward to assigned Audit Teams. |
| Prepare & provide plan enrollment and payment data requests | Conduct duplicate payment audits across Plan Sponsor PDE | Generate Plan Sponsor data populations and provide to assigned Audit Teams. |
| Store original data in secure location and generate copies. | Assign Plan Sponsors to Audit Teams | |

While we anticipate CMS revisions to our process, we typically prepare IDRs, which are standardized forms outlining requested data as well as the desired format(s) for information we need to conduct our recovery audit efforts. The information requested will consist of contact information for all program stakeholders and holders of data. We will also request available information from the DSS and prepare IDRs for all other available PDE, DIR, and approved plans. Upon receipt of electronically transmitted data, we will store in a secure location and make copies of the original data. Typically, our experience is that the initial data we receive are incomplete so we review the data for completeness and make additional requests as necessary. Once we have received a complete set of data, we will conduct duplicate payment reviews. The primary focus of these reviews will be to identify duplicate payments across Plan Sponsors and PDPs. From these reviews, we will segregate and generate reports of these errors. Once complete, data populations will be separated by Plan Sponsor and PDP and entered into the Audit Tracking Database for further review. During this process, we will also assign Plan Sponsors and PDPs to individual audit teams. Each team will be made up of an Audit Team Leader and Audit Support personnel. We anticipate that audit support personnel will consist of experienced Medicare Part D professionals and recovery auditors, data mining analysts, and the Lead Statistician. We currently anticipate that audit teams will be formed by region and that 15 - 20 teams will be required for full program implementation. Once formed, these audit teams will receive PDP, PDE and available DIR data as well as the results of the initial duplicate payment reviews for their assigned Plan Sponsors and their audits will commence.

*Data Audit:* Upon commencement of this process, an Audit Notification Letter will be prepared by the Audit Team Manager and forwarded to the Plan Sponsor. This letter will outline the recovery audit process and expectations and provide contact information for assigned team members. The Audit Team will also review the Data Storage System to ensure that there is no duplication of effort with other Medicare audit contractors or law enforcement. Once complete, an Audit File will be opened and entered into the Audit Tracking Database, which will be discussed in greater detail below. The Audit File is a secured, standardized, hard document file that contains ACLR, Plan Sponsor, and related CMS communications for each audit and includes such information as contact lists, the Audit

Notification Letter, sampling methodologies employed, PDE data, and workpaper documents discussed in greater detail below. The Audit Tracking Database is a key data processing location used to track audit metrics and auditor findings also discussed in greater detail below. Once complete, auditors will review available information for their assigned Plan Sponsors. This will consist of reviews of desk audit findings, approved plans, and other related documentation such as GAO, OIG and other similar reports. These reviews will be conducted to familiarize each auditor with the specifics of individual PDPs and to prioritize issues to be reviewed in the audit that may arise from reviews conducted by other Medicare Part D program stakeholders. Due to the varying terms and conditions of approved plans, ACLR audit team members will review individual plans to familiarize themselves with plan characteristics for such items as plan formularies and estimated DIR amounts.

During this process, ACLR audit teams will conduct exhaustive analysis of PDE data submissions to identify anomalies. This process is designed to verify the veracity of PDE data submissions and to ensure that PDE data submissions comply with CMS requirements and approved plans and is outlined in Exhibit A-3 below.

| Exhibit 1-3 Data Audit | | |
|---|---|---|
| Notify Plan Sponsor of Audit | Conduct Data Audit of PDE Data & DIR | Prepare audit package and schedule Documentation Audit Conference. |
| Create an Open Audit File & enter into the Audit Tracking Database | Generate Improper Payment Reports, Provide to Plan Sponsor & CMS. Select Plan Sponsor for Documentation Audit. | Outline audit expectations and negotiate parameters with Plan Sponsor. |
| Review Approved Plan(s), PDE Data, & Quarterly DIR Submissions | Discuss Findings with CMS & Reopen Reconciliation as Required | Complete MOU and provide to Plan Sponsors. |

ACLR audit teams will utilize our data analysis tools to validate and match individual PDE data fields against CMS defined field values to identify anomalies and generate initial workpapers, or schedules containing listings of all improper payments that can be provided to Plan Sponsors for resolution. For example, auditors will match Product/Service Identifier codes against National Drug Code (NDC) databases to ensure they were submitted in the proper NDC11 format. During this process, ACLR auditors will also identify potential improper payments arising from matching PDE data submissions to plan requirements, inconsistencies in drug PDE submissions, and duplicate payments. These auditors will ensure that CMS or plan formulary excluded drugs were properly excluded, that beneficiary TrOOP expenses were accurately calculated according to CMS and plan requirements, and that the PDE data submissions do not include allowable costs for drugs not listed on the plan formulary, foreign sourced drugs, over the counter drugs, or similar items.

A00389

ACLR auditors will also ensure that beneficiary payments are commensurate with plan requirements and have been properly netted against Plan Sponsor costs, identify duplicate capitation payments and beneficiary and prescription data occurring within and across Plan Sponsor PDE submissions and capitation payments. Once this stage has been completed, listings of these payments will be documented on the workpapers and provided to Plan Sponsors for review. Any remaining unresolved amounts will be identified as improper, recovered, and removed from further review.

As the Medicare Part D program has only been recently implemented and this will be the first recovery audit program enacted, we anticipate that significant amounts of improper payments will be generated during this review. As such, we anticipate that resolving these scheduled improper payments will be burdensome for many Plan Sponsors to resolve. Their inexperience with improper payment audits under the Medicare Part D program coupled with the likelihood that internal control procedures and audit protocols have yet to be devised lead us to believe that typical industry error rate averages of 2% - 3% will exceed 5% - 7%. We also anticipate that our findings will establish good cause sufficient to warrant reopening reconciliation as required under - 42 CFR Part §423.346. Once the Data Audit has been complete we will discuss our findings with CMS. It has been our experience that data submission errors are indicative of poorly constructed internal control processes. While we anticipate performing a Documentation Audit on all Plan Sponsors, we will utilize these initial reports to identify those Plan Sponsors with the most egregious errors and recommend them, and solicit CMS' approval for, conducting documentation audits.

> "An improper payment is any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements. Incorrect amounts are overpayments and underpayments... An improper payment includes any payment that was made to an ineligible recipient or for an ineligible service, duplicate payments, payments for services not received, and payments that are for the incorrect amount. In addition, when an agency's review is unable to discern whether a payment was proper as a result of insufficient or lack of documentation, this payment must also be considered an error."
> *OMB Circular A-123, Appendix C.*

Once the Plan Sponsor has been approved for a Documentation Audit, the Audit Team Leader will prepare an audit package and forward to the Plan Sponsor. The audit package will describe the purpose of the audit, an explanation of the audit scope and methodologies, audit expectations and documents to be reviewed. The package will also contain a request for a Pre-Audit Conference with the Plan Sponsor, which will also be scheduled.

During the Pre-Audit Conference, the Audit Team Leader will discuss the Documentation Audit process and outline audit expectations. The focus of this review will be to audit source documentation and compare it to Plan Sponsor data submissions. Our recommended course of action to accomplish this is to statistically sample individual Plan Sponsor or PDP PDE data. We recognize that CMS is familiar with these processes from our experience with the Medicare PSC program and anticipate that CMS will want to discuss and approve this methodology. If approved, we will negotiate the details of our sampling methodology with the Plan Sponsor. While we anticipate resistance to this approach from some Plan Sponsors it is likely that many, if not all, of them will have undergone similar audits of their accounts

> **Best Practice**
>
> Experience has shown that negotiating audit parameters on such matters as sampling methodologies, sample sizes, and acceptable documentation significantly reduces appeals.

payable data for sales and use tax audits as outlined above. In such cases we will point out the consequences of having to locate and generate sufficient source documentation to comply with our request if 100% of all the documents were to be audited. It has been our experience that most companies prefer sampling methodologies as they save time and generate accurate and measurable results. ACLR auditors have considerable experience in designing sampling methodologies and generating statistical samples and each negotiation will ensure that generally accepted sampling principles, CMS, and OMB regulations are met. To ensure mutual understanding and mitigate future appeals, we will negotiate all sampling methodologies in good faith and will carefully educate Plan Sponsors as to the statistical sampling process so that they may make informed decisions. These discussions will include such topics as sample sizes and their effect on extrapolated results and audit efficiencies versus accuracy. These discussions will also include the source documentation, such as point of sale, TrOOP, and accounting data that are needed to validate PDE submissions. Once the Pre-Audit Conference is complete, the assigned auditor will complete a Memorandum of Understanding (MOU) to document the audit scope, sampling methodology, and documentation requirements, and the field audit commencement date, and provide to applicable Plan Sponsors. The MOU will also consist of the anticipated timing of each event and include a specific date for the field audit to begin. Once complete, the Documentation Audit will commence.

As outlined under our Project Plan and Deliverables Schedule in greater detail below, we anticipate generating improper payment workpapers within one month of data receipt. However, due to implementation issues that may arise and problems experienced by Recovery Audit Contractors (RACs) and Program Safeguard Contractors (PSCs) in the Medicare program as well as complaints by Medicare Providers regarding documentation requests, we anticipate discussing our results with CMS prior to taking any action with Plan Sponsors. We anticipate that this process will be finalized within 3 - 6 months of contract award.

*Documentation Audit:* During the Documentation Audit stage, ACLR auditors will review source documentation for PDE and DIR data as shown in Exhibit A-4.

A00391

| Exhibit 1-4 Documentation Audit | | |
|---|---|---|
| Generate sample and IDRs based on MOU | Audit point-of-sale, plan data, and other source documentation to verify veracity of PDE data. | Generate Improper Payment Reports & Provide to Plan Sponsor & CMS |
| Obtain requested data from Plan Sponsors | Reconcile DIR submissions to actual data. | Exit Conference & Generate Report of Findings |

The Documentation Audit process consists of all of the activities necessary to ensure that data submitted by Plan Sponsors to CMS is accurate. Due to the nature of the Medicare Part D program and its use of capitation payments derived from actual plan costs, considerable attention will be paid to the review of source documentation and actual cost data. As such, ACLR auditors will review Plan Sponsor ledger and source documentation to support PDE submissions and DIR estimates as well as review other plan requirements. All information related to Plan Sponsor audits will be maintained in an Audit Tracking Database. During the Data Audit process, the Audit Team and Plan Sponsor negotiated the sampling methodologies to be employed for our review of PDE data source documentation. As discussed above, upon CMS approval of this approach, the Lead Statistician will be responsible for documenting the methodology employed and generating the sample for each Plan Sponsor or Plan Sponsor PDP. Each sample will be drawn in accordance with the sampling principles as outlined in the Medicare Program Integrity Manual. Once sample PDE items have been generated they will be incorporated into IDRs and provided to Plan Sponsors so that the source documentation may be obtained. Once obtained, ACLR auditors will review source documentation to verify that it matches PDE submissions.

**Best Practice**

Providing Plan Sponsor representatives with feedback throughout the field audit process provides opportunities for immediate resolution of questioned items and the elimination, additional review time for Plan Sponsors to resolve the discrepancy, and the mitigation of subsequent appeal efforts.

Source documentation will consist of such items necessary to validate cardholder information to verify Medicare and timely plan enrollment; prescriptions necessary to ensure the accuracy of drug information provided as well as determining whether the proper substitution of generic brands and the inclusion of reported drugs in plan formularies; and verifying such items as the calculation of TrOOP expenses and the proper representation of 3rd party payments. During this process, auditors will provide Plan Sponsors with identified improper payments so that they may attempt to gain additional information to resolve the error. For example, PDE submission errors may have been identified and reversed in subsequent submissions or Plan Sponsors may be provided the opportunity to replace illegible documents with legible ones. Once every effort has been made to resolve questioned items by the Audit Team, the Plan Sponsor will be

provided with workpapers that document improper payments so that they may attempt to resolve remaining questions. During this process, ACLR auditors will also request and review Plan Sponsor ledger information. These reviews will be focused on reviewing PDE data submissions for completeness and accuracy. Any unreasonable variances between estimated and actual amounts will be provided to Plan Sponsors for resolution. As noted under our DIR Recovery Methodology below, we will also audit DIR data and unexplained variances will be documented on the workpapers. Once these reviews have been completed, a finalized set of audit workpapers detailing all improper payments will be provided to the Plan Sponsor at the Exit Conference. We will also present the results of our audit findings and discuss with the Plan Sponsor. This discussion will take place in the context of provider education and outreach and, to the extent possible, include recommended corrective action plans. It has been our experience that the Exit Conference also quantifies acceptable and disputed findings as well as negotiations regarding same. In each case we will discuss with and utilize our expertise and the experience gained during the audit to make recommendations to CMS to resolve disputes.

ACLR recognizes that the ultimate goal of the recovery audit process is to mitigate future improper payments. To that end we will make every effort to provide CMS, Plan Sponsors, and other program stakeholders with the information necessary to accomplish this mitigation. At the conclusion of each audit, the ACLR Audit Team will summarize issues related to the audit. These issues will include such items as synopses of the problems encountered during the audit and recommended courses of action for the Plan Sponsor. As an addendum to this report and provided only to CMS, we will also include a summary of specific audit metrics. Audit Metrics will consist of audit cycle times, defined as the period between Audit Notification and the issuance of the Audit Report; listings of improper payment types and attendant liabilities; as well as other CMS related items such as issues related to reporting infrastructures. These reports will serve as the foundation of our monthly reporting and inputs to the annual report. As will be discussed in greater detail under the Communication Plan section below, Audit Team members will also document best practices/lessons learned developed as a result of each audit to ensure that identified efficiencies have been implemented and to ensure that mistakes are not repeated. These best practices will be shared with other ACLR Team members and reported to the Oversight Board in the monthly, quarterly, and annual reports as discussed or upon CMS request.

*Post-Audit:*

As detailed below in Exhibit 1-5, the Post-Audit process consists of securing audit results and supporting recovery and appeal efforts.

| Exhibit 1-5 Post-Audit | | |
|---|---|---|
| Archive Audit Documentation | Support Recovery Efforts | Support Appeal Efforts |

Once Plan Sponsor PDP audits have been completed, all final documentation including the Report of Findings and Audit Report will be entered into the Audit File and the Audit Tracking Database will mark the audit as closed. The Audit Team Leader is responsible for completing this task. We recognize the importance of maintaining secure archived information. The Audit Team Leader is responsible for ensuring that the audit file is properly completed and, according to protocols laid out by the System Security Officer (SSO), secured, as well as ensuring that the Audit Tracking Database has been populated.

At the Exit Conference, Plan Sponsors will receive a final assessment, which details the totals of all improper payments remaining as unresolved on the audit workpapers, and can anticipate that net overpayments will be recovered via check, payment offsets to monthly payments, or during the final determination process in accordance with the Medicare Integrity Program or as otherwise required by CMS. We will also assist in the Appeals Process as necessary. ACLR auditors will treat Plan Sponsors fairly and equitably and make every effort to document adverse audit findings in a clear, concise, and indisputable manner. Fortunately, we do not anticipate many appeals. Unlike the national Medicare recovery audit process, Medicare Part D recovery audits will not consist of medical necessity determinations. While drug abuse patterns and trends analysis will be conducted, the vast majority of the Medicare Part D process will be to verify PDE submissions and DIR assertions against source documentation and accounting data. Even issues related to plan interpretations are likely to be much more straightforward than that regarding determinations of medical necessity. We do anticipate; however, that many disputes that arise will be outside the realm of our control. In such a case, we will discuss the parameters of the dispute, the reasons for our findings, and our recommendations with CMS to identify possible solutions. As will be discussed in greater detail under the *Appeals* section below, we understand the necessity of fully documenting all adverse audit findings as well as the audit and sampling methodologies employed. All improper payment determinations made by the audit team will be documented in the Audit Tracking Database. In addition, we maintain detailed audit files for each Plan Sponsor. These audit files contain the sampling methodologies and protocols employed to select the Plan Sponsor and conduct the audit as well as detailed communications between audit team members and Plan Sponsors. Finally, the audit tracking database and audit files will contain records quantifying efforts undertaken by the team to resolve the improper payment as well as an analysis of each payment's determination as improper. This information will be made available to CMS at all times and to administrative law judges or in court as required. In addition, ACLR audit professionals are experienced at providing testimony and litigation support and have successfully defended our findings in protests and appeals to Administrative Law Judges and in courts throughout the country and are prepared to assist CMS upon request.

Upon contract award we will standardize all CMS approved activities and the administration of our processes in accordance with CMS guidance and policies and modify them as requested.

*Alternative Methodologies:*

42

A197

During the course of our work, we anticipate that alternative audit methodologies, which will enhance recoveries and efficiencies, will present themselves. The small Plan Sponsor base and the relative ease of these audits suggest several possibilities. Some of these possibilities have proven effective in state sales and use tax audits and have application in the Medicare Part D recovery audit program. These possibilities include managed audit processes where Plan Sponsors are provided samples generated from their respective PDE data submissions and they conduct their audits. These types of audits permit companies the opportunity to complete audits without the "intrusive" element of a RAC audit. Another possibility is a modified voluntary disclosure program similar to tax amnesties offered by state taxing jurisdictions throughout the country. This type of initiative could be offered to Plan Sponsors under controlled conditions and could possibly significantly increase recoveries and reduce recovery cycle times. If a common ground may be identified and appropriate incentives offered, these as well as other audit methodologies may prove very effective. We will make every effort to document these opportunities and offer alternative solutions whenever opportunities such as these present themselves.

### 1.2.2   TARGETING IMPROPER PAYMENTS

As identified under Methodology above, we conduct numerous analyses of the data to identify and target improper payments. The first, conducted upon data receipt, is a review to identify potential duplicate payments that may arise across Plan Sponsors and PDPs. The second review is a Data Audit that validates the accuracy of PDE submissions to required field values and pre-defined edit checks. The Documentation Audit consists of a source documentation audit that matches point of sale, TrOOP expenses, and other plan data to PDE and DIR submissions. Our most important assets in identifying improper payments are our audit team members. These personnel are highly trained in recovery audits and skilled at identifying anomalies and they undergo and provide numerous training sessions to ensure they remain at the height of their profession. Assisting them in these processes are several proprietary data analysis and tracking tools developed through years of recovery audit experience. We also utilize several canned off the shelf software applications that contain modifications/macros that enable us to complete are tasks more accurately and efficiently.

As shown in Exhibit I-6 below, PDE data elements consist of:

A198

| Exhibit 1-6 Prescription Drug Event Data Elements | | | |
|---|---|---|---|
| Contract Number | Service Provider ID | Dispensing Status | GDCA |
| PBP Identifier | Prescriber ID Qualifier | Drug Coverage Status Code | Patient Pay Amount |
| Claim Control Number | Prescriber ID | Adjustment/Deletion Code | Other TrOOP Amount |
| HICN | Prescription/Service # | Non-Standard Format Code | LICS Subsidy Amount |
| Cardholder Identifier | Product/Service ID | Pricing Exception Code | PLPRO |
| Patient DOB | Compound Code | Catastrophic Coverage Code | CPP Amount |
| Patient Gender | Product Selection Code | Ingredient Cost Paid | NPP Amounts |
| Date of Service | Quantity Dispensed | Dispensing Fee Paid | |
| Paid Date | Days Supply | Total Amount Attributed to | |
| Service Provider ID Qualifier | Fill Number | GDCB | |

We use a variety of techniques and tools to analyze these types of data. Each of these tools is capable of performing analyses enabling ACLR Audit Team members and data analysts to identify anomalies, analyze trends, and to sort and manipulate the data as required during the auditors review. Over time, as we gain a greater understanding of recurring and changing data anomalies, each of these tools is capable of being adapted and modified over time to streamline processes and maximize recoveries.

*Statistical Sampling:* Plan Sponsor PDE data for any given year can exceed one million records. While our automated systems can manipulate all of this data to identify improperly submitted records and conduct a myriad of edit checks that can compare approved plan requirements to the data submissions so that improper payments may be identified, the reviews are limited. The technology necessary to review source documentation, such as individual prescriptions and other point of sale documentation does not exist. As such; a detailed review is required to identify the existence of improper payments arising from invalid PDE data entries at the source or point of sale level; a highly inefficient and costly task. To address this issue, we employ statistical sampling methodologies to select representative samples of PDE data. These samples represent a much smaller subset of the entire population but which may be reviewed on a much more efficient basis. Plan Sponsors obtain source documentation from these sampled items, which are then reviewed by our audit teams to ensure they match the PDE submissions. Any errors are extrapolated, or projected, across the population and an estimated improper payment liability is calculated. This process significantly reduces the amount of time Plan Sponsor personnel must expend obtaining documentation for audit while providing an accurate estimate of liability. It also enables our audit teams to efficiently review audit records and to accurately quantify amounts owing by individual Plan Sponsors. In short, this enables CMS to obtain a reasonable assurance that, within acceptable tolerances, all improper payments have been identified and recovered.

*Audits:* As detailed under *Methodology* above, we use the duplicate payment reviews and data and documentation audits to identify and recover improper payments. While important,

44

A199

errors serve other purposes as well. Namely, these errors assist us in identifying internal control issues that we can use to provide Plan Sponsor outreach and education. It has been our experience that many errors occur as the result of improper training or weak, and easily remedied, internal control processes. This can occur anywhere in Plan Sponsor processes. By identifying specific errors and the recurrence of those errors we can more effectively pinpoint internal control process deficiencies enabling Plan Sponsors to more effectively target problem areas. These errors also serve to make recovery audits more efficient and accurate. By identifying recurring issues experienced by Plan Sponsors and PDPs, our audit teams can more accurately focus their efforts on payment areas more likely to be improper. It is in this same area that we conduct trend analyses. While our audit teams gain experience in identifying specific problem areas, trend analysis utilizes mathematical probabilities and scoring models to identify payment errors that may otherwise be missed, even to the trained observer.

*Trend Analysis:* Our trends analyses expertise is the most important tool in our arsenal for more specifically targeting improper payments and providing CMS with the capability to stop likely errors before they occur. During this analysis we identify specific characteristics about the improper payments identified through the course of our audits. From this, we develop a scoring system whereby payments more likely to be improper are scored high while those that are less likely to be improper receive lower scores. We then apply these scores to incoming data to target those records more likely to be in error. This capability enables us to provide more timely feedback to Plan Sponsors on the efficacy of their data submission improvements as well as to provide CMS with the capability to stop improper payments before they occur.

*Audit Tracking Database:* The Audit Tracking Database is a proprietary database developed by ACLR auditors to track all information related to their audits and improper payments. The database tracks all data sources and data collection methodologies and ensures that audit trails are maintained. This database also contains improper payments and related auditor conclusions about their disposition as well as imaged documents supporting their findings. The importance of this tool is that we can run reports on a variety of data which assists us in our trend analysis and which can be disseminated to the audit teams so that their efforts are more focused. Over time and upon CMS approval, we anticipate making the Audit Tracking Database available via the web for use by CMS so that they monitor our activities and generate reports at will. It is also possible that the Audit Tracking Database may also be utilized by Plan Sponsors to monitor the results of their audits as well provide requested documentation. An example of this database is provided as Exhibit I-7 below:



Exhibit 1-7 Sample Audit Tracking Database

Our personnel and the data analysis tools we employ enable us to efficiently and effectively perform complex in-depth analyses for large datasets to identify payment anomalies and trends.

### 1.2.3 DIR RECOVERY METHODOLOGY:

ACLR recognizes that a key concern in the determination of payment accuracy for payments made under the Medicare Part D program is ensuring that estimated DIR costs match actual amounts. This is a real concern as the timing of the annual reconciliation process occurs when the books and records of Plan Sponsors have yet to be finalized; Plan Sponsors may not even know total actual amounts. As there has been no subsequent requirement to submit these amounts, Plan Sponsors have likely not engaged in reconciling any variances. As estimates are likely derived from previous periods, errors are compounded over time. To address these issues, we will audit actual Plan Sponsor DIR amounts and document errors as they are identified.

Initially, we will review submissions from Plan Sponsors that voluntarily submit total annual DIR amounts received. We have noted that CMS utilizes total drug costs in flagging questionable DIR submissions. We will engage in these evaluations and review financial statement filings of these Plan Sponsors for comparison purposes and to identify anomalies. As noted in our Audit Methodology above, we anticipate conducting DIR audits during the Data Audit and Documentation Audit processes. During these efforts, we will review monthly DIR submissions and compare them across periods as well as across Plan Sponsors and Plan Sponsor PDPs. We will use these reviews to identify outliers and to focus our efforts. We will also request and review source documentation such as worksheets, budgets, accounts, and other accounting data to understand how Plan Sponsors estimated DIR amounts and the assumptions made during the estimation process. We will carefully monitor and note all objections to these

46

A201

reviews and discuss with CMS to identify possible courses of action. We will also request and review source documentation related to the calculation of actual amounts. These requests will consist of ledger, journal entry, and other relevant accounting documentation so that DIR submissions may be verified for accuracy and completeness against the Plan Sponsor's own books and records. To the extent possible, we will also seek alternative information from Pharmacy Benefit Managers and manufacturers. Once we have obtained this information, ACLR auditors will reconcile actual DIR amounts against estimated amounts and provide identified discrepancies to the Plan Sponsor for review and explanation. Any amounts unresolved after this process will be scheduled on the audit workpapers and provided to the Plan Sponsor and CMS for review and unresolved amounts will be recovered from Plan Sponsors. As we continue to audit this data, gather new information, and obtain additional knowledge from Plan Sponsor practices, we anticipate modifying and improving our processes to supply CMS with targeted and timely data so that Plan Sponsor negotiations of future PDPs may be more accurate.

### 1.2.4 OVERSIGHT BOARD INTERACTION

We recognize the importance of communications and our goal is to develop a mutual and rewarding relationship that achieves CMS objectives. We understand the increasing scrutiny placed on improper payments and the need for CMS to stay informed on all current activities and events occurring within the Medicare Part D Recovery Audit Program. Our goal is to ensure that CMS is provided with the information it needs to make business decisions in a timely and efficient manner.

Once developed, ACLR will obtain contact information for all Oversight Board members (Board). The Project Director will serve as the primary point of contact for the Board and the Audit Director will be assigned as an alternative contact. All ACLR Team members will be available to address any questions or issues for the Board and updated contact lists will be provided to the Board. It is our intention that ACLR Medicare Part D recovery audit operations remain open and transparent and all ACLR personnel will comport themselves accordingly.

Once established, we will schedule a meeting with the Board. The primary purpose of this meeting will be to establish relations and obtain a greater understanding of Board needs and desires. To accomplish this, ACLR will develop an agenda that outlines our company, introduces the project and audit directors, and which provides a synopsis of our recovery audit philosophy, methodologies, and approach to future improper payment mitigation. This agenda will also address obtaining Board expectations regarding future meetings, outlining status report topics, audit metrics, and concomitant delivery schedules. Ultimately, we intend this meeting to establish the foundation for future Board interactions.

47

A202

We anticipate that the Board will want to meet regularly to discuss recovery audit activities. To that end, we will schedule monthly conference calls. Schedules permitting, these conference calls will be attended by all ACLR Key Personnel as required by CMS. The Project Director will develop an agenda for these calls as required by CMS prior to the call and provide to all participants. This agenda will be based on a standard format as developed from the initial meeting and subsequently adjusted. During the call and throughout the month, the Project Director will add agenda items and discussion topics as obtained from Board members. We will schedule meetings at the end of each quarter and the end of the year. To the extent possible, we

> **BOARD INTERACTION SUMMARY**
> - Participate in Monthly Conference Calls
> - Attend Quarterly & Annual Meetings
> - Provide Monthly, Quarterly, & Annual Status Reports
> - Provide Audit Metrics

anticipate that these meetings will be conducted at a CMS designated location and will be attended by the Board and the ACLR project and audit directors. Similar to the monthly conference call, a meeting agenda will be forwarded to all participants no later than 3 days prior to the quarterly meetings and one week before the annual meeting. At any time during the course of this project, ACLR will make the Board and CMS immediately aware of any issues requiring urgent action.

We will provide the Board with monthly and quarterly status reports. These reports can be separate or inclusive of the Monthly Progress Reports as required. These status reports will highlight issues we have encountered throughout the month and topics may range from data availability and systems interface issues to infrastructure concerns. We anticipate providing feedback regarding Plan Sponsor outreach and education efforts conducted during the month as well as sharing Plan Sponsor concerns related to the Medicare Part D program. Additionally, the Board will be provided with the results of our recovery efforts including worksheets and graphs listing improper payments by type and amounts. We also anticipate that our processes will evolve over time and as needs become apparent, we will inform the Board of our concerns and recommendations and request approval for implementation. We will also submit any referrals of potential fraud and abuse we identify during the course of our recovery efforts. In addition to these status reports we will also supply the Board with quarterly reports on audit metrics. These metrics are essential because they give tangible, measureable feedback regarding our recovery efforts. Among the items reported include audit cycle times. This metric is defined as the period between the issuance of the Notification of Audit through the issuance of the Audit Report and demonstrated efficiencies gained in the auditing process over time. Audit metric reports will also document average recoveries per audit and time period; initial improper payments identified versus approved improper payments; list the number of Plan Sponsors currently being audited; and will include any other measureable information desired by the Board and captured in our Audit Tracking Database. A sample of information provided on the Audit Metric Report is shown in Exhibit 1-8.

A00400

| Exhibit 1-8 Sample Audit Metrics Report |||

| Types of Errors | Recoveries | % |
|---|---|---|
| Data Submission Errors | 44,047,500 | 25.17% |
| Missing Items | 5,600,000 | 3.20% |
| Excluded Drugs | 9,187,500 | 5.25% |
| DIR Submission Errors | 36,715,000 | 20.98% |
| Documentation Support Errors | 78,750,000 | 45.00% |
| Fraud & Abuse | 700,000 | 0.40% |
| Medicare Part D | 175,000,000 | 100.00% |



| Measurable | 2011 | 2012 |
|---|---|---|
| Audit Cycle Times (Months) | 8 | 5 |
| Number of IP Determinations: | | |
| Overpayments | 187,500,000 | 234,375,000 |
| Underpayments | 12,500,000 | 15,625,000 |
| Totals | 200,000,000 | 250,000,000 |
| Appeals | | |
| Number of Appeals | 1,973 | 1,428 |
| Resolved in Plan Sponsor Favor | 110 | 30 |
| Percentage in Plan Sponsor Favor | 5.60% | 2.10% |

At the end of each annual reporting period, ACLR will provide an annual report of our activities. This report will consolidate the issues and audit metrics reported throughout the year and will serve as the foundation for our input to the CMS' annual report submission to Congress.

## 1.3    DATA STORAGE INTERFACE

ACLR is experienced in the handling of medical data and maintains HIPAA compliance and maintains adequate safeguards that protect this information. ACLR utilizes routers and firewalls configured for data transmission security, VPN, traffic management functionality, denial of service, and distributed denial of service protection and our security systems conform to Level 3 e-Authentication requirements. To the extent necessary, ACLR will extend its infrastructure and telecommunications security controls to the level necessary as requested by CMS or identified by the SSO.

> ACLR security systems conform to Level 3 e-Authentication requirements.

Upon contract award, the ACLR SSO will work with CMS technical personnel to discuss the Data Storage System (DSS) as well as access and encryption requirements, transmission rates, peak operating times, as well as numerous other system protocols necessary for ACLR to retrieve and transmit data in an effective and efficient manner. While we will adopt a methodology more suitable for CMS, we will likely host PDE and similar data on a dedicated server. This process will provide us with an additional layer of security. As the data files we will be working with are large, this process will also allow us greater speed

enhancing our efficiencies. The SSO will also discuss preferred data transfer methodologies with CMS technical staff. Currently, ACLR utilizes PHP to transmit secure data. While this has the capability of encrypting data before it is sent, we can modify our processes to match CMS security requirements as identified by our SSO. As noted in the Statement of Objectives, the DSS is to be established to ensure that the "RAC and entities, such as, Medicare audit contractors or law enforcement, are not simultaneously working on the same payment data". To the extent that non-sensitive data fields, such as randomly assigned reference numbers, are utilized to identify claim data and as the DSS is likely secured, we believe that we may obtain and transmit the assigned reference numbers and action specific identifiers with minimal effort. In the event that CMS anticipates that PDE data submissions will be transmitted through the DSS or that claim specific information such as auditor notes or imaged documents are necessary, then additional efforts will be required. If we are transmitting standard PDE data elements and attendant action identifiers, we anticipate that ACLR will transfer approximately 1 to 2 GB per day. If imaged documents are to be transmitted, we anticipate that data will be transferred at a rate of 40 - 60 GB per day. In such a case, the SSO will discuss storage and bandwidth requirements with CMS technical personnel and we will modify our systems accordingly.

Once identified, the SSO will determine, propose, and upon approval from CMS, will implement data transmission protocols to ensure data are securely and properly transmitted and the Master Table is updated according to the action specific identifiers as determined by CMS.

### 1.4   COMMUNICATIONS:

ACLR recognizes that communication is the key to the successful implementation of any project. Considering the infancy of the Medicare Part D program, lack of mature auditable data processes, and the predicted impact of financial recovery efforts on sponsors; the importance of proactive communications with Plan Sponsors will be ACLR's goal from the start. Medicare Part D RAC purpose and direction to feedback and training to improve the overall effectiveness of data veracity to governing directives will be the focus of our relationship with all stakeholders.

*Initial Introduction:* During the implementation phase of this project, ACLR will design an introduction brochure detailing the Part D RAC project purpose and direction and provide to all program sponsors as approved by CMS. This brochure will include ACLR contact information, program purpose and direction for each phase of the project, communication process maps for direct Plan Sponsor interaction, and a request for Plan Sponsor point of contact information to ensure efficient two-way communication. As each element of the initial introduction brochure will be vetted through CMS, the key points of each element are provided as follows:

A00402

- *ACLR Contact Information:* Direct access numbers assigned to recovery auditors with a detailed response protocol to mitigate the variety of requests from sponsor, official, or media interests.
- *Part D RAC Purpose and Direction:* Detailed purpose identifying governing directives and including an overarching plan which highlights key data review points and anticipated exit points where Plan Sponsor training and trend information is provided.
- *Communication Process Maps:* Chart providing CMS approved direct sponsor to ACLR interaction and indentified avenues through CMS to resolve other than approved communication requests.
- *Plan Sponsor Contact Requests:* ACLR contact information for sponsors to provide internal communication points for ACLR to sponsor interaction on Part D clarification items approved through CMS.

> **COMMUNICATION ELEMENTS**
> - Initial Introduction
> - Contact Information Exchange
> - Communication Tracking
> - Continuous Results Feedback
> - National and Sponsor Trend Metrics

*Communication Tracking:* To minimize duplication of effort, maximize efficiencies, and ensure accountability, this type of project requires standardized communication parameters and a method to document, track, and report communications. The Audit Tracking Database will be used to track the status of all Plan Sponsor communication tasking including communications encountered related to improper payments, process resolutions, follow-up response requirements and corrective actions. The Audit Tracking Database will evolve with the project to meet ACLR and CMS needs and will have a preliminary baseline of fields covering requester, issue identified, action assignment, priority for resolution, current status of each communication, as well as all other information tracked as a part of our recovery efforts. The Audit Tracking Database will also have the ability to sort and track issues identified to determine feasibility of process improvement implementation and will connect directly to the audit tracking database as further resolution is required.

*Results Feedback/Trending Reports:* In order for the Part D program to successfully evolve through internal and external process improvements and to ensure future improper payment risks are continuously mitigated; monthly and quarterly status' reports will be designed to focus on key error indicators (improper payment areas/relationship to governing requirements). These error indicator areas will be provided a statistical comparison to total review and submission population and further broken down to individual Plan Sponsors to provide all stakeholders visibility to key areas of interest for future improper payment risk mitigation. Additionally, these charts will also provide ACLR and CMS the ability to understand and further define target populations throughout the entire Medicare Part D data population to mitigate impact risk.

*CMS Process Recommendations:* ACLR recognizes the importance of cohesive relationship with CMS and the unique importance of maintaining a strong relationship with Plan Sponsors. We believe that our pro-active approach and constant feedback with all stakeholders will provide for a strong relationship throughout the Medicare Part D RAC project and also provide for key program improvements through sponsor education, refined process mapping, and a continuous integration of lessons learned. As detailed in section 1.2.4, ACLR Audit Team members will document best practices/lessons learned developed as a result of each audit to ensure that identified efficiencies have been implemented internally to ensure that mistakes are not repeated. These internal process improvements will be shared with the CMS Oversight Board in the monthly, quarterly, and annual reports. All ACLR recommended external process improvements as well as CMS directed process improvements will be vetted and implemented as required in the best interest of a successful Part D RAC project.

## 1.5   APPEALS

ACLR recognizes the importance of a strong appeals process and works to ensure that all decisions regarding identified improper payments contain the requisite supporting documentation and auditor conclusions regarding their findings. We also recognize that resolving disputes early in the process significantly decreases the administrative burdens of substantiating them upon appeal. To that end, our evidentiary support process begins almost immediately upon data receipt. At each stage of the auditing process, we note our analysis and attach all applicable supporting documentation to each questioned improper payment in the Audit Tracking Database. In addition, creating an audit trail for others to follow this process enables us to quickly review appealed items and to evaluate the merits of any appeal.

All verbal communications relating to improper payment determinations will be directed to the appropriate personnel upon receipt through the Audit Tracking Database. Any additional information received at this time will be reviewed, evaluated, and addressed accordingly. As necessary, ACLR personnel will advise parties making verbal appeals of the established appeals process. While changes will occur once the appeals process requirement has been established and approved by CMS, we anticipate that our appeals assistance process relating to all written appeals, will function as summarized in Exhibit 1-9 below.

A00404



All written appeals will be entered into the Audit Tracking Database upon receipt. This process is completed by well trained ACLR administrative staff that recognizes the importance of documenting formal appeals. Once entered, appeals will be forwarded to the Audit Team assigned to the Plan Sponsor. Once received, members of the audit team will research and document any changes to statutory or administrative appeal processes and establish a timeline of due dates/deadlines and enter into their respective calendars to ensure timely responses to appeal process requirements. The Audit Team will review the appeal and any additional supporting documentation provided. The appeal will then be evaluated and a determination will be made as to its merit. Once complete, we will engage in candid discussions with CMS regarding the likelihood of success of the appeal as well as any cost-benefit analysis that may have bearing on denying or approving the appeal. If a decision regarding a refund is made, we will document the finding in the Audit Tracking Database and return related contingency fees to CMS if required. Once the conclusion to dispute filed appeals has been made, the Audit Team will develop a technical memorandum outlining all facts including amounts involved, issues being contested, our analysis supporting our contentions and a summary of our conclusions.

To ensure simplicity and efficiencies in the upcoming appeals process, we will also assemble and attach exhibits containing copies of all supporting documentation, affidavits, as well as other information needed to support our position.

As seasoned recovery auditors, ACLR has provided testimony and litigation support in numerous administrative appeals and, when necessary, testified in court; we will provide this assistance to

A00405

CMS throughout the appeals process for any disputed amounts if required. We will monitor deadlines and administrative remedies to ensure appeals process compliance by the Plan Sponsor and attend meetings and hearings as necessary. As applicable, we will also review decisions made upon redetermination and reconsideration and at each level of the process, will evaluate the findings/decisions and re-evaluate the merits of continuing disputing and will discuss with and make recommendations to CMS. Upon final resolution of appeals, we will document all findings in the Audit Tracking Database and prepare an addendum to the Audit Report. This addendum will outline appeal findings, discuss action items, and document lessons learned. Any action items requiring a change to ACLR recovery audit processes will be discussed with CMS and implemented as necessary.

## 1.6   ANNUAL REPORT

During the annual report preparation process we will meet with CMS to discuss specific topics necessary for inclusion into this report. We anticipate that much of the information needed will have been provided to the Oversight Board throughout the course of the year. As we discussed in greater detail above, we will provide the Board with monthly, quarterly, and annual status reports designed to convey the results of our efforts, problems encountered, best practices initiatives, and lessons learned. These reports will also detail our efforts with respect to Plan Sponsor outreach and education, which is essential to mitigating future improper payments. The Board will also receive audit metrics noting the measureable and quantifiable results of our efforts that document the success of the Medicare Part D recovery audit program. These results will demonstrate recoveries and their characteristics as well as a wealth of information related to audit activities and measurable efficiency gains. These reports and metrics should provide a good foundation for CMS to meet its congressional annual report submission requirements.

We also anticipate that during the course of the recovery audit we will identify legislative and regulatory issues and opportunities that may enhance the Medicare Part D program. We will also document feedback we receive from Plan Sponsors regarding these issues as well. During the annual report preparation discussions, we will share these thoughts with CMS and provide necessary assistance required to determine feasibility of inclusion in the annual report. In addition, ACLR personnel shall stay apprised of new developments relating to improper payments. We will continually monitor the political environment for new initiatives so that we may recommend modification of our tracking and reporting processes to ensure CMS receives accurate and current information at all times.

## 1.7   ADMINISTRATION

We will schedule the Kick-Off meeting with the Contracting Officer (CO), Contracting Officer Technical Representative (COTR), and other authorized CMS personnel upon contract award. In preparation for this meeting, we will develop an agenda that addresses the overall approach, work breakdown structure, points of contact, reporting formats, scheduling future meetings. We will solicit feedback from CMS regarding their list of action items for inclusion into the meeting agenda and prepare as requested. We anticipate that the primary goal of this meeting will be to

establish overall project guidelines and set CMS and ACLR project expectations. We anticipate that this initial meeting, as permitted by CMS, will consist of the ACLR project and audit directors and the SSO. These personnel have intimate knowledge of the ACLR, its recovery audit processes and procedures, as well as its data capabilities and requirements and will be in a position to provide or obtain answers to CMS inquiries. These personnel will also solicit information regarding CMS project and project implementation requirements and discuss potential issues associated with each. During this meeting, ACLR will request contact information for all appropriate personnel as well as obtain an understanding of their roles and responsibilities. ACLR will also request CMS established milestones and determine whether our initial work efforts should be focused in one direction or another or if we have a blank slate upon which to implement our processes. At the Kick-Off meeting, we will also discuss aspects of our project plan so that we may further refine it based on CMS expectations.

*Project Plan:* Upon contract award, ACLR personnel will begin developing our project plan. This plan will define the project scope and milestones and will lay the groundwork for the development of our Medicare Part D specific recovery audit processes and procedures. Our project plan will likely contain numerous administrative items such as completing background checks, identifying appropriate points of contact, ensuring adequate system security levels, obtaining access to systems, and any training required by CMS. The project plan will also memorialize ACLR communication processes for CMS and will include items ranging from identifying activities requiring CO and COTR intervention to formalized response times to verbal and written inquiries. As data plays such an important role in the course of our recovery efforts, our project plan will also address the various systems utilized by CMS and the need to obtain system instruction manuals and attend available training. We will also outline the methodologies to be used in communication with Plan Sponsors. The project plan will outline such items as scheduling web-based presentations to introduce ACLR and outline expectations as well as discuss our anticipated outreach and education efforts. As the work commences the project plan will also include the development of formalized recovery audit processes and procedures according to CMS guideline as well address the recovery of improper payments.

*Implementation Schedule:* A key component of our project plan will be our implementation schedule. [We recognize that deadlines for recoveries for some periods are approaching and our initial implementation schedule will consider this carefully.] The implementation schedule will outline our Work Breakdown Structure, which will contain a summarized listing of the projected activities required to ensure successful completion of the project, anticipated duration of the activities, and the estimated start and finish dates. Due to the sensitive nature of program data much of our initial efforts will be expended on ensuring that our Information Technology (IT) systems are secure, in accordance with CMS guidelines and as outlined in the Task Order. This will include completing the IT Security Plan, IT Risk Assessment, and FIPS 199 Assessment within 30 days of contract award and the IT Security Classification and Accreditation within 3 months of contract award. While this document will be modified as work progresses, we anticipate that our initial efforts will be to lay the

55

A210

foundation for our future recovery audit processes and will focus primarily on familiarizing ourselves with CMS operations.

Monthly Status Reports: As identified in Oversight Board Interaction above, we will develop monthly status reports. These reports will contain information related to current work efforts, issues encountered, and lessons learned. These reports will also contain information related to improper payments identified and amounts submitted and recovered. We will also develop audit metrics that measure efficiencies gained in auditing processes as time progresses. These reports are shown in Exhibit 1.10 below:

| Exhibit 1-10 Report Types | |
|---|---|
| **Deliverable** | **Approach** |
| Audit Metrics Report | Provide all results related information derived from audit metrics such as, recoveries, improper payment types, and audit cycle times. |
| Monthly Vulnerability Report | Discuss vulnerability inputs, outputs, and corrective action recommendations with CMS and integrate with audit databases, develop standardized reports to meet CMS needs, and provide to CMS. |
| Monthly Progress Report | Provide ongoing reviews of all tasks, meetings, identify issues and concerns (including recommendations), document status of audits, report status of claim issues, update status of outreach efforts, provide information on workloads |
| Monthly Financial Report | Develop web-based system to track identified improper payments, payments reviewed, recoveries identified, plan sponsors audited. Also provide data related to types of improper payments identified and attendant amounts. |
| Annual Report Input | Discuss and identify reportable items with CMS, utilize information from monthly reports, highlight federal requirements (amount of recoveries, amounts identified, specific statistical parameters). |
| *Note: All reports are baselined and are anticipated to evolve with approval and direction of CMS.* | |

Throughout the development of the project plan, implementation schedule, and monthly reporting development process, we will solicit CMS feedback and incorporate recommendations as applicable.

## 1.8    SCHEDULE OF DELIVERABLES

A00408

We anticipate that this Schedule of Deliverables will be modified as work progresses and upon feedback received from CMS and subsequent modification and approval.

| Exhibit 1-11 Schedule of Deliverables | | |
|---|---|---|
| **Deliverable** | **Schedule** | **Approach** |
| Kick-Off Meeting | Within 14 days of contract award (Per CMS availability) | Prepare briefing covering overall approach, Organization Chart, preliminary Project Plan and Implementation Schedule, reporting formats, and suggested regular meeting/conference call times as required.  Hold kick-off meeting to discuss CMS expectations, objectives, critical areas of concern, and requirements.  Coordinate IT requirements between CMS CISO and ACLR SSO.  Generate meeting minutes within 3 business days. |
| Organization Charts | Within 14 days of contract award | Provide Organization Chart to CMS identifying baseline key and support personnel including reporting relationships for communication structure and IT access requirements. |
| Base Year Project Plan | Within 7 days of Kick-Off Meeting completion | Finalize Project Plan for management and support structure for the contract, including our high-level technical approach for conducting all phases of the audit process, collecting lessons learned, coordinating and communicating with stakeholders including outreach plans, and updating our Information Technology Plan. |
| Implementation Schedule | Within 7 days of Kick-Off Meeting completion | Develop schedule outlining plan sponsor notifications, data receipt and review, initial findings to plan sponsors, comprehensive data reviews, identifying audit targets, requesting waivers, conducting and finalizing audits, obtaining recoveries, reporting results, education. |
| Personnel IT Security and Privacy training completion certs | Within 10 days of position sensitivity assignment | Complete as Required by Systems Security Officer. |
| FIPS 199 Assessment | Within 30 days of contract award | The SSO will maintain and update all applicable Authorization to Operate documentation requirements as required by CMS Information Security procedures. |
| IT Security Plan (IT-SP) | Within 30 days of contract award | The SSO will draft a System Security Plan utilizing templates avalable ar the CMS Information Security "Virtual Handbook" Web site. |
| IT Risk Assessment (IT-RA) | Within 30 days of contract award | The SSO will complete all the IT risk assessment as required by CMS. |
| IT Security Classification and Accreditation (IT-SC&A) | Within 3 months of contract award | The SSO will coordinate with CMS to develop/clarify system security level requirements; current ACLR parameters - e-Authentication level 3. |
| Training on RAC Data Warehouse | TBD | Complete as Required by CMS for all applicable personnel. |

| Exhibit 1-11 Schedule of Deliverables Continued | | |
|---|---|---|
| Recurring Reports/Requirements | | |
| **Deliverable** | **Schedule** | Approach |
| Audit Metrics Report | Quarterly | Provide all results related information derived from audit metrics such as, recoveries, improper payment types, and audit cycle times. |
| Vulnerability Report | Monthly | Discuss vulnerability inputs, outputs, and corrective action recommendations with CMS and integrate with audit databases, develop standardized reports to meet CMS needs, and provide to CMS. |
| Progress Report | Monthly | Provide ongoing reviews of all tasks, meetings, identify issues and concerns (including recommendations), document status of audits, report status of claim issues, update status of outreach efforts, provide information on workloads |
| Financial Report | Monthly | Develop web-based system to track identified improper payments, payments reviewed, recoveries identified, plan sponsors audited.  Also provide data related to types of improper payments identified and attendant amounts. |
| Payment Vouchers | Monthly as required | Prepare in accordance with Task Order and recoveries. |
| Oversight Board Input Report | TBD | Prepare and provide reports as required by Oversight Board. |
| Annual Report Input | TBD | Discuss and identify reportable items with CMS, utilize information from monthly reports, highlight federal requirements (amount of recoveries, amounts identified, specific statistical parameters). |
| Key Personnel New Approval Requests | TBD | Provide to CMS upon identification of personnel. |
| Organizational Chart Updates | TBD | Update as required by CMS. |
| IT Security Plan (IT-SP) review/update | Annually | SSO to complete as specified by CMS guidelines. |
| IT Risk Assessment (IT-RA) review/update | Annually | SSO to complete as specified by CMS guidelines. |
| IT Security Classification and Accreditation (IT-SC&A) review/update | Annually | SSO to complete as specified by CMS guidelines. |

## 1.9   CONSTRAINTS & ASSUMPTIONS

As detailed in section 1.3 above, ACLR is experienced in the handling of medical data and maintains HIPAA compliance and our security systems conform to Level 3 e-Authentication requirements.  ACLR has identified a SSO as a key personnel position and the related name, title and credential information is provided in Chapter 3 Staffing Plan.  The ACLR SSO will coordinate directly with CMS CISO to develop FIPS 199 Assessment, IT Security Plan, and IT Risk Assessment within 30 days of contract award and the IT Security Classification & Accreditation within 3 months of contract award as well as all other Information Security requirements identified in the Task Order terms and conditions.

A213

A00410

# ACLR, LLC

## GENERAL SERVICES ADMINISTRATION
## FINANCIAL & BUSINESS SOLUTIONS

### GSA FEDERAL SUPPLY SERVICE
**Authorized Federal Supply Schedule Price List**

*SCHEDULE TITLE:*   FSC Group 520 - Financial Management & Audit Services

*SIN CODES:*   520-9 Recovery Audits
520-11 Accounting

*CONTRACT NUMBER:*   GS-23F-0074W

*CONTRACT TERM:*   June 17, 2010 - June 16, 2015

*CONTRACTOR:*   ACLR, LLC
550 Forest Avenue, Suite 15-2
Plymouth, MI 48375

*CONTACT:*   J.C. Fitch
W: 734.207.0403
F: 734.207.0410
jfitch@aclrsbs.com

*NEGOTIATOR:*   Christopher Mucke, CPA
W: 734.207.0404
F: 734.207.0410
cmucke@aclrsbs.com

*SET ASIDE:*   Small Business

*DATE:*   Current as of June 17, 2010.

*Company*   www.aclrsbs.com (company website)
*Websites:*   www.willyancey.com (resource website)

For more information on ordering from Federal Supply Schedules click on the FSS Schedules at fss.gsa.gov. On-line access to contract ordering information, terms and conditions, up-to-date pricing, and the option to create an electronic delivery order are available through GSA Advantage!, a menu driven database system. The INTERNET address for GSA Advantage! is: GSAAdvantage.gov.

 **ACLR** *Strategic Business Solutions*

## CUSTOMER INFORMATION PAGE

| | | |
|---|---|---|
| 1a. | Awarded Special Item Numbers | 520-9, 520-11 |
| 1b. | Awarded Pricing | See Page 12 |
| 1c. | Labor Category Descriptions | See Page 6 |
| 2. | Maximum order: | $1,000,000 |
| 3. | Minimum order: | $100.00 |
| 4. | Geographic coverage | Domestic |
| 5. | Point(s) of Production | Plymouth, Wayne County, Michigan<br>Atlanta, Fulton County, Georgia |
| 6. | Discount from List Prices | Not Applicable |
| 7. | Quantity discounts: | Negotiated at task order level. |
| 8. | Prompt payment terms: | 1%, Net 15 |
| 9a. | Government Purchase Cards Below Micro-Purchase Threshold | Yes |
| 9b. | Government Purchase Cards Above Micro-Purchase Threshold | No |
| 10. | Foreign items: | Not Applicable |
| 11a. | Time of delivery: | Per Task Order |
| 11b. | Expedited delivery:<br>*Items available for expedited delivery are noted in this price list.* | Per Task Order |
| 11c. | Overnight and 2-day delivery: | Not Applicable |
| 11d. | Urgent requirements:<br>*In accordance with contract clause I-FSS-14-B ACLR, LLC will reply to any inquiry for accelerated delivery within 3 business days after receipt of inquiry. Any telephone inquiries will be confirmed by ACLR, LLC in writing.* | Contact POC |
| 12. | F.O.B. Point(s): | Destination |

2

 **ACLR** *Strategic Business Solutions*

| | | |
|---|---|---|
| 13a. | Ordering Address: | ACLR, LLC<br>550 Forest Avenue<br>Suite 15-2<br>Plymouth, MI 48375 |

13b. Ordering procedures:
*For supplies and services, the ordering procedures, information on blanket purchase agreements (BPA's), and a sample BPA can be found at the GSA/FSS schedule homepage (fss.gsa.gov/schedules).*

| | | |
|---|---|---|
| 14. | Payment address: | ACLR, LLC<br>550 Forest Avenue<br>Suite 15-2<br>Plymouth, MI 48375 |
| 15. | Warranty Provision: | Not Applicable |
| 16. | Export packing charges: | Not Applicable |
| 17. | Terms & Conditions of Government Purchase Card Acceptance | Not Applicable |
| 18. | Terms & Conditions of Rental Maintenance, and Repair | Not Applicable |
| 19. | Terms & Conditions of Installation | Not Applicable |
| 20. | Terms & Conditions of Repair Parts | Not Applicable |
| 20a. | Terms & Conditions for Any Other Services | Not Applicable |
| 21. | List of Service & Distribution Points | Not Applicable |
| 22. | List of Participating Dealers | Not Applicable |
| 23. | Preventative Maintenance | Not Applicable |
| 24a. | Special Attributes | Not Applicable |
| 24b. | Section 508 Compliance Information | Not Applicable |
| 25. | Data Universal Number System (DUNS) Number | 78-027-2873 |
| 26. | Central Contractor Registration Notification | 5QKV2<br>Registered<br>Valid - 05/20/2011 |

3

A217

 **ACLR** *Strategic Business Solutions*

*Letter from the Managing Principal:*

*ACLR, LLC is pleased to provide you with our capabilities and price list for the GSA Financial and Business Solutions Schedule.*

*The negative impact of the current economic environment has taken a toll on the budgets of government agencies and now, more than ever, it is important to maximize the value of each dollar expended. Over the past several years, federal and state auditors have routinely demonstrated that 10 - 35 percent of government program expenditures were improperly paid. Recovering these amounts to replace budget deficits should be the top priority of all government agencies.*

*As a management consulting company, ACLR specializes in the identification and recovery of overpayments. ACLR professionals are experts at reviewing, developing and implementing the internal controls necessary to mitigate and eliminate future improper payments. In addition, our professionals are adept at developing and executing sampling methodologies designed to comply with the most rigorous of auditing programs as well as the Improper Payments Information Act of 2002.*

*We look forward to assisting you in achieving departmental goals and maximizing budgetary value.*

*Very truly yours,*

*Christopher A. Mucke, CPA*
*Managing Principal*

4

A00415

 **ACLR** *Strategic Business Solutions*

## FIRM OVERVIEW

ACLR evolved from a large corporation centric accounting and indirect tax consulting service to a complete business solutions service provider designed to meet the needs of government, major publically owned corporations, and small privately owned businesses. Specializing in a wide range of business solutions from accounting, regulatory compliance, and management consulting, the extensive experience of ACLR professionals have translated into the identification, design, and implementation of best practices for numerous businesses including the retrieval of over $100 million in recoveries and cost reductions for our clients.

With a staff that includes some of the top consultants in the industry, ACLR is right sized to directly provide tax and management consulting services to any size business. The value of ACLR is our core business support structure and our ability to meet your cost needs with the added support of the best in industry.

## SERVICES

**SIN 520-9 - RECOVERY AUDITS:**

ACLR audit recovery professionals are adept at identifying overpayment opportunities and obtaining the necessary evidence to ensure swift resolution of refund claims. Whether conducting a comprehensive review of supplier payments or sampling program purchases to ensure compliance with the Improper Payments Information Act of 2002 and the Recovery Auditing Act; ACLR's mission is to accurately quantify, verify, and recover improper payments through indepth analysis of contracts, contractual changes, and supplier invoices as required to meet our customer's needs. ACLR's charter is to ensure that all terms of the contract are followed throughout the duration of the contract and will locate, review, and verify source documentation for each transaction including bill reconciliation to total contract charges. ACLR has secured over $100 million in refunds for our clients and, in some instances, more than doubled refunds identified by our competition.

**520-11 ACCOUNTING:**

ACLR professionals are well versed in the use of numerous accounting systems utilized today and are adept at identifying information risk and areas for improvement. By performing baseline and on-going accounting system reviews and special studies to include design, development, operation and inspection of accounting requirements, installed systems, controls, and processes, ACLR professionals can provide management level evaluation and recommend needed changes to improve management data processing and control. ACLR professionals are also experienced in reviewing, analyzing, and summarizing clients' transactional data and are adept at resolving accounting issues, implementing process improvements, recommending and implementing

5

A00416



efficiency matrices, and providing related services to maintain and improve financial reporting operations.

 **ACLR** *Strategic Business Solutions*

## LABOR CATEGORIES

**MANAGING PRINCIPAL:**

- *General Education/Experience:* Four-year degree in Accounting. Licensed CPA. Twenty plus years related field experience.

- *Technical Experience:* Managing Principal with over eight years experience leading a financial and office service's corporation. Over twenty years experience in major corporation financial reviews and detailed auditing successfully negotiating multi-million dollar recoveries. Extensive experience as an expert witness in various court cases related to auditing and associated statutory and regulatory compliance.

- *Duties:* Directly responsible for complete management of all contracts assigned to the business and ensuring high standards are achieved on all deliverables. Represents business by actively collaborating with prospective and existing clients by overseeing project management and providing technical input as required to meet and exceed contract requirements. Works directly with the complete management team to ensure client retention and a successful cost-wise relationship. Ensures that all staff personnel receive appropriate training and ongoing performance reviews to achieve maximum potential in the best interest of servicing client needs.

**PRINCIPAL:**

- *General Education/Experience:* Minimum of four-year degree in Accounting. Degree with ten to twelve plus years related field experience. Licensed CPA.

- *Technical Experience:* Minimum of eight years of executive experience in the private and/or public sector or in government. Exceptional experience in business financial systems, contract management, financial reviews, and audit recoveries.

- *Duties:* Provides the overall authority for the conduct of assigned contacting arrangements and is responsible for all work performed included in the review of task order planning, direct supervision of assigned personnel, and final review and completion of work tasking. Monitors the status of all contracts and is responsible for client communication, overall project management and the presentation of the final deliverables. Has full executive financial analysis capabilities to include accounting conformity, budget performance improvements, integrated budgets development and analysis, and forensic and recovery audits. May also work independently, or as part of team, in support of a wide-range of contract tasking to support the delivery order.

7



**DIRECTOR:**

- *General Education/Experience:* Master's Degree or Bachelor's Degree and ten to twelve plus years related field experience.

- *Technical Experience:* Minimum of eight years of executive experience in the private and/or public sector or in government. Exceptional experience in business financial systems, contract management, financial reviews, and audit recoveries.

- *Duties:* Provides the overall authority for the conduct of assigned contacting arrangements and is responsible for all work performed included in the review of task order planning, direct supervision of assigned personnel, and final review and completion of work tasking. Monitors the status of all contracts and is responsible for client communication, overall project management and the presentation of the final deliverables. Has full executive financial analysis capabilities to include accounting conformity, budget performance improvements, integrated budgets development and analysis, and forensic and recovery audits. May also work independently, or as part of team, in support of a wide-range of contract tasking to support the delivery order.

**SENIOR MANAGER:**

- *General Education/Experience:* Master's Degree and six years related field experience or Bachelor's Degree and seven years related field experience.

- *Technical Experience:* Concentrated experience in financial management with demonstrated management capability ability to supervise or lead financial management teams. Multifaceted executive experience in the field of financial management, business and contract accounts management, and forensic and recovery audits. Intricate experience throughout corporate budget analysis for statutory and regulatory compliance. Comprehensive knowledge of new and legacy accounting software applications.

- *Duties:* Performs direct daily oversight of all contract support operations including multiple projects and personnel at multiple locations. Provides corporate authority and responsibility to identify and commit resources needed to support all task orders. This position will also perform associated tasking of assigned Manager and Senior Associate personnel labor categories as required. May also work independently in support of a wide-range of contract tasking to support the delivery order.

8

A222

 **ACLR** *Strategic Business Solutions*

**MANAGER:**

- *General Education/Experience:* Master's Degree and five years related field experience or Bachelor's Degree and six years related field experience.

- *Technical Experience:* Direct experience in financial management with demonstrated management capability ability to supervise or lead financial management teams. Executive experience in the field of financial management, business and contract accounts management, and forensic and recovery audits. In-depth working experience throughout corporate budget analysis for statutory and regulatory compliance. Comprehensive knowledge of new and legacy accounting software applications. May also work independently in support of a wide-range of contract tasking to support the delivery order.

- *Duties:* Provides direct daily contract support personnel management for one or more projects as required in support of delivery orders. The Manager will also perform associated tasking of assigned Senior Associate and Associate personnel labor category and has directional authority over all assigned.

**SENIOR ASSOCIATE:**

- *General Education/Experience:* Master's Degree and four years related field experience or Bachelor's Degree and five years related field experience.

- *Technical Experience:* Experience in the field of financial management, business and contract accounting management, and forensic and recovery audits. In-depth working experience throughout corporate budget analysis for statutory and regulatory compliance. Comprehensive knowledge of new and legacy accounting software applications.

- *Duties:* Provides complete financial analysis to include in-depth accounting conformity, complete budget performance improvements, and invoice to contract reviews for compliance. Conducts complete auditing of contract invoicing to include forensic and recovery audits to include reports development to support recoveries. Ensures direct compliance to various government directives, statutory and regulatory requirements, and contract deliverables. Has extensive experience in business operations throughout government and corporate entities. Works as part of a team, in support of a wide-range of contract tasking to support the delivery order.

9

 **ACLR** *Strategic Business Solutions*

## ASSOCIATE (LEVEL 1, 2, AND 3):

- ***General Education/Experience:***

    - Associate (Level 1): Bachelor's Degree and one year related field experience.
    - Associate (Level 2): Master's Degree and two years related field experience or Bachelor's Degree and three years related field experience.
    - Associate (Level 3): Master's Degree and three years related field experience or Bachelor's Degree and four years related field experience.

- ***Technical Experience:*** Corporate familiarity and working knowledge of integrated budgets to include direct experience in planning, formulation; and post analysis. Possesses direct experience in audit recovery and associated research to support forensic reviews. Has a direct working knowledge of task orders and associated contract deliverables.

- ***Duties:*** Provides direct financial analysis to include accounting conformity and performance improvements as required. Performs in-depth audit analysis and reports development for compliance to contract, statutory and regulatory requirements. Ensures compliance to various government directives with minimal direction and has direct experience in business operations. May also work independently, or as part of team, in support of a wide-range of contract tasking to support the delivery order.

## JUNIOR ASSOCIATE:

- ***General Education/Experience:*** Bachelor's Degree or four years related field experience.

- ***Technical Experience:*** Basic education or experience in the field of financial management and auditing. Can have direct experience in budget and audit management and related research requirements in the field.

- ***Duties:*** Work in concert with other associates in the performance of financial management to include audit research, invoice and budget analysis, and required reports development. With minimal direction, ensures compliance to various government directives and has baseline knowledge of business operations.

10

A224

A00421

 **ACLR** *Strategic Business Solutions*

**ADMINISTRATIVE SUPERVISOR:**

- *General Education/Experience:* High School Diploma and six years of related field experience or Associate's degree and four years of related field experience.

- *Technical Experience:* Experience in direct supervision and management of administrative support personnel. In-depth business computer based software experience including innate ability to support final administrative review of all deliverables, complete business schedule management, inter-office training support for specific task order direction, payroll management, and financial research requirements. Experience with JFTR travel regulations and documentation.

- *Duties:* Directly supervises and manages all on-site and off-site administrative support personnel as required. Maintains direct control of executive level office functions, interpreting and processing all task requests ensuring appropriate staff assignment, implementing and maintaining tracking databases, and managing final review schedules. Proofs all outgoing deliverables for executive approval and summarizes incoming materials including required technical research to minimize senior staff review times. Provides direct management of all staff travel requirements maintaining schedules and ensuring JFTR requirements and associated task invoicing. Provides overall payroll management and reports processing for task invoicing. The Administrative Supervisor will also perform associated tasking of assigned Administrative Assistances and Clerical Support personnel labor categories as required.

**ADMINISTRATIVE ASSISTANT:**

- *General Education/Experience:* High School Diploma and four years of related field experience or Associate's degree and two years of related field experience

- *Technical Experience:* Corporate knowledge in business computer software including experience in supporting administrative review of deliverables, business schedule updating and tracking, and monitoring associated task order requirements. Core experience in reports preparations, developing and finalizing correspondence, and complete database management. Experienced in scheduling travel and ensuring JFTR requirements.

- *Duties:* Performs administrative support including developing and processing correspondence, preparing reports and databases, and maintains office filing systems. Maintains complete office schedules, processes travel requirements and tracks task order deliverables providing complete contract management as required. Handles recurring office procedures including processing routine telephone requests, mail handling, and

11

A00422

 *Strategic Business Solutions*

general financial research as required. Can provide support of office payrolls and associated problem resolution. The Administrative Assistant will also perform associated tasking of assigned Clerical Support personnel labor category as required.

**CLERICAL SUPPORT:**

- *General Education/Experience:* High School Diploma or equivalent. One to two years of related field experience.

- *Technical Experience:* Basic understanding of business computer based software to support word processing, spreadsheet development, and presentation support. Has experience in basic web research including basic financial research.

- *Duties:* Provides administrative support including typing correspondence and reports, updating databases, and maintaining office files. Supports recurring office procedures as directed including processing routine telephone requests, mail handling, appointment scheduling, report reviews, and general research in support of tasking. Assist other staff personnel in various administrative duties as assigned.

12

A226

A00423

 **ACLR** *Strategic Business Solutions*

# LABOR RATES

### June 17, 2010 - June 16, 2015
### (Includes 0.74% IFF)

**OFFSITE LABOR RATES (BASE PERIOD; 1.8% ESCALATION):**

| Offsite Labor Category (SINs 520-9, 520-11) | June 17, 2010 - June 16, 2011 | June 17, 2011 - June 16, 2012 | June 17, 2012 - June 16, 2013 | June 17, 2013 - June 16, 2014 | June 17, 2014 - June 16, 2015 |
|---|---|---|---|---|---|
| Managing Principal | $211.58 | $215.39 | $219.27 | $223.21 | $227.23 |
| Principal | $186.39 | $189.75 | $193.16 | $196.64 | $200.18 |
| Director | $161.20 | $164.10 | $167.06 | $170.06 | $173.12 |
| Sr. Manager | $151.13 | $153.85 | $156.62 | $159.44 | $162.31 |
| Manager | $100.75 | $102.56 | $104.41 | $106.29 | $108.20 |
| Senior Associate | $80.60 | $82.05 | $83.53 | $85.03 | $86.56 |
| Associate (Level 3) | $75.56 | $76.92 | $78.30 | $79.71 | $81.15 |
| Associate (Level 2) | $70.53 | $71.80 | $73.09 | $74.41 | $75.75 |
| Associate (Level 1) | $65.49 | $66.67 | $67.87 | $69.09 | $70.33 |
| Junior Associate | $60.45 | $61.54 | $62.65 | $63.77 | $64.92 |
| Administrative Supervisor | $53.40 | $54.36 | $55.34 | $56.34 | $57.35 |
| Administrative Assistant | $48.36 | $49.23 | $50.12 | $51.02 | $51.94 |
| Clerical Support | $38.29 | $38.98 | $39.68 | $40.40 | $41.12 |

**ONSITE LABOR RATES (BASE PERIOD; 1.8% ESCALATION):**

| Offsite Labor Category (SINs 520-9, 520-11) | June 17, 2010 - June 16, 2011 | June 17, 2011 - June 16, 2012 | June 17, 2012 - June 16, 2013 | June 17, 2013 - June 16, 2014 | June 17, 2014 - June 16, 2015 |
|---|---|---|---|---|---|
| Principal | $151.13 | $153.85 | $156.62 | $159.44 | $162.31 |
| Director | $136.01 | $138.46 | $140.95 | $143.49 | $146.07 |
| Sr. Manager | $120.90 | $123.08 | $125.29 | $127.55 | $129.84 |
| Manager | $90.68 | $92.31 | $93.97 | $95.67 | $97.39 |
| Senior Associate | $70.53 | $71.80 | $73.09 | $74.41 | $75.75 |
| Associate (Level 3) | $65.49 | $66.67 | $67.87 | $69.09 | $70.33 |
| Associate (Level 2) | $60.45 | $61.54 | $62.65 | $63.77 | $64.92 |
| Associate (Level 1) | $55.41 | $56.41 | $57.42 | $58.46 | $59.51 |
| Junior Associate | $50.38 | $51.29 | $52.21 | $53.15 | $54.11 |
| Administrative Supervisor | $45.34 | $46.16 | $46.99 | $47.83 | $48.69 |
| Administrative Assistant | $38.29 | $38.98 | $39.68 | $40.40 | $41.12 |
| Clerical Support | $28.21 | $28.72 | $29.23 | $29.76 | $30.30 |

13

**Excerpts from the Deposition of Theresa Schultz**

**(CONFIDENTIAL: Page 44)**

**EXHIBIT 8**

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

----------------------x

ACLR, LLC

        Plaintiff,

-vs-               Civil Action No. 15-767

THE UNITED STATES    (Judge Campbell-Smith)

        Defendant.

----------------------x

               Tuesday, October 24, 2017

               Baltimore, Maryland


    THE DEPOSITION OF THERESA ANN SCHULTZ


   (Page 38, line 4 through Page 53, line 10

       MARKED CONFIDENTIAL)


   (Page 67, line 17 through Page 72, line 6

       MARKED CONFIDENTIAL)

Theresa Ann Schultz                    ACLR, LLC v. THE UNITED STATES
Case No. 15-767                        October 24, 2017

1        A.    Yes.

2        Q.    -- as far as you recall?

3              Can you tell me what the base

4    period -- how that changed?

5              MR. LYONS:  For the record, the

6    witness is a reviewing the contract and

7    testifying to what the contract says.

8              THE WITNESS:  January 11th -- I

9    mean -- sorry.  January 13th, 2011 through

10   December 31st, 2013.

11   BY MR. BONELLO:

12       Q.    Do you recall why there was the

13   extension in the base year to that time period?

14       A.    To the best of my recollection, it had

15   to do with the statement of work.

16       Q.    And how did the statement of work

17   impact that, the base year?

18       A.    Can you repeat the question?

19       Q.    How did the statement of work impact

20   the time period of the base year of the

21   contract?

22       A.    The statement of work was incorporated

1  at Mod 13 on December 31st, 2013, with an

2  effective date of January 1st, 2014.

3      Q.   So the base period was extended up

4  until the time the statement of work was put in

5  place?

6      A.   Correct.

7      Q.   And you had testified earlier that

8  there was a desire to put the statement of work

9  into place as soon as possible.

10          But it wasn't put into place until,

11  what, almost three years later?

12     A.   It wasn't put into place until

13  December 31st, 2013.  I don't remember exactly

14  when we started to work on the statement of

15  work.

16     Q.   Would you agree that it took a long

17  time to put the statement of work into place?

18     A.   I believe it took definitely longer

19  than what we anticipated, yes.

20     Q.   And why was that?  Why did it take so

21  long to put the statement of work into -- to

22  finalize the statement of work?

Theresa Ann Schultz                    ACLR, LLC v. THE UNITED STATES
Case No. 15-767                            October 24, 2017



Theresa Ann Schultz                    ACLR, LLC v. THE UNITED STATES
Case No. 15-767                                     October 24, 2017

1  with any audit recoveries as of April 26th,

2  2012, was CMS complying with the Part D RAC

3  contract?

4      A.   I don't know the answer to that

5  question.  Again, it was the COR had to

6  determine whether or not they were approving the

7  audits.  So I don't know how to answer that

8  question.

9      Q.   If the COR doesn't let the contractor

10 do what it's supposed to do under the contract,

11 does the contracting officer have some

12 responsibility in that regard?

13     A.   The contracting officer is not going

14 to make a decision on an audit issue against the

15 technical experts.  I wouldn't as a contracting

16 officer.  I can only speak for myself as a

17 contracting officer.

18     Q.   Well, what if there's a contractual

19 obligation to allow that audit to proceed?

20     A.   If the audit is not valid, the audit

21 cannot proceed.

22     Q.   Were you aware that CMS contracted

1   with Booz Allen Hamilton to implement the Part D

2   RAC program prior to ACLR being awarded its

3   contract?

4        A.    I was really only aware of that after

5   this case.

6        Q.    How did you become aware that Booz

7   Allen had been engaged to implement the Part D

8   RAC program prior to ACLR being awarded its

9   contract?

10       A.    We were asked to produce the contract.

11  I really wasn't familiar with that contract --

12  that I remember being familiar with that

13  contract.

14       Q.    And that led you to the conclusion

15  that ACLR -- or prior to ACLR being awarded the

16  contract, that CMS had contracted with Booz

17  Allen to implement the Part D RAC program?

18       A.    That was what I had -- that was my

19  understanding after we had been asked to produce

20  it.

21       Q.    And Booz Allen was involved in

22  developing the statement of work for the Part D

Theresa Ann Schultz                    ACLR, LLC v. THE UNITED STATES
Case No. 15-767                        October 24, 2017

1   audit issues as outlined in the PWS.  CMS was

2   not in agreement with that based on my

3   understanding from program.

4        Q.   Was ACLR, based upon your

5   understanding of the performance work statement,

6   acting in accordance with the performance work

7   statement?

8        A.   That I don't know.  I do not know

9   that.

10       Q.   Why did you draw the conclusion that

11  CMS is very vulnerable?

12       A.   Because we had a contract with the PWS

13  in it that we weren't agreeing with.

14       Q.   If CMS wasn't agreeing with the PWS,

15  then ACLR couldn't perform in accordance with

16  the PWS, correct?

17       A.   Which is why we were doing the

18  statement of work.

19       Q.   And the statement of work wasn't

20  entered into for approximately three years,

21  correct?

22       A.   December 31st, 2013.

**Excerpts from the Deposition of Nicole Hoey**

**EXHIBIT 9**

```
            IN THE UNITED STATES COURT

               OF FEDERAL CLAIMS

---------------------x

ACLR, LLC

          Plaintiff,

-vs-                      Civil Action No. 16-309

THE UNITED STATES         (Judge Campbell-Smith)

          Defendant.

---------------------x

                        Thursday, September 14, 2017

                        Baltimore, Maryland



          THE DEPOSITION OF NICOLE HOEY
```

        The deposition of NICOLE HOEY was

taken on Thursday, September 14, 2017,

commencing at 9:26 a.m., at the Department of

Health and Human services, Office of General

Counsel, 7500 Security Boulevard, Central

Building, Baltimore, Maryland, before CHERYL

NICHOLSON, CCR, CLR, Stenotype Reporter and

Notary Public in and for the State of Maryland.

Nicole Hoey                          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                           September 14, 2017

1   which a final version incorporating the changes

2   in a clean document has not been sent over to a

3   contractor?

4        A.   I'm not sure.  I would say there

5   probably has been.  As long as they have the

6   most accurate statement of work, that's the most

7   important part.

8        Q.   Is it fairly rare that a contractor

9   wouldn't get a version which incorporates all of

10  the changes in a clean format?

11       A.   I'm not sure.  They may or may not.

12  It just depends at the time.

13       Q.   How many times are you aware of, as a

14  contracting officer, where a contractor hasn't

15  received a final clean version of a

16  modification?

17       A.   I honestly don't know.  We do a lot of

18  mods.  I'm not sure of how many actually are or

19  are not redlined when they get finalized.

20       Q.   Did you assist in the development of

21  this statement or work for the Part D RAC

22  contract?

Nicole Hoey                          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                      September 14, 2017

1         A.    I helped assist with getting the

2    documents finalized and helping to try and get a

3    timeline put into the statement of work.

4         Q.    And where is the timeline that you

5    worked on in the statement of work?

6         A.    It's an appendix.

7         Q.    It's Appendix E --

8         A.    Yes.

9         Q.    -- on page 32?

10        A.    Yes.

11        Q.    And why did you work on putting

12   together a timeline?

13        A.    It was requested that a timeline be

14   put in place by the contractor, and we wanted to

15   help assist in that.

16        Q.    And do you have an understanding as to

17   why the contractor requested that a timeline be

18   put in place for the Part D RAC contract?

19        A.    I believe just to have it laid out

20   with the times.

21        Q.    And was it CMS's obligation to comply

22   with the timeline set forth in the Part D RAC

Nicole Hoey                    ACLR, LLC v. THE UNITED STATES
Case No. 16-309                        September 14, 2017

1   contract?

2          MR. PORADA:  Objection to form.

3          Did you hear the question?

4          THE WITNESS:  I'm sorry?

5          MR. BONELLO:  Do you want to read the

6   question back?

7          (Whereupon, the requested record was

8   read back by the reporter.)

9          THE WITNESS:  I think it was our

10  intent to have a timeline to try and closely by

11  it as we could.

12  BY MR. BONELLO:

13     Q.   So is it your testimony, as a

14  contracting officer, that CMS did have an

15  obligation to follow the timeline set forth in

16  the statement of work?

17     A.   I think it was our goal to do that as

18  best as we could.

19     Q.   But CMS didn't believe it had an

20  obligation to adhere to the timeline set forth

21  in the statement of work?

22     A.   I wouldn't say they didn't think they

Nicole Hoey                           ACLR, LLC v. THE UNITED STATES
Case No. 16-309                          September 14, 2017

1  had an obligation.  I think that they tried to

2  abide by it as best as they could for instances

3  where we had -- where we could.

4       Q.   But as a contracting officer, it's

5  your testimony that adherence to the timeline

6  was optional for CMS?

7       A.   I don't think optional.  I think that

8  we had a sample timeline and we tried to meet

9  the dates that were in there, yes.

10      Q.   But was there a contractual obligation

11 on the part of the CMS to meet its obligations

12 in connection with the timeline in the statement

13 of work for the Part D RAC contract?

14      A.   I would say yes.

15      Q.   And when did you begin working on the

16 timeline in the statement of work?

17      A.   I really don't recall that.

18      Q.   Do you, as a contracting officer, have

19 an understanding as to whether CMS met the

20 timeline obligations set forth in the statement

21 of work for the Part D RAC contract?

22      A.   I am not 100 percent sure if we have

Nicole Hoey
Case No. 16-309

ACLR, LLC v. THE UNITED STATES
September 14, 2017

1      A.   I am not sure.  I'd have to talk to

2   their COR or their CO.  I'm not the CO of that.

3      Q.   If you look under Section 4(e) -- do

4   see that section?

5      A.   Uh-huh.

6      Q.   It says:  While it is true that both

7   the RAC and the NBI MEDIC review Part D RAC

8   data, the focus of the RAC contract is

9   identifying and recovering improper payments,

10  such as overpayments, where the NBI MEDIC's

11  contract focus is to prevent, detect and defer,

12  I think it says --

13     A.   Potential.

14     Q.   -- potential fraud, waste and abuse.

15     A.   Uh-huh.

16     Q.   So the RAC and the NBI MEDIC were

17  engaged to do different activities, correct?

18     A.   Yes.

19     Q.   And the RAC didn't do waste, fraud and

20  abuse, correct?

21     A.   Correct.

22     Q.   And the NBI MEDIC wasn't tasked with

Nicole Hoey                    ACLR, LLC v. THE UNITED STATES
Case No. 16-309                       September 14, 2017

1   recovering improper payments, correct?

2        A.    Correct.  We only had one RAC Part D.

3        Q.    And if you look at (f), it says:  CMS

4   denied ACLR's NAIRP for the sales tax error

5   audit in accordance with Section 1.2.3 of the

6   statement of work.

7             And that was the basis for your denial

8   of the sales tax NAIRP was Section 1.2.3?

9        A.    Yes.

10       Q.    And you quote here the sentence that

11   we were just reading in Exhibit 16,

12   Section 1.2.3, correct?

13       A.    Yes.

14       Q.    And did you have an understanding when

15   you wrote the claim denial that the improper

16   payments had already been identified, were being

17   audited and had been corrected/reimbursed

18   elsewhere in CMS for the same audit issue?

19       A.    Yes.

20       Q.    And who told you that?

21       A.    I believe Sonja, but I am not

22   100 percent sure on that.

Nicole Hoey                    ACLR, LLC v. THE UNITED STATES
Case No. 16-309                        September 14, 2017

1            MR. PORADA:  Objection, misstates

2    testimony.

3            THE WITNESS:  It's my interpretation

4    that if we're going to deny it, I don't know

5    that we would have to go 2, 3 and 4.  But for

6    your question, 2, 3 and 4, I would -- based on

7    that, no.

8    BY MR. BONELLO:

9        Q.    Doesn't the denial by CMS of a NAIRP

10   as outlined in the statement of work come after

11   Steps 1 through 4?

12       A.    In this chart, yes.

13       Q.    Is there anything else in the

14   statement of work that outlines the process by

15   which there will be an approval or a denial of a

16   NAIRP submitted by ACLR under the Part D RAC

17   contract?

18       A.    I do not believe so.

19       Q.    Do you believe it was proper for CMS

20   to not engage ACLR in Steps 2 through 4 in

21   connection with the sales tax NAIRP?

22       A.    If they couldn't do it, then I would

Nicole Hoey                         ACLR, LLC v. THE UNITED STATES
Case No. 16-309                            September 14, 2017

1   say, then, yes, to deny in the beginning.

2   Because there were -- if we weren't going to

3   allow them to do it, there would be no way for

4   them to be able to edit it if they couldn't do

5   it as a whole.

6       Q.   Was there any evaluation by CMS as to

7   whether the ACLR sales tax NAIRP could be

8   revised such that it would be acceptable to CMS?

9       A.   I have no idea.

10      Q.   As the contracting officer on the

11  Part D RAC contract, did you ever doubt CMS's

12  ability to successfully execute the Part D RAC

13  contract?

14      A.   Did I ever doubt it -- to execute it?

15  I don't believe so.

16      Q.   What was the objective of the Part D

17  RAC contract?

18      A.   To recover improper payments.

19      Q.   And do you know the estimate of how

20  many -- the total amount of improper payments

21  under Part D RAC that had been estimated on a

22  yearly basis?

**Excerpts from the Deposition of Tanette Downs**

**EXHIBIT 10**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------x

ACLR, LLC

        Plaintiff,

-vs-               Civil Action No. 15-767

THE UNITED STATES    (Judge Campbell-Smith)

        Defendant.

----------------------x

               Monday, November 20, 2017

               Baltimore, Maryland


  THE DEPOSITION OF TANETTE NICOLE BURDEN-DOWNS


        The deposition of TANETTE NICOLE

BURDEN-DOWNS was taken on Monday, November 20,

2017, commencing at 11:12 a.m., at the

Department of Health and Human services, Office

of General Counsel, 7500 Security Boulevard,

Central Building, Baltimore, Maryland, before

CHERYL NICHOLSON, CCR, CLR, Stenotype Reporter

and Notary Public in and for the State of

Maryland.

1  place and to collect improper payments?

2      A.    Yes.

3            (Downs Exhibit No. 121 was marked for

4  identification.)

5  BY MR. BONELLO:

6      Q.    I'm showing you what's been marked as

7  121 for the ACLR depositions that have been

8  taken in this case.  When a deposition is taken

9  by ACLR in this case, we just numbered the

10  exhibits sequentially.  So this is No. 121.

11            If you look at the email at the bottom

12  of the page, this is from Merri-Ellen James to

13  Cindy Moreno, and it says:  What a dick - a room

14  of her choice? Just got the lowdown from Teresa.

15  Apparently she nor Beth were invited to the ACLR

16  meeting.  Tanette told Teresa ACLR needs to get

17  paid before April, and he wants to run 2007

18  excluded providers and run it through the

19  reconciliation process and its associated

20  appeals process and get paid prior to April.

21  Tanette is seeking to run PRS to accomplish

22  this.

Tanette Nicole Burden-Downs          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                               November 20, 2017

1          Can you tell me what -- do you have an

2  understanding of what was being discussed in

3  that email?

4       A.   Um, wow.  Yeah, I'm not sure.  What I

5  do know is I came over in September -- like I

6  said, around September of 2011.  There were

7  people such as Merri-Ellen and Cindy who had

8  worked with the Part D RAC prior to me arriving.

9  I also was able to bring over some of my folks

10 from the office that I worked in prior.  So I

11 don't -- yeah, just by reading what's in this

12 email text, it looks like maybe the folks that

13 were there prior to my arrival were not happy

14 that they weren't included in meetings that I

15 held after my arrival, but -- that was just my

16 assessment when I came over, certain things

17 needed to happen, so I was executing those

18 things.

19      Q.   What things needed to happen when you

20 came over that you identified?

21      A.   Just in terms of making sure, again,

22 the contractor had the data, making sure

Tanette Nicole Burden-Downs        ACLR, LLC v. THE UNITED STATES
Case No. 15-767                              November 20, 2017

1   processes were in place in order for the

2   contractor to be paid in a timely manner, yeah,

3   just operational things.

4        Q.   And why weren't the operational things

5   in place prior to the time that you came over?

6        A.   I have no idea.

7        Q.   And what steps did you take then to

8   make sure the operational things were put in

9   place?

10       A.   We had to meet with our colleagues in

11  other areas.  We had to establish processes and

12  procedures.  I mean, personally I think the

13  group tried to get it done, but there were a lot

14  of things that needed to happen that may not

15  have been contemplated.

16       Q.   And what were some of those things?

17       A.   Again, working with other colleagues

18  within CMS that were responsible for payment

19  operations or that were responsible for the

20  policy of the Part D program to make sure that

21  the audit issues or the things that we were

22  doing were consistent with CMS policy,

1   you off.

2        Q.   No.  Go ahead.

3        A.   Yeah.  From my understanding, I

4   thought we attempted to finalize it on several

5   occasions, but I thought ACLR didn't want to

6   sign it.

7        Q.   Do you recall participating in a

8   conference call with ACLR on November 30th,

9   2011?

10       A.   Do I recall?  I mean, it's quite

11  possible.  I mean, I may have participated in a

12  few phone calls with ACLR, so...

13       Q.   Do you recall a discussion on

14  November 30th, 2011 with ACLR about them sending

15  out the duplicate payment audit information to

16  the plan sponsors identifying overpayments?

17       A.   I do recall a conversation such as

18  that.

19       Q.   Tell me what you can recall about

20  that.

21       A.   Again, I think we were on a conference

22  call and ACLR stated that it was ready to send

1   out notification letters for the duplicate

2   payment audit issue and we weren't prepared to

3   move forward with them sending out the

4   notification letters.  There were processes that

5   needed to be established in order to even

6   collect improper payments.  So the notices would

7   have gone out.  Things weren't in place to be

8   able to collect the improper payments.

9        Q.    And what things needed to be in place?

10       A.    For example, I think the performance

11  work statement had ACLR collecting the

12  overpayments.  There was not a way for those

13  payments to be sent to ACLR from the Part D plan

14  sponsors.  I mean, and we ultimately decided to

15  offset their payments, and that's how we ended

16  up getting the money.

17            So that was like a big one.  There

18  were just -- yeah, I think that was the big one

19  just in terms of how the improper payments would

20  be submitted to CMS.

21       Q.    How was that resolved?

22       A.    That's when we came up with the

Tanette Nicole Burden-Downs        ACLR, LLC v. THE UNITED STATES
Case No. 15-767                    November 20, 2017

1  process that we will offset the plan sponsor's

2  payments.  So we offset their monthly payments,

3  and then we paid ACLR out of the offset amount.

4       Q.   And when was that process put in

5  place?

6       A.   I don't -- I don't remember.

7       Q.   In the call did CMS tell ACLR not to

8  send out the notice letters for the duplicate

9  payments?

10      A.   I believe so.

11      Q.   Because CMS did not want them to send

12 out the notice letters to the plan sponsors

13 because there wasn't a way for CMS to recover

14 the payments?

15      A.   I believe that was the primary reason.

16 There could have been other reasons, but things

17 weren't fully fleshed out in terms of how this

18 recovery process was going to work.

19      Q.   So besides the collection of the

20 overpayments, what else at that time was causing

21 CMS to not want ACLR to send out those notice

22 letters to plan sponsors on the duplicate

Tanette Nicole Burden-Downs     ACLR, LLC v. THE UNITED STATES
Case No. 15-767                 November 20, 2017

1   payment audit issues?

2       A.   That's the only thing that I remember.

3   There could have been other things, but they

4   just don't, you know, come to my memory right

5   now.

6       Q.   Were you under the impression in

7   November of 2011 that ACLR -- that the

8   performance work statement was a contract --

9   part of a contract between CMS and ACLR?

10      A.   Yes.

11      Q.   And that ACLR would have to follow the

12  performance work statement at that time?

13      A.   Yeah, I wasn't familiar with

14  performance work statements prior to coming and

15  working on this ACLR contract.  But I guess,

16  through working with our Office of Acquisitions

17  and Grants Management, I had understood that it

18  was part of the contract.

19      Q.   So in the call did you have an

20  understanding that the performance work

21  statement -- in that November 30th, 2011 call,

22  did you have and understanding that the

Tanette Nicole Burden-Downs        ACLR, LLC v. THE UNITED STATES
Case No. 15-767                               November 20, 2017

1          And then the email in response is

2  Mr. Mucke's email stating that he's completed a

3  review of the statement of work with no issues

4  as written.

5          Were you ever advised that ACLR had no

6  issues with the statement of work draft that

7  they were provided with on April 19th of 2012?

8     A.    I don't believe so.

9     Q.    Would the proper process have been

10  that you would have been advised of ACLR's

11  position with respect to the proposed statements

12  of work that CMS came up with for the Part D RAC

13  program?

14     A.    Great.  If there were any questions or

15  any issues, comments, concerns, they would have

16  sent them to the program office, and if there

17  weren't, then they would have just went ahead

18  and executed the contract.  So if they had no

19  issues, I'm not sure why they did not execute

20  the contract at this time.

21     Q.    Do you know when the Part D RAC

22  appeals process was finalized?

Tanette Nicole Burden-Downs        ACLR, LLC v. THE UNITED STATES
Case No. 15-767                    November 20, 2017

1   written.

2           So do you recall what Frank was

3   talking about?

4       A.   No.

5       Q.   Did you do anything in response to

6   this email?

7       A.   Yeah, I don't recall doing anything.

8   Again, I don't know why, if there were no

9   issues, it wasn't signed.

10      Q.   If there were no issues, it should

11  have been signed, correct?

12      A.   Exactly.  So I don't -- yeah.

13      Q.   Frank writes on there:  I'm hoping

14  ACLR isn't just being cordial/amicable until

15  they receive payment and then walk away from the

16  contract.

17          Was there a concern by CMS that ACLR

18  would walk away from the Part D RAC contract?

19      A.   I believe ACLR threatened on more than

20  one occasion that they would walk away.

21      Q.   And tell me about when those instances

22  occurred.

Tanette Nicole Burden-Downs        ACLR, LLC v. THE UNITED STATES
Case No. 15-767                                November 20, 2017

1      Q.    But you're not sure how long that

2  lookback period was?

3      A.    Yeah, I can't remember if it was three

4  or five years.  I don't recall.

5      Q.    But would you agree then that if an

6  audit issue is delayed then that potentially

7  results in certain years no longer being able to

8  be subject to the Part D RAC audit?

9      A.    If an audit issue is delayed, that --

10  I mean, I guess it would feed into or go into

11  the time period for which the contractor could

12  go back, so yeah.

13      Q.    So, for example, if the duplicate

14  payment issue was -- audit issue was delayed

15  until 2013, if it was a five-year lookback, you

16  can't recover for 2007 duplicate payments?

17      A.    Yes.

18      Q.    Do you recall if that was part of the

19  complaint with the -- as to why ACLR was

20  threatening to walk away from the contract?

21      A.    I don't recall.

22      Q.    Who within your group was primarily --

Tanette Nicole Burden-Downs        ACLR, LLC v. THE UNITED STATES
Case No. 15-767                              November 20, 2017

1        A.    No.

2        Q.    Why not?

3        A.    Because I'm pretty sure I would have

4   made sure that the transition would have

5   occurred in enough time so that things would

6   have kept moving.  So if I was notified that

7   Frank or Lauren were leaving and they were the

8   ones working on it, Sonja would have started --

9   or picked it up prior to them leaving.  So there

10  would not have been a delay because of them

11  leaving.

12       Q.    I'm showing you what we've previously

13  marked as Exhibit 30, and this is a couple of

14  pages of email exchanges.  And I want to direct

15  your attention to the first email on the first

16  page.  This is from Merri-Ellen James to Chris

17  Mucke on October 4th, 2011.

18            It says:  Chris, due to some of the

19  issues you identify below, we have decided that

20  you will receive a data pull of all PDEs from

21  the IDR on X date.  These PDEs will have been

22  submitted by currently active sponsors for dates

Tanette Nicole Burden-Downs      ACLR, LLC v. THE UNITED STATES
Case No. 15-767                  November 20, 2017

1   of service starting in CY 2007 and running

2   through CY 2009.  You will review that data for

3   improper payments for approved audit scope

4   issues, so far excluded providers and duplicate

5   payments.

6            Do you see that?

7       A.   Uh-huh.

8       Q.   So was it your understanding in the

9   fall of 2011 that ACLR audit issues had been

10  approved with respect to excluded providers and

11  duplicate payments?

12      A.   Yes.

13      Q.   Ms. James goes on to write:  Re your

14  proposed methodologies.  Have you considered

15  utilizing the EPLS list to enhance the number of

16  matches.

17           And she continues on.  The last

18  paragraph says:  Your duplicate payment

19  methodology looks sound.

20           Are you aware of whether CMS had a

21  duplicate payment methodology at that point in

22  time in the fall of 2011?

Tanette Nicole Burden-Downs        ACLR, LLC v. THE UNITED STATES
Case No. 15-767                                November 20, 2017

1  process that CMS followed until Rule 4159 came

2  into effect?

3      A.   I do not believe so, no.  I don't

4  believe so.

5      Q.   I want to just be clear.  I'm not sure

6  by your answer I understand what your response

7  is.

8           So my question is:  The appeal process

9  set forth in the performance work statement was

10 not the process followed by the CMS.  Is that

11 true?

12     A.   From what I recall, this -- the

13 appeals process included in the performance work

14 statement is not the appeals process that was

15 followed, no.

16     Q.   By CMS?

17     A.   By CMS.

18     Q.   And then ultimately Rule 4159 came

19 into effect, and that was the appeal process

20 that was followed by CMS?

21           MR. PORADA:  Objection, foundation.

22           THE WITNESS:  Yeah, I'm not sure what

1    A.   I think that was communicated to the

2  Office of Acquisition and Grants Management, and

3  in the revision of the statement of work, we

4  tried to incorporate the changes that needed to

5  be made to come in compliance with -- or to

6  ensure things that were inherently governmental

7  weren't included in a statement of work or a

8  contract.

9    Q.   And that would have caused a delay

10 then, correct, for ACLR's ability to perform its

11 contract?

12   A.   Yeah, I'm not sure if that caused a

13 delay or not.  I just know the concerns were

14 communicated and worked on.

15   Q.   Well, CMS didn't allow ACLR to proceed

16 with certain audits because there needed to be a

17 revision to some of the processes, correct?

18   A.   Correct.

19   Q.   Don't you think that was a problem

20 from ACLR's perspective?

21        MR. PORADA:  Objection, foundation.

22        THE WITNESS:  So there were other