# Part D RAC Contract, OY1 SOW

**EXHIBIT 21**

A00-175

# MEDICARE PART D
# RECOVERY AUDIT SERVICES

### CONTRACT NO GS-23F-0074W
### TASK ORDER NO: HHSM-500-2011-00006G

### MODIFICATION 000013
### EXECUTION DATE – 12.31.13

124

A387

A00476

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | | PAGE  OF PAGES | |
|---|---|---|---|---|---|
| | | | | 1 | 8 |
| 2 AMENDMENT/MODIFICATION NO. | 3 EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | | 5. PROJECT NO. (If applicable) | |
| 000013 | 12/31/2013 | | | | |
| 6. ISSUED BY                           CODE | ASG - DPIFMC | 7. ADMINISTERED BY (If other than Item 6)    CODE | | AGG/JM | |

6. ISSUED BY

CMS,OAGM,ASG,DPIFMC
7500 SECURITY BLVD., MS: C2-21-15
BALTIMORE MD 21244-1850

7. ADMINISTERED BY

Justin Menefee
Contract Specialist

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code) | | (x) | 9A. AMENDMENT OF SOLICITATION NO |
|---|---|---|---|

ACLR, LLC
Attn: CHRIS MUCKE
550 FOREST AVENUE
SUITE 15-2
PLYMOUTH MI 481703793

9B. DATED (SEE ITEM 11)

X 10A. MODIFICATION OF CONTRACT/ORDER NO
GS-23F-0074W
HHSM-500-2011-00006G

10B. DATED (SEE ITEM 13)
01/13/2011

| CODE     780272873 | FACILITY CODE |
|---|---|

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended.  ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified

12. ACCOUNTING AND APPROPRIATION DATA (If required)
N/A

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
|---|---|
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: FAR 43.103 (a)  Bilateral Modification |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT:     Contractor  ☐ is not.   ☒ is required to sign this document and return _____1_____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)
Tax ID Number:  20-2662374
DUNS Number:  780272873
The purpose of this modification is to:
1) Incorporate a Statement of Work with an effective date of January 1, 2014;
2) Revise Paragraph 1 TASK ORDER SUPPORT;
3) Revise Paragraph 2 TYPE OF TASK ORDER;
4) Revise Paragraph 3 PERIOD OF PERFORMANCE;
5) Revise Paragraph 5 PERFORMANCE WORK STATEMENT (PWS);
6) Revise Paragraph 6 TASK ORDER PRICE SUMMARY;
7) Revise Paragraph 9 CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE (COTR) AND/OR CONTRACT SPECIALIST; and,
Continued ...

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| | | Nicole Hoey | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
| Christopher Mucke | 12/31/13 | | |
| (Signature of person authorized to sign) | | (Signature of Contracting Officer) | |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV  10-83)
Prescribed by GSA
FAR (48 CFR) 53 243

125

A388

A00477

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>GS-23F-0074W/HHSM-500-2011-00006G/000013 | | | | PAGE<br>2 | OF<br>8 |

NAME OF OFFEROR OR CONTRACTOR
ACLR, LLC

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | 8) Exercise Option Year 1.<br><br>End of Modification<br>Period of Performance: 01/13/2011 to 12/31/2014 | | | | |

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53 110

The purpose of this modification is to:

1) Incorporate a Statement of Work with an effective date of January 1, 2014
2) Revise Paragraph 1 TASK ORDER SUPPORT
3) Revise Paragraph 2, TYPE OF TASK ORDER
4) Revise Paragraph 3 PERIOD OF PERFORMANCE
5) Revise Paragraph 5 PERFORMANCE WORK STATEMENT (PWS)
6) Revise Paragraph 6 TASK ORDER PRICE SUMMARY
7) Revise Paragraph 9 CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE (COTR) AND/OR CONTRACT SPECIALIST
8) Exercise Option Year 1

A. Statement of work dated January 1, 2014, is hereby incorporated into the contract. The Statement of Work is effective with the exercise of Option Year 1.

B. Paragraph 1 entitled "TASK ORDER SUPPORT" is hereby modified to read as follows:

> 1. TASK ORDER SUPPORT
>
> This task order is issued under General Services Administration (GSA) Contract Number GS-23F-0074W to perform the work required in accordance with the attached Statement of Work and deliverable schedule entitled, "Medicare Part D Recovery Audit Contractor." This task order shall be performed in accordance with the terms and conditions and clauses associated with the GSA contract under the FABS Schedule and the terms and conditions contained herein. Only those sections, which differ from the GSA schedule contract terms and conditions, or provide more detailed information specific to this particular task order, are provided below. For those contract sections not identified below, all terms and conditions and clauses of the GSA contract remain in effect.

C. Paragraph 2 entitled "Type of Task Order" is revised to read as follows:

> 2. TYPE OF TASK ORDER
>
> This is a contingency fee task order. The contingency fee percentage is as prescribed in paragraph 5.

D. Paragraph 3 entitled "PERIOD OF PERFORMANCE" is revised to read as follows:

127

A390

3.  PERIOD OF PERFORMANCE

The base period of the task order is from January 13, 2011 through December 31, 2013.  The task order also includes two (2) 12-month options, plus a 12 ½ month option for purposes of appeals and payment.

| Base Period | January 13, 2011 through December 31, 2013 |
|---|---|
| Option Period 1 | January 1, 2014 through December 31, 2014 |
| Option Period 1 – Administrative and Appeals Option | January 1, 2015 through January 24, 2016 |
| Option Period 2 | January 1, 2015 through December 31, 2015 |
| Option Period 2 - Administrative and Appeals Option | January 1, 2016 through January 24, 2017 |

Only one Administrative and Appeals Option will be exercised.  The Administrative and Appeals option is for the purpose of the RAC to continue to work through the appeals process and for the RAC to receive payment of audit issues approved/processed during the option period.  If Option Period 2 is NOT exercised, The Option Period 1-Administrative and Appeals Option will be exercised for the purpose of the RAC to work thru the appeals process and obtain its contingency fee on amounts recovered.  If Option Period 2 is exercised, Option Period 2-Administrative and Appeals Option will be exercised.  Administrative and Appeals Option period, when exercised, shall be extended as required for active issues that have not completed payment collection.

The last date for the RAC to submit a New Audit Issue Review Package for each Option period is September 18th.  This will allow the 104 day approval process to take place prior to the end of the option period.

E.  Paragraph 4 entitled "PERFORMANCE WORK STATEMENT (PWS) is hereby revised to read as follows:

5.  STATEMENT OF WORK (SOW)

Independently, and not as an agent of the Government, the Contractor shall furnish all necessary services, qualified personnel, material, equipment, and

facilities, not otherwise provided by the Government, as needed to perform
the requirements set forth in Section J.1, Statement of Work.

F. Paragraph 5 entitled "TASK ORDER PRICE SUMMARY" is hereby revised to read as
   follows:

a. All payments shall be paid only on a contingency basis. The recovery audit contractor
   will receive the percentage specified below of all amounts collected. The contingency
   fees shall be paid once CMS collects the Medicare overpayments. The recovery audit
   contractor shall be paid a percentage of the amount that is collected through their
   recovery efforts (as outlined in Section 1.1 Improper Payment Review Process of
   Section J.1, Statement of Work). The recovery audit contractor shall not receive any
   payments for the identification of the underpayments or overpayments not
   recovered/collected. The recovery audit contractor shall submit vouchers on a monthly
   basis (see Attachment 2) with supporting documentation of the recovery. Once
   verified, CMS shall pay the voucher pursuant to the prompt payment provisions.

b. The following payment methodology scale, unless otherwise identified below, shall be
   used to determine payment:

Contingency Fees of 12%, as indicated above, shall be used to determine payment except for
the following:

| Description of Issue | Contingency Fee |
| --- | --- |
| Excluded Provider 2007 | 12.00% |
| Excluded Provider 2008-2011 | 28.00% |
| Scheduled Drugs (contingent upon approval) | 20.00% |
| Approved New Issues (Up to $10m in recoveries) | 15.00% |
| Unauthorized Prescribers | 12.00% |
| All Approved New Issues (After first $10m in recoveries) | 12.00% |

129

A392

G.  Paragraph 7.2, is hereby revised to read as follows:

The following are designated Key Personnel Positions

> **Program Director**
> **Sean Donaghy**
> 38750 Seven Mile Road, Suite 251
> Livonia, MI 48152

> **Audit Director**
> **Jason Barnes**
> 38750 Seven Mile Road, Suite 251
> Livonia, MI 48152

> **Systems Security Officer**
> Bruce Dixon
> 38750 Seven Mile Road, Suite 251
> Livonia, MI 48152

H.  Paragraph 9, **CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE (COTR) AND/OR CONTRACT SPECIALIST** is revised to read as follows:

**9. Contracting Officer's Representative (COR) and Contract Specialist:**

Sonja Brown is designated as the COR for this order.  Sonja's address is:

> Ms. Sonja Brown
> Centers for Medicare and Medicaid Services
> CPI/MPIG/DPOA
> 7500 Security Boulevard
> Phone (410)786-3571
> Email:  Sonja.brown@cms.hhs.gov

All technical correspondence should be directed to the COTR with a copy to the Contract Specialist.

The responsibilities and duties of the COTR include:

130

A393

a) Provide technical direction as needed to the contractor as long as the terms and conditions of the contract are not changed.
b) Monitor contractor's ongoing efforts.
c) Serve as liaison between the contractor, Project Officer and project team.
d) Review deliverables and advise Contracting Officer of the contractor's performance.
e) Advise the Contracting Officer on the contractor's compliance with technical performance requirements.
f) Ensures that the contractor input and/or recommendations are considered by CMS project management.

The Contract Specialist for this task order is Mr. Justin Menefee. His address is:

> Centers for Medicare and Medicaid Services
> 7111 Security Blvd.
> ATTN: Mr. Justin Menefee
> Mailstop: C2-21-15
> Baltimore, MD 21244-1850
> (410) 786-7629
> Justin.Menefee@cms.hhs.gov

The Contracting Officer for this task order is Ms. Nicole Hoey. Her address is:

> Centers for Medicare and Medicaid Services
> 7111 Security Blvd.
> ATTN: Ms. Nicole Hoey
> Mailstop: C2-21-15
> Baltimore, MD 21244-1850
> (410) 786-0489
> Nicole.Hoey@cms.hhs.gov

1. Paragraph 17, **CONDITIONS OF PERFORMANCE** is revised to read as follows:

In addition to the performance requirements of this contract as set forth under the Statement of Work, the contractor may be required to comply with the requirements of any revisions in the legislation or regulations which may be enacted or implemented during the period of the performance of this contract, and are directly applicable to the performance requirements of this contract.

J.  Option Year 1 for the period of January 1, 2014 through December 31, 2014 is hereby exercised in accordance with Paragraph 3 PERIOD OF PERFORMANCE.

## END OF MODIFICATION

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



**Center for Program Integrity**
**HHSM-500-2011-00006G**

# Medicare Part D RAC
# Statement of Work

December 31, 2013
DRAFT

## Table of Contents

1.0  Introduction and Background .......................................................................................... 1 - 3
    1.1  Commonly Used RAC Terms and Acronyms
    1.2  Part D RAC Introduction and Scope
        1.2.1  Part D RAC Scope
        1.2.2  Part D RAC Methodology
        1.2.3  Part D Contracts Excluded from RAC Requirements
2.0  RAC Audit Activities/ Methodology ........................................................................... 3 - 6
    2.1  Improper Payment Review Process
        2.1.1  Improper Payment Impact Calculation Methodology
        2.1.2  Improper Payment Reporting and Tracking
            2.1.1.1  Improper Payment Review Package
            2.1.1.2  No Determination Report
    2.2  Validation of RAC Audit Findings
        2.2.1  RAC/DVC Dispute Resolution
    2.3  Notification Process
        2.3.1  Notification of Improper Payment Letters
3.0  Post-Audit Activities ..................................................................................................... 6 - 8
    3.1  Appeals Process
        3.1.1  Recoupment During the Appeals Process
    3.2  Payment Adjustment Process
        3.2.1  Payment Collection
        3.2.2  Repayment through Plan Sponsor Recoupments
        3.2.2  Compromise and/or Settlement of Overpayment
        3.2.3  RAC Invoice Tracking
4.0  RAC Requirements/Tasks to be Performed ................................................................. 8 - 10
    4.1  Basic Requirements
    4.2  RAC Audit Requirements
5.0  Key Personnel/Other Personnel .............................................................................. 10 - 12
6.0  Quality Assurance ..................................................................................................... 12 - 13
    6.1  Part D RAC Oversight
    6.2  Cooperation/ Coordination
    6.3  Quality
    6.4  Standard Operating Procedures
    6.5  CMS Systems

Appendix A: "Sample Letters" ...................................................................................... 14 - 17
    Notification of Improper Payments
    Request for Additional Information
Appendix B: Schedule of Deliverables ............................................................................... 18
Appendix C: Appeals Policy ......................................................................................... 19 - 22
Appendix D: Improper Payment Impact Calculation Methodology ................................. 23 - 24
Appendix E: Part D RAC Activities Timeline ............................................................... 25 - 28

# 1.0  Introduction and Background

Title I of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA) (P.L. 108-173) was signed into law on December 8, 2003.  The MMA established a new voluntary outpatient prescription drug benefit under Part D of Title XVIII of the Social Security Act (the Act). The prescription drug benefit, referred to as Medicare Part D, as well as an employer subsidy for qualified retiree health plans, began on January 1, 2006.  Coverage for the drug benefit will be provided by private prescription drug plans (PDPs) that offer drug-only coverage or through Medicare Advantage (MA) plans that offer both prescription drug and health care coverage (known as MA-PD plans).  These plans must offer a standard drug benefit, but will have the flexibility to vary the drug benefit within certain parameters.  The Recovery Audit Contractor (RAC) Program, which is designed to ensure proper payments to Part D Plan Sponsors   and providers, was initiated through demonstration programs mandated by the Medicare Modernization Act of 2003.  The success of the initial pilot program for Medicare Parts A and B included the return of millions of dollars in overpayments to the Medicare Trust Fund.  Based on that success, the Medicare Parts A and B RAC Program was permanently established on a national level through the Tax Relief and Healthcare Act of 2006.

Under the 2010 Patient Protection and Affordable Care Act (ACA) legislation enacted in March 2010, CMS is required to expand the RAC Program to the Medicare Advantage (Part C) ) and Prescription Drug Benefit (Part D) () programs.  Section 6411(b) of the ACA provides CMS with general authority to enter into contracts to conduct RAC audits in Medicare Part D. Under the Medicare Integrity Program (MIP), RACs are to identify underpayments and overpayments and recoup any overpayments made associated with the Medicare program. The Part D RAC is dedicated to identifying past improper payments in reconciled Medicare PDE claims and providing information to CMS to help prevent future improper payments.

## 1.1  Commonly Used RAC Terms and Acronyms

For purposes of this Manual, the following list addresses some of the commonly used terms within the Part D RAC Program.  A more comprehensive list can also be found in Appendix B, "Part D RAC Glossary of Terms and Acronyms."

- "Appeals Contractor" (Independent Review Entity) handles the first level of appeals from Plan sponsors challenging RAC findings.
- "Audit Scope" is a list of audit issues that the RAC is required to review during a given year.
- The "Center for Program Integrity" /(CPI) serves as CMS' focal point for all national and state-wide program integrity, fraud and abuse issues in the Medicare and Medicaid programs, and the Children's Health Insurance Program (CHIP).  Specifically, the Division of Plan Oversight and Accountability (DPOA) is the division within the CMS/CPI Medicare Integrity Group responsible for ensuring program integrity for Parts C and D, and oversee Medicare Part D RAC.
- The "Data Validation Contractor" (DVC) measures the accuracy rate of the RAC.  The DVC validates the improper payments identified by the RAC to determine if they are accurate and will review and approve/disapprove improper payment referrals, receive and review New Audit Issues the RAC wants to pursue for improper payments, and provide recommendations to CMS. CMS/CPI contracted with Livanta LLC for this duty.

- "Improper Payment Review Package" (IPRP) is an improper payment file and the supporting documentation for a particular audit issue by contract and year.
- "New Audit Issue Review Package" (NAIRP) is the package of proposed audit issues and includes a sample of Prescription Drug Event (PDE) records for a specified contract year, a new audit issue, an estimate of improper payment amount and the audit methodology.
- The "Payment Recovery Information System" (PRIS) houses referrals made to CMS/CPI after improper payments are identified. The Part D RAC and DVC review the PDEs and their accompanying support submitted into PRIS. Then, the DVC either confirms or rejects the Part D RAC findings, and updates the IPRP in PRIS.
- "Prescription Drug Events" (PDEs) are summary records submitted every time a beneficiary fills a prescription under Medicare Part D. The PDE data are not the same as individual drug claim transactions, but are summary extracts using CMS-defined standard fields.
- The "Recovery Audit Contractor" (RAC) is responsible for reducing Medicare improper payments through the efficient detection of overpayments, underpayments, and assists with the identification of vulnerabilities that will prevent future improper payments. Originally implemented for FFS Medicare, the ACA (Section 6411(b) expands the original RAC Program to Medicare Parts C and D. RACs are paid on a contingency fee basis.
- "Part D plan sponsors" (Plan sponsors) are private organizations that contract with CMS to administer Medicare Parts C and/or D benefits and may offer several different types of Medicare Part C and/or Part D plans. Plan sponsors include, but are not limited to, Medicare Advantage – Prescription Drug Plans (MA-PDPs), Prescription Drug Plans (PDPs).

## 1.2  Part D RAC Introduction and Scope

### 1.2.1  PART D RAC SCOPE

CMS/CPI determines the specific criteria on which the Part D RAC must submit to CMS as improper payments and new audit issues. To direct the Part D RAC's review, CMS/CPI mandates submission of potential improper payments by contract, issue type, and audit year. CMS further defines the audit scope to include the exact audit issue to be reviewed. Audit year will be the year of the data and for reconciled periods approved by CMS.

These issues can be sent to CMS as an Improper Payment Review Package (IPRP). The IPRP should include the contract number, issue type, audit year, and PDE records affected. The IPRP record will include the improper payment amount along with the RAC contingency fee amount.

As the Part D RAC progresses, new audit issues may be approved and added to the RAC's audit scope. In addition to the audit issues already approved by CMS/CPI, audit issues may be expanded to include new issues during the RAC process. A new audit issue must first be proposed to CMS for approval. The new issue shall be submitted in a New Audit Issue Review Package (NAIRP). The new audit issue shall include the issue type, audit scope, recovery estimate, a sample of PDE records, applicable law, policies, etc. and recommendation for automated or complex review. The Part D RAC will be responsible for the development of all new audit issues proposed by CMS. CMS and the Part D RAC will communicate as required to finalize audit issue processes and scope and also make determination of the requirement for a Complex or Automated Review as follows:

- Complex Review: A review determined to require a Request for Information from the plan sponsor to adequately validate conformance with CMS policy and applicable laws. This review

136

A399

A00488

is utilized where additional documentation, such as, prescriptions, prior authorizations, or other documentation is required from the plan sponsor.

- Automated Review: A review completed based upon available PDE records where approved processes are considered to be acceptable without further review of prescription or other documentation.

In cases where CMS determines an interim issue approval for a complex review to determine effectiveness of preliminary approved processes, CMS reserves the right to change the type review for final audit issue approval.

### 1.2.2   PART D RAC METHODOLOGY

The Part D RAC Program conducts audits using a methodology that focuses on identifying and correcting improper payments to plan sponsors. Specifically, the Part D RAC Program uses recovery auditing and conducts reviews of individual Medicare Part D claims and PDE data to determine whether claims were billed properly. This methodology also allows for implementing procedures to prevent future improper payments. This will be described in further detail in Section 2.

### 1.2.3   PART D CONTRACTS EXCLUDED FROM RAC REQUIREMENTS

CMS office of Information Systems (OIS) will provide reconciled PDE records to the RAC. The RAC shall secure the data in a database and use the PDE records to help identify improper payments. The RAC shall track PDE records that were identified as Unavailable for Review (UFR).

CMS/CPI consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue. As a result, certain PDEs may be restricted from review by the Part D RAC. The following detailed scope UFR criteria applies to the Part D RAC contracts:

- **Terminated Contracts** - These contracts with plan sponsors have been contractually ended by CMS on a prior date and are no longer eligible for Part D claims payments.
- **Contracts Already Deemed to Have No Findings** - Contracts reviewed by the RAC where no improper payments were identified and a No Determination Report (NODR) was submitted to CMS. The RAC may not review these contracts for the same audit issue.
- **Contracts Already Included in an Offset** - Once the RAC identifies an overpayment in a contract, a subsequent process of recoupment is initiated through making monthly offsets against the plan sponsors' account. The RAC can review the contract for other audit issues. .
- **Contracts Already Included in an Appeal** - Once the RAC identifies an overpayment in a contract and the plan sponsor initiates an appeal disputing the RAC findings, these contracts are in a "hold status" and excluded from recoupment until the appeal process is complete. The RAC can review the contract for other audit issues.

# 2.0  RAC Audit Activities/Methodology

Audit activities refer to the entire audit work stream performed under the Part D RAC Program as it relates to the Part D RAC. Since the responsible parties for Part D RAC audit functions include CMS/CPI personnel and support contractors, including and aside from the Part D RAC, the effective integration of each audit process and collaboration among stakeholders is critical to the program's success.

The following detail outlines the audit processes for identifying improper payments and compiling an audit package. Specific details related to each audit issue will be highlighted. This section also serves to summarize CMS/CPI's dedication to ensuring accuracy in audit findings and the means by which this will be accomplished.

## 2.1 **Improper** Payment Review Process

To begin this process, the RAC must:
- Retrieve reconciled PDE records from the Integrated Data Repository (IDR) system via CMS Office of Information Systems (OIS).
- Use other CMS systems to validate improper payments
- Perform PDE validation procedures – To ensure the validity of the PDE database, totals from the PDE database must be tied to the reconciliation file.
- Separate PDE records permanently unavailable for review, such as those discussed in Section 1.1.3 - "Part D RAC Excluded Contracts."
- Use CMS and other necessary data to validate improper payments for approved audit issues
- Record and update recommendations for new audit issues and update the NAIRP.

After the documentation is compiled, the Part D RAC can begin testing on audit issues and performing the subsequent improper payment calculations.

In order to identify improper payments based on approved audit issues, the Part D RAC will need to perform a thorough analysis of the PDE database provided or any other data source necessary as required for each approved audit issue. Depending on the audit issue, this database will be evaluated on a contract level, with improper PDEs being separately identified and compiled for each audit issue. Depending on the nature of the audit issue being evaluated, the RAC should be determining improper payments at 100% of the population, unless CMS directs the Part D RAC differently. The Part D RAC is required to coordinate with CMS prior to beginning work on approved audit issues. Outside of specific guidance from CMS, the Part D RAC can determine the scope of testing. In addition to the Part D RAC determining each improper PDE, the Part D RAC should ensure that any identified vulnerabilities, trends or inconsistencies aside from the audit issues are reported to CMS.

Once the preliminary actions are complete, two activity paths occur concurrently:

- On path 1, the RAC analyzes PDEs on approved audit issue specifics for potential improper payments. Once this analysis is complete, the RAC updates the status and determines whether a potential improper payment exists. Once improper payments have been identified, the RAC will submit based on approved review methodology as follows:

  o Complex Review: Contact the plan sponsor to obtain additional information, in the form of a Request for Information (RFI) communication (Appendix A – "Sample Letter"). This action will function as an opportunity for the plan sponsor to perform an initial review of the preliminary improper payments. The RAC will allow the plan sponsor a 30 day window in which they can provide the RAC additional information to negate all or some of the improper payments. Following this 30 day window, the RAC will complete their examination adjusting for any pertinent documentation received from the plan sponsor. Once complete, the RAC creates an Improper Payment Review Package (IPRP) and submits it to the DVC for validation via PRIS.   If no corroborating evidence is

provided by the plan, the RAC shall commence with the Notification of Improper Payment Letter process outlined in Section 2.3 below.

- o Automated Review: The RAC creates an Improper Payment Review Package (IPRP) and submits it to the DVC for validation via PRIS.

- On Path 2, the RAC analyzes PDEs, DIR or other approved audit issue specifics for potential fraudulent activities by the Part D plan sponsor.
  - o If no potential fraudulent activity exists, this path ends.
  - o If the RAC determines that potential fraudulent activity exists, they prepare and submit the fraud referral to the COR.

## 2.1.1 NEW AUDIT ISSUE APPROVAL PROCESS

The RAC must receive approval from CMS/CPI prior to commencing recovery audit activities. As outlined in *Appendix E, New Issues Submission and Approval Process*, the RAC submits a New Audit Issue Review Package (NAIRP) to the COR. This NAIRP contains a proposed audit issue, samples of PDE records, an outline of the processes utilized to identify improper payments, supporting statutory, regulatory, and administrative memoranda, and an estimate of improper payment amounts owing. Once submitted, the RAC works with CMS/CPI to refine and approve or deny the NAIRP. Once approved the RAC begins recovery audit activities.

## 2.1.2 IMPROPER PAYMENT IMPACT CALCULATION METHODOLOGY

The RAC should consult with CMS for guidance on improper payment impact calculation methodology. CMS's approved methodology, for each audit issue, must be used by the RAC to determine the improper payment amount. At CMS's request, the RAC must perform frequent analysis and re-running of potential findings to see various impacts and projections at any time. The RAC must adhere to CMS guidance on determining what constitutes an improper finding to be included in calculating the improper payment impact. Due to the nature of PDEs and the payment reconciliation process, this calculation will need to be carefully fine-tuned in coordination with CMS prior to the RAC determining impact. Reference Appendix D for further guidance on this methodology.

### 2.1.3 IMPROPER PAYMENT REPORTING AND TRACKING

#### 2.1.3.1   Improper Payment Review Package (IPRP)

After the RAC identifies an improper payment, as approved under *Section 2.1.1 New Audit Issue Approval Process,* it compiles an Improper Payment Review Package (IPRP). The IPRP contains the PDE exception reports and the supporting documentation identifying improper payments corresponding to a particular audit issue by contract. A unique ID is assigned to a Package and will be included on and associated with all future tracking reports and letters such as Validation Findings, Notification Letters, Appeal Notifications, Monthly Plan Payment Adjustments, and Invoices. The IPRPs will be unique for each contract, for each year for each audit issue.

#### 2.1.3.2   No Determination Report (NODR)

The NODR is a report generated by the RAC to reflect that there were no improper payments identified on the PDEs being reviewed. Once the RAC files a NODR, the audit process for that package is stopped. A NODR signifies that the contract is flagged to be error-free and excluded from future RAC review for the same audit issue.

## 2.2 Validation of RAC Audit Findings

CMS/CPI contracts with the Data Validation Contractor to perform a review of the IPRP and to submit an IPRP validation finding. The DVC will have 45 calendar days to complete their review process An extension may be granted to the DVC if the review's error rate is 25% or more.

The RAC must concur or non-concur with the validation findings submitted by the DVC. Concurred validation findings will continue through the RAC process.

### 2.2.1 RAC/DVC DISPUTE RESOLUTION

For RAC findings the DVC disagrees with, the DVC must provide a rejection reason and explanatory comments, including their recovery calculations, in the PRIS.

The Part D RAC is required to review all disagreements identified by the DVC and either accept or reject the DVC's validation findings. When the Part D RAC agrees with a rejected IPRP Validation finding, the file is considered validated; all associated PDE records will be removed from the UFR file. When the Part D RAC disagrees with the DVC, they must show support for their findings and offer assistance in understanding the process behind decisions to exclude these disputed PDEs. The Part D RAC should submit this new package with updated data.

The RAC must collaborate with the DVC to attempt resolution of any dispute. Disputes will be entered and tracked through CMS systems. The RAC and DVC should attempt to resolve any disputes within 7 calendar days. If the RAC and DVC cannot come to a resolution, CMS shall make the final decision, which cannot be reviewed or contested by either the RAC or DVC. CMS does not need any statutory or regulatory reference to deny a RAC finding. CMS also has the right to establish minimums and thresholds that the Part D RAC findings must meet to be considered for recoupment. At the conclusion of CMS' decision, the Part D RAC shall submit a new package with the final updated, CMS approved, PDE and reconciliation data to the DVC and/or CMS.

## 2.3 Notification Process

### 2.3.1 NOTIFICATION OF IMPROPER PAYMENT LETTERS

CMS is required to issue a Notification of Improper Payment Letter (Appendix A – "Sample Letters") to the plan sponsor once an improper payment is identified and validated. The letter is formatted by the Part D RAC and uploaded in CMS' systems. The process is further explained in section 3.2, Payment Adjustment Process and Appendix E – Part D RAC Activities Timeline for individual tasks, deadlines and responsible parties..

As per the Part D RAC appeal policy detailed in Appendix C titled "Appeals Policy," the plan sponsor has 30 days to respond to any Notification of Improper Payment Letter. The response period is based on the date that appears on the Notification of Improper Payment Letter. If an appeal with supporting documentation is not received within 30 days, payment collection will be initiated once the data associated with the identified overpayment has been cleared through CMS' internal processes.

A00492

# 3.0  Post-Audit Activities

Once the Part D RAC identifies improper payments and the DVC validates those payments, post-audit activities commence.  This section describes the appeals process, and the guidelines that govern those post-audit activities including the details, reporting requirements and communications needed for the appeals and payment processes. This process is extremely important to the Part D RAC, who is paid by contingency fee, and cannot receive payment for their services from CMS/CPI until the payment process is complete and payment is received from the Part D contract, per section 1893(h)(1)(A) of the Act. In addition, this section will describe the payment collection process in the case an appeal is not pursued.

## 3.1  Appeals Process

CMS/CPI provides Part D contracts that disagree with the Part D RAC's findings a chance to appeal the RAC's decision. CMS/CPI currently proposes a two level appeals process. More guidance regarding the plan sponsors' ability to appeal can be found in "Appendix C: Appeals Policy, **Appeals Process for Identified Overpayments by the Medicare Part D Recovery Audit Contractor (RAC)**". CMS's appeals policy is subject to change and may include third parties.

In addition, prior to, during and after the appeal period, the RAC is required to provide support throughout the appeals process.  This includes providing support or documentation related to the IPRP, such as performing recalculations due to overturned appeal decisions, revising Notification of Improper Payment, revising PDE exception reports, handling and tracking questions from plan sponsors as well as consulting with the appeals team, as necessary.  Specifically, if a request is made, the RAC shall have up to 15 calendar days to submit the requested information and data.  The RAC, with guidance from CMS, should assist plan sponsors in understanding the findings prior to an appeal being submitted.

### 3.1.1  RECOUPMENT DURING THE APPEALS PROCESS

If a plan sponsor files an appeal within the appropriate timeframes, following CMS guidance in Section 1893(f) (2) of the Social Security Act, all recovery efforts shall cease

## 3.2  Payment Adjustment Process

The Part D RAC shall not attempt recoupment for any adjustment. CMS/CPI will collect Medicare Part D Improper Payments by adjusting the plan sponsors' monthly payments that are paid out of the Medicare Trust Fund.  Once  all levels of appeal have been exhausted CMS systems will transmit a file to adjust the improper payment from the contract's monthly payment.  If the Part D RAC receives any payment made out to the Part D RAC from the Part D plan sponsor, they must contact the CMS COR immediately.

There may be instances when the plan sponsor will submit a check as refund of an improper payment, i.e. if the plan sponsor's monthly payment cannot support the improper payment.  All checks shall be sent to CMS for processing. If the RAC receives any form of payment from the plan sponsor, the RAC must deny payment acceptance and must notify CMS immediately.  If the Part D RAC receives any payment made out to the Part D RAC from the Part D plan sponsor, they must contact the CMS COR immediately.

A00493

### 3.2.1 PAYMENT COLLECTION

DPOA will be using a series of systems to recoup improper payments from the plan sponsor. .
To begin, the Part D RAC will prepare the Notification of Improper Payments letter and the final complete IPRP. The submission of both of these items is contingent on the Aggregate Plan Payment System (APPS) payment clock. The APPS system makes payments to the plan sponsors by approximately the 30th of each month. In order for any adjustments to be reflected for a monthly payment, the adjustment must be received by approximately the 10th of the previous month. In order to allow CMS time to adjust for any timing differences or changes in the payment schedule, the RAC shall submit their IPRPs by the 5th of each month or another date specified by CMS.

### 3.2.2 REPAYMENT THROUGH PLAN SPONSOR RECOUPMENTS

The RAC will receive a contingency payment once the full overpayment amount has been recouped from the plan sponsor.

### 3.2.3 COMPROMISE AND/OR SETTLEMENT OF OVERPAYMENT

If the plan sponsor presents CMS with a compromise request or settlement offer and CMS determines that a compromise and/or settlement is in the best interest of Medicare, the Part D RAC shall receive a contingency payment for the portion of the improper payment amount that was recouped.

### 3.2.4 RAC INVOICE TRACKING

Once the improper payment has been adjusted from a plan's monthly payment or a check has been received, CMS will notify the RAC of the recoupment and the Part D RAC shall send an invoice to CMS. The invoice shall include the contingency fee associated with the IPRP. Contingency fees are only associated with the portion of the improper payments identified by the Part D RAC and recouped by CMS.

# 4.0 RAC Requirements/ Tasks to be Performed

## 4.1 Basic Requirements

### Kick-off Meeting

The Part D RAC shall work with the COR to determine a mutually agreeable time to conduct the Kickoff meeting. This meeting shall be held no later than 14 calendar days after the contract is awarded. The kickoff meeting shall include, at a minimum, the following information:
- Introduction of key personnel.
- Discussion of the draft Project Work Plan and how work will be completed in order to meet deadlines.
- List of all deliverables.

Within 5 business days from the kick-off meeting, the RAC is required to electronically submit meeting minutes.

### System Security Plan

The Contractor shall ensure security of sensitive information as well as provide and implement a written security and plan covering all aspects of this task order. The Contractor shall maintain oversight of the physical location of the protected medical information and other proprietary information.  The Contractor shall store and dispose of the records/documents/files containing protected medical information and other proprietary information in accordance with CMS guidelines, and as instructed by the COR.

Specifically, the Part D RAC shall include a draft System Security Plan (SSP) using the current template available at the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity.  The details contained in the RAC's draft SSP shall be commensurate with the size and complexity of the other requirements of the SOW based on the System Categorization determined elsewhere in this document. The System Security Plan shall be submitted no later than 14 calendar days after contract award. The RAC shall be required to update and resubmit its SSP to CMS every three years (at a minimum) following award or when a major modification has been made to its internal system, as defined by the CMS CISO.

### Project Work Plan

The RAC is required to submit a draft Project Work Plan (PWP) within 14 calendar days after the contract is awarded. The PWP is a description of how the RAC plans to accomplish the requirements of the SOW. Specifically, the PWP should include:
- The RAC's review approach, staffing, scheduling, etc.
- All contact information for the RAC's staff.
- Anticipated risk and risk mitigation, including vulnerabilities with program and data.

This document is subject to CMS review and acceptance. Upon CMS review, the RAC will submit a finalized PWP electronically. All PMPs shall be modified and updated continuously after the initial submission to reflect any major changes in the project. When changes are identified, a revised PMP should be submitted for review within 10 days of identifying the change. If no revisions are received, the resubmitted PWP should be considered final.

### Monthly Progress Reports

The Part D RAC shall submit Monthly Progress Reports to the COR and by the 15th of each month for the previous months' effort. The COR and the Contractor shall agree upon the content and format of the Monthly Progress Report as this may change periodically. At a minimum, the monthly progress report should include:
- Administrative Actions
- Progress status by audit issue
- Summaries of  applicable meetings (internal and external)
- Areas of concern requiring CMS action/attention
- Any unresolved issues
- List of activities completed to date
- List of upcoming activities
- Summary of improper payments (by contract) to date
- Listing of any concerns from Plans
- Tracking log of communications between the Part D RAC and the  plan sponsors

143

A406

As a supplement to the monthly report, the Total RAC Invoice Amount Report and Total Improper Payment by Contract Report should be submitted.

### Total RAC Invoice Amount Report

The Part D RAC should include the Total RAC Invoice Amount Report with their Monthly Progress Report. This report will show the total contingency amount submitted for payment by the Part D RAC along with amounts received and outstanding from CMS. The associated improper payment total should also be identified in this report.

### Total Improper Payment by Contract Report

The Part D RAC should include the Total Improper Payment by Contract Report with their Monthly Progress Report. This report will show the total improper payments to date by contract number. Each entry should identify the contract number, Plan ID number, number of improper PDEs, the identified over/underpayments and the total improper payment amount.

### Final Report

At the completion of every audit issue for a particular year and every contract, the Part D RAC shall submit to CMS a final report within 30 calendar days. The final report shall include a synopsis of the entire project as it relates to that audit issue for a particular year. The final report should identify the total amount identified, demanded, collected, appealed, and any amounts outstanding. It should include a brief explanation of the procedures utilized to identify the improper payments. The final report is subject to any other topics CMS feels should be included.

The final report shall be delivered to CMS electronically.

## 4.2   RAC Audit Requirements

As discussed in the sections above, the Part D RAC is required to complete the Improper Payment Review Package (IPRP), No Determination Report (NODR), IPRP Validation Findings dispute, and the Notification of Improper Payment Letters, as applicable for each audit issue/contract.

# 5.0   Key Personnel/Other Personnel

The Contractor shall maintain a staff of key personnel positions as necessary and within the requirements identified below.  Key personnel shall not serve dual responsibilities in key functions unless approved by the Contracting Officer, i.e., the Program Director may not also serve as the Audit Manager. Changes in key personnel positions shall be submitted to the Contracting Officer in writing for approval within 30 **days prior** to any change.

A significant amount of confidential information will be reviewed under this contract. Therefore, all contractor and subcontractor personnel working on this task order shall submit a signed Non-Disclosure Statement prior to the start of the project.

When key personnel positions are vacated due to unforeseen circumstances, a proposed replacement shall be submitted in writing for approval no later than **30 calendar days** from the date the position was

vacated. Interim replacements should be identified when a permanent replacement cannot be identified within this time frame. CMS may consider a **60-day** interim replacement until a permanent replacement is secured.

Unless otherwise approved by the Contracting Officer, the key personnel noted below shall possess the following minimum work experience and educational requirements:

**Program Director**

The Program Director shall possess:

Work Experience
Ten or more years of professional experience with at least three years as a manager responsible for managing complex systems and work flow. Experience in audit recoveries is required.

Educational Requirements
A bachelor's degree from an accredited institution, plus a master's degree from an accredited institution or substitution of 4 additional years of related work experience in lieu of the master's degree.

**Audit Director**

The Audit Director shall possess:

Work Experience
A minimum of 5 years in an audit and reimbursement setting; Medicare audit and reimbursement setting is preferred.

Understanding of Government Auditing Standards, audit procedures, and financial analysis techniques.

Educational Requirements
An advanced degree in finance or accounting; Certified Public Accountant (CPA) or Certified Management Accountant (CMA) certificate is desired.

**Systems Security Officer**

The Systems Security Officer shall possess:

Work Experience:
A minimum of 5 years experience managing complex security programs/systems, implementing necessary safeguards, and ensuring all artifacts are current and up-to-date.

Educational Requirements:
A bachelor's and a master's degree; 5 additional years of related work experience may be substituted in lieu of master's degree.

**Other Personnel**

Although not considered key personnel positions, the following labor category personnel may be required for this SOW. When required, the respective job classification requirements are essential for performance under this contract. Waiver(s) from the essential personnel requirements may be submitted in writing to

the Contracting Officer for approval. All waiver requests should include a copy of a resume along with supporting rationale for the deviation from these requirements.

**Lead Statistician**

The Lead Statistician shall possess the following:

Work Experience
A minimum of 5 years experience using statistics to support corporate/business information needs.

Experience in statistical detection of fraud, fuzzy logic, development of mathematical models, neural networks, and data mining or other analytical methods. Demonstrated experience and knowledge of health care information (health claims data, provider identifiers, etc).

Educational Requirements
Bachelor's degree in statistics or related field.

**Manager, Medicare Part D**

The Manager, Medicare Part D shall possess:

Work Experience
A minimum of 5 years experience specific to benefit administration, payment, and Part D policy and regulations.  The Manager, Medicare Part D shall also possess an in-depth knowledge and understanding of the Medicare Part D Program.

Educational Requirements
A bachelor's and a master's degree; 5 (five) additional years of related work experience may be substituted in lieu of the master's degree.

Knowledge of Medicare law, regulations, manuals, and instructions is required.


**Pharmacist**

The Pharmacist shall possess:

Work Experience
A minimum of 3 years professional pharmacy experience. Experience in pharmacy claims processing, reviewing pharmacy claims and implementing pharmacy edits to ensure appropriate utilization is highly desirable.

Education
Pharm.D. degree or Four-year bachelor's degree in pharmacy recognized by the American Council on Pharmaceutical Education.

Licensure
Must be licensed to practice pharmacy in a State, territory of the United States, or the District of Columbia

A409

Knowledge of Medicare Part D law, regulations, manuals, and instructions is preferred.

# 6.0 Quality Assurance

CMS will utilize a number of quality assurance procedures to ensure contractor compliance with this contract. Examples include inspection of deliverables, review of reports, onsite progress meetings, performance evaluations, etc.

Contractors shall develop and maintain quality assurance procedures for work paper reviews, IT requirements, PDEs, etc. Contractors shall also ensure that data is physically secured and Personal Health Information (PHI) data is handled confidentially. This is required for subcontractors as well. These should be provided to CMS upon request.

## 6.1 Part D RAC Oversight

CMS will conduct Part D RAC oversight at either the RAC's site or at the appropriate CMS office. CMS has the right to request/review any work performed by the contractor at any time; this includes work papers, reports, support for findings, etc. After completion of the engagement, CMS may hold a conference with the Part D RAC to discuss any issues. CMS may choose to visit the Part D RAC site to assess their performance.

## 6.2 Cooperation/Coordination

The Contractor shall cooperate and coordinate with stakeholders other than CMS, including Affiliated Contractors (ACs), and other entities as appropriate. Contractor performance will be evaluated using measures including, but not limited to:
- Demonstration of ongoing dialogue or meetings with the appropriate and necessary parties;
- Feedback from other entities; and
- Number and type of issues that arise and indicate communication, or lack of communication, between appropriate entities and the Contractor.

## 6.3 Quality

The Contractor shall maintain the highest degree of quality for all activities performed throughout the period of performance of the contract. CMS will evaluate Contractor performance using measures including, but not limited to:
- Completeness and accuracy of data analysis;
- Completeness and accuracy of all deliverables

## 6.4 Standard Operating Procedures

The Contractor shall submit detailed Standard Operating Procedures (SOPs) to CMS/CPI for each approved audit issue. At a minimum, the SOPs should include the contractor's methodology for the approved audit issue. The methodology should detail the specific steps the contractor undertook in order to arrive at the potential improper payment.

## 6.5  CMS Systems

The Contractor shall update CMS systems withMedicare Part D Data and to store and track Medicare Part D improper payments.

**Government Property**
No Government Furnished Property shall be issued for this effort.

A411

# Appendix A: "Sample Letters"

## SUBJECT: Notification of Improper Payment

Date: mm/dd/yyyy

**SUBJECT: Notification of Improper Payment**

CEO NAME
CONTRACT NAME
ADDRESS LINE 1
ADDRESS LINE 2
CITY, STATE, ZIP

RE: CONTRACT NAME, CONTRACT#

Dear PREFIX CEO LAST NAME:

The Centers for Medicare & Medicaid Services (CMS) has retained ACLR to carry out the Recovery Audit Contractor (RAC) program efforts for Medicare Part D. The Division of Plan Oversight and Accountability (DPOA) within the Center for Program Integrity (CPI) is responsible for the Part D RAC program. The RAC program, mandated by Congress through the Affordable Care Act, is aimed at identifying Medicare improper payments.

This letter is to notify you that CMS has made an overpayment to CONTRACT NAME in the amount of $XXXX.XX. This overpayment was calculated based on data analysis performed by the RAC on Prescription Drug Event (PDE) data submitted to CMS from all plan IDs under CONTRACT # for the XXXX plan year. The RAC's review of this PDE data was focused on payments made by CONTRACT NAME to excluded pharmacies and for prescriptions ordered by excluded physicians.

Under 1862(e)(1) of the Social Security Act, and implementing regulations at 42 C.F.R. § 1001.1901(b)(1), Medicare payment may not be made for items or services furnished by an excluded provider or entity or on the prescription of an excluded physician. Specifically, 42 C.F.R. § 1001.1901(b)(1) provides, "no payment will be made by Medicare, Medicaid or any of the other Federal health care programs for any item or service furnished, on or after the effective date specified in the notice period, by an excluded individual or entity, or at the medical direction or on the prescription of a physician or other authorized individual who is excluded when the person furnishing such item or service knew or had reason to know of the exclusion." Additionally, in HPMS memos to plan sponsors, dated January 13, 2010 and March 29, 2010, CMS made clear that, "Medicare payment may not be made for items or services furnished by an excluded provider or entity or on the prescription of an excluded physician." We clarified in the January 13, 2010 memo that these prohibitions, "apply not only to drugs prescribed by excluded providers, but also claims for prescription drugs dispensed

149

A412

A00501

by excluded pharmacies." Payments made by CMS to a plan sponsor for prescriptions filled by excluded pharmacies or written by excluded prescribers constitute an overpayment by CMS.

The $XXX.XX was calculated by identifying excluded servicing providers (pharmacies) and excluded prescribers by their identifiers in each PDE record. The RAC then determined the overpayment amount by calculating the effect of the payment made to the excluded pharmacy or for the prescription ordered by the excluded prescriber on reinsurance and Low Income Cost- Sharing (LICS) amounts. To adjust the reinsurance subsidy, the RAC subtracted all impacted PDE amounts for Gross Drug Cost Above (GDCA) the catastrophic phase from the originally reported final reconciliation numbers for each plan benefit package (PBP) under CONTRACT#. The RAC findings were also reflected in the Direct and Indirect Remuneration (DIR) ratio by subtracting the impacted PDE amounts for GDCA and Gross Drug Cost Below (GDCB) from the original DIR ratio calculation. LICS was adjusted by removing the total LICS amount associated with RAC identified improperly paid PDEs. The revised amounts for reinsurance and LICS were then added to the original risk sharing amount (risk-sharing was not altered due to RAC findings) to determine the RAC identified impact amount. The difference between the 2010 reconciliation final amounts, which includes the original LICS, original reinsurance and original risk sharing amounts, and the RAC revised amount, which includes the revised LICS, revised reinsurance and original risk sharing amount, is what CMS has determined was improperly paid.

A brief description of the Prescription Drug Events (PDEs) associated with this improper payment can be found on the *Improper Payment Exception Report* provided in an encrypted file along with this letter. An interim adjustment in the amount owed will be made to your monthly payment, which will be reflected in your Membership Detail Report approximately two months from the date of this letter. Prior to CMS running a reopening of 2010 reconciliation, this interim adjustment will be credited back to CONTRACT NAME. It is the plan's responsibility to delete the PDEs identified in the exception report to correct any errors in the PDEs identified by the RAC, before the reopening of the 2010 reconciliation.

CMS provides plan sponsors with a two-tiered appeals process, should the plan sponsor disagree with the assessment of the improper payment(s). You have 30 days from the date of this notification letter to submit a Request for Redetermination to CMS. Once the Request for Redetermination is filed, CMS will review the supporting documentation and provide a Redetermination Decision. Within 15 days from the date of the Notice of Redetermination Decision, the plan sponsor may file with CMS a Request for Reconsideration. If the Redetermination Decision is not appealed, it will become the final agency decision. If the sponsor does submit a Request for Reconsideration, CMS will review it and then issue a final agency decision. To appeal a decision, an email with all supporting documentation must be sent to ACLR at info@ACLRRAC.com and CMS at PartDRACAppeals@cms.hhs.gov. Applicable guidance about the Redetermination and Reconsideration processes as well as the required appeal templates can be found at: http://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Part-D-RAC-Appeal-Process.html.

A413

The appeal must be submitted in the following format:

Include the contract number and "RAC Redetermination Request" in the subject line of the email (ex. "H1234 RAC Redetermination Request").

Documentation shall be submitted to CMS by CONTRACT#, using the template provided by CMS. If a sponsor is requesting a redetermination for multiple contracts, each request must be submitted individually by contract; all supporting documentation should be carefully categorized, clearly legible, easily understood and cross referenced where necessary. All relevant information to the Request for Redetermination of this notification must be included in this initial submission to be considered for review. If the documentation provided by the sponsor in support of its Request for Redetermination is not sufficient for CMS to appropriately consider the Request for Redetermination, CMS will provide notice to the sponsor that its submission has not been accepted. The sponsor will then have the balance of the remaining 30 day timeframe to submit a revised Request for Redetermination.
The plan will receive an email within two (2) business days acknowledging that the appeal was received by CMS.

CMS will issue a decision within 90 days of receiving the plan's Request for Redetermination. The plan then has 15 days to ask for a Request for Reconsideration by emailing CMS at PartDRACReconsiderations@cms.hhs.gov with the contract number and "RAC Request for Reconsideration" in the subject line (ex. "H1234 RAC Request for Reconsideration").

If you have questions or would like to discuss the process by which ACLR detected or calculated the overpayment, please direct your inquiry to ACLR at 1-855-722-6333.

Sincerely,



Tanette Downs
Director, Division of Plan Oversight and Accountability
Centers for Medicare & Medicaid Services

Enclosure: Level I Part D RAC Appeal Redetermination Package

cc:
CFO NAME
CO NAME

151

A414

## SUBJECT:  Request for Additional Information

RAC Point of Contact
Plan Sponsor Name
Plan Sponsor Street Address
Plan Sponsor Street Address 2
City, State, Zip

RE:  Request for Information

Dear RAC Point of Contact:

The Centers for Medicare & Medicaid Services (CMS) has contracted with ACLR Strategic Business Solutions, LLC to carry out the Recovery Audit Contractor (RAC) program for Medicare Part D.  As part of our initial duplicate payment review for CY XXXX, we have identified the Prescription Drug Events (PDEs) in the attached report as duplicate payments, resulting in improper payments made by CMS.  The PDEs will be used as the basis for our calculation of any improper payments.  In an effort to ensure the accuracy of this information, we are allowing [Plan name], [Contract #], 60 (90 days if directed by CMS) calendar days from the date of this notification to submit documentation in support of or against the improper payments currently identified. We will consider any documentation received within this 60 (90 days if directed by CMS) day window. Any documentation received after this time frame will not be factored into our improper payment calculation.

If an improper payment is determined at the conclusion of our review, a Notification of Improper Payment letter will be issued to [Plan Name], [Contract#]. The letter will inform you of the improper payment amount as well as appeal instructions should you disagree with our findings.  Please review the attached report and submit your response via Secure Mail to info@ACLRRAC.com within 60 (90 days if directed by CMS)days from the date of this request. Any questions directly related to this information request can be sent to PartD_RACCommunications@cms.hhs.gov.

Sincerely,


Christopher Mucke
Part D RAC Program Director
ACLR Strategic Business Solutions, LLC

# Appendix B:  Schedule of Deliverables

The contractor shall submit all required reports and deliverables in accordance with the statement of work and the following schedule:

| Task Descriptions | Quantity/ Recipient | Delivery Schedule |
|---|---|---|
| Kick-off Meeting | Due to the COR | No later than 14 calendar days after contract award |
| Kick-off Meeting Minutes | Electronically to the COR | Within 5 business days from the kick-off meeting |
| System Security Plan | Due to the COR | No later than 14 calendar days after contract award |
| Project Work Plan Draft | Electronically to the COR | No later than 14 calendar days after contract award |
| Project Work Plan Final | Electronically to the COR | Within 10 days of CMS revisions |
| Vulnerability Report | Due to the COR | Monthly |
| Progress Report | Electronically to the COR | By the 15th of each month for the previous month's efforts |
| Total RAC Invoice Amount Report | Electronically to the COR | Due with the Monthly Progress Report |
| Total Improper Payment by Contract Report | Electronically to the COR | Due with the Monthly Progress Report |
| Final Report | Electronically to the COR | At the completion of an audit issue for every contract for a particular year |
| Ad-hoc Reports | Due to the COR | Upon Request |
| Recalculation of Impacts | Due to the COR | Upon Request |

153

A416

# Appendix C:  Appeals Policy

## Appeals Process for Identified Overpayments by the Medicare Part D Recovery Audit Contractor (RAC)

Section 6411(b) of the Affordable Care Act expanded §1893 of the Social Security Act to extend the recovery audit program to Part C and Part D to identify underpayments and overpayments and recoup overpayments under the Medicare program. The effective date for this provision was December 31, 2010.  The Centers for Medicare & Medicaid Services (CMS), Medicare Program Integrity Group (MPIG) is providing this guidance as an explanation of how Part D plan sponsors can file an appeal for overpayments identified by the Medicare Part D Recovery Audit Contractor.  All overpayments that are identified by the RAC will be confirmed by a separate independent contractor, a Data Validation Contractor (DVC).

### When must appeals be filed?

Appeals that are submitted after the established deadline will be dismissed without the ability to re-file. If the deadline falls on a weekend or a Federal Holiday, the filing period will be extended to the next business day.  Electronic submissions will be considered timely if they are received in the designated appeals mailbox by 11:59 p.m. EST on the deadline date.  Physical submissions that are mailed must be postmarked by the date of the deadline. The deadlines are as follows:

Level I, Request for Redetermination:  Level I appeals must be filed no later than 30 calendar days from the date of the Notification of Improper Payment Letter.

Level II, Request for Reconsideration:  Level II appeals must be filed no later than 15 calendar days from the issuance date of the Level I review decision.

Extension of established deadlines:  In very limited circumstances, CMS may grant a request to extend the deadline.  The decision to grant such an extension is entirely at the discretion of CMS,  and the SO must show that extenuating circumstances (e.g. natural disaster, Notification of Improper Payment went to incorrect address, death, etc.) existed that prevented the filing of an appeal by the deadline. Circumstances involving staff turnover or an oversight of the established deadline will not be considered.

### Who can appeal?

All Part D Sponsors receiving a Notification of Improper Payment Letter.

### What IS appealable?

- The Part D plan sponsor may appeal the determination made by the Part D RAC that an overpayment was made to the plan sponsor as a result of payments made by the plan sponsor to excluded pharmacies and for prescriptions ordered by excluded physicians. The plan sponsor may also appeal the amount of the overpayment. CMS will afford plan sponsors with a two-level appeal process which includes a "Request for Redetermination" and a "Request for

Reconsideration." Plan sponsors are encouraged to contact the RAC to work out any issues relating to the identified overpayment prior to submitting a Request for Redetermination.

**What is NOT appealable?**

- This appeals process prohibits the plan sponsor from appealing the methodology and standards used to identify and calculate the overpayment(s).

- PDEs submitted by the plan sponsor subsequent to the final reconciliation of the plan year being reviewed, constitute new payment information, and were not considered by the RAC as part of its review and have no relation to the RAC findings. This new information will not be considered in this appeals process, but will be included in any subsequent reopening of the final reconciliation for the plan year.

- Any issues besides the ones identified in the Notification of Improper Payment Letter. The appeal is strictly limited to the excluded servicing and prescribing provider qualifiers and identifiers.

- Any issues related to reopenings.

**Where can Part D Plan Sponsors submit inquiries regarding the Part D RAC Appeals Process?**

Part D Plan Sponsors can submit inquiries on the Part D RAC appeals process to PartD_RACCommunications@cms.hhs.gov.
Inquiries regarding the status of pending appeals should be submitted to PartDRACAppeals@cms.hhs.gov for Level I appeals and PartDRACReconsiderations@cms.hhs.gov for Level II appeals.

**General requirements for filing an appeal**

**Include all relevant issues in the initial appeal:** Plan sponsors must raise all relevant issues at the time of the Level I appeal. Issues that are not raised in the Level I appeal cannot be raised at a later time and will be dismissed. Plan Sponsors may amend the Level I appeal if they need to include additional information that may be relevant to their argument. Amendments must be submitted before the appeal timeframe expires. The Level I 30 day appeal deadline does not change upon the receipt of appeal or upon the receipt of an appeal amendment.

- **Electronic Appeal Requests:** Level I (Request for Redetermination) appeals and supporting documentation, submitted via email, should be sent to CMS at PartDRACAppeals@cms.hhs.gov and to the RAC at info@ACLRRAC.com. Level II (Request for Reconsideration) appeals submitted via email, should be sent to CMS at PartDRACReconsiderations@cms.hhs.gov. For electronic submissions, SOs must use the template provided with the Notification of Improper Payment Letter or the template posted at http://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Part-D-RAC-Appeal-Process.html. The following format should be used:

155

A418

1. Include the contract number and "RAC Redetermination Request" or "RAC Reconsideration" in the subject line of the email (ex. "H1234 RAC Redetermination Request").
2. Documentation shall be submitted to CMS by Contract # using the template provided by CMS. If the plan sponsor is requesting an appeal for multiple contracts, the plan sponsor must submit a separate email request for each contract; all supporting documentation should be carefully categorized, clearly legible, easily understood and cross referenced where necessary. All relevant information to the appeal of this notification should be included in this initial submission to be considered for review. A plan sponsor may amend its Request for Redetermination to include additional, relevant information, provided that all information is submitted before the appeal timeframe expires. In addition, if the documentation provided by the sponsor in support of its Request for Redetermination is not sufficient for CMS to appropriately consider the Request for Redetermination, CMS will provide notice to the sponsor that its submission has not been accepted. The Part D sponsor will then have the balance of the remaining 30 day timeframe to submit a revised Request for Redetermination.

- **Physical Appeal Requests:** All physical appeal requests must be submitted on CD to the following address:

  > Centers for Medicare & Medicaid Services (CMS)
  > Division of Plan Oversight and Accountability
  > ATTN: "RAC Redeterminations" or "RAC Reconsiderations"
  > Mailstop: AR-18-50
  > 7500 Security Boulevard
  > Baltimore, Maryland 21244

- **Withdrawing an appeal:** Part D plan sponsors may withdraw an appeal at Levels I or II at any time prior to a decision being issued. All Level I withdrawal requests should be submitted via email to PartDRACAppeals@cms.hhs.gov. All Level II withdrawal requests should be submitted to PartDRACReconsiderations@cms.hhs.gov .

**Redeterminations and Reconsiderations:**

1. **Request for Redetermination Decision:**

CMS will issue a Notification of Improper Payment letter to the plan sponsor which includes the amount owed, how the amount was calculated and the Prescription Drug Events (PDEs) in question. The plan sponsor will then have 30 calendar days to file an appeal on any PDEs it believes are valid; this appeal must include a detailed narrative/explanation of why the plan sponsor believes each RAC determination is incorrect along with supporting evidence regarding the PDEs in question. Once this appeal and supporting documentation are received by CMS and the RAC, CMS will respond with an email to the plan sponsor confirming receipt within 2 business days.

The RAC will be required to submit its findings to be used to rebut the allegations made by the plan sponsor in its appeal, or its decision not to rebut the allegations made by the plan sponsor, to CPI, and a

156

A419

A00508

copy to the plan sponsor, within 15 calendar days of receipt of the appeal from the plan sponsor. If the RAC decides not to rebut the allegations, the RAC must submit a statement stating this decision and the appeal will be upheld. However, if the RAC decides to rebut the plan sponsor's allegations after reviewing the plan sponsor's supporting documentation, the RAC may submit its findings and any additional documentation to support its findings (e.g. its rebuttal). Once the RAC submits its rebuttal, a review decision will be made by CMS on all outstanding issues raised in the appeal within 60 calendar days from the date of the Notification of Improper Payment. If amended statements are received from the plan sponsor closer to the 30 day appeal deadline, then the timeframe for CMS' review will be extended and CMS will render a decision within 90 days of the Notification of Improper Payment. Evidence from both the plan sponsor and the RAC will be used to make a determination. CMS may consult the DVC if additional technical information is needed to resolve the dispute between the RAC and the plan sponsor.

After the review decision is made, CMS will notify the plan sponsor and the RAC regarding the Redetermination Decision and provide the SO with information on how to file a Request for Reconsideration. If the plan sponsor does not submit a timely Request for Reconsideration, the Redetermination Decision will be deemed a final decision and CMS will move to offset the amount in the notification or revise the notification based on the outcome of the appeal decision and offset the amount as revised.

## 2. Requests for Reconsideration:

The plan sponsor must file a Request for Reconsideration within 15 calendar days of the issuance date of the Redetermination Decision. The request should include a detailed narrative of why each of the Redetermination decisions is incorrect.

On receiving a Request for Reconsideration, CMS will review the material previously submitted in support of the Request for Redetermination and make a final decision within 30 calendar days. After its review is complete, CMS will notify the plan sponsor regarding the Reconsideration decision. If the Reconsideration decision is wholly unfavorable or partially unfavorable to the plan sponsor, CMS will offset the amount in the notification or revise the notification based on the outcome of the appeal decision and offset the amount as revised.

## 3. Offsets

Interim offsets will not be made until after the administrative process or time to appeal has expired. These interim offsets will be returned to the plan sponsor prior to reopening reconciliation. It is the plan sponsor's responsibility to correct any errors in the PDEs identified by the RAC by deleting those PDEs before the reopening of the final reconciliation for the plan year.

# Appendix D: Improper Payment Impact Calculation Methodology

The purpose of this appendix is to outline the methodology the RAC, as advised by CMS, should use to calculate the impact of any improper payments found as a result of auditing the approved issues. The basis for the RAC's evaluation will be the PDE database for each contract as well as the associated payment reconciliation files.

The RAC will analyze their database to determine the total population. Once these populations are established, various PDE fields will be summed in order to begin the calculation of improper payment.

Due to the nature of the Part D program, the impact calculation methodology will essentially consist of a recalculation of the year-end reconciliation. The items that contribute to year-end reconciliation are Low Income Cost Sharing (LICS), Reinsurance cost-sharing, and the risk corridor adjustment (risk-sharing reconciliation amount). Re-computation of the year-end reconciliation, adjusted for improper payments, will be completed for each audit issue where improper payments have been identified. The initial reconciliation and the re-performed/corrected reconciliations will be compared to determine the total overpayment/underpayment.

Specifically, for four corrected PDE payment fields the RAC will quantify, sum for all findings, and incorporate into the Part D Payment Reconciliation calculations for each payment mechanism. The re-performed/corrected amounts due to CMS or owed to Sponsors for LICS and Reinsurance will then be summed together and compared to the results of the initial Part D Payment Reconciliation to determine the total impact on Part D payment. CMS reserves the right to change the calculation methodology at any time. The RAC must follow CMS guidance in calculating the actual impact, as some of the calculation fields/methodologies may change.

Each piece of this reconciliation will be described below:

## LICS

Medicare provides additional assistance, referred to as Low-Income Cost Sharing (LICS), to low-income individuals (who meet the income and resource criteria) to reduce the individual's Part D premium and cost-sharing amounts. CMS makes monthly prospective LICS subsidy payments to reimburse Plan Sponsors for the LICS costs associated with providing prescription drug coverage to qualifying individuals. These payments are based on prospective estimates that sponsors provide in their bids prior to the beginning of the plan year.

The LICS subsidy payments that Plan Sponsors make on behalf of the qualifying low-income beneficiaries must be documented and reported back to CMS so that, after the close of the plan year, CMS can reconcile these payments with the Plan Sponsors' actual costs to determine whether the Plan Sponsors have overpaid or underpaid. Upon year end, CMS reconciles the sum of the LICS amounts reported in relevant PDE data fields against the monthly prospective LICS subsidy payments made by CMS. A final overpayment or underpayment is calculated and recovered as a lump sum recovery or by adjusting monthly payments throughout the remainder of the current coverage year.

In calculating the impact to the government for improper payments, LICS amounts associated with improper payments are calculated on a dollar value basis by summing the amount included in the LICS

158

A421

PDE data field, and comparing the amounts paid or that should have been paid in accordance with program/plan requirements. As the LICS reconciliation process offsets estimated amounts against actual amounts paid, no further reconciliation processes are required.

**Reinsurance Subsidy**

The Reinsurance Subsidy guarantees the Plan Sponsor a percentage of the individual's drug costs incurred in the last phase of coverage. Under the Reinsurance Subsidy, the federal government is responsible for 80% of allowable drug costs in the catastrophic phase. Allowable drug costs are those that have been adjusted by Direct and Indirect Remuneration (DIR) (e.g. rebates, discounts, etc that are received by the Plan Sponsor). Unadjusted drug costs are costs that have not been adjusted by DIR. PDEs processed in the catastrophic phase have these costs recorded in the Gross Drug Cost Above Threshold (GDCA) field of the PDE. Costs recorded prior to reaching the catastrophic phase are recorded in the Gross Drug Cost Below Threshold (GDCB) field of the PDE. To calculate the impact to the government, first, the DIR Ratio must be calculated. The DIR Ratio is the unadjusted GDCA divided by unadjusted total drug cost. The DIR ratio is applied to the net DIR amount to determine the reinsurance portion of DIR. To derive allowable reinsurance cost, the reinsurance portion of DIR is subtracted from GDCA. The reinsurance subsidy is 80% of the plan's allowable reinsurance cost.

Amounts associated with improper payments will increase or decrease year-end reconciliation GDCA and GDCB totals. Therefore, to calculate the impact of improper payments, the Plan Year Reconciliation GDCA and GDCB totals will be adjusted for any identified improper payments and the resulting (adjusted) GDBA and GDCB totals will be used in a subsequent reconciliation (Improper Payment Reconciliation) to determine the revised reinsurance subsidy using the same methodology used during year-end reconciliation.

**Total Recoupment Amount**

The corrected total Part D reconciliation amount associated with improper payments will be determined by summing the amounts due to CMS or owed to Sponsors for LICS and Reinsurance payment mechanisms as outlined above. The corrected total Part D reconciliation amount is then compared to the initial total Part D payment reconciliation amount with the difference representing the recoupment amount due CMS/Part D Sponsor.

159

A422

# Appendix E:  Part D RAC Activities Timeline

*New Issues Submission and Approval Process

| Step | Description | SOW Section | Days | Sample Timeline | Responsible Party |
|------|-------------|-------------|------|-----------------|-------------------|
| 1 | RAC submits New Audit Issues Review Package (NAIRP) to CMS | Section 1.2.1 | 0 | 10/01/2013 | Part D RAC |
| 2 | RAC conducts a walk-thru of the new issue at the next scheduled CMS/RAC Operations Meeting | Section 1.2.1 | Within 14 days of submitting NAIRP (By COB the next business day after the walk-thru/meeting, the Part D RAC COR will send an email notification to the Part D RAC summarizing the walk-thru/meeting and the deadline for CMS feedback) | 10/14/2013 | Part D RAC |
| 3 | CMS provides its initial feedback to the RAC – feedback is provided both verbally and in writing. | Section 1.2.1 | Within 30 days of the walk-thru | 11/14/2013 | CMS COR |
| 4 | Based on the CMS feedback, the RAC in collaboration with CMS may decide to abandon the original NAIRP or revise it.  If the RAC plans to continue with the audit issue, the RAC shall resubmit the NAIRP to CMS based on CMS feedback. | Section 1.2.1 | Within 30 days of receiving initial feedback from CMS | 12/14/2013 | CMS COR /RAC |
| 5 | CMS provides complete approval, conditional approval or denial of the NAIRP.  Complete approval of the NAIRP shall be provided to the RAC in writing.  If conditional approval, CMS shall provide the RAC with a written explanation as to the terms of the | Section 1.2.1 | Within 30 days of receiving the revised NAIRP | 1/14/2014 | CMS COR |

| | | | | | |
|---|---|---|---|---|---|
| | conditional approval. If denial, CMS shall provide the RAC with a written explanation as to the reasons for the denial. | | | | |
| Total Cycle Time | | | 104 days | | |

*The New Issues Submission and Approval Process is based on the submission of no more than two (2) new audit issues per month.  If more than two (2) audit issues are received within a 30 day period, the CMS timeframes may take longer than identified in the chart.

Once Audit Issue has been approved, the following process shall take place:

Complex Review

| Step | Description | SOW Section | Days | Sample Timeline | Responsible Party |
|---|---|---|---|---|---|
| 1 | Request for Information (RFI) | Section 2.1 | 0 | 10/01/2013 | Part D RAC |
| 2 | Part D Sponsor Response to RFI | Appendix A | 60<br>60 days and 90 days if prescriptions are requested | 11/30/2013 | Part D Plan Sponsors |
| 3 | Improper Payment Review Package (IPRP) Submission | Section 2.1.2.1 | 30 | 12/30/2013 | Part D RAC |
| 4 | Data Validation Contractor (DVC) IPRP Review | Section 2.2 | 45<br>(An extension may be granted to the DVC if the error rate is 25% or more) | 02/14/2014 | DVC |
| 5 | Notification Letter Submission | Section 2.3 | 7 | 02/21/2014 | Part D RAC |
| 6 | CMS sends Notification Letter to Plan Sponsors | Section 2.3 | 7 | 2/28/2014 | CMS/DPOA |
| 7 | Level 1 - Request for Redetermination | Section 2.3, Appendix A, Appendix C | 30<br>30 Days From receipt of the Notification letter | 03/28/2014 | Part D Plan Sponsors |
| 8 | RAC Rebuttal | Section 3.1, Appendix C | 15<br>15 Days From receipt of plan sponsor's Request for Redetermination | 04/14/2014 | Part D RAC |
| 9 | CMS Redetermination Decision | Appendix A | 90<br>From Request for Redetermination | 07/14/2014 | Part D RAC Appeals Contractor |
| 10 | Revise Improper Payment Packages (Revise NIPs, Revise Exception Reports) | Section 3.1 | 7 days | This action occurs within the 90 day Redetermination Decision Period | Part D RAC |
| 11 | Level 2 - Request for Reconsideration | Appendix A, Appendix C | 15<br>From Issue Date of Redetermination Decision | 07/29/2014 | Part D Plan Sponsors |

A424

A00513

| 12 | Level 2 - CMS Reconsideration Decision | Appendix C | 30<br>From Receipt of plan sponsor's Request for Reconsideration | | 08/29/2014 | CMS/Division of Policy & Regulatory Development (DPRD) |
| 13 | Revise Improper Payment Packages (Revise NIPs, Revise Exception Reports) | Section 3.1 | 7 days | | This action occurs within the 30 day Reconsideration Decision Period | Part D RAC |
| 14 | CMS/DPOA submits payment adjustments forms to Division of Payment Operations (DPO) | Section 3.2 | Next scheduled Plan Data due date | | 9/2/2014 | CMS/DPOA |
| 15 | Offset | Section 3.2 | Typically no more than 30 days but will vary based on the DPO payment schedule (Transmit after all appeals levels have been exhausted) | | 10/1/2014 or later | CMS/DPO<br>Year 2014 MA Monthly Schedul |
| 16 | CMS/DPOA notifies RAC that recoupment has been made | Section 3.2.4 | 15 | | 10/8/2014 | CMS/DPOA |
| 17 | RAC Invoice | Section 3.2.4 | 15<br>Upon Notification of Recoupment by CMS | | 10/23/2014 | Part D RAC |
| 18 | RAC Payment | N/A | 30 | | 11/23/2014 | CMS/OFM |
| | Total Audit Cycle | | 389 | | | |

**Automated Review**

| Step | Description | SOW Section | Days | Sample Timeline | Responsible Party |
|---|---|---|---|---|---|
| 1 | Improper Payment Review Package (IPRP) Submission | Section 2.1.2.1 | | 12/30/2013 | Part D RAC |
| 2 | Data Validation Contractor (DVC) IPRP Review | Section 2.2 | 45<br>(An extension may be granted to the DVC if the error rate is 25% or more) | 2/14/2014 | DVC |
| 3 | Notification Letter Submission | Section 2.3 | 7 | 2/21/2014 | Part D RAC |
| 4 | CMS sends Notification Letter to Plan Sponsors | Section 2.3 | 7 | 2/28/2014 | CMS/DPOA |
| 5 | Level 1 - Request for Redetermination | Section 2.3, Appendix A, Appendix C | 30<br>30 Days From receipt of the Notification letter | 03/28/2014 | Part D Plan Sponsors |
| 6 | RAC Rebuttal | Section 3.1, | 15 | 4/14/2014 | Part D RAC |

A425

| | | Appendix C | 15 Days From receipt of Plan sponsor's Request for Redetermination | | |
|---|---|---|---|---|---|
| 7 | CMS Redetermination Decision | Appendix A | 90 From Request for Redetermination | 7/14/2014 | Part D RAC Appeals Contractor |
| 8 | Revise Improper Payment Packages (Revise NIPs, Revise Exception Reports) | Section 3.1 | 7 days | This action occurs within the 90 day Redetermination Decision Period | Part D RAC |
| 9 | Level 2 - Request for Reconsideration | Appendix A, Appendix C | 15 From Issue Date of Redetermination Decision | 7/29/2014 | Part D Plan Sponsors |
| 10 | Level 2 - CMS Reconsideration Decision | Appendix C | 30 From Receipt of plan sponsor's Request for Reconsideration | 8/29/2014 | CMS/Division of Policy & Regulatory Development (DPRD) |
| 11 | Revise Improper Payment Packages (Revise NIPs, Revise Exception Reports) | Section 3.1 | 7 days | This action occurs within the 30 day Reconsideration Decision Period | Part D RAC |
| 12 | CMS/DPOA submits payment adjustments forms to Division of Payment Operations (DPO) | Section 3.2 | Next scheduled Plan Data due date | 9/2/2014 | CMS/DPOA |
| 13 | Offset | Section 3.2 | Typically no more than 30 days but will vary based on the DPO payment schedule (Transmit after all appeal levels have been exhausted) | 10/1/2014 or later | CMS/DPO Year 2014 MA Monthly Schedul |
| 14 | CMS/DPOA notifies RAC that recoupment has been made | Section 3.2.4 | 15 | 10/8/2014 | CMS/DPOA |
| 15 | RAC Invoice | Section 3.2.4 | 15 Upon Notification of Recoupment by CMS | 10/23/2014 | Part D RAC |
| 16 | RAC Payment | N/A | 30 | 11/23/2014 | CMS/OFM |
| Total Audit Cycle | | | 299 | | |

A426

A00515

164

**Part D RAC Contract, OY2 SOW**

**EXHIBIT 22**

A00522

# MEDICARE PART D
# RECOVERY AUDIT SERVICES

### CONTRACT NO GS-23F-0074W
### TASK ORDER NO: HHSM-500-2011-00006G

### MODIFICATION 000016
### EXECUTION DATE - 12.31.14

171

A429

A00523

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | 1. CONTRACT ID CODE | | PAGE OF PAGES | |
|---|---|---|---|---|
| | | | 1 | 1 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 000016 | 01/01/2015 | N/A | |

| 6. ISSUED BY | CODE | ASG - DPIFMC | 7. ADMINISTERED BY (If other than Item 6) | CODE | AGG/JM |
|---|---|---|---|---|---|

CMS,OAGM,ASG,DPIFMC
7500 SECURITY BLVD., MS: C2-21-15
BALTIMORE MD 21244-1850

Justin Menefee
Contract Specialist

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code) | (x) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|

ACLR, LLC
Attn: CHRIS MUCKE
550 FOREST AVENUE
SUITE 15-2
PLYMOUTH MI 481703793

9B. DATED (SEE ITEM 11)

x | 10A. MODIFICATION OF CONTRACT/ORDER NO.
GS-23F-0074W

HHSM-500-2011-00006G

10B. DATED (SEE ITEM 13)

| CODE | 780272873 | FACILITY CODE | 01/13/2011 |
|---|---|---|---|

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers  ☐ is extended.  ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
N/A

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
|---|---|
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:  FAR 43.103 (a)  Bilateral Modification |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT:    Contractor  ☐ is not.  ☒ is required to sign this document and return _____1_____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Tax ID Number:  20-2662374
DUNS Number:  780272873
The purpose of this modification is to:
1. Exercise Option Period 2 for the period of January 1, 2015 through December 31, 2015;
2. Incorporate a revised statement of work dated January 1, 2015.
All other terms to this contract remain the same.
Period of Performance: 01/13/2011 to 12/31/2015

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| GILBERT MUCKE  ACLR COMPLIANCE OFFICER | Nicole Hoey |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| (Signature of person authorized to sign) | 12/31/14 | (Signature of Contracting Officer) | |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

172

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850

**Center for Program Integrity**
HHSM-500-2011-00006G



# Medicare Part D RAC
# Statement of Work

~~December~~ January 1, 2015~~31~~, 201~~4~~

173

A00525

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

## Table of Contents

1.0   Introduction and Background ............................................................................................ 1 - 3
   1.1   Commonly Used RAC Terms and Acronyms
   1.2   Part D RAC Introduction and Scope
      1.2.1   Part D RAC Scope
      1.2.2   Part D RAC Methodology
      1.2.3   Part D Contracts Excluded from RAC Requirements
2.0   RAC Audit Activities/ Methodology ................................................................................ 3 - 6
   2.1   Improper Payment Review Process
      2.1.1   Improper Payment Impact Calculation Methodology
      2.1.2   Improper Payment Reporting and Tracking
         2.1.1.1   Improper Payment Review Package
         2.1.1.2   No Determination Report
   2.2   Validation of RAC Audit Findings
      2.2.1   RAC/DVC Dispute Resolution
   2.3   Notification Process
      2.3.1   Notification of Improper Payment Letters
3.0   Post-Audit Activities ......................................................................................................... 6 - 8
   3.1   Appeals Process
      3.1.1   Recoupment During the Appeals Process
   3.2   Payment Adjustment Process
      3.2.1   Payment Collection
      3.2.2   Repayment through Plan Sponsor Recoupments
      3.2.2   Compromise and/or Settlement of Overpayment
      3.2.3   RAC Invoice Tracking
4.0   RAC Requirements/Tasks to be Performed ...................................................................... 8 - 10
   4.1   Basic Requirements
   4.2   RAC Audit Requirements
5.0   Key Personnel/Other Personnel ....................................................................................... 10 - 12
6.0   Quality Assurance .............................................................................................................. 12 - 13
   6.1   Part D RAC Oversight
   6.2   Cooperation/ Coordination
   6.3   Quality
   6.4   Standard Operating Procedures
   6.5   CMS Systems

Appendix A: "Sample Letters" .................................................................................................. 14 - 17
   Notification of Improper Payments
   Request for Additional Information
Appendix B: Schedule of Deliverables ..................................................................................... 18
Appendix C: Appeals Policy ..................................................................................................... 19 - 22
Appendix D: Improper Payment Impact Calculation Methodology ......................................... 23 - 24
Appendix E: Part D RAC Activities Timeline .......................................................................... 25 - 28

December 31, 2013

i

A432

A00526

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

# 1.0 Introduction and Background

Title I of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA) (P.L. 108-173) was signed into law on December 8, 2003. The MMA established a new voluntary outpatient prescription drug benefit under Part D of Title XVIII of the Social Security Act (the Act). The prescription drug benefit, referred to as Medicare Part D, as well as an employer subsidy for qualified retiree health plans, began on January 1, 2006. Coverage for the drug benefit will be provided by private prescription drug plans (PDPs) that offer drug-only coverage or through Medicare Advantage (MA) plans that offer both prescription drug and health care coverage (known as MA-PD plans). These plans must offer a standard drug benefit, but will have the flexibility to vary the drug benefit within certain parameters. The Recovery Audit Contractor (RAC) Program, which is designed to ensure proper payments to Part D Plan Sponsors    and providers, was initiated through demonstration programs mandated by the Medicare Modernization Act of 2003. The success of the initial pilot program for Medicare Parts A and B included the return of millions of dollars in overpayments to the Medicare Trust Fund. Based on that success, the Medicare Parts A and B RAC Program was permanently established on a national level through the Tax Relief and Healthcare Act of 2006.

Under the 2010 Patient Protection and Affordable Care Act (ACA) legislation enacted in March 2010, CMS is required to expand the RAC Program to the Medicare Advantage (Part C) ) and Prescription Drug Benefit (Part D) () programs. Section 6411(b) of the ACA provides CMS with general authority to enter into contracts to conduct RAC audits in Medicare Part D. Under the Medicare Integrity Program (MIP), RACs are to identify underpayments and overpayments and recoup any overpayments made associated with the Medicare program. The Part D RAC is dedicated to identifying past improper payments in reconciled Medicare PDE claims and providing information to CMS to help prevent future improper payments.

## 1.1  Commonly Used RAC Terms and Acronyms

For purposes of this Manual, the following list addresses some of the commonly used terms within the Part D RAC Program   A more comprehensive list can also be found in Appendix B, "Part D RAC Glossary of Terms and Acronyms."

- "Appeals Contractor" (Independent Review Entity) handles the first level of appeals from Plan sponsors challenging RAC findings.
- "Audit Scope" is a list of audit issues that the RAC is required to review during a given year.
- The "Center for Program Integrity" /(CPI) serves as CMS' focal point for all national and state-wide program integrity, fraud and abuse issues in the Medicare and Medicaid programs, and the Children's Health Insurance Program (CHIP). Specifically, the Division of Plan Oversight and Accountability (DPOA) is the division within the CMS/CPI Medicare Integrity Group responsible for ensuring program integrity for Parts C and D, and oversee Medicare Part D RAC.
- The "Data Validation Contractor" (DVC) measures the accuracy rate of the RAC. The DVC validates the improper payments identified by the RAC to determine if they are accurate and will review and approve/disapprove improper payment referrals, receive and review New Audit Issues the RAC wants to pursue for improper payments, and provide recommendations to CMS. CMS/CPI contracted with Livanta LLC for this duty.

December 31, 2013

1

A00527

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW  Division of Plan Oversight and Accountability

- "Improper Payment Review Package" (IPRP) is an improper payment file and the supporting documentation for a particular audit issue by contract and year.
- "New Audit Issue Review Package" (NAIRP) is the package of proposed audit issues and includes a sample of Prescription Drug Event (PDE) records for a specified contract year, a new audit issue, an estimate of improper payment amount and the audit methodology.
- The "Payment Recovery Information System" (PRIS) houses referrals made to CMS/CPI after improper payments are identified. The Part D RAC and DVC review the PDEs and their accompanying support submitted into PRIS. Then, the DVC either confirms or rejects the Part D RAC findings, and updates the IPRP in PRIS.
- "Prescription Drug Events" (PDEs) are summary records submitted every time a beneficiary fills a prescription under Medicare Part D. The PDE data are not the same as individual drug claim transactions, but are summary extracts using CMS-defined standard fields.
- The "Recovery Audit Contractor" (RAC) is responsible for reducing Medicare improper payments through the efficient detection of overpayments, underpayments, and assists with the identification of vulnerabilities that will prevent future improper payments. Originally implemented for FFS Medicare, the ACA (Section 6411(b)) expands the original RAC Program to Medicare Parts C and D. RACs are paid on a contingency fee basis.
- "Part D plan sponsors" (Plan sponsors) are private organizations that contract with CMS to administer Medicare Parts C and/or D benefits and may offer several different types of Medicare Part C and/or Part D plans. Plan sponsors include, but are not limited to, Medicare Advantage – Prescription Drug Plans (MA-PDPs), Prescription Drug Plans (PDPs).

## 1.2  Part D RAC Introduction and Scope

### 1.2.1  PART D RAC SCOPE

CMS/CPI determines the specific criteria on which the Part D RAC must submit to CMS as improper payments and new audit issues. To direct the Part D RAC's review, CMS/CPI mandates submission of potential improper payments by contract, issue type, and audit year. CMS further defines the audit scope to include the exact audit issue to be reviewed. Audit year will be the year of the data and for reconciled periods approved by CMS.

These issues can be sent to CMS as an Improper Payment Review Package (IPRP). The IPRP should include the contract number, issue type, audit year, and PDE records affected. The IPRP record will include the improper payment amount along with the RAC contingency fee amount.

As the Part D RAC progresses, new audit issues may be approved and added to the RAC's audit scope. In addition to the audit issues already approved by CMS/CPI, audit issues may be expanded to include new issues during the RAC process. A new audit issue must first be proposed to CMS for approval. The new issue shall be submitted in a New Audit Issue Review Package (NAIRP). The new audit issue shall include the issue type, audit scope, recovery estimate, a sample of PDE records, applicable law, policies, etc. and recommendation for automated or complex review. The Part D RAC will be responsible for the development of all new audit issues proposed by CMS. CMS and the Part D RAC will communicate as required to finalize audit issue processes and scope and also make determination of the requirement for a Complex or Automated Review as follows:

- Complex Review: A review determined to require a Request for Information from the plan sponsor to adequately validate conformance with CMS policy and applicable laws. This review

December 31, 2013

2

A434

A00528

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW — Division of Plan Oversight and Accountability

> is utilized where additional documentation, such as, prescriptions, prior authorizations, or other documentation is required from the plan sponsor.
> - Automated Review — A review completed based upon available PDE records where approved processes are considered to be acceptable without further review of prescription or other documentation.

In cases where CMS determines an interim issue approval for a complex review to determine effectiveness of preliminary approved processes, CMS reserves the right to change the type review for final audit issue approval.

### 1.2.2 PART D RAC METHODOLOGY

The Part D RAC Program conducts audits using a methodology that focuses on identifying and correcting improper payments to plan sponsors. Specifically, the Part D RAC Program uses recovery auditing and conducts reviews of individual Medicare Part D claims and PDE data to determine whether claims were billed properly. This methodology also allows for implementing procedures to prevent future improper payments. This will be described in further detail in Section 2.

### 1.2.3 PART D CONTRACTS EXCLUDED FROM RAC REQUIREMENTS

CMS office of Information Systems (OIS) will provide reconciled PDE records to the RAC. The RAC shall secure the data in a database and use the PDE records to help identify improper payments. The RAC shall track PDE records that were identified as Unavailable for Review (UFR).

CMS/CPI consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue. As a result, certain PDEs may be restricted from review by the Part D RAC. The following detailed scope UFR criteria applies to the Part D RAC contracts:

- **Terminated Contracts** - These contracts with plan sponsors have been contractually ended by CMS on a prior date and are no longer eligible for Part D claims payments.
- **Contracts Already Deemed to Have No Findings** - Contracts reviewed by the RAC where no improper payments were identified and a No Determination Report (NODR) was submitted to CMS. The RAC may not review these contracts for the same audit issue.
- **Contracts Already Included in an Offset** - Once the RAC identifies an overpayment in a contract, a subsequent process of recoupment is initiated through making monthly offsets against the plan sponsors' account. The RAC can review the contract for other audit issues.
- **Contracts Already Included in an Appeal** - Once the RAC identifies an overpayment in a contract and the plan sponsor initiates an appeal disputing the RAC findings, these contracts are in a "hold status" and excluded from recoupment until the appeal process is complete. The RAC can review the contract for other audit issues.

## 2.0 RAC Audit Activities/Methodology

Audit activities refer to the entire audit work stream performed under the Part D RAC Program as it relates to the Part D RAC. Since the responsible parties for Part D RAC audit functions include CMS/CPI personnel and support contractors, including and aside from the Part D RAC, the effective integration of each audit process and collaboration among stakeholders is critical to the program's success.

December 31, 2013       3

A00529

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

The following detail outlines the audit processes for identifying improper payments and compiling an audit package. Specific details related to each audit issue will be highlighted. This section also serves to summarize CMS/CPI's dedication to ensuring accuracy in audit findings and the means by which this will be accomplished.

## 2.1 Improper Payment Review Process

To begin this process, the RAC must:

- Retrieve reconciled PDE records from the Integrated Data Repository (IDR) system via CMS Office of Information Systems (OIS).
- Use other CMS systems to validate improper payments
- Perform PDE validation procedures – To ensure the validity of the PDE database, totals from the PDE database must be tied to the reconciliation file.
- Separate PDE records permanently unavailable for review, such as those discussed in Section 1.1.3 - "Part D RAC Excluded Contracts."
- Use CMS and other necessary data to validate improper payments for approved audit issues
- Record and update recommendations for new audit issues and update the NAIRP.

After the documentation is compiled, the Part D RAC can begin testing on audit issues and performing the subsequent improper payment calculations.

In order to identify improper payments based on approved audit issues, the Part D RAC will need to perform a thorough analysis of the PDE database provided or any other data source necessary as required for each approved audit issue. Depending on the audit issue, this database will be evaluated on a contract level, with improper PDEs being separately identified and compiled for each audit issue. Depending on the nature of the audit issue being evaluated, the RAC should be determining improper payments at 100% of the population, unless CMS directs the Part D RAC differently. The Part D RAC is required to coordinate with CMS prior to beginning work on approved audit issues. Outside of specific guidance from CMS, the Part D RAC can determine the scope of testing. In addition to the Part D RAC determining each improper PDE, the Part D RAC should ensure that any identified vulnerabilities, trends or inconsistencies aside from the audit issues are reported to CMS.

Once the preliminary actions are complete, two activity paths occur concurrently:

- On path 1, the RAC analyzes PDEs on approved audit issue specifics for potential improper payments. Once this analysis is complete, the RAC updates the status and determines whether a potential improper payment exists.  Once improper payments have been identified, the RAC will submit based on approved review methodology as follows:

  o Complex Review:  Contact the plan sponsor to obtain additional information, in the form of a Request for Information (RFI) communication (Appendix A – "Sample Letter"). This action will function as an opportunity for the plan sponsor to perform an initial review of the preliminary improper payments. The RAC will allow the plan sponsor a 30 day window in which they can provide the RAC additional information to negate all or some of the improper payments. Following this 30 day window, the RAC will complete their examination adjusting for any pertinent documentation received from the plan sponsor. Once complete, the RAC creates an Improper Payment Review Package (IPRP) and submits it to the DVC for validation via PRIS.  If no corroborating evidence is

December 31, 2013                                                                                     4

A00530

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

provided by the plan, the RAC shall commence with the Notification of Improper Payment Letter process outlined in Section 2.3 below.

o Automated Review: The RAC creates an Improper Payment Review Package (IPRP) and submits it to the DVC for validation via PRIS.

- On Path 2, the RAC analyzes PDEs, DIR or other approved audit issue specifics for potential fraudulent activities by the Part D plan sponsor.
  o If no potential fraudulent activity exists, this path ends.
  o If the RAC determines that potential fraudulent activity exists, they prepare and submit the fraud referral to the COR.

### 2.1.1 NEW AUDIT ISSUE APPROVAL PROCESS

The RAC must receive approval from CMS/CPI prior to commencing recovery audit activities. As outlined in *Appendix E, New Issues Submission and Approval Process*, the RAC submits a New Audit Issue Review Package (NAIRP) to the COR. This NAIRP contains a proposed audit issue, samples of PDE records, an outline of the processes utilized to identify improper payments, supporting statutory, regulatory, and administrative memoranda, and an estimate of improper payment amounts owing. Once submitted, the RAC works with CMS/CPI to refine and approve or deny the NAIRP. Once approved the RAC begins recovery audit activities.

### 2.1.2 IMPROPER PAYMENT IMPACT CALCULATION METHODOLOGY

The RAC should consult with CMS for guidance on improper payment impact calculation methodology. CMS's approved methodology, for each audit issue, must be used by the RAC to determine the improper payment amount. At CMS's request, the RAC must perform frequent analysis and re-running of potential findings to see various impacts and projections at any time. The RAC must adhere to CMS guidance on determining what constitutes an improper finding to be included in calculating the improper payment impact. Due to the nature of PDEs and the payment reconciliation process, this calculation will need to be carefully fine-tuned in coordination with CMS prior to the RAC determining impact. Reference Appendix D for further guidance on this methodology.

### 2.1.3 IMPROPER PAYMENT REPORTING AND TRACKING

#### 2.1.3.1 Improper Payment Review Package (IPRP)

After the RAC identifies an improper payment, as approved under *Section 2.1.1 New Audit Issue Approval Process*, it compiles an Improper Payment Review Package (IPRP). The IPRP contains the PDE exception reports and the supporting documentation identifying improper payments corresponding to a particular audit issue by contract. A unique ID is assigned to a Package and will be included on and associated with all future tracking reports and letters such as Validation Findings, Notification Letters, Appeal Notifications, Monthly Plan Payment Adjustments, and Invoices. The IPRPs will be unique for each contract, for each year for each audit issue.

#### 2.1.3.2 No Determination Report (NODR)

The NODR is a report generated by the RAC to reflect that there were no improper payments identified on the PDEs being reviewed. Once the RAC files a NODR, the audit process for that package is stopped. A NODR signifies that the contract is flagged to be error-free and excluded from future RAC review for the same audit issue.

December 31, 2013

5

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

## 2.2  Validation of RAC Audit Findings

CMS/CPI contracts with the Data Validation Contractor to perform a review of the IPRP and to submit an IPRP validation finding. The DVC will have 45 calendar days  to complete their review process An extension may be granted to the DVC if the review's error rate is 25% or more.

The RAC must concur or non-concur with the validation findings submitted by the DVC. Concurred validation findings will continue through the RAC process.

### 2.2.1  RAC/DVC DISPUTE RESOLUTION

For RAC findings the DVC disagrees with, the DVC must provide a rejection reason and explanatory comments, including their recovery calculations, in the PRIS.

The Part D RAC is required to review all disagreements identified by the DVC and either accept or reject the DVC's validation findings. When the Part D RAC agrees with a rejected IPRP Validation finding, the file is considered validated, all associated PDE records will be removed from the UFR file. When the Part D RAC disagrees with the DVC, they must show support for their findings and offer assistance in understanding the process behind decisions to exclude these disputed PDEs. The Part D RAC should submit this new package with updated data.

The RAC must collaborate with the DVC to attempt resolution of any dispute. Disputes will be entered and tracked through CMS systems. The RAC and DVC should attempt to resolve any disputes within 7 calendar days. If the RAC and DVC cannot come to a resolution, CMS shall make the final decision, which cannot be reviewed or contested by either the RAC or DVC. CMS does not need any statutory or regulatory reference to deny a RAC finding. CMS also has the right to establish minimums and thresholds that the Part D RAC findings must meet to be considered for recoupment. At the conclusion of CMS' decision, the Part D RAC shall submit a new package with the final updated, CMS approved, PDE and reconciliation data to the DVC and/or CMS.

## 2.3  Notification Process

### 2.3.1  NOTIFICATION OF IMPROPER PAYMENT LETTERS

CMS is required to issue a Notification of Improper Payment Letter (Appendix A – "Sample Letters") to the plan sponsor once an improper payment is identified and validated.   The letter is formatted by the Part D RAC and uploaded in CMS' systems. The process is further explained in section 3.2, Payment Adjustment Process and Appendix E – Part D RAC Activities Timeline for individual tasks, deadlines and responsible parties.

As per the Part D RAC appeal policy detailed in Appendix C titled "Appeals Policy," the plan sponsor has 30 days to respond to any Notification of Improper Payment Letter. The response period is based on the date that appears on the Notification of Improper Payment Letter. If an appeal with supporting documentation is not received within 30 days, payment collection will be initiated once the data associated with the identified overpayment has been cleared through CMS' internal processes.

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

# 3.0  Post-Audit Activities

Once the Part D RAC identifies improper payments and the DVC validates those payments, post-audit activities commence. This section describes the appeals process, and the guidelines that govern those post-audit activities including the details, reporting requirements and communications needed for the appeals and payment processes. This process is extremely important to the Part D RAC, who is paid by contingency fee, and cannot receive payment for their services from CMS/CPI until the payment process is complete and payment is received from the Part D contract, per section 1893(h)(1)(A) of the Act. In addition, this section will describe the payment collection process in the case an appeal is not pursued.

## 3.1  Appeals Process

CMS/CPI provides Part D contracts that disagree with the Part D RAC's findings a chance to appeal the RAC's decision. CMS/CPI currently proposes a two level appeals process. More guidance regarding the plan sponsors' ability to appeal can be found in "Appendix C: Appeals Policy, **Appeals Process for Identified Overpayments by the Medicare Part D Recovery Audit Contractor (RAC)**". CMS's appeals policy is subject to change and may include third parties.

In addition, prior to, during and after the appeal period, the RAC is required to provide support throughout the appeals process. This includes providing support or documentation related to the IRRP, such as performing recalculations due to overturned appeal decisions, revising Notification of Improper Payment, revising PDE exception reports, handling and tracking questions from plan sponsors as well as consulting with the appeals team, as necessary. Specifically, if a request is made, the RAC shall have up to 15 calendar days to submit the requested information and data. The RAC, with guidance from CMS, should assist plan sponsors in understanding the findings prior to an appeal being submitted.

### 3.1.1  RECOUPMENT DURING THE APPEALS PROCESS

If a plan sponsor files an appeal within the appropriate timeframes, following CMS guidance in Section 1893(f)(2) of the Social Security Act, all recovery efforts shall cease.

## 3.2  Payment Adjustment Process

The Part D RAC shall not attempt recoupment for any adjustment. CMS/CPI will collect Medicare Part D Improper Payments by adjusting the plan sponsors' monthly payments that are paid out of the Medicare Trust Fund. Once the Administrator determines which Level 3 appeals will be accepted, all levels of appeal have been exhausted CMS systems will transmit a file to adjust the improper payment from the contract's monthly payment that did not appeal to Level 3 or have been rejected for review by the Administrator. If the Part D RAC receives any payment made out to the Part D RAC from the Part D plan sponsor, they must contact the CMS COR immediately.

There may be instances when the plan sponsor will submit a check as refund of an improper payment, i.e. if the plan sponsor's monthly payment cannot support the improper payment. All checks shall be sent to CMS for processing. If the RAC receives any form of payment from the plan sponsor, the RAC must deny payment acceptance and must notify CMS immediately. If the Part D RAC receives any payment made out to the Part D RAC from the Part D plan sponsor, they must contact the CMS COR immediately.

A00533

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

### 3.2.1  PAYMENT COLLECTION

DPOA will be using a series of systems to recoup improper payments from the plan sponsor. To begin, the Part D RAC will prepare the Notification of Improper Payments letter and the final complete IPRP. The submission of both of these items is contingent on the Aggregate Plan Payment System (APPS) payment clock. The APPs system makes payments to the plan sponsors by approximately the 30th of each month. In order for any adjustments to be reflected for a monthly payment, the adjustment must be received by approximately the 10th of the previous month. In order to allow CMS time to adjust for any timing differences or changes in the payment schedule, the RAC shall submit their IPRPs by the 5th of each month or another date specified by CMS.

### 3.2.2  REPAYMENT THROUGH PLAN SPONSOR RECOUPMENTS

The RAC will receive a contingency payment once the full overpayment amount has been recouped from the plan sponsor.

### 3.2.3  COMPROMISE AND/OR SETTLEMENT OF OVERPAYMENT

If the plan sponsor presents CMS with a compromise request or settlement offer and CMS determines that a compromise and/or settlement is in the best interest of Medicare, the Part D RAC shall receive a contingency payment for the portion of the improper payment amount that was recouped.

### 3.2.4  RAC INVOICE TRACKING

Once the improper payment has been adjusted from a plan's monthly payment or a check has been received, CMS will notify the RAC of the recoupment and the Part D RAC shall send an invoice to CMS. The invoice shall include the contingency fee associated with the IPRP. Contingency fees are only associated with the portion of the improper payments identified by the Part D RAC and recouped by CMS.

## 4.0  RAC Requirements/ Tasks to be Performed

## 4.1  Basic Requirements

#### Kick-off Meeting

The Part D RAC shall work with the COR to determine a mutually agreeable time to conduct the Kickoff meeting. This meeting shall be held no later than 14 calendar days after the contract is awarded. The kickoff meeting shall include, at a minimum, the following information:
- Introduction of key personnel.
- Discussion of the draft Project Work Plan and how work will be completed in order to meet deadlines.
- List of all deliverables.

Within 5 business days from the kick-off meeting, the RAC is required to electronically submit meeting minutes.

December 31, 2013

8

A440

A00534

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

### System Security Plan

The Contractor shall ensure security of sensitive information as well as provide and implement a written security and plan covering all aspects of this task order. The Contractor shall maintain oversight of the physical location of the protected medical information and other proprietary information. The Contractor shall store and dispose of the records/documents/files containing protected medical information and other proprietary information in accordance with CMS guidelines, and as instructed by the COR.

Specifically, the Part D RAC shall include a draft System Security Plan (SSP) using the current template available at the CMS Information Security "Virtual Handbook" Web site at http://www.cms.gov/InformationSecurity. The details contained in the RAC's draft SSP shall be commensurate with the size and complexity of the other requirements of the SOW based on the System Categorization determined elsewhere in this document. The System Security Plan shall be submitted no later than 14 calendar days after contract award. The RAC shall be required to update and resubmit its SSP to CMS every three years (at a minimum) following award or when a major modification has been made to its internal system, as defined by the CMS CISO.

### Project Work Plan

The RAC is required to submit a draft Project Work Plan (PWP) within 14 calendar days after the contract is awarded. The PWP is a description of how the RAC plans to accomplish the requirements of the SOW. Specifically, the PWP should include:
- The RAC's review approach, staffing, scheduling, etc.
- All contact information for the RAC's staff.
- Anticipated risk and risk mitigation, including vulnerabilities with program and data.

This document is subject to CMS review and acceptance. Upon CMS review, the RAC will submit a finalized PWP electronically. All PMPs shall be modified and updated continuously after the initial submission to reflect any major changes in the project. When changes are identified, a revised PMP should be submitted for review within 10 days of identifying the change. If no revisions are received, the resubmitted PWP should be considered final.

### Monthly Progress Reports

The Part D RAC shall submit Monthly Progress Reports to the COR and by the 15th of each month for the previous months' effort. The COR and the Contractor shall agree upon the content and format of the Monthly Progress Report as this may change periodically. At a minimum, the monthly progress report should include:
- Administrative Actions
- Progress status by audit issue
- Summaries of applicable meetings (internal and external)
- Areas of concern requiring CMS action/attention
- Any unresolved issues
- List of activities completed to date
- List of upcoming activities
- Summary of improper payments (by contract) to date
- Listing of any concerns from Plans
- Tracking log of communications between the Part D RAC and the plan sponsors

December 31, 2013                                                                                   9

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW   Division of Plan Oversight and Accountability

As a supplement to the monthly report, the Total RAC Invoice Amount Report and Total Improper
Payment by Contract Report should be submitted.

### Total RAC Invoice Amount Report

The Part D RAC should include the Total RAC Invoice Amount Report with their Monthly Progress
Report. This report will show the total contingency amount submitted for payment by the Part D RAC
along with amounts received and outstanding from CMS. The associated improper payment total should
also be identified in this report.

### Total Improper Payment by Contract Report

The Part D RAC should include the Total Improper Payment by Contract Report with their Monthly
Progress Report. This report will show the total improper payments to date by contract number. Each
entry should identify the contract number, Plan ID number, number of improper PDEs, the identified
over/underpayments and the total improper payment amount.

### Final Report

At the completion of every audit issue for a particular year and every contract, the Part D RAC shall
submit to CMS a final report within 30 calendar days. The final report shall include a synopsis of the
entire project as it relates to that audit issue for a particular year. The final report should identify the total
amount identified, demanded, collected, appealed, and any amounts outstanding. It should include a brief
explanation of the procedures utilized to identify the improper payments. The final report is subject to any
other topics CMS feels should be included.

The final report shall be delivered to CMS electronically.

## 4.2  RAC Audit Requirements

As discussed in the sections above, the Part D RAC is required to complete the Improper Payment
Review Package (IPRP), No Determination Report (NODR), IPRP Validation Findings dispute, and the
Notification of Improper Payment Letters, as applicable for each audit issue/contract.

# 5.0  Key Personnel/Other Personnel

The Contractor shall maintain a staff of key personnel positions as necessary and within the requirements
identified below. Key personnel shall not serve dual responsibilities in key functions unless approved by
the Contracting Officer, i.e., the Program Director may not also serve as the Audit Manager. Changes in
key personnel positions shall be submitted to the Contracting Officer in writing for approval within **30
days prior** to any change.

A significant amount of confidential information will be reviewed under this contract. Therefore, all
contractor and subcontractor personnel working on this task order shall submit a signed Non-Disclosure
Statement prior to the start of the project.

When key personnel positions are vacated due to unforeseen circumstances, a proposed replacement shall
be submitted in writing for approval no later than **30 calendar days** from the date the position was

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

vacated. Interim replacements should be identified when a permanent replacement cannot be identified within this time frame. CMS may consider a **60-day** interim replacement until a permanent replacement is secured.

Unless otherwise approved by the Contracting Officer, the key personnel noted below shall possess the following minimum work experience and educational requirements:

**Program Director**

The Program Director shall possess:

Work Experience
Ten or more years of professional experience with at least three years as a manager responsible for managing complex systems and work flow. Experience in audit recoveries is required.

Educational Requirements
A bachelor's degree from an accredited institution, plus a master's degree from an accredited institution or substitution of 4 additional years of related work experience in lieu of the master's degree.

**Audit Director**

The Audit Director shall possess.

Work Experience
A minimum of 5 years in an audit and reimbursement setting; Medicare audit and reimbursement setting is preferred.

Understanding of Government Auditing Standards, audit procedures, and financial analysis techniques.

Educational Requirements
An advanced degree in finance or accounting; Certified Public Accountant (CPA) or Certified Management Accountant (CMA) certificate is desired.

**Systems Security Officer**

The Systems Security Officer shall possess:

Work Experience.
A minimum of 5 years experience managing complex security programs/systems, implementing necessary safeguards, and ensuring all artifacts are current and up-to-date.

Educational Requirements.
A bachelor's and a master's degree; 5 additional years of related work experience may be substituted in lieu of master's degree.

**Other Personnel**

Although not considered key personnel positions, the following labor category personnel may be required for this SOW. When required, the respective job classification requirements are essential for performance under this contract. Waiver(s) from the essential personnel requirements may be submitted in writing to

December 31, 2013                                                                                                11

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

the Contracting Officer for approval. All waiver requests should include a copy of a resume along with supporting rationale for the deviation from these requirements.

**Lead Statistician**

The Lead Statistician shall possess the following:

Work Experience
A minimum of 5 years experience using statistics to support corporate/business information needs.

Experience in statistical detection of fraud, fuzzy logic, development of mathematical models, neural networks, and data mining or other analytical methods. Demonstrated experience and knowledge of health care information (health claims data, provider identifiers, etc).

Educational Requirements
Bachelor's degree in statistics or related field.

**Manager, Medicare Part D**

The Manager, Medicare Part D shall possess:

Work Experience
A minimum of 5 years experience specific to benefit administration, payment, and Part D policy and regulations. The Manager, Medicare Part D shall also possess an in-depth knowledge and understanding of the Medicare Part D Program.

Educational Requirements
A bachelor's and a master's degree; 5 (five) additional years of related work experience may be substituted in lieu of the master's degree.

Knowledge of Medicare law, regulations, manuals, and instructions is required.

**Pharmacist**

The Pharmacist shall possess:

Work Experience
A minimum of 3 years professional pharmacy experience. Experience in pharmacy claims processing, reviewing pharmacy claims and implementing pharmacy edits to ensure appropriate utilization is highly desirable.

Education
Pharm.D. degree or Four-year bachelor's degree in pharmacy recognized by the American Council on Pharmaceutical Education.

Licensure
Must be licensed to practice pharmacy in a State, territory of the United States, or the District of Columbia.

December 31, 2013

12

A444

A00538

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

Knowledge of Medicare Part D law, regulations, manuals, and instructions is preferred.

# 6.0 Quality Assurance

CMS will utilize a number of quality assurance procedures to ensure contractor compliance with this contract. Examples include inspection of deliverables, review of reports, onsite progress meetings, performance evaluations, etc.

Contractors shall develop and maintain quality assurance procedures for work paper reviews, IT requirements, PDEs, etc. Contractors shall also ensure that data is physically secured and Personal Health Information (PHI) data is handled confidentially. This is required for subcontractors as well. These should be provided to CMS upon request.

## 6.1 Part D RAC Oversight

CMS will conduct Part D RAC oversight at either the RAC's site or at the appropriate CMS office. CMS has the right to request/review any work performed by the contractor at any time; this includes work papers, reports, support for findings, etc. After completion of the engagement, CMS may hold a conference with the Part D RAC to discuss any issues. CMS may choose to visit the Part D RAC site to assess their performance.

## 6.2 Cooperation/Coordination

The Contractor shall cooperate and coordinate with stakeholders other than CMS, including Affiliated Contractors (ACs), and other entities as appropriate. Contractor performance will be evaluated using measures including, but not limited to:
- Demonstration of ongoing dialogue or meetings with the appropriate and necessary parties;
- Feedback from other entities; and
- Number and type of issues that arise and indicate communication, or lack of communication, between appropriate entities and the Contractor.

## 6.3 Quality

The Contractor shall maintain the highest degree of quality for all activities performed throughout the period of performance of the contract. CMS will evaluate Contractor performance using measures including, but not limited to:
- Completeness and accuracy of data analysis;
- Completeness and accuracy of all deliverables.

## 6.4 Standard Operating Procedures

The Contractor shall submit detailed Standard Operating Procedures (SOPs) to CMS/CPI for each approved audit issue. At a minimum, the SOPs should include the contractor's methodology for the approved audit issue. The methodology should detail the specific steps the contractor undertook in order to arrive at the potential improper payment.

December 31, 2013 13

A00539

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW   Division of Plan Oversight and Accountability

## 6.5  CMS Systems

The Contractor shall update CMS systems with Medicare Part D Data and to store and track Medicare Part D improper payments.

**Government Property**
No Government Furnished Property shall be issued for this effort.

December 31, 2013

14

A00540

# **Appendix A: "Sample Letters"**

**SUBJECT: Notification of Improper Payment**

Date: mm/dd/yyyy

**SUBJECT: Notification of Improper Payment**

CEO NAME
CONTRACT NAME
ADDRESS LINE 1
ADDRESS LINE 2
CITY, STATE, ZIP

RE: CONTRACT NAME, CONTRACT#

Dear PREFIX CEO LAST NAME:

The Centers for Medicare & Medicaid Services (CMS) has retained ACLR to carry out the Recovery Audit Contractor (RAC) program efforts for Medicare Part D. The Division of Plan Oversight and Accountability (DPOA) within the Center for Program Integrity (CPI) is responsible for the Part D RAC program. The RAC program, mandated by Congress through the Affordable Care Act, is aimed at identifying Medicare improper payments.

This letter is to notify you that CMS has made an overpayment to CONTRACT NAME in the amount of $XXXX.XX. This overpayment was calculated based on data analysis performed by the RAC on Prescription Drug Event (PDE) data submitted to CMS from all plan IDs under CONTRACT # for the XXXX plan year. The RAC's review of this PDE data was focused on payments made by CONTRACT NAME to excluded pharmacies and for prescriptions ordered by excluded physicians.

Under 1862(e)(1) of the Social Security Act, and implementing regulations at 42 C.F.R. § 1001.1901(b)(1), Medicare payment may not be made for items or services furnished by an excluded provider or entity or on the prescription of an excluded physician. Specifically, 42 C.F.R. § 1001.1901(b)(1) provides, "no payment will be made by Medicare, Medicaid or any of the other Federal health care programs for any item or service furnished, on or after the effective date specified in the notice period, by an excluded individual or entity, or at the medical direction or on the prescription of a physician or other authorized individual who is excluded when the person furnishing such item or service knew or had reason to know of the exclusion." Additionally, in HPMS memos to plan sponsors, dated January 13, 2010 and March 29, 2010, CMS made clear that, "Medicare payment may not be made for items or services furnished by an excluded provider or entity or on the prescription of an excluded physician." We clarified in the January 13, 2010 memo that these prohibitions, "apply not only to drugs prescribed by excluded providers, but also claims for prescription drugs dispensed

December 31, 2013                                                                                  15

189

A447

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

by excluded pharmacies." Payments made by CMS to a plan sponsor for prescriptions filled by excluded pharmacies or written by excluded prescribers constitute an overpayment by CMS.

The $XXX.XX was calculated by identifying excluded servicing providers (pharmacies) and excluded prescribers by their identifiers in each PDE record. The RAC then determined the overpayment amount by calculating the effect of the payment made to the excluded pharmacy or for the prescription ordered by the excluded prescriber on reinsurance and Low Income Cost- Sharing (LICS) amounts. To adjust the reinsurance subsidy, the RAC subtracted all impacted PDE amounts for Gross Drug Cost Above (GDCA) the catastrophic phase from the originally reported final reconciliation numbers for each plan benefit package (PBP) under CONTRACT#. The RAC findings were also reflected in the Direct and Indirect Remuneration (DIR) ratio by subtracting the impacted PDE amounts for GDCA and Gross Drug Cost Below (GDCB) from the original DIR ratio calculation. LICS was adjusted by removing the total LICS amount associated with RAC identified improperly paid PDEs. The revised amounts for reinsurance and LICS were then added to the original risk sharing amount (risk-sharing was not altered due to RAC findings) to determine the RAC identified impact amount. The difference between the 2010 reconciliation final amounts, which includes the original LICS, original reinsurance and original risk sharing amounts, and the RAC revised amount, which includes the revised LICS, revised reinsurance and original risk sharing amount, is what CMS has determined was improperly paid.

A brief description of the Prescription Drug Events (PDEs) associated with this improper payment can be found on the *Improper Payment Exception Report* provided in an encrypted file along with this letter. An interim adjustment in the amount owed will be made to your monthly payment, which will be reflected in your Membership Detail Report approximately two months from the date of this letter. Prior to CMS running a reopening of 2010 reconciliation, this interim adjustment will be credited back to CONTRACT NAME. It is the plan's responsibility to delete the PDEs identified in the exception report to correct any errors in the PDEs identified by the RAC, before the reopening of the 2010 reconciliation.

CMS provides plan sponsors with a three-tiered appeals process, should the plan sponsor disagree with the assessment of the improper payment(s). You have 60 calendar days from the date of this notification to submit a Request for Reconsideration to CMS. Once the Request for Reconsideration is filed, CMS' Independent Reviewer will review the supporting documentation and provide a Reconsideration Decision. Within 30 calendar days from the date of the Reconsideration Decision, the plan sponsor may file with CMS a Request for Hearing Official Review. If the Reconsideration Decision is not appealed, it will become the final agency decision. If the plan sponsor does submit a Request for Hearing Official Review, CMS hearing official will review it and then issue a decision in 60 days. Within 30 calendar days from the date of Hearing Official Decision, the plan sponsor may request a CMS Administrator Review. If the plan sponsor does not submit a request for CMS Administrator Review, the Hearing Official Decision will be the final agency decision. To appeal a decision, an email with all supporting documentation must be sent to ACLR at info@ACLRRAC.com and CMS at PartDRACReconsiderations@cms.hhs.gov. Applicable guidance about the Reconsideration, CMS Hearing Official Review and CMS Administrator Review processes. The

December 31, 2013                                                                                          16

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW   Division of Plan Oversight and Accountability

required appeal templates can be found at: http://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Part-D-RAC-Appeal-Process.html.

The appeal must be submitted in the following format:

Include the contract number and "RAC Reconsiderationtion Request" in the subject line of the email (ex. "H1234 RAC Reconsideration Request").

Documentation must be submitted to CMS by CONTRACT#, using the template provided by CMS. If a plan sponsor is requesting a reconsideration for multiple contracts, each request must be submitted individually by contract; all supporting documentation must be carefully categorized, clearly legible, easily understood and cross referenced where necessary. All relevant information to the Request for Reconsideration of this notification must be included in this initial submission to be considered for review. If the documentation provided by the sponsor in support of its Request for Reconsideration is not sufficient for CMS to appropriately consider the Request for Reconsideration, CMS will provide notice to the sponsor that its submission has not been accepted. The sponsor will then have the balance of the remaining 60 calendar day timeframe to submit a revised Request for Reconsideration. The plan will receive an email within two (2) business days acknowledging that the appeal was received by CMS.

CMS Independent Reviewer will issue a decision after receiving and reviewing the plan's Request for Reconsideration. The plan then has 30 days to ask for a Request for CMS Hearing Official Review by emailing CMS at CMSHearingOfficial_Review@cms.hhs.gov with the contract number and "RAC Request for CMS Hearing Official Review" in the subject line (ex. "H1234 RAC Request for CMS Hearing Official Review"). A hearing official decision will be issued within 60 days of the request for CMS Hearing Official deadline. The plan will then have 30 days to request a CMS Administrator Review of the Hearing Official's Decision by emailing CMS at CMSAdministrator_Review@cms.hhs.gov with the contract number and "RAC Request for CMS Administrator Review" in the subject line (i.e.; "H1234 RAC Request for CMS Administrator Review" . The CMS Administrator has 45 days to accept or reject

If you have questions or would like to discuss the process by which ACLR detected or calculated the overpayment, please direct your inquiry to ACLR at 1-855-722-6333.

Sincerely,


Director, Division of Plan Oversight and
Accountability
Centers for Medicare & Medicaid Services

December 31, 2013                                                                 17

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

Enclosures: Level 1 Part D RAC Appeal Redetermination Package
             Exception Report

cc:
CFO NAME
MCO NAME
AM NAME

CMS provides plan sponsors with a two-tiered appeals process, should the plan sponsor disagree with the assessment of the improper payment(s). You have 30 days from the date of this notification letter to submit a Request for Redetermination to CMS. Once the Request for Redetermination is filed, CMS will review the supporting documentation and provide a Redetermination Decision. Within 15 days from the date of the Notice of Redetermination Decision, the plan sponsor may file with CMS a Request for Reconsideration. If the Redetermination Decision is not appealed, it will become the final agency decision. If the sponsor does submit a Request for Reconsideration, CMS will review it and then issue a final agency decision. To appeal a decision, an email with all supporting documentation must be sent to ACLR at info@ACLRRAC.com and CMS at PartDRACAppeals@cms.hhs.gov. Applicable guidance about the Redetermination and Reconsideration processes as well as the required appeal templates can be found at http://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Part-D-RAC-Appeal-Process.html.

The appeal must be submitted in the following format:

Include the contract number and "RAC Redetermination Request" in the subject line of the email (ex. "H1234 RAC Redetermination Request").

Documentation shall be submitted to CMS by CONTRACT#, using the template provided by CMS. If a sponsor is requesting a redetermination for multiple contracts, each request must be submitted individually by contract; all supporting documentation should be carefully categorized, clearly legible, easily understood and cross-referenced where necessary. All relevant information to the Request for Redetermination of this notification must be included in this initial submission to be considered for review. If the documentation provided by the sponsor in support of its Request for Redetermination is not sufficient for CMS to appropriately consider the Request for Redetermination, CMS will provide notice to the sponsor that its submission has not been accepted. The sponsor will then have the balance of the remaining 30-day timeframe to submit a revised Request for Redetermination. The plan will receive an email within two (2) business days acknowledging that the appeal was received by CMS.

CMS will issue a decision within 90 days of receiving the plan's Request for Redetermination. The plan then has 15 days to ask for a Request for Reconsideration by emailing CMS at PartDRACReconsiderations@cms.hhs.gov with the contract number and "RAC Request for Reconsideration" in the subject line (ex. "H1234 RAC Request for Reconsideration").

December 31, 2013                                                                 18

192

A450

A00544

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

If you have questions or would like to discuss the process by which ACLR detected or
calculated the overpayment, please direct your inquiry to ACLR at 1-855-722-6333.

Sincerely,


Tanette Downs
Director, Division of Plan Oversight and Accountability
Centers for Medicare & Medicaid Services

Enclosure: Level I Part D RAC Appeal Redetermination Package


cc:
CFO NAME
CO NAME

December 31, 2013                                                      19

A00545

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

## SUBJECT:  Request for Additional Information

RAC Point of Contact
Plan Sponsor Name
Plan Sponsor Street Address
Plan Sponsor Street Address 2
City, State, Zip

RE:  Request for Information

Dear RAC Point of Contact:

The Centers for Medicare & Medicaid Services (CMS) has contracted with ACLR Strategic Business Solutions, LLC to carry out the Recovery Audit Contractor (RAC) program for Medicare Part D.  As part of our initial duplicate payment review for CY XXXX, we have identified the Prescription Drug Events (PDEs) in the attached report as duplicate payments, resulting in improper payments made by CMS.  The PDEs will be used as the basis for our calculation of any improper payments.  In an effort to ensure the accuracy of this information, we are allowing [Plan name], [Contract #], 60 (90 days if directed by CMS) calendar days from the date of this notification to submit documentation in support of or against the improper payments currently identified.  We will consider any documentation received within this 60 (90 days if directed by CMS) day window.  Any documentation received after this time frame will not be factored into our improper payment calculation.

If an improper payment is determined at the conclusion of our review, a Notification of Improper Payment letter will be issued to [Plan Name], [Contract#].  The letter will inform you of the improper payment amount as well as appeal instructions should you disagree with our findings.  Please review the attached report and submit your response via Secure Mail to info@ACLRRAC.com within 60 (90 days if directed by CMS)days from the date of this request.  Any questions directly related to this information request can be sent to PartD_RACCommunications@cms.hhs.gov.

Sincerely,


Christopher Mucke
Part D RAC Program Director
ACLR Strategic Business Solutions, LLC


December 31, 2013                                                                                          20

A00546

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

# <u>Appendix B:  Schedule of Deliverables</u>

The contractor shall submit all required reports and deliverables in accordance with the statement of work and the following schedule

| Task Descriptions | Quantity/ Recipient | Delivery Schedule |
|---|---|---|
| Kick-off Meeting | Due to the COR | No later than 14 calendar days after contract award |
| Kick-off Meeting Minutes | Electronically to the COR | Within 5 business days from the kick-off meeting |
| System Security Plan | Due to the COR | No later than 14 calendar days after contract award |
| Project Work Plan Draft | Electronically to the COR | No later than 14 calendar days after contract award |
| Project Work Plan Final | Electronically to the COR | Within 10 days of CMS revisions |
| Vulnerability Report | Due to the COR | Monthly |
| Progress Report | Electronically to the COR | By the 15th of each month for the previous month's efforts |
| Total RAC Invoice Amount Report | Electronically to the COR | Due with the Monthly Progress Report |
| Total Improper Payment by Contract Report | Electronically to the COR | Due with the Monthly Progress Report |
| Final Report | Electronically to the COR | At the completion of an audit issue for every contract for a particular year |
| Ad-hoc Reports | Due to the COR | Upon Request |
| Recalculation of Impacts | Due to the COR | Upon Request |

December 31, 2013

21

# Appendix C:  Appeals Policy

### Appeals Process for Identified Overpayments by the Medicare Part D Recovery Audit Contractor (RAC)

Section 6411(b) of the Affordable Care Act expanded §1893 of the Social Security Act to extend the recovery audit program to Part C and Part D to identify underpayments and overpayments and recoup overpayments under the Medicare program. The effective date for this provision was December 31, 2010.  The Centers for Medicare & Medicaid Services (CMS), Medicare Program Integrity Group (MPIG) is providing this guidance as an explanation of how Part D plan sponsors can file an appeal for overpayments identified by the Medicare Part D Recovery Audit Contractor.  All overpayments that are identified by the RAC will be confirmed by a separate independent contractor, a Data Validation Contractor (DVC).

### When must appeals be filed?

Appeals that are submitted after the established deadline will be dismissed without the ability to re-file. If the deadline falls on a weekend or a Federal Holiday, the filing period will be extended to the next business day.  Electronic submissions will be considered timely if they are received in the designated appeals mailbox by 11:59 p.m. EST on the deadline date.  Physical submissions that are mailed must be postmarked by the date of the deadline. The deadlines are as follows:

Level I, Request for Redetermination:  Level I appeals must be filed no later than 30 calendar days from the date of the Notification of Improper Payment Letter.

Level II, Request for Reconsideration:  Level II appeals must be filed no later than 15 calendar days from the issuance date of the Level I review decision.

Level III, Request for Review by the Administrator:  Level III appeals must be filed no later than 30 calendar days from the date of the Level II Hearing Official Decision.

Extension of established deadlines:  In very limited circumstances, CMS may grant a request to extend the deadline.  The decision to grant such an extension is entirely at the discretion of CMS,  and the SO must show that extenuating circumstances (e.g. natural disaster, Notification of Improper Payment went to incorrect address, death, etc.) existed that prevented the filing of an appeal by the deadline. Circumstances involving staff turnover or an oversight of the established deadline will not be considered.

### Who can appeal?

All Part D Sponsors receiving a Notification of Improper Payment Letter.

### What IS appealable?

December 31, 2013                                                                                                      22

A00548

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

- If the plan believes the Part D RAC did not apply CMS' stated payment methodology correctly. ~~The Part D plan sponsor may appeal the determination made by the Part D RAC that an overpayment was made to the plan sponsor as a result of payments made by the plan sponsor to excluded pharmacies and for prescriptions ordered by excluded physicians. The plan sponsor may also appeal the amount of the overpayment. CMS will afford plan sponsors with a two level appeal process which includes a "Request for Redetermination" and a "Request for Reconsideration." Plan sponsors are encouraged to contact the RAC to work out any issues relating to the identified overpayment prior to submitting a Request for Redetermination.~~

**What is NOT appealable?**

- This appeals process prohibits the plan sponsor from appealing the methodology and standards used to identify and calculate the overpayment(s).

- PDEs submitted by the plan sponsor subsequent to the final reconciliation of the plan year being reviewed, constitute new payment information, and were not considered by the RAC as part of its review and have no relation to the RAC findings. This new information will not be considered in this appeals process, but will be included in any subsequent reopening of the final reconciliation for the plan year.

- Any issues besides the ones identified in the Notification of Improper Payment Letter. ~~The appeal is strictly limited to the excluded servicing and prescribing provider qualifiers and identifiers.~~

- Any issues related to reopenings.

**Where can Part D Plan Sponsors submit inquiries regarding the Part D RAC Appeals Process?**

Part D Plan Sponsors can submit inquiries on the Part D RAC appeals process to PartD_RACCommunications@cms.hhs.gov.
Inquiries regarding the status of pending appeals must be submitted to PartDRACReconsiderations@cms.hhs.gov for Level I appeals and CMSHearingOfficial_Review@cms.hhs.gov for Level II appeals.

**General requirements for filing an appeal**

**Include all relevant issues in the initial appeal:** Plan sponsors must raise all relevant issues at the time of the Level I appeal (Reconsideration). Issues that are not raised in the Level I appeal (Reconsideration), cannot be raised at a later time and will be dismissed. Plan sponsors may amend the Level I appeal (Reconsideration) if they need to include additional information that may be relevant to their argument. Amendments must be submitted before the appeal timeframe expires. The Level I 60 calendar day appeal deadline does not change upon the receipt of appeal or upon the receipt of an appeal amendment.

- **Electronic Appeal Requests:** Level I (Request for Reconsideration) appeals and supporting documentation, submitted via email, must be sent to CMS at PartDRACReconsiderations@cms.hhs.gov and to the RAC at info@ACLRRAC.com.

A00549

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

Level II (Request for Hearing Official Review) appeals submitted via email, must be sent to CMS at CMSHearingOfficial_Review@cms.hhs.gov. Level III (Request for CMS Administrator Review) appeals submitted via email, must be sent to CMS at CMSAdministrator_Review@cms.hhs.gov. For electronic submissions, plan sponsors must use the template provided with the Notification of Improper Payment (NIP)or the template posted at http://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Part-D-RAC-Appeal-Process.html. The following format must be used

1. Include the contract number and "RAC Reconsideration Request" or "RAC Hearing Official Review" or "RAC CMS Administrator Review" in the subject line of the email (ex. "H1234 RAC Reconsideration Request").

2. Documentation must be submitted to CMS by Contract number using the template provided by CMS. If the plan sponsor is requesting an appeal for multiple contracts, the plan sponsor must submit a separate email request for each contract; all supporting documentation must be carefully categorized, clearly legible, easily understood and cross referenced where necessary. All relevant information to the appeal of this notification must be included in this initial submission to be considered for review. A plan sponsor may amend its Request for Reconsideration to include additional, relevant information, provided that all information is submitted before the appeal timeframe expires. In addition, if the documentation provided by the plan sponsor in support of its Request for Reconsideration is not sufficient for CMS Independent Reviewer to appropriately consider the Request for Reconsideration, CMS will provide notice to the plan sponsor that its submission has not been accepted. The Part D plan sponsor will then have the balance of the remaining 60 calendar day timeframe to submit a revised Request for -Reconsideration.

- **Physical Appeal Requests:** All physical appeal requests must be submitted on CD to the following address:

  Centers for Medicare & Medicaid Services (CMS)
  Division of Plan Oversight and Accountability
  ATTN: "RAC Reconsiderations" or "RAC CMS Hearing Official Review" "RAC CMS Administrator Review""
  Mailstop: AR-18-50
  7500 Security Boulevard
  Baltimore, Maryland 21244

A00550

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW — Division of Plan Oversight and Accountability

- **Withdrawing an appeal:** Part D plan sponsors may withdraw an appeal at Levels I or II at any time prior to a decision being issued. All Level I withdrawal requests must be submitted via email to PartDRACReconsiderations@cms.hhs.gov. All Level II withdrawal requests must be submitted to CMSHearingOfficial_Review@cms.hhs.gov. All Level III withdrawal requests must be submitted to CMSAdministrator_Review@cms.hhs.gov.

**Reconsiderations and Hearing Official Reviews:**

**1. Request for Reconsideration Decision:**

CMS will issue a Notification of Improper Payment letter to the plan sponsor which includes the amount owed, how the amount was calculated and the Prescription Drug Events (PDEs) in question. The plan sponsor will then have 60calendar days to file an appeal on any PDEs it believes are valid; this appeal must include a detailed narrative/explanation of why the plan sponsor believes each Part D RAC determination is incorrect along with supporting evidence regarding the PDEs in question. Once this appeal and supporting documentation are received by CMS and the Part D RAC, CMS will respond with an email to the plan sponsor confirming receipt within two (2) business days.

CMS will be required to submit its findings to be used to rebut the allegations made by the plan sponsor in its appeal, or its decision not to rebut the allegations made by the plan sponsor, within 30 calendar days of receipt of the appeal from the plan sponsor. If CMS decides not to rebut the allegations, CMS must submit a statement stating this decision and the appeal will be upheld. However, if CMS decides to rebut the plan sponsor's allegations after reviewing the plan sponsor's supporting documentation, the Part D RAC may submit its findings and any additional documentation to support its findings (e.g.,its rebuttal). Once CMS submits its rebuttal, a review decision will be made by the Independent Appeals Reviewer on all outstanding issues raised in the appeal within 60 calendar days from the date of the Notification of Improper Payment. If amended statements are received from the plan sponsor closer to the 60 day appeal deadline, then the timeframe for the Independent Appeals Reviewer will be extended and CMS will render a decision within 90 days of the Notification of Improper Payment. Evidence from both the plan sponsor and CMS will be used to make a determination.

After the review decision is made, CMS will notify the plan sponsor and the Part D RAC regarding the Reconsideration Decision and provide the plan sponsor with information on how to file a Request for Hearing Official Review. If the plan sponsor does not submit a timely Request for Hearing Official Review, the Reconsideration Decision will be deemed a final decision and CMS will move to offset the amount in the notification or revise the notification based on the outcome of the appeal decision and offset the amount as revised once all levels of appeal have been completed.

**2. Request for Hearing Official Review:**

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW   Division of Plan Oversight and Accountability

The plan sponsor must file a Request for Hearing Official Review within 30 calendar days of the issuance date of the Reconsideration Decision. The request must include a detailed narrative of why each of the Reconsideration decisions is incorrect. CMS will be required to submit its findings to be used to rebut the allegations made by the plan sponsor in its appeal, or its decision not to rebut the allegations made by the plan sponsor, within 30 calendar days of receipt of the Request for hearing Official Review from the plan sponsor

On receiving a Request for Hearing Official Review, CMS will review the material previously submitted in support of the Request for Reconsideration and make a final decision within 60 calendar days.  After its review is complete, CMS will notify the plan sponsor regarding the Hearing Official's decision.  If the Hearing Official's decision is wholly unfavorable or partially unfavorable to the plan sponsor, CMS will offset the amount in the notification or revise the notification based on the outcome of the appeal decision and offset the amount as revised once all levels of appeal have been completed

**3. Request for Administrator Review:**

If a plan sponsor is dissatisfied with the Hearing Official's decision, it must file a Request for Review by the Administrator within 30 calendar days of the issuance date of the Hearing Official's decision. The request must include a detailed narrative of why each of the Hearing Official decisions is incorrect.

The CMS Administrator (Administrator) has the discretion to review or decline review of the Hearing Official's decision.  The Administrator will notify the plan sponsor within 45 calendar days of receiving the request of whether or not he or she intends to review the Hearing Official's decision.  If the Administrator declines to review the Hearing Official's decision, the Hearing Official's decision is final.

If the Administrator agrees to review the Hearing Official's decision, CMS may file a rebuttal statement within 30 calendar days of the Administrator's notice.  CMS will send a rebuttal statement to the plan sponsor at the same time it is submitted to the Administrator.  The Administrator will review the Hearing Official's decision, the plan sponsor's argument, and CMS rebuttal, and determine if the Hearing Official's decision must be upheld, reversed, or modified. The Administrator will provide a written decision to the plan sponsor and CMS.  The Administrator's decision is final.

4. **Offsets**

Interim offsets will not be made until after the Administrator determines which Level 3 appeals will be accepted . These interim offsets will be returned to the plan sponsor after the reopening reconciliation if the plan sponsor has corrected the identified PDE records. It is the plan sponsor's responsibility to correct any errors in the PDE records that have been identified by the Part D RAC by deleting those PDEs before the reopening of the final reconciliation for the plan year.

December 31, 2013                                                                                                26

A00552

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW   Division of Plan Oversight and Accountability

Part-D Plan Sponsors can submit inquiries on the Part-D RAC appeals process to
PartD_RACCommunications@cms.hhs.gov.
Inquiries regarding the status of pending appeals should be submitted to
PartDRACAppeals@cms.hhs.gov for Level I appeals and PartDRACReconsiderations@cms.hhs.gov for
Level II appeals.

**General requirements for filing an appeal**

**Include all relevant issues in the initial appeal.** Plan sponsors must raise all relevant issues at the time
of the Level I appeal. Issues that are not raised in the Level I appeal cannot be raised at a later time and
will be dismissed.  Plan Sponsors may amend the Level I appeal if they need to include additional
information that may be relevant to their argument.  Amendments must be submitted before the appeal
timeframe expires. The Level I 30 day appeal deadline does not change upon the receipt of appeal or upon
the receipt of an appeal amendment.

- **Electronic Appeal Requests:**  Level I (Request for Redetermination) appeals and supporting
  documentation, submitted via email, should be sent to CMS at PartDRACAppeals@cms.hhs.gov
  and to the RAC at info@ACLRRAC.com.  Level II (Request for Reconsideration) appeals
  submitted via email, should be sent to CMS at PartDRACReconsiderations@cms.hhs.gov. For
  electronic submissions, SOs must use the template provided with the Notification of Improper
  Letter or the template posted at http://www.cms.gov/Research-Statistics-Data-and-
  Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Part-D-RAC-
  Appeal-Process.html. The following format should be used.

    1. Include the contract number and "RAC Redetermination Request" or "RAC
       Reconsideration" in the subject line of the email (ex. "H1234 RAC
       Redetermination Request").
    2. Documentation shall be submitted to CMS by Contract # using the template
       provided by CMS. If the plan sponsor is requesting an appeal for multiple
       contracts, the plan sponsor must submit a separate email request for each
       contract; all supporting documentation should be carefully categorized, clearly
       legible, easily understood and cross-referenced where necessary. All relevant
       information to the appeal of this notification should be included in this initial
       submission to be considered for review.  A plan sponsor may amend its Request
       for Redetermination to include additional, relevant information, provided that all
       information is submitted before the appeal timeframe expires.  In addition, if the
       documentation provided by the sponsor in support of its Request for
       Redetermination is not sufficient for CMS to appropriately consider the Request
       for Redetermination, CMS will provide notice to the sponsor that its submission
       has not been accepted.  The Part D sponsor will then have the balance of the
       remaining 30 day timeframe to submit a revised Request for Redetermination.

- **Physical Appeal Requests:** All physical appeal requests must be submitted on CD to the
  following address:

December 31, 2013                                                             27

A00553

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

---

Centers for Medicare & Medicaid Services (CMS)
Division of Plan Oversight and Accountability
ATTN: "RAC Redeterminations" or "RAC Reconsiderations"
Mailstop-AB-18-50
7500 Security Boulevard
Baltimore, Maryland 21244

- Withdrawing an appeal. Part D plan sponsors may withdraw an appeal at Levels I or II at any time prior to a decision being issued. All Level I withdrawal requests should be submitted via email to PartDRACAppeals@cms.hhs.gov. All Level II withdrawal requests should be submitted to PartDRACReconsiderations@cms.hhs.gov.

**Redeterminations and Reconsiderations:**

**1. Request for Redetermination Decision:**

CMS will issue a Notification of Improper Payment letter to the plan sponsor which includes the amount owed, how the amount was calculated and the Prescription Drug Events (PDEs) in question. The plan sponsor will then have 30 calendar days to file an appeal on any PDEs it believes are valid; this appeal must include a detailed narrative/explanation of why the plan sponsor believes each RAC determination is incorrect along with supporting evidence regarding the PDEs in question. Once this appeal and supporting documentation are received by CMS and the RAC, CMS will respond with an email to the plan sponsor confirming receipt within 2 business days.

The RAC will be required to submit its findings to be used to rebut the allegations made by the plan sponsor in its appeal, or its decision not to rebut the allegations made by the plan sponsor, to CPI, and a copy to the plan sponsor, within 15 calendar days of receipt of the appeal from the plan sponsor. If the RAC decides not to rebut the allegations, the RAC must submit a statement stating this decision and the appeal will be upheld. However, if the RAC decides to rebut the plan sponsor's allegations after reviewing the plan sponsor's supporting documentation, the RAC may submit its findings and any additional documentation to support its findings (e.g. its rebuttal). Once the RAC submits its rebuttal, a review decision will be made by CMS on all outstanding issues raised in the appeal within 60 calendar days from the date of the Notification of Improper Payment. If amended statements are received from the plan sponsor closer to the 30 day appeal deadline, then the timeframe for CMS' review will be extended and CMS will render a decision within 90 days of the Notification of Improper Payment. Evidence from both the plan sponsor and the RAC will be used to make a determination. CMS may consult the DVC if additional technical information is needed to resolve the dispute between the RAC and the plan sponsor.

After the review decision is made, CMS will notify the plan sponsor and the RAC regarding the Redetermination Decision and provide the SO with information on how to file a Request for Reconsideration. If the plan sponsor does not submit a timely Request for Reconsideration, the Redetermination Decision will be deemed a final decision and CMS will move to offset the amount in the notification or revise the notification based on the outcome of the appeal decision and offset the amount as revised.

**2. Requests for Reconsideration:**

A00554

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW — Division of Plan Oversight and Accountability

The plan sponsor must file a Request for Reconsideration within 15 calendar days of the issuance date of the Redetermination Decision. The request should include a detailed narrative of why each of the Redetermination decisions is incorrect.

On receiving a Request for Reconsideration, CMS will review the material previously submitted in support of the Request for Redetermination and make a final decision within 30 calendar days. After its review is complete, CMS will notify the plan sponsor regarding the Reconsideration decision. If the Reconsideration decision is wholly unfavorable or partially unfavorable to the plan sponsor, CMS will offset the amount in the notification or revise the notification based on the outcome of the appeal decision and offset the amount as revised.

### 3  Offsets

Interim offsets will not be made until after the administrative process or time to appeal has expired. These interim offsets will be returned to the plan sponsor prior to reopening reconciliation. It is the plan sponsor's responsibility to correct any errors in the PDEs identified by the RAC by deleting those PDEs before the reopening of the final reconciliation for the plan year.

December 31, 2013

29

# Appendix D:  Improper Payment Impact Calculation Methodology

The purpose of this appendix is to outline the methodology the RAC, as advised by CMS, should use to calculate the impact of any improper payments found as a result of auditing the approved issues. The basis for the RAC's evaluation will be the PDE database for each contract as well as the associated payment reconciliation files.

The RAC will analyze their database to determine the total population.  Once these populations are established, various PDE fields will be summed in order to begin the calculation of improper payment.

Due to the nature of the Part D program, the impact calculation methodology will essentially consist of a recalculation of the year-end reconciliation. The items that contribute to year-end reconciliation are Low Income Cost Sharing (LICS), Reinsurance cost-sharing, and the risk corridor adjustment (risk-sharing reconciliation amount). Re-computation of the year-end reconciliation, adjusted for improper payments, will be completed for each audit issue where improper payments have been identified. The initial reconciliation and the re-performed/corrected reconciliations will be compared to determine the total overpayment/underpayment.

Specifically, for four corrected PDE payment fields the RAC will quantify, sum for all findings, and incorporate into the Part D Payment Reconciliation calculations for each payment mechanism.  The re-performed/corrected amounts due to CMS or owed to Sponsors for LICS and Reinsurance will then be summed together and compared to the results of the initial Part D Payment Reconciliation to determine the total impact on Part D payment. CMS reserves the right to change the calculation methodology at any time. The RAC must follow CMS guidance in calculating the actual impact, as some of the calculation fields/methodologies may change.

Each piece of this reconciliation will be described below:

### LICS

Medicare provides additional assistance, referred to as Low-Income Cost Sharing (LICS), to low-income individuals (who meet the income and resource criteria) to reduce the individual's Part D premium and cost-sharing amounts. CMS makes monthly prospective LICS subsidy payments to reimburse Plan Sponsors for the LICS costs associated with providing prescription drug coverage to qualifying individuals.  These payments are based on prospective estimates that sponsors provide in their bids prior to the beginning of the plan year.

The LICS subsidy payments that Plan Sponsors make on behalf of the qualifying low-income beneficiaries must be documented and reported back to CMS so that, after the close of the plan year, CMS can reconcile these payments with the Plan Sponsors' actual costs to determine whether the Plan Sponsors have overpaid or underpaid. Upon year end, CMS reconciles the sum of the LICS amounts reported in relevant PDE data fields against the monthly prospective LICS subsidy payments made by CMS.  A final overpayment or underpayment is calculated and recovered as a lump sum recovery or by adjusting monthly payments throughout the remainder of the current coverage year.

In calculating the impact to the government for improper payments, LICS amounts associated with improper payments are calculated on a dollar value basis by summing the amount included in the LICS

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW — Division of Plan Oversight and Accountability

PDE data field, and comparing the amounts paid or that should have been paid in accordance with program/plan requirements. As the LICS reconciliation process offsets estimated amounts against actual amounts paid, no further reconciliation processes are required.

### Reinsurance Subsidy

The Reinsurance Subsidy guarantees the Plan Sponsor a percentage of the individual's drug costs incurred in the last phase of coverage. Under the Reinsurance Subsidy, the federal government is responsible for 80% of allowable drug costs in the catastrophic phase. Allowable drug costs are those that have been adjusted by Direct and Indirect Remuneration (DIR) (e.g. rebates, discounts, etc that are received by the Plan Sponsor). Unadjusted drug costs are costs that have not been adjusted by DIR. PDEs processed in the catastrophic phase have these costs recorded in the Gross Drug Cost Above Threshold (GDCA) field of the PDE. Costs recorded prior to reaching the catastrophic phase are recorded in the Gross Drug Cost Below Threshold (GDCB) field of the PDE. To calculate the impact to the government, first, the DIR Ratio must be calculated. The DIR Ratio is the unadjusted GDCA divided by unadjusted total drug cost. The DIR ratio is applied to the net DIR amount to determine the reinsurance portion of DIR. To derive allowable reinsurance cost, the reinsurance portion of DIR is subtracted from GDCA. The reinsurance subsidy is 80% of the plan's allowable reinsurance cost.

Amounts associated with improper payments will increase or decrease year-end reconciliation GDCA and GDCB totals. Therefore, to calculate the impact of improper payments, the Plan Year Reconciliation GDCA and GDCB totals will be adjusted for any identified improper payments and the resulting (adjusted) GDBA and GDCB totals will be used in a subsequent reconciliation (Improper Payment Reconciliation) to determine the revised reinsurance subsidy using the same methodology used during year-end reconciliation.

### Total Recoupment Amount

The corrected total Part D reconciliation amount associated with improper payments will be determined by summing the amounts due to CMS or owed to Sponsors for LICS and Reinsurance payment mechanisms as outlined above. The corrected total Part D reconciliation amount is then compared to the initial total Part D payment reconciliation amount with the difference representing the recoupment amount due CMS/Part D Sponsor.

205

A00557

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW - Division of Plan Oversight and Accountability

# Appendix E:  Part D RAC Activities Timeline

*New Issues Submission and Approval Process

| Step | Description | SOW Section | Days | Sample Timeline | Responsible Party |
|------|-------------|-------------|------|-----------------|-------------------|
| 1 | RAC submits New Audit Issues Review Package (NAIRP) to CMS | Section 1.2.1 | 0 | 10/01/2013 | Part D RAC |
| 2 | RAC conducts a walk-thru of the new issue at the next scheduled CMS/RAC Operations Meeting | Section 1.2.1 | Within 14 days of submitting NAIRP (By COB the next business day after the walk-thru/meeting, the Part D RAC COR will send an email notification to the Part D RAC summarizing the walk-thru/meeting and the deadline for CMS feedback) | 10/14/2013 | Part D RAC |
| 3 | CMS provides its initial feedback to the RAC – feedback is provided both verbally and in writing. | Section 1.2.1 | Within 30 days of the walk-thru | 11/14/2013 | CMS COR |
| 4 | Based on the CMS feedback, the RAC in collaboration with CMS may decide to abandon the original NAIRP or revise it. If the RAC plans to continue with the audit issue, the RAC shall resubmit the NAIRP to CMS based on CMS feedback. | Section 1.2.1 | Within 30 days of receiving initial feedback from CMS | 12/14/2013 | CMS COR /RAC |
| 5 | CMS provides complete approval, conditional approval or denial of the NAIRP. Complete approval of the NAIRP shall be provided to the RAC in writing. If conditional approval, CMS shall provide the RAC with a written explanation as to the terms of the | Section 1.2.1 | Within 30 days of receiving the revised NAIRP | 1/14/2014 | CMS COR |

December 31, 2013

32

A00558

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

| | | | | |
|---|---|---|---|---|
| | conditional approval. If denial, CMS shall provide the RAC with a written explanation as to the reasons for the denial. | | | |
| Total Cycle Time | | 104 days | | |

*The New Issues Submission and Approval Process is based on the submission of no more than two (2) new audit issues per month. If more than two (2) audit issues are received within a 30 day period, the CMS timeframes may take longer than identified in the chart.

Once Audit Issue has been approved, the following process shall take place:

Complex Review

                                                                                          [Formatted Table]

| Step | Description | SOW Section | Days | Responsible Party |
|---|---|---|---|---|
| 1 | Request for Information (RFI) | Section 2.1 | 0 | Part D RAC |
| 2 | Part D Sponsor Response to RFI | Appendix A | 60<br>60 days and 90 days if prescriptions are requested | Part D Plan Sponsors |
| 3 | Improper Payment Review Package (IPRP) Submission | Section 2.1.2.1 | 30 | Part D RAC |
| 4 | Data Validation Contractor (DVC) IPRP Review | Section 2.2 | 45<br>(An extension may be granted to the DVC if the error rate is 25% or more) | DVC |
| 5 | Notification Letter Submission | Section 2.3 | 7 | Part D RAC |
| 6 | CMS sends Notification Letter to Plan Sponsors | Section 2.3 | 7 | CMS/DPOA |
| 7 | Level 1 - Request for ~~Redetermination~~Reconsideration | Section 2.3, Appendix A, Appendix C | ~~3~~60 Days From receipt of the Notification letter | Part D Plan Sponsors |
| 8 | RAC Rebuttal | Section 3.1, Appendix C | ~~15~~30 Days From receipt of plan sponsor's Request for ~~Redetermination~~Reconsideration | Part D RAC |
| 9 | CMS ~~Redetermination~~ Reconsideration Decision | Appendix A | 90<br>From Request for ~~Redetermination~~ Reconsideration | Part D RAC Appeals Contractor |
| 10 | Revise Improper Payment Packages (Revise NIPs, Revise Exception Reports) | Section 3.1 | 7 days | Part D RAC |
| 11 | Level 2 - Request for ~~Reconsideration~~Hearing Official Review | Appendix A, Appendix C | ~~15~~30<br>From Issue Date of ~~Redetermination~~ Reconsideration Decision | Part D Plan Sponsors |

December 31, 2013                                                                 33

A465

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

| 12 | RAC Rebuttal | Appendix C | 30 days from receipt of plan sponsor's request for a Hearing official Review | |
|---|---|---|---|---|
| ~~12~~ 13 | Level 2 - CMS ~~Reconsideration~~ Hearing Official Decision | Appendix C | ~~360 days~~ From Receipt of plan sponsor's Request for ~~Reconsideration~~ Hearing Official Review | CMS/Division of Policy & Regulatory Development (DPRD) |
| ~~13~~ 14 | Revise Improper Payment Packages (Revise NIPs, Revise Exception Reports) | Section 3.1 | 7 days | Part D RAC |
| 15 | Level 3 – Request for Administrator review | Appendix C | 30 Days from Issue Date of Hearing Official Decision | Part D Plan Sponsors |
| 16 | Administrator Decision to Review Hearing Official Decision | Appendix C | 45 days from receipt of plan sponsor's request for Administrator Review | CMS Administrator |
| 17 | RAC Rebuttal | Appendix C | 30 Days from the Administrator's decision to review hearing Official's Decision | Part D RAC |
| ~~14~~ 18 | CMS/DPOA submits payment adjustments forms to Division of Payment Operations (DPO) | Section 3.2 | Next scheduled Plan Data due ~~date~~ date and after the Administrator determines what appeals will be accepted/rejected | CMS/DPOA |
| ~~15~~ 19 | Offset | Section 3.2 | Typically no more than 30 days but will vary based on the DPO payment schedule (Transmit after all appeals levels have been exhausted) | CMS/DPO |
| ~~16~~ 20 | CMS/DPOA notifies RAC that recoupment has been made | Section 3.2.4 | 15 | CMS/DPOA |
| ~~17~~ 21 | RAC Invoice | Section 3.2.4 | 15 Upon Notification of Recoupment by CMS | Part D RAC |
| ~~18~~ 22 | RAC Payment | N/A | 30 | CMS/OFM |

7 days (Part D RAC, Section 3.1 row)



Year 2014 MARx Monthly Schedule.doc

~~Total Audit Cycle~~                                    ~~389~~

| ~~Step~~ | ~~Description~~ | ~~SOW Section~~ | ~~Days~~ | ~~Responsible Party~~ |
|---|---|---|---|---|
| | ~~Automated Review~~ | | | |

A466

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

| 1 | Improper Payment Review Package (IPRP) Submission | Section 2.1.2.1 | | Part D RAC |
|---|---|---|---|---|
| 2 | Data Validation Contractor (DVC) IPRP Review | Section 2.2 | 45 (An extension may be granted to the DVC if the error rate is 25% or more) | DVC |
| 3 | Notification Letter Submission | Section 2.3 | 7 | Part D RAC |
| 4 | CMS sends Notification Letter to Plan Sponsors | Section 2.3 | 7 | CMS/DPOA |
| 5 | Level 1 – Request for Redetermination | Section 2.3, Appendix A, Appendix C | 30 30 Days From receipt of the Notification letter | Part D Plan Sponsors |
| 6 | RAC Rebuttal | Section 3.1, Appendix C | 15 15 Days From receipt of Plan sponsor's Request for Redetermination | Part D RAC |
| 7 | CMS Redetermination Decision | Appendix A | 90 From Request for Redetermination | Part D RAC Appeals Contractor |
| 8 | Revise Improper Payment Packages (Revise NIPs, Revise Exception Reports) | Section 3.1 | 7 days | Part D RAC |
| 9 | Level 2 – Request for Reconsideration | Appendix A, Appendix C | 15 From Issue Date of Redetermination Decision | Part D Plan Sponsors |
| 10 | Level 2 – CMS Reconsideration Decision | Appendix C | 30 From Receipt of plan sponsor's Request for Reconsideration | CMS/Division of Policy & Regulatory Development (DPRD) |
| 11 | Revise Improper Payment Packages (Revise NIPs, Revise Exception Reports) | Section 3.1 | 7 days | Part D RAC |
| 12 | CMS/DPOA submits payment adjustments forms to Division of Payment Operations (DPO) | Section 3.2 | Next scheduled Plan Data due date | CMS/DPOA |
| 13 | Offset | Section 3.2 | Typically no more than 30 days but will vary based on the DPO payment schedule (Transmit after all appeal levels have been exhausted) | CMS/DPO Year 2014 MARx Monthly Schedule.doc |
| 14 | CMS/DPOA notifies RAC that recoupment has been made | Section 3.2.4 | 15 | CMS/DPOA |
| 15 | RAC Invoice | Section 3.2.4 | 15 | Part D RAC |

December 31, 2013                                                                    35

A467

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW – Division of Plan Oversight and Accountability

| | | | Upon Notification of Recoupment by CMS | |
|---|---|---|---|---|
| 16 | RAC Payment | N/A | 30 | CMS/OFM |
| Total Audit Cycle | | | 299 | |

## Automated Review

| Step | Description | SOW Section | Days | Responsible Party |
|---|---|---|---|---|
| 1 | Improper Payment Review Package (IPRP) Submission | Section 2.1.2.1 | 30 | Part D RAC |
| 2 | Data Validation Contractor (DVC) IPRP Review | Section 2.2 | 45 (An extension may be granted to the DVC if the error rate is 25% or more) | DVC |
| 3 | Notification Letter Submission | Section 2.3 | 7 | Part D RAC |
| 4 | CMS sends Notification Letter to Plan Sponsors | Section 2.3 | 7 | CMS/DPOA |
| 5 | Level 1 – Request for Reconsideration | Section 2.3, Appendix A, Appendix C | 60 60 Days From receipt of the Notification letter | Part D Plan Sponsors |
| 6 | RAC Rebuttal | Section 3.1, Appendix C | 30 30 Days From receipt of plan sponsor's Request for Reconsideration | Part D RAC |
| 7 | CMS Reconsideration Decision | Appendix A | 90 From Request for Reconsideration | Part D RAC Appeals Contractor |
| 8 | Revise Improper Payment Packages (Revise NIPs, Revise Exception Reports) | Section 3.1 | 7 days | Part D RAC |
| 9 | Level 2 – Request for Hearing Official Review | Appendix A, Appendix C | 30 From Issue Date of Reconsideration Decision | Part D Plan Sponsors |
| 10 | RAC Rebuttal | Appendix C | 30 days from receipt of plan sponsor's request for a Hearing official Review | Part D RAC |
| 11 | Level 2 – CMS Hearing Official Decision | Appendix C | 60 days From Receipt of plan sponsor's Request for Hearing Official Review | CMS/Division of Policy & Regulatory Development (DPRD) |
| 12 | Revise Improper Payment Packages (Revise NIPs, Revise Exception Reports) | Section 3.1 | 7 days | Part D RAC |
| 13 | Level 3 – Request for Administrator review | Appendix C | 30 Days from Issue Date of Hearing Official Decision | Part D Plan Sponsors |

210

A468

A00562

Centers for Medicare & Medicaid Services
Medicare Part D RAC SOW   Division of Plan Oversight and Accountability

| 14 | Administrator Decision to Review Hearing Official Decision | Appendix C | 45 days from receipt of plan sponsor's request for Administrator Review | CMS Administrator |
| 15 | RAC Rebuttal | Appendix C | 30 Days from the Administrator's decision to review hearing Official's Decision | Part D RAC |
| 16 | CMS/DPOA submits payment adjustments forms to Division of Payment Operations (DPO) | Section 3.2 | Next scheduled Plan Data due date and after the Administrator determines what appeals will be accepted/rejected | CMS/DPOA |
| 17 | Offset | Section 3.2 | Typically no more than 30 days but will vary based on the DPO payment schedule (Transmit after all appeals levels have been exhausted) | CMS/DPO  Year 2014 MARx Monthly Schedule.do |
| 18 | CMS/DPOA notifies RAC that recoupment has been made | Section 3.2.4 | 15 | CMS/DPOA |
| 19 | RAC Invoice | Section 3.2.4 | 15  Upon Notification of Recoupment by CMS | Part D RAC |
| 20 | RAC Payment | N/A | 30 | CMS/OFM |

December 31, 2013

37

211

A469

**October 4, 2011 Email**

**EXHIBIT 23**

While matching to EPLS is a valid process and likely to yield additional errors it does not ensure the same specificity as that of matching an NPI from MED. In the latter instance, a plan sponsor submitted a specific identifiable excluded provider virtually guaranteeing an error while the former process yields a potential (albeit likely) error. This begs the question - what about invalid prescribers identified in previous audits? A common improper payment error is to override existing controls such as an exclusion database to process a transaction that otherwise would not be processed. In other words, an invalid identifier is much more "likely" to be in error than normally submitted PDE; should we be identifying invalid numbers as well? We were not given approval to include invalid prescriber identifiers as an audit scope issue.

**Christopher Mucke | Managing Principal | ACLR, LLC**
38705 7 Mile Rd, Ste 460 | Livonia, Michigan 48152-3975 | ☎(734) 744 - 4401 | 🖷(734) 744 - 4150 |
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

**From:** James, Merri-Ellen (CMS/CPI) [mailto:merri-ellen.james@cms.hhs.gov]
**Sent:** Tuesday, October 04, 2011 9:58 AM
**To:** Christopher Mucke
**Cc:** Dorsey, Marnie (CMS/CPI); Dangerfield, Teresa (CMS/CPI); Moreno, Cynthia E. (CMS/CPI); James, Merri-Ellen (CMS/CPI)
**Subject:** FW: Audit Scope
**Importance:** High

Chris,

Due to some of the issues you identify below, we have decided that you will receive a data pull of all PDEs from the IDR on X date. These PDEs will have been submitted by currently active sponsors for dates of service starting in cy 2007 and running through CY 2009. You will review that data for improper payments for approved audit scope issues, so far excluded providers and duplicate payments. You will not be responsible for assuming any changes to that data after it has been pulled for review. There are no current CMS or law enforcement actions that would impact that data. Sponsors will be informed that once the data is pulled they will not "get credit" for submitting corrected data.

Re your proposed methodologies. Have you considered utilizing the EPLS list to enhance the number of matches. My understanding is that the EPLS has more information than the LEIE and MED. In separate studies, we have seen the match rate rise substantially with the additional information. I believe the drawback is in validating the matches. Many are based on name matches. I'm not what percent you could increase your match rate by but it may be of value.

Your duplicate payment methodology looks sound. Again, you will not be responsible for analyzing PDEs that are submitted after the pull date. This should eliminate many of the complications you identified. Let me know your thoughts.

Merri-Ellen James
Medicare Program Integrity Group
7500 Security Blvd.
Baltimore, MD 21244
410.786.4462

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:*
*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

**From:** James, Merri-Ellen (CMS/CPI)
**Sent:** Friday, September 30, 2011 1:06 PM
**To:** James, Merri-Ellen (CMS/CPI)
**Subject:** RE: Audit Scope

**From:** Christopher Mucke [cmucke@aclrsbs.com]
**Sent:** Friday, September 30, 2011 12:40 PM
**To:** James, Merri-Ellen (CMS/CPI)
**Cc:** Dorsey, Marnie (CMS/CPI); Moreno, Cynthia E. (CMS/CPI); jbarnes@aclrsbs.com
**Subject:** RE: Audit Scope

Merri-Ellen,

During our conference call on Wednesday, I discussed some of the difficulties with providing more detailed information. In short, without reviewing the data we cannot measure the type of data or the integrity and credibility of the data we will be receiving. For example, we've reviewed DDPS rules and requirements regarding adjusted/deleted records and how "DDPS will exclude inactivated PDE records from any subsequent calculations for the beneficiary, PBP, or Contract". Until we can confirm that statement and determine precisely (identify all PDE whose CPP reconciles to UAARCC) we cannot propose a methodology

9

**November 2011 Email**

**EXHIBIT 24**

| From: | Bruce Dixon |
| To: | Dangerfield, Teresa \(CMS/CPI\); Christopher Mucke |
| Cc: | Dorsey, Marnie \(CMS/CPI\) |
| Subject: | RE: ACLR filenames for CRQ000000163022 |
| Date: | Thursday, November 17, 2011 4:13:54 PM |

Hi Teresa,

We started receiving data about an hour ago.  So far about 6 gigabytes of data have been sent so the transfer time will be about 4 - 5 hours to get the file.

At least it working!!

Thanks,

Bruce

---

*Bruce Dixon | Systems Security Officer | ACLR, LLC*
38705 Seven Mile Rd.| Suite 460 | Livonia, Michigan 48152-3975 | Off. Ph. (734) 744-4405 |  Cell Ph. (248) 894-6940  |  Fax (734) 744-4150 | email:  bdixon@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

---

**From:** Dangerfield, Teresa (CMS/CPI) [mailto:Teresa.Dangerfield1@cms.hhs.gov]
**Sent:** Thursday, November 17, 2011 12:36 PM
**To:** Bruce Dixon; Christopher Mucke; Jason Barnes
**Cc:** Dorsey, Marnie (CMS/CPI)
**Subject:** FW: ACLR filenames for CRQ000000163022

Hi Bruce

Please let me know when the files has transmitted and validate that ACLR has enough space to retrieve the files.

Thanks
Teresa

**From:** Horton, Dinah L. (CMS/OIS)
**Sent:** Thursday, November 17, 2011 12:23 PM
**To:** Dangerfield, Teresa (CMS/CPI)
**Cc:** Nguyen, Binh V. (CMS/OIS); Mooney, Jennifer L. (CMS/OIS)
**Subject:** RE: ACLR filenames for CRQ000000163022

Hi Teresa,

11AR124

I just sent the Jan 2007 file EFT. The fourth qualifier 'Y0107' designates the month and year of the file.

T#EFT.ON.ACLRIDR.Y0107PDE.D111117.T1154000 record Count = 82,416,957

This file is extremely large and could take awhile to transmit. Due to open enrollment and the extremely large size of the files, I am limited to the number of files that can be sent at a time. Once we find out approximately how long it takes for the file to transmit and the space used. I can give you a status on how many we can send at a time and approximately how long it will take for ACLR to receive all the files.

Also, I just wanted to verify that ACLR has enough space for the data they will be receiving. These record counts together with the approximate record length of 400, makes these files extremely large.

Let me know if there are any problems or if you need anything else. I am out of the office tomorrow. I do check my email periodically.

Have a great weekend.

## PDE SAF COUNTS

| Month | 2007 | 2008 | 2009 |
|-----------|------------|------------|------------|
| January | 82,416,957 | 88,512,167 | 89,794,662 |
| February | 73,465,127 | 81,667,797 | 82,213,401 |
| March | 81,276,443 | 85,454,821 | 91,295,701 |
| April | 78,857,667 | 85,845,184 | 89,510,809 |
| May | 82,901,339 | 86,771,594 | 88,242,529 |
| June | 79,167,427 | 84,829,772 | 90,752,116 |
| July | 81,724,306 | 88,501,681 | 91,759,247 |
| August | 84,435,341 | 85,402,161 | 89,471,537 |
| September | 77,144,043 | 86,785,791 | 90,129,123 |
| October | 86,181,638 | 90,176,886 | 92,031,755 |
| November | 82,096,603 | 81,729,884 | 88,034,807 |
| December | 81,269,569 | 91,591,361 | 94,014,357 |

*Dinah Horton*
CENTER FOR MEDICARE AND MEDICAID SERVICES
OIS/EDG/DEIMS
410-786-0160

**From:** Dangerfield, Teresa (CMS/CPI)

11AR125

A474

A02765

**Sent:** Wednesday, November 16, 2011 2:13 PM
**To:** Horton, Dinah L. (CMS/OIS)
**Subject:** RE: ACLR filenames for CRQ000000163022

Please start with year 2007.

---

**From:** Horton, Dinah L. (CMS/OIS)
**Sent:** Wednesday, November 16, 2011 2:08 PM
**To:** Dangerfield, Teresa (CMS/CPI)
**Subject:** RE: ACLR filenames for CRQ000000163022

Hi Teresa

I will be sending 36 files.  Is there a particular year you want me to start with?

*Dinah Horton*
CENTER FOR MEDICARE AND MEDICAID SERVICES
OIS/EDG/DEIMS
410-786-0160

---

**From:** Dangerfield, Teresa (CMS/CPI)
**Sent:** Wednesday, November 16, 2011 10:57 AM
**To:** Horton, Dinah L. (CMS/OIS)
**Cc:** Dorsey, Marnie (CMS/CPI)
**Subject:** FW: ACLR filenames for CRQ000000163022
**Importance:** High

Hi Dinah

When can we expect the file to be sent to ACLR?

We need to send PDE records for closed years 2007, 2008 & 2009.  Below is the information you provided.


"Attached is the documentation you requested for the Part D SAF.

The  2010 SAF layout and Data definitions are attached...

See below for SAF information from previous years:

1.  Record layouts for each year are located here:.

https://portal.hhs.gov:443/portal/server.pt/gateway/PTARGS_32_0_215_0_-1_47/http:/collab.hhs.gov:11930/collab/do/document/overview?projID=133919&folderID=210551

126

11AR126

Thanks
Teresa

**From:** Lomo, Mary (CMS/CTR)
**Sent:** Wednesday, November 02, 2011 4:26 PM
**To:** Dangerfield, Teresa (CMS/CPI); Horton, Dinah L. (CMS/OIS); Bruce Dixon
**Cc:** James Kelley
**Subject:** ACLR filenames for CRQ000000163022
**Importance:** High

Teresa, we've completed connectivity testing. ACLR can now receive files from CMS using MFT
platform server.

We can begin testing with the application using the ACLR filenames? Dinah, would you be the
one to test with?

Thank you,

**Mary Lomo**
CMS-CITIC
Enterprise File Transfer Team
EFT_ADMIN@cms.hhs.gov
(410) 382-4209 Work
Mary.Lomo@cms.hhs.gov

**From:** James Kelley [mailto:jkelley@msiatlanta.com]
**Sent:** Tuesday, November 01, 2011 8:58 PM
**To:** Lomo, Mary (CMS/CTR)
**Subject:** Re: Troubleshooting with ACLR

Confirmed!  I have the file, it 205KB.  Great, thanks for all your help.

James

On Nov 1, 2011, at 3:20 PM, Lomo, Mary (CMS/CTR) wrote:

The transfer worked!
Please confirm the receipt of: D:\CMS\T.ACLRIDR.YTESTPDE.D111101.T1516000

Thank you,

**Mary Lomo**
CMS-CITIC
Enterprise File Transfer Team
EFT_ADMIN@cms.hhs.gov
(410) 382-4209 Work
Mary.Lomo@cms.hhs.gov

127

11AR127

**November 3, 2011 Email**

**EXHIBIT 25**

Δ π EXHIBIT ___79___
Deponent B̲i̲z̲z̲e̲n̲
Date 1/9/17 Rptr CₐL
WWW.DEPOBOOK.COM

**From:** James, Merri-Ellen (CMS/CPI)
**Sent:** Thursday, November 03, 2011 7:08 PM
**To:** Moreno, Cynthia E. (CMS/CPI)
**Subject:** TanetteRAC Summary11_3_11mej mark-up (2).docx



TanetteRAC
Summary11_3_1...
        most updated version

1

HHS1_01019488

A478

Part C & D RAC Implementation
Status: 11.3.11

**General Background**

As a result of expansion of Section 6411(b) of ACA the use of recovery audit contractors has been expanded to all of Medicare (title XVIII) amending the existing fee-for-service RAC statute at section 1893(h). The amendments to 1893(h) would provide CMS with general authority to enter into contracts with RACs to identify overpayments and underpayments and recoup overpayments in Parts C and D. It also includes implementation of the following Special Rules:
1. (9)(A)Ensure that each MA plan under Part C has an anti-fraud plan in effect and review the effectiveness of each such anti-fraud plan
2. (9)(B)Ensure that each MA plan under Part D has an anti-fraud plan in effect and review the effectiveness of each such anti-fraud plan
3. (9)(C)Examine claims for reinsurance payments under section 1860D-15(b) to determine whether prescription drug plans submitting such claims incurred costs in excess of the allowable reinsurance costs permitted under paragraph (2) of that section; and
4. (9)(D)Review estimates submitted by prescription drug plans by private plans with respect to the enrollment of high cost beneficiaries (as defined by the Secretary) and to compare such estimates with the numbers of such beneficiaries actually enrolled by such plans.

**Summary CPI Implementation Activities**

| | |
|---|---|
| **12.27.2010** | CPI published CMS-6041-NC 12-27 soliciting the views of industry stakeholders on how to best implement the RAC program requirements established in section 6411(b) of the ACA for the Medicare Part C and Part D programs. |
| **1.13.2011** | ACLR awarded Part D RAC contract |
| **9.30.2011** | Livanta awarded as Part D RAC Data Validation Contract |
| **NOTE:** | 5.2011 MPPG submitted A19 to strike requirement for Part C RAC due to concurrent and duplicative CMS work efforts associated with RADV audits |

**Detailed Description of Part C and D work streams:**

| Work Stream | Page | POC | Attachment* |
|---|---|---|---|
| 1. Part C RAC Status | 3 | LMK | Part C RAC Issue Analysis_Booz Allen_9_23_011 LMK.docx |

1

HHS1_01019489

| Work Stream | Page | POC | Attachment |
|---|---|---|---|
| 2. Part D RAC Infra structure | | | |
| A. PRIS | 3 | TD | PRIS SDLC Artifacts |
| B. iPRIS | 3 | TD | iPRIS SDLC |
| C. HPMS | 4 | TD | |
| D. Data Sharing | 4 | TD | Data Sharing |
| E. Business Process Modeling | 5 | TD | RAC BPM |
| F. Vulnerability Tracking Sys | 5 | TD | VTS |
| G. Payment Process- Operational | 5 | TD | Payment Process |
| H. CMS Part D RAC Website | 6 | TD | RAC Website |
| 3. ACLR Authority to Operate | 6 | MD | |
| 4. Part D RAC Data Val Cont | 6 | TD | RAC Part D Validation Statement of Work (SOW) final.docx |
| 5. Appeals Policy Development | 7 | KL/FW | Part D RAC Appeals briefing paper 10_4_11.docx |
| 6. D RAC Appeals Contract SOW | 7 | AMR/KL/DN | RAC Appeal SOW.doc |
| 7. Communications | | | |
| A. Launch Letter to Spon. | 7 | TBD | CMS RAC Sponsor Update Memo10122011.docx |
| B. ACLR Website Content | 7 | SC | |
| C. Part D RAC Website Content | 7 | SC | |
| D. Improp Payment Notif. Letter | 7 | MD/KL | Notification of Improper Payment Letter DRAFT-KML2.doc |
| E. FAQ | 7 | SC | |
| F. Part D RAC Comm. Plan | 7 | SC | Part D RAC Communications Plan 9 21 2011 |
| G. No Findings Letter | 7 | MD | No Findings Letter- Automated Draft.doc |
| H. Part D RAC Fact Sheet | 7 | SC | Part D RAC Fact Sheet 10 28 2011 CEM mark-up – MCD adds.docx |
| 8. SOP | 8 | TBD | RAC SOP Guidance_10242011 |
| 9. Audit Scope | | | |
| A. Duplicate Payments | 8 | MEJ | |
| B. Excluded Providers | 8 | MEJ | CMS RAC Sponsor Update_Excluded Provider Audits 10_26_2011 |

2

HHS1_01019490

A480

| Work Stream | Page | POC | Attachment |
|---|---|---|---|
| 10. Improper Payment Calculation | 13 | MEJ | IP Impact Methodology.docx<br>Part D Liability Calculation<br>Outreach-Revised.xlsx |
| 11. New Issue Review Board | 13 | TBD | |

*Documents can be found at
\\cadshare\share\Share\OA\Coo\OFM\PIG\DMMAI\RAC\RAC Summary

1.   PART C RAC STATUS

At this time, a final decision on how we are going to implement the Part C RAC has not been made. An options paper has been written which will provide management with the different alternatives that could be used to implement a Part C RAC.

2.   PART D RAC INFRASTRUCTURE STATUS

A.  Payment Recovery Information System- PRIS formerly eRAC

The primary purpose of the PRIS application is to combine functionality of the current PRIS application and the Recovery Audit Contractor Data Warehouse (RACDW) along with Parts C & D defined functionalities. The PRIS application will capture the functionality of the Improper Payment Lifecycle. The lifecycle includes the Recovery Audit Contractor, Data Validation Contractor, Appeals Contractor and Payment processing functions along with reporting.

PRIS currently supports the RAC Initiatives for Medicare Fee for Service. As a result, there will be a new name given to PRIS to support Parts C & D RAC

Below is the time line

| Item | Targeted Start Date | Targeted End Date |
|---|---|---|
| Requirements | 07/11/2011 | 10/14/2011 |
| Design | 09/01/2011 | 11/01/2011 |
| Development | 10/01/2011 | 02/01/2012 |
| Test | 02/01/2012 | 04/01/2012 |
| Implementation | 04/01/2012 | 05/01/2012 |

B.  iPRIS

The primary purpose of the iPRIS application is to develop an interim system that will manage the improper payment processes until iPRIS is deployed. It's being developed by

3

HHS1_01019491

BAH. The iPRIS system will include functions of the RAC, DVC, Appeals and reporting. When the iPRIS application becomes available, the data in iPRIS will be migrated to PRIS.

Below is the time line

| Item | Targeted Start Date | Targeted End Date |
|---|---|---|
| Requirements | 09/12/2011 | 09/30/2011 |
| Design | 09/15/2011 | 10/14/2011 |
| Development | 10/09/2011 | 10/21/2011 |
| Test | 10/22/2011 | 10/28/2011 |
| Implementation | 11/01/2011 | 11/30/2011 |
| Data migration | 04/20/2012 | 05/01/2012 |

## C. HPMS Data Fields

DPOA has requested to establish a Recovery Audit Contact in HPMS. The purpose of this contact is to send RAC notifications to All Part C & D plans via HPMS.

Below is the time line

| Item | Targeted Start Date | Targeted End Date |
|---|---|---|
| Sent Request | 08/02/2011 | 08/04/2011 |
| Developed CR Form | n/a | n/a |
| Contact Added | 02/2012 | 02/2012 |
|  |  |  |

## D. Data Sharing

PDE data will be made available to the Part D RAC contractor once the ATO has been issued. The RAC will also be given access to some of CMS systems that support Part D and Medicare Advantage. The data and the systems will be used by the RAC to help identify improper payments.

Below is the time line

| Item | Targeted Start Date | Targeted End Date |
|---|---|---|
| TIBCO set-up | 07/01/2011 | 11/5/2011 |
| IDR Data Request form | 07/01/2011 | 07/15/2011 |
| IDR Data File received | 07/16/2011 | 07/19/2011 |
| IDR – EFT Survey Form | 09/25/2011 | 09/30/2011 |
| EFT Meeting | 10/03/2011 | 10/03/2011 |
| Open Firewall | 10/10/2011 | 10//15/2011 |
| SR – VPN (Firewall Team) | 10/15/2011 | 10/25/2011 |
| EFT Testing | 10/25/2011 | 10/30/2011 |

4

HHS1_01019492

| Item | Targeted Start Date | Targeted End Date |
|---|---|---|
| DUA (MARx, IDR, HPMS, One PI) | TBD | TBD |

### E. BPM

The purpose of the Business Process Modeling is to capture the activities associated with the RAC program and to identify the systems and various CMS divisions that support the activities.

Below is the time line

| Item | Targeted Start Date | Targeted End Date |
|---|---|---|
| Recovery Audit Contractor Program for Part D – High-Level Process – To Be | 07/2011 | 10/30/2011 |
| RAC Prescription Drug Event Selection and Validation – To B | 07/2011 | 10/30/2011 |
| New Audit Issue Review – To Be | 07/2011 | 10/30/2011 |
| Accounts Payable and Receivable – To Be | 07/2011 | 10/30/2011 |
| Part D Plan Appeals – To Be | 07/2011 | 10/30/2011 |

### F. VTS

The Vulnerability Tracking System (VTS) will facilitate the exchange of unstructured content related to vulnerability between contractors and CMS. This system will allow CMS to implement corrective actions to address the vulnerability.

Below is the time line

| Item | Targeted Start Date | Targeted End Date |
|---|---|---|
| Requirements | 11/01/2010 | 03/30/2012 |
| Design | 03/01/2011 | 06/30/2011 |
| Development | 05/01/2011 | 10/30/2011 |
| Test | 11/01/2011 | 11/30/2011 |
| Implementation | 12/01/2011 | 12/30/2011 |
| | | |

### G. Payment Process

5

HHS1_01019493

A483

Validated Improper payments will be adjusted from Medicare Advantage Plan's monthly payments. As a result, PRIS will interface with APPS. This interface is needed to request a plan's payment adjustment and to confirm that the adjustment was satisfied.

The RAC's contingency payment will be invoiced after the Full Improper Amount has been adjusted from the plan's monthly payment.

An Interface Control Document will be created by MPPG that details the interface between the impacted systems. (PRIS, APPs & HIGLAS)Higlas) Meeting is scheduled 11.2.11 payment group to review ICD for Apps.

Below is the time line

| Item | Targeted Start Date | Targeted End Date |
|------|---------------------|-------------------|
| Requirements | 08/12/2011 | 10/21/2011 |
| Payment Process Meeting | 08/15/2011 | 10/15/2011 |
| ICD Deliverable | 09/12/2011 | 10/21/2011 |

### H. CMS RAC Web site

Part C & D RAC website will provide messaging around the RAC program.

Below is the time line

| Item | Targeted Start Date | Targeted End Date |
|------|---------------------|-------------------|
| Website Request to OBIS | 06/01/2011 | 06/09/2011 |
| Website Approval | 06/09/2011 | 09/15/2011 |
| Website & Stellant Training | 09/15/2011 | 09/25/2011 |
| Content Development | 09/15/2011 | 10/15/2011 |
| Stellant Approval | 10/10/2011 | 10/15/2011 |
| Website Launch | 10/15/2011 | 10/30/2011 |

**3.    PART D RAC AUTHORITY TO OPERATE**

The C&A (Certification & Accreditation) Package was uploaded into CFACTS on 9/1/11, and a notice was sent (Olivia Williams on behalf of John Spiegel) to Michael Mellor, CISO requesting that the accreditation decision be made prior to September 16, 2011. The ATO was awarded effective October 15, 2011, but due to findings (several low and moderate risks still exist) that there is an overall higher risk than is typical for the requested Moderate system, the ATO is only issued for a year, and expires October 15, 2012.

**4.    PART D RAC DATA VALIDATION CONTRACTOR**

6

HHS1_01019494

We received two proposals to our RFP (deadline: 9/8/11 12:00pm). Staff completed the Technical Evaluation and sent the recommendations to OAGM. OAGM and our staff negotiated a signed contract by the 9/30/11; contract awarded to Livanta. Livanta kickoff meeting occurred October 20, 2011.

5.   **PART D APPEALS POLICY**

This paper outlines the proposed appeals process for the Part D Recovery Audit Contractor (RAC). It includes the relevant policy issues and the projected timeline to implement this process. Meeting scheduled 11.3.2011 to discuss additional policy issues.

6.   **PART D RAC APPEALS CONTRACTOR**

Draft version in development with DRPD.

7.   **COMMUNICATIONS**

**A. HPMS Launch Letter-** Draft completed; pending DPOA final review and signoff from John Spiegel.

**B. ACLR Website Content**

Booz Allen is currently reviewing ACLR's proposed website content. Recommendations are due Oct 31, 2011

**C. CMS Part D RAC Website**

Part D RAC will utilize existing Part A/B RAC website infrastructure. Booz Allen is developing proposed website content. Draft language is due October 28, 2011.

**D. Improper Payment Notification Letter**

Draft letter reviewed by Booz Allen; letter ready for final internal CMS review.

**E. Part D RAC FAQ's**

Booz Allen is currently drafting. Draft language is due October 26, 2011.

**F. Part D RAC Communications Plan**

Draft submitted by Booz Allen; pending CMS review. See Attached.

**G. No Findings Letter**

Draft letter sent to Booz Allen on 11/1/11 for comment.

**H. Part D RAC FACT Sheet**

HHS1_01019495

**8.    PART D RAC SOP**

Initial draft submitted by Booz Allen 10.24.11.  This document is designed to be a narrative summary of the key Part D RAC procedures and processes.  Pending CMS review.

**9.    PART D AUDIT SCOPE**

**A. Duplicate Payments** - proposed ACLR audit methodology under review with Booz Allen.  Proposed ACLR methodology technically acceptable.  Booz Allen assisting with draft design appropriate for Sponsor outreach.  Draft Pendingpending Booz Allen revisions

**B. Excluded Providers** - proposed ACLR audit methodology under review with Booz Allen.  Proposed ACLR methodology technically acceptable  Booz Allen assisting with draft design appropriate for Sponsor outreach.  Draft received- 10.31.11; pending CMS review.

**10.    PART D IMPROPER PAYMENT CALCUALTION METHODOLOGY**

Methodology for the identification of recoupable amounts presented to MPPG on XX. ACLR proposed Sponsor outreach version of methodology under revision.  Current request is to create one narrative outlining the process similar to draft and one example of methodology.  ACLR is currently revising; revised version due 10.27.11.  See attached draft proposals Revised draft sent to MPPG for second review 10.31.2011.

**11.    NEW ISSUE REVIEW BOARD**

The New Issue Review Board (NIRB) is the planned governance/oversight board that identifies reviews, approves and sends new Part D audit issues to CMS/CPI. Membership includes representatives from various CMS offices. Development of the NIRB was delayed to focus on priorities associated with the ATO approval, infrastructure development and the acquisition of support contractors.

8

HHS1_01019496

A486

# December 9, 2011 Email

**EXHIBIT 26**

A02805



| | |
|---|---|
| **From:** | Sanders, Jessica B. \(CMS-OAGM-\) |
| **To:** | Christopher Mucke |
| **Cc:** | Wheeler, Desiree Y. \(CMS/OAGM-\) |
| **Subject:** | RAC Medicare Part D RAC Draft SOW |
| **Date:** | Friday, December 09, 2011 11:04:03 AM |
| **Attachments:** | Part D RAC Draft SOW 12092011.docx |

Good Morning,

As promised, attached is the **draft** Statement of Work (SOW) revision for the Recovery Audit Contract (RAC) for Medicare Part D. Please review and provide your questions/comments by COB Friday, December 16, 2011.

Thank you,

*Jessica B. Sanders*

Contract Specialist
Office of Acquisition & Grants Management (OAGM)
Centers for Medicare & Medicaid Services
Mailing Address: 7500 Security Boulevard, Mail Stop B2-14-21, Baltimore, MD 21244-1850
Physical Address: 7111 Security Boulevard, 2nd Floor Cube B2-12-24, Baltimore, MD 21244-1850
☎ (410) 786-1076
. (410) 786-9088
   jessica.sanders@cms.hhs.gov

**IMPORTANT:** This e-mail, including all attachments, constitute Federal Government records and property that is intended only for the use of the individual or entity to which it is addressed. It also may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this e-mail transmission is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is strictly prohibited. If you have received this e-mail in error, please notify the sender by responding to the e-mail and then delete the e-mail immediately

11AR166

A02806

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services

PROGRAM INTEGRITY TECHNICAL ASSISTANCE CONTRACT

Contract No. HHSM-500-2010-00251G

# Medicare Part D RAC
# Statement of Work

December 9, 2011
PRELIMINARY DRAFT – Version 1

167

A02807

## Table of Contents

1.0   Introduction and Background......................................................................................................1 - 4
    1.1      Commonly Used RAC Terms and Acronyms
    1.2      Part D RAC Introduction and Scope
        1.2.1      Part D RAC Scope
        1.2.2      Part D RAC Methodology
        1.2.3      Part D Contracts Excluded from RAC Requirements
2.0   RAC Audit Activities/ Methodology .........................................................................................4 - 6
    2.1      Improper Payment Review Process
        2.1.1      Improper Payment Impact Calculation Methodology
        2.1.2      Improper Payment Reporting and Tracking
            2.1.1.1      Improper Payment Review Package
            2.1.1.2      No Determination Report
    2.2      Validation of RAC Audit Findings
        2.2.1      RAC/DVC Dispute Resolution
    2.3      Notification Process
        2.3.1      Notification of Improper Payment Letters
3.0   Post-Audit Activities...................................................................................................................7
    3.1      Appeals Process
    3.2      Payment Adjustment Process
        3.2.1      RAC Invoice Tracking
4.0   RAC Requirements/ Tasks to be Performed .............................................................................7 - 9
    4.1      Basic Requirements
    4.2      RAC Audit Requirements
5.0   Key Personnel/Other Personnel ..............................................................................................9 - 11
6.0   Quality Assurance ...................................................................................................................11 - 12
    6.1      RAC Oversight
    6.2      Cooperation/ Coordination
    6.3      Quality
    6.3      Standard Operating Procedures
    6.3      Website
    6.3      CMS Systems

Appendix A: "Sample Letters" ......................................................................................................13
Appendix B: Schedule of Deliverables ..........................................................................................14
Appendix C: Appeals Policy ..........................................................................................................15
Appendix D: Improper Payment Impact Calculation Methodology ..........................................16 - 18

11AR168

A490

A02808

# 1.0  Introduction and Background

Title I of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA) (P.L. 108-173) was signed into law on December 8, 2003. The MMA established a new voluntary outpatient prescription drug benefit under Part D of Title XVIII of the Social Security Act (the Act). The prescription drug benefit, referred to as Medicare Part D, as well as an employer subsidy for qualified retiree health plans, began on January 1, 2006. Coverage for the drug benefit will be provided by private prescription drug plans (PDPs) that offer drug-only coverage or through Medicare Advantage (MA) plans that offer both prescription drug and health care coverage (known as MA-PD plans). These plans must offer a standard drug benefit, but will have the flexibility to vary the drug benefit within certain parameters. The Centers for Medicare & Medicaid Services (CMS) has identified 26 MA Regions and 34 PDP Regions, not including territories, each of which is its own PDP region.

The Recovery Audit Contractor (RAC) Program, which is designed to ensure proper payments to Sponsoring Organizations (SOs) and providers, was initiated through demonstration programs mandated by the Medicare Modernization Act of 2003. The success of the initial pilot program for Medicare Parts A and B included the return of millions of dollars in overpayments to the Medicare Trust Fund. Based on that success, the Medicare Parts A and B RAC Program was permanently established on a national level through the Tax Relief and Healthcare Act of 2006.

Under the 2010 Patient Protection and Affordable Care Act (ACA) legislation enacted in March 2010, CMS is required to expand the RAC Program to the Medicare Part C (Medicare Advantage) and Part D (Prescription Drug Benefit) programs. Section 6411(b) of the ACA provides CMS with general authority to enter into contracts to conduct RAC audits in Medicare Part D. Under the Medicare Integrity Program (MIP), RACs are to identify underpayments and overpayments and recoup any overpayments made associated with the Medicare program. The Part D RAC is dedicated to identifying past improper payments in reconciled Medicare PDE claims and providing information to CMS to help prevent future improper payments.

## 1.1  Commonly Used RAC Terms and Acronyms

For purposes of this Manual, the following list addresses some of the commonly used terms within the Part D RAC Program. A more comprehensive list can also be found in Appendix B, "Part D RAC Glossary of Terms and Acronyms."

- "Appeals Contractor" (Independent Review Entity) handles the first level of appeals from SOs challenging RAC findings.
- "Audit Scope" is a list of audit issues that the RAC is required to review during a given year.
- The "Center for Program Integrity" (CMS/CPI) serves as CMS' focal point for all national and state-wide program integrity, fraud and abuse issues in the Medicare and Medicaid programs, and the Children's Health Insurance Program (CHIP). Specifically, the Division of Plan Oversight and Accountability (DPOA) is the division within the CMS/CPI Medicare Integrity Group responsible for ensuring program integrity for Parts C and D, and oversees Medicare Part D RAC.
- The "Data Validation Contractor" (DVC) measures the accuracy rate of the RAC. The DVC takes random samples of the improper payments identified by the RAC to determine if they are accurate and will review and approve/disapprove improper payment referrals, receive and review

11AR169

A02809

New Audit Issues the RAC wants to pursue for improper payments, and provide recommendations to the New Issues Review Board (NIRB). CMS/CPI contracted with Livanta LLC for this duty.

- "Improper Payment Review Package" (IPRP) is an improper payment file and the supporting documentation for a particular audit issue by contract and year.
- "New Audit Issue Review Package" (NAIRP) is the package of proposed audit issues and includes a sample of PDE records for a specified contract year, a new audit issue, an estimate of improper payment amount and the audit methodology.
- The "New Issues Review Board" (NIRB) is the planned CMS/CPI group that identifies, reviews, and approves Part D RAC audit issues.
- The "Payment Recovery Information System" (PRIS) houses referrals made to CMS/CPI after improper payments are identified. The RAC and DVC review the claims and their accompanying medical records and charges, either confirm or reject claims, and update the records with an approval or rejection to request money from the provider. Until the PRIS is fully operational, CMS/CPI developed the "Interim Payment Recovery Information System" (i-PRIS) as an interim solution in order for the Part D RAC to begin reviewing data files and expediting the Part D RAC. The i-PRIS will be discontinued once the PRIS is completely operational.
- "Prescription Drug Events" (PDEs) are summary records submitted every time a beneficiary fills a prescription under Medicare Part D. The PDE data are not the same as individual drug claim transactions, but are summary extracts using CMS-defined standard fields.
- The "Recovery Audit Contractor" (RAC) is responsible for reducing Medicare improper payments through the efficient detection and collection of overpayments, the identification of underpayments, and assists with the implementation of actions that will prevent future improper payments. Originally implemented for FFS Medicare, the ACA (Section 6411(b)) expands the original RAC Program to Medicare Parts C and D. RACs are paid for identified improper payments on a contingency fee basis. DPOA contracted with ACLR for this duty.
- "Sponsoring Organizations" (SOs) are private organizations that contract with CMS to administer Medicare Parts C and/or D benefits and may offer several different types of Medicare Part C and/or Part D plans. SOs include, but are not limited to, Medicare Advantage Organizations (MAOs), Medicare Advantage – Prescription Drug Plans (MA-PDPs), and Prescription Drug Plans (PDPs).

## 1.2  Part D RAC Introduction and Scope

### 1.2.1  PART D RAC SCOPE

CMS/CPI determines the specific criteria on which the Part D RAC must submit to CMS as improper payments and new audit issues. To direct the RAC's review, CMS/CPI mandates submission of improper payments by contract, issue type, and audit year. CMS/CPI further defines the audit scope to include the exact audit issue to be reviewed.

Contracts will include Medicare Prescription Drug Plans who have not been terminated. Issue types will include approved audit scopes. Audit year will be the year of the data and for reconciled periods beginning with 2007.

There are currently three audit issues that have received approval to be the focus of the Part D RAC review in the RAC's start-up time frame. These three issues are:

11AR170

A02810

- **Excluded Providers** - Part D RAC excluded prescribing provider audits focus on improper payments made for Part D drugs that were prescribed by a provider who was excluded from the Medicare program at the time of the claim. The audit is conducted using an automated approach to match critical provider demographics against the Medicare Exclusion Database (MED file). PDE records submitted for Part D drugs prescribed by excluded providers are examined to identify improper payments.

- **Duplicate Payments** - Part D RAC duplicate payment audits focus on identifying duplicate PDE claims made by SOs. The audit reviews PDEs submitted for the same beneficiary, same medication, for the same or very close dates. After the RAC has determined the population of duplicate payments, additional procedures to verify the duplicates will be performed. These verification procedures could include review of related prescriptions, as well as the SOs explanation for the occurrence. Any item that cannot be justified as a valid PDE will be identified as a duplicate payment and included by the RAC as an improper payment.

- **Direct and Indirect Remuneration (DIR)** - Part D RAC DIR remuneration audits focus on Plan Benefit Packages (PBPs) for which SOs have resubmitted DIR amounts for the contract year that conflict with the amounts originally entered for reconciliation. Supporting documentation from the SOs and/or their Pharmacy Benefit Managers (PBMs), including quarterly rebate reports, PBM contracts, manufacturer contracts, rebate tracking documents, worksheets, budgets, accounts, and other accounting data are examined to verify reported DIR amounts and identify any overstatements/understatements.

These issues can be sent to CMS as an Improper Payment Review Package (IPRP). The IPRP should include the contract number, issue type, audit year, and PDE records. The IPRP record will include the improper payment amount along with the RAC contingency fee amount.

As implementation of the Part D RAC progresses, new audit issues may be approved and added to the RAC's audit scope. In addition to the audit issues already identified by CMS/CPI, audit issues may be expanded to include new issues during the RAC process. A new audit issue must first be proposed to CMS' New Issues Review Board (NIRB) for approval. The new issue shall be submitted to the NIRB in a New Audit Issue Review Package (NAIRP). The new audit issue shall include the issue type, audit scope, recovery estimate and a sample of PDE records.

The RAC can submit an IPRP after a NAIRP receives a proper approval from the New Issues Review Board (NIRB) and CMS/CPI. CMS/CPI limits the number of new audit issues to a maximum of five per year.

### 1.2.2 PART D RAC METHODOLOGY

The Part D RAC Program conducts audits using a methodology that focuses on identifying and correcting improper payments to SOs. Specifically, the RAC Program uses recovery auditing and conducts reviews of individual Medicare Part D claims and PDE data to determine whether claims were billed properly. This methodology also allows for implementing procedures to prevent future improper payments. This will be described in further detail in Section 2.

A A D 171

A02811

### 1.2.3 PART D CONTRACTS EXCLUDED FROM RAC REQUIREMENTS

CMS' office of Information Systems (OIS) will provide reconciled PDE records to the RAC. The RAC shall secure the data in a database and use the PDE records to help identify improper payments. The RAC shall track PDE records that were identified as Unavailable for Review (UFR).

CMS/CPI consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS. As a result, certain PDEs are restricted from review by the Part D RAC. The following detailed scope UFR criteria applies to the Part D RAC contracts:

- **Terminated Contracts** - These contracts with SOs have been contractually ended by CMS on a prior date and are no longer eligible for Part D claims payments.
- **Contracts Already Deemed to Have No Findings** - Contracts reviewed by the RAC where no improper payments were identified and a No Determination Report (NODR) was submitted to CMS. The RAC may not review these contracts for the same audit issue.
- **Contracts Already Included in an Offset** - Once the RAC identifies an overpayment in a contract, a subsequent process of recoupment is initiated through making monthly offsets against the SO's account. Contracts in the recoupment phase are excluded from further RAC review.
- **Contracts for which Underpayments have been Identified** - Contracts reviewed by the RAC may reveal underpayments made by CMS. In these instances, account adjustments are made and contracts are paid accordingly. These contracts are flagged and are to be excluded from further RAC review.
- **Contracts Already Included in an Appeal** - Once the RAC identifies an overpayment in a contract and the SO initiates an appeal disputing the RAC findings, these contracts are in a "hold status" and excluded from further RAC review until the appeal process is complete.

# 2.0  RAC Audit Activities/Methodology

Audit activities refer to the entire audit work stream performed under the Part D RAC Program as it relates to the Part D RAC. Since the responsible parties for Part D RAC audit functions include CMS/CPI personnel and support contractors, including and aside from the Part D RAC, the effective integration of each audit process and collaboration among stakeholders is critical to the program's success.

The following detail outlines the audit processes for identifying improper payments and compiling an audit package. Specific details related to each audit issue will be highlighted. This section also serves to summarize CMS/CPI's dedication to ensuring accuracy in audit findings and the means by which this will be accomplished.

## 2.1  Improper Payment Review Process

To begin this process, the RAC must:
- Retrieve reconciled PDE records from the Integrated Data Repository (IDR) system via CMS' Office of Information Systems (OIS)
- Use other CMS systems to validate improper payments

11AR172

A02312

- Perform PDE validation procedures – To ensure the validity of the PDE database, totals from the PDE database must be tied to the reconciliation file.
- Separate PDE records permanently unavailable for review, such as those discussed in Section 1.1.3 - "Part D RAC Excluded Contracts."
- Record and update audit issues

After the documentation is compiled, the RAC can begin testing for the various audit issues and performing the subsequent improper payment calculations.

In order to identify improper payments based on the current audit issues, the RAC will need to perform a thorough analysis of the PDE database provided for each contract. This database will be evaluated on a PDE level, with improper PDEs being separately identified and compiled for each audit issue. Depending on the nature of the audit issue being evaluated, the RAC should be determining improper payments at 100% of the population. The RAC is required to consult with CMS prior to beginning work on new audit issues. Outside of specific guidance from CMS during the preliminary consultation, the RAC can determine the scope of testing. In addition to the RAC determining each improper PDE, the RAC should ensure that any trends or inconsistencies aside from the audit issues are reported to CMS.

Once the preliminary actions are complete, two activity paths occur concurrently:

- On path 1, the RAC analyzes PDEs for potential improper payments. Once this analysis is complete, the RAC updates the PDE record status and determines whether a potential improper payment exists.
  - If a potential improper payment exists, the RAC creates an Improper Payment Review Package (IPRP) and submits it to the DVC for validation via PRIS.

- On Path 2, the RAC analyzes PDEs for potential fraudulent activities by the Part D contract.
  - If no potential fraudulent activity exists, this path ends.
  - If the RAC determines that potential fraudulent activity exists, they prepare and submit the fraud referral to CMS/CPI via e-Referral.

Due to the nature of Direct and Indirect Remuneration (DIR), additional steps will be required when completing the examination of this issue. Part D sponsors are required to fully disclose to CMS any DIR associated with the drug costs for the purposes of determining reinsurance payments and risk sharing. In addition to the CMS reporting requirements, SOs are subject to DIR reporting requirements. These are reported to CMS at the plan ID level; however, for the purposes of the RAC audits, the improper payments will be determined at the contract level in order to avoid issues with allocation. At year-end, sponsors submit the DIR Report for Payment Reconciliation to support the total DIR that is being used in the reconciliation process. In order to determine any error in DIR, it may be necessary for the RAC to make site visits to either the SO or the SO's PBM. The DIR received by a SO is based on contracted amounts usually between the PBM and the drug manufacturers. These discounts are then passed on to the SO. The RAC will need to review contracts, DIR received from manufacturers by quarter report, Quarterly Rebate Report by Drug (this will also be shown on a manufacturer breakdown by drug report). The RAC will need to test if the DIR agreed amounts in the contracts are the amounts actually received. They will also need to determine if the support provided by the PBM and SO support the amounts used during reconciliation. In general, the RAC will need to review whatever supporting documentation is deemed necessary in order to be able to rely upon the amount of DIR the SO actually received. **As described above, the scope of this testing, as determined by the RAC, is required to be reviewed with CMS prior to beginning the examination.** The two paths above can be followed at the conclusion of the DIR examination.

11AR173

A02813

### 2.1.1 Improper Payment Impact Calculation Methodology

The RAC should consult with CMS for guidance on improper payment impact calculation methodology. Due to the nature of PDEs and the payment reconciliation process, this calculation will need to be carefully fine-tuned in coordination with CMS prior to the RAC determining impact. Reference Appendix D for further guidance on this methodology.

### 2.1.2 Improper Payment Reporting and Tracking

#### 2.1.2.1 Improper Payment Review Package (IPRP)

After the RAC identifies an improper payment, it compiles an Improper Payment Review Package (IPRP) which contains the Improper Payment File and the supporting documentation identifying improper payments corresponding to a particular audit issue by contract. A unique ID is assigned to a Package and will be included on and associated with all future tracking reports and letters such as Validation Findings, Notification Letters, Appeal Notifications, Monthly Plan Payment Adjustments, and Invoices.

#### 2.1.2.2 No Determination Report (NODR)

The NODR is a report generated by the RAC to reflect that there were no improper payments identified on the PDEs being reviewed. Once the RAC files a NODR, the audit process for that package is stopped. A NODR signifies that the contract is flagged to be error-free and excluded from future RAC review for the same audit issue.

## 2.2 Validation of RAC Audit Findings

CMS/CPI contracts with the Data Validation Contractor (DVC) to perform a review of the IPRP and to submit a IPRP validation finding. The DVC will follow the same review process as the RAC. The DVC will also validate the UFR records, the improper payment amount, and the contingency fee.

The RAC must concur with or non-concur with the validation findings submitted by the DVC. Concurred validation findings will continue through the RAC process.

### 2.2.1 RAC/DVC Dispute Resolution

For RAC findings the DVC disagrees with, the DVC must provide a rejection reason and explanatory comments, including their recovery calculations, in the PRIS.

The RAC is required to review all disagreements identified by the DVC and either accept or reject the DVC's validation findings. When the RAC agrees with a rejected IPRP Validation finding, the file is considered validated; all associated PDE records will be removed from the UFR file. The RAC should submit a new package with updated data.

The RAC must collaborate with the DVC to attempt resolution of any dispute. Disputes will be entered and tracked through CMS systems.

A496

A02814

## 2.3 Notification Process

### 2.3.1 NOTIFICATION OF IMPROPER PAYMENT LETTERS

The RAC is required to issue a Notification of Improper Payment Letter (Appendix A – "Sample Letters") to the SO once an improper payment is identified and validated. The letter is formatted and issued through the RAC's internal systems and uploaded in CMS' systems.

As per the Part D RAC appeal policy detailed in Appendix C titled "Appeals Policy," the SO has 60 days to respond to any Notification of Improper Payment Letter. The response period is based on the date that appears on the Notification of Improper Payment Letter.

# 3.0 Post-Audit Activities

Once the RAC identifies improper payments and the DVC validates those payments, post-audit activities commence. This section describes the appeals process, which must be complete before the payment process begins, and the guidelines that govern those post-audit activities including the details, reporting requirements and communications needed for the appeals, and payment processes. This process is extremely important to the RAC, who is paid by contingency fee (7.5%), and cannot receive payment for their services from CMS/CPI until the payment process is complete and payment is received from the Part D contract. In addition, this section will describe the payment collection process in the case an appeal is not pursued.

## 3.1 Appeals Process

CMS/CPI provides Part D contracts that disagree with the RAC's findings a chance to appeal the RAC's decision. CMS/CPI proposes a three level appeals process beginning with a review by an Independent Review Entity (IRE). Until CMS/CPI contracts with an IRE, there will be an interim process is in place. At the conclusion of the appeals process, the payment adjustment process will proceed.

## 3.2 Payment Adjustment Process

CMS/CPI will collect Medicare Part D Improper Payments by adjusting the plans monthly payments that are paid out of the Medicare Trust Fund. Once the appeals process has passed, CMS systems will transmit a file to adjust the improper payment from the contract's monthly payment.

There may be instances when the plan will submit a check as refund of a improper payment. All checks shall be sent to CMS for processing.

### 3.2.1 RAC INVOICE TRACKING

Once the improper payment has been adjusted from a plan's monthly payment or a check has been received, the RAC shall send an invoice to CMS. The invoice shall include the contingency fee associated with the IPRP.

11AR175

A02815

# 4.0 RAC Requirements/ Tasks to be Performed

## 4.1 Basic Requirements

### Kick-off Meeting

The RAC shall work with the PO to determine a mutually agreeable time to conduct the Kickoff meeting. This meeting shall be held no later than 14 calendar days after the contract is awarded. The kickoff meeting shall include, at a minimum, the following information:
- Introduction of key personnel.
- Discussion of the draft Project Work Plan and how work will be completed in order to meet deadlines.
- List of all deliverables.

Within 5 business days from the kick-off meeting, the RAC is required to electronically submit meeting minutes.

### System Security Plan

The Contractor shall ensure security of sensitive information as well as provide and implement a written security and plan covering all aspects of this task order. The Contractor shall maintain oversight of the physical location of the protected medical information and other proprietary information. The Contractor shall store and dispose of the records-documents/files containing protected medical information and other proprietary information in accordance with CMS guidelines, and as instructed by the PO.

Specifically, the RAC shall include a draft System Security Plan (SSP) using the current template available at the CMS Information Security "Virtual Handbook" Web site at:
http: www.cms.gov Information Security). The details contained in the RAC's draft SSP shall be commensurate with the size and complexity of the other requirements of the SOW based on the System Categorization determined elsewhere in this document. The System Security Plan shall be submitted no later than 14 calendar days after contract award. The RAC shall be required to update and resubmit its SSP to CMS every three years (at a minimum) following award or when a major modification has been made to its internal system, as defined by the CMS CISO.

### Project Work Plan

The RAC is required to submit a draft Project Work Plan (PWP) within 14 calendar days after the contract is awarded. The PWP is a description of how the RAC plans to accomplish the requirements of the SOW. Specifically, the PWP should include:
- The RAC's review approach, staffing, scheduling, etc.
- All contact information for the RAC's staff.
- Anticipated risk and risk mitigation.

This document is subject to CMS review and acceptance. Upon CMS review, the RAC will submit a finalized PWP electronically. All PMPs shall be modified and updated continuously after the initial submission to reflect any major changes in the project. When changes are identified, a revised PMP should be submitted for review within 10 days of identifying the change. If no revisions are received, the resubmitted PWP should be considered final.

11AR176

A02816

### Monthly Progress Reports

The RAC shall submit Monthly Progress Reports to the PO and by the 15th of each month for the previous months' effort. The PO and the Contractor shall agree upon the content and format of the Monthly Progress Report as this may change periodically. At a minimum, the monthly progress report should include:

- Administrative Actions
- Progress status by audit issue
- Summaries of applicable meetings (internal and external)
- Areas of concern requiring CMS action/attention
- Any unresolved issues
- List of activities completed to date
- List of upcoming activities
- Summary of improper payments (by contract) to date
- Listing of any concerns from Plans

As a supplement to the monthly report, the Total RAC Invoice Amount Report and Total Improper Payment by Contract Report should be submitted.

### Total RAC Invoice Amount Report

The RAC should include the Total RAC Invoice Amount Report with their Monthly Progress Report. This report will show the total contingency amount submitted for payment by the RAC along with amounts received and outstanding from CMS. The associated improper payment total should also be identified in this report.

### Total Improper Payment by Contract Report

The RAC should include the Total Improper Payment by Contract Report with their Monthly Progress Report. This report will show the total improper payments to date by contract number. Each entry should identify the contract number, Plan ID number, number of improper PDEs, the identified over/underpayments and the total improper payment amount.

## 4.2  RAC Audit Requirements

As discussed in the sections above, the RAC is required to complete the Improper Payment Review Package (IPRP), No Determination Report, IPRP Validation Findings dispute, and the Notification of Improper Payment Letters, as applicable for each audit issue/contract.

# 5.0  Key Personnel/Other Personnel

The Contractor shall maintain a staff of key personnel positions as necessary and within the requirements identified below. Key personnel shall not serve dual responsibilities in key functions unless approved by the Contracting Officer, i.e., the Program Director may not also serve as the Audit Manager. Changes in key personnel positions shall be submitted to the Contracting Officer in writing for approval within 30 days prior to any change.

11AR177

A02817

A significant amount of confidential information will be reviewed under this contract. Therefore, all contractor and subcontractor personnel working on this task order shall submit a signed Non-Disclosure Statement prior to the start of the project.

When key personnel positions are vacated due to unforeseen circumstances, a proposed replacement shall be submitted in writing for approval no later than 30 calendar days from the date the position was vacated. Interim replacements should be identified when a permanent replacement cannot be identified within this time frame. CMS may consider a 60-day interim replacement until a permanent replacement is secured.

Unless otherwise approved by the Contracting Officer, the key personnel noted below shall possess the following minimum work experience and educational requirements:

**Program Director**

The Program Director shall possess:

Work Experience
Ten or more years of professional experience with at least three years as a manager responsible for managing complex systems and work flow. Experience in audit recoveries is required.

Educational Requirements
A bachelor's degree from an accredited institution, plus a master's degree from an accredited institution or substitution of 4 additional years of related work experience in lieu of the master's degree.

**Audit Director**

The Audit Director shall possess:

Work Experience
A minimum of 5 years in an audit and reimbursement setting; Medicare audit and reimbursement setting is preferred.

Understanding of Government Auditing Standards, audit procedures, and financial analysis techniques.

Educational Requirements
An advanced degree in finance or accounting; Certified Public Accountant (CPA) or Certified Management Accountant (CMA) certificate is desired.

**Manager, Medicare Part D**

The Manager, Medicare Part D shall possess:

Work Experience
A minimum of 5 years experience specific to benefit administration, payment, and Part D policy and regulations. The Manager, Medicare Part D shall also possess an in-depth knowledge and understanding of the Medicare Part D Program.

Educational Requirements
A bachelor's and a master's degree; 5 (five) additional years of related work experience may be

11AR178

A02818

substituted in lieu of the master's degree.

Knowledge of Medicare law, regulations, manuals, and instructions is required.

**Systems Security Officer**

The Systems Security Officer shall possess:

Work Experience:
A minimum of 5 years experience managing complex security programs systems, implementing necessary safeguards, and ensuring all artifacts are current and up-to-date.

Educational Requirements:
A bachelor's and a master's degree; 5 additional years of related work experience may be substituted in lieu of master's degree.

### Other Personnel

Although not considered a key personnel position, the following labor category personnel may be required for this SOW. When required, the respective job classification requirements are essential for performance under this contract. Waiver(s) from the essential personnel requirements may be submitted in writing to the Contracting Officer for approval. All waiver requests should include a copy of a resume along with supporting rationale for the deviation from these requirements.

**Lead Statistician**

The Lead Statistician shall possess the following:

Work Experience
A minimum of 5 years experience using statistics to support corporate business information needs.

Experience in statistical detection of fraud, fuzzy logic, development of mathematical models, neural networks, and data mining or other analytical methods. Demonstrated experience and knowledge of health care information (health claims data, provider identifiers, etc).

Educational Requirements
Bachelor's degree in statistics or related field.

# 6.0  Quality Assurance

CMS will utilize a number of quality assurance procedures to ensure contractor compliance with this contract.  Examples include inspection of deliverables, review of reports, onsite progress meetings, performance evaluations, etc.

Contractors shall develop and maintain quality assurance procedures for work paper reviews, IT requirements, PDEs, etc.  Contractors shall also ensure that data is physically secured and Personal Health Information (PHI) data is handled confidentially.  This is required for subcontractors as well. These should be provided to CMS upon request.

11AR179

A501

A02819

## 6.1 RAC Oversight

CMS will conduct RAC oversight at either the RAC's site or at the appropriate CMS office. CMS has the right to request/review any work performed by the contractor at any time; this includes work papers, reports, etc. After completion of the engagement, CMS may hold a conference with the RAC to discuss any issues. CMS may choose to visit the RAC site to assess their performance.

## 6.2 Cooperation/Coordination

The Contractor shall cooperate and coordinate with stakeholders other than CMS, including Affiliated Contractors (ACs), and other entities as appropriate. Contractor performance will be evaluated using measures including, but not limited to:
- Demonstration of ongoing dialogue or meetings with the appropriate and necessary parties;
- Feedback from other entities; and
- Number and type of issues that arise and indicate communication, or lack of communication, between appropriate entities and the Contractor.

## 6.3 Quality

The Contractor shall maintain the highest degree of quality for all activities performed throughout the period of performance of the contract. CMS will evaluate Contractor performance using measures including, but not limited to:
- Completeness and accuracy of data analysis;
- Completeness and accuracy of all deliverables

## 6.4 Standard Operating Procedures

The Contractor shall follow the procedures that are outlined in the SOPs submitted by CMS/CPI.

## 6.5 Website

The Part D RAC will also develop and maintain a website for viewing by Part D plans and sponsoring organizations and or other interested entities. The website shall be developed and maintained in accordance with CMS standards and guidelines for contractor websites and will contain various types of information related to the RAC and the RAC Program. The website shall allow Part D plans to gain access to RAC audit issues related to its contract. CMS will approve content and links posted on the RAC's website.

## 6.6 CMS Systems

The Contractor shall maintain CMS systems to review Medicare Part D Data and to store and track Medicare Part D improper payments.

**Government Property**
No Government Furnished Property shall be issued for this effort.

11AR180

A502

A02820

# Appendix A: "Sample Letters"

## SUBJECT: Notification of Improper Payment

RAC Point of Contract
Plan Sponsor Name
Plan Sponsor Street Address
Plan Sponsor Street Address 2
City, State, Zip

RE: Plan Name, PDP Name

Dear RAC Point of Contact:

The Centers for Medicare & Medicaid Services (CMS) has retained ACLR to carry out the Recovery Audit Contractor (RAC) program for Medicare Part D. The RAC program, mandated by Congress through the Affordable Care Act, is aimed at identifying Medicare improper payments.

This letter is to notify you that Medicare has made an improper payment to you in the amount of *$Demand Amount.* A brief description of the Prescription Drug Events (PDE) associated with this improper payment can be found on the Improper Payment Report (workpapers) as an attachment to this document. An adjustment will be made to your monthly Membership Detail Report 60 days from the date of this letter.

These improper payments were generated from data analysis performed on PDE data submitted to CMS from *Plan Name, Contract Number.*

You have 60 days to appeal this determination. CMS provides Part D plan sponsors with a three-tiered appeals process should the plan sponsor disagree with our assessment of the improper payment(s). Further information on the appeals process can be found on-line. General Part D RAC information can be found at our website (insert appeals website address here). We have also created an email account to receive specific inquiries (DPOACommunications@cms.hhs.gov).

11AR181

A02821

# Appendix B: Schedule of Deliverables

The contractor shall submit all required reports and deliverables in accordance with the statement of work and the following schedule:

| Task Descriptions | Quantity/ Recipient | Delivery Schedule |
|---|---|---|
| Kick-off Meeting | Due to the PO | No later than 14 calendar days after contract award |
| Kick-off Meeting Minutes | Electronically to the PO | Within 5 business days from the kick-off meeting |
| System Security Plan | Due to the PO | No later than 14 calendar days after contract award |
| Project Work Plan Draft | Electronically to the PO | No later than 14 calendar days after contract award |
| Project Work Plan Final | Electronically to the PO | Within 10 days of CMS revisions |
| Vulnerability Report | Due to the PO | Monthly |
| Progress Report | Electronically to the PO | By the 15th of each month for the previous month's efforts |
| Total RAC Invoice Amount Report | Electronically to the PO | Due with the Monthly Progress Report |
| Total Improper Payment by Contract Report | Electronically to the PO | Due with the Monthly Progress Report |
| Ad-hoc Reports | Due to the PO | TBD |

11AR182

A504

A02822

# Appendix C:  Appeals Policy

Being developed

11AR183

A02823

# Appendix D:  Improper Payment Impact Calculation Methodology

The purpose of this appendix is to outline the methodology the RAC, as advised by CMS, should use to calculate the impact of any improper payments found as a result of auditing the approved issues. The basis for the RAC's evaluation will be the PDE database for each contract as well as the associated payment reconciliation files.

The current audit issues that will follow this methodology are duplicate payments and PDEs associated with excluded providers. The RAC will analyze their database to determine the total population of actual duplicate PDEs and actual PDEs associated with excluded providers. Once these populations are established, various PDE fields will be summed in order to begin the calculation of improper payment.

Due to the nature of the Part D program, the impact calculation methodology will essentially consist of a recalculation of the year-end reconciliation. The items that contribute to year-end reconciliation are Low Income Cost Sharing (LICS), Reinsurance cost-sharing, and the risk corridor adjustment (risk-sharing reconciliation amount). Re-computation of the year-end reconciliation, adjusted for improper payments, will be completed for each audit issue where improper payments have been identified. The initial reconciliation and the re-performed/corrected reconciliations will be compared to determine the total overpayment/underpayment.

Specifically, for four corrected PDE payment fields the RAC will quantify, sum for all findings, and incorporate into the Part D Payment Reconciliation calculations for each payment mechanism.  The re-performed/corrected amounts due to CMS or owed to Sponsors for LICS, Reinsurance, and Risk Sharing will then be summed together and compared to the results of the initial Part D Payment Reconciliation to determine the total impact on Part D payment.

Each piece of this reconciliation will be described below:

## LICS

Medicare provides additional assistance, referred to as Low-Income Cost Sharing (LICS), to low-income individuals (who meet the income and resource criteria) to reduce the individual's Part D premium and cost-sharing amounts. CMS makes monthly prospective LICS subsidy payments to reimburse Plan Sponsors for the LICS costs associated with providing prescription drug coverage to qualifying individuals.  These payments are based on prospective estimates that sponsors provide in their bids prior to the beginning of the plan year.

The LICS subsidy payments that Plan Sponsors make on behalf of the qualifying low-income beneficiaries must be documented and reported back to CMS so that, after the close of the plan year, CMS can reconcile these payments with the Plan Sponsors' actual costs to determine whether the Plan Sponsors have overpaid or underpaid. Upon year end, CMS reconciles the sum of the LICS amounts reported in relevant PDE data fields against the monthly prospective LICS subsidy payments made by CMS. A final overpayment or underpayment is calculated and recovered as a lump sum recovery or by adjusting monthly payments throughout the remainder of the current coverage year.

In calculating the impact to the government for improper payments, LICS amounts associated with improper payments are calculated on a dollar value basis by summing the amount included in the LICS

11AR184

A02824

PDE data field, and comparing the amounts paid or that should have been paid in accordance with program/plan requirements. As the LICS reconciliation process offsets estimated amounts against actual amounts paid, no further reconciliation processes are required.

## Reinsurance Subsidy

The Reinsurance Subsidy guarantees the Plan Sponsor a percentage of the individual's drug costs incurred in the last phase of coverage. Under the Reinsurance Subsidy, the federal government is responsible for 80% of allowable drug costs in the catastrophic phase. Allowable drug costs are those that have been adjusted by Direct and Indirect Remuneration (DIR) (e.g. rebates, discounts, etc that are received by the Plan Sponsor). Unadjusted drug costs are costs that have not been adjusted by DIR. PDEs processed in the catastrophic phase have these costs recorded in the Gross Drug Cost Above Threshold (GDCA) field of the PDE. Costs recorded prior to reaching the catastrophic phase are recorded in the Gross Drug Cost Below Threshold (GDCB) field of the PDE. To calculate the impact to the government, first, the DIR Ratio must be calculated. The DIR Ratio is the unadjusted GDCA divided by unadjusted total drug cost. The DIR ratio is applied to the net DIR amount to determine the reinsurance portion of DIR. To derive allowable reinsurance cost, the reinsurance portion of DIR is subtracted from GDCA. The reinsurance subsidy is 80% of the plan's allowable reinsurance cost.

Amounts associated with improper payments will increase or decrease year-end reconciliation GDCA and GDCB totals. Therefore, to calculate the impact of improper payments, the Plan Year Reconciliation GDCA and GDCB totals will be adjusted for any identified improper payments and the resulting (adjusted) GDBA and GDCB totals will be used in a subsequent reconciliation (Improper Payment Reconciliation) to determine the revised reinsurance subsidy using the same methodology used during year-end reconciliation.

## Risk Sharing

If costs (adjusted to exclude reinsurance subsidy payments and administrative costs) exceed risk corridor thresholds by a certain amount, CMS will reimburse the Plan Sponsor a percentage of the difference. Conversely, if adjusted allowable drug coverage costs are below expected levels, CMS will reduce future payments or otherwise recover a percentage of payments made. The risk sharing calculation is performed by calculating the Adjusted Allowable Risk Corridor Cost (AARCC) and then applying the appropriate risk sharing percentage to the AARCC. The Adjusted Allowable Risk Corridor Cost (AARCC) is the Covered Plan Paid Amount (CPP) less Net Covered Part D DIR and Reinsurance Subsidy, divided by the Induced Utilization Ratio (for enhanced alternative plans [1]). It is then determined where the AARCC falls with respect to the Risk Corridor Threshold. The Appropriate Risk Corridor percentage is then applied to the AARCC. The result is the Risk Sharing Amount associated with the plan.

In calculating the impact of identified improper payments, changes in GDCA. GDCB, and CPP totals will be determined. As outlined above, changes in CPP directly affect the calculation of AARCC while changes in GDCB and GDCA affect the Reinsurance Subsidy (as described in the section above), which is used in calculating AARCC. Improper payment amounts due CMS or owed to Part D Plan Sponsors will be calculated by subtracting the improper payment Risk Sharing Reconciliation amount from the initial Risk Sharing Plan Year Reconciliation amount.

---

[1] Dividing by the Induced Utilization Ration is only used when determining the AARCC for enhanced plans Defined standard and actuarially equivalent plans do not include the division step involving the Induced Utilization Ration.

11AR185

A02825

**Total Recoupment Amount**

The corrected total Part D reconciliation amount associated with improper payments will be determined by summing the amounts due to CMS or owed to Sponsors for LICS, Reinsurance, and Risk Sharing payment mechanisms as outlined above. The corrected total Part D reconciliation amount is then compared to the initial total Part D payment reconciliation amount with the difference representing the recoupment amount due CMS/Part D Sponsor.

11AR186

**April 20, 2012 Email Approving Draft SOW**

**EXHIBIT 27**

A030

Δ π EXHIBIT 73
Deponent
Date
WWW.DEPOBOOK.COM

| | |
|---|---|
| From: | Gil Mucke |
| To: | Sanders, Jessica B. \(CMS/OAGM\) |
| Cc: | Hoey, Nicole E. \(CMS/OAGM\); Schultz, Theresa A. \(CMS/OAGM\); Christopher Mucke |
| Subject: | RE: Draft Statement of Work (SOW) for RAC for Medicare Part D |
| Date: | Friday, April 20, 2012 1:36:15 PM |

Jessica,

 Chris and I have completed the review of the draft SOW with no issues as written.  We will probably need some direction from the program office on sequencing of the issue reviews and we are more than able to support their direction.

Thanks, Gil Mucke

**From:** Sanders, Jessica B. (CMS/OAGM)
**Sent:** Thu 4/19/2012 2:54 PM
**To:** Gil Mucke; Christopher Mucke
**Cc:** Hoey, Nicole E. (CMS/OAGM); Schultz, Theresa A. (CMS/OAGM)
**Subject:** Draft Statement of Work (SOW) for RAC for Medicare Part D

Good Afternoon,

In an attempt to have a feasible and effective Statement of Work (SOW) so that CMS can adequately determine whether or not to exercise Option Period One (1) of the Recovery Audit Contract for Medicare Part D, the attached **draft** SOW revision is provided for your review and comment. If possible, please submit your questions and/or comments to me via email by Thursday, April 26, 2012.

Thank you,

*Jessica B. Sanders*
Contract Specialist
Centers for Medicare and Medicaid Services
7500 Security Blvd.
Baltimore, MD 21244-1850
Mail Stop B2-14-21
410-786-1076
jessica.sanders@cms.hhs.gov

IMPORTANT: This e-mail, including all attachments, constitute Federal Government records and property that is intended only for the use of the individual or entity to which it is addressed. It also may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this e-mail transmission is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is strictly prohibited. If you have received this e-mail in error, please notify the sender by responding to the e-mail and then delete the e-mail immediately.

**Part D RAC, Modification 3**

**EXHIBIT 28**

A00430

# MEDICARE PART D
# RECOVERY AUDIT SERVICES

### Contract No GS-23F-0074W
### Task Order No: HHSM-500-2011-00006G

### Modification 000003
### Execution Date - 01.31.12

A00431

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1 CONTRACT ID CODE | | PAGE OF PAGES | |
|---|---|---|---|---|---|
| | | | | 1 | 3 |

| 2 AMENDMENT/MODIFICATION NO | 3 EFFECTIVE DATE | 4 REQUISITION/PURCHASE REQ NO | 5 PROJECT NO (if applicable) |
|---|---|---|---|
| 000003 | 02/01/2012 | | |

| 6 ISSUED BY | CODE | ASG – DPIFMC | 7 ADMINISTERED BY (if other than Item 6) | CODE | AGG/ JS |
|---|---|---|---|---|---|

CMS, OAGM, ASG, DPIFMC
7500 SECURITY BLVD., MS: C2-21-15
BALTIMORE MD 21244-1850

Jessica Sanders
Contract Specialist
(410) 786-1076

| 8 NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code) | (x) | 9A AMENDMENT OF SOLICITATION NO |
|---|---|---|

ACLF, LLC
Attn: CHRIS MUCKE
550 FOREST AVENUE
SUITE 15-2
PLYMOUTH MI 481703793

9B DATED (SEE ITEM 11)

| X | 10A MODIFICATION OF CONTRACT/ORDER NO<br>GS-23F-0074W |
|---|---|

HHSM-500-2011-00006G

10B DATED (SEE ITEM 13)
01/13/2011

| CODE | 780272873 | FACILITY CODE |
|---|---|---|

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended ☐ is not extended

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Item s 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (if required)
See Schedule

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | | |
|---|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO #i ITEM 10A | |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b) | |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF | |
| X | D. OTHER (Specify type of modification and authority)<br>FAR 43.103 (a) (3) and mutual agreement of the parties | |

E. IMPORTANT:   Contractor ☐ is not ☒ is required to sign this document and return ___1___ copies to the issuing office

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)
Tax ID Number: 20-2662374
DUNS Number: 780272873

The purpose of this modification to Task Order No. HHSM-500-2011-00006G under GSA Contract No. GS-23F-0074W is to extend the base period of performance through August 31, 2012 at a contingency fee of 12%. After the base period of performance has ended, the contingency fee will revert back to 7.5%

The extension to the base period is being made to allow the Medicare Part D Recovery Audit Contractor (RAC) to perform a special study recovery audit related to excluded providers for the year 2007, in accordance with the schedule on page 3 of this modification. For this special study, the RAC will deviate from the Performance Work Statement (PWS) as it is Continued ...

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect

| 15A NAME AND TITLE OF SIGNER (Type or print) | 16A NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| Christopher Mucke | THERESA A. SCHULTZ |

| 15B CONTRACTOR/OFFEROR | 15C DATE SIGNED | 16B UNITED STATES OF AMERICA | 16C DATE SIGNED |
|---|---|---|---|
| (Signature of person authorized to sign) | 1/31/2012 | (Signature of Contracting Officer) | 1/31/2012 |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

80

A513

A00432

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>GS-23F-0074W/HHSM-500-2011-00006G/000003 | PAGE<br>2 | OF<br>3 |
|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
ACLR, LLC

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | currently written. Specifically, the RAC shall recalculate the recovery impact without the risk-sharing portion.<br><br>All key personnel requirements are waived until such time that the appeals period begins. At this time, a Part D Manager may be needed to address appeals and disputes matters. The Part D Manager does not need to be full time and can be a subcontractor or consultant.<br><br>The Contracting Officer is changed from Desiree Wheeler to Theresa Schultz. The Contracting Officers Representative is changed from Marnie Dorsey to Frank Chartier.<br><br>To that effect, the following sections of this task order are hereby modified as follows:<br><br>Refer to pages 3-6.<br><br>All other terms and conditions remain unchanged.<br>Period of Performance: 01/13/2011 to 08/31/2012 | | | | |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)<br>Sponsored by GSA<br>FAR (48 CFR) 53.110

A00433

Special Study Recovery Audit
Issue - Excluded Providers
Year - 2007

The CMS will require the RAC to provide a special study recovery audit related to excluded providers for the year 2007
For this special study, the RAC will deviate from the SOW as it is currently written. Specifically:
The RAC's review is substantially complete. The RAC will need to recalculate the impact without the risk-sharing portion
CMS is making the assumption that this recalculation can be completed prior to the 7.15.2012 start date below.
A Request for Additional Information (RFI) will not be required to be sent to the plan
The system requirements (PRRs/PRRS) will be waived

| Excluded Providers - 2007 | | | | | | 2012 | | | | | | |
| Process | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RAC submits finalized data to DVC | | 02.15.2012 | | | | | | | | | | |
| DVC reviews - 45 days | | | 03.31.2012 | | | | | | | | | |
| Potential disputes between RAC/DVC - 7 days | | | | 04.07.2012 | | | | | | | | |
| RAC finalizes packages and calculations of impact calc | | | | 04.14.2012 | | | | | | | | |
| RAC sends notification letter | | | | 04.15.2012 | | | | | | | | |
| Anticipated receipt date by SD of notification letter | | | | 04.18.2012 | | | | | | | | |
| Appeal period - 30 days | | | | | 05.18.2012 | | | | | | | |
| CMS recovers appealed contracts | | | | | | 06.08.2012 | | | | | | |
| Submit data to process for recoupment by RA* | | | | | | 06.19.2012 | | | | | | |
| Improper payment recouped | | | | | | 06.29.2012 | | | | | | |
| CMS calculated amount recouped | | | | | | | 07.13.2012 | | | | | |
| Notify RAC of amount to invoice | | | | | | | 07.13.2012 | | | | | |
| Invoice received | | | | | | | 07.17.2012 | | | | | |
| Invoice approval - internal CMS process | | | | | | | | 08.07.2012 | | | | |
| RAC Paid | | | | | | | | 08.14.2012 | | | | |

References:

* MARx transport calculator

82

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Modification No. 000003

Page 4 of 6

A. **Section 3. PERIOD OF PERFORMANCE,** is hereby modified to extend the
base period of performance through August 31, 2012, and reads as follows:

The base period of the task order is from January 13, 2011 through August 31,
2012. The task order also includes four (4) 12-month optional periods. No
contingency fees shall be paid after the end of the period of performance.

B. **Section 5. TASK ORDER PRICE SUMMARY,** is hereby modified to revise
the payment methodology scale percentages for the extension to the base period
only, and reads as follows:

   a. All payments shall be paid only on a contingency basis. The recovery audit
contractor will receive 12.0% of all amounts collected, for the base period
only. After the base period of performance has ended, the contingency fee
will revert back to 7.5%. The contingency fees shall be paid once the recovery
audit contractor collects the Medicare overpayments. The recovery audit
contractor shall be paid a percentage of the amount that is collected through
their recovery efforts. The recovery audit contractor shall not receive any
payments for the identification of the underpayments or overpayments not
recovered/collected. The recovery audit contractor shall submit vouchers on a
monthly basis (see Attachment 2) with supporting documentation of the
recovery. Once verified, CMS shall pay the voucher pursuant to the Prompt
Payment Provisions.

   b. The following payment methodology scale shall be used to determine
payment:

      1. (12.0%) - When non-MSP recovery is made through RACs efforts (check
sent in by sponsor in response to demand letters, phone calls...);

         (i) (100%) of the contingency fee specified in number 1 above
when non-MSP recovery is made after the debt is referred to
the Department of Treasury;

         (ii) (75%) of the contingency fee specified in number 1 when non-
MSP payment is identified as a result of MEDIC or CMS
internal referral,

         (iii) (100%) of the contingency fee specified in number 1 when a
non-MSP underpayment is identified. Payment occurs after
CMS validates the underpayment and determines the actual
amount;

C. **Section 9. Contracting Officer's Technical Representative (COTR) and
Contract Specialist/Contracting Officer:**

83

A516

Contract No. GS-23F-0074W                                            Page 5 of 6
Task Order No. HHSM-500-2011-00006G
Modification No. 000003

Frank Chartier is designated as the COTR for this order. Frank's address is:

Mr. Frank Chartier
Centers for Medicare and Medicaid Services
OFM/CPI/MPIG/DMI
7500 Security Boulevard
Phone: (410)786-4462
Email: Frank.Chartier@CMS.HHS.gov

All technical correspondence should be directed to the COTR with a copy to the Contract
Specialist.

The responsibilities and duties of the COTR include:

a) Provide technical direction as needed to the contractor as long as the terms
   and conditions of the contract are not changed.
b) Monitor contractor's ongoing efforts.
c) Serve as liaison between the contractor, Project Officer and project team.
d) Review deliverables and advise Contracting Officer of the contractor's
   performance.
e) Advise the Contracting Officer on the contractor's compliance with technical
   performance requirements.
f) Ensures that the contractor input and/or recommendations are considered by
   CMS project management.

The Contract Specialist for this task order is Ms. Jessica Sanders. Her address is:

Centers for Medicare and Medicaid Services
7111 Security Blvd.
ATTN: Ms. Jessica Sanders
Mailstop: B2-14-21
Baltimore, MD 21244-1850
(410) 786-1076

The Contracting Officer for this task order is Ms. Theresa Schultz. Her address is:

Centers for Medicare and Medicaid Services
7111 Security Blvd.
ATTN: Ms. Theresa Schultz
Mailstop: B2-14-21
Baltimore, MD 21244-1850
(410) 786-8496

84

A517

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Modification No.  000003

END OF MODIFICATION

**PY 2007 Excluded Provider Audit Submission**

**EXHIBIT 29**

A02434

# RAC REPORT OF FINDINGS
# EXCLUDED PROVIDER AUDIT

RAC: <u>ACLR, LLC</u>
PLAN YEAR(S): <u>2007</u>
START DATE: <u>FEBRUARY 5, 2012</u>
END DATE: <u>APRIL 26, 2013</u>

TOTAL OVERPAYMENTS IDENTIFIED: <u>$27.9 MILLION</u>
AUDIT SCOPE REDUCTIONS: <u>$19 MILLION</u>
TOTAL AMOUNTS COLLECTED: <u>$1,865,110</u>
TOTAL DELAYS: <u>254 DAYS</u>

## OVERVIEW:

This preliminary report summarizes the findings of the Recovery Audit Contractor (RAC) for the Medicare Part D Program (Part D) as they pertain to the identification and recovery of improper identification and recovery of improper payments made by CMS to plan sponsors arising from providers excluded from Medicare participation. Originally, this review consisted of identify all such improper payments, but was subsequently revised to recovery improper payments on prescriptions written by providers excluded from participation in Medicare.

## SUMMARY OF FINDINGS:

Key findings from the PY07 Excluded Provider Audit may be summarized as follows:

- CMS scope reductions eliminated $26.9 million in recoverable illegal payments.
- CMS' implementation of a "cross appeal application" methodology resulted in an appeal success rate that exceeded amounts originally appealed by plan sponsors.
- CMS exceeded audit cycle times by 254 days; 140% of originally contracted deadlines.
- Improper payment amounts recovered for this issue totaled $1,865,110.

## AUTHORITY TO CONDUCT RECOVERY AUDITS:

Under the 2010 Patient Protection and Affordable Care Act (ACA) legislation enacted in March 2010, CMS was required to expand the RAC Program to Part D. Section 6411(b) of the ACA provides CMS with general authority to enter into contracts to conduct RAC audits in Part D. In addition to the ACA, the Improper Payments Elimination and Recovery Act (IPERA) requires that federal agencies such as CMS implement programs to recover and eliminate improper payments of federal monies; the Office of Management and Budget is responsible for issuing guidance to all federal agencies related to IPERA .

As required by federal and state law, regulations, CMS guidelines and memoranda, as well as the terms and conditions of its contract, CMS and the Part D RAC are responsible for identifying and recovering past improper payments occurring within Part D and assisting CMS in its efforts to prevent future improper payments.

On January 13, 2011, CMS awarded the Part D RAC contract to ACLR, LLC (RAC).

## PART D PAYMENTS & RAC AUDIT REVIEW STANDARDS:

There are four mechanisms by which plan sponsors receive Part D Payments; the direct subsidy, low income subsidy, reinsurance subsidy, and risk sharing. As a condition of payment, all Part D plans must

A02435

submit, by contract, information necessary for CMS to carry out payment provisions. This information is submitted to CMS as a Prescription Drug Event record (PDE). In addition to information of general interest, PDE records also contain information associated with the beneficiary for whom prescriptions were filled, prescribing physicians, drug names quantities dispensed, cost and expenditure information, as well as other fields necessary for CMS to determine amounts owing and to ensure that plan sponsors are complying with federal and state law as they pertain to the dispensing of prescription drug medications.

*PDE DATA:*

PDE data submission requirements are governed by federal law[1], national standards promulgated by the National Council for Prescription Drug Programs (NCPDP)[2], and CMS guidelines and memoranda[3]. The submission of these data are also governed by the Health Insurance Portability and Accountability Act (HIPAA) and state laws, which at a minimum, require the accurate and uniform documentation of key prescription dispensing event data such as; prescription/service reference number, patient and prescriber information; drug name, quantity, dosage, fill information; and directions for use.

Plan sponsors and administrative support entities such as pharmacy benefit managers (PBMs) are required to attest to the accuracy of PDE data submitted to CMS for payment.

CMS provides PDE records to the RAC on a payment year ("plan year" or "PY") basis. Once received, the RAC validates the payment information contained therein and matches it to total payments made by CMS to plan sponsors. The validated PDE records form the basis of the RAC's recovery auditing activities and the calculation of improper payments owed by plan sponsors to CMS (EP1033-EP1036)[4].

ACLR currently maintains PDE data for plan years 2007 - 2011.

*State Law:*

As outlined in 42 CFR § 423.104(h), Part D plan sponsors may only provided benefits for Part D drugs that require a prescription if those drugs are dispensed upon a valid prescription, which is further defined as a "prescription that complies with all applicable State law requirements"[5].

State laws and regulations outline prescription dispensing requirements and the failure to dispense prescriptions in accordance with these requirements could result in the imposition of fines and license suspension or loss. In addition to requirements pertaining to the use of licensed pharmacists, prescription expiration periods, and limitations on the dispensing of controlled and non-controlled substances, state laws also dictate the parameters by which a drug must be dispensed, prescription bottle labeling requirements, and the accurate and uniform maintenance of all electronically maintained dispensing events and the certification by third party auditors of such electronic information systems. In

---

[1] *Please see 42 CFR §423.322.*
[2] *Please see 45 CFR 162.1102.*
[3] *Please see Requirements for Submitting Prescription Drug Event Data, PDE Record Layout, NCPDP File Format, and NCPDP Telecommunication Standard - Transaction Instructions.*
[4] *CMS delays collections of improper payments related to the risk subsidy, typically 30% of improper payment amounts due, until reconciliations are reopened, which typically occurs four years after the plan year reconciling payment is made. ACLR was informed by CMS that inclusion of risk sharing in the impact calculation methodology "may lead to a higher appeal rate".*
[5] *Please see 42 CFR §423.100.*

A521

essence, each state requires that the following information be entered, transmitted, and maintained without error. These data and applicable CMS PDE data fields[6] may be summarized as:

| State Requirements | PDE Field Name | Reference |
|---|---|---|
| Unique Prescription Identifier | PTAP_RX_SERV_REF_NUM | SRN |
| Patient Information | PTAP_INS_CLAIM_NUM | HICN |
| Prescriber Information | PTAP_PRESCRIBER_ID; PTAP_PRESCRIBER_ID_QUAL | Prescriber NPI |
| Pharmacy Information | PTAP_SRVC_PROVIDER_ID; PTAP_SRVC_PROVIDER_ID_QUAL | Pharmacy NPI |
| Drug Name, Strength, & Quantity | PTAP_PROD_SERVICE_ID; PTAP_QUANTITY_DISPENSED; PTAP_DAYS_SUPPLY | NDC |
| Directions for Use | Can be imputed by a review of concatenated PDE information. | Directions |
| Date of Service | PTAP_RX_DOS_DT | DOS |
| Fill/Refill Information | PTAP_FILL_NUM | Fill |

*FEDERAL LAW - IMPROPER PAYMENTS:*

The primary document dictating CMS and RAC recovery audit review standards can be found in OMB Circular A-123, Appendix C. Part I(A)(2) ("OMB Requirements") of this documents defines an improper payment as:

> any payment that should not have been made or that was made in an incorrect amount *under statutory, contractual, administrative, or other legally applicable requirements*. Incorrect amounts are overpayments and underpayments (including inappropriate denials of payment or service). An improper payment includes any payment that was made to an ineligible recipient or for an ineligible service, duplicate payments, payments for services not received, and payments that are for the incorrect amount. In addition, when an agency's review is unable to discern whether a payment was proper as a result of *insufficient or lack of documentation*, this payment must also be considered an error. [*Emphasis added.*]

To make a determination as to the efficacy of CMS payments to plan sponsors, the RAC reviews applicable federal and state law and regulations, CMS promulgations and guidelines, as well as available evidence such as PDE payment data submissions. In instances where a clear, likely, or probable error occurs, the RAC identifies the error as an improper payment in accordance with OMB requirements.

To make a determination as to the efficacy of CMS payments to plan sponsors, the RAC reviews applicable federal and state law and regulations, CMS promulgations and guidelines, as well as available evidence such as PDE payment data submissions. In instances where a clear, likely, or probable error occurs, the RAC identifies the error as an improper payment in accordance with OMB requirements.

*RAC AUDIT PROCESS:*

The original contract awarded by CMS to ACLR provided for the unrestricted review and recovery of improper payments and CMS informed Part D stakeholders that the Part D RAC program would be implemented during "the third quarter of 2011" (A01090). In November 2011, CMS directed ACLR to

---

[6] *The fields shown pertain to required CMS field submissions only.*

A02437

suspend all recovery audit activities[7]; subsequent contract modifications dictated the audit review protocols and deadlines to be implemented by ACLR.

On January 31, 2012, CMS executed Modification 000003 (A00430-A00436). This modification authorized ACLR to conduct a "special study" to recover improper payments associated with excluded providers during PY07.

The audit process originally consisted of a process whereby ACLR identified improper payments and compiled them into an Improper Payment Review Package (IPRP), which was then submitted records to a Data Validation Contractor who would validate ACLR's improper payment findings. Upon completion of its review, ACLR was required to send a Notification Letter (NIP) to each plan sponsor who was then provided a 30 day period of time to appeal ACLR's findings. Any amounts that were not appealed would be immediately collected by CMS for processing and ACLR would be paid. This process was changed to incorporate an appeals process and to extend the period of collections for contracts which did not appeal.

The following chart highlights contracted audit processes and related deadlines associated with the 2007 Excluded Provider Recovery Audit.

| Exhibit C - PY07 Excluded Provider Calendar | | | | | | |
|---|---|---|---|---|---|---|
| Audit Process | Responsible Party | Step | Days | Due | Actual | Variance |
| RAC submits finalized data to DVC | RAC | 1 | 0 | 02/15/12 | 02/15/12 | 0 |
| DVC reviews - 45 days | DVC | 2 | 45 | 03/31/12 | 05/21/12 | -51 |
| Potential disputes between RAC/DVC - 7 days | RAC/DVC | 3 | 7 | 05/28/12 | 05/25/12 | 3 |
| RAC finalizes packages and calculations of impact calc | RAC/CMS | 4 | 7 | 06/01/12 | 06/08/12 | -7 |
| RAC sends notification letter | RAC | 5 | 1 | 06/09/12 | 06/13/12 | -4 |
| Anticipated receipt date by SO of notification letter | SO | 6 | 3 | 06/16/12 | 06/18/12 | -2 |
| Appeal period - 30 days | SO | 7 | 30 | 07/18/12 | 07/13/12 | 5 |
| CMS removes appealed contracts | CMS | 8 | 21 | 08/03/12 | 01/01/13 | -151 |
| Submit data to process for recoupment by 6/8* | CMS | 9 | | | | |
| Improper payment recouped | CMS | 10 | 21 | 01/22/13 | 02/01/13 | -10 |
| CMS calculated amount recouped | CMS | 11 | 15 | 02/16/13 | 02/13/13 | 3 |
| Notify RAC of amount to invoice | CMS | 12 | | | | |
| Invoice received | RAC | 13 | 4 | 02/17/13 | 02/15/13 | 2 |
| Invoice approval - internal CMS process | CMS | 14 | 21 | 03/15/13 | 04/26/13 | -42 |
| RAC Paid | CMS | 15 | 7 | | | |
| Totals | | | 182 | 436 | | -254 |

Modification 000003 required an audit cycle time of 182 days (A00433); CMS process changes and extensions resulted in a total audit cycle period of 436 days[8]. These delays arose as a result of CMS developing its internal processes such as obtaining approval for plan sponsor communications (EP1002) and extending appeal deadlines (EP10SS) during the audit, which accounted for a portion of the missed deadlines outlined above. The primary causes of audit cycle delays; however, were as follows:

---

[7] PART D RAC - 2011 ANNUAL REPORT at 11AR165.

[8] CMS directed SOW deviation.

- CMS required the resubmission of RAC improper payments so that payments associated with excluded owners and pharmacies employing excluded pharmacists could be removed; this accounted for a 43 day extension[9].
- CMS suspended the recoupment of contracts for which no appeal was made until all appeals were finalized (EP1056, EP1060, EP1062)[10].
- CMS extended level 1 and level 2 appeal review periods by 90 days (EP1063, EP1066)[11].

**AUDIT METHODOLOGY - PY07 EXCLUDED PROVIDER AUDIT:**

CMS informed ACLR that the Excluded Provider issue had been approved on August 25, 2011 (11AR014) and ACLR provided detailed audit processes and procedures on August 29, 2011 (11AR011, 11AR01S-11AR112, EP1003- EP1004)

The underlying prohibition on these payments is found under section 1862(e)(1) of the Medicare Prescription Drug, Improvement, and Modernization Act (MMA) of 2003, amended Title XVIII of the Social Security Act (SSA), and federal regulations at 42 C.F.R. § 1001.1901(b)(1), which states that Medicare payments may not be made for items or services furnished by an excluded provider or entity or on the prescription of an excluded physician.  Specifically, 42 C.F.R. §1001.1901(b)(1) provides, "no payment will be made by Medicare, Medicaid or any of the other Federal health care programs for any item or service furnished, on or after the effective date specified in the notice period, by an excluded individual or entity, or at the medical direction or on the prescription of a physician or other authorized individual who is excluded when the person furnishing such item or service knew or had reason to know of the exclusion."  Additionally, pharmacies owned by excluded individuals are subject to 42 CFR §1001.1001, which provides that the OIG may exclude an entity if "a person with a relationship with such entity" has "been excluded from participation in Medicare" and has "a direct or indirect ownership interest (or any combination thereof) of 5 percent or more in the entity" or is "a managing employee" of such entity.

Additional guidance regarding payment of items or services furnished by excluded providers may also be found in *OIG Special Advisory Bulletin, The Effect of Exclusion From Participation in Federal Health Care Programs*, issued September 1999:

> The effect of an OIG exclusion from Federal health care programs is that no Federal health care program payment may be made for any items or services (1) furnished by an excluded individual or entity… This payment ban applies to all methods of Federal program reimbursement… Any items and services furnished by an excluded individual or entity are not reimbursable under Federal health care programs… ***This prohibition applies even when the Federal payment itself is made to another provider, practitioner or supplier that is not excluded***. [*Emphasis Added*.]

In addition this guidance provides that "services performed by excluded pharmacists or other excluded individuals who input prescription information for pharmacy billing or who are involved in any way in filling prescriptions for drugs reimbursed, directly or indirectly, by any Federal health care program" are similarly excluded.

---

[9] *COR directed SOW deviation.*
[10] *CMS directed SOW deviation.*
[11] *CMS directed SOW deviation.*

A02439

This guidance, coupled with OMB Requirements, determined the process development by ACLR and discussed immediately below.

*RECOVERY AUDIT PROCESS DEVELOPMENT - EXCLUDED PROVIDERS:*

In developing the process to identify excluded providers, ACLR reviewed applicable Federal laws, regulations, and guidance as discussed above, and obtained data contained within CMS' Medicare Exclusion Database (MED). In addition to storing data that provides plan sponsors with data necessary to ensure payments of Medicare funds are not made to excluded providers, the MED also contains provider identifier information, which could be used identify improper payments by matching excluded provider identifiers against provider identifiers contained within submitted PDE data. Provider identifiers typically consist of a National Provider Identifier (NPI), Drug Enforcement Agency (DEA) identifier, or a seven digit NCPDP identifier[12].

Once obtained, it was readily apparent that the MED did not contain all of the information necessary to conduct a thorough review of potential excluded provider payments and the RAC informed CMS of the necessity to obtain necessary NPIs and DEA and NCPDP identifiers (EP1003- EP1006).

As outlined in the submission of PY07 Excluded Provider IPRPs on February 13, 2012 (EP1036- EP1037), ACLR matched available excluded provider information in the MED, the OIG's List of Excluded Individuals and Entities (LEIE), and Excluded Parties List System (EPLS) databases to the National Plan and Provider Enumeration System (NPPES), CMS Provider Enrollment, Chain, and Ownership System (PECOS), National Technical Information Service Controlled Substances Act Registrants Database (NTIS), and applicable state license verification websites. In addition, the RAC identified excluded pharmacists and employer pharmacies by matching NPPES business address information to identical NPPES information for pharmacies and identified excluded owners of pharmacies by reviewing individual state corporate registrations. Finally, the RAC also reviewed other publically available information to identify likely identifiers[13].

Upon completion of these reviews, the RAC generated a list of likely excluded provider identifiers. These identifiers were matched against the PTAP_PRESCRIBER_ID (prescriber) field and/or the PTAP_SRVC_PROVIDER_ID (pharmacy) field of the PDE data and improper payment (exception) reports for applicable contracts were generated from matching records.

**Audit Findings: PY07 Excluded Provider Audit:**

ACLR prepared and submitted IPRPs, in amounts totaling $27.9 million, to the DVC for validation on February 15, 2012 (EP1036- EP1037).[14]

   *Revision of Approved Audit Protocols:*

   Subsequent to the submission of RAC findings, CMS made two substantive revisions to review
   protocols. The first consisted of the elimination of improper payments for pharmacies employing

---

[12] *The NCPDP identifier is a legacy identifier used to identify pharmacies.*
[13] *Such reviews also included searches of commercially and publically available databases such as; Healthgrades, HIPAASPACE, and eCare.*
[14] *Amount calculated net of risk sharing as required by CMS. Amounts associated with risk sharing totaled $7.5 million.*

excluded pharmacists; the second shifted burden of proof from the plan sponsors, as required by OMB requirements, to the RAC; and the third consisted of the elimination of terminated contracts.

- Excluded Pharmacists: CMS informed the RAC of its intentions to eliminate pharmacies where an excluded pharmacist was employed from its review of excluded providers on March 13, 2012 (EP1038). Believing this to be an impermissible interpretation of federal law, the RAC filed a protest on March 14, 2012 (EP1039-EP1040). In addition the RAC notified Theresa Schultz, Part D RAC Contracting Officer of RAC concerns regarding the revised treatment for selected excluded providers and the requirement by ACLR to validate and resubmit its own data[15]. While no formal response to ACLR's protest was provided; CMS directed ACLR[16] to resubmit 2007 excluded provider exception reports to the DVC and to limit RAC findings to:

  > prescribing providers and servicing providers (pharmacies) that share a direct link to the excluded provider database. A direct link constitutes a PDE field reflecting an ID that has been identified as excluded in the OIG database. Instances where an excluded pharmacist is working for, or an owner of, a pharmacy, should not be considered excluded for the scope of this review.

  On March 27, 2012 ACLR was informed by Ms. Schultz that she "had received a letter from the OIG", which stated that there was "legal justification" for the "removal of pharmacies that employed excluded pharmacists from consideration as improper payments" and that the ACLR should "proceed with the resubmission of improper payments". Ms. Schultz also informed the RAC that she "could not provide a copy of the OIG letter" to the ACLR[17].

  CMS' decision to eliminate items filled by excluded pharmacists and owners of pharmacies reduced improper payments by $16.2 million[18].

- *Burden of Proof Requirements*: As outlined above, ACLR assigned identifiers to excluded providers based on its reviews of available documentation contained within CMS, OIG, and DEA databases. These reviews were conducted in accordance with OMB Requirements and only those identifiers deemed likely to be associated with excluded providers were selected. On May 9, 2012, CMS informed ACLR that these standards no longer applied and that "the burden of proof will land on ACLR to support the decision to exclude the PDE" (EP1046). As ACLR primarily relied heavily on data maintained by CMS, details of which were unavailable for ACLR review, ACLR was forced to withdraw its rebuttal of DVC findings (EP1048).

  CMS' decision to shift the burden of proof to ACLR reduced improper payments by $2.75 million.

---

[15] *Under the established process, the DVC was required to eliminate inaccurate findings, not ACLR.*

[16] PART D RAC - 2012 ANNUAL REPORT at 12AR066

[17] *Subsequent conversations with plan sponsors indicated this was an issue that had been identified as a problem during CMS "compliance audits". Further, annual reports for one large corporate pharmacy contained a footnote, which stated that it was "negotiating a settlement" with the OIG for an excluded pharmacist working in one of its "New York pharmacies"; an excluded pharmacist identified during ACLR's review. These clearly demonstrated that this was a viable issue for review.*

[18] *Improper payments associated with excluded owners of pharmacies represented approximately 1.5% of total scope reductions.*

A02441

Notification letters and related exception reports were submitted to plan sponsors for 75 contracts on June 13, 2012; improper payment amounts submitted totaled $8.5 million.

*APPEALS:*

Plan sponsors filed timely Level 1 appeals (Redetermination) for 52 contracts representing a 69.3% appeal rate[19] as follows:

- Amounts appealed by plan sponsors totaled $6.4 million; amounts not appealed totaled $2.1 million.
- 13 contracts submitted no evidence to support appealed contentions.  Improper payments associated with these contracts totaled $2.5 million.
- 23 contracts did not file appeals; improper payment amounts associated with these contracts totaled $0.5 million (EP1064- EP1065).

While some of these appeals questioned CMS' authority to engage in recovery audit efforts; the majority of plan appeals addressed the exclusionary status of the prescribers and pharmacies selected by the RAC[20].

*Redetermination - ACLR Response:*

In its review of evidence, the RAC concurred with plan sponsor contentions related to three pharmacies and four prescribers for amounts totaling $1.5 million and $0.2 million respectively.  Of remaining appeals, the RAC submitted rebuttals for appealed pharmacies and prescribers as follows:

Pharmacies:  The majority of appeals associated with pharmacies relied solely on letters issued by the Office of Inspector General.  These letters indicated that 7 of the 8 excluded pharmacies selected by the RAC were not the entities that were currently in operation and, as such, were not excluded from participation in Medicare.  Notable findings from the RAC's review are highlighted below:

- In the case of three pharmacies for which the OIG issued a letter, the RAC submitted evidence demonstrating that each of the pharmacies had requested and been granted reinstatement into Medicare[21] noting that had the pharmacies not been excluded, there would have been no need for an application for reinstatement.  Improper payment amounts associated with these pharmacies totaled $1.2 million.
- In the case of one pharmacy, the OIG issued a letter stating that it had "received evidence" that the excluded pharmacy "is not the same entity" as that of the new pharmacy, which was ultimately audited by the RAC.  Evidence submitted by the RAC; however,

---

[19] *10 contracts were granted an extension to file appeals by CMS.  These extensions were granted outside of CMS published located on its website, which noted that appeals are "entirely at the discretion of CMS, and the Part D plan sponsor must show that extenuating circumstances (e.g. natural disaster, Notification of Improper Payment went to incorrect address, death, etc.) existed that prevented the filing of an appeal by the deadline".*

[20] *ACLR also referred three cases of potential fraud to CMS (EP1057).*

[21] *Reinstatement into Medicare is dictated by very specific laws and regulations, not the least of which is that "an excluded individual or entity... may submit a written request for reinstatement to the OIG only after the date specified in the notice of exclusion".  Please see 42 CFR §1001.3001.*

A02442

demonstrated that the State of New York Division of Corporations had dissolved the corporation for which the OIG had issued the letter and that the original, excluded pharmacy was still in operation.  Improper payments associated with this pharmacy totaled $62,000.

- In the case of another pharmacy, the OIG issued a letter stating that "a review of the information submitted" demonstrated that the new pharmacy was "owned by a different individual, has a different tax ID number, and State corporation number".  Evidence submitted by the RAC; however, demonstrated that the pharmacy was operating under the same license as that of the excluded provider, officers listed on corporate filings for each pharmacy were the same, and that disciplinary action had been taken against its registered pharmacist.  Improper payments for this pharmacy totaled $1.03 million.
- In the case of another pharmacy, $284,000 in pharmacy-related improper payments was eliminated despite the lack of any appeal or evidentiary support.

Prescribers:  In its review of appeals associated with excluded prescribers, the RAC noted that no objective evidence such as affidavits, driver's licenses, passports, and/or other forms of court recognized evidentiary documentation necessary to demonstrate that selected providers were not excluded from Medicare had been submitted.  Rather, plan sponsors submitted audited unverified information contained within their own databases or copies of information such as NPPES and state license verification websites, which had been relied on by the RAC and the DVC to determine exclusionary status.

Due to the absence of evidence, the RAC submitted rebuttals asserting threshold to resolve the insufficient documentation assertion required by OMB Circular A-123, Appendix C. Part I(A)(2) had not been met.  The RAC concurred with 35 plan appeals related to 4 prescribers; amounts associated with these prescribers totaled $199,800 and remaining findings from the RAC's review of appeals may be summarized as follows:

- In the case of one provider, the RAC provided evidence demonstrating the prescriber identifier selected matched that of the excluded provider, CMS databases corroborated RAC findings, and the prescriber was in the same location and field as that of the excluded provider.  While no evidence was submitted by plans for this provider, plans asserted that the prescriber identifiers selected by the RAC were incorrect on the basis that the excluded provider was "inactive" in state license databases.  The RAC provided evidence demonstrating that it was another provider, and not the one selected by the RAC, having the same name and living in the same state[22], which had been appealed by the plans. Amounts associated with this prescriber totaled $67,600.
- In the case of another provider, plans submitted an "affidavit" stating that PBM personnel had had talked to "Tina" an "office manager" who stated the "other physician has a middle initial and is not the prescriber indicated" and was therefore not excluded from participation in Medicare.  The RAC provided documentation demonstrating the prescriber identifier selected was the same age and graduated from the same university in the same field as that of the excluded provider.  Improper payments associated with this prescriber totaled $79,500.

*Redetermination Findings:*

---

[22] *This prescriber was determined to be accurately selected by the RAC during the PY08-PY11 Excluded Provider audit.*

Upon conclusion of its review, CMS overturned RAC findings on all pharmacies identified in the audit; including the pharmacy for which no appeal was filed. Amounts associated with this portion of the appeal totaled $5.6 million. CMS also overturned RAC findings on 21% (EP1061) of the prescribers selected as excluded and for which no objective evidence was provided. Amounts associated with overturned prescribers totaled $0.8 million.

These amounts also included CMS' revised appeal finding protocol which required "if there is a reversal on the decision, it will impact any contract that previously included it in the PDE records... even if the plan didn't appeal" (EP10S2). As a result of this revision, plan sponsors received additional reductions of $3.2 million resulting in an appeal success rate of 104% of amounts originally appealed. A summary of the financial impact of this review is provided below:

| PY 07 Excluded Provider Review - Financial Impact | | | | |
|---|---|---|---|---|
| NIP Amounts | Amounts Appealed | Amounts Not Appealed | Cross Appeal Application | Collections |
| 8,500,760 | 6,351,883 | 2,148,877 | 3,242,252 | 1,865,110 |

The following chart summarizes the overall impact of the review:

| | PY07 Excluded Provider Results | | | |
|---|---|---|---|---|
| | Pharmacies | Amounts | Prescribers | Amounts |
| NIPs | 11 | 5,612,043 | 478 | 2,888,717 |
| RAC Concurrence | 3 | 1,516,355 | 4 | 199,800 |
| Successful Appeals | 8 | 4,095,688 | 49 | 823,806 |
| Net Results | 0 | 0 | 425 | 1,865,110 |

*Reconsideration:*

ACLR did not directly receive Level II (Reconsideration) appeal requests from plan sponsors. Reconsideration decisions; however, were received for 5 contracts. None of these appeals were determined to be successful and no request for revisions of amounts owing were received by the RAC from CMS.

*Collections:*

Total collections for the PY07 Excluded Provider Recovery Audit were $1,865,110.

**March 30, 2012 Email**

**EXHIBIT 30**

A02482

| From: | Strauss, Lauren R. \(CMS/CPI\) |
|-------|--------------------------------|
| To: | Christopher Mucke |
| Cc: | Chartier, Frank D. \(CMS/CPI\) |
| Subject: | Excluded Providers |
| Date: | Tuesday, March 13, 2012 12:49:40 PM |

Hi Chris,

We wanted to follow-up from our excluded provider conference call last Friday prior to this Friday's discussion.

We have reached out to both Policy and the OIG regarding excluding all prescriptions related to a pharmacy where an excluded provider is employed. Both the OIG and our Policy area have determined that this cannot be done. A PDE must contain an excluded provider ID to be considered an overpayment. Further, this is still the case even when the excluded provider is the owner of the pharmacy. Cases of an excluded provider owning a pharmacy should be noted separately and reported back to us, but it would have no impact on the RAC recoupment process.

In addition, we have determined that reviewing the certification between the SOs and the pharmacies employing excluded providers would not be sufficient documentation to exclude or include all prescriptions from a pharmacy. This certification would not distinguish who filled the Medicare prescriptions, which is necessary for exclusion.

As a result of this, we will need you to re-perform your excluded provider data matching and reconciliation process, adjusted for the above items. Please let us know approximately when we can expect a revised file.

Let me know if you have any questions.

Thank you,
Lauren

**Lauren R. Strauss**
Division of Plan Oversight and Accountability
Centers for Medicare & Medicaid Services
7500 Security Blvd
Baltimore, MD 21244
mail stop: AR-18-50
fax: (410) 786-9188
phone: (410) 786-6502
Lauren.Strauss@cms.hhs.gov

EP1038