# Duplicate Payment Report

**EXHIBIT 51**



**Duplicate Payments RFI Report**

## OBJECTIVE

CMS granted approval to the RAC to audit Duplicate Payments for plan years 2010, 2011 and 2012 using a complex review approach. The RAC submitted a revised NAIRP dated May 13, 2014 containing the approved methodology. Pursuant to this methodology the RAC identified a population of potential duplicate payments for inclusion in the Requests for Information (RFIs). CMS tasked the DVC to perform a methodological validation of the potential duplicate payments identified by the RAC before the RFIs are sent to the Plans.

A methodological validation is designed to determine that the RAC correctly applied the approved methodology in identifying the potential duplicate payments. The DVC is primarily concerned with identifying those potential duplicate payments, if any, that do not conform to the methodology approved by CMS. The DVC is not concerned with identifying any potential duplicate payments the RAC may have missed as the DVC is not performing a blind review of the PDE universe using the approved methodology.

## DELIVERABLES

The DVC is delivering the following five reports for each year under review, as applicable:

1. **Agreed Duplicative Pairs.** This list is compiled in an Excel workbook titled Duplicate_Pymts_RFIs_Agreed_PY201X.xlsx. It contains all of the potentially duplicative paired PDEs with which the DVC agrees the methodology was correctly applied.

2. **Disagreed Duplicative Pairs.** This list is compiled in an Excel workbook titled Duplicate_Pymts_RFIs_Disagreed_PY201X.xlsx. It contains all of the potentially duplicative paired PDEs in which the DVC disagrees with the RAC as a flaw in the application of the approved methodology has been identified.

3. **Plan-to-Plan (P2P).** This list is compiled in an Excel workbook titled Duplicate_Pymts_RFIs_P2P_PY201X.xlsx. The list identifies the PDEs that meet the P2P condition where the contract of record does not match the contract number in one or both of the paired PDEs.

4. **Non-Standard Format.** This list is compiled in an Excel workbook titled Duplicate_Pymts_RFIs_Non_Std_FMT_PY201X.xlsx. The DVC flagged the Originating and/or Duplicate PDEs for a non-standard format code where the PTAP_NON_STAND_FMT_CD was not "Null". A non-standard format includes paper claims from providers, beneficiary submitted claims, coordination of benefits claims, NCPDP electronic submissions and X12 837 claims.

5. **Dosage Change Increase.** This list is compiled in an Excel workbook titled Duplicate_Pymts_RFIs_Dosage_Increase_PY201X.xlsx. Through the complex review process, the RAC is seeking legitimacy for the records that would eliminate potentially duplicative records. One such legitimate reason is for a prescribed change in dosage. The DVC reviewed the paired PDEs for a dosage change by comparing the daily dosage (quantity dispensed divided by the days supply) of the Originating PDE with that of the Duplicate PDE in each pair.

© 2004-2013 Livanta LLC • All rights reserved • Various trademarks held by their respective owners
Livanta LLC | 6820 Deerpath Rd. Suite F | Savage, MD 20763
June 25, 2014
Page 1

HHS0093225

A613



**Duplicate Payments RFI Report**

## DVC APPROACH TO VALIDATION

For validation purposes the DVC produced <u>reject</u> logic to test for the correct application of the approved methodology for the following six criteria:

1. **Five Key Fields** – The paired PDEs, containing the "Originating" PDE and the "Duplicate" (also called the Subsequent) PDE, identified by the RAC were tested to determine that the five key fields in each PDE match. If the fields did <u>not</u> match, the PDE was flagged "Y" for disagree.

2. **Allowable Days Elapsed** – The days elapsed between the paired PDEs was tested to determine that the difference was less than 50% of the days supply from the Originating PDE. If the resulting percentage (threshold) was <u>not</u> less than 50%, the PDE was flagged "Y" for disagree.

3. **Partial Fill** – The paired PDEs were tested for a code "P" in the PTAP_DISP_STAT_CD field. If the PDE was associated with a partial fill, the PDE was flagged with a "Y" for disagree.

4. **Long Term Care (LTC)** – The paired PDEs were tested for a NPI in the PTAP_SRVC_PROVIDER_ID and the PTAP_ALT_SRVC_PROV_ID fields associated with a LTC pharmacy. If the PDE was associated with a LTC pharmacy, the PDE was flagged "Y" for disagree.

5. **Mail Order (MO)** – The paired PDEs were tested for a NPI in the PTAP_SRVC_PROVIDER_ID and the PTAP_ALT_SRVC_PROV_ID fields associated with a MO pharmacy. If the PDE was associated with a MO pharmacy, the PDE was flagged "Y" for disagree.

6. **Vaccination Administrative Fee (VAF)** – The paired PDEs were tested for vaccination administrative fee in the PTAP_VAC_ADMIN_FEE field. If the VAF in the field was greater than zero, the PDE was flagged "Y" for disagree.

## RESULTS – AGREED

1. **Five Key Fields** – For all three years under review, the five key fields matched in the paired PDEs.

2. **Allowable Days Elapsed** – For all three years under review, the difference in the days elapsed between the paired PDEs was less than 50% of the days supply of the Originating PDE. However, the DVC flagged 33 PDEs for 2010 as "N/A" because the threshold calculation could not be made (the denominator, days supply, was zero). These PDEs were further tested for a PDE submission arising from non-standard sources where the PTAP_NON_STAND_FMT_CD = not Null. In 100% of the cases the non-standard format code was not null and therefore the result applied was agree.

3. **Partial Fills** – For all three years under review, there were no PDEs associated with partial fills.

4. **Long Term Care, Mail Order and Vaccination Administrative Fees** – If the criteria was met, then the PDEs were flagged "N" and included in the population of agrees.

## RESULTS - DISAGREED

For PY 2010 the DVC identified 3,821 potentially duplicative pairs that have a **vaccination administrative fee (VAF)** in either the Originating PDE or the Duplicate PDE. According to the revised NAIRP "PDE associated with partial fills are removed as well as duplicative records associated with long term care and vaccination administrative fees." The DVC review logic flagged a PDE if the VAF was greater than zero in the PTAP_VAC_ADMIN_FEE field in the PDE. The DVC disagrees with the RAC as these 3,821 PDE pairs contain a VAF. The DVC recommends that the RAC review these PDEs and identify other criteria the RAC may have used in the methodology that is not detailed in the revised NAIRP for including these PDEs in the population of potentially duplicative PDEs. The DVC flagged 1,516 PDE pairs as "N/A" for the

© 2003-2013 Livanta LLC • All rights reserved • Various trademarks held by their respective owners
Livanta LLC | 9020 Corridor Rd, Suite F | Savage, MD 20763
June 25, 2014
Page 12

HHS0093226

A614



**Duplicate Payments RFI Report**

allowable days elapsed because the threshold calculation could not be made (the denominator, days supply, was zero). These PDEs are in the disagreed report because they all are associated with vaccine administrative fees.

For **PY 2011** the DVC identified 2,993 potentially duplicative pairs that have a **VAF** in either the Originating or the Duplicate PDE. In addition, the DVC identified 83 Originating PDEs that have a service provider ID associated with a **Long Term Care (LTC)** pharmacy and 288 Originating PDEs that have a service provider ID associated with a **Mail Order (MO) pharmacy**. The DVC recommends that the RAC review these PDEs with a VAF, or a LTC/MO pharmacy to determine if they should be excluded from the RFIs. The DVC flagged 1,023 PDE pairs as "N/A" for the allowable days elapsed because the threshold calculation could not be made (the denominator, days supply, was zero). These PDEs are in the disagreed report because they all are associated with vaccine administrative fees.

For **PY 2012** the DVC identified 6,594 potentially duplicative pairs that have a **VAF** in either the Originating or the Duplicate PDE. In addition, the DVC identified 131 Originating PDEs that have a service provider ID associated with a **Long Term Care (LTC) pharmacy** and 315 Originating PDEs that have a service provider ID associated with a **Mail Order (MO) pharmacy**. The DVC recommends that the RAC review these PDEs with a VAF or LTC/MO pharmacy to determine if they should be excluded from the RFIs. The DVC flagged 1,951 PDE pairs as "N/A" for the allowable days elapsed because the threshold calculation could not be made (the denominator, days supply, was zero). These PDEs are in the disagreed report because they all are associated with vaccine administrative fees.

### RESULTS – OBSERVATIONS

The DVC performed additional analytics to identify conditions that merit more review before the RFIs are sent to the Plans. Please note that the flags are not mutually exclusive. The same PDE pair can reside in one or more files if multiple flags are "Y".

1.  **Terminated Contracts** – The DVC reviewed the population of paired PDEs for terminated contracts. For all three years under review, all of the contracts were active.

2.  **Plan-to-Plan (P2P)** – The DVC flagged with a "Y" 3,486, 2,781 and 1,405 pairs for 2010, 2011 and 2012 respectively that met the P2P condition where the contract of record did not match the contract number. The DVC recommends that the RAC and CMS review these PDEs to decide if they should be excluded from the RFIs.

3.  **Non-Standard Format** – The DVC flagged the PDEs with a "Y" if the format code was not null. The results for either one or both PDEs in a pair with a non-standard format code was 86%, 89% and 36% for 2010, 2011 and 2012 respectively. At the conclusion of the audit, if the payments are determined to be duplicate payments, then it would indicate a potentially serious vulnerability with the non-standard format claims process. The significant decline in 2012 indicates the possibility that potential weaknesses in the process may have started to be addressed.

4.  **Dosage Increase** – The DVC flagged the PDEs with a "Y" if the increase in daily dosage was equal to or greater than 50%. For 2010, 56% of the pairs have a dosage increase of 50% or more. The DVC recommends that the RAC and CMS review these PDEs to decide if they should be excluded from the RFIs. The same test was applied to both 2011 and 2012. However, the DVC observed that the quantity dispensed in more than 99% of the PDEs was zero. Thus, the dosage change could not be calculated. The DVC scanned these PDEs in in the IDR and in its universe of PDEs and found a quantity dispensed in all cases. Accordingly, the DVC is recommending that the RAC review the PDEs for a potential problem with the data.

© 2004-2011 Livanta LLC. • All rights reserved • Various trademarks held by their respective owners.
Livanta LLC | 9520 Corridor Rd. Suite F | Savage, MD 20763
June 25, 2014
Page 3

HHS0093227



**Duplicate Payments RFI Report**

## OTHER COMMENTS

The DVC acknowledges there are a number of double-counted PDE pairs for those records that have the same date of service. The RAC indicated it was not able to identify the Originating PDE from the Duplicate PDE. The RAC therefore included the PDE pairs twice with one pair identifying PDE1 as the Originating and PDE2 as the Duplicate and vice versa for the second pair. The DVC made no attempt to isolate or uniquely count these pairs. The DVC validated each pair identified by the RAC as potentially duplicative. The DVC recommends that the Plans be notified of this condition to avoid duplication in the final results.

© 2004-2013 Livanta LLC. • All rights reserved • Various trademarks held by their respective owners
Livanta LLC | 8520 Corridor Rd. Suite F | Savage, MD 20763
June 25, 2014
Page 13

HHS0093228

**July 8, 2014 Email**

**EXHIBIT 52**

-----Original Message-----
From: Christopher Mucke
Sent: Tuesday, July 8, 2014 5:41 PM
To: Ms. Sonja Brown
Cc: Dominca Kenya (CMS/CPI); India M. Thomas; Frank Tetkoski (CMS/CPI); Thais Thompson
Subject: PY10-PY11 Duplicate Payments & Data Issues

Sonja, as I mentioned earlier, checking and obtaining a new data set from CMS and/or reloading the data to obtain quantity dispensed (and other) data will take some time (2-3 weeks minimum). We will begin the review process but it would be nice if the DVC could conduct a more comprehensive review of the PDE to determine if there are more fields that do not match. In short, not catching this issue in previous reviews has cost us well over $150,000 in IPRP development time for PY10-PY11 duplicate payments, which will now have to be completely redone. Because of this, it is entirely possible that we will not conduct duplicate payment reviews for those plan years.

Again, the quantity dispensed field as well as many of the fields are not control fields and most contain bad data. As we previously discussed, we are in the process of assigning unique identifiers - any additional fields that do not match the DVCs (or vice versa) need to be identified prior to the next import. While this time around will likely only cost CMS the loss of PY10-PY11 duplicate payment recoveries and ACLR administrative costs associated with the additional work, the next time (due to the importance of the unique identifier field) could result in key infrastructure problems that would be more costly. Please let me know if you have any questions, Chris.

Christopher Mucke
Managing Principal
ACLR

> On Jul 8, 2014, at 5:03 PM, "Brown, Sonja J. (CMS/CPI)" <sonja.brown@cms.hhs.gov> wrote:
>
> Chris,
> Given the issues that were identified in the 2011 and 2012 PDE data, CMS approves the release of RFIs for CY 2010 only. However, please be aware that this could potentially decrease your estimated recoveries for subsequent plan years as most plan sponsors will likely move forward with correcting data for CYs 2011-12. Please let me know if you'd like to move forward with CY 2010 only or if you'd rather wait until you've resolved the issue with the 2011 and 2012 data and send all three plan years at once. In addition, if you decide to go ahead with 2010, what is the date that you plan to send the RFIs? Please advise.
>
> Thanks,
> Sonja
>
> -----Original Message-----
> From: Christopher Mucke [mailto:cmucke@aclrsbs.com]
> Sent: Tuesday, July 08, 2014 12:11 PM
> To: Brown, Sonja J. (CMS/CPI)
> Cc: Kenya, Dominca (CMS/CPI); Thais Thompson
> Subject: Duplicate Payment RFIs
>

**October 1, 2014 CMS Email Extension**

**EXHIBIT 53**

A02280

| From: | Info Aclrrac |
|---|---|
| To: | Christopher Mucke |
| Subject: | FW: Duplicate Payment RFI Extension |
| Date: | Wednesday, October 01, 2014 6:06:16 PM |
| Attachments: | RFIExtension092914f.docx |

**From:** CMS PartD_RACCommunications
**Sent:** Wednesday, October 01, 2014 6:06:09 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** CMS PartD_RACCommunications
**Cc:** Info Aclrrac
**Subject:** Duplicate Payment RFI Extension

This email is to notify you that the Centers for Medicare & Medicaid Services (CMS) has granted an extension of 60 calendar days for Part D plan sponsors to submit their responses to the Duplicate Payment Request for Information (RFI) sent on July 8, 2014 by the Part D Recovery Audit Contractor (RAC). The responses are now due December 8, 2014.

Please submit your response to the Duplicate Payment RFI via Secure Mail to info@ACLRRAC.com by **December 8, 2014.**

For information about the required content and format of your response, please review the RFI. Any questions directly related to the RFI can be sent to PartD_RACCommunications@cms.hhs.gov.

Sincerely,


Part D RAC Team
Division of Plan Oversight and Accountability
Centers for Medicare & Medicaid Services

DP1207

A02281

This email is to notify you that the Centers for Medicare & Medicaid Services (CMS) has granted an extension of 60 calendar days for Part D plan sponsors to submit their responses to the Duplicate Payment Request for Information (RFI) sent on July 8, 2014 by the Part D Recovery Audit Contractor (RAC). The responses are now due December 8, 2014.

Please submit your response to the Duplicate Payment RFI via Secure Mail to info@ACLRRAC.com by **December 8, 2014.**

For information about the required content and format of your response, please review the RFI. Any questions directly related to the RFI can be sent to PartD_RACCommunications@cms.hhs.gov.

Sincerely,


Part D RAC Team
Division of Plan Oversight and Accountability
Centers for Medicare & Medicaid Services

DP1208

**Part D RAC Contract, Modification**

**EXHIBIT 54**

# MEDICARE PART D
# RECOVERY AUDIT SERVICES

CONTRACT NO GS-23F-0074W
TASK ORDER NO: HHSM-500-2011-00006G

MODIFICATION 000005
EXECUTION DATE - 09.27.12

91

A00443

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | | PAGE OF PAGES | |
|---|---|---|---|---|---|
| | | | | 1 | 6 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 000005 | 10/01/2012 | | |
| 6. ISSUED BY                    CODE | ASG - DPIFMC | 7. ADMINISTERED BY (If other than Item 6)   CODE | AGG/JS |

6. ISSUED BY
CMS, OAGM, ASG, DPIFMC
7500 SECURITY BLVD., MS: C2-21-15
BALTIMORE MD 21244-1850

7. ADMINISTERED BY
Jessica Sanders
Contract Specialist
(410) 786-1076

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

ACLR, LLC
Attn: CHRIS MUCKE
550 FOREST AVENUE
SUITE 15-2
PLYMOUTH MI 481703793

CODE   780272873

| (x) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|
| | 9B. DATED (SEE ITEM 11) |
| x | 10A. MODIFICATION OF CONTRACT/ORDER NO. GS-23F-0074W |
| | HHSM-500-2011-00006G |
| | 10B. DATED (SEE ITEM 13) |
| | 01/13/2011 |

FACILITY CODE

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified

12. ACCOUNTING AND APPROPRIATION DATA (If required)
See Schedule

13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

CHECK ONE

☐ A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

☐ B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

☐ C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

☐ D. OTHER (Specify type of modification and authority)
X   FAR 43.103 (a) (3) and mutual agreement of the parties

E. IMPORTANT:   Contractor ☐ is not, ☒ is required to sign this document and return _____1_____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)
Tax ID Number:  20-2662374
DUNS Number:  780272873
The purpose of this modification to Task Order No. HHSM-500-2011-00006G under GSA Contract
No. GS-23F-0074W is to extend the base period of performance through March 31, 2013.

The Contracting Officer is changed from Theresa Schultz to Nicole Hoey. The Contracting
Officers Representative is changed from Frank Chartier to Sonja Brown.

To that effect, the following sections of this task order are hereby modified as follows:

Refer to pages 2-4.
Continued ...

Except as provided herein, all terms and conditions of the document referenced in Item 8A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| GIL MUCKE, ACLR COMPLIANCE OFFICER | | Nicole Hoey | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
| (Signature of person authorized to sign) | 9/27/12 | (Signature of Contracting Officer) | |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

92

A624

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>GS-23F-0074W/HHSM-500-2011-00006G/000005 | | | | PAGE<br>2 | OF<br>6 |
|---|---|---|---|---|---|---|
| NAME OF OFFEROR OR CONTRACTOR<br>ACLR, LLC | | | | | | |

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | All other terms and conditions remain unchanged.<br>Period of Performance: 01/13/2011 to 03/31/2013 | | | | |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

93

A625

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Modification No. 000005

Page 3 of 6

**A. Section 3. PERIOD OF PERFORMANCE,** is hereby modified to extend the base period of performance through March 31, 2013, and reads as follows:

The base period of the task order is from <u>January 13, 2011</u> through <u>March 31, 2013</u>. The task order also includes four (4) 12-month optional periods. No contingency fees shall be paid after the end of the period of performance.

**B. The timeline provided on Modification No. 000004,** is hereby removed in its entirety and replaced with the following:

| Process | Date |
|---|---|
| RAC is available for Sponsoring Organization inquiries, appeals and provides communication and administrative support on behalf of CMS | Now thru appeal process |
| RAC reruns PDE information from appeal decisions and creates new Improper Payment Review Packages (IPRPs) with revised impacts by contract number | Now thru completion |
| RAC submits revised IPRP packages to the DVC | Now thru completion |
| DVC validates RACs updated IPRPs from appeal decisions and communicates results to the RAC | Now thru completion |
| RAC sends revised Notification of Improper Payment letters to SOs with updated PDE information | Now thru completion |

**Legend:**
SO – Sponsoring Organization
RAC – Recovery Audit Contractor
PDE – Prescription Drug Event
IPRP – Improper Payment Review Packages
DVC – Data Validation Contractor

*DVC reviews will be conducted and accepted/disputed on a rolling basis.
**DVC and RAC have 7 days per dispute to come to a resolution before CMS makes a final determination.

**C. Improper payment Reporting and Tracking:**
Prior to invoicing, the RAC must submit the Improper Payment Review Package into PRIS . After the RAC identifies an improper payment, it compiles an Improper Payment Review Package (IPRP) which contains the Improper Payment File and the supporting documentation identifying improper payments

94

A626

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G                          Page 4 of 6
Modification No. 000005

corresponding to a particular audit issue by contract. A unique ID is assigned to a Package and will be included on and associated with all future tracking reports and letters such as Validation Findings, Notification Letters, Appeal Notifications, Monthly Plan Payment Adjustments, and Invoices. The IPRPs will be unique for each contract, for each year for each audit issue.
The IPRP must be updated to reflect appeal decisions.

### D. Potential Disputes between RAC/DVC:

The RAC is required to review all disagreements identified by the DVC and either accept or reject the DVC's validation findings. When the RAC agrees with a rejected IPRP Validation finding, the file is considered validated; all associated PDE records will be removed. The RAC should submit a new package with updated PDE and reconciliation data once issues are resolved.

The RAC must collaborate with the DVC to attempt resolution of any dispute. The RAC and DVC should attempt to resolve any disputes within 7 calendar days. If the RAC and DVC cannot come to a resolution, CMS makes the final decision, which cannot be contested or reviewed by the RAC or DVC for any reason.

### E. Notification of Improper Payment Letters:

The RAC is required to issue a Notification of Improper Payment Letter to the SO once an improper payment is identified and validated. The RAC shall get the notification letter approved by CMS. Electronic or hardcopies must be sent to CMS. In order to allow the plan the full appeals window, the RAC is required to post-date the Notification of Improper Payment letter and keep a record as to when letters are sent.

The SO has 30 days to respond to any Notification of Improper Payment Letter. The response period is based on the date that appears on the Notification of Improper Payment Letter. Updated Notification of Improper Payment Letters must be sent to SOs to reflect appeal decisions. The excluded provider audit may have an impact on SOs that did not appeal. If a SO did not appeal, but is affected by another SOs appeal decision, both SOs IPRPS and Notification of Improper Payment Letters must reflect the final appealed decision. Therefore, a revised Notification of Improper Payment Letter must be sent to the SO with the PDE supporting the revisions. CMS will not recoup overpayments until all excluded providers with a SO are validated and the appeal process is complete.

### F. Progress Reports:

At the request of CMS, the RAC shall provide a progress report that states at a minimum:
   a. Administrative Actions
   b. Progress status by audit issue
   c. Summaries of applicable meetings (internal and external)
   d. Areas of concern requiring CMS action/attention

95

A00447

    e.  Any unresolved issues
    f.  List of activities completed to date
    g.  List of upcoming activities
    h.  Summary of improper payments (by contract) to date
    i.  Listing of any concerns from Plans
    j.  Any and all work papers supporting RAC activities including databases, fields, processes, internal protocols, or any other documentation/databases used for RAC activities.

CMS will conduct RAC oversight at either the RAC's site or at the appropriate CMS office. CMS has the right to request/review any work performed by the contractor at any time; this includes work papers, reports, etc. After completion of the engagement, CMS may hold a conference with the RAC to discuss any issues. CMS may choose to visit the RAC site to assess their performance.

**G. Quality Assurance:**
CMS will utilize a number of quality assurance procedures to ensure contractor compliance with this contract. Examples include inspection of deliverables, review of reports, progress meetings, performance evaluations, audit protocol review and acceptance, audit finding review and acceptance, etc.

Contractors shall develop and maintain quality assurance procedures for work paper reviews, IT requirements, PDEs, etc. Contractors shall also ensure that data is physically secured and Personal Health Information (PHI) data is handled confidentially. This is required for subcontractors as well. These should be provided to CMS upon request.

**H. SO communication via FTP, Website, or other CMS approved method of communicating PHI information securely to plans (to be approved by CMS):**
The Part D RAC will develop and maintain a website/FTP or other method for viewing PDE/PHI by Part D plans and sponsoring organizations and or other interested entities. The website/FTP or other secure method shall be developed and maintained in accordance with CMS standards and guidelines for contractor websites and will contain various types of information related to the RAC and the RAC Program. The FTP, Website or other method shall allow Part D plans to gain access to RAC audit issues related to its contract. CMS will approve content and links posted on the RAC's website.

The period of performance is extended through 3/31/2013 to allow for appeals by Sponsoring Organizations and the submission of the invoice by the RAC.

## B. Section 9. CONTRACTING OFFICER'S REPRESENTATIVE (COR) and CONTRACTING OFFICER / SPECIALIST:

Sonja Brown is designated as the COR for this order. Sonja's address is:

A00448

Contract No. GS-23F-0074W
Task Order No. HHSM-500-2011-00006G
Modification No. 000005

Ms. Sonja Brown
Centers for Medicare and Medicaid Services
OFM/CPI/MPIG/DMI
7500 Security Boulevard
Phone: (410)786-3571
Email: Sonja.Brown@cms.hhs.gov

The Contracting Officer for this task order is Ms. Nicole Hoey. Her address is:

Centers for Medicare and Medicaid Services
7500 Security Blvd.
ATTN: Ms. Nicole Hoey
Mailstop: B2-14-21
Baltimore, MD 21244-1850
(410) 786-0489

## END OF MODIFICATION

**Memorandum Appointing COR Brown**

**EXHIBIT 55**

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop B3-30-03
Baltimore, Maryland 21244-1850



OFFICE OF ACQUISITION
& GRANTS MANAGEMENT

### MEMORANDUM

DATE:     October 17, 2014

TO:       Sonja Brown
          CPI/MPIG

FROM:     Nicole Hoey
          Contracting Officer

SUBJECT:  Contract GS-23F-0074W/HHSM-500-2011-00006G with ACLR, LLC,
          Appointment as Contracting Officer's Representative (COR)

In accordance with Federal Acquisition Regulation (FAR) 1.602-2(d), the Contracting Officer
(CO) shall "…Designate and authorize, in writing and in accordance with agency procedures, a
contracting officer's representative (COR) on all contracts and orders other than those that are
firm-fixed price, and for firm-fixed-price contracts and orders as appropriate, unless the
contracting officer retains and executes the COR duties." This memorandum appoints you as
the COR for the subject contract, in order to assist with technical monitoring and contract
administration. Specifically, you are authorized to act on behalf of the Contracting Officer with
respect to technical and administrative matters, within the scope of the contract referenced
above, subject to the limitations set forth in Appendix A, Contracting Officer's Representative
(COR) Appointment Memorandum Duties and Responsibilities. This appointment replaces any
previous appointments associated with subject contract.

**Limitations:** In accordance with the HHS Acquisition Workforce program policy, an appointed
COR may not serve simultaneously as the Project or Program Manager on the subject contract.
This appointment is also not further delegable by you to any other individual. However, you
may receive input and guidance from other acquisition workforce team members and technical
experts, in carrying out your duties and responsibilities.

Your appointment as the COR is an expression of confidence that you will accept the challenges
and meet the demands, in such a manner as to reflect credit upon the United States of America
and the Centers for Medicare & Medicaid Services. Your duties and responsibilities as a COR will
provide you with an opportunity to use your experience and training in a most important position and
imposes the strictest standards of conduct upon your activities.

**FAC-COR Certification:** As a COR, you are responsible for maintaining an active Federal
Acquisition Certification COR (FAC-COR) certification, in accordance with the requirements of
the Federal Acquisition Institute (http://www.fai.gov/drupal/) and the implementing HHS FAC-
COR Handbook, throughout the duration of your appointment. Therefore, please provide the
Contracting Officer with certification updates as they are received.

**Duration of Appointment:** The period of this appointment shall be from the date of this
memorandum through the submission of all required close-out documentation to the Contracting

2

A631

Page 2 – Sonja Brown

Officer after the contract expiration date. If the appointment is superseded for any reason before completion of the contract, or if your FAC-COR certification is not maintained, you shall turn over all contract-related information in your possession at the time of revocation, to the successor COR or make other dispositions as directed by the Contracting Officer.

**Standards of Conduct and Conflict of Interest**: You are reminded that Government employment, as a public trust, requires that HHS personnel place loyalty to country, ethical principles and law, above private gain and other interests. In doing so, you must comply with the HHS Standards of Ethical Conduct and other CMS Ethics Rules and Regulations located at http://intranet.cms.gov/Component/OOM/Ethics/Regs.html. You are required to read and familiarize yourself with Appendix A, Contracting Officer's Representative (COR) Appointment Memorandum Duties and Responsibilities, to ensure that in carrying out your responsibilities in your official capacity, you avoid any action which might result in, or reasonably be expected to create, the appearance of conduct prejudicial to the Government. You should not allow yourself to be placed in a position where conflicts of interest might arise or might justifiably be suspected.

Procurement integrity is also entrusted to you in your role as a COR and continues throughout the life of the contract. Therefore, you should not discuss procurement plans or any other information with the contractor that might provide preferential treatment to one company over another when a future solicitation is planned or issued for a competitive procurement.

**Unauthorized Commitments:** In carrying out your duties as the COR, you are reminded that in accordance with FAR 1.602-2 Responsibilities, the COR "...Has no authority to make any commitments or changes that affect price, quality, quantity, delivery, or other terms and conditions of the contract, or in any way direct the Contractor, or its Subcontractors, to operate in conflict with the contract terms and conditions." Doing so constitutes an "Unauthorized Commitment." FAR 1.602-3, Ratification of unauthorized commitments, defines an Unauthorized Commitment as "...an agreement that is not binding solely because the Government representative who made it lacked the authority to enter into that agreement on behalf of the Government...."

Examples of unauthorized commitments are:
1. Orders placed with a Contractor without a valid contractual instrument in place.
2. Directing any Contractor to do additional work, in excess of the contract value, or work beyond the Period of Performance.
3. Authorize new work to a contract without notifying the Contracting Officer (CO) or Contract Specialist (CS) and having a modification in place for the new work.
4. Directing the Contractor, in any way that could change the terms and conditions of the contractual instrument or be deemed outside the Scope of the Statement of Work.

Unauthorized Commitments are a serious matter and may result in personal liability on the part of the employee who committed the Unauthorized Commitment. Ratification, as used in the FAR1.602-3, "...means the act of approving an unauthorized commitment by an official who has the authority to do so." It is the Policy of CMS to prevent the occurrence of unauthorized

Page 2 of 21

3

Page 3 – Sonja Brown

commitments and to ratify only in limited circumstances (See Appendix B, CMS Policy, Ratification of Unauthorized Commitments).

The Federal contracting process has been designed to efficiently ensure the delivery of goods and services. However, factors may come into play that could suggest the presence of, or enhanced potential for, fraud and/or abuse at various stages in the contracting process. You are encouraged to become familiar with fraud and abuse indicators. in order to detect improprieties and to take appropriate actions to ensure the integrity of the contracting process. Please review the following helpful fraud and abuse prevention guides:

- DHHS policy website for the policy on Preventing and Detecting Fraud in HHS Contracting; and,
- Office of the Inspector General, Office of Investigations, has prepared a Fraud Indicators Handbook.

Your attention is now directed to Appendix A, Contracting Officer's Representative (COR) Appointment Memorandum Duties and Responsibilities. Once you have read Appendix A, both you and your supervisor are required to sign and *return this appointment memorandum to the Contract Specialist no later than five (5) business days after its receipt.* Please keep a copy for your official records. You are also encouraged to review this memorandum's contents often, as a refresher of your role and responsibility as a COR.

Any questions should be directed to the respective Contract Specialist.

Nicole Hoey -S

Digitally signed by Nicole Hoey -S
DN: c=US, o=U.S. Government, ou=HHS, ou=CMS,
ou=People, cn=Nicole Hoey -S,
0.9.2342.19200300.100.1.1=2000657541
Date: 2014.11.20 14.01.57 -05'00'

Enclosures:                          Nicole Hoey
                                     Contracting Officer

cc:
ACLR – Thais Thompson
Leigh Snyder, OOM, Ethics Administration Office

Appendices:
Appendix A – Contracting Officer's Representative (COR) Appointment Memorandum Duties and Responsibilities
Appendix B – CMS Policy, Ratification of Unauthorized Commitments
Appendix C - CMS Policy – Contract Invoice/Voucher Payments

Page 3 of 21

A633

Page 4 – Sonja Brown

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

**CONTRACTING OFFICER'S REPRESENTATIVE (COR) APPOINTMENT ACCEPTANCE**

**COR**:

I, Sonja Brown, hereby:
- Acknowledge that I received this appointment memorandum;
- Fully understand the scope of my designated responsibilities;
- Have no known conflicts of interest that would prevent unbiased direction to the contractor;
- Agree to the terms and conditions of this appointment; and,
- Agree to work within the limitations of my authority.

10/20/14

Sonja Brown          Date
CPI/IAG

**COR's SUPERVISOR ACKNOWLEDGEMENT**:

I hereby acknowledge that I fully understand the scope of the COR's designated responsibilities.

Rosalind Abankwah 10-20-2014

Rosalind Abankwah          Date
CPI/IAG

Page 4 of 21

5

A634

Page 5 – Sonja Brown

### APPENDIX A - CONTRACTING OFFICER'S REPRESENTATIVE (COR) APPOINTMENT MEMORANDUM DUTIES AND RESPONSIBILITIES

SUBJECT:   Contract GS-23F-0074W/HHSM-500-2011-00006G with ACLR. LLC.
Appointment as Contracting Officer's Representative (COR)

**Special Note on Upcoming Changes to the Following Duties**: OAGM is in the process of developing a CMS COR Manual. Once the manual is implemented, this Appendix A will be automatically superseded by the COR Manual (without modification to this appointment memorandum) as if it were provided in full text herein.

You, Sonja Brown, having been duly appointed as the Contracting Officer's Representative for subject contract, the following duties and responsibilities are hereby delegated to you:

1.  **Contract Terms and Conditions**: The COR must read and understand the subject contract in order to perform his/her duties efficiently and effectively. Any question about contract terms and conditions should be referred to the Contract Specialist or Contracting Officer immediately so that the following duties and responsibilities are clearly understood.

    You are reminded that the COR is *not* empowered to, nor does he/she have the authority to, perform any of the following duties since, in accordance with FAR, they are reserved only for a CO:

    a) Make changes to the contract terms and conditions.
    b) Direct the contractor to perform work or make deliveries not specifically required under the contract.
    c) Waive or relax the Government's rights, with regard to the Contractor's compliance with the specifications, price, delivery or any other terms or conditions of the task order; and,
    d) Make any commitments or approve any actions that would create any financial obligation on the part of the Government.

2.  **Government Liaison**: The COR shall serve as the primary liaison between the Contractor and the Contracting Officer[1]. Care must be exercised to ensure that your statements or actions while participating in meetings, conferences, site visits or any other communications with Contractor representatives, cannot be construed by the Contractor as authority to alter the terms of the contract or perform any work not covered by the written contract.

3.  **Communication/Work with other Integrated Project Team (IPT) Members**: The COR shall:

---

[1] For the purposes of this appointment memorandum, the term Contracting Officer shall also include the Contract Specialist, unless otherwise specifically indicated.

Page 5 of 21

6

A635

a) Provide the Contracting Officer and Project/Program Manager, as appropriate, with copies of all of your written correspondence from/to the Contractor, including electronic communications;

b) Coordinate with the respective Project and/or Program Manager, as applicable;

c) As requested by the Contracting Officer, provide him/her with technical assistance on contract-related matters (e.g., scope changes, option exercise, disputes, settlements, litigation, patent and copyright issues, final payment during closeout, etc.); and,

d) Work with the Contracting Officer, as necessary, on other administrative matters.

4. **Technical Guidance/Monitoring:** The COR shall be responsible for issuing technical guidance, which is within the scope of the contract, as written, in order to ensure proper development of requirements and assist Contracting Officers in managing their contracts. Although not all inclusive, the COR shall be responsible for providing technical guidance and oversight as follows:

a) **Program Oversight:** Provide general program oversight and direction, if no Project or Program Manager is assigned to the contract;

b) **Quality Assurance -** Perform, at a minimum, the following Quality Assurance responsibilities:

   i. **Accepting Deliverables:** In accordance with FAR 46, Quality Assurance, and subject contract Section E, Inspection and Acceptance, you are hereby delegated responsibility for inspection, testing and acceptance of products and/or services delivered by the Contractor to the Government. This responsibility includes, at a minimum, review and acceptance of draft and final reports or other deliverables. Unless otherwise identified in the contract at Section E, you must accept or reject a deliverable within 30 days of its receipt. If rework is required, please notify the Contracting Officer immediately;

   ii. **Quality Assurance Surveillance Plans (QASP)** – The COR is responsible for developing a QASP when a Performance Work Statement (PWS) or Performance Based Service Contract (PBSC) is awarded. A QASP defines measurable performance standards (i.e., in terms of quality, timeliness, quantity, etc.) and is a Government developed and applied document, used to provide a means for evaluating whether the contractor is meeting the performance standards/quality levels identified in the SOW/PWS and the contractor's Quality Control Plan (QCP). It is a tool used to ensure that the government pays only for the level of services received. CMS is in the process of developing a standard QASP to be used. Until such time as CMS develops a QASP template, examples of QASPs can be found by searching the Internet for "Quality Assurance Surveillance Plans."

c) **Key Personnel:** Monitor the Contractor's use of key personnel and notify the Contracting Officer of any changes in key personnel proposed by the Contractor;

d) **Communications with Contractors:**

Page 7 – Sonja Brown

i. **Telephone**: Inform the Contracting Officer of substantive telephone or oral communications with the Contractor. The COR should document all substantive conversations and provide notes and/or summaries of them, as requested; and,

ii. **Written Communications**: It is possible that the technical direction that a COR provides could be misconstrued and could lead to Contractor performance that is not fully consistent with the terms of a contract. Therefore, technical guidance within the scope of the contract, as written, shall be "in writing" whenever possible and routed through the Contracting Officer prior to release to the Contractor. Where doubt exists as to whether proposed technical guidance is within or outside the scope of the contract, the Contracting Officer shall be contacted.

All technical guidance letters, including emails, shall conclude with the following statement:

*"The above technical guidance is not to be construed as a change, or intent to change, the scope of the work under the contract. It is to be acted upon only if it falls within the general scope of the contract and sufficient funds are available. Your attention is directed to the contract, Section I, FAR 52.232.20, Limitation of Cost, and FAR 52.243-7, Notification of Changes."*

Technical guidance, which is not within the scope of the contract, as written, shall be forwarded to the Contracting Officer via a Request for Modification to the contract. The Request for Modification shall include, at a minimum, the following:
- ✓ Cover Memorandum (similar to the Request for Contract document) that highlights the requested changes;
- ✓ Statement of Work changes;
- ✓ Independent Government Cost Estimate, which identifies the cost of deleted work, the changed or new work, and the net difference; and,
- ✓ 393 for the required funding.

e) **Subcontractors**: Although not all inclusive, the COR shall perform the following subcontractor related duties:

i. **Consent to Subcontract**: Review the qualifications of proposed Subcontractors and the appropriateness of subcontracting contract work, and make recommendations to the Contracting Officer regarding consent to the placement of Subcontracts; and,

ii. **Subcontractor Evaluations**: As part of the annual performance evaluations, you will be asked to provide input on any subcontractors work. Therefore, please monitor the appropriateness of subcontractors work, to the extent possible.

8

A637

Page 8 – Sonja Brown

    f) **Market Research**: Review/Monitor industry standards to assess whether new or emerging technologies might be more appropriate for CMS requirements. If so, coordinate with the Contracting Officer for potential contract modification for changes to requirements;

    g) **Deliverable Distribution**: Ensure proper distribution of final products and other information resulting from the contract; and.

5. **Working Contract File**: The COR shall maintain a complete working contract file for the assigned contract that will be turned over to the Contracting Officer for contract closeout at completion of the period of performance. Documentation shall be kept in electronic format, to the greatest extent practicable. The COR file shall include, at a minimum, the following:

    ✓ A copy of the Contracting Officer's COR Appointment memorandum and other documents describing the COR's duties and responsibilities;

    ✓ Copy of contract, delivery task orders, and all respective modifications to them;

    ✓ List of Technical Monitors providing assistance to the COR;

    ✓ Written Correspondence: All written correspondence, including emails, between your office and the Contractor, is official correspondence. As a reminder, all technical direction shall be documented in writing whenever possible:

      • Correspondence File: The COR shall be responsible for keeping a correspondence file of items submitted to, and received from, the Contractor. The correspondence file shall include, at a minimum, copies of technical guidance letters, emails and site visit records (See #7 below for additional information), etc. The correspondence file shall be retained by the COR for incorporation into the official contract file upon contract completion;

      • Deliverables File: The COR shall be responsible for keeping the official contract draft, interim and final technical reports or other deliverables file, as well as documentation of acceptability/unacceptability of deliverables. In addition, the COR shall be responsible for keeping a deliverables log, which lists the date that the deliverable was received, as well as the date it was accepted by the Government. The deliverables list will also be very beneficial in preparing annual performance evaluations. The deliverables file will become a part of the official contract file upon completion of the contract;

    ✓ Contractor performance and evaluation reports (See #6 below for additional detail);

    ✓ Documentation of on-site visits at the Contractor's facility (See #7 below for more detail);

    ✓ Copies of all invoices/vouchers and a payment record or invoice log indicating the balance of funds remaining (See #8 below for additional detail);

    ✓ Government Property records (See #9 below for more detail);

    ✓ Earned Value Management (EVM) information, if applicable (See #10 below for more detail);

    ✓ Any other pertinent materials or information relating to actions taken in accordance with the COR appointment letter;

    ✓ Contract closeout documents, as applicable, to include, but not limited to:

      • Contract completion letter;

Page 9 – Sonja Brown

- • Final invoice;
- • Final Contractor performance or evaluation report; and.
- ✓ Award fee determination information, as applicable.

6. **Contractor Performance**: Contractor Performance oversight includes all of the following:

a) **CPARS Evaluations**: FAR 42.15 Contractor Performance Information, requires that the Contractor's performance be evaluated and documented on an annual basis. The Contracting Officer shall provide annual performance evaluations to the Contractor as soon as practicable after completion of the evaluation period. The Contractor performance evaluations are a team effort. The COR, Contracting Officer and, where appropriate, end users of the product or service, all provide input for each annual evaluation.

The COR shall work with the Contracting Officer in order to complete and submit Interim and Final performance evaluations into the Contractor Performance Assessment Reporting System (CPARS). Both Interim and Final evaluations will be initiated by the Contract Specialist within 60 days following the end of each contract year and end of the contract period of performance respectively. You (COR) have 30 days, from the date the Contract Specialist sends the evaluation to you, for completion.

**Caution**: **In no event shall performance information be released to other than Government personnel and/or the Contractor whose performance is being evaluated.** Performance evaluations may be used to support future award decisions and, therefore, unauthorized disclosure of such information could cause harm both to the commercial interest of the Government and to the competitive position of the Contractor being evaluated.

Departments/Agencies shall share past performance information, in addition to CPARS evaluations, with other Departments/Agencies when requested to support future award decisions. The information may be provided through interview and/or by sending the evaluation and comment documents to the requesting source selection official. The COR shall cooperate with other Government Departments/Agencies when performance information is sought in support of future award decisions. At a minimum, the COR shall require that the request from another Department/Agency be submitted, in writing, before a response is provided.

b) **Adverse Performance**: Making timely reports to the Contracting Officer of any adverse performance indicators early, or when they are first discovered. There are several performance remedies available to the Contracting Officer, but not necessarily the COR. Therefore, early notification may allow for the appropriate corrective action to ensue before performance becomes beyond repair. And,

c) **Other Acquisition Team Personnel**: You may be in a position where you must rely on many other acquisition team members and technical experts (IPT) in order to perform your job successfully. Please work with the CO to ensure that the IPT members know

A639

Page 10 – Sonja Brown

and understand their role, responsibility and limitations.  Be alert and report to the Contracting Officer and concurrently the program office, action or inaction by CMS personnel that may affect the:

i.   Contractor's ability to perform; and/or
ii.  Inappropriate action with regard to the contract (e.g., any action that creates a conflict of interest on the part of the Contractor or causes the Contractor to perform inherently governmental functions).

7.  **Site Visits**:  When visiting the Contractor's facility, a record of the visit, including the date, persons contacted and a summary of the visit, shall be prepared for the CO.  Where practical, the site visit record shall be signed by all parties prior to the conclusion of the visit.  All site visit memorandums shall conclude with the following:

*"The results of this meeting are not to be construed as a change, or intent to change, the scope of the work under the contract.  If you believe that the information provided constitutes a contract change, please notify the Contracting Officer in writing in accordance with FAR 52.243-7, Notification of Changes. "*

8.  **Invoices/Vouchers**:  The COR is required to thoroughly review and approve/reject Contractor's invoices (fixed-price contracts) or vouchers (cost-reimbursement type contracts) invoices, including review of backup documentation submitted therein, in accordance with CMS Policy – Contract Invoice/Voucher Payments (Appendix C).

9.  **Government Property**:  In accordance with FAR 45, Government Property, and HHS Logistics Management Manual (LMM), Appendix Q - HHS Contracting Guide.pdf, located at https://web.archive.org/web/20111015044731/http://www.hhs.gov/hhsmanuals/, the COR shall provide the Contractor with, monitor the use of, and report on Government-furnished property.  Government Property administration assistance may be obtained by contacting the Office of Operations Management, as follows:

a)  Tyrone Harris, contract Property Administrator; or,
b)  Michael William, CMS Property Management Officer, Logistics Team Lead.

10. **Earned Value Management (EVM)**: As required by the Office of Management and Budget (OMB) Circular A-11, Preparation, Submission, and Execution of the Budget, HHS investments will use EVM to monitor their cost, schedule, and performance.  The HHS Office of the Chief Information Officer (OCIO) will ensure that all investments use an appropriate level of EVM as a management tool.  If this contract is for Information Technology (IT) products or services and the contract requires EVM oversight, the COR shall follow, at a minimum, the procedures identified by the OCIO IT Earned Value Management Processes and Procedures located at http://www.hhs.gov/ocio/policy/2005-0004p.html for oversight.  The HHS EVM Process and Procedures (EVMPP) explain how HHS IT Investment Managers and CORs are to receive, organize, analyze, and report cost,

11

A640

Page 11   Sonja Brown

schedule, and performance of their investments in accordance with the HHS EVM Policy and HHS CPIC Policy.

12

A641

**October 22, 2014 Email Regarding PDE Adjustments**

**EXHIBIT 56**

A02284

| From: | Brown, Sonja J. (CMS/CPI) |
|-------|---------------------------|
| To: | Christopher Mucke; Thais Thompson; Gil Mucke |
| Cc: | Kenva, Dominca (CMS/CPI); Thomas, India M. (CMS/CPI); Scott, Jamie (CMS/CPI); Tetkoski, Frank (CMS/CPI) |
| Subject: | Duplicate Payment PDE Adjustments |
| Date: | Wednesday, October 22, 2014 6:10:31 PM |

Chris  and Gil,

Per our meeting this afternoon, please find the protocol that should be used in identifying the PDE records that should be removed from the population of potential improper payments related to the duplicate payment RFIs. Provide a revised exception report for each affected contract and also please provide a spreadsheet broken down by contract, that includes, the original PDE count, the adjusted PDE count and the difference between the two. Also, please provide the breakdown of the financial impact by contract.  If possible, provide results by COB, 10/29. Should you require a follow-up discussion, please let me know.

Protocol

Calculate the dosage for each PDE in the pair by dividing the quantity dispensed by the days supply.  Compare the  dosage for the originating PDE and the dosage for the duplicate PDE and compare the pairs  for this population. If the dosage increased by 50% or more, then apply the following criteria to identify the pairs that are most likely to be false positives:  (1) where the beneficiary (HICN), the drug (NDC) and the fill number are the same and (2) the drug service reference (prescription) number and the date of service (DOS), also called the fill date, are different.  Additionally, the DOS of the subsequent PDE is later. Lastly, remove any PDEs where the service provider id (pharmacy id) and the date of service are different.

Thanks,

Sonja J. Brown
Centers for Medicare & Medicaid Services
Center for Program Integrity
Investigations and Audits Group
Division of Plan Oversight and Accountability
410-786-3571 (Office)
Sonja.Brown@cms.hhs.gov

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information.  Unauthorized disclosure may result in prosecution to the full extent of the law

DP1211

# December 24, 2014 Letter

**EXHIBIT 57**

| | |
|---|---|
| **From:** | Gil Mucke |
| **To:** | Christopher Mucke |
| **Subject:** | FW: PY10 Duplicate Payment IPRP Submission |
| **Date:** | Saturday, February 07, 2015 2:01:03 PM |
| **Attachments:** | 12 24 14 PY10 DP Findings ACLR IPRP Submission.docx |

**From:** Gil Mucke
**Sent:** Wednesday, December 24, 2014 6:42 PM
**To:** Brown, Sonja J. (CMS/CPI) [sonja.brown@cms.hhs.gov]
**Cc:** 'Newkirk, Delois J. (CMS/CPI)'; 'Kenya, Dominca (CMS/CPI)'; 'Scott, Jamie (CMS/CPI)'; Thais Thompson
**Subject:** PY10 Duplicate Payment IPRP Submission

Sonja,

 The attached letter details our RFI review summary and IPRP submission for the DVC review period – uploads were completed in both QuickR and PRIS.

 There are also issues with PDE rejects associated with PRIS uploads which are being finalized and will need to be resolved if CMS chooses to utilize PRIS.  Once the reject file is complete, we will provide to this group via separate correspondence.

Happy Holidays,

Gil Mucke
ACLR Compliance Officer

A02293

 **ACLR**

*38705 Seven Mile Rd.*
*Suite 251*
*Livonia, Michigan 48152*
*Ph: 734.744.1100  Fax: 734.744.1150*

December 24, 2014

Sonja Brown
Contracting Officer's Representative; CMS CPI
7500 Security Boulevard
Baltimore, Maryland 21244-1850

Re: PY10 Duplicate Payment Review - IPRP Submission

Dear Ms. Brown:

We have completed our review of all PDEs and RFI submissions pertaining to the PY10 duplicate payment review. Our IPRP submissions and a discussion of our findings are outlined below.

**IPRP SUBMISSIONS:**

*Exception Reports:*

As we explained to CPI personnel earlier, the PY10 Duplicate Payment audit commenced prior to the implementation of PRIS. Because of this, the unique PDE identifiers submitted to plans via the RFI are different than those utilized by PRIS. As we were unable to receive confirmation from CMS on whether the PRIS or RFI identifier should be utilized, we made two IPRP submissions. The first via QuickR and the second via PRIS.

The PRIS submission is in accordance with SOW requirements and there are issues with PRIS processing which will be addressed in separate correspondence. The "QuickR" submission utilizes the RFI identifier and may be found in the Duplicate Payment 122214 folder. In this manner, CMS can review the issue more closely and determine which process to utilize without further RAC efforts. Please note that it will be necessary to inform the DVC of the identifier issue should CMS choose to the PRIS submission. Most of the plans submitted their documentation utilizing the RFI identifier and it will be necessary for the DVC to regenerate the reports (using the PDE databases submitted to them earlier this year) utilizing the PDE identifiers we sent the plans earlier this year.

*RFI Responses:*

As previously discussed in our request/recommendation for the use of a sFTP for RFI submissions, CMS security requirements, evidentiary responses, and file size restrictions preclude a submission via PRIS. As CMS' decision to utilize a sFTP is pending, we shipped an encrypted hard drive containing evidentiary support submitted by the plans to the DVC as was done for the previous DEA Schedule complex review. The DVC's password was emailed separately to DVC Project Manager Chris Mendez. In the event that CMS wants access to the evidence as well, please inform the DVC and request that the encrypted drive be forwarded to you for download. CMS' password to unlock the data is 106238490710

DP1220

A02294

(this code is unique to CMS).  Please return the hard drive as soon as possible once you have downloaded/reviewed its contents.

**REVIEW PROTOCOL:**

An overview of the review protocols utilized by ACLR during this review are summarized below:

*Review Considerations:*

- Each prescription must be validly written;
- Review screen prints for additional information not already contained in the PDE record that may support the legitimacy of the duplicative PDE (e.g. Rx Written Date);
- Verify internal controls are consistent throughout SO contentions.  For example, one plan contended that all changes in dosage were identify PDE was accompanied by Prior Authorization Code "DC" and should not be considered duplicative.  The same plan also submitted documentation noting many dosage changes occurred as a result of day supply and quantity dispensed calculations; the Prior Authorization Code for each of the records submitted; however, was blank;
- Plan Sponsors are legally and contractually required to submit requested documentation; the failure to [sufficiently] provide such documentation results in an improper payment determination;
- CMS requires that plan sponsors "accurately" report all PDE fields.  In addition, federal and state law requires that key dispensing event fields such as patient and prescriber information, drug name, days supply, SRN, quantity dispensed, date of service, and fill number be accurately and uniformly documented; any such errors to the PDE/EMR (electronic medical record) results in an improper payment determination.

*Acceptable Documentation:*

- Valid prescription copies for both original and duplicate PDE;
- Valid prescription copy for duplicate PDE so long as the date does not precede the original PDE DOS;
- Screen prints for Duplicate PDE containing notations indicating legitimate override (e.g. "Patient indicated child flushed medication down toilet"); and
- Screen prints for both original and duplicate PDE containing an "Rx Written Date" for the duplicate record which is subsequent to the original PDE "Date of Service".

*Automatic Overrides:*

- The Date of Service for both the original and duplicate PDE records is the same;
- RFI submissions indicating the authorization of an early refill and the prescription is not the result of a Federal Disaster override; and
- RFI submissions indicating a dosage change where the Fill Number is not equal to zero.

DPI221

REVIEW RESULTS:

*Overview:*

Of the 367 plans that received an RFI, 254 plans submitted evidence for an average of 29% of the original documents requested. Of the remaining plans, 53 plans did not respond to the RFI and 60 plans submitted a spreadsheet with no additional evidentiary support. As documented in the IPRPs, we submitted findings for 294 plans in amounts totaling $15.9 million.

*Evidentiary Findings:*

The following chart summarizes the top five plan contentions. These percentages are based on only those records for which evidence was submitted[1].

| Plan Sponsor Contention | % |
|---|---|
| 90 Day Fills | 11.32% |
| Dosage Change | 17.41% |
| Not a Duplicate | 31.05% |
| Pharmacy Override | 8.99% |
| Prior Authorization | 8.80% |

Generally, we received no additional information related to "90 Day Fills" but some plans indicated that these were the result of retail pharmacies filling prescriptions in a manner similar to that of a mail order company. The most common plan assertion was "Not a Duplicate". This assertion was typically preceded by the words "there was a different service reference number" with no additional evidentiary support. Similarly, pharmacy overrides and prior authorization assertions were not fully documented or were accompanied by notes such as "Tina authorized this override". In each instance, we reviewed RFI submissions in accordance with the protocols outlined in *Review Protocol* above[2].

*Protocol Findings:*

As we noted in our ESI Assertions - Duplicate Payment RAC Audit response letter to you dated September 2, 2014; CMS published a duplicate payment protocol in March 2012, which identified duplicates where multiple PDEs with matching beneficiary, drug, and fill numbers matched on or close to the same date of service. It was this protocol that was utilized during the 2013 special study and upon which the Duplicate Payment NAIRP was based and our IPRP submission is based. The primary concern voiced by plan sponsors regarding the use of this protocol during this review was the decision to eliminate the Service Reference Number SRN as a determinative factor in identifying individual prescriptions; we share these concerns. As we discussed during the NAIRP review process, CMS' *Requirements for Submitting Prescription Drug Event Data, Memo to Plan Sponsors issued April 27, 2006* states "in the majority of cases, the concatenation of Service Provider, Prescription/Service Reference

---

[1] These findings are based on individual and unaudited RAC observations and are intended for informational purposes only.

[2] At one point, CMS requested that we perform a calculation to eliminate potential false positives arising from legitimate dosage changes. Plan RFI submissions indicate; however, that this protocol would have only been accurate in 26.7% of identified cases.

A02296

Number and Fill Number uniquely identify a prescription"[3]. Our review of RFI responses supports this contention. For example, one significant finding was that plan sponsors deleted 84% of all PDE associated with matching SRNs[4] versus 1.3% of those PDE which did not[5]. In addition, we also conducted a review of all PY10 PDE data, which is comprised of 1,101,783,133 PDE. Of these data, we noted 8,557,849 PDEs that were comprised of matching SRNs, beneficiary, drug, and fill numbers. Another significant finding arose, when we compared our findings for the NAIRP (non-matching SRN) to PDE with matching SRNs, beneficiary, drug, and fill numbers. In this case, we noted that only 37,870 duplicative PDEs for Kaiser, a plan sponsor we noted as having strong internal controls in previous audits, would have been identified versus the 126,629 potentially duplicative PDE identified as a result of this protocol.

For these reasons, we will recommend that CMS determine duplicate payments by concatenating the Service Provider, SRN, beneficiary and fill number fields as an automated review in future audits of this issue. As outlined further under *CPI Consideration* below, we have also submitted for CMS' review, the use of this protocol for the PY10 Duplicate Payment audit currently under review.

CPI CONSIDERATION:

We recognize the need to follow approved NAIRP protocols, and have submitted IPRPs for this audit accordingly. We also believe; however, that audits are fluid in nature and should be adaptive to observations made during the audit. As outlined under *Review Results - Protocol Findings* above, it is clear that matching the SRN is instrumental in determining individual prescriptions. This is supported by plan contentions in its RFI submissions, PY10 PDE data demonstrating that individual SRNs are submitted in 99.22% of all PDE submissions, and that findings for plan sponsors more accurately reflect the strength of individual internal controls identified in previous reviews.

For these reasons, we also determined duplicate payments arising from the concatenation of the Service Provider, SRN, beneficiary, and fill number fields as discussed above. In addition to eliminating any plan sponsor or internal CMS concerns pertaining to the identification of false positives arising from not using the SRN as a determining factor in identifying unique prescriptions, federal and state law requires that unique SRNs be applied to each prescription. As such, we believe the use of this protocol more accurately depicts duplicate payments occurring in PY10. Improper payments arising from this protocol total $161,989,261. We can submit IPRPs utilizing this protocol immediately upon CPI direction.

In summary, we have concluded our review of RFI submissions and fulfilled all SOW requirements related to the submission of our findings. Unless CPI directs us to submit IPRPs in accordance with the recommendation outlined above, all further RAC efforts regarding this review are held in abeyance pending the submission of DVC findings. We will of course make ourselves available to the DVC to discuss matters pertaining to our submission.

---

[3] The concatenation of Service Provider and Prescription/Service Reference Number uniquely identify a prescription while the addition of the fill number identifies unique prescription drug events.

[4] There were 23,632 pairs identified in this protocol which contained a matching Prescription/Service Reference Number.

[5] No or insufficient documentation comprised the remaining 16%.

223

A02297

Very respectfully,

Christopher A. Mucke
Managing Director

cc:   Thompson, Thais; Project Manager
      Mucke, Gil; Contract Compliance Manager

224

A650

**January 8, 2015 Email**

**EXHIBIT 58**

| From: | Christopher Mucke |
|---|---|
| To: | "Harris, Monique (CMS/CPI)"; Nicole.Hoey@cms.hhs.gov; Brown, Sonja J. (CMS/CPI) |
| Cc: | Thomas, India M. (CMS/CPI); Scott, Jamie (CMS/CPI); Kenya, Dominca (CMS/CPI); Brady, Elizabeth A. (CMS/CPI); Tetkoski, Frank (CMS/CPI); Newkirk, Delois J. (CMS/CPI); Brown, Camille J. (CMS/CCIIO); Abankwah, Rosalind M. (CMS/CPI); Thais Thompson; Gil Mucke |
| Subject: | RE: Duplicate Payment Data Discovery Observations |
| Date: | Monday, January 12, 2015 9:03:00 AM |

Monique, while we attempt to respond to reasonable CPI requests, those which require significant contract modifications would be better directed to our COR, Sonja Brown and our Contracting Officer, Nicole Hoey.

It is apparent that your comments below reflect last year's proposed NAIRP revision. As noted by our COR during those discussions, such a revision would constitute a "contractual change". Please be advised that no such change or modification was made and approved NAIRP protocols still apply to this review; our IPRP submission was in full and complete compliance with our contract and the approved NAIRP. Further, and as noted by my audit findings letter to Ms. Brown on December 23, 2014, plan sponsor evidentiary submissions clearly invalidated CPI's mathematical calculation proposed in the NAIRP revision.

Based on your email, it is apparent the DVC has not commenced their review of our IPRP submission (via both PRIS and QuickR) of December 23, 2014. As a practical matter, it is the DVC's responsibility to remove "false positives" or other RAC determinations made in error; it is not the RAC's responsibility to resubmit IPRPs until all such errors are removed. The results of their validation are contractually and procedurally due no later than February 6, 2015; an effort easily accomplished if, as their contract previously stated, only requires a 10% review of our findings.

I was hopeful that unnecessary delays by CPI in previous years, delays that have doubled in the past 12 months, would not also affect the final year of our contract. We have only ever requested that CPI exercise our contract in good faith. It is apparent from your email; however, that CPI efforts to manufacture RAC error, in an attempt to disguise the real cause of these delays, are a continuing cause of concern. Please refer further discussions pertaining to contractual change requests on this or other issues to our COR and Contracting Officer so that they may be more appropriately addressed. Thank you.

*Christopher Mucke | Managing Principal | ACLR, LLC*
38705 7 Mile Rd. Ste 251 | Livonia, Michigan 48152-3975 | ☏(734) 744 - 4401 | 🖷(734) 744 - 4150 | ✉
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer

**From:** Harris, Monique (CMS/CPI) [mailto:Monique.Harris@cms.hhs.gov]
**Sent:** Thursday, January 08, 2015 5:30 PM
**To:** Thais Thompson; Christopher Mucke; Gil Mucke
**Cc:** Thomas, India M. (CMS/CPI); Scott, Jamie (CMS/CPI); Brown, Sonja J. (CMS/CPI); Kenya, Dominca (CMS/CPI); Brady, Elizabeth A. (CMS/CPI); Tetkoski, Frank (CMS/CPI); Newkirk, Delois J. (CMS/CPI); Brown, Camille J. (CMS/CCIIO); Abankwah, Rosalind M. (CMS/CPI)
**Subject:** Duplicate Payment Data Discovery Observations

Christopher,

The DVC has provided CMS with the following observations from the duplicate payment data received from the RAC:
- The duplicative pairs are associated with 294 Plans. Of the 294 identified Plan's 53 did not respond. Of the 241 plans that did respond:
    a) 36 provided only a summary Excel spreadsheet
    b) 72 provided only images of scripts and other documents
    c) 133 provided both a summary Excel spreadsheet and images
- The RAC did not include their determinations/reasons for each duplicate
- In some instances, the case number for the PDE's cannot be linked to the Plan's responses
- The linking of the images to the Excel summaries is not straight forward and requires manipulation of the data to establish the linkage
- A number of the duplicates are for creams, ointments, eye drops and inhalers, which according to the DVC's pharmacist, Nonyem Oguejiofor , resulted in frequent refills of these drugs that are most likely legitimate. The DVC recommends that duplicates for these drugs be removed from the population.
- The DVC determined that 286,398 of the pairs on the RAC's list had been previously identified by the DVC as dosage

DP1225

change false positives and an additional 50,579 of the pairs were previously identified by the DVC as non-dosage change false positives.
- The dosage change pairs or a sample of these pairs should be reviewed separately to determine if the Plans' responses support a legitimate dosage change.
- "Prior Authorization" is another reason frequently supplied by the Plans for legitimate refills. Some of the Plans' responses contain an authorization code; however, the Plans do not provide any definition for the codes used. It will be necessary to individually assess the Plans' responses for validity.

The DVC is requesting the following information to perform validation:
- RAC determinations for each duplicate; . If the RAC conclude the duplicate was still improper then there should be indication along with a reason for the determination.
- The improper duplicate PDE's should accompany the Plan's responses so the DVC can independently validate the RAC's determinations
- PDE's that are not duplicates should not be included on the pair listing and the plans responses for the false positives should not have been sent to the DVC. *The DVC is assuming that all of the pairs on the list are improper.*

Please provide the DVC with the requested information above by COB 1/16/15.  There will be a meeting scheduled with CMS, the RAC and DVC to discuss.

Thanks,


*Monique Harris*
Auditor
Department of Health & Human Services
Center for Medicare & Medicaid Services
Center for Program Integrity
Investigations & Audits Group
Division of Plan Oversight & Accountability
(410)786-5443 (Office)

Monique.Harris@cms.hhs.gov

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or priviledged information.  Any review, dissemination, copying, printing, or other use of this email by persons or entities other than the addressee is prohibited.  If you receive this e-mail in error, please contact the sender immediately and delete this material from any computer.

DP1226

A653

April 24, 2015 Email

EXHIBIT 59



A07298

**Christopher Mucke**

| | |
|---|---|
| **From:** | Brown, Sonja J. (CMS/CPI) [sonja.brown@cms.hhs.gov] |
| **Sent:** | Friday, April 24, 2015 5:22 PM |
| **To:** | Christopher Mucke |
| **Cc:** | Hoey, Nicole E. (CMS/OAGM); Menefee, Justin (CMS/OAGM); Schultz, Theresa A. (CMS/OAGM); Abankwah, Rosalind M. (CMS/CPI); Brown, Camille J. (CMS/CPI) |
| **Subject:** | Technical Direction Letter (Duplicate Payment Audit) |
| **Attachments:** | ACLR TDL Duplicate Payments.pdf |

Chris,

Please see the attached Technical Direction Letter regarding the Duplicate Payment Audit. Please contact me with any questions that you may have.

Thanks,

*Sonja J. Brown*

Centers for Medicare & Medicaid Services
Center for Program Integrity
Investigations and Audits Group
Division of Plan Oversight and Accountability
410-786-3571 (Office)
Sonja.Brown@cms.hhs.gov

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

1

A655

A07299

Department of Health & Human Services
Center for Program Integrity
7500 Security Boulevard, Mail Stop AR-18-50
Baltimore, Maryland 21244-1850



**CENTERS FOR MEDICARE & MEDICAID SERVICES**
**CENTER FOR PROGRAM INTEGRITY**

Technical Direction Letter (TDL) #:

| | |
|---|---|
| **DATE:** | April 24, 2015 |
| **CONTRACT:** | GS-23F-0074/HHSM-500-2011-00006G |
| **PROGRAM:** | Center for Program Integrity (CPI) |
| **FROM:** | Sonja Brown, Contracting Officer Representative (COR) |
| **TECHNICAL DIRECTION:** | Mark Majestic, Director, Investigations and Audits Group Camille Brown, Acting Director, Division of Plan Oversight and Accountability |
| **SUBJECT:** | 2010-2012 Duplicate Payment Audit Review |
| **TO:** | ACLR, LLC |

**Reference: Part D RAC SOW §2.0**

Background

On January 2, 2014, ACLR submitted a New Audit Issue Review Package (NAIRP) for Duplicate Payments to CMS for review. According to the audit criteria developed by ACLR, payments for duplicate Prescription Drug Events (PDE) records occur due to lack of administrative oversight. The lack of adequate procedures and controls in place to detect duplicate PDE records; result in duplicate payments to the plan sponsor. Plan sponsors are required to have a drug and/ or utilization management program in place. The basis for pursuing the duplicate payment audit issue can be found in 42 CFR Section 423.504 (b)(4)(ii):

> *Conditions necessary to contract as a Part D plan sponsor.*
> *Any entity seeking to contract as a Part D plan sponsor must—*
>
> *(4) Have administrative and management arrangements*
> *satisfactory to CMS, as demonstrated by ot least the following:*

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:
This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

A07300

*(ii) Personnel and systems sufficient for the Part D plan sponsor to organize, implement, control, and evaluate financial and marketing activities, the furnishing of prescription drug services, the quality assurance, medical therapy management, and drug and or utilization management programs, and the administrative and management aspects of the organization*

With CMS' approval of the NAIRP, ACLR prepared and sent the Duplicate Payment Request for Information (RFI) to affected plan sponsors on July 8, 2014. The RFI gave plan sponsors an opportunity to perform an initial review of the preliminary improper payments and provide ACLR with additional information that could negate all or some of the improper payments. Plan sponsors contacted CMS to voice concerns regarding the burden of providing supporting documentation for what they believed were the identification of a large number of PDE records that did not appear to be improper submissions. CMS conducted an evaluation of ACLR's audit methodology to determine if the plan sponsors' concerns were valid. CMS' evaluation concluded there were significant flaws with the original audit methodology used by ACLR. To try to remedy these issues, CMS developed a revised methodology that would remove PDE records that were incorrectly identified by the original methodology and provided the revised methodology to ACLR on October 22, 2014. CMS instructed ACLR to use and apply the revised methodology to perform its RFI review and prepare the Improper Payment Review Packages (IPRPs) for validation. However, when ACLR submitted the IPRPs for validation, CMS determined that ACLR did not use the revised methodology.

Consequently, CMS tasked the Medicare Part D RAC Data Validation Contractor (DVC) with using the IPRPs ACLR provided and applying the revised methodology to attempt to validate and/or correct ACLR's Duplicate Payment IPRPs so the audit process could continue. The Part D DVC was able to reduce the number of duplicate PDE records by incorporating the revised methodology and removing PDE records that did not appear to be duplicates.

### Technical Direction/Technical Clarification of Contractor Requirement:

CMS has worked with ACLR to address the concerns of the duplicate payment audit, including making several attempts to revise the methodology. Although the revised methodology used by CMS was able to reduce the number of PDE records identified as improper submissions, CMS continues to have concerns with the validity of the overall audit results. As a result, CMS has decided to rescind its prior approval of the duplicate payment audit for contract years 2010 through 2012. ACLR shall not proceed any further with recovery activities related to this audit review and specified contract years.

Please contact your COR with any questions regarding this TDI.

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW.
This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law

Name:  Sonja Brown, COR

Signature: _____

Required Implementation Date: Upon receipt of this FDL .

INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW
This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use c
and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized
disclosure may result in prosecution to the full extent of the law

**December 11, 2014 Email**
**Regarding Potential SOW Changes**

**EXHIBIT 60**

Δ π EXHIBIT 86
Deponent: Brown
Date: 1/17/17 Rptr: CM
WWW.DEPOBOOK.COM

From:        Downs, Tanette N. (CMS/CPI)
Sent:        Thursday, December 11, 2014 10:45 PM
To:          Brown, Sonja J. (CMS/CPI)
Cc:          Brown, Camille J. (CMS/CCIIO); Abankwah, Rosalind M. (CMS/CPI); Thomas, India M. (CMS/CPI)
Subject:     RE: RAC SOW Changes

Please stop over.

From: Brown, Sonja J. (CMS/CPI)
Sent: Thursday, December 11, 2014 5:44 PM
To: Downs, Tanette N. (CMS/CPI)
Cc: Brown, Camille J. (CMS/CCIIO); Abankwah, Rosalind M. (CMS/CPI); Thomas, India M. (CMS/CPI)
Subject: RE: RAC SOW Changes

Tanette,
I spoke to Camille regarding your suggestion of doing a comparison of current language vs proposed. It may be a little difficult for some of the changes below but here's what we have.

| Current Language | Proposed Change |
|---|---|
| We may have to remove as there is no similar language in the SOW | The Part D RAC cannot abandon an audit issue once it has started. |
| This section also serves to summarize dedication to ensuring the accuracy in audit findings and the means by which it will be accomplished.<br><br>CMS reserves the right to change the type of audit review for the final audit issue approval. | CMS may modify the approved methodology at any time during the audit process. |
| Audit contract year will be the year of the data and for reconciled periods approved by CMS. | The Part D RAC must continue to review approved audit issues for subsequent plan years to continue program oversight unless CMS states otherwise. |
| As outlined in *Appendix E, New Issues Submission and Approval Process*, the Part D RAC submits a New Audit Issue Review Package (NAIRP) to the COR. | The Part D RAC must submit a new NAIRP for subsequent contract years for audit issues that have already been approved and will not require vetting through the new audit approval process, unless a law or an updated guidance changes the Part D RAC's approved methodology. |
| An extension may be granted to the DVC if the error rate is 25% or more. | CMS reserves the right to extend plan sponsor and/or DVC deadlines as deemed necessary. |

1

HHS1_02184921

A660

**From:** Brown, Sonja J. (CMS/CPI)
**Sent:** Thursday, December 11, 2014 3:40 PM
**To:** Downs, Tanette N. (CMS/CPI)
**Cc:** Brown, Camille J. (CMS/CCIIO); Abankwah, Rosalind M. (CMS/CPI); Thomas, India M. (CMS/CPI)
**Subject:** RAC SOW Changes

Tanette,

Per our conversation this morning, we are proposing that you used the language below to justify the changes to the RAC SOW. Please let us know if you have any questions.

As a result of information shared in yesterday's IAG/CPI FO meeting regarding the RAC's next option year, I was informed that leadership has made a decision to submit the Part D RAC SOW without any new changes in order to minimize the risk of CMS engaging in lengthy negotiations with ACLR. However, there are a few changes that I believe should be incorporated to clarify CMS' position in a couple of areas in which both CMS and ACLR agree needs clarification. The following are existing requirements being followed by CMS and the RAC but requires fine tuning to provide a clearer understanding of CMS' expectations and eliminate any ambiguity.

- The Part D RAC cannot abandon an audit issue once it has started. CMS may modify the approved methodology at any time during the audit process.
- The Part D RAC must continue to review approved audit issues for subsequent plan years to continue program oversight unless CMS states otherwise.
- The Part D RAC must submit a new NAIRP for subsequent contract years for audit issues that have already been approved and will not require vetting through the new audit approval process, unless a law or an updated guidance changes the Part D RAC's approved methodology
- CMS reserves the right to extend plan sponsor and/or DVC deadlines as deemed necessary.

*Sonja J. Brown*
Centers for Medicare & Medicaid Services
Center for Program Integrity
Investigations and Audits Group
Division of Plan Oversight and Accountability
410-786-3571 (Office)
Sonja.Brown@cms.hhs.gov

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

2

HHS1_02184922