# ACLR Sales Tax NAIRP

**EXHIBIT 61**

Δ π EXHIBIT 2D
Deponent_____
Date_____ Rptr_____
WWW.DEPOBOOK.COM

**RECOVERY AUDIT SERVICES IN SUPPORT OF PART D
NAIRP: PY12-PY13 SALES TAX ERRORS**

| | |
|---|---|
| NAIRP Submission Date: | August 21, 2015 |
| Walk-Thru Meeting Deadline: | September 4, 2015 |
| CMS NAIRP Feedback Deadline: | October 5, 2015 |
| Revised NAIRP Deadline: | November 4, 2015 |
| NAIRP Approval Deadline[1]: | December 4, 2015 |
| Audit Cycle - Collections[2]: | August 7, 2017 |

**OVERVIEW:**

This NAIRP outlines the RAC review protocols used to identify improper payments arising from the improper billing of sales tax on prescription dispensing events in Medicare Part D.

**PROCESS SUMMARY:**

The Sales Tax Review process consists of an automated review. During this process, state laws pertaining to the collection of sales tax on prescription drugs in Medicare Part D are matched against sales tax remissions within PDE payment submissions. The recovery audit review protocols outlined in this NAIRP address errors associated with sales tax charged in states which do not impose a sales tax, sales tax rates that exceeded the highest allowable sales tax rate within individual states, and a detailed review of sales taxes charged in the states of Louisiana and Minnesota. Upon approval of this NAIRP, the RAC will recalculate reconciliation, arising from identified improper payments, for affected contracts and generate Improper Payment Review Packages (IPRPs) for all contracts with errors exceeding $1,000. These IPRPs will be forwarded to the DVC for review and validation. Upon receipt of the validated records, the RAC will conduct final reconciliation, generate Notification Letters, and submit to CMS for issuance to SOs for recovery of amounts owed.

**BACKGROUND:**

Under the 2010 Patient Protection and Affordable Care Act (ACA) legislation enacted in March 2010, CMS was required to expand the RAC Program to the Medicare Part C (Medicare Advantage) and Part D Prescription Drug Benefit (Part D) programs. Section 6411(b) of the ACA provides CMS with general authority to enter into contracts to conduct RAC audits in Medicare Part D. Under the Medicare Integrity Program (MIP), RACs are to identify underpayments and overpayments and recoup any overpayments associated with the Medicare program.

CMS and the Part D RAC are governed by federal and state law, regulations, and a myriad of agency guidelines and memoranda. In addition to the ACA, the Improper Payments Elimination and Recovery Act (IPERA) requires that federal agencies implement programs to recover and eliminate improper payments of federal monies; the Office of Management and Budget is responsible for issuing guidance to all federal agencies related to IPERA .

---

[1] *Absent contract modification, all RAC activities pertaining to this NAIRP will cease upon CMS denial or expiration of the November 16, 2015 NAIRP approval deadline.*
[2] *Total audit cycle time encompassing NAIRP submission through RAC payment is 717 days for automated reviews and 807 days for complex reviews.*

**TECHNICAL SUPPORT:**

PART D PAYMENT MECHANISM:

There are four mechanisms by which plan sponsors receive Part D Payments; the direct subsidy, low income subsidy, reinsurance subsidy, and risk sharing. As a condition of payment, all SDs must submit, by contract, information necessary for CMS to carry out payment provisions. This information is submitted to CMS as a Prescription Drug Event record (PDE). In addition to information of general interest, PDE records also contain information associated with the beneficiary for whom prescriptions were filled, prescribing physicians, drug names, quantities dispensed, cost and expenditure information, as well as other fields necessary for CMS to determine amounts owing and to ensure that plan sponsors are complying with federal and state law as they pertain to the dispensing of prescription drug medications. Only those improper payment amounts associated with low income and reinsurance subsidies are collected during initial recovery audit processes; remaining risk sharing amounts are recovered when CMS reopens reconciliation on a plan year basis.

PDE CLAIMS DATA - SUBMISSION & PAYMENT:

PDE data submission requirements are governed by federal law, national standards promulgated by the National Council for Prescription Drug Programs (NCPDP), and CMS guidelines and memoranda. The submission of PDE data are also governed by the Health Insurance Portability and Accountability Act (HIPAA) and state laws. These laws require the accurate and uniform documentation of key prescription dispensing event data such as; prescription/service reference number, patient and prescriber information; drug name, quantity, dosage, fill information; and directions for use. The failure of SOs or related downstream entities to comply with the electronic submission of claims for payment criterion as required under 42 U.S. Code § 1320d-2, adopted national standards outlined in 4S CFR 162.1102 constitutes a HIPAA violation[3] subject to recovery as an improper payment.

"Payments to a Part D sponsor are conditioned upon provision of information to CMS that is necessary" for the "calculation and payment" of subsidies and retroactive adjustments and reconciliation payments to Part D plans, or as may be otherwise "required by law" (42 CFR §423.322(a))[4]. In addition, and as outlined in 42 CFR § 423.104(h), payments to plan sponsors are also subject, or otherwise limited, to providing benefits for "Part D drugs that require a prescription if those drugs are dispensed upon a valid prescription". A valid prescription is defined under 42 CFR §423.100 as a "prescription that complies with all applicable State law requirements". State laws and regulations outline prescription dispensing requirements and the failure to dispense prescriptions in accordance with these requirements could result in the imposition of fines and license suspension or loss. In addition to requirements pertaining to the use of licensed pharmacists, prescription expiration periods, and limitations on the dispensing of controlled and non-controlled substances, state laws also dictate the parameters by which a drug must be dispensed, prescription bottle labeling requirements, and the accurate and uniform recording and maintenance of all electronically documented dispensing events and the certification by third party

---

[3] See Letter to IG Daniel Levinson, Office of Inspector General (OIG) Draft Report: "Inappropriate Medicare Part D Payments for Schedule II Drugs Billed as Refills" (OEI-02-09-00605), August 2, 2012 (CMS Response to OIG SII Report) and letter to HHS Secretary Kathleen Sebelius, NCPDP Telecommunication Standard Implementation Guide Version D.Ø Enhancement Based on Regulatory Requirement, November 15, 2012 (NCPDP Response to OIG SI Report); "Use of a field in contravention of the standard would be a HIPAA violation."
[4] Please also see 42 CFR §423.301.

auditors of such electronic information systems.  As such, and in accordance with HIPAA Protocols, each state requires that certain data be entered, transmitted, and maintained without error.  These data and applicable CMS PDE data fields may be summarized as:

| State Requirements | PDE Field Name | Reference |
|---|---|---|
| Unique Prescription Identifier | PTAP_RX_SERV_REF_NUM | SRN |
| Patient Information | PTAP_INS_CLAIM_NUM | HICN |
| Prescriber Information | PTAP_PRESCRIBER_ID; PTAP_PRESCRIBER_ID_QUAL | Prescriber NPI |
| Pharmacy Information | PTAP_SRVC_PROVIDER_ID; PTAP_SRVC_PROVIDER_ID_QUAL | Pharmacy NPI |
| Drug Name, Strength, & Quantity | PTAP_PROD_SERVICE_ID; PTAP_QUANTITY_DISPENSED; PTAP_DAYS_SUPPLY | NDC |
| Directions for Use | Can be imputed by a review of concatenated PDE information. | Directions |
| Date of Service | PTAP_RX_DOS_DT | DOS |
| Fill/Refill Information | PTAP_FILL_NUM | Fill |

Plan sponsors and administrative support entities such as pharmacy benefit managers (PBMs) are required to attest to the accuracy of PDE data submitted to CMS for payment.

CMS provides PDE records to the RAC on a payment year ("plan year" or "PY") basis.  Once received, the RAC validates the payment information contained therein and matches it to total payments made by CMS to plan sponsors.  The validated PDE records form the basis of the RAC's recovery auditing activities and the calculation of improper payments owed by plan sponsors to CMS[5].

FEDERAL LAW – IMPROPER PAYMENTS:

The primary document dictating CMS and RAC recovery audit review standards can be found in OMB Circular A-123, Appendix C.  Part I(A)(2) ("OMB Requirements") of this documents defines an improper payment as:

> any payment that should not have been made or that was made in an incorrect amount *under statutory, contractual, administrative, or other legally applicable requirements*.  Incorrect amounts are overpayments and underpayments (including inappropriate denials of payment or service).  An improper payment includes any payment that was made to an ineligible recipient or for an ineligible service, duplicate payments, payments for services not received, and payments that are for the incorrect amount.  In addition, when an agency's review is unable to discern whether a payment was proper as a result of *insufficient or lack of documentation*, this payment must also be considered an error.  (*Emphasis added.*)

To make a determination as to the efficacy of CMS payments to plan sponsors, the RAC reviews applicable federal and state law and regulations, CMS promulgations and guidelines, as well as available evidence such as PDE payment data submissions.  In instances where a clear, likely, or probable error occurs, the RAC identifies the error as an improper payment in accordance with OMB requirements.

FEDERAL LAW – SALES TAX IMPLICATIONS:

---

[5] *The current impact calculation methodology is limited to amounts associated with the Reinsurance subsidy and Low Income Cost Sharing subsidy; risk sharing is calculated during subsequent reopenings.*

All states, which impose sales taxes, also exempt sales to the federal government. As PDEs constitute sales to beneficiaries, and not sales to the federal government, such laws were not applied or considered in the development of this NAIRP.

STATE LAW - SALES & USE TAXES:

The RAC reviewed the sales tax laws of each state to determine the taxability of prescription drugs in general and as it applied to the Part D program.

*Imposition of Sales & Use Taxes:*

While sales and use tax laws vary by state, sales taxes are generally imposed on retail sales of goods and are collected from the purchaser at the time of sale, or transfer of goods. Alternatively, a use tax is imposed on the purchaser and generally arises on transfers of goods in interstate commerce or in instances of intrastate commerce where sales tax is not billed by the seller of the goods. While some interstate sellers may collect use taxes from the purchaser[6], purchasers typically self assess these taxes and remit them to the applicable state where the good is used.

In each state reviewed by the RAC, retail sales are imposed by the taxing jurisdiction where the transfer of the PDEs to the beneficiaries occurred (taxable situs). As such, the RAC was able to determine applicable state and local tax rates on a PDE by PDE basis by identifying the location of the pharmacy as indicated in the NPPES database.

As outlined in greater detail below, the RAC noted there were five states that did not impose a sales tax and that all states provide a statewide exemption or reduced tax rates on sales of prescription drug medications. The RAC also noted that, unless specifically precluded by state law, local taxing jurisdictions generally do not exempt the sale of prescription drug medications from tax; the RAC did not audit PDEs to determine whether correct local tax rates were properly applied to PDEs.

*No SUT States:* The RAC identified the states of Alaska, Delaware, Montana, New Hampshire, and Oregon as having no state or applicable local sales taxes which were imposed during the PY12-PY13 NAIRP review period.

*Louisiana:* The State of Louisiana imposes sales and use taxes on the retail sales of tangible personal property. The sale of prescription medications; however, is exempt from state tax at LA REV. STATE. ANN. § 47:305(D)(1)(j)(2011), which states that "drugs prescribed by a physician or dentist" are "specifically exempted from the tax imposed by taxing authorities" for "purposes of the state sales and use tax". The state of Louisiana also excludes the levying of local sales and use taxes on sales "made under the provisions of Medicare" (at LA REV. STATE. ANN. § 47:301(10)(u)(2011). As such, sales of Part D PDEs in the State of Louisiana are exempt from state and local taxes[7].

*Minnesota:* The State of Minnesota imposes sales and use taxes on the retail sales of tangible personal property. The RAC determined from its review of Minnesota tax law; however, that MINN

---

[6] *Large multistate companies, which have a physical presence within such states are generally required to collect use taxes for remittance to the state.*
[7] *Louisiana sales tax issues have been previously addressed by CMS; please see PREVIOUS AUDIT FINDINGS - CMS below.*

STAT. § 297A.67(7) (2012) provides an exemption for sales of "drugs and medical devices for human use". The RAC also determined that MINN STAT. § 297A.99(1) (2012) permits political subdivisions of the state to "impose a general sales tax" but that any "goods or services that are otherwise exempt from taxation under this chapter are exempt from a political subdivision's tax" (MINN STAT. § 297A.99(7) (2012). As such, sales of prescription drugs in the State of Minnesota are exempt from state and local taxes[8].

*Miscellaneous GT 50%:* During the course of its review of sales taxes paid, the RAC identified numerous instances where sales tax exceeded the ingredient cost billed in the PDE as well as numerous other instances where the sales tax rate far was greater than or equal to 50% of the cost of the drug. The RAC was unable to identify any state statute or local ordinance permitting tax rates approaching that level.

OVERVIEW:

Under this process, the RAC identified all PY12-PY13 PDEs where sales tax was improperly submitted to CMS for payment. Under this process, the RAC identified improper payments by identifying sales tax billed in states that do not impose a sales tax or were billed at a rate that exceeded legally applicable tax rates. Upon approval of this NAIRP and completion of this approved audit protocol, the RAC will generate IPRPs for all PDEs for which sales tax was billed in error and submit to the DVC for review and validation. Upon receipt of the validated records, the RAC will conduct final reconciliation, generate Notification Letters, and submit to CMS for issuance to SOs for recovery of amounts owed.

PREVIOUS AUDIT FINDINGS - CMS:

During PY10, CMS was notified that some Louisiana pharmacies were billing sales tax on Part D PDEs in violation of state law. During 2010 and early 2011, CMS issued 4 memorandums to plan sponsors regarding the recoupment of erroneously billed Louisiana sales taxes; the subsequent deletion of affected PDEs; and the resubmission of corrected PDEs[9] stating on December 21, 2010:

> The purpose of this memo is to instruct Part D sponsors to immediately move forward with recouping any sales tax paid on 2010 Part D prescriptions in Louisiana and resubmitting corrected Prescription Data Events (PDEs) for these transactions.

APPLICATION OF HIPAA PROTOCOLS, CMS PLAN PAYMENT REQUIREMENTS, & REGULATORY REQUIREMENTS:

As discussed under *PDE CLAIMS DATA - SUBMISSION & PAYMENT* above, HHS adopted HIPAA protocols developed by the NCPDP. The primary HIPAA and PDE submission requirements utilized in the proposed NAIRP protocol are summarized in the table below:

---

[8] *The RAC anonymously contacted the state and selected local taxing jurisdictions; state and local representatives confirmed the RAC's conclusions regarding the exempt status of prescription drug sales in the state.*

[9] *Please see, Cynthia Tudor, Ph.D. Director Medicare Drug Benefit and C & D Data Group, "Notice to Part D Sponsors Operating in Louisiana", HPMS Memo to Part Plan Sponsors. 13 Aug. 2010; Cynthia Tudor, PhD, Director Medicare Drug Benefit and C & D Data Group, "Revised Notice to Part D Sponsors Operating in Louisiana", HPMS Memo to Part Plan Sponsors. 1 Sep. 2010; and Cynthia Tudor, PhD, Director Medicare Drug Benefit and C & D Data Group, "Recoupment of Louisiana Sales Tax Paid on Part D Claims in 2010", HPMS Memo to Part Plan Sponsors. 21 Dec. 2010. Please also see Cynthia Tudor, PhD, Director Medicare Drug Benefit and C & D Data Group, "Recoupment of Louisiana Sales Tax Paid on Part D Claims in 2010", HPMS Memo to Part Plan Sponsors. 11 Apr. 2011, which stated "it remains the sponsor's responsibility to correctly adjudicate claims in accordance with all applicable state laws".*

| Field | HIPAA Name of Field | PDE Field | CMS PDE Definition / Values |
|---|---|---|---|
| | | PDE Submission Protocols | |
| 201-B1 | Service Provider ID | PTAP_SRVC_PROVIDER_ID | 01 = NPI<br>06 = UPIN<br>07 = NCPDP Number<br>08 = State License<br>11 = Federal Tax Identifier<br>99 = Other; When Plans report Service Provider ID Qualifier = "99" - Other, populate Service Provider ID with the default value "PAPERCLAIM" defined for TrOOP Facilitation Contract.<br><br>When Plans report Federal Tax Number (TIN), use the following format: ex 999999999 (do not report embedded dashes) |
| 407-D7 | Product Service ID | PTAP_PROD_SERVICE_ID | Submit 11 digit NDC only  Fill the first 11 positions, no spaces or hyphens, followed by 8 spaces  Format is MMMMMDDDDPP  DDPS will reject the following billing codes for compounded legend and/or scheduled drugs 99999999998, 99999999992, 99999999993, 99999999994, 99999999995, and 99999999996. |
| 523-FN | Amount Attributed To Sales Tax | PTAP_AMT_SALES_TAX | Amounts paid to pharmacy to cover sales tax |
| A33-ZX | CMS Part D Contract ID | PTAP_CNTRT_OF_REC | This field contains the unique number CMS assigns to each contract that a Part D plan has with CMS. |

As shown in the above chart, and as outlined in the Standards, HIPAA protocols outline specific data submission protocols necessary to ensure compliance with federal and state law. As outlined in greater detail under *IPRP DEVELOPMENT & SUBMISSION* below, the primary fields and related Standards' definitions utilized under this protocol are:

- Service Provider ID (793) - ID assigned to a pharmacy or provider.
- Amount Attributed to Sales Tax (523-FN) - Amount to be collected from the patient that is included in 'Patient Pay Amount' (SØS-FS) that is due to sales tax paid.
- Contract Number (A33-ZX) - Designation assigned by CMS that identifies a specific Medicare Part D sponsor.

IDENTIFICATION OF SALES TAX ERRORS:

The RAC conducted a comprehensive review of all PY12-PY13 PDE data to ascertain compliance with applicable state and local sales tax laws.  For purposes of this NAIRP and as outlined in the review protocols below, improper payments are defined as Part D payments which included charges for sales tax precluded or otherwise exempt by state law.

*Sales Tax PDEs & Taxable Situs:*

To determine whether sales tax was inappropriately paid, the RAC generated a list of all PY12-PY13 PDE records where the PTAP_AMT_SALES_TAX was greater than zero (STL).  Once complete, the RAC extracted all PTAP_SERV_PROVIDER_ID NPIs and matched them to the NPI field of the NPPES database. During the matching process, the RAC identified the location of each pharmacy from the ProviderBusinessPracticeLocationAddressStateName (State) and the ProviderBusinessPracticeLocationAddressPostalCode (Zip Code) fields and updated individual PDEs in the STL accordingly.

Taxable situs of each PDE was determined using both the State and Zip Code fields for each pharmacy and improper sales tax payments were noted as follows:

- *No SUT States:* The RAC identified 2,292 PY12-PY13 PDEs where sales tax was submitted on PDEs in states that do not impose a sales tax. Improper payments for these PDEs totaled $5.5 million[10].

- *Louisiana:* The RAC identified 2,045,696 PDEs where sales tax was paid by CMS in the State of Louisiana. Total amounts paid to plan sponsors for these PDEs were $32.03 million[11].

- *Minnesota:* As discussed in under *STATE LAW* above, the RAC noted numerous instances where sales tax was billed on PDEs in the State of Minnesota in violation of state law. The RAC identified 27,272,409 PDEs where sales tax was billed on PDEs in the state. Total amounts paid to plan sponsors for these PDEs were $619.2 million.

- *Miscellaneous GT 50%:* As discussed in under *STATE LAW* above, the RAC also noted some instances in other states where sales tax was billed on PDEs where the tax rate billed exceeded the ingredient cost or was greater than or equal to 50% of drug cost. The RAC identified 262,098 PDEs for PY12-PY13 improper payment amounts totaling $1.62 million.

### NAIRP/IPRP Submission:

This NAIRP and attached supporting documentation contain all PY12-PY13 PDEs that were improperly submitted for payment as outlined in the recovery audit protocols outlined above[12]. A database containing information pertaining to location information for individual pharmacies identified as a result of this audit protocol has been provided to permit a thorough and complete validation prior to issue approval. Upon approval of this issue the RAC will generate IPRPs, as outlined in the review protocols outlined under RFI/IPRP DEVELOPMENT above. This database and related exception reports by contract will be submitted as IPRPs to the DVC for final review and validation. Upon receipt of validated PDEs, the RAC will develop exception reports and notification letters and submit to CMS via PRIS for submission to SOs.

### NAIRP AMOUNTS IDENTIFIED:

Utilizing the protocol outlined above, we identified $652.8 million in PY12-PY13 PDE improper payments and 29.6 million PDEs as follows:

---

[10] *In conducting its review, the RAC noted that approximately 92% of all transactions were billed by one pharmacy in Delaware at a 2% tax rate. Subsequent reviews indicated that these taxes were billed to beneficiaries located within the State of Minnesota, which indicate that this pharmacy was improperly billing the Minnesota Provider Care tax to beneficiaries.*
[11] *In conducting its review, the RAC noted that 78% of the PDEs and 86% of amounts identified were associated with Contract S5660.*
[12] *File size limitations required the findings for the State of Minnesota be uploaded as a text file.*

| Amounts: | PY12 | PY13 | Totals |
|---|---|---|---|
| No SUT States | 2,671,259 | 2,847,544 | 5,518,803 |
| Louisiana - Exempt | 14,848,305 | 17,179,872 | 32,028,178 |
| Minnesota - Exempt | 364,422,715 | 254,761,569 | 619,184,285 |
| Miscellaneous - GT 50% | 806,801 | 816,729 | 1,623,530 |
| Totals | 382,749,081 | 275,605,715 | 658,354,795 |

| PDEs: | PY12 | PY13 | Totals |
|---|---|---|---|
| No SUT States | 792 | 1,500 | 2,292 |
| Louisiana - Exempt | 945,782 | 1,099,914 | 2,045,696 |
| Minnesota - Exempt | 14,632,565 | 12,639,844 | 27,272,409 |
| Miscellaneous - GT 50% | 116,230 | 145,868 | 262,098 |
| Totals | 15,695,369 | 13,887,126 | 29,582,495 |

A670

# CMS Denial of Sales Tax NAIRP

**EXHIBIT 62**

Δ π EXHIBIT ___19___

Deponent _____
Date 10 17 Rptr CN
WWW.DEPOBOOK.COM

| | |
|---|---|
| **From:** | Brown, Sonja J. (CMS/CPI) |
| **To:** | Christopher Mucke |
| **Cc:** | Thais Thompson; Gil Mucke; Howard, Dominca (CMS/CPI), Brown, Camille J. (CMS/CPI), Abankwan, Rosalind M. (CMS/CPI) |
| **Subject:** | RE: PY12-PY13 NAIRP - Sales Tax Errors |
| **Date:** | Thursday, September 03, 2015 4:12:37 PM |

Chris,

Thank you for your NAIRP submission for PY 2012-2013 Sales Tax Errors. We regret to inform you that your NAIRP is denied and a walkthrough will not be scheduled as this audit issue is currently open and active with another CMS contractor. According to Section 1.2.3 of the SOW, "CMS/CPI consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue". Should you have any questions regarding the denial of the NAIRP for Sales Tax Errors, please feel free to contact me.

Thanks,

*Sonja J. Brown*
Centers for Medicare & Medicaid Services
Center for Program Integrity
Investigations and Audits Group
Division of Plan Oversight and Accountability
410-786-3571 (Office)
Sonja.Brown@cms.hhs.gov

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

**From:** Christopher Mucke [mailto:cmucke@aclrshs.com]
**Sent:** Friday, August 21, 2015 3:08 PM
**To:** Brown, Sonja J. (CMS/CPI)
**Cc:** Thais Thompson; Gil Mucke; Howard, Dominca (CMS/CPI)
**Subject:** PY12-PY13 NAIRP - Sales Tax Errors

Sonja,

We have submitted our NAIRP for PY12-PY13 Sales Tax Errors. The NAIRP, related PDE, sample PDE (Minnesota), and other supporting documentation files have been uploaded into QuickR. We also submitted the NAIRP via PRIS and received a "Processed Successfully" response. I confirmed the dates in the NAIRP comply with contractual deadlines but you may want to confirm this as well.

Please let me know if you have any questions.

*Christopher Mucke | Managing Principal | ACLR, LLC*
38705 7 Mile Rd, Ste 251 | Livonia, Michigan 48152-3975 | ☎(734) 744 - 4401 | 🖷(734) 744 - 4150 |
mailto:cmucke@aclrshs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination or distribution or copying of or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error please notify the sender immediately by replying to the message and deleting it from your computer.

**Excerpts from CMS 30(b)(6) Deposition
in ACLR II**

**EXHIBIT 63**

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

---------------------x

ACLR, LLC

       Plaintiff,

-vs-             Civil Action No. 16-309

THE UNITED STATES

       Defendant.

---------------------x

             Wednesday, August 16, 2017

             Baltimore, Maryland


  THE DEPOSITION OF SONJA JEFFERSON BROWN as

Corporate Representative for the Department of

    Health and Human Services 30(b)(6)


           Volume 1

        Pages 1 through 216

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                   August 16, 2017

1  and look.  But maybe -- for this one, 2015,

2  maybe three.

3       Q.   Do you know which ones those were,

4  which NAIRPS?

5       A.   The DEA schedule drugs, unauthorized

6  prescribers and excluded providers.

7       Q.   Do the statement of work terms and

8  conditions permit CMS to terminate any recovery

9  audits by ACLR once they've been approved?

10      A.   Yes.

11      Q.   Can you point to where that is in the

12  statement of work?

13      A.   I know it's the section that says that

14  we can change the methodology or terminate.  I'm

15  not seeing it right now.  But it is in here, I

16  know.

17           I don't see it right now, but I do

18  know there is some language where CMS can

19  terminate an already-approved issue.

20      Q.   And what were the bases for such

21  termination?

22      A.   If it was found to be an issue with

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                   August 16, 2017

1   that PDE records for an audit issue that's

2   already being looked at within CMS, whether it's

3   another contractor or another area of CMS,

4   cannot be duplicated.

5        Q.   And where does it say that?

6        A.   CMS consistently ensures RAC efforts

7   are not duplicative and do not focus on improper

8   payments that are already identified, being

9   audited or have been corrected/reimbursed

10  elsewhere in CMS for the same audit issue.

11       Q.   So in order for CMS to deny an audit

12  issue under Section 1.2.3, the other audit issue

13  must not only be duplicative but it would also

14  have to be focusing on improper payments that

15  are already identified, being audited and have

16  been corrected and reimbursed elsewhere in CMS

17  for the same audit issue.  Isn't that true?

18       A.   That's what it says, yes.

19       Q.   So my question is, then, does the

20  second paragraph -- does that focus on plan

21  sponsor contracts or PDE records?

22       A.   It's both.

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                          August 16, 2017

1      Q.   But CMS's position is it doesn't have

2   to engage in any communications or --

3      A.   Yeah.  There's nothing that says we

4   have to engage with ACLR.

5      Q.   On a NAIRP --

6      A.   Right.

7      Q.   -- that it submits?

8      A.   Right.

9      Q.   Please turn to Section 2.1.1.

10          Does this section outline the process

11   for obtaining new audit issue approval?

12      A.   Yes.

13      Q.   And are these processes further

14   delineated in Appendix E?

15      A.   Yes.  It is.

16      Q.   What are the steps required in this

17   process?

18      A.   Once the audit issue is submitted, I

19   think within 14 days a walk-through of the new

20   issue, which afterwards goes into the feedback

21   period, any adjustments to the methodology and

22   ultimately an approval -- any changes made to

1   the methodology based on feedback and ultimately

2   an approval or denial.

3        Q.   And is CMS contractually obligated to

4   follow this process?

5        A.   Yes.  For viable issues.

6        Q.   And what do you mean by viable issues?

7        A.   Issues that CMS believes could move

8   forward and payments could be recouped from plan

9   sponsors.

10       Q.   And is that articulated anywhere in

11   the statement of work?

12       A.   No, it's not.

13       Q.   Does CMS always follow the process

14   you've just outlined in terms of the steps

15   required for the approval process?

16       A.   Yes.

17       Q.   Does CMS --

18       A.   Unless it's something that, again, we

19   didn't think CMS could move forward on.

20       Q.   Does CMS always adhere to the time

21   lines outlined?

22       A.   Not always, no.

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                              August 16, 2017

1   deny the NAIRP?

2        A.    Uh-huh.

3        Q.    Was ACLR given the opportunity to work

4   with CMS, slash, CPI to refine and approve or

5   deny the sales tax NAIRP?

6        A.    No.   Because it was denied.

7        Q.    Okay.   Take a look at Appendix E.   I

8   think that's on page 32.

9             Do you see Step 2 there?

10       A.    Yes.

11       Q.    It says:   RAC conducts a walk-through

12  of the new issue at the next scheduled CMS,

13  slash, RAC operations meeting?

14       A.    Yes.

15       Q.    Was a walk-through conducted for the

16  sales tax NAIRP?

17       A.    No, it wasn't.

18       Q.    And why not?

19       A.    Because the audit issue was denied

20  once it was submitted.   So there was no need to

21  move to Step 2.

22       Q.    And can you point to any language in

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                            August 16, 2017

1  the statement of work where it states that CMS

2  has the unilateral authority to deny an issue

3  without a walk-through meeting?

4      A.   It doesn't specifically say that

5  anywhere.

6      Q.   Can you point to any language in the

7  statement of work where it states that CMS has

8  the unilateral authority to deny an issue

9  without collaborating with the RAC to refine

10 and/or revise the NAIRP?

11     A.   No.   I don't think there's any

12 specific language pertaining to that.

13     Q.   Can you point to any language in the

14 statement of work that provides that CMS has the

15 unilateral authority to deny an issue prior to

16 receiving a revised NAIRP if the RAC continues

17 with the audit issue?

18     A.   Sorry.   Can you repeat that?

19     Q.   Sure.   Can you point to any language

20 in the statement of work which states that CMS

21 has the unilateral authority to deny an issue

22 prior to receiving a revised NAIRP if the RAC

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                           August 16, 2017

1      Q.    And did the team reach a conclusion as

2  to whether the -- as to the status of sales tax

3  NAIRPs submitted by ACLR?

4      A.    Not initially during -- probably not

5  during that meeting.  Again, that was the RAC

6  team as subsequent meetings took place to

7  discuss this with other members of the team that

8  were actually handling the work being done by

9  another contractor.

10     Q.    You said the -- and you wrote in your

11 email that this audit issue is currently open

12 and active with another CMS contractor.

13           When you said it's currently open and

14 active with another CMS contractor, did you mean

15 that another CMS contractor was actively engaged

16 in the audit activities?

17     A.    Yes.

18     Q.    Was that something that your team had

19 conveyed to you?

20     A.    That -- I knew of it.  Just being in

21 meetings, I knew that another contractor was

22 working on this issue.

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                   August 16, 2017

1    Q.    And how in those meetings did you have

2    an understanding that there was another

3    contractor that was actively working on the

4    audit issues in ACLR's sales tax NAIRP?

5    A.    Their meetings with that particular

6    contractor as well as internal meetings, so the

7    status of those audits are always conveyed

8    during the meetings.

9    Q.    In the email you don't say that the

10   sales tax NAIRP is duplicative, correct?

11   A.    I don't specifically say that, no.

12   But I point to where in the SOW it says that the

13   efforts are duplicative.

14   Q.    Why didn't you tell ACLR that the

15   NAIRP was duplicative?

16   A.    I wrote what I wrote at the time.  I'm

17   not sure why I didn't say it was duplicative.  I

18   just pointed to this section where -- the basis

19   for denial.

20   Q.    And that the basis for denying ACLR's

21   sales tax NAIRP was that it was open and active

22   with another CMS contractor?

1      A.    Yes.

2      Q.    Was there any other basis on which CMS

3  denied ACLR's sales tax NAIRP?

4      A.    No.

5            MR. BONELLO:   Can we take a break for

6  a couple of minutes?

7            THE WITNESS:   Sure.

8            (Recess.)

9            (S. Brown Exhibit Nos. 26 and 27 were

10  marked for identification.)

11  BY MR. BONELLO:

12      Q.    I'm showing you what's been marked as

13  Exhibit 26.

14            Can you identify this document for me?

15      A.    This looks like an approval for a

16  NAIRP submitted for DEA schedule refills,

17  unauthorized prescribers and excluded providers.

18            MR. CARNEY:   Are we still on Topic 1?

19            MR. BONELLO:   Probably a combination

20  of 1 and 3.

21  BY MR. BONELLO:

22      Q.    ACLR was given approval to conduct an

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                          August 16, 2017

1  had the go-ahead to move forward with the

2  subsequent plan years.

3        Q.   Let's go back to Exhibit 19.  And in

4  your letter --

5        A.   What's -- wait a minute.

6        Q.   That's the NAIRP letter -- your email.

7        A.   Where did I put it?  Okay.

8        Q.   You refer to another CMS contractor.

9             Who's the CMS contractor that you're

10 referring to?

11       A.   That's the NBI MEDIC.

12       Q.   Also known as Health Integrity?

13       A.   Yes.

14       Q.   Does the term open and active appear

15 anywhere in the statement of work?

16       A.   I don't think so.  No.

17       Q.   And what relevancy does it have --

18 that phrase -- to the submission of ACLR's

19 NAIRP?

20       A.   If it's open and active, it applies to

21 the section below that I reference, 1.2.3, which

22 means it's open and active with another

1       A.    Uh-huh.

2       Q.    It says:  The RAC has identified the

3    states of Alaska, Delaware, Montana,

4    New Hampshire and Oregon.

5       A.    Uh-huh.

6       Q.    Did the NBI MEDIC review those

7    states -- the PDE records for those states?

8       A.    If it's not in the report, I can't say

9    for sure.  I see -- where is it -- Montana.

10   They looked at Montana according to this report.

11      Q.    But it doesn't look like they looked

12   at Alaska, Delaware, New Hampshire or Oregon,

13   does it?

14      A.    According to this report, no.  This is

15   just saying the top 15 states, but that doesn't

16   mean that they didn't look at all of them.

17      Q.    Did CMS have any information that the

18   NBI MEDIC looked at PDE records in plan year

19   2012-2013 related to Alaska, Delaware

20   New Hampshire and Oregon?

21      A.    Not in any reports that I see.

22      Q.    Aside from determining whether records

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                   August 16, 2017

1  had been deleted for amounts it identified in

2  Louisiana, did the MEDIC after August 10th, 2015

3  conduct any further analysis for any PDE records

4  identified by ACLR for Minnesota?

5      A.   No.

6      Q.   Aside from determining whether records

7  had been deleted for amounts it identified in

8  Louisiana, did the MEDIC conduct any further

9  analysis for any PDE records identified by ACLR

10 in the "no sales tax" states?

11     A.   No.  Not that I'm aware of.  They

12 could have.  I can't confirm.  They could have

13 looked at all of the states again.  They only

14 identified the top 15 --

15     Q.   It could have.

16     A.   -- in the report.

17     Q.   Is CMS aware of any analysis under

18 which CMS did any of that further -- any such

19 further analysis?

20     A.   I can't confirm.

21     Q.   Since the issuance of the August 10th,

22 2015 report, has the NBI MEDIC reviewed any

Sonja Jefferson Brown As      ACLR, LLC v. THE UNITED STATES
Case No. 16-309                              August 16, 2017

1          If the audit issue is not cut and dry,

2    you can't discern what this field is being used

3    for.  If you have information regarding guidance

4    to plan sponsors that values are allowed in

5    these fields, it's pretty hard to tell whether

6    or not the amounts in that field are improper or

7    not.  And because it wasn't clear to CMS, it was

8    not pursued.

9          Q.   So if an audit issue isn't cut and

10   dried, that would be a basis to deny ACLR's

11   proposed NAIRP?

12         A.   ACLR's NAIRP was not based on the cut

13   and dry -- the sales tax.  It was because of the

14   MEDIC conducting the audit for the same time

15   period for the same audit issue.

16         Q.   So if ACLR's audit issue was

17   recoverable, it didn't make any difference in

18   terms of approval, it was denied because CMS's

19   position was it was duplicative?

20         A.   It was denied because it was

21   duplicative.

22         Q.   And at that time CMS had not done

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                              August 17, 2017

1        Q       I think we covered category 65 on the

2    notice of deposition.

3               Sixty-six, I think we have covered.

4               Sixty-seven says, "The factual basis for

5    the defenses to ACLR's claims."

6               Can you tell me the factual basis for

7    CMS's defenses to ACLR's claim in this case?

8        A       Which one of the claims?

9        Q       The claims in this case.

10              MR. CARNEY:  You're talking about the

11   sales tax claim?

12              MR. BONELLO:  Yes.

13              THE WITNESS:  Oh, the sales tax?

14              It's factual that CMS denied the sales

15   tax issue because it was being reviewed by another

16   contractor within CMS.

17              BY MR. BONELLO:

18       Q       Is there any other factual basis for

19   CMS's defenses to ACLR's claims in this case?

20       A       That CMS has the right to approve or deny

21   audit issues submitted by ACLR.

22       Q       That would be in accordance with the

1   statement of work.  Correct?

2         A       Yes.

3         Q       To clarify, meaning it has to be --

4   approving or denying has to be in compliance with the

5   statement of work.  Correct?

6         A       Yes.

7         Q       Are there any other factual bases for

8   CMS's defenses to ACLR's claims?

9         A       The improper payment amount identified by

10  ACLR was not confirmed by CMS or validated.

11        Q       How would CMS validate or confirm the

12  improper payments submitted by ACLR related to the

13  sales taxes?

14        A       It would have had to go -- it would have

15  had to have gone through the whole process.

16        Q       And CMS denied the ACLR NAIRP on the

17  sales taxes before any processes could commence.

18  Correct?

19        A       Exactly, based on the fact that it was

20  being reviewed by another contractor for the same

21  issue and the same time period.

22        Q       Are there any other factual bases for

**CMS Claim Denial**

**EXHIBIT 64**

RPD15086

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop B3-30-03
Baltimore, Maryland 21244-1850



**Office of Acquisition & Grants Management**

*January 15, 2016*

*Christopher Mucke*
*ACLR, LLC*
*38705 7 Mile Road, Suite 251*
*Livonia, Michigan 48152-3975*

Subject:   Claim of ACLR Under Contract Number GS-23F-0074W/Task Order HHSM-500-2011-00006G

Dear Mr. Mucke,

CMS is in receipt of ACLR's claim which was submitted on September 10, 2015. The claim was filed pursuant to the Contract Disputes Act, 41 U.S.C. 7101 and FAR Subpart 33.2. In accordance with FAR 33.211, this letter constitutes the written decision of the Contracting Officer.

I.     Description of the Claim:

ACLR is the Part D RAC contractor and has performed as the Part D RAC contractor since January 2011. The statutory authority for Medicare's Recovery Audit program can be found at Section 1893(h) of the Social Security Act. The statute requires that the RACs are paid on a contingency fee basis. The amount of contingency fee is a percentage of the improper payments recovered or reimbursed. The contract between ACLR and CMS is consistent with the underlying statutory authority. Hence, ACLR is only entitled to payments on a contingency fee basis. (See section 5 of the Contract entitled "Task Order Price Summary".)

The first three pages of the claim submitted by ACLR sets forth its characterization of the facts. Additionally, ACLR submitted documents which it believes provide evidentiary proof of the elements of their claim. Basically, it appears that ACLR's allegations are that CMS has breached the terms of the above referenced contract. The general bases for these allegations are below:

a. CMS breached the Contract by denying the New Audit Issue Review Package (NAIRP) for Plan Year (PY) 12-PY13 Sales Tax Errors without prior identification of Prescription Drug Event (PDE) records as Unavailable for Review (UFR).

RPD15087

b. CMS breached the Contract by contracting with another entity to recover improper payments on PY12-PY13 Sales Tax Errors for the Part D RAC Program.

c. CMS breached the Contract by not identifying and communicating to ACLR all UFR PDEs contained within PYI2-PY13 PDE payment data resulting in the expenditure of resources by ACLR on PDEs for which no recovery is permissible.

d. CMS breached the Contract by engaging another contractor to recover sales tax improper payments for an issue previously identified by ACLR or failing to notify ACLR of MEDIC related actions under the purview of ACLR. ACLR also alleges that CMS misrepresented ongoing recovery actions as it relates to the specific sales tax issues and associated improper payments identified for PY12-PY13 Sales Tax Errors NAIRP.

II. For these alleged breaches, ACLR has claimed entitlement to financial compensation in the following estimated amounts:

a. $79,302,575 for the contractual contingency fee amount related to $658,354,795 improper payments identified in the PY12-PY13 Sales Tax Errors NAIRP submission.

b. $12,000 representing an equitable adjustment to the Contract for estimated internal corporate expenses related to the preparation and filing of this Claim, as well as an amount for reasonable attorney's fees and related expenses

c. A determination that ACLR is entitled to interest on the above amounts from the date of the submission of this claim, in accordance with 41 U.S.C. §611.

The above requested relief amounts to $79,314,575.

III. Reference to the Pertinent Contract Terms:

a. Task order GS-23F-0074W/HHSM-500-2011-00006G is a Firm Fixed Price Contingency fee task order.

b. GS-23F-0074W/HHSM-500-2011-00006G, section 5 entitled "Task Order Price Summary" provides "all payments shall be paid only on a contingency basis. The recovery audit contractor will receive the percentage specified below of all amounts collected. The contingency fees shall be paid once CMS collects the Medicare overpayments. The recovery audit contractor shall be paid a percentage of the amount that is collected through their recovery efforts (as outlined in Section 1.1 Improper Payment Review Process of Section J.1, Statement of Work). The recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments not recovered/collected. The recovery audit contractor shall submit vouchers on a monthly basis with supporting documentation of the recovery. Once verified, CMS shall pay the voucher pursuant to the prompt payment provisions."

c.  Statement of Work (SOW) section 1.2.3 "Part D Contracts Excluded From RAC requirements" states "CMS/CPI consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue."

IV.    Statement of the Factual Areas of Agreement or Disagreement:

a. ACLR is the sole Part D Recovery Audit Contractor, responsible for the recovery of Part D improper payments. ACLR and CMS entered into GS-23F-0074W/HHS-500-2011-00006G effective January 13, 2011.

b. CMS does not concur with ACLRs statement that it notified CMS on October 29, 2010 of improper sales tax computations as an audit issue subject to recovery. However, ACLR did not submit the NAIRP for the Sales Tax Errors until August 21, 2015. On October 29, 2010 and prior to selection as the Part D RAC, ACLR submitted a capability statement to CMS in response to a CMS issued Sources Sought Notice (SSN). ACLR indicated the following in its response:

> "ACLR can devise a national recovery audit plan for Medicare Part D that includes: Automated and detailed reviews of PDE data to identify anomalies such as duplicates, the inclusion of CMS or plan formulary excluded drugs, inaccurate prescriber identifiers, and improper sales tax. These automated reviews may also be conducted on a multi-plan sponsor basis to ensure that adequate reflection of beneficiary and concomitant TrOOP data on plan transfers."

The purpose of the SSN was to conduct market research to assist CMS in determining the appropriate acquisition strategy to obtain contractor support services.  The general information submitted in response to a SSN prior to the award of a contract in no way obligated the Government or became part of the contract between CMS and ACLR.

c. ACLR has alleged that CMS has hired another RAC part D contractor and identifies that other RAC Part D contactor as the National Benefit Integrity (NBI) MEDIC.  ACLR's allegation is incorrect. CMS has a separate cost reimbursement contract with the NBI MEDIC.  The NBI MEDIC contract was awarded on September 29, 2005.  The NBI MEDIC is responsible for preventing, detecting, and deterring Part D fraud, waste, and abuse. Their tasks include intake and handling of complaints from beneficiaries and others as well as requests for information from law enforcement; investigating providers and others and referring them to law enforcement; and analyzing Part D program prescription drug event records and other data to identify patterns indicative of potential fraud, waste, or abuse.

d. CMS also oversees the Part D RAC program, which is tasked with reviewing paid Medicare claims—or, for Part D, prescription drug event data—from plan sponsors and their pharmacies to determine overpayments and underpayments; providing information to CMS to help prevent future improper payments; and referring any potential fraud identified during the auditing process to the Contracting Officer Representative.

e. While it is true that both the RAC and the NBI MEDIC review Part D data,  the focus of the RAC contract is identifying and recovering improper payments—such as

overpayments—while the NBI MEDIC's contract focus is to prevent, detect and defer potential fraud, waste, and abuse. The NBI MEDIC does not perform RAC recovery efforts and the authority for the NBI MEDIC is not section 1893(h) of the Social Security Act.

f. CMS denied ACLR's NAIRP for the Sales Tax Error Audit in accordance with Section 1.2.3 of the SOW. That provision of the ACLR's contract explains that certain activities are excluded from the Part D RAC's review: "CMS/CPI consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue. As a result, certain PDEs may be restricted from review by the Part D RAC."

g. The NBI MEDIC had commenced fraud and abuse work with respect to the Sales Tax Error Audit in October 30, 2014. Thus, in accordance with Section 1.2.3 of the SOW, ACLR could not also perform what would be duplicative audits on this same topic.

h. ACLR notes in its claim that CMS sent four (4) memorandums starting December 2010 through April 2011 pertaining to the Sales Tax Errors in Louisiana. However, ACLR did not submit the NAIRP for the Sales Tax Errors until August 21, 2015.

i. Furthermore, even if CMS had been able to approve ACLRs NAIRP for the Sales Tax Errors ACLRs review and recoupment of overpayments could not have extended to sales tax errors for any year prior to 2011. Thus, to extent that elements of ACLRs claims that assert entitlement based on PYs prior to 2011, these also are wholly without basis.

In conclusion, based upon the terms of the task order, contract and applicable federal law, I must deny this claim in its entirety.

V. Final Decision

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number.

With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's—

(1) Small claim procedure for claims of $50,000 or less or, in the case of a small business concern (as defined in the Small Business Act and regulations under that Act), $150,000 or less; or

(2) Accelerated procedure for claims of $100,000 or less.

RPD15090

Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in 41 U.S.C. 7102(d), regarding Maritime Contracts) within 12 months of the date you receive this decision"; and

(VI) Demand for payment prepared in accordance with 32.604 and 32.605 in all cases where the decision results in a finding that the contractor is indebted to the Government.

Thank you,


Nicole Hoey
Contracting Officer

**Excerpts from the Deposition of Matthew Farabaugh as Corporate Representative For Health Integrity, LLC**

**CONFIDENTIAL**

**EXHIBIT 65**

Matthew Edward Farabaugh                    ACLR, LLC v. THE UNITED STATES
Case No. 16-309                                              June 28, 2017



Matthew Edward Farabaugh
Case No. 16-309

ACLR, LLC v. THE UNITED STATES
June 28, 2017



Matthew Edward Farabaugh
Case No. 16-309

ACLR, LLC v. THE UNITED STATES
June 28, 2017



A699

**Excerpts from the Deposition of Rosalind Abankwah**

**EXHIBIT 66**

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

---------------------x

ACLR, LLC

   Plaintiff,

-vs-       Civil Action No. 16-309

THE UNITED STATES  (Judge Campbell-Smith)

   Defendant.

---------------------x

      Thursday, September 14, 2017

      Baltimore, Maryland


 THE DEPOSITION OF ROSALIND MICHELLE ABANKWAH


   The deposition of ROSALIND MICHELLE ABANKWAH was taken on Thursday, September 14, 2017, commencing at 1:04 p.m., at the Department of Health and Human services, Office of General Counsel, 7500 Security Boulevard, Central Building, Baltimore, Maryland, before CHERYL NICHOLSON, CCR, CLR, Stenotype Reporter and Notary Public in and for the State of Maryland.

Rosalind Michelle Abankwah       ACLR, LLC v. THE UNITED STATES
Case No. 16-309                        September 14, 2017

1  that decision?

2      A.   Yes.  So then they would have -- so

3  Sonja and her team -- she was the COR.  Sonja

4  and her team would have discussed whatever they

5  needed to discuss, because there's certain time

6  frames like, you know, so many days you have to

7  respond and you have to notify -- I mean, it's

8  just a whole process.

9          And I don't remember the days and time

10 frames, but part of that process would have been

11 her internal committee would have looked at it.

12 Then she would have brought it to the managers

13 and -- let me think -- and then there's also --

14 it has to go to CM to review also before a final

15 determination is sent to the contractor ACLR.

16     Q.   So when ACLR submitted its NAIRP,

17 there wasn't -- the NBI MEDIC wasn't doing any

18 more sales tax reviews, were they?

19     A.   No.  They would have been probably

20 trying to figure out how they're going to get

21 money reversed told -- sent to the plans that

22 sent money in you need to send it back and then

Rosalind Michelle Abankwah         ACLR, LLC v. THE UNITED STATES
Case No. 16-309                    September 14, 2017

1  tell the ones who didn't not to do it.

2      Q.   And that would only have been on

3  Louisiana?

4      A.   That would have been only on

5  Louisiana.  So that's what the MEDIC would have

6  been involved in trying to figure that out.

7      Q.   But the NBI MEDIC and CMS wouldn't

8  have been doing anything as it related to

9  Minnesota, correct?

10     A.   That's correct.

11     Q.   You kind of alluded to this before.

12 Couldn't CMS had called in ACLR and sat down and

13 talked through maybe revising the sales tax

14 NAIRP to cover some different areas?

15     A.   When we were told not to do it, you

16 mean?  When we were told at CM there's no money

17 to be recovered?

18     Q.   I'm just asking you.

19     A.   CMS would not have said come in, let's

20 talk about a different thing, because we were

21 told there is no money to be recovered at all.

22          But if it was a different analysis --

**Excerpts from HHS 2010 Financial Report**

**EXHIBIT 67**

A06794



Δ π EXHIBIT 49
Deponent: Moreno
Date 10/3/17 Rpt: CW
WWW.DEPOBOOK.COM

# Department of Health and Human Services



# FY 2010 Agency Financial Report

## November 15, 2010

## 9.20 Achievements

### 9.21 Improving Program Integrity in Medicare and Medicaid

- Medicare:

Section 302 of the *Tax Relief and Health Care Act of 2006* required HHS to implement a Recovery Audit Contractor (RAC) program in all 50 States no later than January 1, 2010. In February 2009, HHS awarded contracts to four RACs. Each RAC is responsible for identifying and correcting improper payments in approximately 25 percent of the country. HHS completed the nationwide implementation effort in October 2009.

FY 2010 was the first year for the national RAC program. During FY 2010 HHS focused on education and outreach, and establishing an infrastructure for managing and overseeing the RACs. As of September 30, 2010, the RAC program has demanded approximately $135 million and recovered $75.4 million. HHS expects collections to continue to increase as the RACs expand their reviews.

- Medicaid:

Section 6411 of the *Affordable Care Act* requires States to establish Medicaid RAC programs. HHS has required States to submit State plan amendments by December 31, 2010, on how they will establish their RAC program. Medicaid RACs will be paid by the States on a contingency basis. They will review Medicaid provider claims to identify and recover overpayments and identify underpayments made for services provided under Medicaid State plans and Medicaid waivers. HHS is in the process of developing a proposed rule that outlines requirements States must meet for this program.

### 9.22 Head Start Signed Statement Template Form

HHS has developed a standard signed statement template form for Head Start, which was made available to all grantees in FY 2009. Since OMB clearance (OMB 0907-0374) was obtained in FY 2010, the use of the form is optional, but grantees are strongly encouraged to use it. The standard signed statement form helps guide grantees on the type of information they need to collect from prospective families during the enrollment process and provides them with a structure for recording this information.

### 9.23 Public Assistance Reporting Information System

The Public Assistance Reporting Information System (PARIS) is a voluntary project that enables participating States' public assistance data to be matched against several databases to help maintain program integrity and detect and deter improper payments in several programs (TANF, Medicaid and the Supplemental Nutritional Assistance Program). The August 2010 data match was the largest to date in terms of number of agencies (50) participating.

HHS engaged in a number of activities to improve data-match capabilities and usefulness to increase State utilization of PARIS. These activities included engaging in outreach activities to encourage States to participate in the PARIS match process; providing HHS training to States in utilizing the PARIS to its fullest capability; conducting an evaluation of the PARIS; formulating recommendations for improving and enhancing its usefulness; and developing a uniform reporting format.

On October 10, 2008, the *QI Program Supplemental Funding Act of 2008* was signed. The *Act* stated that in order to receive Medicaid Federal matching funds for automated data systems to administer the Medicaid State plan, the provision requires States to have an operational Medicaid eligibility determination system that provides for data matching through PARIS (or any successor system), including matching with medical assistance programs operated by other States. HHS issued a State Medicaid Directors Letter dated June 21, 2010 to promulgate this information to the States

### 10.0 Improper Payment Reduction Outlook FY 2009 through 2013

The chart on the following page shows our *IPIA* results for the current year (CY) 2010, the prior year (PY) 2009, as well as the targets for the years 2011 through 2013. For each year we show, for each program, outlays for that fiscal year (FY), an error rate or target (IP%), and the dollars paid improperly (IP$). Table notes are defined in Section 10.1, after the table.

IMPROPER PAYMENT REDUCTION OUTLOOK
FY 2009 - FY 2013
(in Millions)

| Program | PY Outlay $ | PY % | PY $ | CY Outlay $ | CY IP % | CY IP $ | CY+1 Est Outlay $ | CY+1 IP % | CY+1 IP $ | CY+2 Est Outlay $ | CY+2 IP % | CY+2 IP $ | CY+3 Est Outlay $ | CY+3 IP % | CY+3 IP $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medicare FFS | | | | | | | | | | | | | | | |
| Medicare MC | | | | | | | | | | | | | | | |
| Medicare Drug | | | | | | | | | | | | | | | |
| Medicaid | | | | | | | | | | | | | | | |
| CHIP | | | | | | | | | | | | | | | |
| TANF | | | | | | | | | | | | | | | |
| Head Start | | | | | | | | | | | | | | | |
| Foster Care | | | | | | | | | | | | | | | |
| Child Care | | | | | | | | | | | | | | | |

Note: The CY+1, CY+2 and CY+3 estimated dollars paid improperly (IP$) is calculated based on the target error rate and estimated outlays for each year, respectively. However, it is important to note that the measurement periods for each program vary. Therefore, the future outlays estimated are not the actual amounts against which the target error rates will be applied to compute the dollars paid improperly in future years. To illustrate, the CY outlays for Medicaid $235,012 million is actually based on FY 2009 claims data, as explained in note 9, whereas the CY+1 outlays of $258,706 million reflects FY 2011 estimated outlays. When determining the amount of dollars paid improperly next year, the target error rate of 8.4% will be applied to the FY 2010 claims data.

A707

A06970

*10.10 Improper Payment Reduction Outlook Notes*

(a) – PY benefit outlays for Medicare FFS are from the November 2009 Improper Medicare FFS Payments Report (based on claims from April 2008 – March 2009).

(b) – CY benefit outlays for Medicare FFS are from the November 2010 Improper Medicare FFS Payments Report (based on claims from April 2009 – March 2010).

(c) – Medicare FFS CY+1, CY+2, CY+3 benefit outlay numbers are based on the FY 2011 Midsession Review (Medicare Benefit Outlays current law (CL)).

(d) – Medicare Advantage PY benefit outlays are from the Medicare Part C Payment Error Final Report 2009 (based on CY 2007 data).

(e) – Medicare Advantage CY benefit outlays are from the Medicare Part C Payment Error Final Report 2010 (based on CY 2008 data).

(f) – Medicare Advantage CY+1, CY+2, CY+3 benefit outlay numbers are based on the FY 2011 Midsession Review (Medicare Benefit Outlays (CL)).

(g) – Medicare Prescription Drug Benefit PY, CY, CY+1, CY+2, CY+3 outlay numbers are based on the FY 2011 Midsession Review (Medicare Benefit Outlays (CL)).

(h) – PY benefit outlays for Medicaid are from the 2009 Medicaid Annual Error Rate Report (based on FY 2008 claims).

(i) – CY benefit outlays for Medicaid are from the 2010 Medicaid Annual Error Rate Report (based on FY 2009 claims).

(j) – Medicaid CY+1, CY+2, CY+3 benefit outlay numbers are based on the FY 2011 Midsession Review (Medicaid Net Benefit Outlays (CL), excluding CDC Program Vaccine for Children obligations).

(k) – CHIP PY, CY, CY+1, CY+2, CY+3 benefit outlays are based on the FY 2011 Midsession Review (CHIP Total Benefit Outlays with CHIPRA Bonus and Health Care Quality Provisions (CL)).

(1) – The FY 2009 Agency Financial Report (AFR) reported the Medicare FFS error rate as 7.8 percent with $24.1 billion in improper payments. HHS changed its error rate measurement methodology during the FY 2009 review year. Thus, the 7.8 percent represents a combination of review results using two different methodologies. The original methodology, under which most of the claims were reviewed, was less stringent than the new methodology. The error rate based on the subsample of claims using the new stricter methodology was 12.4 percent with $35.4 billion in error (the amount of $35.4 billion in improper payments was derived from statistical calculations based on the subsample reviewed). Given the change in methodology, and that HHS is now using the new methodology, HHS is reporting the prior year error rate as 12.4 percent rather than 7.8 percent.

(2) – For FY 2010 *IPIA* reporting for the Medicare Prescription Drug Benefit, HHS calculated four components of payment error: (1) the Medicare Advantage and Prescription Drug System (MARx) Payment Error (MPE): the measurement reflects errors in Part D payments caused by errors in the transfer/interpretation of source data and errors in payment calculations in the MARx payment system; (2) payment error relating to Low Income Subsidy status (PELS): the measurement reflects errors in Low Income Cost Sharing Subsidy (LICS) payments; (3) Payment Error Related to Incorrect Medicaid Status (PEMS): the measurement reflects errors in LICS and two other Low Income Subsidy-related payments: the Low Income Premium Subsidy and Direct Subsidy amounts; where the FY 2009 Payment Error Rate Measurement (PERM) national Medicaid eligibility case error rate is applied to Part D payments to calculate a PEMS error rate for *IPIA* reporting; and (4) Payment Error Related to Prescription Drug Event Data Validation (PEPV): the measurement reflects errors due to invalid and/or inaccurate Prescription Drug Event (PDE) records that impact Part D LICS and reinsurance payments. The MPE, PELS, and PEMS measures are based on CY 2008 payments, and the PEPV measure is based on CY 2007 payments. Note that the four Part D estimates of gross dollars in error reported for FY 2010 are not mutually exclusive, and therefore, cannot be summed. HHS calculated a Part D MPE rate of 0.1 percent for payments made from January 1, 2008 through December 31, 2008, and estimated a gross amount of payment error totaling $45.0 million. Estimated Part D MPE underpayments were $20.0 million and estimated overpayments were $25.0 million. HHS calculated a Part D PELS error rate of 0.1 percent for payments made from January 1, 2008 through December 31, 2008, and estimated a gross amount of payment error totaling $54.0 million. Estimated Part D PELS underpayments were $33.0 million and estimated overpayments were $21.0 million. HHS calculated a

A06971

Part D PEMS error rate of 1.7 percent for payments made from January 1, 2008 through December 31, 2008, and estimated a gross amount of payment error totaling $785.0 million (all errors are overpayments). HHS calculated a Part D PEPV error rate of 12.7 percent for payments from January 1, 2007 through December 31, 2007, and estimated a gross amount of payment error totaling $5.4 billion. Estimated Part D PEPV underpayments were $3.0 million and estimated overpayments were $5.4 billion.

(3) – HHS calculated and is reporting the three-year weighted average national error rate that includes data reported in the *AFR* for FYs 2008, 2009, 2010. The weighted national error components rates are as follows: Medicaid FFS: 4.4 percent; Medicaid managed care: 1.0 percent; and Medicaid eligibility: 5.9 percent. However, as required under Section 601 of the *Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA P.L. 111-3)*, HHS published a final rule on August 11, 2010, which required the eligibility reviews to be consistent with the State's eligibility verification policy rather than reviewing eligibility against a uniform methodology, which was done in the past. Based on current regulations, certain cases from FYs 2008-2010 would no longer be considered as errors.

(4) – The Payment Error Rate Measurement final rule (75 FR 48816), the methodology used to measure the Medicaid and Children's Health Insurance Program, was published on August 11, 2010, and became effective September 10, 2010. This final rule implements provisions from the *Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA)* with regard to the PERM program. Section 601 of *CHIPRA* prohibits HHS from calculating or publishing any national or state-specific error rates for CHIP until six months after the new PERM final rule is effective. HHS did not report a national error rate for CHIP in the FY 2009 *AFR* and due to timing of the published PERM final rule, will not be reporting a national error rate for CHIP in the FY 2010 *AFR*. However, HHS will begin conducting the CHIP error rate measurement in FY 2011, with the results being published in the FY 2012 *AFR*. Due to the recent publication of the PERM final rule, setting out-year target rates for CHIP is not applicable at this time.

(5) – The TANF program is not reporting an error rate for FY 2010. Statutory limitations prohibit HHS from requiring States to participate in a TANF improper payment measurement. Despite statutory limitations, HHS continues to explore options that will allow for a future error rate measurement.

(6) – HHS is engaged in a number of efforts to reduce erroneous determinations in the Head Start eligibility process and to improve our detection and measurement of errors. Until HHS determines how these efforts will impact error rates, HHS will be maintaining our FY 2010 rates as our out-year targets.

(7) – Since States measure once every three years, this is the first year that HHS is reporting a baseline error rate for Child Care. The error rate is based on a three year weighted average of error rates.

## 11.0 Program-Specific Reporting Information

Within this section we discuss each program's methodology for complying with *IPIA*, the results and future plans. For each program we discuss:

* How they performed their sampling, including sample sizes and methodology;

* Plans for corrective action, including a breakdown of most common error types;

* Recovery Actions taken as a result of identifying improper payments;

* Whether there are statutory, regulatory, or information systems barriers that limit potential corrective actions and;

* Best practices that have been incorporated in each error rate process.

11.10 Medicare Fee-for-Service Program - A Federal health insurance program for: people age 65 or older, people under age 65 with certain disabilities, and people of all ages with End-Stage Renal Disease.

### 11.11 Statistical Sampling Process

The Medicare Fee-for-Service (FFS) improper payment estimate is calculated under the Comprehensive Error Rate Testing (CERT) Program.

The Medicare FFS improper payment methodology begins with a random sample of claims. This year approximately 82,000 claims were sampled. Next, for each sampled claim, HHS obtains medical records from providers and additional claim detail from its shared systems. This information is

A709

# Medicare Part C and D FY 2011 Payment Error Reporting, March 23, 2012

**EXHIBIT 68**

HHS1_00762880

# Medicare Part C and Part D FY 2011 Payment Error Reporting

## March 23, 2012

For internal use

HHS- ASFR – Sheila Connelly Prep for Senate HSGAC Hearing

# Introduction

- The Improper Payments Information Act (IPIA) of 2002, as amended by the Improper Payment Elimination and Recovery Act (IPERA) of 2010, requires the annual reporting of gross payment error estimates for the Part C and Part D Programs.

- CMS reported a composite payment error estimate for Part C in the FY 2011 Agency Financial Report (AFR) based on two component measures.

- CMS reported a baseline Part D composite payment error estimate in the FY 2011 AFR based on five component measures.

HHS1_00762861

2

# FY 2011 Part C Composite Measure

- CMS has reported a composite measure for Part C since FY 2008

- FY 2009 was the baseline measurement*

- The Part C composite measure represents the combined impact of two sources of error:

  – MARx Payment System Error (MPE), measures error related to the MARx Payment System; and

  – Risk Adjustment Error (RAE), measures error in risk adjustment data (clinical diagnosis data) submitted to CMS by plans for risk adjusted payments.

*The FY 2009 measure is the baseline because it was based on CY 2007 payments, the first year payments were 100% risk adjusted. The 2008 measure was based on CY 2006 payments, which were only 75% risk adjusted

HHS1_00762862

# FY 2009 - FY 2011 Reporting
# Part C Composite Payment Error Estimates

| Reporting Year | MARx Payment Error (MPE)[4] | Risk Adjustment Error (RAE)[5] | Part C Composite[6] |
|---|---|---|---|
| FY 2009[1] | 1.5% $1,148,052,164 | 13.9% $10,823,567,113 | 15.4% $11,971,619,277 |
| FY 2010[2] | 0.9% $893,024,208 | 13.3% $12,658,287,747 | 14.1% $13,551,311,955 |
| FY 2011[3] | 0.2% $263,650,675 | 11.0% $12,126,246,593 | 11.0% $12,389,897,268 |

[1]FY 2009 payment error estimates were based on CY 2007 payments
[2]FY 2010 payment error estimates were based on CY 2008 payments.
[3]FY 2011 payment error estimates were based on CY 2009 payments.
[4]The denominator for the MPE in CY 2007 was total prospective Part C payments, $75,646,849,216. For CY 2008 and CY 2009, the denominator was total Part C Reconciled Payments: $96,436,857,883 in CY 2008 and $112,215,458,054 in CY 2009.
[5]The denominator for the RAE is total payment for risk adjusted plans: $77,733,897,482 in CY 2007, $95,327,280,500 in CY 2008, and $110,060,886,594 in CY 2009. This excludes payments to cost plans. The RAE component rate is based on a unique denominator of final risk-adjusted payments only for risk-adjusted MA plans; this allows for trending across RAE estimates. The RAE component denominator excludes cost plan payments, so is smaller than the Part C composite rate denominator. Thus the two component rates do not sum to the composite rate.   CMS does not report component rates in the AFR.
[6]The denominator for the Composite Rate is total Part C Payments, risk and non-risk plans: $77,984,886,085 in CY 2007; $96,436,857,883 in CY 2008; and $112,215,458,054 in CY 2009.

4

HHS1_00762863

# The Part C Error Estimate and IPERA

- The Part C error rate has decreased each year since FY 2009.
  - From FY 2010 to FY 2011 the composite payment error estimate, decreased three percentage points, from 14.1% to 11.0%.
  - The composite payment error estimate of 11.0% is below the target of 13.7% (FY 2010 AFR).
- Despite these reductions, Part C is out of compliance with IPERA because the law requires error rates of less than 10%
- The Part C program has consistently met and exceeded its targets and is projected to be in compliance next year.

**Part C Payment Error Estimates and Targets Reported in the FY 2011 AFR**

| Reporting Year | Actual Reported | Target |
|---|---|---|
| FY 2009 | 15.4% | ----- |
| FY 2010 | 14.1% | 14.3% |
| FY 2011 | 11.0% | 13.7% |
| FY 2012 | ----- | 10.4% |
| FY 2013 | ----- | 9.8% |
| FY 2014 | ----- | 9.2% |

HHS1_00762864

5

HHS1_00762865

# Part C Corrective Actions

- **Outreach/ Education To Plans**

  – CMS provided guidance to plans on how to provide better documentation to support the HCCs most prone to error. It appears that marginally more inpatient records were submitted, which possibly contributed to the reduction in the RAE. CMS plans to continue providing documentation guidance to the plans.

- **Outreach/ Education To Physicians**

  – Contract has been awarded and educational materials are in development

- **MA Contract Level RADV Audits**

  – Final methodology released on February 24, 2012

6

A716

# RADV Audits

- RADV audits are CMS' primary strategy to further reduce the Part C error rate
  - Sentinel effect of audits is reflected in reduction of the RAE.

- CMS announced the final audit methodology on February 24, 2012.
  - A white paper was released that detailed the payment error calculation methodology

- Recovery for the first round of audits is estimated to be $370 million
  - Audits will be based on payment year 2011
  - Approximately 30 plans will be audited
  - Audits will begin this fall

7

HHS1_00762886

# FY 2011 Part D Composite Measure

- In FY 2010, CMS reported four measures of Part D payment error.

- For FY 2011, CMS will report a Part D composite payment error measure for the first time.

- The Part D composite measure represents the combined impact of five sources of error:

  – MARx Payment Error (MPE),

  – Payment Error related to Low Income Subsidy (PELS),

  – Payment Error related to Incorrect Medicaid Status (PEMS),

  – Payment Error related to Prescription Drug Event (PDE) Data Validation (PEPV), and

  – Payment Error related to Direct and Indirect Remuneration (PEDIR) – which is a new Part D component measure for FY 2011 reporting.

HHS1_00762867

8

# FY 2010 and FY 2011 IPIA/IPERA Reporting Part D Payment Error Estimates

| | Error Estimate | FY 2010 [1] | Gross Payment Error | FY 2011 [2] | Gross Payment Error |
|---|---|---|---|---|---|
| New: PEDIR | Payment Error related to Direct and Indirect Remuneration | N/A | N/A | 0.15% | $82,127,403 |
| MPE | MARx Payment Error | 0.10% | $44,512,501 | 0.08% | $43,308,866 |
| PELS | Payment Error related to Low Income Subsidy | 0.12% | $53,470,751 | 0.14% | $74,937,563 |
| PEMS | Payment Error related to Incorrect Medicaid Status | 1.76% | $785,025,722 | 0.66% | $349,623,757 |
| PEPV | Payment Error related to PDE Data Validation | 12.74% | $5,372,697,038 | 2.18% | $1,158,796,270 |
| Part D Composite | Part D Composite Payment Error Estimate [3,4] | N/A | N/A | 3.21% | $1,708,793,859 |

[1] For FY 2010 reporting, MPE, PELS, and PEMS were based on CY 2008 Part D payments of $44,571,018,406; PEPV was based on CY 2007 Part D payments of $42,714,674,417.
[2] For FY 2011 reporting, all component measures are based on CY 2009 payments.
[3] The Part D composite is the sum of the Gross Payment Error for MPE, PELS, PEMS, PEPV, and PEDIR divided by the total CY 2009 Part D payments of $53,162,346,014.
[4] Numbers do not sum due to rounding.

9

HHS1_00762888

A719

# Corrective Actions for Part D

- Continue the national training sessions for Part D sponsors on Part D payment and data submission.

- Continue to routinely implement payment controls in the MARx payment system.

- Provide additional guidance to Part D sponsors to update beneficiary LIS statuses prior to reconciliation.

- HHS is requiring plans to submit DIR amounts by National Drug Code (NDC) to assist plans with improved DIR reporting in the future.

10

HHS1_00762869

**Excerpts from HHS FY 2012
Agency Financial Report**

**EXHIBIT 69**





# Department of Health and Human Services

## FY 2012 Agency Financial Report

November 15, 2012

Regarding the RAE reported in FY 2012, the Medical Record Review was based on a national sample of beneficiaries across all MA contracts. Since this type of sample design does not allow for collection at the MA plan level, no payment recovery has been initiated. To recover overpayments due to RAE, HHS is proceeding with the RADV audits. In FY 2012 HHS conducted payment recovery for the first five contracts involved in the CY 2007 RADV (the pilot plans) and recovered approximately $3.4 million.

### 10.24 Medicare Advantage Information Systems and Other Infrastructure
HHS has the information systems and other infrastructure needed to reduce improper Medicare Part C payments. HHS uses the following internal Medicare systems to make and validate the Part C payments: the Medicare Beneficiary Database, the Risk Adjustment System, the Health Plan Management System and the MARx payment system. No other systems or infrastructure are needed at this time.

### 10.25 Medicare Advantage Statutory or Regulatory Barriers that could limit Corrective Actions
No statutory or regulatory barriers that could limit corrective actions have been identified at this time.

### 10.26 Medicare Advantage Program Best Practices
HHS has taken several steps to ensure payment accuracy in the Medicare Advantage program. HHS performs a monthly evaluation of the MARx payment system, as represented in the MPE estimate, which has led to system refinement and more accurate prospective payments to plans.

## 10.30 Medicare Prescription Drug Benefit or Part D - A Federal prescription drug benefit program for Medicare beneficiaries

### 10.31 Part D Statistical Sampling Process
The FY 2012 Part D Composite Payment Error Rate combines five component payment error measures: the Medicare Advantage Prescription Drug (MARx) Payment Error (MPE) estimate, the Payment Error relating to Low Income Subsidy Status (PELS), the Payment Error Related to Medicaid Status (PEMS), the Payment Error Related to Prescription Drug Event Data Validation (PEPV) and the Payment Error related to Direct and Indirect Remuneration (PEDIR). Combining these five different units of analysis poses complex technical and statistical challenges in calculating a confidence interval for the composite rate. Each component independently meets the OMB precision requirements. The four PDE/beneficiary level measures (MPE, PELS, PEMS and PEPV) combined into a four-component composite measure also meets the precision requirement (without PEDIR).

The Medicare Part D error rate for FY 2012 is 3.1 percent, or $1.6 billion. The net error rate for FY 2012 is 2.2 percent, or $1.1 billion. The net error rate is calculated by subtracting the sample's underpayments from overpayments and dividing by the total dollar value of the sample, thus reflecting the overall estimated monetary loss to the program.

The FY 2012 Part D composite payment error amount is the sum of the payment error amounts for the five component measures divided by the CY 2010 total Part D payments. The five component measures are described in the paragraphs below.

The Part D MPE estimate captures errors in prospective Part D payments caused by errors in the transfer of data, interpretation of data and payment calculations in the MARx system. For FY 2012 reporting, HHS is computing the MPE based on the CY 2009 dollars in error, rather than the CY 2010 dollars in error, due to data issues that would affect an accurate calculation of this component estimate. The FY 2012 methodology consists of:

**September 29, 2014 Email**

**EXHIBIT 70**

| | |
|---|---|
| **From:** | Abankwah, Rosalind M. (CMS/CPI) |
| **Sent:** | Monday, September 29, 2014 2:10 PM |
| **To:** | Thomas, India M. (CMS/CPI); Wheeler, David (CMS/CPI); Baffi, Charles R. (CMS/CPI); Kenya, Dominca (CMS/CPI); Brown, Sonja J. (CMS/CPI); Banks, Lori (CMS/CPI); Scott, Jamie (CMS/CPI) |
| **Subject:** | FW: ACTION - Responses Due Friday Oct 3rd FY 2016 OMB-J Questions |
| **Attachments:** | FY16 OMB-J p310-312.pdf; FY16 OMB-J p334-339.pdf; FY16 OMB-J p350-353.pdf; FY16 OMB-J p161-172.pdf; FY 2016 OMB CPI Qs 09262014.docx |
| **Importance:** | High |
| **Follow Up Flag:** | Follow up |
| **Due By:** | Wednesday, October 01, 2014 12:30 PM |
| **Flag Status:** | Flagged |

Please see the email below and the attachments.  The Word document lists the questions from OMB and the assignments.  Although the assignment is due October 3rd, I will need to review it prior.  Please have your response to me by Wednesday, Oct.1st.

Sonja and RAC team:
**Page 310** Can you provide an update on efforts to implement a Part C Recovery Audit Contractor (RAC) program?

Dominca, David, Lori:
**Page 336-337** Are PSCs/ZPICs held accountable for recovery dollars-related performance metrics? (DPOA is responsible for the MEDIC section)

**Page 337 (last statement before PERM section)** Please discuss the measures CMS is developing to reduce the occurrence of fraud, in accordance with ACA.

Charlie:
**Page 351** What happened to the 1,488 beneficiaries identified in the CNC Pilot with Kaiser?

Thank you,
Rosalind

**From:** Campbell, Joi L. (CMS/CPI)
**Sent:** Friday, September 26, 2014 9:51 AM
**To:** Downs, Tanette N. (CMS/CPI); Abankwah, Rosalind M. (CMS/CPI); Sisti, Cindy A. (CMS/CPI); Bellan, Lori (CMS/CPI); Leaks, Letitia D. (CMS/CPI)
**Cc:** Majestic, Mark (CMS/CPI); Hughes, Paul J. (CMS/CPI)
**Subject:** FW: ACTION - Responses Due Friday Oct 3rd FY 2016 OMB-J Questions
**Importance:** High

1

HHS0087667

A725

Please see the attached CPI OMB questions (word document). I have taken my best guess as to who or what area should address the questions. Although I have listed other groups we only need to focus on the highlighted questions that fall within our area.

BOS has printed the applicable sections that the page numbers correspond to next to each question. If I have gotten any of these wrong please let me know or if the question belongs within another group to respond.

--This is due Oct 3, but if you want me to compile IAG's responses then please have by Thurs Oct 2.

Joi

**From:** Krause, Teresa M. (CMS/CPI)
**Sent:** Friday, September 26, 2014 8:17 AM
**To:** Majestic, Mark (CMS/CPI); Downs, Tanette N. (CMS/CPI); Chong, Zabeen G. (CMS/CPI); Schalm, Charles F. (CMS/CPI); Gillespie, Craig (CMS/CPI); Gilbert, Richard P. (CMS/CPI); Gent, Kelly B. (CMS/CPI); Griner, Anita E. (CMS/CPI); Brown, Douglas B. (CMS/CPI); Wedgeworth, Raymond L. (CMS/CPI); Wolf, Kathy (CMS/CPI); Smith, Linda D. (CMS/CPI); Sofokles, John (CMS/CPI); Wheeler, Desiree Y. (CMS/OAGM); Williams, Olivia L. (CMS/CPI); Fleet, Kenneth (CMS/CPI); Bellan, Lori (CMS/CPI); Leaks, Letitia D. (CMS/CPI); Abankwah, Rosalind M. (CMS/CPI); Bellios, Toula (CMS/CPI); Annadata, Madhu (CMS/CPI)
**Cc:** Pereschuk, Mark (CMS/CPI); Jackson, Michelle (CMS/CPI); Schalm, Charles F. (CMS/CPI); Lawson, Marlene E. (CMS/CPI); Campbell, Joi L. (CMS/CPI); Duvall, Erin S. (CMS/CPI)
**Subject:** ACTION - Responses Due Friday Oct 3rd FY 2016 OMB-J Questions
**Importance:** High

All,

I am sending this to Group and Division Directors/Deputies and special assistants as the points of contact have been shuffled. Please forward as necessary.

Please find the attached questions (Word document) from OMB, which are from the FY 2016 OMB-J submission. The questions refer to various pages in the OMB-J. I have attached those pages for your convenience.

**Please respond to the questions related to your particular program no later than Friday October 3rd. Return to Mark Pereschuk and cc me.**

If you have any questions, feel free to contact me.

Thanks

2

HHS0087668

A726

**RAC Administration.** Please provide a table that details updated information on collections to date, by program, as well as current obligation for RAC costs, program operations, and administrative costs. Please also provide information on expected or target Medicaid and Medicare RAC collections for FY 2014 through FY 2016 and expected RAC expansions.

**Response:**

**Medicare Fee for Service RAC**

The table below provides updated collections and obligations information through 7/31/2014 for Medicare FFS RAC program.

|  | Collections | RAC Obligations | Program Operations Obligations | Administrative Obligations |
|---|---|---|---|---|
| FY 2014 | Thru 7/31/14 – $2.02 billion | Thru 7/31/14 – $220 million | Thru 7/31/14 – $85 million | Thru 7/31/14 – $65 million |
| FY 2015 | Goal – $2 billion | $360 million | $130 million | $90 million |
| FY 2016 | Goal – $2 billion | $360 million | $130 million | $90 million |

**Parts C/D RACs**

CMS anticipates awarding the contract for the Medicare Part C RAC in FY 2015.

The tables below provide Part D RAC Program collections and obligations information for FY 2014 – FY 2016.

| FY 2014 Part D RAC Collections | FY 2014 Part D RAC Obligations | FY 2014 Part D RAC Program Operations Obligations | FY 2014 Part D RAC Administrative Obligations |
|---|---|---|---|
| $2,600,000 | $749,000 | $4,650,000 | $610,000 |

| FY 2015 Part D RAC Collections | FY 2015 Part D RAC Obligations | FY 2015 Part D RAC Program Operations Obligations | FY 2015 Part D RAC Administrative Obligations |
|---|---|---|---|
| $16,200,000 | $2,624,000 | $4,157,000 | $610,000 |

| FY 2016 Part D RAC Collections | FY 2016 Part D RAC Obligations | FY 2016 Part D RAC Program Operations Obligations | FY 2016 Part D RAC Administrative Obligations |
|---|---|---|---|
| $18,000,000 | $2,900,000 | $4,157,000 | $610,000 |

As of 8/12/14, the FY 2014 collections for the Part D RAC are $2.6 million dollars. While we have estimated Medicare Part D RAC collections to be approximately $16.2 million for FY 2015

HHS0087669

and $18 million for FY 2016, these numbers can vary based on appeals and the number of audit reviews performed. We have estimated Medicare Part D RAC fees and Federal costs at $27.1 million for fiscal years 2013 through 2016.

The contract to perform Part D RAC work was awarded on January 13, 2011. Preliminary work by the RAC was performed throughout 2011, and an announcement of the Part D RAC program was sent to the Part C and Part D plans on May 31, 2011. On September 30, 2011, CMS also awarded a contract for a Data Validation Contract (DVC) to provide a validity check to the Part D RAC's work. To provide additional public information about the Part D RAC program, CMS added a Part D RAC informational page to the CMS website on January 19, 2012. This page includes a description of the RAC's authority and functions, and the audit issues intended for review. The Part D RAC has determined priority areas for review including payments to excluded providers and unauthorized prescribers. The RAC has completed its review of all 2007-2011 prescription drug claims that were improperly made as a result of payments associated with excluded providers. Approximately $4.5 million dollars in overpayments were recouped from Part D plan sponsors. The Part D RAC is currently reviewing prescription drug claims for 2009 through 2012 for prescribers that unauthorized to prescribe Part D drugs. Notification of Improper Payment letters were sent for to Part D plan sponsors totaling approximately $5.2 million. Recoupment is expected to begin in the last quarter of FY 2014. The Part D RAC has initiated its review of DEA scheduled drug refill errors for CYs 2010-2011 and potential duplicate payments for CY 2010.For FY 2015, the Part D RAC will continue its review of DEA scheduled drug refill errors and duplicate payments.

**Medicare Secondary Payer (MSP) RAC**

| | Collections | RAC Obligations | Program Operations Obligations | Administrative Obligations |
|---|---|---|---|---|
| FY 2014 | Thru 6/30/14 – $29.4 million* | Thru 6/30/14 – $3.86 million | Thru 6/30/14 – $283,000 | Thru 6/30/14 – $0 |
| FY 2015 | Target – $100 million | $14.95 million | $3.20 million | $1.03 million |
| FY 2016 | Target – $120 million | $17.94 million | $3.30 million | $1.06 million |

In an effort to increase efficiency of its Medicare Secondary Payer (MSP) program, CMS recently completed implementation of a new MSP contracting strategy to restructure its pre- payment coordination of benefits activities and MSP debt recovery activities, which included establishing an MSP Recovery Audit Contractor (MSP RAC). The MSP RAC, also known as the Commercial Repayment Center (CRC), is tasked with identifying and recovering certain mistaken Part A and Part B payments from commercial entities that have primary payment responsibility for Medicare beneficiaries.

Through June 30, 2014, the MSP RAC has recovered $29.4 million (principal and interest). The MSP RAC is also developing enhancements to the GHP recovery process that will modernize and streamline the current paper-based processes. These planned enhancements are designed to improve customer service, increase efficiency, and ultimately increase recoveries for the program.

HHS0087670

**Medicaid RACs**

Medicaid RACs are designed, procured, administered, and operated by states. As such, CMS is not required to compile and report data for states' RAC costs, program operations, administrative costs, or target projections. States were required to implement Medicaid RAC programs by January 1, 2012. As of July 31, 2014, 47 states and the District of Columbia have implemented Medicaid RAC programs. The remaining three states have CMS-approved exceptions due to small beneficiary populations or high managed care penetration. CMS granted five U.S. territories complete exceptions from implementing Medicaid RAC programs because they did not have the necessary Medicaid claims data infrastructure to support a RAC program. CMS has no information to report on further Medicaid RAC expansion at this time.

The table below provides data on states' reports of Medicaid RAC collections adjustments, and refunds reported on the CMS-64. Because many states were beginning to implement their RAC programs in FY 2012, FY 2013 was the first full federal fiscal year of reporting state Medicaid RAC recoveries.

| | Collections* | | Refunds & Adjustments** | | Total | |
|---|---|---|---|---|---|---|
| | Total Computable | Federal Share | Total Computable | Federal Share | Total Computable | Federal Share |
| FY 2012 | $96,063,320 | $57,812,065 | $254,119 | $191,027 | $96,317,439 | $58,003,092 |
| FY 2013 | $107,505,843 | $64,134,376 | $28,133,591 | $17,027,446 | $135,639,434 | $81,161,822 |
| FY 2014 (thru June, 2014)*** | $43,751,988 | $27,884,986 | $7,898,539 | $5,571,935 | $51,650,527 | $33,456,921 |

\* CMS-64.S9 RAC, Line 7
\*\* CMS-64.9O RAC, Line 5  (Note: Refunds represent amounts paid to the Federal Treasury due to the expiration of the one-year deadline specified in statute; adjustments represent amendments and corrections to previously reported amounts.)
\*\*\*Amounts reported are through June 30, 2014.

Note: All amounts in this table are subject to change due to amendments or corrections to the CMS-64 that may be filed.

HHS0087671

**Performance Measures-** Please update the following information on Medicare and Medicaid program integrity performance measures:

- o   A description of performance measures;
- o   A description of the methodology used to derive these measures;
- o   The application of these measures in resource decisions; and
- o   Plans to refine those measures.
- o   Please update the description of the use of error rates and please describe CMS' activities related to Medicaid, CHIP, MA and Part D error rates measurement including FY 2013/2014 accomplishments and planned actions and goals for FYs 2014-2016.
- o   Please provide updated OACT assumptions for the calculation of the return on investment associated with additional HCFAC funding, and a discussion of how the 1.5:1 return rate has been updated to incorporate cost avoidance estimates and analysis or any other updated assumptions.

**Response:**

In compliance with IPERA, CMS has implemented a systematic plan regarding improper payments for Part C and D programs.  Unlike Medicare fee-for-service, CMS makes prospective, monthly per-capita payments to Part C organizations and Part D plan sponsors. Each per-person payment is based on a bid amount, approved by CMS, that reflects the plan's estimate of average costs to provide benefit coverage to enrollees.  CMS risk-adjusts these payments to take into account the cost associated with treating individual beneficiaries based on health status.  In addition, certain Part D prospective payments are reconciled against actual costs, and risk-sharing rules set in law are applied to further mitigate plan risk.

*Medicare Part C (Medicare Advantage Program)*

The Part C payment error estimate reported for FY 2013 (based on calendar year CY 2011) is 9.5 percent, or $11.8 billion.  The Part C payment error estimate has decrease from the FY 2012 rate of 11.4 percent.  The Part C payment error is driven by errors in risk adjustment data (clinical diagnosis data) submitted by Part C plans to CMS for payment purposes.  Specifically, the Part C payment error estimate reflects the extent to which diagnosis that plans report to CMS are not supported by medical record documentation.

In an effort to improve the Part C error rate, CMS has implemented three specific actions; contract level audits, Medicare Advantage Organization guidance, and physician outreach.

- Contract –level audits: The contract-specific Risk Adjustment Data Validation (RADV) audits are designed to recover overpayments to Part C plans.  CMS will conduct payment recovery based on extrapolated estimates beginning with audits based on calendar year 2011 payments.  CMS expects to audit about 30 MA contracts a year. Additionally, the CY 2007 contract-level RADV audits are in the final stages.  In FY 2013, CMS conducted payment recovery (at the beneficiary level) totaling $5.0 million from contracts involved in the CY 2007 RADV Targeted audits.  In FY 2014, CMS is in the process of conducting further recover on the CY 2007 audits for the amount of $5.35 million; a total of $10.35 million will have been collected for the Targeted 2007 audits.
- Medicare Advantage Organization Guidance:  CMS has also implemented a process to assist MA plans while they are submitting medical record documentation for review under the Part C error estimate.

334

HHS0087672

A730

- **Physician Outreach:** CMS has begun a program that enhances physician understanding of the way HHS pays MA organizations and the payment methodology impact on physicians. The focus of this effort is to improve medical record documentation prepared by physicians to support risk adjustment diagnoses.

*Medicare Part D*

The Part D payment error estimate reported for FY 2013 (based on CY 2011) is 3.7 percent, or $2.1 billion. In the FY 2013 AFR, CMS reported four Part D components; PELS, PEMS, PEPV, and PEDIR. These four error measures rates are described below.

**(1) Payment Error Related to Low Income Subsidy Status (PELS)** measures error in low income cost sharing payments to plans due to incorrect information on beneficiaries' low income status, which affects the level of low income cost sharing subsidy a beneficiary receives. PELS captures payment errors based on inconsistencies between the level of copayment paid by a beneficiary for a prescription at the point-of-sale during the contract year (which depends on whether the beneficiary was assigned Low Income Subsidy (LIS) status or not, and what level of LIS) and the beneficiary's true LIS status at Part D reconciliation (after the end of the contract year). The payment error may occur when a state Medicaid agency or the Social Security Administration (SSA) submits to CMS an update on a beneficiary's level of LIS after a Prescription Drug Event (PDE) record(s) has been accepted by CMS' systems. The PELS rate reflects overpayments and underpayments.

**(2) Payment Error Related to Medicaid Status (PEMS)** estimates errors in reconciled payments due to incorrect assignment of Medicaid status which results in incorrect LIS- related payments. Full benefit dually-eligible beneficiaries (eligible for Medicare and Title XIX benefits, i.e., comprehensive health benefits and/or the Medicare Savings Program) are also eligible for the Part D full low-income subsidy (LIS). If a beneficiary were incorrectly assigned Medicaid eligibility, all or part of CMS' LIS-related payment to the Part D sponsor would be in error. The PEMS measure is based on a proxy for incorrect Medicaid status for Medicare beneficiaries from another of HHS' IPIA error rate measurement programs: the Medicaid national active case eligibility error rate determined by the Payment Error Rate Measurement (PERM) program. The PERM eligibility case error rate reflects incorrect status for the entire Medicaid population for whom a subset is dual eligible. The PEMS rate reflects overpayments only.

**(3) Payment Error Related to Prescription Drug Event (PDE) Data Validation (PEPV)** measures errors in payments due to invalid and/or inaccurate PDE records, which result in adjustments to beneficiaries' benefit phases and in turn may impact low income cost sharing and reinsurance payments. Part D sponsors must submit a PDE record to CMS for each prescription a beneficiary fills. Inaccuracy in any of the data on PDE records can result in inaccurate administration by sponsors of beneficiaries' benefit phases, which can result in payment error. CMS evaluates the accuracy of sampled PDE records using supporting documentation, including the prescription hard copy, collected from the Part D Sponsors and their downstream entities and adjusts benefit phases where needed to determine payment error. PDE sample validation findings are imputed onto the PDE records for a random 5 percent sample of the Part D population. The estimated error is calculated for this 5 percent sample of beneficiaries and extrapolated onto the universe of Part D beneficiaries and their payments, to determine

335

HHS0087673

A731

the PEPV gross payment error amount and PEPV rate. The PEPV rate reflects both overpayments and underpayments.

(4) **Payment Error related to Direct and Indirect Remuneration (PEDIR):** measures error in final Part D program payment using corrected Direct and Indirect Remuneration (DIR) amounts reported by Part D sponsors to CMS. DIR is defined as price concessions (offered to purchasers by drug manufacturers, pharmacies, or other sources) that serve to decrease the costs incurred by the Part D sponsor for prescription drugs.    Sponsors reported DIR amounts which are incorrect will result in incorrect CMS payments.  PEDIR measures both underpayments and overpayments.

CMS is taking steps to address the errors measured by the Part D PELS, PEMS, PEPV, and PEDIR.

• Payment Error related to Low Income Status (PELS): HHS analyzed the PELS error estimate to further understand the PELS population and identify additional steps that can be taken to address errors.  In addition, HHS provided guidance to Part D sponsors to update beneficiary low-income status prior to reconciliation.

• Payment Error related to Medicaid Status (PEMS) Medicaid corrective actions, outlined in HHS' Agency Financial Report, will assist in reducing the PEMS error estimate, as this component is driven by Medicaid's Payment Error Rate Measurement (PERM) program findings.

• Payment Error related to Prescription Drug Event Data Validation (PEPV) HHS continued national training sessions for Medicare Part D plans.    Training provides comprehensive information on all aspects of Part D payment and data submission requirements, including sessions focusing on improvements in prescription drug event (PDE) record submission, which is reflected in the PEPV error rate estimate.

• Payment Error related to Direct and Indirect Remuneration (PEDIR).  To assist plans with improved direct and indirect remuneration (DIR) reporting in the future, HHS required plans to submit DIR amounts by National Drug Code (NDC).

In Medicare Program Integrity, CMS performs annual evaluations for Program Safeguard Contractors (PSCs), Zone Program Integrity Contractors (ZPICs), Medicare Drug Integrity Contractors (MEDICs), and the National Supplier Clearinghouse (NSC).  These measures are used to determine the effectiveness of the contractors' activities and to identify and prevent fraud in the Medicare Program.

The following elements are evaluated:

PSCs/ZPICs:
- Business relations with law enforcement
- Business relations with the CMS
- Timeliness of Law enforcement requests
- Timeliness of FID investigations, cases, and payment suspensions
- Timeliness of Deliverables
- Quality of Prioritization of investigations
- Quality of Investigation files
- Quality of Administrative actions

336

HHS0087674

A732

- Quality of Law enforcement referrals
- Quality of FID
- Quality of Medical review for benefit integrity purposes
- Quality of Handling and physical security of sensitive material
- Quality of Facility security
- Quality of Claims data
- Quality of Data analysis
- Quality of Deliverables
- Cost Control related to under spending
- Cost Control related to over spending

## MEDIC

- Quality of Case referrals to State and federal law enforcement;
- Timeliness of handling Complaints; .
- Quality and timeliness of investigations;
- Timeliness of response to law enforcement requests for information (RFIs);
- Effectiveness of outreach activities;
- Identification of program vulnerabilities; and
- Proactive data analysis.

## NSC

- On-site reviews;
- Deactivations/revocations; and
- Timeliness of processing applications and other workload management measures

These performance metrics were developed as quantifiable measures of productivity, effectiveness, and utilization of resources and indicators of significant activities that should be undertaken by contractors performing some, or all, of the duties under section 1893(b) of the Social Security Act.

The key use of performance measures is to determine the contractor's effectiveness in fulfilling the objectives within their Statement of Work.  In addition, performance metrics are utilized to determine if resource and workload reallocation need to be made among contractors.

In accordance with the Patient Protection and Affordable Care Act (ACA), CMS is developing additional measures for its contractors to further enhance the agency's ability to reduce the occurrence of fraud within the contractor's geographic region.

### Medicaid and the Children's Health Insurance Program (CHIP) Payment Error Rate Measurement (PERM)

The Payment Error Rate Measurement (PERM) program measures improper payments in the fee-for-service, managed care, and eligibility components of both Medicaid and the Children's Health Insurance Program (CHIP).  We are measuring improper payments in a subset of 17 States each year as a means to contain cost, reduce the burden on States, and make measurement manageable.  in this way, States can plan for the reviews, and CMS has a

HHS0087675

reasonable chance to complete the measurement on time for the Department of Health and Human Services Agency Financial Report (AFR) reporting. CMS met its 2013 target for Medicaid. CMS will report the Medicaid and CHIP improper payment rates in November 2014. CMS met its 2010 target to publish the Final Regulation in accordance with Section 601 of the Children's Health Insurance Program Reauthorization Act (CHIPRA).   CMS resumed CHIP measurement and published a single-year national CHIP error rate in the FY 2012 AFR.  The CHIP improper payment baseline will be established when all three cycles of States have completed their measurement over a three-year period (FYs 2012 through 2014). HHS will have a CHIP baseline error measurement in FY 2014, and will then establish reduction targets for the program.  Please refer to the Performance section of the Health Care Fraud and Abuse Control (HCFAC) chapter for further information.

_Return on Investment (ROI) Methodologies_

CMS is always working to improve the return on investment in our program integrity activities. The following describes how CMS calculates ROI for major MIP functions which cover all activities within a function and not specific to a contractor.

*       **Medical Review (MR)** – The MR program is designed to promote a structured approach to the collection of information and clinical review of medical records by Medicare Contractors to ensure that payment is made only for services that meet all Medicare coverage, coding, and medical necessity requirements.  The goal of the medical review program is to reduce payment errors by identifying and addressing billing errors concerning coverage and coding made by providers.   This is accomplished by identifying, through analysis of data and evaluation of other information, program vulnerabilities concerning coverage and coding made by individual providers, and taking the necessary action to prevent or address the identified vulnerabilities.

The MR savings is the sum of all claims that are denied during pre-payment and post- payment review, less any reversals.   Some of the denials are systematically done through edits and others require manual review of the medical records; reversals are the sum of denied claims that are overturned during appeal.    These savings (pre-payment + post-payment) are summed and divided by the cost of the medical review program to calculate the ROI for MR.

*       **Medicare Secondary Payer (MSP)** – The MSP program identifies other payers that are primary to Medicare.  Savings accrue to the Medicare program when Medicare either (1) denies primary payment because it has knowledge of other insurance that is primary to Medicare or (2) when Medicare uses MSP information to recover payments that were the responsibility of another primary payer.

Under the first situation, Medicare denies a payment because another payer is primary. Savings are calculated by taking the difference between what Medicare would have paid as primary payer versus what Medicare actually paid as secondary payer.   These savings are referred to as cost avoided or prepay savings.

Under the second situation, Medicare recovers monies previously paid for claims that should have been the responsibility of another primary payer.   These savings are referred to as recoveries or post-pay savings.   The post-pay savings are calculated from claims that are adjusted to reflect Medicare as the secondary payer and savings from direct recoveries against employers, insurers and beneficiaries.

338

HHS0087676

A734

Prepay savings ROI is calculated by taking the total cost avoided savings reported by Medicare claims processing operations over the costs of the Medicare Administrative Contractors, Coordination of Benefits Contractor and Workers' Compensation Review Contractor. These savings include the total dollars set aside to pay future benefits via Workers' Compensation Medicare Set-Aside agreements.

Post-pay savings ROI is calculated by taking total dollars recovered by the Medicare Secondary Payer Recovery Contractor, minus any adjustments, over the costs of the recovery contractor and Medicare Administrative Contractors.

- **Benefit Integrity (BI)** – Benefit Integrity represent the functions performed by Zone Program Integrity Contractors (ZPICs) and Program Safeguard Contractors (PSCs) for their Fee for Service (FFS) work.    They are responsible for detecting, preventing and deterring potential Medicare fraud by identifying program vulnerabilities, identifying incidents of fraud in their area, investigating allegations of potential fraud, providing education to providers, denying or suspending payments and referring cases to the Office of the Inspector General.

The return on investment (ROI) is calculated by taking the savings divided by the cost. Historically, savings have included both pre-pay and post-pay savings. Pre-pay savings include claims denied through automatic edits and prepayment medical review. Post-pay savings are the amount of overpayments identified and reported to the MAC contractors for collections as well as recoveries resulting from law enforcement investigations. In FY 2013, CMS is adding new prepayment savings measures, including savings due to implementing payment suspensions and revoking billing privileges. The cost is the total amount obligated for the Benefit Integrity project.

- **Audit** – Audit savings are based upon the results of auditing Medicare Cost Reports filed by institutional providers such as hospitals, SNFs, HHAs, etc..   Medicare contractors perform various audit functions (i.e., Cost Report Acceptances, Limited and Full Desk Reviews, Audits) on approximately 40,000 cost reports annually prior to the final settlement (reconciliation) of the cost reports.   CMS uses a risk based methodology to concentrate its limited audit resources to the areas of the highest dollar risk, thus producing the most productive savings for the MIP resources.

The numerator of the calculation is the savings amount, which is the difference between the reimbursable amounts claimed by the provider versus the amount determined at final settlement of the cost report. The denominator is the total cost for the cost report activities.

- **Medi-Medi** – The ZPICs and PSCs are responsible for doing this work as well. They conduct data matching for both Medicare and Medicaid providers from those states who have elected to participate in the federal Medi-Medi program. Savings are calculated the same as they are calculated for Benefit Integrity. However, the cost used in the denominator of the ROI calculation is the total amount obligated under the Medi-Medi project.

OACT has reviewed the ROI for the HCFAC program (with data through 2013). For additional HCFAC spending, the assumption reflects a 1.9 to 1 return rate to the trust funds and General fund, which includes all savings amounts (including all cost avoidance savings).

339

HHS0087677

A735

**Program Integrity Pilots and/or Demonstrations.** Please update the summary of any ongoing, recently completed, or planned program integrity demonstrations and/or pilots for both Medicare and Medicaid, and provide the distribution of resources allocated for evaluation of these demonstrations and pilots. Please also include an update on the fraud prevention system, including planned actions and goals for 2014-2016 as well as plans to integrate into base program integrity funding once the Small Business Jobs Act funding is depleted.

**Response:** Below, is a list of recent pilots and/or Demonstrations, which have enhanced our review of providers and have allowed us to test and compare different fraud prevention tools that will assist the agency in eliminating providers that do not meet the needs of beneficiaries or the Medicare program. The results to date of the pilots show the effectiveness of intensified provider enrollment scrutiny and the value of enhanced program integrity resources. Based on the results, CMS may conduct additional pilots to address potential fraud in other provider types or other geographic areas. An update on the fraud prevention system can be found in the recently released Fraud Prevention System Report to Congress 2012. Funding arrangements for the fraud prevention system is discussed in further detail within the HCFAC section of the FY 2016 OMB-J.

<u>Prior Authorization Model – Non-Emergent Hyperbaric Oxygen Therapy:</u>

*Please see the CMMI Chapter for this item.

<u>Prior Authorization Model – Repetitive Scheduled Non – Emergent Ambulance Transport:</u>

*Please see the CMMI Chapter for this item.

<u>Prior Authorization for Power Mobility Devices (PMDs)</u>

One area with high incidences of improper payments that CMS recently addressed was the Power Mobility Device (PMD) benefit; CMS found that over 80 percent of claims for motorized wheelchairs did not meet Medicare coverage requirements in 2011. As result of these and other findings showing very high improper payment rates for PMDs, CMS implemented the Medicare Prior Authorization of PMDs Demonstration in seven high risk states in September 2012 in California, Illinois, Michigan, New York, North Carolina, Florida and Texas.

Since implementation, CMS observed a decrease in expenditures for PMDs in the demonstration states and non-demonstration states. Based on claims submitted as of April 4, 2014, monthly expenditures for the PMDs included in the demonstration decreased from $20 million in September 2012 to $6 million in December 2013 in the non-demonstration states and from $12 million to $3 million in the demonstration states. CMS is expanding this demonstration to 12 additional states (Pennsylvania, Ohio, Louisiana, Missouri, Washington, New Jersey, Maryland, Indiana, Kentucky, Georgia, Tennessee, and Arizona) beginning October 1, 2014.

<u>RAC Prepayment Review</u>

The Prepayment Demonstration began on September 1, 2012 in the following 11 states: FL, CA, MI, TX, NY, LA, IL, PA, OH, NC and MO. These states were chosen due to their high error and fraud rates or high claim volume of short inpatient hospital stays. MS-DRGs are selected for review based on CERT Error Rate data. Claims in these states containing a selected MS-DRG

350

HHS0087678

may be flagged for review, before the claim is paid. Therapy claim reviews were added to the Prepayment Demonstration on April 1, 2013.

This Demonstration is currently in a "pause" status due to contract procurement for these review contractors. Prepayment Additional Documentation Request letters ceased as of Feb 28, 2014. This was necessary to allow time to complete reviews prior to the end of the current review contract, which was on June 1, 2014. Prepayment reviews will not resume until after new contracts are awarded. CMS expects to award the new contracts by the end of 2014.

## Beneficiary Focused Pilot using Geospatial Maps/Beneficiary Complaints
(Also referred to as the 1-800 Medicare Beneficiary Complaints pilot)

The 1-800 Beneficiary Pilot was designed to test the innovative ideas for incorporating beneficiary complaint data and tools into the fraud detection efforts of the ZPIC.  Through the use of innovative data detection tools, the ZPIC evaluated the increased efficiency and effectiveness of fraud detection through analyzing beneficiary complaints. Although the pilot was successful, it was funded from discretionary funding and based on agency priorities, CMS Leadership decided to allocate this funding elsewhere. CMS is not planning to continue or expand this pilot. The funding allocations were $2,787,598 in FY 2011, $2,143,548 in FY 2012, and $0 in FY 2013.

## Compromised Numbers Checklist (CNC) Pilot with Medicare Part C and Part D Plan Sponsor

The purpose of this assessment was to determine whether potentially compromised beneficiary identifiers could be identified. To this end, a list of beneficiaries was obtained from Kaiser Permanente who voluntarily approached CPI to participate in this assessment. KP submitted a list of 884,750 beneficiary numbers. These identifiers were matched to beneficiaries in the CNC database (January). It was anticipated that this comparison would be beneficial in highlighting potentially compromised identifiers. The goals of the pilot include, but are not limited to: Determining whether and how Part C and D plan sponsors use the CNC database. In addition, the pilot will enable CMS to determine what, if any, barriers exist that will impede the use of the database in the conduct of proactive data analysis and the screening of enrollment or claims, or both.

Evaluation of this pilot includes 1.) Measure the use of the database by plan sponsors in the conduct of proactive data analysis. 2.) Determine how many enrollment and claims issues were identified that may require further investigation. 3.) Determine how much money was saved as a result of the database. 4.) Is the database being used in the same manner by all pilot participants? 5.) Are the sponsors reporting similar issues in the same manner and using the same data. 6.) Is the data reliable, valid and specific?

The assessment of the pilot: The analysis was completed and a debriefing was conducted in August 2013 with all participants including CMS/CPI, MEDIC, CNC contractor's Turning Point and Kaiser Permanente. Out of Kaiser's submitted list of over 800,000 beneficiaries, 1,488 beneficiaries were found to be in CMS's Compromised Number (CNC) database.

The Results: This pilot has concluded. The results of the pilot were shared with Kaiser and due to the voluntary nature of this project, lack of required computer resources, and time this pilot will not be continued.

351

HHS0087679

A737

The funding allocations were $0 in FY 2011, $10,781.95 in FY 2012, and $0 in FY 2013.

## Enhanced Provider Oversight (South Florida Enrollment Project)

This is a collaborative project between the Medicare Administrative Contractor (MAC) and Zone Program Integrity Contractor (ZPIC) to utilize and expand the existing programmatic infrastructures to take administrative actions under existing CMS authorities by conducting onsite visits to High Fraud Abuse Index Rating (FAIR) providers and suppliers referred to the ZPIC by the MAC. In certain instances, the MAC allows providers and suppliers with a high FAIR to enroll and a subsequent on-site visit is performed by the ZPIC, resulting in a revocation of their Medicare billing rights.

Since inception in July 2009, this project has produced significant results; including an increased number of revocations, deactivations, and prepay edit savings. The project has also provided valuable information, which CMS has used to identify and implement programmatic changes that have proven successful to deter and prevent Medicare fraud.

As of June 30, 2014, First Coast Service Operations, Inc. (FCSO),the MAC had conducted 6,254 site verifications to verify providers and suppliers' operational status, deactivated 16 practice locations, and revoked or denied 219 providers. FCSO saved $10,848,246 from prepayment review. Safeguard Services, Services (SGS), the ZPIC, was discontinued effective 7/13/2012.

## Probable Fraud Measurement Pilot

The purpose of the Probable Fraud Measurement Pilot is to estimate the rate of probable fraud in Medicare fee-for-service payments for home health agencies (HHAs). No statistically valid rate of probable fraud in any healthcare sector, public or private currently exists. This project will determine such a national rate within HHAs in order to better understand the scope of fraud CMS is responsible for stopping.

This pilot will be evaluated and considered successful if it is able to determine a statistically valid rate of probable fraud in home health.

There is no preliminary assessment regarding this pilot but we are currently planning to expand the pilot to other service areas upon conclusion of home health probable fraud measurements. The funding allocations were $0 in FY 2011, $3,479,981 in FY 2012, and $298 in FY 2013.

## South Florida Hotline

CMS also continued a successful initiative aimed at increasing fraud reporting in South Florida. As part of a two-year infusion therapy demonstration, CMS established a special fraud hotline in 2007 to protect Medicare beneficiaries in South Florida from fraudulent providers of infusion therapy. As a result of the hotline's success, in FY 2009 CMS expanded the scope of this infusion therapy fraud hotline to handle all Medicare fraud-related calls in South Florida; this hotline remained in effect in FY 2013.

Trained, bilingual, or trilingual staff fielded and routed calls, and acknowledged receipt of complaints in writing. A rapid response team at the ZPIC investigated the highest priority leads received from the fraud hotline within 48 hours of receipt of the call and then collaborated with CMS and law enforcement to pursue appropriate follow up action(s). CMS worked with its

HHS0087680

partners to conduct beneficiary outreach and education to ensure beneficiaries understood the types of fraud that may occur and how to read their MSNs to detect potential fraudulent billings.

As of January 2014, the hotline has received more than 111,581 calls since its inception leading to 1,100 new fraud investigations. In addition, the ZPIC has placed 237 providers on prepayment review saving $17.4 million, revoked or deactivated 203 provider numbers, requested $171 million in overpayments, referred 58 cases to law enforcement, and sent 172 Immediate Advisements to the OIG. Additionally, law enforcement has seized $ 3.1 million in provider bank accounts.

Although the initiative was successful, it was funded from discretionary funding and based on agency priorities, CMS Leadership decided to allocate this funding elsewhere. CMS is not planning to continue or expand this pilot.

### Texas Integration Project (IP) Pilot

The purpose of the Texas Integration Project Pilot is to combine current Medi-Medi and MIC to investigate/review Medicaid Investigations. The goal of the pilot is to improve Medicare and Medicaid program integrity efforts by leveraging the strengths and resources of both the Medi-Medi and Medicaid Integrity Contractor (MIC) programs, to capitalize on increased efficiencies through a collaborative approach, resulting in more Medicaid fraud investigations, administrative actions, or recoveries than the States are able to generate on their own.

This project will be evaluated by determining the 1.) Timeliness of Investigations, 2.) Quality of Investigations 3.) State feedback 4.) Administrative Actions 5.) Law Enforcement Activity

The assessment of this project will not be formally assessed until 09/30/2014. Continuation and/or expansion is dependent upon final assessment. The funding allocations were N/A in FY 2011, N/A in FY 2012, and N/A in FY 2013. There is no budget impact as the work is being performed under the existing MIC & Medi-Medi contracts with no new task order or additional funding requirements.

HHS0087681