# IN THE UNITED STATES COURT
## OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| **ACLR, LLC** | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **Civil Action No. 15-767 and 16-309** |
| | ) | (Judge Campbell-Smith) |
| **THE UNITED STATES** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## PLAINTIFF ACLR, LLC'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGEMENT

Plaintiff ACLR, LLC ("ACLR"), by its undersigned counsel and pursuant to Rule 56 of the United States Court of Federal Claims and this Court's February 8, 2018 Scheduling Order, respectfully submits the following proposed findings of uncontroverted facts setting forth all of the material facts upon which ACLR bases its motion for partial summary judgment and as to which ACLR believes there is no genuine dispute.

## UNCONTROVERTED FACTS

### The Part D Recovery Audit Contractor

1.　　CMS was required by law to establish a Part D recovery audit contract for the recovery of improper payments.　Section 6411(b) of the Affordable Care Act ("ACA"); App. at Ex.1, Excerpts of deposition of Cindy Moreno ("Moreno Dep.") at 31:14-32:4; App. at Ex. 2, Excerpts of deposition of Camille Brown ("C. Brown Dep.") at 79:11-20.

2.　　On December 2, 2010, CMS submitted a Request for Quote ("RFQ") to ACLR for the Recovery Audit Contractor Services in Support of Medicare Part D contract ("Part D

RAC") and represented that CMS intended to award a firm-fixed price contingency fee task order for the work such that the recovery audit contractor would only be paid on a percentage of the total Part D improper payment amounts recovered from plan sponsors.  App. at Ex.3, RFQ for Part D RAC.

3.      The purpose of Part D RAC was to obtain contractor support for the Center for Medicare and Medicaid Services ("CMS") in the identification of improper payments and the recoupment of overpayments in Medicare Part D.  App. at Ex. 4, Statement of Objectives.

4.      The Part D RAC contractor would be responsible for the identification and recovery of improper payments on a national scale. *Id.*

The Performance Work Statement

5.      On December 14, 2010, in response to the RFQ, ACLR submitted its technical proposal and Performance Work Statement ("PWS") to CMS.  App. at Ex.5, ACLR Technical Proposal.

6.      The PWS established the audit types and associated processes, including the methodologies to be used by ACLR to identify and recover Part D improper payments arising from duplicative payments, direct and indirect remuneration, and improper plan sponsor prescription drug event data submission audit issues.  *Id.*; App. at Ex.6, Excerpts from 30(b)(6) deposition of CMS in ACLR I ("CMS 30(b)(6) Dep.") at 15:20-16:2.

The Part D RAC Contract

7.      On January 13, 2011, CMS awarded Contract No. GS-23F-0074W/Task Order No. HHSM-500-2011-00006G ("Part D RAC Contract") to ACLR, which incorporated ACLR's PWS in its entirety, including a base period and four 12-month option periods to be executed at CMS's discretion.  App. at Ex.7, Part D RAC Contract.

8.     The primary purpose of the Part D RAC Contract was to identify and collect improper payments.  App. at Ex. 6, CMS 30(b)(6) Dep. at 14:15-18; 163:3-6; App. at Ex.8, Excerpts of deposition of Theresa Schultz ("Schultz Dep.") at 44:10-16; App. at Ex. 9, Excerpts of deposition of Nicole Hoey ("Hoey Dep.) at 110:16-18.

9.     At the outset of the Part D RAC Contract, ACLR was to collect Part D overpayments.  App. at Ex.7, Part D RAC Contract at section 5; App. at Ex. 6, CMS 30(b)(6) Dep. at 19:1-11; 28:4-14; App. at Ex.10, Excerpts of deposition of Tanette Downs ("Downs Dep.") at 57:9-20.

10.     Given the contingency structure of the Part D RAC Contract, if ACLR was not allowed to pursue the recovery of improper payments, ACLR would not be paid under the Part D RAC Contract. App. at Ex.11, Excerpts of Deposition of Desiree Wheeler ("Wheeler Dep.") at 35:10-36:3.

11.     As of the date the Part D RAC Contract was awarded there were no rules or regulations that governed ACLR's Part D efforts.  App. at Ex. 1, Moreno Dep. at 36:11-37:15.

12.     In January 2011, CMS Director Moreno, responsible for the overall implementation of the Part D RAC program, tasked a separate contractor, Booz Allen Hamilton, Inc. ("BAH") to develop the Part D RAC program and a corresponding statement of work.  *See* App. at Ex. 1, Moreno Dep. at 58:17-60:19.

13.     Moreno also determined that ACLR would be unable to recover improper payments or collect fees until the program had been implemented and made no attempt to notify ACLR that CMS would not execute the Part D RAC Contract or to modify it so that ACLR could be compensated for its work efforts prior to an implementation of the program in a manner that

was satisfactory to CMS.  *See* App. at Ex.1, Moreno Dep. at 69:12-71:8; 74:3-76:1; App. at Ex. 8, Schultz Dep. at 64:22-65:20; App. at Ex. 12, July 8, 2011 CMS emails.

14.     During 2011, CMS did not meet PWS requirements to establish a data store and did not complete the security audits necessary for ACLR to timely receive and commence reviewing Part D prescription drug events ("PDEs").  App. at Ex.13, Excerpts of Deposition of Marnie Dorsey ("Dorsey Dep.") at 29:5-10; 109:3-22; App. at Ex.7, Part D RAC Contract; App. at Ex. 14, October 7, 2011 Authorization Decision.

15.     CMS also ignored PWS appeal processes and Part D RAC task order requirements regarding ACLR's collection of improper payments.  App. at Ex. 6, CMS 30(b)(6) Dep. at 40:20-42:15; App. at Ex. 10, Downs Dep. at 124:8-17; App. at Ex. 7, Part D RAC Contract at section 5.

16.     CMS acknowledged that it did not follow PWS requirements.  App. at Ex.13, Dorsey Dep. at 132:20-135:7; App. at Ex.15, GAO Report "MEDICARE PART D: Changes Needed to Improve CMS's Recovery Audit Program Operations and Contractor Oversight" ("GAO Report") at page 17; App. at Ex.16, December 17, 2013 CMS email; App. at Ex.17, December 2014 emails.

17.     Former Part D Part D RAC Contracting Officer Schultz acknowledged that CMS did not act in accordance with PWS requirements and testified that CMS "had a contract with the PWS in it that we weren't agreeing with . . . . which is why we were doing the statement of work."  App. at Ex. 8, Schultz Dep. at 151:10-22.

18.     In a GAO report, GAO stated that "CMS officials said they proposed that the RAC perform work and follow processes that were not in the performance work statement . . . ." App. at Ex.15, GAO Report at page 17.

4

<u>Calculation of Part D Payments & Improper Payment Determination</u>

19.    Plan sponsors must also certify that their Part D PDE claim submissions are accurate, complete, and truthful and acknowledge that the claims data will be used for the purpose of obtaining federal reimbursement and are in compliance with Health Insurance Portability & Accountability Act ("HIPAA") simplification rules.  42 CFR 423.505(k)(3); 42 CFR 423.505(h)(2).

20.    The Office of Management & Budget ("OMB"), responsible for establishing improper payment guidance, defines an improper payment as:

> An improper payment is any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements. Incorrect amounts are overpayments and underpayments (including inappropriate denials of payment or service). An improper payment includes any payment that was made to an ineligible recipient or for an ineligible service, duplicate payments, payments for services not received, and payments that are for the incorrect amount. In addition, when an agency's review is unable to discern whether a payment was proper as a result of insufficient or lack of documentation, this payment must also be considered an error.

App. at Ex.18, excerpts of Part III to OMB Circular A-123, Appendix C.

21.    The OMB definition of an improper payment was included in the Part D RAC Contract PWS and was the improper payment definition used by CMS.  App. at Ex. 7, Part D RAC Contract, PWS at 38; App. at Ex. 6, CMS 30(b)(6) dep. at 56:21-57:8; 84:3-85:20; App. at Ex.19, CMS Part D RAC Overview at page 21.

22.    ACLR reviews final reconciliation PDEs to make determinations of payment veracity and to identify and recover Part D improper payments.  App. at Ex. 20, Affidavit of Christopher Mucke in Support of Motion for Partial Summary Judgment ("Mucke Aff.") at ¶ 13.

23.     ACLR is not responsible for reviewing any PDE changes occurring after final reconciliation as this information constitutes "new payment information" that would only be included in any "subsequent reopening of the final reconciliation."  App. at Ex. 21, Part D RAC Contract, OY1 SOW, Appendix C; App. at Ex. 22, OY2 SOW, Appendix C; *See* App. at Ex. 23, October 4, 2011 email.

24.     CMS began transmitting Part D payment data to ACLR on November 17, 2011, 200 days past PWS requirements. App. at Ex. 6, CMS 30(b)(6) Dep. at 49:11-52:7; App. at Ex. 13, Dorsey Dep. at 109:3-7, 109:10-22; App. at Ex. 24, November 2011 email thread.

<u>2007 Duplicate Payment Audit</u>

25.      The Part D RAC Contract PWS authorized ACLR's recovery of duplicate payments.  App. at Ex. 7, Part D RAC Contract, PWS at 36; App. at Ex. 6, CMS 30(b)(6) Dep. at 57:9-58:6;

26.      One of the primary focuses of ACLR's review under the Part D RAC Contract was the duplicate payment review.  App. at Ex. 6, CMS 30(b)(6) Dep. at 55:11-20.

27.     In addition to its approval of duplicate payment recoveries in the PWS, CMS separately approved the duplicate payment audit issue.  App. at Ex. 6, CMS 30(b)(6) Dep. at 174:13-176:4; App. at Ex. 23, October 4, 2011 email; App. at Ex.10, Downs Dep. at 76:12-77:12; App. at Ex. 19, CMS Part D RAC Overview at page 9.

28.     To conduct the plan year 2007 duplicate payment audit, ACLR relied on plan sponsor certifications that PDE records had been accurate, complete, and truthful and that the data were in compliance with HIPAA simplification rules and matched PDE records containing the same HICN, SRN, pharmacy, and fill number to identify individual prescriptions and eliminate duplicates arising from permissible dosage changes by contract.  App. at Ex. 20,

Mucke Aff. at ¶ 19.  ACLR did not include duplicates arising from PDE records where the fill number was equal to zero. *Id.*

29.    To eliminate permissible partial fills, ACLR reviewed the dispensing status field on each PDE to determine whether duplicative fill numbers arose as the result of a partial fill and eliminated those partial fills from further review. *Id.* at ¶ 20.

30.    Upon elimination of permissible partial fills, ACLR sorted the remaining prescriptions by the date the PDE was filled by the pharmacy ("Date of Service") and identified the earliest PDE Date of Service as the original payment and subsequent PDEs with the same Date of Service as duplicate improper payments. *Id.* at ¶ 21.

31.    Using this methodology, ACLR identified plan year 2007 Part D duplicate payment amounts totaling $313,808,241. *Id.* at ¶ 22.

32.    As of November 3, 2011, ACLR's duplicate payment audit methodology was technically acceptable.  App. at Ex. 1, Moreno Dep. at 87:1-8; App. at Ex. 25, November 3, 2011 email at page 8.

33.    In a November 30, 2011 conference call, ACLR Managing Principal Christopher Mucke, notified CMS Contracting Officer ("CO") Wheeler and CMS Program Integrity Director Downs that ACLR would commence issuing notification of improper payment letters ("NIPs") to plan sponsors and begin recouping amounts associated with 2007 Part D duplicate payments in accordance with the PWS.  App. at Ex. 10, Downs Dep. at 56:13-57:8.

34.    During this call, CMS Contracting Officer Representative ("COR") Dorsey told ACLR her position that the PWS was simply a proposal and was not approved by CMS.  App. at Ex. 13, Dorsey Dep. at 133:4-15; 134:12-19; 135:3-7; 181:4-182:5.

35.     CO Wheeler advised ACLR to not issue the NIP demand letters to recover PY 2007 duplicate payments. App. at Ex. 11, Wheeler Dep. at 86:6-88:11; 89:13-18; 100:10-21; App. at Ex. 10, Downs Dep. at 58:7-10.

36.     While the Part D RAC Contract required that ACLR collect Part D overpayments, ACLR was directed to not pursue its recovery efforts for 2007 duplicate payments, in part, because CMS had not developed its preferred payment collection processes.  App. at Ex. 7, Part D RAC Contract at section 5; App. at Ex. 6, CMS 30(b)(6) Dep. at 58:7-13; 176:4-6; App. at Ex. 10, Downs Dep. 56:13-57:8; 58:11-59:5; 128:15-18.

37.     For CMS to instruct ACLR to take action inconsistent with the Part D RAC Contract, CMS should have followed-up immediately with a contractual document.  App. at Ex. 11, Wheeler Dep. at 72:6-73:4.

38.     ACLR's 7.5% contingency fees on $313,808,241 of plan year 2007 duplicate payments amounts to a contingency fee payment under the Part D RAC Contract of $23,628,892. App. at Ex. 7, Part D RAC Contract at section 2.

39.     On December 9, 2011, CMS submitted a draft statement of work to ACLR, which outlined a revised Part D RAC recovery processes.  App. at Ex. 26, December 9, 2011 email.

40.     After some revisions, ACLR's approval of the statement of work was communicated to CMS on April 20, 2012.  App. at Ex. 6, CMS 30(b)(6) Dep. at 114:10-22; App. at Ex. 27, April 20, 2012 email approving draft SOW.

41.     In early 2012, CMS refused to allow ACLR to conduct a PY 2007 duplicate payments audit special study similar to that approved for the PY 2007 excluded provider audit. App. at Ex. 20, Mucke Aff. at ¶ 23.

42.     On November 13, 2013, ACLR submitted improper payments to CMS totaling $1.05 billion and informed CMS that ACLR would commence recoveries in accordance with its PWS. App. at Ex. 43, November 17, 2013 email.  However, CO Hoey directed ACLR to not send NIP demand letters to plan sponsors.  App. at Ex. 44, November 22, 2013 email.

<u>Option Year 1 Statement of Work</u>

43.     On December 31, 2013, CMS executed Modification 13 to the Part D RAC ("OY1 SOW"), which replaced the PWS with a statement of work containing, among other things, a New Audit Issue Review Package ("NAIRP") process for submitting improper payment audit issues for CMS review and approval and an Improper Payment Review Package ("IPRP") process used by ACLR to submit improper payment PDEs from approved NAIRPs via CMS's payment recovery information system to a data validation contractor ("DVC") responsible for validating ACLR findings in accordance with the approved NAIRP audit methodology. App. at Ex. 21,  Part D RAC Contract, OY1 SOW; App. at Ex. 8, Schultz Dep. at 33:19-34:2.

44.     The OY1 SOW also contained contingency fee payments for new approved issues of 15% for up to $10 million in recoveries and 12% thereafter.  App. at Ex. 21, Part D RAC Contract, OY1 SOW.

45.     At the request of ACLR, the OY1 SOW also incorporated a Part D RAC Activities Timeline, Appendix E, to provide individual tasks, deadlines and responsible parties for "New Issues Submission and Approval Process," and the complex and automated review processes and procedures from initial IPRP submission through RAC payment.  App. at Ex. 21, OY1 SOW at Appendix E; App. at Ex. 9, Hoey Dep at 29:20-32:14.

46.     By the time OY1 SOW was executed on December 31, 2013, almost six years had passed since the conclusion of PY 2007 and the window had expired for ACLR to pursue the

plan year 2007 duplicate payments under the new framework of the OY1 SOW because of statute of limitation periods and appeal timeline constraints.  App. at Ex. 10, Downs Dep. at 74:5-17; App. at Ex. 6, CMS 30(b)(6) Dep. at 199:6-15.

<u>Plan Year 2010 Duplicate Payments</u>

47.     On January 2, 2014, ACLR submitted its NAIRP for plan year 2009-2012 duplicate payments.  App. at Ex. 20, Mucke Aff. at ¶ 27.

48.     After multiple revisions, which also eliminated a review of the 2009 plan year, CMS approved ACLR's review of 2010-2012 duplicate payments NAIRP on May 28, 2014 - 42 days after contracted deadlines.  App. at Ex. 6, CMS 30(b)(6) Dep. at 224:2-225:2;  App. at Ex. 45, May 28, 2014 revised NAIRP approval.

49.     Under the approved methodology in the NAIRP, ACLR identified duplicate payments using CMS's Uniform Examination Program ("UEP") duplicate payment protocol whereby potential duplicate payments are identified as "PDEs submitted to the same beneficiary, for the same medication, and on the same/very close dates."  App. at Ex. 20, Mucke Aff. at ¶ 28. To match individual PDE fields, ACLR matched PDE records containing the same contract and prescription drug plan, HICN, NDC, and fill number fields.  *Id*. at ¶ 29.

50.     To determine the "same/very close dates," the NAIRP contained an early refill methodology, which consisted of comparing the days' supply of the originating PDE record to the days elapsed between the originating PDE and subsequent matching PDE record and calculating the days between each PDE's respective Date of Service.  *Id*. at ¶ 30.  Potential duplicate payments were identified when the days elapsed were less than 50% of the days' supply of the originating PDE record.  *Id*.

51.    The approved NAIRP audit methodology precluded the review of PDEs associated with long term care facilities and mail order pharmacies and these records were eliminated from ACLR's audit.  *Id*. at ¶ 31.

52.    The NAIRP also required that the audit be conducted as a complex review, which required that ACLR obtain evidentiary support such as copies of prescriptions and prescription fill histories for improper payment PDEs via a Request for Information ("RFI") to plan sponsors. App. at Ex. 46, May 6, 2014 email; App. at Ex.47, RFI letter.

53.    After ACLR had completed its initial audit and was preparing to issue RFIs to plan sponsors, CMS, noting that "this piece of the process is not in the current contract," informed ACLR that it could not send RFIs to plan sponsors until the DVC, using "the approved methodology," had reviewed the RFIs and that the DVC's validation process "should be no longer than a week."  App. at Ex.48, June 2014 email thread; *See* App. at Ex. 49, Excerpts of the deposition of Sonja Brown ("S. Brown Dep.") at 34:21-35:15.

54.    ACLR submitted its RFI findings to CMS on June 10, 2014.  App. at Ex. 20, Mucke Aff. at ¶ 32.

55.    On June 25, 2014, the DVC found that ACLR's PY 2010-2012 duplicate payment RFIs only generated 0.0065 in false positives.  App. at Ex. 50, October 2014 email thread.

56.    In addition to its validation work for the Duplicate Payment RFI Report, the DVC deviated from the methodology approved in the NAIRP and applied a "dosage increase" percentage to identify possible permissible dosage changes.  *See* App. at Ex. 51, Duplicate Payment Report; App. at Ex. 20, Mucke Aff. at ¶ 33.

57.    By applying a revised methodology that was not part of the approved NAIRP, the DVC reviewed PDE data fields not contained within CMS data submissions to ACLR for the

11

2011 and 2012 plan years duplicate payment audit causing CMS to only approve the release of plan year 2010 duplicate payment RFIs.  App. at Ex. 20, Mucke Aff. at ¶ 34; *See* App. at Ex. 52, July 8, 2014 email.

58.     On July 8, 2014, ACLR submitted the RFIs for improper 2010 duplicate payments to plan sponsors requiring, in accordance with the OY1 SOW, that evidentiary support be submitted within 60 days.  App. at Ex. 20, Mucke Aff. at ¶ 35.

59.     CMS unilaterally extended the evidentiary support deadline for plan sponsors an additional 60 days.  App. at Ex. 6, CMS 30(b)(6) Dep. at 209:1-11; App. at Ex. 53, October 1, 2014 CMS email extension.

60.     CMS's extension to the plan sponsors was inconsistent with the timeline set forth in the OY1 SOW.  App. at Ex. 6, CMS 30(b)(6) Dep. at 209:12-210:1.

61.     Ms. Sonja Brown was assigned as the COR on October 1, 2012 and was advised that she was not authorized to direct ACLR "in any way that could change the terms and conditions of the contractual instrument."  App. at Ex. 54, Part D RAC Contract, Modification 5; App. at Ex. 55, Memorandum appointing COR Brown at page 2.

62.     On October 22, 2014, CMS instructed ACLR to apply a revised CMS methodology, based on its interpretation of the DVC report, to the 2010 duplicate payment RFI PDEs to eliminate possible permissible dosage changes and to submit new RFI IPRPs to CMS for subsequent resubmission to plan sponsors.  App. at Ex. 6, CMS 30(b)(6) Dep. at 236:6-20; App. at Ex. 56, October 22, 2014 email regarding PDE adjustments; App. at Ex. 20, Mucke Aff. at ¶ 36.

63.     On December 24, 2014, after completing its review of evidentiary support submitted in response to the RFIs, ACLR submitted IPRPs to CMS for improper plan year 2010

duplicate payment amounts totaling $15,909,552, in accordance with OY1 SOW requirements. App. at Ex. 57, December 24, 2014 letter; App. at Ex. 20, Mucke Aff. at ¶ 38.

64.     Contractual language associated with approved audit issues remained unchanged with the exercising of the second option period of the Part D RAC Contract ("OY2 SOW") on December 31, 2014.  App. at Ex. 21, Part D RAC Contract OY1 SOW; App. at Ex. 22, Part D RAC Contract, OY2 SOW.

65.     On January 8, 2015, ACLR was directed by CMS to resubmit ACLR's IPRPs in accordance with CMS's revised methodology. App. at Ex. 58, January 8, 2015 email.

66.     Based upon ACLR's belief that CMS's direction was an additional Part D RAC Contract deviation, ACLR referred the matter to CO Hoey.  App. at Ex. 20, Mucke Aff. at ¶ 37.

67.     On April 24, 2015, COR Brown terminated the 2010 duplicate payment audit through a "Technical Direction Letter."  App. at Ex. 59, April 24, 2015 email.

68.     The justification for terminating the 2010 duplicate payment audit was that "although the revised methodology used by CMS was able to reduce the number of PDE records identified as improper submissions, CMS continued to have concerns with the validity of overall results." *Id.*; *See* App. at Ex. 6, CMS 30(b)(6) Dep. at 237:19-238:16.

69.     There was no language in the Part D RAC Contract that allowed CMS to terminate an approved audit.  App. at Ex. 6, CMS 30(b)(6) at 248:18-250:22; App. at Ex. 60, December 11, 2014 email regarding potential SOW changes.

70.     There was no language in the Part D RAC Contract that allowed CMS to apply a revised methodology to perform 2010 duplicate payment reviews.  *See* App. at Ex. 6, CMS 30(b)(6) Dep. at 173:3-174:9; 249:13-250:22.

71.     ACLR's contingency fee payment for the $15,909,552 plan year 2010 duplicate payments identified by ACLR was $2,209,146.  App. at Ex. 20,  Mucke Aff. at ¶ 38.

Option Year 2 Statement of Work

72.     On December 31, 2014, the OY2 SOW was executed under Modification 16. App. at Ex. 22, Part D RAC Contract, OY2 SOW.

73.     OY2 SOW language pertaining to CMS's promulgation that PDEs submitted by the plan sponsor subsequent to the final reconciliation of the plan year being reviewed constituted new payment information remained unchanged from the OY1 SOW and CMS's prior determination.  *Id*. at Appendix C; App. at Ex. 23, October 4, 2011 email.

ACLR's Sales Tax  NAIRP Submission

74.     The PDE record contains three detailed cost fields: ingredient cost paid, dispensing fee paid, and total amount attributed to sales tax.  App. at Ex. 74, Excerpts of 2007 Prescription Drug Event Data Training Participant Guide; App. at Ex. 20, Mucke Aff. at ¶ 39.

75.     ACLR reviewed reconciled PDE records for PY 2012-2013 and identified all PDE records containing sales tax amounts greater than $0.00. App. at Ex. 20, Mucke Aff. at ¶ 40; App. at Ex. 61,  ACLR sales tax NAIRP.

76.     ACLR then identified the addresses for all pharmacies and reviewed applicable state and local tax laws to identify pertinent sales tax laws and their application to the sales tax PDEs ACLR had identified. App. at Ex. 20, Mucke Aff. at ¶ 41; App. at Ex. 61, ACLR sales tax NAIRP.

77.     During this review, ACLR identified sales taxes that were billed on PDEs from five states that did not impose sales taxes, sales taxes that were billed in the states of Louisiana and Minnesota that exempted PDEs where such taxes were statutorily exempt, and sales tax

charges billed at impermissible tax rates exceeding 50% of PDE drug costs. App. at Ex. 20, Mucke Aff. at ¶ 42; App. at Ex. 61, ACLR sales tax NAIRP.

78.     On August 21, 2015, ACLR submitted its sales tax NAIRP for PY 2012 and 2013 to CMS. App. at Ex. 61, ACLR sales tax NAIRP.

79.     Once a NAIRP is received by CMS, CMS should collaborate with ACLR to determine whether to refine or revise the NAIRP.  App. at Ex. 2, C. Brown Dep. at 67:12-16.

CMS denies ACLR's sales tax NAIRP

80.     On September 3, 2015, CMS denied ACLR's sales tax NAIRP without scheduling a walk-through meeting as required by OY2 SOW Appendix E or collaborating with ACLR to determine whether to refine or revise the NAIRP as required by OY2 SOW Section 2.1.1. App. at Ex. 62, CMS denial of sales tax NAIRP; App. at Ex. 2, C. Brown Dep. at 67:12-16.

81.     No walk through was scheduled and ACLR was not given the opportunity to work with CMS/CPI to refine and approve or deny the sales tax NAIRP because CMS simply denied the NAIRP.  App. at Ex. 6, CMS 30(b)(6) II at 49:3-6; App. at Ex. 49, S. Brown Dep at 42:6-43:22.

82.     The approval process in Appendix E of the OY2 SOW was not utilized for ACLR's sales tax NAIRP. App. at Ex. 49, S. Brown Dep. at 43:19-22.

83.     CMS's denial was solely predicated on its position that "this audit issue is currently open and active with another CMS contractor" and cited OY2 SOW Section 1.2.3 stating that "CMS/CPI consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue." App. at Ex. 63, Excerpts of

CMS 30(b)(6) Deposition in ACLR II ("CMS 30(b)(6) II Dep.") at 55:1-22; 56:9-57:4; 196:9-21; App. at Ex. 49, S. Brown Dep at 42:9-12; App. at Ex. 62, CMS denial of sales tax NAIRP.

84.     On January 15, 2016, in its denial of ACLR's claim filed September 10, 2015, CMS informed ACLR that "the NBI MEDIC had commenced fraud and abuse work with respect to the Sales Tax Error Audit in October 30, 2014. Thus, in accordance with Section 1.2.3 of the SOW, ACLR could not also perform what would be duplicative audits on this same topic." App. at Ex. 64, CMS claim denial.

85.     ACLR identifies improper payments while the NBI MEDIC combats waste fraud and abuse and their processes would be entirely different.  App. at Ex. 2, C. Brown Dep at 70:2-18; 92:13-16; App. at Ex. 9, Hoey Dep. at 58:16-59:2.

86.     The NBI MEDIC does not recover improper payments that are identified.  App. at Ex. 63, CMS 30(b)(6) II Dep. at 95:2-7.

87.     When ACLR submitted its sales tax NAIRP, the NBI MEDIC wasn't doing any more sales tax reviews.   App. at Ex. 66, Excerpts of deposition of Rosalind Abankwah ("Abankwah Dep.") at 57:16-58:1.

88.     After August 10, 2015, the NBI MEDIC did not conduct any further analysis of any of the Minnesota PDE records identified in ACLR's sales tax NAIRP.  App. at Ex. 63, CMS 30(b)(6) II Dep. at 179:22-180:5;  *See* App. at Ex. 65, Excerpts of deposition of Matthew Farabaugh as corporate representative for Health Integrity, LLC ("NBI MEDIC 30(b)(6) Dep.") at 127:1-5; App. at Ex. 66, Abankwah Dep. at 58:7-10.

89.     After July 2015, the NBI MEDIC did no further work on PDE records and improper sales taxes with respect to the states of Delaware, Alaska, Alabama, New Hampshire, Montana, and Oregon.  App. at Ex. 65, NBI MEDIC 30(b)(6) Dep. at 249:6-22.

90.     In its sales tax NAIRP, ACLR identified improper payments related to sales tax included in PDE records in amounts totaling $5,518,803 in states that did not impose a sales tax; $1,623,530 for excessive tax rates; and $32,028,178 and $619,184, 285 in the states of Louisiana and Minnesota respectively, which exempt such transactions.  App. at Ex. 61, ACLR sales tax NAIRP.

91.     ACLR's contingency fee was $75,459,194 based upon improper payments of $626,326,618 on the plan year 2012 and 2013 sales tax NAIRP for Minnesota, the five states that do not charge sales taxes, and sales tax charges billed at impermissible tax rates exceeding 50% of PDE drug costs.  App. at Ex. 20, Mucke Aff. at ¶ 45.

<u>CMS Fails to Seek the Recovery of Billions of Dollars of Improper Payments</u>

92.     In November 2010, Department of Health and Human Services ("HHS") released the Fiscal Year 2010 Agency Financial Report which identified invalid and/or inaccurate PDE records under the Part D program at an estimated error rate of 12.7 percent for payments from January 1, 2007 through December 31, 2007 and estimated a gross amount of payment error totaling $5.4 billion.  App. at Ex. 67, HHS 2010 Financial Report excerpts at section 10:10 (2).

93.     The Medicare Part D payment errors for 2010 were estimated to be $5.3 billion. App. Ex. 68, Medicare Part C and D FY 2011 Payment Error Reporting, March 23, 2012, page 9.

94.     The Medicare Part D error rate for 2012 was $1.6 billion and the estimated loss was $1.1 billion.  App. at Ex. 69, HHS FY 2012 Agency Financial Report excerpts at page 173; App. at Ex. 6, CMS 30(b)(6) Dep. at 151:1-7; 157:13-16.

95.     The Medicare Part D payment error estimate for fiscal year 2013 was $2.1 billion. App. Ex. 70, September 29, 2014 email at page 335.

96.     In 2014, the federal government spent $58 billion on Medicare Part D and an estimated $1.9 billion of this was improper payments due to errors such as the submission of duplicate claims for the same service.  App. at Ex. 15,  GAO Report at page 2; *See* App. at Ex. 6, CMS 30(b)(6) Dep. at 145:15-146:15; 147:17-148:11.

97.     During the course of the Part D RAC Contract, ACLR identified and submitted to CMS Part D improper payments totaling $3 billion.  App. at Ex. 71, November 13, 2013 email; App. at Ex. 20, Mucke Aff. at ¶ 46.

98.     As of August 2015, CMS had approved 1 of the 15 audit proposals from ACLR since the beginning of the Part D RAC.  App. at Ex. 15, GAO Report at page 2.

99.     As of May 2015, CMS had collected less than $10 million in Part D improper payments.  *Id.* at page 2.

100.    Through the date of this filing, CMS Part D improper payment collections, upon which ACLR was paid, totaled $11.9 million.  App. at Ex. 20, Mucke Aff. at ¶ 47.


Dated:  April 26, 2018


                                        DAVID, BRODY &
                                        DONDERSHINE, LLP


                                        _____/s/_____
                                        Thomas K. David
                                        John A. Bonello
                                        12355 Sunrise Valley Drive
                                        Suite 650
                                        Reston, VA 20191
                                        Phone:  703-264-2220

Fax: 703-264-2226
tdavid@dbd-law.com
jbonello@dbd-law.com

Attorneys for Plaintiff ACLR, LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 26 day of April 2017, I caused a copy of the foregoing document to be emailed via the ECF system to the following:

Mark E. Porada
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street NW
Room 11020
Washington, DC 20005

_____/s/_____
Thomas K. David