IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ACLR, LLC,                      )

                                     )

           Plaintiff,           )

                                     )

      v.                      )     Nos. 15-767C & 16-309C

                                     )     (Judge Campbell-Smith)

THE UNITED STATES,          )

                                     )

          Defendant.      )

DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT
AND CROSS-MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

LUCY MAC GABHANN
Attorney
Department of Health and Human Services
Office of the General Counsel
General Law Division
Procurement, Fiscal and Information Law Branch
7500 Security Boulevard
Baltimore, MD  21244-1850

CHRISTOPHER J. CARNEY
Senior Litigation Counsel
ADAM E. LYONS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC  20044

May 25, 2018

CHAD A. READLER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

MARTIN F. HOCKEY, JR.
Deputy Director

MARK E. PORADA
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC  20044
Tel:  (202) 305-3622
Fax: (202) 307-0972
mark.e.porada@usdoj.gov

Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION .................................................................................................................. 1

QUESTIONS PRESENTED .................................................................................................. 3

STATEMENT OF THE CASE ............................................................................................... 4

I.   Statutory Authority For The Part D RAC Program ................................................. 4

II.   CMS's Solicitation For A Part D RAC Contractor ................................................. 6

III.   The Initial Part D RAC Contract ............................................................................ 7

IV.   Modifications To The Part D RAC Contract ......................................................... 10

V.   Other Part D Contractors Performing Services For CMS ..................................... 15

   A.   The Data Validation Contractor .................................................................. 15

   B.   The National Benefit Integrity Medicare Drug Integrity Contractor ......... 17

VI.   The Audit Issues That Are The Subject Of *ACLR I* And *ACLR II* ................... 18

   A.   The Issues In *ACLR I*:  Duplicate Payments ............................................ 19

      1.   2007 Potential Duplicate Payments .................................................. 19

      2.   2010 Potential Duplicate Payments .................................................. 22

   B.   The Issues In *ACLR I*:  ACLR's Alleged Operating Costs For 2012 & 2013 .......... 30

   C.   The Issues In *ACLR II*:  Sales Tax Payments ........................................... 32

      1.   Potential Sales Tax Payments In Louisiana ...................................... 34

      2.   Potential Sales Tax Payments In Minnesota ..................................... 38

      3.   Potential Sales Tax Payments In Other States .................................. 42

      4.   CMS's Denial Of ACLR's Sales Tax NAIRP .................................. 44

ARGUMENT .......................................................................................................................... 48

I.      Standard Of Review .........................................................................................48

II.     To The Extent ACLR Never Presented The Current Scope Of The Alleged Improper
        Sales Tax Payments Audit Issue For A Contracting Officer's Final Decision, The Court
        Lacks Jurisdiction To Consider That Claim .................................................49

III.    As A Matter Of Law, CMS Did Not Breach The Part D RAC Contract By Refusing To
        Pay ACLR Contingent Fees For Audit Issues That Were Never Completed ................51

        A.      The RAC Contract Only Provides For Contingent Fee Payments To ACLR For
                Improper Payments Actually Recovered By CMS ....................................51

        B.      CMS Had Authority Under The RAC Contract To Decide Whether To Approve Or
                Deny ACLR's Audit Proposals .................................................................55

                1.      The Contract Gave CMS Authority To Approve Or Deny Audit Proposals ......55

                2.      CMS's Decision To Reject These Three Audit Proposals Did Not Breach Any
                        Duty Of Good Faith And Fair Dealing ............................................57

                        a.      The 2007 Duplicate Payment Audit Issue ....................................59

                        b.      The 2010 Duplicate Payment Audit Issue ....................................60

                        c.      The 2012-2013 Sales Tax Audit Issue .........................................62

IV.     ACLR's Alleged Damages Are Entirely Speculative And Not Recoverable, Even If
        There Had Been Any Breach Of Contract ....................................................67

CONCLUSION.......................................................................................................75

TABLE OF AUTHORITIES

**Cases**

*Allensworth v. United States*,
   122 Fed. Cl. 45 (2015) ................................................................................. 48

*Am. Tel. & Tel. Co. v. United States*,
   177 F.3d 1368 (Fed. Cir. 1999) ................................................................... 58

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*,
   731 F.2d 831 (Fed. Cir. 1984) ..................................................................... 48

*Centex Corp. v. United States*,
   395 F.3d 1283 (Fed. Cir. 2005) ................................................................... 57

*Claude Mayo Constr. Co., Inc. v. United States*,
   128 Fed. Cl. 616 (2016) ......................................................................... 59, 64

*Coast Prof'l, Inc. v. United States*,
   828 F.3d 1349 (Fed. Cir. 2016) ....................................................... 53, 54, 56

*Dotcom Associates I, LLC v. United States*,
   112 Fed. Cl. 594 (2013) ............................................................................... 58

*Globe Refining Co. v. Landa Cotton Oil Co.*,
   190 U.S. 540 (1903) ..................................................................................... 68

*Horn & Assocs., Inc. v. United States*,
   2017 WL 2303513 (Fed. Cl. May 25, 2017) .......................................... 66, 67

*Johnson Controls World Servs., Inc. v. United States*,
   43 Fed. Cl. 589 (1999) ................................................................................. 49

*Lumbermens Mut. Cas. Co. v. United States*,
   654 F.3d 1305 (Fed. Cir. 2011) ................................................................... 59

*Metcalf Const. Co. v. United States*,
   742 F.3d 984 (Fed. Cir. 2014) ..................................................................... 58

*Miller v. Robertson*,
   266 U.S. 243 (1924) ..................................................................................... 68

*Myerle v. United States*,
   33 Ct. Cl. 1 (1897) ....................................................................................... 74

*Northern Helex Co. v. United States*,
524 F.2d 707 (Ct. Cl. 1975) ............................................................................ 68

*Precision Pine & Timber, Inc. v. United States*,
596 F.3d 817 (Fed. Cir. 2010) ........................................................................ 58

*Prudential Insurance Co. v. United States*,
801 F.2d 1295 (Fed. Cir. 1986) ...................................................................... 68

*Reflectone, Inc. v. Dalton*,
60 F.3d 1572 (Fed. Cir. 1995) ........................................................................ 49

*S. Nat. Corp. v. United States*,
57 Fed. Cl. 294 (2003) .................................................................................... 75

*Servidone Constr. Corp. v. United States*,
931 F.2d 860 (Fed. Cir. 1991) ........................................................................ 68

*Sharman Co. v. United States*,
2 F.3d 1564 (Fed. Cir. 1993) ................................................... 49, 50, 51, 52, 53

*TEG-Paradigm Envtl., Inc. v. United States*,
465 F.3d 1329 (Fed. Cir. 2006) ...................................................................... 53

*Varilease Tech. Grp. v. United States*,
289 F.3d 795 (Fed. Cir. 2002) ........................................................................ 48

*Wells Fargo Bank, N.A. v. United States*,
88 F.3d 1012 (Fed. Cir. 1996) ............................................................. 68, 72, 73

*Wickham Contr. Co., Inc. v. Fischer*,
12 F.3d 1574 (Fed. Cir. 1994) .........................................................................74

## **Statutes**

31 U.S.C. § 3321 ...................................................................................................... 54

41 U.S.C. § 7103 ...................................................................................................... 49

42 U.S.C. § 1395ddd........................................................................................... 5, 6, 15

42 U.S.C. § 1395w-101.............................................................................................. 4

42 U.S.C. § 1395w-112........................................................................................ 32, 39

La. Const. Ann. art. 7 .............................................................................................. 34

La. Stat. Ann. § 46:2625 ......................................................................................... 37

La. Stat. Ann. § 47:301 ........................................................................................... 34

La. Stat. Ann. § 47:302 ........................................................................................... 34

La. Stat. Ann. § 47:305 ........................................................................................... 34

Minn. Stat. Ann. § 295.52 ....................................................................................... 39

Minn. Stat. Ann. § 295.53 ....................................................................................... 40

Minn. Stat. Ann. § 295.582 ..................................................................................... 39

Improper Payments Elimination and Recovery Act of 2010, Pub. L. No. 111-204, 124 Stat. 2224
............................................................................................................................. 54

Improper Payments Elimination and Recovery Improvement Act of 2012, Pub. L. No. 112-248,
126 Stat. 2390 ................................................................................................... 54

Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173,
117 Stat. 2066 ..................................................................................................... 4

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010).............. 6

Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922 ........................... 5

**Rules**

RCFC 56 ................................................................................................................. 48

**Regulations**

42 C.F.R. § 423.346 ............................................................................................ 5, 21

42 C.F.R. § 423.440 ............................................................................................ 32, 41

79 Fed. Reg. 29844 (May 23, 2014) ...................................................................... 15

**Other Authorities**

La. Atty. Gen. Op. No. 02-0177, 2002 WL 1483930 (June 12, 2002) ......................................... 37

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ACLR, LLC,                          )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        Nos. 15-767C & 16-309C
                                    )        (Judge Campbell-Smith)
THE UNITED STATES,                  )
                                    )
            Defendant.              )

DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT
AND CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC),

defendant, the United States, responds to the motion for summary judgment filed by plaintiff,

ACLR, LLC (ACLR), and cross-moves for summary judgment on all counts of the complaints in

these two consolidated cases.

INTRODUCTION

ACLR has filed a series of lawsuits, all arising out of the same January 2011 recovery

audit contract issued by the Centers for Medicare & Medicaid Services (CMS).  The first two

cases, *ACLR, LLC v. United States*, No. 15-767C (*ACLR I*), and *ACLR, LLC v. United States*, No.

16-309C (*ACLR II*), have been consolidated by the Court for purposes of dispositive motions and

are at issue in the parties' respective summary judgment motions.[1]

These cases involve a contract awarded by CMS to ACLR to provide recovery audit

services in connection with the Medicare Part D prescription drug program.  The Part D recovery

audit contractor, ACLR, was one of several different contractors engaged by CMS to analyze or

---

[1] ACLR's third lawsuit arising out of this same contract, *ACLR, LLC v. United States*,
No. 17-627C (*ACLR III*), has been stayed pending the resolution of summary judgment motions
in *ACLR I* and *ACLR II*.

identify vulnerabilities, improper payments, or potential fraud, waste, and abuse in the program payments being made by CMS.  As approved by CMS, ACLR pursued several different recovery audit issues which identified improper payments later recouped by CMS.  Under the terms of the parties' contract, ACLR was to be paid a contingency fee calculated only off of amounts actually recovered by CMS as Part D program overpayments.  ACLR was paid its contingency fees for the completed audit issues, and those payments are not at issue in these cases.  The contract does not provide any basis for payment to ACLR other than as a contingent fee based on amounts of improper payments actually recovered by CMS.

In these cases, ACLR seeks to be paid contingent fees calculated off of speculative amounts that ACLR contends CMS ultimately *might* have been able to recover *if* CMS had approved other audit issues that the agency actually denied.  ACLR's complaints seek $28,413,317 in alleged damages (plus claim preparation costs) in *ACLR I*, and another $112,002,489 in alleged damages (plus claim preparation costs) in *ACLR II*.  The parties agree that CMS did not actually recover *any* of the amounts estimated by ACLR to be overpayments as a result of ACLR's rejected audit issues in either case.  ACLR nevertheless asks the Court to order CMS to pay ACLR's contingency fees as if those audit issues had been approved, had proceeded to completion, and had resulted in CMS recouping every penny of the estimated improper payments identified by ACLR at the outset.  Because the contract does not entitle ACLR to payment of any fees for potential improper payments identified by ACLR but not recovered by CMS, the Government is entitled to summary judgment.

Moreover, all versions of the contract in effect during the duration of ACLR's performance contemplated CMS having a role in reviewing ACLR's proposed audit issues, providing feedback and guidance to ACLR on those issues, and exercising discretion in

2

determining which audit issues to pursue.  CMS had legitimate reasons not to approve each of the specific audit issues that are at issue in *ACLR I* and *ACLR II*.  CMS's decisions not to approve those audit issues cannot be said to amount to a breach of the parties' contract.

Finally, even if the contract could be construed to permit payment of ACLR's contingency fees for audits that neither were approved nor proceeded, ACLR cannot prove its entitlement to any particular amount of contingent fees.  That is so because there is no way to know how the rejected audit issues would have proceeded, which potential improper payments identified in ACLR's preliminary estimates actually would have been found to be improper through the data validation and plan sponsor appeals processes for each audit issue, or how much actually would – or even could – have been recovered by CMS at the end of the day.  There is no way to know with any degree of certainty how much, if any, of the amounts identified by ACLR as potential improper payments actually would have been recouped by CMS if those audits had proceeded.  ACLR simply assumes that CMS would have recouped 100% of every allegedly improper payment identified at the outset by ACLR, but CMS never recovered 100% of the amounts identified by ACLR in any of the audits that were completed.  Consequently, there is no way, beyond speculating, to know what ACLR's contingent fees might have been if those audits had proceeded.

<u>QUESTIONS PRESENTED</u>

1.     Whether the parties' contract required CMS to pay ACLR contingent fees for audit issues that were never approved or completed and for which no improper payments were recouped.

2.     Whether ACLR can prove that CMS breached the contract by denying or rescinding approval for the three proposed audit issues involved in these cases.

3

3.      Even if ACLR could prove that CMS breached the contract and that ACLR is entitled to be paid contingent fees for uncompleted audits, whether ACLR's damages are so speculative that they are not allowable.

## STATEMENT OF THE CASE

### I.      Statutory Authority For The Part D RAC Program

Title I of the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173, established a new voluntary outpatient prescription drug benefit under Part D of Title XVIII of the Social Security Act.  *See* 42 U.S.C. §§ 1395w-101, *et seq.*  The prescription drug benefit, referred to as Medicare Part D, went into effect on January 1, 2006. Coverage for the drug benefit is provided by plan sponsors, which are private prescription drug plans.  Tab 4, A30.[2]  The Medicare Part D program differs from many other entitlement programs in that it operates on a cost-sharing basis.  Plan sponsors pay prescription drug costs on behalf of their beneficiaries, and are compensated for those costs by both the beneficiaries and the Government.  Tab 7, A186 at § 1.1.

All Part D plans are required to provide a minimum set of prescription drug benefits, typically referred to as the "basic" benefit.  Tab 105, SA474 at § 1-2.  For additional premiums, plans can offer benefits that exceed the basic benefits, but the Government only pays for the basic benefit.  *Id.*  Plan sponsors are paid for Part D basic benefits through four mechanisms:  a direct subsidy; a low income subsidy; a reinsurance subsidy; and risk sharing or risk corridor payments.  *Id.*  CMS pays plan sponsors a monthly prospective payment throughout each year for each beneficiary enrolled in the plan.  Tab 141, SA750.

---

[2] References to Tabs 1-75 and "A__" are to ACLR's appendix submitted with its motion for summary judgment.  References to Tabs 76-142 and "SA__" are to the supplemental appendix being submitted with defendant's response and cross-motion for summary judgment.

After the end of each year, CMS reconciles the prospective amounts paid to a plan sponsor with the plan's actual levels of enrollment, risk factors, levels of incurred allowable drug costs, reinsurance amounts, and low-income subsidies.  *Id.*; Tab 7 A186 at § 1.1.  That reconciliation process results in CMS either paying additional funds to a plan sponsor (if the plan's actual costs were greater than the prospective payments made throughout the year), or recouping funds from a plan sponsor (if the plan's actual costs were less than the prospective payments made throughout the year).  Tab 142, SA753.  Final reconciled payments under Part D later can be reopened and corrected for good cause within four years.  *See* 42 C.F.R. § 423.346.

Whenever a Medicare Part D beneficiary fills a prescription, the plan sponsor submits an electronic prescription drug event (PDE) record to CMS.  Tab 15, A303.  The PDE records contain information concerning the type of drug prescribed, the drug cost, payment details, and other information to allow CMS to administer the Part D benefit program.  *Id.*  PDE records contain approximately 74 data fields (the number has changed over time), although not every field is used in every prescription.  Tab 105, SA475-80; Tab 92, SA363 at 129:10-14.  Among other things, the data contained in the PDE records is used by CMS during the year-end payment reconciliation process, to compare plan sponsors' actual payments with the prospective monthly payments made to the plan sponsors by CMS.

As provided in the Tax Relief and Health Care Act of 2006, CMS previously implemented a national Medicare recovery audit contractor (RAC) program as part of Medicare's fee-for-service programs, under Medicare Parts A and B, to identify and recover improper payments in those programs.  *See* Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, div. B, title III § 302, 120 Stat. 2922, 2991-92 (codified at 42 U.S.C. § 1395ddd(h)).  Under that statute, the Secretary of Health and Human Services is directed to "enter into

5

contracts with recovery audit contractors in accordance with this subsection for the purpose of identifying underpayments and overpayments and recouping overpayments under this subchapter with respect to all services for which payment is made under this subchapter." 42 U.S.C. § 1395ddd(h)(1). Under any such recovery audit contracts, "payment shall be made to such a contractor only from amounts recovered," and "from such amounts recovered, payment . . . shall be made on a contingent basis for collecting overpayments." 42 U.S.C. § 1395ddd(h)(1)(A), (B).

The Patient Protection and Affordable Care Act (PPACA) expanded the use of RACs from Medicare Parts A and B to the Medicare Part D prescription drug program, as well, and directed CMS to enter into a Part D RAC contract. *See* PPACA, Pub. L. No. 111-148, § 6411(b), 124 Stat. 119, 775 (2010) (codified at 42 U.S.C. § 1395ddd(h)). Within CMS, the Center for Program Integrity (CPI) oversees Part D program integrity. And within CPI, the Division of Plan Oversight and Accountability (DPOA) is responsible for administering the Part D RAC program. The provisions of section 1395ddd(h)(1)(A) and (B) discussed above, limiting RAC payments to contingent fees based on amounts of overpayments actually recovered by CMS, apply to the Part D RAC program. *See* 42 U.S.C. § 1395ddd(h)(3).

II.   CMS's Solicitation For A Part D RAC Contractor

CMS issued a sources sought notice on October 18, 2010, using the General Services Administration's Federal Supply Schedule, "to determine the availability of small businesses that have the capability to support CMS in identifying and recouping underpayments and overpayments made under the Medicare Prescription Drug Coverage Program, also known as Medicare Part D." Tab 76, SA002. ACLR submitted a capability statement in response to the sources sought notice. Tab 5, A76. ACLR itself had no prior experience analyzing the substance of Part D claims, no prior experience conducting recovery audits related to any

Medicare program, had never before entered into any Government contract, and knew nothing about the Part D program beyond what it gleaned from reviewing regulations and CMS publications following ACLR's receipt of the sources sought notice.  Tab 91, SA308 at 82:11-16, SA309-11 at 83:17-85:6; Tab 94, SA372-73 at 108:16-109:2.

On December 2, 2010, CMS issued a request for quotations (RFQ), stating that CMS "intends to award a Firm-Fixed Price Contingency Fee Task Order for the subject work" under the Part D RAC program.  Tab 77, SA005.  The RFQ contained a statement of objectives (SOO) prepared by CMS.  According to the SOO, the mission of the Part D RAC would be to "reduce Medicare improper payments through the efficient detection and collection of overpayments, the identification of underpayments, and the implementation of actions that will prevent future improper payments."  Tab 4, A31.  The SOO set forth a series of objectives for the Part D RAC, and stated that the Part D RAC "shall furnish all the necessary services . . . *not otherwise provided by the Government*, as needed to meet the objectives."  *Id.* (emphasis added).  Among other things, the SOO tasked the Part D RAC with "[e]stablish[ing] a schedule of deliverables necessary to meet the objectives listed above as well as program initiatives."  Tab 4, A33.  To satisfy Government information technology security requirements, the SOO also provided that the Part D RAC would be required to obtain "a formal Government Authorization to Operate (ATO)."  Tab 4, A35.

ACLR submitted a technical package to CMS in response to the RFQ.  Tab 5, A42. Included in ACLR's response was a proposed performance work statement (PWS) drafted entirely by ACLR.  *Id.* at A46; Tab 90, SA230 at 23:2-5.

III.   The Initial Part D RAC Contract

CMS issued task order HHSM-500-2011-00006G for "Recovery Audit Services in

Support of Medicare Part D" under ACLR's General Services Administration contract number

GS-23F-0074W on January 13, 2011.  Tab 7, A157.  The task order provided for a base period of

performance of January 13, 2011, through January 12, 2012, along with four 12-month option

periods.  *Id.* at A158.  The task order incorporated ACLR's proposed PWS, and stated that

ACLR "shall furnish all necessary services . . . *not otherwise provided by the Government*, as

needed to perform the requirements set forth in" the PWS.  *Id.* at A159 (emphasis added).

The task order specified that

> All payments shall be paid only on a contingency basis.  The
> recovery audit contractor will receive 7.5% of all amounts
> collected.  The contingency fees shall be paid once the recovery
> audit contractor collects the Medicare overpayments.  The
> recovery audit contractor shall be paid a percentage of the amount
> that is collected through their recovery efforts.  The recovery audit
> contractor shall not receive any payments for the identification of
> the underpayments or overpayments not recovered/collected.

*Id.*

The task order also specified that ACLR's performance under the contract was subject to

any applicable statutes and regulations, and that new legislation or regulations might be enacted

that could impact ACLR's performance under the contract.  *Id.* at A170.

The parties understood that ACLR would review reconciled PDE records, *i.e.*, PDE

records that already had been adjusted through the year-end reconciliation process.  Tab 21,

A400 at § 1.2.3; Tab 90, SA242 at 116:2-4.  After ACLR identified any improper payments, and

following the completion of any appeals by the plan sponsors, CMS would recoup the finalized

overpayment amounts by offsetting those amounts from plan sponsors' ongoing monthly

prospective Part D payments.  Tab 97, SA387-89 at 22:14-24:11.  Once the offset occurred,

CMS would be deemed to have recouped the overpayments, and ACLR would be paid its

contingent fee under the RAC contract calculated off of the recouped amounts.  *Id.*; Tab 97,

SA402-03 at 269:5-270:10.

The PWS contemplated that one type of potential improper payment that ACLR proposed to explore was the existence of duplicate payments by CMS for the same prescriptions entered more than once by plan sponsors as separate, duplicative PDE records.  Tab 7, A190, A198. ACLR's position is that, under the PWS, ACLR had unfettered authority to conduct any audits it wished to pursue – including any audit for duplicate payments; to determine which Part D payments were improper based solely on ACLR's review of the PDE data without any oversight or validation by CMS; and to send notices to plan sponsors identifying any PDEs determined by ACLR to be improper payments without prior review or approval by CMS.  Tab 90, SA239 at 105:1-7, SA245 at 119:7-13, SA247 at 122:15-21.

In fact, the PWS – 100% of which was drafted by ACLR, Tab 91, SA300 at 43:8-11, – contains numerous sections that contemplate an active role by CMS in reviewing ACLR's proposed work.  For instance, ACLR's description of its proposed work plan for analyzing duplicate payments stated that ACLR "anticipate[d] CMS revisions to our process."  Tab 7, A191.  For those plan sponsors identified by ACLR as having the most significant errors through a review of PDE data, ACLR's PWS provided that ACLR would "recommend them, and solicit CMS' approval for, conducting documentation audits."  *Id.* at A193.  Elsewhere the PWS stated that ACLR "anticipate[d] that some of our recommendations . . . will require numerous discussions and considerable analysis by ACLR, CMS, Plan Sponsors, as well as other stakeholders."  *Id.* at A188.  In connection with ACLR's proposed process for conducting statistical sampling, ACLR "anticipate[d] that CMS will want to discuss and approve this methodology."  *Id.* at A194.  And the PWS stated that "[u]pon contract award [ACLR] will standardize all CMS approved activities and the administration of [ACLR's] processes in

9

accordance with CMS guidance and policies and modify them as requested." *Id.* at A197.

ACLR's PWS included a schedule of deliverables. *Id.* at A212. The PWS recognized that "this Schedule of Deliverables will be modified as work progresses and upon feedback received from CMS and subsequent modification and approval." *Id.* The schedule of deliverables contemplated ACLR developing various project plans, implementation schedules, and completing information technology-related certifications. CMS completed the systems security review process and issued the ATO to ACLR on October 7, 2011. Tab 103, SA463. CMS then began transmitting Part D PDE records to ACLR for review and analysis in mid-November 2011. Tab 83, SA121.

IV.     Modifications To The Part D RAC Contract

ACLR's Part D RAC task order was modified 16 times. Among other things, those modifications extended the base year of performance through December 31, 2013 (approximately two years from contract award) and allowed for two 12-month option periods that were exercised, continuing the period of contract performance through December 31, 2015. Tab 80, SA117; Tab 21, A388; Tab 22, A430. An additional administrative and appeals option period continued through December 31, 2017, for processing any appeals by plan sponsors challenging improper payment findings under any approved ACLR recovery audits. Tab 81, SA118; Tab 82, SA119.

On several occasions, CMS issued modifications that increased ACLR's contingent fee from the 7.5% provided in the initial task order. For instance, in modification 3 dated January 31, 2012, CMS provided for an increase in ACLR's contingent fee to 12% for a recovery audit being conducted by ACLR that focused on identifying 2007 PDEs that involved providers who were excluded from participation in Federal health care programs. Tab 28, A513. Modification

10

11, dated November 19, 2013, increased ACLR's contingent fee to 16% for ACLR's recovery audit that focused on 2008 through 2011 PDEs involving excluded providers.  Tab 79, SA116. ACLR understood, at the time those modifications were issued, that CMS intended the increased contingent fees as a means of compensating ACLR for any delays or difficulties ACLR had experienced in working with CMS to get the Part D RAC program up and running over the first few years of the RAC contract, before any significant contingent fees had begun to flow to ACLR as a result of recovery audit activities.  Tab 90, SA236 at 89:8-14.

During the first year of the contract, ACLR learned from CMS that CMS intended to develop a statement of work (SOW) to replace ACLR's PWS that was attached to the initial task order.  *Id.* at SA231-34 at 25:18-28:14.  CMS provided a draft of the SOW to ACLR on December 9, 2011.  Tab 26, A488.  The parties continued to negotiate and revise the draft SOW until it was finalized and issued along with contract modification 13 on December 31, 2013.  Tab 21, A388.  The SOW replaced the PWS in its entirety, such that the PWS was no longer in effect. Tab 90, SA237 at 90:12-20.

However, even prior to the issuance of the SOW, ACLR understood that CMS did not agree with ACLR's position that the PWS permitted ACLR to proceed with recovery audit activities for specific audit issues that had not yet been reviewed or approved by CMS. Notwithstanding the fact that the PWS remained a part of the parties' contract until it was replaced with the SOW in modification 13 at the end of 2013, ACLR agreed during the first year of performance in December 2011 that ACLR would "continue executing only those portions of the contract that are consistent with current CMS expectations (e.g. not issuing demand letters) until such time as the PWS/SOW issues have been resolved."  Tab 110, SA602.

ACLR understood that it would not be performing under the terms of the PWS while the

11

SOW was being drafted and finalized.  Tab 90, SA248-49 at 124:18-125:9.  In particular, ACLR

specifically agreed that it would *not* send improper payment notices to any plan sponsors related

to the alleged 2007 duplicate payments that ACLR had referenced during a November 30, 2011,

conference call.  *Id.* at SA250 at 131:8-11.  Thereafter, until the SOW was finalized, the only

recovery audits ACLR pursued were ones authorized by CMS through formal contract

modifications:  2007 PDEs involving potential excluded providers (modification 3); 2008-2011

PDEs involving potential unauthorized prescribers (modifications 6, 11); and 2009 PDEs

involving potential duplicate payments submitted by three specific plans (modification 8).  Tab

28; Tab 36; Tab 78; Tab 79.

> Modification 13 that accompanied the SOW continued the prior task order provision that

> > All payments shall be paid only on a contingency basis.  The
> > recovery audit contractor will receive the percentage specified
> > below of all amounts collected.  The contingency fees shall be paid
> > once CMS collects the Medicare overpayments.  The recovery
> > audit contractor shall be paid a percentage of the amount that is
> > collected through their recovery efforts . . . .  The recovery audit
> > contractor shall not receive any payments for the identification of
> > the underpayments or overpayments not recovered/collected.

Tab 21, A392.  The contract modification adjusted ACLR's contingent fee rate again, increasing

the rate for the 2008 through 2011 excluded provider audit issue to 28%.  *Id.*  The parties also

agreed to a new contingency fee rate for all new approved audit issues, setting the rate at 15% for

the first $10 million in recoveries and then 12% for any recoveries above $10 million per

approved issue.  *Id.*

> The SOW documented the role of CMS in determining the course of the Part D RAC

program, reviewing ACLR's proposed audit issues, and approving or denying ACLR's proposed

audit issues.  The SOW provided that

> > CMS/CPI determines the specific criteria on which the Part D

RAC must submit to CMS as improper payments and new audit issues.  To direct the Part D RAC's review, CMS/CPI mandates submission of potential improper payments by contract, issue type, and audit year.  CMS further defines the audit scope to include the exact audit issue to be reviewed.

. . .

As the Part D RAC progresses, new audit issues may be approved and added to the RAC's audit scope.  In addition to the audit issues already approved by CMS/CPI, audit issues may be expanded to include new issues during the RAC process.  A new audit issue must first be proposed to CMS for approval.

Tab 21, A399 at § 1.2.1.

The SOW set forth a detailed process by which ACLR was required to submit a new audit issue review package (NAIRP) for each audit issue it proposed to pursue.  *Id.*  ACLR was required to include in its NAIRPs "the issue type, audit scope, recovery estimate, a sample of PDE records, applicable law, policies, etc. and recommendation for automated or complex review."  *Id.*  An automated review was described as a recovery audit completed entirely through a review of the data contained in the PDE records.  *Id.*  A complex review was defined as a recovery audit that would require ACLR to request and review additional information from plan sponsors (such as copies of prescriptions or other documentation) to compare to the data contained in the PDE records, to determine the accuracy of the PDE data submissions.  *Id.*

The SOW stated that ACLR "must receive approval from CMS/CPI prior to commencing recovery audit activities."  Tab 21, A402 at § 2.1.1.  Following the submission of a NAIRP for a proposed new audit issue, the SOW provided that ACLR would "work[] with CMS/CPI to refine and approve or deny the NAIRP.  Once approved the RAC begins recovery audit activities."  *Id.*  ACLR agrees that, under the SOW, CMS had to approve any audit issue for ACLR to be permitted to commence and complete that recovery audit.  Tab 91, SA303-04 at 63:20-64:11.  The SOW NAIRP process further specified that, if CMS elected to deny any NAIRP, "CMS

13

shall provide [ACLR] with a written explanation as to the reasons for the denial." Tab 21, A423-24 at App. E.

ACLR agrees that, under the SOW, ACLR did not have the right to proceed with an audit, absent approval from CMS. Tab 91, SA303-04 at 63:20-64:11. ACLR also agrees that CMS had the right under the contract to determine what the methodology would be for any approved audit issue that ACLR pursued, or to "dictate" the methodology it wanted ACLR to use. Tab 90, SA262-64 at 189:20-191:10.

For approved audit issues, once improper payments had been identified by ACLR and validated (as discussed in Section V.A below), ACLR prepared notification of improper payment letters addressed to the applicable plan sponsors that would be issued by CMS. Tab 21, A403 at § 2.3.1. Plan sponsors would be given a period of time to respond to the notice of improper payment by appealing ACLR's findings. *Id.* In the 2013 version of the SOW, CMS continued the existing two-level appeals process. Tab 21, A404 at § 3.1, A419-20 at App. C. Following the completion of any appeals, CMS would recoup any overpayments by adjusting the monthly estimated payments then being issued to plan sponsors under the Part D program. Tab 21, A404-05 at § 3.2. And after that recoupment process, ACLR "will receive a contingency payment once the full overpayment amount has been recouped from the plan sponsor." Tab 21, A405 at § 3.2.2.

The parties agreed to a revised SOW that was issued as part of contract modification 16 and went into effect as of January 1, 2015. Tab 22, A430. The only substantive amendment to the SOW was to change the two-level appeals process to a three-level appeals process, with the final level of appeals resolved by the CMS Administrator's designee. Tab 22, A447 at App. A, A454 at App. C. That change to the SOW was required to conform to one provision of a final

14

rule, known as CMS-4159-F, issued by CMS on May 23, 2014, following notice and comment.
*See* 79 Fed. Reg. 29844 (May 23, 2014).  Rule CMS-4159-F implemented approximately 60
changes to CMS regulations governing Medicare Parts C and D, the vast majority of which had
nothing to do with the Part D RAC program.  One provision of the rule provided "a codified
administrative appeals process to allow for plans to challenge the overpayment findings
generated by the RACs just as [CMS] provide[s] for challenges to overpayment determinations
elsewhere in the Medicare program."  79 Fed. Reg. at 29935.  The addition of the optional third-
level appeal for the Part D RAC program was intended to replicate the appeals process in place
for the RAC programs under Parts A and B.  Tab 99, SA417-19 at 63:21-65:1.  Other than the
addition of the third-level appeals option, ACLR's SOW remained substantively the same.

V.      Other Part D Contractors Performing Services For CMS

        Because the Part D program was fairly new and no RAC previously had operated in the
Part D program, CMS engaged other contractors to assist the agency in formulating strategy and
policies for the recovery program and to validate the results of recovery audits.  Livanta LLC
(Livanta) and Health Integrity, LLC (Health Integrity) were two such contractors engaged by
CMS pursuant to its statutory authority.  *See* 42 U.S.C. § 1395ddd(a), (b), (j).

        A.      The Data Validation Contractor

        CMS contracted with Livanta on September 30, 2011, to serve as the data validator for
the Part D RAC.  Tab 102, SA428.  Livanta's contract required it to "measure the accuracy rate
of the Part D RAC," by reviewing "improper payments identified by [ACLR] to determine if
they are accurate."  *Id.* at SA442.  Livanta also was contracted to "review and
approve/disapprove improper payment referrals [and] receive and review New Audit Issues
[ACLR] wants to pursue for improper payments."  *Id.*  Livanta's contract provided that "CMS

will determine whether [ACLR's] accuracy shall be determined by sampling or as a 100%
review." *Id.* at SA445.  In fact, CMS opted to have Livanta review 100% of ACLR's proposed
improper payments per audit issue.  Tab 92, SA358-59 at 15:19-16:3, SA360 at 28:13-19, SA361
at 35:16-18, SA362 at 37:5-12.  In essence, Livanta was tasked with auditing the potential
improper payments identified by ACLR to validate ACLR's findings that the payments ACLR
had identified as improper satisfied the agreed-upon methodology for each audit issue.

     ACLR learned of Livanta's role as the data validation contractor during the first year of
ACLR's contract, prior to CMS authorizing ACLR to proceed with any specific audit issues.  For
instance, in modification 3, issued January 31, 2012, CMS and ACLR agreed to a timetable for
ACLR to complete its audit of 2007 PDE records for excluded providers that included deadlines
for Livanta to complete its validation review.  Tab 28, A515.  Bilateral modification 4 issued on
April 5, 2012, included a process by which ACLR and Livanta were to resolve any disputes
concerning Livanta's validation of ACLR's audits.  Tab 33, A542-43.  Under those procedures,
ACLR was required to "either accept or reject [Livanta's] validation findings." *Id.*  If ACLR and
Livanta "cannot come to a resolution, CMS shall make the final decision, which cannot be
reviewed or contested by either" ACLR or Livanta.  *Id.*  ACLR was not permitted to send
notification of improper payment letters to plan sponsors prior to the validation of ACLR's
findings by Livanta.  Tab 54, A627.

     The SOW further explained Livanta's role as the data validation contractor.  Tab 21,
A403 at § 2.2.1.  As the SOW made clear and the parties agreed, "CMS does not need any
statutory or regulatory reference to deny a RAC finding." *Id.*  And "CMS also has the right to
establish minimums and thresholds that the Part D RAC findings must meet to be considered for
recoupment." *Id.*

B.     The National Benefit Integrity Medicare Drug Integrity Contractor

CMS also contracted with Health Integrity to serve as the National Benefit Integrity Medicare Drug Integrity Contractor (NBI MEDIC).  Health Integrity's role as the NBI MEDIC is to assist CMS in the "████████████████████████████████████████████ ████."  Tab 93, SA365 at 10:6-11.  Health Integrity was tasked with examining the Part D program to look for fraud, waste, and abuse, that could include, among other things, "[a]llegations that prescription drugs or other items or services were not received"; allegations that a provider or plan sponsor "received a Medicare benefit of monetary value . . . to which he or she is not entitled under current Medicare law, regulations, or policy"; "[m]isrepresenting the . . . prescription drug event data to increase payments"; and "[b]illing Medicare for costs not incurred or which were attributable to non-Medicare activities."  Tab 104, SA468-70.  In particular, Health Integrity, as the NBI MEDIC, was charged with "recommend[ing] recovery of overpayments whenever it is determined that Medicare has erroneously paid."  *Id.* at SA471.

Both Health Integrity's and ACLR's contracts contemplated their cooperation with other CMS contractors.  Health Integrity's contract provided that it "may furnish requested specific information on ongoing fraud investigations and on individually identifiable protected health information to any Medicare contractor."  *Id.* at SA472.  And ACLR's SOW states that ACLR "shall cooperate and coordinate with stakeholders other than CMS, including Affiliated Contractors (ACs), and other entities as appropriate."  Tab 22, A445 at § 6.2.

The SOW also emphasizes the importance to CMS of its contractors not duplicating efforts already being undertaken elsewhere within CMS.  Section 1.2.3 of the SOW provides that "CMS/CPI consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed

17

elsewhere in CMS for the same audit issue.  As a result, certain PDEs may be restricted from review by the Part D RAC."  Tab 22, A435 at § 1.2.3.  The SOW proceeds to identify four specific types of plan sponsor contracts that also would be unavailable for review by ACLR (terminated contracts, contracts already deemed to have no findings of improper payments, contracts already included in an offset, and contracts already included in an appeal).  *Id.*

VI.    The Audit Issues That Are The Subject Of *ACLR I* And *ACLR II*

ACLR submitted audit proposals or NAIRPs for seven audit issues that CMS allowed ACLR to pursue:  (1) payments made for excluded providers in 2007; (2) payments made for excluded providers in 2008-2011; (3) payments made for excluded providers in 2012-2013; (4) payments involving unauthorized prescribers in 2009-2012; (5) payments made for unauthorized prescribers in 2013; (6) payments involving DEA schedule drugs in 2010-2011; and (7) payments involving DEA schedule drugs in 2012-2013.  Tab 140, SA746-47.  In those audits, CMS reported recouping approximately $14 million in improper payments that had been identified by ACLR through its recovery audits, with several million dollars of additional improper payments identified by ACLR that remained in the appeals process as of the spring of 2017.  *Id.*  ACLR was paid its contingent fees on the completed recovery audits for which there either were no appeals or for which the appeals have been finalized, Tab 91, SA306-07 at 80:12-81:4, and additional contingent fees might become payable once the remaining appeals are resolved.  *None of ACLR's approved audits are at issue in either of these lawsuits.*[3]  Rather, *ACLR I* and *ACLR II* involve ACLR's challenges to three specific audit issues that CMS did *not* permit ACLR to complete, with ACLR seeking to be paid the contingent fees that it contends it

_____

[3] ACLR's brief criticizes the process of completing some of those audits, P. Mot. S.J. at 10-12, but neither its complaints nor its motion for summary judgment seek any relief related to those completed audit issues.

would have been paid *if* those audit issues had been approved and *if* CMS actually had recovered all of the amounts estimated to be improper payments by ACLR at the time it made its audit issue submissions.

A.   The Issues In *ACLR I*:  Duplicate Payments

As discussed above, one of the audit issues that ACLR contemplated pursuing when it prepared the PWS was potential duplicate payments, *i.e.*, duplicate payments by CMS for the same exact prescription.  Tab 7, A190, A198.  CMS asked ACLR to submit a draft of a proposed process for "how ACLR would go about auditing a plan on . . . duplicate payments" on August 25 and September 26, 2011.  Tab 108, SA498; Tab 109, SA601.  ACLR sent CMS an email on September 30, 2011, in which ACLR set forth the seven specific fields within the PDE records that ACLR proposed to use to identify potential duplicate payments.  Tab 109, SA600.  That was the first time ACLR informed CMS of the specific process ACLR proposed to use for identifying potential duplicate payments within the PDE record data.  Tab 90, SA240-41 at 111:3-112:9.  As ACLR noted in its email, "if there are multiple PDE records containing the same criteria for all seven data fields then there is the *possibility* that there is a duplicate payment."  Tab 109, SA600 (emphasis added).

1.   2007 Potential Duplicate Payments

CMS began transmitting Part D PDE records to ACLR on November 17, 2011.  Tab 83, SA121.  The transmittal began with 2007 PDE records, and once the 2007 PDE record transmissions were completed, ACLR began to receive PDE records for subsequent years from CMS over the next several weeks.  Tab 90, SA243 at 117:16-22, SA255 at 151:14-19.  ACLR began reviewing the 2007 PDE records shortly after their receipt from CMS and in advance of a November 30, 2011 conference call between ACLR and CMS.  *Id.* at SA243-44 at 117:12-

19

118:20.  During that conference call, ACLR's founder, Christopher Mucke, informed CMS for
the first time that ACLR already had identified approximately $175 million in potential duplicate
payments in the 2007 PDE records, and that ACLR was prepared to begin sending notices of
improper payments to all of the plan sponsors identifying those payments the following week.
*Id.* at SA243-44 at 117:12-118:20, SA247 at 122:15-21.  ACLR had not yet identified for CMS
the specific PDE records that ACLR contended were duplicate payments, nor had anyone else
validated ACLR's findings.  *Id.* at SA244-45 at 118:21-119:15.  In addition, CMS had not yet
implemented the framework for offsetting any actual overpayments from plan sponsors' ongoing
monthly Part D payments, and thus there was no reimbursement process in place.  Tab 99,
SA414-16 at 56:21-58:18.  CMS therefore informed ACLR that CMS did not want ACLR to
begin sending improper payment notices to plan sponsors related to the 2007 PDE records, and
the contracting officer advised ACLR that doing so – notwithstanding CMS's position that plan
sponsor improper payment notifications were premature – would not be in ACLR's best interest.
Tab 100, SA423-24 at 87:7-88:11.

　　　ACLR continued analyzing the 2007 PDE records for potential duplicate payments, and
subsequently determined that it had identified a total of $313,808,241 potential duplicate
payments for 2007.  Tab 106, SA481.  ACLR discussed the potential 2007 duplicate payment
audit issue one more time with CMS, in January 2012.  Tab 90, SA253-54 at 149:12-150:13.
Other than sharing the $313 million total figure with CMS, ACLR did not provide CMS with any
documentation or identification of the specific plan sponsor contracts or PDE records that
constituted that $313 million figure until early 2015, more than three years later, around the time
ACLR submitted its certified claim that led to *ACLR I*.  *Id.* at SA286-87 at 288:5-289:17.  ACLR
did not provide CMS with copies of the specific 2007 PDEs that ACLR contended amounted to

duplicate payments until either the submission of its certified claim in March 2015 at the earliest. *Id.* at SA256-57 at 154:22-155:9, SA287-88 at 289:17-290:13.  By the time ACLR provided some documentation in 2015 or 2016 of the specific plan sponsor contracts that made up ACLR's 2007 duplicate payment findings, the four-year limitations period for reopening final reconciled plan sponsor payments already had expired, in any event.  *See* 42 C.F.R. § 423.346.

ACLR and CMS also discussed during the November 30, 2011 conference call the need for a new SOW to replace the PWS.  *Id.* at SA246-47 at 121:17-122:14.  CMS informed ACLR that portions of the PWS were not workable, from CMS's perspective, and that CMS did not agree ACLR could perform under the terms of the PWS without specific authorization from CMS.  Tab 100, SA421-22 at 69:14-70:3.  CMS also agreed to provide ACLR with a draft of the SOW, which CMS did on December 9, 2011.  Tab 26, A488.  As described above, the parties continued to discuss and revise the SOW until it was finalized and implemented with modification 13 on December 31, 2013.  Tab 21, A388.  Nevertheless, ACLR acknowledged to CMS, the day following the conference call on November 30, 2011, that its "understanding of the issues regarding contract execution is much clearer," and agreed that it "will continue executing *only those portions of the contract that are consistent with current CMS expectations* (e.g. not issuing demand letters) until such time as the PWS/SOW issues have been resolved." Tab 110, SA602 (emphasis added).  From that point forward, until the SOW was implemented, the only audit issues ACLR was permitted to pursue were ones specifically authorized by contract modifications.  Tab 28; Tab 36; Tab 78; Tab 79.

In *ACLR I*, ACLR seeks to recover $23,535,618, which it contends are the contingent fees it would have received if it had been permitted to proceed with the recovery audit for 2007 potential duplicate payments, and if CMS had, in fact, recovered the entirety of the $313,808,241

in potential duplicate payments that ACLR claims it identified within the 2007 PDE records.

Tab 85, SA146-47; Tab 90, SA278 at 272:3-13.  That contingent fee is calculated simply by

multiplying the 7.5% contingency fee rate that was contained in the Part D RAC contract in 2011

times the total $313 million figure.  Tab 90, SA292 at 307:11-18.  ACLR agrees that it has no

knowledge that CMS actually recovered any, let alone all, of the $313 million in potential

duplicate payments found by ACLR.  *Id.* at SA238 at 94:1-8, SA279 at 273:6-18.  Indeed, ACLR

admits that the potential improper payments it identifies at the outset of any audit issue are

merely estimates of the improper payments it expects to confirm through the recovery audit

process.  Tab 91, SA345 at 210:5-21.

2.    <u>2010 Potential Duplicate Payments</u>

After the issuance of modification 13 and the incorporation of the SOW into the Part D

RAC contract, ACLR again proposed a recovery audit for potential duplicate payments, this time

using PDE records from 2010 through 2012.  Following the submission of an initial NAIRP in

January 2014 and multiple revisions, ACLR submitted a final revised NAIRP submission for this

audit issue on May 13, 2014.  Tab 107, SA492.  As requested by CMS, ACLR's revised

submission provided additional information regarding how ACLR intended to identify potential

duplicate payments using the data in the PDE records.  Pursuant to CMS's request, ACLR agreed

that the 2010-2012 duplicate payment audit issue would be conducted as a complex, rather than

automated, review under the SOW.  *Id.* at SA493.  Under the complex review procedures, ACLR

would be required to request information from plan sponsors after ACLR compiled a preliminary

list of potential duplicate payments from the PDE data, and then review documentation received

from the sponsors to determine whether the PDE records were, in fact, duplicate payments based

on the underlying documentation submitted by the plan sponsors.  *Id.* at SA494; Tab 21, A399-

22

400 at § 1.2.1.

According to ACLR's revised NAIRP, ACLR would first look for an "exact match"
between multiple PDEs containing the exact same data contained in five different PDE fields.
Tab 107, SA493.  From those results, ACLR agreed to exclude from its findings any PDE
records related to partial fills (partial prescriptions given to patients while pharmacies are
awaiting the supply to fill the remainder of the prescription dosage, for instance); long term care;
vaccination administrative fees; and prescriptions transitioning from retail to mail order
pharmacies.  *Id.*; Tab 90, SA258-59 at 185:22-186:11.  The goal was to minimize the likelihood
of identifying legitimate payments as duplicates, to lessen the burden on plan sponsors (which
would have to respond to requests for information seeking documentation to justify potentially
thousands of prescriptions spanning multiple years) and CMS (which would have to adjudicate
appeals of erroneous duplicate payment findings made by ACLR).  Tab 96, SA383 at 234:2-9,
SA384-85 at 242:14-243:10.

Once it identified the exact matches using the specified PDE fields and eliminated the
categories of prescriptions described above, ACLR agreed to examine the length of time that
elapsed between each pair of potentially duplicative PDEs.  Tab 90, SA259-61 at 186:12-188:1.
Under that process, "the days elapsed between two PDE selected as a result of the exact match
review is determined and compared to the days supply of the originating PDE."  Tab 107,
SA493.  If the days elapsed was less than 50% of the days' supply of medication contained in the
original PDE, ACLR would identify the subsequent PDE record as "potentially duplicative."  *Id.*
Following the completion of that process, ACLR would generate a list of potential duplicate
payments for which requests for information would be sent to plan sponsors "requesting detailed
prescription data for all potentially duplicative PDEs."  *Id.* at SA494.  ACLR then would review

the documentary submissions received from plan sponsors and generate an improper payment

review package identifying those PDEs that ACLR continued to believe were duplicates, to be

reviewed by the data validation contractor Livanta.  *Id.*

CMS notified ACLR on May 28, 2014, that CMS had approved the revised duplicate

payment NAIRP, but that CMS was continuing to review ACLR's proposed request for

information prior to ACLR sending the notices to the plan sponsors.  Tab 112, SA606.

Specifically, CMS asked ACLR to submit the PDE records associated with its potential duplicate

payment findings to CMS for review prior to notifications being sent to the plan sponsors.  *Id.*

ACLR submitted all of the 2010 through 2012 PDE records identified as potentially

duplicative to CMS on June 9, 2014, and ACLR informed CMS that it anticipated sending

notification letters requesting information to all of the affected plan sponsors "no later than" two

days later, June 11, 2014.  Tab 48, A597-98.  CMS responded the next day, informing ACLR

that CMS could not read any of the PDE files submitted by ACLR due to a formatting issue and

asking ACLR to "hold off on sending the RFIs for this study until CMS is able to read and

review what has been submitted."  *Id.* at A597.  ACLR responded that "we do recognize the

authority of CPI, under Appendix E (New Issue Submission and Approval Process) Step 5 [of

the SOW] to dictate the terms of the actual approval" of the audit issue.  *Id.* at A594.  CMS then

informed ACLR that Livanta, as the data validator, would analyze ACLR's 2010-2012 duplicate

payment NAIRP and "apply the approved methodology to ensure that the PDE records that have

been identified [by ACLR], should be included in the RFI" sent to the plan sponsors.  *Id.* at

A594.

Livanta reviewed ACLR's potential duplicate payment findings "to determine that the

RAC correctly applied the approved methodology in identifying the potential duplicate

payments." Tab 113, SA610.  Livanta questioned thousands of ACLR's potential duplicate

payment findings.  For instance, Livanta identified over 13,000 PDE pairs that were coded for

vaccination administrative fees, which ACLR had agreed should be excluded from the duplicate

payment audit.  *Id.* at SA611-612.  Livanta also compared the dosages in the PDE record pairs

and found that, for 2010, 56% of the PDE pairs had a dosage increase from the originating

prescription to the potentially duplicative prescription of greater than 50%.  *Id.* at SA612.  In

other words, in 56% of the PDE pairs, Livanta reported that the second PDE record reflected an

increase in the dosage of the original prescription of at least 50%, suggesting that the second

record might not be duplicative at all, but rather a new prescription containing an increased

dosage of the same medication.  For 2011 and 2012, Livanta attempted to perform the same

analysis, but the quantity dispensed field in ACLR's data submission had an entry of "zero" in

99% of the PDE records, making the comparison impossible.  *Id.*  Yet when Livanta located the

same PDE records in CMS's data repository, those fields contained data, suggesting that

ACLR's data submission was incomplete.  *Id.*[4]

    CMS provided Livanta's validation results to ACLR on June 26, 2014, and asked ACLR

to "proceed with removing the PDE records that were rejected as a result of the DVC's

validation."  *Id.* at SA608.  ACLR agreed to eliminate the PDEs that were rejected as part of

Livanta's validation work.  *Id.*; Tab 90, SA265-66 at 195:20-196:22.

    Following its review of Livanta's validation report and the concerns raised by Livanta

---

[4] ACLR asserts that Livanta reported a false positive rate of only .65% for ACLR's 2010
duplicate payment audit issue.  *See* P. Mot. S.J. at 37.  In fact, Livanta's analysis was that ACLR
had an error rate – not a false positive rate – of .65%.  Tab 50 at A611.  As Livanta's analysis
shows, all that the error rate signified was that ACLR's report of PDEs containing potential
duplicate payments "correctly applied the approved methodology" except in .65% of the claims.
Tab 113, SA610.  Whether ACLR's methodology was likely to capture false positives was a
separate issue, which Livanta determined would occur in 56% of the PDEs found by ACLR.

regarding the 2011 and 2012 PDE data contained in ACLR's NAIRP submission, CMS informed

ACLR on July 8, 2014, that CMS had approved the release of requests for information to the

plan sponsors for the potential duplicate payments identified by ACLR for 2010 only.  Tab 52,

A618.  CMS asked ACLR to advise whether ACLR would "like to move forward with CY 2010

only or if you'd rather wait until you've resolved the issue with the 2011 and 2012 data and send

all three plan years at once."  *Id.*  ACLR responded by blaming Livanta for not identifying the

flaws in ACLR's data in previous reviews, but did proceed with preparing the requests for

information that were sent to plan sponsors for the 2010 potential duplicate payments identified

by ACLR.  *Id.*

      After the requests for information were sent to plan sponsors, the sponsors responsible for

more than half of the potential improper payments identified by ACLR contacted CMS to request

an extension of time to respond to the requests due to the large volume of PDEs involved.  Tab

114, SA619-20.  ACLR responded that it was prepared to send out similar requests for

information for 2011 and 2012.  *Id.* at SA619.  CMS reported that it continued to receive more

requests for extensions of time to respond to the RFIs for 2010 potential duplicate payments, and

that CMS was "working with several plan sponsors to see why there are so many requests for

extensions and to try to understand the difficulties they are facing in obtaining and submitting the

data requested."  *Id.*  Because of those ongoing issues, CMS stated that "it would be difficult for

CMS to move forward with CY 2011 and 2012 without first understanding the issues

surrounding CY 2010."  *Id.*

      CMS then issued a notice to all plan sponsors on October 1, 2014, notifying them that

CMS had extended the deadline for sponsors to respond to the 2010 duplicate payment RFI by

60 days, through December 8, 2014.  Tab 53, A620.  ACLR sent CMS an email the same day

acknowledging that CMS had placed the 2011 and 2012 duplicate payment RFIs "on hold" and had extended the plan sponsor deadline for responding to the 2010 duplicate payment RFI. Tab 115, SA621-22. ACLR stated that it was "not challenging CMS authority with these decisions" but was raising the issues only for consideration in the context of "future SOW changes." *Id.*

CMS met with certain plan sponsors who raised concerns regarding the burdens of responding to ACLR's requests for information and the likelihood that the PDEs identified by ACLR included many false positives. The concern was that many of the PDEs were not, in fact, duplicates at all, requiring the sponsors to submit extensive documentation related to legitimate prescription payments. To attempt to alleviate those concerns, CMS provided ACLR with a revised protocol on October 22, 2014, to be used in analyzing the 2010 PDE records for duplicate payments. Tab 56, A643. Under the revised protocol, CMS requested that ACLR remove from its pool of potential duplicate payments any PDEs involving a dosage increase of 50% or greater and where the date of service or fill date were different. *Id.* CMS also asked ACLR to remove any PDE pairs in which the pharmacy or service provider ID and the date of service were different between the two PDE records. *Id.* ACLR ran the revised protocol and determined that it reduced the universe of potential duplicate payments previously identified by ACLR by 66.8%. Tab 116, SA623.

Livanta completed a validation of ACLR's revised 2010 duplicate payment analysis, and those results were provided to ACLR on November 13, 2014. Tab 117, SA626. In its validation, Livanta determined, among other things, that more than 2,000 PDE pairs identified by ACLR involved a dosage change and were supposed to be excluded; more than 3,100 PDE pairs involved long-term care prescriptions that were supposed to be excluded; and more than 10,500 PDE records were unpaired, *i.e.*, Livanta could not identify a matching PDE record which would

27

make the records potentially duplicative.  *Id.* at SA625-26.  CMS asked ACLR to eliminate the PDEs questioned by Livanta by November 14, 2014, so that updated reports identifying the narrower universe of PDEs for which information was sought could be provided to the plan sponsors sufficiently in advance of the existing deadline of December 8, 2014, for the responses to ACLR's outstanding RFI.  *Id.* at SA626.

ACLR responded to CMS on the same date, stating that the company was "not available to perform this type of work until our return 11/24," because the business was shut down for hunting season.  *Id.* at SA625; Tab 90, SA269-70 at 237:1-238:15.  However, ACLR stated that it intended to "dispute each and every finding with the DVC."  Tab 117, SA626.  In the meantime, ACLR recommended to CMS that the agency pursue collection from the plan sponsors of the amounts previously identified by ACLR, without considering or accounting for any of Livanta's validation concerns.  *Id.*

After the December 8, 2014 deadline passed for plan sponsors to respond to the RFI, ACLR supposedly reviewed all of the documentation submitted by the plan sponsors and submitted its final 2010 duplicate payment improper payment review package to CMS on December 24, 2014.  Tab 57, A646; Tab 90, SA401 at 242:7-11.  The potential duplicate payments identified by ACLR in its improper payment review package were based on the methodology documented in ACLR's May 2014 NAIRP; those findings did *not* incorporate the revised protocol requested by CMS on October 22, 2014.  Tab 90, SA272 at 245:1-20.  According to ACLR, it identified duplicate payments occurring in 294 contracts in the total amount of $15,909,550 for 2010.  Tab 57, A648; Tab 85, SA146-47.

Livanta reviewed ACLR's December 2014 duplicate payment submission and raised numerous issues.  Livanta reported that 286,398 of the PDE pairs identified by ACLR "had been

previously identified by [Livanta] as dosage change false positives and an additional 50,579 of the pairs were previously identified by [Livanta] as non-dosage change false positives."  Tab 118, SA628-29.  Moreover, Livanta observed that ACLR had failed to provide any explanation or reasoning for why ACLR rejected the information provided by the plan sponsors in response to ACLR's request for information.  *Id.* at SA628.  CMS asked ACLR to provide Livanta with additional information regarding Livanta's concerns.  *Id.* at SA629.  ACLR declined to do so, instead telling CPI to direct its questions to the CMS contracting officer.  *Id.* at SA628; Tab 90, SA274-75 at 255:19-256:5.

The CMS contracting officer's representative, Sonja Brown, sent ACLR a technical direction letter dated April 24, 2015.  Tab 59, A656.  The letter described the history of ACLR's 2010 duplicate payment NAIRP review and approval process, and noted that "[p]lan sponsors contacted CMS to voice concerns regarding the burden of providing supporting documentation for what they believed were the identification of large numbers of PDE records that did not appear to be improper submissions."  *Id.* at A657.  As a result of those concerns, "CMS conducted an evaluation of ACLR's audit methodology to determine if the plan sponsors' concerns were valid," and that evaluation "concluded there were significant flaws with the original audit methodology used by ACLR."  *Id.*  Notwithstanding CMS's development of the revised methodology shared with ACLR in October 2014 to attempt to address the plan sponsors' concerns and CMS's instruction to ACLR to use that revised methodology to prepare the improper payment review package for validation by Livanta, "when ACLR submitted the IPRPs for validation, CMS determined that ACLR did not use the revised methodology."  *Id.*  Consequently, CMS continued "to have concerns with the validity of the overall audit results" and "decided to rescind its prior approval of the duplicate payment audit for contract years 2010

through 2012." *Id.*  CMS directed that "ACLR shall not proceed any further with recovery audit activities related to this audit review and specified contract years." *Id.*

In *ACLR I*, ACLR seeks to recover $2,209,146, which it contends are the contingent fees it would have received *if* it had been permitted to proceed with the recovery audit for 2010 potential duplicate payments, and *if* CMS had, in fact, recovered the entirety of the $15,909,550 in potential duplicate payments that ACLR claims it identified within the 2010 PDE records. Tab 85, SA146-47.  That contingent fee is calculated by multiplying the 15% contingency fee rate that was contained in modification 13 to the Part D RAC contract times the first $10 million in ACLR's projection of 2010 duplicate payments, plus the 12% contingency fee rate times the remaining $5,909,550 in ACLR's projection of 2010 duplicate payments.  Tab 90, SA294 at 311:3-15.  ACLR agrees that it has no knowledge that CMS actually recovered any, let alone all, of that $15.9 million in potential duplicate payments found by ACLR for 2010.  *Id.* at SA279 at 273:6-18.  ACLR's complaint also does not seek any relief arising from CMS's decision to place "on hold," and then to cancel, the prior approval of ACLR's NAIRP for potential 2011 and 2012 duplicate payments.  *Id.* at SA289-90 at 298:21-299:6.

B.      The Issues In *ACLR I*:  ACLR's Alleged Operating Costs For 2012 & 2013

In addition to the potential contingent fees that ACLR asserts it could have been paid if the 2007 and 2010 duplicate payment recovery audits had proceeded and if CMS had recouped all of the amounts estimated by ACLR, ACLR also asserts in *ACLR I* that it is "entitled to the amount of $2,668,553 representing amounts associated with direct labor costs based on ACLR's approved GSA Schedule rates and contract overhead requirements, reasonable expectations of profit, and net of amounts already collected arising from ACLR efforts during subsequent modifications of the Contract."  Tab 85, SA146.  ACLR alleges that the $2.6 million figure

represents all of ACLR's operating costs and anticipated profit from January 1, 2012, through December 31, 2013, minus the contingent fees that ACLR received from CMS during those years for the other unrelated recovery audit issues that did proceed and for which CMS actually recouped overpayments from plan sponsors. Tab 90, SA251 at 145:3-15, SA252 at 146:8-14, SA279 at 273:19-275:1, SA285 at 284:15-18. ACLR seeks that amount on top of the contingency fees it seeks for the non-completed audits.

Nothing in the contract provides for payment to ACLR for these types of costs or profit. ACLR agrees that the contract only provides for payment to ACLR in the form of contingent fees calculated off of amounts actually recovered by CMS in response to ACLR's approved audit issues. *Id.* at SA228 at 21:16-23:1, SA235 at 88:5-18; Tab 91, SA298 at 38:15-18, SA299 at 39:13-17, SA302 at 59:11-22, SA305 at 76:12-19. ACLR believes it produced some balance sheets and profit and loss statements showing a summary of the company's overall costs and expenses for 2012 and 2013, but the company does not maintain any records tracking actual hours worked by employees on particular issues from which one could verify precisely who worked on which audit issues at any given point in time. Tab 90 at SA283-84 at 279:1-280:17, SA291 at 306:5-15.

ACLR submitted a certified claim to CMS dated March 12, 2015, in which ACLR asserted entitlement to the alleged damages discussed above for (1) the denial of the 2007 duplicate payment recovery audit, (2) the cancellation of the 2010 duplicate payment recovery audit, and (3) ACLR's projected costs and profit in 2012 and 2013, net of contingent fees received from CMS for other approved audit issues. Tab 83, SA123. CMS denied the claim by letter dated June 5, 2015, on the ground that the Part D RAC contract does not allow for compensating ACLR for anything other than a contingent fee based on improper payments

31

actually recovered by CMS.  Tab 84, SA131.  "Without documented recoveries, [ACLR] is not entitled to payment of a contingency fee."  *Id.*  ACLR thereafter filed its complaint challenging the denial of its certified claim in *ACLR I*.

C.     The Issues In *ACLR II*:  Sales Tax Payments

Federal law prohibits states from imposing any "premium tax, fee, or other similar assessment . . . for any payment CMS makes on behalf of Part D plan or enrollees under this part (including the direct subsidy, reinsurance payments, and risk corridor payments); or for any payment made to Part D plans by a beneficiary or by a third party on behalf of a beneficiary."  42 C.F.R. § 423.440(b)(1); *see also* 42 U.S.C. § 1395w-112(g).  While states are precluded from imposing taxes or fees specifically targeted at Part D payments, Federal law does not impact generally applicable state sales taxes or fees that apply to all prescriptions.  Rather, to the extent state law imposes taxes or fees on prescriptions across-the-board – including prescriptions for a beneficiary covered under Part D, those taxes or fees would be properly reimbursable by CMS when paid by a pharmacy and passed through to a plan sponsor.  The issue, then, turns on whether the law in each state provides for the imposition of any form of taxes or fees on prescriptions, including Part D prescriptions.  The PDE records contain a field for reporting any "amount attributed to sales tax."  Tab 105, SA477.

Although ACLR previously mentioned its capabilities for auditing sales taxes, ACLR did not actually propose conducting a recovery audit for potential improper sales tax payments until it submitted a NAIRP dated August 21, 2015, in which ACLR requested approval for an audit that would look for improper sales tax payments in the 2012 and 2013 PDE records.  Tab 61, A663.  ACLR had received the 2012 PDE records from CMS in January 2014, and the 2013 PDE records (as updated) from CMS in June 2015.  Tab 91, SA318-19 at 104:21-105:15, SA320

at 106:22-107:3; Tab 86, SA149-50.  Prior to the August 2015 NAIRP submission, ACLR had

not discussed proposing a sales tax audit with anyone at CMS, no one at CMS had requested that

ACLR propose an audit for that issue, and as far as ACLR knows, no one at CMS would have

been aware that ACLR even intended to propose a Part D sales tax recovery audit.  Tab 91,

SA314-17 at 98:18-101:1.

 ACLR's NAIRP proposed an audit of several different states or categories of states.

First, ACLR proposed an audit of any PDEs where any amounts were recorded in the sales tax

field in the states of Alaska, Delaware, Montana, New Hampshire, and Oregon, which ACLR

determined had no applicable state or local sales tax.  Tab 61, A666.  Second, ACLR proposed

auditing PDEs for potential sales tax payments in Louisiana because (as discussed below)

Louisiana had been a focus of CMS in the past.  *Id.*  Third, ACLR proposed auditing PDEs for

potential sales tax payments in Minnesota, because ACLR identified large amounts reported in

the sales tax field in that state.  *Id.*  And fourth, ACLR proposed a nationwide audit of all PDEs

in which the amounts reported in the sales tax field were equal to or greater than 50% of the cost

of the drug, on the assumption that no state could impose taxes at a rate that high.  *Id.* at A667.

 ACLR proposed conducting an automated audit, in which it would determine the

existence of improper sales tax payments by review of the PDE data alone, without reference to

additional supporting documentation or explanations from the plan sponsors.  *Id.* at A663.  In its

NAIRP, ACLR identified for CMS the total amount of the prescription payments for all of the

PDEs it had identified as containing data in the sales tax field.  *Id.* at A670.  In other words,

according to ACLR, if a PDE erroneously included a single cent in the sales tax field, then the

entire PDE payment – including the indisputably correct portions for the drug costs themselves –

should be deemed improper and subject to recoupment, not just the erroneous amount of sales

tax charged.  Tab 91, SA334 at 155:3-9, SA337-38 at 160:22-161:4, SA342 at 201:16-19.

1.    Potential Sales Tax Payments In Louisiana

The issue of sales taxes potentially being improperly assessed and paid under Part D was not a new one, and at the time ACLR submitted its sales tax NAIRP in August 2015, ACLR knew CMS already was aware of the issue in general and had been analyzing the potential vulnerability for many years in certain states.  *Id.* at SA324-25 at 113:4-114:16; Tab 61, A667. As early as 2009 (more than a year prior to the award of the Part D RAC Contract to ACLR), the Health and Human Services Office of Inspector General had commenced actions in Louisiana that resulted in the recovery of more than $3.8 million in late 2013 for sales taxes that improperly had been assessed and paid for Part D prescriptions.  Tab 121, SA638, SA640-41.

Louisiana imposes a sales tax on retail sales and use of personal items, *see* La. Stat. Ann. § 47:302, but specifically exempts "for purposes of the state sales and use tax, drugs prescribed by a physician or dentist."  La. Stat. Ann. § 47:305(D)(1)(j); *see also* La. Const. Ann. art. 7, § 2.2(B)(3).  Louisiana also preempts local governmental entities from imposing sales and use taxes on "the sale of tangible personal property if such sale is made under the provisions of Medicare."  La. Stat. Ann. § 47:301(10)(u).  Therefore, Louisiana law does not currently permit the assessment of state or local sales or use taxes on prescription drug sales, so if such taxes were assessed by pharmacies, paid by plan sponsors, and reimbursed by CMS under Part D, they could be improper payments.

Following commencement of the OIG investigations, CMS issued a series of notices to Part D plan sponsors operating in Louisiana, between August 2010 and April 2011, that instructed plan sponsors to take steps to ensure that sales taxes were not being paid on Part D claims in Louisiana and to take action to recoup any such payments that had been made in 2010.

Tabs 130-133, SA704-07.  CMS directed plan sponsors to resubmit corrected 2010 PDE records

that omitted any improper sales tax payments.  Tab 132, SA706.  CMS also advised plan

sponsors that it was their responsibility "to correctly adjudicate claims in accordance with all

applicable state laws."  Tab 133, SA707.

  As a result of the completion of the OIG actions, Health Integrity, the NBI MEDIC, was

asked in September 2014 to conduct an analysis of Louisiana PDE records from January 1, 2010,

to August 31, 2014, to determine whether there continued to be a vulnerability related to plan

sponsors being paid for sales tax assessments that should not have been imposed on prescriptions

within that state.  Tab 121, SA638; Tab 123, SA658.  Health Integrity concluded, in reports

dated October 31 and November 26, 2014, that during that time period CMS paid approximately

4.3 million PDE records in which some amount greater than $0 was recorded in the sales tax

field of the PDE records; the total amount reported in the sales tax field on those PDE records

was $922,961.59.  Tab 123, SA662.  Health Integrity recommended a "state-by-state project

study of sales taxes paid under the Medicare Part D Program" to "determine whether the

amounts identified in the PDE records as a 'sales tax' actually represent sales taxes in states

where the application of sales taxes to Part D prescription drugs is prohibited by law," or if some

other legitimate information were being recorded in those PDE fields.  *Id.* at SA665.

  Following review of Health Integrity's initial reports on potential sales tax payments in

Louisiana, CMS issued an additional notice to Louisiana plan sponsors in December 2014 that

informed them that the NBI MEDIC "has determined that your parent organization submitted

prescription drug event (PDE) records that included unallowable sales tax payments on Part D

prescriptions in Louisiana."  Tab 134, SA708.  CMS directed the plan sponsors to recoup any

sales taxes paid on Part D prescriptions in Louisiana and to submit corrected PDE records within

90 days.  *Id.* at SA709.

In February 2015, one Louisiana plan sponsor, Express Scripts, responded to CMS's notice by reporting that, while Louisiana law did not provide for sales taxes on Part D prescriptions, state law *did* require the imposition of a 10¢ fee on all prescriptions, and that that fee was being reported in the PDE sales tax field due to a lack of any other field in which to report the charge.  Tab 124, SA671-72.  Express Scripts cited a provision in the Louisiana Medicaid Pharmacy Benefits Management Services Manual that stated that the 10¢ fee should be assessed on each out-patient prescription.  *Id.* at SA671.  After reviewing the response from Express Scripts, CMS agreed not to pursue recoupment of PDE records containing amounts of 10¢ or less in the sales tax field.  *Id.* at SA672.  CMS sent a follow-up notice to Louisiana plan sponsors in February 2015, informing them that CMS was continuing to review the issue, and that the plan sponsors need not take further action on recouping the previously identified amounts until further notice.  Tab 135, SA711.

Health Integrity then conducted a revised analysis where it looked only at amounts greater than 10¢ reported in the sales tax field in Louisiana PDE records between January 1, 2010, and August 31, 2014.  Tab 124, SA672.  That updated analysis revealed that the number of suspect PDEs was reduced from 4.3 million down to 11,578, and the total amount reported in the sales tax field was reduced from $922,961.59 down to only $59,090.36.  *Id.*  Health Integrity updated its analysis again through June 2015, looking at the number of PDE records for the same time period in which amounts greater than 10¢ remained in the universe of records.  Tab 125, SA680-81.  The total amount reported in the sales tax field in such claims had been reduced further to only $53,125.54, following plan sponsors' correction or deletion of PDE records.  *Id.* at SA681.  For 2012 and 2013, the two years that were the subject of ACLR's proposed sales tax

NAIRP submitted on August 21, 2015, Health Integrity reported that there was only $1,789.85 and $18,354.29 reported in the sales tax fields of PDE records, respectively, for PDEs containing amounts greater than 10¢ in that field.  *Id.*; Tab 91, SA331 at 144:12-22.

ACLR's NAIRP did not address the existence or applicability of the 10¢ prescription fee or its potential impact on the viability of ACLR's proposed recovery audit.  Tab 91, SA329-30 at 142:14-143:17.  Rather, ACLR previously took the position in this litigation that the 10¢ fee does *not* apply and only applies to prescriptions covered under Medicaid, not Medicare Part D. Tab 88, SA162-63.  ACLR's position is incorrect.  Louisiana regulations provide that a "prescription fee shall be paid by each pharmacy and dispensing physician for each out-patient prescription dispensed.  The fee shall be $0.10 per prescription dispensed by a pharmacist or dispensing physician."  La. Admin. Code tit. 48, § 4001(D).  That regulation was issued pursuant to state law that directed the state department of health to adopt regulations imposing fees, including a fee of 10¢ per outpatient prescription, to fund healthcare services provided by the state under the Medicaid program.  *See* La. Stat. Ann. § 46:2625(A).  The statute "requires, inter alia, all pharmacies to pay ten cents per out-patient prescription."  La. Atty. Gen. Op. No. 02-0177, 2002 WL 1483930, at *3 (June 12, 2002).

Guidance by the Louisiana Department of Insurance confirms that the statute "authorizes a 10 cent per prescription fee on every out-patient prescription filled by a pharmacy in this state." Tab 136, SA712.  The state has rejected the precise position taken by ACLR, that the 10¢ fee only applies to prescriptions provided to Medicaid enrollees, because "[t]hat argument contradicts the plain language of the statute, its legislative history, and controlling federal law." *Id.* at SA714.  Rather, the statutory 10¢ fee is applied across-the-board to ensure that "all residents of [Louisiana] shoulder the burden of financing the Louisiana Medicaid program."  *Id.*

Therefore, the "ten cent provider fee on out-patient prescriptions authorized in [section 46:2625] applies to every out-patient prescription of any kind whatever, without regard to whether that prescription is processed by or for a Medicaid enrollee." *Id.* at SA715.  ACLR's principal and self-described "expert on the law," Chris Mucke, contends that the Louisiana Department of Insurance's interpretation of Louisiana law is incorrect in that regard, and that Mr. Mucke's interpretation of Louisiana law should control instead.  Tab 95, SA375 at 16:3-16, SA377-79 at 45:20-47:3.

Now, in its summary judgment motion, ACLR states in passing that it "is not seeking summary judgment on the sales tax NAIRP with respect to the Louisiana sales tax issues."  P. Mot. S.J. at 44 n.3.  ACLR apparently belatedly recognizes the flaws in its Louisiana analysis, yet it has not withdrawn that portion of its complaint.  In any event, the Court need not resolve the legal issue of whether the 10¢ Louisiana prescription fee applies to Part D prescriptions or not.  The important point is that ACLR's NAIRP failed to address the 10¢ prescription fee at all, and CMS, through Health Integrity, had spent considerable time evaluating the issue and had been advised that the 10¢ fee *did* apply.  As demonstrated by Health Integrity, the 2012 and 2013 PDEs containing amounts greater than 10¢ reported in the sales tax field, *i.e.*, the potential improper payments, were negligible and inconsistent with ACLR's proposed NAIRP.

## 2. Potential Sales Tax Payments In Minnesota

On behalf of CMS, Health Integrity also had been analyzing the potential for improper sales tax payments in Minnesota for years before ACLR submitted its sales tax NAIRP in August 2015.  In June 2010, following a request for assistance made by the OIG, Health Integrity contacted plan sponsors regarding concerns that sponsors were reporting sales tax in Minnesota PDE records.  Tab 127, SA689; Tab 128, SA696; Tab 129, SA701-02.  In July 2010, two plan

sponsors, UCare and Medica, responded to Health Integrity.  Tabs 127-128.  UCare noted that "the data in the sales tax field does not represent payment of sales tax, and the reflected payments do not violate state or federal law."  Tab 128, SA696.  Rather, UCare stated that the payments reported in the PDE sales tax field reflected payments under Minnesota's wholesale drug distributor's tax.  *Id.*

Although Minnesota does not impose a sales tax on retail prescription drug sales, the state does impose a wholesale drug distributor tax "on each wholesale drug distributor equal to two percent of its gross revenues."  Minn. Stat. Ann. § 295.52(3).  Minnesota law also provides that the wholesale drug distributor tax may be passed on to pharmacies or other health care providers, and those facilities in turn may transfer the added costs on to pharmacy benefit managers and other third-party plans and networks that pay for patients' prescriptions.  *See* Minn. Stat. Ann. § 295.582(1)(a).

UCare alerted Health Integrity to the existence of the wholesale drug distributor tax and represented that the "data in the sales tax field in UCare's PDE shows the amount of reimbursement for expense of the wholesale drug distributor tax, not a sales tax or a tax on UCare's premium payments from CMS."  Tab 128, SA696.  UCare also informed Health Integrity that it had sought legal advice from the Minnesota Pharmacists Association and outside counsel, both of which advised UCare that "the federal law prohibiting taxes and assessments would likely not be construed by a court to preempt our obligation under state law to reimburse pharmacies for the expense of the wholesale drug distributor tax."  *Id.* at SA697.  Moreover, UCare obtained an email from a regional CMS official who advised that "this tax survives the . . . federal provision" preempting state imposition of premium taxes or fees on Medicare Part D payments.  *Id.*; *see* 42 U.S.C. § 1395w-112(g).  Medica likewise informed Health Integrity that

"the tax associated with the PDE data for the claims at issue represents a wholesale drug distributor tax," not sales tax, and thus was allowed under state law.  Tab 127, SA689.

Health Integrity contacted the Minnesota Attorney General's office to obtain further guidance on the issue.  A "citizen research specialist" responded to Health Integrity by letter dated May 31, 2011, noting the existence of the wholesale distributor tax but stating that "healthcare services provided to Medicare recipients and paid for under the Medicare program are exempt from this tax."  Tab 137, SA717.  The "citizen research specialist" cited Minn. Stat. Ann. § 295.53(1) as support for her conclusion.  *Id.*[5]

Ultimately, Health Integrity prepared an executive summary regarding its analysis of the

---

[5] That statute states that "payments received for services provided under the Medicare program" are among the categories of "payments [that] are excluded from the gross revenues subject to the *hospital, surgical center, or health care provider taxes*."  Minn. Stat. Ann. § 295.53(1)(a)(1) (emphasis added).  Section 295.52 provides for a variety of different health care taxes, including a "hospital tax" in section 295.52(1), a "surgical center tax" in section 295.52(1a), a "provider tax" in section 295.52(2), and the wholesale drug distributor tax in section 295.52(3).  Notably, the tax exemption contained in section 295.53(1)(a) does *not* state that "payments received for services provided under the Medicare program" are excluded from gross revenues subject to the *wholesale distributor tax* mandated by section 295.52(3), only that such payments are excluded from gross revenues for purposes of the hospital, surgical center, or health care provider taxes required under section 295.52 subsections (1), (1a), and (2).  The "citizen research specialist" does not appear to have recognized that distinction.

If the tax exemption contained in section 295.53(1)(a) could be construed to apply to the wholesale drug distributor tax in the abstract, it would appear that it could do so only under very limited circumstances.  The wholesale drug distributor tax is assessed on a pharmacy at the time the pharmacy purchases drugs from a wholesale distributor.  At the time that transaction occurs, presumably the pharmacy does not know specifically which patients ultimately will receive the drugs from the pharmacy, *i.e.*, whether those future recipients will be Medicare participants, private insurance beneficiaries, or uninsured patients.  There likely would be no basis for the pharmacy to avoid payment of the wholesale distributor tax under those circumstances, and consequently at the time the purchase is made by the pharmacy from the drug wholesaler, the gross revenue obtained by the wholesaler in that transaction cannot be said to have been "received for services provided under the Medicare program" to fall within the exemption in section 295.53(1)(a)(1).  And because the tax actually has been paid by the pharmacy in that scenario, it could be passed along to whatever plan ultimately pays for the drug when a prescription is filled, under section 295.582(a)(1).

Minnesota tax issues.  Tab 129, SA701.  In that report, Health Integrity noted that a

representative of the Minnesota Department of Revenue stated that the exemption in section

295.53(1)(a) did *not* apply to the wholesale drug distributor tax for the reasons discussed above.

*Id.* at SA702.  However, the state revenue department took the position that the pass through of

the wholesale drug distributor tax would be preempted by Federal law, namely 42 C.F.R. §

423.440.  *Id.*  That opinion was contradicted by the advice received from the "citizen research

specialist" at the state attorney general's office, who had concluded that section 295.53(1)(a) *did*

apply to the wholesale drug distributor tax.  *Id.*

The issue of the applicability of the Minnesota wholesale drug distributor tax to Part D

prescriptions apparently remained open and unresolved, and CMS asked Health Integrity to

analyze the issue again in 2014.  Tab 122, SA647.  In a report dated November 3, 2014, Health

Integrity informed CMS that it had analyzed Minnesota PDEs between January 1, 2010, and

September 30, 2014, and identified a total of 62.6 million PDEs containing amounts reported in

the sales tax field, with amounts totaling $90,928,414 reported in the sales tax field.  *Id.* at

SA652-53.  Given the volume of PDE records with amounts reported in the sales tax field,

Health Integrity recommended a more detailed analysis to specifically include "whether the

amounts identified in the PDE records as a 'sales tax' actually represent sales taxes in states

where the application of sales taxes to Part D prescription drugs is prohibited by state law."  *Id.*

at SA655.  Health Integrity also resubmitted a copy of its 2011 executive summary discussing

the conflicting information it had received from Minnesota officials on the issue of the wholesale

drug distributor tax.  Tab 138, SA738.

CMS and Health Integrity discussed Minnesota tax issues throughout 2015, and CMS

informed Health Integrity that CMS wanted to complete the analysis of Louisiana taxes before

proceeding with any further vulnerability analysis in Minnesota.  Tab 139, SA743.  Health

Integrity reported that, if one accounted for the 2% wholesale drug distributor tax, the $90.9

million total amount reported in the sales tax field for Minnesota PDEs from 2010 through 2014

would be reduced to $10.2 million.  *Id.*  Health Integrity noted that the "Sales Tax Field is being

used for other items," which might be a "vulnerability that we will need to review further after

we settle the sales tax cases."  *Id.* ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ .  Tab 93, SA366-68 at

126:5-128:15; Tab 97, SA392-94 at 91:3-93:15, SA395-96 at 133:14-134:2, SA397-98 at

141:22-142:7; Tab 98, SA410-11 at 50:22-51:16.

ACLR's NAIRP did not address the applicability of the wholesale drug distributor fee or

its potential impact on the viability of ACLR's proposed recovery audit of alleged sales tax

payments in Minnesota in any way.  Tab 91, SA339 at 170:2-6.  Nevertheless, ACLR now takes

the position that the Minnesota wholesale drug distributor tax does not apply to Part D

prescriptions at all.  Tab 88, SA165.  As with Louisiana, the Court need not decide whether the

Minnesota wholesale tax applies to Part D prescriptions.  The significance is that ACLR's

proposed sales tax NAIRP failed to address the potential impact of the tax, and CMS and Health

Integrity already had examined the issue at length and recognized that the complexity of the

issue made potential recovery of amounts reported in the sales tax field in Minnesota PDEs

unworkable.

        3.    <u>Potential Sales Tax Payments In Other States</u>

As discussed above, ACLR proposed that its sales tax recovery audit also address sales

tax payments contained in PDE records (1) in five states that impose no state or local sales tax, and (2) in all 50 states in which the amounts reported in the sales tax field were equal to or greater than 50% of the cost of the drug.  Tab 61, A666-67.  CMS likewise had requested, earlier in 2015, that Health Integrity conduct a nationwide study of amounts reported in the sales tax field.  Tab 124, SA668, SA673-75.  In its review, Health Integrity observed that "aberrant patterns were identified concerning the monetary information that is being populated within the sales tax field."  *Id.* at SA668.  In some cases Health Integrity determined that plan sponsors were recording usage taxes in the sales tax field, but "there were a large number of instances in which the sales tax field bore no discernable relationship to the remainder of the PDE record."  *Id.*

Health Integrity's national study looked at PDE records for 2014, and found that 3.38% of the PDE records in that year (47.9 million out of 1.4 billion total PDE records) contained amounts recorded in the sales tax field.  *Id.* at SA673.  Illinois was the only state identified by Health Integrity as imposing a sales tax (as opposed to some other form of tax or fee) on prescription drugs.  *Id.*  In the top 15 states with amounts reported in the sales tax fields of the PDE records, Health Integrity identified a total of $66 million in payments reported in the sales tax fields.  *Id.* at SA674.  Of those same top 15 states, $38.9 million out of the total $66 million (59%) came from PDE records in Illinois (which does impose sales taxes on prescriptions), and $24.7 million out of the total $66 million (37.4%) came from Minnesota, which potentially involved the permissible imposition of the wholesale drug distributor tax.  *Id.* at SA674.  Those two states therefore accounted for 96.4% of the total amount of payments reported in the PDE sales tax fields for the top 15 states in 2014.

Health Integrity identified the sales tax field as a vulnerability that CMS should consider

addressing through further guidance to plan sponsors, to clarify the purposes for which the sales tax field could be used.  *Id.* at SA675.  Health Integrity's national vulnerability study remained open until December 23, 2015, and at that time Health Integrity's "findings remain[ed] under review by CMS for further action."  Tab 126, SA683, SA686.  As of January 29, 2016, Health Integrity reported that its findings still remained under review by CMS.  *Id.* at SA688.  As of this date, due to the complexity of the issues, CMS has not further pursued the recovery of any amounts reported in the sales tax fields of PDE records that might amount to improper assessments of state sales taxes.  Tab 101, SA426 at 56:12-18, 59:8-15; Tab 98, SA412 at 97:5-11; Tab 97, SA399 at 230:12-15, SA400-01 at 241:18-242:12.

        4.       <u>CMS's Denial Of ACLR's Sales Tax NAIRP</u>

ACLR submitted its sales tax NAIRP to CMS on August 21, 2015.  Tab 61, A663.  Virtually all of the PDEs in which ACLR identified amounts recorded in the sales tax field came from Louisiana and Minnesota (29.3 million out of 29.6 million PDEs, or 99.1%).  *Id.* at A670.  ACLR's submission came within a matter of days of Health Integrity's reports submitted to CMS that also discussed Health Integrity's extensive analysis of potential sales tax PDE payments in Louisiana and Minnesota, and while Health Integrity's nationwide study remained open.  At the time ACLR submitted its sales tax NAIRP, CMS already was evaluating the appropriateness of sales tax charges in PDE records, based on Health Integrity's work.  Tab 98, SA408 at 37:2-6.  CMS concluded that, because the issue of potential improper sales tax charges already had been examined by Health Integrity, and CMS still was assessing Health Integrity's conclusions, it would be duplicative for ACLR to commence a recovery audit on the same issue.  *Id.* at SA405-07 at 22:9-24:5, SA409 at 42:6-16.  CMS's view was that, if an amount reported in the sales tax field on a PDE record reflected an allowable payment for some form of tax or fee – even if not

actually state sales tax – then it would not be deemed an improper payment merely because the payment was recorded in the sales tax field.  Tab 97, SA390-91 at 86:8-87:1.

CMS notified ACLR on September 3, 2015, that ACLR's NAIRP was denied and that "a walkthrough will not be scheduled as this audit issue is currently open and active with another CMS contractor."  Tab 62, A672.  CMS referenced section 1.2.3 of the SOW, that states that "CMS/CPI consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue."  Tab 22, A435 at § 1.2.3.  The contracting officer's representative invited ACLR to contact her with any questions regarding the denial of the NAIRP, Tab 62, A672, but ACLR never considered doing so.  Tab 91, SA341 at 191:10-15.

Instead of contacting CMS to discuss any questions about the sales tax NAIRP denial, ACLR submitted a certified claim a week later, alleging that it was entitled to payment of its contractual contingency fee as if the sales tax recovery audit had been approved and CMS had recouped the entirety of the PDE payments – not just the alleged sales tax amounts – contained in the PDEs identified in ACLR's NAIRP.  Tab 86, SA152; Tab 91, SA342 at 201:16-19.  ACLR had identified $658,354,795 in total PDE payments on the records it identified in its NAIRP as containing some amount in the sales tax field.  Tab 61, A670.  ACLR computed its contingent fee by multiplying the contractual 15% contingent fee rate times the first $10 million in hypothetical recoveries, and then multiplying the 12% contractual contingent fee rate times the remaining $648,354,795 in hypothetical recoveries, to arrive at a total alleged entitlement of $79,302,575.  Tab 86, SA152; Tab 91, SA342-43 at 201:22-202:19.  ACLR admits that it has no evidence that CMS ever recovered any, let alone all, of the amounts identified as improper sales tax payments in ACLR's NAIRP.  Tab 91, SA346-47 at 211:8-212:7.

45

CMS denied ACLR's claim on January 15, 2016.  Tab 64, A691.  The contracting officer noted that Health Integrity already "had commenced fraud and abuse work with respect to the Sales Tax Error Audit [on] October 30, 2014.  Thus, in accordance with Section 1.2.3 of the SOW, ACLR could not also perform what would be duplicative audits on this same topic."  *Id.* at A694.

ACLR thereafter filed its complaint challenging the denial of its certified claim in *ACLR II*.  ACLR's complaint is based on the same categories of PDEs containing alleged improper sales tax payments that were identified in its sales tax NAIRP and certified claim, but asserts that there are millions of additional PDEs and millions of additional dollars of PDE payments containing alleged sales tax amounts than had ever previously been identified by ACLR to CMS.  Tab 91, SA348-49 at 218:5-219:16.  For instance, ACLR's NAIRP and certified claim asserted that ACLR had identified 27,272,409 Minnesota PDEs containing amounts in the sales tax field with total PDE payments on those claims equaling $619,184,285.  Tab 61, A670.  Yet ACLR's complaint alleges that it found 38,145,596 Minnesota PDEs containing amounts in the sales tax field with total PDE payments equaling $889,596,525 – an increase of roughly 11 million PDEs and $270 million in total PDE payments.  Tab 87, SA156 at ¶ 18; Tab 91, SA348-49 at 218:5-219:16.

ACLR's complaint also alleges that it found 2,045,929 Louisiana PDEs containing amounts in the sales tax field with total PDE payments equaling $32,032,166 – an increase of roughly 230 PDEs and $4,000 in total PDE payments compared to what had been reported to CMS in the NAIRP and sought in ACLR's certified claim.  Tab 87, SA156 at ¶ 23; Tab 61, A670; Tab 91, SA349-50 at 219:17-220:17.  Likewise, ACLR's complaint alleges that it identified 264,119 PDEs that contained amounts in the sales tax field that were greater than 50%

of the reported drug costs with total PDE payments on those claims equaling $2,009,005 – an increase of roughly 2,000 PDEs and $400,000 compared to what ACLR reported in its NAIRP and sought in its certified claim.  Tab 87, SA157 at ¶ 28; Tab 61, A670; Tab 91, SA350-51 at 220:18-221:12.

ACLR's certified claim was based on the PDE data reported in ACLR's sales tax NAIRP. Tab 91, SA351 at 221:13-21.  ACLR never discussed with CMS the additional 2012 and 2013 PDE records and payments that it alleges in its complaint, that go above and beyond the records referenced in the NAIRP, nor did ACLR seek a contracting officer's final decision involving the revised claim data.  *Id.* at SA351-52 at 221:22-222:11.  The new claims identified in ACLR's complaint are different prescriptions that had not been identified by ACLR for CMS at any time prior to filing the complaint.  *Id.* at SA354-55 at 226:16-227:18.  Based on the new inflated number of PDEs and total PDE payments that ACLR contends were improper, ACLR's complaint now seeks contingent fees of $112,002,489 (rather than the $79,302,575 asserted in the certified claim) calculated off of the total dollar amount of the PDEs identified by ACLR in which any amount was included in the sales tax field.  Tab 91, SA356 at 230:12-19.  ACLR does not mention those discrepancies at all in its brief.  Instead, ACLR's motion says the alleged Louisiana sales tax charges are not being pursued, and cites only the lower sales tax figures contained in ACLR's sales tax NAIRP, ignoring the inflated numbers in its own complaint.  *See* P. Mot. S.J. at 44 n.3, 59.

ACLR's principal, Chris Mucke, is the only individual who performed any work on the sales tax NAIRP and the analysis of state taxation laws. Tab 91, SA323 at 111:12-16.  He estimates that it took no more than a few days of work to analyze the PDEs to generate ACLR's proposed sales tax NAIRP and to analyze state laws to determine the applicability of sales taxes

to Part D prescriptions.  *Id.* at SA322 at 109:10-14, SA327-28 at 120:21-121:14.  Thus, for the

effort of only a few days' work by one individual, ACLR now demands more than $112 million

in alleged damages.

ARGUMENT

I.     Standard Of Review

The Court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC

56(a).  Summary judgment is appropriate when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  RCFC 56(c)(1).  "[M]ere

denials, conclusory statements, or evidence that is merely colorable will not defeat summary

judgment." *Allensworth v. United States*, 122 Fed. Cl. 45, 48 (2015); *see Barmag Barmer*

*Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984) (the non-moving

party may not defeat summary judgment by presenting "[m]ere denials or conclusory

statements," but must offer proof of "an evidentiary conflict created on the record").  "Contract

interpretation is a question of law generally amenable to summary judgment." *Varilease Tech.*

*Grp. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002).

In this case, there are no disputed issues of any material fact bearing on the merits of

ACLR's claims.  Rather, the central issues for the Court to resolve involve interpretation of the

Part D RAC contract, namely (i) whether the contract allows for ACLR to be paid contingency

fees on the rejected duplicate payment and sales tax audit issues at all, (ii) even if the contract

could be read to permit the payment of such fees, whether CMS's decisions not to approve those

audit issues amounted to breaches of the contract, given the language reserving the right of

48

approval to CMS, and (iii) even if ACLR could establish a breach of contract by CMS, whether ACLR's alleged damages are entirely speculative and unrecoverable.

## II.     To The Extent ACLR Never Presented The Current Scope Of The Alleged Improper Sales Tax Payments Audit Issue For A Contracting Officer's Final Decision, The Court Lacks Jurisdiction To Consider That Claim

In *ACLR II*, ACLR challenges CMS's denial of ACLR's September 2015 certified claim that in turn sought damages arising from CMS's denial of ACLR's sales tax NAIRP one week before.  Although ACLR's allegations in *ACLR II* relate to the sales tax NAIRP denial, ACLR's allegations in its lawsuit go far beyond the information and facts presented to CMS either in the NAIRP itself or, more importantly, in the certified claim submitted to the contracting officer.  As discussed above, ACLR's lawsuit alleges that it has identified more than 11 million additional PDEs that, according to ACLR, contain evidence of improper sales tax payments but were not included either in ACLR's sales tax NAIRP or in its certified claim.  Those additional PDEs represent more than $270 million of total PDE payments from which ACLR (erroneously) purports to calculate the contingent fee for which it asserts CMS is liable.  ACLR agrees that it never discussed with CMS the additional millions of PDE records and payments that it alleges in its complaint, that go above and beyond the records referenced in the NAIRP, and that ACLR never sought a contracting officer's final decision involving those additional claims.

Under the Contract Disputes Act (CDA), "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision."  41 U.S.C. § 7103(a)(1).  "A valid final decision by the contracting officer is thus 'a jurisdictional prerequisite to further legal action thereon.'"  *Johnson Controls World Servs., Inc. v. United States*, 43 Fed. Cl. 589, 592 (1999) (quoting *Sharman Co. v. United States*, 2 F.3d 1564, 1568 (Fed. Cir. 1993), *overruled in part on other grounds by Reflectone, Inc. v. Dalton*, 60

F.3d 1572 (Fed. Cir. 1995)).  And a "valid claim must give adequate notice by specifying the basis and amount of liability."  *Id.*  It is undisputed that ACLR's certified claim, although involving the same rejected audit issue as is involved in *ACLR II*, did not include the same scope of PDE records that ACLR now alleges involved improper payments.

While the legal theory appears to be the same in both the certified claim and the complaint – CMS allegedly breached the contract by rejecting the sales tax NAIRP such that ACLR should be paid its full contingency fee as if CMS had permitted ACLR to proceed with the audit and every cent of every PDE identified by ACLR at the outset as having an improper sales tax payment was recouped – the universe of PDEs that ACLR now contends included improper sales tax payments is vastly different from what was presented to the contracting officer.  The millions of new PDEs referenced in ACLR's complaint are for different prescriptions that had not been identified by ACLR for CMS at any time prior to filing the complaint.  Based on the addition of those millions of additional allegedly improper payments, ACLR's complaint seeks more than $30 million of additional contingent fees from 11+ million more PDEs than were included in the certified claim (or identified in any way for CMS as part of the sales tax NAIRP).  Thus, this case is not one where the contractor adjusts its damages based upon the same set of operative facts.  Here, the facts that give rise to the claim have changed.  They may be similar to earlier claims, but are based upon unique prescriptions that have not been presented to the contracting officer.  Tab 91, SA351-52 at 221:22-222:11, SA354-55 at 226:16-227:18.

If the case were to proceed to trial (apart from the other legal flaws raised in this motion), ACLR would have to prove, and the Court would have to find, that all of the PDEs now identified by ACLR do, in fact, include an improper sales tax payment.  It is not conceivable that

ACLR or the Court could do so without presenting evidence as to each of the PDE records in question.  The Court therefore would be asked to review and make factual determinations regarding the validity of the data contained within millions of distinct PDE records that were never identified by ACLR to CMS prior to the filing of the *ACLR II* complaint.  *Id.*  Regardless of when ACLR contends it first became aware of those additional claims and their impact on the sales tax audit issue, it should be beyond dispute that resolution of ACLR's claim in *ACLR II* would require resolution of facts far beyond the set of operative facts previously presented to the contracting officer for resolution.  Accordingly, the Court lacks jurisdiction over ACLR's claim in *ACLR II*, at least to the extent it involves any PDE records in addition to the records upon which ACLR sought a contracting officer's final decision in September 2015 (which in turn was based entirely on the PDE records described in ACLR's sales tax NAIRP from August 2015).  The Court should dismiss for lack of jurisdiction either the entirety of *ACLR II* or, at a minimum, the excess portion of ACLR's claim that was never the subject of a request for a contracting officer's final decision.

III.   **As A Matter Of Law, CMS Did Not Breach The Part D RAC Contract By Refusing To Pay ACLR Contingent Fees For Audit Issues That Were Never Completed**

A.   **The RAC Contract Only Provides For Contingent Fee Payments To ACLR For Improper Payments Actually Recovered By CMS**

In *ACLR I*, $25,744,764 out of the total $28,413,317 in damages alleged by ACLR consist of the contingency fees that ACLR contends it would have received if CMS had permitted ACLR to proceed with the 2007 and 2010 duplicate payment recovery audits and if CMS eventually had recouped the full amounts identified by ACLR at the outset as improper duplicate payments in those audit issues.  In *ACLR II*, the entirety of the $112,002,489 sought by ACLR consists of the contingency fees that ACLR contends it would have received if CMS had

permitted ACLR to proceed with the 2012 and 2013 sales tax recovery audit and if CMS

eventually had recouped the full amount identified by ACLR in its complaint (but not in the

NAIRP or certified claim) as improper sales tax payments.

It is undisputed that CMS did not permit ACLR to proceed at all with the 2007 duplicate

payment audit issue (in *ACLR I*) and the 2012 to 2013 sales tax audit issue (in *ACLR II*), and that

CMS rescinded approval for the 2010 duplicate payment audit issue before it was completed (in

*ACLR I*).  Tab 90, SA238 at 94:1-13, SA276-77 at 270:22-271:9; Tab 91, SA340 at 183:4-9.

ACLR agrees that it has no evidence that CMS ever recovered any of the amounts identified by

ACLR as improper payments in any of those audit issues, as a result of ACLR's work.  Tab 90,

SA279 at 273:6-18; Tab 91, SA346-47 at 211:8-212:7.  Thus ACLR asks to be paid contingency

fees under the Part D RAC contract based on alleged improper payments that were never

recouped by CMS as a result of ACLR's proposed recovery audits that were never completed.

The contract is clear regarding the method and basis for ACLR to be paid for its work.

Starting with the original task order, the contract provided that it was a "Firm-Fixed Price

Contingency Fee task order."

> All payments shall be paid only on a contingency basis.  The
> recovery audit contractor will receive 7.5% of all amounts
> collected.  The contingency fees shall be paid once the recovery
> audit contractor collects the Medicare overpayments.  The
> recovery audit contractor shall be paid a percentage of the amount
> that is collected through their recovery efforts.  *The recovery audit
> contractor shall not receive any payments for the identification of
> the underpayments or overpayments not recovered/collected.*

Tab 7, A159 at § 5 (emphasis added).  In the PWS, as drafted by ACLR, ACLR recognized that

it would submit its payment vouchers "in accordance with [the] Task Order *and recoveries*."  *Id.*

at A213 (emphasis added).

With contract modifications 13 and 16 that implemented the SOW, the contract continues

to provide that "RACs are paid on a contingency fee basis."  Tab 22, A434 at § 1.1.  The SOW

also states that ACLR "is paid by contingency fee, and cannot receive payment for their services

from CMS/CPI until the payment process is complete and payment is received from the Part D

contract."  Tab 22, A439 at § 3.0  "The RAC will receive a contingency payment once the full

overpayment amount has been recouped from the plan sponsor," or, in the event CMS decides to

compromise a plan sponsor's overpayment for a lesser amount, ACLR "shall receive a

contingency payment for the portion of the improper payment amount that was recouped."  Tab

22, A440 at §§ 3.2.2, 3.2.3.  "Contingency fees are only associated with the portion of the

improper payments identified by the Part D RAC and recouped by CMS."  Tab 22, A440 at §

3.2.4.

 Even ACLR agrees that it is not aware of any provision of the contract "that provides for

payment to ACLR on anything other than a contingent-fee basis."  Tab 91, SA299 at 39:18-22.

Rather, ACLR agrees that the contract only provides for payment to ACLR in the form of a

"contingent fee based on amounts actually recovered by CMS"; the contract does not provide for

any payments to ACLR "based on amounts identified by ACLR as overpayments, only on

amounts recovered."  *Id.* at SA302 at 59:11-22.

 "When interpreting a contract, the language of [the] contract must be given that meaning

that would be derived from the contract by a reasonably intelligent person acquainted with the

contemporaneous circumstances." *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329,

1338 (Fed. Cir. 2006) (internal quotation omitted).  When a "contract's language is unambiguous

it must be given its plain and ordinary meaning."  *Id.* (internal quotation omitted); *see Coast

Prof'l, Inc. v. United States*, 828 F.3d 1349, 1354 (Fed. Cir. 2016) (courts must give

"unambiguous contract terms their plain and ordinary meaning").

In this case, the Part D RAC contract could not be more clear that it allows for payment to ACLR *only* on a contingency fee basis calculated from overpayments actually recouped by CMS as a result of one of ACLR's approved audit issues.  That is consistent with underlying Federal law that governs the establishment of recovery audit programs.  The Medicare RAC statute itself states that "payment shall be made to such a contractor *only from amounts recovered*," and "*from such amounts recovered*, payment . . . shall be made on a contingent basis for collecting overpayments."  42 U.S.C. § 1395ddd(h)(1)(A), (B) (emphasis added).  Thus there is no statutory authority for ACLR to be paid a contingent fee on amounts never collected.

The Improper Payments Elimination and Recovery Act of 2010 (IPERA), Pub. L. No. 111-204, 124 Stat. 2224, and the Improper Payments Elimination and Recovery Improvement Act of 2012 (IPERIA), Pub. L. No. 112-248, 126 Stat. 2390, both codified at 31 U.S.C. § 3321 note, directed OMB to issue guidance to implement those statutes.  *See* IPERA § 2(g); IPERIA § 3(b)(1).  And guidance issued by OMB makes clear that "[c]ontingency fee contracts shall preclude any payment to the payment recapture audit contractor until the recoveries are actually collected by the agency."  Tab 89, SA207.  Similarly, OMB's guidance provides that "[o]verpayments that are identified by the payment recapture auditor, but that are subsequently determined not to be collectable or not to be improper, shall not be considered 'collected' for proceed disposition purposes outlined in this section."  *Id.* at SA208.  Because the 2007 and 2010 duplicate payment audit issues involved in *ACLR I* and the 2012 to 2013 sales tax audit issue involved in *ACLR II* did not result in the recoupment of overpayments by CMS as a result of any work done by ACLR, there is no basis under the contract for ACLR to seek the payment of its hypothetical contingency fees as if those recovery audits had proceeded and the entirety of the amounts estimated to be improper payments by ACLR actually had been recovered.

54

Likewise, ACLR's demand in *ACLR I* that it be paid $2,668,553 allegedly representing all of its expenses and anticipated profits during 2012 and 2013, minus the contingency fee payments that ACLR received from CMS in those years for other audit issues that had been approved and resulted in recoveries, has no support in the contract.  ACLR calculated its historical profit rate at 40 to 50 percent, based entirely on its past success performing work in the private sector, not on any Government contracts.  Tab 90, SA292-93 at 307:19-308:9.  The Part D RAC contract does not contain any provisions guaranteeing that ACLR would realize whatever profit rate it historically had enjoyed when performing work in the private sector.

ACLR's owner, Chris Mucke, testified that he anticipated being "retired and living on an island anywhere" after having "received hundreds of millions back in improper payments" as a result of this contract.  Tab 90, SA282 at 278:5-9.  But the contract does not have any language entitling ACLR to seek those types of damages merely because its wildly inflated expectations for vast riches were disappointed.  ACLR has not identified any language under the contract that could entitle it to payment of its net operating expenses and historical private-sector profit margin in lieu of or in addition to any contingency fee payments for amounts actually recovered by CMS.  The Government therefore is entitled to summary judgment on all of ACLR's claims for these reasons alone, because ACLR cannot establish entitlement to *any* additional payments from CMS under the terms of the contract.

      **B.**    **CMS Had Authority Under The RAC Contract To Decide Whether To Approve Or Deny ACLR's Audit Proposals**

          **1.**    <u>The Contract Gave CMS Authority To Approve Or Deny Audit Proposals</u>

Even if the contract could be interpreted as allowing for payment to ACLR for recovery audits that were never completed, or for ACLR's operational costs net of payments already received, ACLR's claims also fail as a matter of law because ACLR cannot prove that CMS

breached the contract by denying or rescinding approval for the duplicate payment and sales tax audit issues involved in *ACLR I* and *ACLR II*.  Therefore, even if the contract provided for a means of paying ACLR for wrongfully rejected audit issues, CMS's actions in rejecting these audit issues were not improper and did not breach the contract.

The 2010 duplicate payment and the 2012 to 2013 sales tax audit issues were rejected by CMS after the SOW was implemented into ACLR's task order.  The SOW provides that ACLR "must receive approval from CMS/CPI prior to commencing recovery audit activities."  Tab 22, A437 at § 2.1.1.  After submitting a NAIRP, ACLR was obliged to "work[] with CMS/CPI to refine and approve or deny the NAIRP.  Once approved the RAC begins recovery audit activities."  *Id.*  The SOW NAIRP process further specified that, if CMS elected to deny any NAIRP, "CMS shall provide [ACLR] with a written explanation as to the reasons for the denial."  Tab 22, A464-65 at App. E.  The SOW language is clear that CMS retained the authority under the contract to review ACLR's proposed audit issues and to either approve or deny them.  ACLR agrees that, under the SOW, CMS had to approve any audit issue for ACLR to be permitted to commence and complete that recovery audit, and CMS had the authority to deny a proposed audit issue.  Tab 90, SA237 at 90:7-11; Tab 91, SA303-04 at 63:20-64:3, SA326 at115:12-16.  CMS thus had the right to deny approval for any particular audit issues proposed by ACLR; CMS's decisions to do so for those two audit issues therefore cannot amount to a breach of contract.

ACLR's proposed 2007 duplicate payment recovery audit was mentioned by ACLR during a conference call on November 30, 2011, during the initial year of the contract.  At that time, the PWS was still in effect as the SOW had not yet been finalized and incorporated into the contract.  But even the PWS provided that CMS review ACLR's audit issues and assess their

merit.  ACLR's proposed work plan for analyzing duplicate payments stated that ACLR

"anticipate[d] CMS revisions to our process."  Tab 7, A191.  The PWS provided that ACLR

would "recommend . . ., and solicit CMS' approval for, conducting documentation audits" of

plan sponsors identified as having errors in PDE data.  Tab 7, A193.  Additional PWS provisions

describing CMS's role in the oversight of the recovery audit process are discussed above in

Statement of the Case Section III.

Indeed, apart from the language in the PWS and SOW, CMS was required, by law, to

have the final say in the identification of any improper payments identified through the recovery

audit process.  OMB's guidance requires that the "contractor must provide clear evidence of

overpayments to the appropriate agency official" to substantiate any alleged improper payment.

Tab 89, SA200.  And by statute, ACLR as the Part D RAC "shall have no authority to make final

determinations relating to whether any overpayment occurred and whether to compromise, settle,

or terminate overpayment claims."  IPERA § 2(h)(2)(C)(ii).  CMS thus acted within the scope of

its authority under both the contract and governing law in deciding not to allow ACLR to

proceed further with the 2007 or 2010 duplicate payment recovery audits and the 2012 to 2013

sales tax recovery audit.

> 2.     CMS's Decision To Reject These Three Audit Proposals Did Not Breach
>        Any Duty Of Good Faith And Fair Dealing

ACLR alleges that CMS breached its duty of good faith and fair dealing by not

permitting ACLR to proceed with these audit issues.  *See* P. Mot. S.J. at 54-57.  The implied

covenant of good faith and fair dealing "imposes obligations on both contracting parties that

include the duty not to interfere with the other party's performance and not to act so as to destroy

the reasonable expectations of the other party regarding the fruits of the contract."  *Centex Corp.*

*v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  The "implied duty of good faith and fair

dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010).  Put another way, "an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision." *Metcalf Const. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014).  "There is likewise no authority for the proposition that the government must agree with a contractor on contract interpretation so as to avoid litigation." *Dotcom Associates I, LLC v. United States*, 112 Fed. Cl. 594, 601 (2013) (dismissing claim for breach of the covenant of good faith and fair dealing).

Nothing in the RAC contract (or the existing law) entitled ACLR to have unfettered discretion to decide what audit issues to pursue, the methodology for how to pursue those audit issues, which PDEs to identify as improper under those methodologies, and then to notify plan sponsors unilaterally that whatever payments ACLR had identified as improper had to be recouped.  Indeed, ACLR itself describes audit methodologies as "fluid in nature," and concedes that issues can arise even after approval of an audit issue that require changing the methodology for pursuing the audit, to make the audit more accurate.  Tab 90, SA273 at 246:9-22.  CMS could not have contracted to give ACLR unbridled discretion to proceed with audits without CMS's approval, because that would have been inconsistent with the underlying RAC statutes, regulations, and OMB guidance that reserve to the agency the authority to approve or deny audit issues.  *See, e.g.*, *Am. Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1374 (Fed. Cir. 1999) (discussing potential invalidity of contracts entered in violation of statutes).  ACLR cannot expand the good faith and fair dealing doctrine to expand its contractual rights beyond what is

allowed by Federal law.  Because the contract and law gave CMS the authority to do precisely what it did in denying approval for these audit issues, CMS cannot be found to have breached the duty of good faith and fair dealing in so acting.[6]

a.    The 2007 Duplicate Payment Audit Issue

ACLR cannot establish that CMS acted unreasonably in denying approval for these particular audit issues under the undisputed circumstances.  For the 2007 duplicate payment audit issue, ACLR did not submit any formal audit proposal to CMS, but rather mentioned during a telephone conference on November 30, 2011, that ACLR had reviewed a portion of the PDE records that had only been provided to ACLR earlier the same month and was prepared to send out improper payment notification letters to plan sponsors a few days later that would identify hundreds of millions of dollars' worth of PDE records that the plan sponsors would need to reimburse.  ACLR did not inform CMS which PDE records it thought were duplicates or provide any specific data about its findings, other than the estimated total amount, until more than three years later at the time it submitted its certified claim (by which point any attempted recovery of 2007 PDE payments would have been time-barred).  At the time of the initial telephone conference, CMS did not have in place a mechanism for recouping any actual overpayments from the plan sponsors, so it would have been premature for anyone to attempt to commence recoupment activities, whether the payments actually were duplicates or not.  CMS's actions cannot be found unreasonable under the circumstances.

---

[6] Although framed as a breach of contract, ACLR's claim in essence is one for unjust enrichment, with ACLR complaining that it performed analysis for CMS on certain rejected audit issues for which the contract did not allow compensation.  But the Court does not possess jurisdiction over unjust enrichment claims.  *See Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1316 (Fed. Cir. 2011); *Claude Mayo Constr. Co., Inc. v. United States*, 128 Fed. Cl. 616, 622 (2016).

b.      The 2010 Duplicate Payment Audit Issue

For the 2010 duplicate payment audit issue, CMS attempted to work with ACLR to find a

legitimate way to pursue that recovery audit for years, refining the proposed methodology and

developing strategies for addressing the many complicated issues that arose with weeding out

categories of prescriptions that were not likely to be actual duplicates, like partial fills, long term

care prescriptions, and the like.  Once ACLR commenced the recovery audit activities and

identified its initial list of potential duplicate payments, CMS received detailed reports from the

data validator, Livanta, that found numerous errors in ACLR's work and indications that more

than 50% of the identified PDEs were likely to be false positives.

When plan sponsors received requests for information concerning the PDEs identified by

ACLR for the 2010 duplicate payment issue, the plan sponsors responded to CMS with similar

concerns that ACLR's work had captured large quantities of PDE records that were not likely to

be duplicates at all, resulting in significant burdens for plan sponsors in responding to the

requests and, potentially, for CMS in having to resolve disputes between ACLR and the plan

sponsors as to the legitimacy of hundreds of thousands of PDE records.  Some plan sponsors

were required by ACLR's notices to produce documentation for thousands of different PDEs at

once.  Tab 90, SA267-68 at 225:5-226:1.  One plan sponsor reported to CMS that, to respond to

ACLR's 2010 duplicate payment RFI, the plan sponsor would have to generate screen shots for

at least 220,000 PDEs, which would take 16 contractors a total of 86 weeks to complete and cost

nearly $2 million.  Tab 119, SA630.

And when ACLR submitted its improper payment review package for the 2010 duplicate

payment audit issue, ACLR declined to follow the revised methodology requested by CMS.  As

the OMB guidance required, all of those factors suggested that the "likelihood that identified

overpayments will be recaptured" and the "likelihood that the expected recoveries will be greater than the costs incurred to identify and recover the overpayments" were low, in part because "labor intensive manual reviews of paper documentation [would] be required" to identify actual duplicate payments.  Tab 89, SA202.

In sum, CMS had received substantial information from both Livanta and various plan sponsors that raised significant concerns regarding the reliability and validity of the methodology being used for the 2010 duplicate payment audit issue.  CMS's right to consider and rely upon information and recommendations provided by other contractors had been established since the outset of the RAC contract.  The task order provided that ACLR was only expected to "furnish all necessary services . . . *not otherwise provided by the Government*, as needed to perform the requirements set forth in" the contract.  Tab 7, A159 (emphasis added).  And the SOW recognized that "the responsible parties for Part D RAC audit functions include CMS/CPI personnel *and support contractors, including and aside from the Part D RAC*, [and] the effective integration of each audit process and collaboration among stakeholders is critical to the program's success."  Tab 22, A435 at § 2.0 (emphasis added).  ACLR was well aware of Livanta's role in the Part D RAC process, having signed contract modifications and the SOW that all described Livanta's involvement in validating ACLR's proposed audit findings.

ACLR asserts that Livanta was wrong in some of its conclusions or went beyond the methodology ACLR had applied for the 2010 duplicate payment issue.  But the fact remains that it was up to CMS, not ACLR, to resolve those disputes and to make the ultimate determination whether an audit issue was worth pursuing or not, and whether identified payments were improper or not.  In light of all the information provided to CMS concerning the potential flaws with the 2010 duplicate payment audit issue, ACLR cannot prove that CMS acted irrationally or

unreasonably in rescinding approval to complete that recovery audit.

Finally, ACLR notes that CMS's technical direction notice rescinding approval for the 2010 duplicate payment audit was issued by Sonja Brown, the contracting officer's representative, not by a contracting officer.  ACLR argues the obvious point that only contracting officers have authority under the FAR "to enter into and modify contracts."  P. Mot. S.J. at 39.  But Ms. Brown, on behalf of CMS, did not modify ACLR's contract; rather she provided technical direction to ACLR on the performance of its work under the existing contract.  Ms. Brown's appointment specifically authorized her "to act on behalf of the Contracting Officer with respect to technical and administrative matters, within the scope of the contract."  Tab 55 at A631.  ACLR's half-hearted argument that Ms. Brown exceeded her authority is unpersuasive.

c.       The 2012-2013 Sales Tax Audit Issue

The 2012 to 2013 sales tax audit issue involved a similar scenario.  ACLR proposed a recovery audit in August 2015 that focused primarily on Louisiana and Minnesota, which comprised 98.9% of the total PDE payments identified by ACLR in its NAIRP as including potential improper sales tax payments.  Health Integrity, as the NBI MEDIC, already had been analyzing the issue of potential improper sales tax payments in Louisiana and Minnesota, as well as conducting a nationwide survey, for nearly a year.  Previously Health Integrity had analyzed Minnesota sales tax issues in 2010 and 2011, and CMS had been involved, directly and through the OIG, in addressing Louisiana sales tax payments since 2009.

In Health Integrity's most recent analysis submitted to CMS the same month as ACLR's NAIRP submission, Health Integrity concluded that, after accounting for the 10¢ prescription fee allowable under Louisiana law, only $20,144.14 in payments remained in the sales tax field in Louisiana PDEs for 2012 and 2013, rather than the $32 million in alleged improper payments

asserted in ACLR's NAIRP in Louisiana for those same years.  For Minnesota, Health Integrity and CMS had been grappling with the issue of the 2% wholesale drug distributor tax and its potential applicability to Part D prescriptions.  According to Health Integrity, if the wholesale drug distributor tax was appropriately being passed through on Part D prescriptions, the additional amounts remaining in the sales tax field on Minnesota PDEs for 2010 through 2014 totaled $10.2 million for that five-year period.  ACLR's NAIRP that alleged it had identified $619 million in alleged improper payments in Minnesota for 2012 and 2013 alone therefore was questionable in light of Health Integrity's contemporary analysis.  ACLR's sales tax NAIRP did not acknowledge either issue in Louisiana or Minnesota.

CMS denied ACLR's sales tax NAIRP because another contractor – Health Integrity – already had been examining the same issue in the same states and had identified significant issues with proceeding with an automated recovery audit on that issue using PDE data alone. CMS understood that ACLR's proposal to fire off notices of improper payment to plan sponsors identifying hundreds of millions of PDEs as improper payments based on the data recorded in the sales tax field alone, which Health Integrity already had determined was likely *not* sales tax at all (at least in Louisiana and Minnesota, the two primary focuses of ACLR's NAIRP) but rather other forms of taxes and fees that might be permissible under state law, was a recipe for disaster.  The limited amount of potential recovery in Louisiana in particular warranted CMS's denial, as the agency legitimately could conclude that it was not the best use of agency and plan sponsor resources to embark on a complex recovery audit with the maximum potential recovery of only around $20,000.

ACLR argues that CMS's decision to deny the sales tax audit because Health Integrity already had been examining the same issue was inconsistent with the SOW, because CMS did

not afford ACLR the opportunity for a walkthrough before denying the NAIRP and because the denial supposedly was inconsistent with SOW section 1.2.3.  *See* P. Mot. S.J. at 47-53. Appendix E of the SOW contains a "Part D RAC Activities Timeline."  Tab 22 at A464.  The timeline reflects that the NAIRP process begins with the submission of a new proposal by ACLR, and concludes when "CMS provides complete approval, conditional approval, or denial of the NAIRP."  *Id.*  In between, there are additional steps that can occur, including ACLR "conduct[ing] a walk-thru of the new issue at the next scheduled CMS/RAC Operations Meeting."  *Id.*  No walk-through occurred for the sales tax NAIRP, because CMS already determined to deny the NAIRP based on the prior work performed by Health Integrity and the difficulties Health Integrity had uncovered in analyzing what was reported in the PDE sales tax field and whether those amounts were legitimate, which would require a state-by-state and prescription-by-prescription analysis.  As CMS explained, no additional feedback or walk-through was provided because those steps occur "in the middle of a process where CMS is considering to approve" and this audit issue "never made it to this stage of a NAIRP approval process."  Tab 49, A604 at 43:14-22.  Moreover, CMS invited ACLR to contact the agency with any questions about the decision, but ACLR never did so, instead submitting a certified claim. Tab 62, A672; Tab 91, SA341 at 191:10-15.  The fact that CMS did not mechanically follow all of the Appendix E timeline steps, when it already had decided to deny the sales tax NAIRP for legitimate reasons, does not invalidate its decision.  Nor can ACLR complain when it declined to follow up with CMS, despite being invited to do so.

Regarding SOW section 1.2.3, the SOW gave CMS the absolute right to deny any proposed audit issue, so CMS's authority to do so was not limited to section 1.2.3 alone.  But CMS's decision was consistent with section 1.2.3 in any event.  That section states:  "CMS/CPI

consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue." Tab 22, A435 at § 1.2.3.  As CMS explained, the sales tax issue was "currently open and active with another CMS contractor," Health Integrity.  Tab 62, A672.  As discussed above, that was accurate: ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████. Tab 126, SA688; Tab 93, SA366-68 at 126:5-128:15; Tab 97, SA392-94 at 91:3-93:15, SA395-96 at 133:14-134:2, SA397-98 at 141:22-142:7; Tab 98, SA410-11 at 50:22-51:16.

ACLR argues that its proposed sales tax audit was not duplicative of Health Integrity's work, but it does so only by taking an unnaturally myopic view of the work performed by Health Integrity.  ACLR notes that Health Integrity analyzed state sales tax laws and potential charges in the PDE records, but was not the Part D RAC so could not have collected any improper sales tax payments.  That may be so, but it ignores the obvious point that CMS denied the sales tax audit because Health Integrity had identified a range of logistical problems that would apply to anyone attempting to recoup those sums, namely that it was unclear whether the PDEs reflected sales tax payments at all, or some other form of legitimate state tax or fee.  Health Integrity had conducted extensive analysis of both Louisiana and Minnesota, which together comprised nearly 99% of the PDEs identified by ACLR as potentially including improper sales tax charges.  Health Integrity also had conducted a nationwide analysis of amounts recorded in the PDE sales tax field. ACLR's proposal to audit potential sales taxes in Louisiana and Minnesota, as well as a few other states also encompassed in Health Integrity's nationwide analysis, thus was entirely duplicative.

ACLR also argues that Health Integrity's work did not constitute an "audit" and that the amounts identified by Health Integrity had not already been recovered by CMS.  Health Integrity analyzed state laws to attempt to determine the applicability of sales or other taxes and examined the PDE records to compute the amounts recorded in the sales tax field.  That is precisely the same work that ACLR proposed to perform in its sales tax NAIRP.  Tab 61, A663, A667-68. And while it's true that CMS had not attempted to recoup all of the amounts identified in Health Integrity's sales tax reports – primarily because it was apparent that attempting to recoup those amounts would be challenging if not impossible – in Louisiana, at least, the total amounts greater than 10¢ that continued to be reported in the sales tax field after Health Integrity's and CMS's actions had decreased.

CMS was required to implement the Part D RAC program "in a manner designed to ensure the greatest financial benefit to the Government," IPERA § 2(h)(2)(B)(ii), and deciding not to allow ACLR to proceed with a recovery audit that was based on a series of flawed assumptions that another CMS contractor already had been exploring was not unreasonable.  In determining whether to allow ACLR to proceed with a recovery audit, OMB's guidance similarly required CMS to consider whether "the evidence of overpayment is clear and convincing (e.g., the same exact invoice was paid twice) as opposed to whether the recipient of an apparent overpayment has grounds to contest," whether "the overpayment is truly an improper payment which can be recovered rather than a failure to properly document compliance," and the "likelihood that the expected recoveries will be greater than the costs incurred to identify and recover the overpayments."  Tab 89, SA202.  On balance, CMS determined that pursuit of ACLR's proposed sales tax recovery audit was not advisable.

ACLR cites *Horn & Assocs., Inc. v. United States*, 2017 WL 2303513 (Fed. Cl. May 25,

2017), which ACLR argues involved a "similar claim for breach of duty of good faith and fair dealing in connection with a RAC contract." P. Mot. S.J. at 40. Unlike this case, the contract in *Horn* required the plaintiff to "perform a primary audit recovery on all contract payments" within a specified time period. *Id.* at *4, *15. Here, the contract required ACLR to obtain CMS's approval before performing any audit and gave CMS the right to approve or deny audit requests. The contract in this case thus includes agency discretion apparently missing from the *Horn* contract. The *Horn* Court also did not address the issue of damages and whether a RAC contractor could recover any damages where it is only entitled by statute and contract to a contingent fee on amounts actually recovered by the agency. Ultimately the *Horn* parties settled that case, so the Court never had to resolve those issues. *See Horn*, ECF No. 316.

CMS's decisions to deny approval for these audit issues were not irrational or unreasonable under the circumstances as known to the agency at that time. Therefore, even if the contract could be interpreted as allowing for payment to ACLR for recovery audits that were never completed, ACLR's claims still fail as a matter of law because CMS did not breach the contract when it exercised its undisputed authority under the contract to deny approval for the duplicate payment and sales tax audit issues involved in these cases.

IV. **ACLR's Alleged Damages Are Entirely Speculative And Not Recoverable, Even If There Had Been Any Breach Of Contract**

As discussed above, ACLR is neither entitled to any payments under the contract except for contingency fees calculated off of recovered amounts, nor did CMS breach the contract by declining to authorize ACLR to proceed with the three specific audit issues at issue in *ACLR I* and *ACLR II*. For those reasons, the Court need go no further. But even if ACLR could establish that CMS breached the contract by rejecting the duplicate payment or sales tax audit issues, and even if ACLR could establish that it would be entitled to contingent fees for those audit issues

67

despite CMS never recovering the amounts identified in ACLR's NAIRPs as a result of ACLR's audit proposals, ACLR's claims still would fail because it cannot demonstrate any actual – rather than purely speculative – damages.

ACLR bears the burden of establishing liability, causation, and resulting injury for any breach of contract.  *See, e.g.*, *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed. Cir. 1991).  To be recoverable, alleged breach of contract damages must have been foreseeable at the time of the making of the contract, not at the time of breach.  *See, e.g.*, *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 545-47 (1903); *Prudential Insurance Co. v. United States*, 801 F.2d 1295, 1301 (Fed. Cir. 1986).  The non-breaching party is entitled to recover only the amount which will place it in the same, but not a better, position than if no breach had occurred. *See, e.g.*, *Miller v. Robertson*, 266 U.S. 243, 260 (1924).

Damages are not recoverable at all if they are too speculative or too remote from the alleged breach.  "[R]emote and consequential damages are not recoverable in a common-law suit for breach of contract . . . especially . . . in suits against the United States for the recovery of common-law damages. . . ."  *Northern Helex Co. v. United States*, 524 F.2d 707, 720 (Ct. Cl. 1975); *see Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1021 (Fed. Cir. 1996) (rejecting contractor's damage claim that required "attempting to determine what would have happened if the guarantee had been issued" because that "necessarily involves a highly speculative and conjectural inquiry").

All of ACLR's alleged damages in *ACLR II* and the vast majority of ACLR's alleged damages in *ACLR I* are derived from its estimate of what its contingency fee would have been *if* its audit issues had been approved and *if* CMS ultimately had recovered all of the amounts set forth in ACLR's NAIRPs and audit proposals submitted at the outset of the approval process.

68

ACLR's damages model is premised on the following fundamental assumptions:  (1) every single PDE record described in ACLR's rejected audit proposals would have been found to be improper by CMS if the audits had proceeded; and (2) every single dollar identified by ACLR in every one of those PDE records would have been found to be an improper overpayment and thus recovered by CMS.  Tab 90, SA292 at 307:11-18, SA294-95 at 311:3-312:10; Tab 91, SA342 at 201:10-19, SA344 at 207:1-7.  Both assumptions are entirely speculative and not supported by the results of any of the audit issues that ACLR did complete under the contract.

ACLR agrees that the alleged improper payment amounts identified in its NAIRPs are only "estimates" prepared at the start of an audit issue.  Tab 91, SA345 at 210:5-21, SA353 at 225:19-21.  For audit issues that are approved by CMS, there is a back and forth process in which the proposed audit methodology is reviewed and considered, often undergoing revisions.  The 2010 duplicate payment audit issue is a prime example of that iterative process, with the methodology initially proposed by ACLR undergoing many substantive revisions over a lengthy period of time.  The final methodology revisions requested by CMS would have resulted in a further reduction of 66.8% to the total payment amount of the PDEs identified as potentially duplicative, compared to the total estimated by ACLR.  Tab 116, SA623.  ACLR agrees that the ultimate recovery on any of its audit issues was *always* less than what it projected at the beginning, and in some cases varied "significantly" compared to the amounts estimated at the audit's outset.  Tab 91, SA307 at 81:5-13, SA308 at 82:4-9, SA344 at 207:8-18.  And ACLR agrees that it *never* believed it could achieve a 100% success rate in recovering overpayments.  Tab 91, SA301 at 48:8-13.

The 2010 duplicate payment audit issue was pursued as a complex review.  That process gave plan sponsors the opportunity to submit information and documents substantiating the

amounts claimed in the PDE records, to establish that they were not duplicate payments at all.  If the 2007 duplicate payment audit issue had moved forward, there is no reason to believe it would not have required a complex review, as well, based on all of the difficulties the parties uncovered when examining the 2010 to 2012 PDEs for the same issue.  And based on what CMS learned from Health Integrity concerning the sales tax issues in Louisiana and Minnesota, one cannot conclude – as ACLR does – that every cent recorded in the sales tax field of every PDE was improper and would have been recouped, given the reality that sponsors were using that field to record other forms of fees and taxes that might well have been legitimate under state law.  One simply cannot know what would have happened if plan sponsors had been given an opportunity to substantiate any of the PDE payments identified in ACLR's NAIRPs.  At a minimum, it is clear that ACLR's assumption that 100% of the PDEs totaling $1,260,571,867, that ACLR now has identified as 2007 and 2010 duplicate payments ($313,808,241 and $15,909,550, respectively) and 2012 to 2013 sales tax improper payments ($930,854,076), ultimately would have been determined to be improper and fully recouped by CMS is based on unsupported and unsupportable conjecture.

The flaws in ACLR's damages model are further demonstrated by its handling of the sales tax issue.  ACLR assumes that, if a plan sponsor incorrectly included 1¢ of sales tax on an otherwise proper and valid prescription, then the entirety of the PDE payment for that prescription would be deemed improper and recoverable by CMS.  Tab 91, SA332-33 at 147:15-148:7.  To explain by example, if a plan sponsor paid for a $99 prescription that everyone agrees was properly filled, but recorded on the PDE record that it paid $100.00, including $1 of sales tax that was not actually paid, then ACLR argues that the entire $100.00 payment made by CMS to the plan sponsor for that PDE would be deemed improper and should be recouped by CMS,

rather than just the $1 of improper sales tax.  Tab 91, SA334 at 155:3-9.  That is so, despite the

fact that no one is disputing that the pharmacy actually filled that prescription for a patient, that

the prescription was authorized and proper in every way, and that the plan sponsor paid the

pharmacy for the $99 charge for the prescription.  Somehow, in ACLR's view, the inclusion of

any improper component in the PDE record renders the entire record improper, almost as a form

of forfeiture.

      ACLR's sales tax forfeiture presumption is contradicted by OMB's guidance on handling

improper payments, which offers the following example:

> When calculating a program's annual improper payment amount,
> agencies should only utilize the amount paid improperly.  For
> example, if a $100 payment was due, but a $110 payment was
> made erroneously, then the amount applied to the annual estimated
> improper payment amount should be $10, rather than the payment
> amount of $110.  Similarly, if a $100 payment was due, but a $90
> payment was made erroneously, then the amount applied to the
> annual estimated improper payment amount should be $10, rather
> than the payment amount of $90.  However, if a $100 payment was
> due and made, but there is insufficient documentation to support
> the appropriateness of the payment or if a duplicate payment was
> made, then the amount applied to the annual estimated improper
> payment amount should be $100.

Tab 89, SA182-83.  Thus, if $1 was improperly included in a PDE record, it is the $1 that is

improper, not the entire amount.  It is only if there is insufficient documentation to support *any*

portion of the payment that the entirety of the payment would be considered improper.  Yet

ACLR's damage claim fails to take into account that reality.

      The absurdity of ACLR's position is demonstrated by continuing with the example

discussed above, of a $99 prescription (that was filled and authorized under Part D) for which a

plan sponsor erroneously reported a total payment of $100, rather than $99, by including $1 for

sales tax that was not actually paid.  Using ACLR's interpretation, once ACLR identified that

PDE as involving an improper sales tax payment, the entire $100 would be recouped by CMS, and ACLR would get a $15 contingent fee payment (15% of the $100 recouped). Tab 91, SA334 at 155:10-14. Then, because no one disputes that the prescription actually was filled, the plan sponsor likely would submit an adjusted or corrected PDE for $99, to replace the original deleted $100 PDE. As there would no longer be any error in the corrected PDE, CMS presumably would pay it. *Id.* at SA335-36 at 156:13-157:1. Thus, as a result of ACLR identifying $1 of improper sales tax on the original PDE, CMS ultimately would end up paying the plan sponsor and ACLR a total of $114 ($99 for the corrected PDE and $15 for ACLR's contingent fee) – thus ending up *worse off financially* than if the original incorrect $100 PDE had not been found at all. *Id.* at SA336 at 157:2-9; Tab 95, SA376 at 25:3-14.

ACLR's assumption also ignores the appeals process that existed for plan sponsors identified as having received Part D overpayments. That three-level process offered plan sponsors the ability to challenge improper payment findings made by ACLR, and CMS was given the final, non-appealable say in resolving those appeals. ACLR's damages model presumes either that there would not have been a single appeal of any of the duplicate payment or sales tax alleged improper payments, or that if there were any appeals, every single one would have been resolved in ACLR's favor by CMS. That presumption is speculative. Certainly it is not borne out by the parties' experience during the 2010 duplicate payment audit issue, when numerous plan sponsors responded to ACLR's RFIs by contacting CMS to question ACLR's methodology and the likelihood of the process capturing false positives. But ACLR has not accounted for any possibility of its initial projected improper payments being challenged and overturned during the appeals process.

Finally, ACLR's unrealistic presumption of 100% recovery on all three of these audit

issues is not supported by the analysis undertaken by GAO on the other audit issues completed by ACLR.  GAO determined that the rate of recovery on several audit issues ranged from 22% to 99%, when comparing the estimated improper payments identified by ACLR with the amounts actually recovered by CMS.  Tab 15, A321; Tab 91, SA312 at 93:2-19.  Those findings reveal the speculative nature in trying to guess what amounts, if any, might be recovered on any audit issue when looking only at one of ACLR's NAIRPs submitted prior to approval – let alone completion – of the audit issue.  ACLR agrees that in certain instances one cannot determine, from the PDE records alone, whether a Part D payment is proper or improper.  Tab 91, SA313 at 97:17-22.  ACLR also agrees that, at the outset, it did not even contemplate being able to recover 100% of every improper payment.  *Id.* at SA301 at 48:12-13.  Yet ACLR's damages model presumes that every PDE it identified in these three audit issues ultimately would be deemed to be improper, and that every cent of every one of those PDEs would be recouped as an improper payment.  ACLR has failed to account for any possibility that the ultimate recoveries by CMS would be something less than whatever ACLR projected at the beginning.  ACLR's assertion that it should be paid contingent fees calculated off of 100% of the total sum of PDEs that it identified as including potentially improper payments is unsupportable.

The only other form of damages sought by ACLR, in *ACLR I*, are the $2.6 million that ACLR contends reflect its operating costs and historical profit rate for 2012 and 2013, minus the contingent fees already paid by CMS for approved audit issues during those years.  The contract does not entitle ACLR to be compensated in that manner, only for a contingent share of improper payments actually recovered.  For that reason alone, this portion of ACLR's damages claim fails.

Even if the contract allowed for ACLR to be compensated for its operating costs and historical profit margin, ACLR's method of calculating these alleged damages is improper.

73

ACLR appears to be seeking a form of suspension or delay damages without actually following the so-called *Eichleay* formula under which such damages ordinarily are sought.  Indeed, the Federal Circuit has held that the *Eichleay* formula is the only proper method of calculating unabsorbed home office overhead.  *See Wickham Contr. Co., Inc. v. Fischer*, 12 F.3d 1574, 1580-81 (Fed. Cir. 1994) ("the Eichleay formula is the exclusive means for compensating a contractor for unabsorbed overhead").  ACLR has not designated any expert to testify as to this portion of ACLR's alleged damages, by application of the *Eichleay* formula or otherwise.  Tab 95, SA380-81 at 104:7-105:8.  As such, ACLR cannot recover these alleged damages.

ACLR's $2.6 million portion of its damages claim in *ACLR I* also fails to the extent a portion of that amount is attributable to ACLR's historical profit rate realized in prior years when it was performing solely private sector audit work.  Under Federal common law, the non-breaching party is entitled to recover only those profits which it lost as a direct result of that breach, not the profits it lost on other unrelated business transactions.  If the profits "are such as would have been realized by the party from other independent and collateral undertakings . . . then they are too uncertain and remote" to be compensable.  *Myerle v. United States*, 33 Ct. Cl. 1, 26 (1897) (internal quotation omitted).

This is the first and only Federal Government contract to which ACLR has been a party. Tab 91, SA297 at 18:12-14; Tab 94, SA370 at 31:10-14, SA371 at 34:12-15.  ACLR's past profit rate, realized over a span of years in which ACLR was performing entirely private sector work, has no bearing on what profit margin it reasonably could have expected to realize when performing work in an entirely new field, in the public sector, for which ACLR has neither any previous nor subsequent track record of success.  Even in cases where lost profits may be recoverable (unlike this case where the contract does not permit them), a "claimant must present

74

sufficient evidence to prove that the amount of its lost profits was *reasonably certain*."  *S. Nat. Corp. v. United States*, 57 Fed. Cl. 294, 306 (2003) (emphasis added).  Lost profits may not be recovered when the record upon which they are based "is speculative" because it is derived entirely by "using past experience as a predictor of future performance."  *Id.* at 305 (granting defendant summary judgment on plaintiff's lost profits claim).

In sum, even if ACLR could prove that CMS breached the contract in denying the duplicate payment and sales tax audit issues, and even if ACLR could prove that it is entitled under the contract to be paid a contingency fee (or any other fee) notwithstanding the lack of recovery of any of the amounts estimated in ACLR's audit issue proposals, ACLR's claims still fail as a matter of law for lack of quantifiable proof of compensable damages.  ACLR's damage claims are entirely speculative and unfounded, and could not provide a viable basis for any award of damages by the Court.  And because ACLR cannot prove actual damages, its breach of contract claims fail as a matter of law.

<u>CONCLUSION</u>

For all the foregoing reasons, defendant respectfully requests that the Court deny plaintiff's motion for summary judgment, grant defendant's cross-motion, and enter summary judgment in defendant's favor on all counts of the complaints in Nos. 15-767C and 16-309C.

Respectfully submitted,

OF COUNSEL:

CHAD A. READLER
Acting Assistant Attorney General

LUCY MAC GABHANN
Attorney
Department of Health and Human Services
Office of the General Counsel
General Law Division
Procurement, Fiscal and Information Law
    Branch
7500 Security Boulevard
Baltimore, MD  21244-1850

CHRISTOPHER J. CARNEY
Senior Litigation Counsel
ADAM E. LYONS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC  20044

ROBERT E. KIRSCHMAN, JR.
Director

s/ Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Deputy Director

s/ Mark E. Porada
MARK E. PORADA
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC  20044
Tel:  (202) 305-3622
Fax: (202) 307-0972
mark.e.porada@usdoj.gov

May 25, 2018

Attorneys for Defendant