**Index for Defendant's Summary Judgment Appendix**

| Tab | Document |
|---|---|
| 76 | Sources Sought Notice (SA001-004) |
| 77 | Request for Quotes (SA005-113) |
| 78 | Contract modification 8 (SA114-115) |
| 79 | Contract modification 11 (SA116) |
| 80 | Contract modification 12 (SA117) |
| 81 | Contract modification 17 (SA118) |
| 82 | Contract modification 18 (SA119) |
| 83 | *ACLR I* certified claim (SA120-124) |
| 84 | *ACLR I* certified claim denial (SA125-132) |
| 85 | *ACLR I* initial disclosure (SA133-148) |
| 86 | *ACLR II* certified claim (SA149-152) |
| 87 | *ACLR II* complaint (SA153-160) |
| 88 | *ACLR II* expert disclosure (SA161-168) |
| 89 | OMB Circular A-123 App. C (SA169-223) |
| 90 | ACLR Rule 30(b)(6) deposition excerpts in *ACLR I* (SA224-295) |
| 91 | ACLR Rule 30(b)(6) deposition excerpts in *ACLR II* (SA296-356) |
| 92 | Livanta Rule 30(b)(6) deposition excerpts in *ACLR I* (SA357-363) |
| 93 | Health Integrity Rule 30(b)(6) deposition excerpts in *ACLR II* (SA364-368) **CONFIDENTIAL** |
| 94 | C. Mucke deposition excerpts in *ACLR II* (SA369-373) |
| 95 | C. Mucke expert deposition excerpts in *ACLR I* and *ACLR II* (SA374-381) |
| 96 | CMS Rule 30(b)(6) deposition excerpts in *ACLR I* (SA382-385) |

| 97 | CMS Rule 30(b)(6) deposition excerpts in *ACLR II* (SA386-403) |
| 98 | C. Brown deposition excerpts (SA404-412) |
| 99 | T. Downs deposition excerpts (SA413-419) |
| 100 | D. Wheeler deposition excerpts (SA420-424) |
| 101 | R. Abankwah deposition excerpts (SA425-427) |
| 102 | Livanta contract (SA428-462) |
| 103 | ACLR Authority to Operate (SA463-466) |
| 104 | Health Integrity Statement of Work (excerpts) (SA467-472) |
| 105 | PDE Participant Guide (excerpts) (SA473-480) |
| 106 | ACLR Duplicate payment report of findings (SA481-491) |
| 107 | ACLR Revised duplicate payment NAIRP (SA492-496) |
| 108 | 8/29/11 email chain & attachments (SA497-596) |
| 109 | 10/10/11 email chain (SA597-601) |
| 110 | 12/1/11 email (SA602) |
| 111 | 5/31/13 email chain (SA603-605) |
| 112 | 5/28/14 email (SA606-607) |
| 113 | 6/26/14 email & attachments (SA608-618) |
| 114 | 9/15/14 email (SA619-620) |
| 115 | 10/1/14 email (SA621-622) |
| 116 | 11/7/14 email (SA623) |
| 117 | 11/14/14 email chain (SA624-627) |
| 118 | 1/12/15 email chain (SA628-629) |
| 119 | Express Scripts email (SA630-632) |

| 120 | 1/7/14 email (SA633-636) |
| 121 | Health Integrity 10/31/14 report (SA637-646) |
| 122 | Health Integrity 11/3/14 report (SA647-656) |
| 123 | Health Integrity 11/26/14 report (SA657-666) |
| 124 | Health Integrity 8/10/15 report (SA667-676) |
| 125 | Health Integrity 8/28/15 (SA677-682) |
| 126 | Health Integrity vulnerability report (SA683-688) |
| 127 | Medica letter (SA689-695) |
| 128 | UCare letter (SA696-700) |
| 129 | Health Integrity Minnesota executive summary (SA701-703) |
| 130 | CMS Louisiana 8/13/10 memo (SA704) |
| 131 | CMS Louisiana 9/1/10 memo (SA705) |
| 132 | CMS Louisiana 12/21/10 memo (SA706) |
| 133 | CMS Louisiana 4/11/11 memo (SA707) |
| 134 | CMS Louisiana 12/14 memo (SA708-710) |
| 135 | CMS Louisiana 2/15 notice (SA711) |
| 136 | Louisiana Insurance Directive 208 (SA712-716) |
| 137 | Minnesota Attorney General's Office letter (SA717-737) |
| 138 | Health Integrity Minnesota executive summary (SA738-741) |
| 139 | Health Integrity meeting minutes (SA742-744) |
| 140 | CMS spreadsheet of ACLR audit issues status (SA745-747) |
| 141 | Medpac, Part D Payment System (available at http://www.medpac.gov/docs/default-source/payment-basics/medpac_payment_basics_16_partd_final.pdf?sfvrsn=0) (SA748-752) |

| 142 | CMS, Medicare Part D – Direct and Indirect Remuneration (available at https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2017-Fact-Sheet-items/2017-01-19-2.html) (SA753-757) |

# TAB 76

| From: | ebuy_admin@gsa.gov |
|---|---|
| To: | Christopher Mucke |
| Subject: | GSA eBuy RFQs and Quotes (Consolidated Notice) - GS-23F-0074W |
| Date: | Monday, October 18, 2010 5:18:54 PM |

Dear GSA Vendor,

## RFQ NOTICES - please note the Action below:

| RFQ ID | Action | Date/Buyer | Quotes Due By | RFQ Title |
|---|---|---|---|---|
| RFQ526473 | PLEASE QUOTE  No | 10/18/2010 04:13:14 PM EDT | 11/01/2010 11:00:00 AM EDT | RECOVERY AUDIT SERVICES IN SUPPORT OF MEDICARE PAR |

Please click here to view RFQ specifics and/or submit a quote. This links to GSA's eBuy quote system at www.ebuy.gsa.gov. You will be required to login with your contract number and VSC password. Once logged in, click on "RFQs" to view the RFQ. If a quote is requested above and you chose not to quote, click the "No" link.

Please note: you may also have the opportunity to quote on other RFQs for which you have not received an email invite if those RFQs have been placed under categories (i.e. SINs) that you have been awarded. We suggest a proactive approach to finding opportunities by checking the eBuy website each day.

## QUOTE NOTICES - please note the Action below:

| QUOTE ID | Action | Date | RFQ Title |
|---|---|---|---|
| No Quote Notice Received | | | |

If you would like to have these e-mails sent to another individual in your organization or if you do not wish to receive these notices, please login to eBuy at www.ebuy.gsa.gov and modify your e-mail notices at the "Profile" tab.

For questions about the eBuy system, contact vendor.support@gsa.gov or call (877) 495-4849.

NOTE: PLEASE DO NOT REPLY TO THIS E-MAIL.

Thank you!

A00006

<u>RECOVERY AUDIT SERVICES IN SUPPORT OF MEDICARE PART D</u>

**THIS IS NOT A FORMAL REQUEST FOR PROPOSAL (RFP) AND DOES NOT COMMIT THE CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS) TO AWARD A CONTRACT NOW OR IN THE FUTURE**

**INTRODUCTION**

This is a SOURCES SOUGHT NOTICE (SSN) to determine the availability of small businesses that have the capability to support CMS in identifying and recouping underpayments and overpayments made under the Medicare Prescription Drug Coverage Program, also known as Medicare Part D. CMS is interested in responses to this notice from small businesses (including 8(a) businesses, service-disabled veteran owned small businesses, HUBZone small businesses, veteran-owned small businesses, women-owned small businesses and small disadvantaged business).

THIS IS STRICTLY MARKET RESEARCH TO ASSIST IN DETERMINING THE APPROPRIATE ACQUISITION STRATEGY TO OBTAIN CONTRACTOR SUPPORT SERVICES TO PERFORM THE SAME OR SIMILAR REQUIREMENTS TO THOSE DESCRIBED IN THIS NOTICE. THE CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS) MAY OR MAY NOT ISSUE A REQUEST FOR PROPOSAL OR REQUEST FOR QUOTATION. RESPONSES TO THIS SOURCES SOUGHT NOTICE SHALL BE THE SUBMISSION OF A CAPABILITY STATEMENT; ACCORDINGLY, CMS WILL NOT ENTERTAIN QUESTIONS REGARDING THIS MARKET RESEARCH.

**BACKGROUND**

The Centers for Medicare & Medicaid Services (CMS) is performing market research to determine capabilities in the marketplace for identifying and recouping underpayments and overpayments made under Medicare Part D in accordance with The Patient Protection and Affordance Care Act of 2010 (Section 6411).

**RESPONSE REQUIREMENTS/INFORMATION**

In order for CMS to evaluate a firm's capacity, Capability Statements submitted in response to this SSN, shall include written responses that demonstrate extensive knowledge, experience and ability to perform recovery audits under the Medicare Part D program. Specifically, Capability Statements (not exceeding 10 pages) shall include sufficient details that clearly demonstrate the ability to provide the following services:

1. Demonstrate experience and/or knowledge in performing recovery audits on a national basis.

2. Demonstrate an understanding of the Medicare Part D program to sufficiently devise a plan for identifying and recovering improper payments.

3. Demonstrate experience and/or knowledge of recovery audit activities performed on other public or commercial pharmacy benefit programs.

4. Demonstrate experience and/or knowledge of data mining and analysis and how it could be adapted to support Medicare Part D recovery audits.

5. Demonstrate experience and/or knowledge of the Medicare Advantage Prescription Drug (MA-PD) program and Medicare Advantage Prescription Drug Plans (MA-PDP).

Along with the above, the following specific information is requested in your response: (a) company descriptive literature; (b) specific related corporate experience; (c) experience with the type of performance expectations mentioned above; and (d) Business information outlined below.

Business information:

a.    DUNS.
b.    Company Name.
c.    Company Address.
d.    Company Point of Contact, phone number and email address.
e.    Type of company (i.e., small business, 8(a), woman owned, veteran owned, etc.), as validated via the Central Contractor Registration (CCR). All offerors must register on the CCR located at http://www.ccr.gov/index.asp. Additional information on NAICS codes can be found at www.sba.gov.
f.    Point of Contact, phone number and email address of individuals who can verify the demonstrated capabilities identified in the responses.

**Teaming Arrangements**: All teaming arrangements should also include the above-cited information and certifications for each entity on the proposed team.

This Sources Sought Notice is for information and planning purposes only and is not to be construed as a commitment by the Government. This is not a solicitation announcement for Request for Proposal (RFP) and no contract or task order award will result from this Notice. No reimbursement will be made for any costs associated with providing information in response to this Notice. Respondents will not be notified of the results of the evaluation. All information submitted in response to this announcement must arrive on or before the closing date.

All Capability Statements shall be submitted via e-mail to the Contract Specialist at Jessica.Sanders@cms.hhs.gov listed below. Responses must be submitted not later than 11:00 am EST on November 1, 2010. Capability Statements will not be returned and will not be accepted after the due date. Responses shall be limited to 10 pages.

**CONTACT INFORMATION:**

Contract Specialist:  Jessica Sanders
E-mail:             Jessica.Sanders@cms.hhs.gov
Telephone:          (410) 786-1076


Contracting Officer:  Debra Stidham
E-mail:              debra.stidham@cms.hhs.gov
Telephone:          (410) 786-5129

# TAB 77

A00022



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Centers for Medicare & Medicaid Services
Office of Acquisition and Grants Management
Division of Support Contracts
7500 Security Boulevard
Baltimore, Maryland 21244

DATE:        December 2, 2010

TO:          Selected FABS Schedule Holders

SUBJECT:     Request for Quote (RFQ) Recovery Audit Services in Support of
             Medicare Part D; CMS-RFQ-2011-110462

You are invited to submit a proposal/quotation in response to this RFQ.

The Centers for Medicare & Medicaid Services (CMS) intends to award a Firm-Fixed
Price Contingency Fee Task Order for the subject work in accordance with the terms
and conditions of your GSA FINANCIAL AND BUSINESS SOLUTIONS (FABS)
Federal Supply Schedule and the terms and conditions in the attached Sample Task
Order Terms and Conditions.  The period of performance for the resulting task order
shall a 12 month base period commencing at the date of award. The task order will
also include four (4) 12-month option periods.

In order to receive a task order award resulting from this RFQ, your FABS schedule
must include Contingency Fee Percentage pricing/ceiling.

Please be advised that this RFQ does not commit the Government to pay any cost
for the preparation and submission of a quotation.  In addition, the Contracting
Officer is the only individual who can legally commit the Government to the
expenditure of public funds in connection with this procurement. CMS anticipates
making awards without discussions.

Thank you in advance for your interest.

Sincerely,



Debra Stidham
Contracting Officer



Attachments

(1)  Attachment A:  Statement of Objectives/Schedule of Deliverables
(2)  Attachment B:  Quotation Submission Instructions
(3)  Attachment C:  Evaluation Criteria for Award
(4)  Attachment D:  Draft Task Order Terms and Conditions
(5)  Attachment E:  Past Performance Questionnaire

Attachment A:        Statement of Objectives/Schedule of Deliverables

(In a separate Word Document)

Attachment B:       Quotation Submission Instructions

1.  In order to receive a task order award resulting from this RFQ, your FABS schedule must include Contingency Fee Percentage pricing/ceiling. The proposed contingency fee percentage shall not exceed the percentage ceiling in your firm's FABS schedule contract.  If your firm's FABS schedule does not currently include contingency fee percentage pricing, it must be modified to incorporate a contingency fee percentage ceiling; in order to receive the task order award.  If it is necessary to modify your FABS schedule contact Ms. Diane Trice, Contracting Officer at the General Services Administration (GSA) at diane.trice@gsa.gov or (703) 605-9204.

2.  Questions concerning this RFQ shall be submitted in writing via electronic mail to Jessica.Sanders@cms.hhs.gov and Debra.Stidham@cms.hhs.gov no later than **Thursday, December 9, 2010, 11:00 a.m.** local time, Baltimore, MD.  Questions shall reference the particular section of the RFQ.  Answers to all relevant and timely questions will be conveyed to all solicited offerors in sufficient time for submission of a quotation.

3.  Notice of intent to propose shall be submitted in writing via electronic mail to Jessica Sanders at Jessica.Sanders@cms.hhs.gov and Debra.Stidham@cms.hhs.gov no later than **Wednesday, December 15, 2010, 11:00 a.m.** local time, Baltimore, MD 21244-1850. Notice of Intent submissions should include the following information; submitters name, title, organization, and e-mail address.

4.  The quotation shall be submitted in no later than **Thursday, December 16, 2010, 11:00 a.m. local time**, Baltimore, MD.  The quotation shall be submitted to Jessica Sanders, Contract Specialist or other designated individual. Ms. Sanders' address and contact information is as follows:

> Centers for Medicare & Medicaid Services
> Mail Stop C2-21-15
> 7500 Security Boulevard
> Baltimore, MD 21244-1850
> Telephone 410-786-1076

For the purpose of establishing timely receipt of a quotation, the time will be established based upon submission of a hard copy version of the quotation. Offerors are hereby advised that the place for submission of proposals (CMS Single Site at 7500 Security Boulevard, Baltimore (Woodlawn), Maryland), is a secure building.  Therefore, when hand-delivering or utilizing a mail carrier service to deliver proposals, offerors should allow for sufficient time to obtain a visitor's parking pass and registration at the Security Guard's desk located in the Central Building (main entrance to the complex).  Proposal delivery must be made to the exact location stated above on or before the date and time specified.  Proposal delivered by a mail carrier service other than the U.S. Postal Service are not accepted in the CMS

mailroom and therefore, offerors' proposals may not be delivered timely to the location and person specified in this RFQ solicitation.  Offerors are advised to take that possibility into consideration in determining when and how a proposal must be received at the specified location to meet the date and time requirements.

**Any proposal, modification, or revision, received after 11:00 a.m. local time, Baltimore, MD on Wednesday, December 15, 2010**, will be deemed "late" and will not be considered unless it is received before award is made and there is acceptable evidence to establish that it was received at the Government installation prior to the time set for receipt of offers; and the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; or it is the only proposal received.

However, a late modification of an otherwise successful proposal that makes its terms more favorable to the Government will be considered at any time it is received and may be accepted.

 Offerors are also advised to make sure that the proposal is clearly marked as to:

- The RFQ number,

- The due date and time,

- The intended room location,

- The intended recipient, and

- The telephone number of the intended recipient.

5. The quotation must be prepared in three parts – (see paragraph below).  Each of the parts shall be separate and complete in itself so that evaluation of one may be accomplished independently of the other.  However, resource information such as data concerning labor hours and categories, materials, subcontract, etc., shall be contained in the technical quotation so that the understanding of the scope of the work may be evaluated.  Both the technical and business quotation shall be submitted in hard copy to:

>        Centers for Medicare & Medicaid Services
>        OAGM/Division of Support Contracts
>        ATTN: Jessica Sanders, Contract Specialist
>        7500 Security Blvd., M/S C2-21-15
>        Baltimore, MD  21244-1850

6. Assumptions:

    Offerors shall assume the following when developing proposals. Any additional assumptions relied upon shall be clearly stated in the proposal:

A00026

    a. Task Order type: The Government contemplates awarding a contingency fee type task order.

    b. Period of Performance: The Government anticipates an initial period of performance of 12 months from the award date, with four (4) 12-month option periods.

    c. Proposal Validity Timeframe: Proposals in response to this task order request for quotation shall be valid for 180 days (unless a different period is proposed by the offeror).

7. <u>General Proposal Format and Submission Requirements:</u>

    a. **Proposal Volumes**: Proposals shall consist of three separate volumes. The Technical Proposal shall be designated as Volume I, the Business Proposal as Volume II, and the Organizational Conflict of Interest as Volume III. Each volume shall include the chapters specified below:

    <u>Volume 1 – Technical Proposal</u>

    Preface – Transmittal Letter and Table of Contents
    Chapter 1 – Performance Work Statement (PWS) inclusive of a performance metrics and measures.
    Chapter 2 – Past Performance (Quality of Services on Relevant Work)
    Chapter 3 – Task Order Management/Staffing Plan/Key Personnel

    <u>Volume II –Business Proposal</u>

    Chapter 1 – Cost Proposal Narrative
    Chapter 2 – Completed Task Order Template/Terms and Conditions

    <u>Volume III – Organizational Conflict of Interest (OCI)</u>
    Chapter 1 – Organizational Conflict of Interest (OCI) Disclosure Statement

Each volume shall be signed by an official authorized to bind your organization. Specifically, the name, title, and signature of the person authorized, shall be included on the first page of each original volume.  Each shall be separately labeled (e.g. Volume I: Technical Proposal – Original, Volume II - Business Proposal, copy 1 of 5).  Please provide the number of hard copies and compact disc (CD) as specified below:

| Volume | Hard Copies | CDs | Due Date |
|---|---|---|---|
| I – Technical Proposal – Chapters 1, 2, and 3 | Original | Four (4) – see specifications for CDs below. | 11:00 am, December 16, 2010 |
| II – Business | Original | Four (4) – see | 11:00 am, |

| Proposal – Chapters 1 and 2 | | specifications for CDs below. | December 16, 2010 |
|---|---|---|---|
| III – Conflict of Interest Disclosure Statement – Chapter 1 | Original | Four (4) – see specifications for CDs below. | 11:00 am, December 16, 2010 |

**Specifications for CD submissions**:

 i.  The files on each CD shall be compatible with Microsoft (MS) Office 2007.

 ii.  Each file shall be printable to 8x11 paper and be readable (12 pt font or larger) without requiring formatting adjustments.

 iii.  The offeror is responsible for document/file version control and as such shall ensure the multiple CDs contain the exact documents that make up the official proposal submission.

 iv.  The offeror shall certify that each CD has been checked using the latest version of virus detection software and is virus free.  The certification shall identify the virus detection software and version used.

a. Technical Proposal Submission:

Chapter 1 - Performance Work Statement (PWS):

The offeror shall submit a Performance Work Statement (PWS) that fully explains how the Statement of Objectives (SOO) will be met and how performance quality will be measured.  Offeror's must demonstrate their organization's understanding of the requirement and provide a well-thought-out approach for accomplishing the work in a timely and accurate manner.  The PWS shall not exceed **40 single-sided pages**. The PWS including performance metrics/measures will be incorporated into the resultant task order.

Chapter 2 - Past Performance (Quality of Services on Relevant Work)

For commercial and government contracts performed with the last three years for related work either as a prime or subcontractor, the offeror shall send a copy of Task Order RFP Attachment 5, Past Performance Questionnaire directly to the Program Manager for each contract.  The offeror shall request that the Program Manager complete the questionnaire and return it directly to CMS by 11:00 am on December 15, 2010, to the attention of Jessica Sanders, Contract Specialist, via email to Jessica.sanders@cms.hhs.gov or the following address:

    Centers for Medicare & Medicaid Services
    Office of Acquisition and Grants Management

Attn: Jessica Sanders, Contract Specialist
Mail Stop: C2-21-15
7500 Security Boulevard
Baltimore, MD 21244-1850

The Government is not specifying a required minimum number of past performance references. However, a maximum number of 5 past performance references is established for efficiency purposes. Therefore, the Contractor shall determine the appropriate number applicable to its unique experiences to demonstrate a record of quality of services on relevant work.

The proposal shall include a list of the references that are requested to complete and submit past performance questionnaires .This information shall include the task order/contract/project number, brief description of the work performed, name and  contact information for the Program Manager (telephone number and email address).

In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on past performance and accordingly, will receive a neutral rating for past performance.

Chapter 3 – Task Order Management/Staffing Plan/Key Personnel

Describe the proposed approach for providing skilled personnel together with the supervisory, managerial, and administrative services necessary to successfully meet the requirements of the SOO.  Describe the approach meeting the SOO requirements including a staffing plan consisting of labor categories for key and non-key personnel as well as subcontractor personnel as applicable.

The staffing plan shall include the names of individuals proposed as key personnel.  This Staffing Plan shall describe the educational background, professional experience, and special qualifications which directly relate to work of all professional personnel to be involved in this task order.  When consultants or subcontractors are to be used, their special qualifications, educational background, and experience shall be included. The Staffing Plan shall specify how the personnel proposed under this task order will be integrated organizationally and what their responsibilities and percentage of time under the task order will be.

The proposal shall include resumes for all proposed key personnel positions. Resumes shall not exceed three pages each.  The proposal shall also include a letter of commitment reflecting the date of availability and the time period the individual's commitment is binding and shall be signed by the individual and the offeror's authorized official.

The Task Order Management/Staffing Plan/Key Personnel submission shall not exceed **10 single-sided pages**.

b. <u>Business Proposal Submission:</u>

The business submission shall include the contingency fee percentage proposed. The proposed contingency fee percentage shall not exceed the percentage ceiling in your firm's FABS schedule contract.  If your firm's FABS schedule does not currently include contingency fee percentage pricing, it must be modified to incorporate a contingency fee percentage ceiling; in order to receive the task order award.

The submission shall also address the offeror's financial capability, including a demonstration of the ability to sustain performance given the likelihood that several months may elapse before recoveries are made.  In addition, the business submission shall provide information on any subcontractors to be used in this effort.

 Each submission shall contain the most recent copy of your GSA 520 contract. A copy of the GSA contract includes all the terms and conditions of the original contract including all clauses, along with any modifications affecting the terms and conditions of the original contract.

The award resulting from this RFQ will be a Firm-Fixed Price Contingency Fee task order with no funding provided by the Government; the winning offeror will receive payment based on the contingency fee percentage after the debt has been collected.  Please see the Statement of Objectives for further explanation. Since there is no funding being obligated to this task order, the business proposal shall include a signed statement of your understanding of how the reimbursement for your services will be made.  In addition, the Government is not responsible for nor will it reimburse any offeror direct costs associated with the preparation of a proposal in response to this RFQ.

c. <u>Organizational Conflict of Interest (OCI) Disclosure Statement Submission:</u>

A Conflict of Interest Disclosure Statement is required for the Task Order.  The number of pages for the Conflict of Interest Disclosure Statement is **<u>unlimited</u>**. The Offerors shall submit the following information in its Conflict of Interest Disclosure Statement:

    i.    The Government intends to avoid conflict of interest or the appearance of conflicts of interest on the part of the FABS Contractor, subcontractors, joint venture, or any other entity acting in a similar capacity.  Therefore, as part of this proposal submission, Volume III shall include an affirmation of the absence

        of any conflict of interest in serving as the Medicare Part D Recovery Audit Contractor (RAC).

    ii.    The FABS Contractor must disclose all potential, apparent and actual conflicts of interest to the Contracting Officer during the term of the task order. The FABS Contractor shall submit a plan to mitigate all potential, apparent and actual conflicts identified during the term of the task order and a disclosure statement that all work to be performed under this task order is free of conflicts of interest. The FABS Contractor is also responsible for determining if a conflict of interest exists with subcontractors at any tier and for ensuring that the subcontractor at any tier has mitigated any potential, apparent or actual conflict of interest prior to the award, and during the term of any subcontract for furnishing supplies or services under the prime contract.

    iii.    Financial disclosure statements for managers and key personnel.

d.  <u>Award Without Discussion</u>

Offerors are advised that CMS intends to award a task order based on initial proposal submissions.   Accordingly, proposals should be submitted initially on the most favorable terms from a price/cost and technical standpoint. However, CMS reserves the right to request final proposal revisions if it is in its best interest.

Attachment C—Evaluation Criteria

Evaluation Process

1. The Government will select the offer based upon an assessment of the technical and business proposals that, in the Government's estimation, provides the best value. The Government seeks to award this Task Order to the offeror who gives the Government the greatest confidence that it will best meet or exceed the requirements for a fair and reasonable price/contingency fee percentage. The Government will use a tradeoff process to determine which Offeror provides the best overall value to the Government. CMS considers the non-cost evaluation factors, when combined, to be equally important to price/contingency fee percentage.

2. Although overall responsibility has been determined for each FABS contractor, in accordance with FAR 9.405-1, the Government will access the Federal Awardee Performance and Integrity Information System (FAPIIS) in accordance with FAR 9.104-6 and consider the information in making the award determination.  Further, the Government will evaluate Volume III Conflict of Interest to ensure that any real, potential, or perceived organizational conflicts of interests are adequately mitigated.

3. The following non-cost/price evaluation criteria will be used in the technical evaluation of the quotes that comply with the minimum requirements.

|  | **Evaluation Criteria** | **Weight (%)** |
|---|---|---|
| 1 | **Technical Understanding and Approach (all sub-factors listed below are equal in importance)**<br><br>• Technical understanding of  and ability to meet or exceed the SOO<br><br>• Knowledge of Medicare Part D and other pertinent statutes and regulations<br><br>• The approach for identifying and recovering improper payments under the National Medicare Part D Program | 45% |
| 2 | **Task Order Management/Staffing Plan/Key Personnel (all sub-factors listed below are equal in importance)**<br><br>• Management<br>    • Experience managing large-scale projects related to identification and recovery of funds | 30% |

| | | |
|---|---|---|
| | <ul><li>First-hand experience with health care claims and adjudication processes</li><li>Degree of knowledge of Medicare Part D Payment Policy</li><li>Degree of knowledge of data analysis techniques and capability to sort and present data using multiple variables</li></ul><br><ul><li>Subject Matter Expertise<ul><li>Experience with prescription drug benefit program or pharmacy benefit manager (PBM) experience</li><li>Experience researching insurance regulations, Medicare Part D policy, statutes, and guidance</li><li>Clinical understanding of Part D Benefit</li></ul></li></ul> | |
| 3 | **Past Performance (all sub-factors listed below are equal in importance)**<br><br><ul><li>The Government will assess the Offeror's past performance on comparable projects in order to evaluate the relative competence of the Offeror, including all subcontractors, to successfully meet the requirements of the task order. The Government reserves the right to obtain information regarding the Offeror's past performance from any and all sources, including sources outside of the Government, and include this data in the evaluation.</li></ul> | 25% |

Attachment D—Sample Task Order Terms and Conditions

## 1.    TASK ORDER SUPPORT:

This task order is issued under General Services Administration (GSA) Contract Number GS-XXX-XXXXX to perform the work required in accordance with the attached performance work statement (PWS) and deliverable schedule entitled, "Medicare Part D Recovery Audit Contractor."  .  This task order shall be performed in accordance with the terms and conditions of the GSA contract under the FABS Schedule and the terms and conditions contained herein.  Only those contract sections, which differ from the GSA schedule  contract terms and conditions, or provide more detailed information specific to this particular task order, are provided below.  For those contract sections not identified below, all terms and conditions of the GSA contract remain in effect.

## 2.    TYPE OF TASK ORDER:

This is a Firm-Fixed Price Contingency Fee task order.  The Contingency Fee is to be determined (TBD)  %.

## 3.    PERIOD OF PERFORMANCE

The 12 month base period of the task order is from <u>TBD to TBD</u>.  The task order also includes four (4) 12-month optional periods.  No contingency fees shall be paid after the end of the period of performance.

## 4.    TASK ORDER PRICE SUMMARY

All payments shall be paid only on a contingency basis.  The recovery audit contractor will receive _____% of all amounts collected.  The contingency fees shall be paid once the recovery audit contractor collects the Medicare overpayments.  The recovery audit contractor shall be paid a percentage of the amount that is collected through their recovery efforts.  The recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments not recovered/collected.  The recovery audit contractor shall submit vouchers on a monthly basis (see Attachment 2) with supporting documentation of the recovery.  Once verified, CMS shall pay the voucher pursuant to the Prompt Payment Provisions.

If the provider files an appeal disputing the overpayment determination and the appeal is adjudicated in the provider's favor at the first level, the recovery audit contractor shall repay Medicare the contingency payment for that recovery.  If the appeal is adjudicated in the agency's favor at the first level, the recovery audit contractor shall retain the contingency payment for that recovery.  Subsequent appeals, after the first level of appeal, will not affect the recovery audit contractor's ability to retain the contingency payment.

## 5.    OMB A-130 INFORMATION RESOURCE POLICY

Each RAC is required to follow the established comprehensive approach to improve the acquisition and management of their information resources in accordance with this OMB Circular.   This circular is issued pursuant to the Paperwork Reduction Act (PRA) of 1980, as amended by the PRA of 1995, the Clinger-Cohen Act of 1996, et al.   The PRA establishes a broad mandate to perform information resources management activities in an efficient, effective, and economical manner.

## 6.1    HHSAR 352.242-70 Key personnel Key Personnel (January 2006)

The key personnel specified in this contract are considered to be essential to work performance. At least 30 days prior to diverting any of the specified individuals to other programs or contracts (or as soon as possible, if an individual must be replaced, for example, as a result of leaving the employ of the Contractor), the Contractor shall notify the Contracting Officer and shall submit comprehensive justification for the diversion or replacement request (including proposed substitutions for key personnel) to permit evaluation by the Government of the impact on performance under this contract. The Contractor shall not divert or otherwise replace any key personnel without the written consent of the Contracting Officer. The Government may modify the contract to add or delete key personnel at the request of the contractor or Government.

(End of clause)

6.2 The following are designated Key Personnel Positions


        Position TBD (Name TBD, Phone TBD, Email Address TBD)


## 7.    SUBCONTRACT CONSENT

To facilitate the review of a proposed subcontract by the Contracting Officer Technical Representative and the Contracting Officer, the Contractor shall submit the information required by the FAR clause 52.244-2 entitled, SUBCONTRACTS, to the COTR who shall in turn forward the information with his/her recommendation to the Contracting Officer.  The Contracting Officer shall review the request for subcontract approval and the COTR's recommendation and advise the Contractor of his/her decision to consent to or dissent from the proposed subcontract, in writing.  Consent is hereby given to issue the following subcontract(s):

        **TBD**

8.  In accordance with the Health and Human Services Supplemental Acquisition Regulation (HHSAR) and FAR *52.202–1(a)(1),* substitute the following as paragraph (a) of 52.202-1(a)(1) with :

A00035

"(a) The term "Secretary" or "Head of the Agency" (also called "Agency Head") means the Secretary, Deputy Secretary, or any Assistant Secretary, Administrator or Commissioner of the Department of Health and Human Services; and the term "his/her duly authorized representative" means any person, persons, or board authorized to act for the Secretary."

Add the following paragraph 'h' to 52.202-1

"(h) The term "Contracting Officer's Technical Representative" means the person who monitors the technical aspects of contract performance. The Contracting Officer's Technical Representative is not authorized to issue any instructions or directions which cause any increase or decrease in the Statement of Work/Performance Work Statement/Specifications which would result in the increase or decrease in the price of this contract, or changes in the delivery schedule or period of performance of this contract. If applicable, the Contracting Officer's Technical Representative is not authorized to receive or act upon any notification or revised cost estimate provided by the Contractor in accordance with the Limitation of Cost or Limitation of Funds clauses of this contract."

## 8.   Contracting Officer's Technical Representative (COTR) and/CONTRACT SPECIALIST:

TBD is designated as the COTR for this order.  TBD address is:

> Centers for Medicare and Medicaid Services
> 7500 Security Blvd.
> ATTN:
> Mailstop:
> Baltimore, MD  21244-1850
> (410) 786-

All technical correspondence should be directed to the COTR with a copy to the Contract Specialist.

The responsibilities and duties of the COTR include:

a) Provide technical direction as needed to the contractor as long as the terms and conditions of the contract are not changed.
b) Monitor contractor's ongoing efforts.
c) Serve as liaison between the contractor, Project Officer and project team.
d) Review deliverables and advise Contracting Officer of the contractor's performance.
e) Advise the Contracting Officer on the contractor's compliance with technical performance requirements.
f) Ensures that the contractor input and/or recommendations are considered by CMS project management.

The Contract Specialist for this task order is Ms. Jessica Sanders.  Her address is:

> Centers for Medicare and Medicaid Services
> 7500 Security Blvd.
> ATTN:  Ms. Jessica Sanders
> Mailstop:  C2-21-15
> Baltimore, MD  21244-1850
> (410) 786-1076

The Contracting Officer for this task order is Ms. Debra Stidham.  Her address is:

> Centers for Medicare and Medicaid Services
> 7500 Security Blvd.
> ATTN:  Ms. Debra Stidham
> Mailstop:  C2-21-15
> Baltimore, MD  21244-1850
> (410) 786-5129

## 9.   CONFIDENTIALITY

As a result of this task order, the GSA Schedule Contractor may have access to confidential information (i.e., information considered proprietary as well as information that may fall under the Privacy Act).  The GSA Schedule Contractor shall not disclose any such information or findings to any parties other than the Project Officer and staff assigned to this effort.  Appropriate administrative, technical, procedural and physical safeguards shall be established by the GSA Schedule Contractor to protect the confidentiality of the data and to prevent unauthorized access to such data.

## 10.   DESIGNATION OF PROPERTY ADMINSTRATOR AND PROPERTY ADMINISTRATION

a.   The CMS Property Administrator, Administrative Services Group, Office of Property and Space Management at (410) 786-3346, is hereby designated the property administration function for this contract.   The Contractor agrees to furnish information regarding Government Property to the Property Administrator in the manner and to the extent required by the Property Administrator, his duly designated successors, and in accordance with FAR Part 45 and DHHS Manual entitled, Contractor's Guide for Control of Government Property (1990).

b.   The contractor is responsible for an annual physical inventory accounting for all Government property under this contract.  The inventory must be conducted by September 30th and the form 565, Report of Accountable Personal Property (J-15) submitted by October 31st of each year.

c.   The inventory report shall include all items acquired, furnished, rented or leased under the contract.  Employees who conduct the inventories should not be the

same individuals who maintain the property records.  Following the physical inventory, the contractor shall prepare an inventory report and submit the report to the CMS Property Administrator at the following address:

> Centers for Medicare & Medicaid Services
> OICS, Administrative Services Group
> Division of Property and Space management
> 7500 Security Blvd., Mailstop:  SLL-14-06
> Baltimore, MD  21244-1850

d.  Commercially leased software is subject to these reporting requirements.

e.  The RAC shall submit a consolidated report of all accountable Government property under this contract, including subcontractor inventory information.

f.  The final inventory report shall indicate that all items required for continued contract performance are acceptable and free from contamination.  Property that is no longer usable or required shall be reported and disposition requested.

## 11.  INVOICING AND PAYMENT

Invoicing and Payment

a.  Submission of Invoices and Place of Payment

(i)  No more than once each month following the effective date of this contract, the Contractor may submit to the Government an invoice (or public voucher) for payment, in accordance with FAR Clause 52.216-7 "Allowable Cost & Payment." Invoices shall be prepared in accordance with this contract.  All invoices shall be reconciled against the RAC Database (40700NMSPB) or other documentation as appropriate to ensure collection has been made and funds recouped deposited prior to any invoice being paid.

(ii)  To expedite payment, invoices shall be sent, as follows:

> Monthly invoices (original and four copies) shall be sent directly to the address below (where applicable, the Contractor shall submit the invoice to said office via the cognizant government auditor):
>
> Department of Health and Human Services
> Centers for Medicare & Medicaid Services
> P.O. BOX 7520
> 7500 Security Boulevard
> Baltimore, Maryland 21207-0520

(iii) Content of Invoice (If Applicable):

> Contractor's name and invoice date;
> Contract number of other authorization for delivery of
>   property and/or services;
> Description, cost or price, and quantity of property
>   and/or services actually delivered or rendered;
> Shipping and payment terms;
> Other substantiating documentation or information as
>   required by the contract; and
> Name (where practicable), title, phone number, and complete
>   mailing address of responsible official to whom payment is
>   to be sent.

b.  Invoice Payment

(i)   In accordance with FAR 52.232-33, the Centers for Medicare and Medicaid
Services (CMS) shall only make an electronic reimbursement/payment.

In accordance with FAR 52.204-7, the contractor must register in the Central
Contractor Registration (CCR) database.  Failure to register in CCR may prohibit
CMS from making awards to your organization.

The contractor shall notify CMS' Division of Accounting Operations of all EFT and
address changes in CCR via the following email address:
CCRChanges@cms.hhs.gov

(ii) The target date for payment pursuant to the provision of FAR Clause, 52.216-7
"Allowable Cost and Payment" of this contract shall be 30 calendar days after an
invoice containing the information set forth in Paragraph "a" of this article is
received in the7 payment office designated herein.

(iii) Upon receipt of the Contractor's "completion invoice" in the payment office
designated in Paragraph "a" of this article, payment of any remaining cost and
fee determined to be allowable pursuant to the provisions of FAR Clause,
52.216-7 "Allowable Cost and Payment" of this contract shall be due 30 calendar
days after the Contracting Officer approves the "completion invoice" for payment.

(iv)  Payment shall be authorized after the Division of Accounting has audited the
invoice in accordance with Federal Regulations.  This audit includes verification
that the invoice contains the rates/unit prices, those indicated in the contract or
purchase order.  Any discrepancies determined as a result of the audit, could
delay the processing of the invoice and may result in the invoice being returned
to the vendor for correction.  Inquiries relating to payments should be directed to
Jean Katzen on (410) 786-5423 or Suzanne Turgeon on (410) 786-1924.

c.  See Attachment 2 for additional information on the MSP RAC Payment Voucher Process.

## 12.  PAYMENT BY ELECTRONIC FUNDS TRANSFER - CENTRAL CONTRACTOR REGISTRATION

a.  *Method of payment.* (1) All payments by the Government under this contract shall be made by electronic funds transfer (EFT), except as provided in paragraph (a)(2) of this clause. As used in this clause, the term "EFT" refers to the funds transfer and may also include the payment information transfer.  (2) In the event the Government is unable to release one or more payments by EFT, the Contractor agrees to either -

   (i) Accept payment by check or some other mutually agreeable method of payment; or

   (ii) Request the Government to extend the payment due date until such time as the Government can make payment by EFT (but see paragraph (d) of this clause).

b.  *Contractor's EFT information.* The Government shall make payment to the Contractor using the EFT information contained in the Central Contractor Registration (CCR) database. In the event that the EFT information changes, the Contractor shall be responsible for providing the updated information to the CCR database.

c.  *Mechanisms for EFT payment.* The Government may make payment by EFT through either the Automated Clearing House (ACH) network, subject to the rules of the National Automated Clearing House Association, or the Fedwire Transfer System. The rules governing Federal payments through the ACH are contained in 31 CFR part 210.

d.  *Suspension of payment.* If the Contractor's EFT information in the CCR database is incorrect, then the Government need not make payment to the Contractor under this contract until correct EFT information is entered into the CCR database; and any invoice or contract-financing request shall be deemed not to be a proper invoice for the purpose of prompt payment under this contract. The prompt payment terms of the contract regarding notice of an improper invoice and delays in accrual of interest penalties apply.

e.  *Liability for uncompleted or erroneous transfers.* (1) If an uncompleted or erroneous transfer occurs because the Government used the Contractor's EFT information incorrectly, the Government remains responsible for -

   (i) Making a correct payment;

(ii) Paying any prompt payment penalty due; and

(iii) Recovering any erroneously directed funds.

   If an uncompleted or erroneous transfer occurs because the Contractor's EFT information was incorrect, or was revised within 30 days of Government release of the EFT payment transaction instruction to the Federal Reserve System, and -

(iv) If the funds are no longer under the control of the payment office, the Government is deemed to have made payment and the Contractor is responsible for recovery of any erroneously directed funds; or

(v) If the funds remain under the control of the payment office, the Government shall not make payment, and the provisions of paragraph (d) of this clause shall apply.

f.   *EFT and prompt payment.* A payment shall be deemed to have been made in a timely manner in accordance with the prompt payment terms of this contract if, in the EFT payment transaction instruction released to the Federal Reserve System, the date specified for settlement of the payment is on or before the prompt payment due date, provided the specified payment date is a valid date under the rules of the Federal Reserve System.

g.   EFT and assignment of claims. If the Contractor assigns the proceeds of this contract as provided for in the assignment of claims terms of this contract, the Contractor shall require as a condition of any such assignment, that the assignee shall register separately in the CCR database and shall be paid by EFT in accordance with the terms of this clause. Notwithstanding any other requirement of this contract, payment to an ultimate recipient other than the Contractor, or a financial institution properly recognized under an assignment of claims pursuant to subpart 32.8, is not permitted. In all respects, the requirements of this clause shall apply to the assignee as if it were the Contractor. EFT information that shows the ultimate recipient of the transfer to be other than the Contractor, in the absence of a proper assignment of claims acceptable to the Government, is incorrect EFT information within the meaning of paragraph (d) of this clause.

h.   Liability for change of EFT information by financial agent. The Government is not liable for errors resulting from changes to EFT information made by the Contractor's financial agent.

i.   *Payment information.* The payment or disbursing office shall forward to the Contractor available payment information that is suitable for transmission as of the date of release of the EFT instruction to the Federal Reserve System. The Government may request the Contractor to designate a desired format and method(s) for delivery of payment information from a list of formats and methods

the payment office is capable of executing. However, the Government does not guarantee that any particular format or method of delivery is available at any particular payment office and retains the latitude to use the format and delivery method most convenient to the Government. If the Government makes payment by check in accordance with paragraph (a) of this clause, the Government shall mail the payment information to the remittance address contained in the CCR database.

## 13.   DELIVERABLES/INTERNET – INTRANET APPLICATIONS

If applicable, all written deliverables will include a version in HyperText Mark-Up Language (HTML) formatted according to Centers for Medicare and Medicaid (CMS) Internet, Intranet, and Extranet Standards; available online at http:www.cms.gov/about/web/inetspecx.htm.

All websites, Internet applications, and content developed by Contractor shall reside on CMS servers, follow CMS Standards and Guidelines, and filter through the standard agency Internet Clearance process.

If CMS agents or Contractor include information that appears on www.cms.gov or www.medicare.gov as part of their websites, they must link directly to these sites to ensure the validity and timeliness of the information.  Duplication of content is not permitted.

Contractor performing work on projects that include the development of Internet, Intranet, or Extranet applications, shall schedule and meet with CMS's Web Support Team for guidance before they begin to develop the project.

## 14.   HHSAR 352.224-70 PRIVACY ACT (January 2006)

This contract requires the Contractor to perform one or more of the following: (a) Design; (b) develop; or (c) operate a Federal agency system of records to accomplish an agency function in accordance with the Privacy Act of 1974 (Act) (5 U.S.C. 552a(m)(1)) and applicable agency regulations. The term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual. Violations of the Act by the Contractor and/or its employees may result in the imposition of criminal penalties (5 U.S.C. 552a(i)). The Contractor shall ensure that each of its employees knows the prescribed rules of conduct and that each employee is aware that he/she is subject to criminal penalties for violation of the Act to the same extent as Department of Health and Human Services employees. These provisions also apply to all subcontracts the Contractor awards under this contract which require the design, development or operation of the designated system(s) of records [5 U.S.C. 552a(m)(1)]. The contract work statement: (a) identifies the system(s) of records and the design, development, or

operation work the Contractor is to perform; and (b) specifies the disposition to be made of such records upon completion of contract performance.

(End of clause)

**15.   ORGANIZATIONAL CONFLICTS OF INTEREST**

"Organizational conflict of interest" as defined per FAR 2.101, "means that because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage."

(A) Purpose:  The purpose of this clause is to ensure that the Contractor (1) is not biased because of its financial, contractual, organizational, or other interests which relate to the work under this contract, and (2) does not obtain any unfair competitive advantage over other parties by virtue of its performance of this contract. This clause has been created to implement the organizational conflict of interest requirements of FAR 9.5.

(B) Scope:  The restrictions described herein shall apply to performance or participation by the Contractor and any of its affiliates or their successors in interest (hereinafter collectively referred to as "Contractor") in the activities covered by this clause as a prime contractor, subcontractor, co-sponsor, joint venture, consultant, or in any similar capacity. For the purpose of this clause, affiliation occurs when a business concern is controlled by or has the power to control another or when a third party has the power to control both.

(C) Use of Contractor's Work Product:  If the Contractor performs advisory, consulting, analytical, evaluation, study, or similar work under this contract, it shall be ineligible thereafter to participate in any capacity in Government contractual efforts (solicited or unsolicited) which stem directly from such work, and the Contractor agrees not to perform similar work for prospective Offeror's with respect to any such contractual efforts. The Contractor shall be ineligible to participate in any contracts, subcontracts, or proposals (solicited and unsolicited) which stem directly from the Contractor's performance of work under this contract for a period of <u>one (1) year</u> after the completion of this contract. Furthermore, unless so directed in writing by the Contracting Officer, the Contractor shall not perform any system engineering or technical direction support work under this contract on any of its products or services or the products or services of another firm if the Contractor is or has been substantially involved in their development or marketing. Nothing in this subparagraph shall preclude the Contractor from competing for follow-on contracts or subcontracts for advisory and assistance services.

(D) If, under this contract, the Contractor prepares a complete or essentially complete statement of work or specifications to be used in competitive

acquisitions, the Contractor shall be ineligible to perform or participate in any capacity in any contractual effort which is based on such statement of work or specifications. The Contractor shall not incorporate its products or services in such statement of work or specifications unless so directed in writing by the Contracting Officer, in which case the restriction in this subparagraph shall not apply.

(E) Access to and use of information:

    (1) If the Contractor, in the performance of this contract, obtains access to information, such as Government plans, policies, reports, studies, financial plans, internal data protected by the Privacy Act of 1974 (5 U.S.C. 552a), or data which has not been released or otherwise made available to the public, the Contractor agrees that it shall not:

        (a) Use such information for any private purpose unless the information has been released or otherwise made available to the public;

        (b) Compete for work based on such information for a period of <u>one (1) year</u> after either the completion of this contract, or until such information is released or otherwise made available to the public, whichever is first;

        (c) Submit an unsolicited proposal which is based on such information until <u>six (6) months</u> after such information is released or otherwise made available to the public; and,

        (d) Release such information unless such information has previously been released or otherwise made available to the public by the Government.

    (2) In addition, the Contractor agrees that to the extent it receives or is given access to proprietary data, data protected by the Privacy Act of 1974 (5 U.S.C. 552a), or other confidential or privileged technical, business, or financial information under this contract, it shall treat such information in accordance with any restrictions imposed on such information.

(F) Disclosure after award:

    (1) The Contractor agrees that, if changes, including additions, to the facts disclosed by it prior to award of this Contract, occur during the performance of this Contract, it shall make an immediate and full disclosure of such changes in writing to the Contracting Officer. Such disclosure shall include a description of any action which the Contractor

has taken or proposes to take to avoid, neutralize, or mitigate any resulting conflict of interest. The Government may, however, terminate for convenience if it deems such termination to be in the best interest of the Government.

(2) In the event that the Contractor was aware of facts required to be disclosed or the existence of an actual or potential organizational conflict of interest and did not disclose such facts or such conflict of interest to the Contracting Officer, the Contracting Officer may terminate for default.

(G) Remedies:  For breach of any of the above restrictions or for nondisclosure or misrepresentation of any facts required to be disclosed concerning this contract, including the existence of an actual or potential organizational conflict of interest at the time of or after award, the Government may terminate for default, and pursue such other remedies as may be permitted by law.

(H) Waiver:  In accordance with FAR 9.503, any request for waiver must be in writing, shall set forth the extent of the conflict, and requires approval by the agency head or a designee. Agency heads shall not delegate waiver authority below the level of head of a contracting activity.   The agency head or a designee may waive any general rule or procedure of this subpart by determining that its application in a particular situation would not be in the Government's interest.

(I) Subcontracts:  This Organizational Conflict of Interest clause shall flow down to all subcontractors unless an exemption is specifically approved by Contracting Officer, CMS.

## 16.  CONDITIONS FOR PERFORMANCE

In addition to the performance requirement of this contract as set forth under Performance Work Statement, the Contractor may be required to comply with the requirements of any revisions in legislation or regulations which may be enacted or implemented during the period of performance of this contract, and are directly applicable to the performance requirements of this contract.

In the event new legislation or regulations impacting the Contract require immediate implementation, the Contracting Officer shall issue a change order pursuant to FAR Clause 52.243-1, entitled Changes – Fixed-Price.

## 17.  CONFLICT OF INTEREST

The Contractor shall disclose any known or potential conflicts of interest, in accordance with FAR Part 9.5, for the purpose of meeting the requirements of this contract.  The Contractor agrees that if an actual or potential organizational conflict of interest is discovered after an award of a task order, the Contractor shall make full disclosure in writing to the Contracting Officer.  This disclosure shall include a description of actions

that the Contractor has taken or proposes to take to mitigate the actual or potential conflict.  The Contracting Officer shall determine whether a conflict of interest disclosed after award has been adequately resolved.

## 19.    CONTRACTOR PERFORMANCE EVALUATION(S)

In accordance with Federal Acquisition Regulation (FAR) 42.15, CMS will complete annual and final contractor performance evaluations.  Annual evaluations will be prepared to coincide with the anniversary date of the contract.  Additional interim performance evaluations may be prepared at Contracting Officer discretion, as necessary. Final performance evaluations will be completed upon contract expiration.

CMS will utilize the Contractor Performance Assessment Reporting System (CPARS) in order to execute annual and final contractor performance evaluations. CPARS is a secure Internet website located at http://www.cpars.csd.disa.mil/cparsmain.htm.  CMS will register the contractor in CPARS upon receipt of the name and email address of two (2) individuals who will be responsible for serving as the Contractor's primary and alternate CPARS contacts.  Once CMS registers the contractor in CPARS, the Contractor will receive an automated CPARS email message that contains User IDs and instructions for creating a password.

Once a performance evaluation is issued, the Contractor's primary and alternate CPARS contact will receive an email instructing them to logon to CPARS in order to review the performance evaluation.  The Contractor has 30 days from the date of performance evaluation issuance in which to review the evaluation.  If the Contractor is in agreement with the performance evaluation outcome, the evaluation becomes final. Should the Contractor be in disagreement with the performance evaluation outcome, rebuttal comments must be submitted via the CPARS within 30 days from date the evaluation was issued by CMS.  Any disagreement between the Contracting Officer and the Contractor will be referred to the Deputy Director, CMS Office of Acquisition and Grants Management, whose decision will be final.

Copies of each performance evaluation and contractor responses, if any, will be retained as part of the official contract file and will be used to support future award decisions. Evaluations will also be stored for a 3-year period in the Past Performance Information Retrieval System (PPIRS) at www.ppirs.gov.

Contractors may obtain CPARS training material and register for on-line training at http://www.cpars.csd.disa.mil/allapps/cpcbtdlf.htm. There is no fee for registration or use of the CPARS.

## 21.    DISPOSAL OF IMAGED MEDICAL RECORDS

Imaged medical records must be disposed of in a manner than leaves no trace of data. The RAC shall use a method compliant with CMS operating procedures and standards. In addition, a log of all disposed records shall be maintained by the RAC.

A00046

## 22.    HIPAA BUSINESS ASSOCIATE PROVISION

**HIPAA Business Associate Provision II**

**Definitions**:

All terms used herein and not otherwise defined shall have the same meaning as in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA," 42 U.S.C. sec. 1320d) and the corresponding implementing regulations.  Provisions governing the Contractor's duties and obligations under the Privacy Act (including data use agreements) are covered elsewhere in the contract.

"Business Associate'' shall mean the Contractor.

"Covered Entity" shall mean CMS' Medicare Fee for Service program and/or Medicare's Prescription Drug Discount Care and Transitional Assistance Programs.
"Secretary" shall mean the Secretary of the Department of Health and Human Services or the Secretary's designee.

**Obligations and Activities of Business Associate**

(a) Business Associate agrees to not use or disclose Protected Health Information ("PHI"), as defined in 45 C.F.R. § 160.103, created or received by Business Associate from or on behalf of Covered Entity other than as permitted or required by this Contract or as required by law.

(b) Business Associate agrees to use safeguards to prevent use or disclosure of PHI created or received by Business Associate from or on behalf of Covered Entity other than as provided for by this Contract.  Furthermore, Business Associate agrees to use appropriate administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the electronic protected health information ("EPHI"), as defined in 45 C.F.R. 160.103, it creates, receives, maintains or transmits on behalf of the Covered Entity to prevent use or disclosure of such EPHI.

(c) Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Contract.

(d) Business Associate agrees to report to Covered Entity any use or disclosure involving PHI it receives/maintains from/on behalf of the Covered Entity that is not provided for by this Contract of which it becomes aware.  Furthermore, Business Associate agrees to report to Covered Entity any security incident involving EPHI of which it becomes aware.

(e) Business Associate agrees to ensure that any agent, including a subcontractor, to whom it provides PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity, agrees to the same restrictions and conditions that apply through this Contract to Business Associate with respect to such information.  Furthermore, Business Associate agrees to ensure that its agents

A00047

and subcontractors implement reasonable and appropriate safeguards for the PHI received from or on behalf of the Business Associate.

(f) Business Associate agrees to provide access, at the request of Covered Entity, to PHI received by Business Associate in the course of contract performance, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 CFR § 164.524.

(g) Business Associate agrees to make any amendment(s) to PHI in a Designated Record Set that Covered Entity directs or agrees to pursuant to 45 CFR § 164.526 upon request of Covered Entity.

(h) Business Associate agrees to make internal practices, books, and records, including policies and procedures and PHI, relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of Covered Entity, available to Covered Entity, or to the Secretary for purposes of the Secretary determining Covered Entity's compliance with the various rules implementing the HIPAA.

(i) Business Associate agrees to document such disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR § 164.528.

(j) Business Associate agrees to provide to Covered Entity, or an individual identified by the Covered Entity, information collected under this Contract, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR § 164.528.

**Permitted Uses and Disclosures by Business Associate**

Except as otherwise limited in this Contract, Business Associate may use or disclose PHI on behalf of, or to provide services to, Covered Entity for purposes of the performance of this Contract, if such use or disclosure of PHI would not violate the HIPAA Privacy or Security Rules if done by Covered Entity or the minimum necessary policies and procedures of Covered Entity.

**Obligations of Covered Entity**

(a) Covered Entity shall notify Business Associate of any limitation(s) in its notice of privacy practices of Covered Entity in accordance with 45 CFR § 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.

(b) Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by Individual to use or disclose PHI, to the extent that such changes may affect Business Associate's use or disclosure of PHI.

(c) Covered Entity shall notify Business Associate of any restriction to the use or disclosure of PHI that Covered Entity has agreed to in accordance with 45 CFR § 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

**Permissible Requests by Covered Entity**

A00048

Covered Entity shall not request Business Associate to use or disclose PHI in any manner that would not be permissible under the HIPAA Privacy or Security Rules.

**Term of Provision**

(a) The term of this Provision shall be effective as of  March 10, 2005, and shall terminate when all of the PHI provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy PHI, protections are extended to such information, in accordance with the termination provisions in this Section.

(b) Upon Covered Entity's knowledge of a material breach by Business Associate, Covered Entity shall either:

    (1) Provide an opportunity for Business Associate to cure the breach or end the violation consistent with the termination terms of this Contract.  Covered Entity may terminate this Contract for default if the Business Associate does not cure the breach or end the violation within the time specified by Covered Entity; or

    (2) Consistent with the terms of this Contract, terminate this Contract for default if Business Associate has breached a material term of this Contract and cure is not possible; or

    (3) If neither termination nor cure is feasible, Covered Entity shall report the violation to the Secretary.

(c) Effect of Termination.

    (1) Except as provided in paragraph (2) of this section, upon termination of this Contract, for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to PHI that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the PHI.

    (2) In the event that Business Associate determines that returning or destroying the PHI is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible.  Upon such notice that return or destruction of PHI is infeasible, Business Associate shall extend the protections of this Contract to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

**Miscellaneous**

(a) A reference in this Contract to a section in the Rules issued under HIPAA means the section as in effect or as amended.

(b) The Parties agree to take such action as is necessary to amend this Contract from time to time as is necessary for Covered Entity to comply with the requirements of the Rules issued under HIPAA.

A00049

(c) The respective rights and obligations of Business Associate under paragraph (c) of the section entitled "term of Provision" shall survive the termination of this Contract.

(d) Any ambiguity in this Contract shall be resolved to permit Covered Entity to comply with the Rules implemented under HIPAA.

## 23.    COPYRIGHTS

a.   Data first produced in the performance of this contract.

    (i)   The contractor agrees not to assert, establish, or authorize others to assert or establish, any claim to copyright subsisting in any data first produced in the performance of this contract without prior written permission of the contracting officer.  When claim to copyright is made, the contractor shall affix the appropriate copyright notice of 17 U.S.C. 401 or 402 and acknowledgment of government sponsorship (including contract number) to such data when delivered to the government, as well as when the data are published or deposited for registration as a published work in the U.S. Copyright Office. The contractor grants to the government, and others acting on its behalf, a paid-up nonexclusive, irrevocable, worldwide license for all such data to reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, by or on behalf of the government.

    (ii)  If the government desires to obtain copyright in data first produced in the performance of this contract and permission has not been granted as set forth above, the contracting officer may direct the contractor to establish, or authorize the establishment of, claim to copyright in such data and to assign, or obtain the assignment of, such copyright to the government or its designated assignee.

b.   Data not first produced in the performance of this contract.

The contractor shall not, without prior written permission of the contracting officer, incorporate in data delivered under this contract any data not first produced in the performance of this contract and which contain the copyright notice of 17 U.S.C. 401 or 402, unless the contractor identifies such data and grants to the government.

## 24.    DISSEMINATION, PUBLICATION AND DISTRIBUTION OF INFORMATION

a.  Subject to Section H.8, data and information either provided to the contractor or any subcontractor generated by activities under this contract or derived from research or studies supported by this contract shall be used only for purposes of this contract.

b.  Data and information either provided to the contractor, or to any subcontractor, generated by activities under this contract, or derived from research or studies supported by this contract, shall be used only for the purposes of the contract.  It

shall not e duplicated, used or disclosed for any purpose other than the fulfillment of the requirements set forth in this contract.  This restriction does not limit the contractor's right to use data or information obtained from a non-restrictive source.  Any questions concerning "privileged information" shall be referred to the contracting officer.

c.  Some data or information may require special consideration with regard to the timing of its disclosure.  Also, some data or information, which relate to policy matters under consideration by the government, may also require special consideration with regard to the timing of its disclosure so that the open and vigorous debate, within the government, of possible policy options is not damaged.

d.  Any requests for or questions about use or release of the data or information or handling of material under this contract shall be referred to the contracting officer who must render a written determination.  The contracting officer's determinations will reflect the results of internal coordination with appropriate program and legal officials.

e.  The contractor agrees not to release Medicare data and information either provided to the contractor, generated by activities under contract, or derived from research or studies supported by this contract without the prior permission of the contracting officer.

f.  Any presentation of any report, statistical or analytical material based on information obtained from this contract which requires special consideration with regard to the protection of the privacy of individuals or of trade secrets or privileged or confidential commercial information shall be subject to review by the contracting officer before dissemination, publication, or distribution.  Presentation includes, but is not limited to, papers, articles, professional publications, speeches, testimony or interviews with public print or broadcast media.

g.  Written advance notice of at least forty-five (45) days shall be provided to the contracting officer of the contractor's desire to release information where there may be a question of the protection of the privacy of individuals or of trade secrets or privileged or confidential commercial information.

h.  The contracting officer's review shall cover confidentiality issues and the protection of the privacy of individuals.  If the review reveals that the privacy of individuals, trade secrets or privileged or confidential commercial information is, or may be violated, the release/use of the presentation shall be denied until the offending material is removed or until the contracting officer makes a formal determination, in writing, that confidentiality provisions, the privacy of individuals, trade secrets or privileged or confidential commercial information is not being violated.

i. The contractor agrees to acknowledge support by CMS whenever reports of projects funding, in whole or in part, by this contract are published in any medium.  The contractor shall include in any publication resulting from work under this contract, an acknowledgment substantially, as follows:

"The analyses upon which this publication is based were performed under contract number HHSM-500-2005-00002I, entitled, "MMA Section 306 Recovery Audit Demonstration," sponsored by the Centers for Medicare and Medicaid Services, Department of Health and Human Services."  The conclusions and opinions expressed, and methods used herein are those of the author.  They do not necessarily reflect CMS policy.  The author assumes full responsibility for the accuracy and completeness of the ideas presented.  Ideas and contributions to the author concerning experience in engaging with issues presented are welcomed.  Any deviation from the above legend shall be approved, in writing, by the contracting officer.

## 26.   CODE OF CONDUCT

### SMOKING

Effective June 2004, smoking is not permitted anywhere on the CMS single site campus.  This includes all areas outside the building, such as off-site facility, entranceways, sidewalks and parking areas.  Smoking will not be permitted anywhere in Regional Offices or Washington, DC office locations unless permitted by GSA guidelines or local landlord requirements.  Contractor employees are subject to the same restrictions as government personnel.  Fines up to $50 per occurrence will be issued and enforced by the Federal Protective Service.

### DRESS

The preferred dress codes at CMS facilities are professional attire, business attire, or business casual attire.

## 26.   ATTACHMENTS

The following attachments are incorporated in this task order:
    (1) Statement of Objectives and Schedule of Deliveries

## 27. HHSAR 352.203-70 ANTI-LOBBYING (January 2006)

Pursuant to the current HHS annual appropriations act, except for normal and recognized executive-legislative relationships, the Contractor shall not use any HHS contract funds for (i) publicity or propaganda purposes; (ii) the preparation, distribution, or use of any kit, pamphlet, booklet, publication, radio, television or video presentation

designed to support or defeat legislation pending before the Congress or any State legislature, except in presentation to the Congress or any State legislature itself; or (iii) payment of salary or expenses of the Contractor, or any agent acting for the Contractor, related to any activity designed to influence legislation or appropriations pending before the Congress or any State legislature.

(End of clause)

## 28. HHSAR 352.222-70 CONTRACTOR COOPERATION IN EQUAL EMPLOYMENT OPPORTUNITY INVESTIGATIONS.

Contractor Cooperation in Equal Employment Opportunity Investigations (January 2010)

(a) In addition to complying with the clause in FAR 52.222–26, Equal Opportunity, the Contractor shall, in good faith, cooperate with the Department of Health and Human Services (Agency) in investigations of Equal Employment Opportunity (EEO) complaints processed pursuant to 29 CFR Part 1614. For purposes of this clause, the following definitions apply:

(1) "Complaint" means a formal or informal complaint that has been lodged with Agency management, Agency EEO officials, the Equal Employment Opportunity Commission (EEOC), or a court of competent jurisdiction.

(2) "Contractor employee" means all current Contractor employees who work or worked under this contract. The term also includes current employees of subcontractors who work or worked under this contract. In the case of Contractor and subcontractor employees, who worked under this contract, but who are no longer employed by the Contractor or subcontractor, or who have been assigned to another entity within the Contractor's or subcontractor's organization, the Contractor shall provide the Agency with that employee's last known mailing address, e-mail address, and telephone number, if that employee has been identified as a witness in an EEO complaint or investigation.

(3) "Good faith cooperation" cited in paragraph (a) includes, but is not limited to, making Contractor employees available for: (i) Formal and informal interviews by EEO counselors or other Agency officials processing EEO complaints; (ii) formal or informal interviews by EEO investigators charged with investigating complaints of unlawful discrimination filed by Federal employees; (iii) reviewing and signing appropriate affidavits or declarations summarizing statements provided by such Contractor employees during the course of EEO investigations; (iv) producing documents requested by EEO counselors, EEO investigators, Agency employees, or the EEOC in connection with a pending EEO complaint; and (v) preparing for and providing testimony in hearings before the EEOC and U.S. District Court.

(b) The Contractor shall include the provisions of this clause in all subcontract solicitations and subcontracts awarded at any tier under this contract.

(c) Failure on the part of the Contractor or its subcontractors to comply with the terms of this clause may be grounds for the Contracting Officer to terminate this contract for default.

A00053

(End of clause)

## 29.  HHSAR 352.227-70 PUBLICATIONS AND PUBLICITY.

Publications and Publicity (January 2006)

(a) Unless otherwise specified in this contract, the Government encourages the Contractor to publish the results of its work under this contract. A copy of each article the Contractor submits for publication shall be promptly sent to the Contracting Officer's Technical Representative. The Contractor shall also inform the Contracting Officer's Technical Representative when the article or other publication is published, and furnish a copy of it as finally published.

(b) Unless authorized by the Contracting Officer's Technical Representative, the Contractor shall not display the HHS logo on any publications.

(End of clause)

## 30. HHSAR 30. 352.231-71 PRICING OF ADJUSTMENTS (January 2001)

When costs are a factor in determination of a contract price adjustment pursuant to the "Changes" clause or any provision of this contract, the applicable cost principles and procedures set forth below shall form the basis for determining such costs:

| Principles | Types of organizations |
|---|---|
| (a) Subpart 31.2 of the Federal Acquisition Regulation | Commercial. |
| (b) Subpart 31.3 of the Federal Acquisition Regulation | Educational. |
| (c) Subpart 31.6 of the Federal Acquisition Regulation | State, local, and Federally recognized Indian Tribal governments. |
| (d) 45 CFR Part 74 Appendix E | Hospitals (performing research and development contracts only). |
| (e) Subpart 31.7 of the Federal Acquisition Regulation | Other nonprofit organizations. |

(End of clause)

**40. FAR 52.223-18, Contractor Policy to Ban Text Messaging While Driving (Sep 2010)**

(a) Definitions. As used in this clause--

"Driving"—

(1) Means operating a motor vehicle on an active roadway with the motor running, including while temporarily stationary because of traffic, a traffic light, stop sign, or otherwise.

(2) Does not include operating a motor vehicle with or without the motor running when one has pulled over to the side of, or off, an active roadway and has halted in a location where one can safely remain stationary.

"Text messaging" means reading from or entering data into any handheld or other electronic device, including for the purpose of short message service texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to park.

(b) This clause implements Executive Order 13513, Federal Leadership on Reducing Text Messaging while Driving, dated October 1, 2009.

(c) The Contractor should—

(1) Adopt and enforce policies that ban text messaging while driving—

(i) Company-owned or -rented vehicles or Government-owned vehicles; or

(ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.

(2) Conduct initiatives in a manner commensurate with the size of the business, such as—

(i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

(ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

(d) Subcontracts. The Contractor shall insert the substance of this clause, including this paragraph (d), in all subcontracts that exceed the micro-purchase threshold.

<div align="center">(End of clause)</div>

**50. HHSAR 352.239–70, STANDARD FOR SECURITY CONFIGURATIONS**

(a) The Contractor shall configure its computers that contain HHS data with the applicable Federal Desktop Core Configuration (FDCC) (see

**http://nvd.nist.gov/fdcc/index.cfm**) and ensure that its computers have and maintain the latest operating system patch level and anti-virus software level. (Note: FDCC is applicable to all computing systems using Windows XP™ and Windows Vista™, including desktops and laptops—regardless of function—but not including servers.)

(b) The Contractor shall apply approved security configurations to information technology (IT) that is used to process information on behalf of HHS. The following security configuration requirements apply:

(NOTE: The Contracting Officer shall specify applicable security configuration requirements in solicitations and contracts based on information provided by the Project Officer, who shall consult with the OPDIV/STAFFDIV Chief Information Security Officer.)

(c) The Contractor shall ensure IT applications operated on behalf of HHS are fully functional and operate correctly on systems configured in accordance with the above configuration requirements. The Contractor shall use Security Content Automation Protocol (SCAP)-validated tools with FDCC Scanner capability to ensure its products operate correctly with FDCC configurations and do not alter FDCC settings – see **http://scap.nist.gov/validation/.** The Contractor shall test applicable product versions with all relevant and current updates and patches installed. The Contractor shall ensure currently supported versions of information technology products meet the latest FDCC major version and subsequent major versions.

(d) The Contractor shall ensure IT applications designed for end users run in the standard user context without requiring elevated administrative privileges.

(e) The Contractor shall ensure hardware and software installation, operation, maintenance, update, and patching will not alter the configuration settings or requirements specified above.

(f) The Contractor shall (1) include Federal Information Processing Standard (FIPS) 201-compliant (see **http://csrc.nist.gov/publications/fips/fips201-1/FIPS-201-1-chng1.pdf**), Homeland Security Presidential Directive 12 (HSPD-12) card readers with the purchase of servers, desktops, and laptops; and (2) comply with **FAR Subpart 4.13**, Personal Identity Verification.

(g) The Contractor shall ensure that its subcontractors (at all tiers) which perform work under this contract comply with the requirements contained in this clause.

(End of clause)

## 51. HHSAR 352.239–72, SECURITY REQUIREMENTS FOR FEDERAL INFORMATION TECHNOLOGY RESOURCES

(a) Applicability. This clause applies whether the entire contract or order (hereafter "contract"), or portion thereof, includes information technology resources or services in which the Contractor has physical or logical (electronic) access to, or operates a

Department of Health and Human Services (HHS) system containing, information that directly supports HHS' mission. The term "information technology (IT)", as used in this clause, includes computers, ancillary equipment (including imaging peripherals, input, output, and storage devices necessary for security and surveillance), peripheral equipment designed to be controlled by the central processing unit of a computer, software, firmware and similar procedures, services (including support services) and related resources. This clause does not apply to national security systems as defined in FISMA.

(b) Contractor responsibilities. The Contractor is responsible for the following:

(1) Protecting federal information and federal information systems in order to ensure their—

(i) Integrity, which means guarding against improper information modification or destruction, and includes ensuring information non-repudiation and authenticity;

(ii) Confidentiality, which means preserving authorized restrictions on access and disclosure, including means for protecting personal privacy and proprietary information; and.

(iii) Availability, which means ensuring timely and reliable access to and use of information.

(2) Providing security of any Contractor systems, and information contained therein, connected to an HHS network or operated by the Contractor, regardless of location, on behalf of HHS.

(3) Adopting, and implementing, at a minimum, the policies, procedures, controls, and standards of the HHS Information Security Program to ensure the integrity, confidentiality, and availability of federal information and federal information systems for which the Contractor is responsible under this contract or to which it may otherwise have access under this contract. The HHS Information Security Program is outlined in the HHS Information Security Program Policy, which is available on the HHS Office of the Chief Information Officer's (OCIO) website.

(c) Contractor security deliverables. In accordance with the timeframes specified, the Contractor shall prepare and submit the following security documents to the Contracting Officer for review, comment, and acceptance:

(1) IT Security Plan (IT-SP) – due within 30 days after contract award. The IT-SP shall be consistent with, and further detail the approach to, IT security contained in the Contractor's bid or proposal that resulted in the award of this contract. The IT-SP shall describe the processes and procedures that the Contractor will follow to ensure appropriate security of IT resources that are developed, processed, or used under this contract. If the IT-SP only applies to a portion of the contract, the Contractor shall specify those parts of the contract to which the IT-SP applies.

(i) The Contractor's IT-SP shall comply with applicable federal laws that include, but are not limited to, the **Federal Information Security Management Act (FISMA) of**

**2002** (PDF) (Title III of the E-Government Act of 2002, Public Law 107-347), and the following federal and HHS policies and procedures:

(A) Office of Management and Budget **(OMB) Circular A-130**, Management of Federal Information Resources, Appendix III, Security of Federal Automated Information Resources.

(B) National Institute of Standards and Technology (NIST) **Special Publication (SP) 800-18** (PDF), Guide for Developing Security Plans for Federal Information Systems, in form and content, and with any pertinent contract Statement of Work/Performance Work Statement (SOW/PWS) requirements. The IT-SP shall identify and document appropriate IT security controls consistent with the sensitivity of the information and the requirements of **Federal Information Processing Standard (FIPS) 200**, Recommended Security Controls for Federal Information Systems. The Contractor shall review and update the IT-SP in accordance with **NIST SP 800-26,** Security Self-Assessment Guide for Information Technology Systems and FIPS 200, on an annual basis.

(C) **HHS-OCIO Information Systems Security and Privacy Policy.**

(ii) After resolution of any comments provided by the Government on the draft IT-SP, the Contracting Officer shall accept the IT-SP and incorporate the Contractor's final version into the contract for Contractor implementation and maintenance. On an annual basis, the Contractor shall provide to the Contracting Officer verification that the IT-SP remains valid.

(2) IT Risk Assessment (IT-RA) – due within 30 days after contract award. The IT-RA shall be consistent, in form and content, with **NIST SP 800-30**, Risk Management Guide for Information Technology Systems, and any additions or augmentations described in the HHS-OCIO Information Systems Security and Privacy Policy. After resolution of any comments provided by the Government on the draft IT-RA, the Contracting Officer shall accept the IT-RA and incorporate the Contractor's final version into the contract for Contractor implementation and maintenance. The Contractor shall update the IT-RA on an annual basis.

(3) **FIPS 199** Standards for Security Categorization of Federal Information and Information Systems Assessment (FIPS 199 Assessment) – due within 30 days after contract award. The FIPS 199 Assessment shall be consistent with the cited NIST standard. After resolution of any comments by the Government on the draft FIPS 199 Assessment, the Contracting Officer shall accept the FIPS 199 Assessment and incorporate the Contractor's final version into the contract.

(4) IT Security Certification and Accreditation (IT-SC&A) – due within 3 months after contract award. The Contractor shall submit written proof to the Contracting Officer that an IT-SC&A was performed for applicable information systems – see paragraph (a) of this clause. The Contractor shall perform the IT-SC&A in accordance with the HHS Chief Information Security Officer's Certification and Accreditation Checklist; **NIST SP 800-37**, Guide for the Security Certification and Accreditation of Federal Information Systems; and **NIST SP 800-53,** Recommended Security Controls for Federal

A00058

Information Systems. An authorized senior management official shall sign the draft IT-SC&A and provide it to the Contracting Officer for review, comment, and acceptance.

(i) After resolution of any comments provided by the Government on the draft IT-SC&A, the Contracting Officer shall accept the IT-SC&A and incorporate the Contractor's final version into the contract as a compliance requirement.

(ii) The Contractor shall also perform an annual security control assessment and provide to the Contracting Officer verification that the IT-SC&A remains valid. Evidence of a valid system accreditation includes written results of (A) annual testing of the system contingency plan and (B) the performance of security control testing and evaluation.

(d) Personal identity verification. The Contractor shall identify its employees with access to systems operated by the Contractor for HHS or connected to HHS systems and networks. The Contracting Officer's Technical Representative (COTR) shall identify, for those identified employees,  position sensitivity levels that are commensurate with the responsibilities and risks associated with their assigned positions. The Contractor shall comply with the HSPD-12 requirements contained in "HHS-Controlled Facilities and Information Systems Security" requirements specified in the SOW/PWS of this contract.

(e) Contractor and subcontractor employee training. The Contractor shall ensure that its employees, and those of its subcontractors, performing under this contract complete HHS-furnished initial and refresher security and privacy education and awareness training before being granted access to systems operated by the Contractor on behalf of HHS or access to HHS systems and networks. The Contractor shall provide documentation to the COTR evidencing that Contractor employees have completed the required training.

(f) Government access for IT inspection. The Contractor shall afford the Government access to the Contractor's and subcontractors' facilities, installations, operations, documentation, databases, and personnel used in performance of this contract to the extent required to carry out a program of IT inspection (to include vulnerability testing), investigation, and audit to safeguard against threats and hazards to the integrity, confidentiality, and availability, of HHS data or to the protection of information systems operated on behalf of HHS.

(g) Subcontracts. The Contractor shall incorporate the substance of this clause in all subcontracts that require protection of federal information and federal information systems as described in paragraph (a) of this clause, including those subcontracts that—

(1) Have physical or electronic access to HHS' computer systems, networks, or IT infrastructure; or

(2) Use information systems to generate, store, process, or exchange data with HHS or on behalf of HHS, regardless of whether the data resides on a HHS or the Contractor's information system.

(h) Contractor employment notice. The Contractor shall immediately notify the Contracting Officer when an employee either begins or terminates employment (or is no longer assigned to the HHS project under this contract), if that employee has, or had, access to HHS information systems or data.

(i) Document information. The Contractor shall contact the Contracting Officer for any documents, information, or forms necessary to comply with the requirements of this clause.

(j) Contractor responsibilities upon physical completion of the contract. The Contractor shall return all HHS information and IT resources provided to the Contractor during contract performance and certify that all HHS information has been purged from Contractor-owned systems used in contract performance .

(k) Failure to comply. Failure on the part of the Contractor or its subcontractors to comply with the terms of this clause shall be grounds for the Contracting Officer to terminate this contract.

(End of clause)

## 52. HHSAR 352.239–73, ELECTRONIC AND INFORMATION TECHNOLOGY ACCESSIBILITY.

(a) Section 508 of the Rehabilitation Act of 1973 (**29 U.S.C. 794d**), as amended by the Workforce Investment Act of 1998, and the Architectural and Transportation Barriers Compliance Board Electronic and Information (EIT) Accessibility Standards (**36 CFR Part 1194**), require that, unless an exception applies, all EIT products and services developed, acquired, maintained, or used by any federal department or agency permit—

(1) Federal employees with disabilities to have access to and use information and data that is comparable to the access and use of information and data by federal employees who are not individuals with disabilities; and

(2) Members of the public with disabilities seeking information or services from a federal agency to have access to and use of information and data that is comparable to the access and use of information and data by members of the public who are not individuals with disabilities.

(b) Accordingly, any vendor submitting a proposal/quotation/bid in response to this solicitation must demonstrate compliance with the established EIT accessibility standards. Information about Section 508 is available at **http://www.section508.gov/**. The complete text of Section 508 Final Provisions can be accessed at **http://www.access-board.gov/sec508/standards.htm**.

(c) The Section 508 accessibility standards applicable to this solicitation are identified in the Statement of Work/Specification/Performance Work Statement. In order to facilitate the Government's evaluation to determine whether EIT products and services proposed meet applicable Section 508 accessibility standards, offerors must prepare an HHS

A00060

Section 508 Product Assessment Template, in accordance with its completion instructions, and provide a binding statement of conformance. The purpose of the template is to assist HHS acquisition and program officials in determining that EIT products and services proposed support applicable Section 508 accessibility standards. The template allows vendors or developers to self-evaluate their products or services and document in detail how they do or do not conform to a specific Section 508 accessibility standard. Instructions for preparing the HHS Section 508 Evaluation Template may be found under Section 508 policy on the HHS Office on Disability website **(http://www.hhs.gov/od/**).

(d) Respondents to this solicitation must also provide any additional detailed information necessary for determining applicable Section 508 accessibility standards conformance, as well as for documenting EIT products or services that are incidental to the project, which would constitute an exception to Section 508 requirements. If a vendor claims its products or services, including EIT deliverables such as electronic documents and reports, meet applicable Section 508 accessibility standards in its completed HHS Section 508 Product Assessment Template, and it is later determined by the Government – i.e., after award of a contract/order, that products or services delivered do not conform to the described accessibility standards in the Product Assessment Template, remediation of the products or services to the level of conformance specified in the vendor's Product Assessment Template will be the responsibility of the Contractor and at its expense.

(End of provision)

A00061

## 27.    ACKNOWLEDGEMENT OF RECEIPT

Pursuant to the terms and conditions of Contract GS-XXX-XXXXX and this task order, HHSM-500-2004-XXXXX, the contractor shall perform the work required in accordance with the Statement of Work entitled, "Recovery Audit Contractor Demonstration**."**

**Signature of the Contractor represents acceptance of this task order.**


_____    _____
**Contractor**                                    **Date**

   **NOTE:  Only those contract sections that differ from the Umbrella GSA contract terms and conditions, or provide more detailed information specific to this particular Task Order, are provided below.  For those contract sections not identified below, all terms and conditions of the Umbrella GSA contract remain in effect.**

Attachment E:        Past Performance Questionnaire

(In a separate Word Document)

A00063

## MSP RAC PAYMENT VOUCHER PROCESS

The MSP RAC will submit a SF-1034 voucher and four (4) copies, along with detailed supporting documentation of the amount on the voucher in the format as show in the attached template, to the CMS Accounting Office as prescribed in Section TBD, Invoicing and Payment.  Accounting will forward the vouchers to the CMS Project Officer and Contracting Officer.  The amount on the voucher shall be the amount the RAC believes is due to them.  The amount will be the amount collected for the prior month (July's submission will include monies collected from June 1-June 30).  The supporting documentation shall include the beneficiary HIC number, the date demanded, the date collected, the amount collected and the required contingency fee. The amount on the voucher shall take into consideration any reduction because of a high error rate.

The CMS Project Officer will reconcile the amount on the voucher with the attached supporting documentation.  The CMS Project Officer will also reconcile the amount on the voucher with supporting documentation received from the Electronic Correspondence Referral System, the Treasury deposit ticket, and the Affiliated Medicare Contractor.  The CMS Project Officer will contact the RAC to resolve discrepancies and will certify the information is correct only once all discrepancies are resolved.  The CMS Project Officer will forward the certified voucher to the Contracting Officer for approval.  If a discrepancy cannot be resolved within a 14 calendar day time period, the amount in discrepancy will be suspended and may be billed on a future voucher once the discrepancy is resolved.  This will allow for the timely approval and payment of the voucher.

# Statement of Objectives
# Centers for Medicare & Medicaid Services
# Part D Recovery Audit Contractor (RAC)

## 1.0 Background

Title I of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA) (P.L. 108-173) was signed into law on December 8, 2003.  The MMA established a new voluntary outpatient prescription drug benefit under Part D of Title XVIII of the Social Security Act (the Act).  The prescription drug benefit, referred to as Medicare Part D, as well as an employer subsidy for qualified retiree health plans, began on January 1, 2006.  Coverage for the drug benefit will be provided by private prescription drug plans (PDPs) that offer drug-only coverage or through Medicare Advantage (MA) plans that offer both prescription drug and health care coverage (known as MA-PD plans).  These plans must offer a standard drug benefit, but will have the flexibility to vary the drug benefit within certain parameters.  The Centers for Medicare & Medicaid Services (CMS) has identified 26 MA Regions and 34 PDP Regions, not including territories, each of which is its own PDP region.

Section 6411(b) of the Affordable Care Act expanded the use of the statutory 1893 Recovery Audit Contract provisions to utilize RACs under the Medicare Integrity Program to identify underpayments and overpayments and recoup overpayments under the Medicare program associated with medications for which payment is made under Part D of Title XVIII of the Social Security Act. The effective date for this provision is December 31, 2010.

To gain additional knowledge, potential bidders may research the following documents:

- The Debt Collection Improvement Act of 1996
- The Federal Claims Collection Act, as amended and related regulations found in 42 CFR;
- CMS Financial Report
  http://www.cms.gov/CFOReport/Downloads/2009_CMS_Financial_Report.pdf
- The Medicare Prescription Drug Benefit Manual:
  http://www.cms.gov/Manuals/IOM/itemdetail.asp?filterType=none&filterByDID=-99&sortByDID=1&sortOrder=ascending&itemID=CMS050485&intNumPerPage=10
- Part D Claims Data:
  http://www.cms.gov/PrescriptionDrugCovGenIn/08_PartDData.asp#TopOfPage
- Part D Program Analysis:
  http://www.cms.gov/PrescriptionDrugCovGenIn/09_ProgramReports.asp#TopOfPage
- Part D Regulations:
  http://www.cms.gov/PrescriptionDrugCovGenIn/PDR/list.asp#TopOfPage
- Plan Communication Guide:
  http://www.cms.gov/MAPDHelpDesk/02_Plan_Communications_User_Guide.asp
- Part D Reporting Requirements:
  http://www.cms.gov/PrescriptionDrugCovContra/08_RxContracting_ReportingOversight.asp

## 2.0 Overall Objectives

The RAC for the Medicare Part D Program mission is to reduce Medicare improper payments through the efficient detection and collection of overpayments, the identification of underpayments, and the implementation of actions that will prevent future improper payments.

## 3.0 Purpose

The purpose of this contract is to obtain contractor support for the Centers for Medicare & Medicaid Services (CMS) in the identification of improper payments and the recoupment of overpayments in Medicare Part D. The Part D RAC will be responsible for identification and recovery of improper payments on a national scale. The Part D RAC will be paid only from amounts recovered and on a contingent basis consistent with Section 1893(h)(1) of the Social Security Act. Throughout this document the term "improper payment" is used to refer collectively to overpayments and underpayments.

## 4.0 Contract Objectives

The contractor shall identify and recover improper payments made under Medicare Part D. Independently, and not as an agent of the Government, the Contractor shall furnish all the necessary services, qualified personnel, material, equipment, and facilities, not otherwise provided by the Government, as needed to meet the objectives below:

**4.1 – METHODOLOGY**:  Establish and follow a methodology for identifying Medicare improper payments under Part D of Title XVIII of the Social Security Act.

   **4.1.1** Develop innovative methodologies to determine Part D improper payments utilizing resources such as the Office of Inspector General and Government Accountability Office reports, the Part D reporting requirements as described at the CMS.gov Prescription Drug Coverage Contracting webpage (see web address above) and the Part D error rate information in the annual CFO reports. The methodology shall be efficient and maximize recoveries as well as meet all regulatory and security requirements. The methodology should include a detailed description of **data sources**, scope of analysis, anticipated outcomes, and analysis time frame.

   **4.1.2** Develop methodologies and techniques, such as data analysis tools, to identify and /or target areas *most likely to contain improper payments* tools associated with each type of data identified.  A specific Part D claim may not be targeted solely because it is a high dollar claim, but a claim may be targeted if it contains other information that leads the RAC to believe it is likely to contain an improper payment.  Attempting to identify improper payments arising from any program other than Part D; this includes Medicare Advantage, and the Medicare Fee-For-Service program is strictly prohibited.

**4.1.3**  The RAC shall develop a recovery methodology for investigating Direct and Indirect Remuneration (DIR) under the Medicare Part D program. Identify and investigate sources of underreported and/or unreported DIR, which may include:

- DIR amounts retained by PBM's and not reported by Plan Sponsors.

- Price concessions received by manufacturers and not reported by Plan Sponsors.

- Any other source constituting DIR.

**4.1.4** CMS plans to establish an oversight board to govern the Part D RAC.  Develop a plan/process for interacting with the board; the interaction will require presenting issues, and proposing future action(s).  New approaches or changes in approaches developed after contract award shall require preapproval by CMS.

**4.2 – DATA STORE**.   In order to meet the objective of ensuring the RAC and entities, such as, Medicare audit contractors or law enforcement, are not simultaneously working on the same payment data, CMS will establish a Data Storage System to support recovery audits for Medicare Part D.  The Data Storage System shall be used by the RAC for the identification of payment information. The Data Storage System will include a master table of data with action specific identifiers.

**4.2.1** Establish a methodology to securely transmit and interface with the Data Storage System. The methodology shall also provide for updating the master table.  [Securely transmit means sent in accordance with the CMS business systems security manual – e.g., mailed CD, MDCN line, through a clearinghouse.] Consideration should be made for the inclusion of various types and sources of data.  Provide technical parameters such as potential size, housing (e.g. web-based), and access limitations.

**4.3 – COMMUNICATIONS**.  Establish a communication plan for Part D Sponsor outreach and education.  The plan shall ensure that processes and procedures are in place to notify Plan Sponsors of the RAC's purpose and direction.

**4.4 – APPEALS**.  CMS anticipates an appeals process requirement once the Part D RAC is operational.  Establish an appeals assistance process for any RAC-identified improper payment that is appealed by the Sponsor, and any subsequent support required by CMS throughout the process, including Federal Court cases.

**4.5 – ANNUAL REPORT**.  CMS is required to submit an annual report to Congress on the use of RACs.  Develop an approach for providing input to this report.

**4.6 – ADMINISTRATION**.  Develop an overall project plan, implementation schedule(s), organizational charts, and monthly reports that account for all work accomplished during the previous month.  Monthly reports shall include, at a minimum, vulnerability reports, progress reports and financial reports. The project plan shall include methodologies for responding to CMS requests for input.

**5.0  Schedule of Deliverables.** Establish a schedule of deliverables necessary to meet the objectives listed above as well as program initiatives. The deliverables schedule below is provided as a template only and may be revised/tailored to correspond with the performance work statement.

| Deliverable | Schedule |
|---|---|
| Kick-Off Meeting | 14 days post contract award date or earlier |
| Base Year Project Plan | 14 days post contract award date |
| Annual Report Input | TBD |
| Implementation Schedule | 14 days post contract award date |
| Organizational Charts | 14 days post contract award date |
| Monthly Vulnerability Report | TBD |
| Monthly Progress Report | TBD |
| Monthly Financial Report | TBD |

# 6.0 Constraints and Assumptions

**6.1     Information Security.**  The Part D RAC shall be required to comply with system security guidelines.  Information regarding system security requirements is available at the following links:

http://www.cms.gov/manuals/downloads/117_systems_security.pdf
http://www.cms.gov/InformationSecurity/01_Overview.asp#TopOfPage.

The Federal Information Security Management Act of 2002 (P.L. 107-347) (FISMA) requires each agency to develop, document, and implement an agency-wide information security program to safeguard information and information systems that support the operations and assets of the agency, including those provided or managed by another agency, contractor (including subcontractor), or other source on behalf of an agency.  That is, agency information security programs apply to all organizations (sources) which possess or use Federal information – or which operate, use, or have access to Federal information systems (whether automated or manual) – on behalf of a Federal agency. This includes services which are either fully or partially provided; including other agency hosted, outsourced, and cloud computing solutions. The Centers for Medicare & Medicaid Services (CMS) and the National Institute of Standards and Technology (NIST) have issued a number of publications that provide guidance in the establishment of minimum security controls for management, operational and technical safeguards needed to protect the confidentiality, integrity and availability of a CMS system and its information.

If the Statement of Objectives (SOO) requires the successful offeror to (1) process, (2) store, (3) facilitate transport of, or (4) host/maintain Federal information; pursuant to Federal, HHS, and CMS Information Security Program Policies the following requirements apply:

# INFORMATION SECURITY RESPONSIBILITIES

The Contractor/Subcontractor shall appoint a Systems Security Officer (SSO) as a full-time position to oversee its compliance with the CMS security requirements.

The offeror shall include in the "Information Security" portion of its Technical Proposal the name, title, and professional credentials of its official who shall be responsible for all information security requirements should the offeror be selected for an award. Those responsibilities shall include implementation and oversight of the following:

### 6.1.1   System Security Level

For solicitations requiring the Contractor/Subcontract to (1) process, (2) store, (3) facilitate transport of, or (4) host/maintain Federal information, either at the Contractor/Subcontractor site, or at a Federal hosting facility, the offeror shall develop appropriate security controls for CMS security requirements (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity) in accordance with the below-listed parameters:

(a)   Information Type (as defined on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).

(b)   Systems Security Level (Low, Moderate, or High as defined on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).

(c)   E-Authentication level (Level 1, 2, 3, 4, or N/A as applicable by NIST 800-53 controls IA-2 and IA-8 and as defined on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).

The offeror must coordinate with CMS to develop and/or clarify the above listed criteria within 30 days of contract award or when a major modification has been made to its internal system, as defined by the CMS CISO.

### 6.1.2   Security Services

The Contractor/Subcontractor shall provide security services in support of CMS, which shall include coordination among the CMS CISO, business owners, and other stakeholders. The sites and related infrastructure services shall have policies and procedures and implement controls or plans that fulfill the CMS Information Security Policy requirements, including all applicable CMS standards and procedures. The collection of CMS policies, procedures, standards, and guidelines are located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity.

### 6.1.3   Tracking and Correcting Security Deficiencies

The Contractor/Subcontractor shall track and correct any applicable security deficiencies, conditions, weaknesses, findings, and gaps identified by audits, reviews, Security Assessments, and tests, including those identified in Chief Financial Officer (CFO) Audits, FISMA Audits, Statement on Auditing Standards (SAS) 70 reviews, MMA Section 912 evaluations and tests,

Inspector General Audits, A-123 audits, other applicable reviews and audits, and CMS  Security Operations Center (SOC) continuous monitoring activities such as, but not limited to, vulnerability and compliance scanning of all the CMS information systems, in a timely manner.

### 6.1.4   Incident Response

A security incident is a violation, or an imminent threat of a violation, of an explicit or implied security policy, acceptable use policies, or standard security practices.  While certain adverse events, (e.g., floods, fires, electrical outages, and excessive heat) can cause system crashes, they are not considered computer-security incidents.  A security incident becomes a breach when the incident involves the suspected or actual loss of personally identifiable information.  CMS information and information system security related incidents should be reported using the Computer Security Incident Report (CSIR) form.  Incidents that concern PII should be reported using the CSIR form set forth in the CMS Incident Handling procedures available at the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity

### 6.1.5   Information Security Awareness Training

CMS policy requires Contractors/Subcontractors receive security training commensurate with their responsibilities for performing work under the terms and conditions of their contractual agreements.

Contractor shall retain the results of security awareness and role-based information security technical training.  CMS requires basic security awareness training for employees and contractors that support the operation of the Contractor/Subcontractor system.  CMS requires information security technical training to information system security roles.  Training shall be consistent with the requirements contained in C.F.R. Part 5 Subpart C (5 C.F.R. 930.301) and conducted at least annually.

### 6.1.6   Privacy Documentation

Contractor shall be responsible for coordinating with the CMS Privacy Office (http://www.cms.gov/PrivacyOffice/) in preparing and maintaining current all documentation including but not limited to System of Records Notification (SORN) and Privacy Impact Assessments (PIA) which directly and indirectly relating to its program(s) designed to ensure the confidentiality, integrity, and availability of Federal Information and Federal Information System, and its assets that enable its possession or control.

### 6.1.7   System Authorization and Assessment

The implementation of a Federal Government IT system requires a formal Government Authorization to Operate (ATO), formerly certification and accreditation, of infrastructure systems and/or all application systems developed, hosted and/or maintained on behalf of CMS. NIST Special Publication 800-37, (hereafter described as NIST 800-37) and CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity) give guidelines for performing the system ATO process.  The system/application must have a valid ATO (conveyed through the CMS CIO

authorization decision process) before going into operation and processing CMS information. The failure to obtain and maintain a valid ATO may be grounds for termination of the contract.

1) The Contractor shall comply with ==Authorization to Operate (ATO)== requirements as mandated by Federal laws and policies, including making available any documentation, physical access, and logical access needed to support this requirement.  The Level of Effort for the ATO is based on the System's NIST Federal Information Processing Standard (FIPS) Publication 199 categorization and CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).  The contractor shall coordinate with the CMS business owner to create, maintain and update all applicable ATO documentation as defined by CMS Information Security procedures.

2) At the Moderate and High impact levels, all CMS systems and infrastructures must obtain an independent Security Assessment in accordance with CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).  The Contractor shall allow CMS employees (or CMS designated third-party contractors) to conduct Security Assessment activities to include control reviews in accordance with NIST 800-53/NIST 800-53A and CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).  This includes the general support system infrastructure.

3) Identified gaps between required controls and the Contractor's implementation as documented in the Security Assessment report shall be tracked for mitigation in a Plan of Action and Milestones (POA&M) document completed in accordance with CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).  Depending on the severity of the gaps, the Government may require them to be remediated before an Authorization to Operate is issued.

4) The Contractor shall be responsible for mitigating all applicable security risks found during the ATO process and continuous monitoring activities.  All high-risk vulnerabilities must be mitigated within 30 days and all moderate risk vulnerabilities must be mitigated within 90 days from the date vulnerabilities are formally identified.  The Government will determine the risk rating of vulnerabilities.

**6.1.8**   Continuous Monitoring

CMS has the right to perform manual or automated audits, scans, reviews, or other inspections of the Contractor's/Subcontractor's IT environment being used to provide or facilitate services for CMS in support of the Federal requirements to perform continuous monitoring.

Automated scans can be performed by Government personnel, or agents acting on behalf of the Government, using Government operated equipment, and Government specified tools.

CMS established a centralized Security Operations Center (SOC) to provide a robust enterprise continuous monitoring program to improve situational awareness and provide near real-time risk management. The SOC provides information security oversight and monitoring of security events across all information systems that support the operations and assets of CMS, and will notify the appropriate security operations staff of potentially malicious traffic.

In addition to the requirements to meet all of the CMS Information Security requirements documented in the http://www.cms.gov/InformationSecurity Web site, the Contractor/Subcontractor shall work closely with the SOC to undertake security related activities including but not limited to the following:

1) Contractor/Subcontractor shall be responsible for supporting the CMS continuous monitoring program by providing automated data feeds to the SOC as required by the CMS CISO. The SOC will supplement this by conducting independent oversight continuous monitoring activities such as, but not limited to, vulnerability and compliance scanning as well as other network monitoring related activities of all the CMS information systems.
2) Contractor/Subcontractor shall provide updated network architecture, IP address ranges, and security points of contact information for the systems they operate on behalf of CMS to the SOC on a quarterly basis (Jan 1, April 1, July 1, and Oct 1).
3) Contractor/Subcontractor shall maintain and provide changes to the system accounts needed for the SOC credentialed scanning two weeks before the passwords expire or when other changes to the accounts are needed.
4) Contractor/Subcontractor shall provide rack space, cabling, connectivity, and appropriate environmental support for SOC-managed systems/appliances as required by the CMS CISO.

### 6.1.9   Federal Desktop Core Configuration (as applicable)

The Contractor shall certify applications are fully functional and operate correctly as intended on systems using the Federal Desktop Core Configuration (FDCC). This includes Internet Explorer 7 configured to operate on Windows.  The standard installation, operation, maintenance, updates, and/or patching of software shall not alter the configuration settings from the approved FDCC configuration.  The information technology should also use the Windows Installer Service for installation to the default "program files" directory and should be able to silently install and uninstall.  Applications designed for normal end users shall run in the standard user context without elevated system administration privileges.  The contractor shall use Security Content Automation Protocol (SCAP) validated tools with FDCC Scanner capability to certify their products operate correctly with FDCC configurations and do not alter FDCC settings. Deviations must be approved by the CMS CISO.

### 6.1.10  Security Planning

**If the Statement of Objectives (SOO) requires the successful offeror to develop, host and/or maintain a Federal information system(s)**, the following requirements apply:

(1)    Draft Information System Security Plan - The offeror shall include a draft System Security Plan (SSP) using the current template available at the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity.  The details contained in the offeror's draft SSP shall be commensurate with the size and complexity of the requirements of the SOW based on the System Categorization determined elsewhere in the document.
(2)    Subcontracts:  The offeror shall include similar information for any proposed subcontractor that shall perform under the SOW with the offeror whenever the submission of an SSP is required.

(3)     Note to Offerer: The resultant contract shall require the draft SSP to be finalized in coordination with the Project Officer no later than 90 calendar days after contract award. Also, a contractor shall be required to update and resubmit its SSP to CMS every three years (at a minimum) following award or when a major modification has been made to its internal system, as defined by the CMS CISO.

# REQUIRED POLICIES AND REGULATIONS

The CMS Information Technology (IT) Security program was developed in accordance with applicable Federal mandates and CMS requirements for the handling and processing of CMS' information and information systems.  The CMS Information Security Web site at http://www.cms.gov/InformationSecurity provides a list of applicable security policies and procedures across the program.  Some applicable references are provided below:

- *CMS Policy for information Security* (As amended) – The high level CMS policy for the CMS Information Security Program.
- *CMS Policy for the Information Security Program (PISP)* (As amended) - Sets the ground rules under which CMS shall operate and safeguard its information and information systems to reduce the risk and minimize the effect of security incidents.  This document will subsequently reference Contractors/Subcontractors applicable CMS security Standards and procedure.
- *CMS Policy for Investment Management and Governance* (As amended) - Establishes the policy for systematic review, selection/reselection, implementation/control, and continual evaluation of IT investments at CMS.

Contractors/Subcontractors are also required to comply with Federal Information Processing Standards (FIPS), the "Special Publications 800 series" guidelines published by NIST and other Government-wide laws and regulations for protection and security of CMS Information and information technology:

- Federal Information Security Management Act (FISMA) of 2002.
- HIPAA, 1996, P.L. 104-191
- Medicare Modernization Act of 2003, P.L. 108-173
- American Recovery and Reinvestment Act of 2009
- Health Information Technology for Economic and Clinical Health (HITECH) Act (part of the American Recovery and Reinvestment Act of 2009)
- Clinger-Cohen Act of 1996 also known as the "Information Technology Management Reform Act of 1996."
- Privacy Act of 1974 (5 U.S.C. § 552a).
- Homeland Security Presidential Directive (HSPD-12), "Policy for a Common Identification Standard for Federal Employees and Contractors" (as amended).
- Office of Management and Budget (OMB) Circular A-130, "Management of Federal Information Resources", and Appendix III, "Security of Federal Automated Information Systems" (as amended).
- OMB Memorandum M-04-04, "E-Authentication Guidance for Federal Agencies."

- FIPS PUB 199, "Standards for Security Categorization of Federal Information and Information Systems."
- FIPS PUB 200, "Minimum Security Requirements for Federal Information and Information Systems" (as amended).
- FIPS PUB 140-2, "Security Requirements for Cryptographic Modules"
- NIST Special Publication 800-18 (as amended), "Guide for Developing Security Plans for Federal Information Systems."
- NIST Special Publication 800-30 (as amended), "Risk Management Guide for Information Technology Security Risk Assessment Procedures for Information Technology Systems."
- NIST Special Publication 800-34 (as amended), "Contingency Planning Guide for Information Technology Systems."
- NIST SP 800-37, (as amended), "Guide for the Security Certification and Accreditation of Federal Information Systems."
- NIST Special Publication 800-47 (as amended), "Security Guide for Interconnecting Information Technology Systems."
- NIST Special Publication 800-53 (as amended), "Recommended Security Controls for Federal Information Systems."
- NIST Special Publication 800-53A (as amended), "Guide for Assessing the Security Controls in Federal Information Systems."

Additional CMS documents were used as references in the development of this manual.  The CMS Information Security "Virtual Handbook" Web site at http://www.cms.gov/InformationSecurity provides a list of additional applicable documents across the Information Security program.

**6.2     Data Use Agreement.**  A data use agreement will be required for the execution of this work.
http://www.cms.gov/PrivProtectedData/01_Overview.asp#TopOfPage

**6.3     Conflict of Interest.   Real, perceived, or potential significant Conflicts of Interests arising as a result of an entity performing as the RAC for Medicare Part D shall be avoided, neutralized or mitigated to prevent an unfair competitive advantage or the existence of conflicting roles that might impair a contractor's objectivity.** Establish a process for ensuring conflicts of interests are avoided, neutralized or mitigated. Additionally the process shall include a methodology for determining if an organizational conflict of interest exists with subcontractors and in subcontracts and for ensuring that the subcontractor has mitigated any conflict or potential conflict prior to the award of any subcontract for furnishing supplies or services under the prime contract.

**6.4     Background Investigation.**   Contractor personnel performing services for CMS under this contract shall be required to undergo a background investigation. CMS will initiate and pay for any required background investigation(s). (See clause included in task order template).

**6.5     Payment Methodology.** Assume payment will be made after validation of recoveries and in accordance with the terms and conditions of the GSA Schedule Contract and RAC Part D Task order.

A00074

Assume the agreed to contingency fee may be reduced if a recovery is the result of an external referral, e.g. CMS audit findings. Reference Payment Methodology provided in task order template.

Attachment D—Sample Task Order Terms and Conditions

## 1.    TASK ORDER SUPPORT:

This task order is issued under General Services Administration (GSA) Contract Number GS-XXX-XXXXX to perform the work required in accordance with the attached performance work statement (PWS) and deliverable schedule entitled, "Medicare Part D Recovery Audit Contractor."  .  This task order shall be performed in accordance with the terms and conditions of the GSA contract under the FABS Schedule and the terms and conditions contained herein.  Only those contract sections, which differ from the GSA schedule  contract terms and conditions, or provide more detailed information specific to this particular task order, are provided below.  For those contract sections not identified below, all terms and conditions of the GSA contract remain in effect.

## 2.    TYPE OF TASK ORDER:

This is a Firm-Fixed Price Contingency Fee task order.  The Contingency Fee is to be determined (TBD)  %.

## 3.    PERIOD OF PERFORMANCE

The 12 month base period of the task order is from <u>TBD to TBD</u>.  The task order also includes four (4) 12-month optional periods.  No contingency fees shall be paid after the end of the period of performance.

## 4.    TASK ORDER PRICE SUMMARY

All payments shall be paid only on a contingency basis.  The recovery audit contractor will receive _____% of all amounts collected.  The contingency fees shall be paid once the recovery audit contractor collects the Medicare overpayments.  The recovery audit contractor shall be paid a percentage of the amount that is collected through their recovery efforts.  The recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments not recovered/collected.  The recovery audit contractor shall submit vouchers on a monthly basis (see Attachment 2) with supporting documentation of the recovery.  Once verified, CMS shall pay the voucher pursuant to the Prompt Payment Provisions.

If the provider files an appeal disputing the overpayment determination and the appeal is adjudicated in the provider's favor at the first level, the recovery audit contractor shall repay Medicare the contingency payment for that recovery.  If the appeal is adjudicated in the agency's favor at the first level, the recovery audit contractor shall retain the contingency payment for that recovery.  Subsequent appeals, after the first level of appeal, will not affect the recovery audit contractor's ability to retain the contingency payment.

## 5.    OMB A-130 INFORMATION RESOURCE POLICY

Each RAC is required to follow the established comprehensive approach to improve the acquisition and management of their information resources in accordance with this OMB Circular.   This circular is issued pursuant to the Paperwork Reduction Act (PRA) of 1980, as amended by the PRA of 1995, the Clinger-Cohen Act of 1996, et al.  The PRA establishes a broad mandate to perform information resources management activities in an efficient, effective, and economical manner.

### 6.1    HHSAR 352.242-70 Key personnel Key Personnel (January 2006)

The key personnel specified in this contract are considered to be essential to work performance. At least 30 days prior to diverting any of the specified individuals to other programs or contracts (or as soon as possible, if an individual must be replaced, for example, as a result of leaving the employ of the Contractor), the Contractor shall notify the Contracting Officer and shall submit comprehensive justification for the diversion or replacement request (including proposed substitutions for key personnel) to permit evaluation by the Government of the impact on performance under this contract. The Contractor shall not divert or otherwise replace any key personnel without the written consent of the Contracting Officer. The Government may modify the contract to add or delete key personnel at the request of the contractor or Government.

(End of clause)

6.2 The following are designated Key Personnel Positions


Position TBD (Name TBD, Phone TBD, Email Address TBD)


## 7.    SUBCONTRACT CONSENT

To facilitate the review of a proposed subcontract by the Contracting Officer Technical Representative and the Contracting Officer, the Contractor shall submit the information required by the FAR clause 52.244-2 entitled, SUBCONTRACTS, to the COTR who shall in turn forward the information with his/her recommendation to the Contracting Officer.  The Contracting Officer shall review the request for subcontract approval and the COTR's recommendation and advise the Contractor of his/her decision to consent to or dissent from the proposed subcontract, in writing.  Consent is hereby given to issue the following subcontract(s):

**TBD**

1.  In accordance with the Health and Human Services Supplemental Acquisition Regulation (HHSAR) and FAR *52.202–1(a)(1),* substitute the following as paragraph (a) of 52.202-1(a)(1) with :

"(a) The term "Secretary" or "Head of the Agency" (also called "Agency Head") means the Secretary, Deputy Secretary, or any Assistant Secretary, Administrator or Commissioner of the Department of Health and Human Services; and the term "his/her duly authorized representative" means any person, persons, or board authorized to act for the Secretary."

Add the following paragraph 'h' to 52.202-1

"(h) The term "Contracting Officer's Technical Representative" means the person who monitors the technical aspects of contract performance. The Contracting Officer's Technical Representative is not authorized to issue any instructions or directions which cause any increase or decrease in the Statement of Work/Performance Work Statement/Specifications which would result in the increase or decrease in the price of this contract, or changes in the delivery schedule or period of performance of this contract. If applicable, the Contracting Officer's Technical Representative is not authorized to receive or act upon any notification or revised cost estimate provided by the Contractor in accordance with the Limitation of Cost or Limitation of Funds clauses of this contract."

## 8.   Contracting Officer's Technical Representative (COTR) and/CONTRACT SPECIALIST:

TBD is designated as the COTR for this order.  TBD address is:

> Centers for Medicare and Medicaid Services
> 7500 Security Blvd.
> ATTN:
> Mailstop:
> Baltimore, MD  21244-1850
> (410) 786-

All technical correspondence should be directed to the COTR with a copy to the Contract Specialist.

The responsibilities and duties of the COTR include:

a) Provide technical direction as needed to the contractor as long as the terms and conditions of the contract are not changed.
b) Monitor contractor's ongoing efforts.
c) Serve as liaison between the contractor, Project Officer and project team.
d) Review deliverables and advise Contracting Officer of the contractor's performance.
e) Advise the Contracting Officer on the contractor's compliance with technical performance requirements.
f) Ensures that the contractor input and/or recommendations are considered by CMS project management.

The Contract Specialist for this task order is Ms. Jessica Sanders.  Her address is:

> Centers for Medicare and Medicaid Services
> 7500 Security Blvd.
> ATTN:  Ms. Jessica Sanders
> Mailstop:  C2-21-15
> Baltimore, MD  21244-1850
> (410) 786-1076

The Contracting Officer for this task order is Ms. Debra Stidham.  Her address is:

> Centers for Medicare and Medicaid Services
> 7500 Security Blvd.
> ATTN:  Ms. Debra Stidham
> Mailstop:  C2-21-15
> Baltimore, MD  21244-1850
> (410) 786-5129

## 9.    CONFIDENTIALITY

As a result of this task order, the GSA Schedule Contractor may have access to confidential information (i.e., information considered proprietary as well as information that may fall under the Privacy Act).  The GSA Schedule Contractor shall not disclose any such information or findings to any parties other than the Project Officer and staff assigned to this effort.  Appropriate administrative, technical, procedural and physical safeguards shall be established by the GSA Schedule Contractor to protect the confidentiality of the data and to prevent unauthorized access to such data.

## 10.   DESIGNATION OF PROPERTY ADMINSTRATOR AND PROPERTY ADMINISTRATION

a.  The CMS Property Administrator, Administrative Services Group, Office of Property and Space Management at (410) 786-3346, is hereby designated the property administration function for this contract.   The Contractor agrees to furnish information regarding Government Property to the Property Administrator in the manner and to the extent required by the Property Administrator, his duly designated successors, and in accordance with FAR Part 45 and DHHS Manual entitled, Contractor's Guide for Control of Government Property (1990).

b.  The contractor is responsible for an annual physical inventory accounting for all Government property under this contract.  The inventory must be conducted by September 30th and the form 565, Report of Accountable Personal Property (J-15) submitted by October 31st of each year.

c.  The inventory report shall include all items acquired, furnished, rented or leased under the contract.  Employees who conduct the inventories should not be the

same individuals who maintain the property records.  Following the physical inventory, the contractor shall prepare an inventory report and submit the report to the CMS Property Administrator at the following address:

> Centers for Medicare & Medicaid Services
> OICS, Administrative Services Group
> Division of Property and Space management
> 7500 Security Blvd., Mailstop:  SLL-14-06
> Baltimore, MD  21244-1850

d.  Commercially leased software is subject to these reporting requirements.

e.  The RAC shall submit a consolidated report of all accountable Government property under this contract, including subcontractor inventory information.

f.  The final inventory report shall indicate that all items required for continued contract performance are acceptable and free from contamination.  Property that is no longer usable or required shall be reported and disposition requested.

## 11.   INVOICING AND PAYMENT

Invoicing and Payment

a.  Submission of Invoices and Place of Payment

(i)   No more than once each month following the effective date of this contract, the Contractor may submit to the Government an invoice (or public voucher) for payment, in accordance with FAR Clause 52.216-7 "Allowable Cost & Payment."  Invoices shall be prepared in accordance with this contract.  All invoices shall be reconciled against the RAC Database (40700NMSPB) or other documentation as appropriate to ensure collection has been made and funds recouped deposited prior to any invoice being paid.

(ii)   To expedite payment, invoices shall be sent, as follows:

> Monthly invoices (original and four copies) shall be sent directly to the address below (where applicable, the Contractor shall submit the invoice to said office via the cognizant government auditor):
>
> Department of Health and Human Services
> Centers for Medicare & Medicaid Services
> P.O. BOX 7520
> 7500 Security Boulevard
> Baltimore, Maryland 21207-0520

(iii) Content of Invoice (If Applicable):

      Contractor's name and invoice date;
      Contract number of other authorization for delivery of
       property and/or services;
      Description, cost or price, and quantity of property
       and/or services actually delivered or rendered;
      Shipping and payment terms;
      Other substantiating documentation or information as
       required by the contract; and
      Name (where practicable), title, phone number, and complete
       mailing address of responsible official to whom payment is
       to be sent.

b.  Invoice Payment

(i)   In accordance with FAR 52.232-33, the Centers for Medicare and Medicaid Services (CMS) shall only make an electronic reimbursement/payment.

In accordance with FAR 52.204-7, the contractor must register in the Central Contractor Registration (CCR) database.  Failure to register in CCR may prohibit CMS from making awards to your organization.

The contractor shall notify CMS' Division of Accounting Operations of all EFT and address changes in CCR via the following email address: CCRChanges@cms.hhs.gov

(ii) The target date for payment pursuant to the provision of FAR Clause, 52.216-7 "Allowable Cost and Payment" of this contract shall be 30 calendar days after an invoice containing the information set forth in Paragraph "a" of this article is received in the7 payment office designated herein.

(iii) Upon receipt of the Contractor's "completion invoice" in the payment office designated in Paragraph "a" of this article, payment of any remaining cost and fee determined to be allowable pursuant to the provisions of FAR Clause, 52.216-7 "Allowable Cost and Payment" of this contract shall be due 30 calendar days after the Contracting Officer approves the "completion invoice" for payment.

(iv) Payment shall be authorized after the Division of Accounting has audited the invoice in accordance with Federal Regulations.  This audit includes verification that the invoice contains the rates/unit prices, those indicated in the contract or purchase order.  Any discrepancies determined as a result of the audit, could delay the processing of the invoice and may result in the invoice being returned to the vendor for correction.  Inquiries relating to payments should be directed to Jean Katzen on (410) 786-5423 or Suzanne Turgeon on (410) 786-1924.

A00081

c. See Attachment 2 for additional information on the MSP RAC Payment Voucher Process.

## 12.   PAYMENT BY ELECTRONIC FUNDS TRANSFER - CENTRAL CONTRACTOR REGISTRATION

a. *Method of payment.* (1) All payments by the Government under this contract shall be made by electronic funds transfer (EFT), except as provided in paragraph (a)(2) of this clause. As used in this clause, the term "EFT" refers to the funds transfer and may also include the payment information transfer.  (2) In the event the Government is unable to release one or more payments by EFT, the Contractor agrees to either -

(i) Accept payment by check or some other mutually agreeable method of payment; or

(ii) Request the Government to extend the payment due date until such time as the Government can make payment by EFT (but see paragraph (d) of this clause).

b. *Contractor's EFT information.* The Government shall make payment to the Contractor using the EFT information contained in the Central Contractor Registration (CCR) database. In the event that the EFT information changes, the Contractor shall be responsible for providing the updated information to the CCR database.

c.  *Mechanisms for EFT payment.* The Government may make payment by EFT through either the Automated Clearing House (ACH) network, subject to the rules of the National Automated Clearing House Association, or the Fedwire Transfer System. The rules governing Federal payments through the ACH are contained in 31 CFR part 210.

d.  *Suspension of payment.* If the Contractor's EFT information in the CCR database is incorrect, then the Government need not make payment to the Contractor under this contract until correct EFT information is entered into the CCR database; and any invoice or contract-financing request shall be deemed not to be a proper invoice for the purpose of prompt payment under this contract. The prompt payment terms of the contract regarding notice of an improper invoice and delays in accrual of interest penalties apply.

e. *Liability for uncompleted or erroneous transfers.* (1) If an uncompleted or erroneous transfer occurs because the Government used the Contractor's EFT information incorrectly, the Government remains responsible for -

(i) Making a correct payment;

A00082

(ii) Paying any prompt payment penalty due; and

(iii) Recovering any erroneously directed funds.

      If an uncompleted or erroneous transfer occurs because the Contractor's EFT information was incorrect, or was revised within 30 days of Government release of the EFT payment transaction instruction to the Federal Reserve System, and -

(iv) If the funds are no longer under the control of the payment office, the Government is deemed to have made payment and the Contractor is responsible for recovery of any erroneously directed funds; or

(v) If the funds remain under the control of the payment office, the Government shall not make payment, and the provisions of paragraph (d) of this clause shall apply.

f.    *EFT and prompt payment*. A payment shall be deemed to have been made in a timely manner in accordance with the prompt payment terms of this contract if, in the EFT payment transaction instruction released to the Federal Reserve System, the date specified for settlement of the payment is on or before the prompt payment due date, provided the specified payment date is a valid date under the rules of the Federal Reserve System.

g.    EFT and assignment of claims. If the Contractor assigns the proceeds of this contract as provided for in the assignment of claims terms of this contract, the Contractor shall require as a condition of any such assignment, that the assignee shall register separately in the CCR database and shall be paid by EFT in accordance with the terms of this clause. Notwithstanding any other requirement of this contract, payment to an ultimate recipient other than the Contractor, or a financial institution properly recognized under an assignment of claims pursuant to subpart 32.8, is not permitted. In all respects, the requirements of this clause shall apply to the assignee as if it were the Contractor. EFT information that shows the ultimate recipient of the transfer to be other than the Contractor, in the absence of a proper assignment of claims acceptable to the Government, is incorrect EFT information within the meaning of paragraph (d) of this clause.

h.    Liability for change of EFT information by financial agent. The Government is not liable for errors resulting from changes to EFT information made by the Contractor's financial agent.

i.    *Payment information*. The payment or disbursing office shall forward to the Contractor available payment information that is suitable for transmission as of the date of release of the EFT instruction to the Federal Reserve System. The Government may request the Contractor to designate a desired format and method(s) for delivery of payment information from a list of formats and methods

A00083

the payment office is capable of executing. However, the Government does not guarantee that any particular format or method of delivery is available at any particular payment office and retains the latitude to use the format and delivery method most convenient to the Government. If the Government makes payment by check in accordance with paragraph (a) of this clause, the Government shall mail the payment information to the remittance address contained in the CCR database.

## 13.  DELIVERABLES/INTERNET – INTRANET APPLICATIONS

If applicable, all written deliverables will include a version in HyperText Mark-Up Language (HTML) formatted according to Centers for Medicare and Medicaid (CMS) Internet, Intranet, and Extranet Standards; available online at http:www.cms.gov/about/web/inetspecx.htm.

All websites, Internet applications, and content developed by Contractor shall reside on CMS servers, follow CMS Standards and Guidelines, and filter through the standard agency Internet Clearance process.

If CMS agents or Contractor include information that appears on www.cms.gov or www.medicare.gov as part of their websites, they must link directly to these sites to ensure the validity and timeliness of the information.  Duplication of content is not permitted.

Contractor performing work on projects that include the development of Internet, Intranet, or Extranet applications, shall schedule and meet with CMS's Web Support Team for guidance before they begin to develop the project.

## 14.  HHSAR 352.224-70 PRIVACY ACT (January 2006)

This contract requires the Contractor to perform one or more of the following: (a) Design; (b) develop; or (c) operate a Federal agency system of records to accomplish an agency function in accordance with the Privacy Act of 1974 (Act) (5 U.S.C. 552a(m)(1)) and applicable agency regulations. The term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual. Violations of the Act by the Contractor and/or its employees may result in the imposition of criminal penalties (5 U.S.C. 552a(i)). The Contractor shall ensure that each of its employees knows the prescribed rules of conduct and that each employee is aware that he/she is subject to criminal penalties for violation of the Act to the same extent as Department of Health and Human Services employees. These provisions also apply to all subcontracts the Contractor awards under this contract which require the design, development or operation of the designated system(s) of records [5 U.S.C. 552a(m)(1)]. The contract work statement: (a) identifies the system(s) of records and the design, development, or

operation work the Contractor is to perform; and (b) specifies the disposition to be made of such records upon completion of contract performance.

(End of clause)

## 15.   ORGANIZATIONAL CONFLICTS OF INTEREST

"Organizational conflict of interest" as defined per FAR 2.101, "means that because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage."

(A) Purpose:  The purpose of this clause is to ensure that the Contractor (1) is not biased because of its financial, contractual, organizational, or other interests which relate to the work under this contract, and (2) does not obtain any unfair competitive advantage over other parties by virtue of its performance of this contract. This clause has been created to implement the organizational conflict of interest requirements of FAR 9.5.

(B) Scope:  The restrictions described herein shall apply to performance or participation by the Contractor and any of its affiliates or their successors in interest (hereinafter collectively referred to as "Contractor") in the activities covered by this clause as a prime contractor, subcontractor, co-sponsor, joint venture, consultant, or in any similar capacity. For the purpose of this clause, affiliation occurs when a business concern is controlled by or has the power to control another or when a third party has the power to control both.

(C) Use of Contractor's Work Product:  If the Contractor performs advisory, consulting, analytical, evaluation, study, or similar work under this contract, it shall be ineligible thereafter to participate in any capacity in Government contractual efforts (solicited or unsolicited) which stem directly from such work, and the Contractor agrees not to perform similar work for prospective Offeror's with respect to any such contractual efforts. The Contractor shall be ineligible to participate in any contracts, subcontracts, or proposals (solicited and unsolicited) which stem directly from the Contractor's performance of work under this contract for a period of one (1) year after the completion of this contract. Furthermore, unless so directed in writing by the Contracting Officer, the Contractor shall not perform any system engineering or technical direction support work under this contract on any of its products or services or the products or services of another firm if the Contractor is or has been substantially involved in their development or marketing. Nothing in this subparagraph shall preclude the Contractor from competing for follow-on contracts or subcontracts for advisory and assistance services.

(D) If, under this contract, the Contractor prepares a complete or essentially complete statement of work or specifications to be used in competitive

acquisitions, the Contractor shall be ineligible to perform or participate in any capacity in any contractual effort which is based on such statement of work or specifications. The Contractor shall not incorporate its products or services in such statement of work or specifications unless so directed in writing by the Contracting Officer, in which case the restriction in this subparagraph shall not apply.

(E) Access to and use of information:

(1) If the Contractor, in the performance of this contract, obtains access to information, such as Government plans, policies, reports, studies, financial plans, internal data protected by the Privacy Act of 1974 (5 U.S.C. 552a), or data which has not been released or otherwise made available to the public, the Contractor agrees that it shall not:

(a) Use such information for any private purpose unless the information has been released or otherwise made available to the public;

(b) Compete for work based on such information for a period of one (1) year after either the completion of this contract, or until such information is released or otherwise made available to the public, whichever is first;

(c) Submit an unsolicited proposal which is based on such information until six (6) months after such information is released or otherwise made available to the public; and,

(d) Release such information unless such information has previously been released or otherwise made available to the public by the Government.

(2) In addition, the Contractor agrees that to the extent it receives or is given access to proprietary data, data protected  by the Privacy Act of 1974 (5 U.S.C. 552a), or other confidential or privileged technical, business, or financial information under this contract, it shall treat such information in accordance with any restrictions imposed on such information.

(F) Disclosure after award:

(1) The Contractor agrees that, if changes, including additions, to the facts disclosed by it prior to award of this Contract, occur during the performance of this Contract, it shall make an immediate and full disclosure of such changes in writing to the Contracting Officer. Such disclosure shall include a description of any action which the Contractor

has taken or proposes to take to avoid, neutralize, or mitigate any resulting conflict of interest. The Government may, however, terminate for convenience if it deems such termination to be in the best interest of the Government.

(2) In the event that the Contractor was aware of facts required to be disclosed or the existence of an actual or potential organizational conflict of interest and did not disclose such facts or such conflict of interest to the Contracting Officer, the Contracting Officer may terminate for default.

(G) Remedies:  For breach of any of the above restrictions or for nondisclosure or misrepresentation of any facts required to be disclosed concerning this contract, including the existence of an actual or potential organizational conflict of interest at the time of or after award, the Government may terminate for default, and pursue such other remedies as may be permitted by law.

(H) Waiver:  In accordance with FAR 9.503, any request for waiver must be in writing, shall set forth the extent of the conflict, and requires approval by the agency head or a designee. Agency heads shall not delegate waiver authority below the level of head of a contracting activity.   The agency head or a designee may waive any general rule or procedure of this subpart by determining that its application in a particular situation would not be in the Government's interest.

(I) Subcontracts:  This Organizational Conflict of Interest clause shall flow down to all subcontractors unless an exemption is specifically approved by Contracting Officer, CMS.

## 16.   CONDITIONS FOR PERFORMANCE

In addition to the performance requirement of this contract as set forth under Performance Work Statement, the Contractor may be required to comply with the requirements of any revisions in legislation or regulations which may be enacted or implemented during the period of performance of this contract, and are directly applicable to the performance requirements of this contract.

In the event new legislation or regulations impacting the Contract require immediate implementation, the Contracting Officer shall issue a change order pursuant to FAR Clause 52.243-1, entitled Changes – Fixed-Price.

## 17.   CONFLICT OF INTEREST

The Contractor shall disclose any known or potential conflicts of interest, in accordance with FAR Part 9.5, for the purpose of meeting the requirements of this contract.  The Contractor agrees that if an actual or potential organizational conflict of interest is discovered after an award of a task order, the Contractor shall make full disclosure in writing to the Contracting Officer.  This disclosure shall include a description of actions

A00087

that the Contractor has taken or proposes to take to mitigate the actual or potential conflict.  The Contracting Officer shall determine whether a conflict of interest disclosed after award has been adequately resolved.

## 19.    CONTRACTOR PERFORMANCE EVALUATION(S)

In accordance with Federal Acquisition Regulation (FAR) 42.15, CMS will complete annual and final contractor performance evaluations.  Annual evaluations will be prepared to coincide with the anniversary date of the contract.  Additional interim performance evaluations may be prepared at Contracting Officer discretion, as necessary. Final performance evaluations will be completed upon contract expiration.

CMS will utilize the Contractor Performance Assessment Reporting System (CPARS) in order to execute annual and final contractor performance evaluations. CPARS is a secure Internet website located at http://www.cpars.csd.disa.mil/cparsmain.htm.  CMS will register the contractor in CPARS upon receipt of the name and email address of two (2) individuals who will be responsible for serving as the Contractor's primary and alternate CPARS contacts.  Once CMS registers the contractor in CPARS, the Contractor will receive an automated CPARS email message that contains User IDs and instructions for creating a password.

Once a performance evaluation is issued, the Contractor's primary and alternate CPARS contact will receive an email instructing them to logon to CPARS in order to review the performance evaluation.  The Contractor has 30 days from the date of performance evaluation issuance in which to review the evaluation.  If the Contractor is in agreement with the performance evaluation outcome, the evaluation becomes final.  Should the Contractor be in disagreement with the performance evaluation outcome, rebuttal comments must be submitted via the CPARS within 30 days from date the evaluation was issued by CMS.  Any disagreement between the Contracting Officer and the Contractor will be referred to the Deputy Director, CMS Office of Acquisition and Grants Management, whose decision will be final.

Copies of each performance evaluation and contractor responses, if any, will be retained as part of the official contract file and will be used to support future award decisions. Evaluations will also be stored for a 3-year period in the Past Performance Information Retrieval System (PPIRS) at www.ppirs.gov.

Contractors may obtain CPARS training material and register for on-line training at http://www.cpars.csd.disa.mil/allapps/cpcbtdlf.htm. There is no fee for registration or use of the CPARS.

## 21.    DISPOSAL OF IMAGED MEDICAL RECORDS

Imaged medical records must be disposed of in a manner than leaves no trace of data. The RAC shall use a method compliant with CMS operating procedures and standards. In addition, a log of all disposed records shall be maintained by the RAC.

A00088

## 22.    HIPAA BUSINESS ASSOCIATE PROVISION

**HIPAA Business Associate Provision II**

**Definitions**:

All terms used herein and not otherwise defined shall have the same meaning as in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA," 42 U.S.C. sec. 1320d) and the corresponding implementing regulations.  Provisions governing the Contractor's duties and obligations under the Privacy Act (including data use agreements) are covered elsewhere in the contract.

"Business Associate'' shall mean the Contractor.

"Covered Entity" shall mean CMS' Medicare Fee for Service program and/or Medicare's Prescription Drug Discount Care and Transitional Assistance Programs.
"Secretary" shall mean the Secretary of the Department of Health and Human Services or the Secretary's designee.

**Obligations and Activities of Business Associate**

(a) Business Associate agrees to not use or disclose Protected Health Information ("PHI"), as defined in 45 C.F.R. § 160.103, created or received by Business Associate from or on behalf of Covered Entity other than as permitted or required by this Contract or as required by law.

(b) Business Associate agrees to use safeguards to prevent use or disclosure of PHI created or received by Business Associate from or on behalf of Covered Entity other than as provided for by this Contract.  Furthermore, Business Associate agrees to use appropriate administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the electronic protected health information ("EPHI"), as defined in 45 C.F.R. 160.103, it creates, receives, maintains or transmits on behalf of the Covered Entity to prevent use or disclosure of such EPHI.

(c) Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Contract.

(d) Business Associate agrees to report to Covered Entity any use or disclosure involving PHI it receives/maintains from/on behalf of the Covered Entity that is not provided for by this Contract of which it becomes aware.  Furthermore, Business Associate agrees to report to Covered Entity any security incident involving EPHI of which it becomes aware.

(e) Business Associate agrees to ensure that any agent, including a subcontractor, to whom it provides PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity, agrees to the same restrictions and conditions that apply through this Contract to Business Associate with respect to such information.  Furthermore, Business Associate agrees to ensure that its agents

A00089

and subcontractors implement reasonable and appropriate safeguards for the PHI received from or on behalf of the Business Associate.

(f) Business Associate agrees to provide access, at the request of Covered Entity, to PHI received by Business Associate in the course of contract performance, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 CFR § 164.524.

(g) Business Associate agrees to make any amendment(s) to PHI in a Designated Record Set that Covered Entity directs or agrees to pursuant to 45 CFR § 164.526 upon request of Covered Entity.

(h) Business Associate agrees to make internal practices, books, and records, including policies and procedures and PHI, relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of Covered Entity, available to Covered Entity, or to the Secretary for purposes of the Secretary determining Covered Entity's compliance with the various rules implementing the HIPAA.

(i) Business Associate agrees to document such disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR § 164.528.

(j) Business Associate agrees to provide to Covered Entity, or an individual identified by the Covered Entity, information collected under this Contract, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR § 164.528.

## Permitted Uses and Disclosures by Business Associate

Except as otherwise limited in this Contract, Business Associate may use or disclose PHI on behalf of, or to provide services to, Covered Entity for purposes of the performance of this Contract, if such use or disclosure of PHI would not violate the HIPAA Privacy or Security Rules if done by Covered Entity or the minimum necessary policies and procedures of Covered Entity.

## Obligations of Covered Entity

(a) Covered Entity shall notify Business Associate of any limitation(s) in its notice of privacy practices of Covered Entity in accordance with 45 CFR § 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.

(b) Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by Individual to use or disclose PHI, to the extent that such changes may affect Business Associate's use or disclosure of PHI.

(c) Covered Entity shall notify Business Associate of any restriction to the use or disclosure of PHI that Covered Entity has agreed to in accordance with 45 CFR § 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

## Permissible Requests by Covered Entity

Covered Entity shall not request Business Associate to use or disclose PHI in any manner that would not be permissible under the HIPAA Privacy or Security Rules.

**Term of Provision**

(a) The term of this Provision shall be effective as of  March 10, 2005, and shall terminate when all of the PHI provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy PHI, protections are extended to such information, in accordance with the termination provisions in this Section.

(b) Upon Covered Entity's knowledge of a material breach by Business Associate, Covered Entity shall either:

    (1) Provide an opportunity for Business Associate to cure the breach or end the violation consistent with the termination terms of this Contract.  Covered Entity may terminate this Contract for default if the Business Associate does not cure the breach or end the violation within the time specified by Covered Entity; or

    (2) Consistent with the terms of this Contract, terminate this Contract for default if Business Associate has breached a material term of this Contract and cure is not possible; or

    (3) If neither termination nor cure is feasible, Covered Entity shall report the violation to the Secretary.

(c) Effect of Termination.

    (1) Except as provided in paragraph (2) of this section, upon termination of this Contract, for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to PHI that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the PHI.

    (2) In the event that Business Associate determines that returning or destroying the PHI is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible.  Upon such notice that return or destruction of PHI is infeasible, Business Associate shall extend the protections of this Contract to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

**Miscellaneous**

(a) A reference in this Contract to a section in the Rules issued under HIPAA means the section as in effect or as amended.

(b) The Parties agree to take such action as is necessary to amend this Contract from time to time as is necessary for Covered Entity to comply with the requirements of the Rules issued under HIPAA.

A00091

(c) The respective rights and obligations of Business Associate under paragraph (c) of the section entitled "term of Provision" shall survive the termination of this Contract.

(d) Any ambiguity in this Contract shall be resolved to permit Covered Entity to comply with the Rules implemented under HIPAA.

## 23.   COPYRIGHTS

a.   Data first produced in the performance of this contract.

   (i) The contractor agrees not to assert, establish, or authorize others to assert or establish, any claim to copyright subsisting in any data first produced in the performance of this contract without prior written permission of the contracting officer.  When claim to copyright is made, the contractor shall affix the appropriate copyright notice of 17 U.S.C. 401 or 402 and acknowledgment of government sponsorship (including contract number) to such data when delivered to the government, as well as when the data are published or deposited for registration as a published work in the U.S. Copyright Office. The contractor grants to the government, and others acting on its behalf, a paid-up nonexclusive, irrevocable, worldwide license for all such data to reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, by or on behalf of the government.

   (ii) If the government desires to obtain copyright in data first produced in the performance of this contract and permission has not been granted as set forth above, the contracting officer may direct the contractor to establish, or authorize the establishment of, claim to copyright in such data and to assign, or obtain the assignment of, such copyright to the government or its designated assignee.

b.   Data not first produced in the performance of this contract.

   The contractor shall not, without prior written permission of the contracting officer, incorporate in data delivered under this contract any data not first produced in the performance of this contract and which contain the copyright notice of 17 U.S.C. 401 or 402, unless the contractor identifies such data and grants to the government.

## 24.   DISSEMINATION, PUBLICATION AND DISTRIBUTION OF INFORMATION

a.  Subject to Section H.8, data and information either provided to the contractor or any subcontractor generated by activities under this contract or derived from research or studies supported by this contract shall be used only for purposes of this contract.

b.  Data and information either provided to the contractor, or to any subcontractor, generated by activities under this contract, or derived from research or studies supported by this contract, shall be used only for the purposes of the contract.  It

shall not e duplicated, used or disclosed for any purpose other than the fulfillment of the requirements set forth in this contract. This restriction does not limit the contractor's right to use data or information obtained from a non-restrictive source. Any questions concerning "privileged information" shall be referred to the contracting officer.

c.  Some data or information may require special consideration with regard to the timing of its disclosure. Also, some data or information, which relate to policy matters under consideration by the government, may also require special consideration with regard to the timing of its disclosure so that the open and vigorous debate, within the government, of possible policy options is not damaged.

d.  Any requests for or questions about use or release of the data or information or handling of material under this contract shall be referred to the contracting officer who must render a written determination. The contracting officer's determinations will reflect the results of internal coordination with appropriate program and legal officials.

e.  The contractor agrees not to release Medicare data and information either provided to the contractor, generated by activities under contract, or derived from research or studies supported by this contract without the prior permission of the contracting officer.

f.  Any presentation of any report, statistical or analytical material based on information obtained from this contract which requires special consideration with regard to the protection of the privacy of individuals or of trade secrets or privileged or confidential commercial information shall be subject to review by the contracting officer before dissemination, publication, or distribution. Presentation includes, but is not limited to, papers, articles, professional publications, speeches, testimony or interviews with public print or broadcast media.

g.  Written advance notice of at least forty-five (45) days shall be provided to the contracting officer of the contractor's desire to release information where there may be a question of the protection of the privacy of individuals or of trade secrets or privileged or confidential commercial information.

h.  The contracting officer's review shall cover confidentiality issues and the protection of the privacy of individuals. If the review reveals that the privacy of individuals, trade secrets or privileged or confidential commercial information is, or may be violated, the release/use of the presentation shall be denied until the offending material is removed or until the contracting officer makes a formal determination, in writing, that confidentiality provisions, the privacy of individuals, trade secrets or privileged or confidential commercial information is not being violated.

i.    The contractor agrees to acknowledge support by CMS whenever reports of projects funding, in whole or in part, by this contract are published in any medium.  The contractor shall include in any publication resulting from work under this contract, an acknowledgment substantially, as follows:

"The analyses upon which this publication is based were performed under contract number HHSM-500-2005-00002I, entitled, "MMA Section 306 Recovery Audit Demonstration," sponsored by the Centers for Medicare and Medicaid Services, Department of Health and Human Services."  The conclusions and opinions expressed, and methods used herein are those of the author.  They do not necessarily reflect CMS policy.  The author assumes full responsibility for the accuracy and completeness of the ideas presented.  Ideas and contributions to the author concerning experience in engaging with issues presented are welcomed.  Any deviation from the above legend shall be approved, in writing, by the contracting officer.

## 26.    CODE OF CONDUCT

### SMOKING

Effective June 2004, smoking is not permitted anywhere on the CMS single site campus.  This includes all areas outside the building, such as off-site facility, entranceways, sidewalks and parking areas.  Smoking will not be permitted anywhere in Regional Offices or Washington, DC office locations unless permitted by GSA guidelines or local landlord requirements.  Contractor employees are subject to the same restrictions as government personnel.  Fines up to $50 per occurrence will be issued and enforced by the Federal Protective Service.

### DRESS

The preferred dress codes at CMS facilities are professional attire, business attire, or business casual attire.

## 26.    ATTACHMENTS

The following attachments are incorporated in this task order:
(1) Statement of Objectives and Schedule of Deliveries

## 27. HHSAR 352.203-70 ANTI-LOBBYING (January 2006)

Pursuant to the current HHS annual appropriations act, except for normal and recognized executive-legislative relationships, the Contractor shall not use any HHS contract funds for (i) publicity or propaganda purposes; (ii) the preparation, distribution, or use of any kit, pamphlet, booklet, publication, radio, television or video presentation

designed to support or defeat legislation pending before the Congress or any State legislature, except in presentation to the Congress or any State legislature itself; or (iii) payment of salary or expenses of the Contractor, or any agent acting for the Contractor, related to any activity designed to influence legislation or appropriations pending before the Congress or any State legislature.

(End of clause)

## 28. HHSAR 352.222-70 CONTRACTOR COOPERATION IN EQUAL EMPLOYMENT OPPORTUNITY INVESTIGATIONS.

Contractor Cooperation in Equal Employment Opportunity Investigations (January 2010)

(a) In addition to complying with the clause in FAR 52.222–26, Equal Opportunity, the Contractor shall, in good faith, cooperate with the Department of Health and Human Services (Agency) in investigations of Equal Employment Opportunity (EEO) complaints processed pursuant to 29 CFR Part 1614. For purposes of this clause, the following definitions apply:

(1) "Complaint" means a formal or informal complaint that has been lodged with Agency management, Agency EEO officials, the Equal Employment Opportunity Commission (EEOC), or a court of competent jurisdiction.

(2) "Contractor employee" means all current Contractor employees who work or worked under this contract. The term also includes current employees of subcontractors who work or worked under this contract. In the case of Contractor and subcontractor employees, who worked under this contract, but who are no longer employed by the Contractor or subcontractor, or who have been assigned to another entity within the Contractor's or subcontractor's organization, the Contractor shall provide the Agency with that employee's last known mailing address, e-mail address, and telephone number, if that employee has been identified as a witness in an EEO complaint or investigation.

(3) "Good faith cooperation" cited in paragraph (a) includes, but is not limited to, making Contractor employees available for: (i) Formal and informal interviews by EEO counselors or other Agency officials processing EEO complaints; (ii) formal or informal interviews by EEO investigators charged with investigating complaints of unlawful discrimination filed by Federal employees; (iii) reviewing and signing appropriate affidavits or declarations summarizing statements provided by such Contractor employees during the course of EEO investigations; (iv) producing documents requested by EEO counselors, EEO investigators, Agency employees, or the EEOC in connection with a pending EEO complaint; and (v) preparing for and providing testimony in hearings before the EEOC and U.S. District Court.

(b) The Contractor shall include the provisions of this clause in all subcontract solicitations and subcontracts awarded at any tier under this contract.

(c) Failure on the part of the Contractor or its subcontractors to comply with the terms of this clause may be grounds for the Contracting Officer to terminate this contract for default.

(End of clause)


## 29.  HHSAR 352.227-70 PUBLICATIONS AND PUBLICITY.

Publications and Publicity (January 2006)

(a) Unless otherwise specified in this contract, the Government encourages the Contractor to publish the results of its work under this contract. A copy of each article the Contractor submits for publication shall be promptly sent to the Contracting Officer's Technical Representative. The Contractor shall also inform the Contracting Officer's Technical Representative when the article or other publication is published, and furnish a copy of it as finally published.

(b) Unless authorized by the Contracting Officer's Technical Representative, the Contractor shall not display the HHS logo on any publications.

(End of clause)


## 30. HHSAR 30. 352.231-71 PRICING OF ADJUSTMENTS (January 2001)

When costs are a factor in determination of a contract price adjustment pursuant to the "Changes" clause or any provision of this contract, the applicable cost principles and procedures set forth below shall form the basis for determining such costs:

| Principles | Types of organizations |
|---|---|
| (a) Subpart 31.2 of the Federal Acquisition Regulation | Commercial. |
| (b) Subpart 31.3 of the Federal Acquisition Regulation | Educational. |
| (c) Subpart 31.6 of the Federal Acquisition Regulation | State, local, and Federally recognized Indian Tribal governments. |
| (d) 45 CFR Part 74 Appendix E | Hospitals (performing research and development contracts only). |
| (e) Subpart 31.7 of the Federal Acquisition Regulation | Other nonprofit organizations. |

(End of clause)

**40. FAR 52.223-18, Contractor Policy to Ban Text Messaging While Driving (Sep 2010)**

(a) Definitions. As used in this clause--

"Driving"—

(1) Means operating a motor vehicle on an active roadway with the motor running, including while temporarily stationary because of traffic, a traffic light, stop sign, or otherwise.

(2) Does not include operating a motor vehicle with or without the motor running when one has pulled over to the side of, or off, an active roadway and has halted in a location where one can safely remain stationary.

"Text messaging" means reading from or entering data into any handheld or other electronic device, including for the purpose of short message service texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to park.

(b) This clause implements Executive Order 13513, Federal Leadership on Reducing Text Messaging while Driving, dated October 1, 2009.

(c) The Contractor should—

(1) Adopt and enforce policies that ban text messaging while driving—

(i) Company-owned or -rented vehicles or Government-owned vehicles; or

(ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.

(2) Conduct initiatives in a manner commensurate with the size of the business, such as—

(i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

(ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

(d) Subcontracts. The Contractor shall insert the substance of this clause, including this paragraph (d), in all subcontracts that exceed the micro-purchase threshold.

(End of clause)

**50. HHSAR 352.239–70, STANDARD FOR SECURITY CONFIGURATIONS**

(a) The Contractor shall configure its computers that contain HHS data with the applicable Federal Desktop Core Configuration (FDCC) (see

**http://nvd.nist.gov/fdcc/index.cfm**) and ensure that its computers have and maintain the latest operating system patch level and anti-virus software level. (Note: FDCC is applicable to all computing systems using Windows XP™ and Windows Vista™, including desktops and laptops—regardless of function—but not including servers.)

(b) The Contractor shall apply approved security configurations to information technology (IT) that is used to process information on behalf of HHS. The following security configuration requirements apply:

(NOTE: The Contracting Officer shall specify applicable security configuration requirements in solicitations and contracts based on information provided by the Project Officer, who shall consult with the OPDIV/STAFFDIV Chief Information Security Officer.)

(c) The Contractor shall ensure IT applications operated on behalf of HHS are fully functional and operate correctly on systems configured in accordance with the above configuration requirements. The Contractor shall use Security Content Automation Protocol (SCAP)-validated tools with FDCC Scanner capability to ensure its products operate correctly with FDCC configurations and do not alter FDCC settings – see **http://scap.nist.gov/validation/.** The Contractor shall test applicable product versions with all relevant and current updates and patches installed. The Contractor shall ensure currently supported versions of information technology products meet the latest FDCC major version and subsequent major versions.

(d) The Contractor shall ensure IT applications designed for end users run in the standard user context without requiring elevated administrative privileges.

(e) The Contractor shall ensure hardware and software installation, operation, maintenance, update, and patching will not alter the configuration settings or requirements specified above.

(f) The Contractor shall (1) include Federal Information Processing Standard (FIPS) 201-compliant (see **http://csrc.nist.gov/publications/fips/fips201-1/FIPS-201-1-chng1.pdf**), Homeland Security Presidential Directive 12 (HSPD-12) card readers with the purchase of servers, desktops, and laptops; and (2) comply with **FAR Subpart 4.13**, Personal Identity Verification.

(g) The Contractor shall ensure that its subcontractors (at all tiers) which perform work under this contract comply with the requirements contained in this clause.

(End of clause)

## 51. HHSAR 352.239–72, SECURITY REQUIREMENTS FOR FEDERAL INFORMATION TECHNOLOGY RESOURCES

(a) Applicability. This clause applies whether the entire contract or order (hereafter "contract"), or portion thereof, includes information technology resources or services in which the Contractor has physical or logical (electronic) access to, or operates a

A00098

Department of Health and Human Services (HHS) system containing, information that directly supports HHS' mission. The term "information technology (IT)", as used in this clause, includes computers, ancillary equipment (including imaging peripherals, input, output, and storage devices necessary for security and surveillance), peripheral equipment designed to be controlled by the central processing unit of a computer, software, firmware and similar procedures, services (including support services) and related resources. This clause does not apply to national security systems as defined in FISMA.

(b) Contractor responsibilities. The Contractor is responsible for the following:

   (1) Protecting federal information and federal information systems in order to ensure their—

   (i) Integrity, which means guarding against improper information modification or destruction, and includes ensuring information non-repudiation and authenticity;

   (ii) Confidentiality, which means preserving authorized restrictions on access and disclosure, including means for protecting personal privacy and proprietary information; and.

   (iii) Availability, which means ensuring timely and reliable access to and use of information.

   (2) Providing security of any Contractor systems, and information contained therein, connected to an HHS network or operated by the Contractor, regardless of location, on behalf of HHS.

   (3) Adopting, and implementing, at a minimum, the policies, procedures, controls, and standards of the HHS Information Security Program to ensure the integrity, confidentiality, and availability of federal information and federal information systems for which the Contractor is responsible under this contract or to which it may otherwise have access under this contract. The HHS Information Security Program is outlined in the HHS Information Security Program Policy, which is available on the HHS Office of the Chief Information Officer's (OCIO) website.

(c) Contractor security deliverables. In accordance with the timeframes specified, the Contractor shall prepare and submit the following security documents to the Contracting Officer for review, comment, and acceptance:

   (1) IT Security Plan (IT-SP) – due within 30 days after contract award. The IT-SP shall be consistent with, and further detail the approach to, IT security contained in the Contractor's bid or proposal that resulted in the award of this contract. The IT-SP shall describe the processes and procedures that the Contractor will follow to ensure appropriate security of IT resources that are developed, processed, or used under this contract. If the IT-SP only applies to a portion of the contract, the Contractor shall specify those parts of the contract to which the IT-SP applies.

      (i) The Contractor's IT-SP shall comply with applicable federal laws that include, but are not limited to, the **Federal Information Security Management Act (FISMA) of**

**2002** (PDF) (Title III of the E-Government Act of 2002, Public Law 107-347), and the following federal and HHS policies and procedures:

(A) Office of Management and Budget **(OMB) Circular A-130**, Management of Federal Information Resources, Appendix III, Security of Federal Automated Information Resources.

(B) National Institute of Standards and Technology (NIST) **Special Publication (SP) 800-18** (PDF), Guide for Developing Security Plans for Federal Information Systems, in form and content, and with any pertinent contract Statement of Work/Performance Work Statement (SOW/PWS) requirements. The IT-SP shall identify and document appropriate IT security controls consistent with the sensitivity of the information and the requirements of **Federal Information Processing Standard (FIPS) 200**, Recommended Security Controls for Federal Information Systems. The Contractor shall review and update the IT-SP in accordance with **NIST SP 800-26,** Security Self-Assessment Guide for Information Technology Systems and FIPS 200, on an annual basis.

(C) **HHS-OCIO Information Systems Security and Privacy Policy.**

(ii) After resolution of any comments provided by the Government on the draft IT-SP, the Contracting Officer shall accept the IT-SP and incorporate the Contractor's final version into the contract for Contractor implementation and maintenance. On an annual basis, the Contractor shall provide to the Contracting Officer verification that the IT-SP remains valid.

(2) IT Risk Assessment (IT-RA) – due within 30 days after contract award. The IT-RA shall be consistent, in form and content, with **NIST SP 800-30**, Risk Management Guide for Information Technology Systems, and any additions or augmentations described in the HHS-OCIO Information Systems Security and Privacy Policy. After resolution of any comments provided by the Government on the draft IT-RA, the Contracting Officer shall accept the IT-RA and incorporate the Contractor's final version into the contract for Contractor implementation and maintenance. The Contractor shall update the IT-RA on an annual basis.

(3) **FIPS 199** Standards for Security Categorization of Federal Information and Information Systems Assessment (FIPS 199 Assessment) – due within 30 days after contract award. The FIPS 199 Assessment shall be consistent with the cited NIST standard. After resolution of any comments by the Government on the draft FIPS 199 Assessment, the Contracting Officer shall accept the FIPS 199 Assessment and incorporate the Contractor's final version into the contract.

(4) IT Security Certification and Accreditation (IT-SC&A) – due within 3 months after contract award. The Contractor shall submit written proof to the Contracting Officer that an IT-SC&A was performed for applicable information systems – see paragraph (a) of this clause. The Contractor shall perform the IT-SC&A in accordance with the HHS Chief Information Security Officer's Certification and Accreditation Checklist; **NIST SP 800-37**, Guide for the Security Certification and Accreditation of Federal Information Systems; and **NIST SP 800-53,** Recommended Security Controls for Federal

Information Systems. An authorized senior management official shall sign the draft IT-SC&A and provide it to the Contracting Officer for review, comment, and acceptance.

(i) After resolution of any comments provided by the Government on the draft IT-SC&A, the Contracting Officer shall accept the IT-SC&A and incorporate the Contractor's final version into the contract as a compliance requirement.

(ii) The Contractor shall also perform an annual security control assessment and provide to the Contracting Officer verification that the IT-SC&A remains valid. Evidence of a valid system accreditation includes written results of (A) annual testing of the system contingency plan and (B) the performance of security control testing and evaluation.

(d) Personal identity verification. The Contractor shall identify its employees with access to systems operated by the Contractor for HHS or connected to HHS systems and networks. The Contracting Officer's Technical Representative (COTR) shall identify, for those identified employees,  position sensitivity levels that are commensurate with the responsibilities and risks associated with their assigned positions. The Contractor shall comply with the HSPD-12 requirements contained in "HHS-Controlled Facilities and Information Systems Security" requirements specified in the SOW/PWS of this contract.

(e) Contractor and subcontractor employee training. The Contractor shall ensure that its employees, and those of its subcontractors, performing under this contract complete HHS-furnished initial and refresher security and privacy education and awareness training before being granted access to systems operated by the Contractor on behalf of HHS or access to HHS systems and networks. The Contractor shall provide documentation to the COTR evidencing that Contractor employees have completed the required training.

(f) Government access for IT inspection. The Contractor shall afford the Government access to the Contractor's and subcontractors' facilities, installations, operations, documentation, databases, and personnel used in performance of this contract to the extent required to carry out a program of IT inspection (to include vulnerability testing), investigation, and audit to safeguard against threats and hazards to the integrity, confidentiality, and availability, of HHS data or to the protection of information systems operated on behalf of HHS.

(g) Subcontracts. The Contractor shall incorporate the substance of this clause in all subcontracts that require protection of federal information and federal information systems as described in paragraph (a) of this clause, including those subcontracts that—

(1) Have physical or electronic access to HHS' computer systems, networks, or IT infrastructure; or

(2) Use information systems to generate, store, process, or exchange data with HHS or on behalf of HHS, regardless of whether the data resides on a HHS or the Contractor's information system.

(h) Contractor employment notice. The Contractor shall immediately notify the Contracting Officer when an employee either begins or terminates employment (or is no longer assigned to the HHS project under this contract), if that employee has, or had, access to HHS information systems or data.

(i) Document information. The Contractor shall contact the Contracting Officer for any documents, information, or forms necessary to comply with the requirements of this clause.

(j) Contractor responsibilities upon physical completion of the contract. The Contractor shall return all HHS information and IT resources provided to the Contractor during contract performance and certify that all HHS information has been purged from Contractor-owned systems used in contract performance .

(k) Failure to comply. Failure on the part of the Contractor or its subcontractors to comply with the terms of this clause shall be grounds for the Contracting Officer to terminate this contract.

<div align="center">(End of clause)</div>

## 52. HHSAR 352.239–73, ELECTRONIC AND INFORMATION TECHNOLOGY ACCESSIBILITY.

(a) Section 508 of the Rehabilitation Act of 1973 (**29 U.S.C. 794d**), as amended by the Workforce Investment Act of 1998, and the Architectural and Transportation Barriers Compliance Board Electronic and Information (EIT) Accessibility Standards (**36 CFR Part 1194**), require that, unless an exception applies, all EIT products and services developed, acquired, maintained, or used by any federal department or agency permit—

   (1) Federal employees with disabilities to have access to and use information and data that is comparable to the access and use of information and data by federal employees who are not individuals with disabilities; and

   (2) Members of the public with disabilities seeking information or services from a federal agency to have access to and use of information and data that is comparable to the access and use of information and data by members of the public who are not individuals with disabilities.

(b) Accordingly, any vendor submitting a proposal/quotation/bid in response to this solicitation must demonstrate compliance with the established EIT accessibility standards. Information about Section 508 is available at **http://www.section508.gov/**. The complete text of Section 508 Final Provisions can be accessed at **http://www.access-board.gov/sec508/standards.htm**.

(c) The Section 508 accessibility standards applicable to this solicitation are identified in the Statement of Work/Specification/Performance Work Statement. In order to facilitate the Government's evaluation to determine whether EIT products and services proposed meet applicable Section 508 accessibility standards, offerors must prepare an HHS

Section 508 Product Assessment Template, in accordance with its completion instructions, and provide a binding statement of conformance. The purpose of the template is to assist HHS acquisition and program officials in determining that EIT products and services proposed support applicable Section 508 accessibility standards. The template allows vendors or developers to self-evaluate their products or services and document in detail how they do or do not conform to a specific Section 508 accessibility standard. Instructions for preparing the HHS Section 508 Evaluation Template may be found under Section 508 policy on the HHS Office on Disability website **(http://www.hhs.gov/od/**).

(d) Respondents to this solicitation must also provide any additional detailed information necessary for determining applicable Section 508 accessibility standards conformance, as well as for documenting EIT products or services that are incidental to the project, which would constitute an exception to Section 508 requirements. If a vendor claims its products or services, including EIT deliverables such as electronic documents and reports, meet applicable Section 508 accessibility standards in its completed HHS Section 508 Product Assessment Template, and it is later determined by the Government – i.e., after award of a contract/order, that products or services delivered do not conform to the described accessibility standards in the Product Assessment Template, remediation of the products or services to the level of conformance specified in the vendor's Product Assessment Template will be the responsibility of the Contractor and at its expense.

(End of provision)

## 27.   ACKNOWLEDGEMENT OF RECEIPT

Pursuant to the terms and conditions of Contract GS-XXX-XXXXX and this task order, HHSM-500-2004-XXXXX, the contractor shall perform the work required in accordance with the Statement of Work entitled, "Recovery Audit Contractor Demonstration**."**

**Signature of the Contractor represents acceptance of this task order.**


_____        _____

**Contractor**                                                                          **Date**

**NOTE:  Only those contract sections that differ from the Umbrella GSA contract terms and conditions, or provide more detailed information specific to this particular Task Order, are provided below.  For those contract sections not identified below, all terms and conditions of the Umbrella GSA contract**

**ACKNOWLEDGEMENT OF RECEIPT:**

The Contractor is required to acknowledge receipt of CMS Task Order No.   TBD_____
under 8(a) Streamlined Technology Acquisition Resources for Services (STARS) Government
Wide Acquisition Contract (GWAC) Contract No.   TBD_____  by returning to the
Contracting Officer a signed original and within 10 calendar days after its receipt.  Signature of
the Contractor represents acceptance of this task order.

ACCEPTED BY:

_____     _____
Signature & Title                                  Date

## B.1    General:

Pursuant to the terms and conditions of the General Services Administration (GSA)  8(a) STARS
contract, and the special clauses provided herein, the contractor shall perform the work required
in accordance with the attached statement of work and deliverable schedule entitled, "Recovery
Audit Contractor (RAC) Data Warehouse (RW)". Section numbers herein align with the section
numbers in the 8(a) STARS contract or pick up where the 8(a) STARS contract sections end as
applicable. Only those contract sections, which differ from the 8(A) STARS contract terms and
conditions, or provide more detailed information specific to this particular task order, are
provided herein.  For those contract sections not identified below, all terms and conditions of the
8(A) are applicable.

## B.1.2   Type of Task Order:

This is a hybrid type task order consisting of firm fixed price (FFP) contract line item numbers
(CLIN)/sub-CLINs and optional Labor Hour sub-CLINs.

The current total not-to-exceed (NTE) amount of the task order is:  _____TBD_____.

The potential (if all options are exercised) not-to-exceed amount is:  _____TBD_____.

## B.3  Price/Costs/Ceiling Rates

**The table below illustrates the Firm Fixed Price or Ceiling Amount applicable to each sub-CLIN:**

| CLIN | Service | Type | FFP or Ceiling Amount | Amount Funded | Period of Performance |
|------|---------|------|-----------------------|---------------|-----------------------|
| 0001 | Base Period | | | | |

| CLIN | Service | Type | FFP or Ceiling Amount | Amount Funded | Period of Performance |
|---|---|---|---|---|---|
| 0001AA | Base Period - Core Operations/Maintenance | FFP | | | 9/22/2010 - 9/21/2011 |
| 0001AB | Base Period Hosting | FFP | | | 9/22/2010 - 9/21/2011 |
| 0001AC* | Base Period - Major Enhancements (optional) | LH | | | TBD within 9/22/2010 - 9/21/2011 |
| | | | | | |
| 0002 | Optional Period 1 | | | | |
| 0002AA | Optional Period 1 -Core Operations/Maintenance | FFP | | | 9/22/2011 - 9/21/2012 |
| 0002AB | Optional Period 1 Hosting  (optional) | FFP | | | 9/22/2011 - 9/21/2012 |
| 0002AC* | Optional Period 1 - Major Enhancements (optional) | LH | | | TBD 9/22/2011 - 9/21/2012 |
| | | | | | |
| 0003 | Optional Period 2 | | | | |
| 0003AA | Optional Period 2 - Core Operations/Maintenance | FFP | | | 9/22/2012 - 9/21/2013 |
| 0003AB | Optional Period 2 - Hosting  (optional) | FFP | | | 9/22/2012 - 9/21/2013 |
| 0003AC* | Optional Period 2 - Major Enhancements (optional) | LH | | | TBD 9/22/2012 - 9/21/2013 |
| | | | | | |
| 0004 | Optional Period 3 | | | | |
| 0004AA | Optional Period 3 - Core Operations/Maintenance | FFP | | | 9/22/2013 - 5/21/2014 |
| 0004AB | Optional Period 3 - Hosting  - (optional) | FFP | | | 9/22/2013 - 5/21/2014 |
| 0004AC* | Optional Period 3 - Major Enhancements (optional) | LH | | | TBD 9/22/2013 - 5/21/2014 |
| | | | | | |
| Totals | | | | | |

**The tables below illustrate the optional labor hour sub-CLINs (0001AC, 0002AC, 0003AC, and 0004AC):**

A00106

| CLIN 0001AC - Major Enhancements - Optional During Base Period | | | |
|---|---|---|---|
| Labor Category | Labor Rate | Hours | Ceiling Amount |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Total |  |  |  |

| CLIN 0002AC - Major Enhancements - Optional During Option Period 1 | | | |
|---|---|---|---|
| Labor Category | Labor Rate | Hours | Ceiling Amount |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Total |  |  |  |

| CLIN 0003AC - Major Enhancements - Optional During Option Period 2 | | | |
|---|---|---|---|
| Labor Category | Labor Rate | Hours | Ceiling Amount |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| Total | | | |

| CLIN 0004AC - Major Enhancements - Optional During Option Period 3 | | | |
|---|---|---|---|
| Labor Category | Labor Rate | Hours | Ceiling Amount |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Total | | | |

**F.3      Period of Performance**

This task order has a 12-month base period of performance from September 22, 2010 – September 21, 2011 and optional periods as follows:

| Optional Period 1 | 9/22/2011 - 9/21/2012 |
|---|---|
| Optional Period 2 | 9/22/2012 - 9/21/2013 |
| Optional Period 3 | 9/22/2013 - 5/21/2014 |

**G.2      Invoice Submission:**

A.  Submission of Invoices and Payment Office

Invoices/vouchers shall be prepared and submitted with an original and four copies unless otherwise specified.  The contractor shall invoice by period of performance, the services performed during the invoice period, the number of labor hours, the discounted rate, and the total amount of the invoice.  A Standard Form (SF) 1034, Public Voucher for Purchases and Services Other than Personal, shall be used.

To expedite payment, invoices shall be submitted as follows:

(a)  Original and four (4) copies shall be submitted to the following address:

> Department of Health and Human Services
> Centers for Medicare and Medicaid Services
> OFM/Division of Accounting
> P.O. Box 7520
> Baltimore, MD  21207-0520

If overnight delivery is desired:

> Department of Health and Human Services
> Centers for Medicare and Medicaid Services
> Director, Division of Accounting, OFM
> C3-09-27 Central Building
> 7500 Security Boulevard
> Baltimore, MD  21244-1850

(b)  One (1) copy shall be sent to the Project Officer and the Contract Specialist.

    (i)    Content of Invoice (If Applicable):

        a.  Contractor's name and address.
        b.  Invoice date and number
        c.  Purchase Order Number and GSA Schedule Contract Number or other authorization for delivery of property and/or services.
        d.  Individually identify the names of all personnel with appropriate/applicable labor categories and their hours, rates and a breakdown of Other Direct Costs.
        e.  Travel costs shall be broken down to include number of trips, number and name of individuals per trip, mode of transportation, mileage charge, and length of stay.
        f.  Shipping and payment terms.
        g.  Other substantiating documentation or information as required by the task order.
        h.  Name, title, phone number of person to notify in event of defective invoice.

B.  Invoice Payment

Payments will only be made by electronic funds transfer (EFT) using the Contractor's EFT information from the Central Contractor Registration (CCR) database.  In the event that during the performance of this contract, the Contractor elects to designate a different financial institution for receipt of payment using the electronic funds transfer procedures, the contractor shall notify CMS's Division of Accounting Operations of all EFT and address changes made in CCR via the following email address:

CCRChanges@cms.hhs.gov.  The contractor's email notification must contain the contractor's name, DUNS or DUNS+4 number, contract and/or order number, and the name, title, and telephone number of the Contractor's official representative authorized to provide their information.

C.  Prompt Payment

Invoices will be handled in accordance with the Prompt Payment Act (31 U.S.C. 3903) and Office of Management and Budget (OMB) prompt payment regulations at 5 CFR part 1315.

## G.10    Subcontracting

To facilitate the review of a proposed subcontract by the Project Officer and the Contracting Officer, the Contractor shall submit the information required by the FAR clause 52.244-2 entitled, SUBCONTRACTS, to the Project officer who shall in turn forward the information with his/her recommendation to the Contracting Officer.  The Contracting Officer shall review the request for subcontract approval and the Project Officer's recommendation and advise the Contractor of his/her decision to consent to or dissent from the proposed subcontract, in writing.

## G.18.    For Accounting Purposes Only:

| Requisition | Appropriation | CAN | Object Class | Amount |
|---|---|---|---|---|

## G.18    Exercise of Options

As a result of an analysis of the contractor's performance this contract may be extended by the Contracting Officer giving written notice of extension to the contractor prior to the expiration date of this contract; provided that the Contracting Officer shall have given preliminary notice of the Government's intent to extend, not later than sixty (60) calendar days prior to the expiration of the contract.

## G.19.    Government Representatives

The following CMS personnel are points of contact for this task order:

| | | |
|---|---|---|
| Contracting Officer: | Debra Stidham | (410) 786-5129 |
| Contract Specialist: | Jessica Sanders | (410) 786-1076 |
| Technical Representative: | Terry Lew | (410) 786-9213 |

## G.20.    Contracting Officer Technical Representative (COTR):

Mr. Terry Lew is designated as the Contracting Officer's Technical Representative (COTR) for this order. His address is:

> Centers for Medicare and Medicaid Services
> 7500 Security Blvd.
> ATTN: Mr. Terry Lew
> Baltimore, MD  21244-1850
> (410) 786-9213

All technical correspondence should be directed to the COTR with a copy to the Contract Specialist.

The COTR is responsible for: (1) monitoring the Contractor's technical progress, including the surveillance and assessment of performance and compliance with all substantive project objectives; (2) interpreting the statement of work and any other technical performance requirements; (3) performing technical evaluation as required; (4) performing technical inspections and acceptances required by this contract; (5) assisting in the resolution of technical problems encountered during performance; and (6) providing technical direction in accordance with Section G.21; and, (7) reviewing of invoices/vouchers.

The COTR does not have the authority to act as agent of the Government under this contract beyond the roles defined in G.20. above. Only the Contracting Officer has authority to: (1) direct or negotiate any changes in the statement of work; (2) modify or extend the period of performance; (3) change the delivery schedule; (4) authorize reimbursement to the Contractor any costs incurred during the performance of this contract; or (5) otherwise change any terms and conditions of this contract.

## G.21    TECHNICAL DIRECTION

    a.    Performance of the work under this contract shall be subject to the technical direction of the COTR. The term "Technical Direction" is defined to include, without limitation, the follows:

        1.    Directions to the Contractor that redirect the contract effort, shift work emphasis between work areas or tasks, require pursuit of certain lines of inquiry, fill in details or otherwise serve to accomplish the contractual statement of work.

        2.    Provision of information to the Contractor that assists in the interpretation of drawings, specifications, or technical portions of the work description.

        3.    Review and, where required by the contract, approval of technical reports, drawings, specifications, and technical information to be delivered by the Contractor to the Government under the contract.

   b.   Technical direction must be within the general Statement of Work stated in the contract.  The COTR does <u>not</u> have the authority to, and may not issue, any technical directions which:

        1.   Constitutes an assignment of additional work outside the general Statement of Work of the contract.

        2.   Constitutes a change as defined in FAR 52.243-1  Changes – Fixed-Price (Aug 1987) – Alternate I (Apr 1984) or FAR 52.243-3 Changes – Time & Materials or Labor Hours

        3.   In any manner causes an increase or decrease in the total estimated contract cost, fixed-fee, or the time required for contract performance.

        4.   Change any of the expressed terms, conditions, or specifications of the contract.

   c.     All technical direction shall be issued in writing by the Project Officer or shall be confirmed by him/her in writing within 5 working days after issuance.

   d.     The Contractor shall proceed promptly with the performance of technical direction duly issued by the Project Officer in the manner prescribed by this article and within his/her authority under the provisions of this article.

   e.     If, in the opinion of the Contractor, any instruction or direction issued by the Project Officer is within one of the categories as defined in G.21. b(l) through (4) above, the Contractor shall not proceed but shall notify the Contracting Officer in accordance with FAR 52.243-7 Notification of Changes.

## H.3.2   HHSAR 352.270-5 Key Personnel (APR 1984)

The personnel specified in this contract are considered to be essential to the work being performed hereunder. Prior to diverting any of the specified individuals to other programs, the Contractor shall notify the Contracting Officer reasonably in advance and shall submit justification (including proposed substitutions) in sufficient detail to permit evaluation of the impact on the program. No diversion shall be made by the Contractor without the written consent of the Contracting

| Position Title | Name | Phone Number/Email Address |
|---|---|---|
|  |  |  |

A00112

| | | |
|---|---|---|
| | | |
| | | |

## H.18.  Confidentiality

As a result of this Task Order, the GSA Schedule Contractor may have access to confidential information (i.e., information considered proprietary as well as information that may fall under the Privacy Act).  The GSA Schedule Contractor shall not disclose any such information or findings to any parties other than the COTR and staff assigned to this effort.  Appropriate administrative, technical, procedural and physical safeguards shall be established by the GSA Schedule Contractor to protect the confidentiality of the data and to prevent unauthorized access to such data.

## H.19.  HIPPA BUSINESS ASSOCIATE PROVISION:

### HIPAA Business Associate Provision II

### Definitions:

All terms used herein and not otherwise defined shall have the same meaning as in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA," 42 U.S.C. sec. 1320d) and the corresponding implementing regulations.  Provisions governing the Contractor's duties and obligations under the Privacy Act (including data use agreements) are covered elsewhere in the contract.
"Business Associate" shall mean the Contractor.
"Covered Entity" shall mean CMS' Medicare Fee for Service program and/or Medicare's Prescription Drug Discount Care and Transitional Assistance Programs.
"Secretary" shall mean the Secretary of the Department of Health and Human Services or the Secretary's designee.

### Obligations and Activities of Business Associate

(a) Business Associate agrees to not use or disclose Protected Health Information ("PHI"), as defined in 45 C.F.R. § 160.103, created or received by Business Associate from or on behalf of Covered Entity other than as permitted or required by this Contract or as required by law.

A00113

(b) Business Associate agrees to use safeguards to prevent use or disclosure of PHI created or received by Business Associate from or on behalf of Covered Entity other than as provided for by this Contract.  Furthermore, Business Associate agrees to use appropriate administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the electronic protected health information ("EPHI"), as defined in 45 C.F.R. 160.103, it creates, receives, maintains or transmits on behalf of the Covered Entity to prevent use or disclosure of such EPHI.

(c) Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Contract.

(d) Business Associate agrees to report to Covered Entity any use or disclosure involving PHI it receives/maintains from/on behalf of the Covered Entity that is not provided for by this Contract of which it becomes aware.  Furthermore, Business Associate agrees to report to Covered Entity any security incident involving EPHI of which it becomes aware.

(e) Business Associate agrees to ensure that any agent, including a subcontractor, to whom it provides PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity, agrees to the same restrictions and conditions that apply through this Contract to Business Associate with respect to such information. Furthermore, Business Associate agrees to ensure that its agents and subcontractors implement reasonable and appropriate safeguards for the PHI received from or on behalf of the Business Associate.

(f) Business Associate agrees to provide access, at the request of Covered Entity, to PHI received by Business Associate in the course of contract performance, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 CFR § 164.524.

(g) Business Associate agrees to make any amendment(s) to PHI in a Designated Record Set that Covered Entity directs or agrees to pursuant to 45 CFR § 164.526 upon request of Covered Entity.

(h) Business Associate agrees to make internal practices, books, and records, including policies and procedures and PHI, relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of Covered Entity, available to Covered Entity, or to the Secretary for purposes of the Secretary determining Covered Entity's compliance with the various rules implementing the HIPAA.

(i) Business Associate agrees to document such disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR § 164.528.

(j) Business Associate agrees to provide to Covered Entity, or an individual identified by the Covered Entity, information collected under this Contract, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR § 164.528.

**Permitted Uses and Disclosures by Business Associate**

Except as otherwise limited in this Contract, Business Associate may use or disclose PHI on behalf of, or to provide services to, Covered Entity for purposes of the performance of this Contract, if such use or disclosure of PHI would not violate the HIPAA Privacy or Security Rules if done by Covered Entity or the minimum necessary policies and procedures of Covered Entity.

**Obligations of Covered Entity**

(a) Covered Entity shall notify Business Associate of any limitation(s) in its notice of privacy practices of Covered Entity in accordance with 45 CFR § 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.
(b) Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by Individual to use or disclose PHI, to the extent that such changes may affect Business Associate's use or disclosure of PHI.
(c) Covered Entity shall notify Business Associate of any restriction to the use or disclosure of PHI that Covered Entity has agreed to in accordance with 45 CFR § 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

**Permissible Requests by Covered Entity**

Covered Entity shall not request Business Associate to use or disclose PHI in any manner that would not be permissible under the HIPAA Privacy or Security Rules.

**Term of Provision**

(a) The term of this Provision shall be effective as of  **{insert effective date},** and shall terminate when all of the PHI provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy PHI, protections are extended to such information, in accordance with the termination provisions in this Section.
(b) Upon Covered Entity's knowledge of a material breach by Business Associate, Covered Entity shall either:
    (1) Provide an opportunity for Business Associate to cure the breach or end the violation consistent with the termination terms of this Contract.  Covered Entity may terminate this Contract for default if the Business Associate does not cure the breach or end the violation within the time specified by Covered Entity; or
    (2) Consistent with the terms of this Contract, terminate this Contract for default if Business Associate has breached a material term of this Contract and cure is not possible; or
    (3) If neither termination nor cure is feasible, Covered Entity shall report the violation to the Secretary.
(c) Effect of Termination.

A00115

(1) Except as provided in paragraph (2) of this section, upon termination of this Contract, for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to PHI that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the PHI.

(2) In the event that Business Associate determines that returning or destroying the PHI is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible.  Upon such notice that return or destruction of PHI is infeasible, Business Associate shall extend the protections of this Contract to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

**Miscellaneous**

(a) A reference in this Contract to a section in the Rules issued under HIPAA means the section as in effect or as amended.

(b) The Parties agree to take such action as is necessary to amend this Contract from time to time as is necessary for Covered Entity to comply with the requirements of the Rules issued under HIPAA.

(c) The respective rights and obligations of Business Associate under paragraph (c) of the section entitled "term of Provision" shall survive the termination of this Contract.

(d) Any ambiguity in this Contract shall be resolved to permit Covered Entity to comply with the Rules implemented under HIPAA.

## H.20.   Conflict of Interest

The Contractor shall disclose any known or potential conflicts of interest, in accordance with FAR Part 9.5, for the purpose of meeting the requirements of this contract.  The Contractor agrees that if an actual or potential organizational conflict of interest is discovered after an award of a Task Order, the Contractor shall make full disclosure in writing to the Contracting Officer. This disclosure shall include a description of actions that the Contractor has taken or proposes to take to mitigate the actual or potential conflict.  The Contracting Officer shall determine whether a conflict of interest disclosed after award has been adequately resolved.

## H.21.   Code of Conduct

**SMOKING**

Effective June 9, 2004, smoking is not permitted anywhere on the CMS single site campus.  This includes all areas outside the building, such as off-site facility, entranceways, sidewalks and parking areas.  Smoking will not be permitted anywhere in Regional Offices or Washington, D.C. Office locations unless permitted by GSA guidelines or local landlord requirements.  Contractor employees are subject to the same

restrictions as government personnel.  Fines up to $50 per occurrence will be issued and enforced by the Federal Protective Service.

**DRESS**
The preferred dress codes at CMS facilities are professional attire, business attire or business casual attire.

## H.22.  Post Award Evaluation of Contractor Performance

a.  Contractor Performance Evaluations

Interim annual, and final evaluations of contractor performance will be prepared on this contract in accordance with FAR 42.15.  The final performance evaluation will be prepared at the time of completion of work.  At the discretion of the Contracting Officer, interim evaluations should be considered.  Annual evaluations shall be prepared to coincide with the anniversary date of the contract.

A copy of all evaluations should be provided to the Contractor as soon as practicable after completion of the annual and final evaluation.  The Contractor will be permitted thirty (30) days to review the document and to submit additional information or a rebutting statement.  Any disagreement between the parties regarding an evaluation will be referred to the Deputy Director, Acquisition and Grants Group, whose decision will be final.

Copies of the evaluation, contractor responses, and review comments, if any, will be retained as part of the contract file, and will be used to support future award decisions.

b.  Electronic Access to Contractor Performance Evaluations

Contractors that have Internet capability may access evaluations through a secure Web site for review and comment by completing the registration form that can be obtained at the following address: https://cpscontractor.nih.gov.

To register, simply logon and click on the "Register Here" link.  This site provides instructions on how to register and offers computer-based training for contractors through the "CPS Contractor On-Line Training" hyperlink.  There is no fee for registration or use of this system.  Electronic evaluations are available to registered contractors for review 30 days from the date the evaluation is sent.

The registration process requires the contractor to identify an individual that will serve as a primary contact and who will be authorized access to the evaluation for review and comment.  In addition, the contractor will be required to identify an alternate contact who will be responsible for notifying the cognizant contracting official in the event the

primary contact is unavailable to process the evaluation within the required 30-day time frame.

## H.23.  Approval of Contractor Acquired Information Technology (IT)

A.    The Contractor must obtain the Contracting Officer's written approval prior to the acquisition of any IT investments (see FAR Part 2.101, for definition of IT) to ensure compatibility and successful integration with CMS's infrastructure/architecture.

B.    In the performance of a system life cycle development project, the Contractor must submit to the Project Officer the technical specifications for each of the following incremental phase of the projected life cycle prior to the commencement of work:

    1.  Design and Engineering
    2.  Development, and
    3.  Testing

C.    Upon written approval from the Contracting Officer, the Contractor shall commence work under the approved technical specification for the authorized incremental phase.

D.    In either instance of an approved IT investment acquisition, or an incremental phase of a system life cycle development project, the contract shall be modified accordingly and the Contractor shall proceed.

E.    CMS may disallow any contractor incurred cost that would not be allocated to the approved IT investment acquisition.

## H.24.  Section 508, Accessibility of  Electronic and Information Technology (EIT)

A.  This contract is subject to Section 508 of the Rehabilitation Act of 1973 (29 U.S.C. 794d) as amended by the Workforce Investment Act of 1998 (P.L. 105-220).  Specifically, subsection 508(a)(1) requires that when the Federal Government procures Electronic and Information Technology (EIT), the EIT must allow all Federal employees and individuals of the public with disabilities comparable access to and use of information and data that is provided to Federal employees and individuals of the public without disabilities.

B.  The EIT accessibility standards at 36 CFR Part 1194 were developed by the Architectural and Transportation Barriers Compliance Board ("Access Board") and apply to contracts and task/delivery orders, awarded under indefinite quantity contracts on or after June 25, 2001.

C.  Each Electronic and Information Technology (EIT) product or service furnished under this contract shall comply with the Electronic and Information Technology Accessibility Standards (36 CRF 1194), as specified in the contract, as a minimum.  If the Contracting

Officer determines any furnished product or service is not in compliance with the contract, the Contracting Officer will promptly inform the Contractor in writing.  The Contractor shall, without charge to the Government, repair or replace the non-compliant products or services within the period of time to be specified by the Government in writing.  If such repair or replacement is not completed within the time specified, the Government shall have the following recourses:

1. Cancellation of the contract, delivery or task order, purchase order, or line item without termination liabilities; or

2. In the case of custom EIT being developed by a Contractor for the Government, the Government shall have the right to have any necessary changes made or repairs performed, by itself, or by another firm for the non-compliant EIT, with the Contractor liable for reimbursement to the Government for any expenses incurred thereby.

D. The contractor must ensure that all EIT products that are less tan fully compliant with the accessibility standards are provided pursuant to extensive market research and are the most current compliant products or services available to satisfy this contract's requirements.

E. For every EIT product or service accepted under this contract by the Government that does not comply with 36 CRF 1194, the contractor shall, at the discretion of the Government, make every effort to replace or upgrade it with a compliant equivalent product or service, if commercially available and cost neutral, on either the planned refresh cycle of the product or service, or on the contract renewal/effective option date, whichever shall occur first.

**H.25  CMS Information Security -**  This clause applies to all organizations which possess or use Federal information, or which operate, use or have access to Federal information systems (whether automated or manual), on behalf of CMS.

The central tenet of the CMS Information Security (IS) Program is that all CMS information and information systems shall be protected from unauthorized access, disclosure, duplication, modification, diversion, destruction, loss, misuse, or theft—whether accidental or intentional.  The security safeguards to provide this protection shall be risk-based and business-driven with implementation achieved through a multi-layered security structure.  All information access shall be limited based on a least-privilege approach and a need-to-know basis, i.e., authorized user access is only to information necessary in the performance of required tasks.  Most of CMS' information relates to the health care provided to the nation's Medicare and Medicaid beneficiaries, and as such, has access restrictions as required under legislative and regulatory mandates.

The CMS IS Program has a two-fold purpose:

(1) To enable CMS' business processes to function in an environment with commensurate security protections, and

(2) To meet the security requirements of federal laws, regulations, and directives.

The principal legislation for the CMS IS Program is Public Law (P.L.) 107-347, Title III, *Federal Information Security Management Act of 2002 (FISMA)*, http://csrc.nist.gov/drivers/documents/FISMA-final.pdf.  FISMA places responsibility and accountability for IS at all levels within federal agencies as well as those entities acting on their behalf.  FISMA directs Office of Management and Budget (OMB) through the Department of Commerce, National Institute of Standards and Technology (NIST), to establish the standards and guidelines for federal agencies in implementing FISMA and managing cost-effective programs to protect their information and information systems.  As a contractor acting on behalf of CMS, this legislation requires that **the Contractor shall**:

- Establish senior management level responsibility for IS,
- Define key IS roles and responsibilities within their organization,
- Comply with a minimum set of controls established for protecting all Federal information, and
- Act in accordance with CMS reporting rules and procedures for IS.

Additionally, the following laws, regulations and directives and any revisions or replacements of same have IS implications and are applicable to all CMS contractors.
- P.L. 93-579, *The Privacy Act of 1974*, http://www.usdoj.gov/oip/privstat.htm , (as amended);
- P.L. 99-474, *Computer Fraud & Abuse Act of 1986*, www.usdoj.gov/criminal/cybercrime/ccmanual/01ccma.pdf   P.L. 104-13, *Paperwork Reduction Act of 1978*, as amended in 1995, U.S. Code 44 Chapter 35, www.archives.gov/federal-register/laws/paperwork-reduction;
- P.L. 104-208, *Clinger-Cohen Act of 1996* (formerly known as the Information Technology Management Reform Act), http://www.cio.gov/Documents/it_management_reform_act_Feb_1996.html;
- P.L. 104-191, *Health Insurance Portability and Accountability Act of 1996* (formerly known as the Kennedy-Kassenbaum Act) http://aspe.hhs.gov/admnsimp/pl104191.htm;
- OMB Circular No. A-123, *Management's Responsibility for Internal Control*, December 21, 2004, http://www.whitehouse.gov/omb/circulars/a123/a123_rev.html;
- OMB Circular A-130, *Management of Federal Information Resources*, Transmittal 4, November 30, 2000, http://www.whitehouse.gov/omb/circulars/a130/a130trans4.html;
- NIST standards and guidance, http://csrc.nist.gov/; and,
- Department of Health and Human Services (DHHS) regulations, policies, standards and guidance http://www.hhs.gov/policies/index.html

These laws and regulations provide the structure for CMS to implement and manage a cost-effective IS program to protect its information and information systems.  Therefore, **the Contractor shall** monitor and adhere to all IT policies, standards, procedures, directives, templates, and guidelines that govern the CMS IS Program, http://www.cms.hhs.gov/informationsecurity and the CMS System Lifecycle Framework, http://www.cms.hhs.gov/SystemLifecycleFramework.

**The Contractor shall** comply with the CMS IS Program requirements by performing, but not limited to, the following:

- Implement their own IS program that adheres to CMS IS policies, standards, procedures, and guidelines, as well as industry best practices;
- Participate and fully cooperate with CMS IS audits, reviews, evaluations, tests, and assessments of contractor systems, processes, and facilities;
- Provide upon request results from any other audits, reviews, evaluations, tests and/or assessments that involve CMS information or information systems;
- Report and process corrective actions for all findings, regardless of the source, in accordance with CMS procedures;
- Document its compliance with CMS security requirements and maintain such documentation in the systems security profile;
- Prepare and submit in accordance with CMS procedures, an incident report to CMS of any suspected or confirmed incidents that may impact CMS information or information systems; and
- Participate in CMS IT information conferences as directed by CMS.

**If the contractor believes that an updated IS-related requirement posted to the CMS website may result in a significant cost impact, the contractor may submit a request for equitable cost adjustment before implementing change.**

**H. 26 Security Clause -Background - Investigations for Contractor Personnel**

If applicable, Contractor personnel performing services for CMS under this contract, task order or delivery order shall be required to undergo a background investigation. CMS will initiate and pay for any required background investigation(s).

After contract award, the CMS Project Officer (PO) and the Security and Emergency Management Group (SEMG), with the assistance of the Contractor, shall perform a position-sensitivity analysis based on the duties contractor personnel shall perform on the contract, task order or delivery order.  The results of the position-sensitivity analysis will determine first, whether the provisions of this clause are applicable to the contract and second, if applicable, determine each position's sensitivity level (i.e., high risk, moderate risk or low risk) and dictate the appropriate level of background investigation to be processed.  Investigative packages may contain the following forms:

1. SF-85,  Questionnaire for Non-Sensitive Positions, 09/1995
2. SF-85P, Questionnaire for Public Trust Positions, 09/1995

3. OF-612, <u>Optional Application for Federal Employment</u>, 12/2002
4. OF-306, <u>Declaration for Federal Employment</u>, 01/2001
5. <u>Credit Report Release Form</u>
6. FD-258, <u>Fingerprint Card</u>, 5/99, and
7. CMS-730A, <u>Request for Physical Access to CMS Facilities</u> (NON-CMS ONLY), 11/2003.

The Contractor personnel shall be required to undergo a background investigation commensurate with one of these position-sensitivity levels:

**1)  High Risk (Level 6)**
Public Trust positions that would have a potential for exceptionally serious impact on the integrity and efficiency of the service. This would include computer security of a major automated information system (AIS).  This includes positions in which the incumbent's actions or inaction could diminish public confidence in the integrity, efficiency, or effectiveness of assigned government activities, whether or not actual damage occurs, particularly if duties are especially critical to the agency or program mission with a broad scope of responsibility and authority.

Major responsibilities that would require this level include:

a. development and administration of CMS computer security programs, including direction and control of risk analysis and/or threat assessment;
b. significant involvement in mission-critical systems;
c. preparation or approval of data for input into a system which does not necessarily involve personal access to the system but with relatively high risk of causing grave damage or realizing significant personal gain;
d. other responsibilities that involve relatively high risk of causing damage or realizing personal gain;
e. policy implementation;
f. higher level management duties/assignments or major program responsibility; or
g. independent spokespersons or non-management position with authority for independent action.

Approximate cost of each investigation:  $2,900

**2)  Moderate Risk (Level 5)**
Level 5 Public Trust positions include those involving policymaking, major program responsibility, and law enforcement duties that are associated with a "Moderate Risk."  Also included are those positions involving access to or control of unclassified sensitive, proprietary information, or financial records, and those with similar duties through which the incumbent can realize a significant personal gain or cause serious damage to the program or Department. Responsibilities that would require this level include:

a. the direction, planning, design, operation, or maintenance of a computer system and whose work is technically reviewed by a higher authority at the High Risk level to ensure the integrity of the system;
b. systems design, operation, testing, maintenance, and/or monitoring that are carried out under the technical review of a higher authority at the High Risk level;
c. access to and/or processing of information requiring protection under the Privacy Act of 1974;
d. assists in policy development and implementation;
e. mid-level management duties/assignments;
f. any position with responsibility for independent or semi-independent action; or
g. delivery of service positions that demand public confidence or trust.

Approximate cost of each investigation:  $2,400

**3)  Low Risk (Level 1)**
Positions having the potential for limited interaction with the agency or program mission, so the potential for impact on the integrity and efficiency of the service is small.  This includes computer security impact on AIS.

Approximate cost of each investigation: $550

The Contractor shall submit the investigative package(s) to SEMG within three (3) days after being advised by the SEMG of the need to submit packages.  Investigative packages shall be submitted to the following address:

> Centers for Medicare & Medicaid Services
> Office of Operations Management
> Security and Emergency Management Group
> Mail Stop SL-13-15
> 7500 Security Boulevard
> Baltimore, Maryland 21244-1850

The Contractor shall submit a copy of the transmittal letter to the Contracting Officer (CO).

Contractor personnel shall submit a CMS-730A (Request for Badge) to the SEMG (see attachment in Section J).  The Contractor and the PO shall obtain all necessary signatures on the CMS-730A prior to any Contractor employee arriving for fingerprinting and badge processing.

The Contractor must appoint a Security Investigation Liaison as a point of contact to resolve any issues of inaccurate or incomplete form(s).  Where personal information is involved, SEMG may need to contact the contractor employee directly.  The Security Investigation Liaison may be required to facilitate such contact.

SEMG will fingerprint contractor personnel and send their completed investigative package to the Office of Personnel Management (OPM).  OPM will conduct the background investigation.

A00123

Badges will not be provided by SEMG until acceptable finger print results are received; until then the contractor employee will be considered an escorted visitor.  The Contractor remains fully responsible for ensuring contract, task order or delivery order performance pending completion of background investigations of contractor personnel.

SEMG shall provide written notification to the CO with a copy to the PO of all suitability decisions.  The PO shall then notify the Contractor in writing of the approval of the Contractor's employee(s), at that time the Contractor's employee(s) will receive a permanent identification badge.  Contractor personnel who the SEMG determines to be ineligible may be required to cease working on the contract immediately.

The Contractor shall report immediately in writing to SEMG with copies to the CO and the PO, any adverse information regarding any of its employees that may impact their ability to perform under this contract, task order or delivery order.  Reports should be based on reliable and substantiated information, not on rumor or innuendo.  The report shall include the contractor employee's name and social security number, along with the adverse information being reported.

Contractor personnel shall be provided an opportunity to explain or refute unfavorable information found in an investigation to SEMG before an adverse adjudication is made. Contractor personnel may request, in writing, a copy of their own investigative results by contacting:

> Office of Personnel Management
> Freedom of Information
> Federal Investigations Processing Center
> PO Box 618
> Boyers, PA 16018-0618.

At the Agency's discretion, if an investigated contractor employee leaves the employment of the contractor, or otherwise is no longer associated with the contract, task order, or delivery order within one (1) year from the date the background investigation was initiated by CMS, then the Contractor may be required to reimburse CMS for the full cost of the investigation.  Depending upon the type of background investigation conducted, the cost could be approximately $550 to $2,900.  The amount to be paid by the Contractor shall be due and payable when the CO submits a written letter notifying the Contractor as to the cost of the investigation. The Contractor shall pay the amount due within thirty (30) days of the date of the CO's letter by check made payable to the "United States Treasury." The Contractor shall provide a copy of the CO's letter as an attachment to the check and submit both to the Office of Financial Management at the following address:

> Centers for Medicare & Medicaid Services
> PO Box 7520
> Baltimore, Maryland 21207

The Contractor must immediately provide written notification to SEMG (with copies to the CO and the PO) of all terminations or resignations of Contractor personnel working on this contract, task order or delivery order.  The Contractor must also notify SEMG (with copies to the CO and the PO) when a Contractor's employee is no longer working on this contract, task order or delivery order.

At the conclusion of the contract, task order or delivery order and at the time when a contractor employee is no longer working on the contract, task order or delivery order due to termination or resignation, all CMS-issued parking permits, identification badges, access cards, and/or keys must be promptly returned to SEMG.  Contractor personnel who do not return their government-issued parking permits, identification badges, access cards, and/or keys within 48 hours of the last day of authorized access shall be permanently barred from the CMS complex and subject to fines and penalties authorized by applicable federal and State laws.


Work Performed Outside the United States and its Territories

The contractor, and its subcontractors, shall not perform any activities under this contract at a location outside of the United States, including the transmission of data or other information outside the United States, without the prior written approval of the Contracting Officer.  The factors that the Contracting Officer will consider in making a decision to authorize the performance of work outside the United States include, but are not limited to the following:

1.  All contract terms regarding system security
2.  All contract terms regarding the confidentiality and privacy requirements for information and data protection
3.  All contract terms that are otherwise relevant, including the provisions of the statement of work
4.  Corporate compliance
5.  All laws and regulations applicable to the performance of work outside the United States
6.  The best interest of the United States

In requesting the Contracting Officer's authorization to perform work outside the United States, the contractor must demonstrate that the performance of the work outside the United States satisfies all of the above factors.  If, in the Contracting Officer's judgment, the above factors are not fully satisfied, the performance of work outside the United States will not be authorized.  Any approval to employ or outsource work outside of the United States must have the concurrence of the CMS SEMG Director or designee.

## I.12.   Contractual Clauses

All deliverables for this task order will adhere to the specifications, requirements, and guidance as prescribed in the task order, Statement of Work, and 8AStars GWAC contractual clauses and content.

**J.   Attachments**

**J.1 SOW – Recovery Audit Contractor Data Warehouse (RAC DW)
Maintenance, Enhancement, Migration and Interim Hosting Contractor**

A00126

# PAST PERFORMANCE QUESTIONNAIRE
## Sample Cover Letter

[COMPANY LETTERHEAD (**Prime or subcontractor**)]

Reference Name and Address                                    Date

SUBJECT: RFP # CMS-RFP-2011-110462

Dear    **(Client)**        :

We are currently responding to the Centers for Medicare and Medicaid Services (CMS) Request for Proposal number **CMS-RFP-2011-110462**.  The purpose of this contract is to provide Recovery Audit Services in support of Medicare Part D.

There is an increased emphasis on past performance in the federal source selection process. CMS is requesting that customers and clients of offerors provide the information as described within the attached questionnaire and return it to them for evaluation.  We have identified you as one of our references and respectfully request that you complete and sign the attached questionnaire and then return it to CMS.

Questionnaires are due to CMS **no later than 11:00 AM, local prevailing time Baltimore, MD Friday, December 3, 2010**, however, we would appreciate an earlier response if at all possible.

We sincerely appreciate your cooperation in this matter.

                                        Sincerely,

A00127

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C2-21-15
Baltimore, Maryland 21244-1850



## Office of Acquisition and Grants Management

SUBJECT:        Solicitation CMS-RFP-2011-110462

**To Whom It May Concern:**

The Centers for Medicare & Medicaid Services (CMS) very much appreciates your time and thoughtfulness in completing the attached questionnaire.  The information obtained from this questionnaire will be utilized to evaluate the past performance of Offerors/Contractors who wish to be awarded a contract with CMS.  Please be advised that neither your name, nor position or organization, will be divulged either before, during or after this survey has been completed.

The questionnaire is arranged by general performance areas, e.g., quality of service/performance, cost control, timeliness, management, etc.  Each area consists of a few basic questions relating to these aspects of performance with regard to the Offeror/Contractor with which you worked. Please complete the questionnaire as indicated on the form.

Finally, please sign your name and identify your position during your association with the referenced Offeror/Contractor.  Once completed, please submit the questionnaire in one of the following manner:

      Email PDF (**Preferred**):        Jessica.Sanders@cms.hhs.gov **E-mail is the preferred method.**

      Mail Original:        Centers for Medicare and Medicaid Services
           Office of Acquisition and Grants Management
           Division of Medicare Support Contracts
           ATTN: Jessica Sanders
           (410) 786-1076
           Contract Specialist
           7500 Security Blvd., C22115
           Baltimore, MD 21244-1850

Thank you very much for completing the questionnaire!

      Sincerely,
      Jessica Sanders
      Contract Specialist

## PAST PERFORMANCE QUESTIONNAIRE

CMS Solicitation No. CMS-RFP-2011-110462

**Company Being Evaluated** (Offeror)

Offeror/Contractor:      _____

Address:                 _____

                         _____

**Please complete the following questionnaire about the Offeror/Contractor and indicate your responses in the blocks or columns, as appropriate.  Numerical ratings are as indicated in the Rating Scale below for Q6-Q11.   Other Ratings are as indicated in each block.  Note:  Use of the term "Agency" can be interpreted as also Government/non-Government agencies or customers.**

**Rating Scale**:

| | |
|---|---|
| 0 | **Unsatisfactory**:  Non-conformances are jeopardizing the achievement of contract requirements, despite use of Agency resources. Recovery is not likely. If performance cannot be substantially corrected, it constitutes a significant impediment in consideration for future awards containing similar requirements. |
| 1 | **Poor**:  Overall compliance requires significant Agency resources to ensure achievement of contract requirements. |
| 2 | **Fair:**  Overall compliance requires minor Agency resources to ensure achievement of contract requirements |
| 3 | **Good:** There are no, or very minimal, quality problems, and the Contractor has met the contract requirements. |
| 4 | **Excellent:**  There are no quality issues, and the Contractor has substantially exceeded the contract performance requirements without commensurate additional costs to the Government. |
| 5 | **Outstanding**:  The contractor has demonstrated an outstanding performance level that was significantly in excess of anticipated achievements and is commendable as an example for others, so that it justifies adding a point to the score. It is expected that this rating will be used in those rare circumstances where contractor performance clearly exceeds the performance levels described as "Excellent". |

Although not required, we request that you justify each of your ratings with a comment.  Please be as specific in your comment as possible, especially in situations that warrant very high or very low ratings.  Use extra pages as necessary or expand the form electronically as needed.

A00129

| Q1.  What type of Product(s)/service(s) was/are provided by the Offeror? | | |
|---|---|---|
| Q2.  What type of contract(s) (Firm Fixed Price, Cost Reimbursement, Time and Material, etc.), quantity, and subtotal dollar value of each type of contract(s) do/did you have with the Offeror? | | |
| Q3.  Was the contract/subcontract(s) solicited competitively or noncompetitively? | | |
| Q4.  Total value of the contract/subcontract(s) with the Offeror? | | |
| Q5.  Period of Performance of the contract/subcontract(s)? | | |
| Q6.  How was the contractor's quality of products/services?  (Compliance with contract requirements? Accuracy of reports submitted? Technical excellence? Appropriateness of personnel?) – See rating scale narrative on previous page. | Comments: | Rating: |
| Q7.  How well did the contractor control costs?  Was it within budget (over/under target costs?)  If an Earned Value Management System (EVMS) was used, was the Contractor in compliance with the EVMS plan?  Did the Contractor provide current, accurate and complete billings? Relationships of negotiated costs to actual costs?  Cost efficiencies?) Fixed Price = N/A – See rating scale narrative on previous page. | Comments: | Rating: |
| Q8.  How well did the contractor comply with timeliness?  (Did contractor meet interim milestones and delivery dates on time?) – See rating scale narrative on previous page. | Comments: | Rating: |
| Q9. How well did the contractor work with Project/Contracting Officers? (Prompt notification of problems?  Reasonable, cooperative, flexible?  Proactive? Responsive to contract requirements? Recommended solutions?) – See rating scale narrative on previous page. | Comments: | Rating: |
| Q10.  How would you describe the contractor's commitment to customer satisfaction?  (How well did the contractor interface with the end user of the product/service?) – See rating scale narrative on previous page. | Comments: | Rating: |
| Q11.  How well do you assess the contractor's key personnel?  (How long did key personnel stay on contract?  Did they effectively manage contract?  Were they responsive to technical direction?) – See rating scale narrative on previous page. | Comments: | Rating: |

| | |
|---|---|
| Q12.  If there was a cost overrun(s) or delivery delay(s), in your opinion, how much of the overrun/delay was attributable to contractor's management? | a.  All<br>b.  Most<br>c.  Half<br>d.  Little<br>e.  None<br>f.  Not applicable |
| Q13. Based on your experience with this contractor, do you think it can be relied upon to delivery quality products/services by a specific delivery date? | a.  Yes<br>b.  No |
| Q14.  Regarding resolving difficulties of a Technical, Business, Performance, and/or Quality nature, how responsive/effective was the Contractor? | a.  Highly Cooperative and Responsive<br>b.  Moderately Cooperative and Responsive<br>c.  Slightly Cooperative and Responsive<br>d.  Slightly Uncooperative and Unresponsive<br>e.  Moderately Uncooperative and Unresponsive<br>f.  Highly Uncooperative and Unresponsive<br>g.  No opinion |
| Q15. Do you believe the contractor can be relied upon to control the cost of performance? | a.  Yes<br>b. Uncertain<br>c. No |
| Q16.  How frequently did you have to direct the contractor to re-perform the services because it had been performed unsatisfactorily the first time? | a.  None<br>b.  Occasionally<br>c.  Often<br>d.  Always or almost always |
| Q17. Was the contractor's performance generally satisfactory? | a.  Yes<br>b.  No |
| Q18.  Would you hire this contractor again? | a.  Yes<br>b.  No |
| Q19.  Would you recommend this contractor to others? | a.  Yes<br>b.  No |
| Q20. Any other comments regarding the contractor's performance? | Comments: |

## Company **COMPLETING** Questionnaire

Company Name: _____

Address: _____

_____

Signature of Individual Completing the Questionnaire: _____

Date

Name: _____          Telephone No.: _____

Title: _____          Email Address: _____

# TAB 78

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | | PAGE OF PAGES | |
|---|---|---|---|---|---|
| | | | | 1 | 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 000008 | See Block 16C | N/A | |

| 6. ISSUED BY | CODE | ASG - DPIFMC | 7. ADMINISTERED BY (If other than Item 6) | CODE | AGG/JM |
|---|---|---|---|---|---|

CMS,OAGM,ASG,DPIFMC
7500 SECURITY BLVD., MS: C2-21-15
BALTIMORE MD 21244-1850

Justin Menefee
Contract Specialist

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code) | (x) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|

ACLR, LLC
Attn: CHRIS MUCKE
550 FOREST AVENUE
SUITE 15-2
PLYMOUTH MI 481703793

9B. DATED (SEE ITEM 11)

x | 10A. MODIFICATION OF CONTRACT/ORDER NO.
GS-23F-0074W
HHSM-500-2011-00006G

| CODE    7802/2873 | FACILITY CODE | | 10B. DATED (SEE ITEM 13)
01/13/2011 |
|---|---|---|---|

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended.  ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA (If required) |
|---|
| N/A |

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | | |
|---|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. | |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). | |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: | |
| | FAR 43.103 (a)   Bilateral Modification | |
| | D. OTHER (Specify type of modification and authority) | |

E. IMPORTANT:    Contractor ☐ is not.  ☒ is required to sign this document and return ___1___ copies to the issuing office.

**14. DESCRIPTION OF AMENDMENT/MODIFICATION** (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Tax ID Number: 20-2662374
DUNS Number: 7802/2873
The purpose of this modification is to:

1)Authorize ACLR to conduct 2009 duplicate payment reviews for the following three plans:

• Windsor Health
• Wellcare
• Humana Insurance Company

End of Modification.
Continued ...

Except as provided herein, all terms and conditions of the document referenced in Item 8A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 16A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| G.P. MUCKE  ACLR COMPLIANCE OFFICER | Nicole Hoey |

| 15B. CONTRACTOR/OFFEROR | 16C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| _(Signature of person authorized to sign)_ | 7/15/18 | Nicole Hoey-S _(Signature of Contracting Officer)_ | |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

HHS06580

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>GS-23F-0074W/HHSM-500-2011-00006G/000008 | | | | PAGE<br>2 | OF<br>2 |
|---|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
ACLR, LLC

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | Period of Performance: 01/13/2011 to 09/30/2013 | | | | |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

HHS06581

SA115

# TAB 79

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1 CONTRACT ID CODE | PAGE OF PAGES |
|---|---|---|---|
| | | | 1  1 |

| 2 AMENDMENT/MODIFICATION NO | 3 EFFECTIVE DATE | 4 REQUISITION/PURCHASE REQ NO | 5 PROJECT NO (If applicable) |
|---|---|---|---|
| 000001 | See Block 16C | N/A | |

| 6 ISSUED BY | CODE | ASG - DPIFMC | 7 ADMINISTERED BY (If other than Item 6) | CODE | AGG/JM |
|---|---|---|---|---|---|

CMS,OAGM,ASG,DPIFMC
7500 SECURITY BLVD., MS: C2-21-15
BALTIMORE MD 21244-1850

Justin Menefee
Contract Specialist

| 8 NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code) | (x) | 9A AMENDMENT OF SOLICITATION NO |
|---|---|---|

ACLR, LLC
Attn: CHRIS MUCKE
550 FOREST AVENUE
SUITE 15-2
PLYMOUTH MI 481703793

9B. DATED (SEE ITEM 11)

| | X | 10A. MODIFICATION OF CONTRACT/ORDER NO. |
| GS-23F-0074W |
| HHSM-500-2011-00006G |

| CODE | 780272873 | FACILITY CODE | | 10B. DATED (SEE ITEM 13) |
|---|---|---|---|---|
| | | | | 01/13/2011 |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12 ACCOUNTING AND APPROPRIATION DATA (If required) |
|---|
| N/A |

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | | |
|---|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. | |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b) | |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: FAR 43.103 (a)   Bilateral Modification | |
| | D. OTHER (Specify type of modification and authority) | |

| E. IMPORTANT: | Contractor ☐ is not. | ☒ is required to sign this document and return | 1 | copies to the issuing office. |
|---|---|---|---|---|

**14. DESCRIPTION OF AMENDMENT/MODIFICATION** (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Tax ID Number: 20-2662374
DUNS Number: 780272873
The purpose of this modification is to increase the contingency fee to 16% for the current review of Excluder Prescriber Issue years 2008, 2009, 2010, and 2011. The 16% contingency fee shall only be applied to the aforementioned years. The contractor shall not use the 16% contingency fee on any other audit issues within this contract unless specified by the Government.

End of Modification
Period of Performance: 01/13/2011 to 11/30/2013

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| Christopher Mucke, Managing Principal | Nicole Hoey |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| (Signature of person authorized to sign) | 11/19/13 | Nicole Hoey -S | |
| | | (Signature of Contracting Officer) | |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

HHS06552

# TAB 80

A00474

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

| 1. CONTRACT ID CODE | PAGE OF PAGES |
|---|---|
| | 1 — 1 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 000012 | 12/01/2013 | N/A | |

**6. ISSUED BY**   CODE   ASG - DPIFMC

CMS,OAGM,ASG,DPIFMC
7500 SECURITY BLVD., MS: C2-21-15
BALTIMORE MD 21244-1850

**7. ADMINISTERED BY (If other than Item 6)**   CODE   AGG/JM

Justin Menefee
Contract Specialist

**8. NAME AND ADDRESS OF CONTRACTOR** (No., street, county, State and ZIP Code)

ACLR, LLC
Attn: CHRIS MUCKE
550 FOREST AVENUE
SUITE 15-2
PLYMOUTH MI 481703793

| (X) | |
|---|---|
| | 9A. AMENDMENT OF SOLICITATION NO. |
| | 9B. DATED (SEE ITEM 11) |
| X | 10A. MODIFICATION OF CONTRACT/ORDER NO.
GS-23F-0074W
HHSM-500-2011-00006G |
| | 10B. DATED (SEE ITEM 13)
01/13/2011 |

CODE   780272873   FACILITY CODE

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

**12. ACCOUNTING AND APPROPRIATION DATA (If required)**
N/A

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS.  IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority)  THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR 43.103 (a)   Bilateral Modification |
| | D. OTHER (Specify type of modification and authority) |

**E. IMPORTANT:**   Contractor ☐ is not. ☒ is required to sign this document and return _____1_____ copies to the issuing office.

**14. DESCRIPTION OF AMENDMENT/MODIFICATION** (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Tax ID Number:  20-2662374
DUNS Number:  780272873
The purpose of this modification is to extend the period of performance until December 31, 2013.


End of Modification
Period of Performance: 01/13/2011 to 12/31/2013

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| Christopher Mucke | Nicole Hoey |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| (Signature of person authorized to sign) | 11/27/13 | (Signature of Contracting Officer) | |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

TAB 81

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | | PAGE | OF PAGES |
|---|---|---|---|---|---|
| | | | | 1 | 1 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 000017 | See Block 16C | | |

| 6. ISSUED BY | CODE | ASG - DPIFMC | 7. ADMINISTERED BY (If other than Item 6) | CODE | AGG/JM |
|---|---|---|---|---|---|

6. ISSUED BY

CMS,OAGM,ASG,DPIFMC
7500 SECURITY BLVD., MS: C2-21-15
BALTIMORE MD 21244-1850

7. ADMINISTERED BY

Justin Menefee
Contract Specialist

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code) | (x) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| ACLR, LLC<br>Attn: CHRIS MUCKE<br>550 FOREST AVENUE<br>SUITE 15-2<br>PLYMOUTH MI 481703793 | | |
| | | 9B. DATED (SEE ITEM 11) |
| | x | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>GS-23F-0074W<br>HHSM-500-2011-00006G |
| CODE   780272873 | FACILITY CODE | 10B. DATED (SEE ITEM 13)<br>01/13/2011 |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14.  The hour and date specified for receipt of Offers ☐ is extended.  ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended , by one of the following methods: (a) By completing items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted ; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers.  FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted , such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

**12. ACCOUNTING AND APPROPRIATION DATA (If required)**
See Schedule

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | | |
|---|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. | |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). | |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:<br>FAR 43.103 (a)  Bilateral Modification | |
| | D. OTHER (Specify type of modification and authority) | |

| E. IMPORTANT: | Contractor | ☐ is not. | ☒ is required to sign this document and return _____1_____ copies to the issuing office. |
|---|---|---|---|

**14. DESCRIPTION OF AMENDMENT/MODIFICATION** (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Tax ID Number:  20-2662374
DUNS Number:  780272873
The purpose of this modification is to exercise Option Period 2 - Administrative and Appeals Option for the period of January 1, 2016 through January 24, 2017. If all appeals have not concluded and completed payment collection by January 24, 2017, the administrative and appeals option period shall be extended as required.
Period of Performance: 01/13/2011 to 01/24/2017

Except as provided herein, all terms and conditions of the document referenced in Item 9 A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| Gilbert Mucke, ACLR Compliance Officer | | Nicole Hoey | Theresa A. Schultz -S   Digitally signed by Theresa A. Schultz -S |
| 15B. CONTRACTOR/OFFEROR<br>*(Signature of person authorized to sign)* | 15C. DATE SIGNED<br>12/31/15 | 16B. UNITED STATES OF AMERICA<br>*(Signature of Contracting Officer)* | 16C. DATE SIGNED<br>Dec 2015.12.31<br>13:01:04 -05'00' |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

HHS06535

# TAB 82

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | 1. CONTRACT ID CODE | | PAGE OF PAGES |
|---|---|---|---|
| | | | 1      1 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 000018 | 01/25/2017 | N/A | |

| 6. ISSUED BY | CODE | ASG - DPIFMC | 7. ADMINISTERED BY (If other than Item 6) | CODE | AGG/JM |
|---|---|---|---|---|---|

6. ISSUED BY    CODE   ASG - DPIFMC

CMS,OAGM,ASG,DPIFMC
7500 SECURITY BLVD., MS: C2-21-15
BALTIMORE MD 21244-1850

7. ADMINISTERED BY (If other than Item 6)    CODE   AGG/JM

Justin Menefee
Contract Specialist

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

ACLR, LLC
Attn: CHRIS MUCKE
550 FOREST AVENUE
SUITE 15-2
PLYMOUTH MI 481703793

CODE   780272873        FACILITY CODE

(X)

9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

x   10A. MODIFICATION OF CONTRACT/ORDER NO.
GS-23F-0074W
HHSM-500-2011-00006G

10B. DATED (SEE ITEM 13)
01/13/2011

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended , by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted ; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers.  FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER  If by virtue of this amendment you desire to change an offer already submitted , such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
N/A

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS.  IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority)  THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: <br> FAR 43.103 (a)   Bilateral Modification |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT:    Contractor  ☐ is not.  ☒ is required to sign this document and return __1__ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Tax ID Number:  20-2662374
DUNS Number:  780272873
The purpose of this modification is to:


1.Extend Option Period 2 - Administrative and Appeals Option through December 31, 2017. If
all appeals have not concluded and completed payment collection by December 31, 2017, the
administrative and appeals option period shall be extended as required;


2. Add Jamie Scott as the Contracting Officer Representative.
Period of Performance: 01/13/2011 to 12/31/2017

Except as provided herein, all terms and conditions of the document referenced in Item 9 A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| Christopher Mucke  *Digitally signed by Christopher Mucke DN: cn=Christopher Mucke, o=ACLR, ou, email=chrismucke@aclrobs.com, c=US Date: 2017.01.25 11:05:58 -05'00'* | Nicole Hoey |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| *(Signature of person authorized to sign)* | | Nicole Hoey -S  *Digitally signed by Nicole Hoey -S Date: 2017.01.25 15:45:52 -05'00'* <br> *(Signature of Contracting Officer)* | |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

TAB 83



**ACLR**

*38703 Seven Mile Rd.*
*Suite 251*
*Livonia, Michigan 48152*
*Ph: 734.744.4400  Fax: 734.744.4450*

March 12, 2015

Nicole Hoey
Department of Health & Human Services
Centers for Medicare and Medicaid
7500 Security Blvd; M/S C2-21-15
Baltimore, MD  21244-1850

To:  Contracting Officer - Hoey:

ACLR, LLC ("ACLR"), hereby requests the Contracting Officer's Final Decision in accordance with the Contract Disputes Act of 1978, as amended, 41 USC §§601, 605(a) (the "CDA") and FAR Subpart 33.2, with respect to the breaches of the terms of the above-referenced Contract by the Center for Medicaid and Medicare Services ("CMS" or the "Government"), as well as the Government's constructive termination of the Contract.  ACLR seeks a final determination by your office on the propriety of the CMS' actions.

## FACTS

As outlined in greater detail in the evidentiary support accompanying this claim:

1. On December 14, 2010, ACLR submitted a technical proposal outlining the processes it would use to identify and recover improper payments made in the prescription drug benefit program of Medicare (Part D) to CMS' Request for Proposal (RFP) for "Recovery Audit Contractor Services in Support of Medicare Part D"; a subsequent addendum, incorporating CMS' responses to RFP questions asked by ACLR, was submitted to CMS on December 15, 2011.
2. On January 13, 2011, CMS awarded Contract No. GS-23F-0074W/Task Order No. HHSM-500-2011-00006G (Recovery Audit Contractor Services in Support of Medicare Part D) (hereinafter referred to as the "Part D RAC") to ACLR.  The Part D RAC incorporated, in its entirety, ACLR's Performance Work Statement (PWS), which provided audit processes and issues, collection protocols, and appeal processes in their original and unaltered form for the unrestricted review and collection of Part D improper payments which limited CMS activities to listed administrative requirements, providing feedback on ACLR's Project Work Plan and appeal processes, approving ACLR Outreach to plan sponsors, and developing a Data Storage System (DSS) to transmit and receive Part D payment data to ACLR.
3. During the Part D RAC Kick-Off Meeting, held February 23, 2011, CMS provided ACLR the Authority to Proceed.  CMS personnel also informed ACLR that it wanted to "minimize the impact on plan sponsors" and did not want to recover "too much money", that CMS would

not develop a DSS and that it had separately contracted with Booz Allen Hamilton (BAH) to "assist in what the Part D RAC program would look like". ACLR recorded the Kick-Off meeting with the permission of CMS Director Cynthia Moreno and OAGM Contract Specialist Georgette Vlangas.

4. During a conference call scheduled to discuss CMS contractual concerns and security accreditation delays held March 2, 2011, Contracting Officer Debra Stidham reiterated CMS intention to "minimize the impact on the Part D Sponsors" and acknowledged the "current PWS" did not "reflect what reality is" and that CMS was not "crystal clear on what the reality is". CO Stidham again reiterated the authority to proceed and no contract modification was issued as a result of CO Stidham's acknowledgement of contractual deficiencies.

5. During the base period of the Part D RAC (January 13, 2011- January 12, 2012), CMS failed to timely execute contracted deadlines for the issuance of ACLR's Authorization to Operate (ATO), the transmission of Part D payment data, and various administrative requirements. No contract modifications or offers of equitable relief for increased ACLR delay costs were made by CMS.

6. On August 30, 2011, CO Desiree Wheeler informed ACLR that it "was not executing the process defined in the current PWS" and that ACLR's performance was in violation of its contract. Succeeding discussions and ACLR requests for Part D RAC modifications incorporating "material and constructive" CMS contractual changes culminated in CO Wheeler's November 7, 2011 assertion that the "PWS was proceeding" as planned and that there were no issues related to why ACLR "could not execute" its contract; CMS began transmitting Part D claims ("payment" or "PDE" data) to ACLR on November 17, 2011.

7. During a conference call on November 30, 2011, ACLR informed CMS that it had identified improper payments and was going to commence the recovery of improper payments in accordance with the contract. CO Wheeler concurred to which COTR Dorsey and CMS CPI Downs both stated the contracted PWS was just a proposal and CMS CPI does not concur. Despite clarification of the legal requirements of the contract by Contract Specialist Sanders to the COTR, CO Wheeler ordered ACLR, and acknowledged via email on December 1, 2011 to cease all efforts pertaining to the issuance of demand letters to plan sponsor.

8. Improper payments identified by ACLR, and held in abeyance pending CO Wheeler's earlier direction, totaled $313,808,241. On December 14, 2011, ACLR filed a claim seeking recovery of $662,972.83. This sum equaled the 2011 delay costs and did not include the sums owed to ACLR pursuant to contractual requirements. ACLR's claim was denied on April 26, 2012; no language pertaining to ACLR's rights to appeal were provided in CMS claim denial.

9. On January 3, 2012, ACLR was informed that the BAH's Business Process Model (BPM) and Payment Recovery Information System (PRIS), replacing ACLR's Part D RAC audit processes and Audit Tracking Database, would be the sole method by which "improper payments would be submitted and tracked.

10. Subsequent to CO Wheeler's termination of ACLR recovery audit activities on November 30, 2011, CMS executed 11 contract modifications incorporating base period extensions and/or authorizations to commence special studies on improper payments pertaining to excluded providers and duplicate payments. CMS eliminated recoveries associated with excluded

pharmacists and excluded owners of pharmacies and PY09 duplicate payments after execution of contract modifications requiring same.  CMS also failed to timely execute contracted deadlines in each of these audits and mandated changes to contracted recovery audit protocols resulting in increased expenses to ACLR.

11. On November 13, 2013 and in accordance with the Part D RAC and utilizing active recovery audit protocols, ACLR prepared and submitted improper payments totaling $1,050,170, 811 in illegally dispensed and legally recoverable improper payments to CMS and informed CMS that it intended to commence the immediate recovery of same.  CO Hoey terminated, via email, ACLR recovery efforts on November 22, 2013.

12. On December 31, 2013, CMS executed Contract Modification 000013 (OY1 SOW).  The OY1 SOW, which included a formal issue approval and appeals process, replaced the Part D RAC PWS.  OAGM and CMS CPI senior management provided direct oversight assurances including assurances that CMS and ACLR now have an executable contract.

13. On March 23, 2014, CMS issued Rule CMS–4159–F, Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs (4159F).  This rule included specifics outlined in BAH's BPM dated December 9, 2011 and significantly impacted recovery audit activities pertaining to the Part D RAC program.

14. During 2014, ACLR submitted 8 New Audit Review Packages.  Each package, submitted in accordance with OY1 SOW requirements, outlined ACLR's recovery audit processes and included evidence demonstrating that payments had been made for claims dispensed and/or submitted in violation of federal and state law, regulations, and published CMS guidance.  6 of these issues were rejected on the basis that CMS had updated, was in the process of updating, or had not previously issued plan sponsor guidance pertaining to the issues identified by ACLR. ACLR was not provided with a legal analysis outlining CMS' authority to deny issues dispensed or submitted in violation of federal and state law.  One issue, stating that ACLR "did not completely address the requested changes" made by CMS, was denied on February 17, 2015; no attempt to explain how ACLR did not "address the requested changes" was provided by CMS.

15. During 2014, CMS approved 2 audit issues associated with PY10-PY12 Duplicate Payments and PY10-PY11 DEA Schedule Refill Errors.  In each case, CMS subsequently, and outside of approved protocols and contracted requirements, terminated the commencement of recovery audits associated with PY11-PY12 Duplicate Payments and eliminated $1.7 million in known PY10-PY11 DEA Schedule Refill Errors. CMS also attempted to further mitigate PY10 Duplicate Payment findings by targeting approved audit processes and subsequently issued guidance to plan sponsors stating it was implementing edit checks, later deemed incorrect based on plan sponsor evidentiary submissions, which would further mitigate improper payment amounts owing.  On March 10, 2015, informed ACLR that it intended to terminate the ongoing PY10 Duplicate Payment review and start over; an action which would ultimately result in the complete termination of the review.  A final determination by CO Hoey and OAGM as to the dispensation of this issue is currently pending.

16. After three years of Part D RAC delays in the development of the OY1 SOW, CMS failed to execute express contracted processes and deadlines.  After numerous requests by ACLR, OAGM agreed to Alternative Dispute Resolution at OY1 signing.  This agreement was

subsequently rescinded by OAGM thus preventing resolution of all issues related the ACLR's Part D RAC contract.

## CONCLUSIONS

CMS clearly breached the Part D RAC with respect to its express obligations to permit ACLR to recover $313,808,241 in improper payments it identified during the base period of its contract and that ACLR is entitled to damages arising from this breach.

CMS clearly breached Part D RAC express obligations pertaining to the execution of contracted activities and the timely completion of activities within contracted deadlines.  As a result of these breaches, ACLR is entitled to damages.

CMS specifically targeted ACLR's contract to implement recovery audit processes and ACLR's Audit Tracking Database when it contracted with BAH and other contractors to implement same.  As a result of this breach ACLR is entitled to damages.

CMS' implementation of 4159F and its ongoing efforts to "mitigate the impact of the Part D RAC program on plan sponsors" specifically targeted the execution of recovery audit activities by ACLR.  As a result of this breach ACLR is entitled to damages.

CMS clearly breached the Contract with respect to its implied duty of good faith by engaging in a pattern of negotiating equitable relief with ACLR in contract modifications and subsequently and systematically reducing such relief upon modification execution.  As a result of this breach, ACLR is entitled to damages.

ACLR did reasonably and justifiably rely on CMS assertions, public announcements, and misrepresentations and suffered damages as a result of that reliance.

## RELIEF REQUESTED[1]

1.  A determination that ACLR is entitled to $23,535,618 representing amounts owing from its identification of improper payment amounts during the successful execution of the base period of the Contract.

2.  A determination that ACLR is entitled to the amount of $2,668,553 representing amounts expended, reasonable expectations of profit, and net of amounts already collected arising from ACLR efforts during subsequent modifications of the Contract.

3.  A determination, in the event of CMS' pending modification of the PY10 Duplicate Payment audit, that ACLR is entitled to $2,209,146 representing amounts associated with its successful identification of improper payments related to this issue.

---

[1] *ACLR reserves the right to supplement this Claim and seek further damages.*

4.  The execution of a contract with clearly defined deadlines, processes, and timetables to which CMS will be accountable.

5.  A determination that ACLR is entitled to additional amounts representing an equitable adjustment to the Contract for internal corporate expenses related to the preparation and filing of this Claim and amounts for reasonable attorney's fees and related expenses. As of the date of the filing of this claim that sum is $93,274.

6.  A determination that ACLR is entitled to interest on the above amounts from the date of the submission of this claim, in accordance with 41 U.S.C. §611.

The above constitutes the amount for which ACLR certifies this claim in accordance with the CDA.

Respectfully submitted,

## CERTIFICATION

I certify that the foregoing Claim by ACLR, dated March 12, 2015, is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable, and that I am duly authorized to certify the Claim on behalf of the contractor.

BY: Christopher A. Mucke
TITLE: Managing Principal, ACLR

March 12, 2015

# TAB 84

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop B3-30-03
Baltimore, Maryland 21244-1850



**Office of Acquisition & Grants Management**

June 5, 2015

*Christopher Mucke*
*ACLR, LLC*
*38705 7 Mile Road, Suite 251*
*Livonia, Michigan 48152-3975*

Subject:   Claim of ACLR Under Contract Number GS-23F-0074W/Task Order HHSM-
500-2011-00006G

Dear Mr. Mucke,

CMS is in receipt of ACLR's claim which was submitted on March 12, 2015. The claim was
filed pursuant to the Contract Disputes Act, 41 U.S.C. 7101 and FAR Subpart 33.2. In
accordance with FAR 33.211, this letter constitutes the written decision of the Contracting
Officer.

Description of the Claim:

ACLR is the Part D RAC contractor and has performed as the Part D RAC contractor since
January 2011. The statutory authority for Medicare's Recovery Audit program can be found at
Section 1893(h) of the Social Security Act. The statute requires that the RACs are paid on a
contingency fee basis. The amount of contingency fee is a percentage of the improper payments
recovered or reimbursed. The contract between ACLR and CMS is consistent with the
underlying statutory authority. Hence, ACLR is only entitled to payments on a contingency fee
basis. (See section 5 of the Contract entitled "Task Order Price Summary".) At the time of
award, ACLR's contingency fee was 7.5%. It currently is 12% for certain activities (see
Modification 13). There are no other payment provisions in the ACLR contract or task order.

The first three pages of the claim submitted by ACLR sets forth its characterization of the facts.
Additionally, ACLR submitted documents which it believes provide evidentiary proof of the
elements of their claim. Basically, it appears that ACLR's allegations are that CMS has
constructively terminated and breached the terms of the above referenced contract. The general
bases for these allegations and associated CMS responses are below:

1

**SA125**

1. On January 13, 2011, CMS awarded Contract No. GS-23F-0074W/Task Order No. HHSM-500-2011-00006G (Recovery Audit Contractor Services in Support of Medicare Part D) (hereinafter referred to as the "Part D RAC") to ACLR. The Part D RAC contract incorporated, in its entirety, ACLR's Performance Work Statement (PWS), which provided audit processes and issues, collection protocols, and appeal processes in their original and unaltered form for the unrestricted review and collection of Part D improper payments.  System (DSS) to transmit and receive Part D payment data to ACLR.

2. During the base period of the Part D RAC contract (January 13, 2011- January 12, 2012), ACLR alleges that CMS delayed the issuance of ACLR's Authorization to Operate (ATO), the transmission of Part D payment data, and various administrative requirements. No contract modifications or offers of equitable relief for increased ACLR delay costs were made by CMS in connection with these supposed delays.

3. Between August and November 2011, CMS and ACLR had discussions to address processes in the PWS.  Although ACLR requested modifications of the contract to address what it believed were material changes, its position is that CMS did not concur that a contract modification was required.  Instead, CMS began transmitting Part D claims ("payment" or "PDE" data) to ACLR on November 17, 2011.

4. On November 30, 2011, ACLR states that it informed CMS that it had identified improper payments and was going to commence the recovery of improper payments in accordance with the contract. However, per ACLR, it was ordered to cease all efforts pertaining to the issuance of demand letters to plan sponsors.

5. ACLR has calculated hypothetical improper payments, and held in abeyance pending CMS' earlier direction, to total $313,808,241. In the current claim, ACLR states that it filed a prior claim on December 14, 2011seeking recovery of $662,972.83. That sum purportedly equaled the 2011 delay costs and did not include the sums owed to ACLR pursuant to contractual requirements.

   CMS Comment: These allegations are inconsistent with CMS' records showing that ACLR submitted a request for equitable adjustment as opposed to a claim.  ACLR's request for equitable adjustment was denied because the contract authorizes payment on a contingency fee basis.

6. CMS has issued eleven (11) modifications to ACLRs contract.  These modifications included extensions of the base period, revisions to the contingency fee and revisions to SOW activities, including authorizations to commence special studies on improper payments pertaining to excluded providers and duplicate payments. ACLR's claim states that CMS eliminated recoveries associated with excluded pharmacists and excluded owners of pharmacies and PY09 duplicate payments after execution of contract modifications requiring same. Additionally, ACLR charges CMS also failed to timely execute contracted deadlines in each of these audits and mandated changes to contracted recovery audit protocols resulting in increased expenses to ACLR.

2

7. On November 13, 2013 and in accordance with the Part D RAC and utilizing active recovery audit protocols, ACLR prepared and submitted improper payments totaling $1,050,170,811 in illegally dispensed and legally recoverable improper payments to CMS. ACLR informed CMS that it intended to commence the immediate recovery of those funds. However, because the methodology had not been reviewed or approved, on November 22, 2013 the CO instructed ACLR to suspend those recovery efforts.

8. On December 31, 2013, CMS executed Contract Modification 000013 (OY1 SOW). The OY1 SOW, which included a formal issue approval and appeals process, replaced the Part D RAC PWS. OAGM and CMS CPI senior management provided direct oversight assurances including assurances that CMS and ACLR now have an executable contract.

9. On March 23, 2014, CMS issued Rule CMS–4159–F, Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs (4159F). ACLR believes that this rule included specifics outlined in BAH's BPM dated December 9, 2011 and that it significantly impacted recovery audit activities pertaining to the Part D RAC program.

10. According to ACLR, in 2014, they submitted eight New Audit Review Packages (NAIRP). Each package purportedly outlined ACLR's recovery audit processes and included evidence demonstrating that payments had been made for claims dispensed and/or submitted in violation of federal and state law, regulations, and published CMS guidance. ACLR believes that CMS rejected the majority of these issues because they did not align with plan sponsor guidance.

CMS Comment: The eight NAIRPs that were submitted were rejected by CMS for the following reasons:
- One issue was rejected because the methodology did not take into account the process in which the plan sponsor was notified.
- Another NAIRP was rejected because guidance prevents CMS from doing what was proposed.
- ACLR chose to not follow through with one NAIRP
- A few were rejected because ACLR needed to provide more substantive evidence.

3

**SA127**

11. ACLR's claim states that during 2014, CMS approved two audit issues associated with PY10-PY12 Duplicate Payments and PY10-PY11 DEA Schedule Refill Errors. However, CMS subsequently rescinded the commencement of recovery audits associated with PY11-PY12 Duplicate Payments. ACLR claims that this decision eliminated $1.7 million in known PY10-PY11 DEA Schedule Refill Errors. On March 10, 2015, CMS informed ACLR that it intended to terminate the ongoing PY10 Duplicate Payment review. CMS informed ACLR that the DEA scheduled refills could not have PDE records with an incorrect fill number and  should not be reported as improper PDE record submissions as long as plan sponsors provide supporting documentation and the supporting documentation is valid IAW the 2014 call letter and under 42CFR 423.505(b)(8) and (9). CMS attempted several times to revise the methodology and work with stakeholders to address the concerns raised with the duplicate payment review methodology. ACLR was to take the revised methodology and use it to perform their review and to prepare the improper payment review package (IPRPs). When ACLR submitted their IPRP it was determined that ACLR did not use the revised methodology, submitted unorganized plan sponsor supporting documentation and did not provide its determination that indicated why PDE records were considered duplicates.

12. In sum, ACLR believes it is entitled to recover because of delays, CMS' supposed failure to follow contractual procedures and changed deadlines

Specifically, per ACLR:

1. CMS breached the Part D RAC with respect to its express obligations to permit ACLR to recover $313,808,241 in improper payments it identified during the base period of its contract.

2. CMS breached Part D RAC express obligations pertaining to the execution of contracted activities and the timely completion of activities within contracted deadlines.

3. CMS targeted ACLR's contract to implement recovery audit processes and ACLR's Audit Tracking Database when it contracted with BAH and other contractors to implement the same.

4. CMS' implementation of 4159F and its ongoing efforts to "mitigate the impact of the Part D RAC program on plan sponsors" specifically targeted the execution of recovery audit activities by ACLR.

5. CMS breached the Contract with respect to its implied duty of good faith by engaging in a pattern of negotiating equitable relief with ACLR in contract modifications and subsequently and systematically reducing such relief upon modification execution.

4

6. ACLR reasonably and justifiably relied on CMS assertions, public announcements, and misrepresentations and suffered damages as a result of that reliance.

To compensate for these alleged breaches, ACLR has requested the following specific relief:

1. A determination that ACLR is entitled to $23,535,618 representing amounts owing from its identification of improper payment amounts during the successful execution of the base period of the Contract.

2. A determination that ACLR is entitled to the amount of $2,668,553 representing amounts expended, reasonable expectations of profit, and net of amounts already collected arising from ACLR efforts during subsequent modifications of the Contract.

3. A determination, in the event of CMS' pending modification of the PY10 Duplicate Payment audit, that ACLR is entitled to $2,209,146 representing amounts associated with its successful identification of improper payments related to this issue.

4. The execution of a contract with clearly defined deadlines, processes, and timetables to which CMS will be accountable.

5. A determination that ACLR is entitled to additional amounts representing an equitable adjustment to the Contract for internal corporate expenses related to the preparation and filing of this Claim and amounts for reasonable attorney's fees and related expenses. As of the date of the filing of this claim that sum is $93,274.

6. A determination that ACLR is entitled to interest on the above amounts from the date of the submission of this claim, in accordance with 41 U.S.C. §611.

The above requested relief amounts to $28,506,591.

Reference to the Pertinent Contract Terms:

a.    Task order GS-23F-0074W/HHSM-500-2011-00006G is a Firm Fixed Price Contingency fee task order. At time of award the contingency fee was 7.5%. Based on legislation payment shall only be made on amounts recovered. (SEC 1893 (42 U.S.C 1395ddd)(h)(1)(A) )

b.    As stated in Task Order section 5 entitled "Task Order Price Summary" "all payments shall be paid only on a contingency basis. The recovery audit contractor will receive the percentage specified below of all amounts collected. The contingency fees shall be paid once CMS collects the Medicare overpayments. The recovery audit contractor shall be paid a percentage of the amount that is collected through their recovery efforts (as outlined in Section 1.1 Improper Payment Review Process of Section J.1, Statement of Work). The recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments not recovered/collected. The recovery audit contractor shall submit vouchers on a monthly basis (see Attachment 2)

with supporting documentation of the recovery. Once verified, CMS shall pay the voucher pursuant to the prompt payment provisions."

c.  Statement of Work (SOW) section 2.1.1 New Audit Issue Approval Process (NAIRP) states "the RAC must receive approval from CMS/CPI prior to commencing recovery audit activities. As outlined in *Appendix E, New Issues Submission and Approval Process*, the RAC submits a New Audit Issue Review Package (NAIRP) to the COR. This NAIRP contains a proposed audit issue, samples of PDE records, an outline of the processes utilized to identify improper payments, supporting statutory, regulatory, and administrative memoranda, and an estimate of improper payment amounts owing. Once submitted, the RAC works with CMS/CPI to refine and approve or deny the NAIRP. Once approved the RAC begins recovery audit activities."

d.  SOW section 2.1.3 Improper Payment Review Package (IPRP) states After the RAC identifies an improper payment, as approved under *Section 2.1.1 New Audit Issue Approval Process*, it compiles an Improper Payment Review Package (IPRP). The IPRP contains the PDE exception reports and the supporting documentation identifying improper payments corresponding to a particular audit issue by contract. A unique ID is assigned to a Package and will be included on and associated with all future tracking reports and letters such as Validation Findings, Notification Letters, Appeal Notifications, Monthly Plan Payment Adjustments, and Invoices. The IPRPs will be unique for each contract, for each year for each audit issue."

e.  SOW section 2.2 Validation of RAC Audit Findings states CMS/CPI contracts with the Data Validation Contractor to perform a review of the IPRP and to submit an IPRP validation finding. The DVC will have 45 calendar days to complete their review process an extension may be granted to the DVC if the review's error rate is 25% or more.

   The RAC must concur or non-concur with the validation findings submitted by the DVC. Concurred validation findings will continue through the RAC process.

<u>Statement of the Factual Areas of Agreement or Disagreement:</u>

CMS awarded Contract No. GS-23F-0074W/Task Order No. HHSM-500-2011-00006G (Recovery Audit Contractor Services in Support of Medicare Part D) to ACLR on January 13, 2011. The Part D RAC incorporated, in its entirety, ACLR's Performance Work Statement (PWS), which provided audit processes and issues, collection protocols, and appeal processes for the review and collection of Part D improper payments. The RAC Part D contract has been modified several times. Additionally, the Contracting Officer acknowledges that the process for identifying and recovering improper payments made in the prescription drug benefit program have required negotiations and meetings that may not have been anticipated by ACLR. This is consistent with section 2.1.1 New Audit Issue Approval Process in the Statement of Work of the contract which reserves to CMS the authority to review and approve the audit processes and issues.

Section 5 of the contract, entitled "Task Order Price Summary" ,states:

> "All payments shall be paid only on a contingency basis. The recovery audit contractor will receive the percentage specified below of all amounts collected. The contingency fees shall be paid once CMS collects the Medicare overpayments. The recovery audit contractor shall be paid a percentage of the amount that is collected through their recovery efforts (as outlined in Section 1.1 Improper Payment Review Process of Section J.1, Statement of Work). **The recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments not recovered/collected.** (emphasis supplied). The recovery audit contractor shall submit vouchers on a monthly basis (see Attachment 2) with supporting documentation of the recovery. Once verified, CMS shall pay the voucher pursuant to the prompt payment provisions."

There are no provisions in the contract allowing CMS to reimburse ACLR's costs or otherwise pay ACLR for performing audit recovery work for CMS in any manner other than on a contingency fee basis. In the claim and accompanying documents, ALCR has submitted no evidence of collections that would support the payment of a contingency fee. The amounts being requested by ACLR in this claim are completely hypothetical. Since these audit issues were neither developed nor executed, and there were no related collections, there is no way to determine if the audit issues would have been appealed and how the appeal would have been decided. Without documented recoveries, the RAC is not entitled to payment of a contingency fee.

In conclusion, based upon the terms of the task order and applicable federal law, I must deny this claim.

<u>Final Decision</u>

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number.

With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's—

   (1) Small claim procedure for claims of $50,000 or less or, in the case of a small business concern (as defined in the Small Business Act and regulations under that Act), $150,000 or less; or

   (2) Accelerated procedure for claims of $100,000 or less.

Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in 41 U.S.C. 7102(d), regarding Maritime Contracts) within 12 months of the date you receive this decision"; and

(vi) Demand for payment prepared in accordance with 32.604 and 32.605 in all cases where the decision results in a finding that the contractor is indebted to the Government.

<div align="center">

Thank you,

Nicole Hoey -S

Digitally signed by Nicole Hoey -S
DN: c=US, o=U.S. Government, ou=HHS,
ou=CMS, ou=People, cn=Nicole Hoey -S,
0.9.2342.19200300.100.1.1=2000057543
Date: 2015.06.05 15:38:46 -04'00'

Nicole Hoey
Contracting Officer

</div>

8

**SA132**

TAB 85

# IN THE UNITED STATES COURT
## OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **ACLR, LLC**<br>38705 Seven Mile Road<br>Suite 251<br>Livonia, Michigan 48152 | ) ) ) ) ) ) | |
| Plaintiff | ) ) ) | |
| v. | ) ) ) | **Civil Action No. 15-767**<br>(Judge Merrow) |
| **THE UNITED STATES** | ) ) | |
| Defendant | ) ) ) | |

## ACLR, LLC's INITIAL DISCLOSURES

Plaintiff ACLR, LLC ("ACLR"), by and through undersigned counsel, hereby serves its Initial Disclosures.  ACLR preserves any and all privileges that may attach to the information hereby disclosed, and nothing in these Initial Disclosures shall be construed as a waiver thereof.

**A.    Rule  26(a)(1)(A)(i).**    The  following  persons  are  likely  to  have discoverable information that ACLR may use to support its claims or defenses.  ACLR preserves the identification of any and all experts ACLR may call to testify at trial. ACLR also reserves the right to rely on any witness identified by Defendant in its disclosures and further reserves the right to supplement this initial identification of witnesses based upon information obtained during the discovery process and to call other witnesses for impeachment or rebuttal purposes.

| Name | Subject of Discoverable Information | Address and phone number |
|---|---|---|
| Brian Santo,<br>Chris McNamara,<br>Christine Amorosi,<br>Colleen Devoy,<br>Frank Bugg,<br>Karen Grube,<br>Kate Martinez,<br>Kerry Humphrey,<br>Mark Dela Cruz,<br>Missy Britan,<br>Nate Anthony,<br>and Ricky Brathwaite | Knowledgeable about Booz Allen Hamilton (BAH) initial Part D RAC contractual tasking including the associated timelines related to analysis of Medicare Part "D" RAC program, approval of initial audit issues, CMS taskings and direction pertaining to ACLR communication and participation in program development, ACLR Part "D" RAC interview guide tasking, Business Process Model (BPM) development and related PRIS development, and overall development of the BPM to support CMS Final Rule 4159F (4159F), the limitation of ACLR recoveries and the delay of RAC program implementation and execution. | Booz Allen Hamilton, Inc.<br>8283 Greensboro Dr<br>McLean, VA 22102<br><br>Phone:(703) 902-5000 |
| Joseph Chromo<br>and Chris Tillman | Knowledgeable about CAS Severn (CAS) initial contractual tasking and associated timeline related to development of IPRIS, relationship of the BAH BPM, and associated incorporation actions related to iRPIS/PRIS for Part "D" RAC activities. | CAS Severn, Inc.<br>6201 Chevy Chase Drive<br>Laurel, Maryland 20707 |
| Julio Arias | Knowledgeable about NBI MEDIC activities as they pertain to Part D RAC implementation and execution; CMS communications pertaining to the recovery of improper payments and submission of audit issues to review; monthly participation in IDR meetings and discussions pertaining to same; and total NBI MEDIC recoveries and PDEs identified for audit issues associated with Hospice, sales tax, and prescriptions written by veterinarians and concomitant recovery of same. | Health Integrity, LLC<br>9240 Centreville Rd<br>Easton, MD 21601<br><br>Phone: (805) 277-9094 |
| Chris Mendez | Knowledgeable of Part D program implementation and execution; Booz Allen Hamilton (BAH) Business Process Model (BPM) development; iPRIS/PRIS implementation, execution of audit issues including directed or instituted changes to approved audit protocols; adherence to contract pertaining to the validation of recoveries in accordance with NAIRP protocols; contractual, statutory and regulatory basis supporting deviations from contract and approved NAIRP protocols; delays in deliverables; 4159F development and implementation; and associated direction provided to ACLR during program implementation and execution. | Livanta, LLC<br>9090 Junction Drive Suite 9<br>Annapolis Junction, MD 20701 |

2

| | | |
|---|---|---|
| Joe Keochinda | Knowledgeable about CAS and Livanta contractual tasking and associated timelines; related to development of iPRIS/PRIS, relationship of the BAH BPM, and associated incorporation actions to iRPIS/PRIS for Part "D" RAC activities. | Livanta, LLC 9090 Junction Drive Suite 9 Annapolis Junction, MD 20701 |
| Neil Kaufman | Knowledgeable about direction provided to ACLR in regards to Alternative Dispute Resolution (ADR) and conversations with CMS OAGM personnel upon ACLR request. | Department of Health & Human Services Departmental Appeals Board, Alternative Dispute Resolution Division 330 Independence Ave., S.W. Cohen Building, Room G-644 Washington, DC 20201<br><br>Phone: (202) 565-0118 |
| Marnie Dorsey | Knowledgeable of Part D RAC execution and implementation; CMS delays, knowledge of COR duties, responsibilities, and training requirements; ACLR contract requirements and CMS's position that ACLR's contract was merely a proposal and not an executable contract; efforts to include ACLR in contract related execution efforts; activities and discussions pertaining to third party contractors engaged in Part D RAC execution including but not limited to BAH, Livanta, Health Integrity, and CAS that were engaged in Part D RAC implementation efforts. | Centers for Medicare & Medicaid Services (CMS)/ Center for Program Integrity (CPI) Division of Plan Oversight and Accountability (DPOA) 7210 Ambassador Rd Baltimore, MD 21244 I |
| Sonia Brown | Knowledgeable of Part D RAC execution and implementation; CMS delays, knowledge of COR duties, responsibilities, and training requirements; ACLR contract requirements; efforts to include ACLR in contract related execution efforts; activities and discussions pertaining to third party contractors engaged in Part D RAC execution including but not limited to BAH, Livanta, Health Integrity, CAS that were engaged in Part D RAC implementation efforts; communications to ACLR pertaining to Center for Medicare failure to approve audit issues and need to bypass processes for same. | Centers for Medicare & Medicaid Services (CMS)/ Center for Program Integrity (CPI) Division of Plan Oversight and Accountability (DPOA) 7210 Ambassador Rd Baltimore, MD 21244 I |

3

Case 1:15-cv-00767-PEC   Document 54-1   Filed 05/25/18   Page 150 of 514

| | | |
|---|---|---|
| Frank Chartier | Knowledgeable of Part D RAC execution and implementation; CMS delays, knowledge of COR duties, responsibilities, and training requirements; ACLR contract requirements; efforts to include ACLR in contract related execution efforts; activities and discussions pertaining to third party contractors engaged in Part D RAC execution including but not limited to BAH, Livanta, Health Integrity, CAS that were engaged in Part D RAC implementation efforts; elimination of excluded providers and delays in audit execution; and CMS failure to achieve contract deliverables. | Centers for Medicare & Medicaid Services (CMS)/ Center for Program Integrity (CPI) Division of Plan Oversight and Accountability (DPOA) 7210 Ambassador Rd Baltimore, MD 21244 l |
| Cynthia Moreno, Tanette Downs, Camille Brown, Mark Majestic , and Brenda D. Thew, Esq. | Knowledgeable about ACLR Medicare Part "D" program contract (Part "D") implementation, data storage requirements, BAH BPM development, iPRIS/PRIS implementation; new Statement of Work development and implementation and 3 year delay in implementation and contract execution; 4159F development and implementation; issues and obstacles associated with achieving audit issue approval, improper payment recovery, and contract implementation; imputation of CMS error onto ACLR; and associated direction and commitments provided and made to ACLR during program implementation and execution. | Centers for Medicare & Medicaid Services 7500 Security Boulevard Baltimore, MD 21244 |
| Rosalind Abankwah and Capt. Mike Forman, USN | Knowledgeable about ACLR Medicare Part "D" contract implementation, issues and obstacles associated with achieving audit issue approval, improper payment recovery, and contract implementation; imputation of CMS error onto ACLR; approval of alternative evidentiary support submissions for the sole benefit of Express Scripts, Inc and related clients and concomitant elimination of prescription errors utilizing "administrative errors" defense. | Centers for Medicare & Medicaid Services (CMS)/ Center for Program Integrity (CPI) Division of Plan Oversight and Accountability (DPOA) 7210 Ambassador Rd Baltimore, MD 21244 l |

4

SA136

| | | |
|---|---|---|
| Nicole Hoey, Teresa Schultz, Debra Stidham, Georgette Vlangas, Jessica Sanders, Marnie Dorsey, Justin Menefee, Pamela Collins, and Daniel Kane | Knowledgeable about ACLR Part "D" implementation, data storage requirements, BAH BPM development, iPRIS/PRIS implementation; contract execution pertaining to other contractors hired to implement Part D RAC requirements;  new Statement of Work development and implementation and 3 year delay in implementation and contract execution; 4159F development and implementation; issues and obstacles associated with achieving audit issue approval, improper payment recovery, and contract implementation; imputation of CMS error onto ACLR; and associated direction and commitments provided and made to ACLR during program implementation and execution. | Centers for Medicare & Medicaid Services 7500 Security Boulevard Baltimore, MD 21244 |
| Desiree Wheeler | Knowledgeable about Part D RAC Contract; contract execution pertaining to other contractors hired to implement Part D RAC requirements; contract communications to ACLR, November 30, 2011 conference call threatening ACLR upon notification of immediate ACLR contract execution; Marnie Dorsey assertions that ACLR's contract was not binding but rather a "proposal"; and assertions to ACLR of timely CMS contract execution and equitable relief on January 18, 2012. | Centers for Medicare & Medicaid Services 7500 Security Boulevard Baltimore, MD 21244 |
| Cheri Rice | Knowledgeable about Center for Medicare Part D RAC audit issue approval, participation in audit issue walkthrough meetings, personal assertions of DIR recovery immateriality, and internal communications pertaining to same. | Centers for Medicare & Medicaid Services 7500 Security Boulevard Baltimore, MD 21244 |
| Stephanie Hammonds | Knowledgeable about Center for Medicare Part D RAC audit issue approval, participation in audit issue walkthrough meetings, personal assertions that "pharmacists make mistakes... and plan sponsors should not be held accountable to them", and internal communications pertaining to same. | Centers for Medicare & Medicaid Services 7500 Security Boulevard Baltimore, MD 21244 |

5

| | | |
|---|---|---|
| Teresa Dangerfield | Knowledgeable about ACLR/CMS Initial Kick-Off Meeting and related base year implementation including BAH initial contractual tasking and associated timeline related to analysis of Medicare Part "D" RAC program, ACLR Part "D" RAC interview guide tasking, BAH BPM development, provision of Part D payment data, CMS' data warehouse, related PRIS developmental tasking, overall development of the BPM to support 4159F, the limitation of recoveries by ACLR and the delay of RAC program implementation and execution. | Centers for Medicare & Medicaid Services 7500 Security Boulevard Baltimore, MD 21244 |
| Elizabeth Brady | Knowledgeable about BAH initial contractual tasking and associated timeline related to analysis of Medicare Part "D" RAC program, ACLR Part "D" RAC interview guide tasking, BAH BPM development, related PRIS developmental tasking, and overall development of the BPM to support 4159F, the limitation of recoveries by ACLR and the delay of RAC program implementation and execution. | Centers for Medicare & Medicaid Services 7500 Security Boulevard Baltimore, MD 21244 |
| Delois J. Newkirk | Knowledgeable about BAH, CAS and Livanta contractual tasking and associated timeline related to the Part "D" BPM development related PRIS/PRIS developmental tasking, and overall development of the BPM to support 4159F. | Division of Plan Oversight and Accountability Centers for Medicare & Medicaid Services 7500 Security Boulevard Baltimore, Maryland 21244 |
| Dinah Horton | Knowledgeable about provision of Part D payment data to ACLR. | Division of Plan Oversight and Accountability Centers for Medicare & Medicaid Services 7500 Security Boulevard Baltimore, Maryland 21244 |
| Bruce Dixon | Knowledgeable about the contract, Part D RAC systems and security. | ACLR 38705 Seven mile Road Suite 251 Livonia, MI 38152  Phone: (724)744-4400 |
| Christopher Mucke, Jason Barnes, Thais Thomson and Gilbert Mucke | Knowledgeable about the contract, damages, CMS' breach of contract, breach of duty of good faith and fair dealing, Part D RAC implementation and execution. | ACLR 38705 Seven mile Road Suite 251 Livonia, MI 38152  Phone: (724)744-4400 |

6

SA138

B. **Rule 26(a)(1)(A)(ii).** The following list comprises a description by category and location of documents, electronically stored information, and tangible things that are in the possession, custody, and control of ACLR and which ACLR may use to support its claims in accordance with Rule 26(a)(1)(B) of the Federal Rules of Civil Procedure, based upon ACLR's current knowledge.

The foregoing are in the possession of ACLR's counsel or in the possession, custody, or control of ACLR.

| Ref # | Document Location | Document | Date | Page # | Bates Label Identifier(s) | Bates Label Identifier(s) |
|---|---|---|---|---|---|---|
| 1 | Part D RAC - Pre Award Documentation | Original CMS Query | 10/01/10 | 1 | A00001-A00003 | A00001-A00351 |
| | | Sources Sought Notice (SSN) | 10/18/10 | 4 | A00004-A00008 | |
| | | SSN - ACLR Response | 10/29/10 | 9 | A00009-A00020 | |
| | | Original Request for Quotation (RFQ) | 12/02/10 | 21 | A00021-A00130 | |
| | | ACLR RFQ Questions | 12/09/10 | 131 | A00131-A00133 | |
| | | ACLR RFQ & PWS Submission | 12/16/10 | 134 | A00134-A00291 | |
| | | RFQ - Questions & Answers Response | 12/15/10 | 292 | A00292-A00295 | |
| | | RFQ Modification | 12/15/10 | 296 | A00296-A00340 | |
| | | ACLR Revised RFQ Submission | 12/16/10 | 341 | A00341-A00351 | |
| 2 | Part D RAC - Official Contract & Modifications | Original Contract Award | 01/13/11 | 1 | A00352-A00423 | A00352-A00562 |
| | | MOD 000001 - TO Price Change | 08/15/11 | 73 | A00424-A00427 | |
| | | MOD 000002 - BY Extension | 01/12/12 | 77 | A00428-A00429 | |
| | | MOD 000003 - BY Ext & PY07 EP Special Study | 01/31/12 | 79 | A00430-A00436 | |
| | | MOD 000004 - BY Extension & Deadline Elimination | 04/06/12 | 86 | A00437-A00441 | |
| | | MOD 000005 - BY Extension & CO-COR Change | 09/27/12 | 91 | A00442-A00448 | |
| | | MOD 000006 - BY Extension | 02/06/13 | 98 | A00449-A00453 | |

7

| | | | | | | |
|---|---|---|---|---|---|---|
| | | MOD 000007 - BY Extension & Misc | 04/01/13 | 103 | A00454-A00463 | |
| | | MOD 000008 - PY09 DP Special Study | 07/15/13 | 113 | A00464-A00466 | |
| | | MOD 000009 - BY Extension | 09/30/13 | 116 | A00467-A00468 | |
| | | MOD 000010 - BY Extension | 10/31/13 | 118 | A00469-A00470 | |
| | | MOD 000011 - BY Ext & PY08-PY09 EP Review | 11/19/13 | 120 | A00471-A00472 | |
| | | MOD 000012 - BY Extension | 11/27/13 | 122 | A00473-A00474 | |
| | | MOD 000013 - OY 1 Execution - New SOW | 12/31/13 | 124 | A00475-A00515 | |
| | | MOD 000014 - ACLR Project Mgr Change | 05/28/14 | 165 | A00516-A00518 | |
| | | MOD 000015 - CMS Administrative - Invoicing Fee | 10/24/14 | 168 | A00519-A00521 | |
| | | MOD 000016 - OY 2 Execution - Modified SOW | 12/31/14 | 171 | A00522-A00563 | |
| 3 | Part D RAC - Deliverables & Basic Requirements | 2011 Draft Documentation Submission | 02/10/11 | 2 | A00564-A00613 | A00563-A00727 |
| | | 2011 Kick Off Meeting Submission | 02/23/11 | 52 | A00614-A00638 | |
| | | 2011 Final Draft Documentation Submission | 03/03/11 | 77 | A00639-A00660 | |
| | | 2011 Website Documentation | 02/14/11 | 99 | A00661-A00672 | |
| | | 2014 Draft Documentation Submission | 01/06/14 | 111 | A00673-A00690 | |
| | | 2014 Kick Off Meeting Documentation | 01/23/14 | 129 | A00691-A00700 | |
| | | 2015 Draft Documentation Submission | 01/13/15 | 139 | A00701-A00718 | |
| | | 2015 Kick Off Meeting Documentation | 01/28/15 | 157 | A00719-A00727 | |
| 4 | Part D RAC - Monthly Report | January 2011 Monthly Progress Report | 02/10/11 | 2 | A00728 | A00728-A01088 |
| | | February 2011 Monthly Progress Report | 03/16/11 | 47 | A00774 | |
| | | March 2011 Monthly Progress Report | 04/15/11 | 54 | A00781 | |
| | | April 2011 Monthly Progress Report | 05/16/11 | 72 | A00799 | |
| | | May - June 2011 Monthly Progress Report | 07/15/11 | 80 | A00807 | |
| | | July 2011 Monthly Progress Report | 08/15/11 | 82 | A00809 | |
| | | August 2011 Monthly Progress Report | 09/08/11 | 85 | A00812 | |

8

| | | | | | | |
|---|---|---|---|---|---|---|
| | | September 2011 Monthly Progress Report | 10/04/11 | 88 | A00815 | |
| | | October 2011 Monthly Progress Report | 11/04/11 | 90 | A00817 | |
| | | November 2011 Monthly Progress Report | 12/05/11 | 94 | A00821 | |
| | | December 2011 Monthly Progress Report | 01/05/12 | 97 | A00824 | |
| | | January 2012 Monthly Progress Report | 02/08/12 | 103 | A00830 | |
| | | February 2012 Monthly Progress Report | 03/05/12 | 107 | A00834 | |
| | | March 2012 Monthly Progress Report | 04/04/12 | 110 | A00837 | |
| | | April 2012 Monthly Progress Report | 05/07/12 | 114 | A00841 | |
| | | May 2012 Monthly Progress Report | 06/25/12 | 117 | A00844 | |
| | | June 2012 Monthly Progress Report | 07/09/12 | 121 | A00848 | |
| | | July 2012 Monthly Progress Report | 08/10/12 | 124 | A00851 | |
| | | December 2013 Monthly Progress Report | 01/15/14 | 129 | A00856 | |
| | | January 2014 Monthly Progress Report | 02/12/14 | 133 | A00860 | |
| | | February 2014 Monthly Progress Report | 03/13/14 | 139 | A00866 | |
| | | March 2014 Monthly Progress Report | 04/04/14 | 157 | A00884 | |
| | | April 2014 Monthly Progress Report | 05/02/14 | 171 | A00898 | |
| | | May 2014 Monthly Progress Report | 06/13/14 | 186 | A00913 | |
| | | July 2014 Monthly Progress Report | 08/13/14 | 196 | A00923 | |
| | | August 2014 Monthly Progress Report | 09/05/14 | 271 | A00998 | |
| | | September 2014 Monthly Progress Report | 10/02/14 | 286 | A01013 | |
| | | October 2014 Monthly Progress Report | 11/11/14 | 307 | A01034 | |
| | | November 2014 Monthly Progress Report | 12/01/14 | 323 | A01050 | |
| | | December 2014 Monthly Progress Report | 01/12/14 | 342 | A01069 | |
| 5 | Part D RAC - HPMS RAC & Reopening Memos | HPMS Memo - Implementation of Part D RAC | 05/31/11 | 2 | A01090 | A01089-A01109 |
| | | HPMS Memo - Audit of Excluded Providers & Duplicates | 04/12/12 | 3 | A01091 | |
| | | HPMS Memo - Website Correction | 05/07/12 | 4 | A01092 | |

9

**SA141**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | HPMS Memo - PY07 Reopening Notification | 04/29/13 | 5 | A01093 | |
| | | HPMS Memo - PY08-PY09 EP Audit & PY07 EP Appeals | 06/14/13 | 7 | A01095 | |
| | | HPMS Memo - PY07 Reopening - RAC Offset | 07/24/13 | 8 | A01096 | |
| | | HPMS Memo - PY10-PY11 EP Commencement | 08/07/13 | 10 | A01098 | |
| | | HPMS Memo - PY08-PY09 EP Collection | 12/19/13 | 11 | A01099 | |
| | | HPMS Memo - PY08 Reopening Notification | 12/19/13 | 13 | A01101 | |
| | | HPMS Memo - PY09-PY11 UP Audit & Appeals | 02/27/14 | 15 | A01103 | |
| | | HPMS Memo - PY09-PY11EP Non Appeal Collections | 08/27/14 | 16 | A01104 | |
| | | HPMS Memo - PY12 UP Collections & PY09 UP Credits | 11/20/14 | 17 | A01105 | |
| | | HPMS Memo - PY09 Reopening Notification | 12/19/14 | 20 | A01108 | |
| 6 | Part D RAC - Reports to Congress | 2010 Annual Report to Congress - Recovery Audits | 12/31/10 | 3 | A01112-A01151 | A01110-A01294 |
| | | 2011 Annual Report to Congress - Recovery Audits | 12/31/11 | 43 | A01152-A01193 | |
| | | 2012 Annual Report to Congress - Recovery Audits | 12/31/12 | 85 | A01194-A01243 | |
| | | 2013 Annual Report to Congress - Recovery Audits | 12/31/13 | 135 | A01244-A01294 | |
| 7 | Part D RAC - NAIRP Packages | Invalid Prescribers - NAIRP Submission | 08/29/13 | 2 | A01296 | A01295-A01648 |
| | | Invalid Prescribers - NAIRP Q&A | 10/23/13 | 7 | A01301 | |
| | | Invalid Prescribers - NAIRP Decision | 12/13/13 | 14 | A01308 | |
| | | Duplicate Payments - NAIRP Submission | 01/02/14 | 16 | A01310 | |
| | | Duplicate Payments - NAIRP Q&A | 01/22/14 | 20 | A01314 | |
| | | Duplicate Payments - NAIRP Decision | 04/18/14 | 72 | A01366 | |
| | | Duplicate Payments - NAIRP 2nd Decision | 05/06/14 | 79 | A01373 | |
| | | Duplicate Payments - NAIRP 3rd Decision | 05/28/14 | 87 | A01381 | |
| | | Excluded Pharmacists - NAIRP Submission | 01/02/14 | 89 | A01383 | |
| | | Excluded Pharmacists - NAIRP Q&A | 01/22/14 | 103 | A01397 | |
| | | Excluded Pharmacists - NAIRP Decision | 02/19/14 | 105 | A01399 | |

10

|  |  | DEA Schedule Refill Errors LTC - NAIRP Submission | 02/04/14 | 109 | A01403 |  |
|  |  | DEA Schedule Refill Errors LTC - NAIRP Q&A | 02/21/14 | 139 | A01433 |  |
|  |  | DEA Schedule Refill Errors LTC - NAIRP Decision | 04/21/14 | 147 | A01441 |  |
|  |  | Deactivated Prescribers - NAIRP Submission | 02/04/14 | 150 | A01444 |  |
|  |  | Deactivated Prescribers - NAIRP Q&A | 03/18/14 | 153 | A01447 |  |
|  |  | Deactivated Prescribers - Revised NAIRP | 04/16/14 | 167 | A01461 |  |
|  |  | Deactivated Prescribers - NAIRP Decision | 05/19/14 | 173 | A01467 |  |
|  |  | Home Hospice - NAIRP Submission | 03/07/14 | 177 | A01471 |  |
|  |  | Home Hospice - NAIRP Q&A | 03/21/14 | 200 | A01494 |  |
|  |  | Home Hospice - NAIRP Decision | 04/18/14 | 204 | A01498 |  |
|  |  | Incarcerated Beneficiaries - NAIRP Submission | 03/07/14 | 207 | A01501 |  |
|  |  | Incarcerated Beneficiaries - NAIRP Q&A | 03/17/14 | 234 | A01528 |  |
|  |  | Incarcerated Beneficiaries - NAIRP Decision | 05/22/14 | 251 | A01545 |  |
|  |  | DIR - NAIRP Submission | 4/10/2014 | 255 | A01549 |  |
|  |  | DIR - NAIRP Q&A | 4/25/2014 | 260 | A01554 |  |
|  |  | DIR - NAIRP Revised NAIRP | 6/23/2014 | 283 | A01577 |  |
|  |  | Expired Prescriptions - NAIRP Submission | 08/25/14 | 286 | A01580 |  |
|  |  | Expired Prescriptions - NAIRP Q&A | 10/09/14 | 295 | A01589 |  |
|  |  | Expired Prescriptions - NAIRP Decision - 1st Approval | 12/22/14 | 320 | A01614 |  |
|  |  | Expired Prescriptions - NAIRP Decision - 2nd Q&A | 01/26/14 | 343 | A01637 |  |
|  |  | Expired Prescriptions - Technical Direction | 01/29/15 | 348 | A01642 |  |
|  |  | Expired Prescriptions - ACLR Rebuttal | 01/30/15 | 351 | A01645 |  |
| 8 | Part D RAC - CMS Audit Issue Guidance | Invalid Prescribers - HPMS PDE must have Valid Identifier | 05/01/09 | 3 | A01651 | A01649-A01764 |
|  |  | Invalid Prescribers - HPMS - Active & Valid Identifier | 10/01/12 | 7 | A01655 |  |
|  |  | Invalid Prescribers - HPMS - Active & Valid Identifier Reminder | 02/04/13 | 12 | A01660 |  |
|  |  | Invalid Prescribers - HPMS - Edit 833 | 09/20/13 | 14 | A01662 |  |
|  |  | Incarcerated Beneficiaries - HPMS | 12/05/14 | 16 | A01664 |  |

11

SA143

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Incarcerated Beneficiaries - Managed Care Manual - Ch 2 | 11/16/11 | 17 | A01665 | |
| | | Incarcerated Beneficiaries - Managed Care Manual - Ch 17-D | 10/31/03 | 32 | A01680 | |
| | | Home Hospice - HPMS - Preventing Part D Payment | 10/22/10 | 43 | A01691 | |
| | | Home Hospice - HPMS - Correct Part D Payment Errors | 07/26/13 | 44 | A01692 | |
| | | Home Hospice - HPMS - Part D Payment Clarification | 12/06/13 | 45 | A01693 | |
| | | Home Hospice - HPMS - Must Recover & Retrospective Reviews | 03/10/14 | 58 | A01706 | |
| | | Home Hospice - HPMS - Retrospective Reviews | 07/18/14 | 75 | A01723 | |
| | | Deactivated Prescribers -HPMS No One Year Requirement | 02/04/13 | 89 | A01737 | |
| | | Deactivated Prescribers -HPMS One Year Requirement | 09/20/13 | 91 | A01739 | |
| | | Excluded Providers - HPMS Dispensing of Part D Drugs | 03/29/10 | 93 | A01741 | |
| | | DEA Controlled Substances - HPMS Final Call Letter | 04/01/13 | 98 | A01746 | |
| | | DEA Controlled Substances - HPMS | 05/21/13 | 115 | A01763 | |
| 9 | Part D RAC - DVC SOW & Validation Process | DVC SOW & Validation Process | 03/14/12 | 1 | A01765- A01788 | A01765- A01788 |
| 10 | CMS - Guidelines, Rules & Regulations | CMS Updated Instructions - PDE Submissions | 04/27/06 | 1 | A01789- A01882 | A01789- A01882 |
| 11 | Booz Allen Hamilton Documentation | KO Meeting Agenda - Jan 3 2012 BPM Discussion Email | 12/29/11 | 2 | A01884 | A01883- A01984 |
| | | Meeting Agenda - Jan 3 2012 BPM Discussion | 12/29/11 | 3 | A01885 | |
| | | December 2011 RPD BPM - BAH | 12/08/11 | 4 | A01886- A01897 | |
| | | October 2011 BAH iPRIS Training - Release 1 | 10/25/11 | 16 | A01898- A01946 | |
| | | September 2011 Business Process Model - BAH | 09/01/11 | 65 | A01947- A01950 | |
| | | ACLR Responses - BAH Interview Guide Email | 07/07/11 | 69 | A01951 | |
| | | ACLR Response to Booz Allen Interview Guide Questions | 07/07/11 | 70 | A01952- A01971 | |
| | | BAH Bi-Weekly Status Meeting Notes - ACLR Email | 05/25/11 | 90 | A01972 | |

12

SA144

| | | | | | |
|---|---|---|---|---|---|
| | | BAH Bi-Weekly Status Meeting Notes - ACLR | 05/25/11 | 91 | A01973-A01974 |
| | | BAH-ACLR Interview Guide - COR Email | 05/13/11 | 93 | A01975 |
| | | Booz Allen ACLR Interview Guide | 05/13/11 | 94 | A01976-A01979 |
| | | KO Meeting Minutes - BAH Participation Email | 02/28/11 | 98 | A01980 |
| | | KO Meeting Minutes - BAH Participation | 02/28/11 | 99 | A01981-A01984 |
| 12 | PRIS Documentation | BAH iPRIS Training - Release 1 | 10/25/11 | 2 | A01986-A02034 |
| | | CMS - PRIS Moved Into Production | 06/28/12 | 51 | A02035 |
| | | CMS - PRIS User Manual | 07/09/12 | 52 | A02036 |
| | | CMS SOW Deviation - ACLR Testing of PRIS | 07/17/12 | 53 | A02037 |
| | | PRIS Implementation Error - Indication to Use PRIS | 10/02/12 | 55 | A02039-A02044 |
| | | CMS Request to Attend PRIS 1 Training | 02/24/13 | 61 | A02045 |
| | | ACLR Response to File Sizes in PRIS | 09/24/13 | 63 | A02047 |
| | | CMS Request for CMS Integration of PRIS 2 | 11/27/13 | 64 | A02048-A02049 |
| | | ACLR Response to PRIS Status Request | 01/28/14 | 66 | A02050-A02051 |
| | | ACLR-CMS Ongoing PRIS Implementation Issues | 02/09/15 | 74 | A02052-A02061 |
| 13 | RAC Report of Findings - Audit Issues | RAC Draft Report of Findings - Duplicate Payments | Pending | 1 | A02062-A02309 |
| | | RAC Draft Report of Findings - PY10-PY11 DEA Schedule Refill Audit | Pending | 249 | A02310-A20433 |
| | | RAC Report of Findings - PY07 Excluded Provider Audit | 04/26/13 | 373 | A02434-A02510 |
| | | RAC Report of Findings - PY08-PY11 Excluded Provider Audit | 05/07/13 | 450 | A02511-A02551 |
| | | RAC Report of Findings - PY09-PY11 Unauthorized Prescriber Audit | 10/31/14 | 491 | A02552-A02595 |
| | | RAC Report of Findings - PY12 Unauthorized Prescriber Audit | 01/20/15 | 535 | A02596-A02627 |
| 14 | Part D RAC - Annual Reports | Part D RAC - 2011 Annual Report.pdf | 12/31/11 | 1 | A02628-A02901 |
| | | Part D RAC - 2012 Annual Report.pdf | 12/31/12 | 275 | A02902-A03015 |
| | | Part D RAC - 2013 Annual Report.pdf | 12/31/13 | 389 | A03016-A03148 |
| | | Part D RAC - 2014 Annual Report.pdf | 12/31/14 | 522 | A03149-A04116 |

Note: The range column for section 12 (A01985-A02061), section 13 (A02062-A02627), and section 14 (A02628-A04116) spans their respective groups.

13

| 15 | Part D RAC - Spreadsheets | Part D RAC - Contract Calendar | N/A | 1 | A04117 | A04117- A04146 |
|---|---|---|---|---|---|---|
| | | Part D RAC - Contract Modification Summaries | N/A | 2 | A04118- A04119 | |
| | | Part D RAC - Draft SOW Summary | N/A | 4 | A04120 | |
| | | Part D RAC - Contract Breaches | N/A | 5 | A04121- A04122 | |
| | | Part D RAC - NAIRP Summaries | N/A | 7 | A04123- A04125 | |
| | | Part D RAC - Process Delays | N/A | 10 | A04126 | |
| | | Part D RAC - PY07 Duplicate Payments Totals | 12/07/11 | 11 | A04127- A04137 | |
| | | Part D RAC - PY07 Excluded Provider Totals | 02/15/12 | 22 | A04138- A04142 | |
| | | Part D RAC - Kick Off Meeting (Audio CD) | 02/23/11 | 27 | A04143 | |
| | | Part D RAC - Evidence Listing | N/A | 28 | A04144- A04146 | |

ACLR reserves the right to supplement its initial identification of documents based upon information obtained during the discovery process and to rely on other documents for impeachment or rebuttal purposes. ACLR does not waive the attorney-client privilege or the protection of the work product doctrine as to any item listed above.

**C.     Rule 26(a)(1)(A)(iv).**    The following is a computation of ACLR's damages.

ACLR is entitled to $23,535,618 representing amounts associated with the contingency fee for its successful identification of $313, 808,241 in improper payments related to Plan Year 2007 Duplicate Payments during the successful execution of the base period of the Contract. Moreover, ACLR is entitled to the amount of $2,668,553 representing amounts associated with direct labor costs based on ACLR's approved GSA Schedule rates and contract overhead requirements, reasonable expectations of profit, and net of amounts already collected arising from ACLR efforts during subsequent modifications of the Contract. Also, that ACLR is entitled to the amount of $2,209,146

14

representing amounts associated with the contingency fee for its successful identification of $15,909,550 in improper payments related to the approved and subsequently cancelled Plan Year 2010 Duplicate Payment audit.

Lastly, ACLR is entitled to additional amounts representing an equitable adjustment to the Contract for internal corporate expenses related to the preparation and filing of this Claim and amounts for reasonable attorney's fees and related expenses. As of the date of the filing of this claim that sum is $93,274.

ACLR reserves the right to supplement or revise its partial computation based upon information obtained during the discovery process.

Dated:  March 21, 2016

Respectfully submitted,

DAVID, BRODY & DONDERSHINE, LLP

Thomas K. David, Esq.
John A. Bonello, Esq.
12355 Sunrise Valley Drive, Suite 650
Reston, VA 20191
Phone:  703-264-2220
Fax: 703-264-2226

Attorneys for Plaintiff ACLR, LLC

15

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on this 21st day of March 2016, I caused a copy of the

Plaintiff, ACLR, LLC's Initial Disclosures to be emailed and mailed via UPSP to the

following:

Jessica R. Toplin, Esq.
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
PO Box 480
Ben Franklin Station
Washington, D.C. 20044

Jessica.Toplin@usdoj.gov


Thomas K. David

16

TAB 86



*38705 Seven Mile Rd.*
*Suite 251*
*Livonia, Michigan 48152*
*Ph: 734.744.4400  Fax: 734.744.4150*

September 10, 2015

Nicole Hoey
Department of Health & Human Services
Centers for Medicare and Medicaid
7500 Security Blvd; M/S C2-21-15
Baltimore, MD  21244-1850

To: Contracting Officer - Hoey:

ACLR, LLC ("ACLR"), hereby requests the Contracting Officer's Final Decision in accordance with the Contract Disputes Act of 1978, as amended, 41 USC §§601, 605(a) (the "CDA") and FAR Subpart 33.2, with respect to the breaches of the terms of the above-referenced Contract by the Center for Medicaid and Medicare Services ("CMS" or the "Government"). ACLR seeks a final determination by your office on the propriety of the CMS' actions.

<u>**FACTS**</u>

1. On December 31, 2014, CMS executed Modification 000016, which incorporated a Statement of Work (OY2 SOW) that required the RAC to track Part D payment PDE records that were identified as UFR and restricted from Part D RAC requirements.

2. OY2 SOW Section 1.2.3 defines UFR criteria as Terminated Contracts, Contracts Already Deemed to Have No Findings, Contracts Already Included in an Offset, and Contracts Already Included in an Appeal.

3. On January 7, 2014, CMS commenced submitting PY12 PDEs to ACLR; all PDEs associated with Terminated Contracts were separately tracked and no additional RAC requirements were performed on these PDEs by ACLR.

4. During 2014, ACLR submitted 9 New Audit Issue Review Packages (NAIRPs) for improper payments totaling $490,924,393.  Each of these NAIRPs was denied or approved and subsequently rescinded by CMS and no additional UFR PY12 PDEs were identified utilizing Section 1.2.3 OY2 SOW requirements.

5. On or about March 30, 2015, ACLR received PY13 PDE data from CMS.

6. On March 31, 2015, CMS issued "*IDR End User Notification #15-19*", which stated that PY13 PDE data was incomplete, that the file would be updated to include missing data, and that a notification would be provided upon completion of the update.

7.  On June 5, 2015, CMS resubmitted updated PY13 PDE data to ACLR; all PDEs associated with Terminated Contracts were separately tracked and no additional RAC requirements were performed on these PDEs by ACLR.

8.  As of August 31, 2015, ACLR has submitted 4 NAIRPs for improper payments totaling $794,589,240.  Each of these audit issues was denied or is currently pending approval or denial by CMS; no additional UFR PY12-PY13 PDEs were identified utilizing Section 1.2.3 OY2 SOW requirements.

9.  On October 29, 2010, ACLR notified CMS of improper sales tax computations as an audit issue subject to recovery.

10.  On March 10, 2015, ACLR commenced development of the PY12-PY13 Sales Tax Errors NAIRP including a comprehensive multistate statutory review to determine the state and local taxability of Part D PDEs.

11.  On March 10, 2015, ACLR commenced a review of all sales tax related CMS actions and identified 4 CMS memorandums dated December 21, 2010, August 13, 2010, September 1, 2010, and April 11, 2011 pertaining to PY10 improper Louisiana sales tax collections by pharmacies and the subsequent resubmission of corrected PDES for affected transactions.  No other CMS actions related to sales tax on Part D PY07-PY13 PDE were identified.

12.  On August 21, 2015, ACLR submitted a New Audit Issue Review Package (NAIRP) for PY12-PY13 Sales Tax Errors encompassing improper payments where CMS paid for sales tax in states with no sales tax is imposed, Louisiana and Minnesota where prescription drugs are exempt from sales tax, and in states where the gross sales tax exceeded 50 percent of the drug cost.

13.  On September 3, 2015, CMS informed ACLR that its NAIRP for PY12-PY13 Sales Tax Errors was denied in accordance with OY2 SOW Section 1.2.3.

14.  On January 22, 2014, CMS notified ACLR the MEDIC does not recover improper payments and ACLR was permitted to recover improper payments pertaining to veterinarians, previously identified by the MEDIC, in Unauthorized Prescriber Reviews previously conducted by ACLR.

15.  CMS did not notify ACLR that it had contracted with another contractor for the recovery of Part D improper payments.

16.  As of the date of this filing, CMS has not provided ACLR with a listing of the Contracts Already Deemed to Have No Findings, Contracts Already Included in an Offset, and Contracts Already Included in an Appeal as identified by the contractor hired by CMS to recover improper payments associated with improper sales tax collections.

17.  As of the date of this filing, CMS has not provided ACLR a listing of the PDEs that have been identified by the by the contractor hired by CMS to recover improper payments associated with improper sales tax collections to ensure that duplicative audit efforts on identified PDEs are also not selected for other ACLR audit issue submissions.

18. As of the date of this filing, ACLR was unable to identify any CMS internal or public notifications to plan sponsors or other Part D RAC stakeholders that it had contracted with another contractor for the recovery of Part D improper payments.

19. As of the date of this filing, ACLR was unable to identify any CMS internal or public notifications pertaining to the recovery of improper payments related to sales tax collections issued subsequent to ACLR PY12-PY13 Sales Tax Errors NAIRP submission.

20. ACLR identified $98,923,096 in Minnesota improper sales tax collections from beneficiaries and/or the subsequent improper collection of sales taxes from plan sponsors and/or related downstream entities for PY07-PY13 Part D payment PDEs; Medicare Part D improper payments totaled $1,497,577,277.

21. ACLR identified $12,918,782 in Louisiana improper sales tax collections from beneficiaries and/or the subsequent improper collection of sales taxes from plan sponsors and/or related downstream entities for PY07-PY13 Part D payment PDEs; Medicare Part D improper payments totaled $164,124,020.

22. ACLR identified $305,419 in Alaska, Delaware, Montana, New Hampshire, and Oregon improper sales tax collections from beneficiaries and/or the subsequent improper collection of sales taxes from plan sponsors and/or related downstream entities for PY07-PY13 Part D payment PDEs; Medicare Part D improper payments totaled $8,814,920.

23. ACLR identified $3,173,601 in sales tax collections by pharmacies for PY07-PY13 Part D payment PDEs where the sales tax rate exceeded 50%; Medicare Part D improper payments totaled $2,168,577.

## CONCLUSIONS

CMS clearly breached the Contract with respect to its express obligations thereunder in that it had no legal justification to deny the NAIRP for PY12-PY13 Sales Tax Errors without prior identification of PDE records as UFR. As a result of this breach, ACLR is entitled to damages.

CMS clearly breached the Contract with respect to its express obligations thereunder in that it had no legal justification to contract with another entity to recover improper payments on PY12-PY13 Sales Tax Errors for the Part D RAC Program. As a result of this breach, ACLR is entitled to damages.

CMS clearly breached the Contract with respect to its implied duty of good faith by in that it did not identify and communicate to ACLR all UFR PDEs contained within PY12-PY13 PDE payment data resulting in the expenditure of resources by ACLR on PDEs for which no recovery is permissible. As a result of this breach, ACLR is entitled to damages.

CMS clearly breached the Contract with respect to its implied duty of good faith by engaging another contractor to recover sales tax improper payments for an issue previously identified by ACLR or failing to notify ACLR of MEDIC related actions under the purview of ACLR and subsequently misrepresented CMS ongoing recovery actions as it relates to the specific sales tax issues and associated improper payments identified for PY12-PY13 Sales Tax Errors NAIRP. As a result of this breach, ACLR is entitled to damages.

**RELIEF REQUESTED**[1]

1.  A determination that ACLR is entitled to the amount of $79,302,575 representing the contractual contingency fee amount related to $658,354,795 improper payments identified in the PY12-PY13 Sales Tax Errors NAIRP submission.

2.  A determination that ACLR is entitled to an additional amount of $12,000 representing an equitable adjustment to the Contract for estimated internal corporate expenses related to the preparation and filing of this Claim, as well as an amount for reasonable attorney's fees and related expenses

3.  A determination that ACLR is entitled to interest on the above amounts from the date of the submission of this claim, in accordance with 41 U.S.C. §611.

Respectfully submitted,

_____

**CERTIFICATION**

I certify that the foregoing Claim by ACLR, dated September 10, 2015, is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable, and that I am duly authorized to certify the Claim on behalf of the contractor.

_____
BY: Christopher A. Mucke
TITLE: Managing Principal, ACLR

September 10, 2015

---

[1] *ACLR reserves the right to supplement this Claim and seek further damages.*

# TAB 87

ORIGINAL

**FILED**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

#CFC100001871

MAR  9 2016

U.S. COURT OF
FEDERAL CLAIMS

| | | |
|---|---|---|
| **ACLR, LLC**<br>38705 Seven Mile Road<br>Suite 251<br>Livonia, Michigan 48152 | ) ) ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | **No.**   16-309 C |
| **THE UNITED STATES** | ) ) | |
| Defendant | ) ) ) | |

## COMPLAINT

Plaintiff ACLR, LLC ("ACLR"), by and through undersigned counsel, hereby files its

Complaint against Defendant the United States of America and states as follows:

### PARTIES

1.      ACLR is a Michigan limited liability company with a principal place of business

at 38705 Seven Mile Road, Suite 251, Livonia, Michigan 48152.

2.      Defendant is the United States of America acting by and through the United

States Department of Health & Human Services, Center for Medicare & Medicaid Services

("CMS").

### JURISDICTION

3.      This Court has jurisdiction over the subject matter of this action pursuant to the

Tucker Act, 28 U.S.C. 1491 and the Contract Disputes Act ("CDA"), 41 U.S.C. 7101-7109.

**BACKGROUND**

4.      Title I of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA") was signed into law on December 3, 2003. The MMA established a new voluntary outpatient prescription drug benefit under Part D of Title XVIII of the Social Security Act ("SSA"). Coverage for the drug benefit is provided by private prescription drug plans that offer drug-only coverage or through Medicare Advantage ("MA") plans that offer both prescription drug and health care coverage.

5.      Section 6411(b) of the Affordable Care Act ("ACA") expanded the use of the statutory 1893 Recovery Audit Contract provisions to utilize Recovery Audit Contracts under the Medicare Integrity Program to identify underpayments and overpayments and recoup overpayments under the Medicare program associated with medications for which payment is made under Part D of Title XVIII of the SSA.

6.      Section 6411(b) of the ACA required that CMS enter into contracts to conduct recovery audits "no later than December 31, 2010" and that such contracts include, inter alia, the requirement that recovery audit contractors: (a) ensure prescription drug plans implemented antifraud plans and review the effectiveness of such plans; (b) examine claims for reinsurance payments to ascertain whether incurred costs were in excess of allowable costs; and (c) review estimates pertaining to the enrollment of high cost beneficiaries against actual beneficiaries enrolled.

7.      On January 13, 2011, CMS awarded Contract No. GS-23F-0074W/Task Order No. HHSM-500-2011-00006G to ACLR ("Part D RAC").

8.      On December 31, 2013, CMS awarded the first option year under the Part D RAC to ACLR ("OY1 SOW").

9. On December 31, 2014, CMS awarded the second option year under the Part D RAC to ACLR ("OY2 SOW").

10. OY1 SOW and OY2 SOW Section 1.2.3 restricted ACLR from reviewing records pertaining to terminated contracts and contracts already deemed to have no findings or included in an offset or an appeal that have are "already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue" ("Unavailable for Review" or "UFR").

11. CMS contracts with a National Benefit Integrity ("NBI") MEDIC that is "responsible for preventing, detecting, and deterring Part D fraud, waste, and abuse."

12. On November 13, 2013, CMS notified ACLR that it could pursue recoveries pertaining to veterinarian written prescriptions that had been previously identified by the NBI MEDIC on the basis that "recoveries are not made until the CY is reopened and the reprocessing of the reconciliation occurs."

13. On June 9, 2015, CMS provided completed 2013 Part D payment claims data ("PY13 PDEs") to ACLR.

14. MINN. STAT. § 297A.67(7) (2012) provides an exemption for sales of "drugs and medical devices for human use."

15. MINN. STAT. § 297A.99(7) (2012) prohibits political subdivisions from imposing "a general sales tax" on any "goods or services that are otherwise exempt from taxation" under state law.

16. MINN. STAT. § 297A.67(7) (2013) provide a tax exemption for items covered by "Medicare as defined under title XVIII of the Social Security Act, United States Code, title 42, section 1395, et seq. commencing on dates after June 30, 2013.

17.     Subject to "health care provider taxes under sections 295.50 to 295.59," MINN. STAT. § 295.53(1)(a)(1) excludes, from gross revenues  for "payments received for services provided under the Medicare program, including payments received from the government, and organizations governed by sections 1833 and 1876 of title XVIII of the federal Social Security Act, United States Code, title 42, section 1395, and enrollee deductibles, coinsurance, and co-payments, whether paid by the Medicare enrollee or by a Medicare supplemental coverage as defined in section 62A.011, subdivision 3, clause (10)."

18.     ACLR identified $30,492,677 in improper Minnesota sales tax charges on 38,145,596 Part D claims included in 2012-2013 Medicare Part D claim reimbursements totaling $889,596,525 to plan sponsors.

19.     ACLR identified 3,514 pharmacies and 613 contracts receiving payments for Part D claims included in 2012-2013 Medicare Part D claim reimbursements for improper Minnesota sales tax charges.

20.     ACLR identified many instances where Minnesota pharmacies had both billed and not billed sales taxes on prescription drugs on the same day.

21.     LA. REV. STATE. ANN. § 47:305(D)(1)(j)(2011) exempts state sales and use taxes on "drugs prescribed by a physician or dentist."

22.     LA. REV. STATE. ANN. § 47:301(10)(u)(2011) prohibit the levying of local sales and use taxes on sales of "tangible personal property if such sale is made under the provisions of Medicare."

23.     ACLR identified $243,059 in improper sales tax charges by Louisiana pharmacies on 2,045,929 Part D claims included in 2012-2013 Medicare Part D claim reimbursements totaling $32,032,166 to plan sponsors.

24.     ACLR identified 1,441 pharmacies and 93 contracts receiving payments for Part D claims included in 2012-2013 Medicare Part D claim reimbursements for improper Louisiana sales tax charges.

25.     The states of Alaska, Delaware, Montana, New Hampshire, and Oregon have no applicable state or local sales taxes that were imposed during the Part D RAC.

26.     ACLR identified $150,415 sales tax charges by pharmacies located in states with no sales or use taxes on 2,292 Part D claims included in 2012-2013 Medicare Part D claim reimbursements totaling $5,518,803 to plan sponsors.

27.     ACLR identified 29 pharmacies and 43 contracts receiving payments for improper Alaska, Delaware, Montana, New Hampshire, and Oregon sales tax charges.

28.     During its review of 2012-2013 Part D claims data, ACLR identified 264,119 claims and $2,009,005 in sales tax payments arising from the imposition of sales taxes from tax rates exceeding 50% included in 2012-2013 Medicare Part D claim reimbursements totaling $3,706,582 to plan sponsors.

29.     During its review of 2007-2008 Part D claims data, ACLR identified 17,860,312 claims totaling $23,421,962 in erroneous Minnesota sales tax charges by 3,417 pharmacies and 454 contracts.

30.     During its review of 2009-2011 Part D claims data, ACLR identified 34,791,275 claims totaling $44,556,648 in erroneous Minnesota sales tax charges by 3,339 pharmacies and 845 contracts.

31.     On August 21, 2015, ACLR submitted a New Audit Issue Review Package ("NAIRP") to CMS, which identified improper payments arising from sales tax overpayments ("Sales Tax NAIRP") in 2012-2013 Part D claims data.

32.     On September 3, 2015, CMS denied the Sales Tax NAIRP on the basis that this audit issue is currently open and active with another CMS contractor. According to Section 1.2.3 of the SOW, "CMS/CPI consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue."

33.     On September 10, 2015, ACLR submitted a claim under the CDA alleging contract breach by CMS on the basis that CMS had not identified these claim records as "UFR."

34.     CMS denied ACLR's claim on January 15, 2016 noting "the NBI MEDIC had commenced fraud and abuse work with respect to the Sales Tax Error Audit in October 30, 2014."

35.     The NBI MEDIC audits are not subject to Part D RAC regulations and appeal proceedings as outlined under CMS 4159-F.

36.     On January 19, 2016, ACLR contacted the NBI MEDIC regarding ACLR's concerns pertaining to possible sales tax fraud perpetuated on the State of Minnesota.

37.     On January 19, 2016, ACLR was informed by the NBI MEDIC that it had completed its initial review but that CMS had recently directed the NBI MEDIC "not to expend any additional resources" on the issue and that "CMS is considering various options at this time."

### Count I:
### Breach of Contract

38.     ACLR incorporates and restates here the allegations set forth in Paragraphs 1 through 37 of the Complaint.

39.     ACLR and CMS had a contract for ACLR to perform certain work for CMS.

40.     CMS breached the contract by, among other things, the following:

     a.  failing to notify ACLR of records that were unavailable for review;

      b.  falsifying the disposition of sales tax improper payments identified by ACLR for recovery by asserting that 40,457,936 Part D claims totaling $930,854,076 had been "corrected/reimbursed elsewhere in CMS";

      c.  failing to permit ACLR to recover improper payments pertaining to illegal sales tax collections that had not been identified/corrected;

      d.  utilizing the MBI MEDIC to conduct recovery audits outside of express contracted terms and conditions; and

      e.  mitigating the impact of the Part D RAC program on plan sponsors by impeding the execution of recovery audit activities by ACLR concerning improper sales tax payments.

41.    As a direct and proximate result of the CMS's actions, ACLR has suffered, and will suffer, substantial losses and damages.

## Count II
## Breach of Duty of Good Faith and Fair Dealing

42.    ACLR incorporates and restates here the allegations set forth in Paragraphs 1 through 41 of the Complaint.

43.    CMS owed ACLR a fiduciary duty based upon their relationship

44.    CMS breached its duty of good faith and fair dealing to ACLR by, among other things, the following:

      a.  failing to notify ACLR of records that were unavailable for review;

      b.  falsifying the disposition of sales tax improper payments identified by ACLR for recovery by asserting that 40,457,936 Part D claims totaling $930,854,076 had been "corrected/reimbursed elsewhere in CMS;"

    c.   failing to permit ACLR to recover improper payments pertaining to illegal sales tax collections that had not been identified/corrected; and

    d.   impeding the execution of recovery audit activities by ACLR concerning improper sales tax payments.

45.    As a direct and proximate result of CMS's breach of its duty of good faith and fair dealing, ACLR has suffered, and will suffer, substantial losses and damages.

WHEREFORE, Plaintiff ACLR prays for judgment against Defendant as follows:

1.    Damages in the amount of not less than $112,002,489;

2.    The costs of pursuing the relief sought herein, including, but not limited to, attorney's fees and costs pursuant to the Equal Access to Justice Act; and

3.    Additional relief as the Court deems just and proper.


Dated: March 9, 2016


Respectfully submitted,

DAVID, BRODY & DONDERSHINE, LLP


Thomas K. David, Esq.
John A. Bonello, Esq.
12355 Sunrise Valley Drive, Suite 650
Reston, VA 20191
Phone: 703-264-2220
Fax: 703-264-2226

Attorneys for Plaintiff ACLR, LLC

# TAB 88

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

| ACLR, LLC | ) | |
|---|---|---|
| | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **Civil Action No. 16-309** |
| | ) | (Judge Campbell-Smith) |
| THE UNITED STATES | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**PLAINTIFF ACLR, LLC'S RULE 26 (a)(2)(C) DISCLOSURES**

Pursuant to this Court's June 30, 2017 Order and Rule 26(a)(2)(C)(i) and (ii), Chris Mucke of ACLR, LLC is expected to present evidence on the following subject matters and testify to the following facts and opinions:

A.  Subject Matter of Mr. Mucke's Expert Testimony

Mr. Mucke will testify as to the permissibility of CMS payments to plan sponsors in the Medicare Prescription Drug Benefit Program (Part D) for claims pertaining to state sales, use, and provider taxes and fees and ACLR's damages in this case.

B.  Summary of the Facts and Opinions of Mr. Mucke's Expert Testimony

The amounts billed for Part D prescription drug event claims as described in ACLR's PY12-PY13 Sales Tax NAIRP ("ACLR's NAIRP") submission on August 21, 2015 were improper payments and are recoverable in their entirety.  State laws precluded the imposition of sales, use, provider, or other transactional taxes on the PDEs submitted to CMS for Part D payment and identified in ACLR's Complaint.  There was a total of $930,854,076 in improper payments

identified in the Complaint.   Consequently, ACLR was entitled to a contingency fee of $112,002,489.

ACLR's NAIRP identifies improper payments associated with sales taxes billed on PDEs in states having no sales and use tax ("No SUT"), the states of Louisiana and Minnesota, and in instances where the sales tax rate billed was in excess of 50% ("Miscellaneous GT 50%").

*No SUT States*:  The point of sale for these PDE records was determined to be the business location of the pharmacy as published in CMS National Plan & Provider Enumeration database as determined by the value submitted in the PTAP_SRVC_PROVIDER_ID field of the PDE record. The pharmacies identified for this issue were located in the states of Alaska, Delaware, Montana, New Hampshire, and Oregon, which do not impose sales taxes.[1]

*Miscellaneous GT 50%*:  There are no taxing jurisdictions that impose sales taxes at rates exceeding 50% of the actual drug costs in Part D PDEs submitted to CMS for payment.

*Louisiana*:  The State of Louisiana imposes a state sales tax but exempts Part D prescription drugs at both the state and local levels. LA REV. STAT. ANN. § 47:305(D)(1)(j) (2011) provides that "drugs prescribed by a physician or dentist" are "specifically exempted from the tax imposed by taxing authorities" for "purposes of the state sales and use tax." LA REV. STAT. ANN. § 47:301(10)(u) (2011) also excludes the levying of local sales and use taxes on sales "made under the provisions of Medicare."

Health Integrity, LLC, CMS's National Benefit Integrity Medicare Drug Integrity Contractor ("MEDIC"), conducted a review of Louisiana PDE records that contained Louisiana sales taxes and notified plan sponsors of its findings.  In response, one plan sponsor took the position that a $0.10 prescription fee tax on Louisiana PDE records was proper.  This fee is

---

[1] *ACLR's NAIRP also identified the possibility that one Delaware pharmacy was billing Minnesota beneficiaries for the 2% provider tax.*

2

associated with the LA REV. STAT. ANN. § 46:2625 and is imposed on pharmacies for "health care services provided by the Medicaid program," but has no bearing on the Part D.  CMS, however, precluded further MEDIC attempts to request that the plan sponsors delete such PDE records. PDEs for all other Louisiana sales tax in excess of $0.10 contained on Louisiana PDE submissions identified by the MEDIC were deleted.[2]  In addition to all other improperly billed Louisiana sales taxes, ACLR's NAIRP also identified PDEs containing $0.10 amounts billed in the sales tax column and paid by CMS.

*Minnesota*:  The State of Minnesota imposes a state sales tax but provides an exemption for sales of "drugs and medical devices for human use" at MINN STAT. § 297A.67(7) (2012). Similarly, local jurisdictions are prohibited from imposing a sales tax on prescription drugs at MINN STAT. § 297A.99(7) (2012), which states that "goods or services that are otherwise exempt from taxation under this chapter are exempt from a political subdivision's tax."

In 2010, the MEDIC commenced a review of Minnesota PDE records containing sales taxes.  In response to MEDIC requests for additional information from plan sponsors, plan sponsors asserted that amounts appearing as sales taxes in Minnesota PDE claim submissions in that state pertained to the Minnesota's 2% Wholesale Drug Distributor Tax ("Wholesale Tax").[3]

On May 18, 2011, the MEDIC contacted the Minnesota Office of Attorney General ("OAG") requesting a legal opinion as to the applicability Minnesota sales taxes and the Wholesale Tax to drugs paid in Part D.  On May 31, 2011, the Minnesota OAG responded and confirmed MEDIC contentions that sales taxes are not imposed on over-the-counter or on prescription drugs. With respect to the Wholesale Tax, the Minnesota OAG stated that the Wholesale Tax, also

---

[2] In its June 2015 Update for Deleted Prescription Drug Event Records for the Louisiana Sales Tax Project HITS#29897, the MEDIC indicated that improper Louisiana sales tax PDEs were deleted rather than adjusted.

[3] MEDIC findings and records submitted during discovery did not identify any additional evidence supporting plan contentions.

"known as the MinnesotaCare tax, is 2 percent of gross revenues, and is an expense that may be passed on to third party payers. However, healthcare services provided to Medicare recipients and paid for under the Medicare program are exempt from this tax." The Minnesota OAG also included "a House Research Report on the MinnesotaCare Provider tax (June, 2010)." This report also stated that MinnesotaCare Provider Taxes were exempt "for services provided under Medicare." Based on its review findings, the MEDIC concluded that Minnesota sales taxes and the Wholesale Tax could not be billed to Medicare and advised CMS of its findings. MEDIC findings are also corroborated in findings and reports issued by the Minnesota Taxpayers Association and the Minnesota Pharmacists Association.

The Wholesale Tax is imposed on wholesale drug distributors at MINN. STAT. § 295.52(3) (2012) at a tax rate "equal to two percent of its gross revenues" defined as the "total amounts received in money... for sale or distribution of legend drugs that are delivered in Minnesota" MINN. STAT. § 295.50(3)(4) (2012). While these taxes are imposed on the wholesale drug distributor, the distributor is permitted to separately state and collect the Wholesale Tax on invoices to its customers provided that it is not done in "a deceptive of misleading manner" MINN. STAT. § 295.53(3) (2012). Minnesota law does not permit pharmacies to separately state and collect from its customers the Wholesale Tax paid to the wholesale drug distributor. At their discretion, Minnesota pharmacies may, however, recover "all or part" of the Wholesale Tax from pharmacy benefit managers or plan sponsors by increasing the actual cost of the drug negotiated between the pharmacy and the plan sponsor or the pharmacy benefit manager MINN. STAT. § 295.582(a) (2012). Even if plan sponsor assertions that amounts billed to CMS represented permissible Wholesale Tax charges, such amounts would have already been included in the ingredient cost amount

4

SA164

negotiated between the pharmacies and plan sponsors or pharmacy benefit managers resulting in impermissible duplicative Wholesale Tax payments by CMS.

Plan sponsor contentions that the Wholesale Tax may be submitted in the sales tax field of PDEs are also not supported by CMS payment guidelines. As outlined in the 2011 Prescription Drug Event Participant Guide, 2011 Prescription Drug Event Participant Guide ("Guide"), the PDE record contains three detail cost fields: Ingredient Cost Paid, Dispensing Fee Paid, and Total Amount Attributed to Sales Tax. For all PDEs, the gross drug cost is a sum total of these three detail fields in the PDE record." Guide at 4-9. The Ingredient cost paid is the "dollar amount paid to the pharmacy for the drug itself "and should "not include costs such as dispensing fees or sales tax." Guide 3-21. The Guide further provides "in cases where these three fields are not disaggregated, plans should report the total cost in the "Ingredient Cost Paid" field, and report zero dollar amounts for the other two fields." Guide at 3-27. The Guide provides that the sales tax field "represents the dollar amount of sales tax, if any, associated with the prescription drug event." Guide 3-21. The Wholesale Tax is not a sales tax and CMS guidelines do not permit its billing as such.

Moreover, to the extent that Minnesota did not exempt the Wholesale Tax and permitted pharmacies to separately state and recoup the Wholesale Tax from the sales of prescription drugs, such amounts would still be impermissible under Minnesota law. In such a case, the amounts billed for sales tax would not equate to 2% of the ingredient cost field, but would equate to 2% of the wholesale amount paid for the drugs by the pharmacy. Over 90% of the 2012-2013 Minnesota PDE records indicate that the amounts billed in the sales tax column were billed at tax rates of 2% or higher on the ingredient cost paid, also indicating that the sales tax field is incorrect and that amounts paid for these PDEs are improper overpayments.

5

CMS guidance published April 1, 2013[4] and July 3, 2013[5] define instances where amounts billed that result in an "incorrect payment calculation on claims that were otherwise appropriate for coverage" are financial errors and that plan sponsors must "resubmit the PDE... with the correct financial fields." The Guide states that changes or corrections to PDEs after they have been saved in CMS' Drug Data Processing System require an adjustment to the PDE or a deletion and resubmission of the PDE. The Guide also notes that a PDE adjustment "completely replaces the original record" and that "adjusted or deleted records" are inactive records that "are excluded from any payment calculations". Guide 3-6 & 4-5.

As required by the *Improper Payment Information Act of 2002 (IPIA)*, the *Recovery Auditing Act (RAA)*, Improper *Payments Elimination and Recovery Act (IPERA)*, and Executive Order 13520 *Reducing Improper Payments*, federal agencies are required to identify, report, and recover improper payments and mitigate future improper payments. To assist in these requirements the Office of Management and Budget (OMB) issued Parts I, II, and III to Appendix C of OMB *Circular A-123 - Responsibility for Internal Control*. This guidance defines an improper payment as:

> any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements. Incorrect amounts are overpayments and underpayments (including inappropriate denials of payment or service). An improper payment includes any payment that was made to an ineligible recipient or for an ineligible service, duplicate payments, payments for services not received, and payments that are for the incorrect amount. In addition, when an agency's review is unable to discern whether a payment was proper as a result of insufficient or lack of documentation, this payment must also be considered an error.

This guidance also requires that agencies recover overpayments resulting from payment errors, which are further defined as "errors resulting from duplicate payments; errors on invoices or financing requests; failure to reduce payments by applicable sales discounts, cash discounts,

---

[4] *Announcement of Calendar Year (CY) 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*

[5] *PDE Guidance for Post Point-of-Sale Claim Adjustments*

rebates, or other allowances; payments for items not received; mathematical or other errors in determining payment amounts and executing payments; and the failure to obtain credit for returned merchandise." Federal agencies are required to recover improper payments as required under IPIA, RAA, IPERA, and Executive Order 13520.

ACLR's damages were calculated by performing the Part D Payment Reconciliation process on the sales tax PDEs identified in ACLR's NAIRP and summing the recalculated low income cost sharing, reinsurance, and risk sharing subsidies as follows:

| ACLR's NAIRP | Reconciled Improper Payment Totals |
|---|---|
| No SUT | 5,518,803 |
| Miscellaneous GT 50% | 3,706,582 |
| Louisiana | 32,032,166 |
| Minnesota | 889,596,525 |
| Totals | 930,854,076 |
| Contingency Fee 15% of First $10m | 1,500,000 |
| Contingency Fee 12% After first $10m | 110,502,489 |
| ACLR Damages | 112,002,489 |

Dated: October 30, 2017

DAVID, BRODY &
DONDERSHINE, LLP

/s/
John A. Bonello
Thomas K. David
12355 Sunrise Valley Drive
Suite 650
Reston, VA 20191
Phone: 703-264-2220
Fax: 703-264-2226
jbonello@dbd-law.com
tdavid@dbd-law.com

7

<u>**Certificate of Service**</u>

I, John A. Bonello, hereby certify that on this 30th day of October 2017, a copy of the

foregoing document was sent by first-class mail, postage prepaid, to:

Mark E. Porada
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC  20044

/s/
John A. Bonello

8

**SA168**

# TAB 89



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

THE DIRECTOR

October 20, 2014

M-15-02

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:     Shaun Donovan
          Director

SUBJECT:  Appendix C to Circular No. A-123, *Requirements for Effective Estimation and Remediation of Improper Payments*

    The Administration has made reducing improper payments—payments made to the wrong entity, in the wrong amount, or for the wrong reason—a top priority. Since coming into office, the President has signed two laws and issued three directives—including an Executive Order—that created a robust infrastructure for agencies to reduce improper payments in their programs. Through this committed focus, the government-wide improper payment rate has declined for four consecutive years, from 5.42 percent in fiscal year (FY) 2009 to 3.53 percent in FY 2013.

    The enactment of the Improper Payments Elimination and Recovery Improvement Act (IPERIA) of 2012 provided an opportunity for the Office of Management and Budget (OMB) to re-examine existing guidance to ensure agencies are able to more efficiently reduce their improper payment rates, while also complying with multiple legislative and administrative requirements. The goal of this overhauled version of Appendix C to Circular No. A-123[1] is to transform the improper payment compliance framework to create a more unified, comprehensive, and less burdensome set of requirements. Appendix C accomplishes the following:

- Consolidates and streamlines reporting requirements for agencies and Inspectors General, and eliminates duplicative and old one-time requirements so agencies can spend less time producing compliance reports and more time focusing on game-changing solutions for achieving payment accuracy;
- Establishes new categories for reporting improper payments that will provide more granularity on improper payment estimates—thus leading to more effective corrective actions at the program level and more focused strategies for reducing improper payments at the government-wide level;

---

[1] Appendix C implements requirements from the following: (1) the Improper Payments Information Act of 2002 (IPIA), as amended; (2) the Improper Payments Elimination and Recovery Act of 2010 (IPERA); (3) the Improper Payments Elimination and Recovery Improvement Act of 2012 (IPERIA); and (4) Executive Order 13520— *Reducing Improper Payments*—issued November 20, 2009.

- Introduces a new internal control framework to ensure that payments are made in the right amount, to the right entity, and for the right purpose; and
- Provides guidance to agencies—as required by the most recent statute, IPERIA—to strengthen the statistical validity of estimates and include payments to Federal employees in the definition of improper payments, among other things.

OMB Circular A-123, Appendix C, Parts I and II (which were issued in April 2011 as OMB Memorandum M-11-16) and Part III (which was issued in March 2010 as OMB Memorandum M-10-13) are hereby modified. Unless otherwise noted in the guidance, the requirements found in Appendix C are effective starting in FY 2014. OMB will continue to work closely with agencies and Inspectors General to provide further implementation guidance as needed.

Please contact Flavio Menascé (fmenasce@omb.eop.gov), Heather Pajak (hpajak@omb.eop.gov), or Mike Wetklow (mwetklow@omb.eop.gov) in OMB's Office of Federal Financial Management with any questions regarding this guidance.

Attachment

2

**APPENDIX C**

Requirements for Effective
Estimation and Remediation of
Improper Payments

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 5
OVERVIEW ...................................................................................................... 5
PART I – IMPROPER PAYMENTS ELIMINATION AND RECOVERY ....................... 7
A. RISK-ASSESSING, ESTIMATING, AND REPORTING IMPROPER PAYMENTS.................... 7
1) Which agencies are required to comply with the requirements of IPIA, IPERA, and IPERIA? ................................................................................................ 7

2) What is an improper payment? .................................................................. 7

3) What is a payment for an ineligible good or service?.................................. 7

4) What is a program or activity?.................................................................... 8

5) Must agencies include payments to employees in improper payment risk assessments?... 8

6) Must agencies include payments related to charge cards in improper payment risk assessments? ............................................................................................ 8

7) Must agencies review intra-governmental transactions? ............................ 9

8) What constitutes an improper loan or loan guarantee payment? ................ 9

9) What specific steps are agencies required to take?..................................... 9

Step 1: Review all programs and activities and identify those that are susceptible to significant improper payments.............................................................. 9

Step 2: Obtain a statistically valid estimate of the annual amount of improper payments in programs and activities for those programs that are identified in Step 1 as susceptible to significant improper payments............................................... 11

Step 3: Implement a plan to reduce improper payments............................. 15

Step 4: Report annually in the AFR or PAR................................................ 16

10) When must agencies conduct risk assessments?......................................... 16

11) What information should agencies provide to persons or entities producing improper payment estimates? ................................................................................. 17

12) Are agencies allowed to rely upon self-reporting by recipients of agency payments when estimating improper payments? ................................................................ 17

13) Are agencies allowed to implement an estimation approach that excludes improper payments that have been subsequently corrected and recovered from the annual estimate? ................................................................................................ 18

14) May agencies use alternative sampling and estimation approaches? ............ 18

15) Should data used for estimating improper payments coincide with the fiscal year being reported in the AFR or PAR?.................................................................... 20

16) What are Federally-funded, State-administered programs, and may agencies consider other approaches for these types of programs?............................................. 21

17) Are programs that are identified as susceptible to significant improper payments, and that annually report improper payment estimates, permanently subject to improper payments reporting requirements? .................................................................................................. 21

18) Are programs and activities that have been deemed susceptible to significant improper payments as a result of the Disaster Relief Appropriations Act, 2013, permanently subject to improper payments reporting requirements? ............................................................. 22

B. IMPROVING THE DETERMINATION OF IMPROPER PAYMENTS .................................................... 23
1) How will OMB determine the "high-priority" programs as required under IPERIA?..... 23

2) What are the requirements under IPERIA for establishing semi-annual or quarterly actions for reducing improper payments?........................................................................ 23

3) Do high-priority programs have any specific requirements regarding corrective actions? .................................................................................................................................... 24

4) Are there any additional reporting requirements for agencies that have high-priority programs?.................................................................................................................... 24

C. CATEGORIES FOR REPORTING IMPROPER PAYMENTS ................................................................. 24
1) What categories should agencies use when reporting improper payment estimates? ...... 24

2) How should agencies focus on fraudulent activities?....................................................... 28

D. PAYMENT RECAPTURE AUDITS ................................................................................................. 28
1) What are the definitions used for payment recapture auditing in this guidance? ............. 28

2) What are the general agency requirements for implementing a payment recapture audit program? .......................................................................................................................... 29

3) Should agencies establish targets for their payment recapture audit programs? .............. 30

4) What is the scope for payment recapture audit programs?................................................ 30

5) What criteria should an agency consider in determining whether a payment recapture audit is cost-effective? ...................................................................................................... 31

6) What should an agency do if it determines that a payment recapture audit program would not be cost-effective?......................................................................................................... 32

7) Should the agency follow any particular procedures when conducting payment recapture audits of grants payments?................................................................................................. 32

8) Can Federal agencies provide money to States and Local governments for Financial Management Improvement efforts?.................................................................................... 33

9) Who may perform payment recapture audits?.................................................................. 33

10) May contractors perform payment recapture audit services? ........................................... 33

11) Are there any specific requirements when using a contracted payment recapture auditing firm?.................................................................................................................................. 33

12) Are there any prohibitions when using a payment recapture audit contractor?................ 34

13) Who performs recovery activities once the improper payments are discovered and verified? ............................................................................................................................ 34

14) What is the proper disposition of recovered amounts?..................................................... 35

15)  Are agencies authorized to implement Financial Management Improvement Programs? 37

16)  What are the reporting requirements for payment recapture audits?................................ 37

17)  How are improper payment estimates different from payment recapture audit efforts? .. 38

**PART II – COMPLIANCE WITH THE IMPROPER PAYMENT REQUIREMENTS ................................ 39**
A. RESPONSIBILITIES OF AGENCY INSPECTORS GENERAL ................................................................... 39

1)  When should each agency Inspector General begin reviewing improper payment
performance to determine whether the agency is in compliance under IPERA? ............. 39

2)  When should the agency Inspector General complete its review of agency compliance
under IPERA? ................................................................................................................... 39

3)  What should each agency Inspector General review to determine if an agency is in
compliance under IPERA?................................................................................................ 39

4)  What else should the agency Inspector General include in its compliance review and
report? .............................................................................................................................. 40

5)  Who should the agency Inspector General notify when it has completed its determination
of whether an agency is in compliance under IPERA?..................................................... 40

B. RESPONSIBILITIES FOR AGENCIES ................................................................................................. 40

1)  What are the requirements for agencies not compliant under IPERA? ............................ 40

C. INTERNAL CONTROL OVER IMPROPER PAYMENTS ........................................................................ 42

1)  What are the criteria as to when an agency should initially be required to obtain an
opinion on internal control over improper payments?...................................................... 42

2)  How do internal control standards apply to improper payments? ..................................... 43

**PART III – REQUIREMENTS FOR IMPLEMENTING EXECUTIVE ORDER 13520 ............................ 46**
A. GENERAL GUIDANCE....................................................................................................................... 46

1)  Which agencies are subject to the requirements of Executive Order 13520?.................. 46

2)  How will OMB determine the "high-priority" programs as required under Section 2(a)(i)
of the Executive Order? ................................................................................................... 46

3)  What are agencies required to submit for the improper payments website as required
under Section 2(b) of the Executive Order? .................................................................... 46

4)  Why is program access important? .................................................................................. 46

5)  Does this guidance create any special rights?.................................................................. 47

B. SUPPLEMENTAL MEASURES............................................................................................................. 47

1)  What are the requirements for establishing annual or semi-annual measurements in high-
priority programs, also known as supplemental measures?............................................. 47

2)  Which tools should agencies use to identify supplemental measures?............................ 47

3)  Who is required to establish annual or semi-annual measurements under the Executive
Order? .............................................................................................................................. 48

4)  How should agencies establish annual or semi-annual targets for supplemental measures?
.......................................................................................................................................... 49

5) Are the reduction targets described in section I.A.9 of this guidance the same as the supplemental targets that agencies will set to comply with the Executive Order?........... 49

6) How will agencies report annual or semi-annual supplemental measures and targets? ... 49

C. ACCOUNTABLE OFFICIAL REQUIREMENTS ............................................................................. 50

1) Which agencies are responsible for establishing accountable officials under Section 3(a) of the Executive Order? ...................................................................................................... 50

2) Who may serve as an agency or component accountable official under Section 3(a) of the Executive Order? ........................................................................................................... 50

3) What are the accountable officials' roles and responsibilities? ........................................ 50

4) What are the agency requirements for providing a report to their IGs in response to Section 3(b) of the Executive Order?................................................................................... 50

5) What are the Inspector General's responsibilities with respect to the report under Section 3(b) of the Executive Order?.............................................................................................. 51

D. AGENCY HEAD QUARTERLY HIGH-DOLLAR REPORT TO THE INSPECTOR GENERAL ................. 51

1) What is a "high-dollar" overpayment? ............................................................................ 51

2) Which sources should agencies utilize to identify high-dollar overpayments?............... 52

3) What information should be included in agency reporting on high-dollar overpayments? ........................................................................................................................................ 52

4) Which agencies must report on high-dollar overpayments?  Where shall agencies report high-dollar overpayments to the public?  What if an agency has no high-dollar overpayments? ................................................................................................................... 52

5) Are there exceptions to the reporting requirements for the high-dollar report? ............. 52

SA175

## INTRODUCTION

Unless otherwise noted, the requirements found in this guidance are effective for fiscal year (FY) 2014 and beyond.  This guidance implements the requirements from the following:

- Improper Payments Information Act of 2002 (IPIA; Pub. L. No. 107-300), as amended;
- Improper Payments Elimination and Recovery Act of 2010 (IPERA; Pub. L. No. 111-204);
- Improper Payments Elimination and Recovery Improvement Act of 2012 (IPERIA; Pub. L. No. 112-248)[1]; and
- Executive Order 13520—*Reducing Improper Payments*—issued November 20, 2009.

Issuance of this guidance hereby modifies the Office of Management and Budget (OMB) Circular A-123, Appendix C, Parts I and II (which were issued in April 2011 as OMB Memorandum M-11-16) and Part III (which was issued in March 2010 as OMB Memorandum M-10-13).

## OVERVIEW

Before the passage of IPIA, there was no overarching government-wide framework for measuring—let alone reducing—Federal improper payments.  Between 2002 and 2009, as more agencies began measuring and reporting improper payment estimates for their programs, it became increasingly clear that Federal improper payments represented a significant loss to the government.  As a result, between 2009 and present time, the Federal government has built a robust infrastructure of legislative and administrative requirements with which agencies must comply in order to achieve tangible results.  These requirements—which apply to a wide array of stakeholders—are described in detail in Appendix C to OMB Circular A-123.  The six paragraphs below, as well as Figure 1, provide only a cursory overview of some key Appendix C requirements.  However, for a more precise and comprehensive description, readers should consult the subsequent pages of the guidance.

*Payment Recapture Audits.*  One fundamental requirement that agencies must meet is to recover any Federal dollars that should not have gone out the door.  IPERA requires any program that expends at least $1 million to implement payment recapture audits, if cost effective to the agency, in order to recover improper payments (see section I.D).

*Low-Risk Programs.*  Independent of any payment recapture activities, IPERA also requires that all programs assess their risk for improper payments.  If an agency deems a program to be at a low risk for improper payments, the agency will re-assess that program's risk at least every three years (see section I.A.9, step 1).

*Programs Susceptible to Significant Improper Payments.*  If an agency deems a program to be susceptible to significant improper payments, the agency is required to estimate and report improper payments for that program annually, in addition to implementing corrective actions to reduce its improper payments (see section I.A.9, steps 2-4).  In doing so, agencies should identify

---

[1] This guidance does not address the Do Not Pay initiative, which is found in Section 5 of IPERIA.

the root causes of, and implement appropriate corrective actions to prevent and reduce the related improper payments. Agencies should continuously identify innovative corrective actions to prevent and reduce improper payments. For example, corrective actions could leverage new technologies and advanced techniques—such as forensic tools, pre-payment software, and data matches. In addition, for all programs that are susceptible to significant improper payments, Executive Order 13520—*Reducing Improper Payments*—requires agencies to produce a quarterly report of any "high-dollar" overpayments (see section III.D).

*High-Priority Programs.* IPERIA reinforces the requirements from Executive Order 13520 by: fostering greater agency accountability; requiring OMB to designate the programs with the most egregious cases of improper payments as high-priority; and requiring those programs to develop indicators of improper payments (called supplemental measures) that are more frequent than the annual estimates, as a tool for tracking progress (see section III.B). Furthermore, Executive Order 13520 also requires those agencies with high-priority programs to name accountable officials to oversee efforts to reduce program improper payments (see section III.C).

*Annual Reporting.* Once a year, agencies will report in the Agency Financial Report (AFR) or the Performance and Accountability Report (PAR) most of the required components listed in Appendix C.[2] As agencies implement Appendix C, they should approach improper payments with an internal control framework in mind and provide a thoughtful analysis linking agency efforts in establishing internal controls and reducing improper payment rates (see section II.C).

*Annual Inspector General Compliance Review.* IPERA adds an important component of accountability to the entire spectrum of improper payment efforts. Every year, each agency Inspector General reviews agency improper payment reporting in the agency's AFR or PAR to determine if the agency is in compliance with Appendix C requirements listed under section II.A.3.

### Figure 1: Appendix C at a Glance



---

[2] Per OMB Circular No. A-136, agencies may choose either to produce a consolidated PAR or to produce a separate AFR and Annual Performance Report (APR).

## PART I – IMPROPER PAYMENTS ELIMINATION AND RECOVERY

Part I discusses the requirements of IPIA[3], IPERA, and IPERIA.

### A. RISK-ASSESSING, ESTIMATING, AND REPORTING IMPROPER PAYMENTS

### 1) Which agencies are required to comply with the requirements of IPIA, IPERA, and IPERIA?

The agencies required to comply with IPIA, IPERA, and IPERIA are defined broadly as "a[ny] department, agency, or instrumentality in the executive branch of the United States" as defined in Title 31, Section 102 of the United States Code.

### 2) What is an improper payment?

An improper payment is any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements.  Incorrect amounts are overpayments or underpayments that are made to eligible recipients (including inappropriate denials of payment or service, any payment that does not account for credit for applicable discounts[4], payments that are for an incorrect amount, and duplicate payments).  An improper payment also includes any payment that was made to an ineligible recipient or for an ineligible good or service, or payments for goods or services not received (except for such payments authorized by law).  In addition, when an agency's review is unable to discern whether a payment was proper as a result of insufficient or lack of documentation, this payment must also be considered an improper payment.

The term "payment" in this guidance means any disbursement or transfer of Federal funds (including a commitment for future payment, such as cash, securities, loans, loan guarantees, and insurance subsidies) to any non-Federal person, non-Federal entity, or Federal employee, that is made by a Federal agency, a Federal contractor, a Federal grantee, or a governmental or other organization administering a Federal program or activity.  The term "payment" includes Federal awards subject to the Single Audit Act and the Uniform Guidance for Federal assistance (2 CFR 200 Subpart F) (Single Audits) that are expended by both recipients and sub-recipients.

### 3) What is a payment for an ineligible good or service?

A payment for an ineligible good or service includes a payment for any good or service that is not permitted under any provision of a contract, grant, lease, cooperative agreement, or other funding mechanism.

---

[3] Unless otherwise indicated, from this point forward in the guidance the term "IPIA" will imply "IPIA, as amended by IPERA and IPERIA."

[4] *Applicable discounts* are only those discounts where it is both advantageous and within the agency's control to claim them.

**4) What is a program or activity?**

The law anticipates that agencies will examine the risk of, and feasibility of recapturing, improper payments in *all* programs and activities administered. The term "program" includes activities or sets of activities recognized as programs by the public, OMB, or Congress, as well as those that entail program management or policy direction.[5]  This definition includes, but is not limited to, all grants including competitive grant programs and block/formula grant programs, non-competitive grants such as single-source awards, regulatory activities, research and development activities, direct Federal programs, all types of procurements (including capital assets and service acquisition), and credit programs.  It also includes the activities engaged in by the agency in support of its programs.

For Federal awards subject to the Single Audit Act or otherwise listed in the Catalog of Federal Domestic Assistance (CFDA), agencies should consider using the groupings in the Compliance Supplement for Single Audits (referred to as "clusters of programs") and the CFDA.  However, unless otherwise specified in OMB Circular A-11, each Federal agency, after consultation with OMB, is authorized to determine the grouping of programs which most clearly identifies and reports improper payments for their agency.  Agencies must not put programs or activities into groupings that may mask significant improper payment rates by the large size or scope of a grouping.  For transparency, the basis for these groupings must be reported in the agency's AFR or PAR.

**5) Must agencies include payments to employees in improper payment risk assessments?**

Yes. IPERIA amended the definition of "payment" in IPIA to include payments made to Federal employees, in addition to payments made to non-Federal persons or entities.  Therefore, agencies must include payments made to employees (including salary, locality pay, travel pay, and other payments to Federal employees) in the risk assessments (beginning in FY 2014) and, if applicable, in improper payment estimates (the following fiscal year).  For improper payment reporting purposes, when a shared service provider is responsible for the actual disbursements of payments to employees (for example, payroll) on behalf of a customer agency, the customer agency and shared service provider[6] should assess only the portions of the process that are within their respective control.

**6) Must agencies include payments related to charge cards in improper payment risk assessments?**

Yes.  Agencies should include such payments in risk assessments (beginning in FY 2014) and, if applicable, in improper payment estimates (the following year).  Agencies should leverage guidance in OMB Circular A-123, Appendix B—*Improving the Management of Government Charge Card Programs*—and OMB Memorandum M-13-21—*Implementation of the*

---

[5] The term "program" in this guidance implies "program and activity."

[6] Shared service providers can leverage service organization internal control reports such as *Reports on Controls at a Service Organization Relevant to User Entities' Internal Control over Financial Reporting* (also known as SOC 1 Reports) or other OMB A-123 assessments.

*Government Charge Card Abuse Prevention Act of 2012*—when performing these risk assessments.

### 7)  Must agencies review intra-governmental transactions?

No.  IPIA does not require agencies to include payments made by a Federal agency to another Federal agency.  Therefore, agencies are not obligated to review intra-governmental transactions.  However, any agency may review such payments, and must do so if directed by OMB.

### 8)  What constitutes an improper loan or loan guarantee payment?

Under a direct loan program, improper payments may include disbursements to borrowers or other payments by the Government to non-Federal entities that are based on incomplete, inaccurate, or fraudulent information.  They may also include disbursements or other payments that are duplicate, in an incorrect amount, or for purposes other than those allowed by law, program regulations, or agency policy.

Under a loan guarantee program, an improper payment may include payments by the Government to non-Federal entities for defaults, delinquencies, interest and other subsidies, or other payments that are based on incomplete, inaccurate, or fraudulent information.  They may also include duplicate payments, payments in an incorrect amount, or any payments that are not in compliance with law, program regulations, or agency policy.

### 9)  What specific steps are agencies required to take?

Unless an agency has specific written approval from OMB to deviate from the steps explained below, agencies are required to follow these steps to determine whether the risk of improper payments is significant and to provide valid annual estimates of improper payments[7].  The agency is responsible for maintaining the documentation to demonstrate that the following steps (if applicable) were satisfied.

> ### Step 1:  Review all programs and activities and identify those that are susceptible to significant improper payments.
>
> a.  Definition.  For the purposes of this guidance, beginning with FY 2014 reporting and beyond, "significant improper payments" are defined as gross annual improper payments (i.e., the total amount of overpayments and underpayments) in the program exceeding (1) both 1.5 percent of program outlays and $10,000,000 of all program or activity payments made during the fiscal year reported or (2) $100,000,000 (regardless of the improper payment percentage of total program outlays).

---

[7] Improper payment rates referenced here and throughout this guidance should be based on dollars rather than number of occurrences.  In other words, the improper payment rate should be the amount in improper payments divided by the amount in program outlays for a given program in a given fiscal year (rather than the number of improper payments divided by the total number of payments).

b. <u>Systematic Method</u>. All agencies shall institute a systematic method of reviewing all programs and identify programs susceptible to significant improper payments. This systematic method could be a quantitative evaluation based on a statistical sample or a qualitative method (e.g., a risk-assessment questionnaire). At a minimum, agencies shall take into account the following risk factors likely to contribute to improper payments, regardless of which method (quantitative or qualitative) is used:

   i.   Whether the program or activity reviewed is new to the agency;
   ii.  The complexity of the program or activity reviewed, particularly with respect to determining correct payment amounts;
   iii. The volume of payments made annually;
   iv.  Whether payments or payment eligibility decisions are made outside of the agency, for example, by a State or local government, or a regional Federal office;
   v.   Recent major changes in program funding, authorities, practices, or procedures;
   vi.  The level, experience, and quality of training for personnel responsible for making program eligibility determinations or certifying that payments are accurate;
   vii. Inherent risks of improper payments due to the nature of agency programs or operations;
   viii. Significant deficiencies in the audit reports of the agency including, but not limited to, the agency Inspector General or the Government Accountability Office (GAO) audit report findings, or other relevant management findings that might hinder accurate payment certification; and
   ix.  Results from prior improper payment work.

When appropriate, agencies may leverage other existing processes to help implement this systematic method. For example, if an agency chose to develop and implement an improper payment risk-assessment questionnaire, the agency might consider leveraging another existing similar tool, such as an internal control questionnaire.

c. <u>Other Risk Susceptible Programs</u>. OMB may determine on a case-by-case basis (e.g., if an audit report raises questions about an agency's risk assessment or improper payments results) that certain programs that do not meet the threshold requirements described above may still be subject to the annual AFR or PAR reporting requirement.

d. <u>Examples</u>. To further clarify use of the quantitative evaluation method for performing risk assessments in this step, we provide four examples:

   *Example 1*:  Under the analysis in Step 1, a program has a potential improper payment rate of 1.2 percent or $14 million. Under this guidance an agency need <u>not</u> perform Step 2—obtaining a statistically valid estimate of improper payments in the program—because even though the potential amount of improper payments in the program exceeds $10 million, the potential improper payment rate does not exceed 1.5 percent.

*Example 2*: Under the analysis in Step 1, a program has a potential improper payment rate of 1.8 percent or $9 million. Under this guidance, an agency need not perform Step 2—obtaining a statistically valid estimate of improper payments in the program—because even though the potential improper payment rate exceeds 1.5 percent, the potential amount of improper payments in the program does not exceed $10 million.

*Example 3*: Under the analysis in Step 1, a program has a potential improper payment rate of 1.8 percent and $11 million. Under this guidance, an agency must perform Step 2—obtaining a statistically valid estimate of improper payments in the program—because the potential improper payment rate exceeds 1.5 percent and the potential amount of improper payments exceeds $10 million. The agency must report a statistically valid improper payment rate for the program in its annual AFR or PAR.

*Example 4*: Under the analysis in Step 1, a program has a potential improper payment rate of 0.6 percent and $125 million. Under this guidance, regardless of the potential improper payment rate, the agency must perform Step 2—obtaining a statistically valid estimate of improper payments in the program—because the potential amount of improper payments in the program exceeds $100 million.

**Step 2:  Obtain a statistically valid estimate of the annual amount of improper payments in programs and activities for those programs that are identified in Step 1 as susceptible to significant improper payments.[8]**

Programs reporting improper payments for the first time and programs revising their current methodology shall conform to the process and content described below in steps 2.1 and 2.2.  Programs that are currently using methodologies approved by OMB under the previous version of OMB A-123 Appendix C do not need to resubmit a methodology plan—unless an update to the plan is warranted.  Programs should consider updating their plan if the program undergoes any significant changes such as legislative, funding, structural, etc.

Step 2.1: Process.  All programs and activities susceptible to significant improper payments shall design and implement appropriate statistical sampling and estimation methods to produce statistically valid improper payment estimates.  In doing so, agencies shall conform to the following process:

a.  <u>Annual Estimated Amount</u>.  For all programs and activities susceptible to significant improper payments, agencies shall determine an annual estimated amount of improper payments made in those programs and activities.  When calculating a program's annual improper payment amount, agencies should only utilize the amount paid improperly.  For example, if a $100 payment was due, but a $110 payment was

---

[8] Step 2 should occur in the fiscal year following the fiscal year in which the risk assessment was conducted under Step 1.

made erroneously, then the amount applied to the annual estimated improper payment amount should be $10, rather than the payment amount of $110. Similarly, if a $100 payment was due, but a $90 payment was made erroneously, then the amount applied to the annual estimated improper payment amount should be $10, rather than the payment amount of $90. However, if a $100 payment was due and made, but there is insufficient documentation to support the appropriateness of the payment or if a duplicate payment was made, then the amount applied to the annual estimated improper payment amount should be $100. Agencies are required to determine an annual estimate that is a gross total of both over and underpayments (i.e., overpayments plus underpayments). However, in addition to the *gross* total, agencies are also allowed to calculate and disclose in their AFRs or PARs the *net* total (i.e., overpayments minus underpayments).

b. <u>Statistical Sampling and Estimation Plans</u>. Agencies are responsible for designing and documenting their sampling and estimation plan. Each plan shall be prepared by a statistician[9] (either an agency employee or a contractor) and submitted to OMB no later than June 30 of the fiscal year for which the estimate is being produced (e.g., the sampling methodology to be used for the FY 2014 reporting cycle must be submitted by June 30, 2014). The agency shall also include a summary of their sampling methodology plan in its AFR or PAR. The sampling and estimation plan shall be accompanied by a document certifying that the methodology will yield a statistically valid improper payment estimate (see below).

c. <u>Certification</u>. IPERA requires agencies to produce statistically valid estimates of improper payments, and therefore each plan shall be accompanied by a certification stating that the methodology will produce a statistically valid estimate. The certification shall be signed by an agency official of the agency's choosing (e.g., this could be the Chief Financial Officer, his/her Deputy, a program official, etc.). Upon receipt, OMB will review the documents (i.e., the proposed statistical sampling plan and the accompanying signed certification) to verify that they are complete and include all the requisite components listed in Step 2.2 below. *It is important to note that OMB will not be issuing a formal approval to the agency for the sampling plan— rather, it is the agency's responsibility to produce a statistically valid methodology.* The signed certification will serve as evidence that the agency believes the methodology is statistically sound. OMB does reserve the right to raise questions about the particular methodology, should the need arise.

d. <u>Working with other Entities</u>. Agencies should consider working with entities—such as grant recipients—that are subject to Single Audits to leverage ongoing audits to assist in the process to estimate an improper payment rate and amount.

e. <u>Incorporating Recommendations</u>. Whenever possible, agencies should incorporate refinements to their improper payment methodologies based on recommendations

---

[9] This person should have training and experience designing statistical samples and using statistical methods to calculate population estimates and sampling errors from a probability sample. This person would generally have an advanced degree in statistics, biostatistics, mathematics, a quantitative social science, or a similar field.

from agency staff or auditors (such as their agency Inspector General, GAO, or private auditors).

f.  Example Plans from Other Agencies.  OMB will make available to agencies examples of statistical sampling and estimation plans submitted by agencies. Agencies are encouraged to review these examples and consult with other agencies when preparing their sampling plans.  While each plan will likely be slightly different given the unique nature of each program, there are some characteristics that are common across many programs, and agencies should benefit from each other's work. However, each agency is responsible for designing and executing an appropriate sample to statistically estimate improperly paid dollars that meets the requirements in this guidance.

Step 2.2: Content of Statistical Sampling and Estimation Plans.  Agencies shall clearly and concisely describe the statistical methods that will be used to design and draw the sample and produce an improper payment estimate for the program in question.  The plans shall explain and justify why the proposed methodology is appropriate for the program in question—this explanation must be supported by accurate statistical formulas, tables, and any additional materials to demonstrate how the sampling and estimation will be conducted and the appropriateness of those statistical methods for the program. Agency sampling and estimation plans must be complete and internally consistent.  The following aspects must be clearly addressed:

a.  Probability Sampling.  Improper payment estimates shall generally be based on probability samples and shall provide estimates of the sampling error for the amount of the improper payments.  Agencies may use simple random samples if those are appropriate, but many agencies have employed more complex stratified or multi-stage or clustered samples in order to obtain estimates of different components of the program that are more actionable than can be afforded by simpler sample designs. Depending on the nature and distribution of the payments made by a program, many agencies also use unequal probabilities of selection to capture larger payments with higher probability (i.e., probability proportionate to size).  If the universe of payments for a program or a component/stratum of the program is small, agencies may review a complete census of payments in those cases and would not have any sampling error for that component or stratum—assuming a statistician is consulted on this approach.

b.  Assumptions about the amount of Improper Payments.  The agency may use their initial determination of the *potential* improper payment in Step 1, above, to aid in determining the sample size.  Since most agencies have been conducting ongoing reviews of their improper payments for some time, they should utilize results from previous years and make appropriate adjustments to the sample size and even the sample design based on previous findings in order to obtain a more efficient sample or obtain more useful estimates of improper payments by program component.

c.  Appropriate Sample Sizes.  Because of the imprecision of the risk assessment performed in Step 1, agencies should ensure that they select a sample that will meet

the minimum precision requirements in Step 2.2.d below. For initial estimates of improper payments, agencies should take a conservative approach and use higher estimated improper payments in their sample size calculations to ensure that they will meet the precision targets. As noted above, since most agencies have been conducting ongoing reviews of their improper payments for some time, they should utilize results from previous years and make appropriate adjustments to the sample size.

d. <u>Precision</u>. Agencies should design the sample and select a sample size sufficient to yield an estimate of improper payments with a 90 percent confidence interval of plus or minus 2.5 percent of the total amount of all payments for a program around the estimate of the dollars of improper payments.[10] For example, if the total amount of all payments for a program was $1,000,000,000 and the estimated total of improper payments based upon the statistical sample was $80,000,000, the 90 percent confidence interval around the estimate should be no more than plus or minus $25,000,000—i.e., $55,000,000 to $105,000,000. These guidelines for precision shall be taken as the minimum, and agencies are encouraged to take samples above the minimum to achieve greater precision in their estimates in order for agencies to better understand underlying causes of improper payments and creating action plans. Agencies shall maintain documentation to support the calculation of these estimates.

e. <u>Sample Design Documentation.</u> Agency sampling and estimation plans shall generally provide sufficient documentation of the sample design so that a qualified statistician would be able to replicate what was done or so that OMB, agency Inspector General, or GAO personnel can evaluate the design. Agencies shall clearly identify the frame or source for sampling payments and document its accuracy and completeness. All stages of selection, any stratification, and/or any clustering shall be clearly described. Explicit strata shall be clearly defined, as should any variables used for implicit stratification. Tables shall generally be provided showing the size of the universe and sample by strata (if applicable). Sampling plans shall also specify whether cases are selected with equal or unequal probabilities and how the probabilities of selection are determined when they are unequal.

f. <u>Documentation of Estimation Formulas</u>. Agency sampling and estimation plans shall include documentation of the statistical formulas that will be used to estimate the amount of improper payments (and the associated confidence intervals for the sample) and to project those results to the entire program. Documentation should include appropriate citations for these formulas. Agency sampling and estimation plans must be complete and internally consistent (for instance, estimation formulas must appropriately reflect the complexity of the sample design).

g. <u>Updates and Changes to Agency Plans</u>. Agencies should update their sampling and estimation plans, as needed, to reflect the current design and methods being used and incorporate refinements based on previous results, consultations with others, and/or

---

[10] Agencies may alternatively use a 95 percent confidence interval of plus or minus 3 percent around the estimate of the dollar amount of improper payments.

recommendations from Inspectors General, GAO, or OMB. Any updated plans will need to be submitted to OMB no later than June 30 of the fiscal year for which the estimate is being produced (e.g., the sampling methodology to be used for the FY 2014 reporting cycle must be submitted by June 30, 2014). The plans shall include all the components described in steps 2.1 and 2.2 above. A plan that is being updated or changed should include some language explaining why the plan is changing and how the plan is different from the one previously submitted.

Agencies shall submit an explanation and justification to OMB for any instances where a program is not able to fulfill the requirements described in Step 2. OMB will review requests for deviation from these requirements and must approve any alternative methods (see section I.A.14 below).

**Step 3:  Implement a plan to reduce improper payments.**

a.  Root Causes and Corrective Actions.  For all programs and activities as determined under Step 2 with improper payments exceeding the thresholds listed earlier in Step 1, agencies shall identify the reasons their programs and activities are at risk of improper payments and put in place a corrective action plan to reduce them. In many cases, agencies will implement long-term, on-going corrective actions that will be implemented and refined on a continuous basis (e.g., the corrective action is in place for many years, though it may be refined from year to year). Agencies should annually review their existing corrective actions to determine if any existing action can be intensified or expanded, resulting in a high-impact, high return-on-investment in terms of reduced or prevented improper payments. In addition, IPERIA requires agencies to tailor their corrective actions for programs that are deemed high-priority to better reflect the unique processes, procedures, and risks involved in each specific program. This information shall be reported in the agency's AFR or PAR annually. More detailed information about high-priority programs can be found below in section I.B.

b.  Reduction Targets.  When compiling plans to reduce improper payments, agencies shall set reduction targets for future improper payment levels and a timeline within which the targets will be reached. Reduction targets must be approved by the Director of OMB (this approval process will take place during the OMB review and approval process of draft AFRs and PARs). In cases in which a program needs a few years to fully establish an improper payment rate baseline (for example, state-administered programs with a "rolling rate" in which only a fraction of the states report each year), OMB does not expect the program to publish a reduction target until a full baseline has been established and reported.

c.  Accountability.  Agencies must ensure that managers and accountable officers (including the agency head), programs and program officials, and where applicable States and local partners, are held accountable for reducing improper payments. In addition, for programs that are not implemented directly by Federal or State agencies or government, agencies may also consider establishing these accountability

mechanisms. For example, non-Federal entities could include colleges that disburse grants and loans to students, or banks that disburse loans to students. Agencies shall assess whether the organizations have the internal controls, human capital, information systems, and other infrastructure needed to reduce improper payments to minimal cost-effective levels, and identify any statutory or regulatory barriers which may limit the agencies' corrective actions in reducing improper payments. This information shall be reported in the agency's AFR or PAR annually.

**Step 4: Report annually in the AFR or PAR.**

a. <u>Reporting</u>. Agencies shall report to the President and Congress (through AFRs or PARs in the format required by OMB Circular A-136 for improper payment reporting) an estimate of the annual amount and rate of improper payments for all programs and activities determined to be susceptible to significant improper payments under Step 1, regardless of the dollar amount of the estimate, as further explained below. OMB approval of some improper payment requirements (e.g., reduction targets) occurs through OMB's review of the improper payment section of each agency's AFR or PAR. Improper payment information from AFRs and PARs is subsequently analyzed for inclusion in OMB's government-wide reporting on improper payments. This information (i.e., government-wide improper payment rates and improper payment amount estimates) is also posted on PaymentAccuracy.gov— the improper payments website created under Executive Order 13520, *Reducing Improper Payments*.

b. <u>Improper payment estimates that meet statutory thresholds</u>. For programs and activities reporting improper payment estimates that meet the statutory thresholds described in Step 1(a) above, agencies shall follow all the improper payment reporting requirements delineated in OMB Circular A-136. The improper payments section in Circular A-136 outlines what information agencies are required to include in their annual AFRs or PARs regarding improper payment estimates, reduction targets, root causes, corrective actions, and other areas.

c. <u>Improper payment estimates that DO NOT meet statutory thresholds</u>. For programs and activities reporting improper payment estimates that DO NOT meet the statutory thresholds described in Step 1(a) above, agencies are still required to report an estimate of the annual amount and rate of improper payments, as well as reduction targets, in their annual AFRs or PARs, but they are not required to complete the additional steps referenced above in Step 4(b) and outlined in Circular A-136 (e.g., root causes, corrective actions, etc.).

**10) When must agencies conduct risk assessments?**

IPERA required agencies to conduct improper payment risk assessments for all programs starting in FY 2011, unless they received a waiver from OMB. For programs that are deemed to be low risk of significant improper payments, agencies must perform risk assessments at least once every three years thereafter (programs that have been determined to be susceptible to significant

improper payments and that are already reporting an estimate—or in the process of establishing an estimate—do not have to perform additional risk assessments). However, if a low risk program experiences a significant change in legislation and/or a significant increase in its funding level, agencies are required to re-assess the program's risk susceptibility during the next annual cycle, even if it is less than three years from the last risk assessment.

## 11) What information should agencies provide to persons or entities producing improper payment estimates?

IPERIA requires OMB to instruct agencies to give persons or entities producing improper payment estimates access to all necessary payment data, including access to relevant documentation. In order to produce accurate improper payment estimates, agencies must provide full documentation to persons or entities producing their improper payment estimates. In addition, this documentation must be maintained for the length of time required by the National Archives and Records Administration for the particular type of material being held in order for post-payment audits to be performed and to allow internal and external auditors to replicate reported results. For specific records retention requirements, agencies may contact their Senior Agency Official, a listing of which can be found at http://www.archives.gov/records-mgmt/agency/sao-list.html.

## 12) Are agencies allowed to rely upon self-reporting by recipients of agency payments when estimating improper payments?

IPERIA requires OMB to explicitly bar agencies from relying on self-reporting by the recipients of agency payments as the sole source basis for improper payments estimates. Specifically, agencies shall not base their improper payment estimates solely on self-reporting of actual improper payments by the sub-agencies that made the payments or individuals or entities who received the payments. In other words, agencies may not use self-reporting by recipients of actual improper payments in lieu of a statistical estimate.

However, agencies may continue to utilize sub-agencies and recipients of Federal funding to assist in the improper payment rate estimation process if the methodology is statistically valid (or, in the case of alternative methodologies, if approved by OMB) and if the appropriate checks and balances are in place, including Federal oversight to ensure the integrity of the process. For example, a Federal agency overseeing a Federally-funded, State-administered program may choose to ensure that a structured sampling methodology and procedures are prescribed for states' use for estimating and reporting improper payments using information from a variety of sources[11], and not just from the beneficiaries of the program.

Historically, some agencies used alternative methodologies for estimating and reporting improper payments that relied solely on self-reporting of actual improper payments. Current law no longer supports alternative methodologies that are comprised strictly of self-reporting or identification of actual improper payments by employees, vendors, or agency staff, instead of a

---

[11] These sources should be reliable and the information provided should be accurate and complete. Documentation of data reliability testing should be maintained by the sources.

statistical sample resulting in program estimates. Therefore, self-reported improper payments may be reported, but only in addition to the agency's statistical estimates.

### 13) Are agencies allowed to implement an estimation approach that excludes improper payments that have been subsequently corrected and recovered from the annual estimate?

IPERIA requires agencies to include all improper payments that were identified in the sample in the reported estimate, regardless of whether the improper payment has been or is being recovered. Prior to the passage of IPERIA, OMB guidance allowed agencies—in limited cases, and with prior approval from OMB—to implement an estimation approach that excluded improper payments that had been subsequently corrected and recovered from the annual estimate reported in the agency's AFR or PAR. Therefore, any program that currently excludes recovered amounts identified in the sample from its estimate shall update its methodology to reflect the new IPERIA requirement. In this case, OMB will work with the agency to help determine how and when the new methodology will go into effect, and how to report the change in the AFR or PAR (for example, possibly allowing the agency to use an additional figure to disclose the effect of recovered funds on the improper payment rate).

### 14) May agencies use alternative sampling and estimation approaches?

Yes, Section 2(b) of IPERA requires agencies to produce a statistically valid estimate, or "an estimate that is otherwise appropriate using a methodology approved" by the Director of OMB. This means that if, and only if, agencies are unable to develop a sampling methodology that follows the guidance described above in section I.A.9, step 2, they may utilize an alternative sampling and estimation approach after obtaining OMB approval. A request for approval and the proposed alternative sampling and estimation approach must be submitted in writing to OMB no later than June 30 in the fiscal year for which the alternative approach is being developed (e.g., an alternative approach to be used for the FY 2014 reporting cycle must be submitted by June 30, 2014). The request must describe the proposed alternative methodology in detail, and clearly explain why the agency is unable to produce a statistically valid estimate (as described in section I.A.9, step 2). OMB anticipates that a statistician[12] (either an agency employee or a contractor) will be consulted when preparing an alternative sampling and estimation approach.

If approved by OMB, agencies are responsible for maintaining documentation for the alternative sampling and estimation approach. The agency shall also include a summary of this alternative methodology in its AFR or PAR, including the justification for using an alternative methodology.

The scenarios described below are examples of the types of approaches that may be approved by OMB as alternatives to section I.A.9, step 2 of this guidance. However, agencies are required to

---

[12] This person should have training and experience designing statistical samples and using statistical methods to calculate population estimates and sampling errors from a probability sample. This person would generally have an advanced degree in statistics, biostatistics, mathematics, a quantitative social science, or a similar field.

obtain OMB approval prior to implementation.  The scenarios below are merely illustrations, and other alternatives may be presented to OMB.

> *Scenario 1.*  An agency has a previous baseline improper payment rate, and has a plan in place to obtain another full program improper payment rate within five years from the baseline year.
>
> Step 1:  Aging the baseline rate.  The agency should use statistical methods to update or "age" the baseline improper payment rate in the intervening years, until the next program rate is established.  Specifically, the agency should use available data to extrapolate updates of the baseline rate.  At a minimum, the analysis should provide a reasonable basis to conclude whether the baseline rate is trending upward, downward, or remaining static.
>
> Step 2:  Program component annual estimate.  The agency should develop an annual improper payment rate for a component of the program.  The component can be defined based on population, program area, or known problem area.  To the extent possible, the component chosen for analysis should be based on risk so that the agency is targeting an area of the program in which a significant amount of improper payments is expected to occur.  This approach could mean choosing an area because of overall financial exposure, or in the case of State-administered programs, possibly selecting larger states to cover more of the risk.  This program component should be statistically sampled annually to obtain an improper payment rate consistent with the statistical rigor requirements of this guidance.  The goal for the component study is not to extrapolate an improper payment rate for the program as a whole.  Rather, the goal is only to estimate an improper payment amount for the relevant program component being studied.  Component-specific baseline and target rates, as well as corrective action plans, should be developed to assess agency progress in reducing improper payments in the program component.

Please note, that both Steps 1 and 2 in Scenario 1 are required if this alternative is chosen by the agency and approved by OMB.

> *Scenario 2.*  No baseline comprehensive improper payment rate is established and no statistically valid methodology is yet developed to obtain one.
>
> Step 1:  Plan for comprehensive baseline improper payment rate.  A methodology to obtain a comprehensive baseline improper payment rate must be developed with a timeline that would allow for the first estimate to occur within three years of when the plan was approved by OMB.  Statistical rigor must meet, at a minimum, the requirements previously stated in this guidance.
>
> Step 2:  Program component annual improper payment rate.  While the agency is working toward a comprehensive baseline rate, the agency should annually identify a component to assess, and begin to report an improper payment rate for that component within one year of the plan's approval by OMB (see Step 2 in Scenario 1 above).

Step 3: <u>Determine rate</u>. Once the baseline rate is established, and if the rate cannot be re-estimated annually, the agency should perform both Steps 1 and 2 of Scenario 1 above to ensure that adequate information on improper payments is obtained on an annual basis. If an agency decides to utilize one of the scenarios listed above, it must complete all of the steps for the scenario selected. It is important to note that agencies are not restricted to using only these two approaches; different strategies may be necessary because of pre-existing legislative requirements and/or prohibitions, or because a different method may be more appropriate in providing results for a particular program. Agencies may also consider non-probabilistic sampling approaches, such as purposive sampling or cut-off samples, when legislative requirements make probabilistic samples untenable.

***Scenario 3***. The risk of improper payments in a program may be part of a larger inefficiency that the agency is attempting to address. For instance, the improper payments in the program may be a subset of a larger initiative, and the agency may only focus on one portion of the improper payments within the program that is under its control rather than the entire inefficiency.

Step 1: <u>Identify program component</u>. The agency should identify the component of the program that it wants to estimate and report on. This selection should be a component of the program that is within its control, is a driver of improper payments within the program, and whose estimation would produce benefits that outweigh their costs. Once this selection is identified, the agency should implement an estimation plan that meets the statistical rigors stated in this guidance.

Step 2: <u>Continue broader program estimate</u>. During and after the development of the program component improper payment rate, the agency should continue to report the overall program improper payment estimate. Eventually, OMB may notify the agency that it may stop conducting the overall program estimate and instead use the program component estimate in its place, but the agency should continue to report both the component and program improper payment rate until OMB notifies the agency that it may stop doing so.

As detailed above, whether an agency decides to use one of these three scenarios, or proposes a different process, all deviations from section I.A.9, step 2, shall be submitted to OMB no later than June 30 in the fiscal year for which the estimate is being produced and documented in the AFR or PAR. In addition, programs should consider updating their alternative methodology if the program undergoes any significant changes such as legislative, funding, structural, etc.

### 15) Should data used for estimating improper payments coincide with the fiscal year being reported in the AFR or PAR?

To the extent possible, data used for estimating improper payments in a given program should coincide with the fiscal year being reported (for example, the estimate reported in the FY 2014 AFR or PAR should be based on data from FY 2014). However, agencies may utilize a different 12-month reporting period with approval from OMB. This request for approval shall be submitted to OMB no later than June 30 in the fiscal year for which the estimate is being

reported and shall be documented in the AFR or PAR. For example, the estimate reported in the FY 2014 AFR or PAR could be based on data from FY 2013, if approved by OMB. As another example, the estimate reported in the FY 2014 AFR or PAR could be based on data from the last two quarters of FY 2013 and the first two quarters of FY 2014, if approved by OMB. For consistency purposes, the agency shall continue using the same time period for subsequent reporting years, unless a different time period is proposed by the agency and approved by OMB. Therefore, agencies do not need to re-submit a request for approval every year, only when they are planning to change their reporting time period.

**16) What are Federally-funded, State-administered programs, and may agencies consider other approaches for these types of programs?**

Federally-funded, State-administered programs (e.g., Medicaid, Unemployment Insurance, TANF, Title I Grants to States, Child and Adult Care Food Program) receive at least part of their funding from the Federal Government, but are administered, managed, and operated at the State or local level. Where programs are administered at the State level, statistically valid estimates of improper payments may be provided at the State level either for all States or for all sampled States annually. If the improper payment estimates are provided at the State level, these State-level estimates should then be used to generate a national improper payment dollar estimate and rate. However, agencies may submit a plan to OMB for approval to provide national level estimates for State-administered programs based on a systematic selection of such states each year. This request for approval must be submitted in writing to OMB no later than June 30 of the fiscal year for which the approach is being developed (in other words, an approach to be used for the FY 2014 reporting cycle would be submitted by June 30, 2014).

One example of this type of approach can be seen in the Title IV-E Foster Care Program, wherein current regulations require that programs be reviewed every three years for compliance. With prior OMB approval, this program has taken the review cycle already in place and leveraged it for estimating improper payments, providing a rolling three-year average improper payment rate.

Alternate methodologies, such as those described above, must be approved by OMB in advance of implementation. The justification to use this type of approach must include a description of the States to be selected each year, the methodology for generating annual national estimates, and a justification for using the proposed plan rather than an estimate based on a random statistical sample.

**17) Are programs that are identified as susceptible to significant improper payments, and that annually report improper payment estimates, permanently subject to improper payments reporting requirements?**

No. If an agency's program is currently estimating and reporting improper payments, but has documented a minimum of two consecutive years of improper payments that are below the statutory thresholds described in section I.A.9, the agency may request relief from the annual reporting requirements for this program or activity. This request must be submitted in writing to OMB, and must include an assertion from the agency's Office of Inspector General that it

concurs with the agency's request for relief. The request for approval must be submitted to OMB no later than June 30 in the fiscal year for which the agency is requesting to halt reporting (e.g., a request to halt reporting for a program beginning with the FY 2014 reporting cycle must be submitted by June 30, 2014).

OMB will not grant automatic approval. Rather, OMB will review the request and will also take into account the following criteria:

  a. Burden—does measuring and reporting improper payments lead to a heavy burden (e.g., in terms of funding, program staff hours, etc.)?
  b. Legislative considerations—are there any legislative requirements or recent changes that affect the program's ability or inability to estimate and report improper payments?
  c. Audit findings—are there any audit findings (i.e., by the Inspector General or GAO) that point to reasons why the program might want to continue measuring and reporting improper payments?
  d. Ongoing risk mitigation strategies—are there any appropriate controls, policies, or corrective actions that have been put in place to mitigate the risk of fraud and error in the program?
  e. Other considerations—are there any other key factors that should be considered in deciding whether or not to grant relief from measuring and reporting improper payments?

In order to expedite OMB's review, agencies should consider the five criteria above and discuss them, if appropriate, in the written request. If OMB approves the request, the agency shall incorporate that program or activity into its risk assessment cycle. However, if significant legislative changes occur, if program funding is significantly increased, or if any change results in substantial program impact, agencies must perform a risk assessment of this program as part of its next reporting cycle, even if it has been less than three years since the last risk assessment. If the risk assessment indicates that the program is again susceptible to significant improper payments, the agency will return to the full estimation and reporting process as required by IPIA. Agencies must continue to report improper payment rates, amounts, and remediation efforts as long as annual improper payments for a program exceed the reporting thresholds.

**18) Are programs and activities that have been deemed susceptible to significant improper payments as a result of the Disaster Relief Appropriations Act, 2013, permanently subject to improper payments reporting requirements?**

No. Improper payment measuring and reporting for funds received under the Disaster Relief Appropriations Act, 2013, for Hurricane Sandy-related activities must only be performed until those funds are expended. According to the Disaster Relief Appropriations Act, 2013, all Federal programs or activities receiving funds under that Act are automatically considered susceptible to significant improper payments, regardless of any previous improper payment risk-assessment results, and are required to calculate and report an improper payment estimate. For further guidance on Hurricane Sandy-related improper payment requirements, please refer to OMB Memorandum M-13-07, *Accountability for Funds Provided by the Disaster Relief Appropriations Act*, issued on March 12, 2013.

**B. IMPROVING THE DETERMINATION OF IMPROPER PAYMENTS**

**1)   How will OMB determine the "high-priority" programs as required under IPERIA?**

High-priority programs will be determined by OMB based on improper payment reporting in agencies' AFRs or PARs.

OMB may classify a program as high-priority if the program meets the following conditions:

   a.   It is susceptible to significant improper payments as defined by statute and OMB implementing guidance and either:
      i.   Estimated and reported improper payments above the threshold determined by OMB or contributed to the majority of government-wide improper payments in the most recent reporting year; or
      ii.   Did not report an improper payment estimate in the most recent reporting year, but had reported improper payments before and did not receive relief from OMB from measuring and reporting; or
      iii.   Has not yet reported an overall program improper payment estimate amount, but the aggregate of the program's component improper payments are above the threshold.

   b.   For those programs with improper payment amounts above the threshold, but with improper payment rates below 1.5 percent of program outlays, agencies may work with OMB to determine if the program can be exempted from fulfilling certain OMB requirements for high-priority programs.

The threshold for high-priority program determinations for FY 2014 reporting, and for subsequent years, is $750 million in estimated improper payments as reported in the AFR or PAR (regardless of the improper payment rate estimate).  OMB may revise this threshold in future years and, if so, will notify agencies of the new threshold and if any programs shall be added or removed (based on reporting errors above or below the new threshold) from the high-priority list.  If a program is identified as high-priority (e.g., because it did not report an improper payment estimate, or reported an improper payment estimate above $750 million), but in subsequent years reports an improper payment estimate below $750 million, it will no longer be considered a high-priority program.

**2)   What are the requirements under IPERIA for establishing semi-annual or quarterly actions for reducing improper payments?**

IPERIA requires OMB, in coordination with agencies responsible for administering high-priority programs, to establish semi-annual or quarterly actions for reducing improper payments associated with each high-priority program.  IPERIA codified parts of Executive Order 13520, including this particular requirement, which stems from the Executive Order supplemental measures and targets.  For more details, please see section III.B of this guidance.

3) **Do high-priority programs have any specific requirements regarding corrective actions?**

High-priority programs are already required to develop corrective actions, as discussed in section I.A. However, IPERIA requires agencies to tailor their corrective actions for high-priority programs. Therefore, any agency that has any programs identified as high-priority shall explain in its AFR or PAR how it has specifically tailored its corrective actions for high-priority programs to better reflect the unique processes, procedures, and risks involved in each specific program.

4) **Are there any additional reporting requirements for agencies that have high-priority programs?**

Yes. IPERIA requires each agency that has any programs identified as high-priority to report to their Inspector General, and make available to the public (including availability through the internet): (1) any action the agency has taken—or plans to take—to recover improper payments; and (2) any action the agency intends to take to prevent future improper payments. In order to avoid duplication and reduce the number of agency reports related to improper payments, agencies shall fulfill this requirement by including this information in their AFRs or PARs starting with FY 2014 reporting. Please note that this reporting requirement will also fulfill the "accountable official" report required under Section 3(b) of Executive Order 13520.

Inspectors General shall review this information (i.e., the information discussed in this question, in the paragraph above) when they conduct their annual compliance reviews (see Part II of this guidance). OMB will make the improper payments portions of AFRs and PARs publicly available on PaymentAccuracy.gov starting with the FY 2014 reporting cycle. As required by IPERIA, the agency shall not include any referrals the agency made or anticipates making to the Department of Justice, or any information provided in connection with such referrals. In addition, this requirement shall not prohibit any referral or information being made available to an Inspector General as otherwise provided by law.

## C. CATEGORIES FOR REPORTING IMPROPER PAYMENTS

1) **What categories should agencies use when reporting improper payment estimates?**

Prior to FY 2015 reporting, agencies were required to categorize their improper payment estimates based on three categories of improper payments: documentation and administrative errors; authentication and medical necessity errors; and verification errors. However, those categories proved to be limited and not necessarily applicable to most programs. Therefore, OMB—in consultation with agencies—developed new improper payment categories. Reporting information based on these categories shall be required for FY 2015 reporting and beyond. To the extent possible, for FY 2014 reporting OMB encourages agencies with programs that are susceptible to significant improper payments to report information in their AFR or PAR based on the categories described below.

These new categories will: (1) prove more pertinent to the vast array of programs across the Federal landscape; (2) help agencies better present the different categories of improper payments in their programs and the percentage of the total improper payment estimate that each category represents; and (3) provide more granularity on improper payment estimates—thus leading to more effective corrective actions at the program level and more focused strategies for reducing improper payments at the government-wide level.

The matrix below provides a cross-tabulation framework for the way in which each program shall categorize and report its improper payment estimate.

Table 1: Matrix of Improper Payment Categories ($ in millions)

| Reason for Improper Payment | | Type of Improper Payment | | |
|---|---|---|---|---|
| | | Overpayments | Underpayments | |
| Program Design or Structural Issue | | | | 1 |
| Inability to Authenticate Eligibility | | | | 2 |
| Failure to Verify: | Death Data | | | 3 |
| | Financial Data | | | 4 |
| | Excluded Party Data | | | 5 |
| | Prisoner Data | | | 6 |
| | Other Eligibility Data (explain) | | | 7 |
| Administrative or Process Error Made by: | Federal Agency | | | 8 |
| | State or Local Agency | | | 9 |
| | Other Party (e.g., participating lender, health care provider, or any other organization administering Federal dollars) | | | 10 |
| Medical Necessity | | | | 11 |
| Insufficient Documentation to Determine | | | ✕ | 12 |
| Other Reason (explain) | | | | 13 |
| | | A | B | |

In the matrix, columns A and B include two categories based on the type of improper payment, and rows 1 through 13 include thirteen categories based on the reason why the improper payment was made (each category is explained in more detail below). The matrix has a total of 25 cells (i.e., coordinates A1 through B13, where B12 is not to be used, as indicated by the 'X' in cell

B12 in the matrix). Each program shall distribute its total improper payment estimate (which is based on dollars, as opposed to number of occurrences) across the 25 cells in the matrix—with the understanding, of course, that not every cell will apply to every program.

For example, suppose a program reported $100 million in estimated improper payments. Here is an example of how the table might be filled out:

- If $70 million were overpayments caused by the inability to authenticate eligibility, then that amount would go in cell A2.
- If $10 million were underpayments caused by process errors at State agencies administering the program, then that amount would go in cell B9.
- If $20 million were cases where there was insufficient documentation to determine if payments were proper or improper, in which case it is assumed those are overpayments, then that amount would go in cell A12.

Ultimately, the amounts placed across the different cells in the matrix need to add up to the total reported estimated improper payment amount for that given program. Please note that, taken by themselves, the amounts placed in each cell do not need to meet the statistical requirements described above in section I.A.9, step 2. Also note that, although there are 25 cells in the matrix below, agencies should only fill in relevant cells, and may leave cells blank if they are not relevant to the program's estimated improper payments. *Finally, it is important to note that in cases where the agency believes more than one cell might be suitable to any given improper payment category, the agency should determine which cell it believes to be the most appropriate.*

All categories found in the matrix are described as follows:

a. *Overpayments (column A) and Underpayments (column B)*: An overpayment is a payment that is evidently higher than it should have been (including a duplicate payment), and an underpayment is a payment that is evidently lower than it should have been.

b. *Program Design or Structural Issue (row 1)*: A situation in which improper payments are the result of the design of the program or a structural issue. For example, a scenario in which a program has a statutory (or regulatory) requirement to pay benefits when due, regardless of whether or not all the information has been received to confirm payment accuracy.

c. *Inability to Authenticate Eligibility (row 2)*: A situation in which an improper payment is made because the agency is unable to authenticate eligibility criteria. Though other scenarios are also possible, here we discuss three likely ways in which this can happen. First, the inability to authenticate eligibility can happen because no databases or other resources exist to help the agency make a determination of eligibility (for example, the inability to establish that a child lived with a family for a certain amount of time—for the purpose of determining that a family is eligible for a tax credit—because no database exists to do so). Second, a beneficiary has failed to report information to an agency that is needed for determining eligibility (for example, a beneficiary failing to provide an

agency with information on earnings, and the agency does not have access to databases containing the earnings information). Finally, statutory constraints prevent a program from being able to access information that would help prevent improper payments (for example, not confirming a recipient's earnings or work status through existing databases due to statutory constraints).

d. *Failure to Verify Data (rows 3-7)*: A situation where the agency (Federal, State, or local), or another party administering Federal dollars, fails to verify appropriate data to determine whether or not a recipient should be receiving a payment, even though such data exist in government or third-party databases. For reporting purposes, the kind of data in question would include, but are not limited to, the following:

   i. *Death Data (row 3)*—failure to verify that an individual is deceased, and the agency pays that individual.

   ii. *Financial Data (row 4)*—failure to verify that an individual's or household's financial resources (for example, current income or assets) do not meet the threshold to qualify him or her for a benefit, and the agency makes a benefit payment to that individual or household.

   iii. *Excluded Party Data (row 5)*—failure to verify that an individual or entity has been excluded from receiving Federal payments, and the agency pays that individual or entity.

   iv. *Prisoner Data (row 6)*—failure to verify that an individual is incarcerated and ineligible for receiving a payment, and the agency pays that individual.

   v. *Other Eligibility Data (row 7)*—any other type of data not already listed above, causing the agency to make an improper payment as a result.

e. *Administrative or Process Errors (Rows 8-10):* Errors caused by incorrect data entry, classifying, or processing of applications or payments. For example, an eligible beneficiary receives a payment that is too high or too low due to a data entry mistake, or an agency enters an incorrect invoice amount into its financial system. These types of errors can be made by:

   i. *Federal Agency (row 8)*

   ii. *State or Local Agency (row 9)*

   iii. *Other Party (row 10)*—for example, a participating lender, or any other type of organization administering Federal dollars that is not a Federal or State agency.

f. *Medical Necessity (row 11)*: A situation in which a medical provider delivers a service or item that does not meet coverage requirements for medical necessity (for example, providing a power wheelchair to a patient whose medical record does not support meeting coverage requirements for a power wheelchair).

g. *Insufficient Documentation to Determine (row 12)*: A situation where there is a lack of supporting documentation necessary to verify the accuracy of a payment identified in the improper payment testing sample. For example, a program does not have documentation to support a beneficiary's eligibility for a benefit (in this case, the beneficiary may have been eligible, but the documentation is not present to confirm it during the review period).

h. *Other Reason (row 13)*: If none of the above categories apply, include any other reasons for the improper payment under this category—and please explain the reasons in more detail either in footnotes or in the narrative below the table. In instances where agencies are able to identify improper payments resulting from fraud, they should report those dollar amounts in this row—unless they already report fraud through a mechanism outside of the annual improper payment process (e.g., an annual report to Congress). Additional considerations for fraudulent activities are discussed below.

**2) How should agencies focus on fraudulent activities?**

When agencies are reviewing the root causes of improper payments, or analyzing areas for supplemental measures and targets, agencies should be mindful of maintaining a focus on fraudulent activity within the program. For instance, fraudulent actions (e.g., using fraudulent documents to receive a benefit or contract payment) may have an impact on agency outlays, and may also be something that agencies can reduce through improved pre-payment reviews and additional safeguards. Agencies should refer matters involving possible fraudulent activities to the appropriate parties as determined by specific agency policy. Such parties may include, but are not limited to, the Office of Inspector General or the Department of Justice.

**D. PAYMENT RECAPTURE AUDITS**

This section of the guidance implements the requirements of IPERA Section 2(h), which requires agencies to conduct payment recapture audits (also known as recovery audits) for each program and activity that expends $1 million or more annually if conducting such audits would be cost-effective. Before IPERA, payment recapture audits were only required for agencies that entered into contracts with a total value in excess of $500 million in a fiscal year, and for certain other programs.

A more recent law, IPERIA, requires OMB to determine current and historical rates and amounts of improper payment recoveries (or, in cases in which improper payments are identified solely on the basis of a sample, recovery rates and amounts estimated on the basis of the applicable sample), including a list of agency recovery audit contract programs and specific information of amounts and payments recovered by recovery audit contractors.

**1) What are the definitions used for payment recapture auditing in this guidance?**

For purposes of this guidance the following terms and definitions are used:

a. *Post-Award Audit* refers to a post-award examination of the accounting and financial records of a payment recipient that is performed by an agency official, or an authorized representative of the agency official, pursuant to the audit and records clauses incorporated in the contract or award. A post-award audit is normally performed by an internal or external auditor that serves in an advisory capacity to the agency official. A post-award audit, as distinguished from a payment recapture audit, is normally performed

for the purpose of determining if amounts claimed by the recipient are in compliance with the terms of the award or contract, and with applicable laws and regulations. Such reviews involve the recipient's accounting records, including the internal control systems. A post-award audit may also include a review of other pertinent records (e.g., reviews to determine if a proposal was complete, accurate, and current); and reviews of recipients' systems established for identifying and returning any improper payments received under its Federal awards.

b. *Payment Recapture Audit* is a review and analysis of an agency's or program's accounting and financial records, supporting documentation, and other pertinent information supporting its payments, that is specifically designed to identify overpayments. It is not an audit in the traditional sense covered by Government Auditing Standards. Rather, it is a detective and corrective control activity designed to identify and recapture overpayments, and, as such, is a management function and responsibility.

c. *Payment Recapture Audit Program* is an agency's overall plan for risk analysis and the performance of payment recapture audits and recovery activities. The agency head will determine the manner and/or combination of payment recapture activities to use that are expected to yield the most cost-effective results (see definition below).

d. *Cost-Effective Payment Recapture Audit Program* is one in which the benefits (i.e., recaptured amounts) exceed the costs (e.g., staff time and resources, or payments for the payment recapture audit contractor) associated with implementing and overseeing the program.

e. *Payment Recapture Audit Contingency Contract* is a contract for payment recapture audit services in which the contractor is paid for its services as a percentage of overpayments actually collected. The contractor must provide clear evidence of overpayments to the appropriate agency official. More information on contingency contracts can be found in the remaining questions of section I.D.

f. *Recapture Activity* is any activity by an agency to attempt to identify and recover overpayments identified by a payment recapture audit or a post-award audit.

g. *Financial Management Improvement Program* is an agency-wide program to address the deficiencies in an agency's internal controls over payments identified during the course of implementing a payment recapture audit program, or other agency activities and reviews. The first priority of such a program is to address problems that contribute directly to agency improper payments and other instances of waste, fraud, and abuse.

## 2) What are the general agency requirements for implementing a payment recapture audit program?

Agencies shall have a cost-effective program of internal control to prevent, detect, and recover overpayments. A program of internal control may include policies and activities such as prepayment reviews, a requirement that all relevant documents be made available before making

payment, and performance of post-award audits. Effective internal controls could include payment recapture auditing techniques such as data matching with Federal, State, and local databases; and data mining and predictive modeling to identify improper payments. However, for agencies that have programs and activities that expend more than $1 million in a fiscal year, a payment recapture audit program is a required element of their internal controls over payments if conducting such audits is cost-effective. These payment recapture audits should be implemented in a manner designed to ensure the greatest financial benefit to the Federal government.

**3) Should agencies establish targets for their payment recapture audit programs?**

Yes, all agencies are required to establish annual targets for their payment recapture audit programs that will drive their annual performance. Agencies shall develop their own payment recapture targets for review and approval by OMB (this approval process will take place during the OMB review and approval process of draft AFRs and PARs). Agencies are expected to set targets that show an increase in recoveries over time, and OMB reserves the right to notify specific agencies that they need to establish stricter targets. An agency may set different payment recapture targets for the different types of payments it makes (for example, a given agency might set a target that encompasses all contract payments lumped together, and another target that encompasses all grant payments lumped together), or for each program. Lastly, agencies may also identify and implement additional metrics beyond these targets to evaluate their payment recapture audit programs, but these metrics shall not be used as a substitute for establishing annual recovery targets.

**4) What is the scope for payment recapture audit programs?**

a. All programs and activities that expend $1 million or more annually—including grant, benefit, loan and contract programs—shall be considered for payment recapture audits.

b. Agencies shall review their different types of programs and activities and prioritize conducting payment recapture audits on those categories that have a higher potential for overpayments and recoveries. Agencies should utilize known sources of improper payment information and give priority to recent payments and to payments made in programs identified as susceptible to significant improper payments. Possible sources of improper payment information include: statistical samples and risk assessments, agency post-payment reviews, prior payment recapture audits, agency Inspector General reviews, Government Accountability Office reports, self-reported errors, reports from the public, audit reports, and the results of the agency audit resolution and follow-up process.

c. Agencies shall conduct a payment recapture audit program in a manner that will ensure the greatest financial benefit for the government.

d. Agencies may exclude payments from certain programs and activities from payment recapture audit activities if the agency determines that payment recapture audits are not a cost-effective method for identifying and recapturing improper payments.

e.  The payment recapture audit contractor may, with the consent of the employing agency, notify entities (including individuals) of potential overpayments made to such entities, respond to questions concerning potential overpayments, and take other administrative actions with respect to overpayment claims made or to be made by the agency.  However, the payment recapture audit contractor will not have the authority to make determinations relating to whether any overpayment occurred and whether to compromise, settle, or terminate overpayment claims.

f.  To the extent possible, any underpayments identified through the payment recapture audit process should also be corrected by the agencies.  Agencies may include provisions that authorize payments to payment recapture auditors for underpayments identified.

g.  Payment recapture auditing activities should not duplicate other audits of the same (recipient or agency) records that specifically employ payment recapture audit techniques to identify and recapture overpayments.  At a minimum, agencies should coordinate with their Inspectors General and other organizations with audit jurisdiction over agency programs and activities.

h.  Instances of potential fraud discovered through payment recapture audit and recapture activities shall be reported immediately to the appropriate parties as determined by specific agency policy.  Such parties may include, but are not limited to, the Office of Inspector General or the Department of Justice.

**5)  What criteria should an agency consider in determining whether a payment recapture audit is cost-effective?**

An agency may consider the following criteria in determining whether a payment recapture audit is cost-effective:

a.  The likelihood that identified overpayments will be recaptured.  For example:
   i.  Whether laws or regulations allow recovery;
   ii.  Whether the recipient of the overpayment is likely to have resources to repay overpayments from non-Federal funds;
   iii.  Whether the evidence of overpayment is clear and convincing (e.g., the same exact invoice was paid twice) as opposed to whether the recipient of an apparent overpayment has grounds to contest, and the agency's assessment of the strength of the recipient's counterargument; and
   iv.  Whether the overpayment is truly an improper payment that can be recovered rather than a failure to properly document compliance.

b.  The likelihood that the expected recoveries will be greater than the costs incurred to identify and recover the overpayments.  For example:
   i.  Can efficient techniques such as sophisticated software and matches be used to identify significant overpayments at a low cost per overpayment or will labor-intensive manual reviews of paper documentation be required?

31

ii.   Are tools available to efficiently perform the payment recapture audit and minimize payment recapture audit costs?  Payment recapture audits are generally most efficient and effective where there is a central electronic database (e.g., a database that contains information on transactions and eligibility information) where sophisticated software can be used to perform matches and analysis to identify recoverable overpayments (e.g., duplicate payments).

iii.  How expensive will attempts to recover some or all of the overpayments be, particularly in complex financial situations, and when recipients may contest the assertion of an overpayment, especially when litigation is anticipated (in which situations, the agency should consult with its counsel and, as appropriate, with the Department of Justice)?

Agencies are encouraged to use limited scope pilot payment recapture audits in areas deemed of highest risk (e.g., based on IPIA risk assessments or estimation process) to assess the likelihood of cost-effective payment recapture audits on a larger scale.

**6)  What should an agency do if it determines that a payment recapture audit program would not be cost-effective?**

If an agency determines that it would be unable to conduct a cost-effective payment recapture audit program for certain programs and activities that expend more than $1 million, then it must notify OMB and the agency's Inspector General of this decision and include any analysis used by the agency to reach this decision.  OMB may review these materials and determine that the agency should conduct a payment recapture audit to review these programs and activities.  In addition, the agency shall report in its annual AFR or PAR: 1) a list of programs and activities where it has determined conducting a payment recapture audit program would not be cost-effective; and 2) a description of the justifications and analysis that it used to determine that conducting a payment recapture audit program for these programs and activities was not cost-effective.

**7)  Should the agency follow any particular procedures when conducting payment recapture audits of grants payments?**

Agencies with grant programs shall consider payment recapture auditing contracts at the grant recipient level.  Federal agencies should work with State and local governments to ensure that they have enough resources to conduct payment recapture audits (for example, through direct funding, allowable administrative expenses, or contingency contracts).  Whenever applicable, agencies should leverage work already being carried out outside of payment recapture audits.  For example, agencies are encouraged to rely on and use the audit work already being carried out under the Single Audit Act and the Uniform Guidance for federal assistance (2 CFR 200 Subpart F).  Generally, Federal agencies should not look to pass-through entities for repayment of improper payments identified by payment recapture audits for funds they pass-through until repayment has been made by the sub-recipient or the final payee.  Federal agencies should also coordinate among themselves to reach partnerships with grant recipients to ensure a coordinated, cost-effective approach to implement these payment recapture audit requirements.  The

cognizant agency assignment model used in the Single Audit or cost allocation processes can help in streamlining the coordination between the Federal agencies and grant recipients.

**8) Can Federal agencies provide money to States and Local governments for Financial Management Improvement efforts?**

Yes. Many programs are Federally-funded but State-administered, and Federal agencies should support State efforts to reduce improper payments in these programs. As authorized in IPERA and this guidance, agencies may use up to 25 percent of funds recovered under a payment recapture audit program to support Financial Management Improvement Programs (as described in more detail in section I.D.14 below), including making a portion of this funding available to State and local governments to support their Financial Management Improvement Programs.

**9) Who may perform payment recapture audits?**

Payment recapture audits may be performed by employees of the agency, by any other department or agency of the Federal government acting on behalf of the agency, by non-Federal entities (as defined in the Uniform Guidance, 2 CFR Subpart A, section 200.69) expending Federal awards, by contractors performing payment recapture audit services under contracts awarded by the executive agency, or any combination of these options.

**10) May contractors perform payment recapture audit services?**

Yes. With respect to contracts with private sector contractors performing payment recapture audits, agencies may utilize a number of options, including a contingency contract with a private sector contractor, to conduct payment recapture audit services. With the passage of IPERA, agencies are allowed and encouraged to utilize contingency contracts for private sector contractors to implement the authorities under the new law to review all types of payments and activities.

However, certain types of payments recovered may not be available to pay the payment recapture audit costs (for instance, amounts recovered due to interim improper payments made under ongoing contracts if these amounts are still needed to make subsequent payments under the contract, recoveries from an appropriation other than a discretionary appropriation, or recovered overpayments from an appropriation that has not expired—please refer to section I.D.14 below for more details). Therefore, agencies would need to establish other funding arrangements (such as through appropriations) when making payments to private sector payment recapture audit contractors in such cases where recoveries cannot be used to pay contingency fee contracts.

**11) Are there any specific requirements when using a contracted payment recapture auditing firm?**

Agencies should require contractors to become familiar with the agency's specific policies and procedures, and take steps to safeguard the confidentiality of sensitive financial information that has not been released for use by the general public and any information that could be used to identify a person.

At a minimum, each contract for payment recapture audit services shall require the contractor to:

a.  Provide periodic reports to the agency on conditions giving rise to overpayments (e.g., root causes of overpayments) identified by the auditor and any recommendations on how to mitigate such conditions.  If requested, the agency should provide the results of such analyses and related recommendations to its Office of Inspector General;

b.  Notify the agency of any overpayment identified by the contractor pertaining to the agency or to any other agency or agencies that are beyond the scope of the contracts; and

c.  Report to the agency and the agency's Office of Inspector General credible evidence of fraud or vulnerabilities to fraud, and conduct appropriate training of contractor personnel on identification of fraud.

Agencies may allow payment recapture auditors to establish a presence on, or visit, the property, premises, or offices of any subject of payment recapture audits.  Such physical presence is not prohibited, and may in fact allow the payment recapture auditor to do a more thorough review of the subject's payments, and related documentation and payment files.

**12) Are there any prohibitions when using a payment recapture audit contractor?**

In addition to provisions that describe the scope of payment recapture audits (and any other provisions required by law, regulation, or agency policy), any contract with a private sector firm for payment recapture audit services shall include provisions that prohibit the payment recapture audit contractor from:

a.  Requiring production of any records or information by the agency's contractors.  Only duly authorized employees of the agency can compel the production of information or records from the agency's contractors, in accordance with applicable contract terms and agency regulations;

b.  Using or sharing sensitive financial information with any individual or organization, whether associated with the Federal government or not, that has not been officially released for use by the general public, except for an authorized purpose of fulfilling the payment recapture audit contract; and

c.  Disclosing any information that identifies an individual, or reasonably can be used to identify an individual, for any purpose other than as authorized for fulfilling its responsibilities under the payment recapture audit contract.

**13) Who performs recovery activities once the improper payments are discovered and verified?**

The actual collection activity may be carried out by Federal agencies or non-Federal entities expending Federal awards, as appropriate.  However, agencies or non-Federal entities may use

another private sector entity, such as a private collection agency, to perform this function, if this practice is permitted by statute. As noted above, the payment recapture audit contractor may not perform the collection activity, unless it meets the definition of a private collection agency, and the agency involved has statutory authority to utilize private collection agencies. Agencies shall ensure that applicable laws and regulations governing collection of amounts owed to the Federal government are followed.

**14) What is the proper disposition of recovered amounts?**

Funds collected under a payment recapture audit program can be used for the following purposes:

a. Recaptured overpayments from **expired discretionary fund accounts** that were **appropriated after** enactment of IPERA (i.e., July 22, 2010) shall be available to the agency to reimburse the actual expenses incurred by the agency for the following purposes:
   i. To reimburse the actual expenses incurred by the agency for the administration of the program (including payments made to other agencies that carry out payment recapture audit services on behalf of the agency); and
   ii. To pay contractors for payment recapture audit services.

b. Recaptured overpayments from **expired discretionary fund accounts** that were **appropriated after** enactment of IPERA (i.e., July 22, 2010) that are not used to reimburse expenses of the agency or pay payment recapture audit contractors—as described above in section I.D.14.a—shall be used for: a financial management improvement program, the original purpose of the funds, Inspector General activities, or returned to the Treasury as miscellaneous receipts or returned to trust or special fund accounts. Each agency shall determine the actual percentage of recovered overpayments used for the purposes outlined here (up to the maximum amount allowed in the law and this guidance). Specifically:
   i. Up to 25 percent of the recaptured funds may be used for the <u>financial management improvement program</u> described below in section I.D.15. This funding shall be credited, if applicable, for that purpose identified by the agency head to any agency appropriations and funds that are available for obligation at the time of collection. These funds shall be used to supplement and not supplant any other amounts available for that purpose, and shall remain available until expended. As discussed in section I.D.8, such funds can go to non-Federal entities such as State and local governments if the agency determines that is the best disposition of the funds to support its financial management improvement program.
   ii. Up to 25 percent of the recaptured funds may be used for the <u>original purpose</u>. This funding shall be credited to the appropriation or fund, if any, available for obligation at the time of collection for the same general purposes as the appropriation or fund from which the overpayment was made, and shall remain available for the same period of availability and purposes as the appropriation or fund to which credited. If the appropriation from which the overpayment was

made has expired, the funds shall be newly available for the same time period as the funds were originally available for obligation. However, any funds that are recovered more than five fiscal years after the last fiscal year in which the funds were available for obligation shall be deposited in the Treasury as miscellaneous receipts.

iii. Up to 5 percent of the recaptured funds shall be available to the agency Inspector General. The agency Inspector General may use this funding to carry out the law's requirements, and perform other activities relating to investigating improper payments or auditing internal controls associated with payments. However, the funding shall remain available for the same period of availability and purposes as the appropriation or fund to which it is credited.

iv. The remainder of the recaptured, expired discretionary funds that were appropriated after enactment of IPERA (i.e., July 22, 2010)—including recaptured overpayment amounts from **trust and special fund accounts**—that are not applied in accordance with the preceding 14.a.i, 14.a.ii, 14.b.i, 14.b.ii, and 14.b.iii shall be credited to the expired account from which the overpayment was made.

c. Recaptured overpayments from **unexpired discretionary fund accounts** that were **appropriated after** enactment of IPERA (i.e., July 22, 2010) shall be credited to the account from which the overpayments were made without using it for any purposes outlined above in 14.a and 14.b.

d. Recaptured overpayments from **mandatory fund accounts** shall be credited to the account from which the overpayments were made without using it for any purposes outlined above in 14.a and 14.b.

e. In the case of recaptured overpayments from **expired or unexpired discretionary fund accounts** that were **appropriated before** enactment of IPERA (i.e., July 22, 2010), agencies have the same authorities as before IPERA was enacted. Therefore, in this case recaptured overpayments may be applied in accordance with the preceding 14.a, but shall not be applied in accordance with the preceding 14.b. The remainder shall be credited to the expired account from which the overpayment was made.

f. In the case of **closed accounts**, the budgetary resources are cancelled, and all recaptured overpayments shall be deposited in the Treasury as miscellaneous receipts.

g. Contingency fee contracts shall preclude any payment to the payment recapture audit contractor until the recoveries are actually collected by the agency.

h. All funds collected and all direct expenses incurred as part of the payment recapture audit program shall be accounted for specifically. The identity of all funds recovered shall be maintained as necessary to facilitate the crediting of recovered funds to the correct appropriations and to identify applicable time limitations associated with the appropriated funds recovered.

i.  Overpayments that are identified by the payment recapture auditor, but that are subsequently determined not to be collectable or not to be improper, shall not be considered "collected" for the disposition purposes outlined above.

j.  Some programs and payments have separate statutory authority or requirements to conduct payment recapture audits, and thus are not required to follow the disposition of recovered funds outlined above for funds recovered from these programs and payments. For instance, under Section 302 of Division B of the Tax Relief and Health Care Act (Section 1893 of the Social Security Act; 42 U.S.C. 1395ddd) and Section 6411 of the Patient Protection and Affordable Care Act (Pub. L. No. 111-148), the Department of Health and Human Services is required to conduct reviews of certain Medicare program payments to identify and recover improper payments, and States are required to conduct similar reviews under Medicaid. In a similar example, under the authority of 31 U.S.C. 3726, the General Services Administration audits agency transportation payments for improper payments. Agencies with oversight of such programs and payments may choose to follow the disposition uses outlined in this guidance—provided that is consistent with any other applicable statutory requirements—but are not required to do so. Disposition of payments associated with loans and loan guarantees must conform to the requirements of the Federal Credit Reform Act of 1990, as amended (2 U.S.C. 661a et. seq.)

**15) Are agencies authorized to implement Financial Management Improvement Programs?**

Yes. IPERA authorizes agencies to implement "financial management improvement programs." Such programs shall take the information obtained from the payment recapture audit program (as well as other audits, reviews, or information that identify weaknesses in an agency's internal controls), and ensure that actions are taken to improve the agency's internal controls to address problems that directly contribute to agency improper payments. In conducting its financial management improvement programs, agency heads may also seek to reduce errors and waste in programs and activities other than where funds are recaptured.

**16) What are the reporting requirements for payment recapture audits?**

Agencies shall annually report information on their payment recapture audit program in their AFRs or PARs, as outlined in OMB Circular A-136.

In addition, by November 1, agencies are required to complete a separate, annual report to OMB as well as the Senate Committee on Homeland Security and Governmental Affairs and the House Committee on Oversight and Government Reform. This report shall describe any recommendations identified by the payment recapture auditor on how to mitigate conditions giving rise to overpayments, and any corrective actions the agency took during the preceding fiscal year to address the auditor recommendations. This report shall describe agency efforts during the previous fiscal year (for example, for the November 1, 2014 report, the agency would describe recommendations and actions between October 1, 2013, and September 30, 2014; subsequent reports would describe efforts for subsequent fiscal years). This report is required only for Federal agencies utilizing external contractors to conduct their payment recapture audits

and only in instances where these contractors have provided any recommendations, as described above.  This report is not required for state agencies utilizing contractors to conduct their payment recapture audits.

**17) How are improper payment estimates different from payment recapture audit efforts?**

Improper payment estimates evaluate a small number of payments in a program or activity to determine if the payments were improper or proper.  The results of these reviews are then extrapolated to the universe of payments in a program or activity to determine the program or activity's annual improper payment amount and rate.  Payment recapture audits are not statistical samples, and instead are targeted examinations of high-risk payments which most likely can be cost-effectively recaptured (e.g., cash collected from the final payee exceeding collection costs).

## PART II – COMPLIANCE WITH THE IMPROPER PAYMENT REQUIREMENTS

Part II provides guidance to assist Inspectors General and agency management in implementing improper payment requirements.

### A. RESPONSIBILITIES OF AGENCY INSPECTORS GENERAL

**1) When should each agency Inspector General begin reviewing improper payment performance to determine whether the agency is in compliance under IPERA?**

Each agency Inspector General should annually review agency improper payment reporting in the agency's annual AFR or PAR, and accompanying materials, to determine if the agency is in compliance under IPERA.

**2) When should the agency Inspector General complete its review of agency compliance under IPERA?**

An agency Inspector General should review the agency's annual AFR or PAR, and accompanying materials, and complete its review and determination within 180 days of their publication.

**3) What should each agency Inspector General review to determine if an agency is in compliance under IPERA?**

To determine compliance under IPERA, the agency Inspector General should review the agency's AFR or PAR (and any accompanying information) for the most recent fiscal year. Compliance under IPERA means that the agency has:

  a. Published an AFR or PAR for the most recent fiscal year and posted that report and any accompanying materials required by OMB on the agency website;
  b. Conducted a program specific risk assessment for each program or activity that conforms with Section 3321 note of Title 31 U.S.C. (if required);
  c. Published improper payment estimates for all programs and activities identified as susceptible to significant improper payments under its risk assessment (if required);
  d. Published programmatic corrective action plans in the AFR or PAR (if required);
  e. Published, and is meeting[13], annual reduction targets for each program assessed to be at risk and estimated for improper payments (if required and applicable); and
  f. Reported a gross improper payment rate of less than 10 percent for each program and activity for which an improper payment estimate was obtained and published in the AFR or PAR.

If an agency does not meet one or more of these requirements, then it is not compliant under IPERA.

---

[13] A program will have met a reduction target if the improper payment rate for that program in the current year falls within plus or minus 0.1 percentage points of the reduction target set in the previous year's AFR or PAR.

**4)   What else should the agency Inspector General include in its compliance review and report?**

The report must contain a high-level summary toward the beginning of the report that (a) clearly states the agency's compliance status (i.e., compliant or non-compliant) and (b) indicates which of the six requirements the agency complied with and which requirements the agency did not comply with.

As part of this review, the agency Inspector General may also evaluate the accuracy and completeness of agency reporting, and evaluate agency performance in reducing and recapturing improper payments.  For example, when reviewing the program improper payment rates, corrective action plans, and improper payment reduction targets, the Inspector General should determine if the corrective action plans are robust and focused on the appropriate root causes of improper payments, effectively implemented, and prioritized within the agency, to allow it to meet its reduction targets.  As part of its report, the agency Inspector General may include its evaluation of agency efforts to prevent and reduce improper payments, and any recommendations for actions to further improve: the agency's or program's performance in reducing improper payments; corrective actions; or internal controls (see section II.C below).

Finally, as part of the annual compliance review, for agencies that have high-priority programs, the agency Inspector General shall: evaluate the agency's assessment of the level of risk associated with the high-priority programs and the quality of the improper payment estimates and methodology; determine the extent of oversight warranted; and provide the agency head with recommendations, if any, for modifying the agency's methodology, promoting continued program access and participation, or maintaining adequate internal controls.

**5)   Who should the agency Inspector General notify when it has completed its determination of whether an agency is in compliance under IPERA?**

Each fiscal year, the agency Inspector General should determine whether the agency is in compliance under IPERA.  Once it has completed its assessment, the agency Inspector General must submit its results to:
   a.   The agency head;
   b.   The Senate Committee on Homeland Security and Governmental Affairs;
   c.   The House Committee on Oversight and Government Reform;
   d.   The Comptroller General; and
   e.   The OMB Controller.

**B. RESPONSIBILITIES FOR AGENCIES**

**1)   What are the requirements for agencies not compliant under IPERA?**

Agencies that are not compliant under IPERA must complete several actions, as described below:

a. For agencies that are not compliant for **one fiscal year**, within 90 days of the determination of non-compliance, the agency shall submit a plan to the Senate Committee on Homeland Security and Governmental Affairs, the House Committee on Oversight and Government Reform, and the OMB, describing the actions that the agency will take to become compliant.  The plan shall include:
   i. Measurable milestones to be accomplished in order to achieve compliance for each program or activity;
   ii. The designation of a senior agency official who shall be accountable for the progress of the agency in coming into compliance for each program or activity; and
   iii. The establishment of an accountability mechanism, such as a performance agreement, with appropriate incentives and consequences tied to the success of the senior agency official in leading agency efforts to achieve compliance for each program and activity.

b. For agencies that are not compliant for **two consecutive fiscal years** for the same program or activity, the Director of OMB will review the program and determine if additional funding would help the agency come into compliance.  This process will unfold as part of the annual development of the President's Budget.  If the Director of OMB determines that additional funding would help the agency become compliant, the agency shall obligate an amount of additional funding determined by the Director of OMB to intensify compliance efforts.  When providing additional funding for compliance efforts, the agency shall:
   i. Exercise reprogramming or transfer authority to provide additional funding to meet the level determined by the Director of OMB; and
   ii. Submit a request to Congress for additional reprogramming or transfer authority if additional funding is needed to meet the full level of funding determined by the Director of OMB.

c. For agencies that are not compliant for **three consecutive fiscal years** for the same program or activity, within 30 days of the determination of non-compliance, the agency will submit to Congress the following, in order to bring the program or activity in question into compliance:
   i. Reauthorization proposals for each (discretionary) program or activity that has not been in compliance for three or more consecutive fiscal years; or
   ii. Proposed statutory changes necessary to bring the program or activity into compliance.

In addition, OMB may require agencies that are not compliant with the law (for one, two, or three years in a row) to complete additional requirements beyond those requirements listed above.  For example, if a program is not compliant with the law, OMB may determine that the agency must re-evaluate or re-prioritize its corrective actions, intensify and expand existing corrective action plans, or implement or pilot new tools and methods to prevent improper payments.  OMB will notify agencies of additional required actions as needed.  Lastly, agencies should share any plans or proposals required by this section with their respective Inspectors General.

## C. INTERNAL CONTROL OVER IMPROPER PAYMENTS

### 1) What are the criteria as to when an agency should initially be required to obtain an opinion on internal control over improper payments?

As agencies implement the requirements described in Parts I, II, and III of this guidance, they should approach improper payments with an internal control framework in mind. IPERA introduced the concept of internal control over improper payments. Agencies should first be given the opportunity to establish, maintain, and assess internal controls before a requirement to obtain an audit opinion on internal control over improper payments. Beginning in FY 2015, each agency reporting improper payments shall summarize the status of internal control over improper payments within the agency's AFR or PAR using: (1) a narrative explaining efforts undertaken to provide reasonable assurance that controls are in place and working; and (2) the table illustrated below. The primary purpose of the summary is to provide a thoughtful analysis linking agency efforts in establishing internal controls and reducing improper payment rates. Agencies should leverage existing internal control plans and at a minimum should address the internal control standards provided in question C.2 below. An illustrative example for the table is provided below (see Table 2). The programs listed at the top of each column would be the programs susceptible to significant improper payments currently reporting improper payments.

Table 2: Example of the Status of Internal Controls

| Internal Control Standards | Program A | Program B | Program C | Program D | Program E |
|---|---|---|---|---|---|
| Control Environment | 3 | 2 | 2 | 4 | 1 |
| Risk Assessment | 4 | 1 | 4 | 4 | 1 |
| Control Activities | 4 | 3 | 2 | 2 | 2 |
| Information and Communication | 3 | 1 | 3 | 1 | 2 |
| Monitoring | 2 | 1 | 4 | 3 | 1 |

**Legend:**

4 = Sufficient controls are in place to prevent improper payments

3 = Controls are in place to prevent improper payments but there is room for improvement

2 = Minimal controls are in place to prevent improper payments

1 = Controls are not in place to prevent improper payments

OMB will utilize the agency internal control summaries to monitor progress and ensure that planned actions result in the outcome of reducing improper payment rates. In addition, OMB will review the status of an agency's internal control over improper payments against the following factors to determine when an agency should be required to obtain an internal control over improper payments audit:

a. **Current Condition of Internal Control over Improper Payments:** The current condition of internal control over improper payments can be assessed by a number of factors, including recent audit findings (e.g., financial statement, performance, or compliance audit results) and the nature of material weaknesses or scope of management's control. In addition, management's overall assurance statement required by Section 2 of the Federal Managers Financial Integrity Act should inform agency internal control plans. However, no separate assurance statement for internal control over improper payments is required.

b. **Agency Demonstration of Progress:** If the agency is not demonstrating measurable improvements in its internal control, OMB may encourage progress by requiring an audit of internal controls over improper payments, as it may assist agencies to identify and prioritize corrective actions to long-standing internal control weaknesses. In addition, innovative and cost-effective audit resolution approaches such as the Cooperative Audit Resolution and Oversight Initiative (CAROI)[14] will be encouraged to address internal control weaknesses related to improper payments.

In deciding when to require an opinion on internal control over improper payments, the facts and circumstances of individual agencies will be considered on a case-by-case basis. It is expected that Inspectors General or firms contracted with to provide an audit opinion will work to leverage resources deployed as part of financial statement or performance audits and an efficient and cost-effective audit approach will be developed.

## 2) How do internal control standards apply to improper payments?

Robust internal control processes should lead to fewer improper payments. Establishing and maintaining effective internal controls—including an internal control system that prevents improper payments from being made and promptly detects and recovers any improper payments that are made—should be a priority. It is important to note that the five standards and attributes below should be applied to the specific facts and circumstances of the various agency operations and programs. In addition, management has discretion in determining the breadth and depth of the scope of assessing internal control over improper payments. These standards and attributes can be implemented to fit the circumstances, conditions, and risks relevant to the situation of each agency. For example, one agency's program might lend itself to effective improper payment detection controls at the point of agency disbursement, while another program might be primarily administered by state or local entities where the appropriateness of a disbursement can only be determined at the state or local level. In these cases, agencies should describe efforts to provide oversight to state and local governments.

a. ***Control Environment.*** The agency has created a control environment that instills a cultural framework of accountability over improper payments by:
   i. Fostering an atmosphere in which reducing improper payments are a top management priority.

---

[14] CAROI is described in detail at http://www.agacgfm.org/AGA/ToolsResources/documents/CAROI.pdf.

ii.    Providing a cultural framework for managing risk by engaging key stakeholders in the risk management process.

iii.   Increasing accountability and providing leadership in setting and maintaining the agency's ethical code of conduct and laying out defined consequences for violations.

iv.    Clearly defining key areas of authority and responsibility and establishing appropriate lines of reporting within and external to the agency (e.g., program offices or state governments).

v.     Ensuring that personnel involved in developing, maintaining, and implementing control activities have the requisite skills and knowledge, recognizing that staff expertise needs to be frequently updated in evolving areas such as information technology and fraud investigation.

b.  *Risk Assessment*.  The agency has determined the nature and extent of improper payments by:

i.     Establishing well defined goals and objectives for eliminating improper payments and execution of corrective actions.

ii.    Determining where risks exist, what those risks are, and the potential or actual impact of those risks on program goals, objectives, and operations.

iii.   Using risk-assessment results to target high-risk areas and focus resources where the greatest exposure exists and return on investment can be maximized.

iv.    Reassessing risks on a periodic basis to evaluate the impact of changing conditions, both external and internal, on program operations.

v.     Establishing an inventory of root causes of improper payments and internal control deficiencies to develop corrective action plans for risk-susceptible programs.  The inventory should include an explanation of how root causes were identified, prioritized, and analyzed to ensure corrective actions produce the highest return on investment for resolving improper payment control deficiencies.

c.  *Control Activities*.  The agency has developed control activities to help management achieve the objective of reducing improper payments by:

i.     Establishing internal control activities that are responsive to management's directives to mitigate risks of improper payments (e.g., policies and procedures related to transaction authorization and approvals of program activities).

ii.    Implementing pre-award and pre-payment reviews where detailed criteria are evaluated before funds are expended.

iii.   Utilizing data analytics tools, such as Treasury's Do Not Pay Program, to compare information from different sources to help ensure that payments are appropriate.

iv.    Performing cost-benefit analyses of potential control activities before implementation to help ensure that the cost of those activities to the organization is not greater than the potential benefit of the control.

d.  *Information and Communications*.  The agency has effectively used and shared knowledge to manage improper payments by:

i.   Determining what information is needed by managers to meet and support
     initiatives aimed at preventing, reducing, and recapturing improper payments.

ii.  Ensuring that needed information is provided to managers in an accurate and
     timely manner.

iii. Providing managers with timely feedback on applicable performance measures so
     they can use the information to effectively manage their programs.

iv.  Developing educational programs to assist program participants in understanding
     program requirements.

v.   Ensuring that there are adequate means of communicating with, and obtaining
     information from, external stakeholders that may have a significant impact on
     improper payment initiatives.

vi.  Developing working relationships with other organizations to share information
     and pursue potential instances of waste, fraud and abuse.

vii. Making the results of performance reviews widely available to permit
     independent evaluations of the success of efforts to reduce improper payments.

e. *Monitoring*.  The agency has assessed the success of improper payment initiatives by:

i.    Adhering to existing laws and OMB guidance to institute a statistical
      methodology to estimate the level of improper payments being made by the
      agency's programs.

ii.   Using an internal control assessment methodology that includes testing of control
      design and operating effectiveness and the evaluation of the significance of
      internal control deficiencies related to improper payments.

iii.  Establishing program-specific targets for reducing improper payments in
      programs that measure and report annual improper payment estimates.

iv.   Assessing the progress of implementation of corrective actions over time and
      ensuring that the root causes of improper payment internal control deficiencies are
      resolved.

v.    Considering the possibility of contracting activities out to firms that specialize in
      specific areas where in-house expertise is not available, such as payment
      recapture audits and fraud detection analytics.

vi.   Ensuring timely resolution of problems identified by audits and other reviews.

vii.  Adjusting control activities, as necessary, based on the results of monitoring
      activities.  The agency should periodically test the controls to ensure they are
      effective in identifying, preventing, and recapturing improper payments.

viii. Understanding any statutory or regulatory barriers that may limit the agency's
      corrective actions in reducing improper payments and actions taken by the agency
      to mitigate the barriers' effects.

## PART III – REQUIREMENTS FOR IMPLEMENTING EXECUTIVE ORDER 13520

Part III discusses the requirements of Executive Order 13520—*Reducing Improper Payments*—issued November 20, 2009.  IPERIA essentially codified a number of requirements from the Executive Order.  Therefore, in order to reduce duplication in this document, Part III makes reference to Part I for all requirements that are found both in IPERIA and in the Executive Order.

### A. GENERAL GUIDANCE

**1)  Which agencies are subject to the requirements of Executive Order 13520?**

The agencies required to comply with Executive Order 13520 are defined broadly as "a[ny] department, agency, or instrumentality in the executive branch of the United States" as defined in Title 31, Section 102 of the United States Code .

**2)  How will OMB determine the "high-priority" programs as required under Section 2(a)(i) of the Executive Order?**

This is also an IPERIA requirement.  Please refer to section I.B of this guidance.

**3)  What are agencies required to submit for the improper payments website as required under Section 2(b) of the Executive Order?**

Agencies shall submit the following information, subject to Federal privacy policies and to the extent permitted by law:
   a.  The names of the accountable officials;
   b.  Current and historical rates and amounts of estimated improper payments, including, where known and appropriate, causes of the improper payments;
   c.  Current and historical rates and amounts of recovery of improper payments, where appropriate (or, where improper payments are identified solely on the basis of a sample, recovery rates and amounts estimated on the basis of the applicable sample);
   d.  Targets for reducing as well as recovering improper payments, where appropriate; and
   e.  The entities that have received the greatest amount of outstanding improper payments (or, where improper payments are identified solely on the basis of a sample, the entities that have received the greatest amount of outstanding improper payments in the applicable sample).

**4)  Why is program access important?**

The purpose of the Executive Order is to reduce improper payments while continuing to ensure that Federal programs serve and provide access to their intended beneficiaries.  Because the Executive Order targets waste, fraud, and abuse, efforts to reduce improper payments must protect access to Federal programs by their intended beneficiaries.  Therefore, efforts to reduce improper payments in high-priority programs should not deter eligible beneficiaries from seeking and receiving benefits.  Furthermore, eligible beneficiaries who are receiving benefits should not

be improperly denied or removed from program benefits as a result of agency efforts to reduce improper payments.

**5) Does this guidance create any special rights?**

This guidance is not intended to, and does not create, any right or benefit, substantive or procedural, enforceable at law or in equity by a party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Further, this guidance is not intended to impose, and does not impose, liability on the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person for action taken pursuant to the guidance.

**B. SUPPLEMENTAL MEASURES**

**1) What are the requirements for establishing annual or semi-annual measurements in high-priority programs, also known as supplemental measures?**

Agencies with high-priority programs shall establish annual or semi-annual (or more frequent, if possible) supplemental measures (or actions) for reducing improper payments. Supplemental measures should focus on higher risk areas within the high-priority programs and report on root causes of improper payments that agencies can resolve through corrective actions. In addition, the measures should use available and accessible information (e.g., claims, payments, files) for the current year rather than previous years to the extent possible. Lastly, the supplemental measures do not have to meet the statistical requirements of section I.A.9.

Possible measurement examples include:
   a. *A measurement that focuses on the main cause of improper payments in the program.* For example, if documentation is the leading cause of improper payments in a high-priority program, then the program could establish a measurement that focuses on that specific issue;
   b. *A measurement that focuses on one of the main causes of improper payments in the program.* For example, if an agency is unable to identify the leading root cause of improper payments, it could establish a measure to examine another major root cause of improper payments; or
   c. *A measurement or set of measurements of contributing factors or proxy indicators of improper payments in the program.* For example, if an agency can identify a timely measured factor known to move in the same or inverse direction of improper payments, while not a main cause, it could establish a measure or set of factor measures.

**2) Which tools should agencies use to identify supplemental measures?**

When identifying areas within the high-priority program that should be part of the supplemental measurement requirement, agencies should focus on areas that will provide the greatest rate of return on investment to the program. To identify such areas where agencies could achieve

optimal impact on improper payment prevention and reduction, the agencies should analyze their programs and root causes of improper payments through two perspectives:
- a. The degree to which an agency has control over reducing improper payments within a program:
  - i. *More Control* – Improper payments that could be addressed through administrative or regulatory changes based on existing program requirements;
  - ii. *Less Control* – Improper payments that require statutory changes at the Federal or State level
- b. The impact on agency outlays:
  - i. *High-Impact Improper Payments* – High-dollar improper payments that may be intentional (e.g., fraud), or unintentional (but still high dollar) and have a large impact on Federal outlays;
  - ii. *Low-Impact Improper Payments* – Small-dollar improper payments (e.g. infrequent data entry mistakes, errors due to lack of supporting documentation) that likely have a minimal impact on Federal outlays.

Using these two identified areas, the matrix below shows four different quadrants that agencies can consider when developing supplemental measures for high-priority programs (i.e., high-impact improper payments within agency control, low-impact improper payments within agency control, high-impact improper payments not within agency control, and low-impact improper payments not within agency control).  OMB recommends that agencies focus on root causes of improper payments within high-priority programs that would be within the program's ability (or control) to reduce, or which would impact program outlays.

Table 3: Considerations for Developing Supplemental Measures

| | *More Control* | *Less Control* |
|---|---|---|
| *High Impact* | • Fraud<br>• System errors<br>• Agency policies | • Statutory definitions and requirements |
| *Low Impact* | • Infrequent data entry errors by Federal agencies (with low-dollar impact) | • Infrequent instances of State agencies lacking minor documentation (with low-dollar impact) |

## 3) Who is required to establish annual or semi-annual measurements under the Executive Order?

Under the Executive Order, agencies with high-priority programs are required to establish annual or semi-annual measurements or actions for reducing improper payment:
- a. For high-priority programs that already report an annual estimate, agencies should develop annual or semi-annual supplemental measurements within 180 days of a program being deemed high-priority; or
- b. For high-priority programs that are establishing or revising their estimation methodology, agencies should work with OMB to establish a plan for meeting the Executive Order

supplemental measure requirements within 180 days of a program being deemed high-priority.

If a high-priority program is unable to conduct or report supplemental measurements (e.g., due to data restrictions, or resource constraints), it may work with OMB to meet this requirement in another manner (e.g., to develop a supplemental measure using an alternative time frame or an alternative type of information).

**4) How should agencies establish annual or semi-annual targets for supplemental measures?**

Agencies with high-priority programs will work with OMB to establish—and/or update—annual or semi-annual supplemental measures and targets required by the Executive Order. When establishing supplemental measures, agencies should set aggressive targets (e.g., targets for improved performance in the future) and develop supporting analytics (e.g., projected impact of corrective actions or regulatory changes that might lead to lower rates) on how the agency chose those targets. Targets for supplemental measures in high-priority programs will be set once an initial supplemental measurement is reported. If the program shows significant progress in reducing improper payments or meeting supplemental measure targets, the program may work with OMB to develop different supplemental measures and targets to focus on another high-impact area.

**5) Are the reduction targets described in section I.A.9 of this guidance the same as the supplemental targets that agencies will set to comply with the Executive Order?**

No, agencies will need to establish two sets of targets for high-priority programs:
   a. Reduction targets for all programs susceptible to significant improper payments under IPIA, as described in section I.A.9, step 3.b of this guidance and OMB Circular A-136; and
   b. Annual or semi-annual supplemental measures and related targets.

**6) How will agencies report annual or semi-annual supplemental measures and targets?**

Agencies shall post supplemental measures to PaymentAccuracy.gov annually or semi-annually—depending on the frequency of the measure and to the extent possible. In addition, agencies shall ensure that their AFRs or PARs contain a basic summary discussing the supplemental measures, the frequency of each supplemental measurement (i.e., how often will the area be measured and reported on PaymentAccuracy.gov), the measurement baseline, a discussion of how information from this measurement will help the program reduce improper payments, and the actual (or planned) targets, including any reasons for meeting, exceeding, or failing to meet the supplemental targets.

## C. ACCOUNTABLE OFFICIAL REQUIREMENTS

### 1) Which agencies are responsible for establishing accountable officials under Section 3(a) of the Executive Order?

Agencies with high-priority programs, as determined under Section 2 of the Executive Order, are required to designate an agency accountable official to oversee agency efforts to reduce improper payments. Agencies with high-priority programs should also designate a component accountable official—responsible for efforts within a component or bureau—if a single component or bureau makes up a significant portion of the agency's improper payments. The component accountable official should work within the component or bureau to coordinate the bureau's program integrity efforts.

OMB encourages all agencies to appoint improper payment accountable officials and to continually assess the effectiveness of its internal controls for preventing and detecting improper payments. However, if an agency without a high-priority program elects to appoint an accountable official, the agency is not expected to fulfill the specific requirements under the Order related to high-priority programs.

### 2) Who may serve as an agency or component accountable official under Section 3(a) of the Executive Order?

An agency's accountable official must hold an existing position that requires Senate confirmation; in other words, agencies do not have to create a new position. The second component accountable official does not have to hold a Senate-confirmed position. Agencies must submit each accountable official's name and position to the Director of OMB (including any acting accountable officials) for review and approval by the Director within 30 calendar days of a vacancy (e.g., retirement or resignation).

In subsequent years, if an agency did not previously have a high-priority program but has a newly designated high-priority program, the agency has 30 calendar days from the date of the announcement of a new high-priority program to submit the name and position of proposed agency and component accountable officials.

### 3) What are the accountable officials' roles and responsibilities?

Each accountable official is responsible for the agency's or component's efforts to implement the Executive Order and its requirements. For instance, accountable officials are responsible for meeting improper payment reduction targets in a manner that does not negatively impact program access. Implementing the Executive Order should represent a significant responsibility and be a major focus of the accountable official and the second component accountable official.

### 4) What are the agency requirements for providing a report to their IGs in response to Section 3(b) of the Executive Order?

This is also an IPERIA requirement. Please refer to section I.B.4 of this guidance.

**5) What are the Inspector General's responsibilities with respect to the report under Section 3(b) of the Executive Order?**

This is also an IPERIA requirement.  Please refer to section I.B.4 of this guidance.

**D. AGENCY HEAD QUARTERLY HIGH-DOLLAR REPORT TO THE INSPECTOR GENERAL**

**1) What is a "high-dollar" overpayment?**

A high-dollar overpayment can be made to an individual[15] or an entity[16].  A high-dollar overpayment is any overpayment that is in excess of 50 percent of the correct amount of the intended payment under the following circumstances:

  a. Where the total payment to an individual exceeds $25,000 as a single payment or in cumulative payments for the quarter; or
  b. Where the total payment to an entity exceeds $100,000 as a single payment or in cumulative payments for the quarter.

The Executive Order requires some agencies to report on their high-dollar overpayments on a quarterly basis.  The following are examples, for illustrative purposes only, of overpayments that would need to be included in an agency's quarterly report on high-dollar overpayments:

*Scenario 1*: A single payment, or cumulative payments for the quarter, to the wrong individual or entity that exceeds the respective $25,000 or $100,000 limit.  In this case, the full payment would be reported as a high-dollar overpayment.

*Scenario 2*: A single payment, or cumulative payments for the quarter, to the correct individual of $26,000 (the payment exceeds $25,000) when the intended amount was $16,000.  In this case, an overpayment was made in the amount of $10,000 (which is more than 50 percent higher than the intended amount).  Therefore, this scenario meets the criteria to qualify as a high-dollar improper payment to an individual.  The amount to be reported as a high-dollar overpayment is $10,000.

*Scenario 3*: A single payment, or cumulative payments for the quarter, to the correct entity of $106,000 (the payment exceeds $100,000) when the intended amount was $70,000.  In this case, an overpayment was made in the amount of $36,000 (which is more than 50 percent higher than the intended amount).  Therefore, this scenario meets the criteria to qualify as a high-dollar improper payment to an entity.  The amount to be reported as a high-dollar overpayment is $36,000.

Please note that if the agency has corrected the overpayment within the quarter in which the payment was made, it does not need to be reported as a high-dollar overpayment.

---

[15] For purposes of this guidance, an individual is someone acting in either a personal or commercial capacity (that is, a sole proprietor).
[16] For purposes of this guidance, an entity is a non-individual or a Federal, State, and local government agency.

51

**2) Which sources should agencies utilize to identify high-dollar overpayments?**

High-dollar overpayments can be identified by examining one or more relevant sources of information available to agencies. For instance, agencies could identify high-dollar overpayments, where applicable and cost-effective, through:

    a. Annual improper payment testing samples;

    b. Payment recapture audits; or

    c. Other sources identified by the agency.

**3) What information should be included in agency reporting on high-dollar overpayments?**

This information is subject to Federal privacy laws, regulations, and policies, and should not include information about improper payments or recipients that the agency has referred, or anticipates referring, to the Department of Justice for enforcement, collection, or other legal action. At a minimum, the report should describe:

    a. The total amount of high-dollar overpayments made by the agency (the agency does not need to list each individual high-dollar overpayment in the report);

    b. Any actions the agency has taken or plans to take to recover high-dollar overpayments (the report should address overall actions and strategies); and

    c. Any actions the agency will make to prevent overpayments from occurring in the future (the report should address overall actions and strategies).

**4) Which agencies must report on high-dollar overpayments? Where shall agencies report high-dollar overpayments to the public? What if an agency has no high-dollar overpayments?**

Agencies with programs susceptible to significant improper payments under the IPIA are required to report quarterly on high-dollar overpayments that occurred within those specific programs. Agencies may report this information to the public on their own website, or through other mechanisms designed to allow the public to access agency information. For any given quarter, if an agency with programs susceptible to significant improper payments has had no high-dollar overpayments, then the agency should inform OMB and the agency's Inspector General that the agency had no high-dollar overpayments in that quarter. Agencies without any programs susceptible to significant improper payments do not need to report or notify either OMB or the Inspector General.

**5) Are there exceptions to the reporting requirements for the high-dollar report?**

If an agency believes that the high-dollar report is duplicative of other reports compiled by the agency, they may submit a written request to OMB for an alternative reporting structure. Included in the request should be a listing of the other report(s) and a detailed description of how those reports provide the same information as the high-dollar report. After reviewing any such request, OMB may permit agencies to leverage existing reporting mechanisms in lieu of separate quarterly high-dollar overpayment reports.

# TAB 90

Christopher Mucke 30(b)(6)                          November 7, 2017
                          Reston, VA

                                                        Page 1

 1         IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2      -------------------------------

 3                                      :

 4      ACLR, LLC,                      :

 5                                      :

 6            Plaintiff,                :

 7                                      :

 8        v.                            :   Civil Action No.

 9                                      :

10      UNITED STATES OF AMERICA,       :   15-767C

11                                      :

12            Defendant.                :

13                                      :

14      -------------------------------

15         30(b)(6) Deposition of CHRISTOPHER MUCKE, a

16      witness herein, at the law offices of David, Brody &

17      Dondershine, LLP, 12355 Sunrise Valley Drive, Suite

18      650,  Reston, Virginia, commencing at 8:55 a.m. on

19      Tuesday, November 7, 2017 and the proceedings being

20      taken down by stenotype and transcribed by Catherine

21      B. Crump, a Notary Public in and for the Commonwealth

22      of Virginia.

Christopher Mucke 30(b)(6)                                    November 7, 2017
Reston, VA

Page 18

1          That was my primary understanding for what

2     the database was used for.

3          Q.    In the A and B?

4          A.    In the Medicare A and B.  I know that

5     looking at some of the Part D stuff, it seemed

6     apparent, at least to me, when we did the Statement

7     of Objectives that they were going to do the same

8     thing.  We were required to -- or the database was

9     going to have action-specific identifiers, I believe

10    is the correct terminology, and we would be required

11    to interface back and forth with it.

12          My understanding was it would be used in the

13    same way that the A and B RACs were.  At least that's

14    what I believed at the time we did the proposal.

15          Q.    Instead, in the Part D RAC program,

16    ultimately, CMS ended up transmitting PDE data

17    directly to ACLR for review and processing; is that

18    how it worked?

19          A.    Yes, it is.

20          Q.    Did ACLR understand at the time it

21    submitted a response to the RFQ that ACLR would need

22    to obtain an authorization to operate, or ATO?

Christopher Mucke 30(b)(6)                                    November 7, 2017
                                  Reston, VA

                                                                  Page 19

    1          A.     Yes.

    2          Q.     To be able to perform as the Part D RAC?

    3          A.     Yes.

    4          Q.     Let me have you turn to Section 6.1.7.

    5          A.     Okay.

    6          Q.     That's the system authorization and

    7     assessment section.  It references the ATO.  Do you

    8     see that?

    9          A.     Yes, I do.

   10          Q.     That section also references certain CMS

   11     procedures in what they refer to as the Virtual

   12     Handbook at the website.  Do you see that?

   13          A.     Yes, I do.

   14          Q.     Was that information that ACLR reviewed

   15     at that website in the Virtual Handbook at the time

   16     was submitting a response to the RFQ?

   17          A.     Yes.

   18          Q.     So ACLR understood what was involved in

   19     the process of obtaining an ATO?

   20          A.     Yes.

   21          Q.     ACLR understood that it was the

   22     company's responsibility to obtain the ATO from CMS;

Christopher Mucke 30(b)(6)                            November 7, 2017
Reston, VA

Page 20

1    is that correct?

2           A.    That's correct.

3           Q.    Did ACLR also understand that a failure

4    to obtain an ATO could be grounds for terminating the

5    contract?

6           A.    I didn't understand that to be the case,

7    but I would assume that, yes, if we could never get

8    an ATO that we wouldn't be allowed to proceed and I

9    guess in parlance would have been a breach, but that

10   does make sense, but I don't recall thinking that at

11   the time.

12          Q.    Let me have you look at the next page,

13   the top of the next page.  Do you see, just to orient

14   you, in that second sentence, it says -- the first

15   full sentence on that page:  "The failure to obtain

16   and maintain a valid ATO may be grounds for

17   termination of the contract."

18          A.    Okay.  Yes.  I see that and I confirm

19   that's it there.

20          Q.    Was it ACLR's understanding that ACLR

21   would be responsible for mitigating or correcting any

22   security risks that were found during the ATO

Page 21

1   process?

2            A.    Yes.

3            Q.    For purposes of the deposition today, if

4   I refer to you, just to be clear, I'm referring to

5   you as in ACLR as opposed to you personally, just so

6   we're clear about that; is that fair?

7            A.    Okay.  That's fair.

8                          [ACLR Exhibit No. 4 was

9                          marked for identification.]

10  BY MR. PORADA:

11           Q.    I'm showing you what we have marked as

12  Exhibit 4, which appears to be the January 13, 2011

13  Order for Supplies or Services from CMS to ACLR.  Was

14  this the initial Part D RAC contract?

15           A.    Yes, it is.

16           Q.    We talked about this in your other

17  deposition, but it was ACLR's understanding as part

18  of this RAC contract that ACLR would be paid on a

19  contingent fee basis under the contract; is that

20  correct?

21           A.    That's correct.

22           Q.    And that would be a contingent fee based

Christopher Mucke 30(b)(6)                                    November 7, 2017
Reston, VA

Page 22

1    on amounts actually recovered by ACLR as in proper

2    payments?

3          A.    Under the original Performance Work

4    Statement, it would be amount collected by us.  The

5    task order was pretty specific that we would be

6    recovering those amounts.

7          Q.    Okay.  That's a fair point.  Under the

8    original PWS, it would be a contingent fee based on

9    amounts recovered by somebody, whether it was you or

10   CMS?

11         A.    That's correct.

12         Q.    And it was your understanding that the

13   contract didn't provide for any form of compensation

14   for ACLR other than the contingent fee based on

15   amounts recovered?

16         A.    I'm very familiar with that.  I am also

17   familiar that if my contract lapsed before those

18   amounts were recovered, I wouldn't be paid either.

19   So yes.  It was a very important -- it was very

20   important language to us.

21         Q.    And that was your understanding of the

22   contract?

Christopher Mucke 30(b)(6)                          November 7, 2017
                         Reston, VA

                                                              Page 23

 1          A.    Yes.

 2          Q.    You mentioned the PWS that's

 3   incorporated into the contract, the Performance Work

 4   Statement.  Was that drafted by ACLR?

 5          A.    Yes, it was.

 6          Q.    That's the document or portion of the

 7   document that starts at page A00382; is that correct?

 8          A.    That's correct.

 9          Q.    Did ACLR contemplate through the

10   Performance Work Statement that many of the audit

11   issues that it might be engaged in under the Part D

12   contract would involve review of additional documents

13   beyond the PDE records themselves?

14          A.    I believe that there would be limited

15   cases where we would have to review additional

16   documents.  Yes.

17          Q.    You anticipated that there would be some

18   audits that required review of outside documents

19   beyond the PDEs?

20          A.    Yes and that the PWS does address that.

21   We had two forms of audits.  One was considered a --

22   what we considered to be a documentation audit or, in

Christopher Mucke 30(b)(6)                                    November 7, 2017
Reston, VA

Page 25

1    the PDE records matches the underlying documentation

2    from the plan sponsors; is that correct?

3            A.    Yes, it is.

4            Q.    Did ACLR understand from the outset of

5    this contract that a Statement of Work was going to

6    be required to replace the Performance Work

7    Statement?

8            A.    From the outset of the contract, you

9    mean from when the PWS was awarded?

10           Q.    Let's start there.  As of the date of

11   the contract, January 13, 2011, did ACLR understand

12   as of that point that a Statement of Work was going

13   to be required to replace the PWS?

14           A.    No.  My understanding was that we would

15   make all of those determinations.  We would conduct

16   all of the reviews.  We would collect the monies and

17   then proceed from there.

18           Q.    When did ACLR first learn that a

19   Statement of Work was going to be required to replace

20   the PWS?

21           MR. BONELLO:  Objection, form.

22           THE WITNESS:  It was relatively late in the

Christopher Mucke 30(b)(6)                        November 7, 2017
                        Reston, VA

                                                    Page 26

1    year.  We knew that CMS was doing a lot of different

2    things and processes, but I don't remember.  I didn't

3    know until November 30th that we weren't going to be

4    allowed to execute our PWS.

5    BY MR. PORADA:

6              Q.    November 30th of 2011?

7              A.    That is correct.

8              Q.    As of November 30, 2011, did ACLR

9    already know at that point that a Statement of Work

10   was being drafted or discussed or was it after that

11   that you first learned of that?

12             A.    I can't recall whether there was a

13   Statement of Work being done before that.  There may

14   have been, but, again, through the -- even throughout

15   the year after -- when we were awarded the

16   Performance Work Statement, it was my understanding

17   that we were going to do all of the work, that we

18   made the determinations of improper payment, we

19   alone, not CMS or any other contractor, that we would

20   be recovering the amounts.

21             I think early on, we recognized that we may

22   not be recovering those and that maybe it would be

Christopher Mucke 30(b)(6)                          November 7, 2017
                          Reston, VA

                                                    Page 27

 1    going through Treasury.  I didn't know that some of

 2    those conversations were taking place.

 3         With respect to a specific Statement of Work

 4    being generated, I can't recall.  I know that CMS

 5    published guidance in March or I believe it may have

 6    been May that we were going to commence or ACLR was

 7    going to commence recovery audits in the third

 8    quarter of 2011.  Certainly at that point in time,

 9    which would have been right after that, we hadn't

10    seen a Statement of Work.

11         The first Statement of Work that I remember

12    seeing was December 9, 2011, but until that time, I

13    thought we were going to be able to execute.  In

14    fact, when we went into that November 30th phone

15    call, I had suspicions that CMS or CPI was doing some

16    things that were contrary to the PWS, but with

17    respect to a Statement of Work specifically, I can't

18    recall that and I don't know that that was going to

19    happen.

20         Q.    You don't know what was going to happen?

21         A.    They were going to give us a new

22    Statement of Work and not allow us to do the PWS.

Christopher Mucke 30(b)(6)                                    November 7, 2017
                              Reston, VA

                                                              Page 28

    1          Q.    As of November 11, 2011, you didn't know

    2    that; is that what you're saying?

    3          A.    Yes.  I believe that's the first time I

    4    knew there would be no Statement of Work.  In fact, I

    5    think I recall from the conversation then, Tanette

    6    Downs was surprised that our PWS was actually the --

    7    I guess the SOW, for lack of a better word, the

    8    process by which the audit was going to be conducted.

    9    It was at that point in time she told the contracting

   10    officer that, No, no, we don't want to do that, and

   11    we were shut down.

   12          From then, I can confirm at that date, at

   13    least, I knew that something else was going to be

   14    developed.

   15          Q.    Did ACLR object to CMS replacing the PWS

   16    with a Statement of Work?

   17          A.    Well, we raised our concerns many times,

   18    not the least of which that we weren't able to do any

   19    recoveries, but we at that time were working with

   20    them.  While I would say that while we certainly

   21    objected to it, we did understand that they were

   22    going to do one and they had their own processes for

Christopher Mucke 30(b)(6)                          November 7, 2017
                          Reston, VA

Page 88

1          A.     That's correct.

2          Q.     So this, then, was the first Statement

3     of Work that was implemented for the ACLR contract?

4          A.     That's correct.

5          Q.     Nothing in the Statement of Work changed

6     the method for ACLR's payment under the contract from

7     contingent fee to something else; is that correct?

8          A.     Well, the price summary, the contingency

9     basis or how the payments were made was completely

10    modified, but we still -- if I understood correctly,

11    we still received a contingency fee for amounts that

12    were ultimately recovered.

13         Q.     Right, and the modification or the

14    Statement of Work didn't contain any provision for

15    payments to ACLR on something other than that

16    contingent fee basis based on amounts recovered.

17    Correct?

18         A.     That's correct.

19         Q.     And looking at that table that you're

20    looking at, at page 5 of 8 of the contract, it

21    provides that the contingency fee rate was increased

22    to 12 percent, and then for certain issues, it was

Christopher Mucke 30(b)(6)                                November 7, 2017

Reston, VA

Page 89

1    increased above and beyond that to 28 percent or 20

2    percent or 15 percent; is that correct?

3           A.    That's correct.

4           Q.    So those rates were -- again, they were

5    substantially higher than the 7.5 percent that was in

6    the base.  Correct?

7           A.    That's correct.

8           Q.    Was it ACLR's understanding that by

9    providing for these increased contingency fee rates

10   that CMS was attempting to compensate ACLR for --

11   again, for any issues that had arisen with the

12   contract up to that point?

13          A.    Yes.  It was our understanding that they

14   were attempting to do that.

15          Q.    And as part of this modification for any

16   new audit issues that were approved after this

17   Statement of Work went into effect, the contingency

18   fee rate was increased to 15 percent for the first

19   $20 million in recoveries and then 12 percent for any

20   recoveries beyond the 10 million; is that correct?

21          A.    That's correct.

22          Q.    The Statement of Work incorporated the

Christopher Mucke 30(b)(6)                              November 7, 2017
                              Reston, VA

Page 90

1    provisions that set out the new audit issue review

2    package process.  Correct?

3           A.    That's correct.

4           Q.    And that's what's also known as the

5    NAIRP?

6           A.    That's correct.

7           Q.    Was it ACLR's understanding that as part

8    of the NAIRP process, CMS had to approve any new

9    audit proposals from ACLR before they could be

10   commenced?

11          A.    That's correct.

12          Q.    Was it ACLR's understanding that after

13   this Statement of Work was incorporated into the

14   contract that it replaced the Performance Work

15   Statement that was a part of the initial contract?

16          A.    That's correct.

17          Q.    So after that, the Performance Work

18   Statement was no longer in effect under ACLR's

19   understanding?

20          A.    That's correct.

21          Q.    The Statement of Work itself, as you

22   described earlier, also talks about the data

Christopher Mucke 30(b)(6)                                November 7, 2017
                           Reston, VA

Page 94

1          Q.     What was the result of that recovery

2    audit process for the 2007 duplicate payment issues?

3          A.     I believe we identified, I want to say,

4    $313 million in improper payments.  I believe that

5    was the final result of that.

6          Q.     And what ultimately happened with that?

7    Were those amounts recovered?

8          A.     No.  CMS killed the review.

9          Q.     When did CMS kill the review?

10         A.     November of 2011, November 30, 2011.

11         Q.     During that conference call you

12   described earlier?

13         A.     That's correct.

14         Q.     We'll delve more into the details of the

15   2007 duplicate payment issue, but I want to just get

16   sort of an overview first.  Did ACLR later conduct

17   audit activities for the duplicate payment issue for

18   other payment years beyond 2007?

19         A.     When you're asking, did we personally do

20   that or based in the context of what we did or with

21   the modifications or the NAIRPs that CMS approved?

22         Q.     I'm asking more generally.  Did ACLR in

Christopher Mucke 30(b)(6)                              November 7, 2017
Reston, VA

Page 105

1           Q.    So as of that point in time, August 26,

2    2011, CMS hadn't yet signed off on or approved any

3    particular methodology or process for going about the

4    duplicate payment audit; is that correct?

5           MR. BONELLO:  Objection, form.

6           THE WITNESS:  At that point in time, they

7    didn't have the ability to approve or not approve.  I

8    was just sending -- they had requested a copy of our

9    processes.  I think I even note that their draft

10   processes -- and, again, at that point in time, we

11   had not received any payment data.  So I wouldn't be

12   able to adjust or modify our processes.

13          At the end of the day, this is just our

14   quality, the quality processes that we had in place

15   to conduct these audits.

16   BY MR. PORADA:

17          Q.    And ACLR hadn't yet received any PDE

18   data as of August 2011.  Correct?

19          A.    That's correct.

20          Q.    And you didn't yet have the ATO until

21   October 2011; is that right?

22          A.    That's correct.

Christopher Mucke 30(b)(6)                                  November 7, 2017
                              Reston, VA

```
                                                      Page 111

 1   processes?"

 2           A.    Yes.  That's correct.

 3           Q.    Then she said:  "What criteria are you

 4   going to use to determine a PDE is as duplicate?"

 5           Do you see that?

 6           A.    Yes, I do.

 7           Q.    You wrote back on September 30, 2011 and

 8   provided information for excluded providers, and then

 9   for duplicate payments, you identified seven

10   different fields within the PDE records that ACLR at

11   that point, I guess, was proposing to use as part of

12   its methodology for identifying duplicate payments;

13   is that right?

14           A.    That's correct.  We hadn't seen the PDE

15   data yet, but we in this case, actually, used the

16   National Council for Prescription Drug Programs or

17   NCPDP's process for identifying duplicates.

18           Q.    So would that have been the first point

19   in time when ACLR had identified for CMS the specific

20   fields within the PDE records that it was proposing

21   to use to identify the duplicate payments?

22           A.    I believe so, yes, and the only reason I
```

Christopher Mucke 30(b)(6)                                    November 7, 2017
Reston, VA

Page 112

1    hedge is that I'm not really sure on some of the

2    other documents.  I know that in a lot of the

3    documentation that we submitted for duplicate

4    payments and excluded providers also included those

5    fields.  I don't know if that's what the first one

6    did.  Maybe not, because Merri-Ellen did come back,

7    but it would have been at or around this time

8    regardless, but this very well could have been the

9    first time.

10          Q.    Over on the first page of that exhibit,

11   at the bottom, there's an E-mail from you from

12   October 5, 2011.  You said:  "I'm probably a little

13   oversensitive about the data and tend to overanalyze

14   any information we receive about them."

15          Do you see that?

16          A.    Yes, I do.

17          Q.    What did you mean by that?

18          A.    One of the issues that we had back then

19   is determining what PDE records we would look at.  In

20   the normal process, you had -- or in a specific plan

21   year, for example in 2007, CMS makes payment on

22   basically a subsidy payment basis or subsidy payments

Christopher Mucke 30(b)(6)                                November 7, 2017
Reston, VA

Page 116

1   timelines.

2          Q.    But, ultimately, ACLR was looking

3   exclusively at reconciled data; is that correct?

4          A.    That's correct.

5          MR. PORADA:  Why don't we take just a short

6   break.

7          MR. DAVID:  Okay.

8          [Recess.]

9   BY MR. PORADA:

10         Q.    The November 30, 2011 conference call

11  that you mentioned, do you remember who made the

12  arrangements to set up that call?  Was it ACLR or

13  CMS?

14         A.    CMS ultimately arranged to have the call

15  at our urging, but I think, ultimately, they set up

16  the call.

17         Q.    Who participated from ACLR in that call?

18         A.    I think it was just me.  I'm pretty sure

19  it was just me.  It might have been Jason Barnes, my

20  audit director, but I don't really recall.

21         Q.    Do you remember who was on the call for

22  from CMS?

Page 117

1          A.     Desiree Wheeler, our contracting

2     officer, Tanette Downs, the new director for DPOA,

3     and our COTR, Marnie Dorsey, and the contract

4     specialist, Jessica Sanders.

5          Q.     Was that one of the additional telephone

6     conversations that you recorded?

7          A.     Yes.

8          Q.     And no one from CMS was asked to give

9     permission for that particular recording; is that

10    correct?

11         A.     That's correct.

12         Q.     Was that the first time that ACLR

13    informed CMS of the approximate dollar amount of the

14    improper payments that it had identified to date?

15         A.     I believe so, yes.

16         Q.     Those amounts all came from 2007 PDE

17    data; is that correct?

18         A.     Yes.  I think that it was actual fairly

19    limited at that point in time.  We were receiving

20    data.  I think that was based on the first two

21    quarters, maybe the first three quarters.  I can't

22    recall, but we were still receiving data.

Christopher Mucke 30(b)(6)                          November 7, 2017
Reston, VA

Page 118

1        Q.    So the number that you discussed in that

2   call, it would have been improper payments that ACLR

3   thought it had identified from some portion of the

4   2007 PDE data; is that correct?

5        A.    That's correct.

6        Q.    Do you remember how much you identified

7   during that phone call as improper payments you

8   identified?

9        A.    No.  The number 175 million keeps coming

10  into play, but I don't really recall a specific

11  number or even a number.

12       Q.    The amount that you identified and

13  discussed during that call, was that all for alleged

14  duplicate payments that you had identified from the

15  2007 PDE data that you had received to date?

16       A.    I believe so, yes.  I remember the first

17  thing that we did was run the duplicate payment

18  protocol against it, because that was one issue that

19  even though it was in our PWS, it had also been

20  approved by CMS.

21       Q.    As part of that call, did you provide --

22  did ACLR provide CMS any documentation that

Christopher Mucke 30(b)(6)                          November 7, 2017
                        Reston, VA

                                                        Page 119

1    quantified or documented those PDEs that you had

2    identified as improper payments involving duplicate

3    payments for 2007 or was it just the total number

4    that you discussed during the call?

5         A.    It was just the total number.  We hadn't

6    submitted any documentation at that time.

7         Q.    And the 2007 PDE reports that ACLR had

8    been analyzing to identify those potential duplicate

9    payments, those findings, that 175 million that you

10   discussed in the call, that hadn't been validated by

11   any other entity other than ACLR; is that correct?

12        A.    Again, our contract didn't require such

13   validation or permit such validation.

14        Q.    So no one else had?

15        A.    That's correct.

16        Q.    What was the methodology that ACLR used

17   to identify those duplicate payments for 2007?  Was

18   it the methodology that you had laid out in your

19   E-mail that we looked at in Exhibit 15, your E-mail

20   of September 30, 2011?

21        A.    It was close to that methodology, but

22   slightly modified.

Christopher Mucke 30(b)(6)                                November 7, 2017
                           Reston, VA

                                                            Page 121

 1   there, but it may have been included, but I do

 2   believe that these were the only ones that we did,

 3   just providing a hedge because I'm not sure if I also

 4   included the national drug code.

 5          Q.   Did CMS discuss with ACLR during that

 6   call from November 30, 2011 that CMS was working on a

 7   draft Statement of Work to replace the PWS?

 8          A.   I don't recall if they were actually

 9   talking about it, but I do recall Tanette stating

10   along the lines that the Statement of Work that she

11   had possession of was not the one that was in place

12   under the contract.  So, again, I don't know if -- I

13   actually don't remember actually placing much store

14   in that, but that was at least one early event that I

15   would have been able to identify a separate or a

16   different Statement of Work was identified.

17          Q.   You don't remember there being a

18   discussion during that call about the draft Statement

19   of Work being prepared and being forthcoming to ACLR

20   in the coming weeds?

21          A.   Oh, I'm sorry.  Yes.  Toward the end of

22   the conversation, after that occurred, there was some

Christopher Mucke 30(b)(6)                                    November 7, 2017
Reston, VA

Page 122

1    discussion about us or about CMS forwarding us that

2    document.  I think it was apparent, at least from the

3    call, that the contracting officer and the contract

4    specialist had -- did not know that CPI had ignored

5    our PWS or that they didn't -- I mean, at a point in

6    time, I think our COTR even said it was just a

7    proposed process and didn't recognize that it was a

8    signed contract that was supposed to be executed, and

9    once Ms. Downs made the comment that, Wait a minute,

10   this isn't the Statement of Work that I'm holding,

11   after that, she said that we don't want to do this

12   work and told the contracting officer, and at that

13   point in time, the contracting officer said she would

14   forward us a Statement of Work.

15        Q.    During that call when you identified

16   that 175 or so million dollars of improper payments

17   that you had flagged at that point in time, did you

18   say that you were, ACLR was, prepared to start

19   sending out notices of improper payments to those

20   plan sponsors the following week?

21        A.    Oh, yes.

22        Q.    And at that point, CMS advised you that

Christopher Mucke 30(b)(6)                                    November 7, 2017
Reston, VA

Page 124

1    end of the day, I think when she understood it, she

2    recognized we had a contract to be done.  I say that

3    to say that being competent, you know, she's a

4    contracting officer.  In my experience or at least in

5    my discussions with my brother who had done a lot of

6    contracting work for the Navy or had participated in

7    a lot of contracts, you know, their authority was

8    paramount.  I mean, they directed you.

9         When she said that, my biggest concern at that

10   point in time was I've already a spent million

11   dollars or whatever it was and whether or not I was

12   going to even get paid.  So yeah.  I felt immensely

13   threatened.

14        Q.    Threatened that what?  That the contract

15   might be terminated?

16        A.    Absolutely, yeah, and at that point in

17   time, I had no idea what my recourse would be.

18        Q.    So did ACLR have an understanding as a

19   result of that conference call from November 30, 2011

20   as to whether CMS wanted ACLR to perform under the

21   terms of the PWS while this new Statement of Work was

22   being draft and finalized?

Christopher Mucke 30(b)(6)                          November 7, 2017
Reston, VA

Page 125

1        A.    You mean throughout the year prior to

2    November 30th?

3        Q.    No.  From that point forward.

4        A.    I would say at that point forward, it

5    was pretty obvious that we wouldn't be performing the

6    Performance Work Statement.  In my parlance or at

7    least my understanding of what that meant was that,

8    basically, we had been effectively given a stop work

9    order.

10        Q.    Although no written stop work order was

11    issued; is that correct?

12        A.    Yes.  CMS is really good about not

13    trying to cover their rear ends on whether or not --

14    you know, they'll tell you to stop and then not

15    follow up with it, but yes.  She did not follow up

16    with a stop work order.

17        Q.    You say CMS is really good at that.

18    That's based on this one contract you had with CMS?

19        A.    Yes.  Basically, the Part D RAC

20    Contract.  We had another instance in December of

21    2013 where we also threatened to send it.  In this

22    case, we actually submitted the improper payments to

Christopher Mucke 30(b)(6)                                November 7, 2017
Reston, VA

Page 131

```
 1          A.    I think it would be more accurate to say

 2     that CMS or the contracting officer told us that they

 3     would resolve the issue quickly, that we would get a

 4     Statement of Work that would allow us to recover

 5     amounts.  I was thanking her for that, and yes.  I

 6     would not perform that portion of the PWS while we

 7     were doing that.

 8          Q.    So ACLR had agreed to follow CMS's

 9     request that you not issue those demand letters, for

10     instance, for the 2007 duplicate payment issue?

11          A.    That's correct.

12                         [ACLR Exhibit No. 17 was

13                          marked for identification.]

14     BY MR. PORADA:

15          Q.    I've shown you what we have now marked

16     as Exhibit 17, which is a December 19, 2011 letter

17     from you to Desiree Wheeler that says it is ACLR's

18     request for equitable adjustment.  Do you remember

19     this document?

20          A.    I do.

21          Q.    That's your signature on the second

22     page?
```

Christopher Mucke 30(b)(6)                                    November 7, 2017
Reston, VA

Page 145

1    amounts are included within the damages that are

2    claimed in the ACLR complaint?

3          A.    Well, let me be more clear.  So for our

4    complaint, the way that it's structured is that for

5    2011, we based -- the complaint is based on the

6    improper payments we identified during that period or

7    duplicate payments and improper payments that we

8    identified for 2011.

9          With respect to January or all amounts for

10   2012 through December 31, 2013, that was a

11   representation of our cost less some of the amounts

12   that we received in the contract.  That net amount is

13   what we requested there.

14         Q.    In the complaint?

15         A.    That's correct.

16         Q.    So this $662,000 that was in your

17   request for equitable adjustment, that is the 2011

18   component of the delay damages that are contained in

19   your complaint; is that correct?

20         And then your complaint includes 2012 and 2013

21   additional delay costs; is that correct?

22         A.    Yes.  So, basically, what we did was in

Christopher Mucke 30(b)(6)                        November 7, 2017

Reston, VA

Page 146

1    our complaint, we didn't request any amounts

2    associated with delay costs.  With respect to 2011,

3    what we did was we reverted back to what the contract

4    stated and used, Okay, what did we do in the period

5    of 2011.  We identified $300 million in duplicate

6    payments that -- and we applied our contingency fee

7    to that.

8              With respect to delay costs between '12 and

9    '13, we also requested those amounts that were our

10   expenses or amounts incurred.  So, for example, for

11   me less our recoveries and then that gave us a net

12   amount.

13             Q.    For 2012 to '13?

14             A.    That's correct.

15             Q.    So then for 2011, the $662,000, it was

16   in your request for equitable adjustment.  That is

17   not a part of the specific damage amounts that are

18   included in your complaint, because for 2011, all

19   you're claiming is the loss contingent fee on that

20   300-some million dollars on 2007 duplicate payments;

21   is that right?

22             A.    That's correct, yes.  The only amounts

Christopher Mucke 30(b)(6)                    November 7, 2017
Reston, VA

Page 149

1          Q.     That's the same amount that you were

2     just describing earlier that is part of ACLR's

3     complaint in this case that relates to 2011.

4     Correct?

5          A.     I believe so, yes.

6          Q.     And the entirety of that amount relates

7     to the 2007 PDE records.  Correct?

8          A.     That's correct.

9          Q.     And it's all for alleged duplicate

10    payments that ACLR identified in the 2007 PDE data?

11         A.     That's correct.

12         Q.     After the November 30, 2011 conference

13    call that we talked about earlier, did ACLR ever

14    again propose conducting a recovery audit for 2007

15    duplicate payments after that call?

16         A.     Yes.

17         Q.     When was that?

18         A.     In the -- we had a meeting, I believe in

19    early January of 2012, where we met with Desiree

20    Wheeler, Theresa Schultz, Tanette Downs, and I

21    believe Frank Chartier, who was the COR on the

22    contract or was going to be the COR on the contract,

Christopher Mucke 30(b)(6)                                    November 7, 2017
Reston, VA

Page 150

1    and we pushed very hard to be able to do duplicate

2    payments because the excluded provider review,

3    frankly, wasn't going to be much money.

4         So we were trying to get -- particularly since

5    CMS had already published or publicized that

6    duplicate payments had been an improved issue and

7    that, you know, it was part of our PWS and that they

8    had approved it already.

9         Q.    Was that an in-person meeting or a phone

10   conference?

11        A.    That was an in-person meeting.

12        Q.    In Maryland?

13        A.    Yes, it was.

14        Q.    That meeting is not described in this

15   annual report.

16        A.    Okay.  It probably isn't, I guess.

17        Q.    Do you recall whether there was any

18   written submission by ACLR regarding the 2007

19   duplicate payment audit issue that occurred in

20   connection with that January 2012 meeting that you

21   described having?

22        A.    They were -- I took a presentation with

Christopher Mucke 30(b)(6)                                    November 7, 2017
                                Reston, VA

                                                              Page 151

1    me or I had submitted it back to them -- I don't

2    think it was in 2011.  I think it was early of 2012

3    -- where when we were setting up our meeting to

4    discuss issues, including our request for equitable

5    adjustment, that I had included a presentation that

6    included duplicate payments and it was, I think at

7    that time, probably 2007 through 2009 or '10.  I

8    can't recall exactly what it was, but that document

9    showed that in addition to excluded providers, we

10   also wanted to go after duplicate payments.

11        Q.   And your memory was that meeting

12   occurred in January 2012?

13        A.   That's correct.

14        Q.   So as of January 2012, ACLR had already

15   received PDE data up through 2010?

16        A.   Yes.  They were actively sending it to

17   us.  I can't recall exactly what it was.  It might

18   have been only nine, but once we started receiving

19   data, we received it on a continual basis.

20        At that point in time, it took us about a week

21   to do a year, maybe a week to two weeks.  They were

22   able to streamline that process.  So we may have had

Christopher Mucke 30(b)(6)                                    November 7, 2017
                              Reston, VA

Page 154

1        We did not submit -- I can't remember how many

2   contracts it was, probably a couple of thousand

3   contracts worth of contract data.  So, again, I did

4   not say 313 million, but this contractor that we

5   identified and prepared a notification of improper

6   payment was based on that review.

7        So the only -- again, there was a slight

8   difference in the amount, but that was because of the

9   decimal point limitation.

10       Q.    So then if I'm understanding you

11  correctly, prior to your submission of this 2011

12  report, ACLR had not identified that total sum of

13  313.8 million as potential duplicate payments for

14  2007 to CMS before that; is that correct?

15       A.    I would have to look at the timeline.

16  We also did a duplicate payment audit report.  I

17  don't know when that was done.  I don't know when we

18  did that.  That may have occurred prior to this or

19  after this report, but there was another document

20  where we did identify it, but it was a duplicate

21  payment audit issue report that we did.

22       Q.    Did ACLR ever provide to CMS specific

Christopher Mucke 30(b)(6)                                    November 7, 2017
                              Reston, VA

                                                              Page 155

1   documentation identifying all of the PDEs that it

2   contended were duplicate payments for 2007?

3        A.    No.  We did in discovery, I believe when

4   we went through discovery, but not prior to that.

5        Q.    So prior to the litigation in this case,

6   ACLR had not identified for CMS the specific PDEs

7   that it contended were duplicate payments for 2007;

8   is that right?

9        A.    That's correct.

10        Q.    Based on what you testified earlier,

11   there came a point in time, I guess, later on when

12   ACLR began analyzing duplicate payments for

13   subsequent payment years after 2007; is that right?

14        A.    That's correct.

15        Q.    And I believe, earlier, you testified

16   the additional chunk of time, if you will, when ACLR

17   was analyzing duplicate payments was for the 2010

18   through '12 payment years; is that right?

19        A.    That was what was in the approved NAIRP,

20   yes, but we also conducted reviews of 2008 and 2009.

21        Q.    The 2009, that was addressed in the

22   modification for those three specific contracts.

Christopher Mucke 30(b)(6)                               November 7, 2017
                              Reston, VA

                                                              Page 185

 1    understanding was that CMS wanted a complex review

 2    that actually would look at the underlying

 3    documentation from the plan sponsors in addition to

 4    whatever was in the PDE fields themselves.  Correct?

 5          A.    That's correct.

 6          Q.    Prior to this, had CMS given contingent

 7    approval to the duplicate payment NAIRP prior to this

 8    revised submission?

 9          A.    No.

10          Q.    Okay.

11          A.    Oh, I'm sorry.  They may have.  The only

12    reason I'm hedging on that is that there were a

13    couple of other things prior to that.  Let me see

14    here.

15          Yes.  They had.

16          Q.    So at that page that says 83 at the

17    bottom, up at the top there, there's a series of

18    different dates that reference prior submissions that

19    ACLR had made and prior responses from CMS on the

20    same duplicate payment audit issue; is that right?

21          A.    That's correct.

22          Q.    As part of the process, ACLR had agreed

Christopher Mucke 30(b)(6)                                    November 7, 2017
                              Reston, VA

                                                                  Page 186

1    to remove PDEs that were associated with partial

2    fills; is that right?

3          A.    That's correct.

4          Q.    As well as PDEs associated with

5    long-term care or vaccination administrative fees?

6          A.    That's correct.

7          Q.    And ACLR also had agreed to remove PDEs

8    that arose from prescriptions that were transitioning

9    from a retail pharmacy to a mail order pharmacy.

10   Right?

11         A.    I think that's correct, yes.

12         Q.    At this point, for this audit issue,

13   ACLR was going to use a process that identified two

14   PDEs that had the same information that occurred

15   within 50 percent of a day's supply; is that right?

16         If you look at page 83, near the bottom of

17   that paragraph.

18         A.    Yes.

19         Q.    Why had that changed from the 25 percent

20   that you used in that 2009 study of duplicate

21   payments?

22         A.    Well, primarily, the study that we

Christopher Mucke 30(b)(6)                                          November 7, 2017
                              Reston, VA

                                                                    Page 187

1    conducted didn't really give us much useful

2    information.  In fact, it demonstrated that maybe

3    some the protocols weren't as strong as they should

4    have been, but the reason that we did 25 percent was

5    kind of to limit the burden for the purposes of the

6    special study.  We were only going after three plans.

7            This one, we were going after the others, and

8    it was just more accurate.  Typically, insurance

9    companies have a deadline, that early refill of 75 to

10   75 percent.  In this case, we thought going with 50

11   percent of that, still well below the plan submission

12   requirements, would be adequate or more accurate at

13   least.

14           Q.   So this process would capture two PDEs

15   that had the same information in the identified

16   fields that were occurring within 50 percent of when

17   the original prescription was filled; is that right?

18           A.   That's correct.  For example, if it was

19   a 30-day supply, then we would look at PDEs up to 15

20   days, issued prior to that 15-day window.

21           Q.   Within the first 15 days of the first

22   prescription?

Christopher Mucke 30(b)(6)                                    November 7, 2017
                              Reston, VA

                                                              Page 188

 1          A.    That's correct.

 2          Q.    And this process on page 84 describes

 3     how, after the initial review is completed, there

 4     would be RFIs generated that would go out to the plan

 5     sponsors that would request detailed prescription

 6     data.  Do you see that?

 7          A.    Yes, I do.

 8          Q.    So as of this point, ACLR understood

 9     that the duplicate payment audit issue was going to

10     be conducted as a complex review?

11          A.    That's correct.

12                         [ACLR Exhibit No. 22 was

13                          marked for identification.]

14     BY MR. PORADA:

15          Q.    I have given you Exhibit 22, which is a

16     May 28, 2014 E-mail from India Thomas back to you.

17     Was this the notice that ACLR got that CMS had

18     approved the duplicate payment revised NAIRP that we

19     just looked at that was Exhibit 21?

20          A.    Yes, it is.

21          Q.    And Ms. Thomas informed you that CMS was

22     still reviewing their RFIs for this audit review and

Christopher Mucke 30(b)(6)                                November 7, 2017
                              Reston, VA

                                                            Page 189

 1   was going to provide comments; is that right?

 2          A.    Yes.

 3          Q.    Was it ACLR's understanding under the

 4   contract it had with CMS that CMS had the authority

 5   under the contract to determine the terms for

 6   approving the duplicate payment recovery audit?

 7          A.    My understanding of the SOW, as it was

 8   written, is that they would work with us to approve

 9   it, but yes.  They did have the ability to deny the

10   NAIRP.

11          Q.    Or to determine the specific terms of

12   the NAIRP that would be approved?

13          A.    I don't know what you mean by terms.

14   You mean like audit methodologies?

15          Q.    Right.

16          A.    Yes.

17                        [ACLR Exhibit No. 23 was

18                         marked for identification.]

19   BY MR. PORADA:

20          Q.    I've shown you Exhibit 23, which is a

21   chain of E-mails from June 2014 between Sonja Brown

22   and Gil Mucke, among others, and if you look at Gil

Christopher Mucke 30(b)(6)                                    November 7, 2017
                              Reston, VA

                                                             Page 190

1   Mucke's E-mail on the first page from June 11, 2014,

2   he said:  "Based on your E-mail of 11 June below, we

3   do recognize the authority of CPI under Appendix E,

4   new issue submission and approval process, Step 5.

5   CMS shall provide the RAC with a written explanation

6   as to terms of a conditional approval to dictate the

7   terms of the actual approval."

8         Do you see that?

9         A.    Yes, I do.

10        Q.    So, I mean, does ACLR agree that CMS had

11   the authority under the contract to, as Gil said, to

12   dictate the terms of the actual approval of an audit

13   issue?

14        MR. BONELLO:  Objection, calls for a legal

15   conclusion.

16        THE WITNESS:  I would say that with respect

17   to the terms, it would be at audit methodologies.  I

18   think this is a terminology thing, but yes.  I would

19   agree, you know, with respect to audit methodology,

20   they had the ability to do that.

21        Now, of course, I had the option -- so

22   "dictate" is a strong word, but I also had the option

Christopher Mucke 30(b)(6)                                    November 7, 2017
Reston, VA

Page 191

1   not to pursue it myself.

2   BY MR. PORADA:

3        Q.    So ACLR would agree that CMS had the

4   authority to decide what the methodology would be for

5   an approved audit issue.  Correct?

6        A.    That's correct.

7        MR. BONELLO:  Objection.

8   BY MR. PORADA:

9        Q.    Correct?

10       A.    Correct.

11       Q.    And then your other point is that ACLR,

12  then, could decide if it didn't want to proceed with

13  the audit issue under those -- under that methodology

14  that CMS had determined should be used, ACLR could

15  decide not to do it?

16       A.    That's correct, not only that.  The

17  contracting officer after that was approved, we also

18  had the authority to stop an audit at any point in

19  time.

20       Q.    I'm sorry.  Who had the authority to

21  stop an audit?

22       A.    We did.

Christopher Mucke 30(b)(6)                        November 7, 2017
                          Reston, VA

                                                        Page 195

 1          A.    That's correct.

 2          I would like to amend something I said, that

 3     they followed the protocol.  They actually didn't.

 4     It was the results of their review that 2011 and 2012

 5     were eliminated from further review.

 6          Q.    As a result of Levanta's review?

 7          A.    That's correct.

 8                          [ACLR Exhibit No. 24 was

 9                          marked for identification.]

10     BY MR. PORADA:

11          Q.    You have in front of you now Exhibit 24,

12     which is a chain of E-mails on June 26, 2014 along

13     with an attachment that appears to be Levanta's

14     validation report for the duplicate payment NAIRP

15     prior to RFIs going out.  Is that what this is?

16          A.    Yes, it is.

17          Q.    ACLR received this at the time from CMS;

18     is that correct?

19          A.    Yes.

20          Q.    Did ACLR understand that Levanta

21     disagreed with some of the duplicate payments that

22     had been identified as part of ACLR's audit issue

Christopher Mucke 30(b)(6)                                November 7, 2017
                              Reston, VA

                                                            Page 196

1    process?

2            A.    Yes.

3            Q.    So if you look, starting at page 189 at

4    the bottom, there's a section that says results,

5    disagreed, and then it lists a few different

6    categories of the duplicate payments identified by

7    ACLR that Levanta had disagreed with.  Do you see

8    that?

9            A.    Yes, I do.

10           Q.    And, for instance, they identified 3,821

11   payors that had a vaccination administrative fee and

12   they concluded that under the revised NAIRP, those

13   were to be removed.  Do you see that?

14           A.    Yes, I do.

15           Q.    Did ACLR agree with that?

16           A.    Yes, we did.

17           Q.    And for 2011 and '12, they identified,

18   it looks like, about 9,500 or so duplicative pairs

19   that also had the vaccination administrative fee in

20   them.  Is that something ACLR agreed to remove as

21   well?

22           A.    Yes.

Christopher Mucke 30(b)(6)                                     November 7, 2017
Reston, VA

Page 225

1    30 days.  I think even before we commenced it, it

2    might have been a period as little as 15 days.

3           So, you know, the 90-day built-in requirement

4    there was pretty expansive.

5           Q.    But some of these plan sponsors received

6    notices or, I should say, received RFIs for

7    potentially thousands of PDEs that were identified

8    through ACLR's 2010 duplicate payment process.

9    Correct?

10          A.    Um-hum.

11          Q.    So in response to the RFI, what they

12   were being asked to do, at least, was to submit

13   underlying documentation for every one of those PDEs

14   to substantiate them.

15          A.    That's correct.

16          Q.    Is that correct?

17          A.    That's correct.

18          Q.    So, potentially, for thousands of PDEs,

19   they would have to try to pull together the

20   underlying documentation and submit it in response to

21   the RFI to try to justify the payment as

22   non-duplicative; is that correct?

Christopher Mucke 30(b)(6)                                November 7, 2017
Reston, VA

Page 226

1          A.    That's correct.

2          MR. BONELLO:  Objection, form.

3    BY MR. PORADA:

4          Q.    Did ACLR, after this sort of fall 2014

5    timeframe, did ACLR learn that the issue of dosage

6    increases potentially causing false positives

7    continued to be a concern for CMS with the duplicate

8    payment audit issue?

9          A.    I know that the dosage increase was a

10   problem for them, but with respect to false

11   positives, I mean, you know, a false positive can't

12   occur until we actually render a decision or state

13   that we believe this to be an improper payment or, in

14   parlance of the contract, until we submit

15   notification letters to the plans.

16         Q.    So let me rephrase that then.  Did you

17   learn that CMS continued to be concerned that the

18   issue of dosage increases might be causing ACLR to

19   have identified as duplicative two payments that,

20   perhaps, weren't duplicative because there was a

21   dosage increase involved?

22         A.    Okay.  I'm going to have to pick that

Christopher Mucke 30(b)(6)                                    November 7, 2017
                              Reston, VA

                                                              Page 237

 1          Q.    And then above that, Gil Mucke had

 2    responded on the same date stating that ACLR was not

 3    available to perform this type of work until our

 4    return on 11-24.  Do you see that?

 5          A.    Yes.

 6          Q.    So why was that?  Was the entire company

 7    shut down for those 10 or 11 days or why was that?

 8          A.    Actually, it was.  It was hunting

 9    season.  We have a lot of hunters.

10          In this case and, ultimately, we didn't wait

11    that long.  We got back and got them uploaded

12    immediately, but when this first came out, the reason

13    we had that is I was actually in a location where I

14    had to travel to the top of a hill to make a phone

15    call.  So we didn't have lot of access to anything,

16    really.

17          Q.    That was a hunting trip, you were on?

18          A.    Yes.

19          Q.    At this point in time, who was involved

20    in the duplicate payment audit issue process for

21    ACLR?  You, Gil Mucke, and Thais Thompson.  Was

22    anybody else involved?

Christopher Mucke 30(b)(6)                                    November 7, 2017
                              Reston, VA

                                                              Page 238

 1          A.     Shawn Donokey.  Jason Barnes, I believe

 2     at the time was still on the contract, and then we

 3     also had other people that would come in whenever we

 4     had data to go through this.

 5          The duplicate payment was a while ago.  I

 6     don't recall it being overly burdensome for the most

 7     part because plans really didn't submit that much

 8     data.

 9          Q.     So because of the hunting season, ACLR,

10     at least Gil had expressed ACLR wasn't going to be

11     able to perform a detailed response to Levanta's

12     analysis until after the 24th of November; is that

13     right?

14          A.     That was his response, but that's not

15     how long it took.

16          Q.     He says at the bottom of his E-mail:

17     "If CMS wants to hold this off so that we may

18     adequately dispute each and every finding of DVC, we

19     intend to do so."

20          Do you see that?

21          A.     Yes.

22          Q.     So was it correct that ACLR disputed

Christopher Mucke 30(b)(6)                              November 7, 2017
                              Reston, VA

                                                        Page 242

     1              A F T E R N O O N     S E S S I O N

     2                           [2:12 p.m.]

     3                     [ACLR Exhibit No. 33 was

     4                     marked for identification.]

     5        FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT

     6   BY MR. PORADA:

     7        Q.    I'm showing you what we've marked as

     8   Exhibit 33.  This is the December 24, 2014 2010

     9   duplicate payment review IPRP submission of ACLR; is

    10   that right?

    11        A.    Yes.  That's correct.

    12        Q.    This document was prepared following

    13   ACLR's review of the PDEs and whatever RFI

    14   submissions it received from the plan sponsors in

    15   response to the RFIs; is that right?

    16        A.    That's correct.

    17        Q.    If you look at page A02295, at the top

    18   corner, the overview there references 367 plans that

    19   received an RFI.  So would that have been the total

    20   number of plans that ACLR had identified as having

    21   potential duplicate payments that were sent the RFIs?

    22        A.    The 254 and the --

                          Alderson Court Reporting

Christopher Mucke 30(b)(6)                              November 7, 2017
                              Reston, VA

Page 245

1        Q.    Was that $15.9 million number of

2   duplicate payments, the total, was that calculated

3   using the revised protocol that we looked at in

4   Exhibit 30 or a different protocol?

5        A.    It was -- no.  It was the approved audit

6   duplicate payment protocol for the original NAIRP or

7   the revised NAIRP.

8        Q.    So it was using the protocol that was

9   contained in the revised NAIRP that was submitted

10  back in May 2014?

11       A.    That's correct.

12       Q.    So then if I'm understanding correctly,

13  this 15.9 million total does not take into account

14  the revised protocol that was Exhibit 30; is that

15  right?

16       A.    Well, insofar as we had the evidence

17  supporting it.  So I think I mentioned earlier that

18  we didn't submit or that CMS didn't send out the

19  revised exception report.  So I reverted back to the

20  original approved protocol.

21            In our subsequent determinations, if it was a

22  dosage change, we would remove it.  So that's what we

Christopher Mucke 30(b)(6)                                    November 7, 2017
                            Reston, VA

                                                              Page 246

 1    did.

 2          Q.    If there was documentation to

 3    substantiate the dosage change?

 4          A.    That's correct.

 5          Q.    If I could have you turn to the next

 6    page, there's a section called CPI Consideration.  Do

 7    you see that?

 8          A.    Yes.

 9          Q.    In the second sentence, you said:  "We

10    also believe, however, that audits are fluid in

11    nature and should be adaptive to observation made

12    during the audit."

13          Do you see that?

14          A.    Um-hum.

15          Q.    So did ACLR agree that issues might

16    arise after an audit was approved that might require

17    changing the methodology or the protocol for pursuing

18    the audit?

19          A.    Based on observations, yes.

20          Q.    And that could be appropriate in some

21    circumstances to render more accurate results?

22          A.    Yes.

Christopher Mucke 30(b)(6)                                    November 7, 2017
Reston, VA

Page 255

1   the first excluded provider audit that we did.   In

2   this case, we had a solid SOW.

3          I submit the records.   They perform the

4   validation.   If they disagreed, there's a process

5   built in the contract for that.   In this case, it was

6   apparent that they didn't even review our submission,

7   you know, because the submission -- when we did our

8   submission, if there was evidence for a dosage

9   change, we removed it, period.

10          So, again, if they're coming up with the exact

11   same error rate that they had before, I mean, to me

12   at least, clearly, it's saying that they didn't

13   review the submission, and my understanding of how

14   they operate and the problems that they have with

15   respect to performing the validations, you know, this

16   is three weeks later.   I doubt extremely very much

17   that they would have even sorted the data we

18   submitted or the evidence that was submitted.

19          Q.   So the E-mail from Monique Harris asked

20   ACLR to provide the DVC with the requested

21   information by close of business January 16, 2015.

22   Did ACLR actually further respond to Levanta about

Christopher Mucke 30(b)(6)                                    November 7, 2017
                              Reston, VA

                                                            Page 256

 1    these issues?

 2            A.    I don't recall.  I think this -- I

 3    believe this might have been my last response on it,

 4    and then after that, I would have dealt specifically

 5    with our contracting officer.

 6                            [ACLR Exhibit No. 35 was

 7                            marked for identification.]

 8    BY MR. PORADA:

 9            Q.    I have given you Exhibit 35, which is

10    the 2014 Annual Report Recovery Audit Services in

11    Support of Part D.  This is another annual report

12    that ACLR prepared; is that right?

13            A.    Yes.

14            Q.    Let me have you turn to page A03151.

15    Down at the bottom of that page, you talk about CMS'

16    Rule 4159(F).  Do you see that?

17            A.    Yes, I do.

18            Q.    Then in the bold text, you say that:

19    "The issuance of this rule demonstrated that CMS had

20    willfully engaged in a preplanned, well-coordinated

21    effort to delay implementation of the Part D RAC,

22    that it intentionally withheld such information from

Christopher Mucke 30(b)(6)                          November 7, 2017
                        Reston, VA

Page 270

1    Correct?

2         A.    That's correct, yes.

3         Q.    That was the final number that ACLR

4    identified as the duplicate payments for 2010?

5         A.    That's correct.

6         Q.    And that was using the methodology that

7    is described in the IPRP that was Exhibit 33?

8         A.    That was using the methodology was in

9    the approved NAIRP, revised NAIRP.

10        Q.    From May 2014?

11        A.    That's correct.  Again, Mr. Porada, with

12   respect to that revised NAIRP, that was also based on

13   our findings from the audit, you know, based on the

14   evidence that was submitted to us.

15        Q.    In response to the RFIs?

16        A.    That's correct.  We just didn't rely on

17   the approved process.  We actually reviewed the

18   documentation as well to come up with that number.

19                         [ACLR Exhibit No. 37 was

20                          marked for identification.]

21   BY MR. PORADA:

22        Q.    I have given you here Exhibit 37.  This

Christopher Mucke 30(b)(6)                    November 7, 2017
Reston, VA

Page 271

1    is a technical direction letter dated April 24, 2015

2    from CMS to ACLR.  I take it you received this and

3    reviewed it at the time you got it.

4            A.    Yes, we did.

5            Q.    And did ACLR understand after it

6    received this technical direction letter that CMS had

7    rescinded the prior approval for the duplicate

8    payment audit issue for Years 2010 through 2012?

9            A.    Yes.

10                         [ACLR Exhibit No. 38 was

11                          marked for identification.].

12   BY MR. PORADA:

13           Q.    I've shown have you Exhibit 38, which is

14   the March 12, 2015 certified claim submission from

15   ACLR to CMS; is that right?

16           A.    Yes.

17           Q.    And this is -- if you look at the last

18   page, you signed the letter and you signed

19   certification.  Correct?

20           A.    That's correct.

21           Q.    This was actually submitted to CMS prior

22   to the technical direction letter that we just looked

Christopher Mucke 30(b)(6)                              November 7, 2017
                            Reston, VA

                                                        Page 272

1    at as Exhibit 37.  Right?

2           A.    That's correct.

3           Q.    Let me have you turn to the section that

4    says relief requested, the second to the last page

5    number.  No. 1 asks for $23,535,618 and it says it's

6    related to improper payments identified during the

7    base period of the contract.  Right?

8           A.    That's correct.

9           Q.    So that would be the contingent fee that

10   ACLR claims that it would be entitled to receive on

11   the $313.8 million of 2007 duplicate payments that it

12   identified?

13          A.    That's correct.

14          Q.    We'll skip No. 2.

15          No. 3 requests $2,209,146 and that would be

16   the contingent fee that ACLR claims it would have

17   received if the 2010 duplicate payment audit had

18   proceeded and the $15.9 million identified by ACLR

19   was recovered.  Correct?

20          A.     Correct.

21          Q.    Other than the 2007 and 2010 duplicate

22   payment audit issues, is it correct that ACLR's

Christopher Mucke 30(b)(6)                                    November 7, 2017
Reston, VA

Page 273

1    damages in this case are not based on the denial or

2    termination of any other recovery audit issues beyond

3    those two duplicate payment audit issues?  Is that

4    right?

5          A.    That's correct.

6          Q.    Does ACLR know whether CMS actually

7    recouped any of those alleged improper payments for

8    either the '07 or 2010 duplicate payment audit

9    issues?

10         A.    I can't qualify that.  I wouldn't be

11   surprised if they had.

12         Q.    But you're not aware of any information

13   as to whether they specifically did recoup any of

14   those amounts?

15         A.    That's correct.

16         Q.    Or whether they recouped all of those

17   amounts?

18         A.    That's correct.

19         Q.    No. 2 under the relief requested asks

20   for $2,668,553 for amounts expended, reasonable

21   expectations of profit, and net of amounts already

22   collected arising from ACLR efforts during subsequent

Christopher Mucke 30(b)(6)                              November 7, 2017
Reston, VA

Page 274

1    modifications of the contract.  Is that what you were

2    describing earlier today as amounts that ACLR

3    expended in 2012 and 2013 net of whatever it received

4    in contingent fees for audit issues during those

5    years?

6            A.    Yeah, and in this case, we were looking

7    at -- all of these are based on reasonable

8    expectations of profit, but in this case right here,

9    I limited since I was based it on actual -- the cost

10   of delays.  I limited the reasonable expectations to

11   what our profit expectations or what our actual

12   profits had been in prior years before we got the CMS

13   contract.

14           Q.    So that was based on profit percentages

15   that ACLR had realized doing its prior work in

16   private industry?

17           A.     That's correct.  You know, for example,

18   in the period, we didn't -- you know, for the period

19   of '12 and '13, we didn't ask for a contingency fee

20   on the billion dollars that we submitted.  This was

21   -- you know, our approach here was just to look at

22   really the amount of time that had been expended

Christopher Mucke 30(b)(6)                                November 7, 2017
Reston, VA

Page 275

1    trying to develop a new SOW.

2            Q.    So this period of delay in 2012 and

3    2013, is it based on CMS delays in approving any

4    audit issues?

5            A.    Well, I would say that they didn't

6    approve anything at that point in time.  There was no

7    ability for them to approve audit issues.

8            I mean, the PWS was still in place, you know,

9    and under the PWS, we made a determination of

10   improper payments, not CMS, and I think, as I

11   testified earlier, at the end of 2013, we submitted a

12   billion dollars.  I, once again, told them that I was

13   going to submit, you know, in accordance with our

14   PWS, you know, if nothing else, just to get movement.

15           It had been two years since they first gave us

16   a draft SOW and nothing was happened.

17           Q.    So what was the delay in 2012 and 2013?

18   Was it the delay in finalizing the SOW?

19           A.    Well, there were multiple delays.

20   Again, the timelines, them meeting timelines, really

21   never occurred.  It got so bad, the contracting

22   officer finally eliminated all of them.  So those

Christopher Mucke 30(b)(6)                          November 7, 2017
                            Reston, VA

                                                         Page 278

     1        A.    Well, with respect to -- again, going

     2   back to the reasonable expectation of profit, long

     3   before that contract even started, before we were

     4   awarded, I was already, you know, making those

     5   calculations.  I figured by that time, I possibly

     6   would be retired and living on an island anywhere.  I

     7   mean, at that point in time, I figured would have

     8   received hundreds of millions back in improper

     9   payments.

    10        If you look at the A-B program, in three

    11   years, they had recovered a billion dollars.  Part D

    12   audits were significantly easier than determining the

    13   medical necessity reviews in A and B.

    14        Q.    Although, Part A and B Programs are much

    15   larger that than "D", to your understanding; is that

    16   correct?

    17        A.    I understand that, but so are the review

    18   protocols, for example, medical necessity that

    19   requires intense reviews.  Actually, I found out in

    20   discovery that we weren't even -- without our

    21   knowledge not able to go after medical necessity

    22   reviews.

Christopher Mucke 30(b)(6)                        November 7, 2017
                         Reston, VA

                                                      Page 279

 1        Q.    What documentation does ACLR have that

 2   substantiates or documents that $2.6 million in the

 3   delay damages that you're claiming in No. 2?  Is it

 4   whatever you submitted with the certified claim?

 5        A.    I can't remember.  I'm sure that those

 6   amounts would be in there, but I do know that in

 7   discovery for this case, I did have to provide those

 8   calculations.

 9        Q.    So is it ACLR's position that the

10   company has produced documents beyond whatever was

11   included with the certified claim that substantiate

12   that figure in particular, that $2.6 million figure?

13        A.    It's my testimony that I don't remember

14   what was in there or what supporting document was

15   submitted with the claim, but, certainly, we have

16   since submitted that documentation.  I do recall

17   doing it during discovery.

18        Q.    What types of documents do you recall

19   producing in discovery that relate to that $2.6

20   million claim?

21        A.    I think there were some income and

22   profit loss statements.  I can't remember if there

Christopher Mucke 30(b)(6)                                    November 7, 2017
                              Reston, VA

                                                              Page 280

 1    were balance sheets.  There were also our spreadsheet

 2    calculations with respect to how we calculated the

 3    initial incurred amounts.  I did it at two different

 4    levels.  One was a mixture of costs incurred, and

 5    then I also did a calculation on our GSA contracted

 6    rates for personnel and the time spent on that

 7    contract.  If I remember correctly, we averaged those

 8    two amounts and then subtracted out recoveries.

 9         Q.   When you say you subtracted out

10    recoveries, does that mean you subtracted out every

11    dollar that ACLR received in contingent fees during

12    2012 and '13?

13         A.   Well, we didn't receive any money in

14    2012, but 2013 and '14, I think maybe even up through

15    the claim, I can't remember exactly what it was, but

16    the amount was a $1,500,000, I think was the amount

17    that we reduced.

18                      [ACLR Exhibit No. 39 was

19                      marked for identification.]

20    BY MR. PORADA:

21         Q.   I have shown you now what we marked as

22    Exhibit 39, which is a table that's titled "Contract

                      Alderson Court Reporting

Christopher Mucke 30(b)(6)                          November 7, 2017
                          Reston, VA

Page 284

1    periods, yes.

2         Q.    So are you saying that all of these

3    different submissions and decisions occurred within

4    that 2012 to '13 timeframe?

5         A.    Some of these would have occurred

6    afterwards.  I think, in fact, some of them are noted

7    here as starting in 2014.

8         Q.    Right.  The NAIRP denials that are

9    described there all seem to be 2014, but with respect

10   to the recovery audits in the top table, are those

11   all audits that -- other than the duplicate payments,

12   are those other ones all audits that CMS approved and

13   that proceeded?

14        A.    That's correct, yes.

15        Q.    So in terms of the period of delay that

16   relates to your $2.6 million delay claim, is it,

17   simply, January 1, 2012 through December 31, 2013?

18        A.    Yes.

19        Q.    So these specific number of days here

20   that are identified for each of these particular

21   issues don't relate to that delay claim because the

22   delay claim is simply both years in their entirety,

Christopher Mucke 30(b)(6)                                November 7, 2017
                              Reston, VA

                                                            Page 288

 1    think of submit, it's like a formal process.  I may

 2    have shared it with them, but, again, under the PWS

 3    that was existing, you know, it was -- you know, I

 4    didn't submit.

 5          Q.    Okay.  Let's use the word "share", then,

 6    if that's what you prefer.  Do you recall sharing

 7    this table with CMS prior to 2015?

 8          A.    No.  I don't recall it.

 9          Q.    And can you tell me what is this table

10    reflecting or representing?

11          A.    This was our calculation of the improper

12    payments associated with our duplicate payment

13    protocol for the duplicate payments we identified in

14    2011.

15          Q.    For Payment Year 2007?

16          A.    That's correct.

17          Q.    So if you look at the last page, there's

18    a total at the very bottom.  That seems to be the

19    same $313.8 million number that carries forward into

20    your complaint as the amount of duplicate payments

21    you believe you identified for 2007.  Correct?

22          A.    That's correct.

Christopher Mucke 30(b)(6)                                    November 7, 2017
Reston, VA

Page 289

1        Q.    So if I'm understanding this, this table

2   is listing each contract of record in which ACLR

3   identified any amount of what it believed were

4   duplicate payments; is that right?

5        A.    That's correct.

6        Q.    And then it lists the total amount for

7   each contract of the payments that ACLR believed were

8   duplicates.  Right?

9        A.    That's correct.

10        Q.    This table doesn't identify the specific

11   PDEs; it's just the total amount for each contract

12   that you believed were duplicative; is that correct?

13        A.    That's correct, although, I believe in

14   the claim itself, we submitted a CD, I believe, that

15   all the PDEs were with it as well, but we did not

16   print off the exception reports for that.

17        Q.    So it's your belief that along with the

18   certified claim, there was a CD that was submitted

19   that had all of the PDEs for all of these $313.8

20   million for 2007 duplicate payments?

21        A.    Well, not just that, but the totality of

22   our claim.  We included all of the evidence in there,

Christopher Mucke 30(b)(6)                                November 7, 2017
                                Reston, VA

                                                              Page 290

 1    including this table, for example.  The claim that I

 2    filed with them or that I electronically submitted to

 3    CMS, I believe only included the claim itself, not

 4    all the supporting documents.  I believe that we

 5    FedEx'd that information to them or over-nighted it

 6    to them.

 7          Q.    But it's your belief that in connection

 8    with the certified claim, you provided CMS with files

 9    of all the individual PDEs that make up this $313.8

10    million?

11          A.    Yes.  I believe so, Mr. Porada.  It's

12    difficult to remember that, but I'm almost positive

13    that we did.

14                          [ACLR Exhibit No. 43 was

15                          marked for identification.]

16    BY MR. PORADA:

17          Q.    Take a look at Exhibit 43.  This is a

18    June 5, 2015 letter to you from CMS.  This is CMS's

19    response to ACLR's certified claim that we looked a

20    moment ago, Exhibit 38; is that right?

21          A.    That's correct.

22          Q.    ACLR understood when it got this that

Christopher Mucke 30(b)(6)                          November 7, 2017
                              Reston, VA

                                                              Page 298

 1          MR. BONELLO:  I just want to clarify.  You're

 2     talking about this case?

 3     BY MR. PORADA:

 4          Q.   In this case, yes, because in this case,

 5     you're claiming delay damages for that period of time

 6     in lieu of damages based on contingent fees for

 7     submissions that were denied.  I think that's what

 8     you testified earlier.  Correct?

 9          A.   Well, I'm stating that that wasn't the

10     damages that we got.  I don't know that I testified

11     that I did that in lieu of, but, you know, we based

12     it off of our calculation of incurred costs or an

13     estimate of our incurred costs and the amounts that

14     we did, that we calculated from our GSA schedule

15     rates less the recoveries that we received.

16          Q.   So in this case, you're not seeking any

17     contingent fees under that billion dollars of alleged

18     improper payments that you submitted in November

19     2013.  Correct?

20          A.   That's correct.

21          Q.   Let me have you look at paragraph 53.

22     Paragraph 53 talks about July 2014 with CMS notifying

Christopher Mucke 30(b)(6)                                November 7, 2017
                              Reston, VA

                                                              Page 299

 1    ACLR that CMS had rescinded an approval of the 2011

 2    and '12 duplicate payment issue.  ACLR is not

 3    claiming any damages based on contingent fees

 4    calculated off of that $52.6 million for 2011 and

 5    2012; is that right?

 6          A.    Not for this complaint, no.

 7          Q.    That might be in the third case; is that

 8    what you're saying?

 9          A.    Or future claims.  No.  I don't think it

10    is actually included in ACLR 2 or ACLR 3.

11          Q.    Okay.  There might be an ACLR 4 coming?

12          A.    You're asking me to guess, but I don't

13    know at this time.

14          Q.    Can I have you look at paragraph 57.

15    This is talking about the $15.9 million in duplicate

16    payments for 2010, and that is part of this case, the

17    damages.  Correct?

18          A.    That's correct.

19          Q.    Right, and in that paragraph 57, you say

20    that ACLR notified CMS that its edit check did not

21    match plan sponsor evidentiary submissions and was in

22    error in 73.3 percent of all instances in which it

Christopher Mucke 30(b)(6)                                    November 7, 2017
                              Reston, VA

                                                              Page 306

     1          Yeah.  I'm sure that we did in discovery.  I

     2    don't know is the short answer.  I know that the

     3    total costs associated with those records were

     4    included.

     5          Q.    In the form of the annual financial

     6    statements?

     7          A.    That's correct.

     8          Q.    So that would be a summary total for the

     9    year.  Correct?

    10          A.    That's correct.

    11          Q.    So but in terms of more specific payroll

    12    records or timekeeping system records that show who

    13    was working on what issues and when, those types of

    14    things haven't been produced; is that correct?

    15          A.    Yeah.  We didn't track costs that way.

    16          MR. BONELLO:  I think you're getting close to

    17    the end.

    18          MR. PORADA:  I think we are.

    19                         [ACLR Exhibit No. 45 was

    20                         marked for identification.]

    21    BY MR. PORADA:

    22          Q.    So you have in front of you now Exhibit

Christopher Mucke 30(b)(6)                                    November 7, 2017
                              Reston, VA

                                                                   Page 307

 1    45.   These are the initial disclosures from ACLR in

 2    this case; is that right?

 3           A.    Yes.

 4           Q.    Section C contains ACLR's computation of

 5    damages.   Do you see that?

 6           A.    Yes.

 7           Q.    Those are the same amounts that we've

 8    already talked about that were in the complaint and

 9    the certified claim.   Correct?

10           A.    Yes.

11           Q.    So with respect to the contingent fee

12    for the 2007 duplicate payments of 23 and a half

13    million dollars, is that simply a calculation of

14    seven and a half percent, which was the contingent

15    fee under the base contract, times the 313.8 million

16    in the total of the alleged duplicate payments for

17    that year?

18           A.    Yes.

19           Q.    On the $2.6 million delay damage piece,

20    you mentioned that the profit rate that ACLR applied

21    was based on a historical rate before the CMS

22    contract.   What rate was used?   Do you know?

Christopher Mucke 30(b)(6)                          November 7, 2017
Reston, VA

Page 308

1        A.    I want to think it was about 40 percent,

2   40 to 50 percent.  We had had an enormous profit

3   margin, but I believe it was anywhere from 40 to 55

4   percent.

5        Q.    That had been ACLR's historical profit

6   rate on the private contract work?

7        A.    Yes.

8        Q.    I should say private industry work.

9        A.    Yes.

10        Q.    Over what period of time had ACLR

11   realized that profit rate in the past?

12        A.    Probably since we were in business.  I

13   mean, it was always pretty high.  It's difficult to

14   say.  Initially, when I went out on my own, I think I

15   testified in ACLR 2 that we had -- that the previous

16   company was Corporate Tax Consultants, and it was

17   those periods that we were doing -- initially, I was

18   a contractor and it was just me, but then as we

19   expanded, those rates were always pretty close to

20   that amount.

21        So yeah.  It would have been -- we were always

22   pretty profitable.

Christopher Mucke 30(b)(6)                    November 7, 2017
Reston, VA

Page 311

1   years that -- or those two years that nothing was

2   done or, more accurately, not much was done.

3        Q.   For the next piece of the damages, the

4   $2.2 million, that's based on 2010 duplicate payment

5   audit issue, and the way you determined that, was it

6   simply by taking the $15.9 million in the total

7   amount of the alleged duplicate payments that you

8   identified for 2010 and taking the 15 percent

9   contingent fee off the first 10 million and then 12

10  percent off the remaining 5.9 million?

11       A.   I believe that's the case, yeah.  I

12  would have to go back and look at the contract.  Our

13  contract might have given us a higher percentage on

14  duplicate payments.  That number was separated, but I

15  do believe it was that calculation.

16       Q.   So if you look at Exhibit 12, which was

17  Modification 13, on page 5 of 8 at the top --

18       Exhibit 12.

19       A.   I'm sorry.  Okay.

20       Q.   So that's the table there that contains

21  the updated contingent fee rates for the different

22  issues.  Right?

Alderson Court Reporting

1-800-FOR-DEPO                         www.aldersonreporting.com
SA294

Christopher Mucke 30(b)(6)                                    November 7, 2017
                                Reston, VA

Page 312

1          A.    That's correct.

2          Q.    And duplicate payments isn't called out

3     as a special issue that got something higher than

4     that.  It just got the 15 percent off the first 10

5     million and 12 percent off whatever is on top of the

6     12 million.

7          A.    That's correct.

8          Q.    So that's how you have would computed

9     that $2.2 million?

10         A.    Yes.  That's correct.

11         MR. PORADA:  I don't think I have any further

12    questions.

13         MR. BONELLO:  He'll read and sign.

14         [Whereupon, at 3:46 p.m., the deposition

15    concluded.]

16                         [Signature not waived.]

17

18

19

20

21

22

# TAB 91

Christopher Mucke 30(b)(6)                          September 11, 2017
Reston, VA

Page 1

1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2    ----------------------------x

3    ACLR, LLC,                      :

4            Plaintiff,      :  Case No.: 16-309c

5        vs.                      :  (Judge Campbell-Smith)

6    THE UNITED STATES,              :

7            Defendant.      :

8    ----------------------------x

9

10        30(b)(6) DEPOSITION OF CHRISTOPHER MUCKE

11                    Reston, Virginia

12                Monday, September 11, 2017

13                         9:02 a.m.

14

15

16

17

18

19

20   Job No.:  72509

21   Pages:  1 - 271

22   Reported by:  Elizabeth Mingione, RPR

Christopher Mucke 30(b)(6)                                    September 11, 2017

Reston, VA

Page 18

```
 1   corporate work and going into beginning government

 2   work.  We had to establish -- where we established

 3   your GSA schedule.  I believe at the time we might

 4   have been doing some residual tax work, but that's

 5   all I can recall.

 6        Q.    So was this the first government contract

 7   on which ACLR submitted a response?

 8        A.    No.  We had done -- we had submitted

 9   proposals, I believe, for maybe two or three

10   different contracts.  I think one or two of them may

11   have also been with Health and Human Services.

12        Q.    As of this point in time, October 2010,

13   had ACLR received any other government contracts?

14        A.    No, we had not.

15        Q.    Why was it that ACLR was making a

16   transition from doing corporate work toward trying to

17   obtain government contracts?

18        A.    The -- after I decided to move away from

19   tax work, I recalled my earlier experiences working

20   with other companies, we did a lot of government

21   contracting work back then.  And I knew that there

22   were opportunities for recoveries in government.  And
```

Christopher Mucke 30(b)(6)                                    September 11, 2017
                              Reston, VA

                                                                    Page 38

 1        Q.    Did you review the entirety of the

 2   contract at the time -- at the time you signed it?

 3        A.    Yes, I did.

 4        Q.    Did you understand all the terms of the

 5   contract at the time you signed it?

 6        A.    Yes, I did.

 7        Q.    At that time, the time that you were

 8   awarded -- you being ACLR were awarded the contract,

 9   did you or anyone else at ACLR ask CMS to alter or

10   amend any of the terms of the contract  when it was

11   awarded?

12        A.    At the time of award?

13        Q.    Yes.

14        A.    No, we did not.

15        Q.    Is it correct that ACLR understood at the

16   time the contract was awarded that it would be paid

17   on a contingency basis by CMS; is that right?

18        A.    That's correct.

19        Q.    You mentioned a moment ago 7.5 percent.

20   That seems to be the percent of the contingent fee

21   listed in Section Number 5 on page 3 of 29.

22              Do you see that?

Christopher Mucke 30(b)(6)                                September 11, 2017
Reston, VA

Page 39

1        A.    Yes, I do.

2        Q.    So that was the rate that ACLR had

3    proposed to CMS for the contract?

4        A.    That's correct.  Yes.

5        Q.    Do you see the language in the middle of

6    that paragraph, the fifth sentence, I believe it

7    says:  The recovery audit contractor shall not

8    receive any payments for the identification of the

9    underpayments or overpayments not recovered, slash,

10   collected.

11            Do you see that?

12       A.    Yes, I do.

13       Q.    So is it correct that ACLR's understanding

14   at the time the contract was issued was that ACLR

15   would only be paid based on amounts actually

16   recovered or collected by CMS?

17       A.    Yes.  That's correct.

18       Q.    Is ACLR aware of any other provision of

19   the contract here at Exhibit 4 that provides for

20   payment to ACLR on anything other than a

21   contingent-fee basis?

22       A.    No.

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

Page 43

1    our other clients at that -- previous to that.  And

2    we just used CMS, transitioned that over to the CMS's

3    systems.

4        Q.    Did CMS -- anyone at CMS ask ACLR to make

5    any modifications or revisions to the PWS at the time

6    of the initial contract award?

7        A.    No.  Not that I can recall.

8        Q.    So, to the best of your recollection, the

9    performance work statement that was referenced in the

10   initial contract was 100 percent ACLR's work product?

11       A.    Yes.

12       Q.    You mentioned a few minutes ago that in

13   connection with submitting the proposal for this

14   contract, you had received a whole variety of prior

15   OIG reports and other reports to Congress and things

16   of that nature related to the Part D program; is that

17   right?

18       A.    That's correct.  Yes.

19       Q.    Had ACLR ever performed any work in

20   connection with the Part D program prior to the award

21   of this contract?

22       A.    It was indirect.  I'm trying to remember

Christopher Mucke 30(b)(6)                                September 11, 2017
Reston, VA

Page 48

1    overpayments in those areas as well, but it was

2    primarily tax.

3         Q.    Did ACLR, at the time it was awarded this

4    contract, think that it could achieve a higher

5    success rate than the 4.86 percent that you reported

6    for the Part A and B RAC demonstration project?

7         A.    Beyond doubts, yes.

8         Q.    What -- do you recall what your

9    expectation was as to the success rate that ACLR

10   should be able to achieve?

11        A.    I would say that we would be able to

12   achieve close to 100 percent.  I did not anticipate

13   that we would recover 100 percent.

14        Q.    So what's the distinction between being

15   able to achieve nearly 100 percent but not expecting

16   that you would be able to achieve nearly 100 percent?

17        A.    The previous roadblock I brought up.  in

18   This instance you are looking at an industry that is

19   receiving, at least for Medicare, two to seven

20   billion dollars a year in overpayments.  Removing

21   that kind of cash from a business industry will have

22   an impact.

Christopher Mucke 30(b)(6)                              September 11, 2017
                        Reston, VA

Page 59

1   or revisions.  I do recall asking a lot of questions

2   about what was included in there.

3        Q.    Were those questions answered to ACLR's

4   satisfaction?

5        A.    I think, ultimately, yes.

6        Q.    When you say ultimately, do you mean by

7   the time this statement of work was issued as part of

8   modification 13, by that time your questions had been

9   answered to your satisfaction?

10       A.    Yes.

11       Q.    Was it ACLR's understanding that once the

12  statement of work was issued, the method of payment

13  for ACLR would continue to be on a contingent-fee

14  basis?

15       A.    Yes.

16       Q.    And that would continue to be a contingent

17  fee based on amounts actually recovered by CMS?

18       A.    That's correct.  Yes.

19       Q.    So the contingent fee wouldn't be based on

20  amounts identified by ACLR as overpayments, only on

21  amounts recovered?

22       A.    That's correct.

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

Page 63

 1   during this statement of work.

 2              We both looked at it and realized that

 3   there wasn't any money there.  So it was, you know,

 4   we decided not even to propose a NAIRP.  That was a

 5   discussion that took place before that.  And I

 6   anticipated that similar discussions would occur with

 7   all of those.  We did not expect abject denials.

 8        Q.   So it was ACLR's expectation that once a

 9   NAIRP, which is N-A-I-R-P, which stands for New Audit

10   Issue Review Package; is that right?

11        A.   That's correct.  Yes.

12        Q.   So it was ACLR's expectation that once it

13   submitted a NAIRP, it would work with CMS; and CMS

14   and ACLR together would decide whether an audit issue

15   should go forward or not?

16        A.   Absolutely.  The statutes themselves, I

17   mean, put the burden of going after these improper

18   payments on CMS.  You know, we merely saw ourselves

19   as an agent of CMS in assisting them to do that.

20        Q.   So if the statement of work says that CMS

21   has to approve additional audit issues, in ACLR's

22   mind did that include the ability to not approve a

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

Page 64

1    new audit issue, if CMS determined it did not want it

2    to proceed?

3         A.    Yes.

4         Q.    After the statement of work was issued on

5    this contract, did ACLR ever assert to CMS that ACLR

6    had the right to proceed with an audit, absent

7    approval from CMS?

8         A.    For the statement of work?

9         Q.    After the statement of work was issued.

10        A.    No.  We -- I did not.  We did not believe

11   that we had that right.

12        Q.    Let me ask you to turn to Section 1.2.3 of

13   the statement of work.  You see that section?

14        A.    Yes, I do.

15        Q.    Do you remember, specifically with regard

16   to this section, was this the language that was

17   contained in the original proposals from Booz Allen

18   Hamilton that you described, or had there been

19   changes made to the language?

20        A.    Well, I don't recall there being any

21   changes.  I believe it was the same language that was

22   there as proposed in December of 2010, or in the

Christopher Mucke 30(b)(6)                                    September 11, 2017
                          Reston, VA

                                                                  Page 76

  1        Q.    And if you notice this version, in the

  2   upper left corner of every page, there's a ACLR 2

  3   Bates number, which I'll tell you indicates that

  4   these were produced by ACLR as part of the

  5   litigation.

  6              Do you recall that?

  7        A.    Yes, I do.

  8        Q.    Was this the red-lined version of that

  9   January 1, 2015 statement of work that you described

 10   you had recalled seeing in the past?

 11        A.    That's correct.  Yes.

 12        Q.    Is it ACLR's understanding that the

 13   revised statement of work continued to provide for

 14   payments to ACLR only on a contingent-fee basis?

 15        A.    That's correct.

 16        Q.    And that again was still based on a

 17   contingent fee of amounts actually recovered by CMS,

 18   correct?

 19        A.    That's correct.  Yes.

 20        Q.    Is it ACLR's understanding that this was

 21   the version of the statement of work in effect at the

 22   time that ACLR submitted its sales tax audit

Christopher Mucke 30(b)(6)                                        September 11, 2017
                                    Reston, VA

                                                                          Page 80

 1    know, the appeal processes would change.  A lot of

 2    the processes changed.  Deadlines were extended, and

 3    the like, but there was an appeals process in it, if

 4    that answers your question.  But it did change,

 5    actually, with every review that we did.

 6         Q.    Okay.  So, but the way the process worked,

 7    once ACLR would identify potential overpayments, and

 8    plan sponsors were notified of those potential

 9    overpayments, the plan sponsors would have an

10    opportunity to rebut that finding essentially?

11         A.    That's correct.  Yes.

12         Q.    And did ACLR ultimately receive contingent

13    fee payments from CMS based on the completion of

14    those audit issues that we described earlier, the

15    excluded providers, the unauthorized prescribers, and

16    the DEA scheduled drugs?

17         A.    Yes, we did.

18         Q.    So at some point then after those audits

19    were completed, was ACLR notified by CMS about the

20    total amounts that had been recovered on those audit

21    issues?

22         A.    Yes, we had.

Christopher Mucke 30(b)(6)                                    September 11, 2017
                              Reston, VA

                                                                    Page 81

     1        Q.    And you were then notified what your

     2   contingent fee would be based on those recovered

     3   amounts?

     4        A.    That's correct.  Yes.

     5        Q.    Where there any of the approved audits

     6   that ACLR completed where 100 percent of the

     7   identified overpayments that were identified by ACLR

     8   were recovered by CMS?

     9        A.    We didn't receive what we identified.

    10   Correct.  It was reduced during the appeals process.

    11        Q.    So the total overpayment amounts were

    12   reduced during the appeals process?

    13        A.    That is correct.  Yes.

    14        Q.    In some of those approved audit issues was

    15   ACLR's recovery rate significantly below the 98

    16   percent that you had predicted at the time you

    17   submitted the performance work statement?

    18        A.    Well, if the question pertains to 98

    19   percent, at the time that 98 percent was predicated

    20   on our performance work statement, where we would

    21   determine the issues, and it was predicated on going

    22   after the entire universe of overpayments.  To the

Christopher Mucke 30(b)(6)                          September 11, 2017
Reston, VA

Page 82

1    extent that your -- whether or not you are asking if

2    the amounts that we submitted were reduced by

3    appeals, they were reduced.  Yes.

4         Q.   Did the recovery rate vary significantly

5    from one audit to another of the audits that ACLR

6    completed?

7         A.   It depended on the changes made by CMS

8    after the audit issue was approved.  But in some

9    cases, it didn't.  In some cases, it did.

10                        -  -  -

11              (A document was marked as Deposition

12   Exhibit Number 9.)

13                        -  -  -

14              BY MR. PORADA:

15        Q.   So I've shown you what we've marked as

16   Exhibit Number 9.  This is a GAO report of August

17   2015 entitled Medicare Part D Changes Needed to

18   Improve CMS's Recovery Audit Program Operations and

19   Contractor Oversight.

20              Do you see that?

21        A.   Yes, I do.

22        Q.   Is this a document that you were familiar

Christopher Mucke 30(b)(6)                          September 11, 2017
                        Reston, VA

Page 83

1    with?

2        A.    Yes, I am.

3        Q.    So you've reviewed it before?

4        A.    Yes, I have.

5        Q.    Does ACLR have any understanding as to why

6    the GAO initiated this particular investigation or

7    study?

8        A.    We had made several requests of the Ways

9    and Means Committee to look into CMS's practices

10   regarding the Park and Rec program.

11       Q.    When you say we had made those requests,

12   who at ACLR made those requests?

13       A.    Well, I would have made those requests.

14   ACLR, I mean, certainly I would have talked to Gil on

15   those things regarding the appropriateness of it and

16   the like, but I made those requests.

17       Q.    How was it that you made those requests to

18   the Committee on Ways and Means at the House of

19   Representatives?

20       A.    I just contacted them.  I had met one or

21   two of the Ways and Means teams, not committee

22   members, I think at that time, but some of the

Christopher Mucke 30(b)(6)                                September 11, 2017

Reston, VA

Page 84

1    personnel that supported them, and I knew who they

2    were.  So I contacted them through those -- or the

3    Ways and Means Committee through these people.

4          Q.    Were those staff people of congressmen or

5    congresswomen?

6          A.    That's correct.  Yes.

7          Q.    Do you remember specifically which staff

8    people you contacted or which representatives that

9    you worked for?

10         A.    In our initial discussions with them

11   during 2011 and 2012, it would have been through the

12   chairman's office, which I believe at that time was

13   Congressman McCotter and his chief of staff, Martin

14   Van Valkenburg.  During that time we met -- I can't

15   recall his name.  I believe his first name was Brian.

16   But then in our subsequent dealings with them,

17   McCotter was no longer the chairman, and we contacted

18   those personnel.

19               Ultimately I believe the name Nick

20   Uehlecke was the one that we worked primarily with

21   regarding the GAO report.

22         Q.    What was it that inspired ACLR to reach

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

1    out to congressional staffers to try to initiate some

2    sort of GAO process?

3         A.    During the base year period of the

4    contract, it became apparent that CMS wasn't allowing

5    us to execute our contract, and wasn't really dealing

6    with us at all.  We rarely spoke with our COTR.  Any

7    attempts at resolution with respect to implementing

8    the program or getting some of the timelines met in

9    the thing -- in the contract -- were rebuffed, you

10   know, when we had gone to the OAGM.

11            And we recognized sometime in the middle

12   of the contract year that we just weren't going to be

13   able to execute the contract, or at least it looked

14   like there were some problems associated with that.

15   That culminated in a meeting in November 30 when it

16   became clear that we weren't -- they weren't going to

17   let us execute our contract, in fact directed us to

18   stop, or more accurately not continue working,

19   because it was in our best interest.

20        Q.    November of what year was that?

21        A.    November -- it was November 30 of 2011.

22        Q.    Under the initial year of the contract?

Christopher Mucke 30(b)(6)                                    September 11, 2017

Reston, VA

Page 93

1    the time, CMS did not have that information as well.

2        Q.   So for that particular audit issue, it

3    looks like roughly 78 percent or so of the improper

4    payments identified by ACLR ultimately were not

5    recouped.  Does that seem right?

6        A.   That's correct.  Yes.

7        Q.   For the next version, or a round of the

8    excluded providers, 2008 to 2011, ACLR identified

9    $3.4 million of potential improper payments, correct?

10       A.   That's correct.

11       Q.   And then CMS ultimately collected $2.676

12   million of that amount, correct?

13       A.   That's correct.

14       Q.   So that one looks like it was

15   percentage-wise sort of a flip from the prior year

16   where roughly 78 of so percent of the amount

17   identified as improper was collected.

18       A.   Yes.  That is correct.  In this case, we

19   didn't pursue excluded pharmacies.

20       Q.   So for 2007 excluded providers, the

21   discrepancy in your view came from pursuing excluded

22   pharmacies; is that correct?

Christopher Mucke 30(b)(6)                                     September 11, 2017
                              Reston, VA

                                                                    Page 97

```
 1    cases, the record, the original record is eliminated,

 2    and a new record replaces it.

 3         Q.    A new record with the correct information?

 4         A.    That's correct.

 5         Q.    So then would you agree that you can't

 6    always tell from looking at the PDE records

 7    themselves whether a payment is improper or proper?

 8         A.    No.

 9         Q.    No, you wouldn't agree, or no --

10         A.    No, I don't agree that that's the case.  I

11    believe that there are some instances, for example,

12    if we were doing a medical necessary review, where we

13    would have to request additional information, but it

14    is my belief that under Part D regs you have, you

15    know, my understanding of how the process should

16    work, that the data that we have would be sufficient.

17         Q.    So there are certain types of issues then

18    where you would agree someone auditing the Part D

19    payments would need to look to information beyond

20    what's just in the PDE record to understand if a

21    payment was proper or improper?

22         A.    There would be instances of that.  Yes.
```

Christopher Mucke 30(b)(6)                                    September 11, 2017
                              Reston, VA

                                                                  Page 98

 1          Q.    Do you want to take a-five minute break?

 2                          -  -  -

 3                (Recessed at 10:51 a.m.)

 4                (Reconvened at 11:02 a.m.)

 5                          -  -  -

 6          BY MR. PORADA:

 7          Q.    So did there come a point in time when

 8    ACLR submitted a audit proposal to look at the sales

 9    tax issue?

10          A.    Yes.

11          Q.    Okay.  I thought you would say so.

12                Do you remember when that was?

13          A.    I believe August of 2015 or thereabouts.

14          Q.    Did ACLR believe that the PDE data that it

15    had reviewed reflected substantial Part D

16    overpayments based on payments of sales tax?

17          A.    Yes, we did.

18          Q.    Prior to ACLR's submission of the sales

19    tax NAIRP, had ACLR had any discussion with anyone at

20    CMS about pursuing a sales tax recovery audit?

21          A.    No.  I think the only time it ever came up

22    was in the initial response to the sources sought

Christopher Mucke 30(b)(6)                           September 11, 2017
                            Reston, VA

                                                              Page 99

1    notice, mostly because of our experience there.

2    There may have been discussions when the 2010 --

3    after we noticed those but, I mean, they would have

4    been inconsequential.  I guess what I'm saying is to

5    the best of my recollection, I don't believe we

6    discussed it with anybody there.

7         Q.    Okay.  So you mentioned in response to the

8    sources sought notice, which was Exhibit 3, ACLR's

9    response, ACLR might have mentioned that improper

10   sales tax was something that could be looked at; is

11   that correct?

12        A.    I think that's correct.  Yes.

13        Q.    Okay.

14        A.    I believe it's correct.  Yes.

15        Q.    So looking at Exhibit 3, the page with the

16   Bates stamp ACLR 200957 down at the bottom of that

17   page, it says ACLR can devise a national recovery

18   audit plan for Medicare Part D that includes -- and

19   then it lists a variety of things.  And one of those

20   things is improper sales tax.  Do you see that?

21        A.    Yes, I do.

22        Q.    So is that the -- you described a moment

Christopher Mucke 30(b)(6)                                September 11, 2017
Reston, VA

Page 100

1    ago that you recalled -- maybe in response to the

2    sources sought notice, ACLR had mentioned sales tax,

3    but that was the only time prior to submitting the

4    sales tax NAIRP; is that right?

5         A.    That's correct.  Yes.

6         Q.    So this in Exhibit 3 that we just looked

7    at, that would have been the prior occasion when ACLR

8    had mentioned it?

9         A.    That's correct.

10        Q.    And prior to the August 2015 NAIRP

11   submission, ACLR hadn't submitted any audit proposals

12   for sales tax issues before that; is that correct?

13        A.    That's correct.

14        Q.    Prior to ACLR's submission in August 2015,

15   had anyone at CMS instructed ACLR to analyze sales

16   taxes or to propose a sales tax audit?

17        A.    No.

18        Q.    Had anyone at CMS, prior to that point in

19   time, asked ACLR to analyze sales taxes or to propose

20   a sales tax audit?

21        A.    No.

22        Q.    Does ACLR know of anyone at CMS who was

Christopher Mucke 30(b)(6)                                    September 11, 2017

Reston, VA

Page 101

1    aware that ACLR was going to submit a sales tax audit

2    before it actually submitted the proposal in August

3    2015?

4         A.    I can't answer that question.  I don't

5    believe they would have known.

6         Q.    When did ACLR begin analyzing the 2012 and

7    2013 PDE data to look at potential sales tax issues

8    to prepare that sales tax data?

9         A.    We had looked at 2012 initially, I believe

10   in 2013 or '14.  And then -- but looking at '12 and

11   '13 together, we looked at them after we received the

12   data in 2015, Which I think it was May of that year.

13        Q.    So is it correct then that ACLR didn't

14   begin to analyze the PDE records for sales tax

15   payments until it had received both the 2012 and 2013

16   PDE data?

17        A.    Well, again, 2012 we had reviewed before,

18   for the purposes for this NAIRP.  When we were

19   putting it together, we reviewed it again with 2013

20   data, and then submitted it.

21        Q.    I see.  So ACLR had looked at the 2012 PDE

22   data previously, and then looked at it again once it

Alderson Court Reporting

Christopher Mucke 30(b)(6)                                    September 11, 2017
                              Reston, VA

                                                                  Page 104

    1       Q.    And how did you change your entire

    2   approach?

    3       A.     Well, it was in reaction to a -- it was --

    4   our response was in reaction to a walk-through

    5   meeting that we had with CPI members that we worked

    6   with, and the center for Medicare planned payment

    7   groups there.  It was apparent after that meeting

    8   that there was going to be no collaboration, so we

    9   took a step back and we looked at issues that would

   10   be more specific.  In this case, we focused on the

   11   expired prescription review, because we knew that

   12   there was opportunity there.

   13             And then we waited like eight or nine

   14   months do that.  Or, excuse me -- yeah, I believe

   15   eight months before we submitted that NAIRP, or five

   16   months, I can't remember.

   17       Q.    What was that walk-through that you

   18   participated in where you changed your course of

   19   action?  Which audit issue did that relate to?

   20       A.    Direct and indirect remuneration.

   21       Q.    So I believe you said ACLR received the

   22   2013 PDE data in June 2015; is that correct?

Christopher Mucke 30(b)(6)                           September 11, 2017
                              Reston, VA

Page 105

1        A.    For 2013?

2        Q.    Yes.

3        A.    Yes.  I believe that's correct.

4        Q.    And you had previously received the 2012

5   PDE records, correct?

6        A.    That's correct.  We had also previously

7   received a copy of the 2013 PDE, but there were

8   errors in it.  So CMS issued guidance saying that

9   they were going to fix it and then reissue it, so --

10       Q.    And so -- excuse me.  Go ahead.

11       A.    And so that was the data.  We looked at

12   the corrected data.

13       Q.    And when ACLR received the corrected 2013

14   PDE data, that was in June 2015, correct?

15       A.    I believe so.  Yes.

16                     -  -  -

17            (A document was marked as Deposition

18   Exhibit Number 10.)

19                     -  -  -

20            BY MR. PORADA:

21       Q.    I'm showing you what's been marked as

22   Exhibit Number 10, which is a string of e-mails in

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

Page 106

1    which the subject of the e-mails is 2012 PDE files.

2              If you look at the first e-mail, which is

3    the last one in the exhibit, second-to-last page, it

4    looks like on December 30, 2013, someone from CMS

5    informed Bruce Dixon that the 2012 PDE files are

6    available.  It says, I can start sending them next

7    week if you are ready.

8              Do you see that?

9        A.    Yes, I do.

10       Q.    And then there were some more e-mails back

11   and forth after that.  And it looks like on January

12   7, 2014, CMS informed Mr. Dixon that CMS had

13   submitted the program to transmit what looks like the

14   2012 PDE files.  Is that your understanding?

15       A.    Yes.

16       Q.    And then above that Bruce Dixon has asked

17   someone named James Kelly at MSI Atlanta.Com to let

18   him know when the records had been received.  And

19   Mr. Kelly said we have started receiving on January

20   7, 2014.  Do you see that?

21       A.    Yes.

22       Q.    So does that sound right to you that at

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

1    the beginning of January 2014 is when ACLR received

2    the 2012 PDE records?

3          A.    That is correct.  Yes.

4          Q.    And who -- do you know who James Kelly at

5    MSI Atlanta.Com is?

6          A.    Yes.  They are our IT personnel.

7          Q.    And when you say they are ACLR's IT

8    personnel, what does that mean specifically?  What

9    were they supposed to be doing?

10         A.    We've contracted them -- or we contract

11   with them just to make sure that all our systems are

12   in place, make sure that they are running properly,

13   make sure that the backups occur correctly.

14         Q.    So when CMS transmitted PDE records, were

15   they actually received by ACLR on ACLR's computer

16   servers or were they received by this MSI Atlanta

17   entity?

18         A.    It would have been received on ACLR's

19   computers.  Our computer servers -- I believe that

20   for this they came through a TIBCO server.  I'm not

21   really sure, but I believe that was the time frame

22   for this one.  And that would have been on our

Christopher Mucke 30(b)(6)                        September 11, 2017
Reston, VA

1    working with the data?

2        A.    We would generate the report.  And then

3    we'll get -- I mean, we just generated reports.  And

4    sometimes due to the size of the PDE fields, it could

5    take a couple of hours to run the reports.  But then

6    once we've run the reports, you know, we would

7    manipulate the data, try to understand, you know,

8    what's going on there, or do further filtering and

9    the like.  And that's what that refers to.

10       Q.    So your recollection is that it took ACLR

11   a day, or maybe a few days to sort the 2012-2013 PDE

12   records to come up with the amount that was in the

13   sales tax field?

14       A.    That would be correct.  Yes.

15       Q.    And did all that work occur sometime

16   between June 2015 when you got the corrected 2013 PDE

17   records, and August 21, 2015, when you submitted the

18   sales tax NAIRP?

19       A.    Yes.  That's correct.

20       Q.    Do you remember when during that roughly

21   two month block of time that analysis was performed?

22       A.    I can't remember the timing.

Christopher Mucke 30(b)(6)                                    September 11, 2017
                          Reston, VA

                                                            Page 111

1    correctly, we would have processed the data for the

2    other issues first.

3         Q.    Right.

4         A.    And then we would have done that.

5         Q.    And when you say we would have done that

6    one, you mean the sales tax?

7         A.    That's correct.  Yes.  The duplicate

8    payment data manipulation was a lot more difficult

9    just due to the size of the PDE data.  The sales tax

10   one, by comparison, would be easy.  We just had to

11   generate the records.

12        Q.    Who at ACLR was involved in analyzing the

13   PDE data to look at the sale tax issue?

14        A.    I was.

15        Q.    Anybody else?

16        A.    No.

17        Q.    Did ACLR track time in such a way that you

18   recorded or tracked the amount of time that you spent

19   on particular audit issues, like the sales tax audit

20   issue?

21        A.    No.

22        Q.    Did ACLR have access to the PDE records

Christopher Mucke 30(b)(6)                                    September 11, 2017

Reston, VA

Page 113

1    specifically recall.  It may have been transmitted,

2    but I seem to recall it being -- we received it in a

3    hard drive, or multiple hard drives.

4         Q.    Did -- does ACLR have any understanding of

5    when CMS first became aware of the issue of sales

6    taxes potentially being incorrectly charge on Part D

7    prescriptions?

8         A.    Yes.

9         Q.    And what is ACLR's understanding?

10        A.    Based on the documentation that we

11   received during discovery, I believe it was brought

12   up by a CMS contracting officer, or somebody in 2010,

13   early 2010 maybe, maybe it was 2009.  I can't

14   remember the exact dates.  It was prior to our being

15   contracted to serve as the Part D RAC.

16        Q.    At the time that ACLR submitted its sales

17   tax NAIRP in August 2015, did ACLR know at that time

18   whether CMS was already aware of the issue of sales

19   taxes potentially being improperly charged in Part D

20   prescriptions?

21        A.    The only knowledge that we had that they

22   were aware of it was the Louisiana notifications that

Christopher Mucke 30(b)(6)                                      September 11, 2017
                              Reston, VA

                                                              Page 114

1    they made, I believe in 2010, maybe '11.

2         Q.    Those Louisiana memos or notifications

3    that you mentioned from 2010 or 2011, were those

4    things that ACLR had reviewed prior to submitting the

5    sales tax NAIRP?

6         A.    Yes, it was.

7         Q.    So at the time that ACLR submitted the

8    sales tax NAIRP, it was not ACLR's understanding that

9    it was introducing a new issue to CMS that it hadn't

10   explored previously; is that correct?

11        A.    Well, I wouldn't say that, because the

12   reviews that we saw were limited to Louisiana.  So at

13   a macro level, yes, CMS would have been aware that

14   they had problems with sales tax.  At a micro level,

15   I don't know that they knew the extent of it, or with

16   respect to other states and the like.

17                        -  -  -

18            (A document was marked as Deposition

19   Exhibit Number 11.)

20                        -  -  -

21            BY MR. PORADA:

22        Q.    So if you take a look at what we have

Christopher Mucke 30(b)(6)                          September 11, 2017
                            Reston, VA

Page 115

1   marked as Exhibit 11, this appears to be ACLR's sales

2   tax error NAIRP for years 2012 and 2013 that was

3   submitted August 21, 2015.  Is that correct?

4        A.   That's correct.

5        Q.   If you look at footnote 1 on the first

6   page, it says, Absent contract modification, all RAC

7   activities pertaining to this NAIRP will cease upon

8   CMS denial or expiration of the November 16, 2015

9   NAIRP approval deadline.

10            Do you see that?

11       A.   Yes, I do.

12       Q.   So was it ACLR's understanding, at the

13   time it submitted this sales tax NAIRP, that CMS had

14   the authority under the contract to deny the

15   proposal?

16       A.   Yes.

17       Q.   Looking at the paragraph under Process

18   Summary, on the first page, the third sentence, I

19   believe it is, says, The recovery audit review

20   protocols outlined in this NAIRP address errors

21   associated with sales tax charged in states which do

22   not impose a sales tax.  Sales tax rates that

Christopher Mucke 30(b)(6)                                    September 11, 2017
                              Reston, VA

Page 120

    1          A.    Yes.

    2          Q.    Without reaching out to sponsors for more

    3    information about a particular claim, correct?

    4          A.    I believe there were two instances of

    5    audits where we did believe that we should conduct a

    6    complex review, but in almost all instances we

    7    anticipated an automated review.

    8          Q.    And the way the automated review would

    9    work though is that you would identify improper

   10    payments based on the PDE records, and then notices

   11    would be sent out to the sponsors identifying those

   12    records and asking for recovery of those amounts?

   13          A.    That's correct.

   14          Q.    Why did ACLR believe that the sales tax

   15    review would be appropriate to do as an automated

   16    review versus a complex one?

   17          A.    There was no ambiguity about the data that

   18    we received.

   19          Q.    And what do you mean by that?

   20          A.    Well, we were able to identify, you know,

   21    where the particular transaction took place.  For

   22    example service provider would be located in

Christopher Mucke 30(b)(6)                                    September 11, 2017
                              Reston, VA

Page 121

1    Maryland, Virginia, Minnesota; so we knew where the

2    site of the transaction was.  And then we also knew,

3    just based on our knowledge of the laws or any

4    additional research we would have done, you know,

5    whether or not sales tax could be applied to it.  And

6    that was, you know, that data alone would be enough

7    to make that interpretation.

8        Q.    So ACLR didn't think that plan sponsors

9    would have additional information that might explain

10   why figures had been recorded in the sales tax field

11   that might explain why they were there?

12       A.    No.

13       Q.    Would you agree that the issue of whether

14   the payment of sales taxes is proper or improper in

15   each state would depend on an analysis of federal and

16   state law in that particular state?

17       A.    Well, I think in the case of just sales

18   taxes, I think it would be solely the state sales and

19   use tax laws, not federal law.  But in the context of

20   this, federal law would have to be considered.

21       Q.    Who at ACLR was involved in reviewing the

22   laws of all 50 states to determine whether they

Christopher Mucke 30(b)(6)                                September 11, 2017
                              Reston, VA

                                                              Page 142

 1    Louisiana state law allows for a 10-cent prescription

 2    fee on Part D prescriptions?

 3         A.    We haven't done that.

 4              MR. BONELLO:  Can we take like a

 5    two-minute break.  I know he had wanted to ask me

 6    something, so I want to make sure -- would this be a

 7    good time to --

 8              MR. PORADA:  Sure.

 9                        -  -  -

10              (Recessed at 11:57 a.m.)

11              (Reconvened at 12:03 p.m.)

12                        -  -  -

13              BY MR. PORADA:

14         Q.    The process that you described where you

15    looked at a sample of about 50 of the Louisiana

16    pharmacy PDE records, do you know what specific

17    fields in the PDE records you examined as part of

18    that more detailed sample that you looked at?

19         A.    I identified the pharmacy from the service

20    provider ID.  I identified the beneficiary on number

21    from -- I should remember what that thing is, the pen

22    beneficiary field.  The hit came from the beneficiary

Christopher Mucke 30(b)(6)                                September 11, 2017
Reston, VA

Page 143

1    field.  And then I looked at the 10-cent billing in

2    the sales tax field.

3         Q.   That sample review process you engaged in,

4    that's not described in the NAIRP anywhere, is it?

5         A.   No.

6         Q.   Did you or did ACLR document that review

7    of the sample that you engaged in in any way?

8         A.   I can't remember.  I think it was just for

9    me going into CMS's systems and looking at each

10   beneficiary by beneficiary that I had selected for

11   the specific Louisiana pharmacies, and trying to

12   identify if there was any -- what their state was,

13   whether it was Louisiana, Alabama, or anywhere.

14        Q.   So you don't recall keeping any notes of

15   that, or writing any written report of which specific

16   beneficiaries you looked at?

17        A.   No.

18        Q.   How did you decide which of the roughly 50

19   beneficiaries to look at?

20        A.   I just went down the spreadsheet of PDEs

21   that I had and just randomly selected them.  I did

22   not perform a statistical sample, just randomly

Christopher Mucke 30(b)(6)                                    September 11, 2017
                                    Reston, VA

                                                                    Page 144

1    selecting PDE records.

2         Q.    Are you familiar with the -- as part of

3    the report that's in front of you from the NBI MEDIC,

4    Exhibit 12, the analysis that the MEDIC undertook to

5    look at PDE records in Louisiana that had something

6    greater than 10 cents in the sales tax field?  Let me

7    point you, if it's helpful, to page 5.  There's a

8    table at the top there, Table 3.

9         A.    Okay.

10        Q.    Have you taken a look at that before?

11        A.    Yes, I have.

12        Q.    So is it ACLR's understanding that

13   according to the MEDICs analysis for year 2012, as of

14   June 2005 there's -- there was a little less than

15   $1,800 left in the sales tax fields in amounts that

16   were greater than 10 cents?

17        A.    Yes.

18        Q.    And for 2013 there was a little over

19   $18,000 left in the sales tax field that was in

20   amounts greater than 10 cents as of June 2015.  Do

21   you see that?

22        A.    That's correct.

Christopher Mucke 30(b)(6)                                        September 11, 2017
                                    Reston, VA

                                                                        Page 147
1    that it looked at on the sales tax issues?

2         A.    That's correct.

3         Q.    My question for you is on the prior page

4    you say ACLR identified $652.8 million in improper

5    payments.  And the table on the last page says

6    $658,354,795.

7              Do you see that?

8         A.    Mm-hmm.

9         Q.    And I'm wondering what the difference is

10   between the 652.8 million reported on the prior page,

11   and the 658.3 million on the table in the last page?

12        A.    I don't know.  If I were to guess, it

13   would be a transcription error or something, but I

14   don't know the answer.

15        Q.    Is it ACLR's position that if there's any

16   incorrect charge in the sales tax field on a PDE

17   record, that that makes the entire payment amount of

18   that claim an improper claim?

19        A.    Yes.

20        Q.    So it's not just the improper sales tax

21   amount that's improper in ACLR's view, it's the

22   entire claim payment?

Christopher Mucke 30(b)(6)                           September 11, 2017
Reston, VA

Page 148

1       A.    That's correct.

2       Q.    So even if there's no dispute that a

3   prescription was filled properly under the Part D

4   program, it's ACLR's contention that the entire claim

5   is improper if even a single cent is included in the

6   sales tax field where it shouldn't be?

7       A.    That's correct.

8       Q.    How does ACLR understand what plan

9   sponsors -- let me strike that.  Start over again.

10          What is ACLR's understanding as to how

11  plan sponsors would correct a PDE record that

12  contains an improper amount in the sales tax field?

13      A.    Well, there would be two methods that they

14  could do it under.  They could delete the record or

15  they could correct the record.

16      Q.    And what is ACLR's understanding as to why

17  plan sponsors might choose one path versus the other?

18      A.    I couldn't tell you why they would delete

19  versus correct.  I know in my experience they have

20  deleted and resubmitted records.  I know that they

21  have corrected records.  I know that they have just

22  deleted records, but I couldn't ascertain their --

Christopher Mucke 30(b)(6)                          September 11, 2017
Reston, VA

Page 155

1   subsequently turned out, is that we only reviewed

2   reconciled data, no corrections before or after.

3        Q.    So with respect to the sales tax issue in

4   particular, if you had a $100 PDE record, $100 claim

5   payment that included a one-dollar figure in the

6   sales tax field, is it ACLR's position that the

7   entire $100 claim is the improper payment?

8        A.    Based on our interpretation of improper

9   payments, or definition of improper payment, yes.

10       Q.    And so under the contract with CMS then,

11  ACLR would get I guess a $15 contingent fee, on that

12  particular example, 15 percent of the $100 claim; is

13  that right?

14       A.    That's correct.

15       Q.    And then if the plan sponsor were to

16  resubmit the same claim but omit the dollar for tax,

17  or resubmit a $99 claim, in ACLR's view that claim

18  would no longer be an improper claim, improper

19  payment at that point, because it no longer includes

20  the sales tax, right?

21       A.    Well, no.  Again, when we do our work, I

22  only look at payments.  Whether a plan -- after

Christopher Mucke 30(b)(6)                          September 11, 2017

Reston, VA

Page 156

1   reconciliation, whether a plan sponsor deletes or

2   corrects a record has no impact on the work that we

3   do.  It's not a payment.

4            CMS reserves the right to reopen a period

5   and, you know, for all intents and purposes, or

6   practical purpose, they do actually do that.  But CMS

7   could always decide not reopen an period.  Well, that

8   corrected claim ultimately wouldn't be recovered by

9   CMS if they don't do that reopening, because it's

10  just a change.  It doesn't -- it doesn't do anything.

11  It's just a deleted record or a corrected record that

12  sits in limbo until reopening is done.

13       Q.   So at the time of reopening, though, if

14  there was now a corrected claim for $99 sitting in

15  there that doesn't have the one dollar in tax

16  anymore, from ACLR's perspective that -- if CMS paid

17  that claim, the $99, that would no longer be an

18  improper claim or payment, because there's no dollar

19  tax, correct?

20       A.   It wouldn't be for those purposes.

21       Q.   Yes, for those purposes, for the sales tax

22  purposes.

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

Page 157

1        A.      For sales tax purposes, yes.

2        Q.      Right.  So in that world then, CMS would

3    actually be losing money, right, as a result of ACLR

4    performing the audit, because you would have gotten

5    paid a $15 contingent fee on the first claim, and

6    then the claim is resubmitted and paid at $99 by CMS.

7    So they would be -- end up paying more than the

8    dollar fax that was recovered?

9        A.      If CMS permitted them to correct it, yes.

10       Q.      What is the basis for ACLR's position that

11   the entirety to of the claim payment is the improper

12   payment, when there's something included in the sales

13   tax field that shouldn't be there?

14       A.      Definition of an improper payments.

15       Q.      But where did you get that definition?

16       A.      A 1, 2, 3, or Schedule C, I think is the

17   definition of -- the OMB's definition of an improper

18   payment.

19                       - - -

20              (A document was marked as Deposition

21   Exhibit Number 13.)

22                       - - -

Christopher Mucke 30(b)(6)                          September 11, 2017
                              Reston, VA

                                                          Page 160

1    allows us to get back payments on recovered amounts.

2         Q.    So I just want to make sure I'm

3    understanding, though.  Other than the definition of

4    an improper payment, there's nothing in this circular

5    that ACLR looked to or relied upon to help inform

6    that conclusion as to how to define the improper

7    payment in the context of these sales tax claims in

8    particular?

9         A.    Well, we reviewed the entirety of the

10   memorandum, but that was the conclusion that we came

11   a way with.

12        Q.    Based on that definition at page 7?

13        A.    That would be correct.

14        Q.    Returning to ACLR sales tax NAIRP, which

15   was Exhibit 11, ACLR also concluded that Minnesota

16   law doesn't provide for any state or local sales

17   taxes on prescriptions; is that right?

18        A.    That's correct.

19        Q.    And that was also you, I take it, just you

20   for ACLR who made that determination?

21        A.    Yes, it was.

22        Q.    So was it ACLR's conclusion that any

Christopher Mucke 30(b)(6)                              September 11, 2017
                              Reston, VA

                                                            Page 161

1    amounts that were reported in the sales tax field for

2    Minnesota pharmacies were improper payments because

3    they reflected an improper assessment of sales tax?

4          A.    That's correct.

5          Q.    Let's me ask you to take a look back at

6    Exhibit 11, please, in the NAIRP.  And your

7    discussion of Minnesota starts at the bottom of the

8    page with the Bates Number 634 and carries onto page

9    635.  Do you see that?

10         A.    I am sorry.  My discussion of Minnesota?

11         Q.    Of Minnesota.

12         A.    Yes.  I see that.

13         Q.    And at the end of that paragraph about

14   Minnesota on page 635, you put a footnote number 8

15   that says the RAC anonymously contacted the state and

16   selected local tax and jurisdictions.  State and

17   local representatives confirmed the RAC's conclusions

18   regarding the exempt status of prescription drug

19   sales in the state.

20               That was specific to Minnesota?

21         A.    That's correct.  Yes.

22         Q.    How were the state and local taxing

Christopher Mucke 30(b)(6)                                     September 11, 2017
Reston, VA

Page 170

1    I knew that they were looking at Minnesota.

2         Q.    I did ask that before, but my question was

3    whether ACLR didn't include anything in the NAIRP

4    about the applicability of that two-percent wholesale

5    distributor tax, correct?

6         A.    That's correct.

7         Q.    But is it your position that ACLR had

8    looked into that two-percent wholesale tax in

9    Minnesota prior to submitting the sales tax NAIRP?

10        A.    Yes.

11        Q.    And you had concluded, at the time you

12   submitted the sales tax NAIRP, that the two-percent

13   wholesaler tax under Minnesota law could not be

14   properly passed through on Part D prescriptions?  Is

15   that correct?

16        A.    I -- well, that's correct, but at that

17   time I figured -- I had concluded it was a moot

18   point.

19        Q.    But why was it a moot point?

20        A.    Because they weren't -- they were wrong.

21        Q.    Well, who was they?

22        A.    If it was a provider tax.  One of the

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

Page 183

1    Exhibit Number 14.)

2                              -  -  -

3              BY MR. PORADA:

4        Q.    I'm showing you what we've marked as

5    Exhibit 14.  This is an e-mail from Sonya Brown to

6    you, September 3, 2015.  Is this the e-mail

7    communication you received from CMS notifying you of

8    the denial of the sales tax NAIRP?

9        A.    Yes.

10       Q.    The e-mail in the second sentence refers

11   to the audit issue being currently open and active

12   with another CMS contractor.  Do you see that?

13       A.    Yes, I do.

14       Q.    At the time that you received this e-mail,

15   did ACLR know what other contractor it was who CMS

16   was reporting currently had the same issue open and

17   active?

18       A.    No.

19       Q.    After you received this e-mail on

20   September 3, 2015, did you have any further

21   discussions or communications with CMS about the

22   sales tax NAIRP prior to submitting ACLR's certified

Christopher Mucke 30(b)(6)                                    September 11, 2017
                              Reston, VA

Page 191

1        Q.    Okay.  What -- you say we considered it.

2    What was the consideration process within ACLR as to

3    -- within that one-week period, as to whether to file

4    a certified claim or not?

5        A.    Oh, I think at this point in time this was

6    just the latest in a long line of contract breaches.

7    And since we were done with our contracts, we really

8    couldn't submit any more issues that we would go

9    ahead and just file the claim.

10       Q.    Did you give any consideration to

11   following up with Sonya Brown in response to the

12   sales tax NAIRP when she asked if you have any

13   questions, to contact her, rather than filing the

14   certified claim?

15       A.    No.

16       Q.    In paragraph 10 of the certified claim,

17   the letter states that on March 10, 2015, ACLR

18   commenced development of the payment year '12 and '13

19   sales tax errors NAIRP.  That -- is that correct?

20       A.    Yes.

21       Q.    And that would have been before ACLR had

22   received the corrected 2013 PDE data in June of 2015,

Christopher Mucke 30(b)(6)                              September 11, 2017
Reston, VA

Page 201

1    of $79,302,575, is that contingent fee based off of

2    the total amount of the PDE claims in which ACLR

3    identified some sales tax amounts?

4        A.    Yes, it is.

5        Q.    The way you derive that, is it correct

6    that you -- under the contract you took 15 percent

7    off of the first $10 million, and then 12 percent

8    contingent fee off of the remaining $648.3 million?

9        A.    That's correct.

10       Q.    Does that calculation -- that calculation

11   assumes that every one of the PDE records in which

12   ACLR had identified a potential improper payment

13   would in fact be deemed to be an improper payment and

14   recouped; is that correct?

15       A.    That's correct.

16       Q.    And it also assumes that the entirety of

17   the claim amount for every one of those claims would

18   be recouped, not just the sales tax amount, correct?

19       A.    That's correct.

20       Q.    And that was based on your prior review of

21   that OMB circular A-123 that we talked about that

22   defines improper payment.  That's how you determined

Christopher Mucke 30(b)(6)                              September 11, 2017
                                Reston, VA

Page 202

1    that the entirety of the claim amount would be deemed

2    to be improper, rather than just the sales tax

3    component?

4         A.    Well, I mean, that's part of it, but that

5    was also CMS's practices.

6         Q.    In the prior audits?

7         A.    In the prior audits, and as far as I can

8    recall for the A and B audits as well.

9         Q.    With respect to the prior audits that ACLR

10   completed, those involved things like duplicate

11   payments where there was essentially a double charge;

12   isn't that correct?  Or an excluded provider who

13   should not have submitted a claim that was paid at

14   all; is that correct?

15        A.    That's correct.

16        Q.    So in those scenarios there was a claim

17   that was paid that never should have been paid at

18   all, either because it was a duplicate, or because

19   the provider or prescriber wasn't authorized to write

20   the prescription or fill the prescription in the

21   first place; is that right?

22        A.    Well, there are two aspects to that.  They

Christopher Mucke 30(b)(6)                                September 11, 2017
                         Reston, VA

Page 207

```
1        Q.    With respect to your certified claim

2    amount, I believe you said that the calculation is

3    based on the assumption that every one of the PDE

4    records that ACLR identified as improper would in

5    fact have been found to be improper and recouped,

6    correct?

7        A.    That's correct.

8        Q.    And ACLR knew at the time it submitted

9    this claim, that on the prior audits you had

10   completed for CMS, in none of those had CMS actually

11   recouped 100 percent of the amount that had been

12   identified in the NAIRP, correct?

13       A.    That's correct.

14       Q.    And you also knew that in none of the

15   prior audits that ACLR had completed was ACLR's

16   contingent fee calculated based on 100 percent of the

17   claims that were initially identified in the NAIRPs?

18       A.    That's correct.

19       Q.    Correct?  Did you give any consideration,

20   when you filed this claim, to adjusting the amount

21   that you were claiming based on some consideration of

22   the likelihood of recouping 100 percent of the
```

Christopher Mucke 30(b)(6)                          September 11, 2017
                              Reston, VA

Page 210

1   submitted it to the DVC, it was 100 percent in

2   accordance with the approved methodology.  Those are

3   the amounts that we submitted.  That would be

4   accurate.

5        Q.    Okay.  So not the amounts stated in the

6   NAIRPs.  Those were estimates is what you are saying?

7        A.    Typically, yes.  We'd get as close as we

8   could, but those are estimates.  This one I think is

9   pretty close to it, because it wasn't -- it wasn't

10  that difficult to run the amounts on.

11       Q.    But ACLR's experience in the prior audits

12  was that it would propose an audit with an estimated

13  amount.  When the audit was approved, and it went

14  forward, the amount would be refined and reviewed by

15  the data validator.  And that amount ultimately would

16  be something different from what was in the initial

17  NAIRP, correct?

18       A.    It was anticipated.  I mean, from the

19  beginning, I mean, both CMS and we looked at each of

20  these as an estimate.  It was never meant to be

21  exact.  It was just a proposed NAIRP.

22              To give you an example, if we were to do

Christopher Mucke 30(b)(6)                                    September 11, 2017
                                   Reston, VA

Page 211

1   excluded providers today, we would identify all of

2   those excluded providers we believed to be excluded

3   from Medicare participation.  After we went to that

4   process, and it looked like we were going to get

5   approval, or CMS asked additional questions, we would

6   review those data in greater detail.  And that may

7   make it rise or even go down in payments.

8        Q.   Does ACLR have any information suggesting

9   that CMS actually recovered any of the amounts that

10  were identified in ACLR's sales tax NAIRP?

11       A.   I have information indicating that it

12  wasn't recovered, but I do have information showing

13  that they -- some of those records had been either

14  corrected or deleted.

15       Q.   And does ACLR know which, in terms of

16  volume of records, were corrected or deleted?

17       A.   It was -- yes.

18       Q.   And what is that information you have?

19       A.   It was supplied to us during discovery,

20  showing records that were deleted for Louisiana.  I

21  don't remember the exact number.

22       Q.   Other than Louisiana, did ACLR see any --

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

Page 212

1    or gape any information that suggests that any of the

2    other amounts identified as improper payments based

3    on sales taxes were recovered or recouped by CMS?

4         A.    There was no other evidence of any

5    recoupments or recoveries.  And, again, those amounts

6    that were deleted would not have been recovered or

7    recouped.

8         Q.    The certified claim, paragraph 2 of the

9    relief requested for the last page seeks an

10   additional amount of $12,000 related to estimated

11   internal corporate expenses related to the

12   preparation and filing of this claim, as well as an

13   amount for reasonable attorneys fees and related

14   expenses.  Do you see that?

15        A.    Yes, I do.

16        Q.    So is it your testimony that ACLR incurred

17   $12,000 in expenses in the week between the NAIRP

18   denial and this submission in the course of preparing

19   this certified claim?

20        A.    Yes.

21        Q.    And how was it that you calculated that

22   $12,000 amount to prepare this certified claim

Christopher Mucke 30(b)(6)                        September 11, 2017
Reston, VA

Page 218

1      A.    You know, you are right.  This is the
2  number of dollars that we identified for Minnesota
3  sales tax charges on total Part D claims containing
4  Minnesota sales tax.  My apologies, I was mistaken.
5      Q.    Okay.  So the 38.1 million number of
6  claims, that's just the Minnesota claims that had
7  something in the sales tax field?
8      A.    That's correct.
9      Q.    Okay.  That's not all Minnesota claims in
10  the time period?
11      A.    That's correct.
12      Q.    Now if you look back at the sales tax
13  NAIRP, which is Exhibit 11, that -- at the time you
14  submitted the NAIRP, ACLR identified about 27.2
15  million PDE records in which there was sales tax
16  found, or something found in the sales tax field; is
17  that right?
18      A.    That's correct.
19      Q.    So the complaint is alleging that there
20  were roughly 11 million additional PDE claims in
21  which ACLR found something in the sales tax field,
22  correct?

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

Page 219

```
 1        A.    That's correct.

 2        Q.    And, likewise, the complaint alleges that

 3    there was additional -- additional amounts that were

 4    identified as improper sales tax amounts by quite a

 5    bit, correct?  You have identified total claim

 6    payments for Minnesota of 889.5 million in paragraph

 7    18 of the complaint, correct?

 8        A.    That's correct.

 9        Q.    And in your sales tax NAIRP, you had found

10    and identified at that point little over $619 million

11    of total claim payments in Minnesota in which there

12    was something in the sales tax field, correct?

13        A.    That's correct.

14        Q.    So that's about $270 million more alleged

15    in the complaint than was in the NAIRP?

16        A.    That's correct.

17        Q.    Let me have you look at paragraph 23 of

18    the complaint.  Paragraph 23 identifies improper

19    sales tax charges by Louisiana pharmacies; is that

20    right?

21        A.    That's correct.

22        Q.    And alleged in paragraph 23 of the
```

Page 220

1    complaint is that there were 2,045,929 Part D claims

2    that included sales tax amounts in Louisiana in those

3    years; is that right?

4         A.    That's correct.

5         Q.    And looking back at the sales tax NAIRP,

6    Exhibit 11, at the time you submitted the NAIRP, you

7    identified 2,045,696 PDE records with something in

8    the sales tax field, right?

9         A.    That's correct.

10        Q.    So that was an addition of a couple

11   hundred additional PDE records?

12        A.    Yes.

13        Q.    And the amount likewise increased by about

14   -- by a small amount as well; is that correct?

15        A.    That's correct.

16        Q.    About $4,000?

17        A.    That's correct.

18        Q.    Let me have you take a look at paragraph

19   28 of the complaint.  That paragraph relates to the

20   states in which -- or, excuse me, the claims in which

21   ACLR identified amounts in the sales tax field that

22   exceeded 50 percent of the claim reimbursements; is

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

Page 221

1    that right?

2        A.    Yes.

3        Q.    And in the complaint, paragraph 28, you

4    have alleged that ACLR identified 264,119 claims that

5    had sales tax in the sales tax field.  And in the

6    sales tax NAIRP for those states, you had alleged

7    that you had found 262,098 total claims; is that

8    right?

9        A.    That's correct.

10       Q.    So that had also increased by 2,000 or so

11   PDE records?

12       A.    That's correct.

13       Q.    Now ACLR's certified claim that we looked

14   at, which was Exhibit 16, that was based on the

15   numbers that came from the sales tax NAIRP; is that

16   right?

17       A.    That's correct.

18       Q.    So, ACLR's certified claim was not based

19   on the increased claim numbers and dollar amounts

20   that are contained in the complaint; is that right?

21       A.    That's correct.

22       Q.    And is it correct that ACLR never

Christopher Mucke 30(b)(6)                                    September 11, 2017

Reston, VA

Page 222

1    discussed the additional 2012 to 2013 PDE records and

2    claim payments that are alleged in the complaint

3    above and beyond the amounts that were in the

4    certified claim, never discussed those with CMS

5    before filing the complaint?

6           A.     That's correct.

7           Q.     And ACLR never requested a contracting

8    officer's decision on the expanded universe of the

9    PDE records that's contained in the complaint; is

10   that right?

11          A.     That's correct.

12          Q.     Now, in paragraphs 29 and 30 of the

13   complaint, the complaint alleges certain claims that

14   were identified by ACLR regarding erroneous Minnesota

15   sales tax charges for 2007 to 2008, and 2009 to 2011.

16   Do you see that?

17          A.     Yes, I do.

18          Q.     ACLR never submitted a NAIRP to CMS

19   proposing a Minnesota sales tax audit for those

20   years; is that right?

21          A.     That's correct.

22          Q.     And so is it correct that ACLR is not

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

Page 225

1    it more accurate, we looked at both fields, both the

2    provider and the alternative prescriber field.

3              So, by doing that, we identified more MPIs

4    in the alternative provider, service provider ID

5    field.

6         Q.   and that information was important to

7    identify in which state the pharmacy was situated for

8    determining which state's tax laws would apply, any

9    other purpose?

10        A.   That's correct.  Yes.

11        Q.   So ACLR felt that the analysis it

12   conducted to prepare the complaint was more accurate

13   and complete than the analysis contained in the

14   NAIRP?

15        A.   That's correct.

16        Q.   Why was it that that analysis wasn't

17   conducted at the time that ACLR submitted the sales

18   tax NAIRP?

19        A.   As I mentioned earlier, whenever we --

20   whenever we submitted a NAIRP, it was just basically

21   an estimate of what we thought was there.  In this

22   case, we just looked at the service provider

Christopher Mucke 30(b)(6)                                        September 11, 2017
                                    Reston, VA

Page 226

1    identifiers within the service provider identifier

2    field, and we didn't look at the alternative one.

3            Had we gone through the walk-through

4    meeting and done additional discussions back and

5    forth with CMS, then we would have gone through that

6    process then and done that as well.

7    Q.    Is it possible that those two fields could

8    contain different data, one field identifying one

9    location, and the other field identifying a different

10   location?

11   A.    They contain different data, but they

12   don't contain -- at least in my experience, they

13   don't contain data that demonstrates that it's a

14   different location.  It's the same pharmacy.  They

15   just have two different numbers.

16   Q.    So the additional PDEs that are identified

17   and referenced in the complaint, those are -- there

18   are additional PDEs that are unrelated to the PDEs

19   that were identified at the time you submitted the

20   NAIRP proposals; is that right?

21   A.    Well, they are related to the pharmacies,

22   but they are not the same PDEs.  They would be

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

Page 227

 1    additional PDEs since the higher amount, but they are

 2    related insofar as they are sales tax improper

 3    payments in Minnesota.

 4        Q.    And the other states?

 5        A.    And the other states.  Although in this

 6    case I think I thought we were just doing Minnesota

 7    but, yes, it would have been the same for the other

 8    issues as well.

 9        Q.    Right.  Like the additional ones in

10    Louisiana?

11        A.    Yes.

12        Q.    Or the greater-than-50-percent states?

13        A.    That's correct.

14        Q.    So I just want to make sure I understand.

15    So these are additional PDE records you found that

16    are -- they are different prescriptions that were

17    filled that you identified as improper?

18        A.    That's correct.

19        Q.    Did ACLR obtain any new 2012 or 2013 PDE

20    data from CMS that it used to run these revised

21    calculations, or was it the same data you had at the

22    time of the NAIRP submission?

Christopher Mucke 30(b)(6)                                September 11, 2017
Reston, VA

Page 230

1        Q.    And, likewise, in paragraph 40B, the

2   reference to the 40.4 million Part D claims, that

3   comes from the total claim numbers in those same

4   paragraphs, 18, 23, 26 and 28?

5        A.    I'm sorry.  Can you say that again?

6        Q.    Sure.  Looking at paragraph 40B, we talked

7   about the dollar amount, but the total claim number

8   of 40.457 million, that total claim number likewise

9   comes from those same paragraphs, paragraphs 20 --

10  18, 23, 26 and 28?

11       A.    They should, yes.

12       Q.    And the damages that are alleged in the

13  complaint, the last page, paragraph 1, $112,002,489;

14  do you see that?

15       A.    Yes, I do.

16       Q.    And is that simply based on the RAC

17  contract contingent fee rate multiplied by that

18  $930.8 billion figure from paragraph 40B?

19       A.    Yes, it is.

20                         -   -   -

21            (A document was marked as Deposition

22  Exhibit Number 19.)

TAB 92

IN  THE  UNITED  STATES  COURT

OF  FEDERAL  CLAIMS

--------------------x

ACLR, LLC

        Plaintiff,

-vs-               Civil  Action  No.  15-767

THE  UNITED  STATES

        Defendant.

--------------------x

              Monday,  October  30,  2017

              Reston,  Virginia

THE  DEPOSITION  OF  CHRISTOPHER  MARTIN  MENDEZ

As  Corporate  Representative  for  Livanta,  LLC

30(b)(6)

Volume  1

Christopher Martin Mendez                ACLR, LLC v. United States of America
Case No. 15-767                                         October 30, 2017

1        A.    Well, they preceded the Part D RAC,

2   and, in fact, the Part D -- our contract was

3   framed on the A/B RAC validation contractor.

4        Q.    And how was your contract framed on

5   the A/B RAC data validation contractor?

6        A.    Well, like one of the main things was

7   the -- one of the main tasks was called an

8   accuracy review.  And that terminology is pretty

9   close to almost exactly what it was in the

10  A/B RAC validation contract.  And since their

11  contracts were before ours, it just makes sense,

12  you know, that it was based on theirs.

13       Q.    I think your testimony was that part

14  of your job was to assess whether the findings

15  of the RAC before they were sent out to the

16  plans as identifying improper payments -- you

17  were to validate those?

18       A.    Right.

19       Q.    And were you doing a sampling of the

20  RAC's findings, or were you doing --

21       A.    We were doing a 100 percent

22  validation.  The accuracy reviews were based on

1  a sampling, but we were not instructed by CMS to

2  perform it based on a sampling.  We were asked

3  to do a 100 percent.

4        Q.    And when would the RAC send out

5  notification of improper payments to plans?

6        A.    When?  In what context?  Do you mean

7  in --

8        Q.    You understand the RAC process?

9        A.    Sure.

10       Q.    They would have an audit approved by

11 CMS?

12       A.    Right.

13       Q.    And then they would perform their

14 analysis?

15       A.    Right.

16       Q.    Then what would happen next?  Would

17 they submit it to --

18       A.    They would submit it to us for

19 validation, correct.

20            If it was a complex review, they would

21 request supporting documentation from the plans

22 first.  And then they would do their analysis

Page 28

Christopher Martin Mendez                    ACLR, LLC v. United States of America
Case No. 15-767                                              October 30, 2017

1        A.    Right.

2        Q.    Is that a correct description of

3   accuracy reviews that you described --

4        A.    That we talked about earlier, it is.

5   And that's -- initially the contract was written

6   so that we would perform accuracy reviews based

7   on a sample.  But that's not the way CMS ended

8   up tasking us.

9        Q.    When did Livanta get tasked with

10  something other than doing accuracy reviews?

11       A.    It started with our very first

12  validation, the 2007 excluded providers.

13       Q.    And why did CMS say they wanted

14  something other than accuracy reviews?

15       A.    You'll have to ask them.

16       Q.    Did they provide you with any

17  description as to why?

18       A.    No.  They just asked us -- instructed

19  us to perform 100 percent validation.

20       Q.    Take a look at the next page.  At the

21  top it says under Framework --

22       A.    Yes.

1   in a later version, because CMS did not task us

2   to perform the accuracy reviews as are provided

3   here in Task 4.  They asked us and instructed us

4   to perform 100 percent validations.  So that

5   task was added in a subsequent version of the

6   statement of work.

7        Q.    So as of March of 2012, there was no

8   tasking for Livanta to perform validation?

9        A.    That's correct.  There was -- the

10  statement of work is fairly fluid, and I think

11  the early 2000 not the 2007 excluded providers

12  was tasked under special-study-type action,

13  maybe even an accuracy-type review in terms of

14  what they want done, but not -- but it was not

15  based on a sample.  It was 100 percent.

16       Q.    When did you begin the 100 percent

17  validation?

18       A.    Right away.

19       Q.    But you didn't have it in the

20  statement of work?

21       A.    That's correct.  But like I said, the

22  statement of work is flexible.  If we were

1          It took a little bit of time, but it
2     is in a subsequent version that describes more
3     correctly the validations they were tasking us
4     to perform.
5          Q.   And do you know when, then, in the
6     timeline that happened, where they tasked you to
7     perform 100 percent validations?
8          A.   They started in -- from the get-go it
9     was 100 percent.  The 2007 excluded provider was
10    the very first validation we performed.  My
11    recollection, as I testified, it was early 2012,
12    and it was 100 percent validation.
13         I don't recall how long it took for
14    CMS to adjust the statement of work, but it
15    certainly took a bit of time.
16         Q.   So it would have been sometime
17    after --
18         A.   Yes, sometime after --
19         Q.   -- March of 2012?
20         A.   Yes.  Probably even a year or more,
21    right.
22         Q.   Did you begin performing 100 percent

1 increases without looking at the scripts,

2 because you need a new script if the dosage was

3 increased.

4       Q.    Wouldn't it be an obligation to put a

5 dosage number in a PDE record?  Is that a field

6 that's supposed to be included in the PDE

7 record, the dosage amount?

8       A.    Not to my knowledge.

9       Q.    What about the quantity?

10      A.    I mean, we worked with the PDE records

11 as they were.  We had no say in what fields were

12 there, what fields weren't, why some were

13 populated, why some were not.  We had no -- it

14 was just, worked with the data.

15      Q.    Do you know what a service reference

16 number is?

17      A.    My recollection is that's a field in

18 the PDE record.  The service reference number.

19 It could be -- and I believe it is.  So let me

20 just say that I'm not 100 percent certain.  It's

21 been a while.  I think it's the ID that the

22 pharmacy signs for a prescription.

# TAB 93

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

--------------------x

ACLR, LLC

       Plaintiff,

-vs-                Civil Action No. 16-309

THE UNITED STATES

       Defendant.

--------------------x

               Wednesday, June 28, 2017

               Baltimore, Maryland

C-O-N-F-I-D-E-N-T-I-A-L

DEPOSITION OF MATTHEW EDWARD FARABAUGH

as Corporate Representative for Health

Integrity, LLC, 30(b)(6)

Matthew Edward Farabaugh                    ACLR, LLC v. THE UNITED STATES
Case No. 16-309                                          June 28, 2017



Matthew Edward Farabaugh                ACLR, LLC v. THE UNITED STATES
Case No. 16-309                                          June 28, 2017



Matthew Edward Farabaugh
Case No. 16-309

ACLR, LLC v. THE UNITED STATES
June 28, 2017

Matthew Edward Farabaugh                ACLR, LLC v. THE UNITED STATES
Case No. 16-309                                        June 28, 2017

# TAB 94

Christpher Mucke                                        September 12, 2017
Reston, VA

```
                                                              Page 1

 1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2     ----------------------------x

 3     ACLR, LLC,                    :

 4              Plaintiff,           :   Case No.: 16-309c

 5        vs.                        : (Judge Campbell-Smith)

 6     THE UNITED STATES,            :

 7              Defendant.           :

 8     ----------------------------x

 9

10              DEPOSITION OF CHRISTOPHER MUCKE

11                   Reston, Virginia

12               Tuesday, September 12, 2017

13                       9:04 a.m.

14

15

16

17

18

19

20    Job No.:  72510

21    Pages:  1 - 117

22    Reported by:  Elizabeth Mingione, RPR
```

Christpher Mucke                                      September 12, 2017
Reston, VA

Page 31

1    Or at least in our Atlanta office, they took that

2    over.  So they were no longer employed with the

3    company.

4              I believe that we retained three people

5    that were not -- that were not asked -- or that were

6    not offered a position with the new company.  And

7    then two of those people left relatively soon for

8    other work.  And another individual stayed on for

9    about three or four months.

10        Q.   At the time that the name was changed from

11   Corporate Tax Consultants to ACLR, did the business

12   have any government contracting work at that point in

13   time?

14        A.   No, we did not.

15        Q.   Can you describe for me what ACLR -- what

16   its business model is, what types of work it is

17   engaged in performing?

18        A.   Recovery audits on a contingency-fee

19   basis.

20        Q.   How many employees does ACLR currently

21   have?

22        A.   Three.

Christpher Mucke                                    September 12, 2017

Reston, VA

Page 34

1        Q.    Setting aside for the moment the contract

2   with CMS for the Part D RAC program as the focus of

3   this case, can you tell me what other types of

4   recovery audit work ACLR has engaged in since its

5   inception?

6        A.    Sales tax.  It's primarily sales tax work,

7   or sales and use taxes.  There were efforts in

8   license taxes, and we assisted in property tax work.

9   There were some payroll tax issues that we had to do

10  with unemployed taxes, but primarily it was sales and

11  use taxes.

12       Q.    Has ACLR secured any government contracts,

13  other than the contract with CMS, as the focus of

14  this case?

15       A.    No, we have not.

16       Q.    So the other work that you described

17  performing for ACLR, that was for private clients?

18       A.    That's correct.

19       Q.    What types of industries or clients have

20  you done that -- those recovery audits for?

21       A.    The same as I brought up before,

22  manufacturing, research and development services,

Christpher Mucke                                    September 12, 2017
                        Reston, VA

                                                        Page 108

1        A.      No, it wasn't.

2        Q.      -- had you ever done it before?

3        A.      I'm sorry.  I had done it before.  Yes.

4        Q.      In connection with what work?

5        A.      The work that I did with Will Yancey.

6        Q.      That was in connection with the work that

7    you said you saw some PDE -- you saw some Part D

8    data, correct?  But primarily that project focused on

9    the A and B ZPIC work; is that right?

10       A.      No.  As I recall, I don't remember any

11   specific project that we did.  I know that we had the

12   data.  I just -- I can't recall right now what that

13   project was associated with, but I'm relatively

14   confident that it did not have anything to do with

15   the ZPICs.

16       Q.      So the first time that you had to analyze

17   PDE records for the Part D program to assess the

18   propriety of payments was as part of this contract

19   with CMS for the Part D RAC?

20       A.      That would be correct.  Yes.

21       Q.      Before you began performing the work on

22   the Part D RAC contract, did you have any training on

Christpher Mucke                                September 12, 2017

Reston, VA

Page 109

1    reviewing or interpreting Part D PDE records?

2         A.    No, I had not.

3         Q.    Was any training provided to ACLR's other

4    employees on how to interpret Part D PDE records?

5         A.    It would have been for -- I presume that

6    it would have been for Cindy Schilling, but not for

7    any of the other people on the -- and perhaps Bruce

8    Dixon.  He did have healthcare experience with

9    respect to data, but he may have had some training on

10   that, but not anybody else that I can recall.

11        Q.    But do you know if Mr. Dixon had that

12   training before he started working on this contract?

13        A.    I don't recall that.

14        Q.    And with respect to Ms. Schilling, do you

15   know if she had had any training before this contract

16   on interpreting Part D PDE files or --

17        A.    I don't know that.

18        Q.    Before this contract, had you had any

19   training on the Medicare Part D rules?

20        A.    No, I had not.

21        Q.    And as part of this -- beginning the

22   performance of this contract, did you undergo any

TAB 95

```
 1            IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2

 3   -------------------------------
                                   :
 4   ACLR, LLC,                    :
                                   :
 5            Plaintiff,           :
                                   :
 6      v.                         :  Civil Action Nos.
                                   :
 7   UNITED STATES OF AMERICA,     :  15-767C and 16-309C
                                   :
 8            Defendant.           :
                                   :
 9   -------------------------------

10

11        Deposition of CHRISTOPHER MUCKE, an expert

12   witness herein, at the law offices of David, Brody &

13   Dondershine, LLP, 12355 Sunrise Valley Drive, Suite

14   650,  Reston, Virginia, commencing at 9:31 a.m. on

15   Wednesday, January 10, 2018 and the proceedings being

16   taken down by stenotype and transcribed by Catherine

17   B. Crump, a Notary Public in and for the Commonwealth

18   of Virginia.

19

20

21

22
```

```
 1   laws to Part D prescriptions?

 2          A.    Yes.

 3          Q.    Do you consider yourself to be an expert

 4   on the law?

 5          A.    Yes.

 6          MR. BONELLO:  Objection, form.

 7   BY MR. PORADA:

 8          Q.    And in what way do you consider yourself

 9   to be an expert on the law, what aspects of the law?

10          A.    Just from my work experience and history

11   in dealing with, in this case, state laws and the

12   imposition of taxes by states.

13          Q.    Have you ever previously been recognized

14   by any court as an expert on the interpretation of

15   statutes or rules?

16          A.    No.

17          Q.    Have you ever been retained by anyone

18   else prior to these cases to offer any expert

19   opinions on the interpretation of statutes or

20   regulations?

21          A.    I'd ask for your interpretation or your

22   meaning of the word "retained".
```

1    over everything.  So for me, I don't think that that

2    would meet the definition of worse off.

3           Q.    But in that hypothetical, CMS ultimately

4    would end up having paid more out as a result of ACLR

5    identifying the one dollar improper sales tax; would

6    you agree with that?

7           A.    I would.

8           MR. BONELLO:  Objection, form.

9           THE WITNESS:  I would agree to that if, in

10   fact, they did go through reopening and paid that

11   money out.

12   BY MR. PORADA:

13          Q.    On the adjusted PDE?

14          A.    That's correct.

15          Q.    For the no sales or use tax states that

16   ACLR identified as part of the sales tax NAIRP that's

17   discussed on page 2 of Exhibit 1, ACLR had identified

18   five states that do not impose any sales tax on

19   anything; is that correct?

20          A.    That's correct.

21          Q.    And those were Alaska, Delaware,

22   Montana, New Hampshire, and Oregon.  Right?

1    documentation or processes for a non-Medicaid

2    purpose.

3         So, for example, in the Medicaid manuals and

4    processes for collecting these fees, you know, they

5    aren't even supposed to be separately stated.  They

6    are included in the dispensing fee and would not be

7    separately stated as a tax in a sales tax field or

8    anything subsequent to that.

9         So the absence of the application of those two

10   other things would indicate to me that, yes, they

11   only intended it initially for Medicaid.

12        Q.    But you had not seen anything from any

13   Louisiana State entities that affirmatively said that

14   the ten cent prescription fee only applied to

15   Medicaid prescriptions; is that correct?

16        MR. BONELLO:  Objection, form.

17        THE WITNESS:  I would state that that's

18   correct, but I wouldn't expect there to be.

19   BY MR. PORADA:

20        Q.    So it's your opinion as an expert on the

21   law that, notwithstanding the Louisiana Department of

22   Insurance taking the position in this directive that

1    the ten cent prescription fee applies to every

2    prescription, it only should apply to Medicaid

3    prescriptions?

4         A.    In my expertise, I look at the law

5    first.  I'm driven by the statute in the absence of

6    case law.

7         To the extent that there's case law on it, I

8    would also look at that to get additional guidance

9    from the courts on how it would be treated.  I did

10   not identify any case law pertaining in this

11   transaction or this type of transaction.

12        So I based my expertise or I based my opinion

13   based on what the law says.  In my experience,

14   Departments of Revenue typically change their mind.

15   Administrations change and new ways of interpreting

16   the laws are always applied.

17        So I look at that guidance, but then, you

18   know, if it meets what my experience demonstrates,

19   then, you know, I would rely on my guidance.  If it

20   contradicts what my previous experience has shown to

21   be true based on my review of other states, based on

22   my review of case law in similar circumstances, I

1    would defer to that; and in this case right here, you

2    know, we have the statute that states clearly that

3    it's Medicaid health care services.

4         Q.    And your recollection of the statute is

5    that it says that the ten cent fee is to be assessed

6    only on Medicaid prescriptions, not that it's to be

7    assessed to fund the Medicaid program?

8         MR. BONELLO:  Objection, form.

9         THE WITNESS:  The first sentence of the

10   imposition statute says that, I guess, the Department

11   of Hospitals, I think, or Health Insurance -- I can't

12   remember which department, but it says that the

13   department can issue taxes on health care services,

14   Medicaid health care services, and then after that,

15   it lists -- then it says, "on all", and then it goes

16   into saying things, for example, like every

17   outpatient prescription filled by a pharmacy and

18   certain out-of-state pharmacies, and then it lists

19   that ten cent fee after that.

20   BY MR. PORADA:

21        Q.    Let me have you turn to the second page

22   of that Exhibit 2, which quotes the statute, Section

1    identified for 2010 using the protocol that you

2    believe should have been used?

3            A.    That's correct.

4                            [Mucke Exhibit No. 8 was

5                            marked for identification.]

6    BY MR. PORADA:

7            Q.    I'm showing you what has been marked as

8    Exhibit 8, which is ACLR's initial disclosures in the

9    ACLR 1 case.  If you look at page 14, please, one of

10   the components of ACLR's damages as claimed in ACLR 1

11   is the $2,668,553 that you said represents amounts

12   associated with direct labor costs and contract

13   overhead requirements, reasonable expectations of

14   profit net of whatever amounts ACLR received from

15   CMS.

16           Do you see that?

17           A.    Yes, I do.

18           Q.    And that $2.6 million, I believe you

19   said that relates to ACLR's alleged costs and profits

20   for 2012 and '13.  Correct?

21           A.    Yes.  That's correct.

22           Q.    There's no mention of that component of

 1   the damages in what we looked at as Exhibit 7, the

 2   expert disclosure.  Do you agree with that?

 3        A.    That's correct.

 4        Q.    So is it correct, then, that you are not

 5   proposing to offer any testimony as an expert

 6   regarding that component of ACLR's alleged damages?

 7   Is that right?

 8        A.    That's correct.

 9        MR. PORADA:  I don't have any further

10   questions.

11        [Whereupon, at 11:52 p.m., the deposition

12   concluded.]

13

14

15

16

17

18

19

20

21

22

# TAB 96

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

--------------------x

ACLR, LLC

       Plaintiff,

-vs-             Civil Action No. 15-767

THE UNITED STATES

       Defendant.

--------------------x

           Thursday, October 19, , 2017

           Baltimore, Maryland


THE DEPOSITION OF SONJA JEFFERSON BROWN as

Corporate Representative for the Department of

Health and Human Services 30(b)(6)


Volume 1

1    And I'm referring to where in Exhibit 85.

2         A.    It doesn't specifically say false

3    positives.  But it is implied in the first full

4    paragraph on A07300 where:  Plan sponsors

5    contacted CMS to voice concerns regarding the

6    burden of providing supporting documentation for

7    what they believed were the identification of

8    PDE records that did not appear to be improper

9    submissions.

10        Q.    So was that basis for terminating the

11   audit, was the concern by the plan sponsors as

12   to the burden of providing supporting

13   documentation?

14        A.    No.  If you read further, it said:

15   CMS conducted an evaluation of ACLR's audit

16   methodology to determine if the plan sponsors'

17   concerns were valid.  CMS's evaluation concluded

18   there were significant flaws with the original

19   audit methodology used by ACLR.

20        Q.    And what was CMS's evaluation?  Was

21   that what the validation contractor did?

22        A.    That was only part of it.  As I said

1  improper payments, I think CMS just made the

2  decision not to do that again.

3       Q.    So CMS wasn't in a position at the

4  time it issued the technical direction letter in

5  which it quantified at all what false positives

6  were generated by the new methodology that CMS

7  wanted ACLR to use.  Is that true?

8       A.    Yes.  I think the number, you know, of

9  improper payments were reduced but still, you

10 know, couldn't validate whether they were

11 improper or not without going back out with

12 another RFI, and, again, CMS decided not to do

13 that.

14      Q.    So CMS's concern was it didn't want to

15 burden the plan sponsors with having to submit

16 any information in connection with the

17 duplicative payment audit?

18      A.    No.  That's not what I said.  I just

19 said that, as it said in the technical direction

20 letter, CMS had concerns with the validity of

21 the audit results, and that's enough to not move

22 forward and to rescind the approval.

1      Q.    And the concerns were a burden on the

2   plan sponsors and the possibility of false

3   positives?

4      A.    They could have been the concerns.

5   Those were the initial concerns, yes.

6      Q.    Those were some of the concerns that

7   the --

8      A.    Once we got the -- yes.  Once we were

9   notified by the plan sponsors that they were

10  incorrectly identified, yes.

11     Q.    Once the plan sponsors notify you that

12  there were -- improper payments were, in fact,

13  proper, then CMS revised the methodology to

14  address that issue?

15     A.    Yes.

16     Q.    But CMS wasn't confident that its

17  revised methodology addressed the false positive

18  issue?

19          MR. CARNEY:  Objection,

20  mischaracterizes.

21  BY MR. BONELLO:

22     Q.    I'm just trying to understand.  So --

TAB 97

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

---------------------x

ACLR, LLC

       Plaintiff,

-vs-                 Civil Action No. 16-309

THE UNITED STATES

       Defendant.

---------------------x

              Wednesday, August 16, 2017

              Baltimore, Maryland

THE DEPOSITION OF SONJA JEFFERSON BROWN as

Corporate Representative for the Department of

Health and Human Services 30(b)(6)

Volume 1

Pages 1 through 216

1        A.    Yes.   That's correct.

2        Q.    What other obligations did CMS have

3   under the statement of work?

4        A.    I think those were the primary

5   obligations.

6              The other obligation, I guess, was to

7   notify plan sponsors of the potential improper

8   payments and make plan sponsors aware of the

9   appeal process.

10       Q.    Was that CMS's obligation or ACLR's

11  obligation?

12       A.    That was -- CMS sent the letters to

13  the plan sponsors.

14       Q.    Did CMS have any other obligations

15  under the statement of work other than what

16  you've testified here today?

17       A.    An obligation, I guess, to ensure that

18  ACLR was paid a contingency fee.

19       Q.    And how would CMS satisfy that

20  obligation?

21       A.    Through plan sponsor offsets, which

22  CMS is also responsible for.

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                              August 16, 2017

1        Q.    How would those offsets occur?

2        A.    They occur in the division of plan

3    operations -- payment operations within CMS, and

4    those offsets are taken from plan sponsors'

5    monthly capitation payments.

6        Q.    Then how is ACLR paid the contingency

7    fee?

8        A.    They're paid -- whatever is

9    recovered -- they are paid a percentage of

10   whatever is recovered, and the percentage varied

11   for each audit issue.

12       Q.    When you say recovered, what do you

13   mean recovered?

14       A.    It's the same as the offset, and

15   recouping the overpayments from the plan

16   sponsors was -- that process was done through

17   offsets.  That essentially was the recovery.

18       Q.    When did the offsets occur?

19       A.    There were several offsets.  I don't

20   have those dates in front of me.

21       Q.    When should they occur generally in

22   the process?

1      A.    At the end of the appeals process.

2      Q.    What if there's no appeal process?

3      A.    There's an appeals -- it's always been

4  an appeals process.

5      Q.    So if ACLR identifies an improper

6  payment, then it's an automatic appeal process?

7      A.    Yes.  The plan sponsor has the option

8  to appeal or not.

9      Q.    So it would be after the opportunity

10 to appeal?

11     A.    Yes.

12     Q.    Other than what you've testified to,

13 are there any other obligations by CMS under the

14 statement of work?

15     A.    Not that I can think of right now.

16 Those are the most important obligations.

17     Q.    Well, I want you to tell me if there

18 are any other obligations.

19     A.    No.  Not that I'm aware of.

20     Q.    Did CMS meet all of its obligations

21 under the statement of work?

22     A.    As far as I know, yes.

1      A.   Mostly requesting additional

2  information from the plan sponsor as far as, you

3  know, questioning the value that was put into

4  that field.

5      Q.   So it's administrative error if values

6  are put into a sales tax field even though

7  there's no legal basis to bill any sales tax?

8      A.   That's correct.  Inputting -- keying

9  errors can occur all of the time.  Remember,

10  these are people manually submitting these

11  numbers into these fields.  So it is very

12  possible that someone put maybe a dispensing fee

13  or some other type of fee in the sales tax field

14  that they had no knowledge of until it was

15  brought to their attention.

16      Q.   But that would still be an improper

17  payment, correct?  Because if you're not

18  supposed to bill sales tax and it was billed --

19      A.   If they can prove -- if they can prove

20  that it wasn't a sales tax and it was a

21  different fee, for whatever reason, that is

22  allowable by CMS, it would not be an improper

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                              August 16, 2017

1   payment.

2        Q.    And how would CMS make that

3   determination?

4        A.    Again, you can't just look at the

5   record and tell.  You would have to do further

6   research, and basically that's by requesting

7   information from the plan sponsor.

8        Q.    So it's your position that improper

9   payments are different than administrative

10  errors?

11       A.    They are.  If we deem it not allowable

12  under the program, that is deemed an improper

13  payment.

14       Q.    And how do you deem it as not

15  allowable?

16       A.    If we can prove that it shouldn't have

17  been there or the plan sponsor couldn't provide

18  us sufficient documentation, then we could say

19  that it's improper payment.  It just depends.

20  It's a case by case.

21       Q.    So if there's values billed in the

22  sales tax column and there's no legal basis to

1    A.    They could have, but I'm not aware of

2  it right now.

3    Q.    What does CMS know with respect to

4  what the NBI MEDIC did with respect to the

5  Minnesota sales tax issue?

6    A.    There were some -- I guess it wasn't

7  black and white, it wasn't clear, and so they

8  didn't move forward with it.

9    Q.    So NBI MEDIC didn't move forward on

10  the Minnesota sales tax issue?

11    A.    Correct.  Because there were issues

12  with the review itself.

13    Q.    What were the issues with the review?

14    A.    I just know there was some policy

15  issues as related to allowable charges.  And

16  those issues had not been resolved at the time

17  they were looking at it.  So it wasn't clear-cut

18  that sales tax or some value in that field could

19  not -- was not allowable.

20    Q.    So NBI MEDIC didn't continue with that

21  review on Minnesota, did they?

22    A.    Not that I'm aware of, no.

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                                August 16, 2017

1    Q.    Do you know when that review

2 essentially stopped?

3    A.    I think early '16 maybe.  I'm not

4 sure.

5    Q.    When was the last time the NBI MEDIC

6 did any work, to your knowledge, on the

7 Minnesota sales tax issue?

8    A.    Probably early '16.

9    Q.    Okay.  What had NBI MEDIC done with

10 respect to the sales tax issue in Minnesota from

11 the time of ACLR's sales tax NAIRP?

12    A.    I don't know exactly.  I just knew

13 that it was still open and active and they were

14 still looking at data.  That's all I know.

15    Q.    Does CMS have any knowledge as to what

16 NBI MEDIC was doing with respect to the

17 Minnesota sales tax issue after ACLR submitted

18 its sales tax NAIRP?

19    A.    Doing as far as what exactly?

20    Q.    That's what I'm asking you.

21    A.    Well, how specific?  I mean, they're

22 looking at data, so they're still trying to, I

1    guess, interpret whether they should move

2    forward with it.  I don't know to what extent,

3    you know, they were looking at it.  I just know

4    they were looking at the data still.  They were

5    trying to still --

6        Q.    So it was CMS's belief when ACLR

7    submitted its NAIRP that NBI MEDIC was

8    continuing to review sales tax data related to

9    Minnesota?

10       A.    That is my understanding, that they

11   were looking into it, yes, and it had not been

12   closed.  So I would say, yes, it was still open.

13       Q.    And that was part of the basis for

14   denying ACLR's sales tax NAIRP?

15       A.    Yes.

16       Q.    ACLR was contracted as a recovery

17   auditor for the Part D RAC as required by the

18   Affordable Care Act?

19            MR. CARNEY:  Objection, compound.

20            THE WITNESS:  Yes.

21   BY MR. BONELLO:

22       Q.    As a Part D RAC was ACLR contracted to

1  respect to the issue of Minnesota sales tax

2  charges on PDE records, CMS wasn't engaged in

3  any work or service?

4      A.   Yes, they were -- well, if the MEDIC

5  was still engaged, then CMS was involved.

6      Q.   But putting aside whatever a

7  contractor was doing, CMS itself was not engaged

8  in any work in connection with the Minnesota

9  sales tax issue after August 10th of 2015,

10 correct?

11         MR. CARNEY:  Objection, vague.  What

12 do you mean by work?

13 BY MR. BONELLO:

14     Q.   After August 10 of 2015, what, if any,

15 activities was CMS itself, not contractors,

16 engaged in with respect to the issue of sales

17 taxes on PDE records in the state of Minnesota?

18     A.   As analysts, I'm sure they were

19 reviewing or at least consulting on the MEDIC on

20 the work that they were doing on this issue.

21 And I don't know what that would be other -- it

22 could be --

1      Q.   Well, I need to know what --

2      A.   -- looking at records.

3      Q.   What I'm asking is:  What work was

4 being done, if any, by CMS in that regard?

5      A.   And that's what I'm telling you.  I

6 don't know specifically.

7      Q.   Does CMS know anything generally if

8 any work was being done after August 10th, 2015

9 on the issue of Minnesota sales tax --

10      A.   Other than --

11      Q.   -- charges on PDE records?

12      A.   -- probably consulting with the

13 contractor.  I can't be more specific than that.

14      Q.   You're the representative for CMS.

15 Does CMS have any more information as to what,

16 if any, work it was doing after August 10th of

17 2015 on the issue of Minnesota's sales taxes on

18 PDE records?

19      A.   Again, I'm sure that work was being

20 looked at.  Data may have been being reviewed.

21 I can't confirm at this time exactly what was

22 being done.

1      Q.   That's what I'm asking for.  What is

2  being done --

3      A.   I don't specifically know what those

4  activities are and what the dates are for those

5  activities is what I'm saying.

6      Q.   So CMS isn't sure what, if anything,

7  was done with respect to the Minnesota sales tax

8  issue within CMS after August 10th of 2015.

9  Isn't that true?

10            MR. CARNEY:  Objection,

11  mischaracterizes testimony.

12  BY MR. BONELLO:

13      Q.   Is that true?

14      A.   No, it's not true.  Because I

15  answered, if it were open, then CMS could

16  have -- I'm not going to specifically say what

17  they were doing.  But if it's open, then --

18      Q.   The question --

19      A.   -- CMS is still looking at it.

20            MR. CARNEY:  Please let her finish.

21            MR. BONELLO:  Sorry.

22            THE WITNESS:  If CMS is still looking

1  at the audit issue, the fact that it was still

2  open and active means that CMS was still

3  actively looking at the audit issue.  Whether

4  that, again, was reviewing data, reviewing

5  policy, meeting with the contractors, getting

6  information from whomever in CMS, then that's

7  what was going on.

8        Q.   And when you denied ACLR's NAIRP, that

9  was based on your personal belief that there was

10  actually activities going on on a daily basis by

11  CMS with respect to the Minnesota sales tax

12  issue?

13        A.   That's incorrect.  It's not my

14  personal belief.  I confirm -- confirmed through

15  different channels that this was open and active

16  and work was still being done by the NBI MEDIC.

17        Q.   I'm not talking about the NBI MEDIC.

18             Can an audit issue be open but no work

19  being done on the issue?

20        A.   It could be.  We could be waiting on

21  information.  It could be at a standstill.  It

22  could be on hold because we're waiting for

Sonja Jefferson Brown As        ACLR, LLC v. THE UNITED STATES
Case No. 16-309                 August 17, 2017

1  1.2.3 wording was based upon recommendations by a

2  third party or another contractor.

3           Does this refresh CMS's recollection as

4  to how section 1.2.3 came about in terms of its

5  wording?

6     A      No.  I can't confirm that that's where it

7  came from.

8     Q      In the notice of deposition, section

9  number 43 -- I'm sorry -- number 44 was whether

10 Minnesota could charge sales taxes on Medicare Part D

11 drug events since 2009.

12          Does CMS have a position on whether

13 Minnesota could charge sales taxes on Medicare Part D

14 prescription drug events since 2009?

15    A      No.  It still has not been resolved.

16    Q      Let's move on to category 45 on the

17 30(b)(6) notice.

18          At some point, CMS received a proposed

19 Minnesota tax alert to the Part D sponsors.  Correct?

20    A      I would have to see.  I don't know.  I

21 can't recall.

22                  (The document referred to was

Sonja Jefferson Brown As               ACLR, LLC v. THE UNITED STATES
Case No. 16-309                                    August 17, 2017

```
 1          Q       Moving on to category 52 in the 30(b)(6)

 2   notice, can CMS identify PDE records from Minnesota

 3   where usage taxes were placed into the sales tax

 4   field for plan year 2012 to 2013?

 5          A       Not that I'm aware.

 6          Q       What is CMS's understanding of what usage

 7   taxes are in Minnesota as it relates to PDE records?

 8          A       That's not clear.  Again, the whole issue

 9   of taxes with Minnesota was never resolved.

10          Q       And moving on to category 53 in the

11   notice of deposition, can CMS identify PDE records

12   from Minnesota where the sales taxes were

13   attributable to administrative errors for plan year

14   2012 and 2013?

15          A       No.

16          Q       We may have already covered this, but

17   I'll just go in order here.

18                  Moving on to 54 in the notice of

19   deposition:  As for instructions to plan sponsors

20   regarding Part D claims originating in Louisiana,

21   that included sales taxes, is there anything other

22   than -- I think you testified there was a letter sent
```

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                   August 17, 2017

1  out to the plan sponsors about excluding -- you can't

2  charge sales taxes when it's 10 cents or less, or you

3  can charge?  Just clarify that for me.

4      A      It was an allowable 10-cent fee --

5  prescription fee that was allowable.  And that's the

6  only notification that I'm aware of at this point,

7  unless there is something else that I can point to.

8      Q      Moving on to 55 -- I think we have

9  covered this -- there are no instructions to plan

10 sponsors regarding Part D claims originating in

11 Minnesota that included sales taxes.  Correct?

12     A      Correct.

13     Q      We have already covered 56.

14            Category 57:  CMS's internal

15 communications during the period January 1, 2014, to

16 March 8, 2016, regarding Part D sales tax issues as

17 it relates to Louisiana, Minnesota, Alaska, Delaware,

18 Montana, New Hampshire, and Oregon.

19            I think we have probably already covered

20 Minnesota and Louisiana.

21            So, what about the other states?  Have

22 there been any internal communications during that

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                              August 17, 2017

1   interim adjustment process?

2          A       At what section are you?

3          Q       I'm just asking in general, and if you

4   want to refer to something --

5          A       The interim adjustments, I believe, are

6   the adjustments to the plan sponsor's monthly

7   payments.

8          Q       And those are after the RAC identifies

9   improper payments.  Correct?

10         A       And once the appeals process has been

11  exhausted.

12         Q       And that occurs between the initial

13  reconciliation and re-opening.  Correct?

14         A       Yes.  This happens on a monthly basis.

15  Interim adjustments:  It happens every month.

16         Q       What do you mean, the payment to the plan

17  sponsors?

18         A       The plan sponsors, they received payments

19  every month for, you know, bennies that they provide

20  prescription drug services to.

21         Q       And if there is an improper payment

22  identified by ACLR as part of an approved audit, that

```
 1  payment to a plan sponsor would be reduced based upon

 2  the improper payment?

 3       A      Yes.

 4       Q      How would ACLR be paid then?

 5       A      Once those adjustments are taken from the

 6  plan sponsor's monthly payments, we're notified that

 7  that transaction has happened.

 8              CMS would send an invoice to ACLR to --

 9  with the amount, which is a percentage of those

10  recoveries from plan sponsors.

11              MR. BONELLO:  Let's take a break for a

12  couple of minutes.

13              MR. CARNEY:  Sure.

14                   (There was a break taken from

15                   11:27 a.m. to 11:32 p.m.)

16              BY MR. BONELLO:

17       Q      So, just to confirm, ACLR is paid its

18  contingency fees once CMS is reimbursed and the

19  interim adjustment is complete.  Correct?

20       A      Yes.

21       Q      And this payment to ACLR occurs

22  regardless of whether the plans have deleted the PDE
```

# TAB 98

```
            IN THE UNITED STATES COURT

               OF FEDERAL CLAIMS

--------------------x

ACLR, LLC

          Plaintiff,

-vs-                         Civil Action No. 16-309

THE UNITED STATES

          Defendant.

--------------------x

                         Thursday, August 10, 2017

                         Baltimore, Maryland


           THE DEPOSITION OF CAMILLE BROWN


           The deposition of CAMILLE BROWN was

taken on Thursday, August 10, 2017, commencing

at 9:56 a.m., at the Department of Health and

Human services, Office of General Counsel, 7500

Security Boulevard, Central Building, Baltimore,

Maryland, before CHERYL NICHOLSON, CCR, CLR,

Stenotype Reporter and Notary Public in and for

the State of Maryland.
```

Camille Brown                          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                               August 10, 2017

1  held in comparison to when the NAIRP was

2  submitted?

3        A.   No.  I don't remember those time

4  frames.

5        Q.   And was that the first time that DPOA

6  had sat down and had a meeting about the NAIRP

7  that ACLR had submitted on the sales taxes?

8        A.   Yes.

9        Q.   And what happened next after that

10  meeting with respect to ACLR's sales tax NAIRP?

11        A.   After that point, because it was

12  brought to our attention -- my attention that it

13  was already being worked on and it was

14  considered a duplicative audit issue, I vetted

15  that through our senior leadership to determine

16  what the next steps would be.

17        Q.   So you have a meeting, and you're

18  advised that the NAIRP was duplicative.  Is that

19  your testimony?

20        A.   Yes.

21        Q.   Okay.  Did you make a determination as

22  to whether it was duplicative?

1        A.    No, I did not.  Not at that time.

2        Q.    Did at any time you make the

3   determination that it was duplicative?

4        A.    I vetted that through our senior

5   leadership, and once that was vetted through our

6   senior leadership and they were aware that this

7   was a duplicative issue and based on the

8   feedback from them -- we received back from

9   them, then there was a decision to say we cannot

10  move forward with this.

11       Q.    Did you advise the senior leadership

12  that the NAIRP was duplicative?

13       A.    Yes.

14       Q.    And you didn't make a determination

15  that the NAIRP was duplicative though?

16       A.    I made a determination based on the

17  feedback from the staff that it was duplicative

18  based on my knowledge of what they told me in

19  addition to the work that was being conducted by

20  the MEDIC.

21       Q.    When you were in the meeting with your

22  staff when you received a summary of the NAIRP,

Camille Brown                    ACLR, LLC v. THE UNITED STATES
Case No. 16-309                          August 10, 2017

1   what was your understanding of what work the

2   MEDIC was doing on the issue?

3        A.   The MEDIC was working on a sales tax

4   audit issue that looked at Louisiana sales tax

5   as well as Minnesota.

6        Q.   How did you have an understanding as

7   to what the MEDIC was doing with respect to

8   sales tax?

9        A.   My understanding from what the MEDIC

10  was doing, when I first came over to the area

11  and started sitting -- or attending, rather,

12  meetings, they were looking at -- or analyzing,

13  rather, PDE records that may have had a sales

14  tax imposed, and this was for Louisiana.  And

15  the project started based on a referral from the

16  OIG.

17       Q.   Do you know the status of the MEDIC

18  sales tax review as of the time ACLR submitted

19  its NAIRP?

20       A.   That occurred -- from what I can

21  recall, the status of that was still -- at that

22  time that particular audit issue was still open.

1   not from CPI.

2        Q.   At the time ACLR's NAIRP was

3   submitted, it's your testimony that CMS was

4   still evaluating the appropriateness of sales

5   tax charges in PDE records?

6        A.   Uh-huh.  Yes.

7        Q.   At that time was CMS evaluating

8   anything else with respect to the work that the

9   MEDIC was doing other than the Louisiana issue?

10       A.   I don't know.  I don't remember.  But

11  when you say were they evaluating anything else,

12  what do you mean by that?

13       Q.   At the time ACLR submitted its NAIRP,

14  was CMS evaluating anything else with respect to

15  the MEDIC sales tax review other than the

16  Louisiana sales tax issue?

17       A.   From what I recall, they were still

18  evaluating -- they were evaluating the Louisiana

19  sales tax issue.

20       Q.   But nothing other than that?

21       A.   When you say CMS, if you're talking

22  about the audit issue -- or are you talking

1     Q.    And you don't recall who was in the

2  meeting that gave you the initial briefing?

3     A.    I mentioned earlier Sonja Brown.

4     Q.    She was in the meeting?

5     A.    Uh-huh.

6     Q.    Okay.  Then you said the conclusion

7  from this meeting about ACLR's NAIRP between you

8  and staff was that it was duplicative?

9     A.    Correct.

10    Q.    And it was duplicative because MEDIC

11 was evaluating sales taxes?

12    A.    Correct.

13    Q.    Was it because MEDIC was evaluating

14 sales taxes in Louisiana?

15    A.    The MEDIC was -- it was because the

16 MEDIC was evaluating sales taxes.

17    Q.    At that time MEDIC wasn't evaluating

18 sales taxes in -- what states at that time when

19 ACLR submitted its NAIRP had MEDIC analyzed?

20    A.    The MEDIC had initially started off

21 and submitted a proposal for Louisiana.

22    Q.    That was the only state they had

1   MEDIC conduct its sales tax review and ACLR

2   conduct its review considered in the --

3   submitted in the NAIRP?

4           MR. PORADA:  Objection to form.

5           THE WITNESS:  I'm not sure I

6   understand when you say --

7   BY MR. BONELLO:

8       Q.   Well, you said your concern with

9   allowing ACLR to proceed, in part, was that

10  there could be two entities reaching out to plan

11  sponsors for information?

12      A.   Correct.

13      Q.   It's your understanding, isn't it

14  true, that NBI MEDIC hadn't reached out to any

15  plan sponsors yet to request any information --

16  isn't that true -- as of the date of the ACLR's

17  NAIRP?

18      A.   I wouldn't -- I can't attest to that

19  to say that that's true or not true.

20      Q.   Well, did you evaluate that?

21      A.   I did not see that, no.

22      Q.   So what else would be a concern about

1  having -- by CMS with respect to having ACLR

2  pursue its NAIRP on the sales taxes other than

3  what you've mentioned already?

4       A.   There could be various concerns that

5  you could probably think of.  But to me the one

6  that stands out the most is that we would not

7  want one contractor -- two contractors working

8  on the same issue.

9       Q.   And as of the time ACLR had submitted

10  its NAIRP, NBI MEDIC wasn't engaging in any

11  additional work on the sales tax review, was it?

12       A.   They were pending a decision from --

13  and next steps from CMS.  So I wouldn't say that

14  they didn't have additional work.  They were

15  waiting for a response from CMS on the next

16  steps.

17       Q.   So there was no additional work going

18  on on the sales tax review by NBI MEDIC at the

19  time ACLR submitted its NAIRP.  Isn't that true?

20            MR. PORADA:  Objection.

21            THE WITNESS:  I can't answer that

22  question because I've mentioned previously that

1        Q.    Was there any determination made by CM

2   that they were using the sales tax field

3   inappropriately?

4        A.    I can't recall.

5        Q.    So since July of 2015 has there been

6   any determination by anybody at CMS about

7   appropriateness of sales taxes in PDE records?

8              MR. PORADA:   Objection, foundation.

9   BY MR. BONELLO:

10       Q.    That you're aware of.

11       A.    I'm not aware of that.

12       Q.    Was ACLR contracted as a recovery

13   auditor for Part D as required by the Affordable

14   Care Act?

15             MR. PORADA:   Objection.

16             THE WITNESS:   I'm not sure what you're

17   asking me.  I think you asked me a similar

18   question perviously about ACLR and the Part D

19   RAC contract, and I believe we -- I stated that

20   the contract allowed us to meet their

21   requirements under the ACA.

22   BY MR. BONELLO:

# TAB 99

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------x

ACLR, LLC

        Plaintiff,

-vs-                          Civil Action No. 15-767

THE UNITED STATES        (Judge Campbell-Smith)

        Defendant.

---------------------x

                  Monday, November 20, 2017

                  Baltimore, Maryland


  THE DEPOSITION OF TANETTE NICOLE BURDEN-DOWNS


      The deposition of TANETTE NICOLE
BURDEN-DOWNS was taken on Monday, November 20,
2017, commencing at 11:12 a.m., at the
Department of Health and Human services, Office
of General Counsel, 7500 Security Boulevard,
Central Building, Baltimore, Maryland, before
CHERYL NICHOLSON, CCR, CLR, Stenotype Reporter
and Notary Public in and for the State of
Maryland.

1   you off.

2        Q.   No.  Go ahead.

3        A.   Yeah.  From my understanding, I

4   thought we attempted to finalize it on several

5   occasions, but I thought ACLR didn't want to

6   sign it.

7        Q.   Do you recall participating in a

8   conference call with ACLR on November 30th,

9   2011?

10       A.   Do I recall?  I mean, it's quite

11   possible.  I mean, I may have participated in a

12   few phone calls with ACLR, so...

13       Q.   Do you recall a discussion on

14   November 30th, 2011 with ACLR about them sending

15   out the duplicate payment audit information to

16   the plan sponsors identifying overpayments?

17       A.   I do recall a conversation such as

18   that.

19       Q.   Tell me what you can recall about

20   that.

21       A.   Again, I think we were on a conference

22   call and ACLR stated that it was ready to send

1   out notification letters for the duplicate

2   payment audit issue and we weren't prepared to

3   move forward with them sending out the

4   notification letters.  There were processes that

5   needed to be established in order to even

6   collect improper payments.  So the notices would

7   have gone out.  Things weren't in place to be

8   able to collect the improper payments.

9        Q.   And what things needed to be in place?

10       A.   For example, I think the performance

11  work statement had ACLR collecting the

12  overpayments.  There was not a way for those

13  payments to be sent to ACLR from the Part D plan

14  sponsors.  I mean, and we ultimately decided to

15  offset their payments, and that's how we ended

16  up getting the money.

17            So that was like a big one.  There

18  were just -- yeah, I think that was the big one

19  just in terms of how the improper payments would

20  be submitted to CMS.

21       Q.   How was that resolved?

22       A.   That's when we came up with the

1  process that we will offset the plan sponsor's

2  payments.  So we offset their monthly payments,

3  and then we paid ACLR out of the offset amount.

4      Q.   And when was that process put in

5  place?

6      A.   I don't -- I don't remember.

7      Q.   In the call did CMS tell ACLR not to

8  send out the notice letters for the duplicate

9  payments?

10     A.   I believe so.

11     Q.   Because CMS did not want them to send

12 out the notice letters to the plan sponsors

13 because there wasn't a way for CMS to recover

14 the payments?

15     A.   I believe that was the primary reason.

16 There could have been other reasons, but things

17 weren't fully fleshed out in terms of how this

18 recovery process was going to work.

19     Q.   So besides the collection of the

20 overpayments, what else at that time was causing

21 CMS to not want ACLR to send out those notice

22 letters to plan sponsors on the duplicate

1          And then the email in response is

2    Mr. Mucke's email stating that he's completed a

3    review of the statement of work with no issues

4    as written.

5          Were you ever advised that ACLR had no

6    issues with the statement of work draft that

7    they were provided with on April 19th of 2012?

8          A.    I don't believe so.

9          Q.    Would the proper process have been

10   that you would have been advised of ACLR's

11   position with respect to the proposed statements

12   of work that CMS came up with for the Part D RAC

13   program?

14         A.    Great.  If there were any questions or

15   any issues, comments, concerns, they would have

16   sent them to the program office, and if there

17   weren't, then they would have just went ahead

18   and executed the contract.  So if they had no

19   issues, I'm not sure why they did not execute

20   the contract at this time.

21         Q.    Do you know when the Part D RAC

22   appeals process was finalized?

Tanette Nicole Burden-Downs          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                                November 20, 2017

1          A.    I do not remember.

2          Q.    Do you recall there being -- that CMS

3    was working on a revised appeals process --

4          A.    I do.

5          Q.    -- from what was set forth in the

6    performance work statement?

7          A.    Yes.

8          Q.    Can you tell me about that?

9          A.    Oh, gosh.  From what I recall, there

10   may have been two levels of review, and the new

11   appeals process was adding a third level.

12         Q.    Do you know why there was a third

13   level that CMS wanted to add to the process?

14         A.    I believe CMS wanted to be consistent

15   with the A/B RAC structure.

16         Q.    The A/B RAC structure includes three

17   levels of appeals?

18         A.    I believe so.

19         Q.    And how do you have the understanding

20   that they wanted -- CMS wanted three levels for

21   the Part D RAC appeals process?

22         A.    I think I was involved in meetings and

1  that's how I came to that understanding.

2      Q.   Can you describe the appeals process

3  for me, how it works?

4            MR. PORADA:  You mean in Part D?

5            MR. BONELLO:  Yeah.  I'm sorry.  In

6  Part D.

7            THE WITNESS:  The plan sponsor could

8  submit a -- I don't know the terminology.  The

9  plan sponsor can appeal.  So there was the

10  first-level review, and we contracted that --

11  that was contracted out to a contractor to

12  review the appeals as they came in to determine

13  whether or not they were consistent or

14  inconsistent with the regulations or the reason

15  that was provided for the audit issue.

16            Then there was a second-level review

17  that was in-house, in-house within the Center

18  for Program Integrity.  Another area was

19  responsible for reviewing at that level.  And

20  those were the only -- and coming up with the

21  final decision on the appeal.

22  BY MR. BONELLO:

# TAB 100

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

ACLR, LLC                    *
                             *
          Plaintiff          *
                             *      Civil Action
     v.                      *
                             *      No. 15-767
THE UNITED STATES            *
                             *   (Judge Campbell-Smith)
          Defendant          *
          * * * * * * * * *


          Pursuant to Notice, the deposition of

DESIREE WHEELER was taken on Wednesday, September

27th, 2017, commencing at 11:37 a.m., at HHS Office

of General Counsel, 7500 Security Boulevard,

Central Building, Room C2-01-17, Baltimore,

Maryland 21244, before Kelly A. Taylor, Notary

Public.




Reported by:  Kelly A. Taylor

1      Q     And what was your understanding as

2   contracting officer as to whether the performance

3   work statement was binding or not?

4      A     That if it was a part of the contract

5   then yes, it was binding.

6      Q     And if the performance work statement

7   allowed ACLR to send out demand letters to recover

8   improper payments then ACLR could proceed in that

9   fashion, correct?

10     A     I mean unless we gave them a reason not

11  to do that.  I mean you wouldn't want to work

12  against what the government believes should be

13  done.

14     Q     If there's something in the contract

15  that permits ACLR to do something, can the

16  government without making any change to the

17  contract direct the contractor to do something

18  different?

19     A     We should, but I'm sure that that's what

20  all of the talks were about, the revised statement

21  of work that needed to be done, because we, I think

22  we acknowledged that that performance work

1   statement did not reflect what we actually needed

2   ACLR to do.  So we were working together to come up

3   with a revised statement of work.

4          Q     But if the performance work statement

5   allows ACLR to send demand letters to the plan

6   sponsors to recover improper payments, is there any

7   contractual right for CMS to preclude ACL --

8          A     Not until we got done that --

9          Q     Wait until I finish.

10         MR. BONELLO:  I'm sorry.  Can you read

11  that back?

12     (The reporter read the record as requested.)

13         Q     If the CMS, if the Part D RAC contract

14  permitted ACLR to send out demand letters to

15  planned sponsors to recover improper payments, in

16  order to preclude that CMS would have to have a

17  contractual basis to do so, correct?

18         A     Correct, if the statement of work said

19  that they were able to do something.  If we, in

20  fact, found out for some reason that they shouldn't

21  do that or if they weren't able to do that, then we

22  should revise that statement of work, yes.

1  perspective you don't want that to happen.  I don't

2  want Desiree to come back and say okay, Chris, I'm

3  going to issue a cease and desist and kick you to

4  the curb either, okay.  But I have an executable

5  contract and if I don't execute that, that has

6  additional problems for me.  If I have --

7              FEMALE VOICE:  I think you hear the

8  contracting officer and program personnel telling

9  you that you know, we don't think that's in the

10  best interest for you to do that, so I think we all

11  stand by that that we don't think it's in the best

12  interest for you do that until we work out all of

13  the issues to be resolved.

14              MALE VOICE:  Desiree, and I'm not saying

15  that --

16      Q     Who was the last person that was

17  speaking there?

18      A     Desiree.

19      Q     That's you?

20      A     Uh-huh.  Yes.

21      Q     And when you say in the call it's not in

22  the best interest for you to do that, you meant it

1  wasn't in the best interest of ACLR to send out

2  demand letters, correct?

3       A    I was saying it's in your statement of

4  work that you can do, I'm not saying that you can't

5  do, but it's not the best interest that you did do

6  it.  I think that's what I was saying.

7       Q    What did you mean it's not in the best

8  interest?

9       A    The program office was saying they

10 didn't want him to do it, it was simply reinforcing

11 that we didn't think he should do it.

12      Q    Even though ACLR had the right to do

13 that under the Part D RAC contract, correct?

14           MR. PORADA:  Objection to form.

15      A    Correct.

16      Q    Was there anything in the Part D RAC

17 contract which made it not in the best interest of

18 the ACLR to send out the demand letters?

19      A    I just simply went with expertise of the

20 program office.

21      Q    But not sending out the demand letters

22 was, would be inconsistent with the Part D RAC

# TAB 101

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

--------------------x

ACLR, LLC

      Plaintiff,

-vs-             Civil Action No. 16-309

THE UNITED STATES    (Judge Campbell-Smith)

      Defendant.

--------------------x

             Thursday, September 14, 2017

             Baltimore, Maryland


THE DEPOSITION OF ROSALIND MICHELLE ABANKWAH


      The deposition of ROSALIND MICHELLE
ABANKWAH was taken on Thursday, September 14,
2017, commencing at 1:04 p.m., at the Department
of Health and Human services, Office of General
Counsel, 7500 Security Boulevard, Central
Building, Baltimore, Maryland, before CHERYL
NICHOLSON, CCR, CLR, Stenotype Reporter and
Notary Public in and for the State of Maryland.

1   all looked at it.  When I say the committee of

2   folks, the team, we would have all looked at it

3   and reviewed it and, you know, it's like, well,

4   there's no money here.

5                 Sometimes what would have been

6   possible is -- let's say we looked at -- a

7   couple of years we looked at NBI MEDIC.  It's

8   possible, if there was money to be recovered,

9   they'd say, you know what, ACLR, you do the

10  following years but there is no money.  There

11  was nothing to be recovered, so...

12       Q.   Because at the time that ACLR had

13  submitted its sales tax NAIRP, CMS had already

14  made the decision that it wasn't going to

15  proceed to do any recoveries on --

16       A.   Right.

17       Q.   -- sales taxes in PDE records?

18       A.   Yes.

19       Q.   And you were the supervisor of Sonja

20  Brown?

21       A.   Deputy supervisor, yeah.

22       Q.   So you were in the committee that made

Rosalind Michelle Abankwah        ACLR, LLC v. THE UNITED STATES
Case No. 16-309                            September 14, 2017

1    let's say it was deceased prescriber, because

2    that was one we were trying to get them to take

3    on but -- so if we had deceased prescriber -- so

4    if the MEDIC did three years in the past and now

5    we have two more years of recoverable funds,

6    that could have been something ACLR could have

7    taken on and reviewed and recovered money.

8         Q.    So I guess the point is, then, when

9    ACLR submitted its NAIRP on the sales taxes, CMS

10   had already concluded we're not proceeding on

11   collecting any sales tax?

12        A.    Because CM has let us know there's no

13   money to be recovered there.  So we're not going

14   to have a contractor look at something that's a

15   dead end.

16        Q.    The issue was over?

17        A.    Yes.  It was like there is no money to

18   be recovered, we cannot recover anything there.

19        Q.    Did you think CM's position was

20   correct?

21        A.    Can I just tell you it's not what I

22   think, it's CM, and at that time CM had -- so to

# TAB 102

| ORDER FOR SUPPLIES OR SERVICES | PAGE | OF PAGES |
|---|---|---|
| | 1 | 12 |

IMPORTANT: Mark all packages and papers with contract and/or order numbers.

| 1. DATE OF ORDER | 2. CONTRACT NO. *(If any)* | 6. SHIP TO: | | | |
|---|---|---|---|---|---|
| 09/30/2011 | HHSM-500-2005-00013I | a. NAME OF CONSIGNEE | | | |

| 3. ORDER NO. | 4. REQUISITION/REFERENCE NO. | Not Applicable |
|---|---|---|
| HHSM-500-T0002 | 811-1-2308-01 | |

| 5. ISSUING OFFICE *(Address correspondence to)* | b. STREET ADDRESS |
|---|---|
| CMS, OAGM, ASG, DPIFMC | |
| 7111 SECURITY BLVD., MS: B3-30-03 | |
| BALTIMORE MD 21244-1850 | |

Δ π EXHIBIT 106
Depo Ident. Mendez
10/30/17 Rptr CW
WWW.DEPOBOOK.COM

| c. CITY | d. STATE | e. ZIP CODE |
|---|---|---|
| | | |

| 7. TO: Maria Caschetta | f. SHIP VIA |
|---|---|

| a. NAME OF CONTRACTOR | |
|---|---|
| Livanta LLC | |

| b. COMPANY NAME | 8. TYPE OF ORDER | |
|---|---|---|
| | ☐ a. PURCHASE | ☒ b. DELIVERY |

| c. STREET ADDRESS | REFERENCE YOUR: | Except for billing instructions on the reverse, this delivery order is subject to instructions contained on this side only of this form and is issued subject to the terms and conditions of the above-numbered contract. |
|---|---|---|
| 9090 Junction Drive | | |
| Suite 9 | Please furnish the following on the terms and conditions specified on both sides of this order and on the attached sheet, if any, including delivery as indicated. | |

| d. CITY | e. STATE | f. ZIP CODE |
|---|---|---|
| Annapolis Junction | MD | 20701-1140 |

| 9. ACCOUNTING AND APPROPRIATION DATA | 10. REQUISITIONING OFFICE |
|---|---|
| 15992370-75X8393-252Z | Medicare Program Integrity |

| 11. BUSINESS CLASSIFICATION *(Check appropriate box(es))* | | | 12. F.O.B. POINT |
|---|---|---|---|
| ☒ a. SMALL | ☐ b. OTHER THAN SMALL | ☐ c. DISADVANTAGED  ☐ g. SERVICE-DISABLED VETERAN-OWNED | Destination |
| ☐ d. WOMEN-OWNED | ☐ e. HUBZone | ☐ f. EMERGING SMALL BUSINESS | |

| 13. PLACE OF | | 14. GOVERNMENT B/L NO. | 15. DELIVER TO F.O.B. POINT ON OR BEFORE *(Date)* | 16. DISCOUNT TERMS |
|---|---|---|---|---|
| a. INSPECTION | b. ACCEPTANCE | | 09/29/2012 | |
| Destination | Destination | | | Net 30 |

| 17. SCHEDULE *(See reverse for Rejections)* | | | | | | |
|---|---|---|---|---|---|---|
| ITEM NO. (a) | SUPPLIES OR SERVICES (b) | QUANTITY ORDERED (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) | QUANTITY ACCEPTED (g) |
| | Tax ID Number:  05-0609649 DUNS Number:  172035300 Recovery Audit Contractor (RAC) Validation Contract for Medicare Part D Period of Performance: 09/30/2011 to 09/29/2012 Continued ... | | | | | |

| | 18. SHIPPING POINT | 19. GROSS SHIPPING WEIGHT | 20. INVOICE NO. | | (17)(h) TOTAL (Cont. pages) |
|---|---|---|---|---|---|
| | | | | | ◀ |

| | 21. MAIL INVOICE TO: | | |
|---|---|---|---|
| SEE BILLING INSTRUCTIONS ON REVERSE | a. NAME | DHHS, CMS, OFM, FSG | $1,892,068.00 |
| | b. STREET ADDRESS (or P.O. Box) | Div. of Financial Operations, P.O. Box 7520 | 17(i) GRAND TOTAL |
| | c. CITY  Baltimore | d. STATE  MD  e. ZIP CODE  21207-0520 | $1,892,068.00 ◀ |

| 22. UNITED STATES OF AMERICA BY *(Signature)* | 23. NAME *(Typed)* |
|---|---|
| ▶ *Desiree Wheeler* | Desiree Wheeler |
| | TITLE: CONTRACTING/ORDERING OFFICER |

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION NOT USABLE

OPTIONAL FORM 347 (Rev. 4/2006)
Prescribed by GSA/FAR 48 CFR 53.213(e)

HHS02847

# ORDER FOR SUPPLIES OR SERVICES
## SCHEDULE - CONTINUATION

PAGE NO.

2

IMPORTANT: Mark all packages and papers with contract and/or order numbers.

| DATE OF ORDER | CONTRACT NO. | | ORDER NO. |
|---|---|---|---|
| 09/30/2011 | HHSM-500-2005-00013I | | HHSM-500-T0002 |

| ITEM NO. (a) | SUPPLIES/SERVICES (b) | QUANTITY ORDERED (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) | QUANTITY ACCEPTED (g) |
|---|---|---|---|---|---|---|
| 0001 | RAC Validation Contract for Medicare Part D | | | | 1,892,068.00 | |

| TOTAL CARRIED FORWARD TO 1ST PAGE (ITEM 17(H)) | | | | | $1,892,068.00 | |

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION NOT USABLE

OPTIONAL FORM 348 (Rev. 4/2006)
Prescribed by GSA FAR (48 CFR) 53.213(f)

HHS02848

SA429

### Regional Task Order Contract

Pursuant to the terms and conditions of Contract **HHSM-500-2005-00013I** and this task order, the contractor shall perform the work required in accordance with the Statement of Work entitled, **"Recovery Audit Contactor (RAC) Validation for Medicare Part D Contractor"**

**Signature of the Contractor below represents acceptance of this task order contract award.**

*[signature]*

**Maria M. Caschetta**
**President, Advanta Medical Solutions, LLC**
**Member, Livanta LLC**                                    **9/30/2011**

**Name of Contractor**                                          **Date**

NOTE: Only those contract sections which differ from the Umbrella IDIQ contract terms and conditions, or provide more detailed information specific to this particular Task Order, are provided below. For those contract sections not identified below, all terms and conditions of the Umbrella IDIQ contract remain in effect.

3

HHS02849

## SECTION B - SUPPLIES OR SERVICES PRICES/COSTS

### B.3   DETERMINATION OF ORDER TYPE/PRICES/COSTS

The Government anticipates award of a Firm-Fixed Price (FFP) type task order.  It is estimated that the total cost to the Government for full performance of this contract will be in accordance with the Contract Line Item Number(s) (CLINs) set forth below.

| CLIN | DESCRIPTION | FIRM FIXED PRICE AMOUNT | AMOUNT PAID | PERIOD OF PERFORMANCE |
|------|-------------|------------------------|-------------|----------------------|
| 0001 | Base Period | $1,892,068 | $1,892,068 | September 30, 2011 – September 29, 2012 |
| 00002 | Option Period One (1) | $2,045,540 | | September 30, 2012 – September 29, 2013 |
| 0003 | Option Period Two (2) | $2,082,288 | | September 30, 2013 – September 29, 2014 |
| 0004 | Option Period Three (3) | $2,148,199 | | September 30, 2014 – September 29, 2015 |
| 0005 | Option Period Four (4) | $2,201,409 | | September 30, 2015 – September 29, 2016 |
| TOTAL | | $10,369,505 | $1,892,068 | |

The total potential firm fixed price is **$10,369,505.**

   a. The total funds currently available for payment and allotted to CLIN 0001 is **$1,892,068.**

### B.5   INDIRECT COST RATES

a. In accordance with FAR 42.707, entitled "Cost Sharing Rates and Limitations on Indirect Cost Rates," the following indirect cost ceiling(s) is hereby established:

Negotiated Indirect Cost Ceiling(s)

| Cost Element/Pool | Rate |
|---|---|
| (Fringe) | 34.94% |
| (G&A) | 30.80% |

The Contractor is hereby limited to the negotiated indirect cost ceiling stated above. However, if it appears that the Contractor may exceed this ceiling, the Government, upon review of documentation submitted by the Contractor, may modify the contract to establish new ceilings, but in no case shall the government reimburse the Contractor for more than the total estimated cost of each individual Task Order Contract for which the rate(s) may be applied.

b. Pursuant to the provisions of FAR 52.216-7 entitled Allowable Cost & Payment, in Section I of the umbrella contract, the allowable Indirect Costs under this contract

4

HHS02850

shall be obtained by applying the final rates or rates negotiated to the appropriate bases. The period or periods for which such rates will be established shall correspond to the Contractor's fiscal year(s). The final rate proposal is to be submitted to the Contracting Officer at:

> Centers for Medicare and Medicaid Services
> Office of Acquisition and Grants Management (OAGM)
> Division of Medicare Support Contracts (DMSC)
> Attn: Contracting Officer
> 7500 Security Boulevard, C2-21-15
> Baltimore, Maryland 21244-1850

In the event that the final rate proposal is submitted to a cognizant audit agency other than CMS, the Contractor shall also provide a copy to the cognizant CMS Contracting Officer if requested.

c. Pending establishment of final rates for any period, provisional reimbursement will be made on the basis of the provisional rates shown below. To prevent substantial over or under payment, and to apply either retroactively or prospectively, provisional rates may, at the request of either party, be revised by mutual agreement.

| Type | Cost Center | Period Rate Base | |
|------|-------------|------------------|---|
| Provisional | Fringe | 31.94% | (a) |
| Provisional | G&A | 27.80% | (b) |

Notes:
(a) applied to Total Labor Dollars
(b) applied to Total Cost Input

Negotiated provisional indirect costs are IAW CMS Approved Provisional Billing Rate Agreement 2010-258 or Fiscal Year ending December 31, 2010 (July 1, 2010).

5

HHS02851

## SECTION F - DELIVERIES OR PERFORMANCE

### F.1     PERIOD OF PERFORMANCE

The base period of performance for this contract shall be from twelve months from the date of contract award. Performance beyond the base period of the contract may be authorized by the Government's right to unilaterally incorporate the following optional periods:

| | | |
|---|---|---|
| CLIN 0002 | Option Period One (1) | September 30, 2012 – September 29, 2013 |
| CLIN 0003 | Option Period Two (2) | September 30, 2013 – September 29, 2014 |
| CLIN 0004 | Option Period Three (3) | September 30, 2014 – September 29, 2015 |
| CLIN 0005 | Option Period Four (4) | September 30, 2015 – September 29, 2016 |

6

HHS02852

## SECTION G - CONTRACT ADMINISTRATION DATA

### G.1    ACCOUNTING AND APPROPRIATION DATA

| Requisition # | Appropriation # | CAN # | Object Class | Amount |
|---|---|---|---|---|
| R-811-1-2308-01 | 75X8393 | 1-5992370 | 252Z | $1,892,068 |

### G.4   CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE/GOVERNMENT TASK LEADER

1) The following Contracting Officer Technical Representative (COTR) will represent the Government, for the purpose of this contract:

Ms. Teresa Dangerfield
CMS/OA/CPI/MPIG/DPOA
Email: Teresa.Dangerfield@cms.hhs.gov
Phone: (410) 786-0960
Mail stop: AR-18-50

2) The COTR is responsible for (1) monitoring the Contractor's technical progress, including the surveillance and assessment of performance and compliance with all substantive project objectives; (2) interpreting the statement of work and any other technical performance requirements; (3) performing technical evaluation as required; (4) performing technical inspections and acceptances required by this contract; (5) assisting in the resolution of technical problems encountered during performance; and (6) providing technical direction in accordance with Section G-14 entitled, "Technical Direction"; and (7) reviewing of invoices/vouchers.

3) The COTR does not have the authority to act as an agent of the Government, under this contract. Only the Contracting Officer has authority to (1) direct and/ore negotiate changes in the statement of work; (2) modify or extend the period of performance; (3) change the delivery schedule; (4) authorize reimbursement to the Contractor of any costs incurred during performance of this contract; or (5) otherwise change any terms and conditions of this contract.

4) The Government may unilaterally change its COTR designation. Government Task Leaders (GTL's) may assist the COTR. The GTL's will not have the authority to provide technical direction in accordance with Section G-12, entitled, "Technical Direction", however, they may be responsible for:

   a)   monitoring the Contractor's technical progress, including surveillance and assessment of performance and compliance with all substantive project objectives

   b)   interpreting the statement of work and any other technical performance requirements

   c)   performing technical evaluation as required

7

HHS02853

**SA434**

d)  performing technical inspections and acceptances required by the contract
e)  assisting in the resolution of technical problems encountered during performance; and
f)  reviewing of invoices/vouchers.

## G.8   HHSAR 352.242-70 KEY PERSONNEL

The following individuals are considered key personnel:

| Key Personnel | Position Title |
|---|---|
| Christopher Mendez | Program Manager |
| Philip DeGele | Audit Manager – Reimbursement (AMR) |
| Michelle Lewis | Senior Auditor |
| Tom Dehart | System Security Officer |

Subcontractor key personnel shall be:

| Key Personnel | Position Title |
|---|---|
| Dana Keller | Chief Statistician (Halcyon Research) |
| Deirdre Reed | Audit Manager – Examinations (Reed & Associates) |

Pursuant to the provisions of the key personnel clause of the MEDIC Umbrella contract no. HHSM-500-2005-00013I, the Government reserves the right to approve any proposed successor to the above designated contractor/subcontractors key personnel.

## G.16   CONSENT TO SUBCONTRACT

c.  Consent to Subcontract is hereby granted for the following entities:

**Advanta Government Services, LLC.**
**Halcyon Research, Inc.**
**Reed and Associates, CPAs, Inc.**

8

HHS02854

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

### H. 2   ORGANIZATIONAL CONFLICTS OF INTEREST

"Organizational conflict of interest" as defined per FAR 2.101, "means that because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage."

(A) Purpose: The purpose of this clause is to ensure that the Contractor (1) is not biased because of its financial, contractual, organizational, or other interests which relate to the work under this contract, and (2) does not obtain any unfair competitive advantage over other parties by virtue of its performance of this contract. This clause has been created to implement the organizational conflict of interest requirements of FAR 9.5.

(B) Scope: The restrictions described herein shall apply to performance or participation by the Contractor and any of its affiliates or their successors in interest (hereinafter collectively referred to as "Contractor") in the activities covered by this clause as a prime contractor, subcontractor, co-sponsor, joint venture, consultant, or in any similar capacity. For the purpose of this clause, affiliation occurs when a business concern is controlled by or has the power to control another or when a third party has the power to control both.

(C) Use of Contractor's Work Product: If the Contractor performs advisory, consulting, analytical, evaluation, study, or similar work under this contract, it shall be ineligible thereafter to participate in any capacity in Government contractual efforts (solicited or unsolicited) which stem directly from such work, and the Contractor agrees not to perform similar work for prospective Offeror's with respect to any such contractual efforts. The Contractor shall be ineligible to participate in any contracts, subcontracts, or proposals (solicited and unsolicited) which stem directly from the Contractor's performance of work under this contract for a period of <u>one (1) year</u> after the completion of this contract. Furthermore, unless so directed in writing by the Contracting Officer, the Contractor shall not perform any system engineering or technical direction support work under this contract on any of its products or services or the products or services of another firm if the Contractor is or has been substantially involved in their development or marketing. Nothing in this subparagraph shall preclude the Contractor from competing for follow-on contracts or subcontracts for advisory and assistance services.

(D) If, under this contract, the Contractor prepares a complete or essentially complete statement of work or specifications to be used in competitive acquisitions, the Contractor shall be ineligible to perform or participate in any capacity in any contractual effort which is based on such statement of work or specifications. The Contractor shall not incorporate its products or services in such statement of work or specifications unless so directed in writing by the Contracting Officer, in which case the restriction in this subparagraph shall not apply.

9

HHS02855

(E) Access to and use of information:

    (1) If the Contractor, in the performance of this contract, obtains access to information, such as Government plans, policies, reports, studies, financial plans, internal data protected by the Privacy Act of 1974 (5 U.S.C. 552a), or data which has not been released or otherwise made available to the public, the Contractor agrees that it shall not:

        (a) Use such information for any private purpose unless the information has been released or otherwise made available to the public;

        (b) Compete for work based on such information for a period of <u>one (1) year</u> after either the completion of this contract, or until such information is released or otherwise made available to the public, whichever is first;

        (c) Submit an unsolicited proposal which is based on such information until <u>six (6) months</u> after such information is released or otherwise made available to the public; and,

        (d) Release such information unless such information has previously been released or otherwise made available to the public by the Government.

    (2) In addition, the Contractor agrees that to the extent it receives or is given access to proprietary data, data protected by the Privacy Act of 1974 (5 U.S.C. 552a), or other confidential or privileged technical, business, or financial information under this contract, it shall treat such information in accordance with any restrictions imposed on such information.

(F) Disclosure after award:

    (1) The Contractor agrees that, if changes, including additions, to the facts disclosed by it prior to award of this Contract, occur during the performance of this Contract, it shall make an immediate and full disclosure of such changes in writing to the Contracting Officer. Such disclosure shall include a description of any action which the Contractor has taken or proposes to take to avoid, neutralize, or mitigate any resulting conflict of interest. The Government may, however, terminate for convenience if it deems such termination to be in the best interest of the Government.

    (2) In the event that the Contractor was aware of facts required to be disclosed or the existence of an actual or potential organizational conflict of interest and did not disclose such facts or such conflict of interest to the Contracting Officer, the Contracting Officer may terminate for default.

(G) Remedies: For breach of any of the above restrictions or for nondisclosure or misrepresentation of any facts required to be disclosed concerning this contract, including

HHS02856

the existence of an actual or potential organizational conflict of interest at the time of or after award, the Government may terminate for default, and pursue such other remedies as may be permitted by law.

(H) Waiver: In accordance with FAR 9.503, any request for waiver must be in writing, shall set forth the extent of the conflict, and requires approval by the agency head or a designee. Agency heads shall not delegate waiver authority below the level of head of a contracting activity. The agency head or a designee may waive any general rule or procedure of this subpart by determining that its application in a particular situation would not be in the Government's interest.

(I) Subcontracts: This Organizational Conflict of Interest clause shall flow down to all subcontractors unless an exemption is specifically approved by Contracting Officer, CMS.

## H. 3  CONFLICT OF INTEREST

The Contractor shall disclose any known or potential conflicts of interest, in accordance with FAR Part 9.5, for the purpose of meeting the requirements of this contract. The Contractor agrees that if an actual or potential organizational conflict of interest is discovered after an award of a task order, the Contractor shall make full disclosure in writing to the Contracting Officer. This disclosure shall include a description of actions that the Contractor has taken or proposes to take to mitigate the actual or potential conflict. The Contracting Officer shall determine whether a conflict of interest disclosed after award has been adequately resolved.

11

HHS02857

**SA438**

**ATTACHMENTS**:

J-1    STATEMENT OF WORK

J-2    WAGE DETERMINATION

12

HHS02858

DEPARTMENT OF HEALTH & HUMAN SERVICES
The Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland  21244 – 1850



CENTERS FOR MEDICARE & MEDICAID SERVICES
**CENTER FOR PROGRAM INTEGRITY**

CENTER FOR PROGRAM INTEGRITY

Contract No. HHSM-500-2005-00013I

# Medicare Part D RAC Data Validation Contractor (DVC) Statement of Work

September 30, 2015

HHS02912

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

## Table of Contents

1.0 Introduction and Background .................................................................................................. 1 - 3
    1.1      Commonly Used Terms and Acronyms
    1.2      Other Resources and Information
    1.3      DVC Introduction and Scope
        1.3.1     DVC Scope
2.0 DVC Review Activities ........................................................................................................... 3 - 6
    2.1      New Issue Review
        2.1.1     New Issue Review Reporting and Tracking
    2.2      Accuracy and Improper Payment Review
        2.2.1     Accuracy/Improper Payment Review Reporting and Tracking
    2.3      Validation of RAC Audit Findings
        2.3.1     DVC/RAC Dispute Resolution
3.0 Special Studies ......................................................................................................................... 6
4.0 DVC Requirements/ Tasks to be Performed ......................................................................... 6 - 13
    4.1      Basic Requirements
    4.2      System Requirements
    4.3      Data Access Requirements
5.0 Key Personnel/Other Personnel ........................................................................................... 13 - 16
6.0 Quality Assurance ................................................................................................................ 16 - 17
    6.1      DVC Oversight
    6.2      Cooperation/ Coordination
    6.3      Quality
    6.4      Standard Operating Procedures
    6.5      CMS System
7.0 Transitions ............................................................................................................................... 17
Appendix A: Dispute Form for New Issue and Accuracy ................................................................ 18
Appendix B: Items to be furnished and deliverable schedule ......................................................... 19
Appendix C: CMS Contacts ........................................................................................................... 20

i

HHS02913

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

# 1.0 Introduction and Background

Title I of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA) (P.L. 108-173) was signed into law on December 8, 2003. The MMA established a new voluntary outpatient prescription drug benefit under Part D of Title XVIII of the Social Security Act (the Act). The prescription drug benefit, referred to as Medicare Part D, as well as an employer subsidy for qualified retiree health plans, began on January 1, 2006. Coverage for the drug benefit will be provided by private prescription drug plans (PDPs) that offer drug-only coverage or through Medicare Advantage (MA) plans that offer both prescription drug and health care coverage (known as MA-PD plans). These plans must offer a standard drug benefit, but will have the flexibility to vary the drug benefit within certain parameters. The Centers for Medicare & Medicaid Services (CMS) has identified 26 MA Regions and 34 PDP Regions, not including territories, each of which is its own PDP region.

The Recovery Audit Contractor (RAC) Program, which is designed to ensure proper payments to Sponsoring Organizations (SOs) and providers, was initiated through demonstration programs mandated by the Medicare Modernization Act of 2003. The success of the initial pilot program for Medicare Parts A and B included the return of millions of dollars in overpayments to the Medicare Trust Fund. Based on that success, the Medicare Parts A and B RAC Program was permanently established on a national level through the Tax Relief and Healthcare Act of 2006.

Under the 2010 Patient Protection and Affordable Care Act (ACA) legislation enacted in March 2010, CMS is required to expand the RAC Program to the Medicare Part C (Medicare Advantage) and Part D (Prescription Drug Benefit) programs. Section 6411(b) of the ACA provides CMS with general authority to enter into contracts to conduct RAC audits in Medicare Part D. Under the Medicare Integrity Program (MIP), RACs are to identify underpayments and overpayments and recoup any overpayments made associated with the Medicare program. The Part D RAC is dedicated to identifying past improper payments in reconciled Medicare PDE claims and providing information to CMS to help prevent future improper payments.

To measure the accuracy rate of the Part D RAC, CMS contracts with a <u>Data Validation Contractor (DVC)</u>. The DVC takes random samples of the improper payments identified by the RAC to determine if they are accurate. The DVC also review and approve/disapprove improper payment referrals, receive and review New Audit Issues the RAC wants to pursue for improper payments, and provide recommendations to the New Issues Review Board (NIRB).

## 1.1 Commonly Used Terms and Acronyms

For purposes of this Statement of Work (SOW), the following list addresses some of the commonly used terms within the Part D RAC Program.

- <u>"Appeals Contractor"</u> (Independent Review Entity) handles the first level of appeals from MAOs challenging RAC findings.
- <u>"Audit Scope"</u> is a list of audit issues the RAC is required to review during a given year.
- The <u>"Center for Program Integrity"</u> (CMS/CPI) serves as CMS' focal point for all national and state-wide program integrity, fraud and abuse issues in the Medicare and Medicaid programs, and the Children's Health Insurance Program (CHIP). Specifically, the Division of Plan Oversight and Accountability (DPOA) is the division within the CMS/CPI Medicare Integrity Group responsible for ensuring program integrity for Medicare Parts C and D, and oversees Medicare Parts C and D RAC.

1

HHS02914

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

- The "Data Validation Contractor" (DVC) measures the accuracy rate of the RAC. The DVC reviews 100% or takes random samples of the improper payments identified by the RAC to determine if they are accurate and will review and approve/disapprove improper payment referrals, receive and review new audit issues the RAC wants to pursue for improper payments, and provide recommendations to the New Issues Review Board (NIRB).
- "Improper Payment Review Package" (IPRP) is an improper payment file and the supporting documentation for a particular audit issue by contract and year.
- "New Audit Issue Review Package" (NAIRP) is the package of proposed audit issues for a specified contract year, a new audit issue, an estimate of improper payment amount and the audit methodology.
- The "New Issues Review Board" (NIRB) is the planned CMS/CPI group that identifies, reviews, and approves Part D RAC audit issues.
- The "Payment Recovery Information System" (PRIS) houses referrals made to CMS/CPI after improper payments are identified. The RAC and DVC review the claims and their accompanying medical records and charges, either confirm or reject claims, and update the records with an approval or rejection to request money from the provider.
- The "Recovery Audit Contractor" (RAC) is responsible for reducing Medicare improper payments through the efficient detection and collection of overpayments, the identification of underpayments, and assists with the implementation of actions that will prevent future improper payments. Originally implemented for FFS Medicare, the ACA (Section 6411(b)) expands the original RAC Program to Medicare Parts C and D. RACs are paid for identified improper payments on a contingency fee basis.
- "Plan Sponsors" are private organizations that contract with CMS to administer Medicare Parts C and/or D benefits and may offer several different types of Medicare Part C and/or Part D plans. Plan Sponsors include, but are not limited to, Medicare Advantage Organizations (MAOs), Medicare Advantage – Prescription Drug Plans (MA-PDPs), Prescription Drug Plans (PDPs).

## 1.2 Other Resources and Information

To gain additional knowledge potential bidders may research the following documents:
- The Debt Collection Improvement Act of 1996
- The Federal Claims Collection Act, as amended and related regulations found in 42 CFR;
- CMS Financial Report
  http://www.cms.gov/CFOReport/Downloads/2009_CMS_Financial_Report.pdf
- The Medicare Prescription Drug Benefit Manual:
  http://www.cms.gov/Manuals/IOM/itemdetail.asp?filterType=none&filterByDID=-99&sortByDID=1&sortOrder=ascending&itemID=CMS050485&intNumPerPage=10
- Part D Claims Data:
  http://www.cms.gov/PrescriptionDrugCovGenIn/08_PartDData.asp#TopOfPage
- Part D Program Analysis:
  http://www.cms.gov/PrescriptionDrugCovGenIn/09_ProgramReports.asp#TopOfPage
- Part D Regulations:
  http://www.cms.gov/PrescriptionDrugCovGenIn/PDR/list.asp#TopOfPage
- Plan Communication Guide:
  http://www.cms.gov/MAPDHelpDesk/02_Plan_Communications_User_Guide.asp
- Part D Reporting Requirements:
  http://www.cms.gov/PrescriptionDrugCovContra/08_RxContracting_ReportingOversight.asp

2

HHS02915

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

## 1.3 DVC Introduction and Scope

### 1.3.1 DVC SCOPE

The primary purpose of the RAC Data Validation Contractor (DVC) is to review RAC claim determinations on Medicare claims that were paid under Part D of title XVIII of the Social Security Act, and to ensure that the RAC only identify and attempt to recover claims resulting in an overpayment to the plan sponsors.

This SOW includes the following tasks which are defined in detail in subsequent sections of this contract:

- Reviewing new issues the RAC wants to pursue for improper payments where Part D plans have not been notified of an improper payment. The RVC will submit reports to CMS on their findings.
- Reviewing claims on which the RAC has made overpayment determinations. The RVC will also validate files used by the RAC to create overpayment notification letters (demand letters). The RVC will submit reports to CMS on their findings.
- Meeting and communicating with CMS and the RAC about their review findings, as well as developing public relations material upon CMS' request.

For the purposes of this SOW, CMS is not concerned with a RAC missing a potential overpayment (i.e., a RAC failing to identify an overpayment), only that a RAC may be inappropriately identifying an overpayment.

## 2.0 DVC Review Activities

## 2.1 New Issue Review

The DVC shall review the new issues that the RAC wishes to pursue for potential improper payments. Each proposed new issue will be reviewed based on the method identified by the RAC, either automated or complex review. Automated review occurs when determination is performed at the system level without a human review of the pertinent documents. In situations where there is high probability (but not certainty) that an improper payment was made outside the scope of automated reviews, complex review would be necessary (i.e. for DIR validation).

The DVC shall review each submitted claim, claim selection criteria, associated documentation (for complex reviews only), improper payment finding, reviewer rational, and denial type and subtype.

The DVC shall document the following findings for each claim in the study:
- for automated reviews only: whether the criteria for automated review was met (or whether the RAC should have performed complex review instead)
- whether the DVC agrees or disagrees with the RAC's claim of improper payment determination (full overpayment, partial overpayment, underpayment, etc.)
- for each disagreement: indicate the correct determination. At CMS' discretion the DVC may be required to recalculate recoupment amounts.
- whether the DVC agrees or disagrees with the RAC's error type (no documentation, insufficient documentation, or other) and subtype (to be provided by CMS) for the claim determination
    - for each disagreement, indicate the correct denial type and subtype

3

HHS02916

### 2.1.1 NEW ISSUE REVIEW REPORTING AND TRACKING

The DVC shall submit to CMS one report per new issue. The DVC shall also provide a brief explanation (one to two sentences) for each claim reviewed communicating the reason for the DVC's finding. The DVC shall review previously submitted new issues and provide clarification and discussion upon CMS request.

The DVC shall provide a comparison and contrast (C/C) report for similar (i.e. edit parameters, rationale, provider type) or same new issues proposed by different RACs if CMS implements multiple RACs to handle Part D. The C/C report shall include a checklist including which findings each new issue proposal do or do not contain. This comparison and contrast is deliverable to CMS with the DVC new issue report under review.

The DVC shall track and report identified policy vulnerability issues during new issue review. The vulnerability report shall include recommended corrective actions the agency should undertake. This vulnerability report is a deliverable to CMS along with the DVC new issue report under review. At CMS' discretion, a standardized format for the report and/or tracking may be required. If a standardized format is required, CMS will provide the format.

New Issues Reviews can be accomplished as part of special studies as requested by CMS. When using this approach to accomplishing New Issues Reviews, the DVC shall determine the appropriate protocols to accomplish the work, e.g., analysis plan and audit plan, discuss the overall approach with CMS, and communicate the findings in a format appropriate to the type of the review, in accordance with a timeframe and format that is mutually agreeable by CMS and the DVC.

The report shall be delivered by the 25th calendar day, following the DVC's receipt of the claims, and will be in a format determined by CMS. The report shall be uploaded in PRIS or delivered to CMS.

## 2.2 Accuracy and Improper Payment Review

The DVC shall measure the accuracy rate for the RAC by reviewing a randomly selected sample of claims or 100% of the claims that the RAC has reviewed. CMS will provide Improper Payment Review Packages (IPRP) to the DVC which includes one audit issue, one plan, and 1 audit year. The RAC will add the packages to PRIS; the IPRP will be made available to the DVC for validation. The accuracy review begins once the DVC receives claim detail information from PRIS or otherwise noted by CMS. CMS will determine whether the RAC's accuracy shall be determined by sampling or as a 100% review. This decision will be evaluated separately for each new audit issue

The DVC shall review each submitted improper payment review package and randomly select a sample of claims from each package to review for accuracy. The DVC shall also review associated documentation, edit parameters, improper payment finding, reviewer rationale, communication to provider, error type and subtype, The DVC will also review the letter sent to the provider communicating the improper payment finding and will develop a standardized checklist to assist in this review unless otherwise directed by CMS.

The DVC shall document the following findings for each claim in the study:
- for automated reviews only: whether the criteria for automated review was met (or whether the RAC should have performed complex review instead)
- whether the DVC agrees or disagrees with the RAC's claim of improper payment determination (full overpayment, partial overpayment, underpayment, etc)

4

- for each disagreement: indicate the correct determination. At CMS' discretion the DVC may be requested to recalculate recoupment amount
- whether the DVC agrees or disagrees with the RAC's error type (no documentation, insufficient documentation, or other) and subtype (to be provided by CMS) for the claim determination
  - for each disagree, indicate the correct denial type and subtype
- whether the DVC believes the language used by the RAC to communicate the improper payment to the provider was clear and accurate based on current CMS guidelines.
- The DVC shall agree or disagree with the following calculations
  - Improper Payment Amount
  - RAC Contingency Fee
  - Medicare Trust Fund Amount

Accuracy Reviews can be accomplished as part of special studies as requested by CMS. When using this approach to accomplishing Accuracy Reviews, the DVC shall determine the appropriate protocols to accomplish the work, e.g., analysis plan and audit plan, discuss the overall approach with CMS, and communicate the findings in a format appropriate to the subject of the review, in accordance with a timeframe and format that is mutually agreeable by CMS and the DVC.

### 2.2.1 ACCURACY/IMPROPER PAYMENT REVIEW REPORTING AND TRACKING

The DVC shall submit to CMS via PRIS unless otherwise determined by CMS one Validation Findings report for each IPRP. The Validation Findings report shall describe the claim accuracy rates as well as a brief explanation (one to two sentences) for each improper payment reviewed communicating the reason for the DVC's finding. The report shall also include a narrative section with information about patterns of inappropriate denials that can be seen from the data. The report shall be delivered by the 45th day after the DVC's receipt of the claims. The report shall follow the name filing conventions assigned by CMS and uploading in PRIS or delivered to CMS via encrypted tools.

Annually, the DVC shall write a cumulative report of the accuracy rate study. The report shall include the overall accuracy rates for the RAC, and a narrative section with information about patterns of inappropriate denials that can be seen from the data as well as recommendations to CMS regarding any needed policy(s) based on trends identified during review. The report shall also include corrective actions the agency should undertake when the DVC has identified a consistent pattern during accuracy reviews. The report shall be no more than (10) pages. The annual report shall be written in a format determined by CMS. CMS will specify the sampling period for the annual report. The report is due 60 days after the end of the fiscal year. A draft report is due to CMS 30 days after the fiscal year ends and a final report is due 30 days after the draft.

## 2.3 Validation of RAC Audit Findings

The DVC shall perform a review of the IPRP and to submit an IPRP validation finding to CMS. The DVC will follow the same review process as the RAC. The DVC will also validate the UFR records, the improper payment amount, and the contingency fee. The DVC will have 45 calendar days to complete its review process.

The RAC must agree or disagree with the validation findings submitted by the DVC. Concurred validation findings will continue through the RAC process.

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

### 2.3.1 DVC/RAC Dispute Resolution

When the RAC disagrees with the DVC new issue or accuracy determination, the dispute process shall follow with the dispute form (DF) or by a dispute indicator in PRIS. The DVC shall review the DF and submit a response to CMS within seven (7) days (Appendix A). The process will be subject to change at CMS' request. The dispute process will involve no more than five improper payment type accuracy reviews or new issues per RAC per month. Issues may consist of multiple claims with the same denial reason completed by automated review.

For RAC findings the DVC disagrees with, the DVC must provide a rejection reason and explanatory comments, including their recovery calculations.

The RAC is required to review all disagreements identified by the DVC and either accept or reject the DVC's validation findings. When the RAC agrees with a rejected IPRP Validation finding, the file is considered validated; all associated findings will be removed from the Unavailable for Review (UFR) file. When the RAC disagrees with the DVC, they must show support for their findings and offer assistance in understanding the process behind decisions to exclude these disputed findings. The RAC should submit this new package with updated data.

The DVC must collaborate with the RAC to attempt resolution of any dispute. Disputes will be entered and tracked through CMS systems. The DVC and RAC should attempt to resolve any disputes within 7 calendar days. If the DVC and RAC cannot come to a resolution, CMS shall make the final decision, which cannot be reviewed or contested by either the RAC or DVC. CMS does not need any statutory or regulatory reference to deny a RAC finding. CMS also has the right to establish minimums and thresholds that RAC findings must meet to be considered for recoupment. The RAC shall submit a new package with the final updated, CMS approved, audit findings.

## 3.0  Special Studies

The DVC shall review additional claims for special studies at CMS' request. For each special study, the DVC shall submit a report to CMS including, at a minimum, claim and dollar accuracy rates, a narrative section with information about patterns of inappropriate denials that can be seen from the data, as well as a brief explanation (one to two sentences) for each claim reviewed communicating the reason for the DVC's finding. The special study report shall also include recommendations and corrective actions for any policy(s) during the review. CMS has the discretion to request the DVC to recalculate recoupment amounts. Exact parameters for each special study will be determined by CMS prior to assignment.

The volume, frequency and extent of Special Studies shall be assigned and scheduled by CMS in consideration of the DVC resource constraints and the extent of concurrent New Issues Reviews and Accuracy Reviews. If at any time, third party databases that require additional funding are required to accomplish a study, the DVC shall bring the matter to the attention of CMS for a funding approval decision.

6

HHS02919

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

# 4.0  DVC Requirements/Tasks to be Performed

## 4.1  Basic Requirements

Independently, and not as an agent of the Government, the DVC shall furnish all the necessary services, qualified personnel, material, equipment, and facilities, not otherwise provided by the Government, as needed to perform the requirements of this Statement of Work (SOW).

CMS will provide minimum administrative support which may include help communicating with Medicare contractors, policy interpretations, and other support deemed necessary by CMS to allow the DVC to perform its tasks efficiently. CMS will support changes it determines are necessary but cannot guarantee timeframes or constants. In changing systems to support greater efficiencies for CMS, the end product could result in an administrative task being placed on the DVC that was not previously. These administrative tasks will not extend from the tasks in this contract and will be applicable to the review of identification and recovery of the overpayment/underpayment. CMS can periodically conduct onsite visits to audit the DVC review functions and business practices.

### Kick-off Meeting

The DVC shall work with the Contracting Officers Representative (COR) to determine a mutually agreeable time to conduct the Kickoff meeting. This meeting shall be held no later than 14 calendar days after the contract is awarded. The kickoff meeting shall include, at a minimum, the following information:
- Introduction of key personnel
- Discussion of the draft Project Work Plan and how work will be completed in order to meet deadlines
- List of all deliverables

Within 5 business days from the kick-off meeting, the DVC is required to electronically submit meeting minutes.

### System Security Plan

The DVC shall ensure security of sensitive information as well as provide and implement a written security plan covering all aspects of this SOW. The Contractor shall maintain oversight of the physical location of the protected medical information and other proprietary information. The Contractor shall store and dispose of the records/documents/files containing protected medical information and other proprietary information in accordance with CMS guidelines, and as instructed by the COR.

Specifically, the DVC shall include a draft System Security Plan (SSP) using the current template available at the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity. The details contained in the DVC's draft SSP shall be commensurate with the size and complexity of the other requirements of the SOW based on the System Categorization determined elsewhere in this document. The System Security Plan shall be submitted no later than 14 calendar days after contract award. The DVC shall be required to update and resubmit its SSP to CMS every three years (at a minimum) following award or when a major modification has been made to its internal system, as defined by the CMS Chief Information Security Officer (CISO).

7

HHS02920

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

### Project Work Plan

The DVC is required to submit a draft Project Work Plan (PWP) within 14 calendar days after the contract is awarded. The PWP is a description of how the DVC plans to accomplish the requirements of the SOW. Specifically, the PWP should include:

- The DVC's review approach, staffing, scheduling, etc.
- All contact information for the DVC's staff
- Anticipated risk and risk mitigation

This document is subject to CMS review and acceptance. Upon CMS review, the DVC will submit a finalized PWP electronically. All PWPs shall be modified and updated continuously after the initial submission to reflect any major changes in the project. When changes are identified, a revised PWP should be submitted for review within 10 days of identifying the change. If no revisions are received, the resubmitted PWP should be considered final.

### Quality Assurance Plan

The DVC shall develop a quality assurance (QA) plan to be approved by the COR. The plan shall include, at a minimum, a review of 10% of all claims reviewed, as well as a second level of review if the first-level reviewer disagrees with a RAC determination. The plan shall also include a process for when the second-level reviewer disagrees with the first-level reviewer.
If required, the DVC shall spend up to two hours per week at CMS discretion on activities aimed at ensuring the consistency of claim reviews between CMS and its claim review entities. The Program Director (PD) shall provide oversight of all issues under review included but not limited to new issue, accuracy, and special studies for quality assurance. The DVC shall electronically image reviewer's notes and any other documentation used to make an error determination. The RVC shall store these cases in such a way that they can be accessed immediately upon request. The DVC shall shred any case that has been successfully imaged. The DVC shall retain the findings for each claim indefinitely.

### Monthly Progress Reports

The DVC shall submit Monthly Progress Reports to the COR and by the 10th of each month for the previous months' effort. The COR and the DVC shall agree upon the content and format of the Monthly Progress Report as this may change periodically. At a minimum, the monthly progress report should include:

- Number of new issue claims reviewed and agreement rate
- Number of accuracy claims reviewed and agreement rate
- Number of special study claims reviewed and a summary of study
- Number of identified vulnerability issues and a summary each issue
- Cumulative number of new issue claims reviewed incurred to date
- Cumulative number of accuracy claims reviewed incurred to date
- Cumulative number of special study claims reviewed incurred to date
- Complications completing any task
- Communication with RACs
- Communication with PRIS Contractor
- Action Items
- Problems Encountered
- Major Findings identified from new issue review and  RAC monthly calls

8

HHS02921

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

### DVC Operations Manual

The DVC shall develop and maintain an approved DVC Operations Manual. The draft manual shall be submitted to the COR no later than 30 days after the initial contract award and at least quarterly thereafter. If no comments are received from the COR within 30 days of submission of a draft manual change, the DVC shall submit the final within 10 days after the COR comment period ends. The DVC Manual is a living document and may be updated without contract modification. The contractor shall provide written comments to the COR on changes, updates or corrections to the manual on a continual basis so that it will be kept current to accommodate workload and other changes in the DVC processes as necessary. Changes identified in revisions to the review manual are to be acted upon only if they fall within the general scope of the contract. The DVC manual documents the various processes that the DVC follows in its daily operations, including the process for obtaining, processing and reviewing medical records and claims, reporting procedures, and other processes and business rules as necessary.

### Vulnerability Tracking

The DVC shall track and communicate vulnerabilities to CMS via a Vulnerability Tracking report. Vulnerabilities are identified in the following categories and tracked on an excel spreadsheet.
1. *Procedure/Process*: Vulnerabilities that may affect current procedures or processes
2. *Regulatory*: Vulnerabilities that may affect current regulations
3. *Statutory*: Vulnerabilities that may affect current statutes
4. *Security*: Vulnerabilities that may be a threat or weakness to CMS systems or data

The Vulnerability Tracking report shall be submitted to CMS monthly via QuickR or email to COR and discussed during bi-weekly conference calls.

### PRIS/RVC Integration

Once the DVC has established connections with CMS and the RAC over the secure CMS Net (formerly Medicare Data Communications Network (MDCN) and Multiprotocol Label Switching (MPLS) connectivity), the DVC shall integrate with the PRIS system within 60 days. The DVC/PRIS integration includes testing mock packages to ensure that the DVC can successfully pick up, process, move through the system and return back to CMS all packages.

Following DVC/PRIS integration, the DVC shall conduct training to appropriate staff (DVC/CMS) for utilization of the DVC system. The DVC shall use PRIS for all communication with regard to the three review types (new issue, accuracy, and special studies) unless otherwise noted by CMS. All communication in PRIS shall respond in the next 24 hours or the next business day.

CMS may need to access the DVC system. At a minimum the DVC shall provide the "read-only" accessibility for CMS upon request.

### Conference Calls

CMS and the DVC shall meet bi-weekly via conference call for status updates and to discuss any process issues or vulnerabilities. CMS and the DVC shall have additional conference calls with the RACs as necessary to discuss the validation study. At the request of CMS, the DVC team shall consult with CMS Division of Plan Oversight and Accountability (DPOA) staff for any issues (policy, etc.) related to RAC review. The meeting schedule shall be flexible and can change as needed.

9

HHS02922

The DVC shall provide phone lines for all scheduled bi-weekly calls. Beyond the initial kickoff and planning calls, the DVC shall facilitate each call, record the meeting minutes, and distribute meeting minutes after the call.

The DVC shall participate in monthly user group calls with DPOA and the MEDIC. The user group call will be used to identify trends, system issues, best practices, and upcoming events.

### Quarterly Meetings

CMS and the DVC shall meet in person quarterly for project status updates and to discuss current and new audit issues, RAC program vulnerabilities, etc. Quarterly meetings will be coordinated between CMS and the DVC for an agreeable date, time and location. DVC key personnel are required to attend.

The DVC is required to electronically submit meeting minutes including any action items within 5 business days from the meeting.

## 4.2  System Requirements

The DVC shall possess appropriate hardware, software, and telecommunications equipment to undertake this SOW. Following award of the contract, the DVC shall establish connections with CMS and the RAC over the secure CMS Net (formerly Medicare Data Communications Network (MDCN)) and Multiprotocol Label Switching (MPLS) connectivity and site to site VPN. This connectivity will be used to access any information systems CMS develops for the Part C and Part D recovery auditing program. This connectivity shall also be used for sending Protected Health Information (PHI), and for communicating analysis findings and new issues electronically to CMS. When utilizing the public internet for communications that include PHI or other sensitive data, SecureZip or other FIPs-approved product may also by the RVC. Encrypted CDs and external hard drives are also permitted as communication mechanisms when either sending data among the parties by Federal Express or some other form of traceable mail and when making hand-deliveries of larger or special data files.

The DVC shall include this requirement in any subcontract awarded under this prime contract. If this SOW requires the DVC to (1) process, (2) store, (3) facilitate transport of, or (4) host/maintain Federal information; pursuant to Federal, DHHS, and CMS Information Security Program Policies the following requirements apply:

### System Security Level

In the performance of this SOW, the DVC shall develop appropriate security controls for CMS security requirements (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity) in accordance with the below-listed parameters:

    a.  Information Type (as defined on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).

    b.  Systems Security Level (Low, Moderate, or High as defined on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).

    c.  E-Authentication level (Level 1, 2, 3, 4, or N/A as applicable by NIST 800-53 controls IA-2 and IA-8 and as defined on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).

HHS02923

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

The DVC must coordinate with CMS to develop and/or clarify the above listed criteria within 30 days of contract award or when a major modification has been made to its internal system, as defined by the CMS Chief Information Security Officer (CISO).

### Security Services

The DVC shall provide security services in support of CMS, which shall include coordination among the CMS CISO, business owners, and other stakeholders.  The sites and related infrastructure services shall have policies and procedures and implement controls or plans that fulfill the CMS Information Security Policy requirements, including all applicable CMS standards and procedures.  The collection of CMS policies, procedures, standards, and guidelines are located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity.

### Tracking and Correcting Security Deficiencies

The DVC shall track and correct any applicable security deficiencies, conditions, weaknesses, findings, and gaps identified by audits, reviews, Security Assessments, and tests, including those identified in Chief Financial Officer (CFO) Audits, FISMA Audits, Statement on Auditing Standards (SAS) 70 reviews, MMA Section 912 evaluations and tests, Inspector General Audits, A-123 audits, other applicable reviews and audits, and CMS  Security Operations Center (SOC) continuous monitoring activities such as, but not limited to, vulnerability and compliance scanning of all the CMS information systems, in a timely manner.

### Incident Response

A security incident is a violation, or an imminent threat of a violation, of an explicit or implied security policy, acceptable use policies, or standard security practices.  While certain adverse events, (e.g., floods, fires, electrical outages, and excessive heat) can cause system crashes, they are not considered computer-security incidents.  A security incident becomes a breach when the incident involves the suspected or actual loss of personally identifiable information.  CMS information and information system security related incidents should be reported using the Computer Security Incident Report (CSIR) form.  Incidents that concern PII should be reported using the CSIR form set forth in the CMS Incident Handling procedures available at the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity.

### Information Security Awareness Training

CMS policy requires Contractors/Subcontractors receive security training commensurate with their responsibilities for performing work under the terms and conditions of their contractual agreements.  The DVC shall retain the results of security awareness and role-based information security technical training.  CMS requires basic security awareness training for employees and contractors that support the operation of the DVC systems.  CMS requires information security technical training to information system security roles.  Training shall be consistent with the requirements contained in C.F.R. Part 5 Subpart C (5 C.F.R. 930.301) and conducted at least annually.

### Privacy Documentation

The DVC shall be responsible for coordinating with the CMS Privacy Office (http://www.cms.gov/PrivacyOffice/) in preparing and maintaining current all documentation including but not limited to System of Records Notification (SORN) and Privacy Impact Assessments (PIA) which directly and indirectly relating to its program(s) designed to ensure the confidentiality, integrity, and

11

HHS02924

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

availability of Federal Information and Federal Information System, and its assets that enable its possession or control.

### System Authorization and Assessment

The implementation of a Federal Government IT system requires a formal Government Authorization to Operate (ATO), formerly certification and accreditation, of infrastructure systems and/or all application systems developed, hosted and/or maintained on behalf of CMS.  NIST Special Publication 800-37, (hereafter described as NIST 800-37) and CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity) give guidelines for performing the system ATO process.  The system/application must have a valid ATO (conveyed through the CMS CIO authorization decision process) before going into operation and processing CMS information.  The failure to obtain and maintain a valid ATO may be grounds for termination of the contract.

1) The DVC shall comply with Authorization to Operate (ATO) requirements as mandated by Federal laws and policies, including making available any documentation, physical access, and logical access needed to support this requirement.  The Level of Effort for the ATO is based on the System's NIST Federal Information Processing Standard (FIPS) Publication 199 categorization and CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).  The contractor shall coordinate with the CMS business owner to create, maintain and update all applicable ATO documentation as defined by CMS Information Security procedures.

2) At the Moderate and High impact levels, all CMS systems and infrastructures must obtain an independent Security Assessment in accordance with CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).  The Contractor shall allow CMS employees (or CMS designated third-party contractors) to conduct Security Assessment activities to include control reviews in accordance with NIST 800-53/NIST 800-53A and CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).  This includes the general support system infrastructure.

3) Identified gaps between required controls and the DVC's implementation as documented in the Security Assessment report shall be tracked for mitigation in a Plan of Action and Milestones (POA&M) document completed in accordance with CMS procedures (located on the CMS Information Security "Virtual Handbook" Web site at: http://www.cms.gov/InformationSecurity).  Depending on the severity of the gaps, the Government may require them to be remediated before an Authorization to Operate is issued.

4) The DVC shall be responsible for mitigating all applicable security risks found during the ATO process and continuous monitoring activities.  All high-risk vulnerabilities must be mitigated within 30 days and all moderate risk vulnerabilities must be mitigated within 90 days from the date vulnerabilities are formally identified.  The Government will determine the risk rating of vulnerabilities.

### Continuous Monitoring

CMS has the right to perform manual or automated audits, scans, reviews, or other inspections of the Contractor's IT environment being used to provide or facilitate services for CMS in support of the Federal requirements to perform continuous monitoring.

12

HHS02925

Automated scans can be performed by Government personnel, or agents acting on behalf of the Government, using Government operated equipment, and Government specified tools.

CMS established a centralized Security Operations Center (SOC) to provide a robust enterprise continuous monitoring program to improve situational awareness and provide near real-time risk management. The SOC provides information security oversight and monitoring of security events across all information systems that support the operations and assets of CMS, and will notify the appropriate security operations staff of potentially malicious traffic.

In addition to the requirements to meet all of the CMS Information Security requirements documented in the http://www.cms.gov/InformationSecurity Web site, the DVC shall work closely with the SOC to undertake security related activities including but not limited to the following:

1) Contractor shall be responsible for supporting the CMS continuous monitoring program by providing automated data feeds to the SOC as required by the CMS CISO. The SOC will supplement this by conducting independent oversight continuous monitoring activities such as, but not limited to, vulnerability and compliance scanning as well as other network monitoring related activities of all the CMS information systems.
2) Contractor shall provide updated network architecture, IP address ranges, and security points of contact information for the systems they operate on behalf of CMS to the SOC on a quarterly basis (Jan 1, April 1, July 1, and Oct 1).
3) Contractor shall maintain and provide changes to the system accounts needed for the SOC credentialed scanning two weeks before the passwords expire or when other changes to the accounts are needed.
4) Contractor shall provide rack space, cabling, connectivity, and appropriate environmental support for SOC-managed systems/appliances as required by the CMS CISO.

### Federal Desktop Core Configuration (as applicable)

The DVC shall certify applications are fully functional and operate correctly as intended on systems using the Federal Desktop Core Configuration (FDCC). This includes Internet Explorer configured to operate on Windows. The standard installation, operation, maintenance, updates, and/or patching of software shall not alter the configuration settings from the approved FDCC configuration. The information technology should also use the Windows Installer Service for installation to the default "program files" directory and should be able to silently install and uninstall. Applications designed for normal end users shall run in the standard user context without elevated system administration privileges. The DVC shall use Security Content Automation Protocol (SCAP) validated tools with FDCC Scanner capability to certify their products operate correctly with FDCC configurations and do not alter FDCC settings. Deviations must be approved by the CMS CISO.

The DVC shall monitor and adhere to all IT policies, standards, procedures, directives, templates, and guidelines that govern the CMS IS Program, http://www.cms.hhs.gov/informationsecurity. Some applicable references are provided below:

- *CMS Policy for information Security* (As amended) – The high level CMS policy for the CMS Information Security Program.
- *CMS Policy for the Information Security Program (PISP)* (As amended) - Sets the ground rules under which CMS shall operate and safeguard its information and information systems to reduce the risk and minimize the effect of security incidents. This document will subsequently reference Contractors/Subcontractors applicable CMS security Standards and procedure.

13

HHS02926

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

- *CMS Policy for Investment Management and Governance* (As amended) - Establishes the policy for systematic review, selection/reselection, implementation/control, and continual evaluation of IT investments at CMS.

### Section 508

This SOW is subject to Section 508 of the Rehabilitation Act of 1973 (29 U.S.C. 794d) as amended by the workforce Investment Act of 1998 (P.L. 105-220). Specifically, subsection 508 (a)(1) requires that when the Federal Government procures Electronic and Information Technology (EIT), the EIT must allow Federal employees and individuals of the public with disabilities comparable access to and use of information and data that is provided to Federal employees and individuals of the public without disabilities.

The EIT accessibility standards at 36 CFR Part 1194 were developed by the Architectural and Transportation Barriers Compliance Board ("Access Board") and apply to contracts and task/delivery orders, awarded under indefinite quantity contracts on or after June 25, 2001.

Each Electronic and Information Technology (EIT) product or service furnished under this contract shall comply with the Electronic and Information Technology Accessibility Standards (36 CFR 1194), as specified in the contract, as a minimum. If the Contracting Officer determines any furnished product or service is not in compliance with the contract, the Contracting Officer will promptly inform the Contractor in writing. The Contractor shall, without charge to the Government, repair or replace the non-compliant products or services within the period of time to be specified by the Government in writing. If such repair or replacement is not completed within the time specified, the Government shall have the following recourses:

1. Cancellation of the contract, delivery or task order, purchase or line item without termination liabilities; or
2. In the case of custom Electronic and Information Technology (EIT) being developed by a contractor for the Government, the Government shall have the right to have any necessary changes made or repairs performed by itself or by another firm for the noncompliant EIT, with the contractor liable for reimbursement to the Government for any expenses incurred thereby.

The DVC must ensure that all EIT products that are less than fully compliant with the accessibility standards are provided pursuant to extensive market research and are the most current compliant products or services available to satisfy the contract requirements.

As discussed in the sections above, the RAC is required to complete the IPRP, No Determination Report, IPRP Validation Findings dispute, and the Notification of Improper Payment Letters, as applicable for each audit issue/contract.

# 5.0 Key Personnel/Other Personnel

The DVC shall maintain a staff of key personnel positions as necessary and within the requirements identified below. Key personnel shall not serve dual responsibilities in key functions unless approved by the Contracting Officer, i.e., the Program Director may not also serve as the Audit Manager. Changes in key personnel positions shall be submitted to the Contracting Officer in writing for approval within **30 days prior** to any change.

14

HHS02927

A significant amount of confidential information will be reviewed under this contract. Therefore, all contractor and subcontractor personnel working on this SOW shall submit a signed Non-Disclosure Statement.

When key personnel positions are vacated due to unforeseen circumstances, a proposed replacement shall be submitted in writing for approval no later than **30 calendar days** from the date the position was vacated. Interim replacements should be identified when a permanent replacement cannot be identified within this time frame. CMS may consider a **60-day** interim replacement until a permanent replacement is secured.

Unless otherwise approved by the Contracting Officer, the key personnel noted below shall possess the following minimum work experience and educational requirements:

**Program Manager**

The Program Manager shall possess:

Work Experience
Ten or more years of professional experience with at least three years as a manager responsible for managing complex systems and work flow. Experience in audit recoveries is required.

Educational Requirements
A bachelor's degree from an accredited institution, plus a master's degree from an accredited institution or substitution of 4 additional years of related work experience in lieu of the master's degree.

**Audit Manager – Examinations (AME)**

The Audit Manager shall possess:

Work Experience
A minimum of 5 years in an audit and reimbursement setting; Medicare audit and reimbursement setting is preferred.

Understanding of Government Auditing Standards, audit procedures, and financial analysis techniques.

Educational Requirements
An advanced degree in finance or accounting; Certified Public Accountant (CPA) or Certified Management Accountant (CMA) certificate is desired.

**Audit Manager – Reimbursement (AMR)**

The Audit Manager shall possess:

Work Experience
A minimum of 5 years in an audit and reimbursement setting; Medicare audit and reimbursement setting is preferred.

Understanding of Government Auditing Standards, audit procedures, and financial analysis techniques.

15

HHS02928

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

Educational Requirements
An advanced degree in finance or accounting; Certified Public Accountant (CPA) or Certified Management Accountant (CMA) certificate is desired.

**Systems Security Officer**

The Systems Security Officer shall possess:

Work Experience:
A minimum of 5 years of experience managing complex security programs/systems, implementing necessary safeguards, and ensuring all artifacts are current and up-to-date.

Educational Requirements:
A bachelor's and a master's degree; 5 additional years of related work experience may be substituted in lieu of master's degree.

**Lead Statistician**

The Lead Statistician shall possess the following:

Work Experience
A minimum of 5 years experience using statistics to support corporate/business information needs.

Experience in statistical detection of fraud, fuzzy logic, development of mathematical models, neural networks, and data mining or other analytical methods. Demonstrated experience and knowledge of health care information (health claims data, provider identifiers, etc).

Educational Requirements
Bachelor's degree in statistics or related field.

### Other Personnel

Although not considered key personnel positions, the following labor category personnel may be required for this SOW. When required, the respective job classification requirements are essential for performance under this contract. Waiver(s) from the essential personnel requirements may be submitted in writing to the Contracting Officer for approval. All waiver requests should include a copy of a resume along with supporting rationale for the deviation from these requirements.

**Data Analyst**

The Data Analyst shall possess the following:

Work Experience
A minimum of 3 years of experience using various data sources to support corporate/business information needs.

Experience in managing, analyzing, interpreting and transforming data in the detection of fraud, waste, and abuse. Demonstrated experience and knowledge of health care information (health claims data,

16

HHS02929

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

provider identifiers, etc.).

Educational Requirements
Bachelor's degree in business administration, statistics, information technology or related field.

**Pharmacist**

**The Pharmacist shall possess the following:**

Work Experience
A minimum of 5 years experience in prescription drug benefit management with three 3 years experience managing a prescription drug formulary, medication therapy management, and drug interaction program.

The Pharmacist shall have experience in the development of plans and the review of claims to ensure clinically appropriate utilization. This shall include experience in claims analysis, claims data review for abnormalities, auditing of claims, and setting up edits and audits to ensure proper utilization of benefits. The Pharmacist shall also have knowledge and experience concerning the current uses of medications, new or emerging issues, issues related to electronic prescribing, among other general knowledge and experience in the prescription drug benefits. A minimum of 1-2 years experience working in a retail pharmacy as a licensed pharmacist is strongly preferred.

Educational Requirements
The Pharmacist shall be a board trained certified pharmacist with a Doctorate of Pharmacy (Pharm.D) and trained in Biochemistry, Chemistry and Pharmacokinetics.

# 6.0  Quality Assurance

CMS will utilize a number of quality assurance procedures to ensure contractor compliance with this SOW. Examples include inspection of deliverables, review of reports, onsite progress meetings, performance evaluations, etc.

The DVC shall develop and maintain quality assurance procedures for work paper reviews, IT requirements, etc. The DVC shall also ensure that data is physically secured and Personal Health Information (PHI) data is handled confidentially. This is required for subcontractors as well. These should be provided to CMS upon request.

## 6.1  DVC Oversight

CMS will conduct DVC oversight at either the DVC's site or at the appropriate CMS office. CMS has the right to request/review any work performed by the contractor at any time; this includes work papers, reports, support for findings, etc. After completion of the engagement, CMS may hold a conference with the DVC to discuss any issues. CMS may choose to visit the DVC site to assess their performance.

## 6.2  Cooperation/Coordination

The DVC shall cooperate and coordinate with stakeholders other than CMS, including Affiliated Contractors (ACs), and other entities as appropriate. Contractor performance will be evaluated using measures including, but not limited to:
- Demonstration of ongoing dialogue or meetings with the appropriate and necessary parties;

17

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

- Feedback from other entities; and
- Number and type of issues that arise and indicate communication, or lack of communication, between appropriate entities and the Contractor.

## 6.3  Quality

The DVC shall maintain the highest degree of quality for all activities performed throughout the period of performance of the contract. CMS will evaluate the DVC performance using measures including, but not limited to:

- Completeness and accuracy of data analysis;
- Completeness and accuracy of all deliverables

## 6.4  Standard Operating Procedures

The DVC shall follow the procedures that are outlined in the SOPs submitted by CMS/CPI.

## 6.5  CMS Systems

The DVC shall maintain CMS system access to review Medicare Part D Data and to store and track Medicare Part D improper payments.

**Government Property:**

Government property has been issued on this contract, which CMS granted Permission for Livanta to use property from the MEDIC RDS Task Order. Livanta currently submits inventory requests to the CMS property administrator with a copy to the Contracting Officer in October of each year.

# 7.0  Transitions

From time to time in the DVC program transitions from one DVC to another DVC will need to occur.  It is in the best interest of all parties that these transitions occur smoothly.

The transition plan will include specific dates with regard to any outstanding reports for new issue reviews, accuracy reviews, and special studies.  The transition plan will be communicated to all affected parties (including subcontractors) by CMS within 60 days of its enactment.

HHS02931

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

## APPENDIX A – Dispute Form for New Issue or Accuracy

<div style="border:1px solid black">

### NEW ISSUE & ACCURACY REVIEW DISPUTE FORM

**RAC:** Choose an item.                    **Dispute Type:** Choose an item.


**Date/Time:** Click here to enter a date.    **Determination:** Choose an item.

**New Issue or Claim Number:**               **Review Type:** Choose an item.


Clearly identify all areas that are being disputed.



Provide detailed reasoning and rationale for each disputed area.




List all questions that you have for the RVC and/or CMS regarding the disputed areas
identified above.

</div>

19

HHS02932

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

## APPENDIX B - ITEMS TO BE FURNISHED AND DELIVERABLE SCHEDULE

The DVC shall submit all required reports and deliverables in accordance with the statement of work and the following schedule:

| ITEM NO. | SECTION NO. | DESCRIPTION | RECIPIENT | DELIVERY |
|---|---|---|---|---|
| 1 | 2.1.1 | New Issue Review Report | COR | 25 days after receipt of claims |
| 2 | 2.2.1 | Validation Findings Report | COR | 45 days after receipt of claims |
| 3 | 2.2.1 | Cumulative Accuracy Rate Report | COR | Annually Draft due 30 days after the end of fiscal year. Final due 30 days following draft deliverable to CMS |
| 4 | 2.3.1 | Dispute Form | COR | 7 days after receipt of form |
| 5 | 3.0 | Special Studies Report | COR | As needed |
| 6 | 4.1 | System Security Plan | COR | 14 days after contract award |
| 7 | 4.1 | Project Work Plan | COR | 14 days after contract award |
| 8 | 4.1 | Quality Assurance Plan | COR | 30 days after contract award; updated as needed |
| 9 | 4.1 | Monthly Progress Report | COR | 10th day of the month for the previous month's effort |
| 10 | 4.1 | DVC Operations Manual | COR | 30 days after contract award; quarterly thereafter |
| 11 | 4.1 | Vulnerability Tracking | COR | Monthly |
| 12 | 4.1 | Conference Calls | COR | Biweekly/As needed |

20

HHS02933

The Centers for Medicare & Medicaid Services
RAC Data Validation Contractor SOW – Division of Plan Oversight and Accountability

## APPENDIX C – CMS Contacts

Contracting Officer
Nicole Hoey
410-786-0489
7500 Security Boulevard
Baltimore, MD 21244
Nicole.Hoey@cms.hhs.gov

Contracting Specialist
Justin Menefee
410-786-7629
7500 Security Boulevard
Baltimore, MD 21244
Justin.Menefee@cms.hhs.gov

Contracting Officer's Representative
Monique Harris
410-786-1152
7500 Security Boulevard
Baltimore, MD 21244
Monique.Harris@cms.hhs.gov

21

HHS02934

# TAB 103



DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N3-15-25
Baltimore, Maryland 21244-1850



**CENTERS for MEDICARE & MEDICAID SERVICES**

**OFFICE OF INFORMATION SERVICES**

**MEMORANDUM**

OCT − 7 2011

**DATE:**

**TO:**     Director
            Medicare Program Integrity Group (MPIG)

**FROM:**   Chief Information Officer, and
            Director, Office of Information Services (OIS)

**SUBJECT:** Authorization Decision for Recovery Audit Contractor Part D ACLR (RAC Part
            D ACLR)

## ACTION REQUIRED 30 DAYS FROM THE DATE OF THIS MEMORANDUM

The Recovery Audit Contractor Part D ACLR (RAC Part D ACLR) system is a *Moderate* system
located at a co-location data in Atlanta, Georgia. The business function for which ACLR was
contracted is to retrieve Medicare Part D prescription drug event data for audit and recovery of
improper payments.

On September 1, 2011, you certified the controls for the system and submitted along with your
certification the other required documentation to obtain an authority to operate for the RAC Part
D ACLR. However, the most recent Security Assessment has indicated that there is an overall
higher volume of *moderate* and *low* risk findings than are typical for comparable CMS systems.
These aggregate findings present an overall higher risk than is typical for this class of system.

Therefore, I have determined, through a thorough review of the authorization package that the
risk to CMS information and information systems resulting from the operation of RAC Part D
ACLR is acceptable predicated on the completion of the actions described in the attachment.
Accordingly, I am issuing an **Authorization to Operate (ATO)** for RAC Part D ACLR to
operate in its current environment and configuration until **October 15, 2012**. This ATO allows
sufficient time to lower the overall risk of the system by closing the large number of open
findings.

This security authorization decision is my formal declaration that adequate security controls have
been implemented in the information system and that a satisfactory level of security is present in
the system. The security authorization of the information system will remain in effect as long as:
(i) the required security status reports for the system are submitted to this office in accordance
with current CMS policy; (ii) the vulnerabilities reported during the continuous monitoring
process do not result in additional agency-level risk that is deemed unacceptable; and (iii) the
system has not exceeded the maximum allowable time period between security authorizations in
accordance with Federal or CMS policy.

The attachment provides information on requirements not met, as well as corrective actions
needed to bring them into compliance. The actions set forth in the attachment <u>must</u> be entered

CMS SENSITIVE INFORMATION – REQUIRES SPECIAL HANDLING

Attachment

# Recovery Audit Contractor Part D ACLR (RAC Part D ACLR)
Authorization Decision

**Authorization decision is required for the following reason(s):**

| X | New System |
|---|---|
| | Major system modification |
| | Serious security violation |
| | Changes in the threat environment |
| | Expired authorization to operate |

## I.  Authorization Decision

I have reviewed the information concerning the request for an Authorization to Operate and, with consideration of the recommendations provided by my staff, I concur with the assessment of the security risk. This risk has been weighed against the business operational requirements and security measures that have or will be implemented. I have determined the following authorization decision is appropriate.

| X | **Authorization to Operate** The current risk is deemed to be acceptable. The applicable system is authorized to operate until the designated date, subject to the authorization actions in Section II. |
|---|---|
| | **Interim Authorization to Operate** The current risk is deemed to be higher than desired. The applicable system may operate for a limited period without authorization until the designated date, subject to completion of authorization actions in Section II, after which, verification and resubmission of the authorization package is required. |

**This authorization will expire on: October 15, 2012.** This authorization may be withdrawn at the discretion of the Authorizing Official for lack of progress on the authorization actions in Section II, or any security violations deemed to increase the risk to CMS beyond a tolerable level.

| | **Denial of Authorization to Operate** The current risk is deemed to be unacceptable. The applicable system may not operate until the authorization actions listed in Section II are completed, after which, verification of corrective actions and resubmission of the authorization package is required. |
|---|---|

(Authorizing Official Signature and Date)
Tony Trenkle
CMS Chief Information Officer

CMS SENSITIVE INFORMATION – REQUIRES SPECIAL HANDLING
Page 1 of -2

SA464

CMS SENSITIVE INFORMATION – REQUIRES SPECIAL HANDLING

Attachment

## Recovery Audit Contractor Part D ACLR (RAC Part D ACLR)

### II.  Authorization Actions

Failure to meet the assigned due dates without prior approval invalidates this authorization to operate.  The following specific actions are to be completed by the date(s) indicated:

| Vulnerability | Control/Action Description | Due Date |
|---|---|---|
| The Privacy Impact Assessment (PIA) has not been vetted through or signed by the CMS Privacy Office. | Vet the PIA document, obtain a CMS Privacy Officer's signature, and post the PIA document in CFACTS. | January 9, 2012 |
| Information in CFACTS is inconsistent or missing. | Update contacts in CFACTS to reflect current CMS positions.  Include the identification section, security controls tab, interconnections section, inventory (including Systems), and consider ISAs with external entities. | January 9, 2012 |
| The System Security Plan (SSP) is incomplete. | SSP must be updated to include the description of the business process, operational information, system information, and the system environment. | January 9, 2012 |

SA465

CMS SENSITIVE INFORMATION – REQUIRES SPECIAL HANDLING

Attachment

## Recovery Audit Contractor Part D ACLR (RAC Part D ACLR)

| Vulnerability | Control/Action Description | Due Date |
|---|---|---|
| There are an excessive number of open medium risk findings. | Even though there are no high risk findings, there are an excessive number of open findings, presenting an excessive aggregate risk to sensitive information being processed on behalf of CMS.  The following open findings, along with the applicable non-compliant CMS minimum security requirements, are:<br><br>• RAC Part D ACLR_D_2011_2 – AC-6 Least Privilege,<br>• RAC Part D ACLR_D_2011_3 – CM-7 Least Functionality,<br>• RAC Part D ACLR_D_2011_4 - CM-7 Least Functionality,<br>• RAC Part D ACLR_D_2011_5 - SC-13 Use of Cryptography,<br>• RAC Part D ACLR_D_2011_6 - SC-13 Use of Cryptography,<br>• RAC Part D ACLR_D_2011_8 - CP-2 Contingency Plan,<br>• RAC Part D ACLR_D_2011_9 - RA-3 Risk Assessment,<br>• RAC Part D ACLR_D_2011_10 - AC-4 Information Flow Enforcement,<br>• RAC Part D ACLR_D_2011_11 - AC-3 Access Enforcement,<br>• RAC Part D ACLR_D_2011_12 - AC-5 Separation of Duties,<br>• RAC Part D ACLR_D_2011_13 - PL-2 System Security Plan (SSP),<br>• RAC Part D ACLR_D_2011_14 - SA-3 Life Cycle Support,<br>• RAC Part D ACLR_D_2011_15 - PE-2 Physical Access Authorizations, PE-6 Monitoring Physical Access,<br>• RAC Part D ACLR_D_2011_16 - SI-2 Flaw Remediation,<br>• RAC Part D ACLR_D_2011_17 – Access Control,<br>• RAC Part D ACLR_D_2011_18 - AU-6 Audit Review, Analysis, and Reporting, and<br>• RAC Part D ACLR_D_2011_20 - AC-2 Account Management.<br><br>The action is to close the open findings and become compliant with the applicable CMS minimum security requirements. | June 15, 2012 |
| END OF ACTIONS | | |

# TAB 104

HHSM-500-2005-00010I

# Medicare Prescription Drug Integrity Contractor (MEDIC) Statement of Work

### Centers for Medicare & Medicaid Services
### April 2005

**SA467**

HHS01672

HHSM-500-2005-00010I

15 percent of drug costs above the catastrophic threshold.  The enrollee is responsible to pay the greater of 5 percent coinsurance or a small copay ($2 for generic or preferred multi-source brand and $5 for any other drug).

**Claim Review**
Using information on a claim, or other information requested, from and submitted by a provider to support the services billed, to make a determination.

**Closed Case**
A case shall be closed when no further action will be required of the MEDIC by the law enforcement agency(ies) working the case and when the law enforcement agency(ies) has ended all its activity on the case.  Note that even after the case is closed, there may still be administrative actions that the MEDIC will take.

**CMS Analysis, Reporting and Tracking (CMS ART) System**
The system utilized by Centers for Medicare & Medicaid Services to track and analyze MEDIC costs.

**Complaint (of Fraud or Abuse)**
A complaint is a statement, oral or written, alleging that a provider, Part D Plan, Retiree Drug Sponsor, MA Plan, beneficiary etc, received a Medicare benefit of monetary value, directly or indirectly, overtly or covertly, in cash or in kind, to which he or she is not entitled under current Medicare law, regulations, or policy.  Included are allegations of misrepresentation and violations of Medicare requirements applicable to persons or entities that bill for covered items and services.  Examples of complaints include but are not limited to:

- Allegations that prescription drugs or other items or services were not received.
- Allegation that a pharmacist is billing Medicare for a different prescription drug than what was furnished to the beneficiary.
- Allegations that a pharmacist has billed both the beneficiary and Medicare for the same drug or service.
- Allegations regarding waiver of co-payments or deductibles.
- Allegations that a provider or pharmacy has misrepresented itself as having an affiliation with an agency or department of the state, local, or federal government, whether expressed or implied.
- Beneficiary inquiries concerning payment for an item or service, that in his/her opinion, far exceeds reasonable payment for the item or service that the beneficiary received.

The following are not examples of a fraud complaint:

- Complaints or inquiries regarding Medicare coverage policy;
- Charges that appear excessive, but that have reasonable explanations;
- Complaints over the status of a claim;
- Complaints regarding the appeals process;

**SA468**

HHS01685

HHSM-500-2005-00010I

of action or establishing any specific requirements on the part of the government or its agents with respect to any investigation. Similarly, these guidelines shall not be interpreted as creating any rights in favor of any person, including the subject of an investigation.

When the MEDIC has determined that a situation is not potential fraud, it shall refer these situations to the appropriate CMS Part D, MA, or RDS sponsor account manager for pursuit of follow-up compliance activity.

### 6.1.1 - Examples of Fraud

The most frequent kind of fraud arises from a false statement or misrepresentation made, or caused to be made, that is material to entitlement or payment under the Medicare program. The violator may be a provider, a beneficiary, or an employee of a provider or some other person or business entity, including a Part D plan, Retiree Drug Subsidy sponsor or MA Plan.

Fraud may take such forms as:

- Misrepresenting the enrollment, encounter, and prescription drug event data to increase payments;
- Improper reporting of prescriptions dispensed to maximize payments.
- Billing for services not furnished and/or drugs not provided.
- Billing that appears to be a deliberate application for duplicate payment for the same services or prescriptions, billing both Medicare and the beneficiary for the same service, or billing both Medicare and another insurer in an attempt to get paid twice.
- Altering scripts, electronic claim records, medical documentation, etc., to obtain a higher payment amount.
- Soliciting, offering, or receiving a kickback, bribe, or rebate, e.g., paying for a referral of patients in exchange for the ordering of specific pharmaceuticals and other services or medical equipment.
- Completing pharmaceutical scripts for patients not known by the provider.
- Participating in schemes that involve collusion between a provider and a beneficiary, pharmacy and a beneficiary, or between a pharmacy and a provider, or any other parties to a PDP's network or plan participants, and result in higher costs or charges to the Medicare program.
- Billing based on "gang visits," e.g., a pharmacist visits a nursing home and bills for 100 pharmaceutical prescriptions without furnishing any specific service to individual patients.
- Misrepresentations of dates and descriptions of prescriptions or other services furnished or the identity the individual who furnished the services.
- Billing non-covered prescriptions as covered items.
- Using another person's Medicare card to obtain prescriptions.
- Billing for specific pharmaceuticals, first under Part A or Part B, and then a second time under Medicare Part D.

**SA469**

HHS01719

HHSM-500-2005-00010I

- Dispensing without a prescription.
- Billing for recycled prescription drugs.
- Submitting false Medicare claims.
- Receiving duplicative co-pays or premiums from beneficiaries.
- Billing for brand when generics are dispensed.
- Prescription drug shorting.
- Inappropriate drug switching.
- False actuarial attestations for RDS

Examples of financial fraud may include:

- Improperly allocating administrative costs.
- Including costs of non-covered services, supplies, or equipment in allowable costs.
- Arrangements by providers with employees, independent contractors, pharmacies, PBMs, and others that appear to be designed primarily to overcharge the program through various devices (commissions, fee splitting) to siphon off or conceal illegal profits.
- Billing Medicare for costs not incurred or which were attributable to non-Medicare activities, other enterprises, or personal expenses.
- Improper allocation of costs to related organizations that have been determined to be improper.
- Accounting manipulations.
- Failing to report pharmacy or manufacturer rebate and any or all other negotiated discount information to CMS or intentionally disguising rebates as some other form of payment by the pharmaceutical companies so that the Part D plans or RDS plan sponsors may avoid rebate adjustments when calculating reinsurance and/or risk corridor payments or RDS payments.
- Misrepresenting TrOOP to avoid catastrophic cost share.
- Misrepresenting TrOOP to incur catastrophic cost share.
- Misrepresenting low income subsidy eligible individuals to obtain LICS payments
- Misrepresenting wrap-around coverage in order to avoid catastrophic cost share.
- Misrepresenting wrap-around coverage in order to incur catastrophic cost share.

### 6.1.2 - MEDIC Benefit Integrity Unit

The MEDIC is responsible for preventing, detecting, and deterring fraud in the Part D, RDS, and MA programs. The MEDIC shall (this is not an all-inclusive list):

- Prevent fraud by identifying program vulnerabilities (including vulnerabilities at the Part D or MA Plan, RDS sponsor, provider, beneficiary, and prescriber).
- Proactively identify incidents of potential fraud that exist within its service area and takes appropriate action on each case.

**SA470**

HHS01720

HHSM-500-2005-00010I

Before preparing an Alert, the MEDIC shall consult with the applicable CMS representative, MEDIC network, or PSC network. The MEDIC shall determine whether or not a similar Alert has been issued by contacting MEDICs in contiguous jurisdictions. If so, that Alert shall be used and the name and address of your organization shall be added to the contact section. If there is no such Alert, the Alert shall be forwarded in draft to the MEDIC communication network for input. The MEDIC shall forward the draft to the GTL and associate GTL for review and clearance. The Program Integrity Group reviews the draft, acknowledges the Alert, and notifies the MEDIC whether:

- A National Medicare Fraud Alert will be issued;
- A Restricted Medicare Fraud Alert will be issued; or
- The Alert should be issued as a MEDIC Alert.

The CMS CO keeps the MEDIC informed of the progress of the Alert throughout the clearance process.

### 6.15.5 - Distribution of Alerts

CMS issues the Alert to the MEDICs for further distribution. Approved NMFAs are sent through the electronic mail system (password protected) and approved RMFAs are mailed (password protected diskette, CD ROM). Upon receipt of an approved Alert, the MEDIC shall add their name and telephone number to the existing contact information on the Alert. They shall then reproduce the Alert on their own supply of CMS approved stationery. MEDICs shall distribute the Alert to the entities that appear on the audience line.

### 6.16 – Administrative Actions

The MEDICs shall use the administrative actions listed in this section of the Statement Work as appropriate.

### 6.16.1 - Overpayments

MEDICs shall recommend recovery of overpayments whenever it is determined that Medicare has erroneously paid. In any case involving an overpayment, even where there is a strong likelihood of fraud, the MEDIC shall recommend recovery of the overpayment. MEDICs must notify law enforcement of their intention to recommend collection of outstanding overpayments in cases in which they are aware of a pending investigation.

There may be situations where OIG/OI or other law enforcement agencies might recommend that overpayments are postponed or not collected; however, this must be made on a case-by-case basis, and only when recovery of the overpayment would undermine the specific law enforcement actions planned or currently taking place. MEDICs should refer such requests and forward all corresponding documentation from law enforcement to the GTL and associate GTL. If delaying recoupment minimizes eventual recovery, delay may not be appropriate.

SA471

HHS01760

HHSM-500-2005-00010I

MEDICs may furnish requested specific information on ongoing fraud investigations and on individually identifiable protected health information to any Medicare contractor (MEDIC, PSC, Part D Plan, etc). Medicare Contractors are "business associates" of CMS under the Privacy Rule and thus are permitted to exchange information necessary to conduct health care operations. If the request concerns cases already referred to the OIG/OI, MEDICs shall refer the requestor to the OIG/OI.

### 7.2.3 - Quality Improvement Organizations and State Survey and Certification Agencies

MEDICs may furnish requested specific information on ongoing fraud investigations and on individually identifiable protected health information to the QIOs and State Survey and Certification Agencies. The functions QIOs perform for CMS are required by law, thus the Privacy Rule permits disclosures to them. State Survey and Certification Agencies are required by law to perform inspections, licensures, and other activities necessary for appropriate oversight of entities subject to government regulatory programs for which health information is necessary for determining compliance with program standards, thus the Privacy Rule permits disclosures to them. If the request concerns cases already referred to the OIG/OI, MEDICs shall refer the requestor to the OIG/OI.

### 7.2.4 - State Attorneys General and State Agencies

MEDICs may furnish requested specific information on ongoing fraud investigations to state Attorneys General and to state agencies. Releases of information to these entities in connection with their responsibility to investigate, prosecute, enforce, or implement a state statute, rule or regulation may be made as a routine use under the Privacy Act of 1974, as amended; 5 USC § 552a(b)(3) and 45 CFR Part 5b Appendix B (5). See Section 2.8 below for further information regarding the Privacy Act requirements. If individually identifiable protected health information is requested, the disclosure shall comply with the Privacy Rule. See Section 2.7 below and PIM Exhibit 25 for guidance on how requests should be structured to comply with the Privacy Rule. MEDICs, at their discretion, share Exhibit 25 with the requestor as a template to assist them in preparing their request. If the request concerns cases already referred to the OIG/OI, MEDICs shall refer the requestor to the OIG/OI.

### 7.2.5 – Request from Medicaid Fraud Control Units

Under current Privacy Act requirements applicable to program integrity investigations, MEDICs may respond to requests from Medicaid Fraud Control Units (MFCUs) for information on current investigations. Releases of information to MFCUs in connection with their responsibility to investigate, prosecute, enforce, or implement a state statute, rule or regulation may be made as a routine use under the Privacy Act of 1974, as amended; 5 USC § 552a(b)(3) and 45 CFR Part 5b Appendix B (5). See Section 2.8 below for further information regarding the Privacy Act requirements. If individually identifiable protected health information is requested, the disclosure shall comply with the Privacy Rule. See §2.7 below and PIM Exhibit 25 for guidance on how requests

HHS01774

TAB 105





# Prescription Drug Event Participant Guide

## 2011 Regional IT Technical Assistance
July 14 - 15, 2011 ◆ San Diego, California





**2011 Regional Prescription Drug
Event Data Technical Assistance
Participant Guide**

**PART D PAYMENT METHODOLOGY**

# MODULE 1 – PART D PAYMENT METHODOLOGY

## Purpose (Slide 2)

Introduce Part D payment mechanisms so plans understand the statutorily established payment methodologies and the financial data needed to support Part D payment.

## Learning Objectives (Slide 3)

At the completion of this module, participants will be able to:

- Identify and define the four legislative payment mechanisms.
- Describe payments subject to reconciliation and risk sharing.
- Establish other context for understanding PDE data reporting and reconciliation processes.
- Understand the provisions of the Affordable Care Act, including the Coverage Gap Discount Program and coverage for generics in the Coverage Gap.



| ICON KEY | |
|---|---|
| Definition | |
| Example | |
| Reminder | |
| Resource | |

## 1.1  Overview

In December 2003, Congress passed the Medicare Prescription Drug Benefit, Improvement, and Modernization Act (MMA), amending the Social Security Act (the Act) by adding Part D under Title 18. The new benefit allows Medicare payment to plans that contract with CMS to provide qualified Part D prescription drug coverage. The law provides four payment mechanisms and, as a condition of payment, requires that plans submit data and information necessary for CMS to carry out those payment provisions.

The Affordable Care Act, as enacted in section 3301, and amended by section 1101 of the Health Care and Education Reconciliation Act of 2010 (H.R. 4872) (HCERA), phases in a reduction in beneficiary cost-sharing for non-low income beneficiaries when they purchase drugs in the Coverage Gap Phase of the Medicare Part D benefit through the Coverage Gap Discount Program and coverage for generic drugs in the Coverage Gap.

## 1.2  Part D Payment Methodologies (Slide 4)

All Part D plans are required to provide a minimum set of prescription drug benefits, typically referred to as the "basic" benefit (see Module 4 entitled, The Basic Benefit). The MMA mandated either a specific benefit design called the Defined Standard benefit or an alternative that is considered to be actuarially equivalent. For an extra premium, plans can offer benefits that exceed the basic amount (see Module 7 entitled, Enhanced Alternative Benefit), but the government only pays for the basic benefit.



**2011 Regional Prescription Drug
Event Data Technical Assistance
Participant Guide**

**DATA FORMAT**

**TABLE 3M – PDE RECORD LAYOUT (CONTINUED)**

| FIELD NO | POSITION | SUBMISSION STATUS | NCPDP FIELD | FIELD NAME | EXPLANATION |
|---|---|---|---|---|---|
| 1 | 1 – 3 | Mandatory | | Record-ID | This field should always be populated with "DET". |
| 2 | 4 – 10 | Mandatory | | Sequence Number | This field identifies the detail record submitted. The first detail record in a batch must begin with 0000001. All successive detail sequence numbers in the batch must be incremented by one. |
| 3 | 11 – 50 | Optional | | Claim Control Number | This optional field may be used by the plan to identify the DET record submitted. The field allows up to 40 alphanumeric characters. Left justify and enter spaces, not zeros, in unused spaces. |
| 4 | 51 – 70 | Mandatory | | HICN | The Health Insurance Claim Number for the beneficiary. This is a 20-character alphanumeric field. |
| 5 | 71 – 90 | Mandatory | 302-C2 | Cardholder ID | Plan-assigned beneficiary identification number that maps to the HICN in field 4. This is a 20-position alphanumeric field. Left justify and enter spaces, not zeros, in unused spaces. |
| 6 | 91 – 98 | Optional | 304-C4 | Patient DOB | This optional field may be populated with the patient's date of birth and used to verify that the correct beneficiary was submitted. If the field is populated, it must be formatted as CCYYMMDD. If this field is populated, DDPS will edit this field against the information on file at the MBD. If no DOB is submitted, fill with spaces or zeros. |
| 7 | 99 – 99 | Mandatory | 305-C5 | Patient Gender | This field codes the gender of the beneficiary. It will be used to confirm beneficiary identity. Must be populated with either a "1" or a "2", no zeros. |
| 8 | 100 – 107 | Mandatory | 401-D1 | Date of Service | This field identifies the date the prescription was filled and must be submitted in CCYYMMDD format. This field should **not** contain dates associated with plan payment or transaction adjustments. |
| 9 | 108 – 115 | Mandatory for Fallback plans; Optional for all others | | Paid Date | This field identifies the date on which the plan originally paid the pharmacy for the prescription drug and must be submitted in CCYYMMDD format. This field will be used to reconcile costs against draw down accounts for Fallback Plans only. Default values for non-Fallback plans are either spaces of zeros. |



**2011 Regional Prescription Drug
Event Data Technical Assistance
Participant Guide**

**DATA FORMAT**

**TABLE 3M – PDE RECORD LAYOUT (CONTINUED)**

| | | | | | |
|---|---|---|---|---|---|
| colspan="6" | **PDE RECORD DET – DETAIL LEVEL** |
| **FIELD NO** | **POSITION** | **SUBMISSION STATUS** | **NCPDP FIELD** | **FIELD NAME** | **EXPLANATION** |
| 10 | 116 – 127 | Mandatory | 402-D2 | Prescription Service Reference NO | As of January 1, 2011, a pharmacy-issued 12-character numeric code was implemented in preparation for NCPDP D.0 standard in 2012 to identify a dispensed prescription is used to populate this field. Plans should right justify the number and fill with five leading zeros. In cases where this field is not submitted by the pharmacy, the plan must assign a number that is unique for any DOS and Service Provider ID combination. |
| 11 | 128 – 129 | Mandatory | | Filler | Must be populated with 2 spaces. The "Filler" field allows for additional fields in the future. |
| 12 | 130 – 148 | Mandatory | 407-D7 or 489-TE | Product Service ID | National Drug Code (NDC) 11 digit format. Identifies the dispensed drug. For compound drugs submit the NDC for the most expensive Part D Covered drug. |
| 13 | 149 – 150 | Mandatory | 202-B2 | Service Provider ID Qualifier | Indicates the source of the code used in field 14. |
| 14 | 151 – 165 | Mandatory | 201-B1 | Service Provider ID | This field identifies the pharmacy or physicians office where the prescription was filled. In standard format PDEs populate the field with the NCPDP number or NPI. In non-standard format PDEs use the UPIN, State License Number, or Federal Tax Identification Number, NCPDP number of NPI. |
| 15 | 166 – 167 | Mandatory | 403-D3 | Fill Number | Indicates the number of the current fill. |
| 16 | 168 – 168 | Mandatory for 2011; Situational prior to 2011 | 343-HD | Dispensing Status | This field provides the dispensing status of a prescription. Mandatory field is <blank> for PDEs with DOS January 1, 2011 and forward. Situational on PDEs with DOS prior to January 1, 2011 as <blank>, partial fill ('P'), or completion of partial fill ('C'). |
| 17 | 169 – 169 | Mandatory | 406-D6 | Compound Code | Indicates if the dispensed drug was compounded or not. |
| 18 | 170 – 170 | Mandatory | 408-D8 | Dispense as Written (DAW) | This field reports the instructions provided by the Prescriber regarding substitution of generic equivalents. |
| 19 | 171 – 180 | Mandatory | 442-E7 | Quantity Dispensed | This field lists the number of units (e.g., pills, milliliters) that were dispensed. |
| 20 | 181 – 182 | Mandatory | | Filler | Must be populated with 2 spaces. The "Filler" field allows for additional fields in the future. |
| 21 | 183 – 185 | Mandatory | 405-D5 | Days Supply | Indicates the number of days of medication provided by the current prescription. |
| 22 | 186 – 187 | Mandatory for 2012 | 466-EZ | Prescriber ID Qualifier | Describes the data source of the code used in field 23. |



**2011 Regional Prescription Drug
Event Data Technical Assistance
Participant Guide**

**DATA FORMAT**

**TABLE 3M – PDE RECORD LAYOUT (CONTINUED)**

| | | | | | PDE RECORD DET – DETAIL LEVEL |
|---|---|---|---|---|---|
| **FIELD NO** | **POSITION** | **SUBMISSION STATUS** | **NCPDP FIELD** | **FIELD NAME** | **EXPLANATION** |
| 23 | 188 – 202 | Mandatory for 2012 | 411-DB | Prescriber ID Number | Populate this field with either the Drug Enforcement Agency (DEA) Number or the NPI, UPIN or State License number that identifies the prescriber in cases where the DEA is not available. |
| 24 | 203 – 203 | Mandatory | | Drug Coverage Status Code | Indicates if the dispensed drug is a Part D drug or not. |
| 25 | 204 – 204 | Situational | | Adjustment/ Deletion Code | This field is used to identify records for either deletion or adjustment. If neither action is required the field is left blank. |
| 26 | 205 – 205 | Situational | | Non-Standard Format Code | This field is coded only when data are collected in non-standard format. Blank indicates standard format. |
| 27 | 206 – 206 | Situational | | Pricing Exception Code | Indicates PDEs using pricing rules that differ from the plan's negotiated price. |
| 28 | 207 – 207 | Optional for 2011; Mandatory prior to 2011 | | Catastrophic Coverage Code | Optional for PDEs with DOS January 1, 2011 and forward. Mandatory on PDEs with DOS prior to January 1, 2011. This field identifies the beneficiary's status in the benefit. It is populated when the beneficiary either reaches the OOP Threshold (code=A), or is above the OOP Threshold (code=C). This field is left blank for beneficiaries below the OOP Threshold. For any beneficiary with a "C" code in this field, there will usually be one previous record coded "A" to indicate the drug event associated with crossing the OOP threshold. |
| 29 | 208 – 215 | Mandatory | 506-F6 | Ingredient Cost Paid | Populate this field with the dollar amount paid to the pharmacy for the drug itself; do not include costs such as dispensing fees or sales tax. When costs are not disaggregated, enter the total cost of the drug in this field. |
| 30 | 216 – 223 | Mandatory | 507-F7 | Dispensing Fee Paid | Populate this field with the dollar amount paid to the pharmacy for activities related to the transfer of the drug from the pharmacy to the beneficiary. Include charges for mixing drugs, delivery, and overhead. Do not include administrative or other costs in this field. |
| 31 | 224 – 231 | Situational | 523-FN | Amount Attributed to sales tax | This field represents the dollar amount of sales tax, if any, associated with the prescription drug event. |
| 32 | 232 – 239 | Mandatory | | Gross Drug Costs Below Out-of-Pocket Threshold (GDCB) | Sum fields 29-31 to calculate gross drug costs. This field is populated by an actual dollar amount when the beneficiary is at or **below** the OOP threshold and the drug is a covered Part D Drug. Otherwise enter a zero dollar amount. |



**2011 Regional Prescription Drug
Event Data Technical Assistance
Participant Guide**

**DATA FORMAT**

**TABLE 3M – PDE RECORD LAYOUT (CONTINUED)**

| FIELD NO | POSITION | SUBMISSION STATUS | NCPDP FIELD | FIELD NAME | EXPLANATION |
|---|---|---|---|---|---|
| | | | **PDE RECORD DET – DETAIL LEVEL** | | |
| 33 | 240 – 247 | Mandatory | | Gross Drug Costs Above Out-of-Pocket Threshold (GDCA) | Sum fields 29-31 to calculate gross drug costs. This field is populated by an actual dollar amount when the beneficiary is **above** the OOP threshold and the drug is a covered Part D Drug. Otherwise enter a zero dollar amount. |
| 34 | 248 – 255 | Mandatory | 505-F5 | Patient Pay Amount | Populate this field with the dollar amount paid by the beneficiary. |
| 35 | 256 – 263 | Mandatory | | Other TrOOP Amount | This field indicates the dollar amount paid on behalf of the beneficiary by third party TrOOP eligible payers. |
| 36 | 264 – 271 | Mandatory | | Low Income Cost-Sharing Subsidy (LICS) Amount | Plans populate this field with the dollar amount attributed to LICS. |
| 37 | 272 – 279 | Mandatory | | Patient Liability Reduction Due to Other Payer Amount (PLRO) | This field is populated with the dollar amount paid by entities that reduce patient liability/cost, but do **not** count as TrOOP. |
| 38 | 280 – 287 | Mandatory | | Covered D Plan Paid Amount (CPP) | This field reports the net amount the plan paid for a Covered Part D Drug under the Defined Standard benefit. If Drug Coverage Status Code is coded "E" or "O", then this field must be populated with a zero amount. |
| 39 | 288 – 295 | Mandatory | | Non-Covered Plan Paid Amount (NPP) | This field reports the net amount the plan paid for benefits beyond the standard/basic benefit. This dollar amount should include non Part-D drugs, OTC Drugs, EA Drugs and EA cost-sharing. |
| 40 | 296 – 303 | Mandatory | | Estimated Rebate at POS | The amount of the rebate the plan passed through to the pharmacy. |
| 41 | 304 – 311 | Mandatory | | Vaccination Administration Fee | Amount the plan paid for administering a vaccination. |
| 42 | 312 – 312 | Mandatory for 2010; Optional prior to 2010 | 419-DJ | Prescription Origin Code | Required on PDEs with DOS January 1, 2010 and forward. Indicates the origin of the prescription with values: not specified ('0'), written ('1'), telephone ('2'), Electronic ('3'), facsimile ('4'), and <blank>.On PDEs with DOS prior to January 1, 2010, "0" = Not Specified and blank are also allowed. |
| 43 | 313 – 320 | Mandatory for 2011 | | Date Original Claim Received | Indicates date Part D sponsor received original claim. Required for PDEs with DOS January 1, 2011 and forward. PDEs prior to January 1, 2011, must be blank or zeros. Required for all LI-NET PDEs submitted regardless of DOS. |



**2011 Regional Prescription Drug
Event Data Technical Assistance
Participant Guide**

**DATA FORMAT**

## TABLE 3M – PDE RECORD LAYOUT (CONTINUED)

| FIELD NO | POSITION | SUBMISSION STATUS | NCPDP FIELD | FIELD NAME | EXPLANATION |
|---|---|---|---|---|---|
| | | | PDE RECORD DET – DETAIL LEVEL | | |
| 44 | 321 – 346 | Mandatory for 2011 | | Claim Adjudication Began Timestamp | Indicates date and time sponsor began adjudicating the claim in Greenwich Mean Time. Required on PDES with DOS January 1, 2011 and forward. PDEs prior to January 1, 2011, must be blank or zeros. |
| 45 | 347 – 355 | Mandatory for 2011 | | Total Gross Covered Drug Cost (TGCDC) Accumulator | This field reports the sum of a beneficiary's covered drug costs for the benefit year known immediately prior to adjudicating the claim. Required on PDEs with DOS January 1, 2011 and forward. PDEs prior to January 1, 2011, must be blank or zeros. |
| 46 | 356 – 363 | Mandatory for 2011 | | True Out-of-Pocket (TrOOP) Accumulator | This field reports the sum of a beneficiary's incurred costs for the benefit year known immediately prior to adjudicating the claim. Required on PDEs with DOS January 1, 2011 and forward. PDEs prior to January 1, 2011, must be blank or zeros. |
| 47 | 364 – 364 | Mandatory for 2011 | | Brand/Generic Code | Identifies whether the plan adjudicated the claim as a brand or generic drug. Required on PDEs with DOS January 1, 2011 and forward. PDEs prior to January 1, 2011, must be blank. Applies to covered drugs only. Valid values: 'B'=brand, 'G'=generic. |
| 48 | 365 – 365 | Mandatory for 2011 | | Beginning Benefit Phase | This field identifies the plan-defined benefit phase in effect immediately prior to the time the sponsor began adjudicating the individual claim being reported. Required on PDEs with DOS January 1, 2011 and forward. PDEs prior to January 1, 2011, must be blank. Applies to covered drugs only. Valid values: 'D'=Deductible, 'N'=Initial Coverage Phase, 'G'=Coverage Gap, 'C'=Catastrophic. |
| 49 | 366 – 366 | Mandatory for 2011 | | Ending Benefit Phase | This field identifies the plan-defined benefit phase in effect upon completing adjudication of the individual claim being reported. Required on PDEs with DOS January 1, 2011 and forward. PDEs prior to January 1, 2011, must be blank. Applies to covered drugs only. Valid values: 'D'=Deductible, 'N'=Initial Coverage Phase, 'G'=Coverage Gap, 'C'=Catastrophic. |
| 50 | 367 – 374 | Mandatory for 2011 | | Reported Gap Discount | This field identifies the reported amount the Part D sponsor advanced at point-of-sale for the Gap Discount for applicable drugs. Required on PDEs with DOS January 1, 2011 and forward. PDEs prior to January 1, 2011, must be blank or zeros. Counts towards TrOOP. |



**2011 Regional Prescription Drug
Event Data Technical Assistance
Participant Guide**

**DATA FORMAT**

### TABLE 3M – PDE RECORD LAYOUT (CONTINUED)

| FIELD NO | POSITION | SUBMISSION STATUS | NCPDP FIELD | FIELD NAME | EXPLANATION |
|---|---|---|---|---|---|
| colspan=6 | **PDE RECORD DET – DETAIL LEVEL** |
| 51 | 375 – 375 | Mandatory for 2011 | | Tier | Formulary tier in which the Part D sponsor adjudicated the claim. Required on PDEs with DOS January 1, 2011 and forward. PDEs prior to January 1, 2011, must be blank. Applies to covered drugs only. Valid values = 1-6. |
| 52 | 376 – 376 | Mandatory for 2011 | | Formulary Code | Indicates if the drug is on the plan's formulary. PDEs prior to January 1, 2011, must be blank. Applies to covered drugs only. Valid values: 'F'=formulary, 'N'=non-formulary. |
| 53 | 377 – 377 | For future use | | Gap Discount Plan Override Code | Values TBD. Must be blank. |
| 54 | 378 – 407 | Mandatory | | FILLER | Must be populated with 29 spaces. The "Filler" field allows for additional fields in the future. |
| 55 | 408 – 415 | Return File | | CMS Calculated Gap* | Amount calculated by CMS during on-line PDE editing based on data reported in the PDE. |
| 56 | 416 – 418 | Return File | | PBP of Record* | This field should be submitted with spaces. |
| 57 | 419 – 420 | Return File | | Alternate Service Provider ID Qualifier* | This field should be submitted with spaces. |
| 58 | 421 – 435 | Return File | | Alternate Service Provider ID* | This field should be submitted with spaces. |
| 59 | 436-440 | Return File | | Original Submitting Contract* | This field should be submitted with spaces. |
| 60 | 441 – 445 | Return File | | P2P Contract of Record* | This field should be submitted with spaces. |
| 61 | 446 – 465 | Return File | | Corrected HICN* | This field should be submitted with spaces. |
| 62 | 466 – 467 | Return File | | Error Count* | This field should be submitted with spaces. |
| 63 | 468 – 470 | Return File | | Error 1* | This field should be submitted with spaces. |
| 64 | 471 – 473 | Return File | | Error 2* | This field should be submitted with spaces. |
| 65 | 474 – 476 | Return File | | Error 3* | This field should be submitted with spaces. |
| 66 | 477 – 479 | Return File | | Error 4* | This field should be submitted with spaces. |
| 67 | 480 – 482 | Return File | | Error 5* | This field should be submitted with spaces. |
| 68 | 483 – 485 | Return File | | Error 6* | This field should be submitted with spaces. |
| 69 | 486 – 488 | Return File | | Error 7* | This field should be submitted with spaces. |
| 70 | 489 – 491 | Return File | | Error 8* | This field should be submitted with spaces. |
| 71 | 492 – 494 | Return File | | Error 9* | This field should be submitted with spaces. |
| 72 | 495 – 497 | Return File | | Error 10* | This field should be submitted with spaces. |
| 73 | 498 – 500 | Return File | | Exclusion Reason Code* | This field should be submitted with spaces. This field is the subcategory reject code for an NDC Error Code of 738 identified in Errors 1-10. |
| 74 | 500 – 512 | Mandatory | | Filler | Must be populated with 12 spaces. The "Filler" field allows for additional fields in the future. |

*These fields will be populated as necessary during data processing.