# TAB 106

## PART D RAC REPORT OF FINDINGS
## DUPLICATE PAYMENT ISSUE

*PY07 AUDIT:*

| | |
|---|---|
| **RAC:** <u>ACLR, LLC</u> | **TOTAL OVERPAYMENTS IDENTIFIED:** <u>$313,808,241</u> |
| **PLAN YEARS:** <u>2007</u> | **AUDIT SCOPE REDUCTIONS:** <u>$313,808,241</u> |
| **START DATE:** <u>AUGUST 25, 2011</u> | **TOTAL AMOUNTS COLLECTED:** <u>$0</u> |
| **END DATE:** <u>DECEMBER 7, 2011</u> | |

*PY10 AUDIT:*

| | |
|---|---|
| **RAC:** <u>ACLR, LLC</u> | **TOTAL OVERPAYMENTS IDENTIFIED:** <u>$74,091,509</u> |
| **PLAN YEARS:** <u>2010</u> | **AUDIT SCOPE REDUCTIONS:** <u>$74,091,509</u> |
| **START DATE:** <u>AUGUST 17, 2011</u> | **TOTAL AMOUNTS COLLECTED:** <u>$0</u> |
| **END DATE:** <u>AUDIT TERMINATED APRIL 24, 2015</u> | **CURRENT DELAYS:** <u>131 DAYS</u> |

**OVERVIEW:**

This report summarizes the findings of the Recovery Audit Contractor (RAC) for the Medicare Part D Program (Part D) as they pertain to the identification and recovery of improper duplicate payments made by CMS to plan sponsors.  Since CMS originally approved duplicate payments as an audit issue in 2011, this review has presented many challenges; namely, CMS' refusal to adopt ACLR's proposed use of the Service Reference Number, which distinguishes unique prescriptions; CMS' dismissal of ACLR concerns pertaining to the identification of non-duplicative dispensing events arising from dosage changes; and subsequent CMS attempts to rectify the oversight, which ultimately resulted in CMS' termination of the review.

The etymology of the duplicate payment recovery audit review process commenced with ACLR's submission of the issue to CMS on July 7, 2011 and CMS' subsequent notification to ACLR it had been approved as a viable audit issue on August 25, 2011, which resulted in ACLR's submission of its audit review process to CMS.  CMS subsequently modified ACLR's process and communicated changes to ACLR December 9, 2011 and disseminated publically soon thereafter.  A special study, which tested CMS' duplicate payment audit protocols commenced on July 15, 2013 and the final process, modified by the results of the special study, was approved on May 28, 2014.  The original approved protocol called for a review of PY10-PY12 payment data but CMS later eliminated PY11-PY12 plan years.  After commencement of the audit, CMS attempted a revision[1] that would mitigate the selection of non duplicative payment data but plan sponsor evidentiary support revealed a revision error rate of 73.3%.  CMS terminated the review on April 24, 2015[2].

**SUMMARY OF FINDINGS:**

Key findings from the review of PY07-PY12 Duplicate Payments may be summarized as follows:

---

[1] *CMS COR attempted OY1 SOW deviation.*

[2] *CMS COR OY1 SOW deviation.*

- ACLR submitted the Duplicate Payment audit issue to CMS on July 7, 2011.
- CMS informed ACLR of its approval of the Duplicate Payment audit issue on August 25, 2011.
- CMS CO Desiree Wheeler terminated the PY07 Duplicate Payment Review on November 30, 2011 upon notification that ACLR was commencing recovery of identified amounts.
- ACLR submitted PY07 Duplicate Payment findings totaling $313,808,241 to CMS on December 7, 2011.[3]
- CMS informed ACLR of its modified process for identifying duplicate payments on December 18, 2011 and publically announced same in March 2012.
- CMS commenced a special study to test modified audit protocols in 2013 yielding improper payments totaling $427,007.59; these amounts were not recovered by CMS.
- CMS approved the PY10 Duplicate Payment Review and ACLR submitted $15,909, 552 in improper payments, identified as a result of its review of plan sponsor evidentiary support, for validation on December 23, 2014.
- Citing "significant flaws" with its own audit methodology, CMS terminated the PY10 Duplicate Payment Review on April 24, 2015.
- Prior to audit termination, CMS exceeded contracted audit cycle deadlines by 173%.

**AUTHORITY TO CONDUCT RECOVERY AUDITS:**

Under the 2010 Patient Protection and Affordable Care Act (ACA) legislation enacted in March 2010, CMS was required to expand the RAC Program to Part D.  Section 6411(b) of the ACA provides CMS with general authority to enter into contracts to conduct RAC audits in Part D.  In addition to the ACA, the Improper Payments Elimination and Recovery Act (IPERA) requires that federal agencies such as CMS implement programs to recover and eliminate improper payments of federal monies; the Office of Management and Budget is responsible for issuing guidance to all federal agencies related to IPERA .

As required by federal and state law, regulations, CMS guidelines and memoranda, as well as the terms and conditions of its contract, CMS and the Part D RAC are responsible for identifying and recovering past improper payments occurring within Part D and assisting CMS in its efforts to prevent future improper payments.

On January 13, 2011, CMS awarded the Part D RAC contract to ACLR, LLC (RAC).

*Part D Payments & Payment Submissions:*

There are four calculations by which SOs receive Part D Payments; the direct subsidy, low income subsidy, reinsurance subsidy, and risk sharing.  As a condition of payment, all SOs must submit, by contract, information necessary for CMS to carry out payment provisions[4]. This information is submitted to CMS as a Prescription Drug Event record (PDE).  In addition to information of general interest, PDE records also contain information associated with the beneficiary for whom prescriptions were filled, prescribing physicians, drug names, quantities dispensed, cost and expenditure information, as well as other fields necessary for CMS to determine amounts owing and to ensure that SOs are complying with federal and state law as they pertain to the dispensing of prescription drug medications.   Only those improper payment amounts associated with low income and reinsurance subsidies are collected during

---

[3] *This amount reflects total amounts owing from risk sharing, low income cost sharing, and reinsurance; CMS' current impact methodology, which eliminates risk sharing, yields amounts owing of $206,157,467 (Charts DP1227-DP1236).*
[4] *Please see 42 CFR §423.322(a) and 42 CFR §423.301.*

initial recovery audit processes; remaining risk sharing amounts are recovered when CMS reopens reconciliation on a plan year basis.

PDE data submission requirements are governed by federal law, national standards promulgated by the National Council for Prescription Drug Programs (NCPDP), and CMS guidelines and memoranda.  The submission of PDE data are also governed by the Health Insurance Portability and Accountability Act (HIPAA) and individual state laws.  These laws dictate the national standards required for the electronic submission of health care data and which require the accurate and uniform transcription of prescription dispensing event data.

### HIPAA:

Under federal law and in accordance with HIPAA requirements for the electronic submission of claims for payment (42 U.S. Code § 1320d-2), the Department of Health and Human Services (HHS) adopted national standards promulgated by the National Council for Prescription Drug Programs (NCPDP) at 45 CFR 162.1102; Part D sponsors and applicable intermediaries must comply with these standards[5].  These standards (HIPAA/NCPDP Protocols) define "the record layout for real-time prescription claim transactions between" entities, which "dispenses prescription drugs and submits those prescriptions to a payer for reimbursement" and the "list of value codes with descriptions for data elements used within specified NCPDP Standards"[6].

### State Laws:

State laws and regulations outline prescription dispensing requirements and the failure to dispense prescriptions in accordance with these requirements could result in the imposition of fines and license suspension or loss.  In addition to requirements pertaining to the use of licensed pharmacists, prescription expiration periods, and limitations on the dispensing of controlled and non-controlled substances, state laws also dictate the parameters by which a drug must be dispensed, prescription bottle labeling requirements, and the accurate and uniform recording and maintenance of all electronically documented dispensing events and the certification by third party auditors of such electronic information systems.  State prescription labeling data fields and CMS PDE data documentation fields may be summarized as follows:

| State Requirements | PDE Field Name | Reference |
|---|---|---|
| Unique Prescription Identifier | PTAP_RX_SERV_REF_NUM | SRN |
| Patient Information | PTAP_INS_CLAIM_NUM | HICN |
| Prescriber Information | PTAP_PRESCRIBER_ID; PTAP_PRESCRIBER_ID_QUAL | Prescriber NPI |
| Pharmacy Information | PTAP_SRVC_PROVIDER_ID; PTAP_SRVC_PROVIDER_ID_QUAL | Pharmacy NPI |
| Drug Name, Strength, & Quantity | PTAP_PROD_SERVICE_ID; PTAP_QUANTITY_DISPENSED; PTAP_DAYS_SUPPLY | NDC |
| Directions for Use | Can be imputed by a review of concatenated PDE information. | Directions |
| Date of Service | PTAP_RX_DOS_DT | DOS |
| Fill/Refill Information | PTAP_FILL_NUM | Fill |

---

[5] *Please see 42 CFR 423.120(c)(2).*

[6] *Please see National Council for Prescription Drug Programs (NCPDP) Telecommunication Standards Implementation Guide, Version 5, Release 1, September 1999, and equivalent NCPDP Batch Standards Batch Implementation Guide, Version 1, Release 1, (Version 1.1), January 2000, supporting Telecommunication Version 5.1 for the NCPDP Data Record in the Detail Data Record and subsequent releases as outlined in 45 CFR 162.1102(b)(i).*

*FEDERAL LAW - IMPROPER PAYMENTS:*

The primary document dictating CMS and RAC recovery audit review standards can be found in OMB Circular A-123, Appendix C.  Part I(A)(2) ("OMB Requirements") of this documents defines an improper payment as:

> any payment that should not have been made or that was made in an incorrect amount *under statutory, contractual, administrative, or other legally applicable requirements*.  Incorrect amounts are overpayments and underpayments (including inappropriate denials of payment or service).  An improper payment includes any payment that was made to an ineligible recipient or for an ineligible service, duplicate payments, payments for services not received, and payments that are for the incorrect amount.  In addition, when an agency's review is unable to discern whether a payment was proper as a result of *insufficient or lack of documentation*, this payment must also be considered an error.   [*Emphasis added*.]

To make a determination as to the efficacy of CMS payments to plan sponsors, the RAC reviews applicable federal and state law and regulations, CMS promulgations and guidelines, as well as available evidence such as PDE payment data submissions.  In instances where a clear, likely, or probable error occurs, the RAC identifies the error as an improper payment in accordance with OMB requirements.

*RAC AUDIT PROCESS:*

The original contract awarded by CMS to the RAC provided for the unrestricted review and recovery of improper payments and CMS informed Part D stakeholders that the Part D RAC program would be implemented during "the third quarter of 2011" (A01090).  In November 2011, CMS directed ACLR to suspend all recovery audit activities[7].

On December 31, 2013, CMS executed Modification 000013 (A00475).  This modification contained a new Statement of Work, which outlined CMS' new recovery audit process.  On December 31, 2014, ACLR executed Modification 000016[8].  Additional refinements to the recovery audit process, pertaining to additional appeal requirements, were made in this modification.  There are five primary activities currently outlined in the contract; New Audit Issue Review Package (NAIRP) submission and approval; recovery audit activities; appeals; offset, or collection activities; and RAC payment.

- NAIRP Submission & Approval:  CMS must approve all audit issues prior to the commencement of any audit activities.  To accomplish this, ACLR submits a NAIRP, which contains "a proposed audit issue, samples of PDE records, an outline of the processes utilized to identify improper payments, supporting statutory, regulatory, and administrative memoranda, and an estimate of improper payment amounts owing".  Once the NAIRP has been submitted, "the RAC works with CMS/CPI to refine and approve or deny the NAIRP".  (A00528) There is a 104 deadline for approval of a NAIRP and ACLR is limited to submitting "no more than two (2) new audit issues per month".  (A00557)

---

[7] *PART D RAC - 2007 ANNUAL REPORT at 11AR165*
[8] *This audit was originally scheduled to be completed within Modification 000013 timelines; CMS delays ensured implementation of additional appeal requirements contained within Modification 000016.*

A06275
RPD13199

- Recovery Audit Activities (A00528-A00530):  There are four primary steps during the recovery audit process; ACLR's identification of improper payments, validation of ACLR findings by a Data Validation Contractor (DVC), and submission of a Notification of Improper Payment (NIP) to plan sponsors outlining amounts owed.  ACLR review activities are conducted as an automated review, where a review "completed based upon available PDE records… are considered to be acceptable without further review" or a complex review, where "additional documentation, such as, prescriptions, prior authorizations, or other documentation is required" (A00527). Once ACLR has completed the automated or complex review, it develops an Improper Payment Review Package (IPRP), which consists of an exception report, which lists each improper payment, and all supporting documentation used to identify the improper payment (A00530).  Once submitted, the DVC, a separate contractor of CMS validates the IPRPs by accepting or rejected RAC determinations.  This process, unless errors exceeding 25% are identified, must be completed within 45 days.  Upon completion of validation, the DVC and ACLR, within a 7 day period, work together to resolve disagreements; any issues not resolved are forwarded to CMS for final disposition.  Upon final resolution of the validation process, ACLR formats a NIP, which details the total amounts due and plan sponsor appeal processes and submits it, with exception reports, revised as required to concur with validation findings, to CMS for submission to plan sponsors (A00531).

- Appeals:  Plan sponsors are provided a three tiered appeals process; Reconsideration; Hearing Official Review, and Administrator Review.  During Reconsideration, plan sponsors are required to submit all evidentiary support necessary to support appealed contentions within 60 days of the NIP.  Plan Sponsors that do not agree with Reconsideration decisions are permitted a second level appeal and then a third.  The submission of additional evidence by plan sponsors is not permitted during the second and third levels of appeal.  ACLR is required to review all plan sponsor appeal submissions submit rebuttals as it deems necessary.

- Offsets & RAC Payment: At the conclusion of the plan sponsor appeal process, but no later than a decision by the Administrative Reviewer to grant a third tier appeal, CMS submits remaining improper payment determinations for immediate collection.  Upon confirmation of collection and subsequent submission of an invoice by ACLR, payment to ACLR is made.

The following chart, updated to conform to Modification 00016 requirements, outlines the PY10 Duplicate Payment Review audit processes and related deadlines:

| Recovery Audits (Complex Reviews) - 2015 SOW | | | | Duplicate Payments - (PY10) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Dates | | | Variances | | | Process | Delay |
| SOW Description | Duty | Process | Days | Due | Actual | Extensions | ACLR | CMS | | Delays | Totals |
| NAIRP Submission | RAC | NAIRP | 0 | 01/02/14 | 01/02/14 | | 0 | | | 0 | 0 |
| Walk-Though Meeting | CMS | NAIRP | 14 | 01/16/14 | 01/16/14 | | | 0 | | 0 | 0 |
| Initial Feedback Due | CMS | NAIRP | 30 | 02/15/14 | 02/19/14 | | | 4 | | 4 | 4 |
| NAIRP Revision | RAC | NAIRP | 30 | 03/21/14 | 03/21/14 | | 0 | | | 0 | 4 |
| Approval/Denial | CMS | NAIRP | 30 | 04/20/14 | 07/08/14 | | | 79 | | 79 | 83 |
| RFI Submission | RAC | Audit | 0 | 07/08/14 | 07/08/14 | | 0 | | | 0 | 83 |
| RFI Response (60 Day/90 Day for Rx) | SOs | Audit | 90 | 10/06/14 | 12/08/14 | 30 | | 33 | | 63 | 146 |
| IPRP Submission | RAC | Audit | 30 | 01/07/15 | 12/23/14 | | -15 | | | -15 | 131 |
| DVC Review | DVC | Audit | 45 | 02/06/15 | 04/24/15 | | | 77 | | 77 | 208 |
| Notification Letter Submission to CMS | RAC | Audit | 7 | Review Terminated by CMS on April 24, 2015 | | | | | | 0 | 208 |
| Current Audit Cycle Time | | | 276 | | 477 | 30 | -15 | 193 | | 208 | 208 |
| Scheduled/Estimated Audit Completion Date | | | | Scheduled - February 2015 / Current Estimate - Terminated | | | | | | | |

As shown above, this audit exceeded contracted deadlines by 208 days prior to termination.

**AUDIT METHODOLOGY - PY10 DUPLICATE PAYMENT AUDIT:**

CMS informed ACLR that the Duplicate Payment issue had been approved on August 25, 2011[9] and ACLR submitted detailed audit processes and procedures to CMS on August 29, 2011[10] (DP1001-DP1100).

At the time of this request, ACLR had not received PDE data and its initial review protocol mimicked CMS' process as outlined in Updated Instructions: Requirements for Submitting Prescription Drug Event Data issued April 27, 2006 (A01807).  Under this methodology unique PDE records are identified by a concatenation of *HICN, Service Provider ID, Service Provider ID Qualifier, Prescription/Service Reference Number, Date of Service, Fill Number, and Dispensing Status* and ACLR was notified by CMS that its methodology "looks sound" on October 4, 2011 (DP1111).  On December 9, 2011, CMS submitted a new Draft SOW, which included a revision to ACLR's proposed duplicate process that eliminated the SRN from review and consisted of reviewing the "same beneficiary, same medication, for the same or very close dates" (DP1120-DP1125)[11]

While CMS had been informed of the magnitude of duplicative payments arising from the concatenation of the Service Provider, Prescription/Service Reference Number (SRN) and Fill Number used to uniquely identify prescriptions and concomitant fill/refill events (A01807)[12], ACLR personnel are unaware as to what may have caused CMS to abandon the SRN as a definitive unique prescription indicator[13].  CMS did not seek the advice nor discuss alternative methodologies with ACLR prior to the development its new process.  It seems likely; however, that Booz Allen Hamilton (BAH), a contractor hired by CMS to develop the Part D RAC Business Process Model[14], assisted in its development.  As a matter of public record, BAH personnel developed a presentation detailing key components of audit protocols in March 2012 (DP1128-DP1153).  It is also possible that Livanta (DVC), the contractor responsible for validating ACLR improper payment determinations, assisted as well.  CMS provided ACLR a copy of the DVC's SOW and Validation Process Work Papers on March 14, 2012, which consisted of validation protocols consistent with that of CMS' new duplicate payment review process (DP1127)[15].

In accordance with its contract and upon receipt of PY07 PDE payment data, ACLR commenced duplicate payment recovery audits for PY07 PDE data.  In its initial reviews, ACLR had identified in excess of 25 million duplicative PDE arising from PY07 PDE payment data and communicated its findings to CMS.  In reviewing these improper payments in greater detail; however, ACLR noted a preponderance of duplicates associated with original fills (Fill Number = 0) and, upon subsequent review of CMS protocols, noted that a prescription fill number default value of "0" may be considered permissible in some cases[16].

---

[9] *Please see PART D RAC - 2011 ANNUAL REPORT at 11AR014.*

[10] *Please see PART D RAC - 2011 ANNUAL REPORT at 11AR011 and 11AR015-11AR112*

[11] *As outlined in ACLR's 2011, 2012, and 2013 annual reports, CMS terminated the execution of recovery audits as outlined in its initial contract.  This draft SOW, was the first of many drafts which ultimately culminated in a SOW executed on December 31, 2013.*

[12] *Initial reports conducted by ACLR indicated duplicative PDE events well in excess of 25 million records ($1 billion).  Please also see ACLR's 2007 Annual Report outlining ACLR's identification of $175 million in duplicate payments and CMS' subsequent termination of ACLR recovery audit activities.*

[13] *Every state has laws or regulations requiring that each prescription maintain a unique identifier, which for CMS PDE purposes is identified as the PTAP_SERV_REF_NUM, or SRN.*

[14] *Please see PART D RAC – 2011 ANNUAL REPORT.*

[15] *PART D RAC - 2011 ANNUAL REPORT*

[16] *NCPDP notes that a "default value" is only used in those instances where no information is supplied and that the default value must match the actual value; but states its use is permissible in those instances where the payer does not require a value.*

Because of this, ACLR eliminated duplicate payments arising from original fills[17] and conducted duplicate payment reviews which identified duplicative payments utilizing the same SRN[18], same beneficiary, same pharmacy, and same fill number for all PDE with a Fill Number greater than "0".  ACLR completed its review on December 7, 2011 and identified over $313 million in duplicate payments (DP1236)[19].  In 2010, CMS eliminated the permissibility of submitting a default value in the Fill Number field and ACLR adjusted its review protocols accordingly; as can be seen in the chart below, duplicate payment findings increased over 300%.  The following chart illustrates the variances between ACLR's protocol and that of CMS' as determined from reviews of PY07-PY12 Part D payment data (Charts DP1227-DP1236):

| Plan Year | ACLR | CMS | Variance | Variance % |
|---|---|---|---|---|
| 2007 | 206,157,467 | 56,344,639 | 149,812,828 | 72.67% |
| 2008 | 89,809,747 | 63,940,124 | 25,869,623 | 28.80% |
| 2009 | 53,622,465 | 44,015,515 | 9,606,950 | 17.92% |
| 2010 | 166,193,207 | 21,447,627 | 144,745,579 | 87.09% |
| 2011 | 147,275,081 | 25,127,294 | 122,147,787 | 82.94% |
| 2012 | 93,687,614 | 27,516,588 | 66,171,027 | 70.63% |
| Totals | 756,745,581 | 238,391,787 | 518,353,794 | 72.01% |

ACLR made numerous attempts during 2011-2013 to commence duplicate payment reviews.  These attempts were unsuccessful despite repeated CMS' public announcements regarding their pending commencement (DP1160, DP154-DP155).

***Special Study:***

CMS recommended duplicate payment recovery audit discussions with ACLR in March 2012 and, after discussing the application of CMS' process, executed Modification 000008 on July 15, 2013 (A00465).  This modification was limited to performing a special study of PY09 duplicate payments as they pertained to three plans.  The audit was performed as a complex review and matched the contract, beneficiary, medication, and fill number fields to identify probable duplicates.  To match CMS' protocol of "the same or close to the same dates", ACLR developed an "early refill" methodology, which limited selection of potential duplicates to subsequent PDEs that occurred within a time period not greater than 25% of the total days supply of the original PDE (DP1164-DP1165).  After several additional reviews of the proposed protocols and the subsequent approval by CMS, ACLR submitted RFIs to each of the three plans on July 25, 2014, which dictated a response time of 30 days.  ACLR reviewed each plan sponsors submission and communicated the results of its reviews to CMS on August 29, 2013 and September 16, 2013 (DP1169-DP1170) and informed CMS of SOW requirements to submit a NIP to each plan to recover amounts owing on October 22, 2013 (DP171)[20].

***NAIRP Submission:***

---

[17] *PDE records associated with partial fills of a prescription were also eliminated from consideration as duplicative.*

[18] *The SRN requires the review of multiple competing factors; CMS guidelines, NCPDP protocols, and state law.  As a practical matter, states require that each prescription contain a unique identifier and that it be accurately and uniformly maintained and that failure to so do is punishable by fines and/or suspension.*

[19] *Amounts shown for the 2007 ACLR protocol have been adjusted, for purposes of consistency, to reflect CMS' current calculation methodology, which does not include risk sharing.*

[20] *CMS directed OY1 SOW Deviation.*

CMS ignored subsequent attempts by ACLR to have the duplicate payment issue approved prior to the close of 2013 and on December 31, 2013, executed contract Modification 000013 (OY1 SOW at A00476). As discussed under **RAC AUDIT PROCESS** above, the new SOW required that ACLR submit a NAIRP for any audit issues it desired to pursue.  On January 2, 2014, ACLR submitted NAIRP - Duplicate Payments (A01311-A01313)[21] via PRIS but was informed by its' COR that PRIS was not operational and that it should be submitted via email (DP1178)[22].  This review protocol followed that of the protocol discussed under **Special Study** above, except that the early refill methodology was revised from 25% to 50%.

As directed under the OY1 SOW, NAIRPs must be approved or denied by CMS within 104 days of NAIRP submission; this NAIRP was approved on July 8, 2014 and exceeded contracted deadlines by 180% (83 days):

| PY10 Duplicate Payment Review | | | OY1 SOW | | | | | |
| | | | Dates | | Variances | | | Process Delays | Delay Totals |
| SOW Description | Duty | Days | Due | Actual | Extensions | ACLR | CMS | Process Delays | Delay Totals |
|---|---|---|---|---|---|---|---|---|---|
| NAIRP Submission | RAC | 0 | 01/02/14 | 01/02/14 | 0 | 0 | | 0 | 0 |
| Walk-Though Meeting | CMS | 14 | 01/16/14 | 01/16/14 | 0 | 0 | | 0 | 0 |
| Initial Feedback Due | CMS | 30 | 02/15/14 | 02/19/14 | 0 | | 4 | 4 | 4 |
| NAIRP Revision | RAC | 30 | 03/21/14 | 03/21/14 | 0 | 0 | | 0 | 4 |
| Approval/Denial* | CMS | 30 | 04/20/14 | 07/08/14 | 0 | | 79 | 79 | 83 |

As noted above, the NAIRP approval/denial process outlined in OY1 SOW consists of 5 steps; Submission, Walk-Through Meeting, Initial Feedback, NAIRP Revision, and CMS' approval or denial of the NAIRP.  A walkthrough meeting to discuss ACLR's submission of this NAIRP occurred on January 16, 2014 and CMS submitted initial feedback on February 19, 2014 (A01316-A01320) and, in response to ACLR feedback submitted on February 27, 2014 (A01321-A01365), submitted additional feedback on March 7, 2014 (A01359), to which ACLR responded on March 12, 2014 (A01362).  The deadline for NAIRP revision expired on March 21, 2014 and CMS "conditionally approved" the NAIRP on April 18, 2014 (A01367)[23]. The terms of the conditional approval were subject to the following conditions:

- The RAC clearly defines a duplicate payment;
- The RAC provides details for the 50% elapsed time approach and explains how it applies to this review; and
- The RAC provide the audit years and estimated recovery amounts for each year.

ACLR submitted the final NAIRP - Duplicate Payments arising from PY10-PY12 PDE payment data in accordance with the contingent approval on April 25, 2014 (A01370) and commenced recovery audit activities in accordance with OY1 SOW (A00490).  On May 6, 2014, CMS informed ACLR of its second conditional approval (A01373-A01375).  The terms of this conditional approval required that[24]:

---

[21] *CMS directed OY1 SOW deviation.*
[22] *CMS COR directed OY1 SOW deviation.*
[23] *CMS directed OY1 SOW deviation.  CMS' conditional approval required that a Revised NAIRP be submitted within 74 days of initial NAIRP submission, and informed ACLR that "a Revised NAIRP must be submitted to CMS within 7 days for final approval after the RAC makes all modifications" (A01369).*
[24] *As outlined in PART D RAC - 2014 ANNUAL REPORT, this subsequent revision process resulted in significantly increased costs to ACLR and delayed RAC payments.*

- The RAC change the review from automated to complex.

ACLR submitted the second Revised NAIRP, incorporating a complex review process, to CMS on May 13, 2014 (A01376-A01380) and CMS submitted its final approval to ACLR on May 28, 2014 (A01381-A01382).  With this approval CMS informed ACLR that it must submit its findings via QuickR rather than PRIS[25].

**Audit Findings:  PY10-PY12 Duplicate Payments:**

On June 9, 2013, ACLR uploaded RFI exception reports into QuickR[26] as required in the final approval and informed CMS that RFIs would be sent out to plan sponsors "no later than" June 11, 2013 (DP1179).

Initial ACLR RFI finding for PY10-PY12 duplicate payments were as follows:

| | PY10 | PY11 | PY12 | Totals |
|---|---|---|---|---|
| Total Contracts | 756 | 730 | 727 | 2,213 |
| Active Contracts | 596 | 624 | 649 | 1,869 |
| RFI Contracts | 367 | 416 | 438 | 1,221 |
| RFI PDE | 1,191,139 | 1,432,738 | 1,501,244 | 4,125,121 |
| Duplicate PDE | 622,197 | 741,205 | 782,063 | 2,145,465 |
| RFI Amounts | 21,447,627 | 25,127,294 | 27,516,588 | 74,091,509 |

On June 10, 2014, COR Brown, noting "this piece of the process is not in the current contract", informed ACLR that it could not submit RFIs to plan sponsors until CMS had reviewed ACLR's findings (DP1181-DP1182)[27].  This was followed by a subsequent communication notifying ACLR that the review would be conducted by the DVC and that the DVC would apply "the approved methodology to ensure that the PDE records that have been identified, should be included in the RFI" and that ACLR and the DVC was required to engage in a dispute resolution process (DP1181)[28].

On June 26, 2014, ACLR received the results of the DVC's review (DP1192-DP1193).  As outlined in its report, the DVC's validation deviated substantially from the approved NAIRP.  Specifically, the DVC raised an issue pertaining to dosage increases, which had been thoroughly discussed during the NAIRP approval process (DP1188, DP1190).  ACLR was also informed that the DVC had, in previous audits, failed to identify errors in the "quantity dispensed" PDE data field received by ACLR.  ACLR submitted its response to this report on June 27, 2014 (DP1194-DP1196).  On July 8, 2014, CMS informed ACLR that it was approving the "release of RFIs for CY 2010 only" and that PY11-PY12 reviews were held pending the resolution of the issues associated with "2010 and 2012 data" (DP1197)[29].

ACLR issued RFIs to plan sponsors on July 8, 2014.

*Revision of Approved NAIRP Audit Protocols:*

---

[25] *CMS directed OY1 SOW deviation.*
[26] *CMS directed SOW deviation.*
[27] *CMS COR directed SOW deviation.*
[28] *COR directed OY1 SOW deviation.*
[29] *COR directed OY1 SOW deviation.*

On September 2, 2014, CMS notified ACLR of concerns it received from Express Scripts, Incorporated (ESI) indicating that ESI believed the "RAC identified the records in error" and that the selected records were not improperly duplicative[30] (DP1199).  ESI is a pharmacy benefit manager (PBM) that contracts separately with plan sponsors with administering their Part D insurance offerings.  PBMs are typically compensated by adjudicating claims and do not directly contract with CMS in this capacity[31].  ACLR responded to ESI's concerns and informed CMS that under a complex review (A00487-A00488), the RAC requests documentation to make a determination as to whether or not a payment was proper and that the "mathematical edits" performed by ESI to support its assertions were no different than those used by plan sponsors participating in the Special Study discussed above (DP1201-DP1204).

On October 1, 2014, CMS provided "an extension of 60 calendar days for Part D plan sponsors to submit their responses to the Duplicate Payment Request for Information (RFI) sent on July 8, 2014 by the Part D Recovery Audit Contractor (RAC)" (DP1207)[32].

On October 22, 2014, CMS informed ACLR should perform a mathematical edit to identify records associated with a "dosage change", identify PDE records that "should be removed from the population" and to provide a "revised exception report for each affected contract" (DP1211)[33]. After multiple implementations and concomitant discussions with CMS over the application of the protocol, ACLR uploaded revised exception reports on November 11, 2014 (DP1203 )[34] and the DVC completed its validation of the records on November 13, 2014 (DP1215-DP1216). It was immediately apparent upon receipt of the DVC's results, indicating that the original pairs listing no longer match the revised submission, that there was a general misunderstanding by CMS and the DVC of what the overall NAIRP revised protocol entailed[35].   Ultimately, CMS did not submit revised RFI exception reports to plan sponsors[36].

*Complex Review Findings - IPRP Submission:*

ACLR completed its review of plan sponsor RFI submissions, developed and submitted IPRPs, and submitted a report to CMS detailing ACLR findings, review protocols, and recommendations (DP1219-DP1224).  These findings are highlighted below:

- PRIS Submission:  ACLR advised CMS of the problems inherent in utilizing PRIS and the likely negative impact such a submission would have on plan sponsors[37] (DP1220).

---

[30] *ESI was referred to CMS for possible violations of the False Claims Act during the PY07 Excluded Provider audit and another referral, for altering prescription evidence submitted during the PY09-PY10 DEA Schedule Refill review is pending.*
[31] *Express Scripts Holding Company, a separate entity, is a plan sponsor.*
[32] *CMS directed OY1 SOW deviation.*
[33] *COR directed OY1 SOW deviation.*
[34] *The first attempt to implement this protocol by ACLR yielded improper payments totaling $523,744.04.*
[35] *Under this protocol, there were multiple instances where originating transactions could have multiple duplicate PDEs associated with it and/or that a PDE could both be the duplicate of an originating event and the originating event of a subsequent duplicate.  The inability to understand the revised protocol would change the order and/or pairing of duplicative events, led to validation findings that ultimately delayed the submission of revised exception reports to plan sponsors.*
[36] *CMS issued a letter to plan sponsors on December 5, 2014 (DP1208), which seemed to indicate a retroactive application of the proposed revision; ACLR had not commenced its review of supporting documentation by the date of the letter.*
[37] *The duplicate payment audit commenced prior to PRIS implementation.  Because of this, plan sponsor evidentiary submissions would contain a different identified that that used in the RFI submission.*

- Review Protocols:  ACLR outlined its application of approved NAIRP protocols to the evidence submitted by the plan sponsors and noted its determination as to "acceptable documentation" for eliminating non-duplicative payments and "automatic overrides" used to determine duplicative status (DP1221).
- Review Results:  ACLR provided a summary of plan contentions and outlining its determination as to the efficacy of audit protocols (DP1222-DP1223).  ACLR also informed CMS that the evidence submitted by plan sponsors demonstrated that CMS' application of the revised protocol, discussed under *Revision of Approved NAIRP Audit Protocols* above, yielded a 26.7% accuracy rate (73.3% error rate) (DP1222).
- CPI Consideration:  ACLR recommended that CMS apply an adaptive methodology to ACLR's review findings and permit the application of a protocol concatenating the beneficiary, SRN, pharmacy, and fill number fields to identify duplicates; wholly supported by plan sponsor RFI contentions (DP1223).

Improper payments submitted by ACLR to the DVC totaled $15,909,552.

On January 8, 2015, CMS informed ACLR that would it be required to resubmit its findings prior to the DVC IPRP validation commencement (DP1225-DP1226).  As this was the eighth CMS directed SOW deviation, ACLR requested Contracting Officer involvement (DP1225).

While no information or subsequent tasking was received from CO Hoey, ACLR was contacted by the DVC on February 6, 2015 (DP1251-DP1252).  In this communication, the DVC requested additional information pertaining to the reconciliation of submitted IPRPs and contract counts.  The RAC provided the requested information (DP1251).  On March 10, 2015, ACLR was notified by COR Brown that CPI would be terminating the audit or commencing with a new RFI process and ACLR subsequently requested intervention by CO Hoey (DP1237).  Following this communication, ACLR was notified in a March 24, 2015 email that the DVC had completed its validation and that it had commenced "uploading the documents in PRIS" (DP1262).  CO Hoey informed ACLR that a revised RFI process would not be necessary (DP1243) and on April 24, 2015, COR Brown issued a Technical Direction Letter (TDL) terminating its previous approval of the PY10-PY12 Duplicate Payment audit issue (DP1224)[38].  In the TDL, COR Brown confirmed ACLR's concern regarding CMS' use of a revised protocol and noted that "although the revised methodology used by CMS was able to reduce the number of PDE records identified as improper submissions", also confirming CMS' commitment to mitigate Part D RAC impact to plan sponsors.  CMS Director Mark Majestic informed plans that the review had been terminated on June 5, 2015 (DP1248).

**AUDIT SUMMARY:**

As outlined under *RAC Audit Process* above, CMS significantly altered the RAC's originally proposed audit methodology.  These alterations were implemented without the solicitation of any feedback from the RAC.  CMS also ignored RAC findings during the PY09 Special Study that indicated that dosage changes were selected as a result of CMS' flawed audit methodology.  The failure on the part of CMS to consider RAC feedback ultimately resulted in the significant expenditure of RAC, plan sponsors, and other Part D RAC stakeholder resources and the termination of an audit four years after it had originally been approved.

---

[38] CMS COR directed OY2 SOW deviation.

# TAB 107

| From: | Christopher Mucke |
| To: | "Thomas, India M. (CMS/CPI)" |
| Cc: | Brown, Sonja J. (CMS/CPI); Abankwah, Rosalind M. (CMS/CPI); Tetkoski, Frank (CMS/CPI); Kenya, Dominca (CMS/CPI); Brandenburg, Sara M. (CMS/CPI); Newkirk, Delois J. (CMS/CPI); Thais Thompson |
| Subject: | RE: Revised Duplicate Payment Decision Notice |
| Date: | Tuesday, May 13, 2014 1:53:00 PM |
| Attachments: | NAIRP - Duplicate Payments Final Revision CA 2.pdf |
| | Duplicate Payments - Draft RFI.docx |
| | Duplicate Payments - Draft RFI.pdf |

India,

I have attached a copy of the Revised NAIRP, which incorporates CMS' request for a complex review. I have also attached a copy of a draft RFI that will be submitted to the SOs upon final CMS approval of the issue. Please let me know if you have any questions, Chris.

*Christopher Mucke | Managing Principal | ACLR, LLC*
38705 7 Mile Rd, Ste 251 | Livonia, Michigan 48152-3975 | ☏(734) 744 - 4401 | 📠(734) 744 - 4150 | ✉
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

**From:** Thomas, India M. (CMS/CPI) [mailto:India.Thomas@cms.hhs.gov]
**Sent:** Tuesday, May 06, 2014 11:39 AM
**To:** Sean Donaghy; Christopher Mucke
**Cc:** Brown, Sonja J. (CMS/CPI); Abankwah, Rosalind M. (CMS/CPI); Tetkoski, Frank (CMS/CPI); Kenya, Dominca (CMS/CPI); Brandenburg, Sara M. (CMS/CPI); Newkirk, Delois J. (CMS/CPI)
**Subject:** Revised Duplicate Payment Decision Notice

Good Morning,

Attached is CMS' revised decision on the Duplicate Payment NAIRP. Please review and submit your updated NAIRP for final approval by COB 5/13/14. Let us know if you have any questions.

Thank you,

*India M. Thomas*
Health Insurance Specialist
Division of Plan Oversight & Accountability
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244
Mail Stop AR-18-50
410.786.1152 desk
410.922.2625 ads
410.786.0711 fax
India.Thomas@cms.hhs.gov

**RECOVERY AUDIT SERVICES IN SUPPORT OF PART D**
**REVISED NEW AUDIT ISSUE REVIEW PACKAGE – DUPLICATE PAYMENTS**

**NAIRP Submission:** January 2, 2014
**Walkthrough Meeting:** January 16, 2014
**Attendees:** CMS, DVC, RAC
**Revised NAIRP Submission:** Not Applicable
**Contingent Approval:** April 18, 2014
**Contingent Approval - NAIRP Submission:** April 25, 2014
**Revised Contingent Approval:** May 6, 2014
**Revised Contingent Approval NAIRP Submission:** May 13, 2014

REVISED CONTINGENT APPROVAL OVERVIEW:

A contingent approval of the proposed Duplicate Payment NAIRP, attached as Exhibit A, was requested to; more clearly define a duplicate payment, provide additional information regarding the 50% elapsed time approach and it application to this audit, and to provide estimated recovery amounts for each audit year in question.  Upon submission of the revised NAIRP, CMS revised its contingent approval to incorporate a complex review.  The revised NAIRP is outlined below.

PROCESS SUMMARY:

Duplicate payments are defined as Part D payments arising from multiple prescription drug event (PDE) submissions of a single prescription drug event.  The duplicate payment review process is a complex review, which consists of an exact match review, calculating days elapsed between matched records, and calculating allowable days elapsed to identify duplicative records.

During the exact match portion of the review, we identify all plan year PDE records where the contract, beneficiary, medication, and fill number match using the PTAP_CNTRT_OF_REC, PTAP_PBP_OF_REC, PTAP_INS_CLAIM_NUM, PTAP_PROD_SERVICE_ID, PTAP_FILL_NUM fields of the PDE for open plan years. From this, PDE associated with partial fills[1] are removed as well as duplicative records associated with long term care and vaccination administrative fees[2].  In addition, duplicates arising from the transition from a retail pharmacy to a mail order pharmacy are also eliminated[3].  To mitigate and eliminate the false identification of duplicative PDE arising from the naturally recurring nature of prescriptions as well as for those arising from improper data submissions and inaccurate reporting by plans, an early fill methodology, a standard operating procedure employed by plans to improve the quality of healthcare and reduce unnecessary costs, was adopted and incorporated into a complex review.  During this process, the days elapsed between two PDE selected as a result of the exact match review is determined and compared to the days supply of the originating PDE.  If the days elapsed between the two PDE is less than 50%[4] of the days supply provided in the originating PDE, the subsequent PDE record is selected as potentially duplicative.  An exception to this rule is applied to PDE submissions arising from non-standard sources (PTAP_NON_STAND_FMT_CD = not "Null").  These PDE

---

[1] *Instances where the PTAP_DISP_STAT_CD field of the PDE data = "P".*
[2] *Long term care facilities are identified by matching NPIs identified in the IDR as containing a primary, secondary, and/or tertiary code equal to "04" to the PTAP_SRVC_PROVIDER_ID field located in the PDE data.*
[3] *Mail order pharmacies are identified by matching NPIs associated with the taxonomy code 3336M0002X in NPPES to the PTAP_SRVC_PROVIDER_ID field located in the PDE data.*
[4] *Plan sponsors typically employ a 75% - 80% early fill methodology to eliminate potentially duplicative drug therapy; a 50% methodology was utilized here to maximize recoveries while minimizing the likelihood of falsely identifying duplicative PDE.*

A01378

will be subject to additional reviews to determine whether they are potentially duplicative[5]; any such records will also be selected as potentially duplicative.

Upon completion of these initial reviews, RFIs are generated and submitted to the SOs requesting detailed prescription data for all potentially duplicative PDEs[6]. To support the legitimacy of these records, SOs will be asked to submit prescriptions; override documentation due to loss, change in dosage, or other authorized override event; or other uniformly maintained readily retrievable record demonstrating the legitimacy of the potentially duplicative PDE listed in the RFI.

The RAC will review all documentation submissions received from the plans to ensure the legitimacy (non-duplicative nature) of the potentially duplicative PDE forwarded to the plans. Upon completion of its review, Improper Payment Review Packages (IPRPs)[7] will be generated from unsupported (duplicative) PDEs and forwarded to the Data Validation Contractor (DVC) for review and validation. Upon receipt of the validated records, the RAC will conduct final reconciliation, generate Notification Letters, and send to SOs for recovery of amounts owed.

*Estimated Recoveries:*

By incorporating our findings from the special study and applying the 50% early fill methodology to selected contracts and extrapolating the results across currently active contracts we estimate recoveries for plan years 2010, 2011, and 2012 as $36,552,276, $36,325,582, and $49,229,004, respectively.

---

[5] *Reviews of PDE submissions associated with non-standard format submissions are more likely duplicative, regardless of days elapsed.*
[6] *ACLR will upload all RFIs and exception reports into QuickR.*
[7] *Please see Section 2.2 Validation of RAC Audit Findings of Part D RAC OY1 SOW*

A01379

DEPARTMENT OF HEALTH & HUMAN SERVICES
CENTERS for MEDICARE & MEDICAID SERVICES
7500 Security Boulevard, Mail Stop AR-18-50
Baltimore, Maryland 21244-1850



CENTERS FOR MEDICARE & MEDICAID SERVICES
CENTER FOR PROGRAM INTEGRITY

Center for Program Integrity

Date: Date

**SUBJECT: REQUEST FOR INFORMATION**

CEO First Name CEO Last Name
Plan Name
Address 1
Address 2
City, State Zip Code

Re: Plan Name, Contract #

Dear CEO Prefix CEO Last Name:

The Centers for Medicare & Medicaid Services (CMS) has retained a contractor, ACLR, LLC (ACLR), to carry out the Recovery Audit Contractor (RAC) program efforts for the Medicare Part D program. The Division of Plan Oversight and Accountability (DPOA) within the Center for Program Integrity (CPI) is responsible for the Part D RAC program. The RAC program, mandated by Congress through the Affordable Care Act, is aimed at identifying and recouping improper payments made by the Medicare program

As part of our review of Prescription Drug Events (PDEs) associated with duplicate payments, we have identified PDEs, in the attached exception report, as being potentially duplicative; the originating PDEs for each of these events have also been included. Duplicative PDEs will be used as the basis for our calculation of any improper payments. In an effort to ensure the accuracy of this information, we are allowing Plan Name, Contract #, 90 calendar days from the date of this notification to submit documentation in support of or against the duplicative PDEs listed in the attached exception report.

Please submit copies of the prescriptions for both the originating and duplicative PDE; override documentation due to loss, change in dosage, or other authorized override event; or other uniformly maintained readily retrievable record to demonstrate the legitimacy of the potentially duplicative PDE listed in the RFI.

If an improper payment is determined at the conclusion of our review, a Notification of Improper Payment letter will be issued to Plan Name, Contract Number. The letter will inform you of the improper payment amount as well as appeal instructions should you disagree with our findings.

Please review the attached report and submit your response via Secure Mail to info@ACLRRAC.com within 90 days from the date of this request.

A01380

Sincerely,
ALCR, LLC
Part D National Recovery Auditor

Enclosures:   Duplicate Payment Exception Report

cc:   CFO:   CFO Last Name, CFO First Name
      MCO:   MCO Last Name, MCO First Name
      AM:    AM Last Name, AM First Name

# TAB 108

| From: | Christopher Mucke |
|---|---|
| To: | Dorsey, Marnie \(CMS/CPI\) |
| Cc: | James, Merri-Ellen \(CMS/CPI\); Moreno, Cynthia E. \(CMS/CPI\); Dangerfield, Teresa \(CMS/CPI\) |
| Subject: | RE: Draft Process Request...... |
| Date: | Monday, August 29, 2011 2:40:00 PM |
| Attachments: | ACLR Draft SOP - RPD.pdf |
| | ACLR - RPD Information Flow.pdf |
| | image001.png |

Marnie, here is the information you requested.  The ACLR Draft SOP (RAC Part D) contains the proposed procedure, work instructions, and forms that govern our internal RAC Part D recovery audit processes.

The ACLR Information Flow document outlines the flow of information from CMS, through ACLR, and back to CMS.  As I indicated earlier, these processes are still being developed and will likely remain so until such time as we've received and reviewed Part D data.  Also, these may be of limited use only because they'll address specific functions such as the specific process of attaching workpapers to a demand letter and making the entire document into a pdf file to be uploaded.

Please let me know if you require additional information.

*Christopher Mucke | Managing Principal | ACLR, LLC*

38705 7 Mile Rd, Ste 460 | Livonia, Michigan 48152-3975 | ☎(734) 744 - 4401 | 🖷(734) 744 - 4150 | ✉ mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

**From:** Dorsey, Marnie (CMS/CPI) [mailto:Marnie.Dorsey@cms.hhs.gov]
**Sent:** Friday, August 26, 2011 11:38 AM
**To:** Christopher Mucke
**Cc:** James, Merri-Ellen (CMS/CPI); Moreno, Cynthia E. (CMS/CPI); Dangerfield, Teresa (CMS/CPI); Dorsey, Marnie (CMS/CPI)
**Subject:** RE: Draft Process Request......

Chris:  Additionally, do you have other documents that would help in supporting an SOP outline.....that would be helpful!

**From:** Dorsey, Marnie (CMS/CPI)
**Sent:** Friday, August 26, 2011 8:19 AM
**To:** Christopher Mucke
**Cc:** James, Merri-Ellen (CMS/CPI); Moreno, Cynthia E. (CMS/CPI); Dangerfield, Teresa (CMS/CPI); Dorsey, Marnie (CMS/CPI)
**Subject:** RE: Draft Process Request......

Thanks, Chris.  This looks great!  We would like for you to give us a draft of both; eventually, they will become the basis of ACLR's SOP.

**From:** Christopher Mucke [mailto:cmucke@aclrsbs.com]
**Sent:** Friday, August 26, 2011 7:47 AM
**To:** Dorsey, Marnie (CMS/CPI)
**Cc:** James, Merri-Ellen (CMS/CPI); Moreno, Cynthia E. (CMS/CPI); Dangerfield, Teresa (CMS/CPI)
**Subject:** RE: Draft Process Request......

Hey Marnie,

Yes, we can provide you with a draft of our audit process.  Are you looking for an overview of the process or the specifics related to how data flow between CMS and ACLR and/or our system protocols?

While being updated as new information becomes available, we have developed two primary processes for conducting these audits.  The first deals with the procedures and processes required for our Quality Management System (we want to have this project ISO certified).  The QMS addresses the actions necessary to complete each of the steps of our audit processes as shown in the flow charts below:

DP1001



The second process addresses the specifics regarding the flow of information between CMS and ACLR. For example, we are currently developing the process for uploading the workpapers and communications (Demand Letters) to eRAC, or more specifically, the MS Access database that will be utilized until eRAC has been completed.

We can also develop an overview of the process in the form of "Outreach" that addresses the audit methodology from a plan sponsor perspective. Please let me know if either (or none) of these address your immediate request; we have a lot of information that we can tailor specifically to meet your needs. Take care, Chris.

*Christopher Mucke | Managing Principal | ACLR, LLC*
38705 7 Mile Rd, Ste 460 | Livonia, Michigan 48152-3975 | ☏ (734) 744 - 4401 | 🖷 (734) 744 - 4150 | ✉
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

**From:** Dorsey, Marnie (CMS/CPI) [mailto:Marnie.Dorsey@cms.hhs.gov]
**Sent:** Thursday, August 25, 2011 3:17 PM
**To:** Christopher Mucke
**Cc:** Dorsey, Marnie (CMS/CPI); James, Merri-Ellen (CMS/CPI); Moreno, Cynthia E. (CMS/CPI); Dangerfield, Teresa (CMS/CPI)
**Subject:** Draft Process Request......

Chris: Good afternoon. We would like for you to draft a process on how ACLR would go about auditing a plan on excluded providers and duplicate payments. Basically we're looking for draft audit SOP/methodology. Would you be able to begin drafting this process and have something to us by the end of next week?

*Marnie Connolly Dorsey*
*Health Insurance Specialist*
*Centers for Medicare & Medicaid Services*
*Center for Program Integrity*
*Division of Plan Oversight and Accountability*
*PH: 410.786.5942*
*FX: 410.786.9188*
marnie.dorsey@cms.hhs.gov

DP1002

A02076



**RECOVERY AUDIT SERVICES**
**IN SUPPORT OF MEDICARE PART D**

**AUGUST 29, 2011**

**"DRAFT RECOVERY AUDIT PROCEDURES, WORK INSTRUCTIONS, AND FORMS"**

DP1003

# TABLE OF CONTENTS

**PAGE**

**WORK PROCEDURE:**

  WP 750-RA-100 Recovery Audit ................................................................................2

**WORK INSTRUCTIONS:**

  WI 750-RA-100 Pre-Audit Phase ...............................................................................8
  WI 750-RA-200 Audit Phase .....................................................................................14
  WI 750-RA-300 Post-Audit Phase ...........................................................................21

**WORK FORMS:**

  WF 720-RA-001 Audit Task Checklist .......................................................................28
  WF 720-RA-002 Client Recovery Audit Work Instruction Specifics .........................31
  WF 720-RA-003 Information Data Request ...............................................................36
  WF 720-RA-004 Audit Issue Submission Report .......................................................37
  WF 720-RA-005 Approved Audit Issues Report ........................................................38
  WF 720-RA-006 Technical Memorandum .................................................................39
  WF 720-RA-007 Audit Methods List of Pros and Cons .............................................40
  WF 720-RA-008 Audit Notification Letter.................................................................42
  WF 720-RA-009 Memorandum of Understanding Letter..........................................44
  WF 720-RA-010 Additional Documentation Request Letter ....................................48
  WF 720-RA-011 Automated Review Demand Letter.................................................51
  WF 720-RA-012 Complex Review Demand Letter ....................................................53
  WF 720-RA-013 Automated Review Refund Letter...................................................55
  WF 720-RA-014 Complex Review Refund Letter .......................................................57
  WF 720-RA-015 Automated Review No Findings Letter............................................59
  WF 720-RA-016 Complex Review No Findings Letter................................................60
  WF 720-RA-017 Affidavit ..........................................................................................61
  WF 720-RA-018 Audit Closing Memorandum ..........................................................62

**CMS DRAFT WORK FORMS:**

  WF 720-RA-001 Audit Task Checklist - CMS ..............................................................65
  WF 720-RA-002 Client Recovery Audit Work Instruction Specifics – CMS................68
  WF 720-RA-003 Information Data Request – CMS.....................................................74

# TABLE OF CONTENTS CONTINUED

Page

WF 720-RA-005 Approved Audit Issues Report – CMS..............................................75
WF 720-RA-007 Audit Methods List of Pros and Cons – CMS ..................................76
WF 720-RA-008 Audit Notification Letter – CMS.....................................................77
WF 720-RA-010 Additional Documentation Request Letter – CMS ..........................79
WF 720-RA-011 Automated Review Demand Letter – CMS......................................83
WF 720-RA-012 Complex Review Demand Letter – CMS.........................................87
WF 720-RA-013 Automated Review Refund Letter – CMS.......................................91
WF 720-RA-014 Complex Review Refund Letter – CMS...........................................92
WF 720-RA-015 Automated Review No Findings Letter – CMS ..............................93
WF 720-RA-016 Complex Review No Findings Letter – CMS...................................94

DP1005



# WORK PROCEDURE

DP1006

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

**1.0  PURPOSE**

1.1   This procedure describes the process to conduct a recovery audit for our clients.

**2.0  ACTIVITIES AFFECTED**

2.1   This procedure applies to all recovery audits conducted for our clients.

**3.0  FORMS USED**

3.1   The forms utilized to carry out the recovery audit process are referenced in the Work Instructions listed in section 4.0 of this work procedure.

**4.0  REFERENCES**

| Reference Number | Description |
|---|---|
| WI 750-RA-100 | Pre-Audit Phase |
| WI 750-RA-200 | Audit Phase |
| WI 750-RA-300 | Post-Audit Phase |

**5.0  DEFINITIONS**

5.1   Recovery Audit: An audit to identify and recover improper payments.

5.2   Improper Payment: An improper payment occurs when funds go to the wrong recipient, the recipient receives the incorrect amount of funds, or the recipient uses the funds in an improper manner.

**6.0  RESPONSIBILITY**

6.1   The Audit Director is responsible for organizing, planning and directing the audit, reporting audit findings, and evaluating corrective actions/recommendations.

6.2   The Auditors are responsible for assisting with or performing any portion of the audit.

**7.0  INSTRUCTIONS**

DP1007

A02081

7.1    The process map for recovery audits consists of three phases as shown below:



Pre Audit Phase: (see WI 750-RA-100 Pre-Audit Phase)

7.2    The Audit Director reviews the contract and addresses any questions with the Managing Principal, Project Director, and Project Manager and identifies the target.

7.3    The Audit Director meets with audit team personnel to discuss the status of their workload and identify the audit team to conduct the recovery audit.

7.4    The Audit Director and Project Manager meet with the audit team to hold a Pre-Audit conference and discuss the specifics of the contract.

DP1008

7.5     The Project Manager schedules the date the recovery audit will commence and develops, with the assistance of the audit team, a workplan.

7.6     The audit team identifies, researches, and discusses client specifics such as company background and processes.

7.7     The audit team identifies and obtains access to the internal ACLR systems and external client systems to be utilized to conduct the recovery audit.

7.8     The audit team receives or extracts data from the client systems.

7.9     The audit team verifies, via audit application, that the data received or extracted is complete per the pre-defined protocols.

7.10    The audit team performs data maintenance and analysis upon the extracted or requested data files via the audit application.

7.11    The audit team identifies issues and quantifies the potential impact via data analysis, review of misc. sources such as the web or news sources, and through client communication.

        Audit Phase: (see WI 750-RA-200 Audit Phase)

7.12    The audit team researches, reviews, and understands, in detail, the pertinent client policies, procedures, standards, general rules and guidelines, results of previous audits, and codes and regulations related to the approved issues identified in the Pre-Audit Phase.

7.13    Audit Team extracts audit population via the audit application.

7.14    Audit team determines audit methodology and obtains sign-off from Audit Director.

7.15    Audit Director generates an audit notification letter and requests a Pre-Audit conference with entity under audit.

7.16    Audit Director forwards Memorandum of Understanding to entity under audit to confirm Pre-Audit conference discussions.

7.17    Audit team conducts the recovery audit to identify improper payments.

DP1009

A02083

7.18   Audit team creates workpapers generated from Automated Review or post the review of supporting documentation submitted during Complex Review.

7.19   Audit Team discusses workpapers with Audit Director and obtains sign-off and approval.

7.20   Audit team forwards workpapers to client and obtains sign-off and approval.

Post-Audit Phase: (see WI 750-RA-300 Post-Audit Phase)

7.21   Audit team creates final set of workpapers.

7.22   Audit team or Lead Statistician utilizes the workpapers and calculates the assessment or refund.

7.23   Audit team creates a demand, refund, or no findings letter and submits to the Audit Director and then client for sign-off and approval.

7.24   Audit team issues the demand, refund, or no findings letter to the entity under audit.

7.25   Upon receipt of the return receipt the administrative team begins the collection or remittance tracking.

7.26   In the event that the applicability of an improper payment or the calculation of the assessment is contested via an appeal the Audit Director, with assistance from the audit team, provides audit process and improper payment support.

7.27   Upon the holding of the appeal the administrative staff begins collection and remittance tracking.

7.28   Upon final remittance of the refund or receipt of the collection in full the audit team drafts a closing memorandum, submits to the Audit Director for approval, if necessary make changes, and submits to the client.

## 8.0   QUALITY RECORDS

8.1   Perform an annual review to update or incorporate changes to the work procedure.

## 9.0   RECORD OF REVISIONS

DP1010

A02084

| Date | Description | Page No. Affected | Author | Approved By |
|------|-------------|-------------------|--------|-------------|
| 7-May-10 | Initial Issue | All | Christopher Mucke | Christopher Mucke |
| 23-May-11 | QMS Reformat | All | Christopher Mucke | Christopher Mucke |
| 12-Jul-11 | Definitions | 2-3 | Jason Barnes | Christopher Mucke |
| 28-Jul-11 | Instructions | 2 | Jason Barnes | Christopher Mucke |
| 5-Aug-11 | Process Map | 2 | Jason Barnes | Christopher Mucke |

DP1011

A02085



# WORK INSTRUCTIONS

DP1012

A02086



XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

**1.0  PURPOSE**

1.1   The purpose of this document is to provide instructions for conducting the Pre-Audit phase of a recovery audit.

**2.0  SCOPE**

2.1   This Work Instruction applies only to Recovery Audits.

**3.0  RECORDS**

3.1   Client communications, such as emails, are to be electronically maintained in each client's engagement file under the Communication tab as specified under @@-###-##-### Communication.

3.2   Client Documentation, such as workplans and forms, are to be electronically maintained in each client's engagement file under the Documentation Management System tab as specified under @@-###-##-### Documentation Management System or @@ ###-##-### Security Protocols.

3.3   Data is electronically maintained in the ACLR internal data store per @@ ###-##-### Security Protocols.

**4.0  ASSOCIATED DOCUMENTS**

| Reference Number | Description |
|---|---|
| WF 750-RA-001 | Audit Task Check List |
| TBD | Naming Conventions |
| TBD | Engagement Details |
| WF 750-RA-002 | Client Audit Work Instruction Specifics |
| TBD | Contract File Storage |
| TBD | Engagement Type Checklist |
| TBD | Applications |
| TBD | Document Management System |
| TBD | Client Contact List |
| TBD | Security Protocols |
| WF 750-RA-003 | Information Data Request |
| AP 735-A | Report Cover Letter |

DP1013



| WF 750-RA-004 | Audit Issue Submission Report |
| WF 750-RA-005 | Approved Audit Issue Report |
| WF 750-RA-006 | Technical Memorandum |
| WI 750-RA-200 | Audit Phase |

**5.0   DEFINITIONS**

5.1   Recovery Audit: An audit to identify and recover improper payments.

5.2   Improper Payment: An improper payment occurs when funds go to the wrong recipient, the recipient receives the incorrect amount of funds, or the recipient uses the funds in an improper manner.

5.3   Recovery Audit Target: The high level issue, process, or data to be audited to identify improper payments.

**6.0   RESPONSIBILITY**

6.1   The Audit Director is responsible for maintaining the accuracy of this instruction.

**7.0   INSTRUCTIONS**

7.1   The process map for the Pre-Audit Phase of recovery audits is shown below:



7.2   The Audit Director or Audit Team electronically updates the pre-audit phase section of the audit checklist (WF 750-RA-001 Audit Task Checklist) to document the start and end date of each of the tasks performed in this work instruction.  The Audit Task Checklist is to be saved in the client engagement file under the Engagement Details folder per @@ ##-###-#### Naming Conventions and @@ ##-###-#### Engagement Details.

DP1014

A02088



7.3     The Audit Director or Audit Team electronically updates pre-audit phase section of the Client Recovery Audit Work Instruction Specifics Form (WF 750-RA-002 Client Audit Work Instruction Specifics) throughout the pre-audit stage, or if known prior to conducting each step, to document client specific facts, a description of each, and the location of where the fact is saved.  The Client Audit Work Instruction Specifics Form is saved in the client engagement file under the Engagement Folder per @@ ##-###-#### Naming Conventions and @@ ##-###-#### Engagement Details).

7.4     The Audit Director reviews the contract and the engagement file checklist (located within the client engagement file under the contract and engagement type folders) addresses any questions with the Managing Principal, Project Director, and Project Manager and identifies the target.  (see @@ ##-###-#### Contract File Storage and @@ ##-###-#### Engagement Type Checklist)

7.5     The Audit Director meets with the audit managers of each audit team to discuss the status of their workload, through the review of their Client Audit Task Checklists (WF 750-RA-001 Audit Task Checklist), and identify the audit team to conduct the recovery audit.

7.6     The Audit Director and Project Manager meet with the assigned audit team to hold a Pre-Audit conference and discuss the specifics of the contract.

7.7     The Project Manager schedules the date the recovery audit will commence and develops, with the assistance of the audit team, a workplan utilizing Microsoft Project (@@ ##-###-#### Applications) and saves the workplan per @@ ##-###-#### Naming Conventions in the Client Engagement folder under the Documentation Management folder (@@ ##-###-#### Document Management System.)

7.8     The audit team identifies, researches, and discusses client specifics such as company background and processes via the internet or documentation provided by client and saved in the client Documentation Management folder per @@ ##-###-#### Document Management System.

7.9     The audit team identifies the internal ACLR systems and external client systems to be utilized to conduct the recovery audit via a discussion with the Audit Director.  The audit team also obtains access to the client systems per client systems access instructions or by contacting the client systems person identified via the client contact list.  (@@ ##-###-#### Applications and @@ ##-###-#### Client Contact List).

DP1015



7.10    The audit team extracts, via a secure connection, per @@ ##-###-#### Applications, data from the client systems utilizing client protocols and saves to the ACLR Internal Data Store per @@ ##-###-#### Naming Conventions and @@ ##-###-#### Security Protocols or;

7.11    The audit team completes and submits an electronically completed Information Data Request ("IDR") (WF 750-RA-003 Information Data Request) along with a cover letter (AP-735-A Report Cover Letter) and forwards to the client via a pre-determined medium.  The IDR is saved per @@ ##-###-#### Naming Conventions in the client engagement file under the documentation management system folder (@@ ##-###-#### Document Management System) and the communication is saved in the same file under the communications folder (@@ ##-###-#### Document Management System).

7.12    The audit team exports and/or saves the data to the ACLR Internal Data Store in a location defined per @@ ##-###-#### Security Protocols and discussions with the System Security Officer.  (see @@ ##-###-#### Applications, WF 750-RA-003 Information Data Request, and @@ ##-###-#### Naming Conventions).

7.13    The audit team verifies, via a system extraction control report or similar saved in the clients engagement file under the Documentation Management System folder under reference documents, that the file size or record count matches the actual file size or record count within the data set exported to the ACLR internal data store.

7.14    In the event the data does not match the system extraction control report or similar, the audit team re-extracts and/or saves the data to the ACLR internal data store or contacts the client source system help desk for assistance.  (see @@ ##-###-#### Applications, @@ ##-###-#### Naming Conventions, @@ ##-###-#### Security Protocols , @@ ##-###-#### Client Contact List)

7.15    The audit team imports the data into the ACLR internal audit application and verifies that the data fields/elements, saved in the clients engagement file under the Documentation Management System folder under reference documents, match the client system record layout / data dictionary, updates any errors and saves the data to the ACLR internal data store as a working copy per @@ ##-###-#### Naming Conventions, and @@ ##-###-#### Security Protocols.

7.16    The audit team opens the working copy file from the ACLR internal data store, via the ACLR internal audit application, and performs the necessary data maintenance inclusive of appending data sets and merging data sets and data subsets; and saves the data as an Audit Source Population and Audit Source Population working copy to the ACLR internal data store per @@ ##-###-#### Naming Conventions, and @@ ##-###-#### Security

DP1016



Protocols.

7.17    The audit team identifies issues and quantifies the potential impact via data analysis of the
        Audit Source Population working file within the audit application, review of misc. sources
        such as the web or news sources, and through client communication.  (see @@ ##-###-
        #### Communication and @@ ##-###-#### Client Contact List)

7.18    The audit team internally scores/ranks the issues per the data analysis, review of misc
        sources, and through client communication by electronically filling out the Audit Issue
        Submission Report (WF 750-RA-004 Audit Issue Submission Report) for the estimated
        improper payments, estimated recoveries, and feasibility of review.  The Audit Issue
        Submission report is saved in the engagement file per @@ ##-###-#### Naming
        Conventions under the documentation management systems folder (@@ ##-###-####
        Document Management System).  In the event the client provides a list of approved issues
        the audit team will update the Approved Audit Issues Report (WF 750-RA-005 Approved
        Audit Issues Report) and save within the location mentioned above relating to the Audit
        Issue Submission Report.

7.19    The audit team electronically completes an Audit Issues Technical Memorandum (WF 750-
        RA-006 Technical Memorandum) for the identified audit issues and saves per @@ ##-###-
        #### Naming Conventions in the client engagement folder under the reference documents
        folder (@@ ##-###-#### Document Management System.)

7.20    The audit team discusses with and obtains approval of the audit issue submission report
        and audit issue technical memorandums from the Audit Director.  Then the audit team
        sends the report and technical memorandums along with a cover letter (AP-735-A Report
        Cover Letter) to the appropriate client contact (@@ ##-###-#### Client Contact List), per a
        pre-determined medium, for approval and saves the communication in the client
        engagement folder under the communications tab per @@ ##-###-#### Naming
        Conventions under the communications folder (@@ ##-###-#### Communication).

7.21    Upon approval by the client the audit team updates the Client Approved Audit Issues Report
        (WF 750-RA-005 Approved Audit Issues Report).  The Client Approved Audit Issues Report is
        saved in the engagement file per @@ ##-###-#### Naming Conventions under the
        documentation management systems folder (@@ ##-###-#### Document Management
        System).

7.22    The audit team proceeds to the Audit Phase to conduct the recovery audit for the client
        approved issues.  (see WI 750-RA-200 Audit Phase)



## 8.0    RECORD OF REVISIONS

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|------|-------------|-------------------|--------|-------------|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 8-JUL-11 | INSTRUCTION | 2-4 | JASON BARNES | CHRISTOPHER MUCKE |
| 26-JUL-11 | INSTRUCTION | 2-4 | JASON BARNES | CHRISTOPHER MUCKE |
| 5-AUG-11 | PROCESS MAP | 2 | JASON BARNES | CHRISTOPHER MUCKE |

DP1018



XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

**1.0   PURPOSE**

1.1   The purpose of this document is to provide instructions for conducting the Audit phase of a recovery audit.

**2.0   SCOPE**

2.1   This Work Instruction applies only to Recovery Audits.

**3.0   RECORDS**

3.1   Client communications, such as emails, are to be electronically maintained in each client's engagement file under the Communication tab as specified under @@ ##-###-#### Communication.

3.2   Client Documentation, such as workplans and forms, are to be electronically maintained in each client's engagement file under the Documentation Management System tab as specified under @@ ##-###-#### Documentation Management System or @@ ##-###-#### Security Protocols.

3.3   Data and workpapers are electronically maintained in the ACLR internal data store per @@ ##-###-#### Security Protocols.

**4.0   ASSOCIATED DOCUMENTS**

| Reference Number | Description |
|---|---|
| WF 750-RA-001 | Audit Task Check List |
| TBD | Naming Conventions |
| TBD | Engagement Details |
| WF 750-RA-002 | Client Work Instruction Specifics |
| TBD | Document Management System |
| TBD | Security Protocols |
| WF 750-RA-007 | Audit Methods List of Pros and Cons |
| WF 750-RA-008 | Audit Notification Letter |
| AP 735-A | Report Cover Letter |
| TBD | Client Contact List |
| TBD | Communications |

DP1019



| WF 750-RA-009 | Memorandum of Understanding Letter |
| TBD | Applications |
| WF 750-RA-010 | Additional Documentation Request |
| WI 750-RA-300 | Post-Audit Phase |

## 5.0 DEFINITIONS

5.1   Recovery Audit: An audit to identify and recover improper payments.

5.2   Improper Payment: An improper payment occurs when funds go to the wrong recipient, the recipient receives the incorrect amount of funds, or the recipient uses the funds in an improper manner.

5.3   Automated Review: A detailed review of transaction / submission data sets against general rules and guidelines to identify input errors (exceptions) identified by audit application data validation criteria.

5.4   Complex Review: A stratified sampled review of transaction / submission data sets against general rules and guidelines to identify submission errors.  Typically documentation is reviewed to identify any submission errors.

5.5   Sample: In statistics, a sample is a subset of a population.  Typically, the population is very large, making a census or a complete enumeration of all the values in the population impractical or impossible.  The sample represents a subset of a manageable size. Samples are collected and statistics are calculated from the samples so that one can make inferences or extrapolations from the sample to the population.  This process of collecting information from a sample is referred to as sampling.

5.6   Memorandum of Understanding (MOU): A document describing a bilateral or multilateral agreement between parties.  It expresses a convergence of will between the parties, indicating an intended common line of action.

## 6.0 RESPONSIBILITY

6.1   The Audit Director is responsible for maintaining the accuracy of this instruction.

## 7.0 INSTRUCTIONS

7.1   The process map for the Audit Phase of recovery audits is shown below:

DP1020





7.2   The Audit Director or Audit Team electronically updates the audit phase section of the audit checklist (WF 750-RA-001 Audit Task Checklist) to document the start and end date of each of the tasks performed in this work instruction.  The Audit Task Checklist is to be saved in the client engagement file under the Engagement Details folder, per @@ ##-###-#### Naming Conventions and @@ ##-###-#### Engagement Details.

7.3   The Audit Director or Audit Team electronically updates the audit phase section of the Client Recovery Audit Work Instruction Specifics Form (WF 750-RA-002 Client Audit Work Instruction Specifics) throughout the audit stage, or if known prior to conducting each step, to document client specific facts, a description of each, and the location of where the fact is saved.  The Client Audit Work Instruction Specifics Form is saved in the client engagement file under the Engagement Folder, per @@ ##-###-#### Naming Conventions and @@ ##-###-#### Engagement Details.

7.4   The audit team researches, reviews, and understands in detail, the pertinent client policies, procedures, standards, general rules and guidelines, results of previous audits, and codes and regulations related to the approved issues identified in the Pre-Audit Phase obtained from the client and saved in the client engagement file under the Document Management folder (@@ ##-###-#### Documentation Management System).

7.5   The audit team opens, via the ACLR internal audit application saved in the ACLR internal data store, the Audit Source Population working copy, and extracts the pertinent data for the approved issues per identified protocols (such as period, issue, location, etc) and saves as an Audit Population and as a working copy Audit Population to the ACLR internal data store per @@ ##-###-#### Naming Conventions and @@ ##-###-#### Security Protocols.

7.6   The audit team opens, via the ACLR internal audit application saved in the ACLR internal data store, the working copy audit population and performs detailed analysis and saves, per @@ ##-###-#### Naming Conventions,  the analysis results in the client engagement file

DP1021

A02095



under the Document Management System folder (@@ ##-###-#### Documentation Management System).

7.7  The audit team electronically completes the Audit Methods List of Pros and Cons form (WF 750-RA-007 Audit Methods List of Pros and Cons) by listing the pros and cons of conducting the recovery audit via an Automated Review or Complex Review, recommends the correct methodology, and saves the form, per @@ ##-###-#### Naming Conventions, in the client engagement file under the Documentation Management System folder (@@ ##-###-#### Documentation Management System).

7.8  The audit team meets with the Audit Director to discuss the recommended methodology, the support behind the decision, any issues identified by the Audit Director, and obtains final approval and sign-off by the Audit Director electronically completing the Audit Director Approval section of the Audit Methods List of Pros and Cons form (WF 750-RA-007 Audit Methods List of Pros and Cons).

7.9  The Audit Director electronically drafts an Audit Notification letter utilizing the Audit Notification Letter form (WF 750-RA-008 Audit Notification Letter) and an electronic cover letter, per AP 735-A Report Cover Letter, and forwards to the entity (@@ ##-###-#### Client Contact List) under audit per a pre-determined medium; the notification will also request a Pre-Audit Conference.  The Audit Director saves the cover letter and audit notification letter under the client engagement file under the documentation management system folder and saves the communication or mail receipts under the communication folder.  (@@ ##-###-#### Documentation Management System and @@ ##-###-#### Communications)

7.10  The Audit Director contacts the entity (@@ ##-###-#### Client Contact List) under audit by phone and, per confirmation of the entity under audit, schedules a Pre-Audit Conference to discuss the purpose of the audit, an explanation of the audit scope and methodologies, audit expectations and if applicable documents to be reviewed.

7.11  Once the Pre-Audit Conference is complete, Audit Director electronically drafts a Memorandum of Understanding Letter (MOU) utilizing WF 750-RA-009 Memorandum of Understanding Letter, to document the audit scope, sampling methodology, documentation requirements, and the field audit commencement date.  The Audit Director drafts a cover letter per AP 735-A Report Cover Letter, attaches it to the MOU and saves them in the client engagement folder under the Document Management System folder (@@ ##-###-#### Documentation Management System).

DP1022



7.12    The Audit Director sends, per a pre-determined medium, the MOA to the entity (@@ ##-###-#### Client Contact List) under audit and saves the communication or mail receipts under the communication folder (@@ ##-###-#### Communications).

7.13    The audit team begins conducting the recovery audit utilizing the approved methodology. Procedures 7.14 through 7.17 discuss the automated review procedures and Procedures 7.18 through 7.27 discuss the complex review procedures.

*Automated Review:*

7.14    The audit team meets and discusses the  pertinent client policies, procedures, standards, general rules and guidelines, results of previous audits, and codes and regulations related to the approved issues to identify validation requirements to be hardcoded into the ACLR internal audit application to identify improper payments.  (see @@ ##-###-#### Documentation Management System)

7.15    The audit team opens, via the ACLR internal audit application (@@ ##-###-#### Applications) located in the ACLR internal data store, the working copy audit population, hardcodes the validation requirements into the application, runs the application to identify the improper payments, creates a set of electronic workpapers, and saves them to ACLR internal data store per @@ ###-##-### Naming Conventions and @@ ##-###-#### Security Protocols.

7.16    The audit team submits the workpapers to the Audit Director for review and recommendations and changes.  If necessary the audit team updates the workpapers and obtains approval and sign-off from the Audit Director via an email to the audit manager. Workpapers are saved to the ACLR internal data store per @@ ##-###-#### Naming Conventions and @@ ##-###-#### Security Protocols and the approval email is saved in the client engagement file under the communication folder (@@ ##-###-#### Communication).

7.17    The audit team submits, via a pre-determined medium, the approved workpapers to the appropriate client contact (@@ ##-###-#### Client Contact List) for review and recommendations and changes ensuring to encrypt the file per client security protocols (WI @@ ##-###-#### Security Protocols).  If necessary the audit team updates the workpapers and obtains approval and sign-off from the client, via a pre-determined medium, which is then saved in the client engagement file under the communications folder per @@ ##-###-#### Naming Conventions and @@ ##-###-#### Communication.

*Complex Review:*

DP1023

A02097



7.18   The audit team meets and discusses the pertinent client policies, procedures, standards, general rules and guidelines, results of previous audits, and codes and regulations related to the approved issues to prepare for conducting the complex review. (see @@ ##-###-#### Documentation Management System)

7.19   The Lead Statistician opens, via the ACLR internal audit application (@@ ##-###-#### Applications) located in the ACLR internal data store, the working copy audit population and performs statistical analysis and generates a sample utilizing the results of statistical analysis and specific stratification parameters.  The statistical analysis is saved in the client engagement file under the Document Management system folder.  (see @@ ##-###-#### Applications)

7.20   The Lead Statistician saves the sample to the ACLR internal data store per @@ ##-###-#### Naming Conventions and @@ ##-###-#### Security Protocols.

7.21   The audit team creates electronic workpapers containing the sampled items, and creates Additional Documentation Request letters (ADR), per WF 750-RA-010 Additional Documentation Request, requesting documentation supporting each of the sampled records.  The ADR is saved to the client engagement file under the Documentation Management System folder per @@##-###-#### Naming Conventions and @@ ##-###-#### Documentation Management System.

7.22   The audit team creates a cover letter, per AP 735-A Report Cover Letter, and forwards the workpapers, and ADR's to the appropriate personnel (@@ ##-###-#### Client Contact List) of the entity being audited via a pre-determined medium per client request.  The communication or mail receipt is saved in the client engagement file under the communications folder per @@ ##-###-#### Naming Conventions and @@ ##-###-#### Communication.

7.23   Upon receipt of the supporting documentation the audit team saves the documentation electronically to the client engagement file under the Documentation Management system folder, per @@ ##-###-#### Naming Conventions and @@ ##-###-#### Security Protocols, reviews the documentation, identifies improper payments, and updates the workpapers with same.

7.24   Audit Team discusses with entity under audit, via conference call, any issues in regard to the supporting documentation or the need for alternative documentation.

DP1024

A02098



7.25   The audit team submits the workpapers to the Audit Director for review and recommendations and changes.  If necessary the audit team updates the workpapers and obtains approval and sign-off from the Audit Director via an email to the audit manager. Workpapers are saved to the ACLR internal data store, per @@ ##-###-#### Naming Conventions and @@ ##-###-#### Security Protocols, and the approval email is saved in the client engagement file under the communication folder (@@ ##-###-#### Communication.)

7.26   The audit team submits, via a pre-determined medium, the approved workpapers to the appropriate client contact (@@ ##-###-#### Client Contact List) for review and recommendations and changes ensuring to encrypt the file per client security protocols (@@ ##-###-#### Security Protocols).  If necessary the audit team updates the workpapers and obtains approval and sign-off from the client, via a pre-determined medium, which is then saved in the client engagement file under the communications folder @@ ##-###-#### Naming Conventions and @@ ##-###-#### Communication.

7.27   The audit team proceeds to the Post Audit Phase (see WI 750-RA-300 Post Audit Phase).

## 8.0   RECORD OF REVISIONS

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|------|-------------|-------------------|--------|-------------|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 8-JUL-11 | INSTRUCTION | 2-4 | JASON BARNES | CHRISTOPHER MUCKE |
| 26-JUL-11 | INSTRUCTION | 2-4 | JASON BARNES | CHRISTOPHER MUCKE |
| 5-AUG-11 | PROCESS MAP | 2 | JASON BARNES | CHRISTOPHER MUCKE |

DP1025



XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

## 1.0  PURPOSE

1.1  The purpose of this document is to provide instructions for conducting the Post-Audit phase of a recovery audit.

## 2.0  SCOPE

2.1  This Work Instruction applies only to Recovery Audits.

## 3.0  RECORDS

3.1  Client communications, such as emails, are to be electronically maintained in each client's engagement file under the Communication tab as specified under @@ ###-##-### Communication.

3.2  Client Documentation, such as workplans and forms, are to be electronically maintained in each client's engagement file under the Documentation Management System tab as specified under @@ ###-##-### Documentation Management System or @@ ###-##-### Security Protocols.

3.3  Data and workpapers are electronically maintained in the ACLR internal data store per @@ ###-##-### Security Protocols.

## 4.0  ASSOCIATED DOCUMENTS

| Reference Number | Description |
| --- | --- |
| WF 750-RA-001 | Audit Task Check List |
| TBD | Naming Conventions |
| TBD | Engagement Details |
| WF 750-RA-002 | Client Audit Work Instruction Specifics |
| TBD | Security Protocols |
| WF 750-RA-011 | Automated Review Demand Letter |
| WF 750-RA-012 | Complex Review Demand Letter |
| WF 750-RA-013 | Automated Review Refund Letter |
| WF 750-RA-014 | Complex Review Refund Letter |
| WF 750-RA-015 | Automated Review No-Findings Letter |
| WF 750-RA-016 | Complex Review No-Findings Letter |
| TBD | Client Contact List |
| TBD | Communication |

DP1026

| TBD | Document Management System |
|-----|---------------------------|
| AP 735-A | Report Cover Letter |
| WF 750-RA-017 | Affidavits |
| WF 750-RA-006 | Technical Memorandum |
| WF 750-RA-018 | Audit Closing Memorandum |

## 5.0 DEFINITIONS

5.1   Recovery Audit: An audit to identify and recover improper payments.

5.2   Improper Payment: An improper payment occurs when funds go to the wrong recipient, the recipient receives the incorrect amount of funds, or the recipient uses the funds in an improper manner.

5.3   Automated Review – A detailed review of transaction / submission data sets against general rules and guidelines to identify input errors (exceptions) identified by audit application data validation criteria.

5.4   Complex Review - A stratified sampled review of transaction / submission data sets against general rules and guidelines to identify submission errors.  Typically documentation is reviewed to identify any submission errors.

## 6.0 RESPONSIBILITY

6.1   The Audit Director is responsible for maintaining the accuracy of this instruction.

## 7.0 INSTRUCTIONS

7.1   The process map for the Post-Audit Phase of recovery audits is shown below:



DP1027

7.2     The Audit Director or Audit Team electronically updates the post-audit phase section of the audit checklist (WF 750-RA-001 Audit Task Checklist) to document the start and end date of each of the tasks performed in this work instruction.  The Audit Task Checklist is to be saved in the client engagement file under the Engagement Details folder per @@-##-###-#### Naming Conventions and @@-##-###-#### Engagement Details.

7.3     The Audit Director or Audit Team electronically updates post-audit phase section of the Client Recovery Audit Work Instruction Specifics Form (WF 750-RA-002 Client Audit Work Instruction Specifics) throughout the post-audit stage, or if known prior to conducting each step,  to document client specific facts, a description of each, and the location of where the fact is saved.  The Client Audit Work Instruction Specifics Form is saved in the client engagement file under the Engagement Folder per @@ ##-###-#### Naming Conventions and @@-##-###-#### Engagement Details).

7.4     The audit team opens, via the ACLR internal audit application located in the ACLR internal data store, the electronic workpapers and creates a final copy ensuring that any improper payments that were not approved by the Audit Director or the client are removed from the workpapers.  The final copy of the workpapers is saved to the ACLR internal data store per @@ ###-##-### Naming Conventions and @@ ###-##-### Security Protocols.

7.5     In the event that an automated review was conducted, the audit team calculates the assessment or refund by utilizing the final copy the electronic workpapers located in the ACLR internal data store.  In the event that a complex review was conducted the Lead Statistician utilizes the final copy of the electronic workpapers located in the ACLR internal data store to extrapolate the improper payment percentage across the audit population to calculate an assessment or refund.

7.6     The audit team electronically drafts a demand, refund, or no findings letter and submits to the Audit Director for approval and signoff via an email to the audit manager.  (see WF 750-RA-011 Automated Review Demand Letter, WF 750-RA-012 Complex Review Demand Letter, WF 750-RA-013 Automated Review Refund Letter, WF 750-RA-014 Complex Review Refund Letter, WF 750-RA-015 Automated Review No Findings Letter, WF 750-RA-016 Complex Review No Findings Letter,  @@ ###-##-### Client Contact List, and @@-###-##-### Communication)

7.7     The audit team saves the letter to the client engagement file under the Documentation Management system folder and saves the approval email to the communication folder per @@ ###-##-### Naming Conventions.

DP1028

7.8 The audit team sends the demand/refund/no findings letters along with a cover letter to (AP-735-A Report Cover Letter) to the appropriate client contact (@@ ###-##-### Client Contact List), per a pre-determined medium, for approval and saves the communication in the client engagement folder under the communications folder per @@ ##-###-#### Naming Conventions under the communications folder (@@ ##-###-#### Communication).

7.9 The audit team electronically drafts a cover letter per AP-735-A Report Cover Letter and the administrative staff issues the demand, refund, or no findings letters along with a copy of the workpapers to the appropriate personnel via certified mail return receipt and awaits the return of the receipt.  (see @@ ###-##-### Naming Conventions, @@ ###-##-### Client Contact List, @@ ###-##-### Communication, @@ ###-##-### Security Protocols, and @@ ###-##-### Documentation Management System)

7.10 Upon receipt of the return receipt the administrative team begins the collection or remittance tracking.  The return receipt is saved in the client engagement file under the communication folder per @@ ##-###-#### Naming Conventions under the communications folder (@@ ##-###-#### Communication).

7.11 In the event that the applicability of an improper payment or the calculation of the assessment is contested via an appeal, the Audit Director, with assistance from the audit team, provides audit process and improper payment support.

7.12 The Process Map for audit process and improper payment appeals support is provided below:



7.13    The Audit Director obtains and reviews the appeal, saves it to the client engagement file under the communication folder and document management system folder; informs via email and discusses via a meeting with the audit team per @@ ###-##-### Naming Conventions, @@ ###-##-### Communications, and @@ ###-##-### Documentation Management System.

7.14    The audit team reviews the statutory & administrative appeal guidelines via the internet or that were saved in the client engagement folder under the Documentation Management folder per @@ ###-##-### Naming Conventions and @@ ###-##-### Documentation Management System.

7.15    Audit team reviews merits of appeal, forwards copy to the client, and discusses with the client via a scheduled meeting.

7.16    Audit team reviews technical memorandum generated in Pre-Audit phase and saved in the client engagement folder under the Documentation Management folder; assembles exhibits of supporting documentation and prepare affidavits by pertinent personnel per WF 750-RA-

A02104

017 Affidavits.  The affidavits are saved in the client engagement file under the Documentation Management System folder per WI-###-##-### Naming Conventions and WI-###-##-### Documentation Management System.

7.17    Audit Director assists in appeals; provides testimony & litigation support; ensures compliance of administrative remedies; and provides technical memoranda of appeal decisions.  (WF 750-RA-006 Technical Memorandum, @@ ###-##-### Naming Conventions)

7.18    Upon the holding of the appeal the administrative staff starts collection and remittance tracking.

7.19    Upon final remittance of the refund or receipt of the collection in full the audit team drafts a closing memorandum per WF 750-RA-018 Audit Closing Memorandum, submit to the Audit Director for approval via an email to the audit manager, if necessary make changes. The audit closing memorandum is saved to the client engagement folder under the documentation management system folder and the email will be saved under the communications folder per @@ ###-##-### Naming Conventions, @@ ###-##-### Communications, and @@ ###-##-### Documentation Management System.

7.20    The audit team drafts the cover letter for the closing memorandum per AP-735-A Report Cover Letter and the Audit Director forwards to the client, via a predetermined medium, the closing memorandum.  The email will be saved in the client engagement folder under the under the communications folder per @@ ###-##-### Naming Conventions and @@ ###-##-### Communications.

## 8.0    RECORD OF REVISIONS

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|---|---|---|---|---|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 8-JUL-11 | INSTRUCTION | 2-3 | JASON BARNES | CHRISTOPHER MUCKE |
| 26-JUL-11 | INSTRUCTION | 2-3 | JASON BARNES | CHRISTOPHER MUCKE |
| 5-AUG-11 | PROCESS MAP | 2 | JASON BARNES | CHRISTOPHER MUCKE |

DP1031



# WORK FORMS

DP1032



**AUDIT TASK CHECKLIST**

| Pre-Audit Stage | | | |
|---|---|---|---|
| **Task** | **Date Started** | **Date Completed** | **Approver** |
| Review Contract | | | |
| Identify Target | | | |
| Identify Auditors | | | |
| Internal Pre-Audit Conference | | | |
| Schedule Audit | | | |
| Research & Discuss Facts | | | |
| Systems Identification & Access | | | |
| IDR or Data Extraction | | | |
| Data Verification | | | |
| Data Maint. & Analysis | | | |
| Issue Identification | | | |

DP1033



| Audit Stage | | | |
|---|---|---|---|
| **Task** | **Date Started** | **Date Completed** | **Approver** |
| Research | | | |
| Audit Population Extraction | | | |
| Audit Methodology Selection | | | |
|    Audit Director Approval & Signoff | | | |
| Audit Notification Letter | | | |
| External Pre-Audit Conference | | | |
| Memo of Understanding | | | |
| Improper Payment Identification | | | |
|   Automated Review: | | | |
|      Review Pertinent Policies etc. | | | |
|      Hardcode Validation Requirements & Run | | | |
|      Create Workpapers | | | |
|      Audit Director Approval & Signoff | | | |
|      Client Approval & Signoff | | | |
|   Complex Review: | | | |
|      Review Pertinent Policies etc. | | | |
|      Generate Sample | | | |
|      Create Workpapers | | | |
|      ADR's | | | |
|      Documentation Review | | | |
|      Update Workpapers | | | |
|      Audit Director Approval & Signoff | | | |
|      Client Approval & Signoff | | | |

DP1034



| Post-Audit Stage | | | |
|---|---|---|---|
| **Task** | **Date Started** | **Date Completed** | **Approver** |
| Finalize Workpapers | | | |
| Assessment/Refund Calculation | | | |
| Create Demand or Refund Letter | | | |
| Issue Demand or Refund Letter | | | |
| Appeals Support (if applicable) | | | |
| Collection or Remittance Tracking | | | |
| Closing Memorandum | | | |

*RECORD OF REVISIONS:*

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|---|---|---|---|---|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 8-JUL-11 | FORM | ALL | JASON BARNES | CHRISTOPHER MUCKE |
| | | | | |
| | | | | |

DP1035



## CLIENT RECOVERY AUDIT WORK INSTRUCTION SPECIFICS

**PRE-AUDIT PHASE:**

1) **Contract**:
   - Description:
   - Internal ACLR Location:

   - Description:
   - Internal ACLR Location:

   - Description:
   - Internal ACLR Location:

2) **Target:**
   - Description:
   - Internal ACLR Location:

3) **Audit Period:** 2007-2009

4) **Lead Auditor:** Jason Barnes

5) **Audit Team:**

6) **Internal Pre-Audit Conference Date:**

7) **Scheduled Audit Start Date:**

8) **Client Specifics (Background Info):**
   - Description:
   - Internal ACLR Location:

9) **Internal ACLR Applications:**
   - Description:
   - Internal ACLR Location:

10) **External Client Applications:**
    - Description:
    - Internal ACLR Location:

DP1036

A02110


**ACLR** *Strategic Business Solutions*

**11) Data Retrieval Method (Extract or IDR):**

**12) Data Storage Location:**
- <u>Description:</u>
- <u>Internal ACLR Location:</u>

**13) Documents Storage Location:**
- <u>Description:</u>
- <u>Internal ACLR Location:</u>
- <u>External Client Location:</u>

**14) Communications Storage Location:**
- <u>Description:</u>
- <u>Internal ACLR Location:</u>
- <u>External Client Location:</u>

**15) Audit Source Population:**
- <u>Description:</u>
- <u>Internal ACLR Location:</u>

**16) Audit Issue Submission Report:**
- <u>Description:</u>
- <u>Internal ACLR Location:</u>
- <u>External Client Location:</u>

**17) Technical Memorandum (Issues):**
- <u>Description:</u>
- <u>Internal ACLR Location:</u>
- <u>External Client Location:</u>

DP1037

A02111



**AUDIT PHASE:**

1) **Client Policies, Procedures, Standards, General Rules & Guidelines, etc.:**
   - Description:
   - Internal ACLR Location:

2) **Audit Population:**
   - Description:
   - Internal ACLR Location:

3) **Audit Methodology:**
   - Description:
   - Internal ACLR Location:
   - External Client Location:

4) **External Pre-Audit Conference Date:**
   - Description:
   - Internal ACLR Location:

5) **Memorandum of Understanding:**
   - Description:
   - Internal ACLR Location:
   - External Client Location:

6) **ADR Letter (Complex Review):**
   - Description:
   - Internal ACLR Location:
   - External Client Location:

7) **Supporting Documentation (Complex Review):**
   - Description:
   - Internal ACLR Location:

DP1038


**ACLR** *Strategic Business Solutions*

**POST-AUDIT PHASE:**

1) **Final Workpapers:**
   - Description:
   - Internal ACLR Location:
   - External Client Location:

2) **Assessment/Refund Amount Calculation Method:**

3) **Assessment/Refund Amount**

4) **Demand/Refund/No-Findings Letter:**
   - Description:
   - Internal ACLR Location:
   - External Client Location:

5) **Demand/Refund/No-Findings Letter Date:**

6) **Collection or Remittance Due Date:**

7) **Appeal Letter:**
   - Description:
   - Internal ACLR Location:
   - External Client Location:

8) **Appeal Date:**

9) **Affidavits (appeal):**
   - Description:
   - Internal ACLR Location:
   - External Client Location:

10) **Closing Memorandum:**
   - Description:
   - Internal ACLR Location:
   - External Client Location:

DP1039



***RECORD OF REVISIONS:***

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|---|---|---|---|---|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 8-JUL-11 | FORM | ALL | JASON BARNES | CHRISTOPHER MUCKE |

DP1040

A02114



## INFORMATION DATA REQUEST (IDR)

| | |
|---|---|
| Client Name: | |
| Client Contact: | |
| Client Contact Phone Number: | |
| Client Contact Email: | |
| Contractor Name: | |
| Contractor Contact: | |
| Contractor Contact Phone Number: | |
| Contractor Contact Email: | |
| Date of Request: | |
| Due Date: | |
| Issue: | |
| Issue Description: | |
| Period: | |
| Data Request #1: | |
| Data Request #2: | |
| Data Request #3: | |
| Data Request #4: | |
| Data Request #5: | |
| Encryption needed (Yes/No): | |
| Encryption Password: | |
| Transmission Medium: | |

**RECORD OF REVISIONS:**

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|---|---|---|---|---|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 8-JUL-11 | REPORT | ALL | JASON BARNES | CHRISTOPHER MUCKE |
| | | | | |
| | | | | |

DP1041



## AUDIT ISSUE SUBMISSION REPORT

| Rank | Issue | Estimated Improper Payments | Estimated Recoveries | Feasibility | Client Approval Contact |
|------|-------|------------------------------|----------------------|-------------|--------------------------|
|      |       |                              |                      |             |                          |
|      |       |                              |                      |             |                          |
|      |       |                              |                      |             |                          |
|      |       |                              |                      |             |                          |
|      |       |                              |                      |             |                          |

*RECORD OF REVISIONS:*

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|------|-------------|-------------------|--------|-------------|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 8-JUL-11 | REPORT | ALL | JASON BARNES | CHRISTOPHER MUCKE |
|          |            |     |             |                   |
|          |            |     |             |                   |

DP1042



## APPROVED AUDIT ISSUES REPORT

| Rank | Issue | Estimated Improper Payments | Estimated Recoveries | Feasibility | Client Approval Date |
|------|-------|------------------------------|----------------------|-------------|----------------------|
|      |       |                              |                      |             |                      |
|      |       |                              |                      |             |                      |
|      |       |                              |                      |             |                      |
|      |       |                              |                      |             |                      |
|      |       |                              |                      |             |                      |

*RECORD OF REVISIONS:*

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|------|-------------|-------------------|--------|-------------|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 8-JUL-11 | REPORT | ALL | JASON BARNES | CHRISTOPHER MUCKE |
|          |            |     |             |                   |
|          |            |     |             |                   |

DP1043



**{INSERT PROJECT NAME} – {INSERT ISSUE}**

**FACTS:**

{Provide background information on the client, such as information that would be listed in the marketing material, or on a website. Summarize the overall facts of the business processes for which the recovery audit will be conducted upon.}

**ISSUE:**

{List the issue identified throughout the course of the Pre-Audit stage in the form of a question}

**CONCLUSION:**

{Address the issue in the form of an answer}

**DISCUSSION:**

{Discuss the statutes, regulations, or any other information supporting the conclusion}

**RECORD OF REVISIONS:**

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|---|---|---|---|---|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 8-JUL-11 | MEMO | ALL | JASON BARNES | CHRISTOPHER MUCKE |
| | | | | |
| | | | | |

DP1044



## AUDIT METHODS LIST OF PROS AND CONS

| Automated Review |
|---|
| **PROS:** |
| 1) |
| 2) |
| 3) |
| 4) |
| 5) |
| |
| **CONS:** |
| 1) |
| 2) |
| 3) |
| 4) |
| 5) |

| Complex Review |
|---|
| **PROS:** |
| 1) |
| 2) |
| 3) |
| 4) |
| 5) |
| |
| **CONS:** |
| 1) |
| 2) |
| 3) |
| 4) |
| 5) |

DP1045


ACLR *Strategic Business Solutions*

| Recommendation |
|---|
| [Insert Recommended Methodology and description of why} |

| Audit Director Approval | | |
|---|---|---|
| Audit Director Name | Audit Director Signature | Date |
| | | |

*Record of Revisions:*

| Date | Description | Page No. Affected | Author | Approved By |
|---|---|---|---|---|
| 7-May-10 | Initial Issue | All | Christopher Mucke | Christopher Mucke |
| 23-May-11 | QMS Format | All | Christopher Mucke | Christopher Mucke |
| 8-Jul-11 | Report | All | Jason Barnes | Christopher Mucke |
| | | | | |
| | | | | |

DP1046

A02120



Subject: Audit Notification Letter                Date: {Request Date}

Letter Request ID: {.....}

{Contact Name}
{Title}
{Company Name}
{Address}
{City, State, Zip}

Re: {...}

Dear .......,

{Client Name} has retained ACLR, LLC to carry out the recovery audit function for {project name}.   {insert description/background of the reason for the audit} for the period {insert dates}.

{Provide the objective of the recovery audit; the identification of improper payments; etc.}

Standard audit procedures will be utilized inclusive of the review of {processes and procedures, data analysis, supporting document review, and interviews with personnel}.  Provided below are the details of our audit plan inclusive of the {purpose of the audit, explanation of the audit scope, methodologies and parameters; audit expectations; and possible documents to be reviewed}.

{Insert Audit Director Name} is the lead on the audit and will contact you in the next couple of days to schedule a Pre-Audit Conference to discuss the purpose of the audit, a detailed explanation of the {audit scope and methodologies, audit expectations, and possible documents to be reviewed}.

If you have any questions please feel free to contact me or the Audit Director at ###-###-####.

Very truly yours,

DP1047

 **ACLR** *Strategic Business Solutions*

{Name}
{Title}
{Enclosure}

***RECORD OF REVISIONS:***

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|---|---|---|---|---|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 7-JUL-11 | LETTER | ALL | JASON BARNES | CHRISTOPHER MUCKE |
| | | | | |
| | | | | |

DP1048



Subject: Memorandum of Understanding Letter                Date: {Request Date}

Letter Request ID: {.....}

{Contact Name}
{Title}
{Company Name}
{Address}
{City, State, Zip}

Re: Recovery Audit Pre-Audit Conference Dated {...}

Dear .......,

This memorandum of understanding ("MOU"), dated as of {xx/xx/xxxx} is by and between ACLR, LLC and {entity being audited}.

**<u>Recitals</u>**

WHEREAS, {client} has contracted with ACLR, LLC to perform a recovery audit services on their behalf during the period {insert date}.

WHEREAS, {entity being audited} understands that the recovery audit is being conducted to identify improper payments associated with {description of process or data being audited}.

NOW THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein, the parties agree as follows:

1. <u>Purpose</u>
   To establish a cooperative agreement between ACLR, LLC and {entity being audited} on specific audit protocols designed for conducting a recovery audit to identify improper payments associated with {client being audited} {description of process or data being

DP1049



ACLR *Strategic Business Solutions*

audited} for the period {insert dates} as discussed in the pre-audit conference held on {month} {day}, {year}.

2. <u>Definitions</u>

*Recovery Audit* – An audit to identify and recover improper payments

*Improper Payment* – An improper payment occurs when funds go to the wrong recipient, the recipient receives the incorrect amount of funds, or the recipient uses the funds in an improper manner.

*Automated Review* – A detailed review of transaction / submission data sets against general rules and guidelines to identify input errors (exceptions) identified by audit application data validation criteria.

*Complex Review* – A stratified sampled review of transaction / submission data sets against general rules and guidelines to identify submission errors.  Typically documentation is reviewed to identify any submission errors.

*Sample* - In statistics, a sample is a subset of a population.  Typically, the population is very large, making a census or a complete enumeration of all the values in the population impractical or impossible.  The sample represents a subset of a manageable size. Samples are collected and statistics are calculated from the samples so that one can make inferences or extrapolations from the sample to the population.  This process of collecting information from a sample is referred to as sampling.

3. <u>Facts/Processes</u>

    a. {Explanation of Audit Scope}
    b. {Explanation of Audit Methodology}
    c. {Audit Expectations}
    d. {Entity being audited to supply supporting documentation upon request}

4. <u>Contact Persons</u>

DP1050

A02124



*For ACLR, LLC:*
       *Attn: {name}, {title}*
              *{Address}*
              *{City, State, Zip}*

*For {entity being audited}:*
       *Attn: {name}, {title}*
               *{Address}*
              *{City, State, Zip}*

5. <u>Signatures</u>

The persons executing this MOU on behalf of their respective entities hereby represent and warrant that they have the right, power, legal capacity, and appropriate authority to enter into this MOU on behalf of the entity for which they sign.

<u>ACLR, LLC</u>

_____      _____

{Name}                                {Date}
{Title}

<u>{Entity being Audited}</u>

_____      _____

{Name}                                {Date}
{Title}

DP1051



***RECORD OF REVISIONS:***

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|---|---|---|---|---|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 7-JUL-11 | LETTER | ALL | JASON BARNES | CHRISTOPHER MUCKE |
|  |  |  |  |  |
|  |  |  |  |  |

DP1052

A02126



**\*\*EXTERNAL REQUEST**

Subject: Additional Documentation Request                    Date: {Request Date}

Letter Request ID: {.....}

{Contact Name}
{Title}
{Company Name}
{Address}
{City, State, Zip}

Re: {....}

{Client Name} has contracted with ACLR, LLC to perform a recovery audit of…………… {also provide some background information}

This notice is to request documentation for the transaction(s) listed in the attachment.  The transaction(s) requested have been selected for review as part of a {list error and regulations, rules, reference}.

The documentation is being requested because {description of issue}.

All documentation should be submitted to the address or fax number below within {##} days of the date of this notice.  Your response is required even if you are unable to locate the requested documentation.

A copy of the request letter should be affixed to the requested additional documentation.  Please bundle documents for each transaction separately to enable us to confirm receipt of documents.

You may submit the documentation by postal mail (either on paper or as images on CD/DVD or via fax.  Documentation can be mailed to:

        {Company Name}

DP1053



{Address}
{City, State, Zip}

Documentation can be faxed to: ###-###-####.

Questions regarding this request should be directed to {name} at ###-###-####.
Please password protect the CD/DVD utilizing the following password: th!s!smhp@#&$$*1

Please submit the following supporting documents, as applicable, and any other documentation to support payment of the transaction.

    1.
    2.
    3.
    4.
    5.
    6.

Sincerely,


{Name}
{Title}
{Enclosure}

DP1054



**\*\*Internal Client Request**

| Additional Documentation Request | |
|---|---|
| Client Name: | |
| Client Contact: | |
| Client Contact Phone Number: | |
| Client Contact Email: | |
| Contractor Name: | |
| Contractor Contact: | |
| Contractor Contact Phone Number: | |
| Contractor Contact Email: | |
| Date of Request: | |
| Due Date: | |
| Issue: | |
| Issue Description: | |
| Period: | |
| Workpapers Attached (Yes/No): | |
| Document Request #1: | |
| Document Request #2: | |
| Document Request #3: | |
| Document Request #4: | |
| Document Request #5: | |
| Encryption needed (Yes/No): | |
| Encryption Password: | |
| *Please only Submit Legible Documentation* | |

*Record of Revisions:*

| Date | Description | Page No. Affected | Author | Approved By |
|---|---|---|---|---|
| 7-May-10 | Initial Issue | All | Christopher Mucke | Christopher Mucke |
| 23-May-11 | QMS Format | All | Christopher Mucke | Christopher Mucke |
| 8-Jul-11 | Report | All | Jason Barnes | Christopher Mucke |
| | | | | |
| | | | | |

DP1055

A02129



Subject: Automated Review Demand Letter                   Date: {Request Date}

Letter Request ID: {.....}

{Contact Name}
{Title}
{Company Name}
{Address}
{City, State, Zip}

Re: {...}

Dear ......,

{Client Name} has contracted with ACLR, LLC to perform a recovery audit of {provide description}.

This letter is to notify you that {client} has made an overpayment to you for the amount of {demand amount}. {Provide the background and description of the claims associated with this overpayment}.  In order to correct this overpayment, please refund {demand amount} by {demand date}.

Please make check payable to {Client Name} and send it with a copy of this letter to the following address:

        {Client Name}
        {Client Street}
        {Client City, State, and Zip}

Thank you for your cooperation and prompt attention to this overpayment.  If you have any questions regarding this letter or would like to discuss the overpayment identification, please direct your inquiry to {specific contact name or department}  at 1-###-###-####.

Sincerely,

DP1056



{Name}
{Title}
{Enclosure}

**"Key Tmeframes may need to be included here; such as remittance, offset, and appeals."**

*RECORD OF REVISIONS:*

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|------|-------------|-------------------|--------|-------------|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 7-JUL-11 | LETTER | ALL | JASON BARNES | CHRISTOPHER MUCKE |
| | | | | |
| | | | | |

DP1057

A02131



Subject: Complex Review Demand Letter                    Date: {Request Date}

Letter Request ID: {.....}

{Contact Name}
{Title}
{Company Name}
{Address}
{City, State, Zip}

Re: {....}

Dear ......,

{Client Name} has contracted with ACLR, LLC to perform a recovery audit of {provide description}.

This letter is to notify you that {client} has made an overpayment to you for the amount of {demand amount}. {Provide the background and description of the claims associated with this overpayment}.  Our request for additional supporting documentation, detailed in the letter dated XX/XX/XXXX, was insufficient to substantiate that the transactions contained in the workpapers were not improper payments.  In order to correct this overpayment, please refund {demand amount} by {demand date}.

Please make check payable to {Client Name} and send it with a copy of this letter to the following address:

> {Client Name}
> {Client Street}
> {Client City, State, and Zip}

Thank you for your cooperation and prompt attention to this overpayment.  If you have any questions regarding this letter or would like to discuss the overpayment identification, please direct your inquiry to {specific contact name or department} at 1-###-###-####.

DP1058

A02132



Sincerely,


{Name}
{Title}
{Enclosure}


**"Key Tmeframes may need to be included here; such as remittance, offset, and appeals."**



*RECORD OF REVISIONS:*

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|------|-------------|-------------------|--------|-------------|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 7-JUL-11 | LETTER | ALL | JASON BARNES | CHRISTOPHER MUCKE |
|  |  |  |  |  |
|  |  |  |  |  |

DP1059



Subject: Automated Review Refund Letter                     Date: {Request Date}

Letter Request ID: {.....}

{Contact Name}
{Title}
{Company Name}
{Address}
{City, State, Zip}

Re: {...}

Dear {.....}

{Client Name} has contracted with ACLR, LLC to perform a recovery audit of {provide description}.

This letter is to notify you that ACLR, LLC has calculated an underpayment to you in the amount of {refund amount}.  {Provide the background and description of the claims associated with this underpayment}.  In order to correct this underpayment, enclosed please find a check from {client} in the amount of {refund amount} dated {check date}.

If you have any questions regarding this letter or would like to discuss the underpayment identification or the attached workpapers, please direct your inquiry to {specific contact name or department}  at 1-###-###-####.

Sincerely,


{Name}
{Title}
{Enclosure}

***RECORD OF REVISIONS:***

DP1060



| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|------|-------------|-------------------|--------|-------------|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| | | | | |
| | | | | |

DP1061

A02135



Subject: Complex Review Refund Letter                    Date: {Request Date}

Letter Request ID: {.....}

{Contact Name}
{Title}
{Company Name}
{Address}
{City, State, Zip}

Re: {....}

{Client Name} has contracted with ACLR, LLC to perform a recovery audit of {provide description}.

This letter is to notify you that ACLR, LLC has calculated an underpayment to you in the amount of {refund amount}. {Provide the background and description of the claims associated with this underpayment}. Our request for additional supporting documentation, detailed in the letter dated XX/XX/XXXX, was sufficient to substantiate that the transactions contained in the workpapers were not improper payments, however we have enclosed workpapers containing the transaction for which you were underpaid.

In order to correct this underpayment, enclosed please find a check from {client} in the amount of {refund amount} dated {check date}.

If you have any questions regarding this letter or would like to discuss the underpayment identification or the attached workpapers, please direct your inquiry to {specific contact name or department}  at 1-###-###-####.

Sincerely,


{Name}
{Title}
{Enclosure}

DP1062



*RECORD OF REVISIONS:*

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|------|-------------|-------------------|--------|-------------|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| | | | | |
| | | | | |
| | | | | |

DP1063



Subject: Automated Review No Findings Letter                    Date: {Request Date}

Letter Request ID: {.....}

{Contact Name}
{Title}
{Company Name}
{Address}
{City, State, Zip}

Re: {....}

Dear ......,

{Client Name} has contracted with ACLR, LLC to perform a recovery audit of…{.........}.

This letter is to notify you that per the audit notification dated XX/XX/XXXX and the Memorandum of Understanding dated XX/XX/XXXX ACLR, LLC has made a no findings determination based on {description of the issue under review and the info or data reviewed}. No further action is needed on your part.

Sincerely,

{Name}
{Title}
{Enclosure}

*RECORD OF REVISIONS:*

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|---|---|---|---|---|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |

DP1064



Subject: Complex Review No Findings Letter                Date: {Request Date}

Letter Request ID: {.....}

{Contact Name}
{Title}
{Company Name}
{Address}
{City, State, Zip}

Re: {....}

Dear .......,

{Client Name} has contracted with ACLR, LLC to perform a recovery audit of…{.........}.

This letter is to notify you that after examination of the supporting documentation provided per our request for additional supporting documentation, detailed in the letter dated XX/XX/XXXX, ACLR, LLC has made a no findings determination for the issue under review on the transactions contained in the attached workpapers.  No further action is needed on your part.

Sincerely,


{Name}
{Title}
{Enclosure}

*RECORD OF REVISIONS:*

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|---|---|---|---|---|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |

DP1065



Subject: Affidavit                                      Date: {Request Date}

## Affidavit of {*deponent's name or affidavit object*}

My name is {deponent's full name}.  I am {age} years old, am working as a {job title}, at ACLR, LLC which currently resides at 38705 Seven Mile Road, Suite 460, Livonia MI 48152-375.

{Subsequent paragraphs constitute the deponent's core statement of facts, each paragraph being confined to a distinct affidavit fact, also called affidavit deed}

{deponent's full name}, being first duly sworn on oath according to law, deposes and says that {he/she} has read the foregoing AFFIDAVIT OF {full name/object} by {his/her} subscribed, that the matters stated herein are true to the best of {his/her} information, knowledge and belief.

{Deponent's Signature}
{ Deponent's Name}

SUBSCRIBED AND SWORN to before me
This {xx} day of {Month}, {year}.

Public Notary: {Name}
(Signature)

Date of Expiry of Notary's Commission: {date}

**RECORD OF REVISIONS:**

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|------|-------------|-------------------|--------|-------------|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 7-JUL-11 | LETTER | ALL | JASON BARNES | CHRISTOPHER MUCKE |
| | | | | |
| | | | | |

DP1066

A02140



{Date}


{Contact Name}
{Title}
{Company Name}
{Address}
{City, State, Zip}

{SUBJECT LINE}

Dear {Contact Name}:

This letter is intended to provide an overview of the recovery audit performed for {Client Name} ("{Shortened Client Name}").  Specifically, this letter addresses the business overview, recovery audit overview, issues identified, and recommended corrective action.


**BUSINESS OVERVIEW:**

{Provide background information on the client, such as information that would be listed in marketing materials, or on a web site.}

**AUDIT OVERVIEW:**

{Summarize audit results in chronological order, such as initial findings, final/approved findings, and savings provided as a result of our efforts.}

**ISSUES IDENTIFIED:**

{Summarize audit issues identified throughout the course of the recovery audit, such as recurring errors from prior audits, or single significant errors resulting in large liabilities.}

**CORRECTIVE ACTIONS:**

{Provide recommended corrective actions related to the issued previously identified.}

DP1067

A02141



Very truly yours,

{Name}
{Title}
{Enclosure}

**RECORD OF REVISIONS:**

| DATE | DESCRIPTION | PAGE NO. AFFECTED | AUTHOR | APPROVED BY |
|---|---|---|---|---|
| 7-MAY-10 | INITIAL ISSUE | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 23-MAY-11 | QMS FORMAT | ALL | CHRISTOPHER MUCKE | CHRISTOPHER MUCKE |
| 8-JUL-11 | MEMO | ALL | JASON BARNES | CHRISTOPHER MUCKE |
| | | | | |
| | | | | |

DP1068



# CMS DRAFT WORK FORMS

DP1069



**AUDIT TASK CHECKLIST**

| Pre-Audit Stage | | | |
|---|---|---|---|
| **Task** | **Date Started** | **Date Completed** | **Approver** |
| Review Contract | 1/11/2011 | 7/11/2011 | Jason Barnes |
| Identify Target | 1/11/2011 | 7/17/2011 | Jason Barnes |
| Identify Auditors | 2/1/2011 | | |
| Internal Pre-Audit Conference | | | |
| Schedule Audit | | | |
| Research & Discuss Facts | 2/1/2011 | | |
| Systems Identification & Access | 3/1/2011 | | |
| IDR or Data Extraction | | | |
| Data Verification | | | |
| Data Maint. & Analysis | | | |
| Issue Identification | 2/1/2011 | | |



| Audit Stage | | | |
|---|---|---|---|
| **Task** | **Date Started** | **Date Completed** | **Approver** |
| Research | | | |
| Audit Population Extraction | | | |
| Audit Methodology Selection | | | |
| Audit Director Approval & Signoff | | | |
| Audit Notification Letter | | | |
| External Pre-Audit Conference | | | |
| Memo of Understanding | | | |
| Improper Payment Identification | | | |
| Automated Review: | | | |
| Review Pertinent Policies etc. | | | |
| Hardcode Validation Requirements & Run | | | |
| Create Workpapers | | | |
| Audit Director Approval & Signoff | | | |
| Client Approval & Signoff | | | |
| Complex Review: | | | |
| Review Pertinent Policies etc. | | | |
| Generate Sample | | | |
| Create Workpapers | | | |
| ADR's | | | |
| Documentation Review | | | |
| Update Workpapers | | | |
| Audit Director Approval & Signoff | | | |
| Client Approval & Signoff | | | |

DP1071



| Post-Audit Stage | | | |
|---|---|---|---|
| Task | Date Started | Date Completed | Approver |
| Finalize Workpapers | | | |
| Assessment/Refund Calculation | | | |
| Create Demand or Refund Letter | | | |
| Issue Demand or Refund Letter | | | |
| Appeals Support (if applicable) | | | |
| Collection or Remittance Tracking | | | |
| Closing Memorandum | | | |

DP1072

 *Strategic Business Solutions*

## CLIENT RECOVERY AUDIT WORK INSTRUCTION SPECIFICS

### PRE-AUDIT PHASE:

1) **Contract**:
   - <u>Description:</u> RAC Part D Signed Task Order – ACLR.pdf
   - <u>Internal ACLR Location:</u> SharePoint under CMS Client Engagement/Contract.

   - <u>Description:</u> RAC Part D Task Order Pg1 Signed HHSM 500 2011 00006G (4).pdf
   - <u>Internal ACLR Location:</u> SharePoint under CMS Client Engagement/Contract.

   - <u>Description:</u> Attachment J 1 Performance Work Statement and Schedule of Deliverables (2).doc
   - <u>Internal ACLR Location:</u> SharePoint under CMS Client Engagement/Contract.

2) **Target:** Plan Sponsor PDE Data to identify improper payments associated with duplicate payments and excluded providers (LEIE).

3) **Audit Period:** 2007-2009.

4) **Lead Auditor:** Jason Barnes.

5) **Audit Team:** Jason Barnes, Christopher Mucke, Cyndi Schilling.

6) **Internal Pre-Audit Conference Date:**

7) **Scheduled Audit Start Date:** Tentatively 3rd quarter 2011.

8) **Client Specifics (Background Info):**
   - <u>Description:</u> Medicare Part D Prescription Drug Coverage Website.
   - <u>Internal ACLR Location:</u> http://www.medicareadvocacy.org/Print/FAQ_PartD.htm

   - <u>Description:</u> PDE Participant Guide, Current as of 7.8.11.
   - <u>Internal ACLR Location:</u> SharePoint under CMS Client Engagement/Documentation Management System/Reference Documents.

   - <u>Description:</u> 2008 Regional Prescription Drug Event Data Technical Assistance Participant Guide.

DP1073

A02147

 *Strategic Business Solutions*

- Internal ACLR Location:
  http://www.palmettogba.com/internet/Cssc.nsf/files/2008reg-pde-ta-pg-final120808_011509.pdf/$FIle/2008reg-pde-ta-pg-final120808_011509.pdf

- Description:  Centers for Medicare & Medicaid Services Website.
- Internal ACLR Location: https://www.cms.gov/

- Description: PDE Guidance.pdf
- Internal ACLR Location:
  https://www.cms.gov/DrugCoverageClaimsData/Downloads/PDEGuidance.pdf

- Description: PDE Data Elements.pdf
- Internal ACLR Location:
  https://www.cms.gov/PrescriptionDrugCovGenIn/Downloads/PDEDataElements.pdf

- Description:  Part D Standard Benefit 2006-2010.
- Internal ACLR Location:
  http://www.medicareadvocacy.org/InfoByTopic/PartDandPrescDrugs/PartD_09_10.08.Chart_StandardBenefit2006to2010.pdf

- Description:  CCH 2010 Master Medicare Guide.
- Internal ACLR Location:  Audit Directors Desk.

- Description:  2011 CCH Medicare Explained.
- Internal ACLR Location:  Audit Directors Desk.

**9) Internal ACLR Applications:**
- Description: Statistica (Audit Application)
- Internal ACLR Location:  SharePoint under CMS Client Engagement/Applications/Internal ACLR (WI ###-##-### Statistica).

- Description: SharePoint
- Internal ACLR Location: SharePoint under CMS Client Engagement/Applications/Internal ACLR (WI ###-##-### SharePoint).

**10) External Client Applications:**
- Description: CMS SSL VPN Service

DP1074


ACLR *Strategic Business Solutions*

- Internal ACLR Location: SharePoint under CMS Client Engagement/Applications/External Client Systems (WI ###-##-### CMS SSL VPN).

- Description: CMS Secure VPN
- Internal ACLR Location: SharePoint under CMS Client Engagement/Applications/External Client Systems (WI ###-##-### CMS Secure VPN).

- Description: HHS Enterprise Portal
- Internal ACLR Location: SharePoint under CMS Client Engagement/Applications/External Client Systems (WI ###-##-### HHS Enterprise Portal).

- Description: Medicare Exclusion Database
- Internal ACLR Location: SharePoint under CMS Client Engagement/Applications/External Client Systems (WI ###-##-### Medicare Exclusion Database).

- Description:  One PI – Advantage Suites
- Internal ACLR Location: SharePoint under CMS Client Engagement/Applications/External Client Systems (WI ###-##-### One PI Advantage Suites).

- Description:  CFACTS
- Internal ACLR Location: SharePoint under CMS Client Engagement/Applications/External Client Systems (WI ###-##-### CFACTS).

**11) Data Retrieval Method (Extract or IDR):** Tentatively both – IDR = PDE Data via TIBCO, Extract = Misc Data via One PI Advantage Suites or Business Objects.

**12) Data Storage Location:**
- Description: SQL Server – Original Data Extract/Receipt
- Internal ACLR Location:  Co-Location Centre in Atlanta, GA (@:/…./……/….)

- Description:  File Server - Workpapers
- Internal ACLR Location: Co-Location Centre in Atlanta, GA (@:/…./……/….)

**13) Documents Storage Location:**
- Description:  SharePoint

DP1075

A02149

 *Strategic Business Solutions*

- <u>Internal ACLR Location:</u> SharePoint under CMS Client Engagement/Document Management System
- <u>External Client Location:</u> HHS Enterprise Portal?

**14) Communications Storage Location:**
- <u>Description:</u> SharePoint
- <u>Internal ACLR Location:</u> SharePoint under CMS Client Engagement/Communications
- <u>External Client Location:</u> HHS Enterprise Portal?

**15) Audit Source Population:**
- <u>Description:</u>
- <u>Internal ACLR Location:</u>

**16) Audit Issue Submission Report:**
- <u>Description:</u>
- <u>Internal ACLR Location:</u>
- <u>External Client Location:</u> HHS Enterprise Portal?

**17) Technical Memorandum (Issues):**
- <u>Description:</u>
- <u>Internal ACLR Location:</u>
- <u>External Client Location:</u> HHS Enterprise Portal?

DP1076

A02150



**AUDIT PHASE:**

1) **Client Policies, Procedures, Standards, General Rules & Guidelines, etc.:**
   - Description:
   - Internal ACLR Location:

2) **Audit Population:**
   - Description:
   - Internal ACLR Location:

3) **Audit Methodology**
   - Description: Automated Review
   - Internal ACLR Location:
   - External Client Location: HHS Enterprise Portal?

4) **External Pre-Audit Conference Date:**
   - Description:
   - Internal ACLR Location:

5) **Memorandum of Understanding:**
   - Description:
   - Internal ACLR Location:
   - External Client Location: HHS Enterprise Portal?

6) **ADR Letter (Complex Review):**
   - Description:
   - Internal ACLR Location:
   - External Client Location: HHS Enterprise Portal?

7) **Supporting Documentation (Complex Review):**
   - Description:
   - Internal ACLR Location:

DP1077



**POST-AUDIT PHASE:**

1) **Final Workpapers:**
   - <u>Description:</u>
   - <u>Internal ACLR Location:</u>
   - <u>External Client Location:</u> eRAC

2) **Assessment/Refund Amount Calculation Method:**

3) **Assessment Refund Amount:**

4) **Demand/Refund/No-Findings Letter:**
   - <u>Description:</u>
   - <u>Internal ACLR Location:</u>
   - <u>External Client Location:</u> eRAC

5) **Demand/Refund/No-Findings Letter Date:**

6) **Collection or Remittance Due Date:**

7) **Appeal Letter:**
   - <u>Description:</u>
   - <u>Internal ACLR Location:</u>
   - <u>External Client Location:</u> HHS Enterprise Portal?

8) **Appeal Date:**

9) **Affidavits (appeal):**
   - <u>Description:</u>
   - <u>Internal ACLR Location:</u>
   - <u>External Client Location:</u> HHS Enterprise Portal?

10) **Closing Memorandum:**
   - <u>Description:</u>
   - <u>Internal ACLR Location:</u>
   - <u>External Client Location:</u> HHS Enterprise Portal?

DP1078



**ACLR** *Strategic Business Solutions*

## INFORMATION DATA REQUEST (IDR)

| Client Name: | Centers for Medicare and Medicaid Services "CMS" |
|---|---|
| Client Contact: | Marnie Dorsey |
| Client Contact Phone Number: | 410-786-5942 |
| Client Contact Email: | Marnie.dorsey@cms.hhs.gov |
| Contractor Name: | ACLR, LLC |
| Contractor Contact: | Jason Barnes |
| Contractor Contact Phone Number: | 734-744-4400 |
| Contractor Contact Email: | jbarnes@aclrsbs.com |
| Date of Request: | 8/18/2011 |
| Due Date: | TBD |
| Issue: | Recovery Audit Services in Support of Medicare Part D |
| Issue Description: | Improper Payments associated with Duplicate Payments and Excluded Providers |
| Period: | 2007-2009 |
| Data Request #1: | PDE data 2007-2009 |
| Encryption needed (Yes/No): | Yes |
| Encryption Password: | Encrypted via Transmission from TIBCO |
| Transmission Medium: | TIBCO |
| Data Request #1: | |
| Encryption needed (Yes/No): | |
| Encryption Password: | |
| Data Request #1: | |
| Encryption needed (Yes/No): | |
| Encryption Password: | |

DP1079



**APPROVED AUDIT ISSUE REPORT**

| Rank | Issue | Estimated Improper Payments | Estimated Recoveries | Feasibility | Client Approval Date |
|------|-------|------------------------------|----------------------|-------------|----------------------|
| 1 | Duplicate Payments | TBD | TBD | TBD | 08/17/2011 |
| 2 | Excluded Providers | TBD | TBD | TBD | 08/17/2011 |
| 3 | DIR | TBD | TBD | TBD | 08/17/2011 |

DP1080

A02154



## AUDIT METHODS LIST OF PROS AND CONS

| Automated Review |
|---|
| **Pros:** |
| 1) See Recommendation |
| |
| **Cons:** |
| 1) See Recommendation |

| Complex Review |
|---|
| **Pros:** |
| 1) See Recommendation |
| |
| **Cons:** |
| 1) See Recommendation |

| Recommendation |
|---|
| It has been determined upfront by CMS that ACLR will conduct the recovery audit utilizing the automated review methodology.  CMS does not want the recovery audit to be conducted via the complex review methodology at this time. |

| Audit Director Approval | | |
|---|---|---|
| AUDIT DIRECTOR NAME | AUDIT DIRECTOR SIGNATURE | DATE |
| Jason Barnes | | 8/18/2011 |

DP1081

A02155



Subject: Audit Notification Letter                    Date: {Request Date}

Letter Request ID: {.....}

{Contact Name}
{Title}
{Company Name}
{Address}
{City, State, Zip}

Re: Recovery Audit Services in Support of Medicare Part D

Dear ......,

The Centers for Medicare & Medicaid Services (CMS) has retained ACLR, LLC to carry out the Recovery Audit Contractor (RAC) program for Medicare Part D.  The RAC program, mandated by Congress, is aimed at identifying Medicare improper payments for the years 2007-2009.

Title I of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA) (P.L. 108-173) was signed into law on December 8, 2003.  The MMA established a new voluntary outpatient prescription drug benefit under Part D of Title XVIII of the Social Security Act (the Act).  The prescription drug benefit, referred to as Medicare Part D, as well as an employer subsidy for qualified retiree health plans, began on January 1, 2006.  Coverage for the drug benefit will be provided by private prescription drug plans (PDPs) that offer drug-only coverage or through Medicare Advantage (MA) plans that offer both prescription drug and health care coverage (known as MA-PD plans).  These plans must offer a standard drug benefit, but have the flexibility to vary the drug benefit within certain parameters.  The Centers for Medicare & Medicaid Services (CMS) has identified 26 MA Regions and 34 PDP Regions, not including territories, each of which is its own PDP region.

Section 6411(b) of the Affordable Care Act expanded §1893 of the Social Security Act to expand the recovery audit program to identify underpayments and overpayments and recoup overpayments under the Part C and Part D Medicare programs.  The effective date for this provision is December 31, 2010.

DP1082

A02156



CMS has retained ACLR, LLC to identify the following types of overpayments and underpayments (improper payments) associated with PDE submissions during the period 2007-2009:

- Duplicate Payments.
- Excluded Providers (LEIE).

Standard audit procedures will be utilized inclusive of the review of processes and procedures and data analysis.  Provided below are the details of our audit plan inclusive of the purpose of the audit, explanation of the audit scope and methodologies, and audit expectations.

The purpose of the audit is to identify only those PDE submissions associated with duplicate payments or containing excluded providers during the period 2007-2009.  The recovery audit will be conducted via an Automated Review.  An automated review is a method of conducting a detailed review of transaction / submission data sets against general rules and guidelines to identify improper payments via validation criteria hardcoded within an audit application. The expectations of the audit are to not only identify improper payments but to provide recommendations on how to alleviate improper payments from occurring in the future.

Jason Barnes is the lead on the audit and will contact you in the next couple of days to schedule a Pre-Audit Conference to discuss the purpose of the audit, a detailed explanation of the audit scope and methodologies, and audit expectations.

If you have any questions please feel free to contact me or the Audit Director at 734-744-4400.

Very truly yours,


Jason Barnes
Audit Director

DP1083



Subject: Additional Documentation Request          Date [Request Date]

Letter Request ID: [Letter Request ID]

[*RAC Point of Contact*]
[*Plan Sponsor Name*]
[*Street Address Line 1*]
[*Street Address Line 2*]
[*City, State, Zip*]

Re: [Provider Name]  [Provider NPI]

The Centers for Medicare & Medicaid Services (CMS) has retained ACLR to carry out the Recovery Audit Contractor (RAC) program for Medicare Part D. The RAC program, mandated by Congress, is aimed at identifying Medicare improper payments.

This notice is to request documentation for the Prescription Drug Event (PDE) records listed in the attached "Complex Review Schedule (Workpapers)".  The results of our data analysis as identified in the Audit Notification letter issued for this audit period, justified reopening your reconciliation under 42 C.F.R. § 423.346(a).

All documentation should be submitted to the address or secure FAX number below within 45 days of the date of this notice.  Your response is required even if you are unable to locate the requested documentation.  You may choose to submit the requested documentation either on paper or as images on a CD by US Mail, FedEx or UPS or by faxing the documents using our secure FAX line.  Instructions can be found at the end of this letter.

A copy of this request letter should accompany the requested additional documentation. Please bundle documents pertaining to each PDE record separately placing the PDE Reference Number on each document to enable us to confirm receipt of documents.

Please submit the following documentation in support of each Prescription Drug Event (PDE) record identified as an overpayment in the attached "Overpayment Report".

- Beneficiary Application (must include all pages of beneficiary's signed application)
- Screen prints from Plan's enrollment system showing the following member information:

DP1084

A02158



     o  Name and Health Insurance Claim Number (HICN)
     o  Dates span of enrollment for plan year specified on PDE record
     o  Date of Birth
     o  Gender
     o  TrOOP calculation for plan year specified on PDE record

- MARx screen print showing beneficiary's active enrollment with your plan
- If applicable, Low Income Subsidy verification, example; Letter from the Social Security Administration (SSA) or screen print from file sent to you from CMS
- Copy of original prescription associated to the PDE record
- Screen print of adjudicated Pharmacy claim
- Pharmacy invoice for drug dispensed on claim
- Prescriber ID Qualifier Code
- Prescriber ID

### _Instructions for Sending Additional Documentation_

Mailing Address:

ACLR Medicare Part D RAC – ADR

38705 Seven Mile Road, Suite 460

Livonia, MI 48152

**Submission of Paper Documents by US Mail, FedEx or UPS**

(Using the US Postal Service send Certified Mail with Return Receipt Request to assure traceability of delivery)

Include the following:

- Copy of the Additional Request Letter.
- Papers should be free of staples or paperclips.
- Papers should be top faced, and face up.
- Photocopy must be of good quality and legible.
- Documents should be copied on ONLY ONE SIDE.
- Include PDE REFERENCE NUMBERon each page of documentation associated with PDE line.

DP1085

A02159



- Please submit only requested documentation as identified in the letter and that the documentation specifically supports the referenced PDE line.

**Submission of Paper Documents by Secure FAX**

- Cover Page with Letter Request Number, Plan Name and Contract Number, and include the total number of pages.
- Copy of the Additional Request Letter
- Insert a separate Cover Page for each PDE Reference Number, with corresponding documentation following referencing the PDE Reference Number on each page.
- Papers should be top faced, and face up.
- Please submit only requested documentation as identified in the letter and that the documentation specifically supports the referenced PDE line.
- Verify successful transmission, and print confirmation page for your records.

**Submission of Additional Documentation Images on CD**

- Please note that all additional documentation is due within 45 daysfrom the date of the Additional Documentation Request letter
- Please submit only requested documentation as identified in the letter and that the documentation specifically supports the referenced PDE line
- Scanned image resolution must be of good quality and legible. (300 dpi and in black and white)
- Image format must be in pdf format
- DO NOT password protect the individual pdf files. Instead, zip all pdf's into a WinZip file and encrypt it, using the following password xxxxxxx.
- The image file name must include the PDE Reference Number
- CD's should be sent in a tamper-proof package

Thank you for your cooperation and prompt attention to this request. If you have any questions regarding this letter, please direct your inquiry to an ACLR Part D Audit Recovery Specialist at 800-555-1234.

Very truly yours,

{Name}

DP1086

A02160



{Title}
{Enclosure}

DP1087

 **ACLR** *Strategic Business Solutions*

Subject:   Automated Review – Demand Letter                 Date: Request Date

Letter Request ID: [Number]

RAC Point of Contact
Plan Sponsor Name
Street Address
City, State, ZIP

Re:   [Plan Name], [Plan Number]

Dear [Plan Sponsor]

The Centers for Medicare & Medicaid Services (CMS) has retained ACLR, LLC to carry out the Recovery Audit Contractor (RAC) program for Medicare Part D.  The RAC program, mandated by Congress, is aimed at identifying Medicare improper payments.

This letter is to notify you that Medicare has made an overpayment to you for the amount of {$Demand Amount}. A brief description of the Prescription Drug Events (PDE) associated with this overpayment can be found on the "Overpayment Report (workpapers)" as an attachment to this document.  Please refund {$Demand Amount} no later than {Demand Date + 41} days to avoid "Offset" from occurring and assessment of interest of this overpayment under 42 C.F.R. § 405.370-371.

These overpayments were generated from data analysis performed on PDE data submitted to CMS from {Plan Name}, {Plan Number}.  The results of our data analysis justified reopening reconciliation under regulation 42 C.F.R. § 423.346(a), 42 C.F.R. § 423.346(b)(3).

**Please make the check payable to CMS, and reference the Letter Request ID on the Check. Send the check with a copy of this letter to the following address:**

> ACLR Medicare Part D RAC
> 38705 Seven Mile Road, Suite 460
> Livonia, MI 48152

DP1088



All requests for immediate offset must be completed through ACLR Medicare Part D Services. Please send your request through our secure FAX line: 888-###-####.  Please ensure the fax cover page clearly indicates the request for immediate offset and includes the original demand letter which clearly identifies which PDE records should be immediately offset.

Thank you for your cooperation and prompt attention to this request.  If you have any questions regarding this letter, please direct your inquiry to an ACLR Part D Audit Recovery Specialist at 800-###-####.

**Key Timeframes**

As you review the overpayment, below is some important information regarding Key Timeframes and Appeals to consider:

**15 Days**

- Rebuttal Process: Under our existing regulations 42 C.F.R. § 405.373 - 375, plan sponsors have 15 days from the date of this demand letter to submit a rebuttal statement. The rebuttal process provides the opportunity to submit a statement and accompanying information indicating why offset should not be initiated.  The outcome of the rebuttal process could change how or if CMS will initiate offset activities.  If you have reason to believe that offset should not occur on [Demand Date + 41] you must notify ACLR before [Demand Date + 41].  ACLR will forward your documentation to CMS to review.  ACLR will advise you of the decision in writing within 15 days of your request.  However, the rebuttal statement is not an appeal of the overpayment determination, and it will not delay/cease offset activities.

**40 Days**

- Offset: After 40 days Medicare will begin withholding.  NOTE: The withholding of Medicare payments will apply to current and future subsidy payments until the full overpayment amount and any applicable interest has been recouped or an acceptable extended repayment request is received.

**How to Stop Offset**

Even if the overpayment and any assessed interest have not been paid in full you can stop Medicare from offsetting any payments if you act quickly and decidedly.  Medicare will permit plan sponsors to stop offset at several points.  This first occurs if Medicare receives a valid and timely request to begin the Appeals process within 40 days from the date of this letter.  If the

DP1089

A02163



appeal is filed later than 40 days, we will also stop recoupment at whatever point that an appeal is received but Medicare may not refund any recoupment already taken.  The deadline to file an Redetermination (the first level of Appeal) is 60 days.

Medicare will again stop offset if, following an unfavorable or partially favorable redetermination decision, you decide to act quickly and file a valid request for reconsideration with the Independent Review Entity (IRE).  The address and details on how to file a request for reconsideration will be included in the redetermination decision letter.

**Appeal Rights**

An appeal is a review performed by people independent of those who have reviewed your payment so far.  There are multiple levels of appeals.  The first level of appeal is called a "Redetermination."  Plan Sponsors must file a Request for Redetermination within 60 days of receipt of this demand letter as outlined in regulation 42 C.F.R. § 423.582.  This process provides the Part D sponsor the opportunity to submit a statement and accompanying evidence indicating why they disagree with the finding or issues in the demand letter and the reasons for their disagreements.  You have the option to appeal all of the PDE records found to have an overpayment, from the "Overpayment Report" or certain PDE records in the "Overpayment Report".  We request that you clearly indicate on your request that this is a "Part D RAC Overpayment Appeal" and you are requesting a Redetermination.  Send your appeal request with a copy of this entire letter to:

> ACLR Medicare Part D RAC - Appeals
> 38705 Seven Mile Road, Suite 460
> Livonia, MI 48152

CMS will have 7 days to respond as outlined in 42 C.F.R. § 423.590.  If you do not receive a response from CMS after 7 days your appeal is deemed denied and will automatically be sent to the Independent Review Entity (IRE) as the next step of appeal; 42 C.F.R. § 423.590(c).

NOTE: Interest continues to accrue throughout the appeals process.

**Information for those in Bankruptcy:** If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process.  Please contact us immediately to notify us about the

DP1090



bankruptcy so that we may coordinate with CMS and the Department of Justice to assure your situation is handled appropriately.  Please supply the name and district under which the bankruptcy is filed if possible.

Very truly yours,

{Name}
{Title}
{Enclosure}

DP1091


**ACLR** *Strategic Business Solutions*

Subject:   Complex Review Demand Letter                     Date: Request Date

Letter Request ID: [Number]

RAC Point of Contact
Plan Sponsor Name
Street Address
City, State, ZIP

Re:   Plan Name, Plan Number

Dear [Plan Sponsor]

The Centers for Medicare & Medicaid Services (CMS) has retained ACLR to carry out the Recovery Audit Contractor (RAC) program for Medicare Part D.  The RAC program, mandated by Congress, is aimed at identifying Medicare improper payments.

This letter is to notify you that Medicare has made an overpayment to you for the amount of $*Demand Amount*.   The enclosed "Complex Review Schedule (workpapers)" provides the detailed reason(s) for the overpayment determination.  In order to correct this overpayment, please refund the [*Demand Amount*] by [*Demand Date + 41*], to avoid "Offset" from occurring and assessment of interest of this overpayment under regulation 42 C.F.R. § 405.370-371.

Our request for additional documentation, detailed in a letter dated xx/xx/xxxx, constituted reopening reconciliation under regulation 42 C.F.R . § 423.346(a).

**Please make the check payable to CMS, and reference the Letter Request ID on the Check. Send the check with a copy of this letter to the following address:**

ACLR Medicare Part D RAC
38705 Seven Mile Road, Suite 460
Livonia, MI 48152

All requests for immediate offset must be completed through ACLR Medicare Part D RAC. Please FAX requests to our secure FAX line 888-123-4567.  Please ensure that the FAX cover

DP1092



page clearly indicates the request for immediate offset and includes the original demand letter with the "Complex Review Schedule" which clearly identifies which PDE records should be immediately offset.

Thank you for your cooperation and prompt attention to this overpayment.  If you have any questions regarding this letter or would like to discuss the overpayment identification, please direct your inquiry to an ACLR Part D Audit Recovery Specialist at 800-555-1234.

**Key Timeframes**

As you review the overpayment, below is some important information regarding Key Timeframes and Appeals to consider:

**15 Days**

- Rebuttal Process:  Under our existing regulations 42 C.F.R. § 405.373 - 375, plan sponsors have 15 days from the date of this demand letter to submit a rebuttal statement.  The rebuttal process provides the opportunity to submit a statement and accompanying information indicating why offset should not be initiated.  The outcome of the rebuttal process could change how or if CMS will initiate offset activities.  If you have reason to believe that offset should not occur on [Demand Date + 41] you must notify ACLR before [Demand Date + 41].  ACLR will forward your documentation to CMS to review.  ACLR will advise you of the decision in writing within 15 days of your request.  However, the rebuttal statement is not an appeal of the overpayment determination, and it will not delay/cease offset activities.

**40 Days**

- Offset:  After 40 days Medicare will begin withholding.  NOTE:  The withholding of Medicare payments will apply to current and future subsidy payments until the full overpayment amount and any applicable interest has been recouped or an acceptable extended repayment request is received.

**How to Stop Offset**

DP1093



Even if the overpayment and any assessed interest have not been paid in full you can stop Medicare from offsetting any payments if you act quickly and decidedly.  Medicare will permit plan sponsors to stop offset at several points.  This first occurs if Medicare receives a valid and timely request to begin the Appeals process within 40 days from the date of this letter.  If the appeal is filed later than 40 days, we will also stop recoupment at whatever point that an appeal is received but Medicare may not refund any recoupment already taken.  The deadline to file an Redetermination (the first level of Appeal) is 60 days.

Medicare will again stop offset if, following an unfavorable or partially favorable redetermination decision, you decide to act quickly and file a valid request for reconsideration with the Independent Review Entity (IRE).  The address and details on how to file a request for reconsideration will be included in the redetermination decision letter.

**Appeal Rights**

An appeal is a review performed by people independent of those who have reviewed your payment so far.  There are multiple levels of appeals.  The first level of appeal is called a "Redetermination."  Plan Sponsors must file a Request for Redetermination within 60 days of receipt of this demand letter as outlined in regulation 42 C.F.R. § 423.582.  This process provides the Part D sponsor the opportunity to submit a statement and accompanying evidence indicating why they disagree with the finding or issues in the demand letter and the reasons for their disagreements.  You have the option to appeal all of the PDE records found to have an overpayment, from the "Overpayment Report" or certain PDE records in the "Overpayment Report."  We request that you clearly indicate on your request that this is a "Part D RAC Overpayment Appeal" and you are requesting a Redetermination.  Send your appeal request with a copy of this entire letter to:

ACLR Medicare Part D RAC - Appeals
38705 Seven Mile Road, Suite 460
Livonia, MI 48152

CMS will have 7 days to respond as outlined in 42 C.F.R. § 423.590.  If you do not receive a response from CMS after 7 days your appeal is deemed denied and will automatically be sent to the Independent Review Entity (IRE) as the next step of appeal; 42 C.F.R. § 423.590(c).

A02168



NOTE:  Interest continues to accrue throughout the appeals process.

**Information for those in Bankruptcy:**  If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process.  Please contact us immediately to notify us about the bankruptcy so that we may coordinate with CMS and the Department of Justice to assure your situation is handled appropriately.  Please supply the name and district under which the bankruptcy is filed if possible

Very truly yours,


{Name}
{Title}
{Enclosure}

DP1095

A02169



Subject: Automated Review Refund Letter                    Date: {Request Date}

Letter Request ID: {.....}

RAC Point of Contact
Plan Sponsor Name
Street Address
City, State, ZIP

Re:   [Plan Name], [Plan Number]

Dear [Plan Sponsor]

The Centers for Medicare & Medicaid Services (CMS) has retained ACLR to carry out the Recovery Audit Contractor (RAC) program for Medicare Part D.  The RAC program, mandated by Congress, is aimed at identifying Medicare improper payments.

This letter is to notify you that ACLR, LLC has calculated an underpayment to you in the amount of {refund amount}.  {Provide the background and description of the claims associated with this underpayment}.  In order to correct this underpayment, enclosed please find a check from {client} in the amount of {refund amount} dated {check date}.

If you have any questions regarding this letter or would like to discuss the underpayment identification or the attached workpapers, please direct your inquiry to {specific contact name or department}  at 1-###-###-####.

Sincerely,

{Name}
{Title}
{Enclosure}

DP1096

A02170

 **ACLR** *Strategic Business Solutions*

Subject: Complex Review Refund Letter                              Date: {Request Date}

Letter Request ID: {.....}

{Contact Name}
{Title}
{Company Name}
{Address}
{City, State, Zip}

Re: {.....}

The Centers for Medicare & Medicaid Services (CMS) has retained ACLR, LLC to carry out the Recovery Audit Contractor (RAC) program for Medicare Part D.  The RAC program, mandated by Congress, is aimed at identifying Medicare improper payments.

This letter is to notify you that ACLR, LLC has calculated an underpayment to you in the amount of {refund amount}.  {Provide the background and description of the claims associated with this underpayment}.  The additional supporting documentation, requested in the letter dated XX/XX/XXXX, was sufficient to substantiate that the transactions contained in the workpapers were not improper payments, however we have enclosed workpapers containing the transaction for which you were underpaid.

In order to correct this underpayment, enclosed please find a check from {client} in the amount of {refund amount} dated {check date}.

If you have any questions regarding this letter or would like to discuss the underpayment identification or the attached workpapers, please direct your inquiry to {specific contact name or department}  at 1-###-###-####.

Sincerely,

{Name}
{Title}
{Enclosure}

DP1097

A02171



Subject:   Automated Review No Findings Letter                    Date: Date

Letter Request ID: {Number}

{RAC Point of Contact}
{Plan Sponsor Name}
{Street Address}
{City, State, ZIP}

Re:   {Plan Name}, {Plan Number}

Re: {Plan Name},   {PDP Contract Number}

Dear Plan Sponsor,

The Centers for Medicare & Medicaid Services (CMS) has retained ACLR, LLC to carry out the Recovery Audit Contract (RAC) program for Medicare Part D.  The RAC program, mandated by Congress, is aimed at identifying Medicare improper payments.

This letter is to notify you that per the audit notification dated XX/XX/XXXX and the Memorandum of Understanding dated XX/XX/XXXX ACLR, LLC has made a no findings determination for the improper payment recovery audit under review on PDE records for the period XX/XX/XXXX through XX/XX/XXXX.  No further action is required.

Very truly yours,


{Name}
{Title}
{Enclosure}

DP1098

A02172



Subject:   Complex Review No Findings Letter                    Date: {Date}

Letter Request ID: {Number}

{RAC Point of Contact}
{Plan Sponsor Name}
{Street Address}
{City, State, ZIP}

Re:   {Plan Name}, {Plan Number}

Re: {Plan Name},   {PDP Contract Number}

Dear Plan Sponsor,

The Centers for Medicare & Medicaid Services (CMS) has retained ACLR, LLC to carry out the Recovery Audit Contract (RAC) program for Medicare Part D.  The Part D RAC program, mandated by Congress, is aimed at identifying Medicare improper payments.

Our Additional Documentation Request, detailed in a letter dated {Request Date}, constituted reopening under 42 C.F.R. § 423.346(a).

This letter is to notify you that after examining the documentation ACLR, LLC has made a "No Findings" determination for the improper payment audit under review on the PDE record(s) for which documentation was requested.  No further action is required.

Very truly yours,


{Name}
{Title}
{Enclosure}

DP1099

A02173



## ACLR FROM/TO CMS "INFORMATION FLOW" CHART



DP1100

# TAB 109

| From: | Christopher Mucke |
|---|---|
| To: | James, Merri-Ellen \(CMS/CPI\) |
| Cc: | Moreno, Cynthia E. \(CMS/CPI\) ; Dorsey, Marnie \(CMS/CPI\) ; Dangerfield, Teresa \(CMS/CPI\) ; jbarnes@aclrsbs.com |
| Subject: | Audit Issues / Improper Payment Calculation - Outreach |
| Date: | Monday, October 10, 2011 4:19:00 PM |
| Attachments: | Plan Sponsor Outreach - Excluded Providers.pdf |
| | Plan Sponsor Outreach - Duplicate Payments.pdf |
| | Plan Sponsor Outreach - Improper Payments.pdf |

Merri-Ellen,

The proposed one page outlines for excluded providers and duplicate payments outreach is attached as you requested.  I have also attached the proposed outreach for the proposed improper payment calculation methodology.  As mentioned earlier, the payment methodology format coincides with the 2011 PDE Participant Guide.  Please let me know if you have any questions or prefer a different outreach format.  Thank you, Chris.

*Christopher Mucke | Managing Principal | ACLR, LLC*
38705 7 Mile Rd, Ste 460 | Livonia, Michigan 48152-3975 | ☏ (734) 744 - 4401 | 🖷 (734) 744 - 4150 | ✉
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

**From:** James, Merri-Ellen (CMS/CPI) [mailto:merri-ellen.james@cms.hhs.gov]
**Sent:** Wednesday, October 05, 2011 10:21 AM
**To:** Christopher Mucke
**Cc:** Moreno, Cynthia E. (CMS/CPI); Dorsey, Marnie (CMS/CPI); Dangerfield, Teresa (CMS/CPI)
**Subject:** RE: Audit Scope

Chris,
Sorry, meant to add this to my previous email.  Would you please draft a one page outline for each process, identification of improper payments associated with excluded providers and duplicate payments.  The target audience is Part D Plan Sponsors.  We also need a draft of the proposed Improper payment calculation methodology, again for Part D plan sponsors.  If you recall the reconciliation risk sharing analysis assumes 100% of DIR, I would like to make it 100% - the ratio applied to the reinsurance subsidy. I've asked folks in the payment area about this and have not gotten a response.  Unless you've figured out why we would assume 100%, I'd rather progress with a calculation that seems more accurate.  Thanks, M-E

Merri-Ellen James
Medicare Program Integrity Group
7500 Security Blvd.
Baltimore, MD 21244
410.786.4462

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:*
*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

**From:** Christopher Mucke [mailto:cmucke@aclrsbs.com]
**Sent:** Wednesday, October 05, 2011 6:35 AM
**To:** James, Merri-Ellen (CMS/CPI)
**Subject:** RE: Audit Scope

Thanks Merri-Ellen, that's helpful.  I'm probably a little oversensitive about the data and tend to overanalyze any information we receive about them.  Take care, Chris.

*Christopher Mucke | Managing Principal | ACLR, LLC*
38705 7 Mile Rd, Ste 460 | Livonia, Michigan 48152-3975 | ☏ (734) 744 - 4401 | 🖷 (734) 744 - 4150 | ✉
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

DP1105

A02179

**From:** James, Merri-Ellen (CMS/CPI) [mailto:merri-ellen.james@cms.hhs.gov]
**Sent:** Tuesday, October 04, 2011 1:49 PM
**To:** Christopher Mucke
**Cc:** Dorsey, Marnie (CMS/CPI); Dangerfield, Teresa (CMS/CPI); Moreno, Cynthia E. (CMS/CPI)
**Subject:** RE: Audit Scope

Chris,
Please see my responses below in red.  Thanks, M-E

Merri-Ellen James
Medicare Program Integrity Group
7500 Security Blvd.
Baltimore, MD 21244
410.786.4462

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:*
*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

**From:** Christopher Mucke [mailto:cmucke@aclrsbs.com]
**Sent:** Tuesday, October 04, 2011 11:12 AM
**To:** James, Merri-Ellen (CMS/CPI)
**Cc:** Dorsey, Marnie (CMS/CPI); Dangerfield, Teresa (CMS/CPI); Moreno, Cynthia E. (CMS/CPI)
**Subject:** RE: Audit Scope
**Importance:** High

Thanks Merri-Ellen, this information was helpful and our questions/comments are below.

It was our understanding that PDE was often submitted by plan sponsors after the six month deadline (June 30) of each plan year and that this data was not used in performing the reconciliation process.  When you state "pull date" on "X date" does that mean that we will also receive those PDE submitted after the initial six month deadline (but before it was sent to us on the X date) or only those data timely submitted?  If so, will the PDE CPP data we receive reconcile to the data used in the reconciliation process? Yes because you will only be able to review data from reconciled years.  If not, what will be our basis of calculating a liability (how will we know which risk corridor applies) or will the data provided be utilized to calculate "current CPP" and our resultant liability calculations? We will provide the reconciliation results to you.  I apologize for assuming we discussed this as your improper payment methodology reflects this concept.

Does "currently active sponsors" mean those sponsors currently offering plans (2011) or sponsors active during the 2007-2009 plan years? Currently active refers to sponsors offering plans in CY 2011.  The Office of Financial Management requested that terminated contracts be excluded from Part D RAC audits.

We have considered utilizing EPLS but believe that it will be difficult to implement during the initial recovery audit phases.  To your point, matching names, addresses, and the like is relatively easy but relies on a more manual review to ensure accuracy.  This also raises the question of the "likelihood of improper payment" (we've been operating under "known error" parameters).  While matching to EPLS is a valid process and likely to yield additional errors it does not ensure the same specificity as that of matching an NPI from MED.  In the latter instance, a plan sponsor submitted a specific identifiable excluded provider virtually guaranteeing an error while the former process yields a potential (albeit likely) error.  This begs the question - what about invalid prescribers identified in previous audits?  A common improper payment error is to override existing controls such as an exclusion database to process a transaction that otherwise would not be processed.  In other words, an invalid identifier is much more "likely" to be in error than normally submitted PDE;  should we be identifying invalid numbers as well? We were not given approval to include invalid prescriber identifiers as an audit scope issue.

---

*Christopher Mucke | Managing Principal | ACLR, LLC*
38705 7 Mile Rd, Ste 460 | Livonia, Michigan 48152-3975 | ☎(734) 744 - 4401 | 🖷(734) 744 - 4150 | ✉
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

DP1106

**From:** James, Merri-Ellen (CMS/CPI) [mailto:merri-ellen.james@cms.hhs.gov]
**Sent:** Tuesday, October 04, 2011 9:58 AM
**To:** Christopher Mucke
**Cc:** Dorsey, Marnie (CMS/CPI); Dangerfield, Teresa (CMS/CPI); Moreno, Cynthia E. (CMS/CPI); James, Merri-Ellen (CMS/CPI)
**Subject:** FW: Audit Scope
**Importance:** High

Chris,

Due to some of the issues you identify below, we have decided that you will receive a data pull of all PDEs from the IDR on X date. These PDEs will have been submitted by currently active sponsors for dates of service starting in cy 2007 and running through CY 2009. You will review that data for improper payments for approved audit scope issues, so far excluded providers and duplicate payments. You will not be responsible for assuming any changes to that data after it has been pulled for review. There are no current CMS or law enforcement actions that would impact that data. Sponsors will be informed that once the data is pulled they will not "get credit" for submitting corrected data.

Re your proposed methodologies. Have you considered utilizing the EPLS list to enhance the number of matches. My understanding is that the EPLS has more information than the LEIE and MED. In separate studies, we have seen the match rate rise substantially with the additional information. I believe the drawback is in validating the matches. Many are based on name matches. I'm not what percent you could increase your match rate by but it may be of value.

Your duplicate payment methodology looks sound. Again, you will not be responsible for analyzing PDEs that are submitted after the pull date. This should eliminate many of the complications you identified. Let me know your thoughts.


Merri-Ellen James
Medicare Program Integrity Group
7500 Security Blvd.
Baltimore, MD 21244
410.786.4462


*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

---

**From:** James, Merri-Ellen (CMS/CPI)
**Sent:** Friday, September 30, 2011 1:06 PM
**To:** James, Merri-Ellen (CMS/CPI)
**Subject:** RE: Audit Scope

---

**From:** Christopher Mucke [cmucke@aclrsbs.com]
**Sent:** Friday, September 30, 2011 12:40 PM
**To:** James, Merri-Ellen (CMS/CPI)
**Cc:** Dorsey, Marnie (CMS/CPI); Moreno, Cynthia E. (CMS/CPI); jbarnes@aclrsbs.com
**Subject:** RE: Audit Scope

Merri-Ellen,

During our conference call on Wednesday, I discussed some of the difficulties with providing more detailed information. In short, without reviewing the data we cannot measure the type of data or the integrity and credibility of the data we will be receiving. For example, we've reviewed DDPS rules and requirements regarding adjusted/deleted records and how "DDPS will exclude inactivated PDE records from any subsequent calculations for the beneficiary, PBP, or Contract". Until we can confirm that statement and determine precisely (identify all PDE whose CPP reconciles to UAARCC) we cannot propose a methodology that may require that we eliminate originally submitted PDE that were subsequently adjusted versus never seeing (by virtue of it not being transmitted to us) the originally submitted PDE; a KEY consideration in identifying relevant PDE for review and, more specifically, duplicate payments. This coupled with variances between the "sample data" provided and known available fields from IDR make it difficult for us to quantify these processes. Having said that; however, we believe the following may result in a proposed audit methodology:

EXCLUDED PROVIDERS:

The sample data we received contained NPI numbers only and only 10% of the excluded prescribers or service providers in the MED data file contain a NPI number. Because of this, we will need to update the MED data file with a download of the National Provider Identifier Standard from the National Plan and Provider Enumeration System (NPPES) Downloadable File located at https://www.cms.gov/nationalprovidentstand/06a_datadissemination.asp so that we can link the NPI numbers from the PDE data to the MED data. In the event that the NPI is not provided (which we anticipate) in the Prescriber ID (PTAP_PRESCRIBER_ID) or Service Provider ID (PTAP_SRVC_PROVIDER_ID PDE) data field we may also need to update the MED database with the UPIN Number, DEA Number, NCPDP, State License Number, or "other" that will enable us to link the PDE data to the MED data.

DP1107

We will also identify only those transactions during the period for which the Prescriber or Service Provider is sanctioned.  To do this we will utilize the "PTAP_RX_DOS_DT" (prescription filled date, as reported in the PDE) field or the "PTAP_PROCESS_DT" (DDPS Operational Data Store (ODS) PDE process date) field as the "PTAP_PAID_DT" (the date on which the plan originally paid the pharmacy for the prescription drug) PDE data field is an optional field.

In summary, we will match NPI/DEA/License number and etcetera from the MED data file to PDE using the effective sanction period against that of the service date.

DUPLICATE PAYMENTS:

We will utilize the following seven PDE data fields to identify a duplicate payment. These seven fields uniquely identify a PDE record and any change in any of the following seven fields indicates a different event.

- HICN ("PTAP_INS_CLAIM_NUM")
- Service Provider ID   ("PTAP_PRESCRIBER_ID")
- Service Provider ID Qualifier ("PTAP_SRVC_PROVIDER_ID_QUAL")
- Prescription/Service Reference Number  ("PTAP_RX_SERV_REF_NUM")
- Date of Service  ("PTAP_RX_DOS_DT" or "PTAP_PROCESS_DT")
- Fill Number  ("PTAP_FILL_NUM")
- Dispensing Status  ("PTAP_DISP_STAT_CD")

In short, if there are multiple PDE records containing the same criteria for all seven data fields then there is the possibility that there is a duplicate payment.  As shown in the process flow chart we will identify duplicates (from the seven fields above).  From this dataset we identify inter-PBP duplicates (beneficiary plan transfers).  To identify inter-PBP duplicates we will also review the Contract Number ("PTAP_CNTRT_OF_REC"), Plan Benefit Package ID ("PTAP_PBP_OF_REC"), and the date on which the prescription was filled ("PTAP_RX_DOS_DT") or the date the PDE was processed by the DDPS ODS ("PTAP_PROCESS_DT") to ensure that the duplicate payment is submitted to the correct PBP.  Once complete, we will then identify intra-PBP duplicates based on the seven fields above.  [Inter-PBP duplicates are completed prior to intra duplicates so that the "correct" PDE is maintained in that PBP's data so that additional reviews may be conducted.]

As mentioned in the first paragraph above, we will also need to review the data to determine whether we need to eliminate original/adjusted/deleted PDE or whether the original [incorrect] PDE still exists within the data and was used in the calculation of CPP/UAARCC.  While important for any audit issue, original/adjusted/deleted records are inherently duplicative and require careful consideration.  We will use the Adjustment/Deletion ("PTAP_ADJ_DEL_CD") PDE data field to accomplish this.

The field names were taken from the "SAF 2008 Layout and Data Definitions" located on the HHS portal via the following link: https://portal.hhs.gov:443/portal/server.pt/gateway/PTARGS_32_0_215_0_-1_47/http:/collab.hhs.gov;11930/collab/do/document/overview?projID=133919&folderID=210551 provided by Teresa yesterday.

I wish I could be more specific but understanding the data and verifying the veracity and completeness of the data is the most difficult part of the recovery audit process.  Without additional details it is difficult to propose specific audit methodologies.

Please call me if you have any questions.  Take care, Chris.

---

*Christopher Mucke | Managing Principal | ACLR, LLC*
38705 7 Mile Rd, Ste 460 | Livonia, Michigan 48152-3975 | ☎(734) 744 - 4401 | 🖷(734) 744 - 4150 | ✉ mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

**From:** James, Merri-Ellen (CMS/CPI) [mailto:merri-ellen.james@cms.hhs.gov]
**Sent:** Thursday, September 29, 2011 12:27 PM
**To:** Christopher Mucke
**Cc:** Dorsey, Marnie (CMS/CPI); Moreno, Cynthia E. (CMS/CPI)
**Subject:** RE: Audit Scope

Chris,
Can you supply more detailed information.  For each of the processes.  I assume from the Excluded Provider Flow chart that you will be using the

MED file as your document.  What matching criteria are going to base your analysis on- NPI, name, address etc.  Same for duplicate payments. What criteria are you going to use to determine a PDE is a duplicate?  Thanks, M-E

Merri-Ellen James
Medicare Program Integrity Group
7500 Security Blvd.
Baltimore, MD 21244
410.786.4462

**INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:**

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

---

**From:** Christopher Mucke [mailto:cmucke@aclrsbs.com]
**Sent:** Tuesday, September 27, 2011 1:42 PM
**To:** James, Merri-Ellen (CMS/CPI)
**Cc:** Dorsey, Marnie (CMS/CPI); Moreno, Cynthia E. (CMS/CPI)
**Subject:** RE: Audit Scope

Merri-Ellen,

I've attached the draft process flows for duplicate payments and excluded providers as requested.  I've also updated and included our draft "Automated Review Process" to incorporate the Business Process Model information received on September 1st.

Please call me if this is not the information you needed.  Take care, Chris.

***Christopher Mucke | Managing Principal | ACLR, LLC***
38705 7 Mile Rd, Ste 460 | Livonia, Michigan 48152-3975 | ☎(734) 744 - 4401 | 🖷(734) 744 - 4150 | ✉
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

---

**From:** James, Merri-Ellen (CMS/CPI) [mailto:merri-ellen.james@cms.hhs.gov]
**Sent:** Monday, September 26, 2011 5:04 PM
**To:** Christopher Mucke
**Cc:** Dorsey, Marnie (CMS/CPI); Moreno, Cynthia E. (CMS/CPI)
**Subject:** Audit Scope

Chris,
Would you please develop and send a proposed audit methodology to identify improper payments as a result of 1. Excluded providers and 2. Duplicate payments.  Please include all source documents you intend to use i.e. LEIE, EPLS.  Thanks, M-E
Let me know what a reasonable ETA is-figured you may all ready have started on this but not sure.  Would like by COB 10.5 if possible.  Let me know. Thanks, M-E

Merri-Ellen James
Medicare Program Integrity Group
7500 Security Blvd.
Baltimore, MD 21244
410.786.4462

**INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:**

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

DP1109

# TAB 110

**From:** Christopher Mucke
**To:** Wheeler, Desiree Y. \(CMS/OAGM\)
**Cc:** Sanders, Jessica B. \(CMS/OAGM\)
**Subject:** ACLR Contract Execution - GS-23F-0074W / Task Order No. HHSM-500-2011-00006G
**Date:** Thursday, December 01, 2011 7:39:00 AM

Desiree, thank you for setting up our conference call yesterday.  My understanding of the issues regarding contract execution is much clearer.  In accordance with our discussion yesterday; we will continue executing only those portions of the contract that are consistent with current CMS expectations (e.g. not issuing demand letters) until such time as the PWS/SOW issues have been resolved.  Please let me know if I may be of any assistance.  Thank you again for working to resolve this matter.  Take care, Chris.

***Christopher Mucke | Managing Principal | ACLR, LLC***
38705 7 Mile Rd, Ste 460 | Livonia, Michigan 48152-3975 | ☏ (734) 744 - 4401 | 🖨 (734) 744 - 4150 | ✉
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

# TAB 111

| | |
|---|---|
| From: | Christopher Mucke |
| To: | Tetkoski, Frank \(CMS/CPI\) |
| Cc: | Brown, Sonja J. \(CMS/CPI\) |
| Subject: | RE: Duplicate Payment Discussion |
| Date: | Friday, May 31, 2013 8:46:00 AM |
| Attachments: | Alternative Duplicate Payment Process ENC - V1.xlsx |

Frank, here is the spreadsheet containing selected PDE records for each algorithm; I removed some of the non-essential fields but no other manipulation took place.  The password will be sent separately.

*Christopher Mucke | Managing Principal | ACLR, LLC*
38705 7 Mile Rd, Ste 460 | Livonia, Michigan 48152-3975 | ☏ (734) 744 - 4401 | 🖷 (734) 744 - 4150 | ✉
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

**From:** Tetkoski, Frank (CMS/CPI) [mailto:Frank.Tetkoski@cms.hhs.gov]
**Sent:** Thursday, May 30, 2013 2:05 PM
**To:** Christopher Mucke
**Cc:** Brown, Sonja J. (CMS/CPI)
**Subject:** RE: Duplicate Payment Discussion

Chris,
Below are my observations/considerations after reviewing the data you sent.

**Observations on Early Refill Methodology for Duplicate PDEs**

Many come at the end of the year.  This could be the result of the bene storing up before a change in plans.

Many showed that the subsequent refill occurred later than would be expected or skipped the next month.  When comparing the overall day supply of several PDEs with the total time increment, the utilization looked ok.  This would be expected if a legitimate override occurred due to travel etc.

Some showed a dosage increase before the early refill.

Many kicked out with just the same date of service (a simple date duplication process).

**Proposal**
Want to have a defensible process.  Early refill overrides occur all the time and are not uncommon, even after just a few days.

Use the following duplicate fields:
First Algorithm
Same Rx Number (Prescription Service Reference Number)
Same Refill Number
Same HICN
Compound Code – not a multi-ingredient compound
Second Algorithm
Same NDC
Same Date of Service
Same HICN

**Considerations**

Plan of record vs. submitting plan

Adjustment Deletion Code

DP1166

A02240

Dispensing Status *
    Plan had 2 options:
        1) Submit 2 PDEs – one for the partial and one for the completion of the partial fill
        2) Summarize in a single PDE, reporting a blank in the dispensing status
*PDEs in Jan 2008
Blank    115,370,937
P        151
C        105,387


Thanks,
Frank


*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

---

**From:** Brown, Sonja J. (CMS/CPI)
**Sent:** Thursday, May 30, 2013 1:45 PM
**To:** Tetkoski, Frank (CMS/CPI); Christopher Mucke
**Subject:** RE: Duplicate Payment Discussion

Chris,
Frank will be in training next week and therefore, unable to meet to discuss the duplicate payment process. I will schedule the discussion for another date and time.

Frank, please forward Chris any discussion points that you have so that he will be prepared to discuss.

Thanks,

Sonja

---

**From:** Tetkoski, Frank (CMS/CPI)
**Sent:** Thursday, May 30, 2013 9:21 AM
**To:** Christopher Mucke; Brown, Sonja J. (CMS/CPI)
**Subject:** RE: Duplicate Payment Discussion

I may have to reschedule. I am in training all next week.
Thanks,
Frank
.

---

**From:** Christopher Mucke [mailto:cmucke@aclrsbs.com]
**Sent:** Thursday, May 30, 2013 9:13 AM
**To:** Brown, Sonja J. (CMS/CPI)
**Cc:** Tetkoski, Frank (CMS/CPI)
**Subject:** RE: Duplicate Payment Discussion

Hey Sonja,
That sounds good to me. Could you also send me your initial thoughts/issues/discussion points? That would give me some time to review and generate additional scenarios/thoughts/alternatives prior to the meeting. Take care, Chris.

---

***Christopher Mucke | Managing Principal | ACLR, LLC***
38705 7 Mile Rd, Ste 460 | Livonia, Michigan 48152-3975 | ☎(734) 744 - 4401 | 📠(734) 744 - 4150 | ✉
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error,

DP1167

A02241

please notify the sender immediately by replying to the message and deleting it from your computer.

**From:** Brown, Sonja J. (CMS/CPI) [mailto:sonja.brown@cms.hhs.gov]
**Sent:** Wednesday, May 29, 2013 5:23 PM
**To:** Christopher Mucke
**Cc:** Tetkoski, Frank (CMS/CPI)
**Subject:** Duplicate Payment Discussion

Hi Chris,

Frank has reviewed your duplicate payment documentation and would like to discuss in more detail at our next biweekly meeting which is scheduled for Tuesday, June 4th.  We should get through the other agenda items fairly quickly and spend the rest of the time discussing duplicate payments.  Let me know if you have any questions.

Thanks,

*Sonja J. Brown*
Centers for Medicare and Medicaid Services
Center for Program Integrity
Division of Plan Oversight and Accountability
410-786-3571
Sonja.Brown@cms.hhs.gov

DP1168

# TAB 112

| From: | Thomas, India M. (CMS/CPI) |
|---|---|
| To: | Christopher Mucke |
| Cc: | Brown, Sonja J. (CMS/CPI); Abankwah, Rosalind M. (CMS/CPI); Tetkoski, Frank (CMS/CPI); Kenya, Dominca (CMS/CPI); Brandenburg, Sara M. (CMS/CPI); Newkirk, Delois J. (CMS/CPI); Thais Thompson |
| Subject: | Approved Revised Duplicate Payment NAIRP |
| Date: | Wednesday, May 28, 2014 9:04:52 AM |

Good Morning,

CMS approves the Duplicate Payment Revised NAIRP submitted on May 13th. CMS is reviewing the RFI for this audit review and will provide comments. Please submit the PDE records associated with the Duplicate Payment review via Quickr prior to sending to plan sponsors. Let me know if you have any questions.

Thank you,

*India M. Thomas*
Health Insurance Specialist
CMS/CPI/MPIG/DPOA
ext 61152

**From:** Christopher Mucke [mailto:cmucke@aclrsbs.com]
**Sent:** Tuesday, May 13, 2014 1:54 PM
**To:** Thomas, India M. (CMS/CPI)
**Cc:** Brown, Sonja J. (CMS/CPI); Abankwah, Rosalind M. (CMS/CPI); Tetkoski, Frank (CMS/CPI); Kenya, Dominca (CMS/CPI); Brandenburg, Sara M. (CMS/CPI); Newkirk, Delois J. (CMS/CPI); Thais Thompson
**Subject:** RE: Revised Duplicate Payment Decision Notice

India,

I have attached a copy of the Revised NAIRP, which incorporates CMS' request for a complex review. I have also attached a copy of a draft RFI that will be submitted to the SOs upon final CMS approval of the issue. Please let me know if you have any questions, Chris.

_____

**Christopher Mucke | Managing Principal | *ACLR, LLC***
38705 7 Mile Rd, Ste 251 | Livonia, Michigan 48152-3975 | ✆(734) 744 - 4401 | 🖷(734) 744 - 4150 |
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

**From:** Thomas, India M. (CMS/CPI) [mailto:India.Thomas@cms.hhs.gov]
**Sent:** Tuesday, May 06, 2014 11:39 AM
**To:** Sean Donaghy; Christopher Mucke
**Cc:** Brown, Sonja J. (CMS/CPI); Abankwah, Rosalind M. (CMS/CPI); Tetkoski, Frank (CMS/CPI); Kenya, Dominca (CMS/CPI); Brandenburg, Sara M. (CMS/CPI); Newkirk, Delois J. (CMS/CPI)
**Subject:** Revised Duplicate Payment Decision Notice

Good Morning,

Attached is CMS' revised decision on the Duplicate Payment NAIRP. Please review and submit your updated NAIRP for final approval by COB 5/13/14. Let us know if you have any questions.

Thank you,

*India M. Thomas*
Health Insurance Specialist
Division of Plan Oversight & Accountability
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244
Mail Stop AR-18-50

**SA606**

410.786.1152 desk
410.922.2625 ads
410.786.0711 fax
India.Thomas@cms.hhs.gov

# TAB 113

| | |
|---|---|
| **From:** | Brown, Sonja J. (CMS/CPI) |
| **To:** | Kenya, Dominca (CMS/CPI) ; Christopher Mucke |
| **Cc:** | Thais Thompson ; Thomas, India M. (CMS/CPI) |
| **Subject:** | RE: DVC Validation Results |
| **Date:** | Thursday, June 26, 2014 7:49:25 PM |

Chris,

As a follow up to our phone call this evening, proceed with removing the PDE records that were rejected as a result of the DVC's validation . In addition, please provide a response to the four observations found in the DVC's Duplicate Payments RFI Report for CMS review. Once these issues have been addressed, CMS will give the approval to move forward with the RFIs. Please let me know if you have any questions.

Thanks,
Sonja

**From:** Kenya, Dominca (CMS/CPI)
**Sent:** Thursday, June 26, 2014 12:27 PM
**To:** Christopher Mucke
**Cc:** Thais Thompson; Brown, Sonja J. (CMS/CPI)
**Subject:** RE: DVC Validation Results

We can further discuss on today's call.

Thank you,
Dominca Kenya

**From:** Christopher Mucke [mailto:cmucke@aclrsbs.com]
**Sent:** Thursday, June 26, 2014 12:07 PM
**To:** Kenya, Dominca (CMS/CPI)
**Cc:** Thais Thompson; Brown, Sonja J. (CMS/CPI)
**Subject:** Re: DVC Validation Results

Thanks Dominca, we had already identified some of our own as well (nothing substantive) but we'll review and correct as necessary.  Will we also have the RFI modification resolved today?

Christopher Mucke
Managing Principal
ACLR

On Jun 26, 2014, at 12:01 PM, "Kenya, Dominca (CMS/CPI)" <Dominca.Kenya@cms.hhs.gov> wrote:

> Good afternoon Chris,
>
> The DVC completed their validation of the Duplicate Payment RFIs and identified several errors.  These validation results can be found in QuickR PARTDRAC  ►
> Duplicate Payments ► Validation Folder ► and will be reviewed during today's call.

DP1186

A02260

Please keep in mind that all errors identified must be rectified before moving forward.
Let us know if you have any concerns.

Thank you,
Dominca Kenya

DP1187

## OBJECTIVE

CMS granted approval to the RAC to audit Duplicate Payments for plan years 2010, 2011 and 2012 using a complex review approach.  The RAC submitted a revised NAIRP dated May 13, 2014 containing the approved methodology.  Pursuant to this methodology the RAC identified a population of potential duplicate payments for inclusion in the Requests for Information (RFIs).  CMS tasked the DVC to perform a methodological validation of the potential duplicate payments identified by the RAC before the RFIs are sent to the Plans.

A methodological validation is designed to determine that the RAC correctly applied the approved methodology in identifying the potential duplicate payments.  The DVC is primarily concerned with identifying those potential duplicate payments, if any, that do not conform to the methodology approved by CMS.  The DVC is not concerned with identifying any potential duplicate payments the RAC may have missed as the DVC is not performing a blind review of the PDE universe using the approved methodology.

## DELIVERABLES

The DVC is delivering the following five reports for each year under review, as applicable:

1. **Agreed Duplicative Pairs.**  This list is compiled in an Excel workbook titled Duplicate_Pymts_RFIs_Agreed_PY201X.xlsx.  It contains all of the potentially duplicative paired PDEs with which the DVC agrees the methodology was correctly applied.

2. **Disagreed Duplicative Pairs.**  This list is compiled in an Excel workbook titled Duplicate_Pymts_RFIs_Disagreed_PY201X.xlsx.  It contains all of the potentially duplicative paired PDEs in which the DVC disagrees with the RAC as a flaw in the application of the approved methodology has been identified.

3. **Plan-to-Plan (P2P).**  This list is compiled in an Excel workbook titled Duplicate_Pymts_RFIs_P2P_PY201X.xlsx.  The list identifies the PDEs that meet the P2P condition where the contract of record does not match the contract number in one or both of the paired PDEs.

4. **Non-Standard Format.**  This list is compiled in an Excel workbook titled Duplicate_Pymts_RFIs_Non_Std_FMT_PY201X.xlsx.  The DVC flagged the Originating and/or Duplicate PDEs for a non-standard format code where the PTAP_NON_STAND_FMT_CD was not "Null".  A non-standard format includes paper claims from providers, beneficiary submitted claims, coordination of benefits claims, NCPDP electronic submissions and X12 837 claims.

5. **Dosage Change Increase.**  This list is compiled in an Excel workbook titled Duplicate_Pymts_RFIs_Dosage_Increase_PY201X.xlsx.  Through the complex review process, the RAC is seeking legitimacy for the records that would eliminate potentially duplicative records.  One such legitimate reason is for a prescribed change in dosage.  The DVC reviewed the paired PDEs for a dosage change by comparing the daily dosage (quantity dispensed divided by the days supply) of the Originating PDE with that of the Duplicate PDE in each pair.

DP1188

**DVC APPROACH TO VALIDATION**

For validation purposes the DVC produced **reject** logic to test for the correct application of the approved methodology for the following six criteria:

1. **Five Key Fields –** The paired PDEs, containing the "Originating" PDE and the "Duplicate" (also called the Subsequent) PDE, identified by the RAC were tested to determine that the five key fields in each PDE match.  If the fields did <u>not</u> match, the PDE was flagged "Y" for disagree.

2. **Allowable Days Elapsed –** The days elapsed between the paired PDEs was tested to determine that the difference was less than 50% of the days supply from the Originating PDE.  If the resulting percentage (threshold) was <u>not</u> less than 50%, the PDE was flagged "Y" for disagree.

3. **Partial Fill –** The paired PDEs were tested for a code "P" in the PTAP_DISP_STAT_CD field.  If the PDE was associated with a partial fill, the PDE was flagged with a "Y" for disagree.

4. **Long Term Care (LTC) –** The paired PDEs were tested for a NPI in the PTAP_SRVC_PROVIDER_ID and the PTAP_ALT_SRVC_PROV_ID fields associated with a LTC pharmacy.  If the PDE was associated with a LTC pharmacy, the PDE was flagged "Y" for disagree.

5. **Mail Order (MO) –** The paired PDEs were tested for a NPI in the PTAP_SRVC_PROVIDER_ID and the PTAP_ALT_SRVC_PROV_ID fields associated with a MO pharmacy.  If the PDE was associated with a MO pharmacy, the PDE was flagged "Y" for disagree.

6. **Vaccination Administrative Fee (VAF) –** The paired PDEs were tested for vaccination administrative fee in the PTAP_VAC_ADMIN_FEE field.  If the VAF in the field was greater than zero, the PDE was flagged "Y" for disagree.

**RESULTS – AGREED**

1. **Five Key Fields –** For all three years under review, the five key fields matched in the paired PDEs.

2. **Allowable Days Elapsed –** For all three years under review, the difference in the days elapsed between the paired PDEs was less than 50% of the days supply of the Originating PDE.  However, the DVC flagged 33 PDEs for 2010 as "N/A" because the threshold calculation could not be made (the denominator, days supply, was zero).  These PDEs were further tested for a PDE submission arising from non-standard sources where the PTAP_NON_STAND_FMT_CD = not Null.  In 100% of the cases the non-standard format code was not null and therefore the result applied was agree.

3. **Partial Fills –** For all three years under review, there were no PDEs associated with partial fills.

4. **Long Term Care, Mail Order and Vaccination Administrative Fees –** If the criteria was met, then the PDEs were flagged "N" and included in the population of agrees.

**RESULTS - DISAGREED**

For **PY 2010** the DVC identified 3,821 potentially duplicative pairs that have a **vaccination administrative fee (VAF)** in either the Originating PDE or the Duplicate PDE.  According to the revised NAIRP "PDE associated with partial fills are removed as well as duplicative records associated with long term care and vaccination administrative fees."  The DVC review logic flagged a PDE if the VAF was greater than zero in the PTAP_VAC_ADMIN_FEE field in the PDE.  The DVC disagrees with the RAC as these 3,821 PDE pairs contain a VAF.  The DVC recommends that the RAC review these PDEs and identify other criteria the RAC may have used in the methodology that is not detailed in the revised NAIRP for including these PDEs in the population of potentially duplicative PDEs.  The DVC flagged 1,516 PDE pairs as "N/A" for the

allowable days elapsed because the threshold calculation could not be made (the denominator, days supply, was zero).  These PDEs are in the disagreed report because they all are associated with vaccine administrative fees.

For **PY 2011** the DVC identified 2,993 potentially duplicative pairs that have a **VAF** in either the Originating or the Duplicate PDE.  In addition, the DVC identified 83 Originating PDEs that have a service provider ID associated with a **Long Term Care (LTC) pharmacy** and 288 Originating PDEs that have a service provider ID associated with a **Mail Order (MO) pharmacy**.  The DVC recommends that the RAC review these PDEs with a VAF, or a LTC/MO pharmacy to determine if they should be excluded from the RFIs.  The DVC flagged 1,023 PDE pairs as "N/A" for the allowable days elapsed because the threshold calculation could not be made (the denominator, days supply, was zero).  These PDEs are in the disagreed report because they all are associated with vaccine administrative fees.

For **PY 2012** the DVC identified 6,594 potentially duplicative pairs that have a **VAF** in either the Originating or the Duplicate PDE.  In addition, the DVC identified 131 Originating PDEs that have a service provider ID associated with a **Long Term Care (LTC) pharmacy** and 315 Originating PDEs that have a service provider ID associated with a **Mail Order (MO) pharmacy**.  The DVC recommends that the RAC review these PDEs with a VAF or LTC/MO pharmacy to determine if they should be excluded from the RFIs.  The DVC flagged 1,951 PDE pairs as "N/A" for the allowable days elapsed because the threshold calculation could not be made (the denominator, days supply, was zero).  These PDEs are in the disagreed report because they all are associated with vaccine administrative fees.

## RESULTS – OBSERVATIONS

The DVC performed additional analytics to identify conditions that merit more review before the RFIs are sent to the Plans.  Please note that the flags are not mutually exclusive.  The same PDE pair can reside in one or more files if multiple flags are "Y".

1. **Terminated Contracts –** The DVC reviewed the population of paired PDEs for terminated contracts.  For all three years under review, all of the contracts were active.

2. **Plan-to-Plan (P2P) –** The DVC flagged with a "Y" 3,486, 2,781 and 1,405 pairs for 2010, 2011 and 2012 respectively that met the P2P condition where the contract of record did not match the contract number.  The DVC recommends that the RAC and CMS review these PDEs to decide if they should be excluded from the RFIs.

3. **Non-Standard Format –** The DVC flagged the PDEs with a "Y" if the format code was not null.  The results for either one or both PDEs in a pair with a non-standard format code was 86%, 89% and 36% for 2010, 2011 and 2012 respectively.  At the conclusion of the audit, if the payments are determined to be duplicate payments, then it would indicate a potentially serious vulnerability with the non-standard format claims process.  The significant decline in 2012 indicates the possibility that potential weaknesses in the process may have started to be addressed.

4. **Dosage Increase –** The DVC flagged the PDEs with a "Y" if the increase in daily dosage was equal to or greater than 50%.  For 2010, 56% of the pairs have a dosage increase of 50% or more.  The DVC recommends that the RAC and CMS review these PDEs to decide if they should be excluded from the RFIs.  The same test was applied to both 2011 and 2012.  However, the DVC observed that the quantity dispensed in more than 99% of the PDEs was zero.  Thus, the dosage change could not be calculated.  The DVC scanned these PDEs in in the IDR and in its universe of PDEs and found a quantity dispensed in all cases.  Accordingly, the DVC is recommending that the RAC review the PDEs for a potential problem with the data.

**OTHER COMMENTS**

The DVC acknowledges there are a number of double-counted PDE pairs for those records that have the same date of service.  The RAC indicated it was not able to identify the Originating PDE from the Duplicate PDE.  The RAC therefore included the PDE pairs twice with one pair identifying PDE1 as the Originating and PDE2 as the Duplicate and vice versa for the second pair.  The DVC made no attempt to isolate or uniquely count these pairs.  The DVC validated each pair identified by the RAC as potentially duplicative.  The DVC recommends that the Plans be notified of this condition to avoid duplication in the final results.

DP1191

A02265

| | |
|---|---|
| **From:** | Christopher Mucke |
| **To:** | "Brown, Sonja J. (CMS/CPI)" |
| **Cc:** | Thais Thompson; Thomas, India M. (CMS/CPI); Kenya, Dominca (CMS/CPI) |
| **Subject:** | RE: DVC Validation Results |
| **Date:** | Friday, June 27, 2014 10:20:00 AM |
| **Attachments:** | 06.27.14 ACLR Response - DVC Duplicate Payment Validation.pdf |

Sonja, our response to your request is attached.  Please let me know if I may be of additional assistance.

---

***Christopher Mucke | Managing Principal | ACLR, LLC***
38705 7 Mile Rd, Ste 251 | Livonia, Michigan 48152-3975 | ☎ (734) 744 - 4401 | 🖨 (734) 744 - 4150 | ✉
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

---

**From:** Brown, Sonja J. (CMS/CPI) [mailto:sonja.brown@cms.hhs.gov]
**Sent:** Thursday, June 26, 2014 7:49 PM
**To:** Kenya, Dominca (CMS/CPI); Christopher Mucke
**Cc:** Thais Thompson; Thomas, India M. (CMS/CPI)
**Subject:** RE: DVC Validation Results

Chris,
As a follow up to our phone call this evening, proceed with removing the PDE records that were rejected as a result of the DVC's validation . In addition, please provide a response to the four observations found in the DVC's Duplicate Payments RFI Report for CMS review. Once these issues have been addressed, CMS will give the approval to move forward with the RFIs. Please let me know if you have any questions.

Thanks,
Sonja

---

**From:** Kenya, Dominca (CMS/CPI)
**Sent:** Thursday, June 26, 2014 12:27 PM
**To:** Christopher Mucke
**Cc:** Thais Thompson; Brown, Sonja J. (CMS/CPI)
**Subject:** RE: DVC Validation Results

We can further discuss on today's call.

Thank you,
Dominca Kenya

---

**From:** Christopher Mucke [mailto:cmucke@aclrsbs.com]
**Sent:** Thursday, June 26, 2014 12:07 PM
**To:** Kenya, Dominca (CMS/CPI)
**Cc:** Thais Thompson; Brown, Sonja J. (CMS/CPI)
**Subject:** Re: DVC Validation Results

Thanks Dominca, we had already identified some of our own as well (nothing substantive) but we'll review and correct as necessary.  Will we also have the RFI modification resolved today?

Christopher Mucke
Managing Principal
ACLR

On Jun 26, 2014, at 12:01 PM, "Kenya, Dominca (CMS/CPI)" <Dominca.Kenya@cms.hhs.gov> wrote:

Good afternoon Chris,

The DVC completed their validation of the Duplicate Payment RFIs and identified several errors.  These validation results can be found in QuickR PARTDRAC ► Duplicate Payments ► Validation Folder ► and will be reviewed

DP1192

A02266

during today's call.

Please keep in mind that all errors identified must be rectified before moving forward.  Let us know if you have any concerns.

Thank you,
Dominca Kenya

DP1193

A02267



## DVC Duplicate Payment RFI Report

## ACLR Response

**Report Date:** June 26, 2014

**ACLR Response Date:** June 27, 2014

**Issue:** Duplicate Payment Review – DVC Validation

The following is our response to the four DVC observations as noted in its Duplicate Payments RFI Report dated June 26, 2014.

*Terminated Contracts:* Section 1.2.3 PART D CONTRACTS EXCLUDED FROM RAC REQUIREMENTS identifies PDE records that are Unavailable for Review (UFR) as:

> **Terminated Contracts** - These contracts with plan sponsors have been contractually ended by CMS on a prior date and are no longer eligible for Part D claims payments.

As such, we have eliminated all contracts that have been terminated by CMS as of January 1, 2014.

*Plan -to-Plan (P2P):* We are aware of this issue and while previous modifications of our contract required its elimination from review, our current contract does not. We recognize this was an oversight in our contract and have implemented a process by which we submit P2P PDE in compliance with contracted terms and conditions, but remove (without protest) those same P2P transactions when subsequently identified by the DVC. We have identified this as an item to be included in the forthcoming contract modification to the current audit processes.

*Non-Standard Format:* We have conducted numerous cursory reviews related to non-standard format codes and agree with the DVC vulnerabilities could exist. As we indicated in our response to Question 24 in our response dated February 27, 2014 to a related question in CMS' initial feedback, originally submitted by CMS on February 19, 2013, "we see a much higher percentage of likely duplication when a paper record has been input than when not". We have not conducted a review related to the "significant decline in 2012" but agree with the DVC that this is also indicative of potential weaknesses. As we have not received any information related to these claims; however, we cannot prove or disprove whether vulnerabilities exist for these records. We will; however, provide CMS with a report of our findings on this issue once evidence is submitted by the plans in accordance with the RFI.

*Dosage Increase*: As this issue was raised and thoroughly considered during the NAIRP submission, discussion, and approval process, we are unclear as to the additional information being requested. We were also unable to determine from the information provided, whether the DVC was submitting newly

DP1194

considered evidence or revisiting evidence already submitted[1].  As such, we have limited our response to related discussions occurring during the NAIRP process.

We have been aware of this issue since the completion of the Duplicate Payment Special Study conducted on behalf of CMS and which was completed on or around August 29, 2013.  As shown in the sample PDE data submitted with the NAIRP on January 2nd, 2014, and as detailed in plan responses to the special study there were numerous instances of "dosage change" PDE.  As we discussed during the NAIRP approval process; however, it was unfortunate that the plans did not provide documentation supporting these assertions.  As a practical matter, we believe that reliance on an unsupported "mathematical calculation" to determine legitimacy of any claim to be ill-advised.  For example, it was plainly apparent from our review that the plans were performing multiple "mathematical calculations"[2] in an attempt to explain away selected PDE rather than conducting a review of objective evidence to determine the actual events leading to the duplication.  As we discussed in our response to Question 13 of CMS' initial feedback to the Walkthrough Meeting, we addressed some of the issues associated with changes in dosage stating:

> To support its contentions, the plan stated the duplicative PDE were the result of their compliance with CMS guidelines and federal law *by relaxing "refill edits"* in major disaster areas. When reviewing the submitted data more closely; however, we noted that 581 of the "refills" had an original fill of "0" (indicative of a new prescription) and *501 of the prescriptions were for a different dosage* than the original fill amount (indicative of a level of care change). The plan also did not provide any supporting documentation or explanation as to why these "refills" occurred so quickly after the initial fill was completed. This was also supported *by the plan's contentions that selected PDE were the result of "vacations", which also consisted of "different dosages"* and identical fill numbers.  [*Emphasis added*.]

Later in the response we noted:

> Further, the plan's contentions that a *legitimate "dosage change" occurred* was undermined *when another field indicated that that the "same dosage" was administered*.  [*Emphasis added*.]

In the first instance, the plan contradicted itself in its response; either the PDE were related to a standard "early" refill permitted during disasters or a dosage change or the result of a vacation – multiple occurrences for the same PDE seem unlikely; the latter is self explanatory.

Again, it was immediately apparent upon reviewing the results of the Special Study that the plans were performing mathematical calculations to justify the duplicative events selected.  In every instance the calculation was unsupported by verifiable evidence or later contradicted by another "mathematical calculation" or assertion made by the plan.  It was our understanding that this was a primary reason behind CMS' ultimate decision to revise our originally proposed automated review to a complex review.

---

[1] *It was our understanding that the results of the special study had been forwarded to the DVC for review; please see our response to Question 2 in our memo dated February 27, 2014 where we responded "yes" to CMS' inquiry regarding DVC review of "100% of the results of the feasibility study".*

[2] *A similar calculation was used to calculate whether the duplicative PDE occurred within a 3 day period.  If so, the plan noted it was an "e-box" claim.*

DP1195

A02269

In summary, we agreed there may be instances where legitimate dosage changes may have occurred and supported CMS' decision to proceed with a complex review of this issue.  As outlined in the RFI for this issue the plans will be required to:

> submit copies of the original, unaltered override documentation arising from loss, ***change in dosage***, other authorized override event; or other uniformly maintained readily retrievable record to demonstrate the legitimacy of the potentially duplicative PDE records listed in the RFI. [***Emphasis added***.]

In short, we will eliminate any PDE associated with an authorized "change in dosage" upon receipt of objective evidence indicative of same.

We agree with DVC assertions that the "quantity dispensed" field contains a "zero" for plan years 2011 and 2012 in numerous PDEs.   As this is not a control field and the issue was not raised in the excluded provider and unauthorized prescriber audits, we conducted no additional reviews.  As discussed on the call; however, we will review the original PDE submissions and provide CMS with additional feedback upon their completion.

DP1196

# TAB 114

**From:** Brown, Sonja J. (CMS/CPI) [mailto:sonja.brown@cms.hhs.gov]
**Sent:** Monday, September 15, 2014 9:14 AM
**To:** Gil Mucke
**Cc:** Kenya, Dominca (CMS/CPI); Scott, Jamie (CMS/CPI); Thais Thompson
**Subject:** RE: PY11-PY12 Duplicate Payment RFI or DVC Submission Requirements

Good Morning Gil,
During this past week, CMS received more requests for extensions for the CY 2010 duplicate payments, some requests going directly to the CPI front office.  We are working with several plan sponsors to see why there are so many requests for extensions and to try to understand the difficulties they are facing in obtaining and submitting the data requested. At this time, it would be difficult for CMS to move forward with CY 2011 and 2012 without first understanding the issues surrounding CY 2010. We plan to meet with a couple of the plan sponsors this week and hopefully, we'll be able to discuss this matter with ACLR by week's end so that we're all on the same page. Please let us know if you have any questions.


Thanks,
Sonja

**From:** Gil Mucke [mailto:gmucke@aclrsbs.com]
**Sent:** Thursday, September 11, 2014 10:10 AM
**To:** Brown, Sonja J. (CMS/CPI)
**Cc:** Kenya, Dominca (CMS/CPI); Scott, Jamie (CMS/CPI); Thais Thompson
**Subject:** PY11-PY12 Duplicate Payment RFI or DVC Submission Requirements

Sonja,

  As discussed, we are now prepared to send RFIs for PY11-PY12 Duplicate Payments.  Based on our last conversation, I understand the DVC is capable to receive and review and was not sure if that was desired.  Either way, please advise.

  For CMS info as required, the attached spreadsheet summarizes the PY11 and PY12 information requested by CMS in the PY10 audit.  We have also updated the PY10 report to reflect actual amounts submitted (the original report contained DVC validation data).

  Standing by for direction.

Thanks, Gil Mucke
ACLR Compliance Officer
619-737-7290

DP1205

**From:** Brown, Sonja J. (CMS/CPI) [mailto:sonja.brown@cms.hhs.gov]
**Sent:** Friday, September 19, 2014 1:15 PM
**To:** Gil Mucke; Thais Thompson
**Cc:** Abankwah, Rosalind M. (CMS/CPI); Kenya, Dominca (CMS/CPI); Newkirk, Delois J. (CMS/CPI); Scott, Jamie (CMS/CPI); Tetkoski, Frank (CMS/CPI); Thomas, India M. (CMS/CPI); Hoey, Nicole E. (CMS/OAGM); Menefee, Justin (CMS/OAGM); Schultz, Theresa A. (CMS/OAGM)
**Subject:** CY 2010 Duplicate Payment Extension

Good Morning Gil and Thais,
Due to the increased phone calls and requests for extensions from plan sponsors regarding the CY 2010 duplicate payments, CMS is considering a 60 day extension to all plan sponsors that've received a RFI. Given the high volume of PDEs that have been identified during this review, the plans are finding it difficult to meet the 10/8 deadline. CMS believes the extension is necessary as the current number of requests make up over half of the improper payments identified by ACLR. We're hoping that the extra 60 days will allow plan sponsors enough time to comply and give ACLR additional time to review the large amount of documentation/data that will be submitted. Please contact us as soon as possible with any questions or concerns you may have regarding this decision.

*Sonja J. Brown*
Centers for Medicare and Medicaid Services
Center for Program Integrity
Division of Plan Oversight and Accountability
410-786-3571
Sonja.Brown@cms.hhs.gov

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

DP1206

# TAB 115

A02282

**From:** Gil Mucke
**Sent:** Wednesday, October 01, 2014 8:16 PM
**To:** Brown, Sonja J. (CMS/CPI)
**Subject:** Part D RAC Contract impact associated with CMS extensions

Sonja,

  The below listing of CMS decisions have an impact to the current Option Year and a forward impact to the administrative period.  ACLR believes they should be addressed with OAGM for resolution and ACLR is standing by as required.

DVC received 30 Day extension for the DEA Schedule Refill Issue IPRP Review.

  - Administrative Period should not be impacted unless follow-on extensions are provided.
  - SOW consideration: DVC extension authority in the current SOW is only tied to 25% more of errors, this decision was based on larger population of PDE.

Plans receiving a 60 day extension for the 2010 Duplicate Payment Issue RFI.

  - Administrative Period should not be impacted although past decisions create risk to one year period.  Population size is larger than the DEA Schedule Refill Issue noted with the DVC.  Additionally, Plans complaints  on larger data sets have risk for additional extensions by CMS.  Current schedule with this decision places full utilization of Administrative Period.
  - SOW consideration:  Plan extensions are not currently addressed in the SOW.  CMS regulations address extensions for environmental events although no specifics related to data population sizes.  Going forward, if the new rule is implemented, will extensions still be a consideration and if so, we believe the SOW should be updated to reflect as required.

Approved Duplicate Payment Issue and PY11 and PY12 Duplicate Payment RFI placed on hold.

  - Administrative Period is impacted as it is currently unknown when the RFI can be released despite ACLR RFI development complete.
  - SOW consideration:  This is more complex as the possible consideration of CMS to change an approved issue between Plan Years is not addressed.  As this initial issue based on NCPDP clear protocols identified over 8.5m PDE, the decision to hybrid the design reduced PDE to approximately 650k creating an impetus for the plans complaints and additional considerations by CMS to reduce the PDE population.  These decisions (specifically process related) should be addressed in the SOW going forward as required.

Expired Prescription NAIRP in process.

  - Administrative Period impact expected and unknown based on extensions above and current lack of clarity if ACLR will be able to submit RFIs when plans already have an RFI in-process.

DP1209

A02283

 As discussed, the comments above are not challenging CMS authority with these decisions and are only being address for resolution of the current Option Year and follow-on Administrative Period and for consideration to future SOW changes.

Vr, Gil
Gil Mucke
ACLR Compliance Officer

DP1210

TAB 116

A02285

| | |
|---|---|
| **From:** | Christopher Mucke |
| **To:** | Gil Mucke · Thais Thompson |
| **Subject:** | PY10 DP Revised Protocol - Contract Totals |
| **Date:** | Friday, November 07, 2014 4:59:00 PM |
| **Attachments:** | PY10 Revised DP Protocol Summaries.xlsx |
| **Importance:** | High |

Here are the updated totals for the revised protocol.  The original PDE request was reduced by approximately 66,8% (57.4% pertained to the dosage increase protocol and 9.4% pertained to the pharmacy protocol).

We are currently generating exception reports and will upload when complete.

---

***Christopher Mucke | Managing Principal | ACLR, LLC***
38705 7 Mile Rd, Ste 251 | Livonia, Michigan 48152-3975 | ☎ (734) 744 - 4401 | 🖷 (734) 744 - 4150 | ✉
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

DP1212

# TAB 117

| From: | Gil Mucke |
|---|---|
| To: | Brown, Sonja J. (CMS/CPI); Thais Thompson |
| Cc: | Christopher Mucke; Harris, Monique (CMS/CPI); Kenya, Dominca (CMS/CPI); Newkirk, Delois J. (CMS/CPI); Tetkoski, Frank (CMS/CPI); Thomas, India M. (CMS/CPI) |
| Subject: | RE: DVC Validation Results (Revised Duplicate) |
| Date: | Friday, November 14, 2014 11:59:38 AM |

Sonja,

  We never agreed to this course of action.  I specifically asked you to allow us to apply the protocol post-RFI and you stated CMS wanted it done now.  We also had the protocol call with the DVC and I specifically stated to the DVC that they are not part of the RFI process yet CMS chose to use them.

  As for the DVC, compare the PDE population size to the DEA review that required an extension for them to finish.  Not because of a 25% error rate as in the contract processes, it was due to their capabilities and resources.  Then CMS tasked them to do a 3 day review on this protocol and despite Chris Mucke spending a lot of time on the phone trying to assist them, they could not find all the links.  They also chose to review LTC which had nothing to do with the revised protocol.

  We stand behind our position that CMS should send the exception reports as is.  They provide a 60% plus reduction of plan review requirements and these other issues can be resolved during the NIP. process.

Gil Mucke
ACLR Compliance Officer

From: Brown, Sonja J. (CMS/CPI)
Sent: 11/14/2014 6:43 AM
To: Gil Mucke; Thais Thompson
Cc: Christopher Mucke; Harris, Monique (CMS/CPI); Kenya, Dominca (CMS/CPI); Newkirk, Delois J. (CMS/CPI); Tetkoski, Frank (CMS/CPI); Thomas, India M. (CMS/CPI)
Subject: RE: DVC Validation Results (Revised Duplicate)

Gil and Chris,
When we initially spoke about the need to revise the protocol and produce new exception reports for the plan sponsors, EVERYONE was well aware that it was not part of the contractual process for the RAC or the DVC; however, in an effort to alleviate the plans from having to respond to any false positives, EVERYONE agreed to the process in which the RAC would rerun the exception reports, the DVC would validate the reports and the RAC would review the DVC's results and respond accordingly. Additionally, CMS made it clear from the beginning that this process had to happen within a shortened time frame in order to get the revised reports to the plans well before the 12/8 deadline. That shortened time frame did not include the normal 45 day validation period or the 7 day dispute period. It was always CMS' understanding that the RAC could and would comply with all phases of the process, regardless of the scheduled vacation as RAC operations are expected to continue. It is unreasonable to expect CMS to wait until your return to resolve this matter.

Since the RAC has made the decision to dispute all of the DVC's findings and will not

be avaliable to discuss the discepancies or make any necessary  changes, the process has been stalled. It would be irresponsible for CMS to move forward with the RAC's exception reports with so many outstanding discrepancies and  risk our credibility with the plans. As such, your response will be noted and forwarded to management for next steps.


Thanks,
Sonja


-------- Original message --------
From: Gil Mucke <gmucke@aclrsbs.com>
Date:11/13/2014 9:55 PM (GMT-05:00)
To: "Brown, Sonja J. (CMS/CPI)" <sonja.brown@cms.hhs.gov>, Thais Thompson <tthompson@aclrsbs.com>
Cc: Christopher Mucke <cmucke@aclrsbs.com>, "Harris, Monique (CMS/CPI)" <Monique.Harris@cms.hhs.gov>, "Kenya, Dominca (CMS/CPI)" <Dominca.Kenya@cms.hhs.gov>, "Newkirk, Delois J. (CMS/CPI)" <Delois.Newkirk@cms.hhs.gov>, "Tetkoski, Frank (CMS/CPI)" <Frank.Tetkoski@cms.hhs.gov>, "Thomas, India M. (CMS/CPI)" <India.Thomas@cms.hhs.gov>
Subject: Re: DVC Validation Results (Revised Duplicate)

Sonja,

As discussed last week, we spent significant resources to perform the new protocol on a released RFI "outside of contractual processes" within the short time frame requested.  As the DVC is not "contractually" part of the RFI process, the choice to use the DVC was solely CMS and, as I stated to you last week, we are not available to perform this type of work until our return 11/24.

If we were to assume this is part of the automated review process and we are in the 7 day discussion period with the DVC, the below would be our comments based on the documents we were able to review:

- Dosage change – 2,011 PDE pairs - The DVC's findings were in error.  PDE selected did not meet 150% protocol discussed during call.  [As you may recall, this requirement was implemented to address the revised protocol's assumption that a duplicative dispensing event was not deemed a 100% increase.]
- Missing Contract – 245 PDE pairs – We cannot address this finding, this contract was included in our original review and submitted to the plan in the original RFI.
- Different Pharmacy – 121 PDE pairs – The DVC's findings are in error.  In every case we reviewed, these PDE were associated with multiple duplicative records (triple, quadruple, etc).  For example, the first and second PDE matched on pharmacy and were within 150% protocol.  The second and third PDE didn't match on same pharmacy but were same date of service; also within the protocol.  (DVC matched third to first).
- LTC – 3,145 PDE pairs; The DVC findings were in error.  The DVC did not follow

DP1214

approved NAIRP - selected NPI numbers were not listed in CMS' IDR database as required in the NAIRP.  As discussed extensively during the NAIRP approval process in reference to determining the NPIs for Long Term Care pharmacies, the RAC was forbidden by CMS to utilize external resources.  Specifically, the RAC was instructed, and the approved NAIRP required, that only those NPIs contained within CMS' IDR be utilized - we were unable to match any DVC NPIs to this database and the DVC is using it on a protocol rerun that did not even mention LTC.   Additionally, validating a last minute protocol change from a quality control perspective should not include those things outside of the protocol.  If CMS so directed, the RAC should have had same direction.  If not, the DVC should be directed to follow approved protocols.

- P2P – 2,492 PDE pairs.  The DVC's findings were in error.  The DVC did not follow approved NAIRP — selected PDE did not account for another matched record which was not a P2P record.
- Unpaired Records – 10,568/ PDE pairs – The DVC's findings were in error.  We were able to pair each record we reviewed.  If DVC is unable to perform the review within tight time constraints, then removal of a record should not be dictated.

If CMS wants to hold this off so that we may adequately dispute each and every finding with the DVC, we intend to do so.  As we stated last week, if CMS' goal is to get the plans relief...then we recommend the exception reports provided by the RAC be immediately forwarded to the plan sponsors for consideration.   Again, these issues related to the DVC are better solved during NIP submission where they reside in the process.  Otherwise, we can address outstanding issues upon our return.

---

**From:** Brown, Sonja J. (CMS/CPI) <sonja.brown@cms.hhs.gov>
**Sent:** Thursday, November 13, 2014 12:04 PM
**To:** Gil Mucke; Thais Thompson
**Cc:** Christopher Mucke; Harris, Monique (CMS/CPI); Kenya, Dominca (CMS/CPI); Newkirk, Delois J. (CMS/CPI); Tetkoski, Frank (CMS/CPI); Thomas, India M. (CMS/CPI)
**Subject:** DVC Validation Results (Revised Duplicate)

Good Afternoon Gil and Thais,
The DVC has completed its validation of the revised exception reports for the duplicate payment review. The results can be found in the following location:   PARTDRAC ► Duplicate Payments ► DVC Validation Results (Revised Duplicate RFI).  If you are in agreement with the results, please make the necessary changes by 12pm on 11/14 so that we can move forward with getting the revised RFIs out the door. If you will have an issue meeting the proposed deadline, let us know right away.

Thanks,

*Sonja J. Brown*
Centers for Medicare & Medicaid Services
Center for Program Integrity

DP1215

A02289

Investigations and Audits Group
Division of Plan Oversight and Accountability
410-786-3571 (Office)
Sonja.Brown@cms.hhs.gov

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential.  It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information.  Unauthorized disclosure may result in prosecution to the full extent of the law.*

DP1216

# TAB 118

| From: | Christopher Mucke |
|---|---|
| To: | "Harris, Monique (CMS/CPI)" ; Nicole.Hoey@cms.hhs.gov ; Brown, Sonja J. (CMS/CPI) ; |
| Cc: | Thomas, India M. (CMS/CPI) ; Scott, Jamie (CMS/CPI) ; Kenya, Dominca (CMS/CPI) ; Brady, Elizabeth A. (CMS/CPI) ; Tetkoski, Frank (CMS/CPI) ; Newkirk, Delois J. (CMS/CPI) ; Brown, Camille J. (CMS/CCIIO) ; Abankwah, Rosalind M. (CMS/CPI) ; Thais Thompson ; Gil Mucke |
| Subject: | RE: Duplicate Payment Data Discovery Observations |
| Date: | Monday, January 12, 2015 9:03:00 AM |

Monique, while we attempt to respond to reasonable CPI requests, those which require significant contract modifications would be better directed to our COR, Sonja Brown and our Contracting Officer, Nicole Hoey.

It is apparent that your comments below reflect last year's proposed NAIRP revision. As noted by our COR during those discussions, such a revision would constitute a "contractual change". Please be advised that no such change or modification was made and approved NAIRP protocols still apply to this review; our IPRP submission was in full and complete compliance with our contract and the approved NAIRP. Further, and as noted by my audit findings letter to Ms. Brown on December 23, 2014, plan sponsor evidentiary submissions clearly invalidated CPI's mathematical calculation proposed in the NAIRP revision.

Based on your email, it is apparent the DVC has not commenced their review of our IPRP submission (via both PRIS and QuickR) of December 23, 2014. As a practical matter, it is the DVC's responsibility to remove "false positives" or other RAC determinations made in error; it is not the RAC's responsibility to resubmit IPRPs until all such errors are removed. The results of their validation are contractually and procedurally due no later than February 6, 2015; an effort easily accomplished if, as their contract previously stated, only requires a 10% review of our findings.

I was hopeful that unnecessary delays by CPI in previous years, delays that have doubled in the past 12 months, would not also affect the final year of our contract. We have only ever requested that CPI exercise our contract in good faith. It is apparent from your email; however, that CPI efforts to manufacture RAC error, in an attempt to disguise the real cause of these delays, are a continuing cause of concern. Please refer further discussions pertaining to contractual change requests on this or other issues to our COR and Contracting Officer so that they may be more appropriately addressed. Thank you.

---

*Christopher Mucke | Managing Principal | ACLR, LLC*
38705 7 Mile Rd, Ste 251 | Livonia, Michigan 48152-3975 | ☎(734) 744 - 4401 | 🖷(734) 744 - 4150 | ✉
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

---

**From:** Harris, Monique (CMS/CPI) [mailto:Monique.Harris@cms.hhs.gov]
**Sent:** Thursday, January 08, 2015 5:30 PM
**To:** Thais Thompson; Christopher Mucke; Gil Mucke
**Cc:** Thomas, India M. (CMS/CPI); Scott, Jamie (CMS/CPI); Brown, Sonja J. (CMS/CPI); Kenya, Dominca (CMS/CPI); Brady, Elizabeth A. (CMS/CPI); Tetkoski, Frank (CMS/CPI); Newkirk, Delois J. (CMS/CPI); Brown, Camille J. (CMS/CCIIO); Abankwah, Rosalind M. (CMS/CPI)
**Subject:** Duplicate Payment Data Discovery Observations

Christopher,

The DVC has provided CMS with the following observations from the duplicate payment data received from the RAC:

- The duplicative pairs are associated with 294 Plans. Of the 294 identified Plan's 53 did not respond. Of the 241 plans that did respond:
  - a) 36 provided only a summary Excel spreadsheet
  - b) 72 provided only images of scripts and other documents
  - c) 133 provided both a summary Excel spreadsheet and images
- The RAC did not include their determinations/reasons for each duplicate
- In some instances, the case number for the PDE's cannot be linked to the Plan's responses
- The linking of the images to the Excel summaries is not straight forward and requires manipulation of the data to establish the linkage
- A number of the duplicates are for creams, ointments, eye drops and inhalers, which according to the DVC's pharmacist, Nonyem Oguejiofor , resulted in frequent refills of these drugs that are most likely legitimate. The DVC recommends that duplicates for these drugs be removed from the population.
- The DVC determined that 286,398 of the pairs on the RAC's list had been previously identified by the DVC as dosage

DP1225

A02299

change false positives and an additional 50,579 of the pairs were previously identified by the DVC as non-dosage change false positives.

- The dosage change pairs or a sample of these pairs should be reviewed separately to determine if the Plans' responses support a legitimate dosage change.
- "Prior Authorization" is another reason frequently supplied by the Plans for legitimate refills. Some of the Plans' responses contain an authorization code; however, the Plans do not provide any definition for the codes used. It will be necessary to individually assess the Plans' responses for validity.

The DVC is requesting the following information to perform validation:

- RAC determinations for each duplicate; .  If the RAC conclude the duplicate was still improper then there should be indication along with a reason for the determination.
- The improper duplicate PDE's should accompany the Plan's responses so the DVC can independently validate the RAC's determinations
- PDE's that are not duplicates should not be included on the pair listing and the plans responses for the false positives should not have been sent to the DVC. *The DVC is assuming that all of the pairs on the list are improper*.

Please provide the DVC with the requested information above by COB 1/16/15.  There will be a meeting scheduled with CMS, the RAC and DVC to discuss.

Thanks,


*Monique Harris*
Auditor
Department of Health & Human Services
Center for Medicare & Medicaid Services
Center for Program Integrity
Investigations & Audits Group
Division of Plan Oversight & Accountability
(410)786-5443 (Office)

Monique.Harris@cms.hhs.gov

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or priviledged information.  Any review, dissemination, copying, printing, or other use of this email by persons or entities other than the addressee is prohibited.  If you receive this e-mail in error, please contact the sender immediately and delete this material from any computer.

DP1226

TAB 119

| **From:** | Mihalevich, Kathryn R. (EHQ) <kate.mihalevich@express-scripts.com> |
|-----------|-----|
| **Sent:** | Monday, September 08, 2014 6:01 PM |
| **To:** | Tetkoski, Frank (CMS/CPI); Forman, Michael (CMS/CPI); Abankwah, Rosalind M. (CMS/CPI); Brown, Sonja J. (CMS/CPI) |
| **Cc:** | Kenya, Dominca (CMS/CPI); Thomas, India M. (CMS/CPI); Scott, Jamie (CMS/CPI) |
| **Subject:** | RE: ESI follow-up from 8/21 call |

Sonja – my apologies for the delay on my end.

In discussion with colleagues in our client audit team, the request on this RFI would be significant when all of our impacted PBM clients are taken into account. Across all such clients, the claims count we would be supporting is approximately 220,000 claims. Because these claims date back several years, there is more work effort needed to obtain the data requested. We anticipate that it will take approximately 15 minutes per claim to review and print documentation.

Based on the forgoing estimate, it would take 55,000 hours or 86 weeks, using 16 full time resources (likely contractors) to complete the full scale documentation for the RFI. Rough cost for those resources would be $1,925,000 for overhead and does not include the any incremental costs associated with hiring, system set-up/ IT support. Further, we want to point out that this estimate is specific to the work effort incurred by the PBM and does NOT include the time and resources that will be spent by our plan clients in reviewing the data received from ESI and submitting the data to CMS.

As we discussed the last time we spoke, Express Scripts wants to support CMS' policy goals in performing this review. In that regard, we believe there is a significant opportunity to appropriately reduce the scope of the review based on the 2006 PDE guidance you shared with us, since we can demonstrate that there are many claims where the elements outlined in the 2006 guidance clearly do not match.  We would really appreciate the opportunity to discuss that approach in greater detail and come up with an alternative approach  - similar to our partnering efforts in the Controlled Substances RFI response. In addition, to ensure that we are able to provide CMS and the RAC with timely data, we can certainly revisit providing an Excel extract directing from our system and provide an attestation that none of the data has been adjusted or otherwise manipulated.

Thanks for your help and continued willingness to work with us on this.

-Kate

---

**From:** Brown, Sonja J. (CMS/CPI) [mailto:sonja.brown@cms.hhs.gov]
**Sent:** Wednesday, September 03, 2014 5:07 PM
**To:** Mihalevich, Kathryn R. (EHQ); Tetkoski, Frank (CMS/CPI); Forman, Michael (CMS/CPI); Abankwah, Rosalind M. (CMS/CPI)
**Cc:** Kenya, Dominca (CMS/CPI); Scott, Jamie (CMS/CPI); Thomas, India M. (CMS/CPI)
**Subject:** RE: ESI follow-up from 8/21 call

Hi Kate,
CMS has reviewed the examples submitted by ESI on 8/22. We just received additional information from the RAC and we will be conducting a final review in the next day or so. Afterwards, we will schedule the follow-up call to discuss.. In the meantime, could you provide CMS with the labor costs associated with complying with the RFI instructions as originally requested by CMS. This will help us with putting all of the pieces together. Please let us know if you have any questions.

Thanks,

Sonja

**From:** Mihalevich, Kathryn R. (EHQ) [mailto:kate.mihalevich@express-scripts.com]
**Sent:** Tuesday, August 26, 2014 9:19 AM
**To:** Tetkoski, Frank (CMS/CPI); Forman, Michael (CMS/CPI); Abankwah, Rosalind M. (CMS/CPI); Brown, Sonja J. (CMS/CPI)
**Subject:** RE: ESI follow-up from 8/21 call

Thank you, have a nice Labor Day weekend!

---

**From:** Brown, Sonja J. (CMS/CPI) [mailto:sonja.brown@cms.hhs.gov]
**Sent:** Tuesday, August 26, 2014 8:13 AM
**To:** Mihalevich, Kathryn R. (EHQ); Tetkoski, Frank (CMS/CPI); Forman, Michael (CMS/CPI); Abankwah, Rosalind M. (CMS/CPI)
**Subject:** RE: ESI follow-up from 8/21 call

Good Morning Kathryn,
Thank you for the follow-up. We did receive the samples and are in the process of reviewing. I will touch base with Trish and Rhonda with any questions that we may have and also to discuss availability for the follow-up call.

Enjoy your time off!

Thanks,
Sonja

-------- Original message --------
From: "Mihalevich, Kathryn R. (EHQ)" <kate.mihalevich@express-scripts.com>
Date:08/26/2014 8:03 AM (GMT-05:00)
To: "Tetkoski, Frank (CMS/CPI)" <Frank.Tetkoski@cms.hhs.gov>, "Forman, Michael (CMS/CPI)" <Michael.Forman@cms.hhs.gov>, "Abankwah, Rosalind M. (CMS/CPI)" <Rosalind.Abankwah@cms.hhs.gov>, "Brown, Sonja J. (CMS/CPI)" <sonja.brown@cms.hhs.gov>
Cc:
Subject: RE: ESI follow-up from 8/21 call

Good morning, Sonja – I just wanted to confirm that you received the below-referenced samples and see if we could schedule a time to discuss follow-up from our call last week.

Just FYI, I will be out of the office the remainder of this week, returning on September 3. I will be monitoring my e-mails on a daily basis while I am out. Trish Nesselhauf and Rhonda Needham can work with you to coordinate a call in my absence if you are available to discuss next steps this week.

Thanks so much for your help,
-Kate

---

**From:** Mihalevich, Kathryn R. (EHQ)
**Sent:** Friday, August 22, 2014 5:22 PM
**To:** Brown, Sonja J. (CMS/CPI); Abankwah, Rosalind M. (CMS/CPI); Tetkoski, Frank (CMS/CPI); Forman, Michael (CMS/CPI); Nesselhauf, Trish A. (EHQ); Vidal, Denise (FKN); Needham, Rhonda K. (EHQ)
**Subject:** ESI follow-up from 8/21 call

HHS0021100

Good afternoon, Sonja –

Attached please find the updated samples we discussed yesterday. The password for the file to follow in a separate e-mail.

Also – if you would be so kind as to forward the guidance mentioned yesterday regarding the manner in which CMS defines a duplicate claim, we would appreciate it!

Have a nice weekend.

Thank you,
-Kate

<< File: ESI PDP Samples for CMS_8 22 14.xlsx >>

Kate Mihalevich
Vice President of Government Programs Compliance
Express Scripts
One Express Way
St. Louis, Missouri 63121
314-684-6434
kate.mihalevich@express-scripts.com

**SA632**

HHS0021101

TAB 120

| From: | Bruce Dixon |
|-------|-------------|
| To: | Christopher Mucke |
| Subject: | Fw: 2012 PDE Files |
| Date: | Wednesday, September 09, 2015 10:31:23 AM |

**From:** James Kelley <jkelley@msiatlanta.com>
**Sent:** Tuesday, January 7, 2014 5:48 PM
**To:** Bruce Dixon
**Subject:** Re: 2012 PDE Files

We have started receiving.

On Jan 7, 2014, at 3:37 PM, Bruce Dixon <bdixon@aclrsbs.com> wrote:

Give us a shout when this completes.   Thanks.

*Bruce Dixon* | *Systems Security Officer* | *ACLR, LLC*
38705 Seven Mile Rd.| Suite 251 | Livonia,  Michigan 48152-3975 | Off. Ph. (734) 744-4405 |  Cell Ph. (248) 894-6940  |  Fax (734) 744-4150 | email: **bdixon@aclrsbs.com**
The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

**From:** Horton, Dinah L. (CMS/OIS) [mailto:Dinah.Horton@cms.hhs.gov]
**Sent:** Tuesday, January 07, 2014 11:14 AM
**To:** Bruce Dixon
**Cc:** James Kelley [External]
**Subject:** RE: 2012 PDE Files

Hi Bruce,

I just submitted the program to transmit the following file EFT.

T#EFT.ON.ACLRIDR.Y1201PDE.D140107.T1104000    102,573,471 records.

The record layout is the same as last year.  Let me know when you receive this file.

Thanks

*Dinah Horton*
Centers for Medicare & Medicaid Services (CMS)
Office of Information Services (OIS)
Enterprise Data Group (EDG)
Division of Information Management Services (DEIMS)
410.786.0160    dinah.horton@cms.hhs.gov
7500 Security Blvd., N2-18-07

**SA633**

Baltimore, MD 21244-1850

Need more information? Please visit the OIS website.

---

**From:** Bruce Dixon [mailto:bdixon@aclrsbs.com]
**Sent:** Monday, January 06, 2014 12:35 PM
**To:** Horton, Dinah L. (CMS/OIS)
**Cc:** James Kelley [External]
**Subject:** RE: 2012 PDE Files

Thanks Dinah.    We'll be waiting.

---

*Bruce Dixon | Systems Security Officer | ACLR, LLC*
38705 Seven Mile Rd.| Suite 460 | Livonia, Michigan 48152-3975 | Off. Ph. (734) 744-4405 | Cell Ph. (248) 894-6940 | Fax (734) 744-4150 |
email: bdixon@aclrsbs.com
The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.

---

**From:** Horton, Dinah L. (CMS/OIS)
**Sent:** Mon 1/6/2014 11:35 AM
**To:** Bruce Dixon
**Cc:** James Kelley [External]
**Subject:** RE: 2012 PDE Files

Happy new year to you too!!  I have a short day today so I will start sending tomorrow.

*Dinah Horton*
Centers for Medicare & Medicaid Services (CMS)
Office of Information Services (OIS)
Enterprise Data Group (EDG)
Division of Information Management Services (DEIMS)
410.786.0160    dinah.horton@cms.hhs.gov
7500 Security Blvd., N2-18-07
Baltimore, MD 21244-1850

Need more information? Please visit the OIS website.

---

**From:** Bruce Dixon [mailto:bdixon@aclrsbs.com]
**Sent:** Friday, January 03, 2014 2:41 PM
**To:** Horton, Dinah L. (CMS/OIS)
**Cc:** James Kelley [External]
**Subject:** FW: 2012 PDE Files

Hi Dinah,

Hope you had a very happy new year's holiday.

We're all set to go so send at will.

**SA634**

Thanks,

Bruce

---

**Bruce Dixon** | **Systems Security Officer** | _ACLR, LLC_
38705 Seven Mile Rd.| Suite 251 | Livonia, Michigan 48152-3975 | Off. Ph. (734) 744-4405 | Cell
Ph. (248) 894-6940 | Fax (734) 744-4150 | email: bdixon@aclrsbs.com
The information contained in this message may be privileged and confidential and protected from disclosure. If
you are not the intended recipient, or an employee or agent responsible for delivering this message to the
intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking
action in reliance on this communication is strictly prohibited. If you have received this communication in error,
please notify the sender immediately by replying to the message and deleting it from your computer.

---

**From:** James Kelley [mailto:jkelley@msiatlanta.com]
**Sent:** Thursday, January 02, 2014 9:05 AM
**To:** Bruce Dixon
**Subject:** Re: 2012 PDE Files

She can send when ready. The receiving server has room for at least a few months worth.
I'll start cleaning up the SAN & DB server and moving old data off to an encrypted
drive(s).

On Dec 30, 2013, at 10:02 AM, Bruce Dixon <bdixon@aclrsbs.com> wrote:

Hi James,

Sounds like Dinah's got our data ready.    Are we ready to start  receiving next week?   If so, I'll
have her start next week.

Thanks,

Bruce

---

**Bruce Dixon** | **Systems Security Officer** | _ACLR, LLC_
38705 Seven Mile Rd.| Suite 251 | Livonia, Michigan 48152-3975 | Off. Ph. (734) 744-4405 | Cell
Ph. (248) 894-6940 | Fax (734) 744-4150 | email: bdixon@aclrsbs.com
The information contained in this message may be privileged and confidential and protected from disclosure. If
you are not the intended recipient, or an employee or agent responsible for delivering this message to the
intended recipient, you are hereby notified that any dissemination of, distribution of, copying of, or taking
action in reliance on this communication is strictly prohibited. If you have received this communication in error,
please notify the sender immediately by replying to the message and deleting it from your computer.

---

**From:** Horton, Dinah L. (CMS/OIS) [mailto:Dinah.Horton@cms.hhs.gov]
**Sent:** Monday, December 30, 2013 6:47 AM
**To:** Bruce Dixon
**Subject:** 2012 PDE Files

Hi Bruce,

The 2012 PDE files are available.  I can start sending them next week if you are ready.

Hope you are having a safe and happy holiday season.

*Dinah Horton*
Centers for Medicare & Medicaid Services (CMS)
Office of Information Services (OIS)
Enterprise Data Group (EDG)
Division of Information Management Services (DEIMS)
410.786.0160    dinah.horton@cms.hhs.gov
7500 Security Blvd., N2-18-07
Baltimore, MD 21244-1850

Need more information? Please visit the OIS website.

# TAB 121

ACLRII00761

*Unallowable Sales Tax Payments*
*Vulnerability*

*Executive Summary*
*and*
*Sales Tax Payments - Louisiana*

**National Benefit Integrity**
**Medicare Drug Integrity Contractor (NBI MEDIC)**

Prepared for:
**The Centers for**
**Medicare & Medicaid Services**

Task Order:
HHSM-500-2005-0001I-0001, Mod 21

**October 31, 2014**

HHS0031428

ACLRII00762

**Executive Summary**

States are prohibited under 42 C.F.R. § 423.440 (codifying the statutory preemption of State law at section 1860D-12(g) of the Social Security Act [42 U.S.C. § 1395w-112(g)])[1] from imposing a premium tax, fee, or other similar assessment for:

> *any payment CMS makes on behalf of Part D Plan or enrollees under this part (including the direct subsidy, reinsurance payments, and risk corridor payments); or for any payment made to Part D Plans by a beneficiary or by a third party on behalf of a beneficiary.*

A state sales tax is different from a premium tax and is not prohibited by the federal statute. States have varying laws addressing state and local sales taxes and most states prohibit the application of a sales tax at both a state and local level to Medicare prescription drugs.

For example, Louisiana statute specifically exempts prescription drugs purchased through or pursuant to Medicare Part B and Part D from the sales and use taxes imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state.

Louisiana also has a constitutional provision exempting prescription drugs from the state and use tax imposed by the state of Louisiana or by a political subdivision whose boundaries are coterminous with those of the state.

Matters concerning the unallowable sales tax payments made by Medicare Part D were referred to the Health and Human Services/Office of Inspector General (HHS/OIG) in 2009, and, as a result of the case referral, two civil actions were imposed resulting in a recovery of more than $3.8 million.

As a result of the successful outcome and recoveries made regarding the Louisiana case referral, the NBI MEDIC conducted a probe analysis in September 2014 to determine if this issue had resurfaced and plan sponsors were complying with CMS guidance. This initial data analysis revealed Part D payments included sales taxes in the amount of $208,851,252 for all states during the period of January 1, 2011-August 31, 2014. Of this amount, $739,107 related to payments made for sales taxes in Louisiana.

---

[1] Section 1860D-12(g) of the Social Security Act, titled "Prohibition of State Imposition of Premium Taxes; Relation To State Laws," states: "The provisions of sections 1854(g) and 1856(b)(3) shall apply with respect to PDP sponsors and prescription drug plans under this part in the same manner as such sections apply to MA organizations and MA plans under part C."

2

HHS0031429

ACLRII00763

Based on the results of this initial data analysis, the NBI MEDIC determined that a program vulnerability exists, plan sponsors are continuing to allow improper payments for unallowable sales tax despite CMS guidance, and further review is warranted.

**Background**

The State of Louisiana imposes a general sales tax of 4 percent. Parishes may also impose sales and use taxes that tend to vary across the state from 3 percent to 6 percent in addition to the state sales tax.[2] Medicare Part D drugs are exempt from both the state and local sales taxes.

*State Sales Tax and Medicare*

In 1994, the state legislation enacted a refund of certain sales taxes paid on the sales, leases and rentals of certain tangible personal property when that sale, lease or rental was paid under the Medicare program.[3]

This exemption covered sales, leases and rentals of tangible personal property making them exempt from the 3 percent state and Louisiana Tourism Promotional District Sales and Use Tax. The 1 percent sales and use tax of the Louisiana Recovery District still applied to such property. This exemption was extended to local taxes in 2000.[4]

Louisiana also has a constitutional amendment in place exempting the imposition of a state sales tax on prescription drug purchases.[5] The constitutional provision states: "Effective July 1, 2003, the sales and use tax imposed by the state of Louisiana or by a political subdivision whose boundaries are coterminous with those of the state shall not apply to sales or purchases of the following items:…(3) Prescription drugs."[6]

---

[2] Louisiana Association of Tax Administrators website, *Parish Tax Agencies*, online at: www.laota.com/pta.htm.

[3] La. Rev. Stat. Ann.§ 47:315.3 (enacted by Act 25 of the 1994 Regular Session).

[4] Act 22 of the 2000 2nd Extraordinary Session became law effective July 5, 2000, and grants a refund to any person who has paid state or local taxes in connection with transactions that come under or are reimbursed through the Medicare Program. Louisiana Act No. 60 of the 2001 Legislative Session, effective July 1, 2001, excludes from local sales and use taxes the purchase, lease or rental of tangible personal property when such sale, lease, or rental is made under the provisions of Medicare. *See* La. Rev. Stat. Ann.§ 47:301.

[5] Under Amendment No. 2, which added Article VII, Section 2.2 to the Constitution of Louisiana, the state sales tax exemption that applied to sales of food for home consumption and residential electricity, water, and natural gas also applied to prescription drugs as of July 1, 2003. See State of Louisiana Department of Revenue, Revenue Information Bulletin, No. 02-020-A, June 11, 2003 (online at www.rev.state.la.us/forms/lawspolicies/RIB02020A.pdf).

[6] Louisiana State Constitution of 1974, Article VII: Revenue and Finance. §2.2(B)(3).

3

HHS0031430

ACLRII00764

*Local (Parish) Tax and Medicare*

In 2006, a statutory provision (implemented through Act No. 411 and Act No. 608)[7] was enacted that excludes Part D drugs (and Part B drugs) from local sales and use taxes. The effective date was July 1, 2006. That provision states: "Notwithstanding any provision of law to the contrary, prescription drugs purchased through or pursuant to a Medicare Part B and D plan shall be exempt from the sales and use taxes imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state."[8]

Local sales and use tax may apply to prescription drugs that are not purchased under Medicare Parts B and D.[9]

In July 2009, the South MEDIC referred this matter to HHS/OIG when a plan sponsor reported multiple Louisiana pharmacies were inappropriately charging state sales taxes to the beneficiaries' Part D prescription drugs.

During the Fraud, Waste and Abuse Training conference held on September 9-11, 2014 in Baton Rouge, Louisiana, the NBI MEDIC learned that as a result of the referral, HHS/OIG was successful in imposing two civil actions. The HHS/OIG news releases are as follows:

- On December 23, 2013 the HHS/OIG announced: "Humana Inc. (Humana), Kentucky, agreed to pay $1,814,000 for allegedly violating the Civil Monetary Penalties Law. OIG alleged that Humana submitted prescription drug event date (PDE claims) that included sales tax from Louisiana pharmacies to the Centers for Medicare & Medicaid Services (CMS) even though Medicare Part D drugs were not taxable under Louisiana law as of July 1, 2006. OIG further alleged that Humana knowingly submitted or caused to be submitted PDE claims to CMS that improperly claimed Louisiana sales tax costs and the CMS used Humana's PDE claims to calculate Medicare Part D payments."[10]

---

[7]   Act No. 411 (House Bill 1003) classified prescription drugs purchased through or pursuant to a Medicare Part D plan as exempt from the sales and use taxes imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state. Effective July 1, 2006. Act No. 608 (Senate Bill 546) eliminated all local sales and use tax on Medicare Part B and D prescription drugs imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state. Effective July 1, 2006.

[8]   La. Rev. Stat. Ann. §4:337.9. Exemptions applicable to local tax in Chapters 2, 2-A, and 2-B; other exemptions applicable, subsection (F).

[9]   In 2008 Louisiana passed legislation (HB 383), codified at La. Rev. Stat. Ann. §47:337.11.1. that requires a pharmacy or pharmacist to collect local sales and use taxes upon the sale of prescription drugs or pharmacist services and to remit the taxes to the levying authority. The health insurance issuer is also required to reimburse the pharmacy or pharmacist the amount of such tax in cases where health insurance coverage for prescription drugs and pharmacist services exists, depending on the terms and conditions of the insured's agreement with its member or insured. This provision, enacted as Act 582, was effective as of June 30, 2008.

[10]   http://oig.hhs.gov/fraud/enforcement/cmp/false_claims.asp.

4

HHS0031431

ACLRII00765

- In July 2014, the HHS/OIG also announced: "Argus Health Systems, Inc.—a health care information management services provider and pharmacy benefits manager headquartered in Kansas City, MO—entered into a settlement agreement with the HHS/OIG, effective July 31, 2014. Under the agreement, Argus agreed to pay OIG $2,029,210 to resolve allegations that the company submitted PDE data to Medicare that included sales tax from Louisiana pharmacies even though Medicare Part D drugs were not taxable under Louisiana law as of July 1, 2006. Specifically, OIG contends that from July 1, 2006 through December 31, 2009, Argus knowingly submitted or caused to be submitted PDE claims to the CMS that improperly claimed Louisiana sales tax costs. CMS then used those PDE claims to calculate Medicare payments to Part D sponsors with whom Argus contracted, which improperly increased reimbursement to the sponsors."[11]

When this matter originally surfaced, Cynthia Tudor, Ph.D., Director, Medicare Drug Benefit and C&D Data Group, educated plan sponsors on three separate occasions to halt unallowable charges for the Louisiana sale tax and recover the improper payments. The areas Dr. Tudor covered included:

- Using Health Plan Management System (HPMS) memo guidance dated August 13, 2010,[12] December 21, 2010,[13] and April 11, 2011,[14] plan sponsors were notified of the unallowable sales tax issue and instructed to recoup any sales taxes paid on 2010 Part D prescriptions in Louisiana, resubmit corrected PDE records for the affected transactions and reimburse any sales tax paid by beneficiaries (as dictated by the plan design), and to take immediate steps to ensure that no further sales taxes are paid on Part D Louisiana pharmacy claims.

- In the December 21, 2010 memo, CMS specifically emphasized that it is the plan sponsor's responsibility to determine whether sales tax on Part D claims is permissible in any locality and that CMS requires plan sponsors to correctly adjudicate the Part D benefit without reliance on CMS to identify such errors.

---

[11] ibid

[12] http://cms.hhs.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/MemoLASalesTax_081310.pdf

[13] http://cms.hhs.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/MemoLASalesTaxRecoupment_122110.pdf

[14] http://cms.hhs.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/MemoLASalesTax_041111.pdf

5

HHS0031432

ACLRII00766

**Conclusion**

During the period of January 1, 2010 to August 31, 2014, plan sponsors submitted 4,502,286 PDE records (each having an unallowable Louisiana sales tax amount greater than $0.00) and cumulatively valued at $977,029.39.

When excluding those records in which CMS had no financial exposure, these figures were reduced to 4,357,112 PDE records and unallowable Louisiana sales taxes of $922,961.59, respectively. A breakdown of how these figures were derived is explained in the ensuing paragraphs.

As the PDE records data analysis results revealed, the application of a sales tax to a Medicare Part D prescription drug sale continues to occur in Louisiana and other states despite:

- Continuous CMS education of plan sponsors and
- Recent civil actions regarding the inappropriate charges of Louisiana state sales tax applied to prescription drug sales.

According to the Medicare Prescription Drug Benefit Manual, Chapter 6, Section 20,[15] PDE records with drug coverage status code equal to "E" or "O" were considered as PDE records including payments for excluded drugs. The drug coverage status code choices include:

> C = Covered
>
> E = Supplemental drugs (reported by Enhanced Alternative plans only)
>
> O = Over-the-counter drugs

PDE records were excluded to determine CMS's actual financial exposure by applying the three criteria below when:

- The total paid amount equaled the Non Covered Plan Paid Amount (NPP)
- The total paid amount equaled the sum of the ingredient cost and dispensing fee
- The drug coverage status code equal to "E" or "O"

---

[15] https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/downloads/Chapter6.pdf

HHS0031433

ACLRII00767

As a result of applying this criteria, the total PDE record count was reduced from 4,502,286 to 4,357,112 or by 145,174 (3.2%); the total paid amount was reduced from $275,110,376.69 to $272,069,071.90; and the total sales tax paid amount was reduced from $977,029.39 to $922,961.59.

Table 1 lists the PDE record count, total paid amount, and sales tax payments by year.

**Table 1. PDE Record Count, Total Paid Amount, and Sales Tax Amount by Year**

| Year | PDE Record Count | Total Paid Amount | Sales Tax Amount |
|---|---|---|---|
| 2010 | 786,943 | $48,148,163.41 | $226,387.67 |
| 2011 | 1,099,080 | $71,248,271.71 | $111,285.77 |
| 2012 | 916,885 | $53,757,920.88 | $93,504.99 |
| 2013 | 1,097,780 | $63,345,759.54 | $137,294.42 |
| 2014 | 456,424 | $35,568,956.36 | $354,488.74 |
| *Grand Total* | *4,357,112* | *$272,069,071.90* | *$922,961.59* |

Under Tables 2-5, the 4,357,112 PDE records were summarized by plan sponsor type, parent organization, pharmacy dispensing type, pharmacy dispensing class, and prescriber specialty.

For comparison purposes, these tables include the PDE record count, total paid amount, total billed amount, and sales tax amount.

**Table 2. Plan Sponsors' Sales Tax Payments from January 1, 2010 to August 31, 2014**

| Plan Sponsor Type | PDE Record Count | Total Paid Amount | Total Billed Amount* | Sales Tax Amount |
|---|---|---|---|---|
| MA-PD | 99,672 | $8,039,672.67 | $8,126,501.10 | $241,365.11 |
| PDP | 4,257,440 | $264,029,399.23 | $275,857,743.51 | $681,596.48 |
| *Grand Total* | *4,357,112* | *$272,069,071.90* | *$283,984,244.61* | *$922,961.59* |

*Total Billed Amount = Ingredient Cost + Dispensing Fee + Sales Tax Amount*

**Table 3. Pharmacy Dispenser Class Sales Tax Payments from January 1, 2010 to August 31, 2014**

| Pharmacy Dispenser Class | PDE Record Count | Total Paid Amount | Total Billed Amount* | Sales Tax Amount |
|---|---|---|---|---|
| Independent Pharmacy | 2,218,138 | $149,585,891.47 | $155,246,434.04 | $606,189.97 |
| Chain Pharmacy | 2,119,526 | $121,354,915.88 | $127,534,564.81 | $310,930.73 |
| Franchise Pharmacy | 19,346 | $1,123,665.27 | $1,198,562.91 | $5,766.29 |
| Alternate Dispensing Site | 102 | $4,599.28 | $4,682.85 | $74.60 |
| *Grand Total* | *4,357,112* | *$272,069,071.90* | *$283,984,244.61* | *$922,961.59* |

*Total Billed Amount = Ingredient Cost + Dispensing Fee + Sales Tax Amount*

7

HHS0031434

ACLRII00768

**Table 4. Pharmacy Dispenser Type Sales Tax Payments from January 1, 2010 to August 31, 2014**

| Pharmacy Primary Dispenser Type | PDE Record Count | Total Paid Amount | Total Billed Amount* | Sales Tax Amount |
|---|---|---|---|---|
| Community/Retail Pharmacy | 4,291,324 | $266,501,009.83 | $278,301,483.54 | $872,722.64 |
| Clinic Pharmacy | 287 | $761,887.07 | $763,526.68 | $30,116.53 |
| Long Term Care Pharmacy | 58,188 | $3,870,015.74 | $3,934,991.78 | $19,083.05 |
| DME | 4,366 | $319,474.57 | $344,497.27 | $442.79 |
| Compounding Pharmacy | 1,957 | $120,403.34 | $134,551.18 | $260.89 |
| Specialty Pharmacy | 896 | $476,157.72 | $484,653.49 | $245.58 |
| Institutional  Pharmacy | 48 | $2,187.22 | $2,187.22 | $48.78 |
| Home Infusion Therapy Provider | 42 | $17,862.42 | $18,279.46 | $38.94 |
| Non-Pharmacy Dispensing Site | 4 | $73.99 | $73.99 | $2.39 |
| *Grand Total* | *4,357,112* | *$272,069,071.90* | *$283,984,244.61* | *$922,961.59* |

*Total Billed Amount = Ingredient Cost + Dispensing Fee + Sales Tax Amount*

**Table 5. Top 7 Sales Tax Paid Amount by Prescriber Specialty from January 1, 2010-August 31, 2014**

| Prescriber Specialty | PDE Record Count | Total Paid Amount | Total Billed Amount | Sales Tax Amount |
|---|---|---|---|---|
| Internal Medicine | 1,720,369 | $110,949,846.91 | $116,767,987.25 | $393,242.05 |
| Family Medicine | 1,360,880 | $71,044,954.83 | $73,728,115.40 | $206,465.06 |
| Nurse Practitioner | 291,118 | $19,691,921.30 | $20,310,018.88 | $65,281.62 |
| Dermatology | 19,508 | $2,579,298.47 | $2,713,426.79 | $53,627.39 |
| Physician Assistant | 36,986 | $2,696,281.52 | $2,797,647.98 | $35,910.25 |
| Specialist | 165,996 | $11,416,653.64 | $12,018,448.08 | $35,361.73 |
| Psychiatry & Neurology | 138,164 | $17,482,748.11 | $18,023,499.87 | $30,809.33 |
| General Practice | 85,309 | $4,420,380.15 | $4,635,914.41 | $12,898.63 |
| **Total** | **3,818,330** | **$240,282,084.93** | **$250,995,058.66** | **$833,595.86** |

Table 6 lists the top 5 parent organizations by sales tax amount. Of the 4,357,112 PDE records containing Louisiana sales taxes, 4,068,635 or 93 percent were submitted by the top 5 parent organizations.

**Table 6. Top 5 Parent Organization by Sales Tax Payments**

| Parent Organization | PDE Record Count | Total Paid Amount | Sales Tax Amount |
|---|---|---|---|
| UnitedHealth Group, Inc. | 81,507 | $9,825,732.61 | $285,014.47 |
| Express Scripts Holding Company | 2,159,819 | $134,274,003.31 | $239,481.82 |
| Vantage Holdings, Inc. | 45,444 | $2,466,721.05 | $138,188.65 |
| CVS Caremark Corporation | 1,260,407 | $81,742,202.29 | $126,905.10 |
| Aetna Inc. | 521,458 | $25,846,258.25 | $52,371.00 |
| *Total* | *4,068,635* | *$254,154,917.51* | *$841,961.04* |

8

HHS0031435

ACLRII00769

Along with the PDE records, attachments A through E contain a summary of payments for parent organization and plan sponsor by year. These include:

- Attachment A (Louisiana Contract Summary 2010)
- Attachment B (Louisiana Contract Summary 2011)
- Attachment C (Louisiana Contract Summary 2012)
- Attachment D (Louisiana Contract Summary 2013)
- Attachment E (Louisiana Contract Summary 2014)

After re-assessing the Louisiana Sales Tax issue and given how issues tend to occur in cycles, the data analysis results warrant a more detailed, expanded review into other states.

As a result, the NBI MEDIC will perform a state-by-state project study of sales taxes paid under the Medicare Part D program.

The objective of this study or studies will be to determine whether the amounts identified in the PDE records as a "sales tax" actually represent sales taxes in states where the application of sales taxes to Part D prescription drugs is prohibited by state law.

9

HHS0031436

ACLRII00770

**Source Statement**

Under the Medicare Part D Program, the Centers for Medicare & Medicaid Services (CMS) makes payments to Medicare Advantage Prescription Drug Plan (MA-PD) and stand-alone Prescription Drug Plan (PDP) sponsors on a monthly basis through estimated subsidy payments and, if required, at year-end as a result of the payment reconciliation process. The payment reconciliation process compares estimated subsidy payments made to plan sponsors throughout the year with the cost data submitted by MA-PD and PDP sponsors through prescription drug event (PDE) records and Direct or Indirect Remuneration (DIR) data to determine any residual payments required by CMS to MA-PD and PDP sponsors or by MA-PD and PDP sponsors to CMS. The reconciliation process relies on four major data sources: the sum of payments made to plan sponsors throughout the year, final updated plan enrollment, PDE records from MA-PD and PDP sponsors, and DIR.

Each time a beneficiary fills a prescription under Medicare Part D, an MA-PD or PDP sponsor must submit a summary record called the PDE record to CMS. PDE records are not the same as individual drug claim transactions but are summary extracts using CMS-defined standard fields. CMS stores the PDE records submitted by MA-PD and PDP sponsors in the Integrated Data Repository (IDR). MA-PD and PDP sponsors submit an original PDE record and may either adjust or delete PDE records submitted to CMS within the designated schedule. The records provided herein represent the latest iteration of the PDE records submitted by MA-PD and PDP sponsors and do not represent the complete adjudication history of drug claim transactions. The complete adjudication history of a drug claim transaction resides with the responsible MA-PD or PDP sponsor.

This report contains confidential Part D data, information, and/or analysis (hereinafter referred to collectively as "material") based on data and records made available to the NBI MEDIC by CMS. To the extent that this material contains or was developed through the use of data contained within the CMS's IDR, please be advised that the IDR database is updated periodically with new or revised data and PDE records. The material contained herein does not reflect IDR additions and revisions made after the material was pulled from the IDR database. Therefore, any newly run calculations/materials may differ from calculations/materials contained herein.

Restriction on Part D Data Only: This information is also consistent with the provisions of 42 U.S.C. §§1395w-115(f)(2), which permit HHS officers, employees, and contractors to use information submitted pursuant to section 1395w-115 for the purposes of, and to the extent necessary in carrying out 42 U.S.C. §1395w-115, which include payment-related oversight and program integrity activities, and for conducting oversight, evaluation, and enforcement under Title XVIII of the Social Security Act. Any use of this information by the Department of Justice (DOJ) will be limited to carrying out health oversight activities.

This content may have been derived through the use of drug reference information obtained from Clinical Drug Information, LLC (CDI). CDI in no way endorses the data, views, opinions, or findings expressed, shared, or otherwise reported by Health Integrity, the National Benefit Integrity Medicare Drug Integrity Contractor. Copyright 2014, Medi-Span, Clinical Drug Information, LLC.

10

HHS0031437

# TAB 122

*Unallowable Sales Tax Payments*
*Vulnerability*

*Executive Summary*
*and*
*Sales Tax Payments - Minnesota*

# National Benefit Integrity
# Medicare Drug Integrity Contractor (NBI MEDIC)

Prepared for:
*The Centers for*
*Medicare & Medicaid Services*

Task Order:
HHSM-500-2005-0001I-0001, Mod 21

*November 03, 2014*

**Executive Summary**

States are prohibited under 42 C.F.R. § 423.440 (codifying the statutory preemption of State law at section 1860D-12(g) of the Social Security Act [42 U.S.C. § 1395w-112(g)])[1] from imposing a premium tax, fee, or other similar assessment for:

> *any payment CMS makes on behalf of Part D Plan or enrollees under this part (including the direct subsidy, reinsurance payments, and risk corridor payments); or for any payment made to Part D Plans by a beneficiary or by a third party on behalf of a beneficiary.*

A state sales tax is different from a premium tax and is not prohibited by the federal statute. States have varying laws addressing state and local sales taxes and most states prohibit the application of a sales tax at both a state and local level to Medicare prescription drugs.

For example, Louisiana statute specifically exempts prescription drugs purchased through or pursuant to Medicare Part B and Part D from the sales and use taxes imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state.

Louisiana also has a constitutional provision exempting prescription drugs from the state and use tax imposed by the state of Louisiana or by a political subdivision whose boundaries are coterminous with those of the state.

Matters concerning the unallowable sales tax payments made by Medicare Part D were referred to the Health and Human Services/Office of Inspector General (HHS/OIG) in 2009, and, as a result of the case referral, two civil actions were imposed resulting in a recovery of more than $3.8 million.

As a result of the successful outcome and recoveries made regarding the Louisiana case referral, the NBI MEDIC conducted a probe analysis in September 2014 to determine if this issue had resurfaced and plan sponsors were complying with CMS guidance. This initial data analysis revealed Part D payments included sales taxes in the amount of $208,851,252 for all states during the period of January 1, 2011-August 31, 2014. Of this amount, $739,107 related to payments made for sales taxes in Louisiana.

---

[1]   Section 1860D-12(g) of the Social Security Act, titled "Prohibition of State Imposition of Premium Taxes; Relation To State Laws," states: "The provisions of sections 1854(g) and 1856(b)(3) shall apply with respect to PDP sponsors and prescription drug plans under this part in the same manner as such sections apply to MA organizations and MA plans under part C."

2

Based on the results of this initial data analysis, the NBI MEDIC determined that a program vulnerability exists, plan sponsors are continuing to allow improper payments for unallowable sales tax despite CMS guidance, and further review is warranted.

**Background**

The State of Louisiana imposes a general sales tax of 4 percent. Parishes may also impose sales and use taxes that tend to vary across the state from 3 percent to 6 percent in addition to the state sales tax.[2] Medicare Part D drugs are exempt from both the state and local sales taxes.

*State Sales Tax and Medicare*

In 1994, the state legislation enacted a refund of certain sales taxes paid on the sales, leases and rentals of certain tangible personal property when that sale, lease or rental was paid under the Medicare program.[3]

This exemption covered sales, leases and rentals of tangible personal property making them exempt from the 3 percent state and Louisiana Tourism Promotional District Sales and Use Tax. The 1 percent sales and use tax of the Louisiana Recovery District still applied to such property. This exemption was extended to local taxes in 2000.[4]

Louisiana also has a constitutional amendment in place exempting the imposition of a state sales tax on prescription drug purchases.[5] The constitutional provision states: "Effective July 1, 2003, the sales and use tax imposed by the state of Louisiana or by a political subdivision whose boundaries are coterminous with those of the state shall not apply to sales or purchases of the following items:…(3) Prescription drugs."[6]

---

[2]  Louisiana Association of Tax Administrators website, *Parish Tax Agencies*, online at: www.laota.com/pta.htm.

[3]  La. Rev. Stat. Ann.§ 47:315.3 (enacted by Act 25 of the 1994 Regular Session).

[4]  Act 22 of the 2000 2nd Extraordinary Session became law effective July 5, 2000, and grants a refund to any person who has paid state or local taxes in connection with transactions that come under or are reimbursed through the Medicare Program. Louisiana Act No. 60 of the 2001 Legislative Session, effective July 1, 2001, excludes from local sales and use taxes the purchase, lease or rental of tangible personal property when such sale, lease, or rental is made under the provisions of Medicare. *See* La. Rev. Stat. Ann.§ 47:301.

[5]  Under Amendment No. 2, which added Article VII, Section 2.2 to the Constitution of Louisiana, the state sales tax exemption that applied to sales of food for home consumption and residential electricity, water, and natural gas also applied to prescription drugs as of July 1, 2003. See State of Louisiana Department of Revenue, Revenue Information Bulletin, No. 02-020-A, June 11, 2003 (online at www.rev.state.la.us/forms/lawspolicies/RIB02020A.pdf).

[6] Louisiana State Constitution of 1974, Article VII: Revenue and Finance, §2.2(B)(3).

3

*Local (Parish) Tax and Medicare*

In 2006, a statutory provision (implemented through Act No. 411 and Act No. 608)[7] was enacted that excludes Part D drugs (and Part B drugs) from local sales and use taxes. The effective date was July 1, 2006. That provision states: "Notwithstanding any provision of law to the contrary, prescription drugs purchased through or pursuant to a Medicare Part B and D plan shall be exempt from the sales and use taxes imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state."[8]

Local sales and use tax may apply to prescription drugs that are not purchased under Medicare Parts B and D.[9]

In July 2009, the South MEDIC referred this matter to HHS/OIG when a plan sponsor reported multiple Louisiana pharmacies were inappropriately charging state sales taxes to the beneficiaries' Part D prescription drugs.

During the Fraud, Waste and Abuse Training conference held on September 9-11, 2014 in Baton Rouge, Louisiana, the NBI MEDIC learned that as a result of the referral, HHS/OIG was successful in imposing two civil actions. The HHS/OIG news releases are as follows:

- On December 23, 2013 the HHS/OIG announced: "Humana Inc. (Humana), Kentucky, agreed to pay $1,814,000 for allegedly violating the Civil Monetary Penalties Law. OIG alleged that Humana submitted prescription drug event date (PDE claims) that included sales tax from Louisiana pharmacies to the Centers for Medicare & Medicaid Services (CMS) even though Medicare Part D drugs were not taxable under Louisiana law as of July 1, 2006. OIG further alleged that Humana knowingly submitted or caused to be submitted PDE claims to CMS that improperly claimed Louisiana sales tax costs and the CMS used Humana's PDE claims to calculate Medicare Part D payments."[10]

---

[7]  Act No. 411 (House Bill 1003) classified prescription drugs purchased through or pursuant to a Medicare Part D plan as exempt from the sales and use taxes imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state. Effective July 1, 2006. Act No. 608 (Senate Bill 546) eliminated all local sales and use tax on Medicare Part B and D prescription drugs imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state. Effective July 1, 2006.

[8]  La. Rev. Stat. Ann. §4:337.9. Exemptions applicable to local tax in Chapters 2, 2-A, and 2-B; other exemptions applicable, subsection (F).

[9]   In 2008 Louisiana passed legislation (HB 383), codified at La. Rev. Stat. Ann. §47:337.11.1. that requires a pharmacy or pharmacist to collect local sales and use taxes upon the sale of prescription drugs or pharmacist services and to remit the taxes to the levying authority. The health insurance issuer is also required to reimburse the pharmacy or pharmacist the amount of such tax in cases where health insurance coverage for prescription drugs and pharmacist services exists, depending on the terms and conditions of the insured's agreement with its member or insured. This provision, enacted as Act 582, was effective as of June 30, 2008.

[10]   http://oig.hhs.gov/fraud/enforcement/cmp/false_claims.asp.

4

- In July 2014, the HHS/OIG also announced: "Argus Health Systems, Inc.—a health care information management services provider and pharmacy benefits manager headquartered in Kansas City, MO—entered into a settlement agreement with the HHS/OIG, effective July 31, 2014. Under the agreement, Argus agreed to pay OIG $2,029,210 to resolve allegations that the company submitted PDE data to Medicare that included sales tax from Louisiana pharmacies even though Medicare Part D drugs were not taxable under Louisiana law as of July 1, 2006. Specifically, OIG contends that from July 1, 2006 through December 31, 2009, Argus knowingly submitted or caused to be submitted PDE claims to the CMS that improperly claimed Louisiana sales tax costs. CMS then used those PDE claims to calculate Medicare payments to Part D sponsors with whom Argus contracted, which improperly increased reimbursement to the sponsors."[11]

When this matter originally surfaced, Cynthia Tudor, Ph.D., Director, Medicare Drug Benefit and C&D Data Group, educated plan sponsors on three separate occasions to halt unallowable charges for the Louisiana sale tax and recover the improper payments. The areas Dr. Tudor covered included:

- Using Health Plan Management System (HPMS) memo guidance dated August 13, 2010,[12] December 21, 2010,[13] and April 11, 2011,[14] plan sponsors were notified of the unallowable sales tax issue and instructed to recoup any sales taxes paid on 2010 Part D prescriptions in Louisiana, resubmit corrected PDE records for the affected transactions and reimburse any sales tax paid by beneficiaries (as dictated by the plan design), and to take immediate steps to ensure that no further sales taxes are paid on Part D Louisiana pharmacy claims.

- In the December 21, 2010 memo, CMS specifically emphasized that it is the plan sponsor's responsibility to determine whether sales tax on Part D claims is permissible in any locality and that CMS requires plan sponsors to correctly adjudicate the Part D benefit without reliance on CMS to identify such errors.

---

[11] ibid

[12] http://cms.hhs.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/MemoLASalesTax_081310.pdf

[13] http://cms.hhs.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/MemoLASalesTaxRecoupment_122110.pdf

[14] http://cms.hhs.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/MemoLASalesTax_041111.pdf

**Conclusion**

When excluding those records in which CMS had no financial exposure, A breakdown of how these figures were derived is explained in the ensuing paragraphs.

As the PDE records data analysis results revealed, the application of a sales tax to a Medicare Part D prescription drug sale continues to occur in Louisiana and other states despite:

- Continuous CMS education of plan sponsors and

- Recent civil actions regarding the inappropriate charges of Louisiana state sales tax applied to prescription drug sales.

According to the Medicare Prescription Drug Benefit Manual, Chapter 6, Section 20,[15] PDE records with drug coverage status code equal to "E" or "O" were considered as PDE records including payments for excluded drugs. The drug coverage status code choices include:

> C = Covered
>
> E = Supplemental drugs (reported by Enhanced Alternative plans only)
>
> O = Over-the-counter drugs

PDE records were excluded to determine CMS's actual financial exposure by applying the three criteria below when:

- The total paid amount equaled the Non Covered Plan Paid Amount (NPP)

- The total paid amount equaled the sum of the ingredient cost and dispensing fee

- The drug coverage status code equal to "E" or "O"

As a result of applying these criteria, during the period of January 1, 2010 to September 30, 2014, plan sponsors submitted $65,111,936 PDE record (each having an unallowable Minnesota sales tax amount greater than $0.00) with $4,309,701,697 total paid amount and $94,350,851 total sales tax paid amount.

The total PDE count, total paid amount and total sales tax paid amount were reduced further (Tables 1-5) to reflect calculations based on existing contracts only.

---

[15] https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/downloads/Chapter6.pdf

6

Table 1 lists the PDE record count, total paid amount, and sales tax payments by year for the existing contracts.

**Table 1. PDE Record Count, Total Paid Amount, and Sales Tax Amount by Year**

| Year | PDE Record Count | Total Paid Amount | Sales Tax Amount |
|------|------------------|-------------------|------------------|
| 2010 | 12,440,896 | $789,467,771 | $16,454,329 |
| 2011 | 13,190,539 | $847,653,940 | $18,017,775 |
| 2012 | 13,143,513 | $853,825,499 | $18,946,213 |
| 2013 | 14,052,702 | $926,463,268 | $21,176,036 |
| 2014 | 9,831,645 | $727,952,504 | $16,334,061 |
| *Grand Total* | *62,659,295* | *$4,145,362,982* | *$90,928,414* |

Under Tables 2-5, the 62,659,295 PDE records were summarized by plan sponsor type, parent organization, pharmacy dispensing type, pharmacy dispensing class, and prescriber specialty.

For comparison purposes, these tables include the PDE record count, total paid amount, total billed amount, and sales tax amount.

**Table 2. Plan Sponsors' Sales Tax Payments from January 1, 2010 to September 30, 2014**

| Plan Sponsor Type | PDE Record Count | Total Paid Amount | Total Billed Amount* | Sales Tax Amount |
|-------------------|------------------|-------------------|----------------------|------------------|
| MA-PD | 27,933,191 | $1,619,324,894 | $1,674,870,121 | $34,041,407 |
| PDP | 34,726,104 | $2,526,038,088 | $2,585,804,709 | $56,887,007 |
| *Grand Total* | *62,659,295* | *$4,145,362,982* | *$4,260,674,830* | *$90,928,414* |

*Total Billed Amount = Ingredient Cost + Dispensing Fee + Sales Tax Amount*

**Table 3. Pharmacy Dispenser Class Sales Tax Payments from January 1, 2010 to September 30, 2014**

| Pharmacy Dispenser Class | PDE Record Count | Total Paid Amount | Total Billed Amount* | Sales Tax Amount |
|--------------------------|------------------|-------------------|----------------------|------------------|
| Chain Pharmacy | 44,667,213 | $3,093,039,289 | $3,185,894,595 | $68,222,353 |
| Independent Pharmacy | 16,891,667 | $966,497,069 | $987,317,412 | $20,875,813 |
| Alternate Dispensing Site | 487,533 | $49,278,822 | $49,973,407 | $1,040,983 |
| Franchise Pharmacy | 515,289 | $31,768,486 | $32,483,021 | $663,527 |
| Government Pharmacy | 97,593 | $4,779,316 | $5,006,394 | $125,737 |
| *Grand Total* | *62,659,295* | *$4,145,362,982* | *$4,260,674,830* | *$90,928,414* |

*Total Billed Amount = Ingredient Cost + Dispensing Fee + Sales Tax Amount*

7

**Table 4. Top 8 Pharmacy Dispenser Type Sales Tax Payments from January 1, 2010 to September 30, 2014**

| Pharmacy Dispenser Type | PDE Record Count | Total Paid Amount | Total Billed Amount* | Sales Tax Amount |
|---|---|---|---|---|
| Community/Retail Pharmacy | 54,359,726 | $3,606,606,390 | $3,706,924,850 | $79,981,230 |
| Long Term Care Pharmacy | 6,749,856 | $365,588,563 | $370,658,968 | $7,498,180 |
| Clinic Pharmacy | 699,388 | $91,093,403 | $94,042,615 | $1,632,819 |
| Mail Order Pharmacy | 584,178 | $66,440,602 | $72,881,836 | $1,429,509 |
| Indian Health Service/Tribal/Urban Indian Health Pharmacy | 140,379 | $6,944,034 | $7,322,721 | $199,188 |
| Compounding Pharmacy | 56,531 | $3,478,905 | $3,543,534 | $79,627 |
| Institutional  Pharmacy | 39,090 | $1,794,587 | $1,841,370 | $36,523 |
| Home Infusion Therapy Provider | 5,264 | $1,642,685 | $1,682,943 | $33,057 |
| *Total* | *62,634,412* | *$4,143,589,169* | *$4,258,898,837* | *$90,890,132* |

*\*Total Billed Amount = Ingredient Cost + Dispensing Fee + Sales Tax Amount*

**Table 5. Top 12 Sales Tax Paid Amount by Prescriber Specialty from January 1, 2010 to September 30, 2014**

| Prescriber Specialty | PDE Record Count | Total Paid Amount | Total Billed Amount | Sales Tax Amount |
|---|---|---|---|---|
| Family Medicine | 26,745,043 | $1,396,167,659 | $1,434,055,383 | $31,314,310 |
| Internal Medicine | 18,269,715 | $1,339,599,469 | $1,388,776,128 | $29,032,503 |
| Psychiatry & Neurology | 3,321,090 | $470,141,395 | $476,863,427 | $10,052,157 |
| Nurse Practitioner | 4,553,816 | $304,401,830 | $311,716,400 | $6,743,563 |
| Physician Assistant | 2,712,805 | $168,559,602 | $172,952,660 | $3,806,264 |
| Ophthalmology | 1,222,539 | $78,916,030 | $80,799,535 | $1,643,887 |
| Clinical Nurse Specialist | 408,037 | $55,534,222 | $56,038,426 | $1,189,150 |
| Specialist | 533,559 | $39,731,962 | $40,959,344 | $858,659 |
| Urology | 439,591 | $31,460,887 | $32,376,692 | $686,984 |
| Optometrist | 427,429 | $30,544,861 | $31,169,202 | $643,450 |
| Dermatology | 314,095 | $27,763,118 | $28,229,125 | $569,734 |
| Registered Nurse | 188,451 | $19,848,533 | $20,213,150 | $430,370 |
| *Total* | *59,136,170* | *$3,962,669,569* | *$4,074,149,473* | *$86,971,030* |

Table 6 lists the top 10 parent organizations by sales tax amount. Of the 62,659,295 PDE records containing Minnesota sales taxes, 59,578,412 or 95 percent were submitted by the top 10 parent organizations.

8

Table 6. Top 10 Parent Organizations by Sales Tax Payments from January 1, 2010 to September 30, 2014

| Parent Organization | PDE Record Count | Total Paid Amount | Sales Tax Amount |
|---|---|---|---|
| Humana Inc. | 6,733,274 | $360,629,904 | $16,515,394 |
| BCBS MN, MT, NE, ND, WY, Wellmark IA and SD | 12,557,442 | $763,083,030 | $15,054,476 |
| CVS Caremark Corporation | 6,672,420 | $652,176,770 | $12,494,412 |
| UCare Minnesota | 10,697,574 | $590,288,154 | $11,878,263 |
| Medica Holding Company | 7,782,779 | $468,667,717 | $9,261,810 |
| UnitedHealth Group, Inc. | 4,060,117 | $335,660,901 | $6,562,226 |
| HealthPartners, Inc. | 4,112,893 | $286,783,274 | $5,851,540 |
| Aetna Inc. | 2,875,002 | $231,235,378 | $4,435,872 |
| CIGNA | 1,680,747 | $144,581,166 | $2,926,416 |
| Blue Cross and Blue Shield of Minnesota | 2,406,164 | $114,439,712 | $2,091,640 |
| *Total* | *59,578,412* | *$3,947,546,006* | *$87,072,049* |

Along with the PDE records, attachments A through E contain a summary of payments for parent organization and plan sponsor by year. These include:

- Attachment A (Minnesota Contract Summary 2010)
- Attachment B (Minnesota Contract Summary 2011)
- Attachment C (Minnesota Contract Summary 2012)
- Attachment D (Minnesota Contract Summary 2013)
- Attachment E (Minnesota Contract Summary 2014)

After re-assessing the Minnesota Sales Tax issue and given how issues tend to occur in cycles, the data analysis results warrant a more detailed, expanded review into other states.

As a result, the NBI MEDIC will perform a state-by-state project study of sales taxes paid under the Medicare Part D program.

The objective of this study or studies will be to determine whether the amounts identified in the PDE records as a "sales tax" actually represent sales taxes in states where the application of sales taxes to Part D prescription drugs is prohibited by state law.

9

**Source Statement**

Under the Medicare Part D Program, the Centers for Medicare & Medicaid Services (CMS) makes payments to Medicare Advantage Prescription Drug Plan (MA-PD) and stand-alone Prescription Drug Plan (PDP) sponsors on a monthly basis through estimated subsidy payments and, if required, at year-end as a result of the payment reconciliation process. The payment reconciliation process compares estimated subsidy payments made to plan sponsors throughout the year with the cost data submitted by MA-PD and PDP sponsors through prescription drug event (PDE) records and Direct or Indirect Remuneration (DIR) data to determine any residual payments required by CMS to MA-PD and PDP sponsors or by MA-PD and PDP sponsors to CMS. The reconciliation process relies on four major data sources: the sum of payments made to plan sponsors throughout the year, final updated plan enrollment, PDE records from MA-PD and PDP sponsors, and DIR.

Each time a beneficiary fills a prescription under Medicare Part D, an MA-PD or PDP sponsor must submit a summary record called the PDE record to CMS. PDE records are not the same as individual drug claim transactions but are summary extracts using CMS-defined standard fields. CMS stores the PDE records submitted by MA-PD and PDP sponsors in the Integrated Data Repository (IDR). MA-PD and PDP sponsors submit an original PDE record and may either adjust or delete PDE records submitted to CMS within the designated schedule. The records provided herein represent the latest iteration of the PDE records submitted by MA-PD and PDP sponsors and do not represent the complete adjudication history of drug claim transactions. The complete adjudication history of a drug claim transaction resides with the responsible MA-PD or PDP sponsor.

This report contains confidential Part D data, information, and/or analysis (hereinafter referred to collectively as "material") based on data and records made available to the NBI MEDIC by CMS. To the extent that this material contains or was developed through the use of data contained within the CMS's IDR, please be advised that the IDR database is updated periodically with new or revised data and PDE records. The material contained herein does not reflect IDR additions and revisions made after the material was pulled from the IDR database. Therefore, any newly run calculations/materials may differ from calculations/materials contained herein.

Restriction on Part D Data Only: This information is also consistent with the provisions of 42 U.S.C. §§1395w-115(f)(2), which permit HHS officers, employees, and contractors to use information submitted pursuant to section 1395w-115 for the purposes of, and to the extent necessary in carrying out 42 U.S.C. §1395w-115, which include payment-related oversight and program integrity activities, and for conducting oversight, evaluation, and enforcement under Title XVIII of the Social Security Act. Any use of this information by the Department of Justice (DOJ) will be limited to carrying out health oversight activities.

This content may have been derived through the use of drug reference information obtained from Clinical Drug Information, LLC (CDI). CDI in no way endorses the data, views, opinions, or findings expressed, shared, or otherwise reported by Health Integrity, the National Benefit Integrity Medicare Drug Integrity Contractor. Copyright 2014, Medi-Span, Clinical Drug Information, LLC.

10

# TAB 123

*Unallowable Sales Tax Payments*
*Vulnerability*

*Executive Summary*
*and*
*Sales Tax Payments - Louisiana*

**National Benefit Integrity**
**Medicare Drug Integrity Contractor (NBI MEDIC)**

Prepared for:
**The Centers for**
**Medicare & Medicaid Services**

Task Order:
HHSM-500-2005-0001I-0001, Mod 21

*November 26, 2014*

CMS000019

**Executive Summary**

States are prohibited under 42 C.F.R. § 423.440 (codifying the statutory preemption of State law at section 1860D-12(g) of the Social Security Act [42 U.S.C. § 1395w-112(g)])[1] from imposing a premium tax, fee, or other similar assessment for:

> *any payment CMS makes on behalf of Part D Plan or enrollees under this part (including the direct subsidy, reinsurance payments, and risk corridor payments); or for any payment made to Part D Plans by a beneficiary or by a third party on behalf of a beneficiary.*

A state sales tax is different from a premium tax and is not prohibited by the federal statute. States have varying laws addressing state and local sales taxes and most states prohibit the application of a sales tax at both a state and local level to Medicare prescription drugs.

For example, Louisiana statute specifically exempts prescription drugs purchased through or pursuant to Medicare Part B and Part D from the sales and use taxes imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state.

Louisiana also has a constitutional provision exempting prescription drugs from the state and use tax imposed by the state of Louisiana or by a political subdivision whose boundaries are coterminous with those of the state.

Matters concerning the unallowable sales tax payments made by Medicare Part D were referred to the Health and Human Services/Office of Inspector General (HHS/OIG) in 2009, and, as a result of the case referral, two civil actions were imposed resulting in a recovery of more than $3.8 million.

As a result of the successful outcome and recoveries made regarding the Louisiana case referral, the NBI MEDIC conducted a probe analysis in September 2014 to determine if this issue had resurfaced and plan sponsors were complying with CMS guidance. This initial data analysis revealed Part D payments included sales taxes in the amount of $208,851,252 for all states during the period of January 1, 2011-August 31, 2014. Of this amount, $739,107 related to payments made for sales taxes in Louisiana.

---

[1] Section 1860D-12(g) of the Social Security Act, titled "Prohibition of State Imposition of Premium Taxes; Relation To State Laws," states: "The provisions of sections 1854(c) and 1856(b)(3) shall apply with respect to PDP sponsors and prescription drug plans under this part in the same manner as such sections apply to MA organizations and MA plans under part C."

2

CMS000020

Based on the results of this initial data analysis, the NBI MEDIC determined that a program vulnerability exists, plan sponsors are continuing to allow improper payments for unallowable sales tax despite CMS guidance, and further review is warranted.

**Background**

The State of Louisiana imposes a general sales tax of 4 percent. Parishes may also impose sales and use taxes that tend to vary across the state from 3 percent to 6 percent in addition to the state sales tax.[2] Medicare Part D drugs are exempt from both the state and local sales taxes.

*State Sales Tax and Medicare*

In 1994, the state legislation enacted a refund of certain sales taxes paid on the sales, leases and rentals of certain tangible personal property when that sale, lease or rental was paid under the Medicare program.[3]

This exemption covered sales, leases and rentals of tangible personal property making them exempt from the 3 percent state and Louisiana Tourism Promotional District Sales and Use Tax. The 1 percent sales and use tax of the Louisiana Recovery District still applied to such property. This exemption was extended to local taxes in 2000.[4]

Louisiana also has a constitutional amendment in place exempting the imposition of a state sales tax on prescription drug purchases.[5] The constitutional provision states: "Effective July 1, 2003, the sales and use tax imposed by the state of Louisiana or by a political subdivision whose boundaries are coterminous with those of the state shall not apply to sales or purchases of the following items:…(3) Prescription drugs."[6]

---

[2] Louisiana Association of Tax Administrators website, *Parish Tax Agencies*, online at: www.laota.com/pta.htm.

[3] La. Rev. Stat. Ann.§ 47:315.3 (enacted by Act 25 of the 1994 Regular Session).

[4] Act 22 of the 2000 2nd Extraordinary Session became law effective July 5, 2000, and grants a refund to any person who has paid state or local taxes in connection with transactions that come under or are reimbursed through the Medicare Program. Louisiana Act No. 60 of the 2001 Legislative Session, effective July 1, 2001, excludes from local sales and use taxes the purchase, lease or rental of tangible personal property when such sale, lease, or rental is made under the provisions of Medicare. *See* La. Rev. Stat. Ann.§ 47:301.

[5] Under Amendment No. 2, which added Article VII, Section 2.2 to the Constitution of Louisiana, the state sales tax exemption that applied to sales of food for home consumption and residential electricity, water, and natural gas also applied to prescription drugs as of July 1, 2003. See State of Louisiana Department of Revenue, Revenue Information Bulletin, No. 02-020-A, June 11, 2003 (online at www.rev.state.la.us/forms/lawspolicies/RIB02020A.pdf).

[6] Louisiana State Constitution of 1974, Article VII: Revenue and Finance, §2.2(B)(3).

3

CMS000021

*Local (Parish) Tax and Medicare*

In 2006, a statutory provision (implemented through Act No. 411 and Act No. 608)[7] was enacted that excludes Part D drugs (and Part B drugs) from local sales and use taxes. The effective date was July 1, 2006. That provision states: "Notwithstanding any provision of law to the contrary, prescription drugs purchased through or pursuant to a Medicare Part B and D plan shall be exempt from the sales and use taxes imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state."[8]

Local sales and use tax may apply to prescription drugs that are not purchased under Medicare Parts B and D.[9]

In July 2009, the South MEDIC referred this matter to HHS/OIG when a plan sponsor reported multiple Louisiana pharmacies were inappropriately charging state sales taxes to the beneficiaries' Part D prescription drugs.

During the Fraud, Waste and Abuse Training conference held on September 9-11, 2014 in Baton Rouge, Louisiana, the NBI MEDIC learned that as a result of the referral, HHS/OIG was successful in imposing two civil actions. The HHS/OIG news releases are as follows:

- On December 23, 2013 the HHS/OIG announced: "Humana Inc. (Humana), Kentucky, agreed to pay $1,814,000 for allegedly violating the Civil Monetary Penalties Law. OIG alleged that Humana submitted prescription drug event date (PDE claims) that included sales tax from Louisiana pharmacies to the Centers for Medicare & Medicaid Services (CMS) even though Medicare Part D drugs were not taxable under Louisiana law as of July 1, 2006. OIG further alleged that Humana knowingly submitted or caused to be submitted PDE claims to CMS that improperly claimed Louisiana sales tax costs and the CMS used Humana's PDE claims to calculate Medicare Part D payments."[10]

---

[7]  Act No. 411 (House Bill 1003) classified prescription drugs purchased through or pursuant to a Medicare Part D plan as exempt from the sales and use taxes imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state. Effective July 1, 2006. Act No. 608 (Senate Bill 546) eliminated all local sales and use tax on Medicare Part B and D prescription drugs imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state. Effective July 1, 2006.

[8]  La. Rev. Stat. Ann. §4:337.9. Exemptions applicable to local tax in Chapters 2, 2-A, and 2-B; other exemptions applicable, subsection (F).

[9]  In 2008 Louisiana passed legislation (HB 383), codified at La. Rev. Stat. Ann. §47:337.11.1. that requires a pharmacy or pharmacist to collect local sales and use taxes upon the sale of prescription drugs or pharmacist services and to remit the taxes to the levying authority. The health insurance issuer is also required to reimburse the pharmacy or pharmacist the amount of such tax in cases where health insurance coverage for prescription drugs and pharmacist services exists, depending on the terms and conditions of the insured's agreement with its member or insured. This provision, enacted as Act 582, was effective as of June 30, 2008.

[10]  http://oig.hhs.gov/fraud/enforcement/cmp/false_claims.asp.

4

CMS000022

- In July 2014, the HHS/OIG also announced: "Argus Health Systems, Inc.—a health care information management services provider and pharmacy benefits manager headquartered in Kansas City, MO—entered into a settlement agreement with the HHS/OIG, effective July 31, 2014. Under the agreement, Argus agreed to pay OIG $2,029,210 to resolve allegations that the company submitted PDE data to Medicare that included sales tax from Louisiana pharmacies even though Medicare Part D drugs were not taxable under Louisiana law as of July 1, 2006. Specifically, OIG contends that from July 1, 2006 through December 31, 2009, Argus knowingly submitted or caused to be submitted PDE claims to the CMS that improperly claimed Louisiana sales tax costs. CMS then used those PDE claims to calculate Medicare payments to Part D sponsors with whom Argus contracted, which improperly increased reimbursement to the sponsors."[11]

When this matter originally surfaced, Cynthia Tudor, Ph.D., Director, Medicare Drug Benefit and C&D Data Group, educated plan sponsors on three separate occasions to halt unallowable charges for the Louisiana sale tax and recover the improper payments. The areas Dr. Tudor covered included:

- Using Health Plan Management System (HPMS) memo guidance dated August 13, 2010,[12] December 21, 2010,[13] and April 11, 2011,[14] plan sponsors were notified of the unallowable sales tax issue and instructed to recoup any sales taxes paid on 2010 Part D prescriptions in Louisiana, resubmit corrected PDE records for the affected transactions and reimburse any sales tax paid by beneficiaries (as dictated by the plan design), and to take immediate steps to ensure that no further sales taxes are paid on Part D Louisiana pharmacy claims.

- In the December 21, 2010 memo, CMS specifically emphasized that it is the plan sponsor's responsibility to determine whether sales tax on Part D claims is permissible in any locality and that CMS requires plan sponsors to correctly adjudicate the Part D benefit without reliance on CMS to identify such errors.

---

[11]  ibid

[12] http://cms.hhs.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/MemoLASalesTax_081310.pdf

[13] http://cms.hhs.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/MemoLASalesTaxRecoupment_122110.pdf

[14] http://cms.hhs.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/MemoLASalesTax_041111.pdf

5

CMS000023

**Conclusion**

During the period of January 1, 2010 to August 31, 2014, plan sponsors submitted 4,502,286 PDE records (each having an unallowable Louisiana sales tax amount greater than $0.00) and cumulatively valued at $977,029.39.

When excluding those records in which CMS had no financial exposure, these figures were reduced to 4,357,112 PDE records and unallowable Louisiana sales taxes of $922,961.59, respectively. A breakdown of how these figures were derived is explained in the ensuing paragraphs.

As the PDE records data analysis results revealed, the application of a sales tax to a Medicare Part D prescription drug sale continues to occur in Louisiana and other states despite:

- Continuous CMS education of plan sponsors and
- Recent civil actions regarding the inappropriate charges of Louisiana state sales tax applied to prescription drug sales.

According to the Medicare Prescription Drug Benefit Manual, Chapter 6, Section 20,[15] PDE records with drug coverage status code equal to "E" or "O" were considered as PDE records including payments for excluded drugs. The drug coverage status code choices include:

> C = Covered
>
> E = Supplemental drugs (reported by Enhanced Alternative plans only)
>
> O = Over-the-counter drugs

PDE records were excluded to determine CMS's actual financial exposure by applying the three criteria below when:

- The total paid amount equaled the Non-Covered Plan Paid Amount (NPP)
- The total paid amount equaled the sum of the ingredient cost and dispensing fee
- The drug coverage status code equal to "E" or "O"

---

[15] https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/downloads/Chapter6.pdf

6

CMS000024

As a result of applying this criteria, the total PDE record count was reduced from 4,502,286 to 4,357,112 or by 145,174 (3.2%); the total paid amount was reduced from $275,110,376.69 to $272,069,071.90; and the total sales tax paid amount was reduced from $977,029.39 to $922,961.59.

The total PDE count, total paid amount and total sales tax paid amount were reduced further (Tables 1-5) to reflect calculations based on existing contracts only.

Table 1 lists the PDE record count, total paid amount, and sales tax payments by year for the existing contracts.

**Table 1. PDE Record Count, Total Paid Amount, and Sales Tax Amount by Year**

| Year | PDE Record Count | Total Paid Amount | Sales Tax Amount |
|------|------------------|-------------------|------------------|
| 2010 | 769,246 | $47,248,882.59 | $223,106.70 |
| 2011 | 1,082,545 | $70,428,902.16 | $109,600.53 |
| 2012 | 908,205 | $53,343,175.92 | $92,636.99 |
| 2013 | 1,095,843 | $63,261,204.77 | $137,072.28 |
| 2014 | 456,350 | $35,565,713.59 | $354,481.34 |
| *Grand Total* | *4,312,189* | *$269,847,879.03* | *$916,897.84* |

Under Tables 2-5, the 4,312,189 PDE records were summarized by plan sponsor type, parent organization, pharmacy dispensing type, pharmacy dispensing class, and prescriber specialty for existing contracts.

For comparison purposes, these tables include the PDE record count, total paid amount, total billed amount, and sales tax amount.

**Table 2. Plan Sponsors' Sales Tax Payments from January 1, 2010 to August 31, 2014**

| Plan Sponsor Type | PDE Record Count | Total Paid Amount | Total Billed Amount* | Sales Tax Amount |
|-------------------|------------------|-------------------|----------------------|------------------|
| MA-PD | 57,917 | $6,006,584.87 | $6,054,139.14 | $237,060.52 |
| PDP | 4,254,272 | $263,841,294.16 | $275,659,011.79 | $679,837.32 |
| *Grand Total* | *4,312,189* | *$269,847,879.03* | *$281,713,150.93* | *$916,897.84* |

*Total Billed Amount = Ingredient Cost + Dispensing Fee + Sales Tax Amount*

**Table 3. Pharmacy Dispenser Class Sales Tax Payments from January 1, 2010 to August 31, 2014**

| Pharmacy Dispenser Class | PDE Record Count | Total Paid Amount | Total Billed Amount* | Sales Tax Amount |
|--------------------------|------------------|-------------------|----------------------|------------------|
| Independent Pharmacy | 2,201,778 | $148,752,600.31 | $154,397,028.82 | $603,192.16 |
| Chain Pharmacy | 2,091,068 | $119,976,092.41 | $126,122,655.53 | $307,877.44 |
| Franchise Pharmacy | 19,241 | $1,114,587.03 | $1,188,783.73 | $5,753.64 |
| Alternate Dispensing Site | 102 | $4,599.28 | $4,682.85 | $74.60 |
| *Grand Total* | *4,312,189* | *$269,847,879.03* | *$281,713,150.93* | *$916,897.84* |

*Total Billed Amount = Ingredient Cost + Dispensing Fee + Sales Tax Amount*

7

CMS000025

**Table 4. Pharmacy Dispenser Type Sales Tax Payments from January 1, 2010 to August 31, 2014**

| Pharmacy Primary Dispenser Type | PDE Record Count | Total Paid Amount | Total Billed Amount* | Sales Tax Amount |
|---|---|---|---|---|
| Community/Retail Pharmacy | 4,246,824 | $264,298,474.44 | $276,049,047.34 | $867,107.88 |
| Clinic Pharmacy | 287 | $761,887.07 | $763,526.68 | $30,116.53 |
| Long Term Care Pharmacy | 57,772 | $3,851,918.46 | $3,916,894.50 | $18,634.76 |
| DME | 4,359 | $318,914.37 | $343,937.07 | $442.09 |
| Compounding Pharmacy | 1,957 | $120,403.34 | $134,551.18 | $260.89 |
| Specialty Pharmacy | 896 | $476,157.72 | $484,653.49 | $245.58 |
| Institutional  Pharmacy | 48 | $2,187.22 | $2,187.22 | $48.78 |
| Home Infusion Therapy Provider | 42 | $17,862.42 | $18,279.46 | $38.94 |
| Non-Pharmacy Dispensing Site | 4 | $73.99 | $73.99 | $2.39 |
| *Grand Total* | *4,312,189* | *$269,847,879.03* | *$281,713,150.93* | *$916,897.84* |

*Total Billed Amount = Ingredient Cost + Dispensing Fee + Sales Tax Amount*

**Table 5. Top 7 Sales Tax Paid Amount by Prescriber Specialty from January 1, 2010-August 31, 2014**

| Prescriber Specialty | PDE Record Count | Total Paid Amount | Total Billed Amount | Sales Tax Amount |
|---|---|---|---|---|
| Internal Medicine | 1,703,385 | $110,048,298.05 | $115,845,733.89 | $391,246.78 |
| Family Medicine | 1,347,369 | $70,473,114.34 | $73,138,688.45 | $204,920.56 |
| Nurse Practitioner | 288,166 | $19,559,956.86 | $20,175,452.42 | $64,955.41 |
| Dermatology | 19,321 | $2,567,563.40 | $2,701,691.72 | $53,604.20 |
| Physician Assistant | 36,253 | $2,676,466.54 | $2,777,826.98 | $35,836.75 |
| Specialist | 163,016 | $11,269,464.92 | $11,867,120.17 | $34,702.22 |
| Psychiatry & Neurology | 137,469 | $17,393,815.17 | $17,933,214.28 | $30,618.73 |
| General Practice | 84,345 | $4,380,768.13 | $4,596,168.08 | $12,755.11 |
| *Total* | *3,779,324* | *$238,369,447.41* | *$249,035,895.99* | *$828,639.76* |

Table 6 lists the top 5 parent organizations by sales tax amount for the existing contracts. Of the 4,357,112 PDE records containing Louisiana sales taxes, 4,065,987 or 93 percent were submitted by the top 5 parent organizations.

**Table 6. Top 5 Parent Organization by Sales Tax Payments**

| Parent Organization | PDE Record Count | Total Paid Amount | Sales Tax Amount |
|---|---|---|---|
| UnitedHealth Group, Inc. | 81,186 | $9,811,250.35 | $284,410.15 |
| Express Scripts Holding Company | 2,158,173 | $134,192,379.11 | $239,278.64 |
| Vantage Holdings, Inc. | 45,421 | $2,465,563.12 | $138,137.57 |
| CVS Caremark Corporation | 1,260,057 | $81,715,946.93 | $126,856.47 |
| Aetna Inc. | 521,150 | $25,829,685.04 | $52,283.32 |
| *Total* | *4,065,987* | *$254,014,824.55* | *$840,966.15* |

8

CMS000026

Along with the PDE records, attachments A through E contain a summary of payments for parent organization and plan sponsor by year. These include:

- Attachment A (Louisiana Contract Summary 2010)
- Attachment B (Louisiana Contract Summary 2011)
- Attachment C (Louisiana Contract Summary 2012)
- Attachment D (Louisiana Contract Summary 2013)
- Attachment E (Louisiana Contract Summary 2014)

After re-assessing the Louisiana Sales Tax issue and given how issues tend to occur in cycles, the data analysis results warrant a more detailed, expanded review into other states. Therefore, the NBI MEDIC will perform a state-by-state project study of sales taxes paid under the Medicare Part D program.

The objective of this study or studies will be to determine whether the amounts identified in the PDE records as a "sales tax" actually represent sales taxes in states where the application of sales taxes to Part D prescription drugs is prohibited by state law.

9

CMS000027

**Source Statement**

Under the Medicare Part D Program, the Centers for Medicare & Medicaid Services (CMS) makes payments to Medicare Advantage Prescription Drug Plan (MA-PD) and stand-alone Prescription Drug Plan (PDP) sponsors on a monthly basis through estimated subsidy payments and, if required, at year-end as a result of the payment reconciliation process. The payment reconciliation process compares estimated subsidy payments made to plan sponsors throughout the year with the cost data submitted by MA-PD and PDP sponsors through prescription drug event (PDE) records and Direct or Indirect Remuneration (DIR) data to determine any residual payments required by CMS to MA-PD and PDP sponsors or by MA-PD and PDP sponsors to CMS. The reconciliation process relies on four major data sources: the sum of payments made to plan sponsors throughout the year, final updated plan enrollment, PDE records from MA-PD and PDP sponsors, and DIR.

Each time a beneficiary fills a prescription under Medicare Part D, an MA-PD or PDP sponsor must submit a summary record called the PDE record to CMS. PDE records are not the same as individual drug claim transactions but are summary extracts using CMS-defined standard fields. CMS stores the PDE records submitted by MA-PD and PDP sponsors in the Integrated Data Repository (IDR). MA-PD and PDP sponsors submit an original PDE record and may either adjust or delete PDE records submitted to CMS within the designated schedule. The records provided herein represent the latest iteration of the PDE records submitted by MA-PD and PDP sponsors and do not represent the complete adjudication history of drug claim transactions. The complete adjudication history of a drug claim transaction resides with the responsible MA-PD or PDP sponsor.

This report contains confidential Part D data, information, and/or analysis (hereinafter referred to collectively as "material") based on data and records made available to the NBI MEDIC by CMS. To the extent that this material contains or was developed through the use of data contained within the CMS's IDR, please be advised that the IDR database is updated periodically with new or revised data and PDE records. The material contained herein does not reflect IDR additions and revisions made after the material was pulled from the IDR database. Therefore, any newly run calculations/materials may differ from calculations/materials contained herein.

Restriction on Part D Data Only: This information is also consistent with the provisions of 42 U.S.C. §§1395w-115(f)(2), which permit HHS officers, employees, and contractors to use information submitted pursuant to section 1395w-115 for the purposes of, and to the extent necessary in carrying out 42 U.S.C. §1395w-115, which include payment-related oversight and program integrity activities, and for conducting oversight, evaluation, and enforcement under Title XVIII of the Social Security Act. Any use of this information by the Department of Justice (DOJ) will be limited to carrying out health oversight activities.

This content may have been derived through the use of drug reference information obtained from Clinical Drug Information, LLC (CDI). CDI in no way endorses the data, views, opinions, or findings expressed, shared, or otherwise reported by Health Integrity, the National Benefit Integrity Medicare Drug Integrity Contractor. Copyright 2014, Medi-Span, Clinical Drug Information, LLC.

10

CMS000028

# TAB 124

# *Prescription Drug Event (PDE) Records – Inappropriate Use of the Sales Tax Field Vulnerability*

## National Benefit Integrity MEDIC

Prepared for:

## The Centers for
## Medicare & Medicaid Services

Task Order:
HHSM-500-2005-0001I-0001, Mod 25

## August 10, 2015

*This material contains confidential, proprietary information of Health Integrity, LLC. This information is to be accessed solely by authorized individuals who will safeguard the security and confidentiality of all Health Integrity confidential and proprietary information to which they are provided access. The information contained in this material (or any part thereof) shall not be used or disclosed for any purpose other than that for which it was furnished and shall be protected from unauthorized use and disclosure. This material shall not be distributed or disclosed to any individual(s) or entity other than the recipient(s) named in the transmitting correspondence without the express consent of Health Integrity, LLC.*

1

## Executive Summary

The vulnerability was opened based on the results of a proactive data analysis project that determined improper sales tax payments by plan sponsors to Louisiana pharmacies. During this project review, the National Benefit Integrity Medicare Integrity Contractor (NBI MEDIC) identified entries for sales taxes on prescription drug event (PDE) records exceeding appropriate amounts.

As a result, this issue was opened as a vulnerability to further study the submission practices surrounding the sales tax field. The review was expanded to include a detailed study for the state of Minnesota and a national study at a summary level.

From the reviews conducted, aberrant patterns were identified concerning the monetary information that is being populated within the sales tax field. In certain instances, it was discovered that usage taxes, such as taxes placed upon health care-related services, were placed into the sales tax field. However, there were a large number of instances in which the sales tax field bore no discernible relationship to the remainder of the PDE record.

As a result of the wide variation of information being populated in the sales tax field of PDE records, a vulnerability to the Medicare Part D program exists that allows manipulation of the sales taxes paid and misrepresentation of plan sponsor payment for the drug provided. As a result, the calculation of Medicare payments to Medicare Part D plan sponsors by the Centers for Medicare & Medicaid Services (CMS) may be improperly overstated.

A reduction in wasteful spending and the realization of significant cost avoidance would likely occur if CMS:

- Develops additional plan sponsor guidance that clarifies the costs that are deemed acceptable to be reported within the sales tax field of the PDE record.

- Requests self-audits by plan sponsors to be performed at a state level in order to further investigate costs that are being inappropriately reported within the sales tax field and to refund the money to Medicare that has been inappropriately paid.

- Educates plan sponsors regarding the results of this vulnerability so that appropriate edits and controls will be implemented to ensure this type of fraud, waste and abuse (FWA) is prevented.

Confidential and Proprietary, Health Integrity, 2015©

## Background

According to the Prescription Drug Event Participant Guide, CMS defines gross drug cost (GDC) as the sum of ingredient cost paid, dispensing fee paid, amount attributed to sales tax, and vaccine administration fee.[1] Each of these four fields that make up gross drug cost are detail cost fields.[2] These fields include 29, 30, 31 and 41.

The GDC is split among the payment fields (patient liability payment fields and plan payment fields). These payment fields include 34, 35, 36, 50, 37, 38 and 39. As such, the submission of inappropriate sales tax has the potential to affect any of the payments fields.

Table 1. Table 3K – Purpose of Dollar Fields[3]

| FIELD # | FIELD NAME | FIELD TYPE | PURPOSE |
|---------|------------|------------|---------|
| 29 | Ingredient Cost Paid | Detail Cost | The sum of these four fields equals the GDC. |
| 30 | Dispensing Fee Paid | Detail Cost | |
| 31 | Amount Attributed to Sales Tax | Detail Cost | |
| 41 | Vaccine Administration Fee | Detail Cost | |
| 32 | Gross Drug Cost Below Out-Of-Pocket Threshold (GDCB) | Summary Cost/Benefit Phase | Sums the cost per covered drug event, and indicates beneficiary's status in relation to the OOP threshold. |
| 33 | Gross Drug Cost Above Out-Of-Pocket Threshold (GDCA) | Summary Cost/Benefit Phase | |
| 34 | Patient Pay Amount | Payment by/on behalf of patient | Tracks the amount of payments made by the beneficiary (including friends and family), other TrOOP payers, LICS and payments made by other payers. When Medicare as a Secondary Payer (MSP) applies, PLRO sometimes documents the amount paid by the primary payer. |
| 35 | Other Troop Amount | Payment by/on behalf of patient | |
| 36 | Low-Income Cost-Sharing Subsidy (LICS) Amount | Payment by/on behalf of patient | |
| 50 | Reported Gap Discount | Payment by/on behalf of patient | |
| 37 | Patient Liability Reduction due to Other Payer Amount (PLRO) | Payment by/on behalf of patient | |
| 38 | Covered D Plan Paid Amount (CPP) | Plan Payment | Sums the dollar amount paid by plans, differentiating between covered amounts paid for Part D drugs and non-covered amounts paid for enhanced benefits (non-Part D drugs or supplemental plan cost-sharing) or over-the-counter drugs. |
| 39 | Non-Covered Plan Paid Amount (NPP) | Plan Payment | |

---

[1] 2011 Regional Prescription Drug Event Data Technical Assistance Participant Guide, Section 1.2.2.1, Drug Cost Subject to Part D Payment, Item 1.

[2] 2011 Regional Prescription Drug Event Data Technical Assistance Participant Guide, Section 4.2.4.1.1, Detail Cost Fields.

[3] http://bit.ly/1EjE4C2. See page 71 (document page 3-16).

Confidential and Proprietary, Health Integrity, 2015©

3

The federal statute does not prohibit state sales tax; however, states have varying laws addressing state and local sales taxes. Most states prohibit the application of a sales tax at both a state and local level to Medicare prescription drugs.

For example, Louisiana statute exempts prescription drugs purchased through or pursuant to Medicare Part B and Part D from the sales and use taxes imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state.

Matters concerning the unallowable Louisiana sales tax payments made by Medicare Part D were referred to the U.S. Health and Human Services/Office of Inspector General (HHS/OIG) in 2009, and, as a result of the case referral, two civil actions were imposed resulting in a recovery of more than $3.8 million.[4,5]

In both civil actions, HHS/OIG specifically reported that the PDE records submitted to CMS that improperly claimed Louisiana sales tax costs were used to calculate payments to Medicare Part D plan sponsors which improperly increased reimbursement to these plan sponsors. The results of this case further supports concerns that the reporting of erroneous sales taxes results in misleading the cost of the drug.[6]

This Louisiana case also prompted CMS distribution of three Health Plan Management System (HPMS) memos, dated August 13, 2010, December 21, 2010, and April 11, 2011, to serve as notification of the unallowable sales tax issue.

At that time, plan sponsors were also instructed to recoup any sales taxes paid on 2010 Medicare Part D prescriptions in Louisiana, resubmit corrected PDE records for the affected transactions and reimburse any sales tax paid by beneficiaries (as dictated by the plan design), and to take immediate steps to ensure that no further sales taxes are paid on Part D Louisiana pharmacy claims.

In the December 21, 2010 memo, CMS specifically emphasized that it is the plan sponsor's responsibility to determine whether sales tax on Part D claims is permissible in any locality and that CMS requires plan sponsors to correctly adjudicate the Part D benefit without reliance on CMS to identify such errors.

---

[4] HHS/OIG Civil Monetary Penalties, False and Fraudulent Claims dated December 23, 2013. Accessed on August 3, 2015. Available at: http://oig.hhs.gov/fraud/enforcement/cmp/false_claims.asp.

[5] HHS/OIG Civil Monetary Penalties, False and Fraudulent Claims, Missouri Health Care IT and Pharmacy Benefits Manager Settles Case Involving Allegations of Fraudulent Medicare Part D Claims dated July 31, 2014. Accessed on August 3, 2015. Available at: http://oig.hhs.gov/fraud/enforcement/cmp/false_claims.asp.

[6] Health Care Compliance Association (HCCA), Fraud Control Issues after the Start of Medicare Part D Prescription Drug Programs, James G. Sheehan, Associate United States Attorney, January 23, 2006. Accessed on August 3, 2015.

Confidential and Proprietary, Health Integrity, 2015©

4

As a result of the successful outcome of the HHS/OIG cases and the recoveries made regarding the Louisiana case referral, the NBI MEDIC conducted a probe analysis in September 2014 to determine if this issue had resurfaced and if plan sponsors were complying with the previous CMS guidance. The results of the probe study revealed Part D payments included sales taxes.

Because these results indicate a continuing problem regarding sales tax payments and lack of adherence to prior education by plan sponsors, this issue was opened as a vulnerability to further study the submission practices surrounding the sales tax field.

**Methodology**

The NBI MEDIC studied the inappropriate submission of sales tax in the state of Louisiana. As a result of the identified findings, the scope of the sales tax study was expanded to include a study of the submitted sales tax for Minnesota and a national review at a summary level.

To further demonstrate the concerns identified, discrepancies regarding sales tax payments for the drug Avonex serve as an example.

**Results**

*Louisiana*

An initial study of PDE records filled during the period of January 1, 2010 through August 31, 2014, specific to the state of Louisiana, revealed a total of 4,502,286 PDE records including sales tax. The total amount of sales tax attributable to these PDE records was $977,029.39. In December 2014, CMS sent a letter to plan sponsors instructing them to submit corrected PDE records to remove the inappropriate sales tax.

In February 2015, as a result of the letter, Express Scripts responded to CMS that according to the Louisiana Pharmacy Benefits Management Services Manual,[7] a $0.10 prescription fee is allowed on all prescriptions filled by the pharmacy.

> *A prescription fee shall be paid by each pharmacy and dispensing physician for each out-patient prescription (Medicaid and non-Medicaid) dispensed. The fee shall be $.10 per prescription dispensed by a pharmacist or dispensing physician. When a prescription is filled outside of Louisiana but not shipped or delivered in any form or manner to a patient in the state, no provider fee shall be imposed. However, out-of-state pharmacies or dispensing physicians dispensing*

---

[7]   http://www.lamedicaid.com/provweb1/Providermanuals/manuals/PHARMACY/PHARMACY.pdf. Accessed on April 30, 2015

Confidential and Proprietary, Health Integrity, 2015©

*prescriptions which are shipped, mailed or delivered in any manner inside the*
*state of Louisiana shall be subject to the $.10 fee per prescription.*

Given this response from Express Scripts, CMS conceded not to pursue PDE records with sales taxes of $0.10 or less filled in the state of Louisiana. A letter was then sent to plan sponsors to discontinue the adjustment of the affected PDE records for the recoupment of sales tax.

As a result of this new direction, a revised analysis revealed that 11,578 PDE records with a sales tax exceeding $0.10 were submitted with payments totaling $59,090.36.

Table 2 shows the comparison for the top five parent organizations on PDE records count, total paid amount, and sales tax amount for PDE records having more than $0.10 sales tax.

**Table 2. PDE Record Count, Total Paid Amount, and Sales Tax Amount Comparison of Top 5 Parent Organization for PDE Records with Sales Tax >$0.10**

| Parent Organization | PDE Record Count | Total Paid Amount | Sales Tax Amount |
|---|---|---|---|
| UnitedHealth Group, Inc. | 3,373 | $585,377.75 | $26,713.05 |
| Express Scripts Holding Company | 2,753 | $289,229.73 | $13,093.97 |
| Catamaran Corporation | 1,158 | $123,248.84 | $5,685.98 |
| WellCare Health Plans, Inc. | 1,220 | $91,072.79 | $3,982.30 |
| Catholic Charities Archdiocese of New Orleans | 945 | $72,894.02 | $3,692.96 |
| **Total** | **9,449** | **$1,161,823.13** | **$53,168.26** |

*Minnesota*

A study of PDE records filled during the period of January 1, 2010 through September 30, 2014 specific to the state of Minnesota revealed a total of 62,659,295 PDE records included sales tax. The total amount of sales tax attributable to these PDE records was $90,928,414.36.

Due to the high volume of PDE records, a selection of PDE records for Omeprazole DR 20 MG Capsule filled in January 2014 was reviewed. The majority of the variation in sales tax was identified for PDE records submitted by Humana.

See example of findings below in Table 3 submitted by contract S5884, Humana Insurance Company.

Confidential and Proprietary, Health Integrity, 2015©

6

**Table 3. Variations in Sales Tax (S5884 – Omeprazole DR 20 MG Capsule)**

| Pharmacy | Ingredient Cost | Dispensing Fee | Sales Tax | Sales Tax Percentage |
|---|---|---|---|---|
| Coborn's Pharmacy | $8.95 | $0.00 | $0.04 | 0.45% |
| Cub Pharmacy | $9.17 | $1.10 | $2.50 | 24.34% |
| CVS Pharmacy | $9.17 | $1.10 | $2.49 | 24.25% |
| Sam's Pharmacy | $9.17 | $1.00 | $0.23 | 2.26% |
| Target Pharmacy | $9.17 | $1.10 | $2.77 | 26.97% |
| Thrift White Pharmacy | $9.17 | $1.00 | $6.67 | 65.59% |
| Wal-Mart Pharmacy | $9.17 | $1.10 | $0.13 | 1.27% |
| **Average** | **$9.14** | **$0.91** | **$2.12** | **21.07%** |

Due to the large variations in submitted sales tax above, it appears there are not proper controls in place for contract S5884 surrounding the contents included in the sales tax PDE record field.

*National Study*

The PDE records for dates of service from January 1, 2014 through December 31, 2014 were extracted from the Integrated Data Repository (IDR) to evaluate sales tax trending at the state level.

Analysis of the PDE records found that 47,940,036 PDE records out of 1,416,410,688 PDE records adjudicated in 2014 contained sales tax (approximately 3.38% of all PDE records). The PDE records analyzed included records from all 50 states as well as the District of Columbia, Guam, Puerto Rico, Virgin Islands, and the Northern Mariana Islands. These records included sales tax for 48 of the 55 states and territories studied.

The Federation of Tax Administrators (FTA) reports that as of January 1, 2015, 46 of the 50 states and the District of Columbia are exempt from sales tax on prescription drugs. Of the five states that are not exempt from sales tax on prescription drugs, four of the states' general tax rate percentage is 0%.

Although these states are not explicitly exempt from sales tax by FTA regulation, sales tax payment is not expected as the states' general tax rate percentage is 0%. Illinois is the only state in which sales tax other than 0% is applicable to prescription drugs. Per the FTA's State Sales Tax Rates and Food & Drug Exemptions table, a 1% sales tax applies to prescription drugs in Illinois.[8]

The sales tax submitted for the top 15 states is summarized in Table 4.

---

[8] http://www.taxadmin.org/fta/rate/sales.pdf . Accessed on August 10, 2015.

Confidential and Proprietary, Health Integrity, 2015©

7

**Table 4. Top 15 States with Sales Tax for 2014 PDE Records**

| State | PDE Record Count (Sales Tax = 0) | Total Paid (Sales Tax = 0) | PDE Record Count (Sales Tax>0) | Total Paid (Sales Tax > 0) | Sales Tax Amount | Percentage of PDE Records Submitted with Sales Tax |
|---|---|---|---|---|---|---|
| Illinois | 19,751,136 | $1,993,378,941.09 | 31,394,996 | $2,232,809,702.23 | $38,859,651.19 | 61.38% |
| Minnesota | 5,330,971 | $379,543,589.41 | 14,525,680 | $1,073,232,039.86 | $24,653,443.04 | 73.15% |
| Indiana | 34,658,050 | $2,590,365,643.70 | 487,912 | $50,589,606.57 | $768,501.26 | 1.39% |
| Montana | 40,388,784 | $3,551,686,888.34 | 256,624 | $27,231,404.70 | $388,753.28 | 0.63% |
| Tennessee | 36,661,879 | $4,149,383,630.35 | 4,261 | $21,793,228.98 | $283,990.10 | 0.01% |
| Ohio | 65,712,565 | $5,834,866,125.81 | 42,004 | $12,065,903.44 | $197,219.17 | 0.06% |
| Texas | 83,173,097 | $7,382,412,953.40 | 101,322 | $13,155,616.01 | $169,201.20 | 0.12% |
| Arizona | 39,630,774 | $2,819,192,366.32 | 87,091 | $10,144,036.10 | $168,742.07 | 0.22% |
| New Jersey | 42,963,016 | $4,332,702,623.82 | 78,861 | $6,972,817.24 | $129,716.38 | 0.18% |
| Louisiana | 22,918,251 | $1,629,416,791.66 | 654,394 | $41,737,516.06 | $127,250.79 | 2.78% |
| Virgin Islands | 225,062 | $10,176,721.82 | 13,797 | $687,070.50 | $58,869.25 | 5.78% |
| Pennsylvania | 71,454,377 | $6,867,791,471.13 | 20,359 | $4,301,735.63 | $56,440.77 | 0.03% |
| California | 136,451,695 | $12,179,330,527.74 | 29,936 | $2,291,388.06 | $46,193.63 | 0.02% |
| Nevada | 10,021,038 | $818,998,002.91 | 14,804 | $2,142,551.15 | $34,535.84 | 0.15% |
| South Carolina | 24,353,975 | $1,662,715,733.03 | 4,966 | $351,062.32 | $22,878.87 | 0.02% |
| **Total** | **633,694,670** | **$56,201,962,010.53** | **47,717,007** | **$3,499,505,678.85** | **$65,965,386.84** | **7.00%** |

While Illinois is one of the few states with clear rules surrounding the permissible submission of sales tax, this table illustrates the volume of PDE records submitted in other states with no sales tax. This chart demonstrates the number plan sponsors that were compliant with regulations surrounding sales tax as well as existing compliance by plan sponsors regarding correct adjudication of PDE records for Louisiana prescriptions.

*Avonex*

Although not initially included within the sales tax analyses, a concurrent review of PDE records filled for Avonex revealed an anomaly in the data with respect to the sales tax field. A plan sponsor self-disclosed to the NBI MEDIC known issues of overpayments made for Avonex; therefore, the NBI MEDIC further investigated this issue to determine the extensiveness.

The PDE records for Avonex were retrieved from the IDR from September 1, 2012 through December 31, 2014. For 12 of the 5,130 PDE records reviewed, the plan sponsors submitted sales tax equal to the ingredient cost and dispensing fee. The sales tax for the 12 PDE records totaled $51,420.99, or an average of $4,285.08 per PDE record.

Table 5 details the 12 PDE records identified.

Confidential and Proprietary, Health Integrity, 2015©

8

**Table 5. Abnormal Reporting of Sales Tax for Avonex**

| Date of Service | Ingredient Cost | Dispensing Fee | Sales Tax |
|---|---|---|---|
| 10/12/2012 | $4,059.88 | $4.75 | $4,064.63 |
| 11/12/2012 | $4,059.88 | $4.75 | $4,064.63 |
| 12/10/2012 | $4,243.09 | $4.75 | $4,247.84 |
| 1/7/2013 | $4,227.12 | $5.25 | $4,232.37 |
| 2/2/2013 | $4,227.12 | $5.25 | $4,232.37 |
| 3/1/2013 | $4,227.12 | $5.25 | $4,232.37 |
| 4/6/2013 | $4,227.12 | $5.25 | $4,232.37 |
| 5/3/2013 | $4,227.12 | $5.25 | $4,232.37 |
| 6/7/2013 | $4,227.12 | $5.25 | $4,232.37 |
| 7/5/2013 | $4,544.64 | $5.25 | $4,549.89 |
| 8/9/2013 | $4,544.64 | $5.25 | $4,549.89 |
| 9/4/2013 | $4,544.64 | $5.25 | $4,549.89 |
| **Grand Total** | **$51,359.49** | **$61.50** | **$51,420.99** |

Based on the prevailing average wholesale price (AWP), the analysis shows the cost for the PDE records in Table 5 were overstated by approximately 100%. The data indicates the sales tax field was inappropriately used to submit the excessive cost. Furthermore, the plan sponsors' controls failed to identify the overpayment and inappropriate use of the sale tax field.

## Conclusions and Recommendations

A vulnerability exists to the Medicare Part D program due to the wide variation of information being populated in the sales tax field of PDE records. The lack of uniformity creates the potential for FWA, as offenders may misrepresent or manipulate this field.

Further, the lack of uniformity in which the field is being populated hinders the auditing of PDE records for accuracy.

As a result of this vulnerability, the NBI MEDIC recommends that CMS:

- Develops additional plan sponsor guidance that clarifies the costs that are deemed acceptable to be reported within the sales tax field of the PDE record.

- Requests self-audits by plan sponsors to be performed at a state level in order to further investigate costs that are being inappropriately reported within the sales tax field and to refund the money to Medicare that has been inappropriately paid.

- Educates plan sponsors regarding the results of this vulnerability so that appropriate edits and controls will be implemented that will ensure this type of potential FWA is prevented.

Confidential and Proprietary, Health Integrity, 2015©

**Source Statement**

Under the Medicare Part D Program, the Centers for Medicare & Medicaid Services (CMS) makes payments to Medicare Advantage Prescription Drug Plan (MA-PD) and stand-alone Prescription Drug Plan (PDP) sponsors on a monthly basis through estimated subsidy payments and, if required, at year-end as a result of the payment reconciliation process. The payment reconciliation process compares estimated subsidy payments made to plan sponsors throughout the year with the cost data submitted by MA-PD and PDP sponsors through prescription drug event (PDE) records and Direct or Indirect Remuneration (DIR) data to determine any residual payments required by CMS to MA-PD and PDP sponsors or by MA-PD and PDP sponsors to CMS. The reconciliation process relies on four major data sources: the sum of payments made to plan sponsors throughout the year, final updated plan enrollment, PDE records from MA-PD and PDP sponsors, and DIR.

Each time a beneficiary fills a prescription under Medicare Part D, an MA-PD or PDP sponsor must submit a summary record called the PDE record to CMS. PDE records are not the same as individual drug claim transactions but are summary extracts using CMS-defined standard fields. CMS stores the PDE records submitted by MA-PD and PDP sponsors in the Integrated Data Repository (IDR). MA-PD and PDP sponsors submit an original PDE record and may either adjust or delete PDE records submitted to CMS within the designated schedule. The records provided herein represent the latest iteration of the PDE records submitted by MA-PD and PDP sponsors and do not represent the complete adjudication history of drug claim transactions. The complete adjudication history of a drug claim transaction resides with the responsible MA-PD or PDP sponsor.

This report contains confidential Part D data, information, and/or analysis (hereinafter referred to collectively as "material") based on data and records made available to the NBI MEDIC by CMS. To the extent that this material contains or was developed through the use of data contained within the CMS's IDR, please be advised that the IDR database is updated periodically with new or revised data and PDE records. The material contained herein does not reflect IDR additions and revisions made after the material was pulled from the IDR database. Therefore, any newly run calculations/materials may differ from calculations/materials contained herein.

**Restriction on Part D Data Only**: This information is also consistent with the provisions of 42 U.S.C. §§1395w-115(f)(2), which permit HHS officers, employees, and contractors to use information submitted pursuant to section 1395w-115 for the purposes of, and to the extent necessary in carrying out 42 U.S.C. §1395w-115, which include payment-related oversight and program integrity activities, and for conducting oversight, evaluation, and enforcement under Title XVIII of the Social Security Act. Any use of this information by the Department of Justice (DOJ) will be limited to carrying out health oversight activities.

**CDI License Agreement**: This content may have been derived through the use of drug reference information obtained from Clinical Drug Information, LLC (CDI). CDI in no way endorses the data, views, opinions, or findings expressed, shared, or otherwise reported by Health Integrity, the National Benefit Integrity Medicare Drug Integrity Contractor. Copyright 2015, Medi-Span, Clinical Drug Information, LLC

Confidential and Proprietary, Health Integrity, 2015©

10

# TAB 125

# *Unallowable Sales Tax Payments Vulnerability*

# *June 2015 Update*

## National Benefit Integrity MEDIC

Prepared for:
### The Centers for
### Medicare & Medicaid Services

Task Order:
HHSM-500-2005-0001I-0001, Mod 25

## August 28, 2015

*This material contains confidential, proprietary information of Health Integrity, LLC. This information is to be accessed solely by authorized individuals who will safeguard the security and confidentiality of all Health Integrity confidential and proprietary information to which they are provided access. The information contained in this material (or any part thereof) shall not be used or disclosed for any purpose other than that for which it was furnished and shall be protected from unauthorized use and disclosure. This material shall not be distributed or disclosed to any individual(s) or entity other than the recipient(s) named in the transmitting correspondence without the express consent of Health Integrity, LLC.*

**Background**

This analysis was conducted at the request of the Centers for Medicare & Medicaid Services (CMS) as part of an ongoing proactive review of unallowable sales tax payments in the state of Louisiana.

States are prohibited under 42 C.F.R. § 423.440 (codifying the statutory preemption of State law at section 1860D-12(g) of the Social Security Act [42 U.S.C. § 1395w-112(g)])[1] from imposing a premium tax, fee, or other similar assessment for:

> *any payment CMS makes on behalf of Part D Plan or enrollees under this part (including the direct subsidy, reinsurance payments, and risk corridor payments); or for any payment made to Part D Plans by a beneficiary or by a third party on behalf of a beneficiary.*

A state sales tax is different from a premium tax and is not prohibited by the federal statute. States have varying laws addressing state and local sales taxes and most states prohibit the application of a sales tax at both a state and local level to Medicare prescription drugs.

For example, the Louisiana statute specifically exempts prescription drugs purchased through or pursuant to Medicare Part B and Part D from the sales and use taxes imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state.

Louisiana also has a constitutional provision exempting prescription drugs from the state and use tax imposed by the state of Louisiana or by a political subdivision whose boundaries are coterminous with those of the state.

Matters concerning the unallowable sales tax payments made by Medicare Part D were referred to the Health and Human Services/Office of Inspector General (HHS/OIG) in 2009, and, as a result of the case referral, two civil actions were imposed resulting in a recovery of more than $3.8 million.

As a result of the successful outcome and recoveries made regarding the Louisiana case referral, the National Benefit Integrity Medicare Integrity Contractor (NBI MEDIC) conducted an initial analysis in November 2014 to identify sales tax payments in Louisiana. This initial analysis revealed Part D payments included sales taxes in the amount of $977,029.39 for the period of January 1, 2010 - August 31, 2014.

---

[1]   Section 1860D-12(g) of the Social Security Act, titled "Prohibition of State Imposition of Premium Taxes; Relation To State Laws," states: "The provisions of sections 1854(g) and 1856(b)(3) shall apply with respect to PDP sponsors and prescription drug plans under this part in the same manner as such sections apply to MA organizations and MA plans under part C."

Confidential and Proprietary, Health Integrity, 2015©

2

In December 2014, CMS sent a letter to plan sponsors to both recoup payment for any sales taxes inappropriately paid on Medicare Part D prescriptions in Louisiana and to instruct the plan sponsors to resubmit corrected prescription drug event (PDE) records for the affected transactions.

In February 2015, as a result of the memo, Express Scripts responded to CMS that according to the Louisiana Pharmacy Benefits Management Services Manual,[2] a $0.10 prescription fee is allowed on all prescriptions filled by the pharmacy.

> *A prescription fee shall be paid by each pharmacy and dispensing physician for each out-patient prescription (Medicaid and non-Medicaid) dispensed. The fee shall be $.10 per prescription dispensed by a pharmacist or dispensing physician. When a prescription is filled outside of Louisiana but not shipped or delivered in any form or manner to a patient in the state, no provider fee shall be imposed. However, out-of-state pharmacies or dispensing physicians dispensing prescriptions which are shipped, mailed or delivered in any manner inside the state of Louisiana shall be subject to the $.10 fee per prescription.*

Given this response from Express Scripts, CMS ruled that PDE records with sales taxes of $0.10 or less is allowed in the state of Louisiana. A letter was then sent to plan sponsors to discontinue the adjustment of the affected PDE records for the recoupment of sales tax.

**Methodology**

As of September 23, 2014, plan sponsors submitted 4,502,286 PDE records (each having an unallowable Louisiana sales tax amount greater than $0.00); cumulatively valued at $977,029.39 during the period of January 1, 2010 to August 31, 2014.

When excluding those records in which CMS had no financial exposure, the figures were reduced to 4,357,112 PDE records and sales taxes in the amount of $922,961.59, respectively.

As of June 17, 2015, 4,232,980 PDE records were identified as still remaining in the Integrated Data Repository (IDR) with $476,843.78 total sales tax amount for the period of January 1, 2010 to August 31, 2014.

The total PDE record count, total paid amount, and total sales tax paid amount were reduced further (Tables 1-4) to reflect calculations based on existing contracts only.

Table 1 shows the comparison of PDE record count, total paid amount, and sales tax payments by year for the PDE records extracted on different dates.

---

[2] http://www.lamedicaid.com/provweb1/Providermanuals/manuals/PHARMACY/PHARMACY.pdf. Accessed on April 30, 2015

Confidential and Proprietary, Health Integrity, 2015©

3

**Table 1. PDE Record Count, Total Paid Amount, and Sales Tax Amount Comparison by Year**

| Year | PDE Record Count Sep2014 | PDE Record Count Jun2015 | Total Paid Amount Sep2014 | Total Paid Amount Jun2015 | Sales Tax Amount Sep2014 | Sales Tax Amount Jun2015 |
|---|---|---|---|---|---|---|
| 2010 | 769,246 | 723,315 | $47,248,882.59 | $44,768,490.54 | $223,106.70 | $84,892.69 |
| 2011 | 1,082,545 | 1,082,386 | $70,428,902.16 | $70,405,123.54 | $109,600.53 | $109,223.06 |
| 2012 | 908,205 | 907,836 | $53,343,175.92 | $53,320,277.89 | $92,636.99 | $92,544.30 |
| 2013 | 1,095,843 | 1,092,275 | $63,261,204.77 | $63,008,920.68 | $137,072.28 | $127,165.72 |
| 2014 | 456,350 | 382,254 | $35,565,713.59 | $24,565,155.76 | $354,481.34 | $56,969.27 |
| **Total** | **4,312,189** | **4,188,066** | **$269,847,879.03** | **$256,067,968.41** | **$916,897.84** | **$470,795.04** |

Table 2 lists the top five parent organizations by total sales tax amount for the PDE records that were extracted on June 17, 2015. Vantage Holdings, Inc. was one of the top five parent organizations identified in the September 23, 2014 analysis; however, this same placement is no longer evident in the more recent analysis and is now filled by Torchmark Corporation.

The other four remain as the top five in terms of sales tax amount. Ninety-nine percent of the PDE records were submitted by the top five parent organizations identified in Table 2.

**Tale 2. Top 5 Parent Organizations by Sales Tax Amount as of June 17, 2015**

| Parent Organization | PDE Record Count | Total Paid Amount | Sales Tax Amount |
|---|---|---|---|
| Express Scripts Holding Company | 2,154,331 | $133,879,016.54 | $229,742.58 |
| CVS Caremark Corporation | 1,259,642 | $81,698,235.10 | $126,189.15 |
| Aetna Inc. | 596,676 | $29,399,093.78 | $59,844.28 |
| UnitedHealth Group, Inc. | 10,991 | $1,066,038.70 | $22,066.94 |
| Torchmark Corporation | 126,904 | $7,319,901.03 | $12,695.47 |
| **Total** | **4,148,544** | **$253,362,285.15** | **$450,538.42** |

Given the response from Express Scripts, CMS advised the NBI MEDIC to conduct an analysis by excluding PDE records with sales tax of $.10 or less.

This review accounted for 76,315 PDE records with a sales tax greater than $0.10 for the period of January 1, 2010 to August 31, 2014 extracted on September 23, 2014. As of June 17, 2015, 10,633 PDE records with more than $0.10 sales tax were identified from IDR for the same time period.

Table 3 illustrates the comparison on PDE record count, total paid amount, and sales tax amount by year for the PDE records with more than $0.10 sales tax extracted on different dates for same time period.  These amounts reflect existing contracts only.

As of June 17, 2015, fourteen percent of the PDE records (having more than $0.10 sales tax) that were initially identified in the September 17, 2014 extraction were still remaining in the IDR.

Confidential and Proprietary, Health Integrity, 2015©

**Table 3. PDE Record Count, Total Paid Amount, and Sales Tax Amount Comparison by Year for PDE Records with Sales Tax >$0.10**

| Year | PDE Record Count Sep2014 | PDE Record Count Jun2015 | Total Paid Amount Sep2014 | Total Paid Amount Jun2015 | Sales Tax Amount Sep2014 | Sales Tax Amount Jun2015 |
|---|---|---|---|---|---|---|
| 2010 | 50,835 | 5,134 | $2,753,288.38 | $281,326.69 | $151,306.83 | $13,112.88 |
| 2011 | 315 | 268 | $27,164.15 | $19,676.27 | $1,420.78 | $1,054.27 |
| 2012 | 244 | 229 | $38,466.91 | $37,511.37 | $1,847.14 | $1,789.85 |
| 2013 | 6,409 | 3,981 | $615,432.21 | $393,561.33 | $28,156.75 | $18,354.29 |
| 2014 | 18,080 | 597 | $7,117,865.51 | $421,067.62 | $310,834.23 | $18,814.25 |
| **Total** | **75,883** | **10,209** | **$10,552,217.16** | **$1,153,143.28** | **$493,565.73** | **$53,125.54** |

Table 4 shows the comparison for the top five parent organizations as of June 17, 2015 on PDE records count, total paid amount, and sales tax amount for PDE records having more than $0.10 sales tax. Eighty-four percent of the PDE records were submitted by these top five parent organizations as of June 17, 2015.

**Table 4. PDE Record Count, Total Paid Amount, and Sales Tax Amount Comparison of Top 5 Parent Organization for PDE Records with Sales Tax >$0.10**

| Parent Organization | PDE Record Count Sep2014 | PDE Record Count Jun2015 | Total Paid Amount Sep2014 | Total Paid Amount Jun2015 | Sales Tax Amount Sep2014 | Sales Tax Amount Jun2015 |
|---|---|---|---|---|---|---|
| UnitedHealth Group, Inc. | 18,825 | 2,363 | $6,193,587.12 | $467,584.70 | $278,224.96 | $21,212.68 |
| Express Scripts Holding Company | 5,172 | 2,881 | $530,537.57 | $316,355.16 | $24,012.69 | $14,622.05 |
| Catamaran Corporation | 1,751 | 1,158 | $171,361.29 | $123,718.67 | $7,993.22 | $5,674.51 |
| WellCare Health Plans, Inc. | 1,303 | 1,220 | $946,970.80 | $91,072.79 | $33,678.45 | $3,982.30 |
| Catholic Charities Archdiocese of New Orleans | 959 | 945 | $73,839.99 | $72,894.02 | $3,749.58 | $3,692.96 |
| **Total** | **28,010** | **8,567** | **$7,916,296.77** | **$1,071,625.34** | **$347,658.90** | **$49,184.50** |

**Conclusions**

In summary, the initial analysis found that $916,897.84 was identified in sales tax in the state of Louisiana. Follow up analysis shows that post plan sponsor receipt of the memo sent in December 2014, $446,117.81 in sales tax was deleted from the IDR.

Confidential and Proprietary, Health Integrity, 2015©

**Source Statement**

Under the Medicare Part D Program, the Centers for Medicare & Medicaid Services (CMS) makes payments to Medicare Advantage Prescription Drug Plan (MA-PD) and stand-alone Prescription Drug Plan (PDP) sponsors on a monthly basis through estimated subsidy payments and, if required, at year-end as a result of the payment reconciliation process. The payment reconciliation process compares estimated subsidy payments made to plan sponsors throughout the year with the cost data submitted by MA-PD and PDP sponsors through prescription drug event (PDE) records and Direct or Indirect Remuneration (DIR) data to determine any residual payments required by CMS to MA-PD and PDP sponsors or by MA-PD and PDP sponsors to CMS. The reconciliation process relies on four major data sources: the sum of payments made to plan sponsors throughout the year, final updated plan enrollment, PDE records from MA-PD and PDP sponsors, and DIR.

Each time a beneficiary fills a prescription under Medicare Part D, an MA-PD or PDP sponsor must submit a summary record called the PDE record to CMS. PDE records are not the same as individual drug claim transactions but are summary extracts using CMS-defined standard fields. CMS stores the PDE records submitted by MA-PD and PDP sponsors in the Integrated Data Repository (IDR). MA-PD and PDP sponsors submit an original PDE record and may either adjust or delete PDE records submitted to CMS within the designated schedule. The records provided herein represent the latest iteration of the PDE records submitted by MA-PD and PDP sponsors and do not represent the complete adjudication history of drug claim transactions. The complete adjudication history of a drug claim transaction resides with the responsible MA-PD or PDP sponsor.

This report contains confidential Part D data, information, and/or analysis (hereinafter referred to collectively as "material") based on data and records made available to the NBI MEDIC by CMS. To the extent that this material contains or was developed through the use of data contained within the CMS's IDR, please be advised that the IDR database is updated periodically with new or revised data and PDE records. The material contained herein does not reflect IDR additions and revisions made after the material was pulled from the IDR database. Therefore, any newly run calculations/materials may differ from calculations/materials contained herein.

**Restriction on Part D Data Only**: This information is also consistent with the provisions of 42 U.S.C. §§1395w-115(f)(2), which permit HHS officers, employees, and contractors to use information submitted pursuant to section 1395w-115 for the purposes of, and to the extent necessary in carrying out 42 U.S.C. §1395w-115, which include payment-related oversight and program integrity activities, and for conducting oversight, evaluation, and enforcement under Title XVIII of the Social Security Act. Any use of this information by the Department of Justice (DOJ) will be limited to carrying out health oversight activities.

**CDI License Agreement**: This content may have been derived through the use of drug reference information obtained from Clinical Drug Information, LLC (CDI). CDI in no way endorses the data, views, opinions, or findings expressed, shared, or otherwise reported by Health Integrity, the National Benefit Integrity Medicare Drug Integrity Contractor. Copyright 2015, Medi-Span, Clinical Drug Information, LLC

Confidential and Proprietary, Health Integrity, 2015©

# TAB 126

 Medicare Drug Integrity Contractor (MEDIC)

**Vulnerability Summary Report**

**Title:  34838 - Vulnerability - Prescription Drug Event (PDE) Records - Inappropriate Use of the Sales Tax Field**

HITS #:        34838
Date Identified:    2/19/2015
Completion Date:    12/23/2015
Executive Summary Submitted Date:    8/10/2015
Status:    Concluded
Category:    Data Access / Accuracy Restrictions
Priority:    MED
Impact:    Part D
Potential Monetary Exposure:    $66,097,442.00
Subject Referred to LE:    0
Total Subjects:    0
Total Complaints:    0
Subjects Referred to BI:    0
Number of Immediate Advisements:    0

**Description**

The vulnerability was opened based on the results of a proactive data analysis project that determined improper sales tax payments by plan sponsors to Louisiana pharmacies. During this project review, the National Benefit Integrity Medicare Integrity Contractor (NBI MEDIC) identified entries for sales taxes on prescription drug event (PDE) records exceeding appropriate amounts.

As a result, this issue was opened as a vulnerability to further study the submission practices surrounding the sales tax field. The review was expanded to include a detailed study for the state of Minnesota and a national study at a summary level.

From the reviews conducted, aberrant patterns were identified concerning the monetary information that is being populated within the sales tax field. In certain instances, it was discovered that usage taxes, such as taxes placed upon health care-related services, were placed into the sales tax field.

 HEALTH integrity LLC

*Keeping the Trust*

*28464 Marlboro Avenue • Easton, Maryland 21601-2732*
*877-7SAFERX • Fax 410-819-8698*

SA683



Medicare Drug Integrity Contractor (MEDIC)

However, there were a large number of instances in which the sales tax field bore no discernible relationship to the remainder of the PDE record.

As a result of the wide variation of information being populated in the sales tax field of PDE records, a vulnerability to the Medicare Part D program exists that allows manipulation of the sales taxes paid and misrepresentation of plan sponsor payment for the drug provided. As a result, the calculation of Medicare payments to Medicare Part D plan sponsors by the Centers for Medicare & Medicaid Services (CMS) may be improperly overstated.

The NBI MEDIC studied the inappropriate submission of sales tax in the state of Louisiana. As a result of the identified findings, the scope of the sales tax study was expanded to include a study of the submitted sales tax for Minnesota and a national review at a summary level.

To further demonstrate the concerns identified, discrepancies regarding sales tax payments for the drug Avonex serve as an example.

Louisiana

An initial study of PDE records filled during the period of January 1, 2010 through August 31, 2014, specific to the state of Louisiana, revealed a total of 4,502,286 PDE records including sales tax. The total amount of sales tax attributable to these PDE records was $977,029.39. In December 2014, CMS sent a letter to plan sponsors instructing them to submit corrected PDE records to remove the inappropriate sales tax.

In February 2015, as a result of the letter, Express Scripts responded to CMS that according to the Louisiana Pharmacy Benefits Management Services Manual, a $0.10 prescription fee is allowed on all prescriptions filled by the pharmacy.

A prescription fee shall be paid by each pharmacy and dispensing physician for each out-patient prescription (Medicaid and non-Medicaid) dispensed. The fee shall be $.10 per prescription dispensed by a pharmacist or dispensing physician. When a prescription is filled outside of Louisiana but not shipped or delivered in any form or manner to a patient in the state, no provider fee shall be imposed. However, out-of-state pharmacies or dispensing physicians dispensing prescriptions which are shipped, mailed or delivered in any manner inside the state of Louisiana shall be subject to the $.10 fee per prescription.

Given this response from Express Scripts, CMS conceded not to pursue PDE records with sales taxes of $0.10 or less filled in the state of Louisiana. A letter was then sent to plan sponsors to discontinue the adjustment of the affected PDE records for the recoupment of sales tax.



*Keeping the Trust*

28464 Marlboro Avenue • Easton, Maryland 21601-2732
877-7SAFERX • Fax 410-819-8698

**SA684**



Medicare Drug Integrity Contractor (MEDIC)

As a result of this new direction, a revised analysis revealed that 11,578 PDE records with a sales tax exceeding $0.10 were submitted with payments totaling $59,090.36.

Minnesota

A study of PDE records filled during the period of January 1, 2010 through September 30, 2014 specific to the state of Minnesota revealed a total of 62,659,295 PDE records included sales tax. The total amount of sales tax attributable to these PDE records was $90,928,414.36.

Due to the high volume of PDE records, a selection of PDE records for Omeprazole DR 20 MG Capsule filled in January 2014 was reviewed. The majority of the variation in sales tax was identified for PDE records submitted by Humana.

National Study

The PDE records for dates of service from January 1, 2014 through December 31, 2014 were extracted from the Integrated Data Repository (IDR) to evaluate sales tax trending at the state level.

Analysis of the PDE records found that 47,940,036 PDE records out of 1,416,410,688 PDE records adjudicated in 2014 contained sales tax (approximately 3.38% of all PDE records). The PDE records analyzed included records from all 50 states as well as the District of Columbia, Guam, Puerto Rico, Virgin Islands, and the Northern Mariana Islands. These records included sales tax for 48 of the 55 states and territories studied.

The Federation of Tax Administrators (FTA) reports that as of January 1, 2015, 46 of the 50 states and the District of Columbia are exempt from sales tax on prescription drugs. Of the five states that are not exempt from sales tax on prescription drugs, four of the states' general tax rate percentage is 0%.

Although these states are not explicitly exempt from sales tax by FTA regulation, sales tax payment is not expected as the states' general tax rate percentage is 0%. Illinois is the only state in which sales tax other than 0% is applicable to prescription drugs. Per the FTA's State Sales Tax Rates and Food & Drug Exemptions table, a 1% sales tax applies to prescription drugs in Illinois.

While Illinois is one of the few states with clear rules surrounding the permissible submission of sales tax, results were provided that illustrates the volume of PDE records submitted in other states with no sales tax and demonstrates the number plan sponsors that were compliant with regulations surrounding sales tax as well as existing compliance by plan sponsors regarding correct adjudication of PDE records for Louisiana prescriptions.



 Medicare Drug Integrity Contractor (MEDIC)

Avonex

Although not initially included within the sales tax analyses, a concurrent review of PDE records filled for Avonex revealed an anomaly in the data with respect to the sales tax field. A plan sponsor self-disclosed to the NBI MEDIC known issues of overpayments made for Avonex; therefore, the NBI MEDIC further investigated this issue to determine the extensiveness.

The PDE records for Avonex were retrieved from the IDR from September 1, 2012 through December 31, 2014. For 12 of the 5,130 PDE records reviewed, the plan sponsors submitted sales tax equal to the ingredient cost and dispensing fee. The sales tax for the 12 PDE records totaled $51,420.99, or an average of $4,285.08 per PDE record indicating the sales tax field was inappropriately used to submit the excessive cost. Furthermore, the plan sponsors' controls failed to identify the overpayment and inappropriate use of the sale tax field.


**Updates**

A vulnerability exists to the Medicare Part D program due to the wide variation of information being populated in the sales tax field of PDE records. The lack of uniformity creates the potential for FWA, as offenders may misrepresent or manipulate this field.

Further, the lack of uniformity in which the field is being populated hinders the auditing of PDE records for accuracy.
The executive summary was submitted to CMS on August 10, 2015.

As a result of this vulnerability, the NBI MEDIC recommends that CMS:

•      Develops additional plan sponsor guidance that clarifies the costs that are deemed acceptable to be reported within the sales tax field of the PDE record.
•      Requests self-audits by plan sponsors to be performed at a state level in order to further investigate costs that are being inappropriately reported within the sales tax field and to refund the money to Medicare that has been inappropriately paid.
•      Educates plan sponsors regarding the results of this vulnerability so that appropriate edits and controls will be implemented that will ensure this type of potential FWA is prevented.

This vulnerability was closed on December 23, 2015.  The findings remain under review by CMS for future action.

**Activity**



*Keeping the Trust*

28464 Marlboro Avenue • Easton, Maryland 21601-2732
877-7SAFERX • Fax 410-819-8698



Medicare Drug Integrity Contractor (MEDIC)

Pharmacist: Jonathan Haag
Auditor: Jenna Hall
Analysts Lead: Ning Ma/Andrea Lewis


Data: W:/INB_HITS29897_Unallowable Sales Tax Payments Louisiana


Concerns regarding the type of information being populated within the sales tax field were discussed during the Monthly Vulnerability Meeting held February 19, 2015. It was agreed to open the issue as a potential vulnerability and perform further evaluation.
----- 2/19/2015   mealym
----- 2/23/2015   mealym
----- 2/26/2015   mealym


This vulnerability has been followed through the ongoing development of the Lousianna Sales Tax recovery attempts and changes that have occurred as a result. Based on discussuion with CMS held on April 22, 2015, the $.10 fee in the sales tax field was going to be allowed because plan sponsors do not have another area to report it onthe PDE record. Once the LA recoveries have been completed, CMS will not proceed any further regarding the tax recoveries for remaining states. However, CMS agreed that we should continue to follow this issue as a vulnerability and maintain the item on the agenda.
----- 4/23/2015   mealym


Using the Louisiana sales tax case, additional data has been requested to help determine overall sales tax payments by all plan sponsors and evaluate for plans that may have been completely compliant with the education provided in the earler HPMS memos. Receipt of the data is still pending due to the tremendous volume of PDE records that need extracted.
----- 6/17/2015   mealym
----- 6/19/2015   mealym


The Executive Summary was submitted to CMS on August 10, 2015 and uploaded to the file.
----- 8/10/2015   mealym



----- 8/10/2015   mealym


Part D exposure was added to the general tab. This amount was pulled from the national study that focused on PDE records filled from 1/1/2014 through 12/31/2015. Some of these sales tax payments may be permissible. This amount represents the full exposure of reported sales tax.



 Medicare Drug Integrity Contractor (MEDIC)

-----8/10/2015 1:11 PM---hallj---Modified or deleted note

Due to the change in process regarding date of closure for vulnerability studies and email notification to CMS, December 23, 2015 was used as the date of closure. The executive summary was previously submitted on August 10, 2015.
----- 12/28/2015   mealym

The findings remain under review by CMS for future action.
----- 1/29/2016   mealym

## Notes

Report Prepared on:   4/28/2017

 *Keeping the Trust*

28464 Marlboro Avenue • Easton, Maryland 21601-2732
877-7SAFERX • Fax 410-819-8698

# TAB 127

PO Box 9310
Minneapolis, MN 55440-9310
952.992.2900

MEDICA

July 30, 2010

Ms. Martina Gilly
Health Integrity, LLC
326 Creekstone Ridge
Woodstock, Georgia 30188

RE:   Review of Prescription Drug Event ("PDE") Data

Dear Ms. Gilly:

I am writing in response to your letter dated June 11, 2010 regarding Health Integrity's review of PDE data for the period of June 1, 2009 to June 30, 2009. You asked Medica to review the CD of data you forwarded and to verify the payment of an amount billed by pharmacies and identified by Health Integrity as a "sales tax" on Medicare Part D prescription claims. Please consider this letter Medica's formal response to your inquiry.

For purposes of clarification, the tax associated with the PDE data for the claims at issue represents a wholesale drug distributor tax. This tax is initially imposed on the distributor, but may be transferred to Medica via a pass-thru arrangement from the pharmacy to the pharmacy benefit manager ("PBM"), as permitted under Minn. Stat. §295.582. The identified tax imposed on the distributor is subsequently paid as an additional expense by Medica to the extent allowed by law and agreed to by Medica and its PBM, MedImpact Healthcare Systems, Inc. ("MedImpact").

You also asked that Medica provide copies of certain materials applicable to the billing and payment of tax on pharmacy claims. As requested, enclosed please find copies of the following information for your review:

1.   The tax section of MedImpact's MedCare Pharmacy Network Policies and Procedures Manual;

2.   The tax section (Section VI) of MedImpact's MedCare Pharmacy Network Agreement; and

3.   The tax section (Section 16) of the Minnesota Addendum to MedImpact's MedCare Pharmacy Network Agreement.



Ms. Martina Gilly
RE: Review of PDE Data
July 30, 2010
Page 2 of 2

If you have any questions or need additional information, please contact Justin Weiss at 952-992-2469 or me at 952-992-2315.

Very truly yours,

Lisa Hornig
Compliance Manager
Medica Center for Healthy Aging

Enclosures

cc:    Justin Weiss, Director, Pharmacy Services, Medica

**SA690**

Network at more favorable rates than that paid to Member Pharmacy. MedImpact shall notify Member Pharmacy of such, and Member Pharmacy may request in writing to MedImpact an equitable adjustment to the rates within thirty (30) days of such notification. If the parties are unable to agree upon an equitable adjustment, Member Pharmacy may terminate its participation in a Network with respect to the applicable Plan by providing thirty (30) days written notice of such termination. As additional consideration to Member Pharmacy, MedImpact represents and warrants that it currently does not, and does not intend to, offer to Plans its own operated, self-contained mail order and specialty mail order pharmacy fulfillment services.

This provision shall not be construed or applied as limiting in any way either MedImpact's or Member Pharmacy's right to engage freely in agreements with other competing entities.

## VI.  TAXES

If any taxes, assessments and/or similar fees ("taxes") are imposed on Member Pharmacy by a governmental authority based upon Member Pharmacy's provision of Prescription Drug Benefits to Eligible Persons, Member Pharmacy may request reimbursement from Payor or Eligible Person for such taxes that are allowed and imposed by applicable Law in accordance with the Plan. Provider must transmit the applicable tax amount allowed by Law through the online claim system. In no event does this give Member Pharmacy any additional or different rights than those allowed by Law. In no event shall MedImpact be liable for any such taxes, assessments or similar fees or the determination of the amount of such taxes, assessments or similar fees. Member Pharmacy shall assume the responsibility of making and shall timely make payments to the appropriate taxing authorities of the amount of any taxes received.

## VII.  COMPLIANCE WITH LAW

Member Pharmacy acknowledges that various state and federal mandates and guidelines may apply with respect to the Agreement and the pharmacy services provided under the Agreement. Member Pharmacy represents and warrants that it is, and shall remain, in compliance with all applicable laws, including but not limited to all applicable Medicare laws, regulations, and CMS instructions, all laws applicable to individuals and entities receiving Federal funds and all other applicable Federal and State laws, regulations, and governmental issuances, including but not limited to those governing participation in the Medicare+Choice Program, Title VI of the Civil Rights Act of 1964, the Age Discrimination Act of 1975, the Americans with Disabilities Act, the Rehabilitation Act of 1973, all applicable Federal and State anti-kickback statutes, and all Federal and State privacy and security requirements, including the privacy and security provisions contained in 42 CFR Section 403.812.

## VIII.  INDEMNIFICATION AND LIMITATION ON LIABILITY

All liability arising from the provision of prescription drugs and services by Member Pharmacy, its employees, agents or representatives, including the professional judgment of Member Pharmacy, its employees, agents or representatives, will be the sole responsibility of Member Pharmacy. Member Pharmacy shall indemnify and hold harmless MedImpact, the Payors, and their respective employees, agents, representatives, members, eligible participants and dependents, against loss, expense, liability, or damage, including, without limitation, any and all claims, causes of action, judgments, awards, settlements, costs, fees, or debts of whatever nature, including without limitation reasonable attorneys' fees and costs, arising out of or in connection with: (a) any actual or alleged malpractice, negligence, misconduct, or breach by Member Pharmacy, its employees, agents or representatives in the performance or omission of any act assumed by Member Pharmacy; or (b) the provision of pharmacy services, including the sale, compounding, dispensing, manufacturing, or use of a drug or device dispensed by Member Pharmacy, its employees, agents or representatives. Such indemnification shall include the duty to defend any such legal action against MedImpact, the Payors, and their respective employees, agents, members, representatives, eligible participants, and dependents. MedImpact is not responsible or liable for Member Pharmacy's professional

### Compounds

Prescription Drug Benefits which are compounded prescriptions for Eligible Persons must be submitted to Med**Impact** by using the NDC number of the most expensive Legend Drug. The compound must contain at least one ingredient that is a Legend Drug.

### Taxes

If any taxes, assessments and/or similar fees ("taxes") are imposed on Member Pharmacy by a governmental authority based upon Member Pharmacy's provision of Prescription Drug Benefits to Eligible Persons, Member Pharmacy may request reimbursement from Payer or Eligible Person for such taxes that are allowed and imposed by applicable Law. Member Pharmacy must transmit the applicable tax amount allowed by Law through the Online Claim System. In no event does this give Member Pharmacy any additional or different rights than those allowed by Law. In no event shall Med**Impact** be liable for any such taxes, assessments or similar fees or the determination of the amount of such taxes, assessments or similar fees. Member Pharmacy shall assume the responsibility of making and shall timely make payments to the appropriate taxing authorities of the amount of any taxes received.

### Prior Authorizations

Certain Prescription Drug Benefits require prior approval before they will be covered by a Payer. Such approval is Plan specific. Follow the guidelines on the Plan Profile Sheet for directions on obtaining the requisite prior approval.

### Format Submission Requirements

Member Pharmacy must transmit the required data for each claim in the then-current standard version of the NCPDP format. The telecommunications interface equipment shall be the responsibility of the Member Pharmacy and shall meet the minimum standards set by Med**Impact** from time to time. Member Pharmacy is responsible for any claims processing fees through claims switch processors.

Without limiting the generality of the foregoing, Member Pharmacy shall transmit its National Provider Identifier ("NPI") with each claim.  Member Pharmacy shall also transmit the prescriber's correct NPI with each claim whenever it is known.  If the prescriber's NPI is not available to Member Pharmacy, Member Pharmacy shall transmit another non-NPI identifier such as an accurate DEA number or state license number for the applicable prescriber, as permitted by state Law.

Without limiting the generality of the foregoing, Member Pharmacy shall comply with **MedImpact's NCPDP version 5.1 applicable Payer Sheet**.

### 6.   CLAIMS PAYMENT

Med**Impact** will reimburse Member Pharmacy according to the Agreement and will provide Member Pharmacy with a report showing the record of all claims submitted, processed, and paid in each processing cycle. If Member Pharmacy fails to advise Med**Impact** in writing of any alleged error, miscalculation, discrepancy or basis for questioning the correctness of any claim within 30 calendar days after the report is sent or available to Member Pharmacy, Member Pharmacy will be deemed to have confirmed the accuracy of the processing and payment of claims as set forth in the report for that cycle. Thus, all claims will be final as to Member Pharmacy on the thirtieth (30th) calendar day following the date the report is sent to Member

Minnesota Addendum to MedCare Pharmacy Agreement

(d) Disclosing accurate information about whether services or treatment will be paid for by Member's health plan company or health insurer or health coverage plan; and

(e) Informing Member about the nature of the reimbursement methodology used by Member's health plan company, health insurer, or health coverage plan to pay Member Pharmacy, except to the extent the Agreement requires Member Pharmacy to keep confidential the specific amounts paid to Member Pharmacy, fee schedules, or other information proprietary to MedImpact or Payor.

M.S.A. 62J.71(1)-(2).

14. Neither MedImpact nor Payor may take retaliatory action against Member Pharmacy solely on the grounds that Member Pharmacy:

(a) Refused to enter into an agreement or provide services or information in a manner that is prohibited in paragraph 13 above;

(b) Disclosed accurate information about whether a health care service or treatment is covered by Payor;

(c) Discussed diagnostic, treatment, or referral options that are not covered or are limited by Payor;

(d) Criticized coverage offered by Payor;

(e) Expressed personal disagreement with a decision made by a person, organization, or health care provider regarding treatment or coverage provided to Member, or assisted or advocated for Member in seeking reconsideration of such a decision, provided that Member Pharmacy made clear that Member Pharmacy was acting in an individual capacity and not as a representative of or on behalf of MedImpact or Payor.; or

(f) Discussed accurate interpretations of provisions of the Agreement that limit the prescribing, providing, or ordering of care.

M.S.A. 62C.16,  62D.12 and M.S.A. 62J.71.

15. Member Pharmacy shall timely cooperate in the investigation and resolution of any complaint or grievance filed by a Member or their authorized representative. M.S.A. 62D.11.

16. If Member Pharmacy is subject to a tax under section M.S.A. 295.52 or if Member Pharmacy has paid additional expense transferred under M.S.A. 295.582 by a wholesale drug distributor, Member Pharmacy may transfer such additional expense generated by M.S.A. 295.52 obligations on to Payor through MedImpact for the purchase of health care services on behalf of a Member, and Payor (not MedImpact) shall be responsible for payments due to the extent agreed upon by Payor and MedImpact and as required by law. M.S.A. 295.582.

17.  Member Pharmacy understands that the Agreement may involve the receipt by Member Pharmacy of state and federal funds, and that Member Pharmacy may, therefore, be subject to criminal prosecution and/or civil or administrative actions for any intentional false statements or other fraudulent conduct related to its obligations under this Agreement.  Member Pharmacy will, upon the request of the applicable state fraud control unit or attorney General's Office or the Comptroller General or Centers for Medicare and Medicaid Services make available to such requesting unit or office all administrative, financial, medical

MEDICA PROPRIETARY AND CONFIDENTIAL MATERIAL
FINAL VERSION

of Biweekly Claims Payment amount from Medica Funds and explanation of benefits (EOBs) will be transmitted by MedImpact electronically to a Participating Pharmacy upon request by the Participating Pharmacy and/or Medica. MedImpact will provide Medica confirmation that payment was made via electronic mail within one (1) business day of making payment to Participating Pharmacies, Non-Participating Pharmacies and/or Participants. Upon request by Medica, MedImpact will immediately provide to Medica a description of the internal controls adopted and implemented by MedImpact to ensure the Biweekly Claims Payment process operates in accordance with the methodology set forth herein. Further, MedImpact shall provide to Medica upon request any exception policies that exist to this Biweekly Claims Payment process methodology.

The following chart is for demonstrative purposes only:

| BIWEEKLY CLAIMS PAYMENT RECEIVED BY MEDIMPACT FROM MEDICA | MEDIMPACT PAYMENT TO PARTICIPATING PHARMACY, NON-PARTICIPATING PHARMACY, AS APPLICABLE |
|---|---|
| Tuesday, 9 am PST | Postmarked no later than Friday |
| Wednesday, 10 am PST | Postmarked no later than Tuesday |
| Thursday, 9 am PST | Postmarked no later than Tuesday |
| Saturday, 9 am PST | Postmarked no later than Thursday |

3.2.4 Notwithstanding the foregoing, Medica is obligated to make Biweekly Claims Payments on behalf of each Sponsor only to the extent that such payment is received by Medica from the Sponsor. The obligation for funding such Biweekly Claims Payments is solely that of such Sponsor although Medica may provide or arrange for such payments. Participating Pharmacies will not look to MedImpact, and MedImpact will not be responsible to Participating Pharmacies, for a Sponsor's payment or Medica's payment to the extent such Sponsor does not fund its Biweekly Claims Payment amount. Medica will not interfere with the collection efforts of MedImpact or any Participating Pharmacy, as applicable, in the event of non-payment of Biweekly Claims Payment by a Sponsor.

3.2.5 If Medica has not transferred a Biweekly Claims Payment to MedImpact five (5) business days after receiving proper notice from MedImpact (as described in Section 7.3.1 of this Agreement) for two (2) consecutive invoice cycles, MedImpact first shall offset the actual amount due and owing against any amount accrued to Medica for MedImpact's failure to satisfy any performance guarantee(s) set forth in Exhibit C, if any, and to the extent such offset is not prohibited by Law. MedImpact shall provide a detailed accounting of any such offset to Medica in connection with this transaction. In the event that any amount accrued to Medica is not sufficient to cover the Biweekly Claims Payment due and owing, MedImpact shall provide notification to Medica of such deficiency. Medica shall then be required to provide MedImpact a deposit amount equal to

MEDICA PROPRIETARY AND CONFIDENTIAL MATERIAL
FINAL VERSION

the difference between the offset amount and the average statement amount over the previous two (2) months. MedImpact shall retain such deposit amount until Medica has made prompt payment of the Biweekly Claims Payment amount due and owing, per the terms of this Agreement, at which time such deposit amount shall be returned, without interest, less any offsets for payment defaults and collection costs, if any (in accordance with Section 3.2.7 below). In the event that taxes, assessments and/or similar fees are imposed on a Participating Pharmacy by Laws based upon Participating Pharmacy's provision of Covered Drugs to Participants, Medica or Sponsor, as applicable, shall pay for such taxes, assessments and/or similar fees. Participating Pharmacy will transmit the applicable tax, assessment and/or fee through the MedImpact on-line claims adjudication system. In no event shall MedImpact be liable for any such taxes, assessments, and/or fees or the calculation thereof.

3.2.7   In the event that Medica Health Plans, Medica Insurance Company, Medica Health Plans of Wisconsin, MSI, SelectCare and/or a Sponsor makes an assignment for the benefit of creditors, files a voluntary or involuntary petition in bankruptcy, is adjudicated insolvent or bankrupt, or has a receiver or trustee appointed, Medica acknowledges that MedImpact may have the right, but not the obligation, to participate in such proceedings on its own behalf and/or on behalf of a Participating Pharmacy. Notwithstanding the foregoing or any participation by MedImpact in an insolvency proceeding, the insolvent Medica Party or Sponsor shall retain all liability for payment of Claims relating to such insolvent Medica Party or Sponsor, as applicable, and MedImpact shall have no liability to any pharmacy, governmental entity or any other party to the insolvency for amounts owed by such insolvent Medica Party or Sponsor, as applicable, to pharmacies or Participants or for MedImpact's Rebate Share.

3.3   Provision of Eligibility File Information.   MedImpact will provide on-line, real-time Participant eligibility information to each Participating Pharmacy upon MedImpact's receipt of each Claim from a Participating Pharmacy. MedImpact will process all Claims received by Participating Pharmacies as described in Section 3.1 of this Agreement and as otherwise set forth in this Agreement. MedImpact will have computer system capabilities sufficient so that Medica may include messages in the current NCPDP format.

3.4   Prescription Claims File; EOB Issuance.   MedImpact will issue to Medica, to Participating Pharmacies, and to Participants in direct payment cases, Prescription Claims Files and/or EOBs, as applicable, detailing payment of each Claim, in conjunction with the corresponding Biweekly Claims Payments.

3.5   Biweekly Claims Data and Report.   MedImpact will provide to Medica, or its third party designee, biweekly Claims data for the immediately preceding month, in the current format prescribed by NCPDP and in a medium mutually acceptable to Medica and to MedImpact, within ten (10) days after the end of each month. This requirement will be deemed satisfied if MedImpact provides real-time Internet access to all Claims data, by way of MedImpact's posting of Medica's Claims data to a secure site so that Medica or

# TAB 128

July 1, 2010

Martina Gilly
Health Integrity
326 Creekstone Ridge
Woodstock, GA 30188

Re:    Claim of Sales Tax in UCare Minnesota PDE

Dear Ms. Gilly:

This letter is in response to your letter to Lori Oleson dated June 11, 2010 where you express concerns about data in the sales tax field in UCare Minnesota's 2009 PDE data submissions. You note a federal law prohibiting states from imposing premium taxes on CMS payments to Medicare Part D plan sponsors, as well as a Minnesota statute that exempts sales of pharmacy drugs from state sales tax.

Although we understand your organization's interest in this matter, we believe your claims are based on incomplete information about the data in question and the applicable law. As shown below, the data in the sales tax field does not represent payment of sales tax, and the reflected payments do not violate state or federal law.

Minnesota requires wholesale drug distributors to pay a tax equal to two percent of its gross revenues. Minn. Stat. § 295.52, subd. 3. Minnesota also has a provision that permits the wholesale drug distributors to pass the cost of the tax to the pharmacies. In turn, the pharmacies may pass the cost to the pharmacy benefits management company or other third party payor, which is required to reimburse the pharmacies for this expense. Minn. Stat. § 295.582, subd. 1(a).

The data in the sales tax field in UCare's PDE shows the amount of reimbursement for expense of the wholesale drug distributor tax, not a sales tax or a tax on UCare's premium payments from CMS.

At the inception of Medicare Part D, UCare was concerned about reimbursement of this tax. With other Minnesota health plans, UCare took the initial position that reimbursement may conflict with the federal prohibition on taxes on premium payments and may be preempted. UCare obviously would rather not be responsible for payment of this expense.



500 Stinson Blvd. NE  Minneapolis  MN 55413-2813  •  P.O. Box 52  Minneapolis  MN 55440-0052
612-676-6500  •  1-866-457-7144  •  TTY: 1-800-688-2534  • · Fax: 612-676-6501  •  www.ucare.org

However, after the Minnesota Pharmacists Association engaged Minnesota health plans on this issue, it became apparent that we would be obligated to reimburse pharmacies for the cost of the wholesale drug distributor tax. We received a copy of a letter from the Minnesota Department of Revenue stating that the tax on wholesale drug distributors is not preempted by the federal probation on taxes or other assessments on Medicare Part D premium payments. More significantly, we received a copy of an e-mail from Gregory Dill at CMS, Region V which echoes the position that this tax survives the above-referenced federal provision. Please find enclosed copies of each.

With this guidance in hand, UCare took the additional step of due diligence by engaging our outside legal counsel to confirm we did not have a compelling legal argument to contest the reimbursement of the tax. Our counsel advised that the federal law prohibiting taxes and assessments would likely not be construed by a court to preempt our obligation under state law to reimburse pharmacies for the expense of the wholesale drug distributor tax.

Faced with the state and federal regulatory guidance and the opinion of our outside counsel, we proceeded with arrangements to reimburse pharmacies for the expense of the tax.

We appreciate your organization's efforts to ensure the financial integrity of the Medicare Part D program. With such efforts, plans like UCare can continue to offer affordable options for drug coverage for seniors. However, we believe your request in this case is misplaced.

If you have questions or would like to discuss this matter, please contact me directly at 612-676-3377.

Sincerely,

Mark Traynor
Sr. Vice President & General Counsel

**SA697**

cc: Lori Oleson (w/ attachments)

# MINNESOTA·REVENUE

September 26, 2005

Elizabeth Carpenter
Vice President, Public Affairs
Minnesota Pharmacists Association
1935 W County Road B-2, Suite 165
Roseville, MN 55113-2722

Dear Ms. Carpenter:

This letter is in response to your request for a clarification of the position of the Department of Revenue on the impact of 42 C.F.R. § 423.440 on the MinnesotaCare tax on wholesale drug distributors.

Section 423.440 preempts premium taxes or "other similar assessment" that are imposed on payments the Centers for Medicare & Medicaid Services (CMS) makes on behalf of Part D plan enrollees, payments made to Part D plans by a beneficiary or by a third party on behalf of a beneficiary.

The MinnesotaCare law imposes a tax on the gross revenues received by wholesale drug distributors for the sale of legend drugs (Minn. Stat. §§ 295.50, subd. 3(4) and 295.52, subd. 3). These gross revenues are generally received from hospitals, pharmacies, and other health care providers.

It is the Department's position that the preemption language contained in Section 423.440 does not apply to the MinnesotaCare tax on wholesale drug distributors. The MinnesotaCare tax is a gross revenues tax. It is not a premiums tax. The preemption prohibits taxing payments made by CMS, beneficiaries, or third parties that pay on behalf of beneficiaries. Under the MinnesotaCare tax, wholesale drug distributors are taxed on payments they receive from providers, hospitals or pharmacies. Wholesale drug distributors do not receive payments from CMS, enrollees, or insurers. I hope this letter answers your question. Please call me, if you would like to discuss this further.

Sincerely,

Michal H. Garber
Attorney

RECEIVED
SEP 2 7 2005

*Appeals & Legal Services Division*
Mail Station 2220
600 North Robert Street
Saint Paul, Minnesota 55146-2220

*Tel:*   (651) 556-4067
*Fax:*   (651) 296-8229
*Minnesota Relay (TTY)* 711
An equal opportunity employer

**SA698**

## Mark Traynor

| | |
|---|---|
| **From:** | DILL, GREGORY R. (CMS/MC) [Gregory.Dill@cms.hhs.gov] |
| **Sent:** | Friday, October 07, 2005 2:27 PM |
| **To:** | Liz Carpenter |
| **Cc:** | Leonis, Peter (CMS/MC); Chesmore, Gregory A. (CMS/MC); Hennessy, Amy K. (CMS/MC) |
| **Subject:** | RE: MN WDD Tax |

Liz,

I was told to pass along the following statement for you in regards to the Minnesota State Wholesale Drug Distributor Tax:

"It is CMS' opinion that the MN wholesale drug distributor tax does not appear to involve the prohibition on state taxes on payments by CMS or beneficiaries (or third parties on their behalf) to Part D plans, and, therefore is not preempted by this MMA provision. It is not within CMS' purview to offer any other opinion on the state tax."

Greg


Gregory R Dill
RO V, CMS
Suite 600
233 North Michigan Ave
Chicago, Il 60601
312 353 1754


---

**From:** Liz Carpenter [mailto:Liz@mpha.org]
**Sent:** Fri 9/30/2005 1:34 PM
**To:** DILL, GREGORY R. (CMS/MC)
**Cc:** Lemke Matthew
**Subject:** MN WDD Tax

Hi Greg,

I apologize for not getting back to you sooner.  Attached is correspondence from our attorney that outlines how the Wholesale Drug Distributor Tax, and the pass-through of these expenses works.  I believe it is pretty comprehensive, but if you have any questions, please give me a call.  I will be out of the office on Monday, but available by cell phone.  The remainder of the week, I will be in the office Tuesday, Wednesday, and Friday.  Out on Thursday, but again available by cell phone.  If for some reason you are not able to reach me, please feel free to contact our attorney, Matthew Lemke.  His contact information can be found on the attached correspondence.

Liz

~~~~~~~~~~~~~~~~~~~~~~~~~~~~
Elizabeth Carpenter
Vice President, Public Affairs
Minnesota Pharmacists Association

**SA699**



P.O. Box 52
Minneapolis, MN 55440-0052

**SA700**

Martina Gilly
Health Integrity
326 Creekstone Ridge
Woodstock GA  30188

301884+3725

# TAB 129

## Executive Summary Regarding Minnesota (MN) Tax

### Issue

In December 2009, the National Benefit Integrity (NBI) Medicare Drug Integrity Contractor (MEDIC) received an inquiry from an investigator with the Office of the Inspector General (OIG), U.S. Department of Health and Human Services (DHHS), requesting assistance with an investigation. The OIG was investigating prescription drug plans (PDPs) that were charging sales tax on Medicare Part D claims. This summary will provide the background of this issue, investigation conducted by the NBI MEDIC and the recommendations for further action.

### Background

In response to the request from the OIG, the NBI MEDIC immediately conducted a data review to first determine whether a sales tax is being charged by Minnesota pharmacies for prescription drugs provided to Medicare beneficiaries and paid for by the Medicare Part D program as a Part D benefit. According to Minnesota Statutes, section 297A.67, subdivision 7, drugs for human use are exempt from the sales tax imposed on the sales price of taxable goods and services sold in Minnesota. States are also prohibited under 42 C.F.R. § 423.440 (codifying the statutory preemption of State law at section 1860D-12(g) of the Social Security Act (42 U.S.C. § 1395w-112(g)), from imposing a premium tax, fee, or other similar assessment for any "payment CMS makes on behalf of a Part D Plan or enrollee under this part (including the direct subsidy, reinsurance payments, and risk corridor payments); or for any payment made to Part D Plans by a beneficiary or by a third party on behalf of a beneficiary."

The NBI MEDIC conducted an analysis of the prescription drug event (PDE) records in the integrated data repository (IDR) of all the Medicare Part D records submitted to Prescription Drug Plans (PDPs) by pharmacies in Minnesota. Our analysis indicated that some of the Part D records included a tax amount, reported in the field entitled "Sales Tax" on the data reporting form. According to the PDE data sample reviewed, PDP's in the State of Minnesota paid a total "sales tax" in the amount of $63,617,759 for the time period of January 1, 2006 through December 2009.

### Investigation Results

In 2010, the NBI MEDIC spoke with a Tax Specialist Principal (MN Tax Specialist) within the Minnesota Special Tax Division who confirmed that the pass through of the tax expense from Minnesota pharmacies to Medicare Part D is preempted. The NBI MEDIC contacted several PDPs operating in Minnesota, asking them to explain the reason that the sales tax paid by the PDPs was passed on, for reimbursement, to the Medicare Part D Program. In

1

**SA701**

CMS000032

response to the NBI MEDICs inquiry, the PDPs explained that the data submitted to the Centers for Medicare and Medicaid Services (CMS) did not represent the imposition of a sales tax, but rather the pass-through of a state wholesale drug tax. More specifically, the wholesale drug tax was reported in the "sales tax" field because there is not another tax field for reporting this within the report format.  This wholesale drug distributor tax is a two percent levy on gross revenues for drugs supplied to pharmacies in Minnesota by wholesalers, and pharmacies or other entities who are required to pay this tax if drugs are obtained via channels other than through a wholesale distributor.  Drugs obtained by a pharmacy directly from a pharmaceutical manufacturer, for example, would be subject to this tax.  One PDP also cited and provided to the NBI MEDIC a copy of an October 2005 e-mail from, Gregory Dill, CMS Region V stating that it was the opinion of CMS that the Minnesota wholesaler drug distributor tax "did not appear to involve the prohibition on State taxes of payments by CMS or beneficiaries."

In April 2011, the NBI MEDIC followed up with the MN Tax Specialist and he stated that he had discussed this issue with a Minnesota Revenue Department attorney who agreed that there is a preemption for Medicare drugs. In response to the NBI MEDIC's request for further clarification regarding the basis for the preemption, the MN Tax Specialist wrote: "MN Statute 295.53(a)(1) applies only [to] the hospital, surgical center and provider tax section of the MinnesotaCare tax and does not apply to the wholesale drug distributor tax. The section of the MinnesotaCare tax law that is relevant to the preemption is Minnesota Statute 295.582 which presents the pass through provision of the tax as it is available to a hospital, provider, surgical center, a wholesale drug distributor or to a pharmacy that was charged the tax from a wholesaler." The MN Tax Specialist stated that "the basis for the pass through preemption is Federal provis[i]on 42 CFR 423.440 because the wholesale drug distributor tax constitutes a 'similar assessment or fee'."

In May 2011, the NBI MEDIC sought an opinion from the Minnesota Attorney General's (AGs) office clarifying the state's interpretation of the wholesale drug distributor tax and its operation relative to drugs paid for under the Medicare Part D program.[1]  Based on the response received from the MN Tax Specialist, the NBI MEDIC inquired as to the State's interpretation of the federal preemption provision.  The NBI MEDIC received a letter in response, dated May 31, 2011, from Angela Skarda, a Citizen Research Specialist with the Minnesota Attorney General's Office (see attached).

Ms. Skarda wrote that "healthcare services provided to Medicare recipients and paid for under the Medicare program are exempt from the [wholesale drug distributor] tax."  The letter does not address the federal preemption provision, rather Ms. Skarda cites the state statutory exemption in Minnesota Statute § 295.53, subdivision 1.  Ms. Skarda enclosed a copy of Minnesota Statute Chapter 295, as well as a copy of a June 2010 House Research Report on /the MinnesotaCare Provider tax.  The House Research Report indicates that "provider taxes"

---

[1] According to information provided on the MN AG's website, the Minnesota Attorney General is authorized by statute to issue written legal opinions only to constitutional executive officers, state agencies, bodies of the state legislature, and attorneys for local governments or pension funds.

2

CMS000033

apply to wholesale drug distributors and that services provided under Medicare are exempt from the provider taxes.

**Conclusion**

Currently, the NBI MEDIC has received information from two different offices within the State of Minnesota.  While both concur that Medicare Part D drugs are exempt from the wholesale drug distributor tax passed through by Minnesota pharmacies, two different authorities are cited: (1) the federal prohibition of the state imposition of premium taxes or similar fees or assessments and, (2) as indicated by the Attorney General's Citizen Research Specialist, the state preemption of the imposition of MinnesotaCare provider taxes (apparently including the wholesale drug distributor tax) on services paid by Medicare.

CMS000034

TAB 130

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



## CENTER FOR MEDICARE

TO:        All Part D Sponsors

FROM:      Cynthia G. Tudor, Ph.D., Director, Medicare Drug Benefit and C & D Data Group

SUBJECT:   Notice to Part D Sponsors Operating in Louisiana

DATE:      August 13, 2010

CMS has recently been notified that some pharmacies in Louisiana appear to have erroneously applied sales tax to Part D claims. Louisiana state law specifically exempts Part D claims from sales tax (including any local government subdivision, school board, or other political subdivision). The Louisiana law can be found at the following link:
www.legis.state.la.us/lss/lss.asp?doc=208447.

If not already doing so, Part D sponsors should reject Part D claims originating from Louisiana pharmacies that include any sales tax. CMS is investigating this issue and will be providing additional guidance on recoupment efforts that sponsors should undertake in an upcoming memo.

If you have any questions concerning this memorandum, please contact your Account Manager.

CMS_EMAIL053113

# TAB 131

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



## CENTER FOR MEDICARE

TO:          All Part D Sponsors

FROM:        Cynthia G. Tudor, Ph.D., Director, Medicare Drug Benefit and C & D Data
             Group

SUBJECT:     Revised Notice to Part D Sponsors Operating in Louisiana

DATE:        September 1, 2010

This memo revises and supersedes our memo of August 13, 2010: "Notice to Part D Sponsors
Operating in Louisiana". As the result of recent compliance actions, CMS has determined that
some Part D sponsors have continued to pay sales taxes on Louisiana pharmacy claims despite
that fact that Louisiana state law prohibited the imposition of local sales taxes on Part D
prescription drug sales effective July 1, 2006. The Louisiana law can be found at the following
link: **www.legis.state.la.us/lss/lss.asp?doc=208447.** (State sales tax for all prescription drugs
was eliminated in Louisiana by Constitution in 2003).

In our previous memo we instructed sponsors to reject any Part D claims originating in Louisiana
that included a sales tax charge. We are now instead requiring sponsors to take immediate steps
to ensure that no further sales taxes are paid on any Part D Louisiana pharmacy claims when
adjudicating and paying such claims. Since local sales tax on non-Part D prescriptions is
permitted, and we know that pharmacies generally cannot distinguish Part D claims from any
other types of claims at this time, we do not believe that claim denial is the appropriate approach
to eliminating sales tax on claim adjudication. We note that the identification of Part D claims
will be facilitated in the future by our 2012 regulatory requirement for Part D sponsors to utilize
unique billing identifiers for Part D claims.

We also remind you that it is the sponsor's responsibility to determine whether sales tax on Part
D claims is permissible in any locality. CMS expects sponsors to correctly adjudicate the Part D
benefit without reliance on CMS to identify such errors. CMS is continuing to consider
corrective action on this issue and will be providing additional guidance on recoupment efforts
that sponsors should undertake in an upcoming memo.

If you have any questions concerning this memorandum, please contact your Account Manager.

CMS_EMAIL053037

# TAB 132

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



## CENTER FOR MEDICARE

TO:        All Part D Sponsors

FROM:      Cynthia G. Tudor, Ph.D.,
           Director, Medicare Drug Benefit and C & D Data Group

SUBJECT:   Recoupment of Louisiana Sales Tax Paid on Part D Claims in 2010

DATE:      December 21, 2010

On August 13, 2010, CMS notified Part D sponsors operating in Louisiana that some Louisiana pharmacies have erroneously applied sales tax to Part D claims, that sponsors should reject Part D claims for Louisiana sales tax, and that CMS would be providing additional guidance on recoupment efforts that Part D sponsors should take. On September 1, 2010, CMS issued revised guidance instructing Part D sponsors to take immediate steps to ensure that no further sales taxes are paid on any Part D Louisiana pharmacy claims, but not simply to deny claims.

The purpose of this memo is to instruct Part D sponsors to immediately move forward with recouping any sales tax paid on 2010 Part D prescriptions in Louisiana and resubmitting corrected Prescription Data Events (PDEs) for these transactions. Any sales tax paid by beneficiaries (as dictated by plan design) should be reimbursed in accordance with 42 CFR 423.466(a). CMS expects that these recoupment efforts should be complete before the start of the 2010 plan year reconciliation process. The adjustment of PDEs for 2010 in no way affects or limits the rights of the Federal Government or any of its agencies or agents to pursue any appropriate criminal, civil, or administrative remedies relating to Louisiana sales tax.

Again, it is the Part D sponsor's responsibility to determine whether sales tax on Part D claims is permissible in any locality. CMS requires sponsors to correctly adjudicate the Part D benefit without reliance on CMS to identify such errors. If you have any questions concerning this memorandum, please contact your Account Manager.

CMS_EMAIL053174

TAB 133

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Medicare Drug & Health Plan Contract Administration Group
7500 Security Boulevard
Baltimore, Maryland 21244-1850



### CENTER FOR MEDICARE

---

### MEMORANDUM

**TO:**        All Part D Sponsors

**FROM:**    Cynthia G. Tudor, Ph.D., Director, Medicare Drug Benefit and C & D Data Group

**SUBJECT:**  Recoupment of Louisiana Sales Tax Paid on Part D Claims in 2010

**DATE:**     April 11, 2011

On December 21, 2010, CMS instructed Part D Sponsors operating in Louisiana to immediately move forward with recouping any sales tax paid on 2010 Part D prescriptions in Louisiana and resubmitting corrected Prescription Data Events (PDEs) for these transactions. A recent letter to CMS raised the prospect that some sponsors' recoupment practices may not be consistent with Louisiana state law. We remind Part D Sponsors that it remains the sponsor's responsibility to correctly adjudicate claims in accordance with all applicable state laws.

CMS notes that the adjustment of PDEs for 2010 in no way affects or limits the rights of the Federal Government or any of its agencies or agents to pursue any appropriate criminal, civil, or administrative remedies relating to Louisiana sales tax.

If you have any questions concerning this memorandum, please contact your Account Manager.

CMS_EMAIL053233

TAB 134

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



**Center for Program Integrity**

Date:        Month XX, 2014

To:          <CEO Name>; CEO
             <Parent Organization Name>
             <Street Address>
             <City, State Zip Code>

From:        Mark Majestic
             Director, Investigations and Audits Group

Subject:     Recoupment of Louisiana Sales Tax Paid on Part D Claims
             <Parent Organization>:  <Contract(s) XXX>

**Background**

The Centers for Medicare & Medicaid Services (CMS), in collaboration with the National
Benefit Integrity Medicare Drug Integrity Contractor (NBI MEDIC) (Health Integrity, LLC),
has determined that your parent organization submitted prescription drug event (PDE)
records that included unallowable sales tax payments on Part D prescriptions in Louisiana.

In previous Health Plan Management System (HPMS) memo guidance dated August 13,
2010,[1] December 21, 2010,[2] and April 11, 2011,[3] plan sponsors were notified of the
unallowable sales tax issue, with respect to the Louisiana State Constitution of 1974, Article
VII: Revenue and Finance, §2.2(B)(3), where it is written : "Effective July 1, 2003, the sales
and use tax imposed by the state of Louisiana or by a political subdivision whose boundaries
are coterminous with those of the state shall not apply to sales or purchases of the following
items:…(3) Prescription drugs.". At that time, plan sponsors were instructed to recoup any
sales taxes paid on 2010 Part D prescription drugs in Louisiana, resubmit corrected PDE
records for the affected transactions and reimburse any sales taxes paid by beneficiaries, and

---

[1] http://cms.hhs.gov/Medicare/Prescription-Drug-
Coverage/PrescriptionDrugCovContra/Downloads/MemoLASalesTax_081310.pdf

[2] http://cms.hhs.gov/Medicare/Prescription-Drug-
Coverage/PrescriptionDrugCovContra/Downloads/MemoLASalesTaxRecoupment_122110.pdf

[3] http://cms.hhs.gov/Medicare/Prescription-Drug-
Coverage/PrescriptionDrugCovContra/Downloads/MemoLASalesTax_041111.pdf

CMS_EMAIL004124

to take immediate steps to ensure that no further sales taxes were paid on Part D Louisiana pharmacy claims.

In addition, CMS specifically emphasized that it is the plan sponsor's responsibility to determine whether sales tax on Part D claims is permissible in any locality and that CMS requires sponsors to correctly adjudicate the Part D benefit without reliance on CMS to identify such errors.

**Summary of Findings**:

The following table provides summary data for your parent organization.

| Parent Organization | Contract # | # PDE Records | Total Sales Taxes Paid |
|---|---|---|---|
|  |  |  |  |

We have also included a password-protected file that contains the specific PDE records to assist you in identifying the correct records.

**Requested Actions**

CMS requires that plan sponsors recoup any sales taxes paid on Part D prescriptions in Louisiana and resubmit corrected PDE records for the affected transactions within 90 days of receipt of this notice.

We are alerting you to this information so that you can take appropriate measures to ensure that PDE records submitted for payment by Medicare Part D are accurate and complete. Please also ensure that downstream and related entities have policies and procedures in place to prevent payment for any unallowable sales taxes.

If you need additional information about this issue, please contact the NBI MEDIC at 1-877-7SAFERX (1-877-772-3379). Any questions on this subject should be emailed to CPIMedicarePartD_data@cms.hhs.gov.

Mark Majestic, Director
Investigations and Audits Group
Centers for Medicare & Medicaid Services

Attachment: PDE Record Sales Tax Report

2

CMS_EMAIL004125

cc:
[CFO Name]; CFO
[MCO Name]; MCO
[AM Name]; AM

3

CMS_EMAIL004126

# TAB 135

| | |
|---|---|
| **From:** | CMS CPIMedicarePartD_Data |
| **Sent:** | Wednesday, March 08, 2017 8:18 AM |
| **To:** | CMS CPIMedicarePartD_Data |
| **Subject:** | Update - Recoupment of Louisiana Sales Tax Paid on Part D Claims |

On December 12, 2014, e-mail notification was sent identifying your organization as having submitted prescription drug event (PDE) records that included unallowable sales tax payments on Part D prescriptions in Louisiana. The Centers for Medicare & Medicaid Services (CMS) has received commentary and additional information regarding prescription drug sales in Louisiana. Pending further review of this information, CMS requests that no action be taken by your organization at this time. When available, notification will be sent via e-mail alerting your organization of a final decision and further actions, if needed.

If you have any questions regarding this issue, please contact CPIMedicarePartD_Data@cms.hhs.gov.

Sincerely,

Data Analytics Team
Division of Plan Oversight and Accountability
Centers for Medicare & Medicaid Services

1

**SA711**

# TAB 136



# LOUISIANA DEPARTMENT OF INSURANCE

## JAMES J. DONELON
### COMMISSIONER

### DIRECTIVE 208

**TO:**   **ALL HEALTH INSURANCE ISSUERS, HEALTH MAINTENANCE ORGANIZATIONS, THIRD-PARTY ADMINISTRATORS, AND GROUP SELF-INSURERS**

**FROM:**   **JAMES J. DONELON, COMMISSIONER OF INSURANCE**

**RE:**   **APPLICABILITY OF THE FEES AUTHORIZED IN LA. R.S. 46:2625; ENFORCEMENT ACTIONS AGAINST ENTITIES FOR VIOLATIONS OF LA. R.S. 46:2625**

**DATE:**   **MAY 9, 2016**

It has come to my attention that various health insurance issuers, health maintenance organizations, group self-insurers (often called "multiple employer welfare arrangements" or "MEWAs"), and third-party administrators (which by law includes pharmacy benefits managers) are substantially out of compliance with provisions of Louisiana law that impose various fees that partially finance the Louisiana Medicaid Program. The purpose of Directive 208 is to confirm applicability of the fees, particularly La. R.S. 46:2625(A)(1)(c), which authorizes a 10 cent per prescription fee on every out-patient prescription filled by a pharmacy in this state and by certain out-of-state pharmacies.

The Medicaid Program is a means-tested entitlement program that finances the delivery of primary and acute medical services, as well as long-term care services. It was established in the Social Security Amendments of 1965 (Public Law 89-97), and represents more than twelve percent (12%) of all mandatory federal spending. Although the administration of the Medicaid Program by each state is optional, every state and the District of Columbia, and the five Territories have elected to administer a Medicaid Program. Due to the large costs in the form of federal mandatory outlays, Congress and the U.S. Department of Health and Human Services exercise a close degree of supervision over the mechanisms by which states, the District of Columbia, and the Territories receive federal matching funds.

Throughout the 1980s, many states and to an extent Louisiana utilized fees on health care providers and health care goods and services to secure federal matching dollars to increase Medicaid spending. However, many states entered into hold-harmless

agreements with health care providers to ensure that providers that were taxed or subject to fees would receive that money back in addition to increased Medicaid expenditures or reimbursement rates. In other words, states implemented a system by which they would create a tax, repay the taxpayer in full, and give that taxpayer a part of the increased revenue that was funded from the federal government through higher reimbursements. These schemes drew the ire of Congress. In 1991, Congress enacted the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments (Public Law 102-234), which prohibits such hold-harmless schemes at the expense of federal tax payers. The act of Congress in 1991 codified a requirement that any provider fee, tax, assessment, or other mandatory payment must be both broad-based (imposed on all providers within the class of providers) and uniform (the same tax, fee, assessment, etc. is imposed on all providers within the class).[1] In addition to other specific requirements, the law expressly prohibits any hold-harmless agreements for the taxes, fees, assessments, etc., and prohibits any such fees from applying only to Medicaid providers or enrollees.

As a result of the Congressional action in 1991, the Louisiana Legislature in 1992 amended the Medicaid financing model used in Louisiana with respect to the fees, taxes, assessments, etc., governed by the Congressional act. The pertinent provisions of the Louisiana statute, codified in Title 46 of the Louisiana Revised Statutes of 1950, reads:

§2625. Fees on health care providers; disposition of fees

A.(1) The Department of Health and Hospitals is hereby authorized to adopt and impose fees for health care services provided by the Medicaid program on every nursing facility, every intermediate care facility for people with developmental disabilities, every pharmacy in the state of Louisiana and certain out-of-state pharmacies, dispensing physicians, and medical transportation providers. The amount of any fee shall not exceed the total cost to the state of providing the health care service subject to such fee. In addition, the amount of the fees imposed under the rules and regulations adopted shall not exceed the following:

(a) Ten dollars per occupied bed per day for nursing facilities.

(b) Thirty dollars per occupied bed per day for intermediate care facilities for people with developmental disabilities.

(c) Ten cents per out-patient prescription.

(d) Ten cents per out-patient out-of-state prescription.

---

[1] The broad-based and uniform requirements are codified in section 1903(w) of the Social Security Act and have implementing regulations at 42 C.F.R. Part 433.

Directive 208
May 9, 2016
Page 3 of 5

        (e) Ten cents per out-patient prescription dispensed by dispensing physicians.

        (f) Seven dollars and fifty cents per medical service trip for medical transportation providers.

        (2)(a) Any fee authorized by and imposed pursuant to this Section shall be considered an allowable cost for purposes of insurance or other third party reimbursements and shall be included in the establishment of reimbursement rates.

The plain language of La. R.S. 46:2625 does not state that the six fees established therein are applicable only to goods or services provided to Medicaid enrollees. Such an interpretation would expressly violate the provisions of federal law, rendering the financing scheme illegal under federal law when the statute was expressly amended in 1992 in order to comply with federal requirements for Medicaid matching funds. Those federal requirements contain the broad-based and uniform standard.[2] Indeed, the rationale for requiring that all residents of this state shoulder the burden of financing the Louisiana Medicaid Program is the same rationale that led Congress to enact the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments in 1991.

A number of health insurance issuers, health maintenance organizations, and third-party administrators have asserted that the fees authorized in La. R.S. 46:2625 are only applicable to Medicaid enrollees. That argument contradicts the plain language of the statute, its legislative history, and controlling federal law. Pursuant to La. R.S. 46:2625(A)(2)(a), failure of those entities to follow the requirements of La. R.S. 46:2625 is a violation of Louisiana Law, for which the Commissioner of Insurance has the authority

---

[2] The plain language of La. R.S. 46:2625 is without ambiguity regarding the applicability of the fees levied within the section. If skepticism as to the universal applicability of La. R.S. 46:2625(A)(1)(c) remains, the legislative record quashes remaining doubt—in particular, the legislative record of the hearings before the House Committee on Appropriations held on April 27, 1992. In that hearing, it was understood that the 10 cent per prescription fee is "for every prescription dispensed in the state..." *House Bill 1615 by Representative Elias Ackal: Hearing on House Bill 1615 Before the Louisiana House Committee on Appropriations*, April 27, 1992, 1992 Regular Legislative Session of the 65th Louisiana Legislature (Testimony before the Committee by Chris Pilley and Charles Castille, of the Louisiana Department of Health and Hospitals).

We see no reason to engage in legal or constitutional debate regarding whether the fees, as they are designated by the statute, La. R.S. 46:2625, are in fact fees for services or taxes for constitutional purposes.

Directive 208
May 9, 2016
Page 4 of 5

to issue sanctions under La. R.S. 22:1860.1 and La. R.S. 22:1654, among other provisions.

This question has mainly arisen when issuers, health maintenance organizations, or third-party administrators have refused to reimburse pharmacists for payment of the 10 cent fee on out-patient prescriptions pursuant to La. R.S. 46:2625(A)(1)(c). To avoid further alleged ambiguity and to definitively counter efforts of entities to avoid obligations under law, all issuers, health maintenance organizations, multiple employer welfare arrangements, and third-party administrators should know the following

- **The ten cent provider fee on out-patient prescriptions authorized in La. R.S. 46:2625(A)(1)(c) applies to every out-patient prescription of any kind whatever, without regard for whether that prescription is processed by or for a Medicaid enrollee, by or for an enrollee or covered person of a fully-insured health plan, or by or for a covered person or enrollee of a self-insured plan, which includes multiple employer welfare arrangements and employer-sponsored plans of self-insurance—often called "ERISA" plans.**

- **The terms of La. R.S. 46:2625 are broad enough to capture all plans, whether Medicaid, fully insured plans (sometimes called "commercial plans") or self-insured plans ("ERISA" plans).**[3,4]

---

[3] In Louisiana Attorney General Opinion 02-0177, it is clear that the Attorney General's Office has long-shared the same opinion that the fee does not apply only to prescriptions filled for Medicaid enrollees. Additionally, in prior guidance, including Directive 157 issued by the Commissioner of Insurance on August 10, 2001, which directs "all insurers, health maintenance organizations, third party administrators, and self-insurance funds" to comply with La. R.S. 46:2625(A)(2)(a), this agency has continuously maintained that any argument that the fees authorized in La. R.S. 46:2625 are only applicable to Medicaid enrollees is without merit.

[4] With respect to self-insured, single-employer sponsored plans or "ERISA" plans, La. R.S. 46:2625 neither relates to nor makes an impermissible reference to the Employee Retirement Income Security Act of 1974, but rather is a law of broad and general application with only tenuous and remote connections to ERISA plans, and as such, La. R.S. 46:2625 is not preempted by ERISA section 514. See *New York State Conference of Blue Cross and Blue Shield Plans vs. Travelers Insurance Co.*, 514 U.S. 645 (1995), *The District of Columbia vs. The Greater Washington Board of Trade*, 506 U.S. 125 (1992), and *De Buono vs. NYSA-ILA Medical and Clinical Services Fund*, 520 U.S. 806 (1997), in which the Court held that the effects of a tax imposed by the state of New York was not preempted simply because ERISA plans had to absorb increased costs—"Any state tax, or other law, that increases the cost of providing benefits to covered employees will have some effect on the administration of ERISA plans, but that simply cannot mean that every state law with such an effect is pre-empted by the federal statute." 520 U.S. 806, 816.

Directive 208
May 9, 2016
Page 5 of 5

As such, by the terms of La. R.S. 46:2625(A)(2)(a), all entities which reimburse pharmacies or pharmacists shall include the ten cent out-patient prescription fee in the reimbursement. The failure to do so may result in the highest sanctions permissible by law.

All regulated entities are hereby directed to bring their business practices into compliance with the purpose and intent of Directive 208.

Please be governed accordingly.

Baton Rouge, Louisiana, this 9th day of May 2016.

_____
JAMES J. DONELON
COMMISSIONER OF INSURANCE

TAB 137



# STATE OF MINNESOTA

### OFFICE OF THE ATTORNEY GENERAL

**LORI SWANSON**
ATTORNEY GENERAL

May 31, 2011

102 STATE CAPITOL
ST. PAUL, MN 55155
TELEPHONE: (651) 296-6196

Ms. Martina Gilly
Benefit Integrity Manager
Health Integrity, LLC
326 Creekstone Ridge
Woodstock, GA 30188

Dear Ms. Gilly:

I thank you for your correspondence received May 24, 2011.

Your organization, Health Integrity, LLC, is authorized to identify and investigate potential fraud, waste, and abuse in the federal Medicare Parts C & D programs. You state that Health Integrity has recently reviewed, at the request of the Office of the Inspector General for the U.S. Department of Health & Human Services, prescription drug data for Minnesota pharmacies that provide prescription drugs to Medicare beneficiaries and that are paid for by the Medicare Part D program. You indicate that your review showed that some pharmacies included a tax amount in Part D claims submitted to plans. You ask for any information or guidance this Office can provide relative to any Minnesota tax on prescription drugs.

First, as you noted, Minnesota does not impose its sales tax on drugs, over-the-counter or prescription, for human use in the diagnosis, treatment, cure, or prevention of disease. *See* Minnesota Statute Section 297A.67, subdivision 7 (2010).

Second, Minnesota imposes a tax on healthcare providers, including wholesale drug distributors and those who resell prescription drugs. This tax, known as the MinnesotaCare tax, is 2 percent of gross revenues, and is an expense that may be passed on to third party payers. However, healthcare services provided to Medicare recipients and paid for under the Medicare program are exempt from this tax. Minnesota Statute Section 295.53, subdivision 1. I have enclosed a copy of Minnesota Statute Chapter 295, which contains the laws related to the MinnesotaCare tax, for your review. I have also enclosed a copy of a House Research Report on the MinnesotaCare Provider tax (June, 2010).



Facsimile: (651) 297-4193 • TTY: (651) 297-7206 • Toll Free Lines: (800) 657-3787 (Voice), (800) 366-4812 (TTY) • www.ag.state.mn.us
An Equal Opportunity Employer Who Values Diversity          ♻Printed on 50% recycled paper (15% post consumer content)
SA717

Ms. Martina Gilly
May 31, 2011
Page 2


        I thank you again for your correspondence.

                    Sincerely,

                    *Angela Skarda*

                    ANGELA SKARDA
                    Citizen Research Specialist


Enclosures:    Minnesota Statute Chapter 295
                House Research: MinnesotaCare Provider Taxes (June, 2010)

AG: #2828994-v1/453106(RCD)

# HOUSE RESEARCH | Short Subjects

Joel Michael

Updated: June 2010

## MinnesotaCare Provider Taxes

**What are the taxes?**

Minnesota imposes a series of gross revenue taxes on various types of providers of health care goods and services. Revenues collected under these taxes are used to pay for the MinnesotaCare program, which provides state-subsidized health care coverage for low-income individuals.

**Who is subject to the tax?**

Provider taxes apply to the following:

- "Health care providers," which include licensed health care professionals such as physicians, dentists, nurses, psychologists, physical therapists, chiropractors, and so forth; nonlicensed individuals who provide services that qualify for reimbursement under Minnesota's Medicaid program; staff model health plan companies (a type of HMO where services are provided by employees); ambulance services; opticians; and sellers of hearing aids
- Hospitals
- Surgical centers
- Wholesale drug distributors

**What entities are exempt from the tax?**

MinnesotaCare provider taxes do not apply to the following:

- Nursing homes and various other residential care facilities, such as board and care homes, adult foster homes, boarding care homes, and adult day care centers
- Home health agencies
- Providers of personal care services
- Providers of private duty nursing services
- An entity that employs health care providers to service only their employees
- An educational institution that provides services to its students, if it does not charge students a fee for extended coverage

**What is the tax base?**

The taxes apply to the gross revenues derived from "patient services," which are defined to include most services provided to patients, such as diagnostic and therapeutic services, bed and board, and so forth. Various types of services are explicitly excluded from patient services, including the following:

- Services provided to nursing homes and in connection with assisted living and congregate housing programs
- Exams for insurance, employment, litigation, and so forth
- Certain mental health services
- Hospice services
- Various types of residential services for the developmentally disabled

| | |
|---|---|
| **What is the tax rate?** | The tax rate is 2 percent. A temporary 1.5 percent rate applied from 1998 through 2002. |
| **What exemptions apply?** | Exemptions from the tax apply to the following payments: |

- For services provided under Medicare
- For home health care services
- Those made from the state chemical dependency fund
- Those funded by charitable donations not designated for an individual or group
- Those under programs funding research on human subjects in compliance with federal law
- Those made by the federal employee and military (Tricare) health insurance plans that cover federal workers and military personnel and retirees
- Those from providers that were already subject to the tax

| | |
|---|---|
| **Are credits allowed?** | Credits are allowed for taxes paid to other states and for qualifying research expenditures. The research credit is subject to an annual cap of $2.5 million; the commissioner of revenue sets the credit rate to equal the cap amount. |
| **How is the tax paid?** | Providers make quarterly estimated payments; an annual return is filed to reconcile the estimated payments with the final liability for the tax year. All payments and returns are required to be filed and made electronically. The Department of Revenue administers the tax. Providers may itemize the tax on patient bills. |
| **How are drugs taxed?** | Legend drugs (i.e., those requiring prescriptions under FDA regulation) are taxed under a wholesale drug tax. This tax is levied on wholesale drug distributors. It applies at a 2 percent rate to the wholesale price. A use tax applies when drugs are purchased for resale in Minnesota from an out-of-state seller who does not have nexus and, thus, cannot be required to pay the tax. The use tax does not apply to purchases by individuals for their own use. |
| **How much revenue is collected from the taxes?** | In February 2010, the Department of Finance estimated that the MinnesotaCare provider taxes will yield $498.4 million in revenues for the health care access fund in fiscal year 2011. Because health costs are rising at a rapid rate and because consumption of health services is also increasing steadily, these revenues are likely to rise at a faster rate than most other state tax sources. |
| **Are these the only sources of revenue for the health care access fund?** | No, the revenues from applying the insurance premiums tax to health maintenance organizations (HMOs) and nonprofit health services corporations (such as Blue Cross) are deposited in the health care access fund and used to pay for MinnesotaCare. In addition, other revenues from the program, such as premium payments by participants and some federal funding, go to the fund. |

**For more information:** Contact legislative analyst Joel Michael at 651-296-5057.

The Research Department of the Minnesota House of Representatives is a nonpartisan office providing legislative, legal, and information services to the entire House.

Case 1:15-cv-00767-PEC   Document 54-2   Filed 05/25/18   Page 273 of 314

# CHAPTER 295
## GROSS REVENUES AND GROSS RECEIPTS TAXES

| | |
|---|---|
| 295.01 | INACTIVE. |
| 295.02 | INACTIVE. |
| 295.021 | INACTIVE. |
| 295.03 | INACTIVE. |
| 295.04 | INACTIVE. |
| 295.05 | INACTIVE. |
| 295.06 | INACTIVE. |
| 295.07 | INACTIVE. |
| 295.08 | INACTIVE. |
| 295.09 | INACTIVE. |
| 295.10 | INACTIVE. |
| 295.11 | INACTIVE. |
| 295.12 | INACTIVE. |
| 295.13 | INACTIVE. |
| 295.14 | INACTIVE. |
| 295.15 | INACTIVE. |
| 295.16 | INACTIVE. |
| 295.17 | INACTIVE. |
| 295.18 | INACTIVE. |
| 295.19 | INACTIVE. |
| 295.20 | INACTIVE. |
| 295.21 | INACTIVE. |
| 295.22 | INACTIVE. |
| 295.23 | INACTIVE. |
| 295.24 | INACTIVE. |
| 295.25 | INACTIVE. |
| 295.26 | INACTIVE. |
| 295.27 | INACTIVE. |
| 295.29 | INACTIVE. |
| 295.30 | INACTIVE. |
| 295.31 | INACTIVE. |
| 295.32 | INACTIVE. |
| 295.33 | INACTIVE. |
| 295.34 | INACTIVE. |

| | |
|---|---|
| 295.35 | INACTIVE. |
| 295.36 | INACTIVE. |
| 295.361 | INACTIVE. |
| 295.365 | INACTIVE. |
| 295.366 | INACTIVE. |
| 295.367 | INACTIVE. |
| 295.37 | INACTIVE. |
| 295.38 | INACTIVE. |
| 295.39 | INACTIVE. |
| 295.40 | INACTIVE. |
| 295.41 | INACTIVE. |
| 295.42 | INACTIVE. |
| 295.43 | INACTIVE. |
| 295.44 | INACTIVE. |
| 295.441 | INACTIVE. |
| | HOSPITALS AND HEALTH CARE PROVIDERS |
| 295.50 | DEFINITIONS. |
| 295.51 | MINIMUM CONTACTS REQUIRED FOR JURISDICTION TO TAX GROSS REVENUE. |
| 295.52 | TAXES IMPOSED. |
| 295.53 | EXEMPTIONS; SPECIAL RULES. |
| 295.54 | CREDIT FOR TAXES PAID. |
| 295.55 | PAYMENT OF TAX. |
| 295.56 | TRANSFER OF ACCOUNTS RECEIVABLE. |
| 295.57 | COLLECTION AND ENFORCEMENT; REFUNDS; APPLICATION OF OTHER CHAPTERS; ACCESS TO RECORDS; INTEREST ON OVERPAYMENTS. |
| 295.58 | DEPOSIT OF REVENUES AND PAYMENT OF REFUNDS. |
| 295.581 | PROHIBITION ON NON-MINNESOTACARE TRANSFERS FROM FUND. |
| 295.582 | AUTHORITY. |
| 295.59 | SEVERABILITY. |
| 295.60 | INACTIVE. |
| | LIQUOR |
| 295.75 | LIQUOR GROSS RECEIPTS TAX. |

**295.01** [Repealed, 1996 c 310 s 1]

**295.02** [Repealed, 1979 c 303 art 7 s 15]

**295.021** [Repealed, 1969 c 399 s 51]

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

**295.03** [Repealed, 1979 c 303 art 7 s 15]

**295.04** [Repealed, 1979 c 303 art 7 s 15]

**295.05** [Repealed, 1979 c 303 art 7 s 15]

**295.06** [Repealed, 1969 c 9 s 101; 1969 c 1147 s 22]

**295.07** [Repealed, 1969 c 9 s 101; 1969 c 1147 s 22]

**295.08** [Repealed, 1969 c 9 s 101; 1969 c 1147 s 22]

**295.09** [Repealed, 1969 c 9 s 101; 1969 c 1147 s 22]

**295.10** [Repealed, 1969 c 9 s 101; 1969 c 1147 s 22]

**295.11** [Repealed, 1969 c 1147 s 22]

**295.12** [Repealed, 1979 c 303 art 7 s 15]

**295.13** [Repealed, 1979 c 303 art 7 s 15]

**295.14** [Repealed, 1979 c 303 art 7 s 15]

**295.15** [Repealed, 1989 c 277 art 1 s 35]

**295.16** [Repealed, 1969 c 1147 s 22]

**295.17** [Repealed, 1969 c 1147 s 22]

**295.18** [Repealed, 1969 c 1147 s 22]

**295.19** [Repealed, 1969 c 1147 s 22]

**295.20** [Repealed, 1969 c 1147 s 22]

**295.21** [Repealed, 1989 c 277 art 1 s 35]

**295.22** [Repealed, 1969 c 1147 s 22]

**295.23** [Repealed, 1989 c 277 art 1 s 35]

**295.24** [Repealed, 1989 c 277 art 1 s 35]

**295.25** [Repealed, 1989 c 277 art 1 s 35]

**295.26** [Repealed, 1969 c 1147 s 22]

**295.27** [Repealed, 1989 c 277 art 1 s 35]

**295.29** [Repealed, 1989 c 277 art 1 s 35]

**295.30** [Repealed, 1989 c 277 art 1 s 35]

**295.31** [Repealed, 1989 c 277 art 1 s 35]

**295.32** [Repealed, 1987 c 268 art 11 s 11 clause (b)]

**295.33** [Repealed, 1987 c 268 art 11 s 11 clause (b)]

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

**295.34** [Repealed, 1987 c 268 art 11 s 11 clause (b)]

**295.35** [Repealed, 1969 c 1147 s 22]

**295.36** [Repealed, 1987 c 268 art 11 s 11 clause (b)]

**295.361** [Repealed, 1969 c 399 s 51]

**295.365** [Repealed, 1987 c 268 art 11 s 11 clause (b)]

**295.366** [Repealed, 1987 c 268 art 11 s 11 clause (b)]

**295.367** [Repealed, 1992 c 511 art 8 s 38]

**295.37** [Repealed, 1996 c 471 art 9 s 16]

**295.38** [Repealed, 1973 c 650 art 27 s 1]

**295.39** [Repealed, 1996 c 471 art 9 s 16]

**295.40** [Repealed, 1996 c 471 art 9 s 16]

**295.41** [Repealed, 1996 c 471 art 9 s 16]

**295.42** [Repealed, 1996 c 471 art 9 s 16]

**295.43** [Repealed, 1996 c 471 art 9 s 16]

**295.44** [Repealed, 2002 c 377 art 10 s 32]

**295.441** MS 2006 [Renumbered 15.001]

## HOSPITALS AND HEALTH CARE PROVIDERS

### 295.50 DEFINITIONS.

Subdivision 1. **Definitions.** For purposes of sections 295.50 to 295.59, the following terms have the meanings given.

Subd. 1a. **Blood components.** "Blood components" means the parts of the blood that are separated from blood by physical or mechanical means and are intended for transfusion. Blood components do not include blood derivatives.

Subd. 2. **Commissioner.** "Commissioner" is the commissioner of revenue.

Subd. 2a. **Delivered outside of Minnesota.** "Delivered outside of Minnesota" means property which the seller delivers to a common carrier for delivery outside Minnesota, places in the United States mail or parcel post directed to the purchaser outside Minnesota, or delivers to the purchaser outside Minnesota by means of the seller's own delivery vehicles, and which is not later returned to a point within Minnesota, except in the course of interstate commerce.

Subd. 3. **Gross revenues.** "Gross revenues" are total amounts received in money or otherwise by:

(1) a hospital for patient services;

(2) a surgical center for patient services;

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

Case 1:15-cv-00767-PEC   Document 54-2   Filed 05/25/18   Page 276 of 314

(3) a health care provider, other than a staff model health carrier, for patient services;

(4) a wholesale drug distributor for sale or distribution of legend drugs that are delivered in Minnesota by the wholesale drug distributor, by common carrier, or by mail, unless the legend drugs are delivered to another wholesale drug distributor who sells legend drugs exclusively at wholesale. Legend drugs do not include nutritional products as defined in Minnesota Rules, part 9505.0325, and blood and blood components; and

(5) a staff model health plan company as gross premiums for enrollees, co-payments, deductibles, coinsurance, and fees for patient services.

Subd. 4. **Health care provider.** (a) "Health care provider" means:

(1) a person whose health care occupation is regulated or required to be regulated by the state of Minnesota furnishing any or all of the following goods or services directly to a patient or consumer: medical, surgical, optical, visual, dental, hearing, nursing services, drugs, laboratory, diagnostic or therapeutic services;

(2) a person who provides goods and services not listed in clause (1) that qualify for reimbursement under the medical assistance program provided under chapter 256B;

(3) a staff model health plan company;

(4) an ambulance service required to be licensed; or

(5) a person who sells or repairs hearing aids and related equipment or prescription eyewear.

(b) Health care provider does not include:

(1) hospitals; medical supplies distributors, except as specified under paragraph (a), clause (5); nursing homes licensed under chapter 144A or licensed in any other jurisdiction; wholesale drug distributors; pharmacies; surgical centers; bus and taxicab transportation, or any other providers of transportation services other than ambulance services required to be licensed; supervised living facilities for persons with developmental disabilities, licensed under Minnesota Rules, parts 4665.0100 to 4665.9900; housing with services establishments required to be registered under chapter 144D; board and lodging establishments providing only custodial services that are licensed under chapter 157 and registered under section 157.17 to provide supportive services or health supervision services; adult foster homes as defined in Minnesota Rules, part 9555.5105; day training and habilitation services for adults with developmental disabilities as defined in section 252.41, subdivision 3; boarding care homes, as defined in Minnesota Rules, part 4655.0100; and adult day care centers as defined in Minnesota Rules, part 9555.9600;

(2) home health agencies as defined in Minnesota Rules, part 9505.0175, subpart 15; a person providing personal care services and supervision of personal care services as defined in Minnesota Rules, part 9505.0335; a person providing private duty nursing services as defined in Minnesota Rules, part 9505.0360; and home care providers required to be licensed under chapter 144A;

(3) a person who employs health care providers solely for the purpose of providing patient services to its employees;

(4) an educational institution that employs health care providers solely for the purpose of providing patient services to its students if the institution does not receive fee for service payments or payments for extended coverage; and

(5) a person who receives all payments for patient services from health care providers, surgical centers, or hospitals for goods and services that are taxable to the paying health care

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

Case 1:15-cv-00767-PEC   Document 54-2   Filed 05/25/18   Page 277 of 314

providers, surgical centers, or hospitals, as provided under section 295.53, subdivision 1, clause (3) or (4), or from a source of funds that is exempt from tax under this chapter.

Subd. 5. [Repealed, 1993 c 345 art 13 s 24]

Subd. 6. **Home health care services.** "Home health care services" are services:

(1) defined under the state medical assistance program as home health agency services provided by a home health agency, personal care services and supervision of personal care services, private duty nursing services, and waivered services or services by home care providers required to be licensed under chapter 144A; and

(2) provided at a recipient's residence, if the recipient does not live in a hospital, nursing facility, as defined in section 62A.46, subdivision 3, or intermediate care facility for persons with developmental disabilities as defined in section 256B.055, subdivision 12, paragraph (d).

Subd. 6a. **Hospice care services.** "Hospice care services" are services:

(1) as defined in Minnesota Rules, part 9505.0297; and

(2) provided at a recipient's residence, if the recipient does not live in a hospital, nursing facility as defined in section 62A.46, subdivision 3, or intermediate care facility for persons with developmental disabilities as defined in section 256B.055, subdivision 12, paragraph (d).

Subd. 7. **Hospital.** "Hospital" means a hospital licensed under chapter 144, or a hospital licensed by any other jurisdiction.

Subd. 8. [Repealed, 1996 c 471 art 6 s 13]

Subd. 9. [Repealed, 1996 c 471 art 6 s 13]

Subd. 9a. [Repealed, 1996 c 471 art 6 s 13]

Subd. 9b. **Patient services.** (a) "Patient services" means inpatient and outpatient services and other goods and services provided by hospitals, surgical centers, or health care providers. They include the following health care goods and services provided to a patient or consumer:

(1) bed and board;

(2) nursing services and other related services;

(3) use of hospitals, surgical centers, or health care provider facilities;

(4) medical social services;

(5) drugs, biologicals, supplies, appliances, and equipment;

(6) other diagnostic or therapeutic items or services;

(7) medical or surgical services;

(8) items and services furnished to ambulatory patients not requiring emergency care; and

(9) emergency services.

(b) "Patient services" does not include:

(1) services provided to nursing homes licensed under chapter 144A;

(2) examinations for purposes of utilization reviews, insurance claims or eligibility, litigation, and employment, including reviews of medical records for those purposes;

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

(3) services provided to and by community residential mental health facilities licensed under Minnesota Rules, parts 9520.0500 to 9520.0690, and to and by residential treatment programs for children with severe emotional disturbance licensed or certified under chapter 245A;

(4) services provided to and by community support programs and family community support programs approved under Minnesota Rules, parts 9535.1700 to 9535.1760, or certified as mental health rehabilitative services under chapter 256B;

(5) services provided to and by community mental health centers as defined in section 245.62, subdivision 2;

(6) services provided to and by assisted living programs and congregate housing programs;

(7) hospice care services;

(8) home and community-based waivered services under sections 256B.0915, 256B.49, 256B.491, and 256B.501;

(9) targeted case management services under sections 256B.0621; 256B.0625, subdivisions 20, 20a, 33, and 44; and 256B.094; and

(10) services provided to the following: supervised living facilities for persons with developmental disabilities licensed under Minnesota Rules, parts 4665.0100 to 4665.9900; housing with services establishments required to be registered under chapter 144D; board and lodging establishments providing only custodial services that are licensed under chapter 157 and registered under section 157.17 to provide supportive services or health supervision services; adult foster homes as defined in Minnesota Rules, part 9555.5105; day training and habilitation services for adults with developmental disabilities as defined in section 252.41, subdivision 3; boarding care homes as defined in Minnesota Rules, part 4655.0100; adult day care services as defined in section 245A.02, subdivision 2a; and home health agencies as defined in Minnesota Rules, part 9505.0175, subpart 15, or licensed under chapter 144A.

Subd. 9c. **Person.** "Person" means an individual, partnership, limited liability company, corporation, association, governmental unit or agency, or public or private organization of any kind.

Subd. 10. [Repealed, 1993 c 345 art 13 s 24]

Subd. 10a. **Pharmacy.** "Pharmacy" means a pharmacy required to be licensed under chapter 151, or a pharmacy required to be licensed by any other jurisdiction.

Subd. 10b. **Regional treatment center.** "Regional treatment center" means a regional center as defined in section 253B.02, subdivision 18, and named in sections 253.015, subdivision 1, and 254.05.

Subd. 11. [Repealed, 1996 c 471 art 6 s 13]

Subd. 12. [Repealed, 1996 c 471 art 6 s 13]

Subd. 12a. [Repealed, 1996 c 471 art 6 s 13]

Subd. 12b. **Staff model health plan company.** "Staff model health plan company" means a health plan company as defined in section 62Q.01, subdivision 4, which employs one or more types of health care provider to deliver health care services to the health plan company's enrollees.

Subd. 13. **Surgical center.** "Surgical center" is an outpatient surgical center as defined in Minnesota Rules, chapter 4675, or a similar facility located in any other jurisdiction.

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

Subd. 14. **Wholesale drug distributor.** "Wholesale drug distributor" means a wholesale drug distributor required to be licensed under sections 151.42 to 151.51.

Subd. 15. **Legend drug.** "Legend drug" means a drug that is required by federal law to bear one of the following statements: "Caution: Federal law prohibits dispensing without prescription" or "Rx only."

**History:** *1992 c 549 art 9 s 5; 1993 c 345 art 13 s 3-10; 1Sp1993 c 6 s 19-23; 1994 c 625 art 8 s 64,65; art 13 s 6-9; 1995 c 234 art 9 s 4-6; 1995 c 264 art 18 s 1,2; 1996 c 305 art 1 s 65; 1996 c 471 art 6 s 1-3; 1997 c 31 art 4 s 1-5; 1997 c 84 art 4 s 1,2; 1997 c 225 art 3 s 4-9,23; 1997 c 251 s 28; 1999 c 243 art 8 s 1; 2000 c 490 art 9 s 2; 1Sp2001 c 5 art 14 s 2-4; 2003 c 127 art 7 s 2; 2004 c 288 art 6 s 25; 2005 c 56 s 1; 1Sp2005 c 3 art 6 s 5,6; 2006 c 212 art 3 s 27; 2006 c 259 art 7 s 3; 2008 c 366 art 14 s 3*

## 295.51 MINIMUM CONTACTS REQUIRED FOR JURISDICTION TO TAX GROSS REVENUE.

Subdivision 1. **Business transactions in Minnesota.** A hospital, surgical center, or health care provider is subject to tax under sections 295.50 to 295.59 if it is "transacting business in Minnesota." A hospital, surgical center, or health care provider is transacting business in Minnesota if it maintains contacts with or presence in the state of Minnesota sufficient to permit taxation of gross revenues received for patient services under the United States Constitution.

Subd. 1a. **Nexus in Minnesota.** A wholesale drug distributor has nexus in Minnesota if its contacts with or presence in Minnesota is sufficient to satisfy the requirements of the United States Constitution.

Subd. 2. [Repealed, 1993 c 345 art 13 s 24]

**History:** *1992 c 549 art 9 s 6; 1993 c 345 art 13 s 11; 1Sp1993 c 6 s 24; 1996 c 471 art 6 s 4,5; 1997 c 31 art 4 s 6; 1997 c 225 art 3 s 10,23; 1997 c 251 s 28*

## 295.52 TAXES IMPOSED.

Subdivision 1. **Hospital tax.** A tax is imposed on each hospital equal to two percent of its gross revenues.

Subd. 1a. **Surgical center tax.** A tax is imposed on each surgical center equal to two percent of its gross revenues.

Subd. 1b. [Repealed, 1997 c 225 art 3 s 23]

Subd. 2. **Provider tax.** A tax is imposed on each health care provider equal to two percent of its gross revenues.

Subd. 3. **Wholesale drug distributor tax.** A tax is imposed on each wholesale drug distributor equal to two percent of its gross revenues.

Subd. 4. **Use tax; legend drugs.** (a) A person that receives legend drugs for resale or use in Minnesota, other than from a wholesale drug distributor that is subject to tax under subdivision 3, is subject to a tax equal to the price paid for the legend drugs multiplied by the tax percentage specified in this section. Liability for the tax is incurred when legend drugs are received or delivered in Minnesota by the person.

(b) A tax imposed under this subdivision does not apply to purchases by an individual for personal consumption.

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

Subd. 4a. **Tax collection.** A wholesale drug distributor with nexus in Minnesota, who is not subject to tax under subdivision 3, on all or a particular transaction is required to collect the tax imposed under subdivision 4, from the purchaser of the drugs and give the purchaser a receipt for the tax paid. The tax collected shall be remitted to the commissioner in the manner prescribed by section 295.55, subdivision 3.

Subd. 5. **Volunteer ambulance services.** Volunteer ambulance services are not subject to the tax under this section. For purposes of this requirement, "volunteer ambulance service" means an ambulance service in which all of the individuals whose primary responsibility is direct patient care meet the definition of volunteer under section 144E.001, subdivision 15. The ambulance service may employ administrative and support staff, and remain eligible for this exemption, if the primary responsibility of these staff is not direct patient care.

Subd. 6. **Hearing aids and prescription eyewear.** The tax liability of a person who meets the definition of a health care provider solely because the person sells or repairs hearing aids and related equipment or prescription eyewear is limited to the gross revenues received from the sale or repair of these items.

Subd. 7. **Tax reduction.** Notwithstanding subdivisions 1, 1a, 2, 3, and 4, the tax imposed under this section equals for calendar years 1998 to 2003, 1.5 percent of the gross revenues received on or after January 1, 1998, and before January 1, 2004.

**History:** *1992 c 549 art 9 s 7; 1993 c 345 art 13 s 12,13; 1Sp1993 c 6 s 25; 1994 c 625 art 13 s 10; 1996 c 471 art 6 s 6; 1997 c 31 art 4 s 7; 1997 c 84 art 4 s 3; 1997 c 199 s 14; 1997 c 225 art 3 s 11-13,23; 1997 c 251 s 27,28; 1998 c 389 art 16 s 13,14; 1999 c 8 s 5; 1999 c 243 art 8 s 2; 1Sp2001 c 5 art 14 s 5,6; 1Sp2005 c 3 art 6 s 7; 2008 c 154 art 14 s 5,6; 2008 c 366 art 14 s 4*

## 295.53 EXEMPTIONS; SPECIAL RULES.

Subdivision 1. **Exemptions.** (a) The following payments are excluded from the gross revenues subject to the hospital, surgical center, or health care provider taxes under sections 295.50 to 295.59:

(1) payments received for services provided under the Medicare program, including payments received from the government, and organizations governed by sections 1833 and 1876 of title XVIII of the federal Social Security Act, United States Code, title 42, section 1395, and enrollee deductibles, coinsurance, and co-payments, whether paid by the Medicare enrollee or by a Medicare supplemental coverage as defined in section 62A.011, subdivision 3, clause (10), or by Medicaid payments under title XIX of the federal Social Security Act. Payments for services not covered by Medicare are taxable;

(2) payments received for home health care services;

(3) payments received from hospitals or surgical centers for goods and services on which liability for tax is imposed under section 295.52 or the source of funds for the payment is exempt under clause (1), (7), (10), or (14);

(4) payments received from health care providers for goods and services on which liability for tax is imposed under this chapter or the source of funds for the payment is exempt under clause (1), (7), (10), or (14);

(5) amounts paid for legend drugs, other than nutritional products and blood and blood components, to a wholesale drug distributor who is subject to tax under section 295.52, subdivision 3, reduced by reimbursements received for legend drugs otherwise exempt under this chapter;

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

Case 1:15-cv-00767-PEC   Document 54-2   Filed 05/25/18   Page 281 of 314

(6) payments received by a health care provider or the wholly owned subsidiary of a health care provider for care provided outside Minnesota;

(7) payments received from the chemical dependency fund under chapter 254B;

(8) payments received in the nature of charitable donations that are not designated for providing patient services to a specific individual or group;

(9) payments received for providing patient services incurred through a formal program of health care research conducted in conformity with federal regulations governing research on human subjects. Payments received from patients or from other persons paying on behalf of the patients are subject to tax;

(10) payments received from any governmental agency for services benefiting the public, not including payments made by the government in its capacity as an employer or insurer or payments made by the government for services provided under general assistance medical care, the MinnesotaCare program, or the medical assistance program governed by title XIX of the federal Social Security Act, United States Code, title 42, sections 1396 to 1396v;

(11) government payments received by the commissioner of human services for state-operated services;

(12) payments received by a health care provider for hearing aids and related equipment or prescription eyewear delivered outside of Minnesota;

(13) payments received by an educational institution from student tuition, student activity fees, health care service fees, government appropriations, donations, or grants, and for services identified in and provided under an individualized education plan as defined in section 256B.0625 or Code of Federal Regulations, chapter 34, section 300.340(a). Fee for service payments and payments for extended coverage are taxable;

(14) payments received under the federal Employees Health Benefits Act, United States Code, title 5, section 8909(f), as amended by the Omnibus Reconciliation Act of 1990. Enrollee deductibles, coinsurance, and co-payments are subject to tax; and

(15) payments received under the federal Tricare program, Code of Federal Regulations, title 32, section 199.17(a)(7). Enrollee deductibles, coinsurance, and co-payments are subject to tax.

(b) Payments received by wholesale drug distributors for legend drugs sold directly to veterinarians or veterinary bulk purchasing organizations are excluded from the gross revenues subject to the wholesale drug distributor tax under sections 295.50 to 295.59.

Subd. 2. **Deductions for staff model health plan company.** In addition to the exemptions allowed under subdivision 1, a staff model health plan company may deduct from its gross revenues for the year:

(1) amounts paid to hospitals, surgical centers, and health care providers that are not employees of the staff model health plan company for services on which liability for the tax is imposed under section 295.52;

(2) net amounts added to reserves, to the extent that the amounts added do not cause total reserves to exceed 200 percent of the statutory net worth requirement, the calculation of which may be determined on a consolidated basis, taking into account the amounts held in reserve by affiliated staff model health plan companies;

(3) assessments for the comprehensive health insurance plan under section 62E.11; and

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

Case 1:15-cv-00767-PEC   Document 54-2   Filed 05/25/18   Page 282 of 314

(4) amounts spent for administration as reported as total administration to the Department of Health in the statement of revenues, expenses, and net worth pursuant to section 62D.08, subdivision 3, clause (a).

Subd. 3. **Separate statement of tax.** A hospital, surgical center, health care provider, or wholesale drug distributor must not state the tax obligation under section 295.52 in a deceptive or misleading manner. It must not separately state tax obligations on bills provided to patients, consumers, or other payers when the amount received for the services or goods is not subject to tax.

Pharmacies that separately state the tax obligations on bills provided to consumers or to other payers who purchase legend drugs may state the tax obligation as the wholesale price of the legend drugs multiplied by the tax percentage specified in section 295.52. Pharmacies must not state the tax obligation based on the retail price.

Whenever the commissioner determines that a person has engaged in any act or practice constituting a violation of this subdivision, the commissioner may bring an action in the name of the state in the district court of the appropriate county to enjoin the act or practice and to enforce compliance with this subdivision, or the commissioner may refer the matter to the attorney general or the county attorney of the appropriate county. Upon a proper showing, a permanent or temporary injunction, restraining order, or other appropriate relief must be granted.

Subd. 4. [Expired]

Subd. 4a. **Credit for research.** (a) In addition to the exemptions allowed under subdivision 1, a hospital or health care provider may claim an annual credit against the total amount of tax, if any, the hospital or health care provider owes for that calendar year under sections 295.50 to 295.57. The credit shall equal 2.5 percent of revenues for patient services used to fund expenditures for qualifying research conducted by an allowable research program. The amount of the credit shall not exceed the tax liability of the hospital or health care provider under sections 295.50 to 295.57.

(b) For purposes of this subdivision, the following requirements apply:

(1) expenditures must be for program costs of qualifying research conducted by an allowable research program;

(2) an allowable research program must be a formal program of medical and health care research conducted by an entity which is exempt under section 501(c)(3) of the Internal Revenue Code as defined in section 289A.02, subdivision 7, or is owned and operated under authority of a governmental unit;

(3) qualifying research must:

(A) be approved in writing by the governing body of the hospital or health care provider which is taking the deduction under this subdivision;

(B) have as its purpose the development of new knowledge in basic or applied science relating to the diagnosis and treatment of conditions affecting the human body;

(C) be subject to review by individuals with expertise in the subject matter of the proposed study but who have no financial interest in the proposed study and are not involved in the conduct of the proposed study; and

(D) be subject to review and supervision by an institutional review board operating in conformity with federal regulations if the research involves human subjects or an institutional

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

Case 1:15-cv-00767-PEC   Document 54-2   Filed 05/25/18   Page 283 of 314

animal care and use committee operating in conformity with federal regulations if the research involves animal subjects. Research expenses are not exempt if the study is a routine evaluation of health care methods or products used in a particular setting conducted for the purpose of making a management decision. Costs of clinical research activities paid directly for the benefit of an individual patient are excluded from this exemption. Basic research in fields including biochemistry, molecular biology, and physiology are also included if such programs are subject to a peer review process.

(c) No credit shall be allowed under this subdivision for any revenue received by the hospital or health care provider in the form of a grant, gift, or otherwise, whether from a government or nongovernment source, on which the tax liability under section 295.52 is not imposed.

(d) The taxpayer shall apply for the credit under this section on the annual return under section 295.55, subdivision 5.

(e) Beginning September 1, 2001, if the actual or estimated amount paid under this section for the calendar year exceeds $2,500,000, the commissioner of management and budget shall determine the rate of the research credit for the following calendar year to the nearest one-half percent so that refunds paid under this section will most closely equal $2,500,000. The commissioner of management and budget shall publish in the State Register by October 1 of each year the rate of the credit for the following calendar year. A determination under this section is not subject to the rulemaking provisions of chapter 14.

Subd. 5. [Repealed, 1997 c 225 art 3 s 23]

**History:** *1992 c 549 art 9 s 8; 1993 c 345 art 13 s 14-17; 1Sp1993 c 6 s 26,27; 1994 c 625 art 13 s 11-13; 1995 c 234 art 9 s 7-9; 1995 c 264 art 14 s 2; art 18 s 3,4; 1996 c 471 art 6 s 7,8; 1997 c 31 art 4 s 8-10; 1997 c 84 art 4 s 4; 1997 c 225 art 3 s 14-17,23; 1997 c 251 s 28; 1998 c 300 art 3 s 8; 1999 c 243 art 8 s 3; 2000 c 490 art 9 s 3; 2002 c 377 art 9 s 7; 2003 c 127 art 7 s 3; 1Sp2003 c 14 art 12 s 87; 2004 c 288 art 6 s 26; 1Sp2005 c 3 art 6 s 8; 2006 c 259 art 7 s 4; 2008 c 366 art 11 s 17; 2009 c 101 art 2 s 109*

## 295.54 CREDIT FOR TAXES PAID.

Subdivision 1. **Taxes paid to another state.** A hospital, surgical center, or health care provider that has paid taxes to another jurisdiction measured by gross revenues and is subject to tax under sections 295.52 to 295.59 on the same gross revenues is entitled to a credit for the tax legally due and paid to another jurisdiction to the extent of the lesser of (1) the tax actually paid to the other jurisdiction, or (2) the amount of tax imposed by Minnesota on the gross revenues subject to tax in the other taxing jurisdictions.

Subd. 2. **Pharmacy refund.** A pharmacy may claim an annual refund against the total amount of tax, if any, the pharmacy owes during that calendar year under section 295.52, subdivision 4. The refund shall equal the amount paid by the pharmacy to a wholesale drug distributor subject to tax under section 295.52, subdivision 3, for legend drugs delivered by the pharmacy outside of Minnesota, multiplied by the tax percentage specified in section 295.52, subdivision 3. If the amount of the refund exceeds the tax liability of the pharmacy under section 295.52, subdivision 4, the commissioner shall provide the pharmacy with a refund equal to the excess amount. Each qualifying pharmacy must apply for the refund on the annual return as provided under section 295.55, subdivision 5. The refund must be claimed within 18 months from the date the drugs were delivered outside of Minnesota. Interest on refunds paid under this subdivision will begin to accrue 60 days after the date a claim for refund is filed. For purposes of

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

this subdivision, the date a claim is filed is the due date of the return if a return is due or the date of the actual claim for refund, whichever is later.

Subd. 3. **Wholesale drug distributor credit.** A wholesale drug distributor who has paid taxes to another state or province or territory of Canada measured by gross revenues or sales and is subject to tax under sections 295.52 to 295.59 on the same gross revenues or sales is entitled to a credit for the tax legally due and paid to another state or province or territory of Canada to the extent of the lesser of (1) the tax actually paid to the other state or province or territory of Canada or (2) the amount of tax imposed by Minnesota on the gross revenues or sales subject to tax in the other taxing jurisdictions.

**History:** *1992 c 549 art 9 s 9; 1993 c 345 art 13 s 18; 1Sp1993 c 6 s 28; 1994 c 625 art 13 s 14; 1996 c 471 art 6 s 9-11; 1997 c 31 art 4 s 11; 1997 c 225 art 3 s 18,19,23; 1997 c 251 s 28; 2008 c 154 art 14 s 7*

## 295.55 PAYMENT OF TAX.

Subdivision 1. **Scope.** The provisions of this section apply to the taxes imposed under sections 295.50 to 295.58.

Subd. 2. **Estimated tax; hospitals; surgical centers.** (a) Each hospital or surgical center must make estimated payments of the taxes for the calendar year in monthly installments to the commissioner within 15 days after the end of the month.

(b) Estimated tax payments are not required of hospitals or surgical centers if: (1) the tax for the current calendar year is $500 or less; or (2) the tax for the previous calendar year is $500 or less.

(c) Underpayment of estimated installments bear interest at the rate specified in section 270C.40, from the due date of the payment until paid or until the due date of the annual return whichever comes first. An underpayment of an estimated installment is the difference between the amount paid and the lesser of (1) 90 percent of one-twelfth of the tax for the calendar year or (2) one-twelfth of the total tax for the previous calendar year.

Subd. 3. **Estimated tax; other taxpayers.** (a) Each taxpayer, other than a hospital or surgical center, must make estimated payments of the taxes for the calendar year in quarterly installments to the commissioner by April 15, July 15, October 15, and January 15 of the following calendar year.

(b) Estimated tax payments are not required if: (1) the tax for the current calendar year is $500 or less; or (2) the tax for the previous calendar year is $500 or less.

(c) Underpayment of estimated installments bear interest at the rate specified in section 270C.40, from the due date of the payment until paid or until the due date of the annual return whichever comes first. An underpayment of an estimated installment is the difference between the amount paid and the lesser of (1) 90 percent of one-quarter of the tax for the calendar year or (2) one-quarter of the total tax for the previous calendar year.

Subd. 4. **Electronic payments.** A taxpayer with an aggregate tax liability of:

(1) $20,000 or more in the fiscal year ending June 30, 2005; or

(2) $10,000 or more in the fiscal year ending June 30, 2006, and fiscal years thereafter,

must remit all liabilities by electronic means in the subsequent calendar year.

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

Subd. 5. **Annual return.** The taxpayer must file an annual return reconciling the estimated payments by March 15 of the following calendar year.

Subd. 6. **Form of returns.** The estimated payments and annual return must contain the information and be in the form prescribed by the commissioner.

Subd. 7. **Extensions for filing returns.** If good cause exists, the commissioner may extend the time for filing MinnesotaCare tax returns for not more than 60 days.

**History:** *1992 c 549 art 9 s 10; 1993 c 345 art 13 s 19; 1994 c 625 art 13 s 15,16; 1995 c 234 art 9 s 10; 1995 c 264 art 18 s 5; 1997 c 84 art 4 s 5; 1997 c 225 art 3 s 20,23; 1997 c 251 s 28; 1999 c 243 art 8 s 4,5; 1Sp2001 c 5 art 17 s 14; 1Sp2003 c 14 art 7 s 68; 2005 c 151 art 2 s 17; 1Sp2005 c 3 art 9 s 4; 2010 c 389 art 6 s 2,3*

## 295.56 TRANSFER OF ACCOUNTS RECEIVABLE.

When a hospital, surgical center, health care provider, or wholesale drug distributor transfers, assigns, or sells accounts receivable to another person who is subject to tax under this chapter, liability for the tax on the accounts receivable is imposed on the transferee, assignee, or buyer of the accounts receivable. No liability for these accounts receivable is imposed on the transferor, assignor, or seller of the accounts receivable.

**History:** *1995 c 234 art 9 s 11; 2009 c 88 art 9 s 5*

## 295.57 COLLECTION AND ENFORCEMENT; REFUNDS; APPLICATION OF OTHER CHAPTERS; ACCESS TO RECORDS; INTEREST ON OVERPAYMENTS.

Subdivision 1. **Application of other chapters.** Unless specifically provided otherwise by sections 295.50 to 295.59, the interest, criminal penalties, and refunds provisions in chapter 289A, the civil penalty provisions applicable to withholding and sales taxes under section 289A.60, and the audit, assessment, appeal, collection, enforcement, and administrative provisions of chapters 270C and 289A, apply to taxes imposed under sections 295.50 to 295.59.

Subd. 2. **Access to records.** For purposes of administering the taxes imposed by sections 295.50 to 295.59, the commissioner may access patients' records that contain billing or other financial information without prior consent from the patients. The data collected is classified as private or nonpublic data.

Subd. 3. **Interest on overpayments.** Interest must be paid on an overpayment refunded or credited to the taxpayer from the date of payment of the tax until the date the refund is paid or credited. For purposes of this subdivision, the date of payment is the due date of the return or the date of actual payment of the tax, whichever is later.

Subd. 4. **Sampling techniques.** The commissioner may use statistical or other sampling techniques consistent with generally accepted auditing standards in examining returns or records and making assessments.

Subd. 5. **Exemption for amounts paid for legend drugs.** If a hospital, surgical center, or health care provider cannot determine the actual cost or reimbursement of legend drugs under the exemption provided in section 295.53, subdivision 1, paragraph (a), clause (5), the following method must be used:

A hospital, surgical center, or health care provider must determine the amount paid for legend drugs used during the month or quarter and multiply that amount by a ratio, the numerator of which is the total amount received for taxable patient services, and the denominator of which is

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

Case 1:15-cv-00767-PEC Document 54-2 Filed 05/25/18 Page 286 of 314

the total amount received for all patient services, including amounts exempt under section 295.53, subdivision 1. The result represents the allowable exemption for the monthly or quarterly cost of drugs.

**History:** *1992 c 549 art 9 s 11; 1993 c 345 art 13 s 20; 1995 c 234 art 9 s 12; 1995 c 264 art 18 s 6; 1999 c 243 art 8 s 6; 1Sp2001 c 5 art 14 s 7; 2002 c 377 art 9 s 8; 2005 c 151 art 2 s 11; 2009 c 88 art 9 s 6*

## 295.58 DEPOSIT OF REVENUES AND PAYMENT OF REFUNDS.

The commissioner shall deposit all revenues, including penalties and interest, derived from the taxes imposed by sections 295.50 to 295.57 and from the insurance premiums tax imposed by section 297I.05, subdivision 5, on health maintenance organizations, community integrated service networks, and nonprofit health service plan corporations in the health care access fund. There is annually appropriated from the health care access fund to the commissioner of revenue the amount necessary to make refunds under this chapter.

**History:** *1992 c 549 art 9 s 12; 1993 c 345 art 13 s 21; 1994 c 625 art 13 s 17; 1997 c 225 art 2 s 62; 2000 c 394 art 2 s 26; 2000 c 490 art 9 s 4*

## 295.581 PROHIBITION ON NON-MINNESOTACARE TRANSFERS FROM FUND.

Notwithstanding any law to the contrary, and notwithstanding section 645.33, money in the health care access fund shall be appropriated only for purposes that are consistent with past and current MinnesotaCare appropriations in Laws 1992, chapter 549; Laws 1993, chapter 345; Laws 1994, chapter 625; and Laws 1995, chapter 234, or for initiatives that are part of the section 1115 of the Social Security Act health care reform waiver submitted to the federal Centers for Medicare and Medicaid Services by the commissioner of human services as appropriated in Laws 1995, chapter 234.

**History:** *1995 c 234 art 9 s 13; 2002 c 277 s 32*

## 295.582 AUTHORITY.

Subdivision 1. **Tax expense transfer.** (a) A hospital, surgical center, or health care provider that is subject to a tax under section 295.52, or a pharmacy that has paid additional expense transferred under this section by a wholesale drug distributor, may transfer additional expense generated by section 295.52 obligations on to all third-party contracts for the purchase of health care services on behalf of a patient or consumer. Nothing shall prohibit a pharmacy from transferring the additional expense generated under section 295.52 to a pharmacy benefits manager. The additional expense transferred to the third-party purchaser or a pharmacy benefits manager must not exceed the tax percentage specified in section 295.52 multiplied against the gross revenues received under the third-party contract, and the tax percentage specified in section 295.52 multiplied against co-payments and deductibles paid by the individual patient or consumer. The expense must not be generated on revenues derived from payments that are excluded from the tax under section 295.53. All third-party purchasers of health care services including, but not limited to, third-party purchasers regulated under chapter 60A, 62A, 62C, 62D, 62H, 62N, 64B, 65A, 65B, 79, or 79A, or under section 471.61 or 471.617, and pharmacy benefits managers must pay the transferred expense in addition to any payments due under existing contracts with the hospital, surgical center, pharmacy, or health care provider, to the extent allowed under federal law. A third-party purchaser of health care services includes, but is not limited to, a health carrier or community integrated service network that pays for health care services on behalf of patients or

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

that reimburses, indemnifies, compensates, or otherwise insures patients for health care services. For purposes of this section, a pharmacy benefits manager means an entity that performs pharmacy benefits management. A third-party purchaser or pharmacy benefits manager shall comply with this section regardless of whether the third-party purchaser or pharmacy benefits manager is a for-profit, not-for-profit, or nonprofit entity. A wholesale drug distributor may transfer additional expense generated by section 295.52 obligations to entities that purchase from the wholesaler, and the entities must pay the additional expense. Nothing in this section limits the ability of a hospital, surgical center, pharmacy, wholesale drug distributor, or health care provider to recover all or part of the section 295.52 obligation by other methods, including increasing fees or charges.

(b) Any hospital, surgical center, or health care provider subject to a tax under section 295.52 or a pharmacy that has paid additional expense transferred under this section by a wholesale drug distributor may file a complaint with the commissioner responsible for regulating the third-party purchaser if at any time the third-party purchaser fails to comply with paragraph (a).

(c) If the commissioner responsible for regulating the third-party purchaser finds at any time that the third-party purchaser has not complied with paragraph (a), the commissioner may take enforcement action against a third-party purchaser which is subject to the commissioner's regulatory jurisdiction and which does not allow a hospital, surgical center, pharmacy, or provider to pass-through the tax. The commissioner may by order fine or censure the third-party purchaser or revoke or suspend the certificate of authority or license of the third-party purchaser to do business in this state if the commissioner finds that the third-party purchaser has not complied with this section. The third-party purchaser may appeal the commissioner's order through a contested case hearing in accordance with chapter 14.

Subd. 2. **Agreement.** A contracting agreement between a third-party purchaser or a pharmacy benefits manager and a resident or nonresident pharmacy registered under chapter 151, may not prohibit:

(1) a pharmacy that has paid additional expense transferred under this section by a wholesale drug distributor from exercising its option under this section to transfer such additional expenses generated by the section 295.52 obligations on to the third-party purchaser or pharmacy benefits manager; or

(2) a pharmacy that is subject to tax under section 295.52, subdivision 4, from exercising its option under this section to recover all or part of the section 295.52 obligations from the third-party purchaser or a pharmacy benefits manager.

**History:** *1993 c 345 art 13 s 22; 1Sp1993 c 6 s 29; 1994 c 625 art 13 s 18; 1995 c 234 art 9 s 14; 1997 c 31 art 4 s 12; 1997 c 225 art 3 s 21,23; 1997 c 251 s 28; 2005 c 77 s 7; 1Sp2005 c 4 art 5 s 15*

## 295.59 SEVERABILITY.

If any section, subdivision, clause, or phrase of sections 295.50 to 295.582 is for any reason held to be unconstitutional or in violation of federal law, the decision shall not affect the validity of the remaining portions of sections 295.50 to 295.582. The legislature declares that it would have passed sections 295.50 to 295.582 and each section, subdivision, sentence, clause, and phrase thereof, irrespective of the fact that any one or more sections, subdivisions, sentences, clauses, or phrases is declared unconstitutional.

**History:** *1992 c 549 art 9 s 13; 1993 c 345 art 13 s 23*

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

**295.60** [Repealed, 2008 c 154 art 12 s 41]

## LIQUOR

### 295.75 LIQUOR GROSS RECEIPTS TAX.

Subdivision 1. **Definitions.** (a) For purposes of this section, the following terms have the meanings given.

(b) "Commissioner" means the commissioner of revenue.

(c) "Gross receipts" means the total amount received, in money or by barter or exchange, for all liquor sales at retail as measured by the sales price, but does not include any taxes imposed directly on the consumer that are separately stated on the invoice, bill of sale, or similar document given to the purchaser.

(d) "Liquor" means:

(1) intoxicating liquor, as defined in section 340A.101, subdivision 14;

(2) beverage containing intoxicating liquor; and

(3) 3.2 percent malt liquor, as defined in section 340A.101, subdivision 19, when sold at an on-sale or off-sale municipal liquor store or other establishment licensed to sell any type of intoxicating liquor.

(e) "Liquor retailer" means a retailer that sells liquor.

(f) "Retail sale" has the meaning given in section 297A.61, subdivision 4.

Subd. 2. **Gross receipts tax imposed.** A tax is imposed on each liquor retailer equal to 2.5 percent of gross receipts from retail sales in Minnesota of liquor.

Subd. 3. **Use tax imposed; credit for taxes paid.** (a) A person that receives liquor for use or storage in Minnesota, other than from a liquor retailer that paid the tax under subdivision 2, is subject to tax at the rate imposed under subdivision 2. Liability for the tax is incurred when the person has possession of the liquor in Minnesota. The tax must be remitted to the commissioner in the same manner prescribed for the taxes imposed under chapter 297A.

(b) A person that has paid taxes to another jurisdiction on the same transaction and is subject to tax under this section is entitled to a credit for the tax legally due and paid to another jurisdiction to the extent of the lesser of (1) the tax actually paid to the other jurisdiction, or (2) the amount of tax imposed by Minnesota on the transaction subject to tax in the other jurisdiction.

Subd. 4. **Tax collection required.** A liquor retailer with nexus in Minnesota, who is not subject to tax under subdivision 2, is required to collect the tax imposed under subdivision 3 from the purchaser of the liquor and give the purchaser a receipt for the tax paid. The tax collected must be remitted to the commissioner in the same manner prescribed for the taxes imposed under chapter 297A.

Subd. 5. **Taxes paid to another jurisdiction; credit.** A liquor retailer that has paid taxes to another jurisdiction measured by gross receipts and is subject to tax under this section on the same gross receipts is entitled to a credit for the tax legally due and paid to another jurisdiction to the extent of the lesser of (1) the tax actually paid to the other jurisdiction, or (2) the amount of tax imposed by Minnesota on the gross receipts subject to tax in the other taxing jurisdictions.

Subd. 6. **Exemptions.** All of the exemptions applicable to the taxes imposed under chapter

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

297A are applicable to the taxes imposed under this section.

Subd. 7. **Sourcing of sales.** All of the provisions of section 297A.668 apply to the taxes imposed by this section.

Subd. 8. **Payment; reporting.** A liquor retailer shall report the tax on a return prescribed by the commissioner of revenue, and shall remit the tax with the return. The return and the tax must be filed and paid using the filing cycle and due dates provided for taxes imposed under chapter 297A.

Subd. 9. **Administration.** Unless specifically provided otherwise by this section, the audit, assessment, refund, penalty, interest, enforcement, collection remedies, appeal, and administrative provisions of chapters 270 and 289A that are applicable to taxes imposed under chapter 297A apply to taxes imposed under this section.

Subd. 10. **Interest on overpayments.** Interest must be paid on an overpayment refunded or credited to the taxpayer from the date of payment of the tax until the date the refund is paid or credited. For purposes of this subdivision, the date of payment is the due date of the return or the date of actual payment of the tax, whichever is later.

Subd. 11. **Deposit of revenues.** The commissioner shall deposit all revenues, including penalties and interest, derived from the tax imposed by this section in the general fund.

**History:** *1Sp2005 c 3 art 6 s 9*

Copyright © 2010 by the Office of the Revisor of Statutes, State of Minnesota. All Rights Reserved.

# TAB 138

| | |
|---|---|
| **From:** | schmicka@healthintegrity.org |
| **Sent:** | Thursday, September 18, 2014 9:35 AM |
| **To:** | Maurene Mealy |

**You have received 4 secure files from <u>schmicka@healthintegrity.org</u>.**
Use the secure links below to download.

Attached is all of the information forwarded to CMS on 03/01/2012, which includes two ES and the HPMS alert relating to the MN tak issue.

Thanks,
April

**Secure File Downloads:**
Available until: **20 September 2014**

Click links to download:

**<u>Minnesota Tax Executive Summary Final  20110624.zip</u>**
50.14 KB, Fingerprint: 2bfa8c704181e073ff678cec99e57f7a (<u>What is this?</u>)

**<u>Executive Summary -- MN Tax White Paper   final  02012011.zip</u>**
39.30 KB, Fingerprint: 76dccd360cc8f3a4488ca67de9343862 (<u>What is this?</u>)

**<u>Draft HPMS Alert  MN Tax  20110908  final.docx</u>**
118.10 KB, Fingerprint: 6d5a965e9637fe7c43114b9e3f9a1a6f (<u>What is this?</u>)

**<u>164  Humana Minnesota  20120301.pdf</u>**
131.53 KB, Fingerprint: c36b5a8b094d515d9355237701e7e413 (<u>What is this?</u>)

You have received attachment link(s) within this email sent via a Secure File Transfer. To retrieve the attachment(s), please click on the link(s).

Secured by Accellion



*9240 Centreville Road*
*Easton, Maryland 21601*
*www.healthintegrity.org*

To:     Bobbie Knickman, CMS
From:  NBI MEDIC
Date:   June 24, 2011

Re:     **Executive Summary Regarding Minnesota (MN) Tax**


**Issue**

In December 2009, the National Benefit Integrity (NBI) Medicare Drug Integrity Contractor (MEDIC) received an inquiry from an investigator with the Office of the Inspector General (OIG), U.S. Department of Health and Human Services (DHHS), requesting assistance with an investigation.  The OIG was investigating prescription drug plans (PDPs) that were charging sales tax on Medicare Part D claims. This summary will provide the background of this issue, investigation conducted by the NBI MEDIC and the recommendations for further action.

**Background**

In response to the request from the OIG, the NBI MEDIC immediately conducted a data review to first determine whether a sales tax is being charged by Minnesota pharmacies for prescription drugs provided to Medicare beneficiaries and paid for by the Medicare Part D program as a Part D benefit.  According to Minnesota Statutes, section 297A.67, subdivision 7, drugs for human use are exempt from the sales tax imposed on the sales price of taxable goods and services sold in Minnesota.  States are also prohibited under 42 C.F.R. § 423.440 (codifying the statutory preemption of State law at section 1860D-12(g) of the Social Security Act (42 U.S.C. § 1395w-112(g)), from imposing a premium tax, fee, or other similar assessment for any "payment CMS makes on behalf of a Part D Plan or enrollee under this part (including the direct subsidy, reinsurance payments, and risk corridor payments); or for any payment made to Part D Plans by a beneficiary or by a third party on behalf of a beneficiary."

The NBI MEDIC conducted an analysis of the prescription drug event (PDE) records in the integrated data repository (IDR) of all the Medicare Part D records submitted to Prescription Drug Plans (PDPs) by pharmacies in Minnesota.  Our analysis indicated that some of the Part D records included a tax amount, reported in the field entitled "Sales Tax" on the data reporting form. According to the PDE data sample reviewed, PDP's in the State of Minnesota paid a total "sales tax" in the amount of $63,617,759 for the time period of January 1, 2006 through December 2009.


**Investigation Results**



*9240 Centreville Road*
*Easton, Maryland 21601*
*www.healthintegrity.org*

In 2010, the NBI MEDIC spoke with a Tax Specialist Principal (MN Tax Specialist) within the Minnesota Special Tax Division who confirmed that the pass through of the tax expense from Minnesota pharmacies to Medicare Part D is preempted.  The NBI MEDIC contacted several PDPs operating in Minnesota, asking them to explain the reason that the sales tax paid by the PDPs was passed on, for reimbursement, to the Medicare Part D Program.  In response to the NBI MEDICs inquiry, the PDPs explained that the data submitted to the Centers for Medicare and Medicaid Services (CMS) did not represent the imposition of a sales tax, but rather the pass-through of a state wholesale drug tax. More specifically, the wholesale drug tax was reported in the "sales tax" field because there is not another tax field for reporting this within the report format.   This wholesale drug distributor tax is a two percent levy on gross revenues for drugs supplied to pharmacies in Minnesota by wholesalers, and pharmacies or other entities who are required to pay this tax if drugs are obtained via channels other than through a wholesale distributor.  Drugs obtained by a pharmacy directly from a pharmaceutical manufacturer, for example, would be subject to this tax.  One PDP also cited and provided to the NBI MEDIC a copy of an October 2005 e-mail from, Gregory Dill, CMS Region V stating that it was the opinion of CMS that the Minnesota wholesaler drug distributor tax "did not appear to involve the prohibition on State taxes of payments by CMS or beneficiaries."

In April 2011, the NBI MEDIC followed up with the MN Tax Specialist and he stated that he had discussed this issue with a Minnesota Revenue Department attorney who agreed that there is a preemption for Medicare drugs. In response to the NBI MEDIC's request for further clarification regarding the basis for the preemption, the MN Tax Specialist wrote: "MN Statute 295.53(a)(1) applies only [to] the hospital, surgical center and provider tax section of the MinnesotaCare tax and does not apply to the wholesale drug distributor tax. The section of the MinnesotaCare tax law that is relevant to the preemption is Minnesota Statute 295.582 which presents the pass through provision of the tax as it is available to a hospital, provider, surgical center, a wholesale drug distributor or to a pharmacy that was charged the tax from a wholesaler." The MN Tax Specialist stated that "the basis for the pass through preemption is Federal provis[i]on 42 CFR 423.440 because the wholesale drug distributor tax constitutes a 'similar assessment or fee'."

In May 2011, the NBI MEDIC sought an opinion from the Minnesota Attorney General's (AGs) office clarifying the state's interpretation of the wholesale drug distributor tax and its operation relative to drugs paid for under the Medicare Part D program.[1]  Based on the response received from the MN Tax Specialist, the NBI MEDIC inquired as to the State's interpretation of the federal preemption provision.  The NBI MEDIC received a letter in response, dated May 31, 2011, from Angela Skarda, a Citizen Research Specialist with the Minnesota Attorney General's Office (see attached).

---

[1] According to information provided on the MN AG's website, the Minnesota Attorney General is authorized by statute to issue written legal opinions only to constitutional executive officers, state agencies, bodies of the state legislature, and attorneys for local governments or pension funds.



*9240 Centreville Road*
*Easton, Maryland 21601*
*www.healthintegrity.org*

Ms. Skarda wrote that "healthcare services provided to Medicare recipients and paid for under the Medicare program are exempt from the [wholesale drug distributor] tax." The letter does not address the federal preemption provision, rather Ms. Skarda cites the state statutory exemption in Minnesota Statute § 295.53, subdivision 1. Ms. Skarda enclosed a copy of Minnesota Statute Chapter 295, as well as a copy of a June 2010 House Research Report on /the MinnesotaCare Provider tax. The House Research Report indicates that "provider taxes" apply to wholesale drug distributors and that services provided under Medicare are exempt from the provider taxes.

**Conclusion**

Currently, the NBI MEDIC has received information from two different offices within the State of Minnesota. While both concur that Medicare Part D drugs are exempt from the wholesale drug distributor tax passed through by Minnesota pharmacies, two different authorities are cited: (1) the federal prohibition of the state imposition of premium taxes or similar fees or assessments and, (2) as indicated by the Attorney General's Citizen Research Specialist, the state preemption of the imposition of MinnesotaCare provider taxes (apparently including the wholesale drug distributor tax) on services paid by Medicare.

**Recommendation**

The NBI MEDIC's concludes; therefore, that the Minnesota wholesale drug distributor tax should not be passed on to the Medicare Part D program. Subsequent to CMS review of this issue and concurrence with this conclusion, the NBI MEDIC proposes to draft a Health Plan Management System (HPMS) alert to be submitted to the PDPs to notify them of this issue and to limit further losses, quantify the Part D liability and develop, as appropriate, a recommendation for a repayment mechanism.

# TAB 139



28464 Marlboro Avenue
Easton, Maryland 21601-2732
www.healthintegrity.org

## Data Analysis Plan Meeting Minutes
### Call-in Number: 800-503-2899
### Passcode: 7709664

| Present | Name | Present | Name |
|---------|------|---------|------|
| | Beth Brady | X | Andrea Lewis |
| X | David Wheeler | | Andy Ranck |
| | Delois Newkirk | X | Anne Marie Youlio |
| | Dominca Kenya | X | April Schmick |
| X | Frank Tetkoski | X | Cherry Sun |
| X | Lashell Mewhorter | X | Craig Briggs |
| X | Michael Forman | X | Doug Quave |
| | Rosalind Abankwah | | Doug Wright |
| | Sonja Brown | X | Jenna Hall |
| | Tanette Downs | X | Jodi Sullivan |
| | Sean Layne | X | Jonathan Haag |
| | Camille Brown | X | Julio Arias |
| | India Thomas | | Katie Kramer |
| X | Ilene Jacob | X | Kelly Dobbins |
| | Patrick Neubert | X | Matthew Farabaugh |
| | Jamie Scott | X | Maurene Mealy |
| | | X | Monica Arbogast |
| | | X | Ning Ma |
| X | Nisha Shah | X | Punam Divadkar |
| | | | Barry Mullins |

Facilitator: _Andrea Lewis_

Where: _Teleconference_

Date of Meeting: _April 7, 2015_

Time: _9:00 a.m._

Confidential and Proprietary, Health Integrity, 2015©

*keeping the Trust*

SA742

| Agenda Topic | Decisions Made and Actions To Take | Individual Responsible | Reporting or Target Date |
|---|---|---|---|
| A. Unallowable Sales Tax | *Louisiana:* PDEs greater than $.10 and memo for Louisiana was delivered to CMS via SFTP March 17, 2015. A PBM summary for the Louisiana data was sent to CMS March 19, 2015. | Andrea | |
| | CMS received feedback from the LA Sales tax project from Express Scripts regarding a $0.10 fee. Jonathan responded that this fee only applies to Medicaid. | | |
| | *Minnesota:* Rosalind advised that CMS does not want to rush Minnesota until we are complete with Louisiana. We are currently conducting more research on what is populated in the sales tax field. | | |
| | We are gathering more information and working with legal counsel to prepare the report. | | |
| | We identified that the 2% wholesalers tax may be allowable so we excluded 2% of the total amount. This leaves us with a total of $10.2 million, which may be recoverable. | | |
| | We will write up the findings we have in order to pursue the $10 million we identified after the exclusion of the 2% wholesaler tax. | | |
| | The Sales Tax Field is being used for other items. This may be a vulnerability that we will need to review further after we settle the sales tax issue. | | |

*keeping the Trust*

**SA743**

| Agenda Topic | Decisions Made and Actions To Take | Individual Responsible | Reporting or Target Date |
|---|---|---|---|
|  | We are waiting on Craig and CM to get back to us. We are waiting for a decision from OGC. Once we hear back, we can move forward. |  |  |

*Next Meeting:* May 7, 2015

*This material contains confidential, proprietary information of Health Integrity, LLC. This information is to be accessed solely by authorized individuals who will safeguard the security and confidentiality of all Health Integrity confidential and proprietary information to which they are provided access. The information contained in this material (or any part thereof) shall not be used or disclosed for any purpose other than that for which it was furnished and shall be protected from unauthorized use and disclosure. This material shall not be distributed or disclosed to any individual(s) or entity other than the recipient(s) named in the transmitting correspondence without the express consent of Health Integrity, LLC.*

# TAB 140

# DOCUMENT PRODUCED IN NATIVE FORMAT

DocExt:       xlsx

Filename:     RAC Audit Issues 030617.xlsx

Comments:     REFER TO NATIVE FILE

CMS000350

| | Part D RAC Audit Issues | | | | |
| Audit Issue | Date NAIRP Submitted | Determination | Date of Determination | Amount Recovered | Comments |
| --- | --- | --- | --- | --- | --- |
| Excluded Pharmacist | 1/2/2014 | Denied | 2/19/2014 | N/A | The Prescription Drug Event (PDE record does not contain a field that identifies the pharmacist that filled the prescription. Therefore, believes that more substantive evidence is needed to make a clear distinction between the excluded owner pharmacist, excluded pharmacist, and the employee-pharmacist, for proving an improperly filled prescription. |
| DEA Schedule Refill Errors (LTC) | 2/4/2014 | Denied | 4/21/2014 | N/A | In its response to the OIG report, CMS indicated that "It is highly likely that OIG is misinterpreting partial fills dispensed to long-term care facility residents as refills of Schedule II drugs." This is a consequence of the limitations with NCPDP billing standards and HIPAA requirements which allow partial fill fields to be used only for inventory shortage situations. |
| Deactivated Prescribers | 2/4/2014 | Denied | 5/19/2014 | N/A | CMS requested ACLR to submit a revision to the Deactivated Prescribers NAIRP by removing PDE records arising from prescribers that had been deactivated for less than one year, include a process eliminating PDE records after a prescriber's reactivation date, replacing PY09 PDE data with PY12 PDE data, and to address other administrative issues. ACLR decided not to resubmit a revised NAIRP for the Deactivated Prescribers audit issue. |
| Incarcerated Beneficiaries | 3/7/2014 | Denied | 5/21/2014 | N/A | CMS determined that the proposed methodology did not consider the process by which the plan sponsor is notified of the incarceration status in order to address improper PDE submissions associated with incarcerated beneficiaries. Further, CMS determined that it had not yet implemented the appropriate controls and system changes to initiate recoveries for incarcerated beneficiaries whose incarceration dates may not have been confirmed by the plan sponsor. |
| Part D Hospice Care Payments | 3/17/2014 | Denied | 4/18/2014 | N/A | Recently issued hospice guidance prevented the Centers for Medicare & Medicaid Services (CMS) from performing hospice audits associated with Medicare Part D potential improper payments at this time. CMS issued a Health Plan Management System (HPMS) memorandum titled Part D Payment for Drugs for Beneficiaries Enrolled in Hospice–Final 2014 Guidance, on March 10, 2014 that states hospice "guidance was ambiguous and there were no objective criteria for Part D sponsors to apply in making Part D versus Part A coverage and payment determinations." Accordingly, retrospective reviews prior to May 1, 2014 could not be pursued. |
| Part D Direct and Indirect Remuneration (DIR) | 4/10/2014 | RAC Withdrew | 7/14/2014 | N/A | ACLR submitted this NAIRP in April 10, 2014 and CMS recommended on 6/23/14 that ACLR revise the original NAIRP to consist of a pilot program. On 7/14/14, ACLR sent CMS an email advising that they will no longer be pursuing the DIR NAIRP due to lack of resources. |
| Expired Prescription | 8/25/2014 | Denied | 2/10/2015 | N/A | After reviewing ACLR's revised NAIRP and the subsequent responses, CMS still believes that ACLR needs to further clarify and provide additional evidence to substantiate an improperly filled prescription. As identified through CMS' questions and concerns, the revised NAIRP and other responses did not completely address the requested changes and/or only mentioned that the requested changes would be considered. At this time, CMS has decided to deny the Expired Prescription audit |

| | | | | | | |
|---|---|---|---|---|---|---|
| Duplicate Payments | | | | 4/24/2015 | N/A | After CMS identified methodological issues with this audit and requested that the RAC change its methodology in order to address them. It chose not to, and the DVC found that the data submitted by the RAC had an error rate of 56 percent. In addition, 37 percent of submissions did not have enough information to determine if they were in error. We believe that a significant number of these submissions would have led to successful appeals. |
| Excluded Providers 2007 | Jun-12 Approved | 1/2/2014 | Terminated | | $1.8 Million | Audit complete |
| Excluded Providers 2008-2011 | 2008-2009; 08/06/2013 2010-2011; 08/29/2013 | | Approved | | $4.5 Million | Audit complete |
| Unauthorized Prescribers 2009-2012 | | 10/31/2013 | Approved | | $5.1 Million | Audit complete |
| DEA Schedule Drugs 2010-2011 | | 10/31/2013 | Approved | | $2.3 Million | 5 contracts remain in level III appeal. |
| CSA Schedule Refills 2012-2013 | | 6/26/2015 | Denied | 10/8/2015 | N/A | Audit issue submitted as CSA Schedule Refills was denied, however, the RAC was permitted to look at contract years 2012-2013 using the same methodology as was approved for the 2010-2011 audit of DEA schedule refill errors. |
| Duplicate Payments 2012-2013 | | 7/16/2015 | Denied | 10/15/2015 | N/A | After the termination of the 2010-2011 Duplicate payment issue no further reviews for duplicate payments were permitted. |
| Unsanctioned Prescribers | | 8/13/2015 | Denied | N/A | N/A | Audit issue submitted as Unsanctioned Prescribers was denied, however, the RAC was permitted to look at Unauthorized Prescribers for contract year 2013 and Excluded Providers for contract years 2012-2013 using the same methodology as was approved for the previously completed audits for those issues. |
| Sales Tax Errors 2012-2013 | | 8/21/2015 | Denied | 9/3/2015 | N/A | Audit issue denied as the MEDIC was in process of reviewing sales tax errors for LA and MN. |
| Excluded Providers 2012-2013 | | 10/22/2015 | Approved | 11/9/2015 | $291,005.30 | 4 contracts remain in level III appeal. |
| Unauthorized Prescribers 2013 | | 10/22/2015 | Approved | 11/9/2015 | N/A | .9 Million identified - in appeals process |
| DEA Schedule Drugs 2012-2013 | | 10/22/2015 | Approved | 11/9/2015 | N/A | $6.6 Million identified - in appeals process. |

# TAB 141



# PART D PAYMENT SYSTEM

*payment***basics**

*Revised:*
*October 2016*

In 2006, Medicare began a voluntary outpatient drug benefit known as Part D. A combination of stand-alone prescription drug plans (PDPs) and Medicare Advantage (MA)–Prescription Drug plans (MA–PDs) delivers the benefit.  In each of 34 geographic regions, plans compete for enrollees on the basis of annual premiums, benefit structures, specific drug therapies covered, pharmacy networks, and quality of services.  Plans bear some risk for their enrollees' drug spending.  Overall, Medicare subsidizes premiums by about 75 percent and provides additional subsidies for beneficiaries who have low levels of income and assets.[1] Medicare's payments to plans are determined through a competitive bidding process, and enrollee premiums are tied to plan bids.

## The drug benefit

The standard 2017 benefit will include:

- a $400 deductible;
- coverage for 75 percent of allowable drug expenses up to a benefit limit of $3,700;
- a $4,950 catastrophic limit on true out-of-pocket (OOP) spending[2]; and
- about 5 percent coinsurance for drug spending above the OOP threshold (Figure 1).

Prior to 2011, enrollees with standard benefits were responsible for paying the full cost of drug spending between the initial benefit limit and the out-of-pocket threshold. The Patient Protection and Affordable Care Act of 2010 (PPACA) directed CMS to phase out this coverage gap between 2011 and 2020.[3] Under the standard benefit, cost sharing for both brand and generic drugs will be reduced each year until 2020, when the coverage gap will be eliminated and beneficiaries will pay 25 percent cost sharing for all drugs until they reach the OOP threshold.

Plans can and often do offer alternative coverage structures. For example, a plan can offer a deductible lower than $400, or use tiered copayments rather than coinsurance—provided that the alternative benefit meets certain tests of actuarial equivalence. Also, plans may offer additional drug coverage that supplements the standard benefit. Medicare payments to plans do not subsidize such supplemental coverage.

Under Part D, Medicare provides primary drug coverage for individuals who are dually eligible for Medicare and Medicaid. Dually eligible individuals with incomes up to 100 percent of poverty have no deductibles, nominal copays, and no coverage gap.  Beneficiaries who do not qualify for full Medicaid benefits but whose incomes are below 150 percent of poverty and who meet an asset test receive full or partial coverage for premiums and cost sharing and do not face a coverage gap.

## Medicare's subsidy amounts

For each Medicare enrollee in a plan (either stand-alone PDP or MA–PD), Medicare provides plans with a subsidy that averages 74.5 percent of standard coverage for all types of beneficiaries.[1] That average subsidy takes two forms:

- Direct subsidy—a capitated payment to plans calculated as a share of the adjusted national average of plan bids.
- Individual reinsurance—Medicare subsidizes 80 percent of drug spending above the out-of-pocket threshold. Reinsurance acts as a form of risk adjustment by providing greater federal subsidies for the highest cost enrollees.

In addition, Medicare establishes symmetric risk corridors separately for each plan to limit a plan's overall losses or profits. Under risk corridors, Medicare

*This document does not reflect proposed legislation or regulatory actions.*

MEDPAC

425 I Street, NW
Suite 701
Washington, DC 20001
ph: 202-220-3700
fax: 202-220-3759
www.medpac.gov



**Figure 1  Standard drug benefit in 2017**

Note:  Benefit structure applicable to an enrollee who has no supplementary drug coverage.
* Cost sharing above the out-of-pocket (OOP) threshold is the greater of either 5 percent coinsurance or a copay of $3.30 for generic drugs, or $8.25 for brand name drugs.
**Equivalent to $4,950 in OOP spending: $400 (deductible) + $825 (25% cost sharing on $3,300) + $3,725 (51% cost sharing for generic drugs, 40% cost sharing for brand name drugs, and 50% manufacturer discount for brand name drugs in the "coverage gap"). The amount of total covered drug spending at which a beneficiary meets the annual OOP threshold depends on the mix of brand name and generic drugs that the individual fills during the coverage gap. The estimated amount of total drug expenses at the annual OOP threshold for 2017 ($8,071.16) is for an individual, not receiving Part D's low-income subsidy (LIS), who has no other sources of supplemental coverage.
†There is a base beneficiary premium of about $428 per year, which is 25.5% of expected Medicare Part D benefits per person, but the actual premiums that beneficiaries pay vary by plan. Federal subsidies pay for the remainder of covered Part D benefits.
††In 2017, cost sharing for drugs filled during the coverage gap will be 51% for generic drugs (the remaining 49% will be picked up by the Part D benefit) and about 40% for brand name drugs. The actual cost sharing amount for brand name drugs will depend on the amount of dispensing fee charged by a plan since the 10% covered by the Part D benefit applies to both the ingredient cost and the dispensing fee, while the 50% manufacturer discount applies only to the ingredient cost.

limits a plans' potential losses (or gains) by financing some of the higher-than-expected costs (or recouping excessive profits). These corridors could be widened in the future, meaning that plans could bear more insurance risk than they currently do. Also, Medicare pays plans that enroll low-income beneficiaries most of their enrollees' cost sharing and premiums.

Note that although plans get essentially the same level of direct subsidy per enrollee (modified by risk adjusters), the level of subsidies granted through the other three mechanisms differ substantially from plan to plan. Subsidy dollars vary depending on the characteristics of individuals that each plan enrolls (e.g., income and health status), as well as whether a plan's losses or profits trigger provisions of its risk corridors.

Part D replaced Medicaid as the primary source of prescription drug coverage for individuals who are dually eligible for Medicare and Medicaid. However, states continue to help finance the costs of drug coverage for dually eligible beneficiaries by making monthly lump sum payments to Medicare.

### Medicare's payments to plans

Each plan submits bids annually to the Centers for Medicare & Medicaid Services (CMS) by the first Monday in June. Those bids should reflect the plan's expected benefit payments plus administrative costs after they deduct expected federal reinsurance subsidies.  Plans base their bids on expected costs for a Medicare beneficiary of average health; CMS then



**Figure 2  Part D payment system**

Note:   RxHCC (prescription drug hierarchical condition category). The RxHCC is the model that estimates the enrollee risk adjuster. Beginning in 2011, CMS replaced its single model of risk scores with five separate sets of model coefficients for: long-term institutionalized enrollees; aged low-income enrollees; aged non–low-income enrollees; disabled low-income enrollees; and disabled non–low-income enrollees. Prior to 2011, payments on behalf of beneficiaries with low-income and long-term institutionalized status were adjusted using multipliers intended to reflect those individuals' higher levels of drug spending.
*  Figure 3 outlines the process for calculating enrollee premiums.
**Plans receive interim prospective payments for individual reinsurance and low-income subsidies that are later reconciled with CMS.

adjusts payments to plans based on the actual health status of the plans' enrollees.

CMS pays plans a monthly prospective payment for each enrollee (the direct subsidy). This payment is first adjusted by the enrollee's case mix and other subsidy factors, namely low-income status and long-term institutionalized status (Figure 2).  A second adjustment to the plan's approved bid is the subtraction of the enrollee's premium. (See the following section on how premiums are calculated.) CMS also provides plans with interim

prospective payment adjustments for individual reinsurance and low-income subsidies. The agency reconciles actual levels of enrollment, risk factors, levels of incurred allowable drug costs (after rebates and other discounts), reinsurance amounts, and low-income subsidies after the end of each year.

**Calculating enrollee premiums**

CMS takes plans' standardized bid amounts for basic benefits or the portion



**Figure 3  Calculating enrollee premiums**

**Calculate nationwide average bid**

**Compare plan bids to nationwide average bid**

In this example, plan 1's bid is smaller than, plan 2's bid is equal to, and plan 3's bid is larger than the nationwide average bid.

**Calculate enrollee premiums**

**Enrollee premium**
(Plan bid – nationwide average bid)
+ base premium

Note:   *Base premium is a share of the nationwide average bid. It equals the nationwide average times a factor with a numerator of 25.5% and a denominator of 100% minus CMS's estimate of aggregate plan revenues for Part D benefits that they receive through federal individual reinsurance subsidies. Beginning in 2011, Part D has begun collecting additional premiums from higher income enrollees. The extra premium amount is equal to the difference between 35, 50, 65, or 80% and the 25.5% applied to the nationwide average bid adjusted for individual reinsurance.

of plan bids attributable to basic coverage and calculates the average (Figure 3). From this nationwide average, plan enrollees must pay a base premium plus any difference between their plan's bid and the nationwide average bid.

Individuals with modified adjusted gross incomes exceeding $85,000 ($170,000 for couples) are subject to a reduced premium subsidy similar to the income-related premium under Medicare Part B. The base premium amount for beneficiaries not subject to a reduced premium subsidy is $35.63 in 2017. Enrollees in costlier plans face higher-than-average premiums for standard Part D coverage; similarly, enrollees in less expensive plans pay lower-than-average premiums.[4]

Most low-income beneficiaries do not pay a premium because Medicare pays for their premium up to a regional threshold amount, calculated as an enrollment-weighted average premium for each PDP region. Since enrollees tended to select or were auto-enrolled in plans with lower premiums, using enrollment weights to calculate the regional thresholds has led to fewer premium-free plans available for low-income beneficiaries. As a result, many individuals have had to change plans or pay the portion of the premium that exceeds the regional threshold to remain in the same plan. To reduce the effects of annual changes in plans that qualify as premium-free, the PPACA changed the benchmark calculation methodology to exclude Medicare Advantage rebates.

## Benefit and payment updates

Medicare updates the deductible, benefit limit, and catastrophic threshold amounts in the standard Part D benefit each year. Plan payments are a function of plans' updated bids. The benefit's threshold amounts increase by CMS's estimate of the annual change in drug spending per person. ■

---

1   As a result of changes made by the Patient Protection and Affordable Care Act of 2010 (PPACA), beginning in 2011 the premium subsidy is reduced for higher income beneficiaries. For more information, refer to the section on calculating enrollee premiums.

2   The term "true out-of-pocket" refers to a feature of Part D that directs fewer federal subsidy dollars toward enrollees who have supplemental coverage. Specifically, only certain types of spending on behalf of the beneficiary count toward the catastrophic threshold: the beneficiary's own out-of-pocket (OOP) spending; that of a family member or official charity; and supplemental drug coverage provided through qualifying state pharmacy assistance programs or Part D's low-income subsidies. In addition, beginning in 2011, drug spending made on behalf of the beneficiary by AIDS Drug Assistance Program, the Indian Health Service, and the 50 percent discount paid for by pharmaceutical manufactures for brand name drugs counts toward the OOP threshold. Beneficiaries need to adhere to their plan's formulary, prior authorization, and formulary exceptions processes in order to receive credit for their OOP spending toward the $4,950 limit.

3   PPACA eliminates the coverage gap by: 1) requiring pharmaceutical manufacturers to offer a 50 percent discount on brand name drugs filled during the coverage gap, 2) gradually phasing down cost sharing for generic drugs beginning in 2011, 3) phasing down cost sharing for brand name drugs beginning in 2013, and 4) reducing the OOP threshold on true out-of-pocket spending over the 2014 to 2019 period.

4   Beneficiaries (other than those who receive low-income subsidies) who delay enrolling in Part D until after their initial enrollment period and who do not have creditable coverage must also pay a late enrollment penalty similar to that for Part B. Creditable coverage refers to prescription drug benefits through sources such as a former employer that are at least as generous as the standard Part D benefit.

TAB 142



## Medicare Part D – Direct and Indirect Remuneration (DIR)

**Date**                    2017-01-19

**Title**                    Medicare Part D – Direct and Indirect Remuneration (DIR)

**Contact**                    press@cms.hhs.gov

### Medicare Part D – Direct and Indirect Remuneration (DIR)

Under Medicare Part D, Medicare makes partially capitated payments to private insurers, also known as Part D sponsors, for delivering prescription drug benefits to Medicare beneficiaries. Medicare relies on transaction data reported by Part D sponsors to make sure these payments are accurate. Often, the Part D sponsor or its pharmacy benefits manager (PBM) receives additional compensation after the point-of-sale that serves to change the final cost of the drug for the payer, or the price paid to the pharmacy for the drug. Examples of such compensation include rebates provided by manufacturers and concessions paid by pharmacies. Under Medicare Part D, this post point-of-sale compensation is called Direct and Indirect Remuneration (DIR) and is factored into CMS's calculation of final Medicare payments to Part D plans.

Total DIR reported by Part D sponsors has been growing significantly in recent years. Part D sponsors and PBMs are engaging to a greater extent in arrangements that feature compensation after the point-of-sale, and the value of such compensation is also generally increasing. As a result, CMS has observed a growing disparity between gross Part D drug costs, calculated based on costs of drugs at the point-of-sale, and net Part D drug costs, which account for all DIR.

This trend has significant implications for Medicare Part D:

- <u>Beneficiary Cost-Sharing</u>: Beneficiaries' cost-sharing is calculated based on the drug price at the point-of-sale, without regard to rebates and other price concessions received after the point-of-sale. Therefore, while DIR may hold down total program expenses (and beneficiary premiums), it does not reduce the cost of drugs for beneficiaries at the point-of-sale.

- <u>Medicare Subsidy Payments</u>: Medicare pays the Part D cost-sharing obligations on behalf of millions of low income Medicare beneficiaries (12 million in 2015), many of whom are dually eligible for Medicare and Medicaid. As the growth of rebates and other price concessions places more of the burden on beneficiary cost-sharing, Medicare's costs for these beneficiaries also grow. Higher beneficiary cost-sharing also results in the quicker progression of Part D enrollees through the Part D drug benefit phases and potentially leads to higher costs in the catastrophic phase, where Medicare liability is generally around 80 percent.

- <u>Plan Liability</u>: The growing use of rebates and other price concessions has contributed to an important shift in how Part D spending is distributed across the final three phases of the part D benefit: the initial coverage phase, the coverage gap, and the catastrophic phase. High priced drugs, now increasingly packaged with high rebates, shift more and more of the drug spend into the catastrophic phase. In the catastrophic phase, Part D plans are responsible for only 15 percent of costs. Moreover, under current Part D rules, the largest share of all rebates and other price concessions is allocated to reduce plan liability, and, therefore, the high price-high DIR trend has a disproportionate impact on plan liability. In other words, Part D sponsors, who control drug spending for Medicare, are, in fact, responsible for only a share of Part D drug spending, and, as a result of the increasing preference for high price-high DIR arrangements, that proportion is shrinking each year. This also explains why Part D premiums, which are based, in large part, on plan liability, have grown only modestly in comparison to gross drug costs.

### Medicare Part D Payment

Medicare's payments to Part D sponsors are largely determined through an annual bidding process. A plan's bid reflects its estimate of the revenue needed to provide beneficiaries with the Medicare prescription drug benefit. Following the close of the payment year, CMS reconciles each plan's bid-based prospective payments based on its actual experience, either reclaiming some funds or making additional payments.

*a. Point-of-Sale Price*

The Part D reconciliation process, in particular, is dependent on transaction data summarized on Prescription Drug Event (PDE) records. The Part D sponsor submits a PDE record to CMS for each transaction in which a beneficiary obtains a prescription drug. The transaction record includes a price, which quantifies the amount paid to the pharmacy that dispenses the drug. The price reported on the PDE record as paid to the pharmacy at the point-of-sale is used to calculate beneficiary cost-sharing and, more broadly, to adjudicate the Part D benefit as it is the primary basis for determining plan, beneficiary, and government liability.[iii]

*b. Direct and Indirect Remuneration (DIR)*

Fees, payments, or payment adjustments made after the point-of-sale that change the cost of Part D covered drugs for Part D sponsors or PBMs must be reported to CMS as Direct or Indirect Remuneration (DIR). DIR results from payment arrangements negotiated independent of CMS, between Part D sponsors, PBMs, network pharmacies, drug manufacturers, and other parties involved in the administration of the Part D benefit. Manufacturer rebates comprise a significant share of all DIR reported to CMS.

The final plan payments by CMS are, per statute, to be based on the costs actually incurred by Part D sponsors. These actual costs must reflect any applicable DIR. DIR is apportioned only between Medicare and the Part D plan, generally based on the share of the total Part D drug costs that each is responsible for over the course of the payment year.

Sponsors must also factor into their plan bids an estimate of the DIR expected to be generated. Higher DIR leads to lower bids and, therefore, puts downward pressure on beneficiary premiums.

**Recent Trends in DIR**

In recent years, CMS has observed a notable growth in DIR collected and reported by Part D sponsors. Figures 1 and 2 below provide a general overview of this trend.

**Figure 1 – DIR by Payment Year**



|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| Total DIR (Billions) | $8.7 | $9.7 | $10.5 | $13.4 | $17.4 | $23.6 |
| Gross Drug Costs (Billions) | $77.5 | $84.8 | $89.7 | $103.6 | $121.5 | $137.4 |

*Source: Analysis of DIR and enrollment data from the 2016 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplemental Medical Insurance Trust Funds (CY 2016 Medicare Trustee's Report) and cost data from PDE records.*

**Figure 2 – Net Drug Costs**



*Source: Analysis of DIR data from the CY 2016 Medicare Trustee's Report and cost data from PDE records.*

Since 2010, the growth in DIR has far outpaced the growth in Part D drug costs, on both a total and a per-member per-month (PMPM) basis. CMS observed total DIR grow about 22 percent per year and PMPM DIR grow nearly 14 percent per year between 2010 and 2015. During the same period, total Part D gross drug costs only grew about 12 percent per year and PMPM Part D gross drug costs only grew nearly 5 percent per year. Gross drug costs and DIR have grown most dramatically since 2013.

**SA754**

Figure 3 below illustrates the impact of DIR on plan and government liability under Part D for every year between 2010 and 2015.

**Figure 3 – Final Annual Medicare Reinsurance and Plan Liability per Beneficiary**[iii]



*Sources: Analysis of DIR, reinsurance subsidy, and enrollment data from the CY 2016 Medicare Trustee's Report and cost data from PDE records.*

Despite the growth in total gross drug costs, the relatively faster growth in DIR has resulted in a steady decline in final plan liability (represented by the darker blue portion in the figure above). Between 2010 and 2015, final annual plan liability per beneficiary declined nearly 5 percent per year. Beneficiary premiums and the Medicare direct subsidy, together, cover plan liability; the chart above displays plan liability before accounting for these plan revenues. During the same period, the Medicare reinsurance subsidy on a per member-per year basis has grown at an annual rate of nearly 17 percent. The last trend is partially the result of the fact that in the more recent years of our analysis, when the growth in the reinsurance subsidy is most pronounced, Part D gross drug cost growth is concentrated in the catastrophic phase of the Part D benefit, where Medicare covers 80 percent of drug costs.

Figure 4 below illustrates how the final plan liability compares to the Part D beneficiary premium. Payment arrangements that result in post point-of-sale concessions lessen plan liability and put downward pressure on beneficiary premiums. This pressure is one reason that premiums remained relatively unchanged between 2010 and 2015, despite the fact that total gross drug costs grew about 12 percent per year in that span.

**Figure 4 – Final Annual Plan Liability and Average Basic Premium per Beneficiary**[iii]



*Source: Analysis of DIR and enrollment data from the CY 2016 Medicare Trustee's Report and CMS released premium information.*

**Impacts of Recent Trends**

Higher levels of DIR generally mean a greater difference between the price assessed at the point-of-sale and the actual financial obligation of the Part D sponsor. The cost of rebates and other price concessions received after the point-of-sale is built into the list price charged at the point-of-sale.

Higher prices for drugs and higher DIR can impact the benefit in a number of ways.

**SA755**

*a. Higher Out-of-Pocket Spending*

Higher point-of-sale prices generally result in higher beneficiary cost-sharing obligations as cost-sharing is often assessed as a percentage of the list price. For example: if a beneficiary's cost-sharing obligation is 10 percent out-of-pocket, a beneficiary will need to pay $10 for a drug with a list price of $100, as opposed to $5 for a drug with a list price of $50.

Moreover, the list prices also play an important role in a beneficiary's progression through the different phases of the Part D benefit; higher list prices mean quicker progression through the benefit and higher overall costs in the catastrophic phase once the beneficiary reaches it. Rebates and other price concessions received after the point-of-sale do not mitigate these impacts.

*b. Moderated Premiums*

Higher levels of DIR can reduce beneficiary premiums and some government costs. Under the Part D payment rules, rebates and price concessions received after the point-of-sale are factored into the calculation of beneficiary premiums and Medicare's direct subsidy payments to Part D sponsors. As a result, a higher level of DIR places downward pressure on beneficiary premiums and the government's plan payment obligations that subsidize premiums. While rebates and other post point-of-sale price concessions are also factored into the calculation of Medicare's reinsurance subsidy, the growth of gross costs in the catastrophic phase of the benefit has outpaced growth in DIR, resulting in increased reinsurance costs incurred in the catastrophic phase by the government.

The net effects of these trends on costs for beneficiaries and the government are still unclear.

*c. Lower Levels of Liability for Plans*

As mentioned earlier and illustrated by figure 3 above, higher levels of DIR also have the impact of moderating the financial liability of Part D plans, counteracting the overall growth of Part D drug spending. High cost-high DIR arrangements ease the financial burden borne by Part D plans essentially by shifting costs to the catastrophic phase of the benefit, where plan liability is limited.

**Additional Resources**

*Medicare Drug Spending Dashboard*

CMS makes information available about the prices of certain drugs in Medicare Part D, including some limited rebate data:

https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Information-on-Prescription-Drugs/

*The Medicare Part D Benefit*

The Medicare Payment Advisory Commission (MedPAC) provides a summary of Medicare Part D payment rules:

http://www.medpac.gov/docs/default-source/payment-basics/medpac_payment_basics_16_partd_final.pdf?sfvrsn=0

**Methodology Notes**

DIR information is available from table IV.B8 of the CY 2016 Medicare Trustee's Report. The Trustee's Report presents the information as a percentage of total gross costs. The percentage is inclusive of rebates and other non-rebate forms of DIR for brand name and generic drugs, which explains why the DIR data presented in this fact sheet will not match the rebate information in the Manufacturer Rebate Summary Report released by CMS in 2016 with the Medicare Drug Spending Dashboard.

Enrollment information is available from table IV.B7 of the CY 2016 Medicare Trustee's Report. The Part D enrollment figures used for the analysis presented in this document are not inclusive of retiree drug subsidy enrollment.

Reinsurance subsidy information is available from table IV.B9 of the CY 2016 Medicare Trustee's Report.

The share of DIR allocated to reduce plan liability and Medicare's reinsurance subsidy obligation is based on the allocation methodology outlined in the *Advance Notice of Methodological Changes for Calendar Year (CY) 2006 Medicare Advantage (MA) Payment Rates.*

Part D premium information is available from the Part D benchmark rollout materials.

Part D drug cost information—including the gross drug cost, LICS, and plan liability amount for each year—is available from the Part D PDE data. Gross drug cost represents total spending, including Medicare, plan, and beneficiary payments, and is equal to the sum of the following fields of the PDE record: covered plan paid amount, not covered plan paid amount, patient pay, patient liability reduced by other, other true out-of-pocket costs, LICS, and gap discount amount. Plan liability is equal to the covered plan paid amount field of the PDE minus the sum of the total reinsurance subsidy amount and the total DIR amount, both of which can be found in the CY 2016 Medicare Trustee's Report. PDE data used for this analysis was current as of January 9th, 2017.[iii]

The annual growth rates presented in this document are compound annual growth rates.

Values may not add due to rounding.

###

Get CMS news at cms.gov/newsroom, sign up for CMS news via email and follow CMS on Twitter @CMSgovPress

[1] For more information about the Part D benefit structure, reference the CY2017 Rate Announcement located here: https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Announcements-and-Documents.html.

[2] The final plan liability presented here is not adjusted for risk sharing reconciliation, through which Medicare recoups some excess plan profits or shares the burden of excess plan losses.

[3] See footnote 2.

[4] For more information regarding the PDE record fields, reference the 2011 PDE Participant Guide located here: http://www.csscoperations.com/internet/cssc3.nsf/DocsCat/CSSC~CSSC%20Operations~Prescription%20Drug%20Event~Training~Prescription%20Drug%20Event~8LAP7A1257?open&navmenu=Prescription^Drug^Event.



A federal government website managed and paid for by the U.S. Centers for Medicare & Medicaid Services. 7500 Security Boulevard, Baltimore, MD 21244



**SA757**