# IN THE UNITED STATES COURT
# OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **ACLR, LLC** | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **Civil Action No. 15-767 and 16-309** |
| | ) | (Judge Campbell-Smith) |
| **THE UNITED STATES** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**PLAINTIFF ACLR, LLC'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...........................................................................................iv

INTRODUCTION ..........................................................................................................1

ARGUMENT...................................................................................................................2

I.     Lack of Jurisdiction Defense Should Be Rejected......................................2

II.     Contingency Fee Nature of Part D RAC Contract Does Not
Preclude Breach of Contract Damages.........................................................4

III.    CMS's Actions Breached The Part D RAC Contract..................................6

      A.     PY 2007 Duplicate Payment Audit...................................................7

      B.     PY 2010 Duplicate Payment Audit ...............................................11

      C.     PY 2012-2013 Sales Tax Audit .....................................................12

      D.     OMB Guidance AND IPERA Do Not Provide CMS
With The Right To Block, Rescind, Or Deny ACLR's
Duplicate Payment Audits and Sales Tax NAIRP........................13

IV.    CMS's Actions Breached Its Duty Of Good Faith And
Fair Dealing ............................................................................................15

      A.     2007 Duplicate Payment Audit......................................................15

      B.     2010 Duplicate Payment Audit......................................................19

      C.     ACLR's Sales Tax NAIRP.............................................................23

           1.     CMS Acted Unreasonably And Contrary
To The Part D RAC SOW Process In
Denying ACLR's Sales Tax NAIRP..................................23

           2.     Amounts Included In The Sales Tax Field
On Minnesota PDE Records Renders Those
PDE Records Improper.......................................................27

           3.     Amounts Included In The Sales Tax Field
On Louisiana PDE Records Renders Them
Improper .............................................................................33

4.      OMB Guidance Supports The Approval
Of ACLR's PY 2012-2013 Sales Tax NAIRP..................35

V.     ACLR's Damages Are Not Speculative ....................................36

CONCLUSION ........................................................................................43

CERTIFICATE OF SERVICE ................................................................44

APPENDIX ..................................................................(A791-A1006)

# TABLE OF AUTHORITIES

Cases                                                                                    Page(s)

*Bigelow v. RKO Radio Pictures*,
   327 U.S. 251 (1946)...................................................................................38, 41, 42
*Cerberonics, Inc. v. United States*,
   13 Cl.Ct. 415 (1987) ............................................................................................ 2
*Dyncorp Int., LLC v. United States*,
   125 Fed. Cl. 446 (2016) ..................................................................................... 17
*Indiana Michigan Power Co. v. United States*,
   422 F.3d 1369 (Fed. Cir. 2005) ......................................................................... 37
*J.F. Shea Co., Inc. v. United States*,
   4 Cl.Ct. 46 (1983) ...................................................................................... Passim
*Kunz Constr. Co. v. United States*,
   12 Cl.Ct. 74 (1987) .............................................................................................. 2
*N. Helex Co. v. United States*,
   524 F.2d 707 (Ct. Cl. 1975)............................................................................... 36
*Schober v. Commissioner of Revnue*,
   778 N.W.2d 289 (Minn. 2010) ..............................................................29, 32, 34
*Wells Fargo Bank, N.A. v. United States*,
   88 F.3d 1012 (Fed. Cir. 1996) ........................................................................... 36

Statutes

42 U.S.C. § 1395ddd(h)(4) ...................................................................................... 8
42 U.S.C. §§ 1395ddd(b)(3), 1395ddd(h)(1) ........................................................ 5
Minn. Stat. Ann. § 295.52(3) ................................................................................ 31
Minn. Stat. § 295.50(4)(1) .................................................................................... 30
Minn. Stat. § 295.53 .............................................................................................. 30
Minn. Stat. § 295.53(3)....................................................................................30, 31
Minn. Stat. § 295.582 ............................................................................................ 30
Minn. Stat. § 295.582(1)(a)................................................................................... 30
Minn. Stat. § 297A.67............................................................................................ 28
Minn Stat. § 297A.77 (2012) ................................................................................ 29
Minnesota Statute § 289A.31, subdivision 7(e)........................................................ 29

Rules

RCFC 12(b).............................................................................................................. 3

Regulations

Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare
   Advantage and the Medicare Prescription Drug Benefit Programs,
    79 Fed. Reg. 29935 (May 23, 2014) ........................................................... 42

# INTRODUCTION

Plaintiff ACLR, LLC's Motion for Partial Summary Judgment ("ACLR's Motion") seeks a ruling in its favor for the Centers for Medicare & Medicaid Services's ("CMS") breach of contract and breach of the duty of good faith and fair dealing arising from CMS's refusal to allow ACLR to proceed with its PY 2007 duplicate payment audit, CMS's termination of ACLR's PY 2010 duplicate payment audit, and CMS's denial of ACLR's PY 2012-2013 sales tax New Audit Issue Review Package ("NAIRP").   In response, CMS has filed an opposition to ACLR's Motion and cross-moves for summary judgment on all counts in *ACLR I* and *ACLR II*.[1]  *See* Document 52, Defendant's Response to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgement ("Defendant's Motion").  CMS's argument is essentially that it had complete unrestrained discretion over ACLR's Part D overpayment recovery efforts and because CMS blocked, terminated, or denied ACLR's Part D overpayment recovery efforts, ACLR's damages based upon the overpayments that would have been recovered are completely speculative. CMS's arguments are set against the backdrop of its own estimates of billions of dollars in overpayments during the Part D RAC Contract time period of which CMS acknowledges it only recouped $13.9 million as of March 31, 2017 from ACLR's efforts on CMS approved audits.  CMS's arguments in response to ACLR's Motion are flawed in many respects not the least of which includes CMS's failure to distinguish between the Part D RAC Contract PWS (governing the PY 2007 duplicate payment audit) and the subsequent SOWs (governing the PY 2010 duplicate payment audit and the PY 2012-2013 sales tax

---

[1] It is not entirely clear from Defendant's Motion as to which arguments by CMS are in opposition to ACLR's Motion and which arguments by CMS are in support of its Motion.  This is an important distinction given the burden on a party moving for summary judgment.

NAIRP), CMS's failure to recognize its contractual and duty of good faith and fair dealing obligations, and the fact that CMS bears the risk of any uncertainty which its own wrongs have created.  This Court should grant ACLR's Motion for Partial Summary Judgment and deny CMS's Cross-Motion for Summary Judgment.

## ARGUMENT

### I.   Lack Of Jurisdiction Defense Should Be Rejected.

CMS asserts that this Court "should dismiss for lack of jurisdiction either the entirety of *ACLR II* or, at a minimum, the excess portion of ACLR's claim that was never the subject of a request for a contracting officer's final decision."  Defendant's Motion at 51.[2]  CMS's argument is misplaced. This Court has regularly held that jurisdiction is proper over an increased claim if "the increase in the amount of the claim is based on the same set of operative facts previously presented to the contracting officer" and "the contractor neither knew nor reasonably should have known, at the time when the claim was presented to the contracting officer, of the factors justifying an increase in the amount of the claim." *Kunz Constr. Co. v. United States*, 12 Cl.Ct. 74, 79 (1987); *see also Cerberonics, Inc. v. United States*, 13 Cl.Ct. 415, 417 (1987); *J.F. Shea Co., Inc. v. United States*, 4 Cl.Ct. 46, 54–55 (1983).  Here, ACLR's September 2015 certified claim was based on its provisional assessment of volumes of sales tax data supplied by CMS that contained millions of PDE records representing over half a billion dollars of questioned payments. Upon filing its timely claim with the Contracting Officer ("CO"), ACLR subsequently identified granular and less conspicuous markers contained in the gross quantity of information that CMS had shared in its blanket delivery. Hence, the same operative facts serve as the predicate for the

---

[2] References to page numbers on Defendant's Motion are to the pleading page numbers and not the Document 52 page numbers generated in the course of filing the pleading.

original claim and the increase in the sum.  Moreover, when filing its claim with CMS, ACLR was not aware of the less than transparent minute indicators contained in the data which gave rise to the increase in the claim.  Further, CMS has not been prejudiced by this increase as the same set of operative facts give rise to both segments of the claim.

 CMS's lack of jurisdiction argument should also be denied in the interest of judicial economy.  CMS failed to assert its lack of jurisdiction defense in a motion prior to filing its Answer in this case.  RCFC 12(b).  The first time CMS raised the defense of lack of jurisdiction was in its Motion – almost two years after *ACLR II* was first filed.  CMS did not assert a lack of jurisdiction defense in its Answer in this case.  *ACLR II*, Document 8. In its January 5, 2017 response to ACLR's interrogatory to CMS to describe the factual basis for any of its defenses to ACLR's claims, CMS never mentioned a lack of jurisdiction. App. at Ex. 73, Responses to Interrogatories, Response No. 18, A757.  When CMS was asked at its August 17, 2017 30(b)(6) deposition for *ACLR II* to state the factual basis for its defenses, CMS did not assert a lack of jurisdiction.  App. at Ex. 146, Excerpts from CMS 30(b)(6) Dep. in *ACLR II*, A820-22 at 265:6-267:10.

To the extent CMS had advised ACLR of CMS's jurisdictional defense in the course of discovery and ACLR concluded that the defense had validity, ACLR could have submitted another certified claim based upon any additional sales tax PDE records identified by ACLR.  CMS would have denied any such additional certified claim and ACLR would have filed another lawsuit based upon the denial of such additional certified claim.  *ACLR II* and the lawsuit covering the additional sales tax PDE records could have been consolidated so the matter would have been resolved in an efficient manner.  If this scenario had occurred, the parties would be in exactly the same position they are in

3

currently with all of the improper PY 2012-2013 sales tax PDE records at issue before the Court. Rule 1 of the United States Court of Federal Claims provides that the rules should be employed "to secure the just, speedy, and inexpensive determination of every action and proceeding." Accordingly, CMS's lack of jurisdiction argument to *ACLR II* should be denied. At the very least, this Court should not dismiss *ACLR II* and allow ACLR to proceed on the PY 2012-2013 sales tax PDE records contained in the sales tax NAIRP that were included in ACLR's certified claim.

II. **Contingency Fee Nature Of Part D RAC Contract Does Not Preclude Breach Of Contract Damages.**

Defendant argues that "[b]ecause the 2007 and 2010 duplicate payment audit issues involved in *ACLR I* and the 2012 and 2013 sales tax audit issue involved in *ACLR II* did not result in the recoupment of overpayments by CMS as a result of any work done by ACLR, there is no basis under contract for ACLR to seek the payment of its . . . contingency fees . . . ." Defendant's Motion at 54. CMS supports its argument by citing various references in the Part D RAC Contract that ACLR was to be paid a contingency fee based upon the amount of overpayments recovered by CMS. *Id.* at 52-53. The contingency fee nature of the Part D RAC Contract is simply the method for measuring what ACLR was to be paid under that contract. ACLR did not recover any overpayments in connection with the PY 2007 duplicate payment audit, the PY 2010 duplicate payment audit, and the proposed PY 2012-2013 sales tax audit because CMS unlawfully prevented ACLR from doing so.

CMS acknowledges that it "did not permit ACLR to proceed at all with the 2007 duplicate payment audit issue (in *ACLR I*) and the 2012 and 2013 sales tax audit issue (in

4

*ACLR II*), and that CMS rescinded approval for the 2010 duplicate payment audit issue before it was completed (in *ACLR I*)." *Id.* at 52.  It is these very actions that ACLR claims were breaches of the Part D RAC Contract and breaches of CMS's duty of good faith and fair dealing.   ACLR was prepared to and/or attempted to recover those improper overpayments for CMS but CMS precluded ACLR from doing so.   Therefore, ACLR complied with its contractual obligations but was thwarted by CMS's actions from recovering the overpayments from plan sponsors.

In further support of its argument, CMS cites to the Medicare Integrity Program statute for support that ACLR was only to be paid for amounts recovered on a contingency fee basis.  *Id.* at 54.  However, that same statute requires CMS to "pursue the recovery of payments that should not have been made" and to recoup any such overpayments.  42 U.S.C. §§ 1395ddd(b)(3), 1395ddd(h)(1).  CMS had a statutory obligation to allow ACLR, as the Part D RAC contractor, to pursue and recover improper overpayments that would have then triggered ACLR's right to be paid its corresponding contingency fee.

CMS also cites to OMB guidance issued in connection with The Improper Payments Elimination and Recovery Act of 2010 and 2012 ("IPERA") that contingency fee contracts shall preclude payment until recoveries are collected by the agency. Defendant's Motion at 54.  Had CMS not breached the Part D RAC Contract, PY 2007 and PY 2010 duplicate payment and overpayments from PY 2012-2013 PDE records containing improperly billed sales tax would have been recovered by CMS.  The OMB guidance relied upon by CMS echoes IPERA requirements that CMS was to pursue and recover overpayments.  "IPERA requires any program that expends at least $1 million to implement payment recapture audits, if cost effective to the agency, in order to recover

improper payments." Tab 89, SA176. CMS also cites the OMB guidance stating that "overpayments that are identified by the payment recapture auditor" that are "subsequently determined not to be collectable or not improper, shall not be considered 'collected.'" Defendant's Motion at 54. ACLR's PY 2007 and 2010 duplicate payment audit and proposed PY 2012-2013 sales tax audit identified overpayments and there is no evidence or determination to show that those overpayments were proper. The proper and equitable measure of damages is arrived at by applying the contingency fee agreed to by the parties for the audit issues in question. This process would put ACLR in the position it would have been in but for CMS's breach of the Part D RAC Contract.

III.    **CMS's Actions Breached The Part D RAC Contract.**

CMS argues that ACLR's breach of contract claims fail as a matter of law because CMS "acted within the scope of its authority under both the contract and governing law in deciding not to allow ACLR to proceed further with the 2007 or 2010 duplicate payment recovery audits and the 2012 to 2013 sales tax recovery audit." Defendant's Motion at 57. ACLR provided extensive factual and legal support to demonstrate CMS's breach of the Part D RAC Contract. Document 50-1, Plaintiff ACLR's Memorandum in Support of its Motion for Partial Summary Judgment ("ACLR's Memorandum") at 24-31 and 44-54.[3] Ignoring, among other things, the testimony of CMS's employees that CMS failed to follow the Part D RAC Contract, CMS argues that it had a contractual right to stop or deny ACLR's duplicate payment and sales tax audits. CMS cannot point to any Part D RAC Contract provisions that justify CMS's actions.

---

[3] References to page numbers on ACLR's Memorandum are to the pleading page numbers and not the Document 50-1 page numbers generated in the course of filing the pleading.

A.  PY 2007 Duplicate Payment Audit

Prior to awarding the Part D RAC Contract, CMS sought the assistance of the potential contract awardees in designing the Part D RAC program through CMS's issuance of a statement of objectives in CMS's RFQ.  App. at Ex. 4, A30-A40.  For example, the statement of objectives provided that the contractor would "[d]evelop innovative methodologies to determine Part D improper payments" and that these methodologies should "maximize recoveries."  *Id.* at A31.  In response, ACLR developed its PWS, including the processes and methodologies to recover Part D improper payments, which also included those arising from duplicate payments.  App. at Ex. 5, A41-A97.  The PWS was incorporated into and became part of the Part D RAC Contract thereby authorizing ACLR to pursue the 2007 duplicate payment audit. ACLR's  Memorandum at 8.

Nevertheless, CMS acknowledges that it "did not permit ACLR to proceed at all with the 2007 duplicate payment audit issue."  Defendant's Motion at 52.  The PWS was in effect until January 1, 2014 when the option year ("OY") 1 SOW was incorporated into the Part D RAC Contract and replaced the PWS.  App. at Ex. 21, Part D RAC Contract, OY1 SOW.  By the time the PWS was replaced with OY1 SOW on January 1, 2014, ACLR's opportunity to pursue the PY 2007 duplicate payments had expired due to the limit on the audit and recovery periods to the fiscal year and retrospectively for a period of not more than four fiscal years prior to such fiscal year.  42 U.S.C. § 1395ddd(h)(4) (amended 2016).

CMS's only arguments attempting to justify its actions precluding ACLR from recovering the PY 2007 duplicate payments are based upon selectively quoting language from the PWS and then arguing that such language somehow gave CMS the right to stop

ACLR's PY 2007 duplicate payment audit.  A careful examination of the language CMS relies upon reveals that CMS had no contractual basis for stopping ACLR from recovering the PY 2007 duplicate payments.

For example, CMS cites to a portion of a sentence in the PWS regarding "CMS revision to our process."  Defendant's Motion at 57.  The full sentence in the PWS states, "[w]hile we anticipate CMS' revisions to our process, we typically prepare IDRs, which are standardized forms outlining requested data as well as the desired format(s) for information we need to conduct a recovery audit efforts."  App, at Ex. 7, Part D RAC Contract, A191.  This sentence pertained to ACLR's use of IDRs (Information Data Requests) to obtain "PDE & DIR data" from CMS, not CMS's right to reject the duplicate payment audit described in the PWS.  *See id.*   The PWS specifically provided "[i]n the Duplicate Payment Review & Data Work Plan process, we prepare Information Data Requests (IDRs) and obtain needed data from the Data Storage System, or as otherwise may be required by CMS."  *Id.* at A189.  CMS notified ACLR of its revision to this process on October 4, 2011 whereby rather than utilizing the Data Storage System, CMS would electronically transmit the PDE records directly to ACLR.  App. at Ex. 23, October 4, 2011 email, A471.

CMS quotes a portion of a sentence regarding CMS's approval to conduct a documentation audit of certain plan sponsors.  Defendant's Motion at 57.  The full sentence in the PWS states "[w]hile we anticipate performing a Documentation Audit on all Plan Sponsors, we will utilize these initial reports to identify those Plan Sponsors with the most egregious errors and recommend them, and solicit CMS' approval for, conducting documentation audits."  App. at Ex. 7, Part D RAC Contract, A193. This sentence has no

8

relationship to the PY 2007 duplicate payment audit because it was not a documentation audit.  A documentation audit occurs after the duplicate payment audit has been concluded.  *Id.*  Under the PWS, ACLR was to generate improper payment reports and provide them to plan sponsors prior to selection of plan sponsors for a documentation audit.  *Id*. at A194-196.  Prior to any documentation audit, the PWS provides that "[a]ny remaining unresolved amounts will be identified as improper, recovered, and removed from further review."  *Id.* at A193.

CMS quotes another incomplete sentence from the PWS that appears in the context of the potential use of statistical sampling to recover Part D improper payments.  Defendant's Motion at 9.  The full sentence in the PWS states "[w]e anticipate that some of our recommendations, such as those mentioned under *Alternative Methodologies* below, will require numerous discussions and considerable analysis by ACLR, CMS, Plan Sponsors, as well as other stakeholders."  App. at Ex. 7, Part D RAC Contract,  A193.  The specific "Alternative Methodologies" referenced in the PWS included a "managed audit process" whereby plan sponsors conduct self-audits based on statistically generated PDE records or plan sponsors conduct "a modified voluntary disclosure program."  *Id.*  These "Alternative Methodologies were ultimately not permitted by CMS.  App. at Ex. 7, Part D RAC Contract, A197-198; App. at Ex. 150, May 11, 2011 Email, A852.

CMS also quotes a portion of a sentence related to statistical sampling.  Defendant's Motion at 9.  The sentence does not refer to CMS's contractual right to approve ACLR's audits but rather CMS's anticipated approval of statistical sampling in connection with documentation audits.  The PWS states "[o]ur recommended course of action to accomplish this is to statistically sample individual Plan Sponsor or PDP PDE data.  We recognize that

CMS is familiar with these processes from our experience with the Medicare PSC program and anticipate that CMS will want to discuss and approve this methodology." App. at Ex. 7, Part D RAC Contract, A194. Statistical sampling as a method for performing documentation audits was rejected by CMS on May 11, 2011. App. at Ex. 150, May 11, 2011 Email, A852. In addition, statistical sampling was not a part of the methodology for the 2007 duplicate payment audit.

Finally, CMS quotes a sentence of the PWS regarding standardizing ACLR's processes. Defendant's Motion at 9-10. That text was from a section titled "Post Audit" and was to be conducted after a "documentation audit." App. at Ex. 7, Part D RAC, A194-96. The text quoted by CMS has no relationship to the 2007 duplicate payment audit because that audit was a data audit. *Id.* at A191-92. Improper Payment Reports would have already been submitted prior to any documentation audit and after amounts for the duplicate payment and other data audits had been "identified as improper, recovered, and removed from further review." *Id.* at A193. Moreover, CMS never provided any guidance or policies that would have modified ACLR's PY 2007 duplicate payment audit. Despite CMS's strained interpretations of the PWS, it provided CMS with no contractual basis to stop or impede ACLR's recovery of PY 2007 duplicate payments.

B.  PY 2010 Duplicate Payment Audit

On May 28, 2014, CMS approved ACLR's PY 2010-2012 duplicate payments NAIRP. Document 53, Response to Plaintiff's Proposed Findings of Uncontroverted Fact and Additional Proposed Findings of Uncontroverted Fact ("CMS Response") at ¶ 48. On April 24, 2015, COR Brown issued a technical direction letter to ACLR "rescinding" approval for the PY 2010-2012 duplicate payment audit. App. at Ex. 59, April 24, 2015

email, A656-58.  ACLR's Memorandum characterized COR Brown's technical direction letter as a termination of the PY 2010 duplicate payment audit.  ACLR's Memorandum at 39-40.  CMS contends that the technical direction letter was not a termination but a rescission of an approval for the PY 2010 duplicate payment audit.  CMS Response at ¶¶ 67-68.  Whether the technical direction letter amounted to a termination, rescission, or stop work order is a distinction without a difference.  The practical effect of the technical direction letter was that ACLR had to cease working on the PY 2010 duplicate payment audit and COR Brown had no authority under the FAR or the Part D RAC Contract to so instruct ACLR.  ACLR's Memorandum at 39-40.

While CMS had authority under the SOW to deny or approve a NAIRP through a contractually agreed upon process, there was no language in the SOW that allowed CMS to terminate or even "rescind" a previously approved NAIRP.  *See* App. at Ex. 21, Part D RAC Contract, OY1 SOW; App. at Ex. 22, Part D RAC Contract, OY2 SOW.  CMS fails to cite to any language in the SOWs that provides CMS with the right to terminate or "rescind" an ongoing previously approved audit.  CMS's stopping of the PY 2010 duplicate payment audit had an even more detrimental impact on ACLR given that ACLR had been investing its time and resources in the audit for more than a year.

C.  PY 2012-2013 Sales Tax NAIRP

CMS did not have a legitimate contractual basis to deny ACLR's PY 2012-2013 sales tax NAIRP and did not follow the required process to deny ACLR's sales tax NAIRP.  ACLR's Memorandum at 46-53.  The language in CMS's denial of ACLR's PY 2012-2013 sales tax NAIRP stated that the "audit issue is currently open and active with another CMS contractor" and that section 1.2.3 of the Part D RAC OY2 SOW states "CMS/CPI

consistently ensures RAC efforts are not duplicative and do not focus on improper payments that are already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issue."  App. at Ex. 62, CMS denial of ACLR's sales tax NAIRP, A672.  CMS makes no attempt to show that ACLR's PY 2012-2013 sales tax NAIRP was duplicative or that it focused on improper payments that had "been corrected/reimbursed elsewhere in CMS for the same audit issue" in its response to ACLR's breach of contract arguments.  Defendant's Motion at 56.   On the contrary, internal CMS documents are consistent that the "responsibilities of the [NBI] MEDIC and the RAC are separate."  App. at Ex. 176, June 19, 2013 Email, A1006.

Now, CMS contends that it did not breach the Part D RAC Contract because CMS had a blanket right to deny ACLR's PY 2012-2013 sales tax NAIRP.  Defendant's Motion at 56.  Prior to denying a NAIRP, CMS was contractually required to "conduct a walk-thru of the new issue," provide "initial feedback to the RAC," such that ACLR would work in "collaboration with CMS . . .  to abandon the original NAIRP or revise it."  App. at Ex. 22, Part D RAC Contract OY2 SOW, A465.   CMS ignored these requirements.   The requirements in the Part D RAC Contract OY2 SOW for a specific NAIRP approval process and for a written explanation of any NAIRP denial was to protect ACLR from unreasonable NAIRP denials.  The undisputed facts support a finding that CMS did not deny ACLR's PY 2012-2013 sales tax NAIRP in accordance with the Part D RAC Contract and that, therefore, CMS breached the Part D RAC Contract.

D.   OMB Guidance And IPERA Do Not Provide CMS With The Right To Block, Rescind, Or Deny ACLR's Duplicate Payment Audits And Sales Tax NAIRP.

Because CMS cannot point to any contractual language that justifies its actions, CMS argues that it "was required, by law, to have the final say in the identification of any improper payments identified through the recovery audit process." Defendant's Motion at 57. For this proposition, CMS relies upon 2014 OMB guidance that provides "[t]he contractor must provide clear evidence of overpayments to the appropriate agency official." *Id.* It would appear from CMS's argument that it is using the OMB guidance to impose a requirement on ACLR to provide clear evidence of overpayments and then imply that somehow ACLR failed to show such evidence of overpayments. The OMB guidance defines an improper payment as:

> An improper payment is any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements. Incorrect amounts are overpayments and underpayments (including inappropriate denials of payment or service). An improper payment includes any payment that was made to an ineligible recipient or for an ineligible service, duplicate payments, payments for services not received, and payments that are for the incorrect amount. In addition, when an agency's review is unable to discern whether a payment was proper as a result of insufficient or lack of documentation, this payment must also be considered an error.

App. at Ex.18, Excerpts of Part III to OMB Circular A-123, A348. The parties agree that this is the improper payment definition used by CMS. Defendant's Response at ¶¶ 20-21. ACLR's PY 2007 and PY 2010 duplicate payment audits provided clear evidence of duplicative payments. In fact, approximately 90% of the plan sponsors failed to provide any documentation in response to ACLR's PY 2010 duplicate payment RFIs, which, based upon the definition of improper payments, rendered those corresponding PDE records to be overpayments. App. at Ex. 175, Affidavit II of Christopher Mucke ("C. Mucke Aff."), A1001 at ¶ 6. Similarly, ACLR's PY 2012-2013 sales tax NAIRP identified PDE records that contained amounts in the PDE record sales tax field in states that did not allow sales

13

tax to be billed on Part D prescriptions or that were billed in an excessive amount.  Such PDE records were made in an incorrect amount under statutory, contractual, and administrative requirements rendering them improper payments.

CMS's reliance on IPERA § 2(h)(2)(C)(ii) is also misplaced.  The fact that the statute provides that a "contractor shall have no authority to make final determinations relating to whether an overpayment occurred" does not justify CMS's actions.  IPERA § 2(h)(2)(C)(ii).  CMS's actions concerning ACLR's audits were not premised on the fact that ACLR purported to make final determinations as to whether an overpayment occurred. Regardless, IPERA § 2(h)(2)(C)(i) expressly provides that "the head of the agency may authorize the contractor to notify entities (including persons) of potential overpayments made to such entities, respond to questions concerning potential overpayments, and take administrative actions with respect to overpayment claims made or to be made by the agency."  IPERA § 2(h)(2)(C)(i).  Through the Part D RAC Contract, ACLR was authorized to undertake the actions that it did, especially in connection with the PY 2007 duplicate payment audit as those actions were expressly set forth in the PWS.

IV.    **CMS's Actions Breached Its Duty Of Good Faith And Fair Dealing**

In arguing that it did not breach its duty of good faith and fair dealing in connection with the PY 2007 and PY 2010 duplicate payment audits and ACLR's PY 2012-2013 sales tax NAIRP, CMS contends that ACLR is seeking "unfettered" or "unbridled discretion" to proceed with audits using its own methodologies and that CMS was legally justified in "denying approval for these audit issues."  Defendant's Motion at 58-59.  CMS deliberately misconstrues ACLR's argument supporting its breach of duty of good faith and fair dealing claims.  CMS approved ACLR's PY 2007 duplicate payment audit when it approved the PWS and executed the Part D RAC Contract and  CMS approved the PY 2010 duplicate

payment audit in accordance with the Part D RAC Contract OY1 SOW only to then intentionally interfere with ACLR's performance and reasonable expectations in connection with the ACLR's duplicate payment audits.  CMS's failure to adhere to the SOWs and unreasonably deny ACLR's PY 2012-2013 sales tax NAIRP was also an intentional interference with ACLR's performance and reasonable expectations.

A.   2007 Duplicate Payment Audit

With respect to the 2007 duplicate payment audit, CMS appears to contend that it never approved the audit and that its actions related to the audit were justified.  Defendant's Motion at 59.  CMS asserts that "ACLR did not submit any formal audit proposal to CMS." *Id.* CMS fails to cite any contractual requirement in the PWS for ACLR to submit a "formal audit proposal to CMS" because none existed.  As discussed in ACLR's Memorandum, CMS's acceptance of the PWS and inclusion in the Part D RAC Contract was the approval of the duplicate payment audit.  ACLR's Memorandum at 24-26.

CMS contends that the PWS "only approved of the concept" of conducting a duplicate payment audit and that the PWS merely "proposed to examine" duplicate payments.  CMS Response at ¶¶ 26-27.  The PWS does not contain the term "propose" in connection with a duplicate payment audit.  *See* Ex. 7, Part D RAC Contract, PWS.  In an email from CMS to ACLR on October 4, 2011, CMS stated "[y]ou will review that data for improper payments for approved audit scope issues, so far excluded providers and duplicate payments."  App. at Ex. 23, October 4, 2011 email, A471.  CMS's approval of the duplicate payment audit issue is further evidenced by its own website from no later than July 18, 2013 which provides "In addition to the audit issues already approved (excluded providers, ***duplicate payments***, DIR) . . . ."  App. at Ex. 143, CMS Website Screen Shot,

A794.[4]  In its June 2012 Q&A for Medicare Part D Recovery Audit Contractor (RAC) Program, CMS stated "CMS has identified three areas that the RAC will initially focus on, which include reviewing Prescription Drug Event (PDE) records associated with excluded providers, Direct and Indirect Remuneration (DIR), and ***duplicate PDEs***."  App. at Ex. 144, June 2012 Q&A for Medicare Part D Recovery Audit Contractor (RAC) Program (emphasis added), A798.  It cannot be disputed that CMS had approved ACLR's PY 2007 duplicate payment audit.

CMS then contends that "ACLR did not inform CMS which PDE records it thought were duplicates or provide any specific data about its findings" until ACLR submitted its certified claim.  Defendant's Motion at 59.  ACLR did not have a contractual obligation to inform CMS which PDE records were duplicates prior to sending the notices of improper payment demand letters ("NIPs") to plan sponsors.  *See* App. at Ex. 7, Part D RAC Contract.  Moreover, CMS did not request information regarding the duplicate PDE records prior to CMS advising ACLR to not issue the NIP demand letters which effectively terminated the 2007 duplicate payment audit.  *See* Defendant's Response at ¶ 35.  The lack of specific data being provided by ACLR to CMS prior to CMS stopping the 2007 duplicate payment audit on November 30, 2011 is also irrelevant given that CMS had already agreed with ACLR's proposed duplicate payment methodology on November 3, 2011.  *Id*. at ¶ 32.

CMS claims that "ACLR understood that it would not be performing under the terms of the PWS while the SOW was being drafted and finalized."  Defendant's Motion at 11-12.  This assertion has no factual support and is contradicted by the evidence.  While ACLR confirmed in a December 1, 2011 email to CO Wheeler that ACLR would refrain

---

[4] The website reference reflecting the duplicate payment audit approval cannot refer to the PY 2010-2012 duplicate payment NAIRP as that was submitted to CMS on January 2, 2014.  *See* CMS Response ¶ 47.

from issuing the NIP demand letters to plan sponsors as instructed by CMS, the email was sent under the specter that ACLR would not be paid for the million dollars already spent in connection with the Part D RAC Contract through late 2011 and was concerned that CMS might terminate the Part D RAC Contract.  Tab 110, SA602; Tab 90, SA248-49 at 124:9-125:9.  The email does not serve as waiver for ACLR's PY 2007 duplicate payment claims.  *See Dyncorp Int., LLC v. United States*, 125 Fed. Cl. 446, 452 (2016).

ACLR took other actions consistent with following the Part D RAC PWS until the execution of the Part D RAC OY1 SOW on December 31, 2013.  For example, on November 13, 2013, ACLR submitted improper payments to CMS totaling $1.05 billion and informed CMS that ACLR would commence recoveries in accordance with its PWS.  App. at Ex. 43, November 17, 2013 Email at A579.  Additionally, ACLR provided a draft SOW proposal to CMS on January 7, 2012 which was ignored.  App. at Ex. 167, January 17, 2012 Email, A940-41.  ACLR also approved CMS's draft SOW submitted by CMS on April 20, 2012 which was also ignored. App. at Ex. 27, April 20, 2012 Email Approving Draft SOW, A510.  ACLR also made repeated requests to CMS for ADR/mediation to address Part D RAC Contract issues, but those requests were ignored by CMS.  App. at Ex. 155, July 2, 2013 Email, A866-67.  ACLR also discussed the potential for the recovery of duplicate payments including those for PY 2007 on multiple occasions after January 2012.  App. at Ex. 175, C. Mucke Aff., A1001 at ¶ 4.  There is no basis for CMS to contend that ACLR agreed not to perform under the PWS until the effective date of the Part D RAC Contract OY1 SOW on January 1, 2014.  App. at Ex. 21, Part D RAC, OY1 SOW, A388.

Finally, CMS contends that at the time CMS advised ACLR to not issue the NIP demand letters to recover the PY 2007 duplicate payments, "CMS did not have in place a

mechanism for recouping any actual overpayments from the plan sponsors, so it would have been premature for anyone to commence recoupment activities."  Defendant's Motion at 59.  CMS's lack of a preferred mechanism for recouping overpayments does not justify its termination of ACLR's PY 2007 duplicate payment audit.  The Part D RAC Contract already contained a mechanism for recouping overpayments as "the PWS stated that ACLR would collect identified overpayments."  CMS Response at ¶ 36.  IPERA § 2(h)(2)(C)(i) expressly provides that "the head of the agency may authorize the contractor to notify entities (including persons) of potential overpayments made to such entities."  Therefore, ACLR had contractual and statutory authority to issue NIPs to the plan sponsors and collect the identified overpayments.

Eventually, CMS implemented its preferred mechanism for recouping overpayments.  CMS did not formally implement its process for recouping overpayments until January 1, 2014 through the Part D RAC Contract OY1 SOW – approximately three years after the Part D RAC was put in place.  App. Ex. 21, Part D RAC Contract, OY1 SOW at 3.2, A404-05; App. Ex. 75, Defendant's Responses to Plaintiff's First Request for Admissions, Response No. 9, A773.  CMS could have implemented its preferred mechanism for recouping overpayments well before ACLR sought to issue its PY 2007 duplicate payment NIPs or, at the very least, before the expiration of the statute of limitations on ACLR's ability to recover those PY 2007 duplicate payments.  To the extent that CMS uses the lack of a CMS preferred mechanism for recouping overpayments as a predicate for terminating ACLR's PY 2007 duplicate payment audit, CMS's three-year delay in implementing its process for recouping these overpayments is further evidence of CMS's breach of its duty of good faith and fair dealing.

18

### B.  2010 Duplicate Payment Audit

ACLR's Motion concerning its PY 2010 duplicate payment audit is simple.  CMS

had no contractual right to terminate or rescind ACLR's PY 2010 duplicate payment audit

and CMS's actions in doing so were also a breach of its duty of good faith and fair dealing.

CMS's defense is an attempt to complicate the issues.  CMS contends that its actions in

connection with the 2010 duplicate payment audit were justified "[i]n light of all the

information provided to CMS concerning the potential flaws with the 2010 duplicate

payment issue."  Defendant's Motion at 61.  To the extent there were "potential flaws with

the 2010 duplicate payment issue," those flaws were directly a result of CMS's actions,

including tasking Livanta, LLC ("DVC") with premature and out-of-scope validations.

ACLR's PY 2010 duplicate payment approved NAIRP provided as follows:

> The RAC will review all documentation submissions received
> from the plans to ensure the legitimacy (non-duplicative nature)
> of the potentially duplicative PDE forwarded to the plans. Upon
> completion of its review, Improper Payment Review Packages
> (IPRPs) will be generated from unsupported (duplicative) PDEs
> and forwarded to the Data Validation Contractor (DVC) for
> review and validation.

Tab 107, SA494.  The only reference to a DVC validation of RAC audit findings in both

ACLR's and the DVC's SOWs is the validation of the IPRP (ACLR's improper payment

determinations) that could not be made until plan sponsors had submitted supporting

documentation for the PDEs identified in the RFI exception reports and ACLR had

conducted its improper payment review.  App. at Ex. 21, Part D RAC Contract, OY1 SOW,

A403, section 2.2; App. at Ex. 22, Part D RAC Contract, OY2 SOW, A438, section 2.2;

App. at Ex. 160, July 2, 2013 Medicare Part D RAC Data Validation Contractor (DVC)

Statement of Work, A892 at section 2.3.   Nevertheless, prior to ACLR's RFIs and

generation of IPRPs, the DVC reviewed dosage change increases which were not part of the CMS approved NAIRP.  Tab 113, SA610.  The DVC's findings pertaining to dosage changes for PY 2010 duplicate payments were based solely on a mathematical calculation performed prior to ACLR's RFIs and the receipt of scripts and fill histories from the plan sponsors.  Tab 113, SA612.  The DVC acknowledged that it "cannot make a determination if they're legitimate dosage increases without looking at the scripts."  App. at Ex. 158, Excerpts from the Deposition of Christopher Martin Mendez as Corporate Representative for Livanta, LLC ("Livanta Dep."), A875-76 at 128:16-129:3.  ACLR responded to the DVC's review and CMS approved release of the PY 2010 duplicate payment RFIs without removal of alleged dosage change PDEs.  App. at Ex. 168, ACLR Response to DVC Duplicate Payment RFI Report, A945; App. at Ex. 52, July 8, 2014 email, A618.

Based on its review of "scripts" and other supporting documentation submitted by plan sponsors, ACLR calculated that the DVC's mathematical calculation correctly predicted a dosage change in less than 27 PDEs out of every 100 PDEs for an accuracy rate of 26.7% and submitted these findings to CMS on December 24, 2014.  App. at Ex. 57, December 24, 2014 letter, A648.  ACLR proposed that CMS submit duplicate payment NIPs to plan sponsors using the audit methodology developed by ACLR to identify PY 2007 duplicate payment amounts noting that it had an accuracy rate of "84%" and that "no or insufficient documentation comprised the remaining 16%."  App. at Ex. 57, December 24, 2014 letter, A648-49.

ACLR then compiled its IPRP package based on the methodology documented in the NAIRP approved by CMS on May 28, 2014.  Those findings did not incorporate the revised protocol requested by CMS on October 22, 2014, because there was no language

in the Part D RAC Contract that allowed CMS to apply a revised methodology to perform PY 2010 duplicate payment reviews.  *See* App. at Ex. 6, CMS 30(b)(6) Dep. at 173:3-174:9; 249:13-250:22.  The Part D RAC OY1 SOW requires that ACLR submit IPRPs containing the "PDE exception reports and the supporting documentation identifying improper payments corresponding to a particular audit issue by contract" to the DVC.  App. at Ex. 21, Part D RAC Contract OY1 SOW, A402.  ACLR provided such information to the DVC and CMS, including duplicate payment data and the information received from the plan sponsors.  App. at Ex. 21, Part D RAC Contract, OY1 SOW, A402; App. at Ex. 22, Part D RAC Contract, OY2 SOW at A437; Tab 118, SA628.  On April 24, 2015, COR Brown effectively terminated the PY 2010 duplicate payment audit through her "Technical Direction Letter."  App. at Ex. 59, April 24, 2015 email.

CMS attempts to justify its action based upon the amount of information plan sponsors would have to provide in response to ACLR's 2010 duplicate payment RFIs.  Defendant's Motion at 60.  It was CMS's decision to require plan sponsors to submit information for the 2010 duplicate payment audit.  ACLR initially proposed that the PY 2009-2012 duplicate payment audit be conducted as an automated audit.  App. at Ex. 175, C. Mucke Aff., A1001 at ¶ 5.  CMS required that the audit be conducted as a complex review, which required that ACLR obtain evidentiary support such as copies of prescriptions and prescription fill histories for improper payment PDEs via its RFIs to plan sponsors.  CMS's Response at ¶ 52.

In making this "burden on plan sponsors" argument, CMS relies upon one email from Express Scripts.  Defendants' Motion at 60.  Express Scripts acts not just as a plan sponsor but also as a pharmacy benefits manager that has a number of plan sponsor clients

21

that may have received RFIs from ACLR.  Tab 119, SA630.  Therefore, Express Scripts may have had responsibility on behalf of its plan sponsor clients to respond to the vast majority of the RFIs sent by ACLR and any "burden" should be evaluated in that context. Without questioning the motivation or accuracy of Express Scripts's email, CMS was not justified in relieving the plan sponsors from providing information given that CMS is legally obligated to recoup overpayments and those duplicate payments were approximately $15 million for PY 2010.

CMS also attempts to justify its actions by contending that "ACLR declined to follow the revised methodology requested by CMS."  Defendants' Motion at 60.  ACLR had a contractual obligation to follow the methodology CMS approved in the NAIRP. "CMS's approved methodology, for each audit issue, ***must*** be used by the RAC to determine the improper payment amount."  App., Ex. 21, Part D RAC Contract, OY1 SOW at 2.1.2, A402 (emphasis added).  CMS did not have a contractual right to revise the methodology set forth in the approved NAIRP.  CMS acknowledged this fact in an internal email concerning potential Part D RAC SOW changes.  App. at Ex. 60, December 11, 2014 email regarding potential SOW changes, A660.  CMS writes under the category of "proposed change," that "CMS may modify the approved methodology at any time during the audit process." [5]  *Id.*  It is incomprehensible that there could be any justification for CMS to terminate or rescind ACLR's PY 2010 duplicate payment audit because ACLR used an audit methodology that CMS contractually required ACLR to use.

C.  ACLR's Sales Tax NAIRP

1.  CMS acted unreasonably and contrary to the Part D RAC SOW process in denying ACLR's sales tax NAIRP.

---

[5] No such change was ever added to the Part D RAC SOW.

CMS's response to ACLR's argument that CMS breached its duty of good faith and fair dealing is essentially that CMS had an unlimited right to deny ACLR's PY 2012-2013 sales tax NAIRP regardless of the Part D RAC Contract and the law requiring CMS to pursue and collect Part D overpayments.  Defendant's Motion at 62-67.  However, CMS's right to deny a proposed audit issue must be in accordance with the Part D RAC Contract and the duty of good faith and fair dealing.  CMS's right to deny an audit issue is only mentioned in section 2.1.1 of the SOW and Appendix E and is limited thereby.  While CMS's authority to deny a proposed audit issue may not have been limited by section 1.2.3 of the SOW, CMS relied upon section 1.2.3 as basis for the PY 2012-2013 sales tax NAIRP denial.[6]  CMS's reliance upon section 1.2.3 of the SOW as the justification for denying ACLR's sales tax NAIRP demonstrates the unreasonableness of CMS's denial of ACLR's PY 2012-2013 sales tax NAIRP.

CMS's Motion fails to offer any evidence or any legitimate argument that the improper payments in ACLR's sales tax NAIRP were "already identified, being audited, and have been corrected/reimbursed elsewhere in CMS for the same audit issues."  CMS never contends that the improper payments in ACLR's sales tax NAIRP were "already identified" as CMS defined that term.  CMS also does not contend that improper payments in ACLR's sales tax NAIRP had been corrected/reimbursed elsewhere in CMS for the same audit issues.

---

[6] CMS had a contractual obligation to provide ACLR with a written explanation of the reasons for the denial.  App. Ex. 21, Part D RAC Contract, OY1 SOW at Appendix E, A423; App. Ex. 22, Part D RAC Contract, OY2 SOW at Appendix E, A464.  Because CMS's written explanation is factually baseless, CMS acted unreasonably and breached its duty of good faith and fair dealing.

CMS does argue that the improper payments in ACLR's sales tax NAIRP were "audited" because "Health Integrity analyzed states laws to attempt to determine the applicability of sales or other taxes and examined the PDE records to compute the amounts recorded in the sales tax field."  Defendant's Motion at 66.  Health Integrity, LLC's ("NBI MEDIC") actions cannot constitute an audit within the context of the Part D RAC Contract because the NBI MEDIC was not undertaking action to recover the improper payments in ACLR's sales tax NAIRP, which was the essence of an audit under the Part D RAC Contract.  Even if the NBI MEDIC's actions amounted to an audit, which they don't, CMS fails to demonstrate that the improper payments in ACLR's sales tax NAIRP were "being audited" by the NBI MEDIC at the time of the submission of ACLR's sales tax NAIRP.  Defendant's Motion at 66; CMS Response at ¶¶ 87-89.

CMS contends that ACLR's sales tax NAIRP was "entirely duplicative" of the NBI MEDIC's analysis.  Defendant's Motion at 65.  CMS even makes the more dramatic assertion that "Health Integrity already had examined the same exact PDE records for the same years for the same issues."  CMS Response at ¶ 85.  The NBI MEDIC's analysis was not entirely duplicative and it did not examine the same exact PDE records for the same years for the same issues.  The NBI MEDIC's "National Study" expressly states "PDE records for the dates of service from January 1, 2014 through December 31, 2014 were extracted from the Integrated Data Repository (IDR) to evaluate sales tax trending at the state level."  Tab 124, SA673.  ACLR's PY 2012-2013 sales tax NAIRP concerned plan year 2012 and 2013 PDE records – completely different years and PDE records from the NBI MEDIC's "National Study."  App. Ex. 61, ACLR Sales Tax NAIRP, A666.  At the very most, the NBI MEDIC's analysis may have overlapped some of the improper

payments identified by ACLR in its PY 2012-2013 sales tax NAIRP as to Louisiana and Minnesota.  Nevertheless, CMS still denied the sales tax NAIRP, in part, as "duplicative." App. at Ex. 62, CMS denial of sales tax NAIRP, A672.  CMS acknowledges that the NBI MEDIC "was not the Part D RAC so could not have collected any improper sales tax payments."  Defendant's Motion at 65.  CMS also acknowledges that "it was not Health Integrity's contractual purpose to identify improper payments for recoupment by CMS." CMS Response at ¶ 85.  The facts do not support a conclusion that ACLR's PY 2012-2013 sales tax NAIRP was duplicative.

At the time ACLR submitted its sales tax NAIRP, CMS was not taking any action to pursue the recovery of overpayment in Louisiana, Minnesota, or any other state based upon improper sales taxes and, contrary to CMS's email denying ACLR's sales tax NAIRP, the audit issue was not "open and active with another CMS Contractor."  CMS concedes that after August 2015, the NBI MEDIC did not recall performing "active work" on the Minnesota sales tax issue.  Defendant's Motion at 42.  CMS fails to offer any facts upon which one could conclude that the NBI MEDIC was actively working on the sales tax issue at the time CMS denied ACLR's sales tax NAIRP.[7]  CMS should have approved ACLR's PY 2012-2013 sales tax NAIRP so that those overpayments could be recovered.

CMS also claims it did not have to follow the "New Issues Submission and Approval Process" detailed in Appendix E of the Part D RAC SOW because "CMS already determined to deny the NAIRP."  Defendant's Motion at 64.  Relying on the self-serving

---

[7] CMS contends the sales tax audit issue was "open" until June 2016.  Defendant's Motion at 65.  While CMS may not have officially closed the sales tax audit issue until June 2016, it can hardly be said that the matter was open given testimony that CMS had already decided by September 2015 to not pursue the recovery of those improper payments. App. at Ex. 172, Excerpts from the Deposition of Rosalind Abankwah at 42:4-44:13, A974-76.

testimony of COR Brown, CMS asserts that the feedback and walk-through requirements are somehow optional because the sales tax NAIRP was not going to be approved.  *Id.*  CMS replaced the PWS with a SOW that outlined a precise process, including timelines, for the approval or denial of a NAIRP.  CMS completely ignored that process in denying ACLR's sales tax NAIRP.  ACLR's Memorandum at 55-58.

CMS, in an attempt to downplay its unreasonableness, states that it "invited ACLR to contact the agency with questions about the decision."  Defendant's Motion at 64.  CMS's offer is disingenuous in light of CMS's position that it was not going to approve ACLR's sales tax NAIRP.  ACLR had no contractual obligation to confer with CMS after CMS's denial of ACLR's sales tax NAIRP.  Moreover, as of September 10, 2015, CMS had rescinded or denied 100% of all the NAIRPs ACLR had submitted to CMS for approval.  App. at Ex. 175, C. Mucke Aff., A1001 at ¶ 10.  Given ACLR's past experience with CMS, ACLR's submission of a certified claim was the proper response for ACLR.

    2.  <u>Amounts included in the sales tax field on Minnesota PDE records renders those PDE records improper.</u>

PDE records contain a field for sales tax and only sales tax can be included in the sales tax field.  CMS's 2011 Prescription Drug Event Participant Guide ("Guide") provides "technical assistance" that "will enable participants to collect and submit Part D data in accordance with Centers for Medicare & Medicaid Services (CMS) requirements" and it "delineates specific rules plans must follow to report the prescription drug cost and payment amounts for covered drugs on the PDE record under all types of PBPs."  App. at Ex. 169, Excerpts of 2011 Prescription Drug Event Participant Guide ("Guide"), A948-49.  According to the Guide, the PDE record contains three detail cost fields: "Ingredient Cost

Paid, Dispensing Fee Paid, and Total Amount Attributed to Sales Tax. For all events, the gross drug cost is a sum total of these three detail fields in the PDE record." *Id.* at A950 at 4.2.4.1.1. The ingredient cost paid is the "dollar amount paid to the pharmacy for the drug itself" and should "not include costs such as dispensing fees or sales tax." *Id.*, A951 (Field No. 30). The Guide further provides "[i]n cases where these three fields are not disaggregated, plans should report the total cost in the 'Ingredient Cost Paid' field, and report zero dollar amounts for the other two fields." *Id.*, A952. The Guide provides that the sales tax field "represents the dollar amount of sales tax, if any, associated with the prescription drug event." *Id.*, A953 (Field No. 31).

Under Minnesota law, drugs for human use are exempt from Minnesota sales tax. Minn. Stat. § 297A.67. To the extent a Minnesota PDE records contain an amount in the sales tax field, the PDE record would be an improper overpayment. ACLR's findings that these payments were improper is also supported by the NBI MEDIC who agreed that there should be no pass through of sales taxes for Minnesota PDE records and CMS makes no attempt to contest this conclusion. App. at Ex. 145, Excerpts from Deposition of Matthew Farabaugh as Corporate Representative for Health Integrity, LLC ("NBI MEDIC Dep."), A805 at 136:6-14. Accordingly, ACLR's PY 2012-2013 sales tax NAIRP identified Minnesota PDE records including amounts in the sales tax field as improper overpayments.

CMS attempts to obfuscate the simple application of its own guidance and Minnesota law by representing that a wholesale drug distributor tax was billed in the sales tax field on Minnesota PDE records. Defendant's Motion at 63. To support this contention, CMS references NBI MEDIC communications with one plan sponsor, UCare, who "sought legal advice from the Minnesota Pharmacists Association and outside

counsel" and "a regional CMS official" regarding the permissibility of wholesale drug distributor tax reimbursement under federal law. Defendant's Motion at 39. CMS's reliance on these communications is misplaced. ACLR's determination that the Minnesota PDE records were improper payments was based solely on its application of CMS guidelines and procedures and Minnesota tax law and not on the permissibility of tax reimbursement under federal law.

CMS posits that "while Minnesota does not impose a sales tax on retail prescription drug sales, the state does impose a wholesale drug distributor tax" and that Minnesota law provides that this tax "may be passed on to the pharmacies" who "in turn may transfer the added costs on to pharmacy benefit managers and other third-party plans and networks that pay for patients' prescriptions." *Id.* at 39. Even if the amounts billed in the sales tax field on Minnesota PDE records represented the wholesale drug distributor tax, such amounts would still render the payments for these PDE records improperly paid. Minnesota limits the billing of sales tax to those transactions taxed under Chapter 297A of the Minnesota Code and the amount of tax charged in individual PDE records would have exceeded any wholesale drug distributor tax.

While Minnesota charges sales tax on retail transaction made in the state, Minnesota also requires that such taxes are required to be "stated and charged separately from the sales price" and that all such collected taxes "must be remitted to the commissioner." Minn Stat. § 297A.77 (2012). No reference to the billing and/or collection of the Minnesota wholesale drug distributor tax is made. In *Schober v. Commissioner of Revnue*, 778 N.W.2d 289 (Minn. 2010), the Minnesota Supreme Court quoting Minnesota Statute § 289A.31, subdivision 7(e), stated that "[a]ny amounts collected, even if

28

*erroneously or illegally collected*, from a purchaser under a representation that they are taxes imposed under chapter 297A are state funds from the time of collection and must be reported on a return filed with the commissioner." *Id.* at 291.  CMS's suggestion that the wholesale drug distributor tax may be passed along as a sales tax is impermissible under state law.

Minnesota law provides that a "health care provider, or wholesale drug distributor must not state the tax obligation under section 295.52 in a deceptive or misleading manner."  Minn. Stat. § 295.53(3) (amended 2017).  A "health care provider" includes "a person whose health care occupation" includes furnishing drugs directly to consumers. Minn. Stat. § 295.50(4)(1) (amended 2016).  Therefore, a Minnesota pharmacist completing a PDE record is a health care provider and subject to Minn Stat. § 295.53(3) (amended 2017).  The submission of a PDE record to CMS for payment containing amounts in the sales tax field that are actually a wholesaler drug distributor tax would amount to stating such tax in a misleading or deceptive manner and violate Minnesota law.

CMS also infers that by virtue of Minn. Stat. § 295.582(1)(a) pharmacies may separately state, bill, and collect for wholesale drug distributor tax amounts they paid to wholesale drug distributors.  Defendant's Motion at 39-40.  Such a contention is unsupported by the plain language of the statute which states that pharmacies "may transfer additional expense" to a third party by "increasing fees or charges" or "by other methods." Minn. Stat. § 295.582(1)(a).  Separate statement of the tax is not addressed in Minn. Stat. § 295.582.  Separate statement of section 295.52 taxes are, however, addressed at Minn. Stat. § 295.53, which provides that a "health care provider, or wholesale drug distributor must not state the tax obligation under section 295.52 in a deceptive or misleading

29

manner." Minn. Stat. § 295.53(3). Even if the assumption that amounts in the sales tax field in Minnesota PDE records were, in fact, the wholesale drug distributor tax, the billing of such amounts would be both "deceptive" and "misleading" and impermissible under state law.

Finally, Minn. Stat. Ann. § 295.53(3) provides that "pharmacies must not state the tax obligation based on the retail price." Even if it was proper to include the wholesaler drug distributor tax in the PDE record sales tax field, it is extremely unlikely that the amount in the sales tax field on Minnesota PDE records accurately represents the wholesale drug distributor tax. The wholesaler drug distributor tax "is imposed on each wholesale drug distributor equal to two percent of its gross revenues." Minn. Stat. Ann. § 295.52(3). Even if the wholesale drug distributor tax could be calculated based upon the wholesale drug cost, there is no field on the PDE record for the wholesale drug cost. App. Ex. 146, Excerpts from CMS 30(b)(6) Deposition in ACLR II, A825 at 276:18-21. Therefore, one cannot determine from a review of a Minnesota PDE record if the amount in the sales tax column was 2% of the wholesale drug cost. *Id.* at 276:22-278:19. Thus, it is incorrect for CMS to contend that "according to Health Integrity, if the wholesale drug distributor tax was appropriately being passed through on part D prescriptions, the additional amounts remaining in the sales tax field on Minnesota PDEs from 2010 to 2014 totaled $10.2 million for that five-year period." Defendant's Motion at 63. The NBI MEDIC never had access to the wholesale drug cost for each PDE record and therefore could not calculate 2% of the corresponding wholesale drug cost. Also, the NBI MEDIC never represented that it made the calculation alleged by CMS. Tab 139, SA743. Instead, it appears the NBI MEDIC made some calculation based upon 2% of the ingredient and dispensing cost fields listed

in the Minnesota PDE records and subtracted that amount from the total in the sales tax field.  App. at Ex. 145, NBI MEDIC Dep., A810-13 at 196:17-199:16; Tab 139, SA743. The wholesale drug cost by its very nature would be some amount less than the ingredient and dispensing cost.

ACLR conducted its own analysis of the Minnesota PDE records comparing the amount in the sales tax field with the amount in the ingredient cost field.  App. at Ex. 175, C. Mucke Aff., A1001 at ¶ 7.  Over 90% of the PY 2012-2013 Minnesota PDE records in ACLR's sales tax NAIRP and Minnesota PDE records covered by ACLR's Complaint have amounts billed in the sales tax field at 2% or higher than the ingredient cost paid.  *Id.* at ¶ 8.  Since the ingredient cost paid represents the retail price charged by the pharmacies and would be greater than the wholesale drug cost, the sales tax field is incorrect even if the wholesale drug tax could be included in the sales tax field and billed at 2% of the wholesale drug cost, which it cannot.[8]   *Id.* at ¶ 9.

CMS also goes to great lengths to demonstrate that the NBI MEDIC "had been analyzing the potential for improper sales tax payments in Minnesota for years before ACLR submitted its sales tax NAIRP in August 2015" and that its initial efforts commenced "in June 2010, following a request for assistance made by the OIG."  Defendant's Motion at 38.  CMS also asserts that the "issue of the applicability of the Minnesota wholesale drug distributor tax to Part D prescriptions apparently remained open and unresolved" such that "CMS requested Health Integrity to analyze the issue again in 2014."  *Id.* at 41.  Finally, CMS claims that it and "Health Integrity discussed Minnesota

---

[8] This type of analysis is the type of information ACLR and CMS could have discussed to more appropriately evaluate the amounts in the sales tax field when evaluating ACLR's sales tax NAIRP.  ACLR was never afforded this opportunity because CMS did not engage in any discussions with ACLR prior to denying ACLR's sales tax NAIRP.

tax issues throughout 2015."[9]  *Id.*  In short, after six years of review, CMS appears unable to discern whether these payments were proper and as such the amounts sales tax field on Minnesota PDE records "must also be considered an improper payment."  App. at Ex.18, excerpts of Part III to OMB Circular A-123, A348.  Accordingly, the Minnesota PY 2012-2013 PDE records that contain amounts in the sales tax field are overpayments and should have been recouped.

3.   Amounts included in the sales tax field on Louisiana PDE records renders them improper.

Sales tax cannot be billed on Louisiana PDE records.  Louisiana law provides that "prescription drugs purchased through or pursuant to a Medicare Part B and D plan shall be exempt from the sales and use taxes imposed by any local governmental subdivision, school board, or other political subdivision whose boundaries are not coterminous with the state."  LA St. §47:337.9F.  As discussed above, CMS requires that only sales tax can be included in the sales tax field on PDE records.  App. at Ex. 169, Guide, A951 and A953. Therefore, if amounts are included in the sales tax field on Louisiana PDE records that are submitted to CMS by plan sponsors, the PDE records are improper overpayments.

According to CMS, Express Scripts took the position that based upon the Louisiana Pharmacy Benefits Services Manual Louisiana required the imposition of a 10 cent prescription provider fee on all prescriptions and that fee was being reported in the PDE sales tax field.  Defendant's Motion at 36.  CMS then "agreed not to pursue recoupment of PDE records containing amounts of 10 cents or less in the sales tax field" in Louisiana

_____

[9] ACLR does not agree that CMS had such discussions with the NBI MEDIC.  The NBI MEDIC did not have any communications with CMS after August 2015 regarding the Minnesota sales tax issue.  App. at Ex. 65, NBI MEDIC Dep. at 127:14-17.

despite the fact CMS had previously issued notices to Louisiana plan sponsors to submit corrected PDE records because their PDE records contained "unallowable sales tax payments." *Id.* at 35. CMS's decision was flawed and the inclusion of sales tax in a Louisiana PDE record renders the PDE record an improper overpayment.

As discussed above, CMS expressly requires that only sales taxes be placed into the sales tax field and does not provide that the field can be used as a catch-all to include other taxes or miscellaneous fees. The NBI MEDIC concluded that the ten cents sales tax was not appropriate to pass through to CMS and recommended that CMS recoup the sales tax in the Louisiana PDE records. App. at Ex. 145, NBI MEDIC Dep., A804-05 at 44:20-45:7 and A808-09 at 184:4-185:1. Most importantly, the Louisiana Pharmacy Benefits Services Manual[10] directs Louisiana pharmacists to include the 10 cent prescription provider fee in the dispensing fee - not the sales tax field. Exhibit 147, Excerpts from The Louisiana Pharmacy Benefits Services Manual, A831. "Pharmacy providers and dispensing physicians are responsible for a ten cent (10 cent) provider fee on all prescriptions they fill. The Medicaid maximum allowable overhead cost (dispensing fee) includes the provider fee mandated under state law." *Id.* Therefore, including a ten cent prescription provider fee in the sales tax field rather than the dispensing fee field of a Louisiana PDE record would be contrary to CMS and Louisiana pharmacy requirements and renders those PDE records improper payment.[11] An improper payment includes "any

---

[10] This appears to be the same document Express Scripts relied upon when it argued to CMS that Express Scripts should be able to include a ten cent prescription provider fee in Louisiana PDE records. Defendant's Motion at 36.

[11] ACLR's position is further supported by the fact that a number of plan sponsors took the step of correcting or deleting their Louisiana PDE records that contained amounts billed in the sales tax field. Defendant's Motion at 36.

payment that should not have been made or that was made in an incorrect amount under . . . contractual, administrative, or other legally applicable requirements."  App. at Ex.18, excerpts of Part III to OMB Circular A-123, A348.  Accordingly, ACLR should have been allowed to recover improper overpayments from Louisiana PDE records that contained amounts in the sales tax field.

4.   OMB guidance supports the approval of ACLR's PY 2012-2013 sales tax NAIRP.

CMS also attempts to legitimize its denial of ACLR's PY 2012-2013 sales tax NAIRP by referring to OMB guidance.[12]  However, CMS's denial of ACLR's PY 2012-2013 sales tax NAIRP was not based upon OMB's guidance.  Even if CMS had consulted OMB guidance before denying ACLR's PY 2012-2013 sales tax NAIRP, OMB's guidance would not have justified the denial.  ACLR's PY 2012-2013 sales tax NAIRP provided clear evidence of overpayments given that sales tax was billed on PDE records when it could not legally be billed as sales tax in Minnesota, Louisiana, five states that do not impose sales tax, and in other states where amounts in the sales tax field were billed at impermissible tax rates exceeding 50% of the PDE drug costs.  Billing sales tax on PDE records when sales taxes are not allowed to be billed on PDE records makes the PDE records improper payments rather than a failure to properly document compliance.

In addition, the expected recoveries for PDE records containing improperly billed sales taxes would be greater than the costs incurred to identify and recover the overpayments as ACLR identified over $600 million in improper overpayments resulting

---

[12] The OMB guidance referenced by CMS is merely a criteria an agency may consider to determine when a recapture audit is cost-effective.  Tab 89, SA202.

from the improper sales tax charges.[13]   The costs incurred to identify and recover these overpayments would be minimal as ACLR was to be paid a contingency fee on the amounts recovered and CMS would have limited internal costs in connection with such recovery. Consequently, OMB guidance would actually support CMS approving ACLR's PY 2012-2013 sales tax NAIRP and recovering the overpayments from PDE records containing improperly billed sales tax.

CMS's denial of ACLR's sales tax NAIRP was unreasonable and demonstrates a lack of cooperation with ACLR.   CMS claims that "due to the complexity of the issues, CMS has not further pursued the recovery of any amounts reported in the sales tax fields of PDE records that ***might*** amount to improper assessments of state sales tax.  Defendant's Motion at 44 (emphasis added).  The issue of including amounts in a sales tax field on PDE records in states where sales tax cannot be billed is not a complex issue.  Such actions render those PDE records improper overpayments.  CMS's inaction and indecisiveness should not be used as a means to condone CMS's interference with ACLR's performance and reasonable expectations under the Part D RAC Contract.  CMS's decision to deny ACLR's sales tax NAIRP was arbitrary and a breach of CMS's duty of good faith and fair dealing.

V.      **ACLR's Damages Are Not Speculative**

CMS asserts that ACLR's claims should be denied because its damages are "purely speculative."  Defendant's Motion at 68.  The concept of speculative damages typically arises when damages are based upon the occurrence of future events, not those arising directly from the breach.  *See Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1023

---

[13] Even if, as CMS proposes, only the amounts in the sales tax field could be recovered, those amounts exceed $30 million thereby justifying recovery of such amounts.

(Fed. Cir. 1996).   ("Like the lost profits in *Ramsey,* Wells Fargo's loss of interest on additional loans it allegedly could have made had there been no breach is 'too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.'") (citations omitted); *N. Helex Co. v. United States*, 524 F.2d 707, 720 (Ct. Cl. 1975) ("It is important to bear in mind that the corporation's claim is not for the anticipated profits of the contracts in question, but is a claim for the anticipated profits of its entire business enterprise. The lost profits of these collateral undertakings, which the corporation was unable to carry out, are too remote to be classified as a natural result of the Government's delay in payment.").   ACLR is seeking damages directly arising from CMS's breach of contract and breach of duty of good faith and fair dealing.

CMS's actions eliminated ACLR's ability to recover the improper overpayments arising from the PY 2007 and 2010 duplicate payments and the PY 2012-2013 improper sales tax PDE records.   ACLR's damages are not speculative simply because ACLR may not have recovered 100% of the improper payments identified on ACLR's PY 2007 duplicate payment NIPs or ACLR's PY 2012-2013 sales tax NAIRP.[14]   ACLR is not required to prove its damages with "with absolute exactness or mathematical" precision. *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).

ACLR had a contract to recover Part D improper payments and was to be paid a contingency fee for the overpayments recovered.   CMS has estimated well over $5 billion in overpayments during the time period of the Part D RAC Contract.   App. at Ex. 67, Excerpts from HHS 2010 Financial Report, A709; App. at Ex. 69, Excerpts from HHS FY

---

[14] ACLR's PY 2012-2013 sales tax NAIRP significantly underestimated the PY 2012-2013 sales tax improper payments as confirmed by CMS's jurisdictional argument.   Defendant's Motion at 49-50.

2012 Agency Financial Report, A723.  Thus, there is no dispute that improper Part D overpayments exist.[15]  If there is any question as to the amount of ACLR's damages, that situation was created by CMS's conduct in stopping ACLR's PY 2007 duplicate payment audit, terminating or rescinding ACLR's PY 2010 duplicate payment audit, and denying ACLR's PY 2012-2013 sales tax NAIRP.  CMS should not be allowed to breach the Part D RAC Contract and to breach its duty of good faith and fair dealing and then claim that ACLR is precluded from recovering damages based upon CMS's actions that created potentially some uncertainty with respect to the precise calculation of ACLR's damages.

> Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. . . . . The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.

*Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).  An approval of such conduct would undermine the ability of the federal government to utilize contingency fee contracts in the future.  Why would a potential contractor enter into contingency fee contracts with the federal government if the contractor's ability to pursue and recover amounts was at the complete whim of the federal government?

The audit issues ACLR attempted to pursue and the quantification of the corresponding overpayments is extremely definitive.  For example, billing amounts in the sales tax field of PDE records in states that don't impose sales taxes on the sales of Part D

---

[15] In Defendant's Response, CMS argues that references to "gross error rate" means that underpayments and overpayments could result in a "net effect" of "$0" if the underpayment and overpayments are equal. Defendant's Response at ¶¶ 92-93 and 95.  While logically accurate, CMS's overpayment estimates exceeded its underpayment estimates.  For example, for PY 2007, estimated "underpayments were $3.0 million and estimated overpayments were $5.4 billion" for a differential of over $5 billion in overpayments. App. at Ex. 67, Excerpts from HHS 2010 Financial Report, A709.

drugs renders those PDE records improper.[16]  To quantify the overpayments all one would need to do is to identify those PDE records that include amounts in the sales tax field and the amount of those PDE records would be the total overpayments.

Similarly, a duplicate payment to a plan sponsor is an overpayment that should be recouped by CMS.  *See* CMS Response ¶¶ 20-21.  ACLR's PY 2007 duplicate payment audit used a very thorough and precise methodology to carefully identify those duplicate PDE records for PY 2007.  CMS should have allowed ACLR to collect those PY 2007 duplicate payments and ACLR would then have been paid its contingency fee based upon those duplicate payment recoveries.  ACLR's PY 2010 duplicate payment audit and corresponding methodology were developed and approved by CMS.  If CMS had allowed ACLR to proceed with this audit, CMS would have recovered $15,909,552 in duplicate payments and ACLR would have been entitled to be paid its corresponding contingency fee.

CMS attempts to undermine ACLR's damages argument by asserting that ACLR's NAIRPs are only "estimates," that the recovery on audit issues "was *always* less than what it projected at the beginning," and that ACLR "*never* believed it could achieve a 100% success rate."  Defendant's Motion at 69.  CMS takes selective information out of context in an attempt to support its arguments.  A NAIRP by its very definition is an "estimate." Ex. 21, Part D RAC Contract, OY1 SOW, A399; Ex. 22, Part D RAC Contract OY2 SOW,

---

[16] CMS appears to contend that one cannot ascertain what ACLR would have recouped on its sales tax NAIRP because "sponsors were using that field to record other forms of fees and taxes that might have been legitimate under state law."  Defendant's Motion at 70.  ACLR has demonstrated how the use of the sales tax field for anything other than sales taxes is contrary to statutory, contractual, administrative, and other legally applicable requirements thereby rendering those PDE records improper payments.  CMS demonstrates nothing to the contrary because doing so would legitimize the creation of inaccurate PDE records and disregard for CMS and state requirements.

A434.  Just because something is an estimate does not mean the estimate cannot be 100%

accurate.  As discussed above, ACLR's PY 2012-2013 sales tax NAIRP calculation utilized

a simple process of identifying PDE records with amounts billed in the sales tax field in

states that did not charge sales taxes on Part D drugs or that had amounts in the sales tax

field at rates exceeding 50% of PDE drug costs.  The NAIRP process did not exist for

ACLR's PY 2007 duplicate payment audit.  For ACLR's PY 2010 duplicate payment audit,

ACLR's NAIRP and corresponding methodology had already been approved by CMS and

CMS is still using the approved NAIRP methodology in its Office of Financial

Management audits of plan sponsors.

Christopher Mucke testified that he believed he "would be able to achieve close to

100 percent recovery" but did not anticipate 100 percent recovery because of "political

ramifications."  App. at Ex. 148, Excerpts from the 30(b)(6) Deposition of Christopher

Mucke in ACLR II ("ACLR II 30(b)(6) Dep."), A834-35 at 48:8-49:12.  Mr. Mucke also

testified that when ACLR submitted a NAIRP, ACLR was confident that 100 percent of

the amounts identified would be recovered but once a NAIRP was approved his experience

was that CMS would change ACLR's methodology so less money would be recovered.  *Id.*

at 207:1-209:13.

CMS also makes the sweeping assertion that "GAO determined that the rate of

recovery on several audit issues ranged from 22% to 99%, when comparing the estimated

improper payments identified by ACLR with the amounts actually recovered by CMS."

Defendant's Motion at 73.  The GAO Report identified only one concluded audit issue as

having a recovery rate of less than 79% and that was a result of CMS providing ACLR

with incorrect information.  App. at Ex. 15, GAO Report, A321.  The PY 2007 excluded

provider audit had a 22% recovery rate because CMS provided ACLR with a CMS Medicare database approved by the OIG that identified excluded pharmacies. App. at Ex. 148, C. Mucke ACLR II Dep., A836-39 at 91:17-94:7.   Later, OIG determined that a number of the pharmacies identified as excluded in the CMS Medicare database should not have been excluded pharmacies thereby causing a change in the results of the PY 2007 excluded provider audit.   *Id.*   After this issue was resolved, the recovery rate for the PY 2008-2011 excluded provider audit increased to 79%.   App. at Ex. 15, GAO Report, A321.[17]

Next, CMS criticizes ACLR's position on its PY 2012-2013 sales tax audit damages that the entire PDE record is deemed an overpayment if an amount is improperly billed in the sales tax field.   While CMS may not like the exposure it has created for itself, ACLR's position that the entire PDE record is improper is consistent with CMS's procedures and prior actions.   CMS requires plan sponsors to delete the entire PDE record if it contains an improper payment.   App. at Ex. 146, Excerpts from CMS 30(b)(6) Deposition in ACLR II, A823-24 at 271:17-272:22.   CMS has taken the position that a PDE record is no longer considered improper "when the corresponding improper Prescription Drug Event (PDE) record has been deleted" by the plan sponsor.   App. at Ex. 73, Responses to Interrogatories at Response No. 2.   When plan sponsors were notified of improper payments based upon

---

[17] CMS's reference to a November 7, 2014 email to claim that CMS's revised methodology would have reduced the 2010 duplicate PDEs is misplaced.   Defendant's Motion at 69.   The DVC's findings pertaining to dosage changes for PY 2010 were based solely on a mathematical calculation performed prior to ACLR's RFIs and the receipt of scripts and fill histories from the plan sponsors.   Tab 113, SA612.   Despite Livanta's own acknowledgement that "you cannot make a determination if they're legitimate dosage increases without looking at the scripts," Livanta ignored the scripts it received in favor of the mathematical calculation.   App. at Ex. 158, Livanta Dep., A875-76 at 128:16-129:3; Tab 118, SA628-29. Based on its review of "scripts" and other supporting documentation submitted by plan sponsors, ACLR calculated that the DVC's mathematical calculation correctly predicted a dosage change in less than 27 PDEs out of every 100 PDEs for an accuracy rate of 26.7% and submitted these findings to CMS on December 24, 2014.   App. at Ex. 57, December 24, 2014 letter, A648.

including improper amounts in the sales tax field on Louisiana PDE records, plan sponsors were required to delete the entire PDE record to address the improper payment. Tab 134, SA708-709. Finally, the Part D RAC OY2 SOW provides that PDEs submitted by plan sponsors (new or corrected PDEs after improper payment PDEs are deleted) "subsequent to the final reconciliation of the plan year being reviewed, constitute new payment information, and were not considered by the RAC as part of its review and have no relation to the RAC findings" and will not be considered on appeal. Ex. 22, Part D RAC Contract, OY2 SOW, A455. When an overpayment is identified by ACLR, CMS directs plan sponsors to delete the improper PDE record. CMS then recoups improper payments from the current year plan sponsor subsidiary payments and pays ACLR from such recoupments regardless of whether such PDEs are deleted or otherwise adjusted.

CMS's reference to OMB guidance on handling improper payments is misplaced. As discussed above, the treatment of the entire PDE record as an improper payment is mandated by the Part D RAC Contract and consistent with CMS's actions. The paragraph CMS relies upon appears in the context of an agency's calculations when reporting a statistically valid estimate of improper payments. Tab 89, SA182-83. This process is not utilized by CMS for improper payment offsets under the Part D RAC program. *Id.*

CMS also contends that ACLR's damages theory is flawed because it does not account for the appeals process. The appeals process would have minimal impact on the improper payments identified in ACLR's duplicate payment audits and sales tax audit. In the Part D RAC Contract SOW, plan sponsors can only appeal if they believe ACLR "did not apply CMS' stated payment methodology." Ex. 22, Part D RAC Contract OY2 SOW, A454-55. Moreover, plan sponsors cannot appeal "the methodology and standards used to

identify and calculate the overpayment(s)." *Id.*, A455. CMS itself represented that third-level appeals would be very limited. It estimated no more than two third-level appeals for all Part C and D RAC programs combined. Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs; Final Rule, 79 Fed. Reg. 29935, 29943 (May 23, 2014) (to be codified at 42 CFR Parts 417, 422, 423, *et. al*). ACLR's damages are simply not speculative.

## **CONCLUSION**

There are no disputed issues of material facts and ACLR is entitled as a matter of law to partial summary judgment on its claims of breach of contract and breach of duty of good faith and fair dealing in *ACLR I* and *ACLR II*.


Dated:  July 6, 2018


DAVID, BRODY &
DONDERSHINE, LLP


_____/s/_____
Thomas K. David
John A. Bonello
2100 Reston Parkway
Suite 370
Reston, VA 20191
Phone:  703-264-2220
Fax: 703-264-2226
tdavid@dbd-law.com
jbonello@dbd-law.com

Attorneys for Plaintiff ACLR,
LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of July 2018, I caused a copy of the foregoing document to be emailed via the ECF system to the following:

Adam Lyons
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street NW
Room 11020
Washington, DC 20005


_____/s/_____
Thomas K. David