# CMS Website Screen Shot

**Exhibit 143**

# CMS.gov

Centers for Medicare & Medicaid Services

| Medicare | Medicaid/CHIP | Medicare-Medicaid Coordination | Private Insurance | Innovation Center | Regulations & Guidance | Research, Statistics, Data & Systems | Outreach & Education |

Home » Research Statistics Data and Systems » Parts C and D Recovery Audit Program » Part D RAC Audits

**Parts C and D Recovery Audit Program**

Part D Recovery Audit Contractor

Current Updates

Part D RAC Data Validation Contractor

Part D RAC Audits

Part D RAC Appeals Process

Medicare Advantage and Prescription Drug Plan Information

## Part D RAC Audits

The Part D RAC conducts a three-stage review of Part D Prescription Drug Events (PDE) on a post-payment basis

| Pre-Analysis | Analysis | Post-Analysis |
|---|---|---|
| - CMS/CPI determines specific criteria for the RAC to review audit packages, including the plan, year and audit issues to be reviewed<br>- In addition to the audit issues already approved (excluded providers, duplicate payments, DIR) proposed new audit issues undergo a thorough, multi-step, multi-party vetting process prior to approval. CMS/CPI limits audit issues to a maximum of five per year. | - The RAC conducts improper payments analyses and impact calculations based on audit data provided by CMS<br>- Cases of suspected fraud are referred directly to the Medicare Drug Integrity Contractor<br>- The RAC's findings undergo in-depth review and analysis by its Data Validation Contractor (DVC), which measures the RAC accuracy rate before being sent to CMS CPI for approval | - If findings are approved, a "Notification of Improper Payment Letter" is issued identifying overpayment or underpayment and requesting payment for overpayment. Sponsors receiving an unfavorable finding have the opportunity to appeal. |

The Part D RAC employs proprietary automated review software algorithms to review all PDEs and identify overpayments and underpayments  The RAC can conduct two types of reviews

- Automated (data housed at CMS)

- Complex (additional data requested from the sponsor)

Part D RAC is guided by Medicare policies  regulations  and manual instructions when conducting all audits

CMS/CPI determines the specific criteria on which the Part D RAC must review audit packages  To direct the RAC's review CMS/CPI mandates review of files that fall within a particular year and contract for a particular plan  CMS/CPI further defines the audit scope to include the exact audit issue to be reviewed  Currently the Part D RAC reviews for excluded providers and duplicate payments  Additional audit topics may be proposed to reflect results of studies that have been highlighted as problem areas by the U S  Department of Health and Human Services (HHS)  the HHS Office of the Inspector General and the U S  Government Accountability Office

### Downloads

RAC D Audit Review  HPMS MEMO [PDF  219KB] ᵀ
Part D RAC Q&A [PDF  626KB] ᵀ

Page last Modified  07/18/2013 5 33 PM

# June 2012 Q & A for Medicare Part D Recovery Audit Contractor (RAC) Program 2007

**Exhibit 144**

A06741



# Q&A for Medicare Part D Recovery Audit Contractor (RAC) Program

These questions and answers provide important information relating to the Medicare Part D RAC Program for Part D plan sponsors, as well as details on where to obtain additional information.

## What is the Medicare Part D RAC Program?

Title XVIII of the Social Security Act (the Act), section 1893(h), authorizes the use of recovery audit contractors (RACs). The Fee-For-Service (FFS) RAC Program was implemented as a demonstration project through The Tax Relief and Health Care Act of 2006. The Centers for Medicare & Medicaid Services (CMS) permanently implemented the FFS RAC Program on a nationwide basis in October 2009. The Affordable Care Act, section 6411(b), added section 1893(h)(9) to the Act, which expanded the use of RACs to include the Medicare Advantage (Part C) and prescription drug (Part D) programs. CMS' Center for Program Integrity (CPI) serves as the focal point for all national and statewide Medicare, Medicaid, and Child Health Insurance Program (CHIP) efforts for preventing and reducing fraud, waste, and abuse (FWA). Identifying and preventing overpayment in Part C and Part D is central to that work. CMS oversees the Part D RAC Program, which is being implemented by the CPI Medicare Program Integrity Group (MPIG), Division of Plan Oversight and Accountability (DPOA).

A06742

## What is DPOA's role?

DPOA is the division at CMS responsible for safeguarding the integrity of Part C and Part D. DPOA is tasked with the implementation and oversight of the Part D RAC Program.

## What does the RAC do?

The Part D RAC is tasked to identify underpayments and overpayments and recoup overpayments. In addition, section 1893(h)(9) of the Act requires Part C and Part D RACs to perform the following functions:

- Ensure that each MA plan under Part C and prescription drug plan under Part D has an anti-fraud plan in effect and to review the effectiveness of each such anti-fraud plan.

- Examine claims for reinsurance payments to determine whether prescription drug plans submitting such claims incurred costs in excess of the costs allowed.

- Review estimates submitted by prescription drug plans with respect to the enrollment of high-cost beneficiaries and compare such estimates with the numbers of such beneficiaries actually enrolled by such plans.

CMS has instructed the Part D RAC to refer any potential fraud findings identified during the auditing process to the Medicare Drug Integrity Contractor (MEDIC).

## Who is the Part D RAC?

CMS has contracted with ACLR Strategic Business Solutions (ACLR, http://aclrsbs.com) to perform the Part D RAC audit functions under its guidance.

## What is the Data Validation Contractor's (DVC) role?

CMS has contracted with Livanta (http://www.livanta.com) to perform the Part D RAC data validation functions under CMS guidance. The DVC ensures the integrity of the Part D RAC Program by performing an independent quality check that confirms the RAC's overpayment findings and measures the RAC's accuracy rate. The DVC must validate the RAC's overpayment findings before CMS issues a notification letter seeking return of an overpayment from a sponsor.

## What happens if the DVC disagrees with RAC findings?

The DVC must provide its reason for rejecting the RAC findings. The RAC may then either accept or reject the DVC's findings. If rejected, the DVC must collaborate with the RAC to attempt resolution. CMS is the final decision maker to resolve disagreements on overpayment findings between the DVC and the RAC.

June 2012
DNA Le-Medicare Part D
Recovery Audit Contractor (RAC) Program

2

A797

A06743

### What should Part D plan sponsors do to prepare?

Part D plan sponsors are not expected to undertake major activities to prepare. If the RAC needs information from the Part D plan sponsor for an audit issue, the RAC will contact the Part D plan sponsor. Part D plan sponsors may need to identify a point of contact for the RAC and watch for updates, announcements, educational materials, and other information.

### How are Part D RAC audits conducted?

There are three phases to the Part D RAC audit.

- **Pre-Audit:** CMS determines audit criteria and scope to conduct audits of previous Medicare Part D payments.

- **Audit:** The Part D RAC conducts payment analysis at the contract ID and plan ID level. The Part D plan sponsor will be notified of the RAC's findings, including the impact of the overpayment. The impact calculation is a combination of the reinsurance and low-income cost-sharing amounts.

- **Post-Audit:** Identified overpayments are collected from the Part D plan sponsor. If a Part D plan sponsor feels the RAC findings are in error, this is also the phase in which a sponsor is provided opportunity to appeal.

### What is the scope of the RAC review?

CMS determines the year and the audit issue as well as the specific criteria on which the Part D RAC must conduct the review. CMS requires the RAC to review all contracts that fall within a particular year for a particular plan.

### Will CMS give Part D plan sponsors notice about the audit issues on which the RAC might focus?

CMS has identified three areas that the RAC will initially focus on, which include reviewing Prescription Drug Event (PDE) records associated with excluded providers, Direct and Indirect Remuneration (DIR), and duplicate PDEs. For its first audit of the 2007 contract year, the RAC only focused on PDE records associated with excluded servicing providers (pharmacies) and excluded prescribers. CMS will identify additional audit issues and keep Part D plan sponsors apprised.

### What data does the RAC use to identify overpayments and underpayments?

The RAC conducts payment analysis and creates impact calculations based on PDE data provided by CMS. In some instances, the RAC might send Requests for Additional Information to the Part D plan sponsor.

June 2012
Q&A for Medicare Part D
Recovery Audit Contractor (RAC) Program

3

A06744

### What are impact calculations and how are they conducted?

The impact of Part D RAC-identified overpayments is determined by calculating the effect of the overpayment on reinsurance and low-income cost sharing amounts. A reconciliation based on corrected payments is performed and then compared to the initial reconciliation to determine the total overpayment. The amount is reflected in the Notification of Improper Payment (NIP) letter as the interim offset amount.

### What is done to protect confidential data during the RAC process?

All Part D plan sponsor data is managed according to Health Insurance Portability and Accountability Act of 1996 (HIPAA) guidelines.

### What should I do if I receive a Notification of Improper Payment (NIP) letter from the RAC?

A Part D plan sponsor who receives one of these letters should research the findings and determine whether to pursue a Request for Redetermination. The NIP letter will identify a phone number and e-mail to reach the RAC if there are specific questions about the notification letter or the RAC process. Additionally, the letter will provide Part D plan sponsors with information on the amount of overpayment identified, the process of recoupment, and appeal information.

### How does the Part D plan sponsor appeal the RAC's findings?

CMS provides the Part D plan sponsor with a two-tiered appeal process, should the sponsor disagree with the overpayment assessment. A Part D plan sponsor has 30 calendar days from the date of the NIP letter to submit a Request for Redetermination of the assessment. The Request for Redetermination must be e-mailed to ACLR at info@aclrrac.com and CMS at PartDRACAppeals@cms.hhs.gov. The contract number and the phrase "RAC Redetermination Request" must be in the e-mail's subject line (example, "H1234 RAC Redetermination Request"). The appeal submission must include all relevant information and be well organized.

If a Part D plan sponsor is not satisfied with the Redetermination Decision, the sponsor has 15 calendar days from the date of receipt of the decision to make a Request for Reconsideration. The Request for Reconsideration must be e-mailed to CMS at PartDRACReconsiderations@cms.hhs.gov. The contract number and the phrase "RAC Request for Reconsideration" must be in the e-mail's subject line (example, "H1234 RAC Request for Reconsideration").



June 2012
Q&A for Medicare Part D
Recovery Audit Contractor (RAC) Program

4

A06745

## How will CMS recoup the identified overpayment?

An interim adjustment in the amount owed will be made to a contract's monthly payment. This will be reflected in the Part D plan sponsor's Membership Detail Report approximately 2 months from the date of the NIP letter. Prior to CMS reopening reconciliation, this offset will be credited at the contract level. PDEs identified by the RAC that were originally paid in error must be submitted to CMS by the Part D plan sponsor immediately. The interim payment adjustment will be reversed during the reopening of reconciliation. Overpayment adjustment dates will be communicated to the Part D plan sponsor in the Plan Payment Letter that they receive from the Medicare Plan Payment Group.

## What does it mean if I do not receive an NIP letter?

This means that the RAC has not currently identified overpayments made to the Part D plan sponsor. NIP letters will be sent to Part D plan sponsors only if the RAC has identified overpayments made to those sponsors. Not all Part D plan sponsors will receive these letters.

## What are the relevant terms that Part D plan sponsors should know?

Part D plan sponsors are encouraged to become familiar with terms such as:

- **Excluded Provider:** An individual or entity that has been excluded from participation in Medicare, Medicaid, and all other Federal health care programs.

- **Exclusion:** Items and services furnished, ordered, or prescribed by an excluded individual or entity will not be reimbursed under Medicare, Medicaid, and all other Federal health care programs until the individual or entity is reinstated by the Office of Inspector General (OIG).

- **Overpayment:** Any funds that a person receives or retains under title XVIII (Medicare) or XIX (Medicaid) to which the person, after applicable reconciliation, is not entitled.

## How will the RAC communicate with Part D plan sponsors?

Part D plan sponsors will receive notification of important RAC information via the Health Plan Management System (HPMS). Additionally, CMS has created the Parts C and D Recovery Audit Program website located at http://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d on the Internet. The website will be updated periodically to ensure Part D plan sponsors have the most up-to-date information.



June 2012
CMS Your Medicare Part D
Recovery Audit Contractor (RAC) Program

5

A06746

## What is the role of StrategicHealthSolutions, LLC (Strategic)?

CMS has contracted with Strategic to facilitate dissemination of information and educational materials relevant to the Part D RAC Program. Moreover, Strategic provides ongoing technical assistance with the Part D RAC process.

CMS has created an e-mail account to communicate important information about the Part D RAC Program. Part D plan sponsors are encouraged to register their point of contact information to receive e-mail alerts, answers to frequently asked questions, and other important information as it becomes available. Please e-mail us at PartD_RACCommunications@cms.hhs.gov if you have questions about the Part D RAC Program. If you have questions or would like to discuss the process by which ACLR detected or calculated an overpayment, please call ACLR at 1-855-722-6333.

 

This fact sheet was current at the time it was published or uploaded onto the web. Medicare policy changes frequently so links to the source documents have been provided within the document for your reference.

This fact sheet was prepared as a service to the public and is not intended to grant rights or impose obligations. This fact sheet may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations, and other interpretive materials for a full and accurate statement of their contents.

June 2012
Q&A for Medicare Part D
Recovery Audit Contractor (RAC) Program

6

# Excerpts from Deposition of Matthew Farabaugh as Corporate Representative for Health Integrity, LLC

# CONFIDENTIAL

# Exhibit 145

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

----------------------x

ACLR, LLC

      Plaintiff,

-vs-             Civil Action No. 16-309

THE UNITED STATES

      Defendant.

----------------------x

              Wednesday, June 28, 2017

              Baltimore, Maryland

C-O-N-F-I-D-E-N-T-I-A-L

DEPOSITION OF MATTHEW EDWARD FARABAUGH

as Corporate Representative for Health

Integrity, LLC, 30(b)(6)

# Excerpts from CMS 30(b)(6) Deposition in ACLR II

**Exhibit 146**

```
            IN THE UNITED STATES COURT

               OF FEDERAL CLAIMS

--------------------x

ACLR, LLC

          Plaintiff,

-vs-                      Civil Action No. 16-309

THE UNITED STATES

          Defendant.

--------------------x

                    Wednesday, August 16, 2017

                    Baltimore, Maryland


   THE DEPOSITION OF SONJA JEFFERSON BROWN as

Corporate Representative for the Department of

      Health and Human Services 30(b)(6)


                  Volume 1

             Pages 1 through 216
```

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - x
                           :
ACLR, LLC,                 :
                           :
             Plaintiff,    :
                           :     Civil Action No. 16-309
vs.                        :
                           :      Judge Campbell-Smith
UNITED STATES OF AMERICA,  :
                           :
             Defendant.    :
                           :
- - - - - - - - - - - - - - x
```

Baltimore, Maryland

Thursday, August 17, 2017

THE DEPOSITION OF SONJA JEFFERSON BROWN

as Corporate Representative for the

Department of Health and Human Services 30(b)(6)

Volume 2

Pages 217 through 282

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                            August 16, 2017

1      A.    And it's not a sales tax --

2            MR. CARNEY:   If I can just -- I'm just

3   going to object on foundation that this actually

4   occurred.  I mean, are you saying hypothetically

5   if that occurred or --

6   BY MR. BONELLO:

7      Q.    No.  I'm asking -- I think the

8   testimony was a determination was made by CMS

9   that a 10-cent sales tax could be --

10      A.    I didn't say sales tax.  It's some

11   kind of fee allowable by Louisiana state.

12      Q.    And it's a 10-cent --

13      A.    10 cents, yes.

14      Q.    Not less than 10 cents?

15      A.    It could be.  I don't know.  It's --

16   up to 10 cents is what I understand.  So

17   anything over 10 cents would not be allowable

18   for this particular fee.

19      Q.    So it's CMS's position that anything

20   of 10 cents or below in the sales tax field in

21   Louisiana PDE records is proper?

22      A.    At the time, yes.

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                          August 17, 2017

```
 1        Q      I think we covered category 65 on the

 2   notice of deposition.

 3              Sixty-six, I think we have covered.

 4              Sixty-seven says, "The factual basis for

 5   the defenses to ACLR's claims."

 6              Can you tell me the factual basis for

 7   CMS's defenses to ACLR's claim in this case?

 8        A      Which one of the claims?

 9        Q      The claims in this case.

10              MR. CARNEY:  You're talking about the

11   sales tax claim?

12              MR. BONELLO:  Yes.

13              THE WITNESS:  Oh, the sales tax?

14              It's factual that CMS denied the sales

15   tax issue because it was being reviewed by another

16   contractor within CMS.

17              BY MR. BONELLO:

18        Q      Is there any other factual basis for

19   CMS's defenses to ACLR's claims in this case?

20        A      That CMS has the right to approve or deny

21   audit issues submitted by ACLR.

22        Q      That would be in accordance with the
```

Sonja Jefferson Brown As            ACLR, LLC v. THE UNITED STATES
Case No. 16-309                            August 17, 2017

1  statement of work.  Correct?

2      A      Yes.

3      Q      To clarify, meaning it has to be --

4  approving or denying has to be in compliance with the

5  statement of work.  Correct?

6      A      Yes.

7      Q      Are there any other factual bases for

8  CMS's defenses to ACLR's claims?

9      A      The improper payment amount identified by

10  ACLR was not confirmed by CMS or validated.

11      Q      How would CMS validate or confirm the

12  improper payments submitted by ACLR related to the

13  sales taxes?

14      A      It would have had to go -- it would have

15  had to have gone through the whole process.

16      Q      And CMS denied the ACLR NAIRP on the

17  sales taxes before any processes could commence.

18  Correct?

19      A      Exactly, based on the fact that it was

20  being reviewed by another contractor for the same

21  issue and the same time period.

22      Q      Are there any other factual bases for

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                   August 17, 2017

1 | ACLR's -- for the defenses to ACLR's claims in this

2 | case?

3 |                    MR. CARNEY:  I'm just going to interpose

4 | an objection.

5 |                    I mean, you can ask her what the defenses

6 | are and ask -- explore her knowledge of that; but

7 | obviously, we reserve the right to make our defenses

8 | based on the facts that come out at trial.

9 |                    THE WITNESS:  I don't really have

10 | anything else.

11 |                    BY MR. BONELLO:

12 |     Q      Sixty-eight:  I think we can proceed

13 | without getting into that right now.

14 |                    For category 69, the issue is:  Can CMS

15 | identify the PDE records in ACLR's NAIRP submission

16 | for plan year 2012-2013 sales tax errors that contain

17 | erroneous payment data or improper payments?

18 |     A      No.

19 |     Q      CMS doesn't have a position -- does it --

20 | with respect to the accuracy or non-accuracy of

21 | ACLR's NAIRP submission for plan year 2012 or 2013

22 | sales tax errors as it relates to the amounts at

1   records?

2       A      Yes.

3                  (The document referred to was marked

4                  for identification as DHHS 30(b)(6)

5                  Deposition Exhibit No. 60.)

6                  BY MR. BONELLO:

7       Q      I'm showing you what has been marked as

8   Exhibit 60, and this is Delois Newkirk's email to

9   various people.

10                 And it says, "All plans that fully or

11  partially deleted the PDE records associated with the

12  identified improper payment will be credited back the

13  full offset amount or partial amount of the original

14  offset."

15                 Is that an accurate statement?

16      A      Yes.

17      Q      Can you describe what she is talking

18  about there?

19      A      Yes.  For the Part D RAC process, as we

20  mentioned, there are interim adjustments made to the

21  plan sponsor's monthly payment.

22                 However, the plan sponsor is also

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                            August 17, 2017

1   required to delete the inappropriate PDE record.  And

2   after the final reconciliation, that amount would

3   come out twice, which is why one of them is credited

4   back to the plan sponsor.

5        Q       After final reconciliation, you mean,

6   also, at re-opening?

7        A       Yes.

8        Q       What if the plan doesn't delete the

9   improper payment?

10       A       Then, I mean, the money is not taken from

11  them; and they're referred for compliance actions

12  -- non-compliance actions.

13       Q       And what if there is a revision to the

14  PDE record that's improper?

15       A       We don't tell them to revise.  We tell

16  them to delete.

17       Q       So if there's an improper --

18       A       It shouldn't have been paid at all.  It

19  should be deleted.

20       Q       If there's an improper payment, the

21  entire PDE record has to be deleted?

22       A       Yes.

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                   August 17, 2017

1          I think we have something here that you

2   can look at to confirm whether it is or not.  Let's

3   see.

4               MR. CARNEY:  Which one?

5               THE WITNESS:  It was a 2011 document for

6   prescription drug events.

7               MR. BONELLO:  Off the record.

8                   (A discussion was held off the record

9                   from 11:43 a.m. to 11:45 a.m.)

10              MR. BONELLO:  Back on the record.

11              MR. CARNEY:  For the record, look at page

12  3-8.  That looks like something different?

13              THE WITNESS:  Yes.

14              MR. CARNEY:  Okay.  Here we go.  3-15?

15              THE WITNESS:  There's a lot of fields.

16  It's a lot of field in the record, so --

17              BY MR. BONELLO:

18      Q     Can you see if the wholesaler acquisition

19  price is a field in the PDE record?

20      A     I don't think that was in there, but I'll

21  look.  I don't see it here.

22      Q     So there would be no way, from looking at

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                    August 17, 2017

1   the PDE record, to determine the appropriateness --

2       A      No.  You would most likely have to get

3   that information from the pharmacy.

4       Q      So, my question is:  There would be no

5   way to -- if the wholesaler tax was allowable, there

6   would be no way to calculate whether the wholesaler

7   tax was accurate on a PDE record.  Correct?

8               MR. CARNEY:  Objection.  It calls for

9   speculation.

10              Do you want to look?  Do you want to take

11  some time and look at the fields?

12              THE WITNESS:  No.  I don't think it's

13  there.  It's not a field I've ever heard of, so --

14  and if that were the case, then Jonathan wouldn't

15  have said what he said in his email.

16              MR. BONELLO:  So, it's true that there

17  would be -- from looking at the PDE record, there

18  would be no way to verify that the wholesaler -- if

19  the wholesaler tax -- let me restate that.

20              BY MR. BONELLO:

21      Q      From looking at the PDE record, if the

22  wholesaler tax could be charged under Part D, you

Sonja Jefferson Brown As            ACLR, LLC v. THE UNITED STATES
Case No. 16-309                     August 17, 2017

1   couldn't tell if the wholesaler tax was appropriate

2   given the fact that there was no wholesaler cost on

3   the PDE record.  Correct?

4               MR. CARNEY:  Objection.  Vague:  the word

5   "appropriate."

6               THE WITNESS:  Yeah.  I can't confirm

7   that.  It's just what's said in this email.

8               BY MR. BONELLO:

9       Q      But if you take -- let's set aside what's

10  said in the email.

11              If a pharmacy is charging something in

12  the sales tax column and that's a wholesale drug

13  price or drug distributor tax, and there is nothing

14  on the PDE records that says what the wholesale price

15  is, the amount in the sales task column cannot be

16  verified by looking at the PDE record.  Correct?

17      A      To my understanding -- yeah -- it would

18  -- you couldn't just look at the PDE and determine

19  what that tax is.

20      Q      You've testified on behalf of CMS about

21  the information known or reasonably available to CMS

22  concerning the matters for examination set forth in

# Excerpts from The Louisiana Pharmacy Benefits Services Manual

**Exhibit 147**



LOUISIANA
**DEPARTMENT OF HEALTH**

# PHARMACY BENEFITS MANAGEMENT SERVICES MANUAL

*Chapter Thirty-Seven of the Medicaid Services Manual*

### Issued December 1, 2005

Claims/authorizations for dates of service on or after October 1, 2015 must use the applicable ICD-10 diagnosis code that reflects the policy intent. References in this manual to ICD-9 diagnosis codes only apply to claims/authorizations with dates of service prior to October 1, 2015.

**State of Louisiana**
**Bureau of Health Services Financing**

## CHAPTER 37:  PHARMACY BENEFITS MANAGEMENT SERVICES

## SECTION 37.2:  PHARMACY PROVIDER ENROLLMENT AND
## PARTICIPATION GUIDELINES                          PAGE(S) 14

- A provider cannot deny services to a recipient solely due to the presence of third party insurance coverage or the recipient's inability to pay a Medicaid co-payment.

### Medical Assistance Program Integrity

The Louisiana Medical Assistance Program Integrity Law (MAPIL), R.S. 46:437.1-46 and 440.3, imposes terms and conditions on Medicaid providers.  See Chapter 1 of the *Medicaid Services Manual*, Section 1 for information concerning the terms and conditions.

### Prescription Provider Fee

A prescription fee shall be paid by each pharmacy and dispensing physician for each outpatient prescription (Medicaid and non-Medicaid) dispensed.  The fee shall be $.10 per prescription dispensed by a pharmacist or dispensing physician.  When a prescription is filled outside of Louisiana, but not shipped or delivered in any form or manner to a patient in the state, no provider fee shall be imposed.  However, out-of-state pharmacies or dispensing physicians dispensing prescriptions which are shipped, mailed or delivered in any manner inside the state of Louisiana, shall be subject to the $.10 fee per prescription.  Medicaid enrolled pharmacy providers must comply with this requirement as a condition of participation in the Medicaid Program.

Activity reports, either manually or electronically produced, must be available upon request and on-site at the pharmacy.  These reports must detail the number of prescriptions dispensed and which provider fees were paid by month for any given month.  Providers are assessed on a quarterly basis by the Louisiana Department of Health (LDH).  This information must be readily available during an audit when requested by a representative of the Medicaid Program.

### Dispensing Cost Survey

All pharmacy providers must complete an overhead cost survey (commonly known as a dispensing cost survey) at enrollment and periodically thereafter.  These surveys are conducted to determine the accuracy of the maximum allowable overhead cost (dispensing fee).

Case 1:15-cv-00767-PEC   Document 59-2   Filed 07/11/18   Page 39 of 60

### National Drug Code (NDC) System

Drugs are identified on Medicaid claims and the Medicaid computer system drug file by the National Drug Code (NDC). The NDC is an 11-digit number. The first five digits identify the manufacturer or supplier, the next four digits identify the product and the last two digits identify the package size.

The provider must enter the entire 11-digit NDC for the actual product and package size dispensed on the claim as the NDC is critical for accurate reimbursement. Billing an NDC number other than the one for the product dispensed is a false claim and a violation of Medicaid policy.

Medicaid can only reimburse drugs whose NDC codes are on the Medicaid computer system drug file.

Medicaid uses ingredient costs that are supplied and updated each week by First Data Bank's National Drug Data File electronic service.

### Maximum Allowable Overhead Cost (Dispensing Fee)

Maximum allowable overhead cost means the expense incurred by pharmacy providers in dispensing covered drugs as determined by Medicaid. Each pharmacy's records shall establish that the overhead cost paid by the Louisiana Medicaid Program does not exceed reimbursement overhead costs paid by others.

Medicaid reimburses the pharmacy a maximum dispensing fee of $10.51 per prescription.

### Provider Fee

Pharmacy providers and dispensing physicians are responsible for a ten cent (10¢) provider fee on all prescriptions they fill. The Medicaid maximum allowable overhead cost (dispensing fee) includes the provider fee mandated under state law.

NOTE:  Refer to Section 37.2 Provider Rights and Responsibilities regarding the provider fee policy.

A831

# Excerpts from the 30(b)(6) Deposition of Christopher Mucke in ACLR II

**Exhibit 148**

Christopher Mucke 30(b)(6)                          September 11, 2017
                            Reston, VA

Page 1

1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2    ----------------------------x

3    ACLR, LLC,                          :

4              Plaintiff,           :   Case No.: 16-309c

5        vs.                        :   (Judge Campbell-Smith)

6    THE UNITED STATES,                 :

7              Defendant.           :

8    ----------------------------x

9

10       30(b)(6) DEPOSITION OF CHRISTOPHER MUCKE

11                  Reston, Virginia

12              Monday, September 11, 2017

13                     9:02 a.m.

14

15

16

17

18

19

20   Job No.:  72509

21   Pages:  1 - 271

22   Reported by:  Elizabeth Mingione, RPR

Christopher Mucke 30(b)(6)                                    September 11, 2017
Reston, VA

Page 48

1    overpayments in those areas as well, but it was

2    primarily tax.

3        Q.    Did ACLR, at the time it was awarded this

4    contract, think that it could achieve a higher

5    success rate than the 4.86 percent that you reported

6    for the Part A and B RAC demonstration project?

7        A.    Beyond doubts, yes.

8        Q.    What -- do you recall what your

9    expectation was as to the success rate that ACLR

10   should be able to achieve?

11       A.    I would say that we would be able to

12   achieve close to 100 percent.  I did not anticipate

13   that we would recover 100 percent.

14       Q.    So what's the distinction between being

15   able to achieve nearly 100 percent but not expecting

16   that you would be able to achieve nearly 100 percent?

17       A.    The previous roadblock I brought up.  in

18   This instance you are looking at an industry that is

19   receiving, at least for Medicare, two to seven

20   billion dollars a year in overpayments.  Removing

21   that kind of cash from a business industry will have

22   an impact.

Christopher Mucke 30(b)(6)                                    September 11, 2017
                                    Reston, VA

                                                                    Page 49

1        Q.    The two to seven billion dollars of

2   overpayments, do you know is that specific to Part D

3   or would that include Parts A and B as well?

4        A.    That was Part D.

5        Q.    So you -- ACLR expected at the outset that

6   there would be some tension between potentially

7   trying to recoup 100 percent of whatever overpayments

8   you identified, and actually being able to accomplish

9   that end?

10       A.    I didn't expect any tension.  I believed

11  that there would be some political ramifications to

12  it, yes.

13       Q.    And in the prior audit work that you did

14  for other private companies that you described, had

15  there been other situations where you had identified

16  amounts of overpayments and ultimately, for whatever

17  reason, you weren't able to collect the full amount

18  because the client, as you said, thought it was too

19  substantial and amount of money to try to recoup?

20       A.    No.

21       Q.    So in your prior work, how did that issue

22  -- how did that issue get resolved between -- you

Christopher Mucke 30(b)(6)                          September 11, 2017
                            Reston, VA

                                                        Page 91

1    from me, either during the site visit or in

2    subsequent follow-up requests, but I just can't

3    recall.

4         Q.    Let me have you take a look at page 22 of

5    that exhibit.  So there's a Table 1 here that appears

6    to be a summary of recovery audit contractor, audit

7    activities, and associated improper payment

8    collections by year proposed as of May 2015.

9              Do you sew that?

10        A.    Yes, I do.

11        Q.    And if I'm understanding this correctly,

12   this table is identifying the amounts of the proposed

13   improper payments that ACLR identified for particular

14   audit issues and then the amounts that were

15   collected.  Is that your understanding as well?

16        A.    That's correct.  Yes.

17        Q.    So, for instance, for the 2007 excluded

18   providers audit issue, it looks like ACLR identified

19   $8.376 million of potential improper payments.  Is

20   that right?

21        A.    That's correct.

22        Q.    And the amount that was ultimately

Christopher Mucke 30(b)(6)                                September 11, 2017
Reston, VA

Page 92

1    collected was 1.865 million.  Is that correct?

2         A.    That's correct.

3         Q.    And then it says the other balance of

4    6.511 million was the amount determined to be proper.

5    Do you see that?

6         A.    Yes, I do.

7         Q.    And you had a little chuckle there.  What

8    was that about?

9         A.    Yeah.  That pertained to a bunch of

10   letters.  These were those that were determined to be

11   proper were letters issued by the OIG stating that

12   the pharmacies in question that we had selected were

13   in fact not excluded, even despite them being

14   excluded on the Medicare database and being actively

15   excluded by the OIG.

16        Q.    So you are saying OIG determined that

17   those pharmacies were not excluded?

18        A.    Yes.

19        Q.    And that was based on information beyond

20   what ACLR had looked at to identify those as improper

21   payments; is that correct?

22        A.     That's correct.  And my understanding at

Christopher Mucke 30(b)(6)                        September 11, 2017
                          Reston, VA

Page 93

1    the time, CMS did not have that information as well.

2        Q.    So for that particular audit issue, it

3    looks like roughly 78 percent or so of the improper

4    payments identified by ACLR ultimately were not

5    recouped.  Does that seem right?

6        A.    That's correct.  Yes.

7        Q.    For the next version, or a round of the

8    excluded providers, 2008 to 2011, ACLR identified

9    $3.4 million of potential improper payments, correct?

10       A.    That's correct.

11       Q.    And then CMS ultimately collected $2.676

12   million of that amount, correct?

13       A.    That's correct.

14       Q.    So that one looks like it was

15   percentage-wise sort of a flip from the prior year

16   where roughly 78 of so percent of the amount

17   identified as improper was collected.

18       A.    Yes.  That is correct.  In this case, we

19   didn't pursue excluded pharmacies.

20       Q.    So for 2007 excluded providers, the

21   discrepancy in your view came from pursuing excluded

22   pharmacies; is that correct?

Christopher Mucke 30(b)(6)                                      September 11, 2017
Reston, VA

Page 94

1         A.      Almost entirely.   Yes.

2         Q.      And then for the unauthorized prescriber

3    reviews, 2009 to 2011, and 2012, it looks like those

4    had a greater recoupment rate between the amount

5    identified by ACLR and the amount collected.   It was

6    probably 97 percent; is that correct?

7         A.      That's correct.

8         Q.      So depending on the particular audit

9    issue, was it ACLR's understanding that the date in

10   the PDE records by itself might not provide all the

11   information needed to know whether a payment was

12   improper or proper?

13        A.      That's correct.   Yes.

14        Q.      And sometimes would planned sponsors have

15   additional information that might explain or justify

16   a payment to make it a proper payment that wouldn't

17   have been information that was contained in the PDE

18   records themselves?

19        A.      Are you asking if they had information

20   that would state that it was proper versus improper?

21        Q.      No.   If ACLR identifies something as a

22   potentially improper payment, looking at the PDE

Christopher Mucke 30(b)(6)                          September 11, 2017
                          Reston, VA

Page 207

1          Q.    With respect to your certified claim

2    amount, I believe you said that the calculation is

3    based on the assumption that every one of the PDE

4    records that ACLR identified as improper would in

5    fact have been found to be improper and recouped,

6    correct?

7          A.    That's correct.

8          Q.    And ACLR knew at the time it submitted

9    this claim, that on the prior audits you had

10   completed for CMS, in none of those had CMS actually

11   recouped 100 percent of the amount that had been

12   identified in the NAIRP, correct?

13         A.    That's correct.

14         Q.    And you also knew that in none of the

15   prior audits that ACLR had completed was ACLR's

16   contingent fee calculated based on 100 percent of the

17   claims that were initially identified in the NAIRPs?

18         A.    That's correct.

19         Q.    Correct?  Did you give any consideration,

20   when you filed this claim, to adjusting the amount

21   that you were claiming based on some consideration of

22   the likelihood of recouping 100 percent of the

Page 208

1    amounts identified?

2        A.     Whenever we submitted a NAIRP, we were

3    confident that one percent of the amounts that we

4    identified would in fact be recovered.  What happened

5    in all of the issues, or even like in the NAIRP

6    submissions, or even after the approved NAIRP

7    process, or after we received an approved NAIRP, CMS

8    would alter the methodology, which would reduce the

9    amounts that we would be likely to recover.

10              For example, in the 2007 excluded provider

11   audit, we actually submitted close to $30 million in

12   excluded providers.  Our contract stated excluded

13   providers.  After we did that work, or after that was

14   signed, then they removed a pharmacy -- or excuse me,

15   they removed owner-owned pharmacies and

16   pharmacist-filled prescriptions.  So that came out

17   when we did -- and so that would be an example of

18   where it would be reduced.

19              Similarly, for the duplicate payments,

20   when that was approved, we had an approval NAIRP

21   process, and then CMS ultimate methodology to bring

22   the rate back.

Christopher Mucke 30(b)(6)                          September 11, 2017
                              Reston, VA

Page 209

1              So while I would answer your question that

2      did I expect to get everything back, yes, if I was

3      doing it in accordance with the audit issue

4      methodology that I had worked out, and we determined

5      would work, or that I had determined would work.  Did

6      I expect to get it even close to that, no.  My

7      experience told me that even with an approved NAIRP,

8      CMS was going to, you know, change the methodology

9      and we would get less money back.

10         Q.   Is it ACLR's position that every single

11     claim it identified in every one of its audit

12     proposals actually was an improper payment?

13         A.   Yes.

14         Q.   So ACLR didn't make a single mistake on

15     identifying any claim as an improper payment?

16         A.   We proposed estimated -- I'm not sure

17     where you are going with that.  I mean, when we did

18     our -- when did the initial NAIRPs, those were

19     estimated amounts.  And we would go through the

20     revise NAIRP.  And as we went through that process,

21     we would get down to an amount.

22              If it was an approved issue, and we

Christopher Mucke 30(b)(6)                                        September 11, 2017

Reston, VA

1    Notice Date: September 21, 2017

2    Deposition Date: September 11, 2017

3    Deponent: Christopher Mucke 30(b)(6)

4    Case: ACLR v. The United States

5    Page: Line             Now Reads                       Should  Read

| Page: Line | Now Reads | Should Read |
|---|---|---|
| 58:14 | it was December of 9 of 2010 | it was December of 9 of 2011 |
| 58:18 | Of 2010. | Of 2011. |
| 64:22 | there as proposed in December of 2010 | there as proposed in December of 2011 |
| 65:1 | statement of work that we received in 2010. | statement of work that we received in 2011. |
| 66:13 | It was removed from consideration in 2010. | It was removed from consideration in 2011. |
| 67:14 | the latter part of 2010, early part of 2011 | the latter part of 2011, early part of 2012 |
| 79:12 | deleted after we did 12, and then we did 13. If | did 12, and then we did 13. If |
| 86:19 | Yeah, during 2010 or early in 2011... | Yeah, during 2011 or early in 2012... |
| 87:17 | occur, like, in 2013. | occur, like, until 2013 |
| 102:21 | letter in 2011, but I think ... | in the latter part of 2011, but I think... |
| 104:6 | with, and the center for Medicare planned payment | with, and the center for Medicare plan payment |
| 123:3 | Professionals and Taxation cost, which can be on | Professionals and Taxation COST, which is the Committee On |
| 146:3 | are view of state law... | review of state law ... |
| 147:8 | Mm-hmm | Yes |
| 152:6 | In 2010 this question came up, and there | In 2011 this question came up, and there |
| 159:20 | would still are quire that the claim be corrected | would still require that the claim be corrected |
| 198:3 | I wouldn't say that they had a contract | I would say that they had a contract |
| 208:3 | confident that one percent of the amounts that we | confident that one hundred percent of the amounts that we |
| 260:6 | Again, if you go through the 2010 stuff, | Again, if you go through the 2011 stuff, |
| 264:4 | you want to do that. Those are efforts. Nobody that | you want to do that. Those are our efforts Nobody that |

A843

Page 270

```
1                   CERTIFICATE OF DEPONENT

2

3     I hereby certify that I have read and examined the

4     foregoing transcript, and the same is a true and

5     accurate record of the testimony given by me.

6     Any additions or corrections that I feel are

7     necessary, I will attach on a separate sheet of

8     paper to the original transcript.

9

10                              _____

11                              Signature of Deponent

12

13    I hereby certify that the individual representing

14    himself/herself to be the above-named individual,

15    appeared before me this ____ day of _____,

16    2017, and executed the above certificate in my

17    presence.

18

19                              _____

19                              NOTARY PUBLIC IN AND FOR

20

20                              _____

21                              County Name

22    MY COMMISSION EXPIRES:
```

1            C E R T I F I C A T E

2    UNITED STATES OF AMERICA  }

3                              Ss:

4    COMMONWEALTH OF VIRGINIA  }

5

6            I, ELIZABETH MINGIONE, Registered

7    Professional Reporter and Notary Public within and for

8    the Commonwealth of Virginia, do hereby certify:

9            That the witness whose testimony appears in

10   the foregoing deposition was duly sworn, and that the

11   within transcript is a true record of the testimony

12   given by such witness.

13           I further certify that I am not related to

14   any of the parties to this action by blood or

15   marriage, and that I am in no way interested in the

16   outcome of this matter.

17           IN WITNESS WHEREOF, I have hereunto set my

18   hand this __21st___ day of _September_, 20_17____.

19

20

21   Notary Registration No. 104119

22   My Commission Expires:  May 31, 2019

A845

# Excerpts from the Expert Deposition
# Of Christopher Mucke

**Exhibit 149**

Christopher Mucke                                              1/10/2018
                             Reston, VA                       Page 1 (1)

```
 1          IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2

 3    -------------------------------
                                     :
 4    ACLR, LLC,                     :
                                     :
 5              Plaintiff,           :
                                     :
 6         v.                        :  Civil Action Nos.
                                     :
 7    UNITED STATES OF AMERICA,      :  15-767C and 16-309C
                                     :
 8              Defendant.           :
                                     :
 9    -------------------------------

10

11          Deposition of CHRISTOPHER MUCKE, an expert

12    witness herein, at the law offices of David, Brody &

13    Dondershine, LLP, 12355 Sunrise Valley Drive, Suite

14    650,  Reston, Virginia, commencing at 9:31 a.m. on

15    Wednesday, January 10, 2018 and the proceedings being

16    taken down by stenotype and transcribed by Catherine

17    B. Crump, a Notary Public in and for the Commonwealth

18    of Virginia.

19

20

21

22
```

```
 1   since you said the contract term expired at the end

 2   of December 2017, whatever work you're performing on

 3   behalf of ACLR as of January 2018 was related to the

 4   lawsuits; is that correct?

 5         A.    Or to, you know, other internal matters

 6   with the company.

 7         Q.    Prior to the award of the Part D RAC

 8   contract to ACLR, you had never had any experience

 9   analyzing the substance of the Medicare Part D claim

10   to determine if they were proper or improper

11   payments; is that correct?

12         A.    When you say Medicare, are you

13   addressing Part D only, the prescription drug

14   benefit, or are you talking about Medicare in

15   general?

16         Q.    Yeah.  Part D.

17         A.    That would be correct.  We did have or I

18   did have experience with reviewing Part D

19   transactions, but it was in the context of doing work

20   under the Medicare ZPIC program.

21         Q.    Right, and so that didn't involve

22   determining if Part D claims were proper or improper?
```

```
 1          A.     No.   That would -- I need to clarify

 2     that.   The work itself was on whether or not these

 3     payments were proper or improper along with A and B,

 4     but my efforts toward that were more dedicated to

 5     determining whether or not the statistical samples

 6     were, in fact, accurate and representative of those

 7     findings.

 8          Q.     So prior to the award of the Part D RAC

 9     contract to ACLR, you had never had any experience

10     analyzing Part D PDE records to determine if they

11     involved proper or improper payments; is that

12     correct?

13          A.     Again, we would been reviewing -- we

14     wouldn't have looked at PDE records.  The data that

15     we would have been reviewing or that I reviewed was

16     for the company's own internal records.  They would

17     mimic that, but we would look at a lot more and a lot

18     less.

19          I did see improper payments.  I did -- you

20     know, I could -- I reviewed whether or not they had

21     been determined to be overpayments or underpayments,

22     but I did not make those determinations.
```

```
1           Q.    Prior to the award of the Part D RAC

2    contract, had you had any experience in researching

3    the Medicare Part D rules or regulations?

4           A.    Yes.

5           Q.    And that was in connection with that

6    ZPIC work that you mentioned a moment ago?

7           A.    That's correct.

8           Q.    Had you ever had any experience prior to

9    this contract with researching or analyzing CMS

10   policies regarding the type of data that is allowed

11   in PDE records?

12          A.    Yes.

13          Q.    Again, in connection with the ZPIC work?

14          A.    That's correct, yes.

15          Q.    Other than these ACLR cases, have you

16   ever been designated by any party as an expert on

17   Part D rules or procedures?

18          A.    No, I have not.

19          Q.    Have you ever been retained by anyone

20   else prior to these ACLR cases to offer any expert

21   advice on Medicare Part D issues?

22          A.    What do you mean by retained?  Could you
```

# May 11, 2011 Email

**Exhibit 150**

| | |
|---|---|
| **From:** | James, Merri-Ellen \(CMS/CPI\) |
| **To:** | Christopher Mucke |
| **Cc:** | Dorsey, Marnie \(CMS/CPI\); Moreno, Cynthia E. \(CMS/CPI\); Lehman, Katie M. \(CMS/CPI\); Brady, Elizabeth A. \(CMS/CPI\) |
| **Subject:** | RE: ACLR RAC - Technical Memorandum & Sampling |
| **Date:** | Wednesday, May 11, 2011 11:19:44 AM |

Chris,

Thanks for the paper. I'm relieved that we had not misinterpreted that part of the reg. Re your sampling question, I don't think we are in a position to determine if sampling is a viable option at this point. Sampling methodology is currently an issue in both the A/B RAC and 1/3 Financial Auditing worlds. For now we must move forward with the understanding that Part D recoveries will occur on a claim by claim basis. Thanks, M-E

Merri-Ellen James
Medicare Program Integrity Group
7500 Security Blvd.
Baltimore, MD 21244
410.786.4462

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW:*
*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

**From:** Christopher Mucke [mailto:cmucke@aclrsbs.com]
**Sent:** Monday, May 09, 2011 11:47 AM
**To:** James, Merri-Ellen (CMS/CPI)
**Cc:** Dorsey, Marnie (CMS/CPI)
**Subject:** ACLR RAC - Technical Memorandum & Sampling

Merri-Ellen, as mentioned on my earlier voice-mail, we agree that ACLR can make assessments without the need to reopen reconciliation. I have attached our technical memorandum on the topic. If you have any questions please let me know.

On a related matter, we anticipate utilizing statistical sampling to audit PDE data. We recognize the need to demonstrate a sustained/high level or educational failure to correct a payment error and anticipate using the findings from our automated reviews to justify sampling within our complex reviews as previously discussed. *Is this necessary or has a finding/determination already been made that Medicare Part D, as a program, has errors sufficient to justify sampling in our complex reviews of all plan sponsors?*

Thank you. Take care, Chris.

*Christopher Mucke | Managing Principal | ACLR, LLC*
550 Forest Avenue, Suite 15-2 | Plymouth, Michigan 48170-3793 | ☎(734) 207-0404 | 🖶(734) 207-0410 |
mailto:cmucke@aclrsbs.com

The information contained in this message may be privileged and confidential and protected from disclosure. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination of distribution of, copying of, or taking action in reliance on this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer.