IN THE UNITED STATES COURTOF FEDERAL CLAIMS

| | |
|---|---|
| **ACLR, LLC** | ) |
| | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| **THE UNITED STATES** | ) |
| | ) |
| Defendant | ) |
| | ) |

**Civil Action No. 15-767 and 16-309**
(Judge Campbell-Smith)

**PLAINTIFF ACLR, LLC'S RESPONSE TO DEFENDANT'S ADDITIONAL PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Plaintiff ACLR, LLC ("ACLR"), by its undersigned counsel and pursuant to Rule 56 of the United States Court of Federal Claims and this Court's February 8, 2018 Scheduling Order, respectfully submits the following response to Defendant's additional proposed findings of uncontroverted facts.

RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Medicare Part D Background

101.    Coverage for the Medicare Part D drug benefit is provided by plan sponsors, which are private prescription drug plans. Tab 4, A30.

RESPONSE:  Admitted.

102.    The Medicare Part D program operates on a cost-sharing basis. Plan sponsors pay prescription drug costs on behalf of their beneficiaries, and are compensated for those costs by both the beneficiaries and the Government. Tab 7, A186 at § 1.1.

RESPONSE:  Admitted.

103.    All Part D plans are required to provide a minimum set of prescription drug benefits, typically referred to as the "basic" benefit. For additional premiums, plans can offer benefits that exceed the basic benefits, but the Government only pays for the basic benefit. Tab 105, SA474 at § 1-2.

RESPONSE:  Admitted.

104.    Plan sponsors are paid for Part D basic benefits through four mechanisms: a direct subsidy; a low income subsidy; a reinsurance subsidy; and risk sharing or risk corridor payments.  *Id.*

RESPONSE:  Admitted.

105.    CMS pays plan sponsors a monthly prospective payment throughout each year for each beneficiary enrolled in the plan. Tab 141, SA750.

RESPONSE:  Admitted.

106.    After the end of each year, CMS reconciles the prospective amounts paid to a plan sponsor with the plan's actual levels of enrollment, risk factors, levels of incurred allowable drug costs, reinsurance amounts, and low-income subsidies. *Id.*; Tab 7 A186 at § 1.1.

RESPONSE:  Admitted.

107.    The payment reconciliation process results in CMS either paying additional funds to a plan sponsor (if the plan's actual costs were greater than the prospective payments made throughout the year), or recouping funds from a plan sponsor (if the plan's actual costs were less than the prospective payments made throughout the year). Tab 142, SA753.

 RESPONSE:  Admitted.

108.    When a Medicare Part D beneficiary fills a prescription, the plan sponsor submits an electronic prescription drug event (PDE) record to CMS. PDE records contain information concerning the type of drug prescribed, the drug cost, payment details, and other information to allow CMS to administer the Part D benefit program. Tab 15, A303.

 RESPONSE:  Admitted.

109.    PDE records contain approximately 74 data fields (the number has changed over time), although not every field is used in every prescription. Tab 105, SA475-80; Tab 92, SA363 at 129:10-14.

 RESPONSE:  Admitted.

The Part D RAC Contracting Process

110. CMS issued a sources sought notice on October 18, 2010, using the General Services Administration's Federal Supply Schedule, "to determine the availability of small businesses that have the capability to support CMS in identifying and recouping underpayments and overpayments made under the Medicare Prescription Drug Coverage Program, also known as Medicare Part D." Tab 76, SA002.

RESPONSE: Admitted.

111. At the time ACLR responded to CMS's sources sought notice, ACLR itself had no prior experience analyzing the substance of Part D claims to determine whether they were proper or improper claims, no prior experience conducting recovery audits related to any Medicare program, and had never before entered into any Government contract. Tab 91, SA308 at 82:11-16, SA309-11 at 83:17-85:6; Tab 94, SA372-73 at 108:16-109:2.

RESPONSE: Qualified. ACLR agrees that prior to becoming the first ever Part D recovery audit contractor, ACLR had never before entered into any Government contract and had not acted as a Medicare recovery auditor. However, ACLR had extensive experience in determining whether Part A, B, and D payments were proper or improper in CMS's Zone Program Integrity Contractor Program (ZPIC), which is used to recover Medicare overpayments. App. at Ex. 149, Excerpts from the Expert Deposition of Christopher Mucke ("Mucke Expert Dep.") A848-A850 at 11:7-13:7.

112. On December 2, 2010, CMS issued a request for quotations (RFQ), stating that CMS "intends to award a Firm-Fixed Price Contingency Fee Task Order for the subject work" under the Part D RAC program. Tab 77, SA005.

RESPONSE: Admitted.

113. The RFQ contained a statement of objectives (SOO) prepared by CMS. According to the SOO, the mission of the Part D RAC would be to "reduce Medicare improper payments through the efficient detection and collection of overpayments, the identification of underpayments, and the implementation of actions that will prevent future improper payments." Tab 4, A31.

RESPONSE: Admitted.

114. The SOO set forth a series of objectives for the Part D RAC, and stated that

3

the Part D RAC "shall furnish all the necessary services . . . not otherwise provided by the Government, as needed to meet the objectives." *Id.*

RESPONSE: Qualified. The quoted language is not accurate. The SOO reads that the Part D RAC "shall furnish all the necessary services, qualified personnel, material, equipment, and facilities, not otherwise provided by the Government, as needed to meet the objectives below: . . . ." App. at Ex. 4, Statement of Objectives at A31.

115. Among other things, the SOO tasked the Part D RAC with "[e]stablish[ing] a schedule of deliverables necessary to meet the objectives listed above as well as program initiatives." Tab 4, A33.

RESPONSE: Admitted.

116. To satisfy Government information technology security requirements, the SOO also provided that the Part D RAC would be required to obtain "a formal Government Authorization to Operate (ATO)." Tab 4, A35.

RESPONSE: Admitted.

117. ACLR submitted a technical package to CMS in response to the RFQ. Tab 5, A42.

RESPONSE: Admitted.

118. ACLR's response to the RFQ included a proposed performance work statement (PWS) that was drafted entirely by ACLR. *Id.* at A46; Tab 90, SA230 at 23:2-5

RESPONSE: Admitted.

The Part D RAC Contract

119. CMS issued task order HHSM-500-2011-00006G for "Recovery Audit Services in Support of Medicare Part D" under ACLR's General Services Administration contract number GS-23F-0074W on January 13, 2011. Tab 7, A157.

RESPONSE: Admitted.

120. The task order incorporated ACLR's proposed PWS, and stated that ACLR "shall furnish all necessary services . . . not otherwise provided by the Government, as needed to perform the requirements set forth in" the PWS. *Id.*

4

at A159.

RESPONSE:  Admitted.

121.　The task order specified:

> All payments shall be paid only on a contingency basis. The recovery audit contractor will receive 7.5% of all amounts collected. The contingency fees shall be paid once the recovery audit contractor collects the Medicare overpayments. The recovery audit contractor shall be paid a percentage of the amount that is collected through their recovery efforts. The recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments not recovered/collected.

> *Id.*

RESPONSE:  Admitted.

122.　The task order also specified that ACLR's performance under the contract was subject to any applicable statutes and regulations, and that new legislation or regulations might be enacted that could impact ACLR's performance under the contract.

> In addition to the performance requirement of this contract as set forth under Performance Work Statement, the Contractor may be required to comply with the requirements of any revisions in legislation or regulations which may be enacted or implemented during the period of performance of this contract, and are directly applicable to the performance requirements of this contract.

> *Id.* at A170.

RESPONSE:   ACLR objects on the ground that Defendant's characterization of the task order is a conclusion of law, not a statement of proposed fact.  ACLR admits that the quoted language from the task order is accurate.   However, Defendant's characterization of the task order is inaccurate.  *See* App. at Ex. 7, Part D RAC Contract at A170.

123.　Under the Part D RAC contract, ACLR was tasked with reviewing reconciled PDE records, *i.e.*, PDE records that already had been adjusted through the year-end reconciliation process. Tab 21, A400 at § 1.2.3; Tab

90, SA242 at 116:2-4.

RESPONSE:  Admitted.

124.    Under the Part D RAC process, after ACLR identified any improper payments, and following the completion of any appeals by the plan sponsors, CMS would recoup the finalized overpayment amounts by offsetting those amounts from plan sponsors' ongoing monthly prospective Part D payments. Once the offset occurred, CMS would be deemed to have recouped the overpayments, and ACLR would be paid its contingent fee under the RAC contract calculated off of the recouped amounts. Tab 97, SA387-89 at 22:14-24:11, SA402-03 at 269:5- 270:10.

RESPONSE: Denied.  At the outset of the Part D RAC Contract, ACLR was to collect Part D overpayments.  App. at Ex.7, Part D RAC Contract at section 5; App. at Ex. 6, CMS 30(b)(6) Dep. at 19:1-11; 28:4-14; App. at Ex.10, Downs Dep. at 57:9-20.  Defendant has admitted this in its Response to Plaintiff's Proposed Findings of Uncontroverted Fact and Additional Proposed Findings of Uncontroverted Fact ("Defendant's Response") at ¶ 8.

125.    ACLR's position is that, under the PWS, ACLR had authority to conduct any audits it wished to pursue – including any audit for duplicate payments; to determine which Part D payments were improper based solely on ACLR's review of the PDE data without any oversight or validation by CMS; and to send notices to plan sponsors identifying any PDEs determined by ACLR to be improper payments without prior review or approval by CMS. Tab 90, SA239 at 105:1-7, SA245 at 119:7-13, SA247 at 122:15-21.

RESPONSE:   Qualified.  ACLR's position is that, under the PWS, ACLR had the authority to recover improper payments associated with duplicate payments and those arising from data submission errors, including but not limited to, PDE "Product/Service Identifier [drug identifiers] codes" not submitted "in the proper NDC11 format," "PDE data submissions" not submitted in accordance with "plan requirements," "CMS or plan formulary excluded drugs" that were not properly excluded from payment, inaccurately calculated "beneficiary TrOOP expenses," and improper payments arising from "PDE data submissions [that] do not include allowable costs for drugs not listed on the plan formulary, foreign sourced drugs, over the

6

counter drugs, or similar items." App. at Ex. 7, Part D RAC Contract at A192. With the exception of appeals submitted by plan sponsors, the Part D RAC Contract PWS does not permit CMS or any other related stakeholder to validate, review, or otherwise dispute any ACLR improper payment findings. *See* App. at Ex. 7, Part D RAC Contract. The Statement of Objectives specifically addressed CMS's intent with the design of the PWS; "New approaches and changes in approaches developed after contract award shall require preapproval by CMS" and ACLR did not develop any "new approaches and changes" to its audit methodologies, processes and procedures, or any other PWS mandated requirements. App. at Ex. 4, Statement of Objectives, A32; Tab 90, SA239 at 105:1-15, SA245 at 119:7-13.

> 126. The PWS stated in the description of ACLR's proposed work plan for analyzing duplicate payments stated that ACLR "anticipate[d] CMS revisions to our process." Tab 7, A191.

RESPONSE: Denied. The full sentence in the PWS states, "[w]hile we anticipate CMS' revisions to our process, we typically prepare IDRs, which are standardized forms outlining requested data as well as the desired format(s) for information we need to conduct a recovery audit efforts." App, at Ex. 7, Part D RAC Contract at A191. This sentence pertained to ACLR's use of IDRs (Information Data Requests) to obtain "PDE & DIR data" from CMS, not CMS's right to reject the duplicate payment audit described in the PWS. *See id.* The PWS specifically provided "[i]n the Duplicate Payment Review & Data Work Plan process, we prepare Information Data Requests (IDRs) and obtain needed data from the Data Storage System, or as otherwise may be required by CMS." *Id.* at A189. CMS notified ACLR of its revision to this process on October 4, 2011 whereby rather than utilizing the Data Storage System, CMS would electronically transmit the PDE records directly to ACLR. App. at Ex. 23, October 4, 2011 email. The PWS stated that, for those plan sponsors identified by ACLR as

7

having the most significant errors through a review of PDE data, ACLR would "recommend

them, and solicit CMS' approval for, conducting documentation audits." *Id.* at A193.

> 127.   The PWS stated that, for those plan sponsors identified by ACLR as having
> the most significant errors through a review of PDE data, ACLR would
> "recommend them, and solicit CMS' approval for, conducting
> documentation audits." *Id.* at A193.

RESPONSE:  Qualified.  The full sentence in the PWS states "[w]hile we anticipate

performing a Documentation Audit on all Plan Sponsors, we will utilize these initial reports to

identify those Plan Sponsors with the most egregious errors and recommend them, and solicit

CMS' approval for, conducting documentation audits."  App. at Ex. 7, Part D RAC Contract at

A193. This sentence has no relationship to the 2007 duplicate payment audit because it was not a

Documentation Audit.  The 2007 duplicate payment audit was a Data Audit.  Under the PWS,

ACLR was to generate improper payment reports and provide to plan sponsors prior to selection

of plans for a Documentation Audit. *Id.* at A194-196.

> 128.   The PWS stated that ACLR "anticipate[d] that some of our recommendations
> . . . will require numerous discussions and considerable analysis by ACLR,
> CMS, Plan Sponsors, as well as other stakeholders." *Id.* at A188.

RESPONSE:  Qualified.  The incomplete quoted sentence appears in the context of the

potential use of statistical sampling to recover Part D improper payments. The full sentence in

the PWS states "[w]e anticipate that some of our recommendations, such as those mentioned

under *Alternative Methodologies* below, will require numerous discussions and considerable

analysis by ACLR, CMS, Plan Sponsors, as well as other stakeholders."  App. at Ex. 7, Part D

RAC Contract, A193.  The specific "Alternative Methodologies" referenced in the PWS included

a "managed audit process" whereby plan sponsors conduct self-audits based on statistically

generated PDE records or plan sponsors conduct "a modified voluntary disclosure program."

These "Alternative Methodologies" were ultimately not permitted by CMS.  App. at Ex. 7, Part

D RAC Contract,  A197-198; App. at Ex. 150, May 11, 2011 Email, A852.

> 129.   The PWS stated, in connection with ACLR's proposed process for
> conducting statistical sampling, that ACLR "anticipate[d] that CMS will
> want to discuss and approve this methodology." *Id.* at A194.

RESPONSE:  Qualified.  The incomplete quoted sentence does not refer to CMS's

contractual right to approve ACLR's audits but rather CMS's anticipated approval of statistical

sampling in connection with Documentation Audits.   The PWS states "[o]ur recommended

course of action to accomplish this is to statistically sample individual Plan Sponsor or PDP PDE

data.  We recognize that CMS is familiar with these processes from our experience with the

Medicare PSC program and anticipate that CMS will want to discuss and approve this

methodology."  App. at Ex. 7, Part D RAC Contract, A194.  Statistical sampling as a method for

performing Documentation Audits was rejected by CMS on May 11, 2011.  App. at Ex. 150,

May 11, 2011 Email.  Statistical sampling was not a part of the methodology for the 2007

duplicate payment audit.

> 130.   The PWS stated that "[u]pon contract award [ACLR] will standardize all
> CMS approved activities and the administration of [ACLR's] processes in
> accordance with CMS guidance and policies and modify them as
> requested." *Id.* at A197.

RESPONSE:  Qualified.  ACLR admits the quoted text is accurate.  However, the text

was from a section titled "Post Audit" which was to be conducted after a "Documentation

Audit."  App. at Ex. 7, Part D RAC, A194-96.  The text quoted by CMS has no relationship to

the 2007 duplicate payment audit because that audit was a data audit.  *Id.* at A191-92.   Improper

Payment Reports would have already been submitted prior to any documentation audit and after

amounts for the duplicate payment and other data audits had been "identified as improper,

recovered, and removed from further review." *Id*. at A193.  Moreover, CMS never provided any

guidance or policies that would have modified ACLR's PY 2007 duplicate payment audit.

> 131.   The PWS included a schedule of deliverables. The PWS stated that "this Schedule of Deliverables will be modified as work progresses and upon feedback received from CMS and subsequent modification and approval." *Id*. at A212.

RESPONSE:   Admitted.   However, the PWS, which included a schedule of

deliverables, was a contractual document that could only be changed by a contract modification.

The schedule of deliverables was changed through subsequent contract modification, including

the execution of the SOW on December 31, 2013.  App. at Ex. 21, Part D RAC Contract, OY 1

SOW, A386-427.

<u>Modifications to the Part D RAC Contract</u>

> 132.   ACLR's Part D RAC task order was modified 16 times. Among other things, those modifications extended the base year of performance through December 31, 2013 (approximately two years from contract award) and allowed for two 12-month option periods that were exercised, continuing the period of contract performance through December 31, 2015. Tab 80, SA117; Tab 21, A388; Tab 22, A430.

RESPONSE:   Denied.   The ACLR Part D RAC task order was modified 18 times.

Eleven modifications took place between the end of the first year of the base period and approval

of the SOW on December 31, 2013 (Option Year One), resulting in an extension of the Base

Period for approximately three years after contract award.   App. at Ex. 151, Contract

Modification Summaries, A854-55.

> 133.   An additional administrative and appeals option period continued through December 31, 2017, for processing any appeals by plan sponsors challenging improper payment findings under any approved ACLR recovery audits. Tab 81, SA118; Tab 82, SA119.

RESPONSE:   Qualified.   The additional administrative and appeals option period commenced with contract modification number 17 on December 31, 2015.  Tab 81, SA118.

134.   On several occasions, CMS issued modifications that increased ACLR's contingent fee from the 7.5% provided in the initial task order. In modification 3 dated January 31, 2012, CMS provided for an increase in ACLR's contingent fee to 12% for a recovery audit being conducted by ACLR that focused on identifying 2007 PDEs that involved providers who were excluded from participation in Federal health care programs. Tab 28, A513.

RESPONSE:   Qualified.   CMS issued 11 modifications between the end of the 2011 Base Period and approval of the first SOW on December 31, 2013.  Two CMS modifications increased contingency fees and eight CMS modifications changed tasking and/or extended the base period with no change in contingency fees. App. at Ex. 151, Contract Modification Summaries, A854-855.

135.   Modification 11, dated November 19, 2013, increased ACLR's contingent fee to 16% for ACLR's recovery audit that focused on 2008 through 2011 PDEs involving excluded providers. Tab 79, SA116.

RESPONSE:   Qualified.  While Modification 11, dated November 19, 2013, increased ACLR's contingent fee to 16% for ACLR's recovery audit, Modification 11 resulted from CMS actions that negatively impacted the direction and timeline dictated in Modification 6 for the 2008-2011 excluded provider audit, which included a direct tasking for ACLR to resubmit PDE with pharmacies ACLR could not determine were excluded and the COR's decision to separate the 2008-2011 excluded provider/prescriber issue into two separate validation periods due to CMS concern with the DVC's ability to review a "somewhat of a huge undertaking." App. at Ex. 36, Part D RAC Contract Modification 6, A553-A556, A573; App. at Ex. 152, May 6, 2013 Email, A857; App. at Ex. 40, June 12, 2013 email, A573.

136.   ACLR understood, at the time those modifications were issued, that CMS intended the increased contingent fees as a means of compensating ACLR for

11

any delays or difficulties ACLR had experienced in working with CMS to get the Part D RAC program up and running over the first few years of the RAC contract, before any significant contingent fees had begun to flow to ACLR as a result of recovery audit activities. Tab 90, SA236 at 89:8-14.

RESPONSE:  Denied.  The cited testimony does not support the characterization "that CMS intended the increased contingent fees as a means of compensating ACLR for any delays or difficulties ACLR had experienced in working with CMS to get the Part D RAC program up and running over the first few years of the RAC contract."  Rather, the cited testimony states that Mr. Mucke understood that CMS was attempting to compensate ACLR for "any issues that had arisen with the contract up to that point."  Tab 90, SA236 at 89:8-14.  Additionally, ACLR notes that CMS attempted to add language pertaining to a Contractor's Statement of Release that would have relieved CMS from any future requests for equitable adjustment.  The proposed language was not added because ACLR informed CMS that ACLR would not execute the contract with the release language.  *ACLR I* Document 1, Complaint at ¶¶ 47-48; *ACLR I* Document 8, Defendant's Answer at ¶¶ 47-48.

137.    During the first year of the contract, ACLR learned from CMS that CMS intended to develop a statement of work (SOW) to replace ACLR's PWS that was attached to the initial task order. *Id.* at SA231-34 at 25:18-28:14.

RESPONSE:  Denied.  The cited testimony does not support the characterization "that during the first year of the contract, ACLR learned from CMS that CMS intended to develop a statement of work (SOW) to replace ACLR's PWS."  Rather, the cited testimony states that Mr. Mucke did not become aware until November of 2011 that CMS would not allow ACLR to perform in accordance with the Part D RAC Contract and the first draft of a statement of work that Mr. Mucke saw was on December 9, 2011.  Tab 90, SA231-34 at 25:18-28:14.

138.    CMS provided a draft of the SOW to ACLR on December 9, 2011. The parties continued to negotiate and revise the draft SOW until it was finalized and issued along with contract modification 13 on December 31,

2013. Tab 21, A388; Tab 26, A488.

RESPONSE: Qualified.  ACLR admits that CMS provided a draft of a statement of work to ACLR on December 9, 2011 and a SOW was issued over two years later as contract modification 13 on December 31, 2013.  ACLR denies that the parties continued to negotiate over this two year period.  After one revision, ACLR's approval of the statement of work was communicated to CMS on April 20, 2012.  App. at Ex. 6, CMS 30(b)(6) Dep. at 114:10-22; App. at Ex. 27, April 20, 2012 email approving draft SOW.  CMS DPOA Director Tanette Downs testified that this version of the SOW should have been signed by CMS at that time.  App. at Ex. 153, Excerpts from the Deposition of Tanette Downs, A861-862 at 68:10-69:12.  Between ACLR's approval of the draft SOW on April 20, 2012 and final SOW revisions for Option Year 1 in December 2013, ACLR received only one request for comment on March 21, 2013.  App. at Ex. 154, Draft SOW Summary, A864.

139.   The SOW replaced the PWS in its entirety, such that the PWS was no longer in effect. Tab 90, SA237 at 90:12-20.

RESPONSE:  Admitted.

140.   Although the PWS remained a part of the parties' contract until it was replaced with the SOW in modification 13 at the end of 2013, ACLR agreed during the first year of performance in December 2011 that ACLR would "continue executing only those portions of the contract that are consistent with current CMS expectations (e.g. not issuing demand letters) until such time as the PWS/SOW issues have been resolved." Tab 110, SA602.

RESPONSE:  Denied.  While the language quoted from the December 1, 2011 email is accurate and ACLR refrained from issuing the demand letters to plan sponsors as instructed by CMS, the PWS was a contractual document that was binding on both parties and CMS had an obligation to allow ACLR to proceed in accordance with the PWS.  ACLR took other actions consistent with following the PWS until the execution of the SOW on December 31, 2013.  For

example, on November 13, 2013, ACLR submitted improper payments to CMS totaling $1.05 billion and informed CMS that ACLR would commence recoveries in accordance with its PWS. App. at Ex. 43, November 17, 2013 email, A579.   Additionally, ACLR provided a draft SOW proposal to CMS on January 7, 2012 which was ignored.   App. at Ex. 167, January 17, 2012 Email, A940-41.   ACLR also approved CMS's draft SOW submitted by CMS on April 20, 2012 which was ignored. App. at Ex. 27, April 20, 2012 email approving draft SOW, A510.   ACLR also made repeated requests to CMS for ADR/mediation to address Part D RAC contract issues, but those requests were also ignored by CMS.   App. at Ex. 155, July 2, 2013 Email, A866-67.

141.   ACLR understood that it would not be performing under the terms of the PWS while the SOW was being drafted and finalized. Tab 90, SA248-49 at 124:18-125:9.

RESPONSE:   Denied.   The cited deposition testimony does not support the characterization.   Considering that the Part D RAC Contract provides that "no contingency fees shall be paid after the end of the period of performance" and that ACLR was being prohibited from recovering improper payments such that ACLR could recoup its expenses and reasonable expectations of profits, Mr. Mucke testified that he felt threatened that ACLR would not be paid for the million dollars already spent in connection with the Part D RAC Contract through late 2011 and was concerned that CMS might terminate the Part D RAC Contract.   Mr. Mucke interpreted CMS's actions as effectively a stop work order, as it became obvious that CMS would not allow ACLR to perform in accordance with the PWS.   App. at Ex. 7, Part D RAC Contract, A158; Tab 90, SA248-49 at 124:9-125:9.

142.   ACLR agreed not to send improper payment notices to any plan sponsors related to the alleged 2007 duplicate payments that ACLR had referenced during a November 30, 2011, conference call. *Id.* at SA250 at 131:8-11.

RESPONSE: Qualified.   ACLR agreed to follow CMS's instructions to not issue demand letters to plan sponsors for 2007 duplicate payments in November 2011.   Tab 90, SA248-49 at 131:1-11.   ACLR complied with CMS's instructions because ACLR felt threatened that it would not be paid for the million dollars already spent in connection with the Part D RAC Contract through late 2011 and was concerned that CMS might terminate the Part D RAC Contract.  *Id.* at SA248-49 at 124:9-125:9.

143.   Until the SOW was finalized, the only recovery audits ACLR pursued were ones authorized by CMS through formal contract modifications: 2007 PDEs involving potential excluded providers (modification 3); 2008-2011 PDEs involving potential unauthorized prescribers (modifications 6, 11); and 2009 PDEs involving potential duplicate payments submitted by three specific plans (modification 8). Tab 28; Tab 36; Tab 78; Tab 79.

RESPONSE:  Denied.  ACLR commenced the duplicate payment audit in November 2011 but CMS instructed ACLR to not issue demand letters to plan sponsors for 2007 duplicate payments and on November 13, 2013, ACLR attempted to pursue the audit of improper payments to CMS totaling $1.05 billion and informed CMS that ACLR would commence recoveries in accordance with its PWS. App. at Ex. 43, November 17, 2013 email, A579.  The only recovery audits CMS allowed ACLR to pursue until the SOW was executed was 2007 PDEs involving potential excluded providers (Modification 3); 2008-2011 PDEs involving potential unauthorized prescribers (Modifications 6, 11); and 2009 PDEs involving potential duplicate payments submitted by three specific plans (Modification 8). ACLR also pursued DEA scheduled refill errors and invalid/unauthorized prescribers which were originally submitted to CMS prior to SOW execution.  App. at Ex. 156, August 21, 2013 Email, A869; App. at Ex. 157, August 29, 2013 Email; A871.

144.   Modification 13 that accompanied the SOW continued the prior task order provision that

All payments shall be paid only on a contingency basis. The recovery audit contractor will receive the percentage specified below of all amounts collected. The contingency fees shall be paid once CMS collects the Medicare overpayments. The recovery audit contractor shall be paid a percentage of the amount that is collected through their recovery efforts . . . . The recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments not recovered/collected.

Tab 21, A392.

RESPONSE:  Admitted.

145.    Modification 13 adjusted ACLR's contingent fee rate again, increasing the rate for the 2008 through 2011 excluded provider audit issue to 28%. The parties also agreed to a new contingency fee rate for all new approved audit issues, setting the rate at 15% for the first $10 million in recoveries and then 12% for any recoveries above $10 million per approved issue.

*Id.*

RESPONSE:  Admitted.

146.    The SOW provided that

CMS/CPI determines the specific criteria on which the Part D RAC must submit to CMS as improper payments and new audit issues. To direct the Part D RAC's review, CMS/CPI mandates submission of potential improper payments by contract, issue type, and audit year. CMS further defines the audit scope to include the exact audit issue to be reviewed.
. . .
As the Part D RAC progresses, new audit issues may be approved and added to the RAC's audit scope. In addition to the audit issues already approved by CMS/CPI, audit issues may be expanded to include new issues during the RAC process. A new audit issue must first be proposed to CMS for approval.

Tab 21, A399 at § 1.2.1.

RESPONSE:  Admitted.

147.    The SOW set forth a process by which ACLR was required to submit a new audit issue review package (NAIRP) for each audit issue it proposed to pursue.

ACLR was required to include in its NAIRPs "the issue type, audit scope, recovery estimate, a sample of PDE records, applicable law, policies, etc. and recommendation for automated or complex review." *Id.*

RESPONSE: Admitted.

148.   An automated review was described as a recovery audit completed entirely through a review of the data contained in the PDE records. *Id.*

RESPONSE: Qualified. An "Automated Review" was defined in the SOW as "a review completed based upon available PDE records where approved processes are considered to be acceptable without further review of prescription or other documentation." App. at Ex. 21, Part D RAC Contract, OY1 SOW, A400.

149.   A complex review was defined as a recovery audit that would require ACLR to request and review additional information from plan sponsors (such as copies of prescriptions or other documentation) to compare to the data contained in the PDE records, to determine the accuracy of the PDE data submissions. *Id.*

RESPONSE: Qualified. A "Complex Review" was defined in the SOW as "a review determined to require a Request for Information from the plan sponsor to adequately validate conformance with CMS policy and applicable laws. This review is utilized where additional documentation, such as, prescriptions, prior authorizations, or other documentation is required from the plan sponsor." App. at Ex. 21, Part D RAC Contract, OY1 SOW, A399-400.

150.   The SOW stated that ACLR "must receive approval from CMS/CPI prior to commencing recovery audit activities." Tab 21, A402 at § 2.1.1.

RESPONSE: Admitted.

151.   Following the submission of a NAIRP for a proposed new audit issue, the SOW provided that ACLR would "work[] with CMS/CPI to refine and approve or deny the NAIRP. Once approved the RAC begins recovery audit activities." *Id.*

RESPONSE: Qualified. Defendant's characterization of the SOW is that ACLR has an affirmative obligation to initiate working with CMS following the submission of the NAIRP.

17

Rather, the language of the SOW requires CMS and ACLR to work to refine a NAIRP prior to

any denial.  "Once submitted, the RAC works with CMS/CPI to refine and approve or deny the

NAIRP."  App. at Ex. 21, Part D RAC Contract, OY1 SOW, A402.

> 152.    Under the SOW, CMS had to approve any audit issue for ACLR to be
> permitted to commence and complete that recovery audit. Tab 91, SA303-04
> at 63:20-64:11.

RESPONSE:  ACLR objects on the grounds that this paragraph is a conclusion of law,

not a statement of proposed fact.  To the extent a response is required, denied.  The RAC does

not require new approvals from CMS to complete an approved audit.  The SOW provides that

the "RAC must receive approval from CMS/CPI prior to commencing recovery audit activities."

App. at Ex. 21, Part D RAC Contract, OY1 SOW, A402.  Additionally, the "RAC begins

recovery audit activities" with the approval of the NAIRP.  *Id.,* A424-25.

> 153.    The SOW NAIRP process specified that, if CMS elected to deny any NAIRP,
> "CMS shall provide [ACLR] with a written explanation as to the reasons for
> the denial." Tab 21, A423-24 at App. E.

RESPONSE:  Admitted.

> 154.    Under the SOW, ACLR did not have the right to proceed with an audit,
> absent approval from CMS. Tab 91, SA303-04 at 63:20-64:11.

RESPONSE:  ACLR objects on the grounds that this paragraph is a conclusion of law,

not a statement of proposed fact.  To the extent a response is required, denied.  The RAC does

not require new approvals from CMS during the course of an audit after the audit is approved.

The SOW provides that the "RAC must receive approval from CMS/CPI prior to commencing

recovery audit activities."  App. at Ex. 21, Part D RAC Contract, OY1 SOW, A402.    This

approval is further defined that with the approval of the NAIRP, the "RAC begins recovery audit

activities."  *Id.* at A424-25.

155.    ACLR stated that CMS had the right under the contract to determine what the methodology would be for any approved audit issue that ACLR pursued, or to "dictate" the methodology it wanted ACLR to use. Tab 90, SA262-64 at 189:20-191:10.

RESPONSE:   ACLR objects on the grounds that this paragraph is a conclusion of law, not a statement of proposed fact.  To the extent a response is required, denied.  The testimony provided was in the context of the methodology to be used in connection with the approval of the NAIRP.  Tab 90, SA262-64 at 189:20-191:10.      The SOW provides that "CMS's approved methodology, for each audit issue, must be used by the RAC to determine the improper payment amount."  App. at Ex. 21, Part D RAC Contract, OY1 SOW, A402, § 2.1.2.  This approval is further defined that with the approval of the NAIRP, the "RAC begins recovery audit activities." *Id.* at A424-25.  There was no language in the Part D RAC Contract that allowed CMS to apply revised methodologies once a methodology is approved.  *See* App. at Ex. 6, CMS 30(b)(6) Dep., A134-35 at 173:3-174:9; A153-54 at 249:13-250:22.

156.    The SOW stated that after that recoupment and appeals process was completed, ACLR "will receive a contingency payment once the full overpayment amount has been recouped from the plan sponsor." Tab 21, A405 at § 3.2.2.

RESPONSE:  Admitted.

157.    The parties agreed to a revised SOW that was issued as part of contract modification 16 and went into effect as of January 1, 2015. Tab 22, A430.

RESPONSE:  Admitted.

158.    The only substantive amendment to the SOW was to change the two-level appeals process to a three-level appeals process, with the final level of appeals resolved by the CMS Administrator's designee. Tab 22, A447 at App. A, A454 at App. C.

RESPONSE:  Admitted.

19

159.    The three-level appeals process contained in the revised SOW was consistent with provisions of a final rule, known as CMS-4159-F, issued by CMS on May 23, 2014, following notice and comment. *See* 79 Fed. Reg. 29844 (May 23, 2014).

RESPONSE:  ACLR objects on the grounds that this paragraph is a conclusion of law, not a statement of proposed fact.

160.    The addition of the optional third-level appeal for the Part D RAC program was intended to replicate the appeals process in place for the RAC programs under Parts A and B. Tab 99, SA417-19 at 63:21-65:1.

RESPONSE: Qualified.  HHS determined that "the general mechanisms set forth in § 422.311 and § 423.350 offered the most appropriate models for the Part C and D RAC appeals process" and that HHS estimated no more than two third-level appeals for all Part C and D RAC programs combined.  Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs; Final Rule, 79 Fed. Reg. 29935, 29943 (May 23, 2014) (to be codified at 42 CFR Parts 417, 422, 423, *et. al*).

Other Part D Contractors Performing Services For CMS: The Data Validation Contractor

161.    CMS contracted with Livanta LLC (Livanta) on September 30, 2011, to serve as the data validator for the Part D RAC. Tab 102, SA428.

RESPONSE:  Admitted.

162.    Livanta's contract required it to "measure the accuracy rate of the Part D RAC," by reviewing "improper payments identified by [ACLR] to determine if they are accurate." *Id.* at SA442.

RESPONSE: Qualified.  The quoted language is from Livanta's September 30, 2015 Statement of Work, which was executed one month after the submission of ACLR's final audit issue under the Part D RAC Contract, and is incomplete.  The Livanta September 30, 2015 Statement of Work provides "[t]o measure the accuracy rate of the Part D RAC, CMS contracts with a Data Validation Contractor (DVC).  The DVC takes random samples of the improper payments identified by the RAC to determine if they are accurate."  Tab 102, SA442.

163.    Livanta also was contracted to "review and approve/disapprove improper payment referrals [and] receive and review New Audit Issues [ACLR] wants to pursue for improper payments." *Id.*

RESPONSE:  Qualified.  The quoted language is from Livanta's September 30, 2015 Statement of Work, which was executed one month after the submission of ACLR's final audit issue under the Part D RAC Contract, and is incomplete.

164.    Livanta's contract provided that "CMS will determine whether [ACLR's] accuracy shall be determined by sampling or as a 100% review." *Id.* at SA445.

RESPONSE:  Qualified.  The quoted language is from Livanta's September 30, 2015 Statement of Work.

165.    CMS tasked Livanta with reviewing 100% of ACLR's proposed improper payments per audit issue. Tab 92, SA358-59 at 15:19-16:3, SA360 at 28:13-19, SA361 at 35:16-18, SA362 at 37:5-12.

RESPONSE:  Defendant objects on the grounds that this proposed uncontroverted fact is vague in that it is unclear in what context Defendant is claiming there was a 100% review by Livanta and when ACLR was subject to this review.  The cited testimony only supports the fact that Livanta conducted a 100% validation rather than an accuracy review.  App. at Ex. 158, Excerpts from the Deposition of Christopher Martin Mendez as Corporate Representative for Livanta, LLC ("Livanta Dep."), A874 at 51:17-20.

166.    ACLR learned of Livanta's role as the data validation contractor during the first year of ACLR's contract, prior to CMS authorizing ACLR to proceed with any specific audit issues. For instance, in modification 3, issued January 31, 2012, CMS and ACLR agreed to a timetable for ACLR to complete its audit of 2007 PDE records for excluded providers that included deadlines for Livanta to complete its validation review. Tab 28, A515.

RESPONSE:  Qualified.  ACLR denies that Livanta had any role as a data validation contractor during the first year of ACLR's contract and that CMS had some separate right to

21

authorize ACLR to proceed with specific audit issues.   The only reference in the PWS to validation pertains to the validation of PDE records by ACLR.   App. at Ex. 7, Part D RAC Contract, PWS at A192, A194, and A198.   The PWS provided that ACLR will conduct a duplicate payment review, generate improper payment reports, and recover improper payment amounts owing.   *Id.* at A192, A199; App. at Ex.6, CMS 30(b)(6) Dep., A101-02 at15:20-16:2. ACLR agrees that it learned of Livanta's role on January 4, 2012, ten days before the first year of its contract was complete.   App. at Ex. 159, December 2011-January 2012 Email Exchange, A878.   ACLR also agrees that in Modification 3, issued January 31, 2012, CMS and ACLR agreed to a timetable for ACLR to complete its audit of 2007 PDE records for excluded providers that included deadlines for Livanta to complete its validation review. App. at Ex. 28, Part D RAC Contract, Modification 3, A513.

167.     Modification 4 issued on April 5, 2012, included a process by which ACLR and Livanta were to resolve any disputes concerning Livanta's validation of ACLR's audits. Under those procedures, ACLR was required to "either accept or reject [Livanta's] validation findings." The modification provided that if ACLR and Livanta "cannot come to a resolution, CMS shall make the final decision, which cannot be reviewed or contested by either" ACLR or Livanta. Tab 33, A542-43.

RESPONSE: Qualified.   This modification pertained solely to ACLR's audit of 2007 excluded providers and did not pertain to any other of ACLR's audits or otherwise modify or replace PWS requirements.   App. at Ex. 33, Part D RAC Contract, Modification 3, A542-43.

168.     ACLR was not authorized to send notification of improper payment letters to plan sponsors prior to the validation of ACLR's findings by Livanta. Tab 54, A627.

RESPONSE:  Denied.  There was no restriction on ACLR's ability to send notifications of improper payment letters to plan sponsors in the PWS.  *See* App. Ex. 7, Part D RAC Contract. The cited evidence is for Modification 4, which applies to ACLR's 2007 audit of excluded

providers and reads that "RAC is required to issue Notification of Improper Payment to the SO

once an improper payment is identified and validated."  App. at Ex. 54, Part D RAC Contract,

Modification 5, A627.

169.    The SOW stated, "CMS does not need any statutory or regulatory reference
        to deny a RAC finding." And "CMS also has the right to establish minimums
        and thresholds that the Part D RAC findings must meet to be considered for
        recoupment." Tab 21, A403 at § 2.2.1.

RESPONSE:    Qualified.    The quoted text refers to CMS's decision during the

RAC/DVC dispute resolution process.  The dispute resolution is conducted on those decisions

where the DVC makes a validation determination on an improper payment contained in the

submitted IPRP and the RAC does not concur with the finding. App. at Ex. 21, Part D RAC

Contract, OY1 SOW, A403 at § 2.2.1.and § 2.2.2.  In the validation of the IPRP, the DVC "shall

perform a review of the IPRP and submit an IPRP validation finding to CMS. The DVC will

follow the same review process as the RAC."  App. at Ex. 160, July 2, 2013, Medicare Part D

RAC Data Validation Contractor (DVC) Statement of Work ("DVC SOW"), A892 at § 2.3.

### Other Part D Contractors Performing Services For CMS: The NBI MEDIC

170.    CMS contracted with Health Integrity, LLC (Health Integrity) to serve as the
        National Benefit Integrity Medicare Drug Integrity Contractor (NBI MEDIC).
        Health Integrity's role as the NBI MEDIC is to assist CMS in the "prevention
        and detection of fraud, waste and abuse for Medicare Part C and Part D." Tab
        93, SA365 at 10:6-11.

RESPONSE:  Admitted.

171.    Health Integrity was tasked with examining the Part D program to look for
        fraud, waste, and abuse, that could include, among other things, "[a]llegations
        that prescription drugs or other items or services were not received";
        allegations that a provider or plan sponsor "received a Medicare benefit of
        monetary value . . . to which he or she is not entitled under current Medicare
        law, regulations, or policy"; "[m]isrepresenting the . . . prescription drug event
        data to increase payments"; and "[b]illing Medicare for costs not incurred or
        which were attributable to non- Medicare activities." Tab 104, SA468-70.

23

RESPONSE:  Admitted.

172.   Health Integrity, as the NBI MEDIC, was tasked with "recommend[ing] recovery of overpayments whenever it is determined that Medicare has erroneously paid." *Id.* at SA471.

RESPONSE:  Admitted.

173.   Health Integrity's contract provided that it "may furnish requested specific information on ongoing fraud investigations and on individually identifiable protected health information to any Medicare contractor." *Id.* at SA472.

RESPONSE:  Admitted.

174.   ACLR's SOW states that ACLR "shall cooperate and coordinate with stakeholders other than CMS, including Affiliated Contractors (ACs), and other entities as appropriate." Tab 22, A445 at § 6.2.

RESPONSE:  Admitted.


ACLR's Completed Audit Issues

175.   CMS authorized ACLR to pursue the following audits: (1) payments made for excluded providers in 2007; (2) payments made for excluded providers in 2008-2011; (3) payments made for excluded providers in 2012-2013; (4) payments involving unauthorized prescribers in 2009-2012; (5) payments made for unauthorized prescribers in 2013; (6) payments involving DEA schedule drugs in 2010-2011; and (7) payments involving DEA schedule drugs in 2012-2013. Tab 140, SA746-47.

RESPONSE:  Qualified.  CMS executed Modification 3, which authorized ACLR to conduct a special study of excluded providers for the 2007 plan year but subsequently reduced the scope to include only excluded prescribers and pharmacies and no modification was made to address this change.  App. at Ex. 28, Part D RAC Contract Modification 3, A513-518; App. at Ex. 161, March 23, 2012 Email, A911.  Subsequent contract modifications for this audit issue stated that only excluded prescribers and pharmacies were to be audited.  App. at Ex. 36, Part D

24

RAC Contract, Modification 6, A553.   CMS authorized ACLR to perform 2009 duplicate

payment reviews for "three plans" but did not recover improper payment amounts submitted by

ACLR.  App. at Ex. 162, Part D RAC, Modification 8, A913.  ACLR agrees that CMS approved

the DEA schedule and unauthorized prescriber audits originally submitted by ACLR while the

PWS was in effect.  During the period while the SOW was in effect, CMS authorized ACLR to

conduct a duplicate payment audit for plan years 2010 – 2012.  This audit was subsequently

terminated by CMS and ACLR admits that no new audit issues were subsequently approved by

CMS.  App. at Ex. 59, April 24, 2015 email, A655-58.

> 176.   ACLR was paid its contingent fees on the completed recovery audits for
> which there either were no appeals or for which the appeals have been
> finalized. Tab 91, SA306-07 at 80:12-81:4.

RESPONSE:  Admitted.

### ACLR's Proposed Audit Issues: 2007 Duplicate Payments

> 177.   One of the audit issues that ACLR contemplated pursuing when it prepared
> the PWS was potential duplicate payments, *i.e.*, duplicate payments by
> CMS for the same exact prescription. Tab 7, A190, A198.

RESPONSE:  Denied.  The PWS required that ACLR conduct the duplicate payment

audit, *i.e.*, duplicate payments by CMS for the same exact prescription dispensing event audit

prior to conducting data audits. App. at Ex. 6, CMS 30(b)(6) Dep., A101-02 at 15:20-16:2; App.

at Ex. 7, Part D RAC Contract, A189.

> 178.   CMS asked ACLR to submit a draft of a proposed process for "how ACLR
> would go about auditing a plan on . . . duplicate payments" on August 25 and
> September 26, 2011. Tab 108, SA498; Tab 109, SA601.

RESPONSE:  Qualified.  ACLR admits that CMS asked ACLR to submit a draft of a

proposed process for "how ACLR would go about auditing a plan on . . . duplicate payments" on

August 25, 2011.  ACLR denies that CMS asked ACLR to submit a draft of a proposed process

for "how ACLR would go about auditing a plan on . . . duplicate payments" on September 26, 2011.  The document Defendant relies upon from September 26, 2011 does not contain the quoted language.  Tab 109, SA601.

> 179.   ACLR sent CMS an email on September 30, 2011, in which ACLR set forth the seven specific fields within the PDE records that ACLR proposed to use to identify potential duplicate payments. Tab 109, SA600.

RESPONSE:  Qualified.  ACLR admits sending the email and that ACLR provided seven specific fields within the PDE records to identify duplicate payments but also notes that ACLR also informed CMS that it had not reviewed PDE data and that "without additional details it is difficult to propose specific audit methodologies." Tab 109, SA600.

> 180.   That was the first time ACLR informed CMS of the specific process ACLR proposed to use for identifying potential duplicate payments within the PDE record data. As ACLR noted in its email, "if there are multiple PDE records containing the same criteria for all seven data fields then there is the *possibility* that there is a duplicate payment." Tab 90, SA240- 41 at 111:3-112:9; Tab 109, SA600 (emphasis added).

RESPONSE:  Qualified.  Denied with respect to the implication that the referenced email from ACLR contains the term "proposed" with respect to the seven PDE data fields.  The email provides, in part, "[w]e will utilize the following seven PDE fields to identify a duplicate payment."  Tab 109, SA600.  ACLR admits the referenced email contains the quoted language.  However, ACLR also informed CMS that it had not reviewed PDE data and that "without additional details it is difficult to propose specific audit methodologies."  Tab 109, SA600.

> 181.   CMS began transmitting Part D PDE records to ACLR on November 17, 2011. The transmittal began with 2007 PDE records, and once the 2007 PDE record transmissions were completed, ACLR began to receive PDE records for subsequent years from CMS over the next several weeks. Tab 83, SA121; Tab 90, SA243 at 117:16-22, SA255 at 151:14-19.

RESPONSE:  Admitted.

> 182.   ACLR began reviewing the 2007 PDE records shortly after their receipt

from CMS and in advance of a November 30, 2011 conference call between ACLR and CMS. Tab 90, SA243-44 at 117:12-118:20.

RESPONSE:  Admitted.

183.   During that conference call, ACLR's founder, Christopher Mucke, informed CMS for the first time that ACLR already had identified approximately $175 million in potential duplicate payments in the 2007 PDE records, and that ACLR was prepared to begin sending notices of improper payments to all of the plan sponsors identifying those payments the following week. *Id.* at SA243-44 at 117:12-118:20, SA247 at 122:15-21.

RESPONSE:  Admitted.

184.   ACLR had not yet identified for CMS the specific PDE records that ACLR contended were duplicate payments, nor had anyone else validated ACLR's findings. *Id.* at SA244-45 at 118:21-119:15.

RESPONSE:   Qualified.   There was no contractual requirement in the Part D RAC Contract PWS that required ACLR to identify to CMS the PDE records that were duplicate payments or that required or permitted any validation of ACLR's findings.  *See* App. at Ex. 7, Part D RAC Contract.

185.   CMS had not yet implemented the framework for offsetting any actual overpayments from plan sponsors' ongoing monthly Part D payments, and thus there was no reimbursement process in place. Tab 99, SA414-16 at 56:21-58:18.

RESPONSE:   Qualified.   ACLR agrees that until the Part D RAC, OY1 SOW was effective, CMS had not implemented a formal process by which it would ultimately recoup overpayments from plan sponsors based upon ACLR's audits.  App. at Ex. 21, Part D RAC, OY1 SOW, A404.   However, the PWS provided that ACLR would collect Part D overpayment and CMS's failure to timely implement an alternative recoupment method was not a justification for denying ACLR the right to continue with its duplicate payment audit. App. at Ex. 7, Part D RAC Contract at A159, section 5.

186.     CMS informed ACLR that CMS did not want ACLR to begin sending improper payment notices to plan sponsors related to the 2007 PDE records. Tab 100, SA423-24 at 87:7- 88:11.

RESPONSE:     Qualified.   CMS advised ACLR to not issue the notices of improper payment demand letters ("NIPs") to recover PY 2007 duplicate payments and did not permit ACLR to proceed at all with the 2007 duplicate payment audit issue.  Document 53, Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact and Additional Proposed Findings of Uncontroverted Fact ("Defendant's Response") at ¶ 35;  Document 52, Defendant's Response to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment ("Defendant's Motion") at 52.[1]

187.     ACLR continued analyzing the 2007 PDE records for potential duplicate payments, and subsequently determined that it had identified a total of $313,808,241 potential duplicate payments for 2007. Tab 106, SA481.

RESPONSE:  Admitted.

188.     ACLR discussed the potential 2007 duplicate payment audit issue one more time with CMS, in January 2012. Tab 90, SA253-54 at 149:12-150:13.

RESPONSE:   Denied.   The cited deposition testimony does not support the alleged uncontroverted fact.   ACLR discussed the potential for the recovery of duplicate payments including those for PY 2007 on multiple occasions after January 2012.   App. at Ex. 175, Affidavit II of Christopher Mucke ("C. Mucke Aff.") at ¶ 4, A1001.

189.     Other than sharing the $313 million total figure with CMS, ACLR did not provide CMS with any documentation or identification of the specific plan sponsor contracts or PDE records that constituted that $313 million figure until early 2015, around the time ACLR submitted its certified claim that led to *ACLR I. Id.* at SA286-87 at 288:5-289:17.

RESPONSE:   Denied.   The cited deposition testimony does not support the alleged uncontroverted fact.   The cited deposition testimony pertains to whether Mr. Mucke shared a

---

[1] References to page numbers on Defendant's Motion and Response are to the pleading page numbers and not the Document 52 and Document 53 page numbers generated in the course of filing the pleading.

table with CMS prior to early 2015 and Mr. Mucke testified that he did not recall whether he submitted the table to CMS prior to 2015.   App. at Ex. 163, Excerpts from the 30(b)(6) Deposition of Christopher Mucke in ACLR I ("ACLR I 30(b)(6) Dep."), A917-21 at 285:18-289:17.

190.   ACLR did not provide CMS with copies of the specific 2007 PDEs that ACLR contended amounted to duplicate payments until either the submission of its certified claim in March 2015 at the earliest or, perhaps, not until discovery during the litigation in *ACLR I*, in 2016. *Id.* at SA256-57 at 154:22-155:9, SA287-88 at 289:17-290:13.

RESPONSE:  Admitted.

191.   In *ACLR I*, ACLR seeks to recover $23,535,618, which it contends are the contingent fees it would have received if it had been permitted to proceed with the recovery audit for 2007 potential duplicate payments, and if CMS had, in fact, recovered the entirety of the $313,808,241 in potential duplicate payments that ACLR claims it identified within the 2007 PDE records. Tab 85, SA146-47; Tab 90, SA278 at 272:3-13.

RESPONSE: Qualified.  ACLR seeks damages, among others, of $23,535,618 on its claims of breach of contract and breach of duty of good faith and fair dealing based upon the contingency fee payments ACLR was entitled to receive for the recovery of overpayments of 2007 duplicate payments.

192.   That contingent fee is calculated by multiplying the 7.5% contingency fee rate that was contained in the Part D RAC contract in 2011 times the total $313.8 million figure.  Tab 90, SA292 at 307:11-18.

RESPONSE:  Admitted.

193.   ACLR has no knowledge that CMS actually recovered any, nor all, of the $313 million in potential duplicate payments found by ACLR. *Id.* at SA238 at 94:1-8, SA279 at 273:6-18.

RESPONSE:  Admitted.

194.   ACLR has characterized the potential improper payments that it identified at the outset of any audit issue as only "estimates" of the actual improper payments that it expects to confirm through the recovery audit process. Tab

91, SA345 at 210:5-21.

RESPONSE:  Qualified.  The referenced deposition testimony only applies to amounts

submitted in NAIRPs occurring on or after January 1, 2014.  Tab 91, SA345 at 210:5-21.  A

NAIRP is defined in the SOWs as "the package of proposed audit issues and includes a sample

of Prescription Drug Event (PDE) records for a specified contract year, a new audit issue, an

*estimate of improper payment amount and the audit methodology.*" (emphasis added).  App. at

Ex. 21, Part D RAC Contract, OY1 SOW at A399, section 1.1; App. at Ex. 22, Part D RAC

Contract, OY2 SOW at A434, section 1.1.

<u>ACLR's Proposed Audit Issues: 2010 Duplicate Payments</u>

195.   After the issuance of modification 13 and the incorporation of the SOW into
the Part D RAC contract, ACLR again proposed a recovery audit for
potential duplicate payments, this time using PDE records from 2010
through 2012. Following the submission of an initial NAIRP in January
2014 and multiple revisions, ACLR submitted a final revised NAIRP
submission for this audit issue on May 13, 2014. Tab 107, SA492.

RESPONSE:  Qualified.  ACLR denies that it "again" proposed a duplicate payment

methodology.  The Part D RAC PWS required that ACLR audit and recover duplicate payments

not "propose" a method of audit recovery.  The Part D RAC Contract PWS authorized ACLR's

recovery of duplicate payments.  App. at Ex. 7, Part D RAC Contract, PWS at 36; App. at Ex. 6,

CMS 30(b)(6) Dep., A117-18 at 57:9-58:6.  ACLR admits that, in accordance with OY1 SOW

Modification 13 executed on December 31, 2013, it submitted a NAIRP containing a duplicate

payment audit methodology originally designed by CMS for recovering duplicate payments

occurring during plan years 2009-2012 and that a final revised NAIRP was submitted on May

13, 2014.

196.   ACLR's revised NAIRP provided additional information regarding how
ACLR intended to identify potential duplicate payments using the data in the

PDE records. Pursuant to CMS's request, ACLR agreed that the 2010-2012 duplicate payment audit issue would be conducted as a complex, rather than automated, review under the SOW. *Id.* at SA493.

RESPONSE:  Qualified.  ACLR agrees with the proposed uncontroverted fact except that CMS required that the audit be conducted as a complex review.  App. at Ex. 46, May 6, 2014 email, A587; App. at Ex.47, RFI letter, A590.

197.    Under the complex review procedures, ACLR would be required to request information from plan sponsors after ACLR compiled a preliminary list of potential duplicate payments from the PDE data, and then review documentation received from the sponsors to determine whether the PDE records were, in fact, duplicate payments based on the underlying documentation submitted by the plan sponsors. *Id.* at SA494; Tab 21, A399-400 at § 1.2.1.

RESPONSE:  Qualified.  The SOW required that ACLR "contact the plan sponsor to obtain additional information," . . . . "complete their examination adjusting for any pertinent documentation received from the plan sponsor," and to create "an Improper Payment Review Package (IPRP) and submit[] it to the DVC for validation via PRIS."  In addition, "[i]f no corroborating evidence is provided by the plan" ACLR "shall commence with the Notification of Improper Payment Letter process . . . ."  App. at Ex. 21, Part D RAC Contract, OY1 SOW at A401-02, section 2.1; App. at Ex. 22, Part D RAC Contract, OY2 SOW at A436-37, section 2.1.

198.    According to ACLR's revised NAIRP, ACLR would first look for an "exact match" between multiple PDEs containing the exact same data contained in five different PDE fields. From those results, ACLR agreed to exclude from its findings any PDE records related to partial fills (partial prescriptions given to patients while pharmacies are awaiting the supply to fill the remainder of the prescription dosage, for instance); long term care; vaccination administrative fees; and prescriptions transitioning from retail to mail order pharmacies. Tab 107, SA493; Tab 90, SA258-59 at 185:22-186:11.

RESPONSE:  Admitted.

199.    Once ACLR identified the exact matches using the specified PDE fields and eliminated the categories of prescriptions described above, ACLR agreed to examine the length of time that elapsed between each pair of potentially

duplicative PDEs. Under that process, "the days elapsed between two PDE selected as a result of the exact match review is determined and compared to the days supply of the originating PDE." If the days elapsed was less than 50% of the days' supply of medication contained in the original PDE, ACLR would identify the subsequent PDE record as "potentially duplicative." Following the completion of that process, ACLR would generate a list of potential duplicate payments for which requests for information would be sent to plan sponsors "requesting detailed prescription data for all potentially duplicative PDEs." Tab 90, SA259-61 at 186:12-188:1; Tab 107, SA493-94.

RESPONSE:  Admitted.

200.    ACLR then would review the documentary submissions received from plan sponsors and generate an improper payment review package identifying those PDEs that ACLR continued to believe were duplicates, to be reviewed by the data validation contractor Livanta. *Id.*

RESPONSE:  Denied.  ACLR's approved NAIRP provided as follows:

> The RAC will review all documentation submissions received from the plans to ensure the legitimacy (non-duplicative nature) of the potentially duplicative PDE forwarded to the plans. Upon completion of its review, Improper Payment Review Packages (IPRPs) will be generated from unsupported (duplicative) PDEs and forwarded to the Data Validation Contractor (DVC) for review and validation.

Tab 107, SA494

201.    CMS notified ACLR on May 28, 2014, that CMS had approved the revised duplicate payment NAIRP, but that CMS was continuing to review ACLR's proposed request for information prior to ACLR sending the notices to the plan sponsors. CMS asked ACLR to submit the PDE records associated with its potential duplicate payment findings to CMS for review prior to notifications being sent to the plan sponsors. Tab 112, SA606.

RESPONSE: Qualified.  ACLR agrees that CMS notified ACLR on May 28, 2014, that CMS had approved the revised duplicate payment NAIRP.  However, the remaining proposed uncontroverted fact is denied as an inaccurate characterization of the May 28, 2014 email.  CMS notified ACLR on June 10, 2014 to "hold off on sending the RFIs for this study until CMS is able to read and review what was submitted."  App. at Ex. 48, A597.  Upon ACLR's response "this is outside the current process (Section 2.1)," CMS replied "you are correct in that this piece

of the process is not in the current contract . . . . and will have to be worked out and will be

included in the modification that we anticipate sending over to OAGM next week." *Id.* at A596.

No modification was ever issued.

> 202.   ACLR submitted all of the 2010 through 2012 PDE records identified as
>        potentially duplicative to CMS on June 9, 2014, and ACLR informed CMS
>        that it anticipated sending notification letters requesting information to all
>        of the affected plan sponsors "no later than" two days later, June 11, 2014.
>        Tab 48, A597-98.

RESPONSE:  Admitted.

> 203.   CMS responded the next day, informing ACLR that CMS could not read
>        any of the PDE files submitted by ACLR due to a formatting issue and
>        asking ACLR to "hold off on sending the RFIs for this study until CMS is
>        able to read and review what has been submitted." *Id.* at A597.

RESPONSE: Admitted.

> 204.   ACLR responded that "we do recognize the authority of CPI, under Appendix E
>        (New Issue Submission and Approval Process) Step 5 [of the SOW] to dictate
>        the terms of the actual approval" of the audit issue. *Id.* at A594.

RESPONSE:  Denied.  The quoted language in the proposed uncontroverted fact is not

consistent with the evidence provided in support.  The complete quote states "[B]ased on your

email 11 June below, we do recognize the authority of CPI, under Appendix E (New Issue

Submission and Approval Process) Step 5 'CMS shall provide the RAC with a written

explanation as to the terms of the conditional approval,' to dictate the terms of the actual

approval."  App. at Ex. 48, June 2014 Email Thread, A594.   CMS provided the Duplicate

Payment NAIRP Conditional Approval on May 6, 2014 and following ACLR's incorporation of

the Conditional Approval NAIRP modifications, CMS approved the Duplicate Payment NAIRP

on May 28, 2014.  Tab 112, SA606; App. at Ex. 164, Revised Duplicate Payment Decision

Notice, A923-24.  ACLR requested clarification of the process and timeframe associated with

the tasking outside SOW requirements.  This clarification was in response to CMS's tasking and

statement "you are correct in that this piece of the process is not in the current contract" and was required as CMS did not issue a corresponding modification.  App. at Ex. 48, June 2014 email thread at A596.

> 205.  CMS then informed ACLR that Livanta, as the data validator, would analyze ACLR's 2010-2012 duplicate payment NAIRP and "apply the approved methodology to ensure that the PDE records that have been identified [by ACLR], should be included in the RFI" sent to the plan sponsors. *Id.* at A594.

RESPONSE:  Admitted.

> 206.  Livanta reviewed ACLR's potential duplicate payment findings "to determine that the RAC correctly applied the approved methodology in identifying the potential duplicate payments." Tab 113, SA610.

RESPONSE:  ACLR objects to the proposed uncontroverted fact as the underlying evidence offered to support the proposed uncontroverted fact has not been authenticated, lacks foundation, and is inadmissible hearsay.  To the extent a response is required, denied.  The quoted language in the proposed uncontroverted fact is not consistent with the evidence provided in support.  While Livanta stated the quoted language was the DVC's primary concern, Livanta reviewed dosage change increases which were not part of the CMS approved NAIRP.  Tab 113, SA610.

> 207.  Livanta reported to CMS that Livanta questioned thousands of ACLR's potential duplicate payment findings. For instance, Livanta stated that it identified over 13,000 PDE pairs that were coded for vaccination administrative fees, which ACLR had agreed should be excluded from the duplicate payment audit. *Id.* at SA611-612.

RESPONSE:  ACLR objects to the proposed uncontroverted fact as the underlying evidence offered to support the proposed uncontroverted fact has not been authenticated, lacks foundation, and is inadmissible hearsay.  To the extent a response is required, qualified.  ACLR admits that of the 2,178,030 PDE records submitted by ACLR to Livanta for the PY 2010-2012 duplicate payment audit, Livanta identified 14,225 PDE records, which were in error.  The error

34

rate calculated by Livanta for this audit was 0.65%, or less than 7 errors for every 1,000 PDEs submitted by ACLR.  App. at Ex. 50, October 2014 email thread, A611.  ACLR also notes that Livata's findings pertaining to dosage changes for PY 2010 were based solely on a mathematical calculation performed prior to ACLR's RFIs and the receipt of scripts and fill histories from the plan sponsors.  Tab 113, SA612.

> 208.    Livanta also compared the dosages in the PDE record pairs and reported to CMS that, for 2010, 56% of the PDE pairs had a dosage increase from the originating prescription to the potentially duplicative prescription of greater than 50%. *Id.* at SA612.

RESPONSE:  ACLR objects to the proposed uncontroverted fact as the underlying evidence offered to support the proposed uncontroverted fact has not been authenticated, lacks foundation, and is inadmissible hearsay.  Qualified.  CMS stated on June 12, 2014, "the DVC will take ACLR's final NAIRP and apply the approved methodology to ensure that the PDE records that have been identified, should be included in the RFI."  App. at Ex. 48, June 2014 Email Thread, A594.   Livanta's SOW states "The DVC will follow the same review process as the RAC."  App. at Ex. 160, DVC SOW, A892 at § 2.3.  Despite CMS tasking and Livanta's SOW requirement, Livanta performed a dosage change review that was not part of the approved NAIRP.  Tab 113, SA612; App. at Ex. 170, PY 2010-2012 Duplicate Payment Approved NAIRP, A956-959.  ACLR also notes that DVC findings pertaining to dosage changes for PY 2010 were based solely on a mathematical calculation performed prior to ACLR's RFIs and the receipt of scripts and fill histories from the plan sponsors.  Tab 113, SA612.  Livanta acknowledged that "you cannot make a determination if they're legitimate dosage increases without looking at the scripts."  App. at Ex. 158, Livanta Dep., A875-76 at 128:16-129:3.  Based on its review of "scripts" and other supporting documentation submitted by plan sponsors, ACLR calculated that the DVC's mathematical calculation correctly predicted a dosage change

35

in less than 27 PDEs out of every 100 PDEs for an accuracy rate of 26.7% and submitted these findings to CMS on December 24, 2014.  App. at Ex. 57, December 24, 2014 letter, A648. ACLR also proposed that CMS submit duplicate payment NIPs to plan sponsors using the audit methodology developed by ACLR to identify 2007 duplicate payment amounts owing noting that it had an accuracy rate of "84%" and that "no or insufficient documentation comprised the remaining 16%."  *Id.*  ACLR also notes that CMS considered the dosage change issue on February 27, 2014 during the NAIRP review and subsequently approved the NAIRP without dosage change methodology requirements.  App. at Ex. 170, PY 2010-2012 Duplicate Payment Approved NAIRP, A956-59; App. at Ex. 174, ACLR Response to Duplicate Payment Questions, A994.  ACLR responded to Livanta's review and CMS approved release of the 2010 Duplicate Payment RFI without removal of alleged dosage change PDEs.  App. at Ex. 168, ACLR Response to DVC Duplicate Payment RFI Report, A943-945; App. at Ex. 52, July 8, 2014 Email, A618.

> 209.   For 2011 and 2012, Livanta reported to CMS that it attempted to perform the same analysis, but the quantity dispensed field in ACLR's data submission had an entry of "zero" in 99% of the PDE records, making the comparison impossible. *Id.*

RESPONSE:   ACLR objects to the proposed uncontroverted fact as the underlying evidence offered to support the proposed uncontroverted fact has not been authenticated, lacks foundation, and is inadmissible hearsay.  To the extent a response is required, qualified.  ACLR agrees that Livanta's utilization of an unapproved dosage change methodology identified a zero in the quantity dispensed field, but this data was a result of a CMS data submission error that was contained in both ACLR and Livanta's PDE records.  App. at Ex. 52, July 8, 2014 email, A618.

> 210.   CMS provided Livanta's validation results to ACLR on June 26, 2014, and asked ACLR to "proceed with removing the PDE records that were rejected as a result of the DVC's validation." *Id.* at SA608.

RESPONSE:   Qualified.   ACLR agrees that on June 26, 2014, CMS provided what were allegedly Livanta's validation results to ACLR and instructed ACLR to "proceed with removing the PDE records that were rejected as a result of the DVC's validation." Tab 113, A608.

> 211.   ACLR agreed to eliminate the PDEs that were rejected as part of Livanta's validation work. *Id.*; Tab 90, SA265-66 at 195:20-196:22.

RESPONSE:   Qualified.   ACLR denies that Livanta conducted a validation of ACLR findings.   The only reference to a DVC validation of RAC audit findings in both ACLR's and Livanta's SOWs is the validation of the IPRP (ACLR's improper payment determinations) that could not be made until plan sponsors had submitted supporting documentation for the PDEs identified in the RFI exception reports and ACLR had conducted its improper payment review. App. at Ex. 21, Part D RAC Contract, OY1 SOW at A403, section 2.2; App. at Ex. 22, Part D RAC Contract, OY2 SOW at A438, section 2.2; App. at Ex. 160, DVC SOW, A892 at § 2.3. ACLR also notes the evidence offered in support of the proposed uncontroverted fact only reflects that ACLR agreed to eliminate PDEs with vaccine administration fees in them.   The evidence offered does not support the proposed uncontroverted fact that ACLR agreed to eliminate all PDEs that were questioned by Livanta's validation work.   ACLR responded to Livanta's review stating "we will eliminate any PDE associated with an authorized 'change in dosage' upon receipt of objective evidence indicative of same."   App. at Ex. 168, ACLR Response to DVC Duplicate Payment RFI Report, A945.   CMS approved the release of the 2010 Duplicate Payment RFI.   App. at Ex. 52, July 8, 2014 email at A618.

> 212.   Following CMS's review of Livanta's validation report and the concerns raised by Livanta regarding the 2011 and 2012 PDE data contained in ACLR's NAIRP submission, CMS informed ACLR on July 8, 2014, that CMS had approved the release of requests for information to the plan

sponsors for the potential duplicate payments identified by ACLR for 2010 only. Tab 52, A618.

RESPONSE:  Qualified.  ACLR denies that Livanta conducted a validation of ACLR findings.  The only reference to a DVC validation of RAC audit findings in both ACLR's and Livanta's SOWs is the validation of the IPRP, which are ACLR's improper payment determinations, which could not be made until plan sponsors had submitted supporting documentation for the PDEs identified in the RFI exception reports and ACLR had conducted its improper payment review.  App. at Ex. 21, Part D RAC Contract, OY1 SOW, A403, section 2.2; App. at Ex. 22, Part D RAC Contract, OY2 SOW, A438, section 2.2; App. at Ex. 160, DVC SOW, A892 at § 2.3.  ACLR also notes that the evidence offered in support of the proposed uncontroverted fact only reflects that CMS approved "the release of RFIs for CY 2010 only." *See* Tab 52, A618.  The evidence offered does not support the proposed uncontroverted fact that CMS's actions were based upon CMS's review of Livanta's validation report and the concerns raised by Livanta regarding the 2011 and 2012 PDE data contained in ACLR's NAIRP submission.

213.   CMS asked ACLR to advise whether ACLR would "like to move forward with CY 2010 only or if you'd rather wait until you've resolved the issue with the 2011 and 2012 data and send all three plan years at once." *Id.*

RESPONSE:  Admitted.

214.   ACLR responded by blaming Livanta for not identifying the flaws in ACLR's data in previous reviews, but did proceed with preparing the requests for information that were sent to plan sponsors for the 2010 potential duplicate payments identified by ACLR.  *Id.*

RESPONSE:  Denied.  ACLR's response noted that the flaw in the data submitted by CMS to ACLR contained a zero in the "quantity dispensed" field and noted that because it was not a "control field" that ACLR should be permitted to conduct the audit of 2011 and 2013 data

similarly to that done for the unauthorized prescriber and excluded provider audits whose

approved audit methodology did not use this as a control field.   App. at Ex. 168, ACLR

Response to DVC Duplicate Payment RFI Report, A945.

215.    After the requests for information were sent to plan sponsors, the sponsors responsible for more than half of the potential improper payments identified by ACLR contacted CMS to request an extension of time to respond to the requests due to the large volume of PDEs involved. Tab 114, SA619-20.

RESPONSE:   ACLR objects to the proposed uncontroverted fact as the underlying

evidence offered to support the proposed uncontroverted fact is inadmissible hearsay and for lack

of personal knowledge.  There is nothing in the relied upon email to indicate that Ms. Brown had

personal knowledge of the requests and communications with the plan sponsors.

216.    ACLR responded that it was prepared to send out similar requests for information for 2011 and 2012. *Id.* at SA619.

RESPONSE:  Admitted.

217.    CMS reported that it continued to receive more requests for extensions of time to respond to the RFIs for 2010 potential duplicate payments, and that CMS was "working with several plan sponsors to see why there are so many requests for extensions and to try to understand the difficulties they are facing in obtaining and submitting the data requested." Because of those ongoing issues, CMS stated that "it would be difficult for CMS to move forward with CY 2011 and 2012 without first understanding the issues surrounding CY 2010." *Id.*

RESPONSE:   ACLR objects to the proposed uncontroverted fact as the underlying

evidence offered to support the proposed uncontroverted fact is inadmissible hearsay and lack of

personal knowledge.  There is nothing in the relied upon email to indicate that Ms. Brown had

personal knowledge of the requests and communications with the plan sponsors.

218.    CMS issued a notice to all plan sponsors on October 1, 2014, notifying them that CMS had extended the deadline for sponsors to respond to the 2010 duplicate payment RFI by 60 days, through December 8, 2014. Tab 53, A620.

RESPONSE: Admitted.

219. ACLR sent CMS an email the same day acknowledging that CMS had placed the 2011 and 2012 duplicate payment RFIs "on hold" and had extended the plan sponsor deadline for responding to the 2010 duplicate payment RFI. ACLR stated that it was "not challenging CMS authority with these decisions" but was raising the issues only for consideration in the context of "future SOW changes." Tab 115, SA621-22.

RESPONSE: Qualified. ACLR agrees that it sent CMS an email the same day acknowledging that CMS had placed the 2011 and 2012 duplicate payment RFIs "on hold" and had extended the plan sponsor deadline for responding to the 2010 duplicate payment RFI. The remainder of the proposed uncontroverted fact is an incomplete quotation from ACLR's email and reads in full as follows: "[a]s discussed above, the comments above are not challenging CMS authority with these decisions and are only being address[sic] for resolution of the current Option Year and follow-on Administrative Period and for consideration to future SOW changes." Tab 115, SA622. Additionally, on January 15, 2015, ACLR subsequently challenged CMS authority for these decisions but was informed by CMS OAGM that "[A]s far as the SOW is concerned, the RAC must get each RFI approved before sending to the plan sponsors" and "that RFIs for the PY11 and 12 duplicate payment will be held until issues with PY10 are resolved." App. at Ex. 165, January 21, 2015 Email, A926. There was no language in the Part D RAC Contract requiring approval of the RFI and ACLR was listed as the responsible party for the RFI communication. App. at Ex. 21, Part D RAC Contract, OY1 SOW, A401, A415, A424; App. at Ex. 22, Part D RAC Contract, OY2 SOW, A436, A452, A465.

220. CMS met with certain plan sponsors who raised concerns regarding the burdens of responding to ACLR's requests for information and the likelihood that the PDEs identified by ACLR included many false positives. The concern was that many of the PDEs were not, in fact, duplicates at all, requiring the sponsors to submit extensive documentation related to legitimate prescription

payments.

RESPONSE:  Denied.  There is no evidentiary support for the proposed uncontroverted

fact.  Moreover, the proposed uncontroverted fact is inadmissible hearsay.

221.    Some plan sponsors were required by ACLR's notices to produce
        documentation for thousands of different PDEs at once. One plan sponsor
        reported to CMS that, to respond to ACLR's 2010 duplicate payment RFI, the
        plan sponsor would have to generate screen shots for at least 220,000 PDEs,
        which would take 16 contractors a total of 86 weeks to complete and cost
        nearly $2 million. Tab 90, SA267-68 at 225:5-226:1; Tab 119, SA630.

RESPONSE:   ACLR objects to the proposed uncontroverted fact as the underlying

evidence offered to support the proposed uncontroverted fact is inadmissible hearsay within

hearsay as the author of the email to CMS writes "in discussion with colleagues in our client

audit team" and there are no facts to establish personal knowledge.  To the extent a response is

required, qualified.  It was CMS's requirement to conduct a complex review which required that

plan sponsors submit corresponding documentation, not ACLR's notices.  App. at Ex. 21, Part D

RAC Contract, OY1 SOW, A401; App. at Ex. 22, Part D RAC Contract, OY2 SOW, A436-437;

App. at Ex. 45, May 28, 2014 Revised NAIRP Approval, A584.

222.    To attempt to alleviate those concerns, CMS provided ACLR with a revised
        protocol on October 22, 2014, to be used in analyzing the 2010 PDE records
        for duplicate payments. Under the revised protocol, CMS requested that
        ACLR remove from its pool of potential duplicate payments any PDEs
        involving a dosage increase of 50% or greater and where the date of service or
        fill date were different. CMS also asked ACLR to remove any PDE pairs in
        which the pharmacy or service provider ID and the date of service were
        different between the two PDE records. *Id.* Tab 56, A643.

RESPONSE:   Denied.   While CMS provided ACLR with a revised methodology on

October 22, 2014, this revised methodology would not have "alleviated" such concerns as most

plan sponsors would still be required "to produce documentation for thousands of different PDEs

at once" because of CMS's requirement to conduct the audit as a complex review.  ACLR also

notes that DVC findings pertaining to dosage changes for PY 2010 were based solely on a mathematical calculation performed prior to ACLR's RFIs and the receipt of scripts and fill histories from the plan sponsors.  Tab 113, SA612.  Livanta acknowledged that "you cannot make a determination if they're legitimate dosage increases without looking at the scripts."  App. at Ex. 158, Livanta Dep. at 128:16-129:3.  Based on its review of "scripts" and other supporting documentation submitted by plan sponsors, ACLR calculated that the DVC's mathematical calculation correctly predicted a dosage change in less than 27 PDEs out of every 100 PDEs for an accuracy rate of 26.7% and submitted these findings to CMS on December 24, 2014.  App. at Ex. 57, December 24, 2014 letter, A648.  ACLR also proposed that CMS submit duplicate payment NIPs to plan sponsors using the audit methodology developed by ACLR to identify 2007 duplicate payment amounts owing noting that it had an accuracy rate of "84%" and that "no or insufficient documentation comprised the remaining 16%."  *Id.* at A649.

> 223.   ACLR ran the revised protocol and determined that it reduced the universe of potential duplicate payments previously identified by ACLR by 66.8%. Tab 116, SA623.

RESPONSE:  Qualified.  ACLR ran the revised protocol as required by the Part D RAC Contract which stated, at CMS's request, "the RAC must perform frequent analysis and re-running of potential findings to see various impacts and projections at any time."  App. at Ex. 21, Part D RAC Contract, OY1 SOW, A402; App. at Ex. 22, Part D RAC Contract, OY2 SOW, A437.

> 224.   Livanta completed a validation of ACLR's revised 2010 duplicate payment analysis, and those results were provided to ACLR on November 13, 2014. Tab 117, SA626.

RESPONSE:  Qualified.  ACLR denies that Livanta conducted a validation of ACLR findings.  The only reference to a DVC validation of RAC audit findings in both ACLR's and Livanta's SOWs is the validation of the IPRP (ACLR's improper payment determinations) that

42

could not be made until plan sponsors had submitted supporting documentation for the PDEs identified in the RFI exception reports and ACLR had conducted its improper payment review. App. at Ex. 21, Part D RAC Contract, OY1 SOW, A403 at section 2.2; App. at Ex. 22, Part D RAC Contract, OY2 SOW, A438, section 2.2; App. at Ex. 160, DVC SOW, A892 at § 2.3. ACLR agrees that CMS provided ACLR with certain information from Livanta's review of the revised exception reports for the duplicate payment review on November 13, 2014.  However, CMS acknowledged that "EVERONE was well aware that it was not part of the contractual process for the RAC or the DVC" and ACLR disputed Livanta's findings.  Tab 117, SA624-25. The only reference to a DVC validation of RAC audit findings in both ACLR's and Livanta's SOWs is the validation of the IPRP. App. at Ex. 21, Part D RAC Contract, OY1 SOW, A403; App. at Ex. 22, Part D RAC Contract, OY2 SOW, A438; App. at Ex. 160, DVC SOW, A892 at § 2.3.

> 225.  In its validation, Livanta reported, among other things, that more than 2,000 PDE pairs identified by ACLR involved a dosage change and were supposed to be excluded; more than 3,100 PDE pairs involved long-term care prescriptions that were supposed to be excluded; and more than 10,500 PDE records were unpaired, *i.e.*, Livanta could not identify a matching PDE record which would make the records potentially duplicative. *Id.* at SA625-26.

RESPONSE:   ACLR objects to the proposed uncontroverted fact as the underlying evidence offered to support the proposed uncontroverted fact has not been authenticated, lacks foundation, and is inadmissible hearsay.  To the extent a response is required, qualified.  ACLR denies that Livanta conducted a validation of ACLR findings.  The only reference to a DVC validation of RAC audit findings in both ACLR's and Livanta's SOWs is the validation of the IPRP (ACLR's improper payment determinations) that could not be made until plan sponsors had submitted supporting documentation for the PDEs identified in the RFI exception reports and ACLR had conducted its improper payment review.  App. at Ex. 21, Part D RAC Contract,

OY1 SOW, A403 at section 2.2; App. at Ex. 22, Part D RAC Contract, OY2 SOW, A438 at

section 2.2; App. at Ex. 160, DVC SOW, A892 at § 2.3.  ACLR also notes that these errors were

identified as a result of Livanta's failure to properly apply CMS's revised audit methodology.

Tab 117, SA625-26.

> 226.    CMS asked ACLR to eliminate the PDEs questioned by Livanta by November
> 14, 2014, so that updated reports identifying the narrower universe of PDEs
> for which information was sought could be provided to the plan sponsors
> sufficiently in advance of the existing deadline of December 8, 2014, for the
> responses to ACLR's outstanding RFI. *Id.* at SA626.

RESPONSE:  Denied.  The email relied upon to support the proposed uncontroverted

fact provides "[i]f you are in agreement with the results, please make the necessary changes by

12pm on 11/14 so that we can move forward with getting the revised RFIs out the door."  ACLR

proceeded to dispute the results.  Tab 117, SA625-26.

> 227.    ACLR responded to CMS on the same date, stating that the company was
> "not available to perform this type of work until our return 11/24," because
> the business was closed due to hunting season. *Id.* at SA625; Tab 90,
> SA269-70 at 237:1-238:15.

RESPONSE:  Qualified.  CMS's proposed uncontroverted fact only cites a selective

excerpt from the relied upon email.  The full sentence reads "[a]s the DVC is not 'contractually'

part of the RFI process, the choice to use the DVC was solely CMS and, as I stated to you last

week, we are not available to perform this type of work until our return 11/24."  Tab 117,

SA625.  Nevertheless, ACLR completed the work within contractual deadlines.  App. at Ex. 163,

ACLR I 30(b)(6) Dep., A916 at 237:6-16.

> 228.    ACLR stated that it intended to "dispute each and every finding with the
> DVC," and recommended to CMS that the agency pursue collection from the
> plan sponsors of the amounts previously identified by ACLR, without
> considering or accounting for any of Livanta's validation concerns. Tab 117,
> SA626.

RESPONSE:  Qualified.  ACLR agrees that it intended to "dispute each and every finding with the DVC" on the basis of "Livanta's validation concerns."  ACLR intended to dispute Livanta's findings because Livanta did not properly apply CMS's revised methodology.  Tab 117, SA625-26.

229.    After the December 8, 2014, deadline passed for plan sponsors to respond to the RFI, ACLR asserts that it reviewed all of the documentation submitted by the plan sponsors and then submitted its final 2010 duplicate payment improper payment review package to CMS on December 24, 2014. Tab 57, A646; Tab 90, SA401 at 242:7-11.

RESPONSE:  Admitted.

230.    The potential duplicate payments identified by ACLR in its improper payment review package were based on the methodology documented in ACLR's May 2014 NAIRP; those findings did not incorporate the revised protocol requested by CMS on October 22, 2014. Tab 90, SA272 at 245:1-20.

RESPONSE:  Qualified.  ACLR agrees that the duplicate payments identified by ACLR in its improper payment review package were based on the methodology documented in the NAIRP approved by CMS on May 28, 2014.  Those findings did not incorporate the revised protocol requested by CMS on October 22, 2014, because there was no language in the Part D RAC Contract that allowed CMS to apply a revised methodology to perform 2010 duplicate payment reviews.  *See* App. at Ex. 6, CMS 30(b)(6) Dep., A134-35 at 173:3-174:9; A153-54 at 249:13-250:22.   The CMS designed SOW defines the RFI process as the Part D RAC's responsibility once a complex review decision is made in the approved NAIRP.  App. at Ex. 21, Part D RAC Contract, OY1 SOW, A401, A415, A424; App. at Ex. 22, Part D RAC Contract, OY2 SOW, A436, A452, A465.  The only language in the SOW addressing plan sponsors issues with the methodology is under appeals which states, "What is not appealable? The appeals process prohibits the plan sponsor from appealing the methodology and standards used to

45

identify and calculate the overpayments(s)."  App. at Ex. 21, Part D RAC Contract, OY1 SOW,

A418; App. at Ex. 22, Part D RAC Contract, OY2 SOW, A455.

231.    According to ACLR, it identified duplicate payments occurring in 294 contracts in the total amount of $15,909,550 for 2010. Tab 57, A648; Tab 85, SA146-47.

RESPONSE:  Admitted.

232.    Livanta reviewed ACLR's December 2014 duplicate payment submission and reported that 286,398 of the PDE pairs identified by ACLR "had been previously identified by [Livanta] as dosage change false positives and an additional 50,579 of the pairs were previously identified by [Livanta] as non-dosage change false positives." Tab 118, SA628-29.

RESPONSE:   ACLR objects to the proposed uncontroverted fact as the underlying

evidence offered to support the proposed uncontroverted fact has not been authenticated, lacks

foundation, lacks person knowledge, and is inadmissible hearsay.  To the extent a response is

required, ACLR notes that ACLR provided Livanta with "scripts," "a summary Excel

spreadsheet," "images of scripts," and "other documents" submitted by plan sponsors in response

to PY2010 RFIs.  Tab 118, SA628.  ACLR also notes that DVC findings pertaining to dosage

changes for PY 2010 were based solely on a mathematical calculation performed prior to

ACLR's RFIs and the receipt of scripts and fill histories from the plan sponsors.  Tab 113,

SA612.  Despite Livanta's own acknowledgement that "you cannot make a determination if

they're legitimate dosage increases without looking at the scripts," Livanta ignored the scripts it

received in favor of the mathematical calculation.  App. at Ex. 158, Livanta Dep. at A875-76 at

128:16-129:3; Tab 118, SA628-29.  Based on its review of "scripts" and other supporting

documentation submitted by plan sponsors, ACLR calculated that the DVC's mathematical

calculation correctly predicted a dosage change in less than 27 PDEs out of every 100 PDEs for

an accuracy rate of 26.7% and submitted these findings to CMS on December 24, 2014.  App. at

Ex. 57, December 24, 2014 letter, A648.

> 233.   Livanta also reported that ACLR had failed to provide any explanation or
> reasoning for why ACLR rejected the information provided by the plan
> sponsors in response to ACLR's request for information. *Id.* at SA628.

RESPONSE:   ACLR objects to the proposed uncontroverted fact as the underlying

evidence offered to support the proposed uncontroverted fact has not been authenticated, lacks

foundation, lacks person knowledge, and is inadmissible hearsay.  To the extent a response is

required, denied.  The SOW requires that ACLR submit an Improper Payment Review Package

(IPRP) containing the "PDE exception reports and the supporting documentation identifying

improper payments corresponding to a particular audit issue by contract" to the DVC.  ACLR

provided such information to the DVC and CMS, including duplicate payment data and the

information received from the plan sponsors.  App. at Ex. 21, Part D RAC Contract, OY1 SOW,

A402; App. at Ex. 22, Part D RAC Contract, OY2 SOW, A437; Tab 118, SA628.

> 234.   CMS asked ACLR to provide Livanta with additional information
> regarding Livanta's concerns. ACLR declined to do so, instead telling CPI
> to direct its questions to the CMS contracting officer. *Id.* at SA628-29;
> Tab 90, SA274-75 at 255:19-256:5.

RESPONSE:  Qualified.  ACLR agrees with the characterization of its position except

for CMS's implied argument that ACLR took no other action.  On January 15, 2015, per the

Contracting Officer's request, ACLR submitted specific contractual issues for Contracting

Officer resolution.  The Contracting Officer did not respond to any contractual issues presented

and issued no modifications for CMS program office actions.  App. at Ex. 166, January 15, 2015

Email, A929-30.

> 235.   In *ACLR I*, ACLR seeks to recover $2,209,146, which it contends are the
> contingent fees it would have received if it had been permitted to proceed with
> the recovery audit for 2010 potential duplicate payments, and if CMS had, in
> fact, recovered the entirety of the $15,909,550 in potential duplicate payments

that ACLR claims it identified within the 2010 PDE records. Tab 85, SA146-47.

RESPONSE:  Qualified.  ACLR seeks damages of $2,209,146 on its claims of breach of contract and breach of duty of good faith and fair dealing based upon the contingency fee payments ACLR was entitled to receive for the recovery of overpayments of 2010 duplicate payments.

236.    That contingent fee is calculated by multiplying the 15% contingency fee rate that was contained in modification 13 to the Part D RAC contract times the first $10 million in ACLR's projection of 2010 duplicate payments, plus the 12% contingency fee rate times the remaining $5,909,550 in ACLR's projection of 2010 duplicate payments. Tab 90, SA294 at 311:3-15.

RESPONSE: Admitted.

237.    ACLR has no knowledge that CMS actually recovered any, nor all, of that $15.9 million in potential duplicate payments found by ACLR for 2010. *Id.* at SA279 at 273:6-18.

RESPONSE:  Admitted.

238.    ACLR also does not seek to recover any alleged damages in these cases arising out of CMS's decision to place "on hold," and then to cancel, the prior approval of ACLR's NAIRP for potential 2011 and 2012 duplicate payments. *Id.* at SA289-90 at 298:21-299:6.

RESPONSE:  Admitted.

239.    ACLR also asserts in *ACLR I* that it is "entitled to the amount of $2,668,553 representing amounts associated with direct labor costs based on ACLR's approved GSA Schedule rates and contract overhead requirements, reasonable expectations of profit, and net of amounts already collected arising from ACLR efforts during subsequent modifications of the Contract." Tab 85, SA146.

RESPONSE: Admitted.

240.    ACLR alleges that the $2.6 million figure represents all of ACLR's operating costs and anticipated profit from January 1, 2012, through December 31, 2013, minus the contingent fees that ACLR received from CMS during those years for the other unrelated recovery audit issues that did proceed and for which CMS actually recouped overpayments from plan sponsors. Tab 90,

SA251 at 145:3-15, SA252 at 146:8-14, SA279 at 273:19-275:1, SA285 at 284:15-18.

RESPONSE:   Qualified.   ACLR admits that the $2.6 million figure represents an estimate of all of ACLR's operating costs and anticipated profit from January 1, 2012, through December 31, 2013, minus the contingent fees that ACLR received from CMS during those years for the other unrelated recovery audit issues that did proceed and for which CMS actually recouped overpayments from plan sponsors.

241.   ACLR calculated its historical profit rate at 40 to 50 percent, based entirely on its past success performing work in the private sector, not on any Government contracts. Tab 90, SA292-93 at 307:19-308:9.

RESPONSE:  Admitted.

242.   ACLR has not identified any provisions in the contract that provide for payment to ACLR for these types of costs or profit. ACLR agrees that the contract only provides for payment to ACLR in the form of contingent fees calculated off of amounts actually recovered by CMS in response to ACLR's approved audit issues. *Id.* at SA228 at 21:16-23:1, SA235 at 88:5- 18; Tab 91, SA298 at 38:15-18, SA299 at 39:13-17, SA302 at 59:11-22, SA305 at 76:12-19.

RESPONSE:  ACLR objects to the proposed uncontroverted fact as it is a conclusion of law.  To the extent a response is required, qualified.  ACLR agrees that the Part D RAC Contract only expressly provides for the payment to ACLR in the form of contingency fees.

243.   ACLR does not maintain any records tracking actual hours worked by employees on particular issues from which one could verify precisely who worked on which audit issues at any given point in time. Tab 90 at SA283-84 at 279:1-280:17, SA291 at 306:5-15.

RESPONSE:  Admitted.

244.   ACLR has not designated any expert to testify as to this portion of ACLR's alleged damages. Tab 95, SA380-81 at 104:7-105:8.

RESPONSE:  Admitted.

<u>ACLR's Proposed Audit Issues: Sales Tax Payments</u>

245.     ACLR had received the 2012 PDE records from CMS in January 2014, and the 2013 PDE records (as updated) from CMS in June 2015. Tab 91, SA318-19 at 104:21-105:15, SA320 at 106:22-107:3; Tab 86, SA149-50.

RESPONSE:  Admitted.

246.     PDE records contain a field for reporting any "amount attributed to sales tax." Tab 105, SA477.

RESPONSE:  Admitted.

247.     ACLR did not propose conducting a recovery audit for potential improper sales tax payments prior to the submission of its sales tax NAIRP dated August 21, 2015, in which ACLR requested approval for an audit that would look for improper sales tax payments in the 2012 and 2013 PDE records. Tab 61, A663.

RESPONSE: Admitted.

248.     Prior to the August 2015 NAIRP submission, ACLR had not discussed proposing a sales tax audit with anyone at CMS, no one at CMS had requested that ACLR propose an audit for that issue, and as far as ACLR knows, no one at CMS would have been aware that ACLR even intended to propose a Part D sales tax recovery audit. Tab 91, SA314-17 at 98:18-101:1.

RESPONSE:  Denied.  On October 29, 2010, ACLR, in its Sources Sought Notice to CMS, stated "ACLR can devise a national recovery audit plan for Medicare Part D that includes: Automated and detailed reviews of PDE data to identify anomalies such as . . . improper sales tax."  App. at Ex. 171, October 29, 2010 Letter to Jessica Sanders, A967.

249.     ACLR proposed conducting an automated audit, in which it would determine the existence of improper sales tax payments by review of the PDE data alone, without reference to additional supporting documentation or explanations from the plan sponsors. Tab 61, A663.

RESPONSE:  Qualified.  ACLR agrees with the characterization of its position except for Defendant's implied argument that an automated review removes the plan sponsors ability to submit supporting documentation or explanations.  ACLR's position in accordance with the Part

50

D RAC SOW is that an automated review should be conducted when the PDE record contains enough information to determine the payment is improper.   Under this process, as with that conducted in a complex review, the plan sponsor has full appeal rights which include supporting documentation or explanations as the plan sponsor determines necessary to support the veracity of the payment.  App. at Ex. 21, Part D RAC Contract, OY1 SOW, A419; App. at Ex. 22, Part D RAC Contract, OY2 SOW, A455-56.

> 250.   In its NAIRP, ACLR identified for CMS the total amount of the prescription payments for all of the PDEs it had identified as containing data in the sales tax field. *Id.* at A670.

RESPONSE:   Qualified.   ACLR calculated the Part D improper payment amount in accordance with the Part D RAC SOW such that "[T]he RAC will analyze their database to determine the total population.  Once these populations are established, various PDE fields will be summed in order to begin the calculation of improper payments." App. at Ex. 22, Part D RAC Contract, OY2 SOW, A462.

> 251.   According to ACLR, if a PDE erroneously included a single cent in the sales tax field, then the entire PDE payment – including the indisputably correct portions for the drug costs themselves – should be deemed improper and subject to recoupment, not just the erroneous amount of sales tax charged. Tab 91, SA334 at 155:3-9, SA337-38 at 160:22-161:4, SA342 at 201:16-19.

RESPONSE:  Qualified.  ACLR agrees with the characterization of its position except for Defendant's implied argument that a portion of an improper payment could be correct.  Even if the drug cost information in the PDE record is accurate, if the PDE record contains an incorrect amount, an improper payment would exist.  CMS and OMB define an improper payment as: "any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements. Incorrect amounts are overpayments and underpayments (including inappropriate denials of payment or service). An improper payment includes any payment that was made to an ineligible recipient or for an

ineligible service, duplicate payments, payments for services not received, and payments that are for the incorrect amount."   App. at Ex.18, excerpts of Part III to OMB Circular A-123, Appendix C, A438.  *See* Response to ¶¶ 20-21.  Moreover, CMS considers an improper payment to be "corrected/reimbursed" from the plan sponsor when "the PDE record has been deleted." App. at Ex. 73, Interrogatory Responses, response to interrogatory number 2, A748-49. CMS required that plan sponsors delete the entire PDE record for Louisiana sales tax overpayments, which were subsequently tracked and reported by the NBI MEDIC in accordance with requests made by CMS.  Tab 134, SA708; App. at Ex. 173, NBI MEDIC's June 2015 Update for Deleted Prescription Drug Event Records for Louisiana Sales Tax Project, A980-8.

*Louisiana*

252.   Health Integrity, the NBI MEDIC, was asked in September 2014 to conduct an analysis of Louisiana PDE records from January 1, 2010, to August 31, 2014, to determine whether there continued to be a vulnerability related to plan sponsors being paid for sales tax assessments that should not have been imposed on prescriptions within that state. Tab 121, SA638; Tab 123, SA658.

RESPONSE:  Qualified.  ACLR agrees that on or about September 2014 the NBI MEDIC conducted an analysis of Louisiana PDE records from January 1, 2010, to August 31, 2014, to determine whether there was a vulnerability related to plan sponsors being paid for sales tax assessments that should not have been imposed on prescriptions within that state.  The evidence relied upon to support the proposed uncontroverted fact does not support the proposed uncontroverted fact that the NBI MEDIC was asked to conduct this analysis or that there was a preexisting vulnerability.  *See* Tab 121, SA638; Tab 123, SA658.

253.   Health Integrity concluded, in reports dated October 31 and November 26, 2014, that during that time period CMS paid approximately 4.3 million PDE records in which some amount greater than $0 was recorded in the sales tax field of the PDE records; the total amount reported in the sales tax field on

those PDE records was $922,961.59. Tab 123, SA662.

RESPONSE: Denied.   The NBI MEDIC report relied upon as evidence for the proposed uncontroverted fact is only a November 26, 2014 report and does not reference an October 31, 2014 report.  Tab123, SA662.

254.    Health Integrity recommended a "state-by-state project study of sales taxes paid under the Medicare Part D Program" to "determine whether the amounts identified in the PDE records as a 'sales tax' actually represent sales taxes in states where the application of sales taxes to Part D prescription drugs is prohibited by law," or if some other legitimate information were being recorded in those PDE fields. *Id.* at SA665.

RESPONSE:   Denied.   The quotations and characterizations in this proposed uncontroverted fact are inaccurate and not contained in the NBI MEDIC November 26, 2014 report that is cited for the proposed uncontroverted fact.  Instead, the NBI MEDIC November 26, 2014 report reads "[t]herefore, the NBI MEDIC will perform a state-by-state project study of sales taxes paid under the Medicare Part D program.  The objective of this study or studies will be to determine whether the amounts identified in the PDE records as a 'sales tax' actually represent sales taxes in states where the application of sales taxes to Part D prescription drugs is prohibited by state law." Tab 123, SA665.

255.    Following receipt of Health Integrity's initial reports on potential sales tax payments in Louisiana, CMS issued an additional notice to Louisiana plan sponsors in December 2014 that informed them that the NBI MEDIC "has determined that your parent organization submitted prescription drug event (PDE) records that included unallowable sales tax payments on Part D prescriptions in Louisiana." CMS directed the plan sponsors to recoup any sales taxes paid on Part D prescriptions in Louisiana and to submit corrected PDE records within 90 days. Tab 134, SA708-09.

RESPONSE:  Admitted.

256.    In February 2015, one Louisiana plan sponsor, Express Scripts, responded to CMS's notice by reporting that, while Louisiana law did not provide for sales taxes on Part D prescriptions, state law *did* require the imposition of a

53

10¢ fee on all prescriptions, and that that fee was being reported in the PDE sales tax field due to a lack of any other field in which to report the charge. Tab 124, SA671-72.

RESPONSE:  ACLR objects to the proposed uncontroverted fact because it contains a conclusion of law as to the permissibility of reporting something other than sales tax as actual sales tax and the underlying evidence offered to support the proposed uncontroverted fact has not been authenticated, lacks foundation, and is inadmissible hearsay.  Moreover, there is nothing in the NBI MEDIC report that indicates how the NBI MEDIC obtained the information concerning Express Scripts. To the extent a response is required, ACLR agrees that the 10 cent fee is not a sales tax and that there is a lack of any other field in which to report the charge.  The Louisiana Pharmacy Benefits Services Manual provides that the 10 cent prescription provider fee is to be included in the dispensing fee.  Exhibit 147, The Louisiana Pharmacy Benefits Services Manual at section 37.6 Maximum Allowable Overhead Cost (Dispensing Fee), Provider Fee, A830-831.

257.    After reviewing the response from Express Scripts, CMS agreed not to pursue recoupment of PDE records containing amounts of 10¢ or less in the sales tax field. *Id.* at SA672.

RESPONSE:  ACLR objects to the proposed uncontroverted fact as the underlying evidence offered to support the proposed uncontroverted fact has not been authenticated, lacks foundation, and is inadmissible hearsay.  Moreover, there is nothing in the NBI MEDIC report that indicates how the NBI MEDIC obtained the information concerning Express Scripts and CMS.

258.    CMS sent a follow-up notice to Louisiana plan sponsors in February 2015, informing them that CMS was continuing to review the issue, and that the plan sponsors need not take further action on recouping the previously identified amounts until further notice. Tab 135, SA711.

RESPONSE:  Admitted.

259.     Health Integrity then conducted a revised analysis where it looked only at amounts greater than 10¢ reported in the sales tax field in Louisiana PDE records between January 1, 2010, and August 31, 2014. That updated analysis revealed that the number of suspect PDEs was reduced from 4.3 million down to 11,578, and the total amount reported in the sales tax field was reduced from $922,961.59 down to only $59,090.36. Tab 124, SA672.

RESPONSE:   ACLR objects to the proposed uncontroverted fact as the underlying evidence offered to support the proposed uncontroverted fact has not been authenticated, lacks foundation, and is inadmissible hearsay.

260.     Health Integrity updated its analysis again through June 2015, looking at the number of PDE records for the same time period in which amounts greater than 10¢ remained in the universe of records. The total amount reported in the sales tax field in such claims had been reduced further to only $53,125.54, following plan sponsors' correction or deletion of PDE records. For 2012 and 2013, the two years that were the subject of ACLR's proposed sales tax NAIRP submitted on August 21, 2015, Health Integrity reported that there was only $1,789.85 and $18,354.29 reported in the sales tax fields of PDE records, respectively, for PDEs containing amounts greater than 10¢ in that field. Tab 125, SA680-81; Tab 91, SA331 at 144:12-22.

RESPONSE:   ACLR objects to the proposed uncontroverted fact as the underlying evidence offered to support the proposed uncontroverted fact is speculation, has not been authenticated, lacks foundation, and is inadmissible hearsay.  For example, the cited deposition testimony is merely questioning about the contents of the NBI MEDIC report.

261.     ACLR's NAIRP did not address the existence or applicability of the 10¢ Louisiana prescription fee or its potential impact on the viability of ACLR's proposed recovery audit. Tab 91, SA329-30 at 142:14-143:17.

RESPONSE:  Admitted.

262.     Guidance by the Louisiana Department of Insurance states that Louisiana law "authorizes a 10 cent per prescription fee on every out-patient prescription filled by a pharmacy in this state." Tab 136, SA712.

RESPONSE:   ACLR objects to the proposed uncontroverted fact as it contains a conclusion of law.   To the extent a response is required, ACLR agrees that the May 9, 2016 Louisiana Department of Insurance Directive 208 contains the quoted language.

263.    The Louisiana Department of Insurance has concluded that the 10¢ fee is not limited only to prescriptions provided to Medicaid enrollees, because "[t]hat argument contradicts the plain language of the statute, its legislative history, and controlling federal law." *Id.* at SA714.

RESPONSE:   ACLR objects to the proposed uncontroverted fact as it contains a conclusion of law.   To the extent a response is required, ACLR agrees that the May 9, 2016 Louisiana Department of Insurance Directive 208 contains the quoted language.

264.    The Louisiana Department of Insurance has stated that the statutory 10¢ fee is applied across-the-board to ensure that "all residents of [Louisiana] shoulder the burden of financing the Louisiana Medicaid program." Therefore, the "ten cent provider fee on out-patient prescriptions authorized in [section 46:2625] applies to every out-patient prescription of any kind whatever, without regard to whether that prescription is processed by or for a Medicaid enrollee." *Id.* at SA714-15.

RESPONSE:   ACLR objects to the proposed uncontroverted fact as it contains a conclusion of law.   To the extent a response is required, ACLR agrees that the May 9, 2016 Louisiana Department of Insurance Directive 208 contains the quoted language and that the Directive accurately characterizes the 10 cent fee as a prescription provider fee.   Tab 136, SA712.

265.    ACLR's principal Chris Mucke, who characterizes himself as an "expert on the law," contends that the Louisiana Department of Insurance's interpretation of Louisiana law is incorrect, and that Mr. Mucke's interpretation of Louisiana law should control instead. Tab 95, SA375 at 16:3-16, SA377-79 at 45:20-47:3.

RESPONSE:   Admitted.   Mr. Mucke's interpretation of the Louisiana law is based upon the specific wording of the statute.   Mr. Mucke's conclusion was also consistent with the NBI MEDIC's position on the inappropriateness of including sales taxes in Louisiana sales tax

PDE records.  App. at Ex. 145, Excerpts from Deposition of Matthew Farabaugh as Corporate

Representative for Health Integrity, LLC ("NBI MEDIC Dep."), A808-09 at 184:4-185:1.

*Minnesota*

266.   On behalf of CMS, Health Integrity also had been analyzing the potential for improper sales tax payments in Minnesota for years before ACLR submitted its sales tax NAIRP in August 2015. In June 2010, following a request for assistance made by the OIG, Health Integrity contacted plan sponsors regarding concerns that sponsors were reporting sales tax in Minnesota PDE records. Tab 127, SA689; Tab 128, SA696; Tab 129, SA701-02.

RESPONSE:  ACLR objects to the proposed uncontroverted finding of fact as having a

lack of foundation and authentication, speculation, and as inadmissible hearsay.  At most, the

supporting evidence merely reflects that Health Integrity sent letters to Medica and UCare in

June of 2010.

267.   In July 2010, two plan sponsors, UCare and Medica, responded to Health Integrity. UCare noted that "the data in the sales tax field does not represent payment of sales tax, and the reflected payments do not violate state or federal law." Rather, UCare stated that the payments reported in the PDE sales tax field reflected payments under Minnesota's wholesale drug distributor's tax. Tab 127; Tab 128, SA696.

RESPONSE:   ACLR objects to the proposed uncontroverted finding of fact as a

conclusion of law, lacking of foundation and authentication, speculation, and as inadmissible

hearsay.  To the extent a response is required, ACLR admits that the supporting evidence merely

reflects that Medica and UCare responded to Health Integrity and that data in the sales tax field

did not represent sales taxes.  ACLR denies that including amounts in the PDE record sales tax

field is not a violation of state or federal law.

268.   UCare alerted Health Integrity to the existence of the wholesale drug distributor tax and represented that the "data in the sales tax field in UCare's PDE shows the amount of reimbursement for expense of the wholesale drug distributor tax, not a sales tax or a tax on UCare's premium payments from CMS." Tab 128, SA696.

RESPONSE:   ACLR objects to the proposed uncontroverted finding of fact as a conclusion of law, lacking of foundation and authentication, speculation, and as inadmissible hearsay.

269.   UCare also informed Health Integrity that it had sought legal advice from the Minnesota Pharmacists Association and outside counsel, both of which advised UCare that "the federal law prohibiting taxes and assessments would likely not be construed by a court to preempt our obligation under state law to reimburse pharmacies for the expense of the wholesale drug distributor tax." *Id.* at SA697.

RESPONSE:   ACLR objects to the proposed uncontroverted finding of fact as a conclusion of law, lacking of foundation and authentication, speculation, inadmissible hearsay, and inadmissible hearsay within hearsay.

270.   UCare obtained an email from a regional CMS official who advised that "this tax survives the . . . federal provision" preempting state imposition of premium taxes or fees on Medicare Part D payments.  *Id.*

RESPONSE:  Denied.  The 2005 CMS email does not contain the quoted language but is rather UCare's interpretation of the 2005 CMS email.  Tab 128, SA697 and SA699.

271.   Medica likewise informed Health Integrity that "the tax associated with the PDE data for the claims at issue represents a wholesale drug distributor tax," not sales tax, and thus was allowed under state law. Tab 127, SA689.

RESPONSE:   ACLR objects to the proposed uncontroverted finding of fact as a conclusion of law, lacking of foundation and authentication, speculation, and inadmissible hearsay.

272.   Health Integrity contacted the Minnesota Attorney General's office to obtain further guidance on the issue. A "citizen research specialist" responded to Health Integrity by letter dated May 31, 2011, noting the existence of the wholesale distributor tax but providing a contrary opinion that "healthcare services provided to Medicare recipients and paid for under the Medicare program are exempt from this tax." Tab 137, SA717.

RESPONSE:  Admitted.

273.    Ultimately, Health Integrity prepared an executive summary regarding its analysis of the Minnesota tax issues. Tab 129, SA701.

RESPONSE:  ACLR objects to the proposed uncontroverted finding of fact as lacking foundation and authentication and as inadmissible hearsay.

274.    The issue of the applicability of the Minnesota wholesale drug distributor tax to Part D prescriptions apparently remained open and unresolved, and CMS asked Health Integrity to analyze the issue again in 2014. Tab 122, SA647.

RESPONSE:  Denied.  The proposed uncontroverted finding of fact is not supported by the cited evidence.  The referenced report does not provide that the issue of the applicability of the Minnesota wholesale drug distributor tax to Part D prescriptions remained open and unresolved, and that CMS asked Health Integrity to analyze the issue again in 2014.  Tab 122, SA647.

275.    In a report dated November 3, 2014, Health Integrity informed CMS that it had analyzed Minnesota PDEs between January 1, 2010, and September 30, 2014, and identified a total of 62.6 million PDEs containing amounts reported in the sales tax field, with amounts totaling $90,928,414 reported in the sales tax field. *Id.* at SA652-53.

RESPONSE:  ACLR objects to the proposed uncontroverted finding of fact as lacking foundation and authentication and as inadmissible hearsay.

276.    Health Integrity recommended a more detailed analysis to specifically include "whether the amounts identified in the PDE records as a 'sales tax' actually represent sales taxes in states where the application of sales taxes to Part D prescription drugs is prohibited by state law." *Id.* at SA655.

RESPONSE:  Admitted.

277.    CMS and Health Integrity discussed Minnesota tax issues throughout 2015, and CMS informed Health Integrity that CMS wanted to complete the analysis of Louisiana taxes before proceeding with any further vulnerability analysis in Minnesota. Tab 139, SA743.

RESPONSE:  Qualified.  ACLR agrees that CMS informed Health Integrity on or about April 7, 2015 that CMS wanted to complete the analysis of Louisiana taxes before proceeding

with any further vulnerability analysis in Minnesota.  Tab 139, SA743.  ACLR denies that CMS and Health Integrity discussed Minnesota tax issues throughout 2015 as there is no evidence offered to support that proposed uncontroverted fact.  In fact, Health Integrity did not have any communications with CMS after August 2015 regarding the Minnesota project.  App. at Ex. 65, NBI MEDIC Dep. at 127:14-17.

> 278.   Health Integrity reported that, if one accounted for the 2% wholesale drug distributor tax, the $90.9 million total amount reported in the sales tax field for Minnesota PDEs from 2010 through 2014 would be reduced to $10.2 million.  *Id.*

RESPONSE:   ACLR objects to the proposed uncontroverted fact as based upon speculation and inadmissible hearsay.  ACLR also denies Defendant's characterization of the statement in the document.  The statement reads "[w]e identified that the 2% wholesaler tax may be allowable so we excluded 2% of the total amount.  This leaves us with a total of $10.2 million which may be recoverable."  It is vague as to what the phrase "the total amount" refers to and how the $10.2 million was calculated.  Moreover, to the extent that Minnesota did not exempt the wholesale drug distributor tax and permitted pharmacies to separately state and recoup the wholesale drug distributor from the sales of prescription drugs, such amounts cannot be included in the PDE record sales tax field.  The amounts billed in the sales tax field on the Minnesota PDE records do not represent the wholesale drug distributor tax because over 90% of the PY 2012-2013 Minnesota PDE records in ACLR's PY 2012-2013 sales tax NAIRP and in its ACLR II Complaint contain amounts billed in the sales tax field at 2% or higher than the ingredient cost paid.  App. at Ex. 175, C. Mucke Aff. at ¶¶ 7-9, A1001.  Therefore, the sales tax field is incorrect because the ingredient cost paid represents the retail price charged by pharmacies and would be greater than the wholesale cost of the drug so the amounts paid for these Minnesota PDE records are improper overpayments.  *Id.*

279.  Health Integrity noted that the "Sales Tax Field is being used for other items," which might be a "vulnerability that we will need to review further after we settle the sales tax cases." *Id.*

RESPONSE:  ACLR objects to the proposed uncontroverted fact as based upon speculation and inadmissible hearsay.

280.  After August 2015, Health Integrity does not recall performing active work on the issue of Minnesota tax payments, although the project remained open until June 2016 while CMS continued to consider the issue of whether or how to proceed. Tab 93, SA366-68 at 126:5- 128:15; Tab 97, SA392-94 at 91:3-93:15, SA395-96 at 133:14-134:2, SA397-98 at 141:22-142:7; Tab 98, SA410-11 at 50:22-51:16.

RESPONSE:  Qualified.  ACLR agrees that after August 2015, Health Integrity did not perform any additional work on the issue of Minnesota tax payments.  ACLR denies that the Minnesota project remained open until June 2016 while CMS continued to consider the issue of whether or how to proceed.  There is no evidence that CMS was considering the issue of whether and how to proceed until June 2016.  Ms. Abankwah testified that CMS made a decision in early 2015 to not pursue Minnesota sales tax.  App. at Ex. 172, Excerpts from the Deposition of Rosalind Abankwah ("Abankwah Dep."), A974-75 at 42:4-44:13.  Similarly, on April 23, 2015, the Health Integrity Vulnerability Report provided that "[o]nce the LA recoveries have been completed, CMS will not proceed any further regarding the tax recoveries for remaining states." Tab 126, SA687.

281.  ACLR's NAIRP did not address the applicability of the wholesale drug distributor fee or its potential impact on the viability of ACLR's proposed recovery audit of alleged sales tax payments in Minnesota in any way. Tab 91, SA339 at 170:2-6

RESPONSE:  Admitted.

*Other States*

282.  CMS requested that Health Integrity conduct a nationwide study of amounts reported in the sales tax field. Tab 124, SA668, SA673-75.

RESPONSE: Denied. The evidence does not support the proposed uncontroverted fact that CMS requested that Health Integrity conduct a nationwide study of amounts reported in the sales tax field. *See* Tab 124, SA668, SA673-75.

> 283. In its review, Health Integrity observed that "aberrant patterns were identified concerning the monetary information that is being populated within the sales tax field." In some cases Health Integrity determined that plan sponsors were recording usage taxes in the sales tax field, but "there were a large number of instances in which the sales tax field bore no discernable relationship to the remainder of the PDE record." *Id.* at SA668.

RESPONSE: ACLR objects to the proposed uncontroverted fact as based upon speculation and inadmissible hearsay.

> 284. Health Integrity's national study looked at PDE records for 2014, and found that 3.38% of the PDE records in that year (47.9 million out of 1.4 billion total PDE records) contained amounts recorded in the sales tax field. *Id.* at SA673.

RESPONSE: Admitted.

> 285. Illinois was the only state identified by Health Integrity as imposing a sales tax (as opposed to some other form of tax or fee) on prescription drugs. *Id.*

RESPONSE: Admitted

> 286. In the top 15 states with amounts reported in the sales tax fields of the PDE records, Health Integrity identified a total of $66 million in payments reported in the sales tax fields. *Id.* at SA674. Of those same top 15 states, $38.9 million out of the total $66 million (59%) came from PDE records in Illinois (which does impose sales taxes on prescriptions), and $24.7 million out of the total $66 million (37.4%) came from Minnesota. *Id.* at SA674.

RESPONSE: Admitted.

> 287. Health Integrity identified the sales tax field as a vulnerability that CMS should consider addressing through further guidance to plan sponsors, to clarify the purposes for which the sales tax field could be used. *Id.* at SA675.

RESPONSE: Qualified. ACLR agrees that Health Integrity identified the sales tax field as a vulnerability that CMS should consider addressing through one option of further

guidance to plan sponsors, to clarify the purposes for which the sales tax field could be used. The evidence relied upon reflects that Health Integrity proposed other options as well to address the issue.  Tab 124 at SA675.

288.   Health Integrity's national vulnerability study remained open until December 23, 2015, and at that time Health Integrity's "findings remain[ed] under review by CMS for further action." Tab 126, SA683, SA686. As of January 29, 2016, Health Integrity reported that its findings still remained under review by CMS. *Id.* at SA688.

RESPONSE:  Denied.  April 23, 2015, the Health Integrity Vulnerability Report provided that "[o]nce the LA recoveries have been completed, CMS will not proceed any further regarding the tax recoveries for remaining states."  Tab 126, SA687.  Moreover, Health Integrity's "national vulnerability study" only covered plan year 2014 while ACLR's Sales Tax NAIRP covered PY 2012 and 2013.  Tab 124, SA673.

289.   Due to the complexity of the issues, CMS has not further pursued the recovery of any amounts reported in the sales tax fields of PDE records that might amount to improper assessments of state sales taxes. Tab 101, SA426 at 56:12-18, 59:8-15; Tab 98, SA412 at 97:5- 11; Tab 97, SA399 at 230:12-15, SA400-01 at 241:18-242:12.

RESPONSE: Denied.  There is no evidence cited that due to the complexity of the issues, CMS has not further pursued the recovery of any amounts reported in the sales tax fields of PDE records that might amount to improper assessments of state sales taxes.  Rather, the evidence cited reflects that CMS never made a decision of the possibility of recovering overpayments based upon PDE records that contained amounts improperly billed in the sales tax field.  Tab 98, SA412 at 97:5- 11; Tab 97, SA399 at 230:12-15.

290.   CMS's view was that, if an amount reported in the sales tax field on a PDE record reflected an allowable payment for some form of tax or fee – even if not actually state sales tax – then it would not be deemed an improper payment merely because the payment was recorded in the sales tax field. Tab 97, SA390-91 at 86:8-87:1.

RESPONSE:  Denied.  If an amount is reported in the sales tax field that is not sales tax the PDE record would be an improper payment.  CMS and OMB define an improper payment as: "any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements. Incorrect amounts are overpayments and underpayments (including inappropriate denials of payment or service). An improper payment includes any payment that was made to an ineligible recipient or for an ineligible service, duplicate payments, payments for services not received, and payments that are for the incorrect amount."    App. at Ex.18, excerpts of Part III to OMB Circular A-123, Appendix C.  *See* Defendant's Response to ¶¶ 20-21.  CMS's 2011 Prescription Drug Event Participant Guide ("Guide") provides "technical assistance" that "will enable participants to collect and submit Part D data in accordance with Centers for Medicare & Medicaid Services (CMS) requirements."  App. at Ex. 169, Excerpts of 2011 Prescription Drug Event Participant Guide ("Guide"), A948.  According to the Guide, it "delineates specific rules plans must follow to report the prescription drug cost and payment amounts for covered drugs on the PDE record under all types of PBPs."  *Id*., A949 at 1.2.2.  As outlined in the Guide, the PDE record contains three detail cost fields: "Ingredient Cost Paid, Dispensing Fee Paid, and Total Amount Attributed to Sales Tax. For all events, the gross drug cost is a sum total of these three detail fields in the PDE record."  *Id*., A950 at 4.2.4.1.1.  The Ingredient cost paid is the "dollar amount paid to the pharmacy for the drug itself" and should "not include costs such as dispensing fees or sales tax." *Id.,* A951 (Field No. 30).  The Guide further provides "In cases where these three fields are not disaggregated, plans should report the total cost in the 'Ingredient Cost Paid' field, and report zero dollar amounts for the other two fields." *Id*., A952. The Guide provides that the sales tax field

"represents the dollar amount of sales tax, if any, associated with the prescription drug event." *Id.*, A953 (Field No. 31).

> 291.   In the notice denying ACLR's proposed sales tax NAIRP, the CMS contracting officer's representative invited her with any questions regarding the denial of the NAIRP, but ACLR never considered doing so. Tab 62, A672; Tab 91, SA341 at 191:10-15.

RESPONSE:  Admitted.

> 292.   ACLR submitted a certified claim a week after the sales tax NAIRP was denied, alleging that it was entitled to payment of its contractual contingency fee as if the sales tax recovery audit had been approved and CMS had recouped the entirety of the PDE payments – not just the alleged sales tax amounts – contained in the PDEs identified in ACLR's NAIRP.  Tab 86, SA152; Tab 91, SA342 at 201:16-19.

RESPONSE:  Qualified.  ACLR agrees that it submitted a certified claim a week after the sales tax NAIRP was denied, alleging that it was entitled to payment of its contractual contingency fee amount related to $658,354,795 improper payments identified in the PY 2012-2013 sales tax NAIRP, which is the amount ACLR would have been entitled to under the Part D RAC Contract.  ACLR's contingency fees were not limited to the amount of the sales tax payments that were recouped.  Tab 86, SA152; Part D RAC Contract at section 5.

> 293.   ACLR had identified $658,354,795 in total PDE payments on the records it identified in its NAIRP as containing some amount in the sales tax field. ACLR computed its contingent fee by multiplying the contractual 15% contingent fee rate times the first $10 million in hypothetical recoveries, and then multiplying the 12% contractual contingent fee rate times the remaining $648,354,795 in hypothetical recoveries, to arrive at a total alleged entitlement of $79,302,575. Tab 61, A670; Tab 86, SA152; Tab 91, SA342-43 at 201:22-202:19.

RESPONSE: Qualified.   ACLR calculated its contingency fee of $79,302,575 in accordance with the Part D RAC contract on PDE records where plan sponsors billed sales tax in states that did not impose sales taxes or where the PDE records were specifically exempt from sales taxation under state law.

65

294.    ACLR has no evidence that CMS ever recovered any, nor all, of the amounts identified as improper sales tax payments in ACLR's NAIRP. Tab 91, SA346-47 at 211:8- 212:7.

RESPONSE:    Denied.    CMS submitted multiple documents during discovery demonstrating that CMS required that plan sponsors delete the entire PDE record for Louisiana sales tax overpayments, which were subsequently tracked and reported by the NBI MEDIC in accordance with requests made by CMS on August 18, 2015 and October 8, 2015.  Tab 134, SA708;  App. at Ex. 173, NBI MEDIC's June 2015 Update for Deleted Prescription Drug Event Records for Louisiana Sales Tax Project, A981.

295.    ACLR's complaint in *ACLR II* is based on the same categories of PDEs containing alleged improper sales tax payments that were identified in its sales tax NAIRP and certified claim, but asserts that there are millions of additional PDEs and millions of additional dollars of PDE payments containing alleged sales tax amounts than had ever previously been identified by ACLR to CMS. Tab 91, SA348-49 at 218:5-219:16.

RESPONSE: Qualified.  ACLR agrees that there are differences in the number of sales tax improper payment PDEs and payments containing sales tax amounts between those submitted in its certified claim and that of its Complaint in *ACLR II*.  ACLR affirms that the PDE records identified in its claim were submitted in accordance with Part D RAC Contract OY2 SOW NAIRP submission requirements that state that the "NAIRP contains a proposed audit issue, samples of PDE records, an outline of the processes utilized to identify improper payments, supporting statutory, regulatory, and administrative memoranda, and an estimate of improper payment amounts owing" and that the sales tax improper payments identified in its Complaint in *ACLR II* represent ACLR's actual, and not estimated, findings.  App. at Ex. 22, Part D RAC, OY2 SOW, A437 at section 2.1.1.

296.    For instance, ACLR's NAIRP and certified claim asserted that ACLR had identified 27,272,409 Minnesota PDEs containing amounts in the sales tax field with total PDE payments on those claims equaling $619,184,285. Yet

ACLR's complaint alleges that it found 38,145,596 Minnesota PDEs containing amounts in the sales tax field with total PDE payments equaling $889,596,525 – an increase of roughly 11 million PDEs and $270 million in total PDE payments. Tab 61, A670; Tab 87, SA156 at ¶ 18; Tab 91, SA348-49 at 218:5-219:16.

RESPONSE: Qualified. ACLR agrees that there are differences in the number of sales tax improper payment PDEs and payments containing sales tax amounts between those submitted in its certified claim and that of its Complaint in *ACLR II*. ACLR affirms that the PDE records identified in its claim were submitted in accordance with Part D RAC OY2 SOW NAIRP submission requirements that state that the "NAIRP contains a proposed audit issue, samples of PDE records, an outline of the processes utilized to identify improper payments, supporting statutory, regulatory, and administrative memoranda, and an estimate of improper payment amounts owing" and that the sales tax improper payments identified in its complaint in ACLR II represent ACLR's actual, and not estimated, findings. App. at Ex. 22, Part D RAC, OY2 SOW, A437 at section 2.1.1.

297. ACLR's complaint also alleges that it found 2,045,929 Louisiana PDEs containing amounts in the sales tax field with total PDE payments equaling $32,032,166 – an - increase of roughly 230 PDEs and $4,000 in total PDE payments compared to what had been reported to CMS in the NAIRP and sought in ACLR's certified claim. Tab 87, SA156 at ¶ 23; Tab 61, A670; Tab 91, SA349-50 at 219:17-220:17.

RESPONSE: Qualified. ACLR agrees that there are differences in the number of sales tax improper payment PDEs and payments containing sales tax amounts between those submitted in its certified claim and that of its Complaint in *ACLR II*. ACLR affirms that the PDE records identified in its claim were submitted in accordance with Part D OY2 SOW NAIRP submission requirements that state that the "NAIRP contains a proposed audit issue, samples of PDE records, an outline of the processes utilized to identify improper payments, supporting statutory, regulatory, and administrative memoranda, and an estimate of improper payment

67

amounts owing" and that the sales tax improper payments identified in its complaint in ACLR II represent ACLR's actual, and not estimated, findings.  App. at Ex. 22, Part D RAC, OY2 SOW, A437 at section 2.1.1.

298.  ACLR's complaint alleges that it identified 264,119 PDEs that contained amounts in the sales tax field that were greater than 50% of the reported drug costs with total PDE payments on those claims equaling $2,009,005 – an increase of roughly 2,000 PDEs and $400,000 compared to what ACLR reported in its NAIRP and sought in its certified claim. Tab 87, SA157 at ¶ 28; Tab 61, A670; Tab 91, SA350-51 at 220:18-221:12.

RESPONSE:  Qualified.  ACLR agrees that there are differences in the number of sales tax improper payment PDEs and payments containing sales tax amounts between those submitted in its certified claim and that of its Complaint in *ACLR II*.  ACLR affirms that the PDE records identified in its claim were submitted in accordance with Part D RAC OY2 SOW NAIRP submission requirements that state that the "NAIRP contains a proposed audit issue, samples of PDE records, an outline of the processes utilized to identify improper payments, supporting statutory, regulatory, and administrative memoranda, and an estimate of improper payment amounts owing" and that the sales tax improper payments identified in its complaint in *ACLR II* represent ACLR's actual, and not estimated, findings.  App. at Ex. 22, Part D RAC, OY2 SOW, A437, section 2.1.1.

299.  ACLR's certified claim was based on the PDE data reported in ACLR's sales tax NAIRP. Tab 91, SA351 at 221:13-21.

RESPONSE:  Admitted.

300.  ACLR never discussed with CMS the additional 2012 and 2013 PDE records and payments that it alleges in its complaint, that go above and beyond the records referenced in the NAIRP, nor did ACLR seek a contracting officer's final decision involving the revised claim data. *Id.* at SA351-52 at 221:22-222:11.

RESPONSE:  Admitted.

301.     The new claims identified in ACLR's complaint are different prescriptions that had not been identified by ACLR for CMS at any time prior to filing the complaint. *Id.* at SA354-55 at 226:-227:14-18.

RESPONSE:  ACLR objects on the grounds that the term "new claims" is vague.  To the extent a response is required, qualified.  For *ACLR II*, ACLR analyzed PDEs containing amounts billed for sales tax in states that did not impose a sales tax, exempted PDEs from sales tax, or in instances where an exorbitant sales tax rate was charged.   No review of prescriptions was conducted by ACLR in connection with *ACLR II*.

302.     Based on the new increased number of PDEs and total PDE payments that ACLR contends were improper, ACLR's complaint now seeks contingent fees of $112,002,489 (rather than the $79,302,575 asserted in the certified claim) calculated off of the total dollar amount of the PDEs identified by ACLR in which any amount was included in the sales tax field. Tab 91, SA356 at 230:12-19.

RESPONSE:  Admitted.

303.     ACLR's principal, Chris Mucke, is the only individual who performed any work on the sales tax NAIRP and the analysis of state taxation laws. He estimates that it took no more than a few days of work to analyze the PDEs to generate ACLR's proposed sales tax NAIRP and to analyze state laws to determine the applicability of sales taxes to Part D prescriptions. Tab 91, SA322 at 109:10-14, SA323 at 111:12-16, SA327-28 at 120:21-121:14.

RESPONSE:  Admitted.

General Recovery Audit Matters

304.     Guidance issued by OMB states that "[c]ontingency fee contracts shall preclude any payment to the payment recapture audit contractor until the recoveries are actually collected by the agency."  Similarly, OMB's guidance provides that "[o]verpayments that are identified by the payment recapture auditor, but that are subsequently determined not to be collectable or not to be improper, shall not be considered 'collected' for proceed disposition purposes outlined in this section." Tab 89, SA207-08.

RESPONSE:  Admitted.

305.     OMB's guidance also provides:

When calculating a program's annual improper payment amount, agencies should only utilize the amount paid improperly. For example, if a $100 payment was due, but a $110 payment was made erroneously, then the amount applied to the annual estimated improper payment amount should be $10, rather than the payment amount of $110. Similarly, if a $100 payment was due, but a $90 payment was made erroneously, then the amount applied to the annual estimated improper payment amount should be $10, rather than the payment amount of $90. However, if a $100 payment was due and made, but there is insufficient documentation to support the appropriateness of the payment or if a duplicate payment was made, then the amount applied to the annual estimated improper payment amount should be $100.

Tab 89, SA182-83.

RESPONSE:   Qualified.   ACLR agrees that the quoted paragraph is correct. However, the paragraph appears in the context of an agency's calculations when reporting a statistically valid estimate of improper payments.   This process is not utilized by CMS for improper payment offsets in the Part D RAC Program.  Tab 89, SA182-83.

306.     ACLR stated that the ultimate recovery on any of its audit issues was always less than what it projected at the beginning, and in some cases varied "significantly" compared to the amounts estimated at the audit's outset. Tab 91, SA307 at 81:5-13, SA308 at 82:4-9, SA344 at 207:8-18.

RESPONSE:   Qualified.   ACLR testified these lesser amounts "depended on the changes made by CMS after the audit issue was approved."  Tab 91, SA308 at 82:4-9.

307.     ACLR never expected that it could achieve a 100% success rate in recovering overpayments. Tab 91, SA301 at 48:8-13.

RESPONSE:   Denied.   Mr. Mucke testified that he believed he "would be able to achieve close to 100 percent recovery" but did not anticipate 100 percent recovery because of "political ramifications."  App. at Ex. 148, Excerpts from the 30(b)(6) Deposition of Christopher

Mucke in ACLR II ("ACLR II 30(b)(6) Dep."), A834-835 at 48:8-49:12 and A843 (errata sheet change).

308. GAO determined that the rate of recovery on several Part D audit issues completed by ACLR ranged from 22% to 99%, when comparing the estimated improper payments identified by ACLR with the amounts actually recovered by CMS. Tab 15, A321; Tab 91, SA312 at 93:2-19.

RESPONSE:  Qualified.  ACLR admits that the GAO Report reflects a 78% to 99% recovery rate for the 2008-2011 excluded provider and 2009-2012 unauthorized prescriber audits.  While the GAO Report reflects a 22% recovery rate for the 2007 excluded provider audit, that recovery rate resulted from ACLR being provided with and using a CMS  Medicare database approved by the OIG identifying excluded  pharmacies.  App. at Ex. 148, ACLR II 30(b)(6) Dep. at 91:17-94:7, A836-39.  Later, OIG determined that a number of the pharmacies identified as excluded in the CMS Medicare database should not have been excluded pharmacies thereby changing the results of the 2007 excluded provider audit.  *Id.*

309. According to ACLR, in certain instances one cannot determine, from the PDE records alone, whether a Part D payment is proper or improper. Tab 91, SA313 at 97:17-22.

RESPONSE:  Qualified.  ACLR admits that in certain instances it cannot identify an improper payment solely through the use of PDE record.  This is true for NAIRPs submitted for the direct and indirect remuneration audit and the 2010-2012 duplicate payment audits because CMS mandated the use of its duplicate payment audit methodology which required additional documentation.  However, for all other audit issues submitted to CMS during the Part D RAC Contract, including the 2007 duplicate payment audit and the proposed 2012-2013 sales tax audit, improper payments could be determined solely through the use of PDE records when analyzed in conjunction with federal and state laws and the terms and conditions of plan sponsor Part D contracts with CMS.

310.    ACLR's owner, Chris Mucke, testified that he anticipated being "retired and living on an island anywhere" after having "received hundreds of millions back in improper payments" as a result of this contract. Tab 90, SA282 at 278:5-9.

RESPONSE:  Admitted.  Given that (i) CMS estimated that there was over $1 billion in improper payments a year, (ii) CMS was legally required to pursue those improper payments, and (iii) ACLR was to receive a contingency fee of at least 7.5% for improper overpayments, it was reasonable for Mr. Mucke as the principal owner of ACLR to conclude that the Part D RAC Contract would be a lucrative contract for him and his company.

Dated:  July 6, 2018

DAVID, BRODY &
DONDERSHINE, LLP


_____/s/_____
Thomas K. David
John A. Bonello
2100 Reston Parkway
Suite 370
Reston, VA 20191
Phone:  703-264-2220
Fax: 703-264-2226
tdavid@dbd-law.com
jbonello@dbd-law.com

Attorneys for Plaintiff ACLR, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of July 2018, I caused a copy of the foregoing document to be emailed via the ECF system to the following:

Adam Lyons
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street NW
Room 11020
Washington, DC 20005

_____/s/_____
Thomas K. David

73