Nos. 15-767C & 16-309C
(Judge Campbell-Smith)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ACLR, LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S REPLY IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT

CHAD A. READLER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

MARTIN F. HOCKEY, JR.
Deputy Director

OF COUNSEL:

LUCY MAC GABHANN
Attorney
Department of Health and Human Services
Office of the General Counsel
General Law Division
Procurement, Fiscal and Information Law Branch
7500 Security Boulevard
Baltimore, MD  21244-1850

ADAM E. LYONS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC  20044
Tel:  (202) 353-2345
Fax: (202) 307-0972
adam.e.lyons@usdoj.gov
Attorneys for Defendant

August 3, 2018

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

RESPONSE TO ACLR'S PURPORTED DISPUTES OF FACT....................................................2

    I.    ACLR Does Not Dispute The Facts Of The Jurisdictional Argument Or The Arguments
         Regarding Damages ..................................................................................................... 2

    II.   ACLR's Disputes Of Fact Regarding The Contract Claims Are Not Genuine................ 4

        A.   ACLR's Interpretations Of Law Do Not Create Material Disputes Of Fact ............... 4

        B.   The Parties' Contract Provides For CMS Control ...................................................... 5

        C.   Evidentiary Objections Do Not Create Material Disputes Of Fact.............................. 6

        D.   There Is No Material Dispute Of Fact That Plan Sponsors Raised The Burden Of
             Responding To ACLR's Requests ............................................................................... 7

        E.   Immaterial Distinctions Do Not Create Material Disputes Of Fact............................. 8

ARGUMENT ........................................................................................................................9

    I.    That Jurisdiction Would Be Convenient For ACLR Does Not Create Jurisdiction Over
         Claims That ACLR Chose Not To Present To The Contracting Officer ........................ 9

    II.   The Contract Provides CMS With Oversight Of ACLR............................................... 10

    III.  Contractual Oversight Does Not Violate The Covenant Of Good Faith And Fair Dealing
         ............................................................................................................................... 14

    IV.  ACLR's Calculation Of Damages Is Impermissibly Speculative ................................. 16

    V.   ACLR Cannot Claim Damages Beyond That Which The Contract Allows ................. 19

CONCLUSION.....................................................................................................................21

# TABLE OF AUTHORITIES

## Cases

*Alpha I, L.P. v. United States*,
    93 Fed. Cl. 280 (2010) ............................................................................................ 6

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................ 2

*Beta Sys., Inc. v. United States*,
    838 F.2d 1179 (Fed. Cir. 1988) ............................................................................. 13

*Bigelow v. RKO Radio Pictures*,
    327 U.S. 251 (1946) ........................................................................................ 18, 19

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................ 6

*Centex Corp. v. United States*,
    395 F.3d 1283 (Fed. Cir. 2005) ............................................................................. 14

*Folden v. United States*,
    379 F.3d 1344 (Fed. Cir. 2004) ............................................................................... 9

*G.L. Christian & Assocs. v. United States*,
    320 F.2d 345 (Ct. Cl. 1963) ............................................................................. 4, 11

*Gen. Eng'g & Mach. Works v. O'Keefe*,
    991 F.2d 775 (Fed. Cir. 1993) ............................................................................... 11

*Indiana Mich. Power Co. v. United States*,
    422 F.3d 1369 (Fed. Cir. 2005) ............................................................................. 17

*Logan Canyon Cattle Assoc. v. United States*,
    34 Fed. Cl. 165 (1995) ........................................................................................... 19

*Massie v. United States*,
    226 F.3d 1318 (Fed. Cir. 2000) ............................................................................. 20

*Nicholson v. United States,*
    29 Fed. Cl. 180 (1993) ........................................................................................... 19

*Nw. Marine Iron Works v. United States*,
    493 F.2d 652 (Ct. Cl. 1974) ............................................................................. 14, 17

*Precision Pine & Timber, Inc. v. United States*,
   596 F.3d 817 (Fed. Cir. 2010) ............................................................................... 14, 18

*Scott Timber Co. v. United States*,
   333 F.3d 1358 (Fed. Cir. 2003) ................................................................................. 8

*Taebel v. United States*,
   No. 18-25C, 2018 WL 385563 (Fed. Cl. Jan. 11, 2018) ........................................... 9

*United States v. King*,
   395 U.S. 1 (1969) ..................................................................................................... 19

*United States v. Testan*,
   424 U.S. 392 (1976) ................................................................................................. 19

*VHC, Inc. v.* Peters,
   179 F.3d 1363 (Fed. Cir. 1999) ............................................................................... 12

## **Regulations**

FAR 46.102 .................................................................................................................. 11

FAR 46.104 .................................................................................................................. 11

FAR 52.246-20 ............................................................................................................. 12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ACLR, LLC,                              )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      Nos. 15-767C & 16-309C
                                        )      (Judge Campbell-Smith)
THE UNITED STATES,                      )
                                        )
            Defendant.                  )

### DEFENDANT'S REPLY IN SUPPORT OF ITS
### CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to the Court's February 8, 2018 scheduling order, defendant, the United States, replies in support of its cross-motion for summary judgment on all counts of the complaint in these two consolidated cases (Cross-Motion).

### INTRODUCTION

ACLR's claims are without merit because they stem from the misconception that CMS had no right of oversight over ACLR's actions.  To the contrary, CMS had oversight over ACLR as a matter of law and of the parties' contract.  As a matter of law, CMS was required to oversee ACLR's actions such that the rights to revise and to terminate audits were inherently part of the contract, regardless of whether those terms were specifically included.  Beyond that, the contract shows the parties' intent that CMS will have approval and revision authority over ACLR's audits.  CMS properly executed its legal and contractual oversight, based on its good faith belief that audit issues ACLR were proposing were not appropriate to pursue.

In addition, where ACLR's damages are based on recovery of amounts that it admits it would not have recovered, and depend on the occurrence of numerous future, uncertain events, its damages are impermissibly speculative.  Because those are the characteristics of all of ACLR's damages, it cannot recover.  Moreover, ACLR's claims are proscribed by the terms of

the contract into which it entered.  That contract sets ACLR's only recovery as a percentage of amounts that CMS actually recovers.  Where there was no CMS recovery, as is the case with regard to all of the amounts ACLR seeks here, there is nothing for ACLR to recover.

## RESPONSE TO ACLR'S PURPORTED DISPUTES OF FACT

As an initial matter, we respond to ACLR's identification of purported disputes of fact. ACLR purports to dispute various facts, but fails to create a genuine dispute of fact that precludes summary judgment.  "By its very terms, [the summary judgment standard] provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 248 (citation omitted).

Although it purports to take issue with a large number of the facts in this matter, those disputes exclusively relate to whether CMS's undisputed actions breached the express or implied terms of the contract.  Before addressing those disputes, we will first address the absence of even purportedly disputed facts as to all of the other arguments we raise in our Cross-Motion.  We will then discuss why ACLR fails to raise a material dispute of fact regarding the alleged breach of the express or implied contract terms.

## I.     ACLR Does Not Dispute The Facts Of The Jurisdictional Argument Or The Arguments Regarding Damages

With regard to our jurisdictional argument, Cross-Motion at 49-51, ACLR does not dispute that the scope of its claim here is different than what it presented to the contracting officer.  Instead, it gives a qualified admission of the one fact necessary to this issue, Cross-

Motion fact no. 296.  That fact asserts that ACLR has changed its claim from what it presented to the contracting officer.  *Id.*  In its qualified admission, ACLR argues that despite the fact of it changing its claim, the Court still has jurisdiction.  That legal argument does not create a dispute of fact.

Similarly, ACLR does not dispute the facts supporting our argument that ACLR's contract measure of damages is a percentage of CMS's actual recovery and that, because CMS had no recovery, ACLR cannot recover a percentage of a non-recovery.  Cross-Mot. at 51-55. We rely on fact nos. 121, 156, 193, 237 and 242 in support of this argument.  Although ACLR disputes the conclusions we draw from those facts, ACLR does not dispute the facts themselves.[1]

Finally, ACLR does not raise any genuine dispute of fact regarding the speculative nature of its claims.  Cross-Mot. at 67-75.  The gravamen of this argument is that ACLR's claimed damages are premised on recovery of 100% of its audit proposals, but all of the evidence is that it would not have recovered 100% of its proposals, even if CMS had allowed it to pursue them. ACLR admits that its proposals are "by very definition estimates," Resp. at 38; that it did not expect to recover 100% of its estimates, due to "political ramifications," *id.* at 39; and its actual historic recovery percentage was some amount significantly below 100%, *id.* at 39-40.[2]  ACLR

---

[1]  ACLR does object that fact no. 242 states a conclusion of law.  Fact no. 242 states that ACLR could not identify any contractual provision allowing it recovery where CMS had no recovery.  Whether a point of fact (because ACLR did not identify such a provision in discovery) or of law (because ACLR does not identify such a provision in its response to the Cross-Motion (Response)) the point is that ACLR does not identify any contractual provision to support its conception of damages.  Thus, there is no genuine dispute on this point.

[2]  Although ACLR admits that in one audit it recovered as little as 22% of its estimate, it contends that the office of the inspector general later determined this was due to CMS's error and it should have recovered 79% in that instance.  Resp. at 39-40.  ACLR contends that the range of recovery on its audits therefore should have been 79-99% of its estimates.  *Id.*  Regardless of whether the range starts at 22% or 79%, the material fact is that ACLR has no basis to claim that it would have recovered 100% on the disallowed audits, when it actually recovered far less.

3

picks at the edges of these facts, asserting that it would have recovered closer to 100% than CMS believes would have occurred.  Regardless, there is no material dispute of fact that ACLR did not expect to collect 100% of its estimates.

## II.     ACLR's Disputes Of Fact Regarding The Contract Claims Are Not Genuine

In the Cross-Motion, we established that the express and implied contract terms made any audit subject to CMS's oversight, revision, and ultimate approval or rejection.  ACLR fails to create a material dispute of fact as to these points.

### A.     ACLR's Interpretations Of Law Do Not Create Material Disputes Of Fact

As we demonstrate below at 10-12, as a matter of law CMS must have control over ACLR's audits.  The relevant law requires CMS oversight of the part D auditor.  Moreover, the right to terminate for convenience and to require correction of defective services are inherent parts of Government contracts.  *G.L. Christian & Assocs. v. United States*, 320 F.2d 345, 355 (Ct. Cl. 1963).

ACLR, however, purports to dispute these legal requirements.  First, ACLR purports to challenge that OMB guidance states that the contractor "must provide clear evidence of overpayments to the appropriate agency official."  SA200.  ACLR's actual response to this point, however, is that other OMB's guidance shows that the payments it sought to audit were overpayments, such that it had "clear evidence."  Resp. at 13.  There is no dispute of fact in ACLR's response to the OMB guidance, only the introduction of a legal theory that ACLR would have satisfied the requirement.  Similarly, ACLR purports to dispute that IPERA requires CMS to "make final determinations relating to whether an overpayment occurred," by asserting that CMS allocated that authority to ACLR through the parties' contract.  *Id.* at 14.  Again, that is

the assertion of a legal argument, which does not dispute the underlying fact of what IPERA and the contract state.

### B.    The Parties' Contract Provides For CMS Control

ACLR cherry-picks the evidence, ignoring key provisions of the contract, to assert a dispute of material fact over the contract requirements.  In our Cross-Motion we note that the contract required ACLR to "solicit CMS's approval for[] conducting documentation audits," that "CMS will want to discuss and approve this methodology," and that ACLR "will standardize all CMS approved activities . . . in accordance with CMS guidance and policies and modify them as requested."  Cross-Mot. at 9-10.  ACLR argues that all of this language only applies to documentation audits, not to seeking approval for *all* audits, but the only audit at issue here that it claims is *not* a documentation audit is the PY 2007 duplicate payment audit.  Resp. to Cross-Mot. fact no. 127, 129-130.  That is an admission that ACLR did expect to need CMS approval for all of the other audits about which it complains.

Regarding the PY 2007 duplicate payment audit (which ACLR proposed under the original contract (PWS)), that, too, would have been a documentation audit had it proceeded. Although ACLR may have initially proposed duplicate payment audits as data-only audits, the PY 2010-12 duplicate payment audits ultimately became documentation audits because of the need to confirm duplicate payments through information beyond that in the PDE data.  Cross-Mot. fact no. 196; Resp. (admitting same).  Accordingly, the contractual provisions on documentation audits would have applied to ACLR's PY 2007 duplicate payment audit, had it proceeded.

Even if the 2007 duplicate payment audit was not a documentation audit, the PWS states that ACLR "anticipate[d] that some of our recommendations . . . will require numerous

discussions and considerable analysis by ACLR, CMS, Plan Sponsors, as well as other

stakeholders."  Cross-Mot. at 9 (fact no. 128).  In its response to the Cross-Motion (Response),

ACLR notes that this sentence includes an example, "such as those mentioned under *Alternate*

*Methodologies* below," and argues that the inclusion of this example limits the language to that

one category.  That is a simple misreading of the contract.  When it included the "Alternative

Methodologies" as an example, ACLR did not write that this was the *only* topic on which there

would be "numerous discussions and considerable analysis by ACLR, CMS, Plan Sponsors, as

well as other stakeholders."  Beyond that, ACLR admits that it wrote in the PWS that its

schedule of deliverables "will be modified as work progresses and upon feedback received from

CMS and subsequent modification and approval."  Resp. to Cross-Mot. fact no. 131.  That is

additional evidence of the parties' intent that CMS have control over any audit occurring under

the PWS.

### C.        Evidentiary Objections Do Not Create Material Disputes Of Fact

ACLR attempts to dispute various facts through evidentiary objections.  *See, e.g.*, Resp.

to Cross-Mot. fact nos. 206-209, 215, 217, 221, 225, 232-33, 256-57, 259-60, 262-64, 266-67,

269, 271, 273, 275, 278, 283.  In making evidentiary arguments, ACLR ignores the well-

established rule that the form in which a party supports facts at summary judgment need not be

admissible in evidence, so long as the facts themselves may be presented in an alternate form in

which they are admissible at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("'We do

not mean that the nonmoving party must produce evidence in a form that would be admissible at

trial in order to avoid summary judgment.'") *quoted in Alpha I, L.P. v. United States*, 93 Fed. Cl.

280, 293 (2010).  Accordingly, ACLR does not create a dispute of fact with repeated refrain that

the documentary support "has not been authenticated, lacks foundation, and is inadmissible

hearsay" or similar evidentiary objections to the form of the evidence. *See, e.g.*, Resp. to Cross-Mot. fact nos. 206-209, 215, 217, 221, 225, 232-33, 256-57, 259-60, 266-67, 269, 271, 273, 275, 278, 283.  Should trial be necessary, we will present live testimony from CMS or the third-parties who provided the underlying statements to properly place these facts in evidence. *See, e.g.* SA357-68, 386-427 (deposition testimony from CMS and third-party witnesses).

Similarly, ACLR misses the point with its objection that numerous facts regarding the errors in its audit methodologies are inadmissible "conclusions of law," *see, e.g.*, Resp. to Cross-Mot. fact nos. 256, 262-64, 267-69, 271.  The various facts regarding ACLR's erroneous methods are presented to show notice to CMS of these concerns and to show CMS's good faith basis for rejecting ACLR's audits.  Because ACLR claims that CMS violated the covenant of good faith and fair dealing, CMS is entitled to demonstrate that it acted in good faith.

### D.    There Is No Material Dispute Of Fact That Plan Sponsors Raised The Burden Of Responding To ACLR's Requests

Fourth, ACLR disputes fact no. 220 on the basis that we failed to cite support for the proposition that plan sponsors contacted CMS, identified the difficulty in responding to ACLR's requests for information, and identified the likelihood of false positives.  We apologize for the typographical error by which the supporting citation was left off this one fact.  Evidence in support of this fact is present in our responses to ACLR's fact nos. 59 and 68. *See* Def. Resp. to Pl. Mot. fact no. 59 (citing Tab 114, SA 619-620; Tab 119, SA 630); *id.* No. 68 (citing Tab 59, A657); *see also* Cross-Mot. at 60.  ACLR addresses this evidence (which it calls the "'burden on plan sponsors' argument") in its Response at 21.  Because it addressed this evidence, ACLR cannot legitimately claim that there is no support for this proposition or that it was unaware of that support.  Moreover, it does not actually dispute that plan sponsors raised these concerns.  It merely argues such did not justify CMS's rejection of its audits. *Id.* at 21-22.

7

E. **Immaterial Distinctions Do Not Create Material Disputes Of Fact**

ACLR purports to dispute various facts on the barest of pretexts, none of which create a material dispute of fact preventing summary judgment.  For example, ACLR purports to dispute Cross-Motion fact no. 136 (that CMS increased the contingency fee percentage to compensate ACLR for delays) by asserting that CMS increased the contingency fee percentage to compensate ACLR for any "issues" that had arisen to that point.  That may be a distinction, but it is not a material one and ACLR nowhere shows why its dispute of this fact precludes summary judgment.  In another example, ACLR disputes Cross-Motion fact no. 189 (that ACLR did not share requested information) by asserting that it does not recall whether it shared this information or not.  To raise a legitimate dispute of that fact, ACLR would have to allege that it did share the requested information.  A simple statement that it does not recall one way or the other fails to dispute the asserted fact that it did not share the information.  ACLR's response is rife with similar immaterial disputes.  *See, e.g.*, Resp. to Cross-Mot. fact nos. 137 (disputing that ACLR knew of CMS's intent to replace the PWS with the statement of work (SOW), by asserting that ACLR knew that it was not going to be performing under the PWS and knew of the SOW), 141 (disputing that ACLR agreed that the parties would replace the PWS, by asserting that ACLR felt it had to agree to the replacement), 177 (disputing that ACLR contemplated the PY 2007 duplicate payment review when it wrote the PWS, by asserting that the PWS required the PY 2007 duplicate payment review), 254 (disputing the quotation of the NBI MEDIC's statement, by asserting a quotation that is materially identical), 290 (disputing a fact that identifies CMS's view of what constitutes an improper payment, by asserting that CMS's view was wrong).  Although ACLR takes issue with a great number of the facts in this matter, ACLR does not show

8

that the distinctions it draws preclude summary judgment.  Those distinctions, therefore, are irrelevant.

## ARGUMENT

### I.    That Jurisdiction Would Be Convenient For ACLR Does Not Create Jurisdiction Over Claims That ACLR Chose Not To Present To The Contracting Officer

For claims under the Contract Disputes Act (CDA), like the one at hand, the Court's jurisdiction requires that the contractor present its claims to the contracting officer.  *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003) (citations omitted).  As we showed in our Cross-Motion, a significant portion of ACLR's claim is based on seeking to audit records that it did not seek to audit when it presented its claim to the contracting officer.  Cross-Mot. at 50.  ACLR states that these additional records are distinct from those it placed before the contracting officer, because it discovered "granular and less conspicuous markers" of improper sales tax payments in records that it otherwise appears to have thought showed proper payments. Resp. at 2.  Whatever else it might mean by "granular and less conspicuous markers," ACLR plainly means that it has found different evidence of allegedly improper sales tax payments than what it had presented.  The fact that this evidence has led ACLR to increase the amount of its claims shows that this relates to different records than those presented to the contracting officer. Because, as we demonstrated in our motion and further discuss below at 14-18, CMS rejected ACLR's sales tax audits because of the problems with the purported overpayments ACLR identified, it is unknown what answer the contracting officer would have given if presented with a claim regarding this different evidence in these additional records.  That is not a claim that the contracting officer considered and is not one that is properly considered here.

That this is inconvenient for ACLR does not change that result.  Although ACLR complains that the Government did not raise jurisdiction earlier in this case, "'[s]ubject-matter

jurisdiction may be challenged by the parties at any time, or by the court *sua sponte*.'" *Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004) *quoted in Taebel v. United States*, No. 18-25C, 2018 WL 385563, at *1 (Fed. Cl. Jan. 11, 2018) (unpublished).  Equally, ACLR's contention that dismissal for lack of jurisdiction will only lead to ACLR pursuing a new claim with the contracting officer does not create jurisdiction over its claim now.  Finally, although ACLR complains about a waste of resources if it has to refile this claim, it is ACLR that has caused that to come about.  ACLR may only proceed before this Court upon the claim it presented to the contracting officer.  Its attempt to do otherwise causes the problem about which it complains.

## II.     <u>The Contract Provides CMS With Oversight Of ACLR</u>

ACLR advances an absurd and illegal interpretation of the contract to create a situation in which CMS would have no oversight over its audits.  That interpretation is patently incorrect.

As a matter of law, CMS is required to provide oversight over ACLR's provision of services.  As we established in our Cross-Motion, OMB's guidance states that the "contractor must provide clear evidence of overpayments to the appropriate agency official."  Cross-Mot. at 57.  ACLR's only response to this is to identify that the OMB guidance made clear (in ACLR's mind) that the payments were improper, such that CMS should have agreed with ACLR.  Resp. at 13.  Regardless of ACLR's interpretation of the guidance, that CMS was to make the determination establishes that CMS was to have authority over whether audits would proceed. Equally, as we demonstrated in our Cross-Motion, IPERA § 2(h)(2)(C)(ii) precludes giving ACLR the authority to make "final determinations" regarding overpayments or "whether to compromise, settle, or terminate overpayment claims."  Cross-Mot. at 57.  ACLR's response is that the contract was an IPERA § 2(h)(2)(C)(i) authorization for ACLR to "notify entities . . . of

potential overpayments . . . . and take administrative actions with respect to overpayment claims made or to be made by the agency."  Resp. at 14.  ACLR, however, points to nothing in the contract that makes such an allocation of authority or that overrides CMS's "final authority" regardless of an allocation.  Instead, ACLR asserts that, because ACLR interprets the contract as providing it with unilateral authority, the contract is itself evidence that CMS determined to do so.  That circular logic, in violation of law, is not correct.

Indeed, the legal requirement that CMS oversee ACLR was even more broad than the specific regulations show.  ACLR's argument ignores that Government oversight is inherently part of any Government services contract.  Under the *Christian* doctrine, "a court may insert a clause into a government contract by operation of law if that clause is required under applicable federal administrative regulations" and is "a deeply ingrained strand of public procurement policy."  *Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993).  As the *Christian* court itself found, the availability of termination for convenience in Government contracts is one such deeply ingrained strand of procurement policy.  *Christian*, 320 F.2d at 355.

Another such ingrained strand is Government oversight of contractor performance.  The Federal Acquisition Regulation requires that the Government oversee the provision of services under its contracts:  "Agencies shall ensure that . . . (d) No contract precludes the Government from performing inspection; (e) Nonconforming supplies or services are rejected . . . ."  FAR 46.102.  Similarly, agencies "shall" "(a) Develop and apply efficient procedures for performing Government contract quality assurance actions under the contract in accordance with the written direction of the contracting office; (b) Perform all actions necessary to verify whether the supplies or services conform to contract quality requirements."  FAR 46.104.  Consistent with those principles, the FAR includes a warranty of services, under which "the Contractor

11

warrants that all services performed under this contract will, at the time of acceptance, be free from defects in workmanship and conform to the requirements of this contract.  The Contracting Officer shall give written notice of any defect" after receipt of which, "the contractor will correct . . . ."  FAR 52.246-20(b).

In rejecting individual audit requests, whether before or after initial approval, CMS was in essence issuing terminations for convenience, stopping ACLR from continuing a particular audit.  *See, e.g.*, *VHC, Inc. v. Peters*, 179 F.3d 1363, 1366 (Fed. Cir. 1999) (analyzing partial termination for convenience, where Government cancels part, but not all, of services to be provided under a contract).  The right to issue a termination for convenience is inherently part of a Government procurement, pursuant to *Christian*, and allows CMS's actions here.  Equally, under the FAR, IPERA, and the OMB guidance, CMS has authority over ACLR's performance of the contract services.  Those principles of Government oversight over contractors are also incorporated into the parties' contract pursuant to *Christian*.  Accordingly, ACLR's argument that it was entitled to proceed with audits of its choosing with no Government oversight is wrong as a matter of law.

In addition, the contract expressly provides for oversight.  In the PWS that ACLR wrote, ACLR acknowledged that it "anticipate[d] CMS revisions to [its] process."  Cross-Mot. at 9.  ACLR attempts to ignore this language, by asserting that this only applied to complex audits (also called "documentation audits"), as opposed to the PY 2007 duplicate payment audit, a "data audit."  Resp. at 8.  As we discuss above at 5, the duplicate payment audits that CMS approved ultimately were documentation audits.  Accordingly, had the PY 2007 duplicate payment audit proceeded, this language would have applied.  ACLR also attempts to distinguish the numerous other references to CMS oversight that ACLR included in the PWS, by arguing that each could

be construed as applying to a singular part of the process.  Resp. at 8-9.  In doing so, however, ACLR ignores that the combined effect of the multiple provisions is to show that the parties' intent was that CMS would have an active oversight of the process, as is evidenced through the language that ACLR wrote.

With regard to the PY 2010 duplicate payment audit under the SOW, ACLR concedes that CMS had authority to deny requests to audit, but contends that rejection of this audit nonetheless breached the contract.  ACLR incorrectly contends that once CMS gave authority to proceed it could not revoke that authority.  Resp. at 10.  ACLR does not point to any language in the SOW, however, that precludes revocation of authority to proceed.  In any event, such a principle would be at odds with the inherent power to terminate for convenience, would be at odds with the provisions of the FAR, and would be invalid for illegality.  *See generally Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed. Cir. 1988) (contract term in violation of regulation is illegal and unenforceable).

With regard to the PY 2012-13 sales tax audit, ACLR agrees that CMS could determine that the audit was not appropriate, but had to give ACLR a "walk-thru" of its position and opportunity to provide a revised audit to fix CMS's objections.  Resp. at 11-12.  These additional procedural steps are preliminary steps to the rejection that CMS gave based on Health Integrity's conclusions that adjusting for allowable state-imposed taxes effectively eliminated any recovery. *See* Mot. Ex. 22, A464 (listing "walk thru" in step 2, and "initial feedback" in step 3, both as preliminary to CMS's decision on "complete approval, conditional approval or denial," in step 5).  With CMS having determined that denial was appropriate on its face and immediately, ACLR cannot point to any harm from CMS's decision to avoid the procedures of steps 2 and 3, which were not necessary.  For that matter, ACLR does not identify how a "walk-thru" would

13

have allowed it to correct the fact that its proposal failed to account for Health Integrity's findings and there is none – the prior reviews of the issue had fully demonstrated to CMS that there was no value on pursuing this audit further.  Indeed, as is clear from the status of this litigation, CMS does not agree with ACLR's position that the issue had not already been explored and no further discussions between the parties would have altered that belief.

Finally, ACLR's interpretation that the contract gave CMS no oversight is an absurd reading that is contrary to basic principles of contract interpretation.  Contract interpretation should "'avoid absurd and whimsical results.'"  *Nw. Marine Iron Works v. United States*, 493 F.2d 652, 657 (Ct. Cl. 1974).  ACLR's interpretation is that it had *carte blanche* to undertake any audit.  If that were so, it could have proposed an illegal audit (one targeting payments for patients in a constitutionally protected class, for example) and CMS would have been powerless to stop it.  That cannot be correct.

## III.   Contractual Oversight Does Not Violate The Covenant Of Good Faith And Fair Dealing

ACLR's good faith and fair dealing claim fails because it seeks to grant ACLR a right to audit without oversight.  As we identified in our Cross-Motion, the covenant of good faith and fair dealing cannot "create duties inconsistent with the contract's provisions."  *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010) *cited in* Cross-Mot. at 58. Also, the covenant preserves the parties' "reasonable expectations" regarding the "fruits of the contract."  *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) *cited in* Cross-Mot. at 57.  As we demonstrate above at 10-14, the contract here vested CMS oversight over the audits, as it must have done to preserve the parties' expectations consistent with law.  There is no breach under those circumstances.

14

ACLR devotes a great part of its Response to arguing that CMS was incorrect in its conclusions that ACLR's audits were erroneous.  Resp. at 14-36.  It does not, however, provide any evidence that CMS did not in fact reach those conclusions or reached them in bad faith.  To the contrary, with regard to the PY 2007 duplicate payment audit, ACLR acknowledges that it "did not inform CMS which PDE records it thought were duplicates," and only argues that it was not legally obligated to do so.  Resp. at 16.  Regardless of its legal right to keep CMS in the dark about audits, the fact that ACLR did so led to CMS's good faith concern about the audit ACLR sought to conduct.  Similarly, ACLR does not deny that it "understood that it would not be performing under the terms of the PWS while the SOW was being drafted and finalized," but instead, asserts that it was forced into doing so for fear of losing the contract entirely.  Resp. at 16-17.  Again, ultimately, that does not challenge CMS's understanding.

With regard to the PY 2010 duplicate payment audit, ACLR admits that its methodology "did not incorporate the revised protocol requested by CMS," arguing that there was no contractual language requiring it to do so and, alternatively, that it could only follow the initially approved methodology.  Resp. at 20-21, 22.  Again, that ACLR believes it could act with impunity in its audits does not change CMS's perception that ACLR was refusing to take the steps necessary to remove false positives from its methodology.  ACLR also does not deny that CMS received information from Express Scripts regarding the enormous burden that ACLR was seeking to impose.  Resp. at 21.  Instead, it contends that, in its view, "CMS is legally obligated to recoup overpayments," regardless of the expense, and that obligation outweighed the burden Express Scripts identified.  Resp. at 22.  ACLR does not deny, however, that OMB guidance listed expense as a criteria for CMS to consider before pursuing any audit, SA202, nor does it deny that CMS received the information on expense that ACLR states CMS should have ignored.

15

With regard to the sales tax audit, ACLR argues that its view that there were overpayments here should outweigh the long-term and consistent result of prior analyses that there were not. Resp. at 23-34. As we established in the Cross-Motion, Health Integrity, the NBI MEDIC, had looked at years of the same alleged improper sales tax payments that ACLR proposed to look at, and had determined that the review did not support the conclusion that these were in fact improper sales tax payments. Cross-Mot. at 62-67. ACLR devotes a great deal of effort to proving its contention that those conclusions were incorrect, based on purported legal analysis and close definition of terms. Resp. at 26-36. The fundamental point with regard to good faith and fair dealing, however, is that CMS had a legitimate basis to inform ACLR that the issue had already been reviewed and that there was no legitimate basis for an audit. Moreover, as demonstrated, the contract placed the responsibility for such a determination with CMS. Accordingly, when CMS acted, it did not violate the covenant. Rather, CMS acted consistent with the contract's terms, ACLR's expectations, and the law.

**IV.    ACLR's Calculation Of Damages Is Impermissibly Speculative**

ACLR's attempt to distinguish cases disallowing speculative damages because those cases are concerned with an attempt to predict "future" events, Resp. at 35, ignores that its claim is premised on speculative, future events occurring in the way it predicts. ACLR seeks to recover damages on the presumptions that, had CMS allowed the audits to go forward (1) the documents it received in response to its audit letters would not have caused it to reduce the scope of the claimed overpayments, (2) the plan sponsors would not have introduced explanations that would have caused it to reduce the scope of its audit, (3) the "political ramifications" that it admits would have prevented it from recovering 100% of what it sought would not have occurred, (4) the plan sponsors would not have appealed, (5) the plan sponsors would have had

16

the funds to repay the alleged overpayments, and (6) that CMS, Government watchdogs, and the public would have consented in ACLR's gross overstatement of its contingency fee. Each of these future, uncertain events would have to go entirely in ACLR's favor for it to recover the amounts it seeks to recover in damages here. Moreover, there could have been other, unexpected events that intervened to further reduce any recovery. The extraordinarily low probability of so many contingent events occurring as ACLR hoped is illustrated by the fact that ACLR did not recover 100% of its estimates on the audits it actually conducted.[3]

ACLR's wrongheaded calculation of recovery on the sales tax audit illustrates this point. ACLR claims that it can calculate its contingency fee based on the entirety of a payment that included both a correct payment and an overpayment. As we demonstrated in our brief, ACLR's contract interpretation not only defies the OMB guidance, but defies basic logic. Cross-Mot. at 70-72. The net effect of ACLR's position is an absurdity under which the use of the Part D auditor to save taxpayer funds leads to the taxpayer paying *more* for Part D prescription benefits, not less. "Construction of the terms of a contract, like construction of a statute, should 'avoid absurd and whimsical results.'" *Nw. Marine*, 493 F.2d 652, 657 (Ct. Cl. 1974) (quotation omitted). That ACLR bases its damages on everyone else accepting its absurd construction further makes that recovery speculative.

ACLR's ultimate admission that it bases its recovery on "estimates" and that it did not in fact expect to recover 100% of those estimates further demonstrates the speculative nature of ACLR's claim. Resp. at 38 ("A NAIRP by its very definition is an 'estimate.'"); *id.* at 39

---

[3] As we note above at 3, ACLR contends that its range of recovery should have been 79-99%, rather than 22-99%. ACLR's actual recoveries were in fact as low as 22% of its estimates, but, at either set of numbers, the fact of a range of recovery shows that ACLR's predictions did not mirror its recoveries in fact.

(ACLR "did not anticipate 100 percent recovery . . . ."); *id.* at 39 (ACLR's "experience was that CMS would change ACLR's methodology so less money would be recovered."); *id.* at 41 (admitting that appeals process would impact recovery, but asserting impact would be "minimal.").  Although damages "need not be 'ascertainable with absolute exactness or mathematical precision[,]' recovery for speculative damages is precluded.'"  *Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005); *see also Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 833 (Fed. Cir. 2010) ("reasonable certainty requires more than a guess.").  Where ACLR makes no attempt to account for the facts that it would not have recovered 100% of its estimates, its damages are rank speculation.

ACLR misplaces reliance on *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) to support its claim.  Resp. at 37.  In *Bigelow* defendants had conspired to obtain films for their group of associated movie theaters in advance of the dates on which the films were made available to plaintiffs' independent theaters.  *Id.* at 254.  The issue before the Court was whether plaintiffs' lost profits were speculative.  *Id.*  To prove their lost profits, plaintiffs compared the revenues of one of their theaters and one of defendant's theaters, each of similar size and locale, for a five year period during which the illegal activities had occurred and compared the same plaintiff's theater's revenues for a period before the conspiracy occurred to the period during the conspiracy.  *Id.* at 257-58.  Defendants argued that "it is impossible to establish any measure of damage, because the unlawful system which [they] have created has precluded petitioners from showing that other conditions affecting profits would have continued without change unfavorable to them during the critical period if that system had not been established . . . ."  *Id.* at 260-61.

The Court rejected defendants' argument, under those facts.  Specifically, the Court held that where plaintiffs had put forward a reasonable basis to measure damages, defendants could not complain that it was impossible to know what plaintiffs' profits would have been had defendants not acted illegally.  *Id.* at 264 ("Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.").  At the same time, the Court confirmed the principle that "even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork."  *Id.*

We do not contend in this case that ACLR's damages are impermissibly speculative simply because it did not in fact run the audits.  To the contrary, we contend that ACLR's damages are impermissibly speculative because the evidence shows that it did not recover 100% of its audit estimates on the audits it did run.  For ACLR to state damages with the necessary level of precision, it must make *some* accounting in which it accounts for the relative improbabilities of the various future events it depends upon occurring as it guesses they will.  Instead, however, ACLR asserts that it absolutely would have recovered 100% of its estimates.  Thus, unlike the *Bigelow* plaintiffs, ACLR does not put forward a reasonable basis to estimate its actual recoveries in the absence of CMS's actions.  Where the facts are entirely against the basis that ACLR puts forth (that it would have recovered 100% of estimates), ACLR cannot recover.

## V.    ACLR Cannot Claim Damages Beyond That Which The Contract Allows

ACLR ignores the contract language to which it agreed when arguing that it is "proper and equitable" for ACLR to recover amounts contrary to the parties' agreement.  Resp. at 6.  This Court is not a court of equity, but one of law.  *See, e.g.*, *Logan Canyon Cattle Assoc. v. United States*, 34 Fed. Cl. 165, 168 (1995) ("This court, however, does not have general equitable jurisdiction in matters of contracts.") (citing *Nicholson v. United States,* 29 Fed. Cl.

19

180, 185 (1993) (citing *United States v. Testan,* 424 U.S. 392, 397–98 (1976); *United States v. King,* 395 U.S. 1, 3 (1969))).  ACLR's attempted reliance on equity to achieve a recovery that it cannot obtain as a matter of law illustrates the fundamental flaw in its argument.

ACLR agreed that it has no recovery if CMS did not recover funds.  Cross-Mot. at 51-53. Had ACLR wanted, it could have sought a contract under which it was paid hourly for its work. Instead, in pursuit of achieving an island retirement for its founder, Cross-Mot. fact no. 310, ACLR undertook a contingency fee contract, under which it would only recover if CMS actually recovered overpayments.  That is the agreement into which ACLR entered and to which ACLR must adhere.

"The Supreme Court has interpreted [the Tucker Act's] language to mean that a plaintiff who seeks redress in the Court of Federal Claims must present a claim for 'actual, presently due money damages from the United States.'"  *Massie v. United States*, 226 F.3d 1318, 1321 (Fed. Cir. 2000) (citations omitted).  There are no funds presently due to ACLR under the parties' contract, and ACLR has no claim.

To avoid that result, ACLR argues that it not seeking to enforce the payment provisions of the contract, but only to recover damages as though its proposed audits had gone forward. Resp. at 4-6.  In essence, what ACLR presents is a claim for specific performance coupled to an award of the damages it hopes it would have if specific performance occurred and CMS pursued the audits, recovered the funds, and then refused to pay ACLR's contingency fee.  Indeed, ACLR specifically argues that the Medicare Integrity Program statute requires that CMS go ahead with the audits, as support for its proposition that it can force the audits to occur.  Resp. at 4.  No part of this argument assists ACLR.  Because jurisdiction in this Court (outside of bid protests) is premised on a claim for "presently due" monies, there is no jurisdiction here to order specific

20

performance.  *Massie*, 226 F.3d at 1321.  The only claim ACLR can properly presents is for breach of contract and its only measure of damages is the amount of money that it is presently due.

Similarly, ACLR provides no response to our point that its claim for $2.6 million in damages relating to its operating costs and expected profits is not a permissible measure of recovery under the contract.  Cross-Mot. at 30-31.  The contract does not allow for recovery of these amounts.  Unless the Court concludes that ACLR had the absolute right to proceed with unjustifiable audits and, therefore, that CMS terminated ACLR's performance for convenience (in which case ACLR could be entitled to some reasonable amount for the costs of the work done), the only funds described in the contract are the contingent fee from CMS's actual recovery.

ACLR has no claim for funds presently due because CMS has not recovered any funds for which there are unpaid contingency fees.  The parties' contract precludes the result that ACLR seeks here.

## **CONCLUSION**

For all of these reasons and those set forth more fully in our Cross-Motion, the Government respectfully requests summary judgment in its favor on all counts of the complaints in Nos. 15-767C and 16-309C.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:

LUCY MAC GABHANN
Attorney
Department of Health and Human Services
Office of the General Counsel
General Law Division
Procurement, Fiscal and Information Law
Branch
7500 Security Boulevard
Baltimore, MD  21244-1850

August 3, 2018

s/ Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Deputy Director

s/ Adam E. Lyons
ADAM E. LYONS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC  20044
Tel:  (202) 353-2345
Fax: (202) 307-0972
adam.e.lyons@usdoj.gov

Attorneys for Defendant