# IN THE UNITED STATES COURT
# OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **ACLR, LLC** | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **Civil Action No. 15-767 and 16-309** |
| | ) | (Judge Campbell-Smith) |
| **THE UNITED STATES** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

PLAINTIFF ACLR, LLC'S SUR-REPLY BRIEF IN RESPONSE TO DEFENDANT'S
<u>REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................iv

INTRODUCTION...........................................................................................................1

ANALYSIS......................................................................................................................1

    I.   Whether the *Christian* doctrine has applicability to the contract at issue in this dispute, either to supplement the terms of the Performance Work Statement, or the Statement of Work. *See* ECF No. 61 at 8 (citing *G. L. Christian & Assocs. v. United States*, 320 F.2d 345, 355 (Ct. Cl. 1963))…...................................................................................................1

    II.  Whether government oversight of contractual performance is a deeply ingrained procurement policy and inherent in the contract at issue here........................................................................................................5

    III. Whether FAR 46.102, FAR 46.104, and FAR 52.246-20(b) have been incorporated into the subject contract through the *Christian* doctrine or other means. *See id.* at 15-16.........................................................................6

    IV. Whether any partial terminations for convenience occurred regarding the audits at issue in the parties' cross-motions. *See id.* at 16 (citing *VHC, Inc. v. Peters*, 179 F.3d 1363, 1366 (Fed. Cir. 1999))..............................................................................................................9

    V. Whether the supremacy of procurement regulations over illegal contract terms has applicability to this contract. *See id*. at 17 (citing *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed. Cir. 1988))....................................11

    VI.  Whether plaintiff seeks equitable relief that is outside the jurisdiction of this court. *See id*. at 23-24 (citing, among other cases, *United States v. Testan*, 424 U.S. 392, 397-98 (1976))..........................................................................13

    VII. Whether plaintiff may obtain damages in this suit other than actual, presently due money damages. *See id*. at 24-25 (citing *Massie v. United States*, 226 F.3d 1318, 1321 (Fed. Cir. 2000))...............................................14

    VIII. Finally, although this may not be an entirely new issue, the government has hypothesized that the 2007 audit would necessary have become a documentation audit, not a data audit, if it had proceeded. *See id.* at 9. Plaintiff shall first explain how the distinction between data and documentation audits would apply to all of the contested audits here,and then address whether the government's hypothesis as to the 2007 audit is correct...........................................................................................................17

**PY 2007 Duplicate Payment Audit**...........................................................19

**PY 2010 Duplicate Payment Audit**........................................................21

**PY 2012-2013 Sales Tax NAIRP**...........................................................22

**Hypothesis Application**...........................................................................23

CONCLUSION..............................................................................................26

APPENDIX ........................................................................(A1007- A1018)

# **TABLE OF AUTHORITIES**

Page(s)

Cases

*American Savings Bank, F.A. v. U.S.*,
  98 Fed. Cl. 291 (2011) ...................................................................................16
*Beta Sys., Inc. v. United States*,
  838 F.2d 1179 (Fed. Cir. 1988) ..............................................................11, 13
*BTR Enterprises of SC, LLC v. United States*,
  2018 WL 4102586 (Fed. Cl. August 29, 2018) ...........................................16, 17
*Energy Capital Corp. v. United States*,
  302 F.3d 1314 (Fed. Cir. 2002) ....................................................................16
*G. L. Christian & Assocs. v. United States*,
  312 F.2d 418 (Ct. Cl. 1963) ...........................................................................1
*G. L. Christian & Assocs. v. United States*,
  320 F.2d 345 (Ct. Cl. 1963) ...........................................................................1
*General Eng'g & Mach. Works v. O'Keefe*,
  991 F.2d 775 (Fed. Cir. 1993) ................................................................2, 5, 6
*Griffin & Griffin Exploration, LLC v. United States*,
  116 Fed. Cl. 163 (2014) ................................................................................17
*Gulf Group General Enterprises Co. W.L.L. v. United States*,
  114 Fed. Cl. 258 (2013) ................................................................................14
*Horn & Associates, Inc. v. United States*,
  140 Fed. Cl. 142 (2017) ................................................................................15
*K-Con, Inc. v. Secretary of the Army*,
  908 F.3d 719 (Fed. Cir. 2018) ........................................................................3
*Lee v. United States*,
  130 Fed. Cl. 243 (2017) ..................................................................................2
*Lua v. United States*,
  123 Fed. Cl. 269 (2015) ..................................................................................4
*Massie v. United States*,
  226 F.3d 1318 (Fed. Cir. 2000) ................................................................14, 15
*Millgard Corp. v. E.E. Cruz/Nab/Fronier-Kemper*,
  2003 WL 22801519 (S.D.N.Y. Nov. 24, 2003)..................................................4
*Night Vision Corp. v. United States*,
  68 Fed. Cl. 368 (2005) ....................................................................................8
*Precision Pine & Timber, Inc. v. United States*,
  72 Fed. Cl. 460 (2006) ..................................................................................16
*RMA Eng'g S.A.R.L. v. United States*,
  140 Fed. Cl. 191 (2018) ..................................................................................6
*Sonoma Apartment Associates v. United States*,
  134 Fed. Cl. 90 (2017) ..................................................................................16
*State of Minnesota v. Larson*,
  605 N.W.2d 706 (2000) ................................................................................23

iv

*Stockton E. Water Dist. v. United States*,
  70 Fed. Cl. 515 (2006) ..................................................................4
*Tigerswan v. United States*,
  118 Fed. Cl. 447 (2014) ................................................................5
*United States v. Testan*,
  424 U.S. 392 (1976).................................................................13, 14
*Van Engers v. Perini Corp.*,
  1993 WL 235911 (E.D. Pa. June 28, 1993) .................................4
*VHC, Inc. v. Peters*,
  179 F.3d 1363 (Fed. Cir. 1999) .................................................9, 10
*Walsh Constr. Co. v. United States*,
  2018 WL 4770781 (Fed. Cl. Oct. 3, 2018) .................................5, 6

Statutes

28 U.S.C. § 1491(a)(1) (1994) .......................................................15
41 U.S.C. 3307 ...............................................................................7
42 U.S.C. § 1395ddd(h)(4) ............................................................13

Rules

Court of Federal Claims Rule 8(c)(1) ............................................4

Regulations

42 C.F.R. §423.505(h)(2) ...............................................................19
42 C.F.R. § 423.505(k)(3) ..............................................................19
45 C.F.R. § 162.1102 .....................................................................19
48 C.F.R. § 2.101 ...........................................................................2
48 C.F.R. § 46.407 .........................................................................8
48 C.F.R. § 46.407(b) .....................................................................8
48 C.F.R. § 49.101(a) .....................................................................10
48 C.F.R. § 49.101(d) .....................................................................10
48 C.F.R. §§ 52.249-1 ....................................................................3
FAR 46.000 ....................................................................................7
FAR 46.102 ..................................................................................6, 8
FAR 46.102(e) ...............................................................................8
FAR 46.104 ..................................................................................6, 7
FAR 49.102 ....................................................................................10
FAR 52.246-20 ...............................................................................8
FAR 52.246-20(b) ........................................................................6, 9
FAR 52.249-2 .................................................................................10
FAR 46.710(d) ...............................................................................8

## INTRODUCTION

In response to this Court's November 1, 2018 Order, Plaintiff ACLR, LLC ("ACLR") addresses the eight topics identified in the Order that were first raised in Defendant's Reply in Support of its Cross-Motion for Summary Judgement ("Reply Brief").

## ANALYSIS

    I.    Whether the *Christian* doctrine has applicability to the contract at issue in this dispute, either to supplement the terms of the Performance Work Statement, or the Statement of Work. *See* ECF No. 61 at 8 (citing *G. L. Christian & Assocs. v. United States*, 320 F.2d 345, 355 (Ct. Cl. 1963)).

The *Christian* doctrine does not have applicability to this dispute to supplement the terms of the Performance Work Statement ("PWS") or the Statements of Work ("SOWs"). The *Christian* doctrine stands for the proposition that a court may incorporate into a federal government contract by operation of law certain clauses required by statute or regulation. *G. L. Christian & Assocs. v. United States*, 312 F.2d 418 (Ct. Cl. 1963).[1]  In *Christian*, the Court analyzed whether a termination for convenience clause could be read into a contract that did not initially incorporate such a clause.  The *Christian* court concluded that although a specific clause may not be included in the contract at issue, if a particular regulation provides for the ability to terminate for convenience *and* the contract is covered by said regulation, then the applicable termination for convenience clause can be read into the contract.  *Id.* at 427.  The Court incorporated into the contract the termination clause contained in Armed Services Procurement Regulation section 8.703.  *Id.* at 424.

---

[1] In the subsequent opinion of *G. L. Christian & Assocs. v. United States*, 320 F.2d 345 (Ct. Cl. 1963), the Court of Claims denied G.L. Christian and Associates' motion for rehearing and reargument, including arguments that the section of the ASPR that formed the basis for including the termination for convenience section did not have the "force of law."  *Id.* at 347

The court in *General Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775 (Fed. Cir. 1993) set out guidelines for when to read omitted clauses into government contracts:

> Thus, under the Christian Doctrine a court may insert a clause into a government contract by operation of law if that clause is required under applicable federal administrative regulations. However, the Christian Doctrine does not permit the automatic incorporation of every required contract clause.
> ....
> Accordingly, the Christian Doctrine applies to mandatory contract clauses which express a significant or deeply ingrained strand of public procurement policy.

*Id.* at 779 (citations omitted).

Here, the *Christian* doctrine should not be a vehicle to alter or change the terms of the PWS or the SOWs. At most, the *Christian* doctrine could insert certain clauses into the Part D RAC Contract but not alter the manner in which the work and services were to be performed as such were specifically described in the PWS and SOWs. *See Lee v. United States*, 130 Fed. Cl. 243, 258 (2017), *aff'd sub nom. Seh Ahn Lee v. United States*, 895 F.3d 1363 (Fed. Cir. 2018) (Reformation of the parties' contract is improper under the *Christian* doctrine.). Initially, the parties had a PWS that governed ACLR's efforts. A Performance Work Statement is defined in the Federal Acquisition Regulations ("FAR") as "a statement of work for performance-based acquisitions that describes the required results in clear, specific and objective terms with measurable outcomes." 48 C.F.R. § 2.101. The PWS should not be viewed as a portion of the Part D RAC Contract that can be modified or revised based upon the *Christian* doctrine.

In its Reply Brief, CMS, for the first time, makes the assertion that it had a right to terminate for convenience and that "[i]n rejecting individual audits requests . . . CMS was in essence issuing terminations for convenience." ECF No. 61 at 8 and 16.[2] There was no contractual right to terminate for convenience under the Part D RAC Contract and there is

---

[2] References to page numbers on ECF documents are to the ECF pagination.

no such termination for convenience clause in the controlling regulation that can be incorporated into the Part D RAC Contract under the *Christian* doctrine.

"For a court to incorporate a clause into a contract under the *Christian* doctrine, it generally must find (1) that the clause is mandatory; and (2) that it expresses a significant or deeply ingrained strand of public procurement policy." *K-Con, Inc. v. Secretary of the Army*, 908 F.3d 719, 724 (Fed. Cir. 2018). Here, CMS has failed to address the first part of the *Christian* doctrine test by not identifying any applicable termination for convenience clause and failing to identify which regulation would prescribe that any such clause have the full effect of federal law. Without identifying the regulation which covers the Part D RAC Contract and specifically pointing to said regulation's termination for convenience clause that would apply to a recovery audit contract, there is no way to justify why any particular termination for convenience clause should be incorporated into the Part D RAC Contract.

While the Part D RAC Contract incorporated certain FAR clauses,[3] a termination for convenience clause was likely not incorporated into the Part D RAC Contract because of the unique contingency fee structure of the contract. FAR Part 49 prescribes seven termination for convenience clauses. *See* 48 C.F.R. §§ 52.249-1 – 52.249.7. Those FAR termination for convenience clauses apply to specific types of contracts such as fixed-price contracts. *See id.* There is no applicable FAR termination for convenience clause for a fixed fee contingency fee contract such as the Part D RAC Contract. Given the unique nature of the Part D RAC Contract, no FAR termination for convenience clause was included in the Part D RAC Contract and no such clause can be incorporated into the Part D RAC Contract under the *Christian* doctrine. Because the *Christian* doctrine does not apply to the RAC Contract, ACLR's breach of contract and breach of duty of good faith

---

[3] App. at Ex. 7, Part D RAC Contract, A160-161 and A164.

and fair dealing claims must be evaluated based upon the express terms of the Part D RAC Contract, including the PWS and SOWs.

Even if some termination for convenience right applied to the Part D RAC Contract, CMS's defense has been waived. A termination for convenience defense would be an affirmative defense. *See Van Engers v. Perini Corp.*, No. CIV. A. 92-1982, 1993 WL 235911, at *10 (E.D. Pa. June 28, 1993); *Millgard Corp. v. E.E. Cruz/Nab/Fronier-Kemper*, No. 99 CIV.2952 LBS, 2003 WL 22801519, at *5 (S.D.N.Y. Nov. 24, 2003) (analyzing affirmative defense of termination for convenience). "An affirmative defense is an assertion raising new facts and arguments that, if proven, defeat the plaintiff's claim even if the allegations in her complaint are true." *Lua v. United States*, 123 Fed. Cl. 269, 275 (2015), *aff'd,* 843 F.3d 950 (Fed. Cir. 2016) (citations omitted).

United States Court of Federal Claims Rule 8(c)(1) provides that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." "The general rule is that affirmative defenses are waived when not pleaded in the answer." *Stockton E. Water Dist. v. United States*, 70 Fed. Cl. 515, 528 (2006). Here, CMS never raised the affirmative defense of termination for convenience in its Answers. ECF No. 8, Defendant's Answer; Case No. 16-309, ECF No. 8, Defendant's Answer. During discovery, CMS never raised the affirmative defense of termination for convenience. App. at Ex. 73, Interrogatory Responses, A757-758; App. at Ex. 146, excerpts from CMS 30(b)(6) Deposition in ACLR II, A820-822.

If CMS had raised the affirmative defense of termination for convenience prior to the close of discovery, ACLR could have specifically sought evidence that would have directly undermined the defense such as evidence that CMS did not intend to have a termination for convenience right in the Part D RAC Contract due to the unique nature and timing of the consideration due to ACLR.[4] Because ACLR had no notice of CMS's

---

[4] While ACLR did not seek evidence directed at the issue of whether there was a termination for convenience, the evidence supports a finding that a termination for convenience did not occur. *See infra* at 10-12.

termination for convenience affirmative defense prior to CMS raising the defense it in its Reply Brief, ACLR has been unfairly prejudiced.  If the Part D RAC Contract or any portion of it had been terminated for convenience, ACLR should have had an opportunity to challenge that termination and seek damages.  *See Tigerswan v. United States*, 118 Fed. Cl. 447, 454-55 (2014) ("At trial, the court will have to determine whether the government's decision to terminate TSI because TSI could not provide the services was rational based on the objective evidence that was available to the CO at the time.").  CMS's termination for convenience affirmative defense should be deemed to have been waived.

II.    Whether government oversight of contractual performance is a deeply ingrained procurement policy and inherent in the contract at issue here.  *See id.* at 15 (citing *Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993)).

Government oversight of contractual performance is not a deeply ingrained procurement policy that is inherent in the Part D RAC Contract.  CMS makes numerous references in its Reply Brief to the nebulous concept of "Government oversight" in an attempt to justify its actions.  ECF No. 61 at 14-16.  However, CMS provides no legal support for a broad general right that gave CMS oversight over ACLR that would justify CMS deviating from the express terms of the PWS or SOWs or legally insulate CMS from ACLR's claims of CMS's breach of its duty of good faith and fair dealing.  Any right to "government oversight" beyond oversight of the contracting process cannot be used to contradict the express terms of the Part D RAC Contract, including the PWS and SOWs. Moreover, CMS was not in a position to provide "oversight" outside the scope of the Part D RAC Contract as the Part D RAC Contract was a new unique contract for CMS.  ACLR was the first Part D recovery audit contractor and the Part D RAC Contract was the first Part D recovery audit contract.

Even if there was a "Government oversight" right, CMS's actions still breached the Part D RAC Contract and violated the duty of good faith and fair dealing.  *See Walsh*

5

*Constr. Co. v. United States*, No. 16-845 C, 2018 WL 4770781, at *19 (Fed. Cl. Oct. 3, 2018) (a "lack of diligence" or "subterfuges and evasions" may violate the implied duty of good faith and fair dealing"); *RMA Eng'g S.A.R.L. v. United States*, 140 Fed. Cl. 191, 221 (2018) ("the scope of the duty of good faith and fair dealing does not necessarily require a breach of the underlying contract"). The Part D RAC Contract set forth the recovery audit process and CMS failed to comply with that process.  If CMS is allowed to rely upon an undefined "Government oversight" theory to justify its actions in this case, such a theory would eviscerate claims of breach of good faith and fair dealing.

To the extent CMS relies on the *Christian* doctrine and *Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993) for the proposition that CMS has broad and undefined legally imposed oversight power in connection with the Part D RAC Contract, CMS's reliance is misplaced.  As discussed above, the *Christian* doctrine, at most, allows certain specific clauses to be included in a government contract in certain situations. Specifically, "the Christian Doctrine applies to mandatory contract clauses which express a significant or deeply ingrained strand of public procurement policy."  *Gen. Eng'g & Mach. Works*, 991 F.2d at 779.  In connection with its argument, CMS does not identify any particular government oversight clause that it contends is a mandatory contract clause and that expresses a deeply ingrained strand of public procurement policy.

III. Whether FAR 46.102, FAR 46.104, and FAR 52.246-20(b) have been incorporated into the subject contract through the *Christian* doctrine or other means. *See id.* at 15-16.

FAR 46.102, FAR 46.104, and FAR 52.246-20(b) have not been incorporated into the Part D RAC Contract through the *Christian* doctrine or any other means.  FAR 46.102[5]

---

[5] 48 C.F.R. § 46.102 reads as follows:  "Agencies shall ensure that—
(a) Contracts include inspection and other quality requirements, including warranty clauses when appropriate, that are determined necessary to protect the Government's interest.
(b) Supplies or services tendered by contractors meet contract requirements;

titled "Policy" and FAR 46.104[6] titled "Contract Administrative Office Responsibilities" are not *mandatory clauses*, rather, they're simply *policies* and *procedures* that pertain to Government contracts.  FAR 46.000 describes the scope of FAR Part 46 as follows: "This part prescribes policies and procedures to ensure that supplies and services acquired under Government contract conform to the contract's quality and quantity requirements. Included are inspection, acceptance, warranty, and other measures associated with quality requirements."  FAR 46.000.  A FAR *provision* is never incorporated into a government contract.  CMS fails to cite to any authority in which any provisions from FAR Part 46 were incorporated into a government contract under the *Christian* doctrine.  This is probably because only FAR *clauses* are included in government contracts.  FAR provisions often direct agencies as to which FAR clause from FAR Part 52 must or may be included

_____

(c) Government contract quality assurance is conducted before acceptance (except as otherwise provided in this part), by or under the direction of Government personnel;
(d) No contract precludes the Government from performing inspection;
(e) Nonconforming supplies or services are rejected, except as otherwise provided in 46.407;
(f) Contracts for commercial items shall rely on a contractor's existing quality assurance system as a substitute for compliance with Government inspection and testing before tender for acceptance unless customary market practices for the commercial item being acquired permit in-process inspection (41 U.S.C. 3307). Any in-process inspection by the Government shall be conducted in a manner consistent with commercial practice; and
(g) The quality assurance and acceptance services of other agencies are used when this will be effective, economical, or otherwise in the Government's interest (see subpart 42.1.)."

[6] 48 C.F.R. § 46.104 reads as follows:  When a contract is assigned for administration to the contract administration office cognizant of the contractor's plant, that office, unless specified otherwise, shall—
(a) Develop and apply efficient procedures for performing Government contract quality assurance actions under the contract in accordance with the written direction of the contracting office:
(b) Perform all actions necessary to verify whether the supplies or services conform to contract quality requirements;
(c) Maintain, as part of the performance records of the contract, suitable records reflecting—
(1) The nature of Government contract quality assurance actions, including, when appropriate, the number of observations made and the number and type of defects; and
(2) Decisions regarding the acceptability of the products, the processes, and the requirements, as well as action to correct defects.
(d) Implement any specific written instructions from the contracting office;
(e) Report to the contracting office any defects observed in design or technical requirements, including contract quality requirements; and
(f) Recommend any changes necessary to the contract, specifications, instructions, or other requirements that will provide more effective operations or eliminate unnecessary costs (see 46.103(c)).

in a contract.  Since FAR 46.102 and 46.104 are general provisions and procedures as opposed to mandatory contract clauses, they cannot be incorporated into the Part D RAC Contract under the *Christian* doctrine or any other means.  *See Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 384 n.9 (2005) (rejecting the incorporation of Small Business Innovation Research program statute into a government contract under the *Christian* doctrine where the statute "offers nothing to incorporate" as it "is not a contract clause at all" and "merely directs the Administrator to establish certain *procedures*").

Even if these FAR provisions were incorporated into the Part D RAC Contract, there is no evidence that CMS complied with these provisions.  For example, FAR 46.102(e) incorporates 48 C.F.R. § 46.407 which provides "(b) The contracting officer ordinarily must give the contractor an opportunity to correct or replace nonconforming supplies or services when this can be accomplished within the required delivery schedule." 48 C.F.R. § 46.407(b).  ACLR was never given an opportunity to correct any alleged nonconforming services.

FAR 52.246-20[7] is titled "Warranty of Services.  The clause begins: "As prescribed in 46.710(d), insert a clause substantially as follows: …."  FAR 46.710(d) reads as follows:

---

[7] 48 C.F.R. § 52.246-20 reads as follows:  "As prescribed in 46.710(d), insert a clause substantially as follows:

Warranty of Services (MAY 2001)
(a) Definitions. Acceptance, as used in this clause, means the act of an authorized representative of the Government by which the Government assumes for itself, or as an agent of another, ownership of existing and identified supplies, or approves specific services, as partial or complete performance of the contract.
(b) Notwithstanding inspection and acceptance by the Government or any provision concerning the conclusiveness thereof, the Contractor warrants that all services performed under this contract will, at the time of acceptance, be free from defects in workmanship and conform to the requirements of this contract. The Contracting Officer shall give written notice of any defect or nonconformance to the Contractor _____ [Contracting Officer shall insert the specific period of time in which notice shall be given to the Contractor; e.g., within 30 days from the date of acceptance by the Government,; within 1000 hours of use by the Government,; or other specified event whose occurrence will terminate the period of notice, or combination of any applicable events or period of time]. This notice shall state either (1) that the Contractor shall correct or reperform any defective or nonconforming services, or (2) that the Government does not require correction or reperformance.
(c) If the Contractor is required to correct or reperform, it shall be at no cost to the Government, and any services corrected or reperformed by the Contractor shall be subject to this clause to the same extent as work

"(d) The contracting officer *may* insert a clause substantially the same as the clause at 52.246-20, Warranty of Services, in solicitations and contracts for services when a fixed-price contract for services is contemplated *and the use of a warranty clause has been approved under agency procedures*; unless a clause substantially the same as the clause at 52.246-19, Warranty of Systems and Equipment under Performance Specifications or Design Criteria, has been used." 48 C.F.R. § 46.710(d) (emphasis added).

In terms of whether FAR 52.246-20(b) should be incorporated into the Part D RAC Contract under the *Christian* doctrine, it's important to note that the clause states that the contracting officer "may" insert this clause in a fixed price contract. To that end, the *Christian* doctrine does not require the incorporation of clauses that are permissive clauses as opposed to mandatory clauses. Not only is the clause a permissive clause rather than a mandatory clause, the clause only applies if the "use of a warranty clause has been approved under agency procedures." CMS provides no facts and makes no argument that the use of a warranty clause has been approved under its agency procedures. In sum, FAR 52.246-20(b) has not been incorporated into the Part D RAC Contract under the *Christian* doctrine or by any other means because it is not mandatory and CMS offers no evidence that it was approved under agency procedures.

IV. Whether any partial terminations for convenience occurred regarding the audits at issue in the parties' cross-motions. *See id.* at 16 (citing *VHC, Inc. v. Peters*, 179 F.3d 1363, 1366 (Fed. Cir. 1999)).

In its Reply Brief, CMS asserts that "in rejecting individual audit requests, whether

---

initially performed. If the Contractor fails or refuses to correct or reperform, the Contracting Officer may, by contract or otherwise, correct or replace with similar services and charge to the Contractor the cost occasioned to the Government thereby, or make an equitable adjustment in the contract price.
(d) If the Government does not require correction or reperformance, the Contracting Officer shall make an equitable adjustment in the contract price.

(End of clause)."

before or after initial approval, CMS was in essence issuing terminations for convenience, stopping ACLR from continuing a particular audit."[8]  ECF No. 61 at 16.  No partial terminations for convenience occurred regarding PY 2007 and 2010 duplicate payment audit or the PY 2012-2013 sales tax NAIRP.  It is the termination clauses or other contract clauses that authorize contracting officers to terminate contracts for convenience.  48 C.F.R. § 49.101(a).  As discussed earlier, there was no termination for convenience clause in the Part D RAC Contract nor was any incorporated under the *Christian* doctrine.  *See supra* at 1-3.[9]  The FAR sets forth a specific process that the Government must follow when terminating a contract for convenience.  The procedure for a termination for convenience that are detailed in FAR 52.249-1 – 52.249-7 are set forth in FAR 49.102.  The notice of termination provision that governs the termination of contracts for the government's convenience provides as follows:  "The contracting officer shall terminate contracts for convenience . . . only by a written notice to the contractor . . . .  The notice shall state – (1) That the contract is being terminated for the convenience of the Government under the contract clause authorizing termination; (2) The effective date of termination; (3) The extent of termination; . . . ."  48 C.F.R. § 49.102.  CMS never provided ACLR with written notice of termination for convenience.  Moreover, if there was a termination for convenience, a termination contracting officer is to negotiate a settlement with the contractor.  48 C.F.R. § 49.101(d).  No contracting officer ever issued a notice of termination or sought to negotiate a settlement based upon a termination for convenience with ACLR throughout the entire time period that the Part D RAC Contract was in

---

[8] CMS cites to *VHC Inc. v. Peters*, 179 F.3d 1363 (Fed. Cir. 1999) in connection with its argument, but *VHC Inc.* involved a partial termination for convenience based upon the contract at issue containing FAR 52.249-2 that allowed for partial termination for convenience.  *VHC Inc.*, 179 F.3d at 1365-66.  *VHC Inc.* has no applicability to the facts before the Court.

[9]  References to page numbers in this document are to the original pagination rather than ECF pagination.

existence or thereafter.

CMS also expressly denied that there was a termination for convenience in connection with the PY 2010 duplicate payment audit.   When CMS's corporate representative was asked in deposition why a technical direction letter was issued in connection with the PY 2010 duplicate payment audit rather than the issuance of a termination for convenience notice, she responded "I don't know.   That's not my decision. That would be the contracting officer's decision."   App. at Ex. 177, excerpts of 30(b)(6) Deposition in ACLR I at A1010-1011.   CMS's corporate representative also testified that the termination of an ongoing audit issue would not be a termination for convenience.   App. at Ex. 178, excerpts of 30(b)(6) Deposition in ACLR II at A1014.    There is no evidence offered by CMS, and none exists, that would support a finding that there was a termination for convenience of the PY 2007 and 2010 duplicate payment audits or the PY 2012-2013 sales tax NAIRP.

   V.   Whether the supremacy of procurement regulations over illegal contract terms has applicability to this contract. *See id.* at 17 (citing *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed. Cir. 1988)).

The supremacy of procurement regulations over illegal contract terms has no applicability to the Part D RAC Contract as the Part D RAC Contract did not contain illegal contract terms.   In its Reply Brief, CMS asserts that "ACLR does not point to any language in the SOW, however, that precludes revocation of authority to proceed.   In any event, such a principle would be at odds with the inherent power to terminate for convenience, would be at odds with the provisions of the FAR, and would be invalid for illegality."   ECF No. 61 at 17.   CMS does not identify any illegal contract terms in the Part D RAC Contract.[10]

---

[10] To the extent CMS is arguing the Part D RAC Contract was illegal, that defense is an affirmative defense that has been waived because it was not pled in CMS's Answer and was first raised in CMS's Reply Brief. ECF No. 8, Defendant's Answer; Case No. 16-309, ECF No. 8, Defendant's Answer.

*See* ECF No. 61.  Instead, CMS presumes an inherent right of "revocation of authority to proceed" and implies that any interpretation to the contrary would render the Part D RAC Contract illegal.  *See* ECF No. 61 at 17.  CMS does not elaborate on where any such inherent right of revocation of authority arises from other than perhaps from CMS's claimed "inherent power to terminate for convenience."  *Id.*  As discussed earlier, there is no inherent right of termination for convenience within a government contract and the incorporation of a termination for convenience clause under the *Christian* doctrine is not appropriate here.  *See supra* at 1-3.  As discussed in ACLR's Motion and Reply, the PWS authorized ACLR to recover duplicate payments and ACLR identified numerous 2007 duplicate payments only to be denied by CMS the right to recover those duplicate payments.  ECF No. 50-1 at 33-34 and 41-43; ECF No. 57 at 11 and 19-23.  Under the SOWs, ACLR's PY 2010 duplicate payment audit was approved by CMS but it later stopped the audit on unjustifiable grounds, including the fact that CMS requested a change in the audit methodology that CMS had previously required and there was no contractual right for CMS to alter the previously approved audit methodology under the SOW.[11]  ECF No. 50-1 at 34-36, 43-47; ECF No. 57 at 11-14 and 23-26.  Under the SOWs, CMS denied ACLR's sales tax audit without proper grounds and without following the proper contractual procedures to do so.  ECF No. 50-1 at 52-59; ECF No. 57 at 15-16 and 26-39.  CMS's actions were a breach of the Part D RAC Contract and a breach of the duty of good faith and fair dealing.  Just because the Part D RAC Contract did not give CMS carte blanche to take any action it wanted to in relationship to ACLR's Part D overpayment recovery activities does not render the contract terms illegal or justify a reformation of the Part D RAC Contract.

---

[11] This is a nuance CMS ignored or conveniently overlooked.

Contrary to CMS's argument, *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988) provides no support for CMS's position.  In *Beta Systems*, the issue was whether there was a mutual mistake by the parties in the selection of a cost index for use in an Economic Price Adjustment clause, not whether there was a contract term in violation of a regulation.  *Beta Systems*, 838 F.2d at 1184.  The court stated: "Government procurement contracts are not insulated from this basic principle of contract law, which, as reflected in the DAR, includes modification to correct a mutual mistake . . . ."  *Id.* at 1185. The Federal Circuit concluded that if the clause violated a particular regulation, there was a mutual mistake that would justify reformation.  *Id.* at 1186.

VI. Whether plaintiff seeks equitable relief that is outside the jurisdiction of this court. *See id.* at 23-24 (citing, among other cases, *United States v. Testan*, 424 U.S. 392, 397-98 (1976)).

ACLR does not seek equitable relief that is outside the jurisdiction of this Court. CMS mischaracterizes ACLR's claim as "a claim for specific performance coupled to an award of the damages it hopes it would have if specific performance occurred."  ECF No. 61 at 24.  Even if ACLR was seeking specific performance, which it is not, ACLR could not now pursue the PY 2007 and 2010 duplicate payment audits because the window for recovering those overpayments is limited to five years.  ECF No. 57 at 11; 42 U.S.C. § 1395ddd(h)(4) (amended 2016).  In fact, it was CMS's delay and unlawful actions that resulted in the foreclosure in 2012 of ACLR's opportunity to recover the 2007 duplicate payments.  ECF No. 57 at 11.  ACLR's claims are not seeking forms of equitable relief. Rather, ACLR's claims are based upon CMS's breach of contract and breach of duty of good faith and fair dealing and seek money damages.  Contrary to CMS's assertions, ACLR can obtain money damages given the nature of its claims.

CMS's reliance on *United States v. Testan*, 424 U.S. 392 (1976) has no application to this case.  In *Testan*, the respondents sought reclassification of their federal civil service positions and back pay.  *Id.* at 393.  Unlike ACLR, the respondents in *Testan* did "not rest their claims upon a contract."  *Id.* at 400.  Ultimately, the Supreme Court ruled that the Classification Act and the Back Pay Act did not create a substantive right for respondents to back pay during the period they may have been wrongfully classified.  *Id.* at 407.  CMS fails to provide any legal authority to support its proposition that ACLR's claims are equitable in nature and cannot be pursued in this Court.

VII.   Whether plaintiff may obtain damages in this suit other than actual, presently due money damages. *See id.* at 24-25 (citing *Massie v. United States*, 226 F.3d 1318, 1321 (Fed. Cir. 2000)).

ACLR is seeking "actual, presently due money damages."   ACLR's money damages are a direct result of CMS breach of the Part D RAC Contract and CMS's breach of its duty of good faith and fair dealing in connection with the Part D RAC Contract.  *See Gulf Group General Enterprises Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 384 (2013) ("Although there may be uncertainty 'as to the extent of the damage,' a court cannot avoid its obligation to provide relief where there is no uncertainty 'as to the fact of damage.'").  CMS acknowledged that "[i]t is undisputed that CMS did not permit ACLR to proceed at all with the 2007 duplicate payment audit issue (in *ACLR I*) and the 2012 to 2013 sales tax audit issue (in *ACLR II*), and that CMS rescinded approval for the 2010 duplicate payment audit issue before it was completed (in *ACLR I*)."  ECF No. 52 at 58.  If CMS would have complied with the Part D RAC Contract and operated in good faith, ACLR would have recovered Part D overpayments related to 2007 and 2010 duplicate payments and 2012-2013 sales tax related payments entitling ACLR to a contingency fee payment on the

14

recovery of those overpayments.  This is not a case of CMS withholding funds from ACLR, but rather CMS's actions or lack thereof that precluded ACLR from recovering the Part D overpayments CMS was legally required to pursue.  ACLR is legally entitled to recover its money damages in this case.  *See Horn & Associates, Inc. v. United States*, 140 Fed. Cl. 142, 184 (2017) (finding that the Government's lack of cooperation and impediments to contractor performance breached the contingency fee audit recovery contract for improper payments).

The concept espoused in *Massie v. United States*, 226 F.3d 1318, 1321 (Fed. Cir. 2000) that "a plaintiff who seeks redress in the Court of Federal Claims must present a claim for 'actual, presently due money damages from the United States'" is a jurisdictional concept that interprets the scope of this Court's jurisdiction under the Tucker Act.  While the Tucker Act does not authorize the Court of Federal Claims to order equitable relief in most circumstances, the Tucker Act does allow the Court of Federal Claims to enter judgment for monetary damages on "any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1) (1994); *see Massie*, 226 F.3d at 1321.

According to CMS, "[t]here are no funds presently due to ACLR under the parties' contract, and ACLR has no claim."  ECF No. 61 at 24.  To the extent there are no funds due ACLR under the Part D RAC Contract, this resulted from CMS's breach of the Part D RAC Contract and breach of duty of good faith and fair dealing.  CMS's argument construes the language in *Massie* to restrict the money damages that can be recovered in a breach of contract or breach of duty of good faith and fair dealing case to essentially money withheld from payment by the Government.  A contractor's right of recovery from the Government in a breach of contract and breach of duty of good faith and fair dealing is much broader than CMS's myopic construction of *Massie*.

15

Similar cases have allowed contractors to recover damages in the form of lost profits and expectancy damages.  For example, in *Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460 (2006), Precision Pine was allowed to pursue lost profit damages for the Government's improper prolonged suspension of nearly all of Precision Pine's timber sale contracts.  In analyzing the lost profit issue, the Court stated "where lost profits directly relate to the subject of the contract, they are recoverable, even if they would have required a transaction with a third party." *Id.* at 472.  At the very least, the monetary damages ACLR seeks directly relate to and flow from the subject matter of the Part D RAC Contract.

In *Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002), the Federal Circuit affirmed the Court of Federal Claim's award of lost profits to Energy Capital on its breach of contract claim.  Energy Capital and the Government had entered into an Affordable Housing Energy Loan Program agreement whereby Energy Capital would originate loans to HUD property owners and generate profits from those loans. *Id.* at 1318.  The Government terminated the agreement prior to Energy Capital originating any loans under the agreement. *Id.* at 1319.  The Government argued that "lost profits may never be recovered for a new business venture that was not performed." *Id.* at 1324.  The Federal Circuit rejected the Government's argument holding that "[w]e do not agree that lost profits should be precluded as a matter of law for new ventures that have not previously been performed by a third party." *Id.* at 1326.  *See American Savings Bank, F.A. v. U.S.*, 98 Fed. Cl. 291, 313 (2011) (awarding plaintiff $83,318,000 in lost profit expectancy damages); *Sonoma Apartment Associates v. United States*, 134 Fed. Cl. 90, 105 (2017) (plaintiff entitled to lost profit expectancy damages from United States); *See also BTR Enterprises of SC, LLC v. United States*, No. 18-215C, 2018 WL 4102586 at *6 (Fed. Cl.

16

August 29, 2018) ("when a contractor can show that the government acted in bad faith in terminating a contract for convenience, a contractor may recover a wide range of damages, including anticipatory profits"). *Griffin & Griffin Exploration, LLC v. United States*, 116 Fed. Cl. 163, 177 (2014) ("Generally, in case of a breach of contract, the injured party has a right to expectation damages.").

Here, ACLR actually performed under the Part D RAC Contract. ACLR identified Part D 2007 and 2010 duplicate payments as well as 2012-2013 sales tax overpayments but was prevented from recovering those overpayments by CMS's improper actions. CMS by its own calculations estimated there was over $5 billion in Part D overpayments during Part D RAC Contract period. ECF No. 57 at 40. ACLR damages are sufficiently actual and presently due to entitle it to recovery in this case.

VIII. Finally, although this may not be an entirely new issue, the government has hypothesized that the 2007 audit would necessarily have become a documentation audit, not a data audit, if it had proceeded. *See id.* at 9. Plaintiff shall first explain how the distinction between data and documentation audits would apply to all of the contested audits here, and then address whether the government's hypothesis as to the 2007 audit is correct.

During the period January 13, 2011 through December 31, 2013, the PWS authorized the use of data audits and documentation audits to recover improper payments. ECF No. 57 at 14; ECF No. 57-6 at ¶¶ 127 and 130. For the periods January 1, 2014 through December 31, 2015, the SOWs authorized the use of automated reviews and complex reviews to recover improper payments. ECF No. 50-1 at 20; ECF No. 50-11 at ¶ 45; ECF No. 57 at 25. These audits and reviews were conducted on individual PDEs, which form the basis on which Part D payments are made.

While functionally different, the data and documentation audits described in the PWS and the automated and complex reviews described in the SOWs operated under the same basic principles. The data audit and automated reviews were used when Part D

17

payments could be deemed improper by reviewing PDE records and/or other available information without requiring additional information from plan sponsors. *See* ECF No. 57-6 at ¶¶ 130, 148, and 249. For example, in the audit of excluded providers, ACLR searched the Department of Health & Human Services Office of Inspector General's List of Excluded Individuals & Entities, a publically available database, CMS's Medicare Exclusion Database, state licensing boards, and other databases to identify the provider identifier number for excluded prescribers and pharmacies. These identifiers were matched to the provider identifiers submitted with the PDE payment records to identify improper payments. This audit was conducted as a data audit as no additional information was needed from plan sponsors to determine that such payments were improper.

Alternatively, documentation audit and complex reviews required additional information from plan sponsors before an improper payment determination could be made. ECF No. 50-1 at 21; ECF No. 50-11 at ¶52; ECF No. 57 at 12-13, 25; and ECF No. 57-6 at ¶¶ 149, 221-222. For example, one audit issue was direct and indirect remuneration ("DIR"), which pertained to price adjustments to drug costs, such as rebates, that were required to be passed along by the plan sponsor to CMS. *See* ECF No. 57-6 at ¶ 309. For example, a rebate may be applicable when a pharmacy benefit manager ("PBM") grants an additional price rebate of 5% if 100,000 units of a particular drug are dispensed. In such a case, ACLR would need to obtain the rebate agreement prior to determining whether CMS was properly remunerated for the rebate when 100,000 or more units were dispensed. As the agreement with the PBM containing the rebate information would be required before an improper payment determination could be made, a documentation audit/complex review would be used. *See id.*

18

To conduct its data audits and make improper payment determinations for the duplicate payment audits, ACLR relied on state and federal laws and CMS promulgations and guidance.  Specifically, ACLR relied on plan sponsor certifications that PDE records had been accurate, complete, and truthful.  ECF No. 50-11 at ¶ 28; 42 C.F.R. § 423.505(k)(3).  ACLR also relied on Health Insurance Portability and Accountability Act ("HIPAA") provisions. *Id.*  As required under HIPAA, the HHS Secretary adopted national standards that specifically defined and quantified each individual data element submitted within PDE records ("HIPAA Administrative Simplification Rules") submitted to CMS for payment. *See* 45 C.F.R. § 162.1102.  For example, these rules state that an original prescription fill number was designated as a "0" and succeeding refills were designated as "1", "2", and so on.  App. at Ex. 20, Mucke Aff. at ¶16, A380-81.  Finally, ACLR relied on CMS promulgations and contract provisions that all plan sponsors were required to submit its PDE records in accordance with HIPAA Administrative Simplification Rules. 42 C.F.R. §423.505(h)(2).  Taken together, ACLR's data audits were predicated on the understanding that each data element was accurate as submitted and that any later determination that such data was incorrectly documented was a violation of state and federal law, CMS promulgations and guidance and was therefore an improper payment as defined by the Office of Management & Budget ("OMB").  App. at Ex. 18, excerpts of Part III OMB Circular A-123, A348.

**PY 2007 Duplicate Payment Audit:**  To determine whether 2007 PDE payments were duplicative, ACLR isolated individual prescriptions and then made a determination as to whether individual dispensing events had been billed to CMS more than once.  As a matter of law, and as dictated by the HIPAA Simplification Rules, every prescription filled by a pharmacy must be uniquely numbered.  In the PDE records, this number is identified

as the Service Reference Number ("SRN").  *See* ECF No. 50-11 at ¶ 28.  While state laws prohibit a pharmacy's use of the same SRN within any given year, it is possible that other pharmacies may use the same number.

Because a SRN could be duplicated by other pharmacies, ACLR isolated individual prescriptions by matching the SRN, pharmacy, and patient identifier, or HICN, fields in the PDEs.  *Id.*  To identify individual dispensing events, ACLR reviewed the fill number field for each isolated prescription.  *Id.*  When a duplicative fill number was identified, ACLR identified both the originating PDE record and the subsequent potentially duplicative PDE, as determined by the date the prescription was filled.  *Id.* at ¶ 30.  A list of these PDEs was generated and ACLR reviewed each originating and subsequent PDE record to determine whether it was the result of a legitimate partial fill or an improper duplicative fill.  *Id.* at ¶¶ 29-30.  In some cases, the fill number for both the partial and completed portion of the fill would be the same and a "P" noting a partial fill or a "C" noting a completed fill, was submitted in the dispensing status field of the PDE record.  *Id.* at ¶ 29.  With this requirement, ACLR reviewed matching originating and subsequent PDEs and removed all those PDEs for which a partial fill had been identified.  *Id.* at ¶ 30.  Once complete, the remaining list contained all duplicative dispensing events that were not related to a partial fill.  *Id.*  ACLR then eliminated all originating PDEs and calculated improper payment amounts due from the remaining PDE records.  *Id. at* ¶¶ 30-31.  Given the methodology and process ACLR used for the PY 2007 duplicate payment audit, there was no justification for converting it into a documentation audit if the audit had proceeded.

Even the use of a documentation audit would not have changed ACLR's PY 2007 duplicate payment audit findings.  At best, any documentation submitted by a pharmacy indicating that a partial fill had occurred would only confirm that the pharmacy failed to

assign a unique identifier to the prescription as required by state laws and HIPAA Simplification Rules -- a result that would still deem the PDE record an improper payment. *See* App. at Ex. 18, excerpts of Part III OMB Circular A-123, A348.  Finally, the PY 2010 duplicate payment audit, which was conducted as a documentation audit/complex review, demonstrated conclusively that ACLR's PY 2007 duplicate payment audit methodology was much more successful in identifying improper payments than CMS's methodology, which was only successful in 26.7% of identified cases.   ECF No. 57 at 24; ECF No. 57-6 at ¶¶ 208, 232.

**PY 2010 Duplicate Payment Audit:**  For purposes of the 2010 Duplicate Payment audit, ACLR was required to conduct a documentation audit/complex review utilizing the methodology articulated in CMS's Uniform Examination Program ("UEP").  ECF No. 50-1 at 20-21; ECF No. 50-11 at ¶49.  This audit methodology differed significantly from ACLR's PY 2007 duplicate payment audit methodology because it eliminated any review of the SRN field.  *See* ECF No. 50-1 at 21.  Because of this, there was no way to successfully isolate dosage changes or other legitimate early refills without conducting further reviews of prescription and fill history documentation.  *Id.*

As outlined in CMS's UEP duplicate payment methodologies, CMS auditors conduct financial audits of plan sponsors to identify potentially duplicative PDEs submitted for "the same beneficiary, for the same medication, and on the same/very close dates."  ECF No. 50-1 at 20-21.  Under this methodology, recurring prescriptions for beneficiaries are identified and reviewed for potential duplication rather than the service reference number for each prescription.  In many instances however, this methodology can inappropriately identify PDEs arising from recurring prescriptions as duplicate payments rather than permissible events.  For example, a beneficiary may be authorized to receive

an early refill on the basis of an impending vacation or dosage change.  To eliminate the possible selection of these types of events from the category of potential improper payments, a mathematical calculation was created to identify only those events that occurred "on the same/very close dates."  *Id.*  While somewhat effective, this calculation did not eliminate all dosage change prescriptions and other permissible early refills and plan sponsors were required to provide additional documentation.  *See id.*  ACLR executed the approved CMS audit methodology for the PY 2010 duplicate payment audit and requested copies of prescriptions and fill histories for all identified PDE records.  ECF No. 50-1 at 21-22.  ACLR reviewed this documentation and eliminated all PDEs associated with dosage changes and other permissible early refills and submitted its findings to CMS. *Id.* at 23.

**PY 2012-2013 Sales Tax NAIRP**:  ACLR identified improper payments for PY 2012-2013 sales taxes utilizing the data audit/automated review protocol.  Under this approach and using an identical process used by CMS in its own identification of sales tax improper payments, ACLR identified all PDEs that included sales tax, the state from which the PDE was generated, and reviewed tax laws in each state to determine whether such amounts were subject to tax.  ECF No. 50-1 at 50.  All PDE payments containing sales tax submitted in a state that did not tax such payments were identified as improper payments. *Id.* at 50-51.  As discussed at length in ACLR's Reply Brief, ACLR's sales tax NAIRP properly identified improper payments based upon amounts contained in the PDE record sales tax field.  ECF No. 57 at 26-39.  CMS states that the NBI MEDIC "looked at years of the same alleged improper sales tax payments that ACLR proposed to look at."  ECF No. at 20.  Thus, CMS allegedly made a decision in connection with ACLR's sales tax NAIRP based upon the data review by NBI MEDIC.

State laws, including the State of Minnesota, require that amounts collected as sales tax must be remitted as sales tax to the state. *See State of Minnesota v. Larson,* 605 N.W.2d 706, 713 (2000).  ACLR's sales tax NAIRP should have been approved by CMS and allowed to proceed as a data audit because no review of additional documentation would, or could, change the unlawful nature of putting amounts in the PDE record sales tax field for states that do not charge sales tax on Part D prescriptions.

**Hypothesis Application:** CMS has hypothesized that the PY 2007 duplicate payment audit would have become a documentation audit under the PWS.  ECF No. 61 at 9.  CMS provides no factual support for this argument.  CMS's argument appears to be based on the mistaken belief that CMS had unbridled oversight with regard to the audit issues and methodologies in the PWS. To justify its assertions, CMS has gone to considerable effort to attempt to demonstrate that the PWS explicitly authorized CMS to approve or deny any audit issue or audit methodology prior to ACLR seeking recovery of any improper payments.  If such were the case, CMS would not have needed three years to devise a SOW authorizing it to do that which CMS contends it already had authority to do. *See* ECF No. 50-1 at 19-20.  Indeed, had CMS desired such immediate authority and control, it could have devised a statement of work dictating the improper payment audit processes, including an issue review and audit methodology approval process prior to contract award.  Instead, CMS accepted ACLR's PWS, which specifically outlined the audit methodologies ACLR would use to recover duplicate payments and other Part D improper payments through its use of data and potentially documentation audits, and incorporated that PWS into the Part D RAC Contract.  As the author of the PWS, ACLR submits that no such CMS approval requirement exists in the PWS.

As outlined in the Part D RAC Statement of Objectives ("SOO"), CMS sought a contractor that would assist CMS "in the identification of improper payments and the recoupment of overpayments in Medicare Part D" and required the contractor to "[d]evelop innovative methodologies to determine Part D improper payments . . . ."  App. at Ex. 4, Statement of Objectives, A31; ECF No. 57 at 11.  While it is true that the SOO did permit CMS some "preapproval" authority, such authority was limited to "new approaches or changes in approaches developed after contract award." *Id.* at A32.  ACLR made no such changes after the Part D RAC Contract was awarded and CMS offers no evidence to the contrary. *See* ECF No. 57-6 at ¶125.  CMS's assertion that the PY 2007 duplicate payment audit would "ultimately become" a documentation audit is facially invalid and had CMS permitted ACLR to execute the Part D RAC Contract, those improper payments would have been recovered years prior to CMS's implementation of the SOW.

CMS asserts that ACLR ignored "key provisions" of the PWS that authorize CMS to unilaterally dictate the method by which duplicate payments would be recovered.  ECF No. 61 at 9.  As thoroughly discussed in ACLR's Reply Brief, a plain language reading of these purported "key provisions" demonstrates that they had no bearing on ACLR's duplicate payment, or other improper payment, audit methodology, and do not support CMS's argument that CMS could convert ACLR's 2007 duplicate payment data audit into a documentation audit.  ECF No. 57 at 12-14.  CMS's  reliance on text that ACLR would solicit "CMS' approval for, conducting documentation audits" pertained solely to ACLR's selection of plan sponsors for a documentation audit, which was not a data audit and could only occur after any duplicate payment data audit had been concluded.  *Id.* at 12-13.  Moreover, CMS's reliance upon the phrase "numerous discussions and considerable analysis by ACLR, CMS, and Plan Sponsors" is misplaced, because not only was the

phrased used in the context of "Alternate Methodologies" but CMS did not engage in any discussions with ACLR regarding the PY 2007 duplicate payment audit other than to simply deny ACLR the right to recover those duplicate payments.   ECF No. 61 at 10; ECF No. 57 at 13; *See* ECF No. 52 at 58.

CMS's assertion that the PY 2007 duplicate payment audit would have become a documentation audit because "the PY 2010-12 duplicate payment audits ultimately became documentation audits because of the need to confirm duplicate payments through information beyond that in the PDE data" is incorrect.  *See* ECF No. 61 at 9.  As articulated above, CMS repudiated the results of the PY 2010 duplicate payment documentation audit and terminated further review on the basis that CMS continued "to have concerns over the validity of the overall audit results."  ECF No. 50-1 at 34-35.  Additionally, one of CMS's own expert witness noted in her opinion that potential duplicates identified by "the CMS Uniform Examination Program (UEP) used for 1/3 financial audits of Part D Plan Sponsors . . . . are often supported as not being duplicate based on documentation provided by the Plan Sponsor because the identified items are Plan to Plan PDEs, dosage changes, prior authorizations with reasons, and overrides for 'too soon', vacation and lost medications." App. at Ex. 179, excerpts of Deidre M. Reed Export Report, A1018.  The UEP is the same documentation audit methodology required by CMS to conduct the PY 2010 duplicate payment audit.

Finally, CMS's argument ignores the uncontroverted evidence that, based solely on documentation submitted by plan sponsors during the PY 2010 duplicate payment audit, CMS's documentation audit methodology successfully identified duplicate payments in only 26.7% of identified cases.  ECF No. 57 at 24; ECF No. 57-6 at ¶¶ 208, 232.  As supported by the evidence, the only audit methodology that should be applied to the

identification of Part D duplicate payments is the data audit methodology used in ACLR's identification of PY 2007 duplicate payments.

In conclusion, ACLR's PY 2007 audit methodology for identifying and recovering duplicate payments was approved by CMS upon contract execution of the PWS and CMS had no authority to modify, impede, or otherwise prevent ACLR's recovery of the duplicate payments in the manner agreed upon in the PWS.  For these reasons, CMS's argument that the PY 2007 Duplicate Payments would, or even should, become a documentation audit should be rejected.

## **CONCLUSION**

There are no disputed issues of material facts and ACLR is entitled as a matter of law to partial summary judgment on its claims of breach of contract and breach of good faith and fair dealing in *ACLR I* and *ACLR II*.


Dated:  December 19, 2018


DAVID, BRODY &
DONDERSHINE, LLP


_____/s/_____
Thomas K. David
John A. Bonello
2100 Reston Parkway
Suite 370
Reston, VA 20191
Phone:  703-264-2220
Fax: 703-264-2226
tdavid@dbd-law.com
jbonello@dbd-law.com

Attorneys for Plaintiff
ACLR, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of December 2018, I caused a copy of the foregoing document to be emailed via the ECF system to the following:

Adam E. Lyons
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street NW
Room 11020
Washington, DC 20005


_____/s/_____
Thomas K. David

27