## **APPENDIX**

Exhibit 177      Excerpts from CMS 30(b)(6) Deposition in ACLR I (A1008- A1011)

Exhibit 178      Excerpts from CMS 30(b)(6) Deposition in ACLR II (A1012- A1014)

Exhibit 179      Excerpts from Expert Report of Deirdre M. Reed (A1015- A1018)

**Excerpts from CMS 30(b)(6) Deposition in ACLR I**

**EXHIBIT 177**

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

---------------------x

ACLR, LLC

       Plaintiff,

-vs-               Civil Action No. 15-767

THE UNITED STATES

       Defendant.

---------------------x

            Thursday, October 19, , 2017

            Baltimore, Maryland


THE DEPOSITION OF SONJA JEFFERSON BROWN as

Corporate Representative for the Department of

Health and Human Services 30(b)(6)


Volume 1

Sonja Jefferson Brown As        ACLR, LLC v. THE UNITED STATES
Case No. 15-767                      October 19, 2017

1               And let me clarify that we may have

2     added the appeal language, but I'm not sure.

3          Q.    Well, can you summarize for me what

4     Booz Allen Hamilton's work for CMS was as it

5     related to ACLR or the contract?

6          A.    Booz Allen was under contract with CMS

7     prior to the implementation of the Part D RAC

8     contract.   It was the program integrity

9     technical assistance contractor, and so they

10    were, to my knowledge, tasked with providing

11    ideas for processes in areas to look at under

12    the Part D RAC program.

13         Q.    And what was CMS's contractual

14    authority under the Part D contract to use Booz

15    Allen in that regard?

16         A.    I think CMS has the authority --

17    inherently has the authority to contract with

18    entities to carry out any obligations under its

19    contract.

20         Q.    In the technical direction letter, why

21    didn't CMS just issue a termination for

22    convenience of the Part D RAC contract?

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 15-767                   October 19, 2017

1        A.    I don't know.   That's not my decision.

2   That would be the contracting officer's

3   decision.

4        Q.    Can you summarize for me what Booz

5   Allen's direction was as it related to the

6   Part D RAC BPM and Rule 4159-F?

7        A.    As far as 4159, I'm not sure.   But as

8   I've said, they were tasked with providing CMS

9   with information or proposed ideas on how to

10  carry out RAC activities.

11       Q.    I'll show you what's been marked as

12  Exhibit 10.

13            Can you summarize for me how CMS used

14  Exhibit 10 in connection with the Part D RAC

15  work?

16       A.    Again, based on some of the ideas or

17  proposals submitted by Booz Allen, they may have

18  been incorporated in different aspects of the

19  Part D RAC audit process.

20       Q.    And this document, Exhibit 10, was

21  dated June 17th, 2011, correct?   So this would

22  have been generated after the Part D RAC

**Excerpts from CMS 30(b)(6) Deposition in ACLR II**

**EXHIBIT 178**

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

--------------------x

ACLR, LLC

          Plaintiff,

-vs-                        Civil Action No. 16-309

THE UNITED STATES

          Defendant.

--------------------x

                    Wednesday, August 16, 2017

                    Baltimore, Maryland


   THE DEPOSITION OF SONJA JEFFERSON BROWN as

 Corporate Representative for the Department of

      Health and Human Services 30(b)(6)


                 Volume 1

            Pages 1 through 216

Sonja Jefferson Brown As          ACLR, LLC v. THE UNITED STATES
Case No. 16-309                              August 16, 2017

1   the methodology or the policy, something that we

2   didn't discover during their approval process.

3        Q.   So an issue with the methodology or --

4        A.   Policy or, you know, anything that

5   affects viability of the audit issue.

6        Q.   If it was a termination of an ongoing

7   audit issue, would that then be a termination

8   for convenience?

9        A.   No.

10            MR. CARNEY:   Objection to the extent

11  it calls for a legal conclusion.

12  BY MR. BONELLO:

13       Q.   What would it be then?

14       A.   It would be that it's inappropriate to

15  move forward with the audit issue because there

16  are flaws, like I said, in the methodology or

17  the policy was misinterpreted, things of that

18  nature.  It's hypothetical.  So I don't have any

19  specific examples right now.

20       Q.   Do you recall any issues with any of

21  ACLR's audit methodologies?

22       A.   Yes.  I believe all of them probably

# Excerpts from Expert Report of Deirdre M. Reed

## EXHIBIT 179



# ACLR LLC
## vs.
# UNITED STATES

---

## Fed Claim Nos. 16-309C and 15-767C

---

**December 15, 2017**

**Expert Report Prepared by**

*Deirdre M. Reed*

---

**Deirdre M. Reed, CPA, CISA, CGFM**
**President**

**Reed & Associates, CPAs, Inc.**
**6 Main Street, Suite 316, Centerbrook, CT 06409**



ACLR I and II
Expert Report

# Introduction

The United States Department of Justice retained Reed & Associates, CPAs, Inc. (Reed) to provide expert services with respect to ACLR LLC v. United States in Fed. Claim Nos. 16-309C and 15-767C. The claims were for $112,002,489 and $28,506,591, respectively. ACLR describes the basis for the claims as:

*15-767C – "$23,535,618 representing amounts associated with the contingency fee for its successful identification of $313,808,241 in improper payments related to Plan Year 2007 Duplicate Payments during the successful execution of the base period of the Contract. Moreover, ACLR is entitled to the amount of $2,668,553 representing amounts associated with direct labor costs based on ACLR's approved GSA Schedule rates and contract overhead requirements, reasonable expectations of profit, and net of amounts already collected arising from ACLR efforts during subsequent modifications of the Contract. Also, that ACLR is entitled to the amount of $2,209,146 representing amounts associated with the contingency fee for its successful identification of $15,909,550 in improper payments related to the approved and subsequently cancelled Plan Year 2010 Duplicate Payment audit. Lastly, ACLR is entitled to additional amounts representing an equitable adjustment to the Contract for internal corporate expenses related to the preparation and filing of this Claim and amounts for reasonable attorney's fees and related expenses. As of the date of the filing of this claim that sum is $93,274."[1]*

*16-309C – "$112,002,489 representing amounts owing from its identification of improper payment amounts associated with sales tax during the execution of Option Year 1 (OP1) of the Contract."[2]*

I, Deirdre Reed, CPA, CISA, CGFM, President and Shareholder at Reed, reviewed documents produced and the Government maintained in relation to ACLR's claims. Documents I have relied upon are noted in this report. I received an undergraduate degree in accounting from Johnson & Wales University in 1985 and have worked in the field of government contracts, Medicare programs, program integrity and auditing for over thirty years. My firm has held over 135 federal and state contracts, including contracts with the Centers for Medicare & Medicaid Services (CMS), since opening Reed & Associates, CPAs, Inc. in 2001 and worked on numerous CMS contracts previously while employed with other Firms. I have specifically worked with the Medicare program since 1986, and specifically with the Medicare Part D program since 2007.

With respect to the Medicare Part D program, I have conducted audits under the 1/3 Financial Audits of the Bid Proposal Tools (BPT), have participated in the validation of identified potential improper payments under the Medicare Part D Recovery Audit Contract (RAC) Data Validation Contract (DVC), and I have participated on behalf of the government in the application of the Improper Payments Elimination and Recovery Act of 1990 (IPERA) to government agency programs. My hourly rate for this engagement is $308.

I have reviewed the elements of ACLR's claim to determine if CMS' actions related to the disapproval or termination of studies/audits proposed by ACLR, the Part D Recovery Audit

---

[1] ACLR, LLC Initial Disclosures, No. 15-767C
[2] ACLR, LLC Initial Disclosures, No. 16-309C

1

ACLR I and II
Expert Report

- CMS stated they believed this would reduce the potential of false positives in the improper payment amounts. CMS thus revised the conditional approval.[35]
  o CMS approved the Duplicate Payment Revised NAIRP on May 28, 2014.[36]
  o ACLR submitted its potential improper payments for PY 2010 through PY 2012 to the DVC for validation. The DVC raised a validation issue pertaining to dosage increases that brought into question that some of the potential duplicate payments identified may be for legitimate dosage increases. ACLR submitted its response on June 27, 2014. On July 8, 2014, CMS informed ACLR that is was approving the release of RFIs for PY 2010 only and the PY2011 – 2012 reviews were being held pending the resolution of the issues associated with the data. ACLR issued RFIs to plan sponsors on July 8, 2014. [37]
  o On August 28, 2014 CMS notified ACLR of concerns it received from Express Scripts, Incorporated (ESI) indicating that ESI, a pharmacy benefit manager (PBM), believed that the RAC identified records in error and that the identified records were not duplicative.[38] ESI had been provided a list of over 250,000 PDEs to provide documentation to support that the PDEs were not duplicative. ESI reported that it would take 16 contractors a total of 86 weeks to pull screen shots for all of the identified PDEs to substantiate whether they were duplicates or not. [39]
  o ACLR modified the review and provided revised exception reports to the DVC.
  o The DVC completed its validation on November 13, 2014[40] indicating the CMS-approved process had not been implemented by ACLR.
  o CMS terminated its prior approval of the duplicate payments review on April 24, 2015.

o Mr. Mucke's expert disclosure indicated that ACLR had eliminated PDE records that represented lawful partial fills[41]. However, it does not address other valid PDEs that were not eliminated based on the automated review including those identified by the DVC of Plan to Plan PDEs, dosage changes, prior authorizations with reasons, and overrides for "too soon", vacation and lost medications.

o Mr. Mucke's expert disclosure also compares their methodology with the CMS Uniform Examination Program (UEP)[42] used for 1/3 financial audits of Part D Plan Sponsors. However, Mr. Mucke fails to mention that all potential duplicates are identified in a different manner, are addressed by the auditor and the Plan Sponsor and are often supported as not being duplicate based on documentation provided by the Plan Sponsor because the identified items are Plan to Plan PDEs, dosage changes, prior authorizations with reasons, and overrides for "too soon", vacation and lost medications.

o Mr. Mucke's expert disclosure states that for the PY 2010 duplicate payments audit, PDEs associated with partial fills, long term care, mail order pharmacies, and vaccination administration fees were removed reducing the potential overpayment using ACLR's

---

[35] A01377
[36] A01381
[37] A06279
[38] A02272
[39] HHS0022025
[40] DP1215
[41] Plaintiff ACLR, LLC's Rule 26(a)(2)(C) Disclosures, page 5
[42] Plaintiff ACLR, LLC's Rule 26(a)(2)(C) Disclosures, page 5

14