# IN THE UNITED STATES COURT
# OF FEDERAL CLAIMS

**ACLR, LLC**                          )
                                       )
                                       )
          Plaintiff                    )
                                       )
          v.                           )   **Civil Action No. 15-767 and 16-309**
                                       )   (Judge Campbell-Smith)
**THE UNITED STATES**                  )
                                       )
          Defendant                    )
_____       )

## PLAINTIFF ACLR, LLC'S *CHRISTIAN* DOCTRINE SUPPLEMENTAL BRIEF

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES…………………………………………………….…iii

INTRODUCTION………………………………………………………………...1

ANALYSIS…………………………………………………………………….…..1

      I. Whether an undefined termination for convenience clause should be incorporated into ACLR's task order contract pursuant to the Christian doctrine……………...……………....……………....……………....1

      II. Whether FAR contractor oversight provisions apply to the Part D RAC Contract……………...……………....……………....……………...…11

CONCLUSION………………………………………………………………..16

## **TABLE OF AUTHORITIES**

Cases                                                                                          Page(s)

*Ace-Fed. Reporters, Inc. v. Barram,*
   226 F.3d 1329 (Fed. Cir. 2000)…………………………………………………………...8
*BearingPoint, Inc. v. United States,*
   82 Fed. Cl. 181 (2008) …………………………………………………………………8
*Boarhog LLC v. United States,*
   129 Fed. Cl. 130 (2016)………………………………………………………………10
*Call Henry, Inc. v. United States,*
   855 F.3d 1348 (Fed. Cir. 2017) …………………………………………………………...1
*CGI Federal Inc., v. United States,*
   779 F.3d 1346 (Fed. Cir. 2015) ………………………………………………2, 6, 7, 14
*Cray Research, Inc. v. United States,*
   41 Fed. Cl. 427 (1998)…………………………………………………………………8
*Digital Techs., Inc. v. United States,*
   89 Fed. Cl. 711 (2009)………………………………………………………………...10
*G. L. Christian & Assocs. v. United States,*
   320 F.2d 345 (Ct. Cl. 1963)…………………………………………………………...1
*General Eng'g & Mach. Works v. O'Keefe,*
   991 F.2d 775 (Fed. Cir. 1993)……………………………………………….......1
*Kalvar Corp. v. United States,*
   543 F.2d 1298 (Ct. Cl. 1976) ……………………………………………………7, 8, 9
*K-Con, Inc. v. Secretary of the Army,*
   908 F.3d 719 (Fed. Cir. 2018)……………………………………………………1, 15
*Lite Machines Corp. v. United States,*
   143 Fed. Cl. 267 (2019)………………………………………………………………...15
*Maxima Corp. v. United States,*
   847 F.2d 1549 (Fed. Cir. 1988)……………………………………………………………9
*Night Vision Corp. v. United States,*
   68 Fed. Cl. 368 (2005)………………………………………………………………12
*Novosteel SA v. U.S., Bethlehem Steel Corp.,*
   284 F.3d 1261 (Fed. Cir. 2002)…………..…………………………………………....10
*Securiforce Int'l Am., LLC v. United States,*
   879 F.3d 1354 (Fed. Cir.), *cert. denied,* 139 S. Ct. 478 (2018)...……………………...9
*Tolliver Grp., Inc. v. United States,*
   140 Fed. Cl. 520 (2018) …………………………………………………………...1
*United Partition Sys., Inc. v. United States,*
   90 Fed. Cl. 74 (2009) …………………………………………………………………8
*Woll v. United States,*
   45 Fed. Cl. 475 (1999) ………………………………………………………………...3

Statutes

15 U.S.C. § 638(r)(4) ................................................................... 15
41 U.S.C. § 3307(e)(2)(B) ............................................................. 6

Regulations

48 C.F.R. § 12.102(c)..................................................................... 7
48 C.F.R. § 12.301(a)..................................................................... 6
48 C.F.R. § 46.102 ...................................................................... 12
48 C.F.R. § 46.102 (f) .................................................................. 11
48 C.F.R. § 46.104 ...................................................................... 13
48 C.F.R. § 46.104(e).................................................................... 13
48 C.F.R. § 46.710(d).................................................................... 13
48 C.F.R. § 49.102 ........................................................................ 5
48 C.F.R. § 52.212-5...................................................................... 6
48 C.F.R. § 52.246-20................................................................... 13
48 C.F.R. §§ 52.249-1- 52.249-7 ................................................... 3
FAR 8.4.................................................................................. 2, 6, 7
FAR 8.406-4 .................................................................................. 2
FAR 8.406-5 .................................................................................. 2
FAR 12............................................................................. 2, 6, 7, 14
FAR 12.301(a) .......................................................................... 2, 7
FAR 12.403................................................................................... 2
FAR 46.102................................................................................ 11, 12
FAR 46.102 (f) .......................................................................... 11, 12
FAR 46.104 ............................................................................... 12, 13
FAR 46.104 (e) .............................................................................. 13
FAR 46.710(d) ......................................................................... 13, 14
FAR 52.246-20 ...................................................................... 13, 14, 15

## INTRODUCTION

In response to this Court's June 26, 2019 Order, Plaintiff ACLR, LLC ("ACLR") addresses the two topics identified in the Order which relate to the *Christian* doctrine and whether certain contract clauses and provisions should be incorporated into the Part D RAC Contract.

## ANALYSIS

**I.      Whether an undefined termination for convenience clause should be incorporated into ACLR's task order contract pursuant to the *Christian* doctrine.**

The *Christian* doctrine, as initially established in *G. L. Christian & Assocs. v. United States*, 320 F.2d 345, 355 (Ct. Cl. 1963), provides that, "For a court to incorporate a clause into a contract under the *Christian* doctrine, it generally must find (1) that the clause is mandatory; and (2) that it expresses a significant or deeply ingrained strand of public procurement policy. *See, Gen. Eng'g & Mach. Works*, 991 F.2d at 779." *K-Con, Inc. v. Secretary of Army*, 908 F.3d 719, 727 (Fed. Cir. 2018).   A clause is deemed mandatory if was "congressionally enacted."   *Call Henry, Inc. v. United States,* 855 F.3d 1348, 1351 n.1. (Fed. Cir. 2017). In *General Engineering & Machine Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993), the Court of Appeals for the Federal Circuit explained that, "under the Christian Doctrine [the board] may insert a clause into a government contract by operation of law if **that clause** is required under applicable federal administrative regulations. However, the Christian Doctrine does not permit the automatic incorporation of every required contract clause."   *Id.* at 779 (emphasis added). "The doctrine turns on whether the contract omits a mandatory clause, not on whether the omission was intentional or inadvertent.   *Tolliver Grp., Inc. v. United States*, 140 Fed. Cl. 520, 529 (2018).   Here, one issue raised by the Court is whether a specific termination for

convenience clause is mandated by law and expresses a deeply ingrained public policy such that it must be incorporated in ACLR's Part D RAC Contract.

It is undisputed that the Federal Acquisition Regulation ("FAR") is the underlying regulatory premise for ACLR's Part D RAC Contract. The Court has noted in its June 26, 2019 Order (ECF No. 66) that FAR 8.406-4 and 8.406-5 respectively address the Government's right to terminate a contract for cause or convenience. Both segments of the FAR set forth policies that apply when an agency uses a General Services Administration Federal Supply Schedule ("FSS") contract. However, FAR 8.406-4 and 8.406-5 do not mandate that particular FAR clauses must be included in FSS contracts as they also make reference to FAR 12.403 which simply states a general policy regarding the termination of contract without dictating the inclusion of a standard established clause. Moreover, as the Court held in *CGI Federal Inc., v. United States*, 779 F.3d 1346 (Fed. Cir. 2015), FAR Part 12, Acquisition of Commercial Items, takes precedence over any FSS provisions. "To the extent there is any perceived inconsistency between FAR Subpart 8.4 and FAR Part 12, FAR Part 12 controls." *Id.* at 1353.

As further detailed below, the application of the *Christian* doctrine to a contract for commercial services under FAR Part 12 must be viewed under the lens of FAR 12.301(a). In brief, a clause such as a termination for convenience clause will not be included in a government contract unless it is either required by law or consistent with customary commercial practices.[1] A unilateral termination for convenience clause of a contingency fee contract which requires an agency to act before payment is due is not required by law or consistent with commercial practices.

---

[1] ACLR's Part D RAC Contract efforts were predicated upon specific state and federal legal mandates related to prescription drugs and designed to safeguard the public as well as mandates associated with eliminating fraud, waste, and abuse. For example, ACLR's efforts to identify sales tax overpayments demonstrated that such amounts were not sales tax and that such amounts were a clear marker of tax fraud. The absence of a viable Part D RAC Contract places the public at great risk as it ventures into the prescription drug arena.

The FAR provides approximately seven termination for convenience clauses that may be inserted to awarded contracts.  *See* 48 CFR §§ 52.249-1 – 52.249.7.  The FAR termination for convenience clauses apply to specific and varying types of contracts such as fixed-price contracts, cost-reimbursement contracts, and contracts that relate to construction activities.  *See id.*  There is no applicable FAR termination for convenience clause for the type of contract evidenced in the Part D RAC Contract – a fixed contingency fee contract.

The rationale behind the absence of a termination for convenience clause in the FAR that would apply to a contingency fee contract (a contract involving an awardee that may or may not gain its compensation only after its total efforts have been expended) is quite simple and logical. If the Government could issue a termination for convenience notice to a contractor after performance had been rendered but prior to making contingency fee payments, it would render the contract illusory and establish a prima facia case of bad faith.  "An illusory contract is an agreement in which one party gives consideration that is so insignificant that an actual obligation cannot be imposed." *Woll v. United States*, 45 Fed. Cl. 475, 478 (1999).

It is of no surprise that ACLR's Part D RAC Contract did not set forth or reference any of the seven FAR clauses which address the Government's right to terminate a contract for convenience since the amount of compensation due to ACLR for its recovery audit efforts was based on conditions subsequent to be performed by CMS.  Therefore, if CMS was able to terminate the Part D RAC Contract after ACLR had already performed various duties but before CMS met its obligations, CMS would arguably have no resulting payment obligations. Moreover, ACLR provided the exact methodology, including processes, laws, and administrative requirements by which the financial recoveries could be made.  Hence, if CMS could terminate

the Part D RAC Contract, CMS could circumvent ACLR and then choose to either perform such recoveries itself or permit another contractor to recover the overpayments at a reduced rate.

The Court should also recognize that ACLR performed substantially all the services which would allow the Government to reap the fruit of ACLR's efforts.  For example, ACLR spent months developing its PY07 duplicate payment audit methodology, identifying overpayments exceeding $313 million. *See* ECF 50-11 at ¶ 31.  In November 2011, CMS, having already approved ACLR's methodology, stopped ACLR's recovery of these PY07 overpayments in lieu of using an alternative audit methodology of CMS's own design.  *Id.* at ¶¶ 32, 35-36. Over the next two years, ACLR was required to codify CMS's methodology, satisfy numerous CMS requests for information, and conduct a special study before approving and ultimately rescinding ACLR's audit of PY10 duplicate payments in April 2014.  *Id.* at ¶¶ 47-67.  These efforts, which proved the efficacy of ACLR's PY07 duplicate payment methodology and the inadequacy of CMS's methodology, required the review of hundreds of thousands of documents as well as the expenditure of thousands of labor hours on the part of ACLR.

CMS has consistently asserted that the Medicare RAC statute and the Part D RAC Contract only afford ACLR the right to recover a percentage of the Medicare Part D overpayments that are eventually collected by CMS.  ECF 52 at 60; ECF 61 at 24-25.  Thus, under CMS's arguments, ACLR would be entitled to no compensation from CMS in the event of a termination for convenience, including the compensation typically afforded contractors when their fixed fee or time and materials contracts are terminated for convenience in a proper manner. Such a scenario would render the Part D RAC Contract illusory.

 Of the approximate seven separate termination for convenience clauses set forth in the FAR, each of these clauses can only be exercised by the Government through a "written notice"

served on the contractor – otherwise known as a "Notice of Termination." The elements which must be contained in a Notice of Termination are detailed at 48 CFR §§ 49.102.

> (a) *General.* The contracting officer shall terminate contracts for convenience or default **only by a written notice** to the contractor (see 49.601). The notice of termination may be expedited by means of electronic communication capable of providing confirmation of receipt by the contractor. When the notice is mailed, it shall be sent by certified mail, return receipt requested. When the contracting office arranges for hand delivery of the notice, a written acknowledgment shall be obtained from the contractor. The notice shall state-
> a. (1) That the contract is being terminated for the convenience of the Government (or for default) under the contract clause authorizing the termination;
> b. (2) The effective date of termination;
> c. (3) The extent of termination;
> d. (4) Any special instructions; and
> e. (5) The steps the contractor should take to minimize the impact on personnel if the termination, together with all other outstanding terminations, will result in a significant reduction in the contractor's work force (see paragraph (g) of the notice in 49.601-2). If the termination notice is by telegram, include these "steps" in the confirming letter or modification.
> (b) *Distribution of copies.* The contracting officer shall simultaneously send the termination notice to the contractor, and a copy to the contract administration office and to any known assignee, guarantor, or surety of the contractor.

48 CFR §§ 49.102.

The FAR requires that a notice of termination include each of these requirements in all termination notices for a number of reasons including, but not limited to, the following: (1) the ability of the contractor to timely notify any subcontractors or vendors, (2) the contactor's awareness of the date by which a settlement proposal may be submitted, and (3) the contractor's awareness of the time period it is afforded to challenge the termination. If the Government disregards its obligation to share these clear advisements with a contractor, prejudice and a

disorderly process will follow.  Notwithstanding the passage of several years, ACLR has yet to receive by any medium a notice of termination from CMS.

The Court has asked the parties to assess the significance of the interplay between FAR Subpart 8.4, which addresses General Service Administration FSS contracts, and FAR Part 12, which applies to all government agencies and the commercial contracts those government agencies award such as the Part D RAC Contract.  As noted by the Court, the master contract under which the RAC Part D Contract was issued was a FSS commercial contract.  Any terminations that are issued under a FSS commercial contract must be framed consistent with the mandates of FAR Part 12.

FAR Part 12 was promulgated in 1995 as part of the Federal Acquisition Streamlining Act of 1994 ("FASA").  In relevant part, FASA stated that government contracts for commercial items and services (such as the RAC Part D Contract) may only contain clauses that are "determined to be consistent with commercial practices." 41 U.S.C. § 3307(e)(2)(B).  FAR Part 12 adopted this mandate and required that only clauses "required by law or determined to be consistent with customary commercial practices" could be included in contracts for commercial items and services.  *See* 48 C.F.R. § 12.301(a).  A well-defined list of clauses that are "Required by Law to Implement Statutes or Executive Orders" is set forth in 48 C.F.R. § 52.212-5. Conspicuously absent from this list are any clauses related to a termination for convenience.  As addressed below, in a contingency fee contract, it is not consistent with commercial practices for a termination for convenience clause to be present.

The FSS program was established as a means for government agencies, such as CMS, to more easily obtain commercial supplies and services.  Only commercial items and services can be sold on FSS contracts.  Therefore, as the Federal Circuit noted in *CGI Fed. Inc. v. United*

*States*, 779 F.3d 1346 (Fed. Cir. 2015), "FAR Part 12's proscription against terms inconsistent with customary commercial practice applies to solicitations for the underlying FSS contracts themselves." *Id.* at 1353.  It is inconsistent with commercial practices to include a termination for convenience clause in contracts that provide for contingency fee compensation when the payment of the fees is inextricably connected to the actions of the payor.[2]  If such termination for convenience clauses could be included in a contingency fee contract, the Government could at any time prior to the payment of contingency fees terminate the contingency fee contract for convenience and thereby avoid paying the contractor the contingency fees the contractor believed were the basis of the bargain.[3]  Such a scenario would significantly diminish contractor interest in entering into contingency fee contracts with the Government.

Moreover, in *CGI Fed. Inc.* the Federal Circuit held, "To the extent there is any perceived inconsistency between FAR Subpart 8.4 and FAR Part 12, FAR Part 12 controls. 48 C.F.R. § 12.102(c) ("When a policy in another part of this chapter is inconsistent with a policy in this part, this part 12 shall take precedence.")." *CGI Fed. Inc.,* 779 F.3d at 1354.  In sum, FAR Part 12 controlled the processes under the Part D RAC Contract if a FAR Subpart 8.4 provision was not in line with a similar provision within FAR Part 12.  As shown above, a termination for convenience clause is not required by law or executive order and it is not consistent with commercial practice for contracts such as the RAC Part D contract. Hence, ACLR's good faith efforts to fulfill its contractual duties may not be deemed unilaterally terminated after the fact as such a construction would stand in stark contrast to the test set forth in FAR 12.301(a).

---

[2] Some of these actions include audit approval and collection Medicare Part D overpayments.

[3] The acceptance of a termination for convenience right in a contingency fee contract becomes even more problematic in that the contractor would have to prove bad faith or an abuse of discretion to establish that the Government breached the contract. *See Kalvar Corp. v. United States*, 543 F.2d 1298, 1304 (Ct. Cl. 1976)

The theory of a "constructive termination for convenience" is a remedy related to the *Christian* doctrine as it allows for a concluded government contract to be deemed retroactively terminated for convenience in a post hoc manner. Normally, the doctrine of a constructive termination for convenience is a remedy sought by the contractor in response to a government issued termination for default. *See United Partition Sys., Inc. v. United States*, 90 Fed. Cl. 74, 93 (2009); *BearingPoint, Inc. v. United States*, 82 Fed. Cl. 181, 182 (2008). If the contractor is successful in converting the termination for default into a constructive termination for convenience, the contractor is no longer saddled with a default termination and the resulting damages. There are instances however, when agencies will attempt to impose a constructive termination for convenience on a contract where performance has concluded in order to escape more robust liability for their failure to follow the governing provisions of a contract. Here, CMS has never argued that a constructive termination for convenience has occurred. *See* ECF Nos. 54 and 61.

Regardless of the circumstances under which a constructive termination for convenience is sought, there must be a contractual right of termination for convenience to impose a constructive termination for convenience. *Ace-Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000) (rejecting concept of constructive termination for convenience because "[t]he agencies had no authority to terminate these contracts, in whole or in part."); *Kalvar Corp. v. United States*, 543 F.2d 1298, 1306 (Ct. Cl. 1976) ("the constructive termination for convenience is a legal fiction which imposes the standard limitations of the termination clause upon a plaintiff even though the termination was never actually ordered by the contracting officer."); *Cray Research, Inc. v. United States*, 41 Fed. Cl. 427, 438 (1998) ("Courts apply the doctrine of constructive termination for convenience 'when the basis upon which a contract was

actually terminated is legally inadequate to justify the action taken.'"). As previously discussed, there is no right of termination for convenience in the Part D RAC Contract so there cannot be a constructive termination for convenience.

Moreover, there are strict limits on when a government agency may attempt to unilaterally modify a contract after work has been performed.  For example, in *Maxima Corp. v. United States*, 847 F.2d 1549, 1557 (Fed. Cir. 1988), the Government neither fulfilled its obligations nor took any affirmative actions to terminate the contract for its convenience.  There, the Government argued that its failure to comply with the contract terms should be treated as constructive termination for convenience by the Government and that the contractor's recovery should be limited by the "Termination for Convenience" clause.  The Federal Circuit refused to apply the "Termination for Convenience" clause retroactively when the contractor had maintained the capability and willingness to perform for the entire contract period and thereby provided the full contractual consideration.  *Id.* at 1556. The Federal Circuit simply stated, "[t]he need for mutual fair dealing is no less requirement in contracts to which the government is a party, than in any other commercial arrangement." *Id*.  Therefore, CMS's desire to reframe the Part D RAC Contract after the fact should fail as ACLR performed its obligations and duties and stood ready to work constructively with CMS for the entire term of the task order.

In addition, a constructive termination cannot be invoked if CMS acted in bad faith or clearly abused its discretion.  *See Securiforce Int'l Am., LLC v. United States*, 879 F.3d 1354, 1363 (Fed. Cir.), *cert. denied*, 139 S. Ct. 478 (2018) (terminations for convenience are reviewed for bad faith or clear abuse of discretion); *Kalvar Corp., Inc.,* 543 F.2d at 1304 ("In the absence of bad faith or clear abuse of discretion, the effect of the **constructive termination for convenience** is to moot all breach claims and to limit recovery to costs which would have been

allowed had the contracting officer actually invoked the [termination for the convenience of the government] clause."); *Digital Techs., Inc. v. United States*, 89 Fed. Cl. 711, 734 (2009) ("Because DTI has alleged a bad faith, constructive termination of its contract, lost profits as breach of contract damages are at least theoretically possible, and the government's motion to dismiss for failure to state a claim upon which relief can be granted fails at this time."); *Boarhog LLC v. United States*, 129 Fed. Cl. 130, 134 (2016) ("A termination for convenience may give rise to a breach of contract only when the Government terminates a contract in bad faith or abuses its discretion to terminate a contract."). CMS only raised the issue of termination for convenience in its Reply in Support of its Cross-Motion for Summary Judgment ("Reply Brief"). ECF No. 61. "Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration." *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002).

CMS has never argued that a constructive termination for convenience occurred. *See* ECF Nos. 54 and 61. If CMS argued in its Motion for Summary Judgment that a termination for convenience or constructive termination for convenience had occurred, ACLR would have set forth the litany of facts to establish CMS's bad faith and clear abuse of discretion. While many of those facts[4] were set forth as part of ACLR's Motion for Summary Judgment on ACLR's breach of duty of good faith and fair dealing claims against CMS, there was no requirement that ACLR offer all facts evidencing bad faith and a clear abuse of discretion given that CMS had not previously argued for a termination for convenience. It would be fundamentally unfair for this

---

[4] Evidence of CMS's bad faith and clear abuse of discretion includes, *inter alia*, only approving one of ACLR's fifteen audit proposals as of August 2015 despite the fact CMS estimated billions of dollars in Medicare Part D payment errors during the period 2010-2014 and CMS was required by law to recover Medicare Part D overpayments. ECF No. 50-11 at ¶¶ 92-100.

Court to grant summary judgment in CMS's favor on the basis that there was a termination for convenience or even constructive termination for convenience where CMS never asserted a defense of termination for convenience (ECF No. 65 at 9-10), first raised the argument in its Reply Brief (*See* ECF No. 61 at 16-17), and where ACLR was not afforded the opportunity to develop and present all of its evidence of CMS's bad faith and clear abuse of discretion.[5]

## II.   Whether FAR contractor oversight provisions apply to the Part D RAC Contract.

In its June 26, 2019 Order, the Court noted that CMS's Reply Brief referenced three FAR provisions that address contract administration and oversight.  As detailed below, none of the three provisions cited by CMS are applicable to the Part D RAC Contract and the matter at hand.

In its Reply Brief, CMS argues that "FAR 46.102 – *Policy*," mandates that all contracts must ensure that the Government may unilaterally inspect and reject services provided by a contractor.  ECF 61 at 15.  This position is misplaced for several reasons.  First, CMS omitted the controlling segment of FAR 46.102 as subsection (f) states, "Contracts for commercial items shall rely on the contractor's existing quality assurance system as a substitute for compliance with Government inspection and testing . . . ."  48 C.F.R. § 46.102(f).[6]  It is undisputed that the RAC Part D services provided by ACLR were "commercial."  Hence, under FAR 46.102, CMS was required to rely on ACLR's existing quality assurance system.  Second, FAR 46.102 is not a "clause" but merely a policy statement that relates to the formation of terms to be inserted into

---

[5] ACLR also notes that in addition to the evidence of bad faith and clear abuse of discretion present in this case, *ACLR, LLC v. United States*, Case No. 17-627C, which has been stayed by this Court, contains significant additional evidence of CMS's bad faith and clear abuse of discretion.

[6] ACLR's adherence to an exceptional quality assurance system is consistent with the fact that it was and is ISO 9000 compliant.

applicable contracts. Third, the language from FAR 46.102 that is cited by CMS in its Reply Brief is tempered by qualifying terms such as "when appropriate" and if "determined necessary." 48 C.F.R. § 46.102.   Therefore, FAR 46.102 does not present a per se "mandate" but rather qualified direction that does not apply to the Part D RAC contract.

A similar issue was presented to the Court in *Night Vision Corporation v. United States*, 68 Fed. Cl. 368 (2005), *aff'd*, 469 F.3d 1369 (Fed. Cir. 2006) where the Government had attempted to employ the *Christian* doctrine to incorporate a regulatory provision into a contract. The Court rejected the Government's position and found that the provision was "not a contract clause at all, let alone a 'mandatory contract clause' as contemplated by the Christian doctrine." *Id*. at 384 n.19.   The Court held that the provision "merely directs the Administrator to establish certain *procedures." Id*.   The Court also noted that the provision did not contain absolute imperatives (a.k.a., mandatory) as the plain language of the regulatory directives were caveated with phrases such as "*where appropriate*", "*may enter into*" and "*to the extent practicable*" and thus, were "not obligatory for the contracting agency." *Id*. at 384.   The Court's holding in *Night Vision Corp*. is germane to the matter here as FAR 46.102 does not present a mandatory contract clause but rather, the provisions contained therein are qualified to be applied on a case-by-case basis. Most importantly, the priority of a government inspection and testing process under FAR 46.102(f) is secondary to that of a commercial contractor's quality assurance system.

The second provision cited in CMS's Reply Brief is "FAR 46.104 - *Contract administration office responsibilities*."   ECF at 11.   CMS suggests that it was required to perform certain activities to ensure that ACLR's deliverables conformed to the requirements in the Part D RAC Contract.   CMS fails to reference any condition precedent or trigger for invocation of FAR

46.104 in connection with the Part D RAC Contract.  FAR 46.104 begins as follows: "When a contract is assigned for administration to the contract administration office cognizant of the contractor's plant . . . ."  48 C.F.R. § 46.104.  The Part D RAC Contract was never assigned by the agency to a contract administration office ("CAO").  A CAO is separate from the contracting office as FAR 46.104(e) requires a CAO to "Report to the contracting office any defect in the design of technical requirements . . . ."  48 C.F.R. § 46.104(e).  Moreover, there is no evidence that ACLR has a "plant" of which a CAO would need to be cognizant.  In sum, CMS's attempt to apply FAR 46.104 is misplaced.

The final provision of purported Government oversight that CMS introduces in its Reply Brief is "FAR 52.246-20, *Warranty of Services*."  ECF at 12.  CMS's attempts to have this non-mandatory clause applied to the Part D RAC Contract post hoc is misplaced.  The initial sentence of the clause states, "As prescribed in 46.710(d), insert a clause substantially as follows . . . ."  48 C.F.R. § 52.246-20.

A simple reading of FAR 46.710(d) shows that the clause is not mandatory and not applicable to the matter at hand.  "The contracting officer **may** insert a clause substantially the same as the clause at 52.246-20, Warranty of Services, in solicitations and contracts for services when a **fixed-price** contract for services is contemplated and the **use of warranty clause has been approved under agency procedures.**"  48 C.F.R. § 46.710(d) (emphasis added).  First, it is clear that use of the clause is elective as the word "may" is not the narrative equivalent of "mandatory."  Second, the Part D RAC Contract was a contingency fee contract and not a fixed-price contract contemplated by the clause.  Lastly, there is no evidence in the record that the use of a warranty clause had been approved by CMS under its own agency procedures.  CMS's

attempt to apply FAR 52.246-20 to the RAC Part D Contract after the fact is inconsistent with the unambiguous terms of the prescription set forth in FAR 46.710(d).

Any reliance by CMS on *CGI Fed. Inc.* to support the inclusion of undefined contract oversight provisions after the fact is misplaced.  The Court's primary focus in *CGI Fed. Inc.* was a pre-award bid protest and the standing of CGI to bring the action if they were not deemed to be a "prospective bidder."  As part of its ruling, the Court held that the Medicare RAC contract at issue could only include "clauses determined to be consistent with customary commercial practices."  *CGI Fed., Inc.,* 779 F.3d at 1346. CMS has neither advocated nor even introduced a "clause" related to contractual oversight that is mandated to be included in the RAC Contract. Moreover, CMS has not shared a "clause" that is applied in customary commercial practices when a contingency fee contract is negotiated.  The failure of CMS to include such clauses in the RAC Part D contract is not an omission but merely a reflection that such provisions do not exist. As the Court noted in *CGI Fed., Inc*., "FAR Part 12's proscription against terms inconsistent with customary commercial practice applies to solicitations for the underlying FSS contracts themselves." *Id.* at 1353.

In *CGI Fed. Inc*., the Court also noted that the solicitation at issue included payment terms that would require the contractor to wait to invoice the Government until all levels of an appeals process had passed - a period of between 120 and 420 days after a demand letter was issued. *CGI Fed., Inc*. 779 F.3d at 1347. The Court held that "the revised payment terms therein are inconsistent with customary commercial practice." *Id.* at 1352.  However, in the RAC Part D Contract, the contingency fee payment terms far exceed those deemed by the GCI Court to be outside of commercial practices.  There is simply no rationale reason for a unilateral termination for convenience clause to be included in a binding contract where the consideration due to the

14

party who is providing services is tied to a condition subsequent of the payor party.  Moreover, as noted above, the RAC Part D Contract was established by a statutory mandate resulting in a logical assumption that the effort to safeguard the public and combat fraud would completed unless the statutory predicate was altered.  *See* ECF 50-1 at 2.

The current facts at bar also stand in opposite to those which prompted the holding of the Federal Circuit in *K-Con, Inc.*  There, the Federal Circuit found that certain bonding requirements for contractor performing government construction projects should be read into the contract because "the bond requirements are mandatory." *K-Con, Inc.*, 908 F.3d at 725. Specifically, the Federal Circuit explained that its underlying rationale for its holding was that "the statute explicitly states that the bonds 'must' be furnished and the FAR both requires the bonds and directs insertion of the relevant clause." *Id.*  In contrast, here there is no statute which mandates specific oversight clauses for a recovery audit contractor such as ACLR and the FAR does not mandate a specific oversight clause for a recovery audit contractor.  The FAR only allows for the insertion of an undefined warranty clause under certain conditions which are not realized or present in the RAC Part D Contract.  *See* FAR 52.246-20.

In *Lite Machines Corp. v. United States*, 143 Fed. Cl. 267 (2019), the plaintiff argued that 15 U.S.C. § 638(r)(4) should have been included in its 2013 contract with Air Force based upon the *Christian* doctrine and the holding in *K-Con, Inc.*  The Court rejected the plaintiff's argument because 15 U.S.C. § 638(r)(4) "does not appear to be a contract clause applicable to performance under the 2013 Contract" and  the "plaintiff has not cited to any provision of law which directed that the Air Force must include the statement in 15 U.S.C. § 638(r)(4) in" plaintiff's 2013 contract.  *Id.* at 285.  As the Court rejected the plaintiff's argument in *Lite Machines Corp.*, this

Court should similarly reject CMS's arguments for the inclusion of contract administration, oversight, and termination for convenience provisions into the Part D RAC Contract.

## <u>CONCLUSION</u>

ACLR reasserts that there are no disputed issues of material fact and the Plaintiff is entitled as a matter of law to partial summary judgment on its claim of breach of contract and breach of good faith and fair dealing in ACLR I and ACLR II.

Dated:  July 31, 2019

DAVID, BRODY &
DONDERSHINE, LLP

s/Thomas K. David____
Thomas K. David
John A. Bonello
2100 Reston Parkway
Suite 370
Reston, VA 20191
Phone:  703-264-2220
Fax: 703-264-2226
tdavid@dbd-law.com
jbonello@dbd-law.com

Attorneys for Plaintiff ACLR, LLC

16

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 31st day of July 2019, I caused a copy of the foregoing document to be emailed via the ECF system to the following:

Adam E. Lyons
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street NW
Room 11020
Washington, DC 20005


_____/s/_____
Thomas K. David