Nos. 15-767C & 16-309C
(Judge Campbell-Smith)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

ACLR, LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S SUPPLEMENTAL RESPONSE BRIEF IN
SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

---

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

MARTIN F. HOCKEY, JR.
Deputy Director

OF COUNSEL:

LUCY MAC GABHANN
Attorney
Department of Health and Human Services
Office of the General Counsel
General Law Division
Procurement, Fiscal and Information Law Branch
7500 Security Boulevard
Baltimore, MD  21244-1850

ADAM E. LYONS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC  20044
Tel:  (202) 353-2345
Fax: (202) 307-0972
adam.e.lyons@usdoj.gov
Attorneys for Defendant

August 15, 2019

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................4

I.    ACLR's GSA Schedule Contract, Under Which CMS Issued The Task Order, Contains Termination And Oversight Provisions .......................................................... 4

    A.    ACLR Ignores Its Schedule Contract ......................................................... 4

    B.    The Schedule Contract Provisions Gave CMS The Right To Terminate ACLR's Nonconforming Audits ............................................................................. 7

        1.    CMS Had The Contractual Right To Inspect Tendered Services And Reject Services That Did Not Conform To Contractual Requirements ....................................................... 7

        2.    CMS Was Entitled To Stop Performance Of Audits Under Its Express Right To Terminate For Convenience ................................................................................. 8

            a.    The Right To Terminate For Convenience Applies To A Contingency Fee Contract ............ ..................................................................................................10

            b.    Termination For Convenience Is Consistent With Commercial Practices ............ 13

            c.    It Is Irrelevant That CMS Did Not Designate Its Actions As Terminations For Convenience .......................................................................................... 15

            d.    The Government May Rely Upon The Doctrine Of Constructive Termination For Convenience .......................................................................................... 19

II.    GSA Regulations Regarding Schedule Contracts and FAR Parts 8 and 46 Include Mandatory Clauses That, If Missing From The Schedule Contract, Would Be Read Into The Contract Under The *Christian* Doctrine ................................................................. 19

    A.    Federal Regulations Make Inspection And Termination Provisions Mandatory In ACLR's Contract ............................................................................... 20

        1.    Clauses Required By Regulation In GSA Schedule Contracts ................................... 21

        2.    Clauses Required By Regulation In Federal Supply Schedule Task Orders ............. 22

            a.    The Proper Reading Of CGI Confirms That 52.212-4 Would Be Read Into ACLR's Contract Under *Christian* .......................................................................... 24

            b.    ACLR Cannot Read The Absence Of A Necessary Provision As Arguing Against Incorporation Under *Christian* .......................................................................... 25

        3.    FAR Inspection And Acceptance Requirements ....................................................... 26

a.   FAR Part 46 Includes A Mandatory Policy Of Inspection And Rejection Of Nonconforming Services ........................................................................................ 27

b.   FAR 52.246-4 Is A Mandatory Inspection Clause .................................................. 30

B.   Termination And Inspection Rights Are Deeply Ingrained Procurement Principles . 31

1.   *Christian* And Its Progeny Establish That Termination For Convenience Is Fundamental To All Government Contracting ............................................................. 31

2.   The Right To Inspect Tendered Services, And Reject Nonconforming Ones, Is A Deeply Ingrained Principle Of Procurement ............................................................. 33

III.   *K-Con* Does Not Bar The Incorporation Of Contract Administration Provisions ......... 35

CONCLUSION ....................................................................................................................... 36

INDEX TO CONTINUATION OF SUPPLEMENTAL APPENDIX ......................................... 37

# TABLE OF AUTHORITIES

*Adams v. United States*,
117 Fed. Cl. 628 (2014) ................................................................................ 26

*Admiral Fin. Corp. v. United States*,
378 F.3d 1336 (Fed. Cir. 2004).................................................................... 11

*BearingPoint, Inc. v. United States*,
82 Fed. Cl. 181 (2008) ................................................................................. 19

*Best Foam Fabricators, Inc. v. United States*,
38 Fed. Cl. 627 (1997) ................................................................................ 19

*Call Henry, Inc. v. United States*,
855 F.3d 1348 (Fed. Cir. 2017)................................................................... 21

*CGI Federal Inc. v. United States*,
779 F.3d 1346 (Fed. Cir. 2015)............................................................... 2, 24

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)..................................................................................... 22

*College Point Boat Corp. v. United States*,
267 U.S. 12 (1925)................................................................................. 15, 19

*Erwin v. United States*,
19 Cl. Ct. 47 (1989) ................................................................................. 3, 15

*G.L. Christian & Associates v. United States*,
312 F.2d 424 (Ct. Cl. 1963) ..............................................................21, 31-32

*G.L. Christian & Associates v. United States*,
320 F.2d 345  (Ct. Cl. 1963) .............................................................. 3, 31, 32

*Gen. Eng'g & Mach. Works v. O'Keefe*,
991 F.2d 775 (Fed. Cir. 1993)............................................................... 20, 35

*In re Fries*,
378 B.R. 304 (Bankr. D. Kan. 2007) ........................................................... 15

*In re Paris*,
568 B.R. 810 (Bankr. C.D. Cal. 2017)........................................................ 14

*In re Willis*,
143 B.R. 428 (Bankr. E.D. Tex. 1992) ........................................................ 15

*Judd Burstein, P.C. v. Long*,
  180 F. Supp. 3d 308 (S.D.N.Y. 2016)................................................................. 14

*Kalvar Corp. v. United States*,
  543 F.2d 1298 (Ct. Cl. 1976) ............................................................... 9, 18, 19

*K-Con, Inc. v Army*,
  908 F.3d 719 (2019)............................................................................... 3, 35

*Krygoski Const. Co. v. United States*,
  94 F.3d 1537 (Fed. Cir. 1996)....................................................................... 33

*Lite Machines Corp. v. United States*,
  143 Fed. Cl. 267 (2019) .......................................................................... 28, 29

*Lua v. United States*,
  123 Fed. Cl. 269 (2015), *aff'd*, 843 F.3d 950 (Fed. Cir. 2016) ........................... 18

*Maxima Corp. v. United States*,
  847 F.2d 1549 (Fed. Cir. 1988)............................................................... passim

*McBride v. McMillian*
  No. 1:15-CV-0815-AT, 2015 WL 13359893 (N.D. Ga. May 1, 2015) ........................... 15

*Millgard Corp. v. E.E. Cruz/Nab/Fronier-Kemper*,
  No. 99 CIV.2952 LBS, 2003 WL 22801519 (S.D.N.Y. Nov. 24, 2003)......................... 18

*Monco v. Zoltek Corp.*,
  No. 17 C 6882, 2018 WL 5311904 (N.D. Ill. Oct. 26, 2018) ........................... 14

*NCLN20, Inc. v. United States*,
  99 Fed. Cl. 734 (2011), *aff'd*, 495 F. App'x 94 (Fed. Cir. 2012) ..................... 19

*Night Vision Corp. v. United States*,
  68 Fed. Cl. 368 (2005) .................................................................... 27, 28, 29

*Night Vision Corp. v. United States*,
  469 F.3d 1369 (Fed. Cir. 2006) ...................................................................... 28

*Novinger v. E.I. DuPont de Nemours & Co.*,
  809 F.2d 212 (3d Cir. 1987).......................................................................... 14

*Novosteel SA v. United States*,
  284 F.3d 1261 (Fed. Cir. 2002)...................................................................... 18

*Praecomm Inc. v . United States*,
    78 Fed. Cl. 5 (2007) ............................................................................................ 9, 16, 19

*Priebe & Sons v. United States*,
    332 U.S. 407 (1947) ...................................................................................................... 32

*Rice Sys., Inc. v. United States*,
    62 Fed. Cl. 608 (2004) ................................................................................................. 19

*S.J. Amoroso Const. Co., v. United States*,
    12 F.3d 1072 (Fed. Cir. 1993) ...................................................................................... 34

*Schoenbrod v. United States*,
    410 F.2d 400 (Ct. Cl. 1969) ..................................................................................... 4, 20

*SCM Corp. v. United States*,
    645 F.2d 893 (Ct. Cl. 1981) ..................................................................................... 3, 20

*Securiforce Int'l Am. LLC v. United States*,
    879 F.3d 1354 (2018) ................................................................................................ 9, 16

*Smith v. Brown*,
    35 F.3d 1516 (Fed. Cir. 1994) ...................................................................................... 26

*Torncello v. United States*,
    681 F.2d 756 (Ct. Cl. 1982) .......................................................................................... 33

*Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*,
    813 F.2d 1207 (Fed. Cir. 1987) .................................................................................... 13

*United Partition Sys., Inc. v. United States*,
    90 Fed. Cl. 74 (2009) .................................................................................................... 19

*United States v. Thompson Center Arms Co.*,
    504 U.S. 505 (1992) ...................................................................................................... 26

*Van Engers v. Perini Corp.*,
    No. CIV. A. 92-1982, 1993 WL 235911 (E.D. Pa. June 28, 1993) ................................ 18

*White v. Delta Constr. Int'l, Inc.*,
    285 F.3d 1040 (Fed. Cir. 2002) .................................................................................... 10

*Zip-O-Log Mills, Inc. v. United States*,
    113 Fed. Cl. 24 (2013) .................................................................................................... 9

# STATUTES

15 U.S.C. § 638(r)(4) ....................................................................................................... 29

# REGULATIONS

FAR 2.101 .......................................................................................................................... 30

FAR 8.402(a) ...................................................................................................................... 22

FAR 8.403(a)(1) ................................................................................................................. 22

FAR 8.406-2 ....................................................................................................................... 23

FAR 8.406-3 ....................................................................................................................... 23

FAR 8.406-4 ....................................................................................................................... 23

FAR 8.406-5 ....................................................................................................................... 23

FAR 12.301 ........................................................................................................ 5, 13, 14, 24

FAR 12.403 .................................................................................................................. 2, 21

FAR 12.403(a) .................................................................................................................... 23

FAR 16.202-1 ..................................................................................................................... 30

FAR 16.402-3 ..................................................................................................................... 30

FAR 16.404 ......................................................................................................................... 30

FAR 46.000 ......................................................................................................................... 26

FAR 46.102 ........................................................................................................ 3, 27, 29, 33

FAR 46.104 ......................................................................................................................... 33

FAR 46.304 ............................................................................................................. 3, 26, 30

FAR § 49.502 ............................................................................................................... 23, 33

FAR 52.212=4 ............................................................................................................ passim

FAR 52.246-4 ............................................................................................................ passim

FAR 52.249-1 through -7 .................................................................................................. 23

GSAR 552.000 ................................................................................................................ 21

GSAR 552.101-70 ........................................................................................................... 21

GSAR 552.212-4 ............................................................................................ 2, 21, 22, 23

## OTHER AUTHORITIES

*Administration of Government Contracts* 697 (5th ed. 2016) ........................................ 34

*Black's Law Dictionary* (11th ed. 2019) ..................................................................... 26

*Williston on Contracts* 52:18 (2015) ............................................................................ 34

*Restatement (Second) of Contracts* § 77 (1981) ......................................................... 10

*Restatement (Second) of Contracts* § 80 (1979) ......................................................... 11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ACLR, LLC,                          )
                                    )
            Plaintiff,              )
                                    )
    v.                              )    Nos. 15-767C & 16-309C
                                    )    (Judge Campbell-Smith)
THE UNITED STATES,                  )
                                    )
            Defendant.              )

## DEFENDANT'S SUPPLEMENTAL RESPONSE BRIEF IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to the Court's June 26, 2019 order (Order), defendant, the United States, files its supplemental response brief in support of its cross-motion for summary judgment on all counts of the complaint in these two consolidated cases.

## INTRODUCTION

ACLR ignores the law, its contract, and this Court's order to continue to argue for its unfettered discretion to undertake illegitimate audits having no basis. In its Order, the Court not only asked for additional briefing on the *Christian* doctrine, but also required ACLR to "attach a copy of **Contract No. GS-23F-0074W** as an exhibit to its supplemental brief." *Id.* at 3 (emphasis in original). ACLR did not attach a copy of the contract to its brief. Indeed, ACLR appears never to have produced a copy of that document in this case, and acts as though it does not exist.

To rectify this failure, we have attached a copy of Contract No. GS-23F-0074W (Schedule Contract), as it existed on the date ACLR entered into the CMS task order. SA758.[1] As the Court will see, the Schedule Contract plainly includes oversight, warranty, and

---

[1]  References to SA758 through SA1168 are to the continuation of the supplemental appendix, attached to this response.

termination provisions.  Those provisions allow CMS to inspect ACLR's work, reject

unacceptable services, and to terminate for convenience (or default).  SA775, SA778.  The

Schedule Contract also includes an express warranty of merchantability and fitness of purpose.

SA778.  Accordingly, the plain language of the Schedule Contract puts to rest ACLR's claim

that CMS overreached when it did not allow ACLR to proceed with invalid, ill-conceived audits.

The contract into which ACLR entered gave CMS the power that it exercised.

In addition, even if the Schedule Contract did not include these express terms, they would

be incorporated into the contract pursuant to the *Christian* doctrine.  Although the express

language of the Schedule Contract makes it no longer necessary for the Court to undertake a

*Christian* analysis to resolve the parties' dispute, under that doctrine any missing oversight,

warranty, and termination provisions would have to be read into ACLR's contract.  First, just as

ACLR ignores the provisions of the Schedule Contract itself, ACLR ignores the GSA regulations

that make mandatory the termination and inspection rights and warranty in schedule contracts

and the task orders issued under them.  Through GSAR 552.212-4, the GSA has mandated the

incorporation of the termination for convenience and inspection provisions existing in FAR

52.212-4.[2]  Second, FAR part 8 requires inspection and termination rights at sections 8.406-3

through -5.  Those provisions further require compliance with FAR 12.403, which in turn

references FAR 52.212-4.  In accordance with the language of these regulations and the guidance

in *CGI Federal Inc. v. United States*, 779 F.3d 1346, 1353-54 (Fed. Cir. 2015), stating that FAR

part 12 applies to task orders and trumps any conflicting provisions in FAR part 8, these

inspection and termination powers and warranty are part of any Federal Supply Schedule (FSS)

---

[2]  GSAR and FAR clauses identified in this this brief may also be found at the sections
having the same numbering within 48 C.F.R. (2018), *e.g.*, 48 C.F.R. 52.212-4 (2018).

contract.  Third, FAR 46.102 and 46.304 require inspection and termination rights in Government services contracts.  Fourth, and finally, we would be remiss not to point out the obvious – *G.L. Christian & Associates v. United States*, 320 F.2d 345 (Ct. Cl. 1963), involved a termination for convenience provision.  In accordance with those provisions and *Christian* itself, the powers that CMS exercised in this case must be within its contractual authority.

Nothing ACLR states in its supplemental brief changes that conclusion.  The inclusion of a termination for convenience provision does not render the contract illusory.  Supp. Br. at 3, 7, 8-9.  To the contrary, the inclusion of such a provision here is consistent with *Maxima Corp. v. United States*, 847 F.2d 1549 (Fed. Cir. 1988), and leaves CMS bound to its obligations.  Moreover, ACLR was paid under its contract, such that the contract cannot be illusory.  ACLR is also incorrect in its assertions that termination for convenience is inconsistent with commercial practices involving contingency fee arrangements.  Supp. Br. at 2-3, 6-7, 14.  To the contrary, termination for convenience is not only consistent with Government procurement, but generally with contingency fee arrangements.

Regarding a purported lack of notice, Supp. Br. at 5, the concept of constructive termination for convenience directly resolves that issue, allowing the Court to treat an action as a termination for convenience even if it was not designated such at the time.  *See Erwin v. United States*, 19 Cl. Ct. 47, 53 (1989).  Finally, although ACLR mentions *K-Con, Inc. v Secretary of the Army*, 908 F.3d 719 (2019), in its supplemental brief at 15, it fails to address the Court's question of whether that decision bars the incorporation of contract administration provisions under the *Christian* doctrine.  Not only does *K-Con* not create a bar, it actually rules that there is "no case that limits the *Christian* doctrine," in that manner.  *Id.* at 727.  That is consistent with prior decisions that incorporated broad policies under the *Christian* doctrine.  *See SCM Corp. v.*

*United States*, 645 F.2d 893, 903-04 (Ct. Cl. 1981); *Schoenbrod v. United* States, 410 F.2d 400, 401 (Ct. Cl. 1969),

The inspection, warranty, and termination provisions are mandatory and are part of ingrained procurement policies of oversight over contractor performance.  Whether by the express terms of the Schedule Contract or through the *Christian* doctrine, CMS had authority to stop ACLR's improper, invalid audits.

## ARGUMENT

### I.   ACLR's GSA Schedule Contract, Under Which CMS Issued The Task Order, Contains Termination And Oversight Provisions

#### A.   ACLR Ignores Its Schedule Contract

The document ACLR identified in its memorandum in support of its motion for summary judgment (Pl. Mem.) as the "Part D RAC Contract," is only part of the contract controlling the parties' rights and obligations in this case.  Pl. Mem. at 3.  Specifically, the document ACLR attached to its motion as Exhibit 7 (A155),[3] is the task order with ACLR's performance work statement (PWS).  The task order identifies, however, that it is issued under the GSA Schedule Contract (GS-23F-0074W) and that ACLR's work "shall be performed in accordance with the terms and conditions of" that Schedule Contract.  A158 ¶ 1.

ACLR entered into the Schedule Contract on June 17, 2010.  SA758.  Thereafter, GSA repeatedly modified the Schedule Contract, and all other contracts under the same schedule, through what it terms a "refresh."  *See https://vsc.gsa.gov/administration/mods.cfm* (description under "Mass Modifications"), *last visited* July 30, 2019.  When ACLR accepted CMS's task order at issue here on January 13, 2011, *see* A156, the most recent refresh to the Schedule

---

[3]  References to "Axxx" are to the pages of the appendix that ACLR attached to its motion.

4

Contract was refresh 11.  SA761-63.  ACLR signed its acceptance of this refresh on September 29, 2010.  SA761.

Schedule Contract refresh 11 expressly provides that an agency ordering services thereunder has the right to terminate for convenience.  In relevant part, the clause at 52.212-4(1)[4] provides:

> *Termination for the Ordering Activity's convenience*.  The ordering activity reserves the right to terminate this contract, or any part hereof, for its sole convenience.  In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work.  Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the ordering activity using its standard record keeping system, have resulted from the termination.

SA778.[5]  The Schedule Contract also includes a provision allowing termination for cause, the last line of which is that "[i]f it is determined that the ordering activity improperly terminated this contract for default, such termination shall be deemed a termination for convenience."  *Id.* (52.212-4(m)).  Further, we note that the Schedule Contract includes a provision titled "Cancellation," under which either party "may cancel this contract in whole or in part by providing written notice" with the cancellation taking effect "30 days after the other party receives the notice of cancellation."  SA855.

---

[4]  Not only is 52.212-4 in the text of Schedule Contract refresh 11 itself, form 1449 incorporates this provision into the contract by reference.  SA758.

[5]  This language is in the standard version of the clause.  Refresh 11 also includes the Alternate I – Oct 2008 version of the clause, SA787, which would relate to a task order having a "time-and-materials or labor-hour" payment arrangement.  FAR 12.301(b)(3).

In addition, the Schedule Contract provides rights of inspection and rejection of nonconforming services.  For commercial items, § 52.212-4(a) provides the ordering agency with the right "to inspect or test any. . . services that have been tendered for acceptance . . . ." SA775.  Where the services do not conform to the requirements of the contract, the agency may reject them if "repair/replacement or reperformance will not correct the defects or is not possible . . . ."  *Id.*  Sub-provision (o) to 52.212-4 provides an express warranty that the "items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract." *Id.*  The contract also contains provision 52.246-4, titled "inspection of services," providing, essentially, the same inspection and rejection rights as those in 52.212-4 for service contracts generally, as we more fully discuss below at § II.A.3.b.  SA838.

ACLR does not appear to have produced a copy of the Schedule Contract in this litigation and it did not identify the Schedule Contract in its initial disclosures.  SA133-148, SA1141-1146. We first became aware of the relevance of the Schedule Contract when we began work to answer the Court's questions regarding what FAR terms apply to the contract here.  *See* Order. Although it may have assisted the Court and the parties had we discovered this document earlier, CMS is not a signatory to the Schedule Contract[6] and did not have a copy in its possession. ACLR, on the other hand, signed not only the original Schedule Contract, but also each of 14 refreshes occurring during the course of the parties' disputes.  SA761, SA879-893 (subsequent signature pages), SA901 (replacement of 2007 version of clause with 2015 version), SA912-20 (2015 version of clause).  Not only did ACLR plainly know about the Schedule Contract, it acknowledges in its latest brief that the Schedule Contract is "the master contract under which

---

[6]  GSA signed the Schedule Contract refreshes for the Government.  SA758, SA761, SA879-893.

the RAC Part D Contract was issued." Supp. Br. at 6. Despite all of this, not only does ACLR never address the terms of the Schedule Contract, it ignores, without explanation, the Court's order to attach a copy of that document to its supplemental reply. Order, dated June 26, 2019, at 3 ("Plaintiff shall attach a copy of **Contract No. GS-23F-0074W** as an exhibit to its supplemental brief.") (emphasis in original).

Regardless of the reason for ACLR's omission, the Schedule Contract includes terms that are fatal to ACLR's claim that CMS had no rights of oversight over its audits and/or to terminate those audits (either by rejection of non-conforming services or by termination for convenience).

**B.      The Schedule Contract Provisions Gave CMS The Right To Terminate ACLR's Nonconforming Audits**

Whether through the express right in the Schedule Contract to reject nonconforming services or to terminate for convenience (also expressly stated therein), CMS had the power to order ACLR to cease performance. These are express terms in the Schedule Contract and are incorporated by reference in the Task Order. A158 ¶ 1. Because those rights are express provisions of the parties' contract, ACLR's claims in breach of contract do not lie.

**1.      CMS Had The Contractual Right To Inspect Tendered Services And Reject Services That Did Not Conform To Contractual Requirements**

CMS had the right to simply reject any services that did not conform to the contract requirements. As stated in the RFQ, the RAC's mission was to identify overpayments, specifically to "reduce Medicare improper payments through the efficient detection and collection of overpayments, the identification of underpayments, and the implementation of actions that will prevent future improper payments." Def. Add'l Proposed Findings of Uncontroverted Fact Nos. 110, 113. Accordingly, ACLR's performance work statement (PWS), plainly identified three "objectives" for its work, the first two of which were "1. Identifying &

7

Recovering Improper Payments.  2.  Reducing Plan Sponsor/CMS Administrative Burden of Recovery Compliance . . . ."  A188.  ACLR's later-created statement of work (SOW) contains similar language, requiring ACLR to "conduct[] audits using a methodology that focuses on identifying and correcting improper payments to plan sponsors."  A400.

As we previously demonstrated, CMS rejected each of the audits at issue in good faith because those audits did not comply with these contractual standards.  Def. Resp. to Pl. Motion for Summ. J. (Def. Resp.) at 59-61.  With regard to the 2007 duplicate payment audit, ACLR asserted an intent to undertake this audit after having the records for less than a month, without identifying to CMS what records were at issue, and when there was no mechanism for recoupment.  *Id.* at 59.  As to the 2010 duplicate payment audit, preliminary review showed that more than 50% of the records were likely to be false positives, such that the audit would create significant burdens for CMS and plan providers, without recouping incorrect payments.  *Id.* at 60.  ACLR further failed to provide compliant services for that audit (and violated the contract terms on reperforming non-compliant services) when it unilaterally declined to follow the revised methodology CMS requested.  *Id.*  For the 2012-2013 sales tax audits, ACLR proposed to undertake audits that Health Integrity had already determined were without merit.  *Id.* at 61. In short, all of these proposed audits were non-compliant with the contractual purpose and with the express warranty of fitness in the Schedule Contract, as CMS determined and acted upon through the inspection and rejection rights CMS had therein.  SA778.  CMS properly rejected them pursuant to these provisions.

### 2.    CMS Was Entitled To Stop Performance Of Audits Under Its Express Right To Terminate For Convenience

The express right to terminate for convenience gave CMS the right to stop ACLR from performing audits that CMS reasonably believed were nonconforming.  The Federal Circuit has

acknowledged the use of partial terminations for convenience.  *See Securiforce Int'l Am. LLC v. United States*, 879 F.3d 1354 (2018).  The Schedule Contract also recognizes this possibility, giving CMS the power to terminate "any part" of the contract "for its sole convenience." SA778.[7]  In deciding whether to terminate for convenience, the Government "is entitled to considerable latitude."  *Praecomm Inc. v. United States*, 78 Fed. Cl. 5, 12 (2007) (citations omitted).  Where the Government could have, but did not, order termination or convenience, and instead stopped performance for some other reason that was later held invalid, a constructive termination for convenience occurs.  *Zip-O-Log Mills, Inc. v. United States*, 113 Fed. Cl. 24, 31 (2013) ("constructive termination for convenience is a legal fiction which imposes the standard limitations of the termination clause upon a plaintiff even though the termination was never actually ordered by the contracting officer.  The court in such a case proceeds as if the termination had in fact been ordered.") (citing *Kalvar Corp. v. United States*, 543 F.2d 1298, 1306 (Ct. Cl. 1976)).

To the extent not justified under the Schedule Contract inspection and warranty clauses, when CMS rejected ACLR's proposed audits, it was, in essence, issuing partial terminations for convenience.  That CMS did not provide notice at the time it acted would make the terminations constructive, but does not make the actions illegitimate.  To the contrary, CMS had the right to oversee ACLR's performance.  SA775, SA838.  When ACLR took actions that CMS reasonably determined to be inappropriate or incorrect, CMS properly acted to stop ACLR from proceeding.

---

[7] The contract also gives either party the right to "cancel" the contract in whole or in part on thirty days' notice.  SA855.

a. **The Right To Terminate For Convenience Applies To A Contingency Fee Contract**

At various points in its brief, ACLR misreads *Maxima Corp. v. United States*, 847 F.2d 1549 (Fed. Cir. 1988), and its progeny, to assert that a termination for convenience provision in a contingency fee contract renders the contract illusory. Supp. Br. at 3, 7, 8-9. That is not so.

In *Maxima,* a contractor claimed a breach when the agency refused to makes minimum payments owed to it under a completed contract. *Id.* at 1551. This occurred after completion of the contract term, when the agency disclaimed its payment obligation, arguing that it had not in fact ordered any services under the contract, and asserted a termination for convenience. *Id.* at 1551. Although the Court accepted the proposition that the agency could have terminated for convenience during the life of the contract, it found that irrelevant because the agency had not done so. *Id.* at 1555. Instead, the Court held that allowing termination for convenience after full performance would render the contract illusory because termination at that point would be an attempt at "unilateral renegotiation of a contract after it has been fully performed." *Id.* The Federal Circuit has confirmed that the holding in *Maxima* is limited to this point. *White v. Delta Constr. Int'l, Inc.,* 285 F.3d 1040, 1044 (Fed. Cir. 2002) ("All that the court held in *Maxima* was that the government could not retroactively terminate the contract for convenience after the contract had been fully performed." ).

Not only does ACLR misread *Maxima*, but it misconceives the concept of an illusory contract in doing so. Contracts are illusory when "by their terms [they] make performance entirely optional with the 'promisor' . . . ." Restatement (Second) of Contracts § 77 (1981).

First, ACLR did in fact receive compensation under its contract with CMS. A385 ¶ 47 (acknowledging payment on $11.9 million in recoveries); SA746-47 (showing nearly $14 million in recoveries and millions more in appeal). CMS agreed to increases in ACLR's contingency fee

10

over time, but, even at the initial rate of 7.5% on only $11.9 million, CMS's recovery was more

than $800,000.  That payment far exceeds the contractual minimum payment under the Schedule

Contract of $2,500.  SA868.  "The fact that part of what is bargained for would not have been

consideration if that part alone had been bargained for does not prevent the whole from being

consideration."  *Restatement (Second) of Contracts* § 80(2) (1979)), *quoted in Admiral Fin.*

*Corp. v. United States*, 378 F.3d 1336, 1341 (Fed. Cir. 2004).  That ACLR performed audits

under the contract and received compensation precludes the conclusion that the contract was

illusory.

Second, at the time of the termination for convenience, CMS did not owe any amounts to

ACLR.  Def. Resp. at 51-55; Def. Reply in Supp. of Summ. J. (Def. Reply) at 19-21.  Thus,

CMS did not unilaterally disclaim a promise, unlike the *Maxima* defendant.  Instead, when it

exercised its inspection rights or terminated, there was no amount that it owed.  Rather than

attempting to avoid paying for work performed, as was the case in *Maxima*, CMS ordered that

the unperformed work (the audit) not be performed.  This is exactly the type of situation in which

the courts have allowed constructive termination as a means to cap the Government's liability.

*Maxima*, 847 F.2d at 1553-55 (summarizing cases and concluding that "[t]hese cases are in tune

with the purpose of reducing the government's risk based on unexpected events that occur during

the term of a contract, by shifting some of this risk to the contractor.").

Third, under the termination for convenience clause, ACLR remains entitled to recovery

of any amounts then due plus its reasonable costs.  The termination for convenience clause

provides that "[s]ubject to the terms of this contract, the Contractor shall be paid a percentage of

the contract price reflecting the percentage of the work performed prior to the notice of

termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the

ordering activity using its standard record keeping system, have resulted from the termination."
ACLR, however, has no claim under either part of this clause because it did not put in any
significant work on these audits.

Although ACLR asserts in its brief that it spent "months" of work and "thousands of
labor hours" on the audits, Supp. Br. at 4, it presents no factual citation to support these points.[8]
To the contrary, ACLR's testimony was that it did not maintain any records tracking actual hours
worked by employees on particular issues from which one could confirm how much effort it
expended on these audits.  Def. Mot. Fact No. 243.  For that matter, ACLR's testimony is that its
actual work on these audits was minimal.  For example, Christopher Mucke testified that the
work in the 2012 Sales Tax audit was "[p]robably less than a day, maybe a week, or maybe a few
days.  It wasn't very long."  SA1148 [ACLR Rule 30(b)(6) depo. p. 108 at 14 – 19]; *see also*
SA1148 [p. 108 at 14 – p. 109 at 19] (short time frame of work on sales tax proposed audit);
SA1149 [p. 111 at 12 – 21] (failure to track time); SA1150-51 [p. 121 at 21 – p. 122 at 14] (three
or four days to analyze state laws on sales tax); *see also* Def. Resp. at 59 (ACLR proposed 2007
duplicate payment audit within a month of receiving records).

ACLR did make a claim to the contracting officer for $2,668,553 in operating costs and
lost profit.  Def. Resp. at 55.  We have demonstrated that the evidence precludes ACLR's claim
for this amount.  *Id.*  ACLR offered no reply to this conclusion.  *See* Pl. Reply.  Whatever portion
of this amount constituted ACLR's actual work on the disallowed audits, ACLR does not know
what that amount is, has not made a claim for it, and cannot recover.

---

[8]   ACLR appears to cite to ECF 50-11 ¶ 31, in support of having spent months to develop an
audit, but that citation states only "Using this methodology, ACLR identified plan year 2007 Part
D duplicate payment amounts totaling $313,808,241."

In light of all of the foregoing, determining there was a constructive partial termination for convenience regarding the disallowed audits would not render CMS's contract illusory.

### b.    Termination For Convenience Is Consistent With Commercial Practices

ACLR cannot evade termination for convenience by arguing that such is inconsistent with commercial practices.  Supp. Br. at 2-3, 6-7.  Although it raises this assertion repeatedly, ACLR has not pointed to any law in support of the proposition that a contingency contract cannot be subject to termination for convenience.  It also offers no proof in support of its claim that this practice is in fact inconsistent with commercial practices.  In the absence of such support, the allegation fails.  *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1211 (Fed. Cir. 1987) ("Arguments of counsel are not evidence.").

Moreover, because it is standard to include a termination for convenience clause in all Government contracts for the "acquisition of commercial items," such a term is necessarily consistent with commercial practices.  FAR 12.301.  FAR 12.301(b) commands that the Government "[i]nsert the following . . . clauses in solicitations and contracts for the acquisition of commercial items: . . (3) *The clause at 52.212-4 . . . .*"  Because the expectation is that such a clause will be included in Government commercial contracts, with no exception for those with fixed-price contingency fee arrangements, it must be a standard for Government commercial practices.  Indeed, FAR 12.301(b)(3) itself identifies that the provisions of FAR 52.212-4 are "to the maximum extent practicable, consistent with customary commercial practices."

As we discussed in our reply and in more detail below, termination for convenience is a well-established and long standing principle that applies to Government contracts.  *See* below at § II.B.1; *see also* Def. Reply at 11.  ACLR ignores FAR 12.301(b), asserting that 12.301(a) limits inclusion of terminations for convenience clauses to those "required by law or consistent

with customary commercial practices."  Supp. Br. at 2, 6.  In fact, after the admonition in

12.301(a) upon which ACLR relies, 12.301(b) plainly states "[i]nsert the following provisions

. . . (3) The clause at 52.212-4."  There is no limitation in 12.301(b)(3) to only insert the clause if

the agency finds it consistent with commercial practices.  Instead, as 12.301(b)(3) expressly

states, the promulgating authority has already determined that the provisions of 52.212-4 are "to

the maximum extent practicable, consistent with customary commercial practices."

For that matter, the fee structure in *Maxima* is very similar to a contingency fee

arrangement, but the Federal Circuit saw no concern with termination for convenience, so long

as it occurred during the life of the agreement.  In *Maxima*, the contract guaranteed a minimum

monthly payment, regardless of how much work the contractor received, and allowed a higher

fee if the agency asked for services in excess of the minimum amount.  847 F.2d at 1551.  With

the acknowledgment that the agency could have terminated for its convenience during the life of

the parties' contract, the Federal Circuit allowed that it would have been proper for the

Government to enter into this arrangement and then immediately terminate for convenience,

despite depriving the contractor of the ability to obtain a greater (or, indeed, any) fee.  *Id.* at

1555.

In fact, terminating for convenience contingency fee agreements appears to be generally

consistent with commercial practices.  There are any number of cases showing that clients

routinely terminate their attorneys for their own convenience, despite the existence of a

contingency fee agreement, after which the attorneys seek recovery in *quantum meruit*.  *See, e.g.*,

*Novinger v. E.I. DuPont de Nemours & Co.*, 809 F.2d 212, 218 (3d Cir. 1987) (Pennsylvania

law); *Monco v. Zoltek Corp.*, No. 17 C 6882, 2018 WL 5311904, at *2 (N.D. Ill. Oct. 26, 2018)

(unpublished); *In re Paris*, 568 B.R. 810, 816 (Bankr. C.D. Cal. 2017); *Judd Burstein, P.C. v.*

14

*Long*, 180 F. Supp. 3d 308, 312 (S.D.N.Y. 2016); *McBride v. McMillian*, No. 1:15-CV-0815-AT,

2015 WL 13359893, at *3 (N.D. Ga. May 1, 2015) (unpublished); *In re Fries*, 378 B.R. 304, 315

(Bankr. D. Kan. 2007); *In re Willis*, 143 B.R. 428, 432 (Bankr. E.D. Tex. 1992).  Thus, not only

is ACLR's position unsupported and contrary to the terms of the FAR, it appears to be incorrect,

generally.

### c.      It Is Irrelevant That CMS Did Not Designate Its Actions As Terminations For Convenience

ACLR fails as a matter of law with its complaint that there could not be a termination for

convenience here because CMS did not provide notice it was taking that action.  Supp. Br. at 5.[9]

To the contrary, the judge-made doctrine of "constructive termination for convenience"

specifically allows the Court to treat an action as a termination for convenience, after the fact.

*See Erwin v. United States*, 19 Cl. Ct. 47, 53 (1989) (citing *Maxima Corp.*, 847 F.2d at 1553).

That rule stems from the principle the Supreme Court first announced in *College Point Boat*

*Corp. v. United States*, 267 U.S. 12 (1925), that a party to a contract may support its actions at a

later date "'by any reason that could have been advanced at the time of the actions, even though

the party was not then aware of it.'"  19 Cl. Ct. at 53 (citation omitted).  Thus, "a Government

directive to end performance of the work will not be considered a breach but rather a

convenience termination – if it could lawfully come under that clause – even though the

contracting officer wrongly calls it a cancellation, mistakenly deems the contract illegal, or

erroneously thinks that he can terminate the work on some other ground."  *Maxima*, 847 F.2d at

1553.

---

[9]  ACLR asserts this point within the context of a right to terminate for convenience under
the *Christian* doctrine, but the point can be addressed with regard to the expressed right to
terminate for convenience as well.

The only meaningful limitations on this principle are the same as those that apply to any termination for convenience – that the termination not be in bad faith or a clear abuse of discretion.  *See id.* at 1553.  The Federal Circuit recently examined a termination for convenience in *Securiforce*, 879 F.3d 1354.  In that case, the Government contracted for fuel supplies at eight sites on the expectation that the contractor would obtain necessary waivers.  Thereafter, it issued partial terminations for convenience, when it determined it could not wait for the issuance of waivers at two of the sites.  *Id.* at 1358.  *The* Court noted that it reviews terminations for convenience only for (1) bad faith and (2) clear abuse of discretion.  *Id.* at 1363; *see also Praecomm*, 78 Fed. Cl. at 12 (stating same standard for constructive termination for convenience) (citations omitted).  Because there was no bad faith or abuse of discretion where the decision to terminate was reasonable and in the Government's interest, the Court found the terminations for convenience to be proper.  879 F.3d at 1364.[10]

Here, CMS acted in good faith and within its discretion in stopping ACLR from proceeding with invalid, wasteful audits.  In accordance with the principles set forth in the RFQ, and in both the SOW and PWS, CMS expected ACLR to identify incorrect payments and propose audits to recover those payments without imposing undue obligations on CMS and on the plan sponsors.  When ACLR proposed audits that did not comply with these stated expectations, CMS appropriately stopped them.  To the extent those were not rejections of proposed services, they were constructive partial terminations for convenience.

---

[10]  The Federal Circuit in *Securiforce* examined the two convenience terminations as potentially precluding a subsequent default termination of the remaining six sites.  *Id.* at 1363. Finding no bad faith or abuse of discretion, the Federal Circuit rejected the contractor's improper default termination assertion on that basis.  *Id.* at 1365.

Although ACLR argues that it is prejudiced by when this argument arose, its claims in this case and actions demonstrate that this is not so.  Supp. Br. at 10-11.  Because ACLR has asserted a claim in breach of the covenant of good faith and fair dealing, the parties have extensively explored CMS's good faith basis for stopping the audits from proceeding.  *See* Pl. Mot. for Summ. J. at 1; Pl. Mem. at 54-57 (arguments for bad faith); Def. Resp. at 57-66; Pl. Reply in Supp. at 15-35 (arguments for bad faith); Def. Reply at 14-16; Pl. Sur-Reply Br. at 5-6. Indeed, ACLR admits that it has already briefed "many" of its assertions on these points and does not identify what additional assertions it would have made.  Supp. Br. at 10.  In short, this briefing shows that ACLR's claim of prejudice (and underlying claim of bad faith) is unsupportable.

We note that ACLR could have avoided the alleged prejudice had it produced copies of the Schedule Contract with its initial disclosures, such that CMS's rights to inspect and terminate for convenience would have been at the forefront of the case from the outset.  In any event, ACLR ignores that the Court has resolved any prejudice ACLR might have suffered.  We previously identified that when CMS rejected individual audit requests it was "in essence issuing terminations for convenience."  Def. Reply. at 12.  Although we would contend we were not raising a new issue, but instead only responding to ACLR's contention that it was subject to no oversight, when we made this point in our summary judgment reply the concept of constructive termination for convenience was plainly at issue.  Having considered that argument, the Court ordered additional briefing "to ensure that both parties are heard" on this and other points. Order, dated Nov. 1, 2018, at 1.  ACLR had full opportunity to respond at that time.  Thereafter, the Court gave ACLR two additional supplemental briefs, one of which is still to come.

17

In *Novosteel SA v. United* States, 284 F.3d 1261, 1274 (Fed. Cir. 2002), the case ACLR relies upon for the premise that an argument is not properly considered if raised in a reply brief, Supp. Br. at 10, the Court noted that part of the problem with allowing such an approach is that the other party "has no right to respond to the reply brief, at least not until oral argument." Here, the Court has resolved any such concern. If ACLR feels it has additional evidence it should bring to the Court's attention, it can do so.[11] Beyond that, we note that there are two seminal decision from the Court of Claims addressing constructive termination for convenience, *John Reiner & Co. v. United* States, 325 F.2d 438 (Ct. Cl. 1963), and *Kalvar*, 543 F.2d 1298 (Ct. Cl. 1976). In the *Kalvar* decision, the Court of Claims notes at the outset that the issue of constructive termination for convenience was not raised until the summary judgment argument, 543 F.2d at 1300, as it was only at that time that the Government discovered the contract contained a termination for convenience provision. ACLR cites *Kalvar*, repeatedly, in its supplemental brief. Supp. Br. at 7-9.

---

[11] In its sur-reply, though not in its Supplemental Brief, ACLR also argued that termination for convenience is an affirmative defense, causing ACLR prejudice because we did not raise it in our answer. Def. Sur-Reply at 4. ACLR does not point to any Federal Circuit or Court of Federal Claims case advancing that argument. The two unpublished district court cases to which ACLR cites state, without explanation, that termination for convenience is an affirmative defense and do not address whether it can waived. *Van Engers v. Perini Corp.*, No. CIV. A. 92-1982, 1993 WL 235911, at *10 (E.D. Pa. June 28, 1993); *Millgard Corp. v. E.E. Cruz/Nab/Fronier-Kemper*, No. 99 CIV.2952 LBS, 2003 WL 22801519, at *5 (S.D.N.Y. Nov. 24, 2003). "An affirmative defense is an assertion raising new facts and arguments that, if proven, defeat the plaintiff's claim even if the allegations in her complaint are true" as opposed to a matter that "merely negates" an element of the plaintiff's claim. *Lua v. United States*, 123 Fed. Cl. 269, 275 (2015), *aff'd*, 843 F.3d 950 (Fed. Cir. 2016) (citation omitted). Termination for convenience merely negates ACLR's claim of breach, and is not an affirmative defense.

> **d.   The Government May Rely Upon The Doctrine Of Constructive Termination For Convenience**

ACLR also misstates the law with its argument that the doctrine of constructive termination for convenience is "normally" used by contractors seeking compensation, such that its use in this case would be incorrect.  Supp. Br. at 8.  It is accurate that some contractors have attempted to invoke the doctrine to their advantage, as occurred in the two cases that ACLR relies upon to show that such is "normal."  *Id.* (citing *United Partition Sys., Inc. v. United States*, 90 Fed. Cl. 74, 93 (2009); *BearingPoint, Inc. v. United States*, 82 Fed. Cl. 181, 182 (2008)). Although we do not dispute that creative litigants may seek to use the law in innovative ways, precedent makes clear that the concept of constructive termination for convenience applies where the Government seeks to justify a termination under a right of which it was unaware at the time of termination.  *College Point*, 267 U.S. 12.  Indeed, as noted, the Court of Claims first addressed constructive termination for convenience in *John Reiner*, 325 F.2d at 443, and later in *Kalvar*, 543 F.2d at 1302.  Both of those decisions found constructive termination in favor of the Government.  *Id.*  There are a host of later cases applying the doctrine to justify the Government's termination of contracts.  *See, e.g.*, *NCLN20, Inc. v. United States*, 99 Fed. Cl. 734, 764 (2011), *aff'd,* 495 F. App'x 94 (Fed. Cir. 2012); *Praecomm*, 78 Fed. Cl. at 12; *Rice Sys., Inc. v. United States*, 62 Fed. Cl. 608, 634 (2004); *Best Foam Fabricators, Inc. v. United States*, 38 Fed. Cl. 627, 629 (1997).

## II.   GSA Regulations Regarding Schedule Contracts and FAR Parts 8 and 46 Include Mandatory Clauses That, If Missing From The Schedule Contract, Would Be Read Into The Contract Under The *Christian* Doctrine

Although the convenience termination provision contained in the Schedule Contract resolves the *Christian* doctrine issue, we provide the following additional analysis in response to the Court's Order.  Generally, to read a provision into a contract under the *Christian* doctrine, the

provision must be (1) required and (2) a "deeply ingrained strand" of procurement policy.  *Gen.*
*Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993).  Numerous provisions
applicable to ACLR's contract fulfill these requirements and would be incorporated if not
already there.

A.      **Federal Regulations Make Inspection And Termination Provisions**
        **Mandatory In ACLR's Contract**

Plaintiff misreads the *Christian* doctrine requirement that a provision be "mandatory" as
meaning that the provision at issue must be a contract clause (not a policy statement) and must
state that the contracting officer "shall" incorporate it in the contract.  Supp. Br. at 11-12.  A
provision having those qualities is mandatory, but so are other provisions that do not.  Thus, in
*SCM Corp. v. United States*, 645 F.2d 893, 903-04 (Ct. Cl. 1981), one of the cases the *General*
*Engineering* Court relied upon as showing the incorporation of a mandatory provision under the
*Christian* doctrine, the provision at issue was the right of one government agency to obtain cost
and pricing data from another agency.  The clause did not expressly identify that it "shall" be
incorporated into any contract, but was, nonetheless, mandatory.  *Id.*  In another of the cases that
*General Engineering* highlights, *Schoenbrod v. United States*, 410 F.2d 400, 401 (Ct. Cl. 1969),
the issue was whether one of the "general policies" of Federal acquisitions (using the "method of
procurement which will be most advantageous to the Government") could be omitted from a
contract.  In light of *Christian*, the *Schoenbrod* court determined that this policy had to be
incorporated, though the regulation does not expressly state that it "shall" be.  *Id.* at 403.  In light
of these cases, it is simply incorrect to read *Christian* as limiting incorporation to contract
clauses, as opposed to broader policies, and only to clauses that expressly state they "shall" be
incorporated.

ACLR also improperly seeks to limit "mandatory" to those provisions that are "congressionally enacted."  Supp. Br. at 1.  To do so, it asserts that the Court in *Call Henry, Inc. v. United States*, 855 F.3d 1348, 1351 n.1 (Fed. Cir. 2017), defined mandatory in this way.  *Id. Call Henry*, however, did not attempt to define the meaning of mandatory.  Instead, the full sentence in the footnote from which ACLR selectively quotes simply states "[p]ursuant to the Christian doctrine, the mandatory SCA clauses applicable to this contract are incorporated by reference, as those clauses reflect congressionally enacted, deeply ingrained procurement policy."  In other words, a Congressionally enacted principle is mandatory.  There is no basis to conclude from *Call Henry*, however, that only a Congressionally enacted principle has that status.  Quite to the contrary, the principle at issue in *Christian* itself was a regulation, not a Congressionally enacted statute.  312 F.2d at 424.

### 1.      Clauses Required By Regulation In GSA Schedule Contracts

Not only does the Schedule Contract in fact include termination, inspection, and warranty provisions, but, as a matter of law, it must do so.  That is because the GSA has issued regulations (the GSAR) that supplement the FAR, and which require the inclusion of these provisions.  *See* GSAR 501.101; GSAR 501.104(d).

The sections within GSAR part 552 provide contract "provisions and clauses which are unique to GSA or supplement the FAR."  GSAR 552.000.  At GSAR 552.101-70(b), titled "Using part 552," the GSA identifies that any clause that it has promulgated to replace all or part of a standard FAR clause is designated by having "the same title as a clause in the FAR" and appearing "under the same subsection number and caption as in the FAR," but with the "number 5" preceding the clause.  At GSAR 552.212-4, a regulation having the same title and appearing under the same subsection number and caption as FAR 52.212-4, the GSA promulgated several

deviations[12] to FAR 52.212-4.  The GSA left unchanged, however, the original text regarding inspections (sub-clause (a)), terminations (sub-clauses (l) and (m)), and warranties (sub-clause (o)).  Also unchanged is the mandate in FAR 52.212-4 to include that provision in contracts for commercial items.  *Id.* ("insert the following clause").

"It has been established in a variety of contexts that properly promulgated, substantive agency regulations have the 'force and effect of law.'"  *Chrysler Corp. v. Brown*, 441 U.S. 281, 296 (1979) (citations omitted).  ACLR agrees that its contract is a commercial contract.  Supp. Br. at 6 ("As noted by the Court, the master contract under which the RAC Part D Contract was issued was a FSS commercial contract.").  GSA schedule contracts, in fact, exist for the purpose of obtaining "commercial supplies and services . . . ."  FAR 8.402(a).  Accordingly, pursuant to GSA regulations, made into law through incorporation in the C.F.R., GSA schedule contracts must include FAR 52.212-4, as modified by GSAR 552.212-4.  Therefore, the inspection/acceptance requirements, termination rights, and warranties in FAR 52.212-4 are required in any GSA schedule contract, including ACLR's Schedule Contract.

As we discuss above, *see* § I.B, these clauses expressly grant CMS the rights it exercised here.

### 2.    Clauses Required By Regulation In Federal Supply Schedule Task Orders

Because ACLR's contract is a task order under a FSS contract, A158, FAR part 8 applies. FAR 8.403(a)(1) states, "[p]rocedures in this subpart apply to—(1) Individual orders for supplies or services placed against [FSS] contracts; and (2) [blanket purchase agreements] established against [FSS] Contracts."  Accordingly, even absent the express provisions in the Schedule

---

[12]  GSAR 552.252-6 provides that any GSA clause that is alters a standard FAR provision is identified as a "deviation."

Contract and the provisions the GSAR requires to be there, consistent with the analysis in *Christian*, numerous provisions in part 8 would require the contractual oversight and cancellation rights that ACLR contends do not exist.

FAR 8.406-2 provides inspection and acceptance/rejection rights.  That provision gives the agency "the right to inspect all services in accordance with the contract requirements and as called for by the order. . . ."  FAR 8.406-2(b).  Where a service "does not conform to the order requirements," the agency has the right to order "corrective action" and, if the contractor fails to comply with that order, the agency "may terminate the order for cause.  FAR 8.406-3.  Also mandatory under this subpart are the termination for cause provision, FAR 8.406-4, and the termination for convenience provision, FAR 8.406-5.

Both of these termination provisions require that terminations comply with FAR 12.403, which references FAR 52.212-4 and distinguishes the rights in FAR 52.212-4 from FAR part 49 provisions that "do not apply when terminating contracts for commercial items."[13]  As we demonstrate above, FAR 52.212-4 (modified in non-relevant part by GSAR 552.212-4) is already mandatory in the Schedule Contract, but, if it were not, it would be mandatory in the task order through this incorporation.  Although ACLR complains that FAR 12.403 "simply states a general policy," Supp. Br. at 2, that is not correct.  Instead, by making terminations subject to

---

[13] ACLR argues about whether the clauses at FAR 52.249-1 through -7 are appropriately incorporated into its contract.  Supp. Br. at 3.  With regard to FAR 52.249-2, it argues that, because it does not have a fixed-price contract, this clause is inapplicable.  In fact, ACLR's task order is specifically termed a "firm fixed-price contingency fee task order."  A158.  Accordingly, ACLR'S argument is without merit.  It is of note, however, that FAR 52.249-2 states that it is required under FAR 49.502(b)(1)(i).  Because FAR 12.403(a) makes the provisions at part 52, rather than those at part 49, applicable to ACLR's contract, incorporation of 52.212-4, rather than 52.249-2, would be appropriate.

52.212-4, this provision makes 52.212-4 mandatory. Moreover, as we address above, statements of policy are appropriate for incorporation under *Christian*. *See* § II.A.

Thus, because FAR 52.212-4 would be incorporated through FAR parts 8 and 12, CMS would, again, have the inspection, warranty, and termination rights it exercised here. *See* § I.B, above.

**a.      The Proper Reading Of CGI Confirms That 52.212-4 Would Be Read Into ACLR's Contract Under *Christian***

As the Court has already noted, the Federal Circuit in *CGI Federal Inc. v. United States*, 779 F.3d 1346, 1353-54 (Fed. Cir. 2015), determined that FAR part 12 applies to task orders and trumps any conflicting provisions in FAR part 8. In light of that precedent, we note that FAR 12.301(b) requires the inclusion of FAR 52.212-4 into all contracts for purchase of commercial items. Accordingly, were there some conflict between FAR parts 8 and 12 over whether FAR 52.212-4 is mandatory, the requirement for that clause in 12.301 would determine the issue.

ACLR incorrectly attempts to render *CGI* inapplicable through its assertion that termination and oversight provisions are at odds with commercial practices for contingency fee contracts. Supp. Br. at 14. But ACLR references no support for its contention that these terms are at odds with commercial practices. The better reading of the FAR and *CGI* is that Government oversight and right to terminate for convenience apply to commercial fixed-fee contingency contracts, just as they apply to other Government fixed-fee contracts.

ACLR also incorrectly attempts to extrapolate from the payment provision at issue in *CGI* to make a termination for convenience here contrary to commercial practices. Supp. Br. at 14-15. *CGI* was a pre-award bid protest concerning a Medicare audit contract, in which plaintiff challenged proposed payment terms allowing payments for contingency fees to be withheld during the life of a challenge to the recovery. 779 F.3d at 1347-48. The *CGI* Court found terms

24

allowing payment to be withheld for 120 to 420 days (during an appeal) to be contrary to commercial practices.  *Id.* at 1352.  From that, ACLR argues the payment terms in its contract are "outside of commercial practices" and, therefore, there "is simply no rationale reason for a unilateral termination for convenience clause to be included in a binding contract where the consideration due to the party who is providing services is tied to a condition subsequent of the payor party."  Supp. Br. at 14-15.  In making that argument, ACLR improperly conflates two different issues.  It may be that holding payment until after resolution of any appeals is not commercially reasonable, but an attempt to invalidate part of the contract is not part of ACLR's complaint in these cases.  *See* Pl. Mem. at 1 (identifying claims as breach of contract and breach of the duty of good faith and fair dealing).  Equally, that holding payment for months or more may be unreasonable has no bearing on whether it is commercially acceptable to have a termination for convenience term under which the contractor gets paid for its costs in case of such a termination.  Such a clause is a standard practice in Government commercial contracts.

> **b.      ACLR Cannot Read The Absence Of A Necessary Provision As Arguing Against Incorporation Under *Christian***

ACLR also asserts the circular argument that the reason the task order does not include a termination for convenience provision is because that concept is not consistent with commercial practices.  Supp. Br. at 14.  If that argument were accepted, however, it would render *Christian* a nullity.  The *Christian* doctrine applies where a contract policy or clause has been omitted.  To take the omission as proof that the clause cannot be read in under *Christian* makes the doctrine without effect.  That reading must be incorrect.

In any event, the reason the task order does not include this provision is that the task order expressly does not restate language already present in the Schedule Contract.  A158 ("Only those contract sections which differ from General Services Administration (GSA) Contract

25

Number GS-23F-0074W . . . or provide more detailed information specific to this particular Task Order, are provided below.  For those contract sections not identified below, all terms and conditions of the contract remain in effect.").

### 3.  FAR Inspection And Acceptance Requirements

To the extent ACLR can avoid FAR 52.212-4 through arguing that the clause is not consistent with commercial practices in contingency fee contracts, inspection and rejection rights would still be incorporated through FAR part 46.  In part 46, the FAR "prescribes policies and procedures to ensure that supplies and services . . . conform to the contract's quality and quantity requirements."  FAR 46.000.  To "prescribe" is to "dictate, ordain, or direct; to establish authoritatively (as a rule or guideline)."  *Prescribe*, Black's Law Dictionary (11th ed. 2019).  Indeed, the FAR itself makes clear that "prescribe" means mandatory.  Thus, the FAR provides at 46.304 that the "officer shall insert the clause at 52.246-4," and, at 52.246-4, refers to inserting 52.246-4 as being "prescribed in 46.304."  "Our normal canons of construction caution us to read the statute as a whole, and, unless there is a good reason, to adopt a consistent interpretation of a term used in more than one place within a statute."  *United States v. Thompson Center Arms Co.*, 504 U.S. 505, 512 (1992); *see also Adams v. United States*, 117 Fed. Cl. 628, 658 (2014) ("[C]anons of construction of course apply equally to any legal text and not merely to statutes.") (citing *Smith v. Brown,* 35 F.3d 1516, 1523 (Fed. Cir. 1994)).  Thus, where the FAR uses "prescribe" it means mandatory and the provisions set forth in FAR part 46 are mandatory terms.

As we illustrate above, inspection and acceptance requirements are already expressly included in the Schedule Contract.  *See* § I.B.  To the extent they were not, however, there are several provisions in this FAR part 46 that would have to be.

a.     **FAR Part 46 Includes A Mandatory Policy Of Inspection And Rejection Of Nonconforming Services**

Pursuant to FAR 46.102, "[a]gencies shall ensure that (a) Contracts include inspection and other quality requirements . . .  (b) Supplies or services tendered by contractors meet contract requirements . . . (d) No contract precludes the Government, from performing inspection; (e) Nonconforming supplies or services are rejected . . . ."  ACLR attempts to disclaim the impact of this provision, first, by pointing to language in sub-clause (f) that "'Contracts for commercial items shall rely on the contractor's existing quality assurance system as a substitute for compliance with Government inspection and testing . . . .'"  Supp. Br. at 11 (quoting FAR 46.102(f)).  Accordingly to ACLR, this language limits the Government to relying on ACLR's systems for all of the inspections listed in FAR 46.102.  Supp. Br. at 11.  To make that argument, however, ACLR elides the part of that sub-clause that identifies that it only applies to "Government inspection and testing *before tender for acceptance*."  FAR 46.102(f) (emphasis added).  That an agency is limited in inspecting a contractor's work before the contractor asserts that the work is ready is not a meaningful limitation on CMS's right to determine whether the audits, as tendered, fulfilled contractual requirements.  Instead, once services are tendered for acceptance, the Government has full rights to inspect them and to reject those that do not meet contractual requirements.

Second, ACLR asserts that these requirements are not mandatory because they are "policies" not "clauses."  Supp. Br. at 11.  As we explain above, ACLR's limited reading of the precedent to exclude inclusion of policies under the *Christian* doctrine is not well-taken.  *See* § II.A.

Third, ACLR misconstrues the trial court decision in *Night Vision Corp. v. United States*, 68 Fed. Cl. 368 (2005), *aff'd*, 469 F.3d 1369 (Fed. Cir. 2006), to argue that a "regulatory

provision" cannot be incorporated under *Christian*.  Supp. Br. at 12.  That decision does not

support ACLR's argument because the *Night Vision* Courts did not rely upon the *Christian*

doctrine to resolve the question they answered.

In *Night Vision*, a contractor, who had developed new technology under Small Business

Innovation Research (SBIR) phase I and II contracts, sought to use the *Christian* doctrine to

impose a requirement that the agency grant it a phase III SBIR contract.  *Id.* at 370.[14]  The Court

rejected the argument because the regulation concerning phase III SBIR contracts gave the

agency discretion over whether to enter into such contracts.  *Id.* at 383-84.  The *Night Vision* trial

court did not state that the *Christian* doctrine cannot apply to regulatory provisions, but instead

ruled against the contractor because the policy the contractor relied upon did not require the

agency to take any action.  *Id.* at 383 ("While § 638(j)(2)(C) clearly directs the SBA

Administrator to take action in issuing procedures, nowhere does it impose an obligation directly

upon a procuring agency nor does it create any enforceable rights under a SBIR contract."); *id.* at

384 ("The plain language of these sections indicates that the awarding of a Phase III contract is

not obligatory . . . .").  Indeed, in its affirmance, the Federal Circuit does not even mention

*Christian*.  *See* 469 F.3d at 1374 ("In sum, § 638 imposes no duty on the government to award a

Phase III contract to a concern that successfully completes a Phase II contract.").

ACLR also misconstrues the decision in *Lite Machines Corp. v. United States*, 143 Fed.

Cl. 267 (2019), another SBIR case and one that relies upon *Night Vision*.  Supp. Br. 15-16.  Like

in *Night Vision*, the plaintiff in *Lite Machines* attempted to use *Christian* to force the

Government to enter into a Phase III SBIR contract with it.  143 Fed. Cl. at 280.  The *Lite*

---

[14] ACLR's representation that *Night Vision* involved the Government's attempt to invoke *Christian* is not correct.  Supp. Br. at 12.

*Machines* Court repeatedly quoted the *Night Vision* trial court and Federal Circuit decisions before reaching the same conclusion as the prior courts did.[15]  Specifically, because "the statutory section does not mandate award to a particular entity . . . .  The statute . . . did not impose mandatory contractual obligations on the Air Force during performance or close out of the 2013 Contract just because 15 U.S.C. § 638(r)(4) was in effect when the 2013 Contract was executed."  *Id.* at 286.  In short, *Lite Machines* only stands for the proposition that a statute granting an agency discretion cannot dictate that the agency reach any particular result; it does not create a rule about what types of statutes or regulations are appropriately considered under *Christian*.

Fourth, ACLR asserts that FAR 46.102 includes "qualifying terms" making it not mandatory.  Supp. Br. at 12.  The only such "qualifying term" in the relevant portions of this clause, however, relates to whether a warranty clause should be included.  FAR 46.102(a).  That subclause states, "Contracts include inspection and other quality requirements, *including warranty clauses when appropriate*, that are determined necessary to protect the Government's interest."  There are no similar limitations to the plain language that "[a]gencies shall ensure" that services meet contractual requirements (FAR 46.102(b)), that the agency has the right to inspect (FAR 46.102(d)), and that non-conforming services are rejected (FAR 46.102(e)).

FAR 46.102 requires the agency to have the ability to inspect tendered services and to reject those that do not conform to contract requirements.  This is a mandatory policy and is appropriately included in a contract under *Christian*.

---

[15]  Due to amendment, the language of the SBIR was slightly different by the time of the *Lite Machines* case from what it had been in *Night Vision.*  143 Fed. Cl. at 285.  Presumably, this change required the Court to undertake a full analysis, rather than simply relying on precedent.

**b.**     **FAR 52.246-4 Is A Mandatory Inspection Clause**

FAR 46.304 provides, in relevant part, "[t]he contracting officer shall insert the clause at

52.246-4, Inspection of Services-Fixed-Price, in solicitations and contracts for services . . . when

a fixed-price contract is contemplated and the contract amount is expected to exceed the

simplified acquisition threshold."   The simplified acquisition threshold is $150,000, FAR 2.101,

an amount well below what ACLR did recover (and was expected to recover under the CMS

contract).   Pl. Mot. at 22 (claiming to expect billions in expected overpayments and millions in

recoveries); A385 ¶ 47 (acknowledging payment on $11.9 million in recoveries).

Under its plain terms, ACLR's task order with CMS constitutes a fixed-price contract.

A158 ("firm fixed-price contingency fee task order."); *see also* SA005.  FAR 16.202-1 defines a

"firm-fixed-price" contract as one where the price "is not subject to any adjustment on the basis

of the contractor's cost experience in performing the contract. . . .   The contracting officer may

use a firm-fixed-price contract in conjunction with an award-fee incentive (see 16.404) and

performance or delivery incentives (see 16.402-2 and 16.402-3 ) . . . . The contract type remains

firm-fixed-price when used with these incentives."  Not only does the task order self-define as a

firm fixed price contract, and is the FAR definition consistent with pricing under ACLR's

contract, but also there is no more applicable provision in FAR part 16, which "describes the

types of contracts that may be used in acquisitions," than FAR 16.202-1.

Under FAR 52.246-4(c), "[t]he Government has the right to inspect and test all services

called for by the contract, to the extent practicable at all times and places during the term of the

contract."  Where the inspection shows the services are non-conforming, the Government may

"require the Contractor to perform the services again in conformity with contract requirements,

at no increase in contract amount.  When the defects in services cannot be corrected by

reperformance, the Government may – (1) Require the Contractor to take necessary action to ensure that future performance conforms to contract requirements . . . ."  FAR 52.246-4(e). Where "the Contractor fails to promptly perform the services again or to take the necessary action to ensure future performance in conformity with contract requirements, the Government may . . . [T]erminate the contract for default."  FAR 52.246-4(f).

In short, the Government's right of inspection and rejection of services is mandatory in Government contracting.  Under that right, CMS appropriately examined ACLR's proposed audits and rejected them as nonconforming.  It further either determined that re-performance would not correct the defects or suggested corrections that ACLR refused to undertake.  Under those facts, CMS acted within its rights in stopping ACLR's proposed audits.

### B.   Termination And Inspection Rights Are Deeply Ingrained Procurement Principles

#### 1.   *Christian* And Its Progeny Establish That Termination For Convenience Is Fundamental To All Government Contracting

As the *Christian* court found, the availability of termination for convenience in Government contracts is a deeply ingrained strand of procurement policy.  *Christian*, 320 F.2d at 355.

*G.L. Christian & Associates v. United States*, 312 F.2d 418, 419, 423 (Ct. Cl. 1963) (*Christian I*) examined whether the Department of Defense could terminate a construction contract for convenience, where the contract did not contain a provision allowing it to do so. That was a meaningful question, because termination without that right would lead to a suit for lost profits, where a suit after termination for convenience is limited to a claim for costs incurred. *Id.* at 423.  In support of its position, the Government pointed to a clause in the Armed Services Procurement Regulations that a termination for convenience clause "shall be inserted" into fixed-

price construction contracts. *Id.* at 424. The *Christian I* court noted that this regulation, issued under statutory authority, "had the force and effect of law." *Id.* (citation omitted).

The *Christian I* court further noted that a termination clause that "limits profit to work actually done, and prohibits the recovery of anticipated but unearned profits . . . is a deeply ingrained strand of public procurement policy." *Id.* at 16. It then reviewed a history of defense department procurement, concluding that "the Defense Department *and the Congress* would be loath to sanction a large contract which did not provide for power to terminate and at the same time proscribe anticipated profits if termination did occur." *Id.* (emphasis added). Accordingly, the court found the regulation "necessarily applicable" to the contract, and incorporated it therein as a matter of law. *Id.* at 17.

The court expanded upon its opinion in a second decision, *G.L. Christian & Associates v. United States*, 320 F.2d 345 (Ct. Cl. 1963) (*Christian II*). That opinion came after plaintiff's request for reconsideration and examined whether the agency had the authority to establish regulations concerning contract termination. *Id.* at 347. The *Christian II* court explained how broad an authority purchasing agencies have: "'The power to purchase on appropriate terms and conditions is, of course, inferred from every power to purchase.'" *Id.* at 348 (quoting *Priebe & Sons v. United States*, 332 U.S. 407, 413 (1947)). Accordingly, for years prior to any statutory authority, Government agencies had placed termination-for-convenience clauses in contracts. *Id.* Thus, "procurement administrators can properly act under broad and general authority until Congress sees fit to channel and guide their conduct more precisely" and the "history of contract-termination over the past decades . . . proves the propriety and reasonableness of the normal articles for a convenience-termination." *Id.* at 349, 350.

The Federal Circuit has spoken about the history of termination for convenience since *Christian II*, making it clear that the requirement is now ingrained in civilian Government contracting.  *See Krygoski Constr. Co. v. United States*, 94 F.3d 1537 (Fed. Cir. 1996).  As the Court noted, the first edition of the Federal Procurement Regulations included optional termination for convenience clauses, making those mandatory in most contracts by 1967.  *Id.* at 1541.  Thus, the requirement of termination for convenience became a "principle for Government contracts of far-ranging varieties."  *Id.* (citing FAR 49.502 (1995)); *see also Maxima Corp.*, 847 F.2d at 1552 (citing *Torncello v. United States,* 681 F.2d 756, 765-66 (Ct. Cl. 1982)) ("After World War II termination for convenience came to be applied to peacetime non-military procurement, in order to achieve the *same fundamental purpose . . . .*") (emphasis added).

In sum, the right to terminate for convenience is a deeply ingrained procurement principle.

**2.     The Right To Inspect Tendered Services, And Reject Nonconforming Ones, Is A Deeply Ingrained Principle Of Procurement**

Inspection and rejection rights are deeply ingrained principles of Federal (indeed all) procurement.  In no small part, the FAR itself establishes this point.  As we explained in our reply in support of summary judgment at 11-12, FAR 46.102, FAR 46.104, and FAR 52.246-20(b) all set forth how deeply ingrained it is that the Government ensure that requested materials meet contractual requirements.  ACLR's argument in response to this point has been that these are general policies, not mandatory contract clauses.  *See* Pl. Sur-Reply at 6-9; Supp. Br. at 11-14.  That argument admits that these are general policies and nowhere disputes that they show an ingrained procurement policy.

33

*Christian II* notes that the "power to purchase on appropriate terms and conditions is, of course, inferred from every power to purchase.'" *Id.* at 348 (citation omitted).  Although the *Christian II* court discussed this principle with regard to the right to terminate for convenience, the principle also supports the point that the Government has the right to inspect to make certain that it is purchasing in accordance with the "appropriate terms and conditions" of the contract.

A review of the relevant literature reinforces these points.  Nash & Cibinic report that the Government's "primary goal" in contracting "is to obtain timely performance in accordance with the contract specifications" and a "secondary goal . . . is to preserve the integrity of the competitive procurement system," both of which it ensures through its "substantial rights to monitor performance and to take appropriate steps when performance is unsatisfactory." Cibinic, Nagle, & Nash, *Administration of Government Contracts*, 697 (5th ed. 2016).  Another commentator notes that "inspection, acceptance and warranty provisions are among the most crucial clauses in the contract, particularly so for the Government," and "inspection is the key method used by the Government to insure that it receives, and accepts, the items for which it contracted . . . ."  Goldberg, 3 *Federal Contract Management* 15.01 (2018).  Indeed, inspection rights are considered essential to contracting generally:  "The Uniform Commercial Code provides that . . . the buyer has a right before either paying for the goods or accepting them . . . to inspect them . . . ."  Lord 18 *Williston on Contracts* 52:18 (2015).

The Federal Circuit has considered the longstanding use of an acquisition requirement as evidence that it is an ingrained policy.  Thus, in *S.J. Amoroso Const. Co., v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993), the Court found evidence that the Buy American Act was an ingrained strand of procurement policy in the fact that it had been part of the FAR for 25 years. The inspection clause at FAR 52.246-4 stems from a clause first appearing in the Armed

34

Services Procurement Regulation in 1971.  22 No. 4 *Nash & Cibinic Rep*. ¶ 22.  This is another

proof of its status as a deeply ingrained part of procurement policy.

For any and all of these reasons, inspection and rejection rights are deeply ingrained

procurement principles.

**III.    *K-Con* Does Not Bar The Incorporation Of Contract Administration Provisions**

In this section of our response, we answer the Court's question of whether *K-Con*, 908

F.3d 719 (2019), bars the incorporation of contract administration provisions under the *Christian*

doctrine.  Order at 3.  It does not.  To the contrary, *K-Con did not limit Christian*, but instead

determined that a contractor's suggested limits to the *Christian* doctrine did not apply.  908 F.3d

at 727.

The specific question in *K-Con* was whether the *Christian* doctrine would justify

incorporating a specific payment bond requirement into a construction contract.  *Id.*  Plaintiff

argued that *Christian* only applied to "'administration-type provision[s]' . . . such as

terminations, changes and the like . . . ."  *Id.* (citation omitted).  The Court, however, did not

agree that prior cases had limited the *Christian* doctrine to incorporation of "administration-type

provisions."  Instead, the *K-Con* Court concluded that, even if prior cases had in fact only dealt

with that type of provisions, there is "no case that limits the *Christian* doctrine" in that way.  *Id.*

The Court held the requirement incorporated under *Christian*.  *Id.* at 728.

In its brief, ACLR does not address the Court's question.  Instead, its argument regarding

*K-Con* is that the case stands for the proposition that a contract provision must be mandatory for

incorporation under *Christian*.  Supp. Br. at 15.  Although we note that even non-mandatory

provisions can be incorporated under *Christian*, *see General Engineering*, 991 F.2d at 780, for

purposes of this case the Court need not reach that issue.  It need not reach that issue because the

35

issue does not change the outcome, where, first, the inspection and termination clauses are already part of the contract, *see* § I.B., and second, inspection and termination provisions are mandatory, *see* §.II.A.

## **CONCLUSION**

Because termination, inspection, and warranty clauses are part of the contract, or are incorporated under *Christian* as mandatory and ingrained principles of procurement, the Government properly availed itself of its rights under those clauses here.  For these reasons, as are more fully set forth above and in the prior briefing in support of our cross-motion for summary judgment, the Government respectfully requests summary judgment in its favor on all counts of the complaints in Nos. 15-767C and 16-309C.

Respectfully submitted,

JOSEPHY H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

s/ Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Deputy Director

OF COUNSEL:

s/ Adam E. Lyons
ADAM E. LYONS

LUCY MAC GABHANN
Attorney
Department of Health and Human Services
Office of the General Counsel
General Law Division
Procurement, Fiscal and Information Law
Branch
7500 Security Boulevard
Baltimore, MD  21244-1850

Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC  20044
Tel:  (202) 353-2345
Fax: (202) 307-0972
adam.e.lyons@usdoj.gov

September 15, 2019

Attorneys for Defendant

## INDEX TO CONTINUATION OF SUPPLEMENTAL APPENDIX

Executed Form 1449, dated June 17, 2010 …………………………………………. SA758

Schedule Contract Refresh 11, dated Sept. 29, 2010 ……………………………….. SA761

Schedule Contract Refresh, dated June 13, 2011  (signature page only) ………………… SA879

Schedule Contract Refresh, dated June 13, 2011 (signature page only) ………………… SA880

Schedule Contract Refresh, dated Aug. 30, 2011 (signature page only) ………………… SA881

Schedule Contract Refresh, dated Sept. 6, 2011 (signature page only) ……………….… SA882

Schedule Contract Refresh, dated Mar. 27, 2012 (signature page only) ………………… SA883

Schedule Contract Refresh, dated Jan. 14, 2014 (signature page only) ….……………… SA884

Schedule Contract Refresh, dated Jan. 16, 2014 (signature page only) ….……………… SA885

Schedule Contract Refresh, dated Jan. 21, 2014 (signature page only) ………………… SA886

Schedule Contract Refresh, dated Jan. 23, 2014 (signature page only) ….……………… SA887

Schedule Contract Refresh, dated Sept. 2, 2014 (signature page only) ….……………… SA888

Schedule Contract Refresh, dated Feb. 4, 2015 (signature page only) ………………… SA889

Schedule Contract Refresh, dated May 12, 2015 (signature page only) ………………… SA890

Schedule Contract Refresh, dated Sept. 29, 2015 (signature page only) ……………….. SA881

Schedule Contract Refresh, dated Oct. 3, 2015 (signature page only) ……………….… SA892

Schedule Contract Refresh, dated Oct. 26, 2015 (signature page only) ………………… SA893

Schedule Contract Refresh, dated Feb. 24, 2016…………………………….………… SA894

Initial Disclosures, dated Sept 30, 2016 …………………………………………..… SA1141

Excerpts from ACLR Rule 30(b)(6) deposition, dated Sept. 11, 2017 ………………….. SA1147