# IN THE UNITED STATES COURT
# OF FEDERAL CLAIMS

| | |
|---|---|
| ACLR, LLC | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Civil Action No. 15-767 and 16-309 |
| | ) (Judge Campbell-Smith) |
| THE UNITED STATES | ) |
| | ) |
| Defendant | ) |

## PLAINTIFF ACLR, LLC'S *CHRISTIAN* DOCTRINE
## SUPPLEMENTAL REPLY BRIEF

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………….……iii

INTRODUCTION……………………………………………………………………....1

ANALYSIS……………………………………………………………………………..1

      I.  Whether CMS's request for the Court to adopt the *Christian* doctrine to incorporate a termination for convenience clause into a contract already containing the clause is appropriate……………………………………………1

      II.  CMS's development of a factual record in compliance with the Court's Order for a supplemental briefing on the *Christian* doctrine……………………..2

      III.  The application of *CGI Fed. Inc.* to the PART D RAC Contract and its relevance to the termination for convenience clause dispute……………………..7

      IV.  CMS's retroactive termination for convenience defense …………………..10

CONCLUSION……………………………………………………………………..13

# **TABLE OF AUTHORITIES**

Cases                                                                                         Page(s)

*CGI Federal Inc., v. United States*,
   779 F.3d 1346 (Fed. Cir. 2015) ……………………………...………1,7,8,9
*Erwin v. United States*,
   19. Cl. Ct. 47, 52 (1989)……………………………………………………….13
*LaLonde v. Sec'y of Health & Human Servs.*,
   746 F.3d 1334 (Fed. Cir. 2014)………..………………………………………13
*Novosteel SA v. U.S., Bethlehem Steel Corp.*,
   284 F.3d 1261 (Fed. Cir. 2002)…………..………………………………......2
*Torncello v. United States,*
   681 F.2d 756 (Ct. Cl. 1982)……………………………………...………3,4,11
*United Partition Sys., Inc. v. United States*,
   90 Fed. Cl. 74 (2009) ……………………………………………………...…11
*Poston Logging*, AGBCA 97-168-1, 99-1 BCA ¶ 30188, 41 GC ¶ 60………………… 12


Regulations

FAR 12.403(a)……………………………………………………………………...10
FAR 49.6……………………………………………………………………………10
FAR 49.601-1………………………………………………………………………10
FAR 49.601-2………………………………………………………………………10
FAR 52.212-4(a)……………………………………………………………………..9
FAR 52.249-2………………………………………………………………………10

**INTRODUCTION**

Consistent with this Court's June 26, 2019 Order, Plaintiff ACLR, LLC ("ACLR") responds to the Defendant United States' ("CMS") August 15, 2019 Supplemental Response Brief ("CMS Response Brief").

As outlined in greater detail below, ACLR addresses the primary fallacies of CMS's ongoing and evolving defense assertions. First, ACLR will address CMS's abandonment of its request of the Court to apply the *Christian* doctrine to incorporate "termination for convenience" language and FAR contract oversight provisions into the Part D RAC Contract. Second, ACLR will discuss the Court's June 26, 2019 Order for supplemental briefing on the *Christian* doctrine and CMS's failed attempts to create a factual record contradicting evidence demonstrating that CMS expressly decided not to move forward with a termination for convenience and sworn testimony by CMS leadership that it never intended to fulfill its promises under the Part D RAC Contract. Third, ACLR will address the applicability of *CGI Fed. Inc. v. United States*, 779 F.3d 1346 (Fed. Cir. 2015) to the Part D RAC Contract and *CGI Fed. Inc.*'s relevance to the termination for convenience clause dispute. Finally, ACLR will address CMS's new retroactive termination for convenience defense.

**ANALYSIS**

I. **Whether CMS's request for the Court to adopt the *Christian* doctrine to incorporate a termination for convenience clause into a contract already containing the clause is appropriate.**

As articulated in the CMS Response Brief, CMS acknowledges that it has finally read its contract with ACLR and that "the express language of the Schedule Contract makes it no longer necessary for the Court to undertake a *Christian* analysis to resolve the parties' dispute." ECF 70 at 10. ACLR agrees. ACLR also notes that CMS's attempts to disavow responsibility for its

waste of both the Court's and ACLR's time and resources based on ACLR's purported failure to produce its Schedule Contract is without merit. ACLR produced the Schedule Contract as part of its May 24, 2016 document production in .pst file Bates stamped A04164. ACLR also provided the Schedule Contract to the Court on August 23, 2019 and apologizes for not attaching a copy as part of ACLR's July 31, 2019 Supplemental Brief as requested by the Court.

## II. CMS's development of a factual record in compliance with the Court's Order for a supplemental briefing on the *Christian* doctrine.

The Court has noted and CMS has acknowledged that it first raised its constructive termination for convenience argument in its Reply Brief in Support of its Cross-Motion for Summary Judgment. ECF 70 at 25. The Court's November 1, 2018 Order expressly limited briefing by ACLR to the topics raised in that Order stating "Plaintiff should limit its rebuttal of the content of defendant's reply brief to these topics" and ACLR filed its brief accordingly. ECF 62 at note 1. In the Court's subsequent request for a supplemental briefing, the Court made no indication that it desired further factual development on whether the constructive termination for convenience defense argued by CMS was supported by the evidentiary record. ECF 66. ACLR notes that CMS, in its response to ACLR's argument under *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) that defenses newly raised in a reply brief were untimely, asserted that any additional evidence that could be brought to the Court's attention should be. ECF 70 at 26. While a lengthy trial would be required to present the abundance of evidence demonstrating CMS's bad faith and abuse of discretion throughout the entirety of the Part D RAC Contract, ACLR would be remiss to not at this juncture submit at least some token evidence demonstrating the frivolity of CMS's current contentions.

Having finally read the entirety of its contract with ACLR, CMS's overarching argument contends that it was contractually obligated to terminate, for the convenience of the government,

2

ACLR's duplicate payment and sales tax audits on the basis that CMS inspected the tendered audits and rejected those audits on the basis they "did not conform to contractual requirements." ECF 70 at 15.  CMS proffers no evidence to support these claims.  Indeed, the word "inspect" never appears anywhere in either CMS's or ACLR's proposed uncontroverted statements of facts.  The Court is simply left with CMS factually unsupported arguments.  The evidentiary record directly contradicts CMS's arguments.

It is important to note that the Part D RAC Contract is governed by the Performance Work Statement ("PWS"), in effect during the period of January 13, 2011 through December 31, 2013, and two separate statements of work for the two option year periods in effect for January 1, 2014 to December 31, 2014 ("OY1 SOW") and January 1, 2015 to December 31, 2105 ("OY2 SOW").  ECF 50-11 at ¶¶ 7-8, 43, 72.  CMS awarded the Part D RAC contract to ACLR on January 13, 2011 for the express purpose of identifying and collecting improper payments.  *Id.* at ¶ 8.  Concurrent with CMS's execution of ACLR's contract, it is the sworn testimony of CMS Director Cindy Moreno, the person responsible for Part D RAC program implementation, that CMS hired another contractor to implement the Part D RAC program and develop a new statement of work.  *Id.* at ¶ 12.  She further testified that ACLR would be unable to execute its contract and PWS to recover improper payments or be compensated until the program was implemented in a manner that was satisfactory to CMS.  *Id.* at ¶ 13.  Finally, she made no effort to notify ACLR of those intentions.  *Id.*  CMS's attempt to apply a retroactive termination for convenience with respect to ACLR's work conducted during the period the PWS was in effect should be summarily dismissed by the Court consistent with the guidance articulated in *Torncello v. United States*, 681 F.2d 756 (Ct. Cl. 1982).  When the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by

adverting to the termination for convenience clause.  *See id.*  Even if CMS had not so grievously breached the Part D RAC Contract in defiance of *Torncello*, overwhelming evidence of CMS's breach is acknowledged by CMS personnel directly involved in Part D RAC Contract execution.  They admitted that CMS did not meet PWS requirements and that CMS also ignored PWS processes and Part D RAC task order requirements regarding ACLR's collection of improper payments.  ECF 50-11 at ¶¶ 14-17.  Finally, the Government Accountability Office ("GAO") issued a public report on CMS's execution of the Part D RAC Contract.  In that report, the GAO confirmed that CMS had ignored the Part D RAC Contract.  *Id.* at ¶¶ 16, 18, and 96.  CMS also avers as part of its rationale for rejecting ACLR's November 2011 duplicate payment audit that "there was no mechanism for recoupment."  ECF 70 at 16.  While CMS's failure to institute a mechanism for recoupment of overpayments was ultimately rectified two years after initial contract award, CMS could not have entered into the contract in good faith when ACLR's sole basis for payment relied on a mechanism that did not exist.

      CMS's contentions regarding ACLR's plan year 2012 and 2013 sales tax NAIRP are equally flawed and demonstrate a total lack of understanding of the Part D Contract and the summary judgment motions currently under review.  ACLR's plan year 2012 and 2013 sales tax NAIRP was submitted by ACLR to CMS for review, not an audit.  *See* ECF 70 at 16.  CMS's request of the Court to go through the machinations of a termination for convenience application with respect to ACLR's plan year 2012 and 2013 sales tax NAIRP is entirely superfluous.  ACLR does not here, nor has it ever, asserted that CMS does not have a right under the SOWs to deny a proposed audit issue.  Indeed, after taking three years to develop its SOW for the Part D RAC Contract, CMS then proceeded to deny 100 percent of all the audit issues submitted by ACLR during OY1 SOW and OY2 SOW periods.  ECF 50-11 at ¶ 98.  ACLR's allegation of

breach of contract and breach of duty of good faith and fair dealing for the plan year 2012 and 2013 sales tax issue pertain, in part, to CMS's failure to abide by contracted terms and conditions regarding CMS's failure, and among other things, to notify ACLR of unreviewable records and CMS's falsification of the disposition of corrected/reimbursed amounts pertaining to sales tax improper payments. ECF 50-1 at 50-59 and 61-64; ECF 57 at 27-39. In its denial of ACLR's 2012-2013 sales tax NAIRP, CMS contended that these improper payments had already been "corrected/reimbursed" by Health Integrity (NBI MEDIC) and therefore constituted a duplicative review impermissible under the Part D RAC Contract. ECF 50-11 at ¶ 83.

The deposition testimony of CMS's Contracting Officer Nicole Hoey and COR Sonja Brown, as well as Health Integrity, establishes that not only had CMS not been reimbursed for these improper sales tax payments, but that Health Integrity did not recover improper payments or even review the PDE records submitted to CMS in ACLR's plan year 2012-2013 sales tax NAIRP. ECF 50-11 at ¶¶ 86-89. CMS's contention that "ACLR proposed to undertake audits that Health Integrity had already determined were without merit" is also false. ECF 70 at 16. The sworn testimony of Health Integrity's representative specifically stated that amounts billed for sales tax by plan sponsors to CMS were not proper and not that they "were without merit." ECF 57 at 31 and 37. Moreover, Health Integrity's "National Study" analysis concerned records from 2014 -- not 2012-2013 PDE records as in ACLR's sales tax NAIRP. *Id.* at 28. How could the charging of sales taxes on PDE records in states that do not have a sales tax be an audit that would be "without merit"?

CMS also contends that ACLR's services pertaining to the 2010 duplicate payment audit were also rejected due to contract non-compliance and, as such, a permissible retroactive termination for convenience. This contention is equally farcical. In this instance, the evidence

shows that not only had CMS considered a termination for convenience regarding the 2010 duplicate payment audit but that it rejected it outright (App. at Ex. 180, RAC "Hot" Items, A1020-A1023), relying instead on a Technical Direction Letter, issued by the COR, to terminate the audit absent contractual authority. ECF 50-11 at ¶¶ 67 and 69. There was no language in the Part D RAC Contract permitting the termination of an approved audit. ECF 50-11 at ¶ 69. Moreover, section 8 of the Part D RAC Contract expressly prohibits the action taken by the COR:

> The term "Contracting Officer's Technical Representative" means the person who monitors the technical aspects of contract performance. The Contracting Officer's Technical Representative is not authorized to issue any instructions or directions which cause any increase or decrease in the Statement of Work/Performance Work Statement/Specifications which would result in the increase or decrease in the price of this contract, or changes in the delivery schedule or period of performance of this contract.

App. at Ex. 7, Part D RAC Contract, A161.

The COR's technical direction was an impermissible decrease in ACLR's work under Part D RAC Contract because it directly led to a decrease in the monies ACLR would have received had it been permitted to complete the audit. CMS's assertion that this audit would "create significant burdens for CMS and plan providers" is also without merit. ECF 70 at 16. CMS's submissions to this Court contain no admissible evidence of the audit creating a significant burden on plan providers and no evidence whatsoever of the audit creating a burden on CMS. *See* ECF 57-6. CMS also errors in its contention that ACLR "unilaterally declined to follow the revised methodology CMS requested." ECF 70 at 16. ACLR demonstrated, after its review of evidence submitted by plan providers, that CMS's revised methodology was wrong in 76% of all cases. ECF 57-6 at ¶ 208. ACLR also demonstrated that these payments were improper as defined by the Office of Management and Budget, which was responsible for

6

establishing improper payment guidance. *See* ECF 50-11 at ¶ 68; ECF 57-6 at ¶ 208. In the end, CMS's decision to terminate the plan year 2010 duplicate payment audit, despite the status of the PDE records as legally recoverable improper payments, was based on the inaccuracy of CMS's own revised methodology and not through the actions of ACLR. *See* ECF 50-11 at ¶ 68. CMS's contentions as they pertain to retroactive application of terminations of convenience are unsupported by the evidentiary record and should be rejected by this Court.

    **III.**    **The application of *CGI Fed. Inc.* to the Part D RAC Contract and its relevance to the termination for convenience clause dispute.**

CMS's reliance on *CGI Fed. Inc. v. United States*, 779 F.3d 1346 (Fed. Cir. 2015) is ironic in light of CMS's actions in connection with the Part D RAC contract. In *CGI Fed. Inc.*, the Court determined that a delay in payment to a contractor -- 120 and 420 days after a bone a fide demand for payment -- was commercially unviable. *See id.* at 1354 and 1358. Under the Part D RAC Contract, waiting a period of 120 to 420 days would have been a vast improvement when considering CMS waited well over 500 days to recoup amounts, including payments for which a plan provider readily agreed that ACLR should be paid. More incredibly ironic, on April 11, 2019, 1,031 days after a demand for payment was made to plan providers, CMS denied ACLR's claim for payment, which was 1,172 days since the date of the filing of the Complaint in this action. Indeed, CMS has effectively said there is no timeline for payment - a position by a governmental agency that is not overly respectful of the Court's rulings.

The Court avers that the holding in *CGI Fed. Inc.* applies with equal force to the FAR Part 12 provisions cited earlier in the Order that might be relevant to the termination for convenience clause dispute and requests the parties' analysis of the same. ACLR agrees and notes that the Court look no further than CMS's contentions pertaining to, and the factual basis of, ACLR's 2010 duplicate payment audit.

While CMS disputes ACLR assertions that it "spent 'months' of work and 'thousands of labor hours' on audits," it is a matter of record that ACLR originally submitted its proposal for auditing the 2010-2012 duplicate payments on January 2, 2014. ECF 50-11 at ¶ 47. It is also undisputed that upon CMS's approval of the audit, ACLR commenced a series of actions pertaining to its audit. Included in these actions were ACLR's identification of potential improper payments and its submission of findings to CMS's data validation contractor ("DVC"), subsequent review of validation findings, submission of information requests to plan providers, and the receipt, compilation, and review of evidentiary support submitted by plan providers as well as the development of exception reports and supporting documentation to submit to the DVC for validation. *Id.* at ¶¶ 47-63. Had CMS not stopped the audit, ACLR would also have developed and issued demand for payment letters to plan sponsors and generally assisted CMS during the appeals process. *See* App. at Ex. 22, A438-439.

CMS's position cannot survive *CGI Federal Inc.* scrutiny. The Court's finding in *CGI Federal Inc.* clearly articulated that a payment delay of 120 days to 420 days was not consistent with customary commercial practices and could, in and of itself, establish a breach of contract and breach of duty of good faith and fair dealing as well as bad faith and abuse of discretion. Here, CMS first raises its termination for convenience defense in its Reply Brief in Support of its Cross-Motion for Summary Judgment filed August 3, 2018 -- 1,318 days after ACLR completed its audit of 2010 duplicate payments. ECF 50-11 at ¶ 63. It seems unlikely that a Court would find retroactive constructive termination commercially viable after a delayed payment greater than the magnitude in *CGI Fed. Inc.* and 3 and a half years after ACLR had completed its audit, assisted in CMS's multi-year appeals process, and recouped amounts owing. Certainly, had ACLR known that CMS would deny 100 percent of all the issues it submitted to CMS for

8

recovery for the OY1 SOW and OY2 SOW periods, ACLR would not have executed OY1 SOW and OY2 SOW.  ACLR would not have generated any income over that length of time and proceeding would have been commercially unviable and ultimately unsustainable.  To permit CMS to reach back several years to eliminate an audit that was approved, audited, and supported and executed in accordance with contracted terms and conditions would render all such contracts illusory.  In short, contractors would have no assurance that payments for services tendered would be ever be secured.  The use of retroactive constructive terminations for convenience in the manner asserted by CMS are without merit and should not withstand a *CGI Fed. Inc.* challenge.

A court, at least in the circumstances occurring in connection with ACLR's 2010 duplicate payment audit, could also determine that CMS's failure to permit ACLR to repair/replace or reperform the audit to correct the deficiencies within the audit methodology, as outlined in FAR 52.212-4(a), would be similarly unviable commercially.  In typical commercial recovery audit settings, recovery auditors routinely modify and revise findings associated with improper payments and recoup such amounts accordingly.  Such activities are commonplace in tax audits.  In tax audits, taxpayers and/or auditors routinely file refund claims with taxing jurisdictions that then audit the claims and negotiate and/or modify refundable amounts owing. Here, CMS mandated the use of CMS's Uniform Examination Program ("UEP") duplicate payment protocol to identify duplicate payments.  ECF 50-11 at ¶ 49.  A protocol that identified potential duplicates that were determined to be "not duplicates" after subsequent reviews of supporting documentation.  App. at Ex. 181, Excerpts from Deposition of Deidre Reed at 81:13-23, A1024-A1027.  ACLR, after reviewing supporting documentation submitted during the 2010 duplicate payment, made the same determination and informed CMS of the protocol's

9

deficiencies on December 24, 2014.  ECF 57-6 at ¶¶ 208, 222, and 232.  In its December 24, 2014 letter, ACLR informed CMS that the CMS's revised audit methodology had an error rate exceeding 76% and proposed ACLR's own revised methodology, which supporting documentation had been shown to be accurate in over 84% of all records identified.  *Id.*  CMS refused ACLR's more accurate methodology relying instead on CMS's own flawed methodology before claiming that CMS "continued to have concerns with the validity of overall results" and issuing a Technical Direction Letter effectively terminating the audit on April 24, 2015.  ECF 50-11 at ¶¶ 67-68.  A court could reasonably find that CMS's failure to permit the repair of this audit, using a methodology it mandated and where a cure was readily available and routinely adopted in such settings amounted to bad faith and an abuse of discretion.

IV. **CMS's retroactive termination for convenience defense.**

CMS's introduction of a new legal defense theory after several years of litigation leaves that doctrine ripe for factual development to weigh its veracity.[1]  It is also apparent that CMS avoided testing its retroactive termination for convenience claim against several guideposts established by regulation and controlling case law.  For example, the standard termination for convenience clause, FAR 52.249-2, which is to serve as guidance for all terminations made under a GSA Schedule contract (*See*, FAR 12.403(a)), requires that all termination notices to a contractor be in writing.

Moreover, FAR 49.6 sets forth only two specific formats that an agency should use when they terminate a contract for convenience. (FAR 49.601-1 Electronic Notice and FAR 49.601-2 Letter Notice). Nowhere in the entirety of the FAR is the concept of a retroactive termination for convenience discussed or approved.  The logical rationale for requiring notices

---

[1] ACLR's Schedule Contract was provided to CMS at contract execution and during ACLR's document production on May 24, 2016 in .pst files Bates A04164.

10

to be in writing is so that all related processes can be accomplished in a timely and orderly manner (i.e., contractor's notices to all subcontractors and vendors, contractor's generation and submission of a termination proposal, etc.).

Since a retroactive termination for convenience is not premised on a regulatory or statutory mandate, one must look to judicial decisions to locate its foundation. Numerous CDA claims challenge the legitimacy of an agency's termination for default. If this Court finds that a termination for default is misplaced or unsupported, the Court may convert the termination for default to a termination for convenience whereby the aggrieved contractor may obtain a degree of relief. In *United Partition Sys., Inc. v. United States*, 90 Fed. Cl. 74, 95 (2009), the Court held "the government improperly terminated the contract for default. The termination is converted to a constructive termination for the government's convenience." It is undisputed that ACLR was not viewed by CMS to be in default of its obligations under the RAC Part D Contract.

A retroactive termination for convenience is unavailable to an agency if the Government entered into the subject contract with foreknowledge that they would not employ the contract consistent with its terms. For example, in *Torncello v. United States,* 681 F.2d 756 (Ct. Cl. 1982), the Court of Claims limited the constructive termination for convenience doctrine by holding that the Government may not reserve for itself "an unlimited right to escape its promises, as termination on knowledge acquired before the contract award surely is," since such a right would risk "violating one of contract law's most fundamental principles, that all contracts must be supported by consideration." *Torncello,* 681 F.2d at 768 (citing *Nash & Cibinic, Federal Procurement Law* 1115 (3d ed. 1980).

Here, the financial fruits of ACLR's efforts could only be realized by ACLR if CMS reasonably pursued and recouped improper payments to third parties that had been identified

through ACLR's audits. Inconsistent with its prescribed role, as noted above, CMS has now admitted that "there was no mechanism for recoupment" when they awarded the contract to ACLR. ECF 70 at 16.

Noted cases have also held that a retroactive termination for convenience cannot be applied when there has been a breach by the Government. In *Poston Logging*, AGBCA 97-168-1, 99-1 BCA ¶ 30188, 41 GC ¶ 60, the respective Board of Contract Appeals held that the Government had breached a timber sales contract by not permitting the contractor to harvest trees that it was permitted to cut under a reasonable interpretation of the contract. The Board rejected the Government's argument that it was entitled to the protection of a retroactive application of a termination clause, stating:

> What the [Government] has attempted to do here with the environmental termination clause is to reach back in time to exercise a right of cancellation which it had available at one time (while the contract was still in effect), but which it never acted upon. The right to terminate under the environmental clause does not go on indefinitely. Here, [the contractor] has proven that the disputed matter ripened into a material breach and it has further shown that it properly elected to declare the contract in breach (in this case, well before the [Government] even considered application of the termination clause). Under the facts here, we have decided to limit the use of the termination clause.

More germane to the matter at hand, when a litigant claims that an agency has breached a contract due to its failure to exercise good faith and fair dealing, the burden of showing that the agency acted appropriately shifts to the Government. CMS summarily dismisses ACLR's evidence of CMS's breach of contract and breach of duty of good faith because CMS allegedly "acted in good faith and within its discretion in stopping ACLR from proceeding with invalid, wasteful audits." ECF 70 at 24. CMS's mere assertion that it acted in good faith does not satisfy the burden it holds. For example, ACLR's duplicate payment audits and sales tax NAIRP identified at least hundreds of millions of dollars in overpayments that CMS was legally required

to recover. Nevertheless, CMS acknowledged that as of May 2015, CMS had collected less than $10 million in Part D improper payments.  ECF 53 at ¶ 99.  CMS must exhibit its proper conduct not through the advocacy claims of counsel which do not serve as evidence before the Court. "Counsel's arguments thus remain unsupported and remain merely arguments, not evidence." *LaLonde v. Sec'y of Health & Human Servs.,* 746 F.3d 1334 (Fed. Cir. 2014).  Rather, factual evidence which must be placed before the Court.

The matter of whether there was a retroactive termination for convenience entitling CMS to summary judgment is a question of fact which precludes CMS's quest for summary judgement. *See Erwin v. United States,* 19 Cl. Ct. 47, 54 (1989). In *Erwin*, the Court also stated that it will apply a retroactive termination for convenience only when a contractor is unwilling to perform the requirements of the contract. *Id.* As noted frequently, ACLR was extremely willing, and obviously able, to perform all the requirements of the RAC Part D Contract as evidenced by its duplicate payment audits, submission of its sales tax NAIRP, and diligent pursuit of all related activities.

## CONCLUSION

ACLR respectfully asserts that ACLR is entitled as a matter of law to partial summary judgment on its claim of breach of contract and breach of good faith and fair dealing in ACLR I and ACLR II.

Dated: August 30, 2019

>                            DAVID, BRODY &
>                            DONDERSHINE, LLP
>
>                            s/Thomas K. David
>                            Thomas K. David

13

John A. Bonello
2100 Reston Parkway
Suite 370
Reston, VA 20191
Phone:  703-264-2220
Fax: 703-264-2226
tdavid@dbd-law.com
jbonello@dbd-law.com

Attorneys for Plaintiff ACLR, LLC

15

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of August 2019, I caused a copy of the foregoing document to be emailed via the ECF system to the following:

Adam E. Lyons
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street NW
Room 11020
Washington, DC 20005

/s/ Thomas David
Thomas K. David