# EXHIBIT B



# ACLR

38705 Seven Mile Rd.
Suite 251
Livonia, Michigan 18152
Ph: 734.744.4400  Fax: 734.744.4450

June 26, 2020

Nicole Hoey
Department of Health & Human Services
Centers for Medicare and Medicaid
7500 Security Blvd; M/S C2-21-15
Baltimore, MD 21244-1850

Re:  *ACLR, LLC v. United States*, Nos. 15-767C and 16-309C (Fed. Cl.)
     Termination for Convenience Settlement Proposal - Remand Order

Contracting Officer Hoey:

I have received and reviewed your May 28, 2020 request for a revised settlement proposal utilizing a price based method for determining compensation as articulated under FAR 52.212-4(l) (Mar 2009) (Deviation Feb. 2007). The attached settlement proposal has been calculated as requested.

I have also received and reviewed your June 4, 2020 letter regarding the measurement of audit value and your request that ACLR agree that the contract price for each audit is $0. While I would not commit ACLR to such an agreement I also do not believe that such a valuation is necessary. As articulated under the PWS and the SOW, ACLR's primary responsibility was to identify and recover improper payments. While the mechanism used to accomplish this is the recovery audit, the value is determined by the amount of improper payments identified. As such, I have determined value based on the amounts identified and determined the percentage of completion as a component of time spent by ACLR during the recovery audit process.

While I would agree that a flawed audit methodology and overturned appeals may affect the PY10 Duplicate Payment audit, such would not be the case with the PY07 Duplicate Payment Audit. As I articulated in my letter to COR Brown dated December 23, 2014, evidence submitted by plan sponsors during the PY10 Duplicate Payment audit demonstrated that the PY07 Duplicate Payment audit methodology was accurate. This, coupled with over 16.7 million identified PDE records and a then 15 day appeal deadline[1] means that this amount may be calculated with some exactitude. I have provided additional details in the attached settlement proposal. Regardless, I have adjusted the amounts to reflect issues that, while unlikely, could affect amounts owing.

---

[1] *As articulated under the definition of improper payments, the burden of proof is on the payee to demonstrate the efficacy of the payment. Please also see Footnote 4.*

I have also included those costs associated with both obtaining a retroactive Termination for Convenience and calculating Termination for Convenience settlement costs. Throughout the course of this contract, ACLR, made multiple attempts to obtain an equitable adjustment so that it could recoup costs expended while CMS delayed project implementation. As you are aware, the rationale for the contracting office's denial was that there was no mechanism under a contingency fee based contract by which an equitable adjustment could be made. Because of this position, ACLR was required to engage legal counsel and expend additional personnel hours for the sole purpose of obtaining a legal decision in this case. As a settlement from CMS was unobtainable without such efforts, we deem these costs directly related to calculating Termination for Convenience costs under 48 CFR 52.249-2. While we would agree the FAR is otherwise silent with respect to legal and administrative costs arising from actions related to obtain a court ruled retroactive termination for settlement, we do believe these amounts would be deemed allowable by the court and have included them in our proposed settlement for CMS approval or denial.

All exhibits and additional supporting documentation may be found on the secured drive that is being sent to you. 842736754 is the code needed to access this drive.

I certify that this settlement proposal is made in good faith, and that the supporting data are accurate and complete to the best of my knowledge and belief.

Please let me know if you require additional information.

Very truly yours,

Christopher A. Mucke
Managing Principal

## SETTLEMENT PROPOSAL[2]

I have prepared the following revised settlement proposal to meet CMS requirements. In this proposal, we have segregated our percentage of completion and valuation determinations. As outlined in Exhibit A, audit costs and settlement fees total $8,855,433 and treasury rate interest totals $1,563,515 for a total proposed settlement fee of $10,418,948.

*Percentage of Completion:*

The percentage of completion was determined as a factor of time required to comply with contractual requirements regarding the preparation, execution, and completion of the recovery audits. With respect to the PY10 Duplicate Payment Audit, this was calculated according to ACLR efforts as required under the OY1 SOW[3]. These efforts are specifically addressed in Appendix E.

For the PY07 Duplicate Payment Audit; however, there was no specific timeline associated with preparing, executing, and completing recovery audits. The PWS, as well as the activities conducted during the initial base year period; however, mimicked many of the same processes later conducted under the OY1 SOW period. These processes, as well as those needed to conduct recovery audits occurred during specific periods. To calculate a percentage of completion for these periods, we reviewed specific time components related to developing a secured system to receive Part D payment data; developing recovery audit and payment calculation processes; and reviewing existing laws and regulations regarding Part D appeal requirements.

*Valuation:*

As noted above, the value of a recovery audit contractor is to identify and recover improper payments. Improper payments are defined, in part, by the OMB as[4]:

> An improper payment is any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements... In addition, when an agency's review is unable to discern whether a payment was proper as a result of insufficient or lack of documentation, this payment must also be considered an improper payment.

Part D payments are also governed by federal laws such as the Controlled Substances Act and HIPAA; state laws, and CMS administrative guidance. Each of the audits terminated for convenience during this contract were conducted, and have been valued, in strict accordance

---

[2] *The total proposed amount has been summarized in Exhibit A.*
[3] *Please see Footnote 25.*
[4] *Please see Exhibit B.*

with these laws[5], administrative promulgations[6], and guidance[7]. These values were also calculated in strict accordance with state laws requiring the accurate and uniform documentation of dispensation and electronic maintenance of prescription dispensing event data such as; prescription/service reference number, patient and prescriber information; drug name, quantity, dosage, fill information; and directions for use.

**PY07 DUPLICATE PAYMENT AUDIT COST CALCULATION:**

As articulated under the PWS[8], the PY07 Duplicate Payment Audit was conducted as a "Data Audit", or "Automated Review", as later identified by CMS. This type of audit was similar to the Automated Review discussed under the OY1 SOW[9]. The tasks required to identify and recover duplicative improper payments consisted of developing a secure location to secure CMS data; obtain "needed" PDE data; "review this data for completeness"; "identify duplicate payments across Plan Sponsors and PDPs"; "generate reports of these errors"; provide "to Plan Sponsors for review"; and recover amounts owing. Additionally, ACLR was required to provide "assistance to CMS throughout the appeals process for any disputed amounts if required".

The final PY07 Duplicate Payment Audit Cost was determined by multiplying the net value of $81,106,299 by the 7.5% contingency fee rate identified in the initial task order[10] to obtain an ACLR fee of $6,082,972. This amount was then multiplied by ACLR's 91.7% completion rate yielding a PY07 Duplicate Payment Audit amount of $5,578,086.

PY07 Duplicate Payment Audit amount also consists of Contract Dispute Act interest calculated at the interest rate set by the Secretary of the Treasury commencing at the date of termination. An estimate of these amounts was calculated through September 2020 and totaled $1,255,633[11].

On a cost reimbursement basis, the net payment amount for the PY07 Duplicate Payment Audit total $6,833,719.

***Percentage of Completion Calculation:***

*Completed PY07 Duplicate Payment Audit Tasks:*

Upon contract award, ACLR's first efforts were directed at developing its secure data infrastructure[12] for the sole purpose of obtaining Part D PDE payment data to identify improper

---

[5] *42 U.S. Code § 1320d-2.*
[6] *45 CFR 162.1102; 42 CFR § 423.505. Please also see NCPDP requirements in Exhibit C.*
[7] *Please see Exhibit D, OIG Report, HHS Secretary Kathleen Sebelius response to OIG report "Use of a field in contravention of the standard would be a HIPAA violation." Please also see Exhibit E.*
[8] *Please see Exhibit 07.*
[9] *Please see Footnote 25.*
[10] *Please see Exhibit 07-2.*
[11] *Please see Exhibit 07-1.*
[12] *Please see Exhibit 07-3.*

payments. These efforts commenced in January 14, 2011 and continued throughout the initial base period. ACLR received its Authorization to Operate from CMS on October 7, 2011[13]. Days expended by ACLR personnel to develop, implement, and authorize this infrastructure totaled 266 days.

During the initial base period, ACLR also received PDE file layouts and data dictionaries[14] and Plan Sponsor contract information. ACLR also developed and submitted to CMS its initial duplicate payment process and demand letters for payment[15]; the Part D calculations necessary to determine Part D improper payment amounts[16]; retrieving Part D PDE payment data and reviewing that data for completeness[17]; conducting the PY07 Duplicate Payment Audit CMS; and contacting CMS on of ACLR's intention to issue Demand Letters for payment on December 5, 2011[18]. ACLR efforts on the PY07 Duplicate Payment Audit were deemed terminated for convenience on November 30, 2011[19].

ACLR efforts during this time were directly related to conducting the PY07 Duplicate Payment Audit and occurred during the period between January 14, 2011 and November 30, 2011. The days expended by ACLR during this period totaled 320 days.

*Uncompleted PY07 Duplicate Payment Audit Tasks:*

As discussed during the November 30, 2011 call with CMS, ACLR notified CMS that it was prepared to develop and submit demand letters to Plan Sponsors "as early as Monday" of the following week. The preparation and submission time required by ACLR to complete these efforts would have been 5 days.

The PWS also required ACLR to assist CMS during the Appeals process. Prior to CMS' implementation of 42 CFR 423.2600-2615 in May 2014, Part D payment appeals were governed by 42 CFR 423.350, which provided for a three-tiered review. Each level of review required that plan sponsors file their appeal within 15 days. In the OY2 SOW[20], executed between ACLR and CMS, ACLR response times to plan sponsor appeals were ½ the time identified for plan sponsor deadlines. During this period, ACLR response times for each level of appeal would be 7½ days[21]. The OY2 SOW also dictated a 15 day ACLR invoice period. Total days associated with appeals and invoicing efforts by ACLR would have totaled 29 days.

*PY07 Duplicate Payment Audit % of Completion:*

---

[13] Please see Exhibit 07-4.
[14] Please see Exhibit 07-5.
[15] Please see Exhibit 07-6.
[16] Please see Exhibit 07-7.
[17] Please see Exhibit 07-8.
[18] Please see Exhibit 07-9.
[19] Please see Exhibit 07-10.
[20] Please see Exhibit 07-11.
[21] This has been rounded to 8 days for calculation purposes.

ACLR completed 320 days of a 349 day recovery audit cycle resulting in a PY07 Duplicate Payment completion rate of 91.7%.

*PY07 Duplicate Payment Value:*

ACLR conducted its PY07 Duplicate Payment Audit similarly to that articulated in its PY12-PY13 Duplicate Payments NAIRP submitted on July 16, 2015[22]. The primary distinction between the audit methodology used here and in the PY10 Duplicate Payment audit was its reliance on the Prescription/Service Reference Number. This number is used by CMS[23] and in the NCPDP standards[24] required under HIPAA to identify a prescription "that is unique for any DOS and Service Provider ID combination". Specifically, the primary fields and related Standards' definitions utilized by ACLR to identify duplicate payments are:

- Prescription/Service Reference Number (4Ø2-D2): As discussed above, the reference number assigned by the provider for the dispensed drug/product and/or services provided.
- Fill Number (4Ø3-D3): The code indicating whether the prescription is an original or a refill and is calculated "as an original (0) or by fill/refill number (01-99)" where the value of the "refill number" is used to "represent the fill number and not necessarily the refill number".
- Product Service ID (4Ø7-D6) - ID number of the drug dispensed.
- Service Provider ID (793) – The ID assigned to a pharmacy or provider.
- Contract Number (A33-ZX) – The contract number of record assigned by CMS that identifies a specific Medicare Part D plan sponsor contract.

To identify a duplicate, PDE records are reviewed to determine whether these individual PDE fields are matched to other PDE records. We also reviewed each individual PDE record identified in our initial PY07 Duplicate Payment Audit submission and applied assumptions derived from the PY10 Duplicate Payment audit results arising from similar transactions to eliminate any ambiguity regarding the valuation of the PY07 Duplicate Payment Audit[25]. The PY07 Duplicate Payment PDEs have been provided at file folder location PY07 DP Exhibits\Audit Cost Calculation. PY07 Duplicate Payment Amounts identified in this review totaled $81,106,299.

**PY10 DUPLICATE PAYMENT AUDIT COST CALCULATION:**

As articulated under the OY1 SOW[26], under which the PY10 Duplicate Payment Audit was conducted as a Complex Review. Appendix E of the OY1 SOW provided a Part D RAC Activities

---

[22] *Please see Exhibit 07-12.*
[23] *Please see Exhibit 07-13.*
[24] *Please see Footnote 6.*
[25] *This application was completed solely in the interest of reasonableness and negotiation in response to the ruling for Termination for Convenience only.*
[26] *Please see Exhibit 10-1.*

Timeline that clearly delineated between ACLR activities and those of other Part D RAC stakeholders. To determine the percentage of completion for these tasks, we identified the total days associated with completed ACLR PY10 Duplicate Payment Audit activities and divided it by the total ACLR activities required for the audit[27].

To calculate the value of the PY10 Duplicate Payment Audit, we used the total improper payment amounts submitted to the Data Validation Contractor (DVC) on this audit. We then calculated an average appeal success rate identified in other complex reviews completed during the course of the Part D RAC contract period. This rate was then applied to the submitted improper payments, which yielded a reasonable net value.

The final PY10 Duplicate Payment Audit Cost was determined by multiplying the net value of $15,909,552 by the contingency fee graduated rates of 15% and 12% as outlined in the SOW to obtain an ACLR fee of $2,209,146. This amount was then multiplied by ACLR's 59.2% completion rate yielding a PY10 Duplicate Payment Audit amount of $1,307,815[28].

PY10 Duplicate Payment Audit amount also consists of Contract Dispute Act interest calculated at the interest rate set by the Secretary of the Treasury commencing at the date of termination. An estimate of these amounts was calculated through September 2020 and totaled $195,328; the spreadsheets used to calculate this estimate has been included for your review

On a cost reimbursement basis, the net payment amount for the PY10 Duplicate Payment Audit total $1,503,143.

### *Percentage of Completion Calculation:*

*Completed PY10 Duplicate Payment Audit Tasks:*

As articulated under OY1 SOW Appendix E, ACLR was required to complete a New Issues Submission and Approval Process (NAIRP). Of the 104 days identified under this process, 44 days are assigned to ACLR as follows:

---

[27] *In the interest of reasonableness and for negotiation purposes only, we have not included the additional work efforts or time delays CMS required of ACLR, which would have significantly increased ACLR's completion percentage. Only those timelines appearing in Appendix E have been used to calculate the completion percentage for this audit.*
[28] *Please see Exhibit 10-2.*

| NAIRP Process | | | | | | |
|---|---|---|---|---|---|---|
| Steps | Description | SOW Section | Responsible Party | Days | ACLR Activities | Completed Activities |
| 1 | RAC NAIRP Submission | Section 1.2.1 | Part D RAC | 0 | 0 | 0 |
| 2 | Walkthrough Meeting | Section 1.2.1 | Part D RAC | 14 | 14 | 14 |
| 3 | CMS Feedback | Section 1.2.1 | CMS COR | 30 | 0 | 0 |
| 4 | NAIRP Revision Process | Section 1.2.1 | CMS COR/RAC | 30 | 30 | 30 |
| 5 | CMS NAIRP Approval/Denial | Section 1.2.1 | CMS COR | 30 | 0 | 0 |
| Total Days | | | | 104 | 44 | 44 |

Under the PY10 Duplicate Payment Audit process that was approved by CMS, ACLR was then required to conduct a Complex Review. Of the 448 days identified under the Complex Review Process, ACLR activities total 81 days as follows:

| Complex Review Process | | | | | | |
|---|---|---|---|---|---|---|
| Steps | Description | SOW Section | Responsible Party | Days | ACLR Activities | Completed Activities |
| 1 | RFI Submission | Section 2.1 | ACLR | 0 | 0 | 0 |
| 2 | SO Response to RFI | Appendix A | Plan Sponsors | 60 | 0 | 0 |
| 3 | IPRP Submission | Section 2.1.2.1 | ACLR | 30 | 30 | 30 |
| 4 | Data Validation Contractor (DVC) IPRP Review | Section 2.2 | DVC | 45 | 0 | 0 |
| 5 | Letter Submission | Section 2.3 | ACLR | 7 | 7 | 0 |
| 6 | CMS Letter Submission | Section 2.3 | CMS | 7 | 0 | 0 |
| 7 | Level 1 Appeal | Section 2.3, Appendix A, Appendix C | Plan Sponsors | 30 | 0 | 0 |
| 8 | RAC Rebuttal | Section 3.1, Appendix C | ACLR | 15 | 15 | 0 |
| 9 | Level 1 Appeal Decision | Section 3.1, Appendix C | CMS | 90 | 0 | 0 |
| 10 | IPRP Revision | Section 3.1 | ACLR | 7 | 7 | 0 |
| 11 | Level 2 Appeal | Appendix A, Appendix C | Plan Sponsors | 15 | 0 | 0 |
| 12 | Level 2 Appeal Decision | Appendix C | CMS | 30 | 0 | 0 |
| 13 | IPRP Revision | Section 3.1 | ACLR | 7 | 7 | 0 |
| 14 | Payment Submission | Section 3.2 | CMS | 15 | 0 | 0 |
| 15 | Offset | Section 3.2 | CMS | 30 | 0 | 0 |
| 16 | CMS/DPOA notifies RAC that recoupment has been made | Section 3.2.4 | CMS | 15 | 0 | 0 |
| 17 | RAC Invoice | Section 3.2.4 | ACLR | 15 | 15 | 0 |
| 18 | RAC Payment | N/A | CMS | 30 | 0 | 0 |
| Total Days | | | | 448 | 81 | 30 |

As shown in the chart, ACLR completed 30 of the 81 days required under this process.

ACLR's total assigned work activities total 125 days. Of this, ACLR completed 74 days. ACLR's percentage of completion (74/125) totals 59.2%.

### *PY10 Duplicate Payment Value:*

On July 8, 2014, CMS issued PY10 Duplicate Payment Audit Requests for Information (RFIs) to plan sponsors. RFI improper payment amounts totaled $18,968,852[29].

These RFIs were issued to obtain documentation to determine whether Part D payments identified as a result of the approved NAIRP protocol were proper. On July 8, 2014, CMS extended OY1 SOW plan sponsor RFI submission deadlines from 90 days to 150 days[30]. As summarized in our December 14, 2014 PY10 Duplicate Payment Audit IPRP submission letter[31]:

> Of the 367 plans that received an RFI, 254 plans submitted evidence for an average of 29% of the original documents requested. Of the remaining plans, 53 plans did not respond to the RFI and 60 plans submitted a spreadsheet with no additional evidentiary support[32].

On December 24, 2014, ACLR submitted IPRP packages to CMS for the PY10 Duplicate Payment Audit. Improper payments identified in this submission totaled $15,909,552[33].

As I noted in my cover letter, I do not disagree that plan sponsors could possibly prevail under appeal in this audit. As identified above; however, plan sponsors, with 150 days to submit evidentiary support were only able to submit 29% of the documentation required[34] and much of that was insufficient to meet CMS requirements. It seems unlikely, that they could sustain the same response rate given a 42 CFR § 423.2605(a) required 60 day appeal deadline. Additionally, while the methodology for a portion of the audit may be considered unreliable, evidence submitted by plan sponsors demonstrated that many of the PDEs were submitted in violation of NCPDP requirements, state laws and regulations, and CMS administrative guidance[35]. These violations meet improper payment determination requirements and would have been recoverable under law.

---

[29] *Please see Exhibit 10-3. Additional supporting documentation may be found on the secured drive provided at file location PY10 DP Exhibits\Audit Cost Calculation\RFIs, which include 125,141 documents received from plan sponsors and reviewed by ACLR personnel.*
[30] *Please see Exhibit 10-4.*
[31] *Please see Exhibit 10-5. Additional supporting documentation may be found on the secured drive provided at file location PY10\Audit Cost Calculation\Evidence\RFIs which include 125,141 documents received from plan sponsors and reviewed by ACLR personnel.*
[32] *Please see Exhibit 10-6 and Footnote 30.*
[33] *Please see Footnote 28; Additional supporting documentation may be found on the secured drive provided at file location PY10 DP Exhibits\Audit Cost Calculation\IPRPs.*
[34] *This was not uncommon in any of the audits we conducted; plan sponsors routinely ignored Part D RAC audit requests.*
[35] *Supporting documentation may be found on the secured drive provided at file location PY10\Audit Cost Calculation\Evidence\Additional Supporting Documentation\RFI Submission\.*

In the interest of reasonableness; however, I have applied the 16.1% success rate[36] the plan sponsors achieved during the RFI process to reduce amounts identified in the original RFIs to simulate a successful appeal rate. This reduces the IPRP submission amount of $15,909,552 to $13,348,114.

**SETTLEMENT FEES:**

Settlement fees are broken into two components; Phase One and Phase Two[37].

***Phase One:***

These costs pertain to ACLR administrative and legal expenses related to the filing and subsequent defense of the claim related to the PY07 and PY10 Duplicate Payment Audits. While the FAR does not articulate a retroactive application of a Termination for Convenience, ACLR considers the costs associated with achieving the order as reasonable and necessary for the conduct of the business as this cost would not have occurred if the government had ordered the Termination of Convenience at the time of occurrence rather than being retroactively applied. ACLR legal fees totaled $635,128[38]. ACLR administrative expenses were determined by estimating hours pertaining to these legal efforts by reviewing email communications, legal filings, and time spent reviewing evidence submitted by the government. In total, ACLR personnel ACLR spent 1,096 hours completing these work efforts; the application of contracted GSA Schedule Rates to these hours totaled $1,200,133[39]. Applying Treasury Rate interest of $112,554 yields a net payment amount of $1,947,815 for Phase 1 Settlement Fees.

***Phase Two:***

These costs pertain to settlement expenses from the date of the court order to submission of this settlement proposal includes ACLR administrative expenses of $112,471[40]; estimated legal fees of $19,300; and Accountant Fees of $2,500 for a current net payment amount of $134,271 for Phase II Settlement Fees. As the total of these expenses are unknown until settlement, ACLR will provide updates upon request.

The net payment amount for settlement fees total $2,082,087

.

---

[36] *This calculation was performed by determining the reduction percentage between initial RFI amounts and IPRP amounts submitted.*
[37] *Please see Exhibit S-1.*
[38] *Please see Exhibit S-2.*
[39] *Please see Exhibit S-3.*
[40] *Please see Exhibit S-4.*