IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ACLR, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Nos. 15-767 & 16-309C |
| | ) | (Judge Campbell-Smith) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

OF COUNSEL:

ROBYN LITTMAN
Office of the General Counsel
U.S. Department of Health and Human Servs.
7500 Security Boulevard
Central Bldg. – Mailstop C2-05-23
Baltimore, MD 21244

JOSEPH A. PIXLEY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-0843
Facsimile: (202) 307-0972

April 9, 2021

Attorneys for Defendant

**TABLE OF CONTENTS**

INRTODUCTION...........................................................................................................1

STATEMENT OF THE ISSUE.....................................................................................2

STATEMENT OF FACTS AND COUNTER STATEMENT OF FACTS ...................................2

    A.     The Termination For Convenience Clause In The Contract: FAR 52-212-4(1) ...........2

    B.     Contingent Fee ......................................................................................3

    C.     Audit Tasks And Deliverables....................................................................4

    D.     ACLR Completed And Was Paid Contingency Fees For Seven Audits.....................6

    E.     2007 Audit ...........................................................................................7

    F.     2010 Audit ...........................................................................................9

PROCEDURAL BACKGROUND.................................................................................9

ARGUMENT ...........................................................................................................11

    I.     Standard Of Review For Summary Judgment ...........................................11

    II.    Termination For Convenience Is Governed By FAR § 52.212-4(l) ..........................12

          A.     ACLR Bases Its Claim For Damages Upon The Wrong Termination For Convenience Clause –FAR § 52.249-2 – That Is Not In The Contract ..........12

          B.     The Clause In Part 49 Of The FAR, Permitting The Government To Terminate A Contract For Convenience, Permits Contractors To Recover "Costs Incurred" For Work Performed Under The Terminated Contract.......13

          C.     A Simplified Termination Provision Written In 1995 Specifically For Use In Commercial Item Procurements Under FAR Part 12 Changed The Focus From "Costs" Incurred To "Percentage Of Work Performed"............15

    III.   ACLR Is Not Entitled To Summary Judgment ........................................................18

          A.     ACLR Fails To Establish A Legal Basis For Summary Judgment ...............18

          B.     ACLR Fails To Provide Relevant Evidence To Support Its Claims...............19

1.      ACLR Fails To Demonstrate The First Prong Of FAR § 52.212-4(l): "Percentage Of The Contract Price Reflecting The Percentage Of The Work Performed" ................... 20

2.      ACLR Cannot Recover Under The Second Prong Of FAR § 52.212-4(l): "Reasonable Charges" .................................. 21

C.      ACLR Fails To Demonstrate Its Charges Are Reasonable .......................... 22

1.      Personnel Costs: 2007 Audit ........................................................ 23

2.      Managing Principal Costs ............................................................. 25

3.      General And Administrative Costs ............................................... 27

4.      Office Lease Costs ....................................................................... 28

5.      Loan Interest Costs ...................................................................... 30

6.      Reasonable Profit ......................................................................... 30

7.      Costs For 2010 Audit .................................................................. 33

8.      Settlement Fees ............................................................................ 34

9.      CDA Interest ................................................................................ 35

CONCLUSION ................................................................................................... 36

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)......................................................................................................12

*Appeal of ESCGov, Inc.,*
   ASBCA No. 58852, May 8, 2017, 17-1 BCA ¶ 36,772, 2017 WL 2603809............... 26, 27, 34

*Bath Iron Works Corp. v. United States,*
   34 Fed. Cl. 218 (1995) .................................................................................................34

*Best Foam Fabricators, Inc. v. United States,*
   38 Fed. Cl. 627 (1997) ..............................................................................................31, 32

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)............................................................................................ 12, 18, 19

*DMS Imaging, Inc. v. United States,*
   123 Fed. Cl. 645 (2015) ................................................................................................35

*G.L. Christian & Assocs. v.United States,*
   312 F.2d 418 (1963)......................................................................................................13

*International Data Prods. Corp. v. United States,*
   492 F.3d 1317 (Fed. Cir. 2007) .......................................................................14, 30, 31, 32

*J.M.T. Mach. Co. v. United States,*
   826 F.2d 1042 (Fed. Cir. 1987) ......................................................................................35

*JKB Solution and Services, LLC v. United States,*
   150 Fed. Cl. 252 (2020) ...............................................................................12, 19, 21, 22

*Joseph Pickard's Sons Co. v. United States,*
   532 F.2d 739 (Ct. Cl. 1976)......................................................................................27, 34

*Krygoski Construction Co., Inc., v. United States,*
   94 F.3d 1537 (Fed. Cir. 1996) ....................................................................12, 19, 31, 32

*Library of Cong. v. Shaw,*
   478 U.S. 310  (1986)....................................................................................................35

*Maxima Corp. v. United States,*
   847 F.2d 1549 (Fed. Cir. 1988) ......................................................................................13

*Novartis Corp. v. Ben Venue Labs.*,
    271 F.3d 1043 (Fed. Cir. 2001) ............................................................. 12, 18, 19

*Orlosky, Inc. v. United States*,
    68 Fed. Cl. 296 (2005) .......................................................................27, 34

*Praecomm, Inc. v. United States*,
    78 Fed. Cl. 5 (2007) ........................................................................ passim

*Red River Holdings, LLC v. U.S.*,
    802 F.Supp. 2d 648 (D.Md. 2011) ..............................................17, 18, 21, 22

*Servidone Construction Corp. v. United States*,
    931 F.2d 860 (Fed. Cir. 1991) ..................................................................30

*White Buffalo Constr., Inc. v. United States*,
    52 Fed. Cl. 1 (2002) ...................................................................... passim

*Yant v. United States*,
    588 F.3d 1369 (Fed. Cir. 2009) ...............................................................12

**Statutes**

28 U.S.C. § 2412 ...........................................................................................35

41 U.S.C. § 7107(c) ......................................................................................10

41 U.S.C. § 7109(a)(1) ..................................................................................35

**Rules**

RCFC 52.2 ....................................................................................................10

RCFC 56(a) ..................................................................................................11

**Regulations**

48 C.F.R. Part 49 .........................................................................................14

48 C.F.R. § 52.212.-4(l) .......................................................................... passim

48 C.F.R. § 52.229-2(g) .......................................................................... passim

FAR § 12.403(a) ...........................................................................................17

FAR § 31.205-20 ..........................................................................................30

FAR § 31.205-47(f)(1) ....................................................................................................34

FAR § 49.20 .................................................................................................................31

FAR § 49.202 ..........................................................................................................31, 32

FAR § 52.212-4(l) ...................................................................................................passim

FAR § 52.249-2(g) ...................................................................................................passim

**Other Authorities**

60 Fed. Reg. 48231 (Sept. 18, 1995) ...............................................................................16

1994 U.S.C.C.A.N. 2561, 2564 .......................................................................................16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ACLR, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Nos. 15-767 & 16-309C |
| | ) | (Judge Campbell-Smith) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully responds to the motion for summary judgment filed by plaintiff ACLR, LLC (ACLR) (Pl. Br.). Because there are genuine issues of fact in dispute, and because ACLR fails to demonstrate it is entitled to judgment as a matter of law, its motion should be denied

**INTRODUCTION**

Currently before the Court is ACLR's motion for summary judgment and supporting memorandum (Pl. Br.), wherein ACLR seeks to recover termination for convenience damages for its Plan Year (PY) 2007 Duplicate Payment Audit (2007 audit) and PY 2010 Duplicate Payment Audit (2010 audit). This follows the Court's March 23, 2020 Opinion and Order (Opinion) wherein the Court granted our cross-motion for summary judgment and denied ACLR's motion for summary judgment pertaining to ACLR's breach of contract claims. *See* ECF No. 76. The Court opined, however, that the Department of Health and Human Services, Centers for Medicare & Medicaid Services's (CMS) termination of the 2007 and 2010 audits effectuated constructive terminations for convenience, but indicated that further briefing on the matter was required. *See* Opinion at 16. The sole issue before the Court, therefore, is whether

ACLR has proved termination for convenience damages.  The answer is unequivocally no, as we will demonstrate.

ACLR's argument for termination for convenience damages is fatally flawed at inception because ACLR cites to, and relies upon, *the wrong termination for convenience clause*:  48 C.F.R. § 52.249-2.  In other words, ACLR bases its entire request for termination for convenience damages, its entire analysis, upon a Federal Acquisition Regulation (FAR) clause (FAR § 52.249) that is *not in the contract*, instead of the one that is: FAR § 52.212-4(l).  The two termination clauses, issued under, respectively, FAR Part 49 (the clause ACLR relies upon) and FAR Part 12 (the clause that is actually in the contract) differ in fundamental ways.  ACLR's inexplicable failure to apply the correct termination for convenience clause is grounds for denying ACLR's motion in its entirety.

## STATEMENT OF THE ISSUE

Whether ACLR has met its burden of proving termination for convenience damages pursuant to FAR § 52.212-4(l), as set forth in the contract.

## STATEMENT OF FACTS AND COUNTER STATEMENT OF FACTS[1]

### A.    The Termination For Convenience Clause In The Contract: FAR 52-212-4(l)

1.    On June 17, 2010, ACLR entered into a Federal Supply Schedule contract for financial and business solutions issued by the General Services Administration (GSA), contract number GS-23F-0074W (GSA Contract).  *See* ECF No. 70 at 1 (SA758).  The GSA Contract

---

[1] There has been extensive briefing in this case, including the statutory background to the Medicare Part D program, and the audit services that ACLR was tasked to perform. Consequently, we will narrowly focus our discussion to the issue at hand, ACLR's claim for termination for convenience costs, and address those facts that pertain to that issue.

included a contract clause from the FAR titled "Contract Terms and Conditions-Commercial Items (March 2009) (Deviation February 2007). *See* ECF 70-1 at 18 (SA775). That clause contained a clause entitling the ordering agency, *e.g.*, CMS, to terminate the contract at its convenience:

> *Termination for the Ordering Activity's convenience*. The ordering activity reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. *Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate, to the satisfaction of the Government using its standard record keeping system, have resulted from the termination*. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the ordering activity any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred that reasonably could have been avoided.

*See* ECF 70-1 at 21 (SA778) (emphasis added); *see* 48 C.F.R. § 52.212-4(l)).

2. On January 13, 2011, pursuant to the GSA Contract, CMS awarded ACLR task order HHSM-500-2011-00006G (task order) to identify improper payments and to recover overpayments made under the Medicare Part D program. *See* ECF No. 51-3 at 152-154 (A156-157). The task order provided for a base period of performance of January 13, 2011, through January 12, 2012, along with four 12-month option periods. ECF No. 51-3 at 154 (A158).

## B.  <u>Contingent Fee</u>

3. The task order specified that any payments to ACLR were contingent upon the recovery of improper payments from plan sponsors, and were to be fixed as a percentage of such

recoveries, as follows:

> All payments shall be paid only on a contingency basis. The recovery audit contractor will receive 7.5% of all amounts collected. The contingency fees shall be paid once the recovery audit contractor collects the Medicare overpayments. The recovery audit contractor shall be paid a percentage of the amount that is collected through their recovery efforts. The recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments not recovered/collected.

*See* ECF. No 51-3 at 155 (A159 ¶ 5).

4.      The task order incorporated ACLR's proposed Performance Work Statement (PWS), with a term of performance from January 13, 2011 to December 31, 2013.  *See* ECF Nos. 51-5 at 6 (A391).  ACLR and CMS later implemented a statement of work (SOW) to replace the PWS. The SOW had two phases from January 1 through December 31, 2014 and January 1 through December 31, 2015.  ECF No. 51-5 at 45 (A430).  The PWS and SOW generally described the audit methodology and process in fairly comparable terms.  *See* ECF No. 51-3 at 184-192 (A188-196) (PWS); *see* ECF No. 51-5 at 104-110 (A489-495) (SOW).

## C.      Audit Tasks And Deliverables

5.      As set forth in the SOW, appendix E, the audit process generally involved three successive stages:

(1) NAIRP Submission through approval/disapproval – the "NAIRP" stage: In the first stage, ACLR would submit a New Audit Issue Review Package (NAIRP) to CMS.  Following a walk through meeting between ACLR and CMS, initial feedback from CMS, and revision to the NAIRP, the NAIRP is approved or disapproved by CMS.  The NAIRP stage generally takes 104 days to complete.

(2) RFI Submission through Notice of Improper Payment – the "RFI/Audit" stage.  In the

next step of the process, assuming the NAIRP is approved, ACLR would perform a full data analysis to identify the universe of possibly improper payments. ACLR would submit a Request for Information (RFIs) to plan sponsors for response to suspected improper payments. ACLR would then submit an Improper Payment Review Package (IPRP) to CMS for validation by CMS's Data Validation Contractor (DVC). If the IRP passes validation, ACLR would then submit Notification of Improper Payments (NIPs) to CMS to send to plan sponsors. The RFI/Audit stages generally takes 149 days to complete.

(3) Reconsideration Appeal Through Payment – the "Appeal" stage. In the third stage, plan sponsors could seek reconsideration, ACLR would submit a rebuttal (RAC Rebuttal) to the reconsideration and CMS would issue a decision. ACLR would then submit a revised NIP, followed by a hearing review before CMS/ Division of Policy & Regulatory Development (DPRD), which would issue a Hearing Review Decision. Plan sponsors could then seek Administrative Review, and ACLR would submit a RAC Rebuttal to CMS, which would issue an Administrative Decision. CMS then prepares an Offset and notifies ACLR that a Recoupment has been made. ACLR then submits an invoice and receives payment by CMS. The appeal stage generally takes 419 days to complete. *See* ECF No. 51-5 at 79-81 (A464-466).[2]

6.      Both the PWS and the SOW included a schedule of deliverables that ACLR was required to submit o CMS, as summarized, below:

| PWS Schedule of Deliverables | SOW Schedule of Deliverables |
|---|---|
| Kick-off Meeting | Kick-off Meeting |
| Organization Charts | Kick-off Meeting Minutes |

---

[2] The PWS, however, did not include timelines.

| Base Year Project Plan | System Security Plan |
|---|---|
| Implementation Schedule | Project Work Plan Draft |
| Personnel IT Security and Privacy training completion certs | Project Work Plan Final |
| Fips 199 Assessment | Vulnerability Report |
| It Risk Assessment (IT-RA) | Progress Report |
| IT Security Classification and Accreditation (IT-SC&A) | Total RAC Invoice Amount Report |
| Training on RAC Data Warehouse | Total Improper Payment by Contract Report |
|  | Final Report |
|  | Ad-hoc Reports |
|  | Recalculation of Impacts |

*See* ECF No. 51-3 at 207-208 (A211-212)  *See* ECF No. 51-5 at 119 (A504) (SOW Appx B) (PWS ¶1.8)

7.      Throughout the audit process, ACLR was also required to submit various reports to CMS including monthly, quarterly, annual, and audit metric reports.  *See* ECF No. 51-3 at 207 (A211), ECF No. 51-5 at 21(A406).

**D.      ACLR Completed And Was Paid Contingency Fees For Seven Audits**

8.      Pursuant to the audit methodologies set forth in the PWS and SOW, ACLR successfully completed seven other audits for which it was paid contingency fees under the GSA Contract and task order, as summarized, below:

| Audit Issue | Original NIP | Recoveries | Contingency Fee Paid |
|---|---|---|---|
| 2007 Excluded Providers | $8,500,760.21 | $1,865,110.50 | $223,813.26 |
| 2008-2011 Excluded Providers | $3,400,190.89 | $2,675,516.61 | $749,144.65 |
| 2009-2011 Unauthorized Prescribers | $5,274,689.13 | $5,161,919.28 | $619,430.31 |
| 2010-2011 DEA Schedule Refill Errors | $2,759,332.65 | $2,510,860.89 | $502,172.18 |
| 2012-2013 Excluded | $442,159.71 | $291,005.30 | $81,481.48 |

| Providers | | | |
|---|---|---|---|
| **2013 Unauthorized Prescribers** | $914,562.79 | $561,548.34 | $67,385.80 |
| **2012-2013 DEA Schedule Refill Errors** | $6,598,149.83 | $5,731,421.44 | $1,146,284.29 |
| **TOTAL** | $27,889,845.22 | $18,797,382.40 | $3,389,711.98 |

*See* Def. Ex. A at 2.

9.       ACLR worked on 13 other audits which were denied and for which it received no contingent fee.  *See Id*.

**E.    2007 Audit**

10.      On August 25, 2011, CMS sent an email asking ACLR to submit a draft of a proposed process for "how ACLR would go about auditing a plan on . . . duplicate payments."  *See* ECF No. 54-2 at 21 (SA498).  ACLR sent CMS an email on September 30, 2011, in which ACLR set forth the seven specific fields within the electronic prescription drug event (PDE) records that ACLR proposed to use to identify potential duplicate payments. *Id.* at 124 (SA600).  On November 17, 2011, CMS began transmitting Part D 2007 PDE records to ACLR, and ACLR began reviewing the 2007 PDE records shortly thereafter.  *See* ECF No. 54-1 at 133 (SA 121); *id.* at 262-263 (SA 243-44).  During the period of the 2007 audit, the GSA contract, the task order, and the PWS were in effect.  *See* Opinion at 6.

11.      During a conference call on November 30, 2011, ACLR's founder and chief executive officer, Christopher Mucke, informed CMS for the first time that ACLR already had identified approximately $175 million in potential duplicate payments in the 2007 PDE records, and that ACLR was prepared to begin sending notices of improper payments to all of the plan sponsors identifying those payments the following week.  *See* ECF No. 54-1 at 262-263 (SA243-

244), *id.* at 265 (SA247).  ACLR admits that the potential improper payments it identifies at the outset of any audit are merely estimates of the improper payments it expects to confirm through the recovery audit process.  *Id.* at 365 (SA345).  ACLR had not yet identified for CMS the specific PDE records that ACLR contended were duplicate payments, nor had anyone else validated ACLR's findings. *Id.* at 263-264 (SA244-45).  In addition, CMS had not yet implemented the framework for offsetting any actual overpayments from plan sponsors' ongoing monthly Part D payments, and thus there was no reimbursement process in place. *Id.* at 442-444 (SA414-416).

12.      CMS therefore informed ACLR that CMS did not want ACLR to begin sending improper payment notices to plan sponsors related to the 2007 PDE records, and the contracting officer advised ACLR that doing so – notwithstanding CMS's position that plan sponsor improper payment notifications were premature – would not be in ACLR's best interest. *Id.* at 452-453 (SA423-424).  During the November 30, 2011 conference call, in the words of Mr. Mucke, "CMS killed the [2007 audit] review."  *See Id.* at 257 (SA238).

13.      Nevertheless, ACLR continued analyzing 2007 PDE records for potential duplicate payments, *after the audit had been terminated* and purportedly determined that it had identified a total of $313,808,241 potential duplicate payments for 2007, *see* ECF No. 54-2 at 2 (SA481), and claimed $23,535,619 in contingency fees.  ECF No. 54-1. at 160-161 (SA 146-147); *id.* at 297 (SA278).[3]

---

[3] This was the subject of ACLR's breach claims for the 2007 audit, which the Court denied, and are not at issue.  *See* ECF. No. 76.

F.      **2010 Audit**

14.      In January of 2014, CMS authorized ACLR to conduct duplicate payment audits for calendar year 2010, and ACLR conducted the 2010 audit in 2014, pursuant to the GSA contract, the task order, and the 2014 SOW.  *See* Opinion at 6  First, following the submission of an initial NAIRP on January 2, 2014, and, after many revisions, a final revised NAIRP on May 13, 2014, *see* ECF No. 54-2 at 14 (SA 492), CMS approved the revised duplicate payment NAIRP on May 28, 2014.  *Id.* at 133 (SA606).  On June 9, 2014, ACLR submitted to CMS relevant PDE records from 2010 through 2012, identified as potentially duplicative, *see* ECF No. 51-7 at 24-25 (A597-598), and submitted its final 2010 duplicate payment review package to CMS on December 24, 2014.  ECF No. 51-8 at 35 (A646).  According to ACLR, it identified duplicate payments occurring in 294 contracts for a total amount of $15,909,550 for 2010.  *Id.* at 37 (A648) ECF No. 54-1 at 160-161 (SA146-147).  ACLR sought contingency fees of $2,209,146.  ECF No. 54-1 at 160-161 (SA146-147).[4]

15.      Throughout the plan year 2010 audit process, CMS and its validation contractor found numerous errors in ACLR's audited data, which, after repeated requests, ACLR failed to address. *See* ECF No. 54-2 at 161-162 (SA628-629).  By letter dated April 24, 2015, CMS rescinded the 2010 audit, due to unaddressed concerns about the validity of ACLR's audit results.  Tab 59, A656-657.

**PROCEDURAL BACKGROUND**

16.      On March 23, 2020, following extensive briefing and oral argument, the Court

---

[4] This was the subject of ACLR's breach claims for the 2010 audit, which the Court denied, and are not at issue.  *See* ECF. No. 76.

issued its Opinion and Order (Opinion) wherein the Court granted our cross-motion for summary

judgment and denied ACLR's motion for partial summary judgment pertaining to ACLR's

claims for contingency fees for the 2007 and 2010 audits.  *See* ECF No. 76.  Nevertheless, in

denying ACLR's larger claims, the Court also held that CMS's termination of the 2007 and 2010

audits effectuated "constructive terminations for convenience," pursuant to the applicable

termination for convenience clause in the contract, FAR § 52.212-4(1).  *See* Opinion at 9, 16.

The Court did not reach the merits of that issue, but found, in effect, that neither party had

presented sufficient argument and evidence at that juncture for the Court to resolve the

termination for convenience matter.  The Court concluded that it would "require additional

submissions from the parties on this issue."  *See* Opinion at 16.

17.    Thereafter, on April 21, 2020, the Court remanded the case, pursuant to the

Contract Disputes Act, 41 U.S.C. § 7107(c) and RCFC 52.2, to the Department of Health and

Human Services, CMS, to consider ACLR's termination for convenience claim for the 2007 and

2010 audits.  *See* ECF No. 82.

18.    On May 15, 2020, ACLR submitted a termination for convenience settlement

proposal to the CMS contracting officer (for $5,923,754), *see* ECF No. 101-1, and a revised

settlement proposal on June 26, 2020 (for $10,418,948).  *See* ECF No. 101-2.  Following the

exchange of additional correspondence, on October 7, 2020, the contracting officer issued a final

decision on remand on ACLR's termination for convenience claims.  *See* ECF No. 98.

19.    In its revised proposal, ACLR calculated a contingent fee contract price of

$6,082,972 for the 2007 audit, that it determined by multiplying the net value of $81,106,266

(the estimated amount of potential overpayments that ACLR maintains would have been

10

recovered had the audit been completed) by the 7.5 % contingency fee in the task order.  *See* ECF No. 98 at 2; ECF No. 101-2 at 5. By this same methodology, ACLR calculated a contingent fee contract price of $2,209,146 for the 2010 audit, based upon $15,909,552 in improper payments it estimated would have been recovered). *See* ECF No. 98 at 8; ECF No. 101-2 at 8. For these audits, ACLR also claimed various costs for profit, interest, administrative costs, legal costs, and accounting costs, bringing its total settlement claim to $10,418,948.  *See* ECF No. 98; ECF No. 101-2 at 4.

20.     In the final decision, applying FAR § 52.212-4, the termination for convenience clause in the GSA Contract, the contracting officer denied ACLR's claim for the 2007 audit in its entirety, finding that ACLR had not submitted any contract "deliverables" for the audit or relevant documents to substantiate its claims.  *See* ECF No. 98 at 2-8.  For the 2010 audit, CMS disagreed with ACLR's calculations and denied all but $157,318.00.  The contracting officer decided that ACLR should be awarded that amount for the terminations of the 2007 and 2010 audits, plus interest beginning on June 26, 2020.  *See* ECF No. 98 at 13.

21.     On November 6, 2020, ACLR filed an amended complaint seeking termination for convenience damages "of at least $5,923,754" plus interest and attorney fees.  *See* ECF No. 101 (Am. Compl. at 4).

## <u>ARGUMENT</u>

## I.     <u>Standard Of Review For Summary Judgment</u>

The Court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a).  A genuine issue of material fact is one that can change the outcome of the

litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In considering a motion for summary judgment, the Court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 242-43; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 249 (1986).

The moving party "has the initial responsibility to identify the legal basis of its motion and of pointing to those portions of the record that it believes demonstrate the absence of a genuine issue of material fact." *Novartis Corp. v. Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (citing *Celotex*, 477 U.S. at 323).

Once the moving party has made the showing described above, the burden shifts to the nonmoving party "to designate specific facts showing that there is a genuine issue for trial." *Novartis*, 271 F.3d at 1046 (citing *Celotex*, 477 U.S. at 324). In considering a motion for summary judgment, "all justifiable inferences are to be drawn in the nonmovant's favor." *Yant v. United States*, 588 F.3d 1369, 1371 (Fed. Cir. 2009) (citing *Anderson*, 477 U.S. at 255).

## II.   <u>Termination For Convenience Is Governed By FAR § 52.212-4(l)</u>

### A.   <u>ACLR Bases Its Claim For Damages Upon The Wrong Termination For Convenience Clause –FAR § 52.249-2 – That Is Not In The Contract</u>

The applicable termination for convenience clause that governs this action, as set forth in the GSA Contract, is FAR § 52.212-4(l). *See* ECF 70-1 at 21 (emphasis added); *see* 48 C.F.R. § 52.212-4(l)); *see* Opinion at 4 (holding same); *see also Krygoski Constructin Co., Inc. v. United States*, 94 F.3d 1537, 1540, 1544 (Fed. Cir. 1996) (the termination for convenience clause in a contract "governs the legal relations of the parties"); *JKB Solution and Services, LLC v. United States*, 150 Fed. Cl. 252, 256 (2020) ("the contract at issue must actually contain a termination for convenience clause in order for the Government to be able invoke it") (citing *Praecomm, Inc. v. United States*, 78

12

Fed. Cl. 5, 11 (2007).  In its opening brief, ACLR pays lip service to this clause, citing it once, *see* Pl. Br. at 8 (citing 48 C.F.R. § 52.212-4(l)), but otherwise completely ignoring it.

Instead, ACLR cites a different FAR clause, 48 C.F.R. § 52.249-2, throughout its brief, and argues for various "costs" based *entirely* upon this clause.  *See* Pl. Br. at 10, 11-12, 13, 14, 16, 17 (citing 48 C.F.R. § 52.249-2).  The GSA Contract makes no reference to FAR § 52.249-2 either expressly, or by incorporation, *see* ECF No. 70 (GSA Contract).

ACLR's argument for termination for convenience "costs," therefore, is fatally flawed at the outset, because ACLR bases its entire request for damages upon a termination for convenience clause, FAR § 52.249-2, that is *not in the contract*, instead of the one that is: FAR § 52.212-4(l).  A termination for convenience under FAR Part 49 (the clause ACLR relies upon) and FAR Part 12 (the clause that is actually in the contract) differ in fundamental ways.  Before addressing ACLR's specific cost claims, we will provide an overview of these two distinct termination for convenience clauses and their applications.

### B.    The Clause In Part 49 Of The FAR, Permitting The Government To Terminate A Contract For Convenience, Permits Contractors To Recover "Costs Incurred" For Work Performed Under The Terminated Contract

The Government's right to terminate a contract for its own convenience, a concept unique to Government contracting, "was developed principally as a means to end the massive procurement efforts that accompanied major wars." *Id.*; *see G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426 (1963) (discussing history of termination for convenience provisions); *see also Maxima Corp. v. United States*, 847 F.2d 1549, 1552 (Fed. Cir. 1988).

Since the FAR was first promulgated in 1983 (as the comprehensive successor to prior acquisition regulations such as the Armed Services Procurement Regulation, the Defense

Acquisition Regulation, and the Federal Procurement Regulation), the termination for convenience clauses that are to be used in most Government contracts have been promulgated in Part 49 of the FAR, for use in both civilian and military contracts and in times of both peace and war. *See* 48 C.F.R. Part 49.

Generally speaking, the Part 49 termination for convenience clauses permit a contractor to recover various types of costs. "Typical costs" that are recoverable "encompass, *inter alia*, the costs of preparations made, work done, and reasonable profit on these." *International Data Prods. Corp. v. United States*, 492 F.3d 1317, 1323 (Fed. Cir. 2007).

FAR § 52.249-2(g), which pertains to termination for convenience of fixed-price contracts, is a Part 49 termination for convenience clause - -and the clause that ACLR erroneously bases its entire claim for "costs." *See* Pl. Br. at 10-12, 13-14, 16-17. Section 52.49-2(g) focuses upon evaluation of the ***costs that the contractor has incurred*** in performing contract work:

> If the Contractor and the Contracting Officer fail to agree on the whole amount to be paid because of the termination of work, the Contracting Officer shall pay the Contractor the amounts determined by the Contracting Officer as follows, but without duplication of any amounts agreed on under paragraph (f) of this clause:
>
> (1) The contract price for completed supplies or services accepted by the Government . . . not previously paid for, adjusted for any saving of freight and other charges.
>
> (2) The total of:
>         (i) *The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto*, but excluding any costs attributable to supplies or services paid or to be paid under subparagraph (g)(1) of this clause;
>                 (ii) *The cost of settling and paying termination settlement*

14

> *proposals under terminated subcontracts that are properly*
> *chargeable to the terminated portion of the contract* if not included
> in subdivision (g)(2)(i) of this clause; and
>> (iii) *A sum, as profit on subdivision* (g)(2)(i) of this clause,
> determined by the Contracting Officer under 49.202 of the [FAR],
> to be fair and reasonable . . . .
> (3) The reasonable costs of settlement of the work terminated,
> including —
>> (i) Accounting, legal, clerical, and other expenses
> reasonably necessary for the preparation of termination settlement
> proposals and supporting data;
>> (ii) The termination and settlement of subcontracts
> (excluding the amounts of such settlements); and
>> (iii) Storage, transportation, and other costs incurred,
> reasonably necessary for the preservation, protection, or
> disposition of the termination inventory.

48 C.F.R. § 52.249-2(g)(emphasis added).

Thus, under FAR § 52.249-2(g), a contractor whose fixed-price contract is terminated for convenience will typically be entitled to recover: (1) the contract price for completed products or services accepted by the Government; (2) costs already incurred in the performance of the contract, including preparatory expenses; (3) costs associated with the termination of subcontracts; and (4) reasonable profits if the contractor was in a position to earn a profit had the contract been completed.

    **C.**    **A Simplified Termination Provision Written In 1995 Specifically For Use In Commercial Item Procurements Under FAR Part 12 Changed The Focus From "Costs" Incurred To "Percentage Of Work Performed"**

Under FAR Part 12, the focus and methodology is different from FAR Part 49. In 1994, Congress enacted the Federal Acquisition Streamlining Act, Public Law 103-355, which included new rules regarding the Government's acquisition of commercial items "to remove impediments to efficient and cost-effective acquisition of commercial items by federal agencies."

15

S. Rep. No. 103-258, at 4 (1994), reprinted at 1994 U.S.C.C.A.N. 2561, 2564.  One major goal

of the legislation was to reduce Government costs: "The purchase of proven products such as

commercial and non-developmental items can eliminate the need for research and development,

minimize acquisition lead time, and reduce the need for detailed design specifications or

expensive product testing." *Id*. at 5, reprinted at 1994 U.S.C.C.A.N. at 2566.  The Senate Report

supporting the statute stated that "[e]xtra development costs and foregone economies of scale

increase the cost of products produced uniquely for the government" and that "[i]ncreasing

reliance on commercially available products would lower costs." *Id*. at 14, reprinted at 1994

U.S.C.C.A.N. at 2574.

Following enactment of Public Law 103-355, the drafters of the FAR included new

standard clauses for commercial item contracts, including a termination for convenience

provision that would be simpler for the Government to administer.  In 1995, the drafters of the

FAR promulgated new regulatory provisions directed at a specific type of contracting:

contracting for commercial items.  *See* 60 Fed. Reg. 48231 (Sept.18, 1995).  As expressly stated

in Part 12 of the FAR, monetary recovery under the commercial item contract termination

provisions intentionally differs from that permitted by the standard Part 49 Termination for

Convenience clauses typically used in other Federal Government contracts:

> *General*. The clause at 52.212-4 permits the Government to
> terminate a contract for commercial items either for the
> convenience of the Government or for cause. However, *the
> paragraphs in 52.212-4 entitled "Termination for the
> Government's Convenience" and "Termination for Cause" contain
> concepts which differ from those contained in the termination
> clauses prescribed in part 49. Consequently, the requirements of
> part 49 do not apply when terminating contracts for commercial
> items and contracting officers shall follow the procedures in this
> section*. Contracting officers may continue to use part 49 as

guidance to the extent that part 49 does not conflict with this
section and the language of the termination paragraphs in 52.212-4.

FAR § 12.403(a), 48 C.F.R. § 12.403(a) (emphasis added).

Instead of a cost-based recovery in Part 49, the Part 12 termination for convenience

provision, FAR § 52.212-4, breaks the contractor's termination settlement recovery into two

categories, or prongs, based upon (1) a **percentage of the contract price** reflecting the

**percentage of the contract work performed**, plus, if any, (2) "**reasonable charges** the

Contractor can demonstrate . . . have resulted from the termination":

> *Subject to the terms of this contract, the Contractor shall be paid a
> percentage of the contract price reflecting the percentage of the
> work performed prior to the notice of termination, plus reasonable
> charges the Contractor can demonstrate to the satisfaction of the
> Government using its standard record keeping system, have
> resulted from the termination.* The Contractor shall not be required
> to comply with the cost accounting standards or contract cost
> principles for this purpose. This paragraph does not give the
> Government any right to audit the Contractor's records. The
> Contractor shall not be paid for any work performed or costs
> incurred that reasonably could have been avoided.

48 C.F.R. § 52.212-4(l) (emphasis added).

The primary focus of FAR § 52.212-4(l), is the first prong, as it "establishes a

'presumption' that a contractor whose contract is terminated for convenience, therein, "will be

adequately compensated by payment of. . . [a] 'percentage of the work performed prior to' the

termination." *See Red River Holdings, LLC v. U.S.*, 802 F.Supp. 2d 648, 661 (D.Md. 2011);

(quoting 48 C.F.R. § 52.212-4(l)). In other words, the scope of § 52.212-4(l)'s first prong

generally captures both *costs and profit. See Red River*, 802 F. Supp. 2d at 662; *Id*. n.18 ("a

percentage-of-work-performed payment will generally provide a contractor with compensation

for *costs incurred and* some amount of profit on those costs") (emphasis in original). In short,

17

the first prong is controlling.

As for the second, "reasonable charges" prong, it serves as a "safety valve," of sorts, to capture those costs that "may not be fully reflected as a percentage of the work performed," in the first prong of § 52.212-4(l)).  *See Red River*, 802 F. Supp. 2d at 661.  As the *Red River* court noted, it "is worth repeating that § 52.212-4(l)'s second, 'reasonable charges' component contemplates *only* those expenses that –even after a percentage-of-work-performed payment – would otherwise go uncompensated." *See Red River*, 802 F. Supp. 2d at 661 n.17 (emphasis in original).

In short, it is the first prong that is controlling.  The second prong serves to capture "such costs [as] are not adequately reflected as a percentage of the work performed, and provided such costs could not have been reasonably avoided."  *See Red River*, 802 F. Supp. 2d at 662.

Understood this way, FAR § 52.212-4(l) provides a simplified method of compensating contractors.  Instead of a cost-based recovery as with FAR § 52.249-2(g), the terminated contractor recovers a straight "percentage of the contract price reflecting the percentage of the

## III.   ACLR Is Not Entitled To Summary Judgment

### A.   ACLR Fails To Establish A Legal Basis For Summary Judgment

When making a summary judgment determination, a court not only considers issues of fact but must also consider whether the moving party is entitled to a judgment as a matter of law. *See Celotex*, 477 U.S. at 322-223.  That is, the summary judgment movant "has the initial responsibility of identifying the *legal basis of its motion*, and of pointing to those portions of the record that it believes demonstrate the absence of a genuine issue of material fact." *See Novartis*, 271 F.3d at

18

1046 (citing *Celotex*, 477 U.S. at 223) (emphasis added).

The "legal basis" of ACLR's summary judgment motion is a house of cards that must necessarily collapse - - it rests upon a termination for convenience clause, FAR § 52.249-2(g), that is not in the contract, and ignores the clause that is: FAR § 52.212-4(l).  Citing 48 C.F.R. § 52.249-2(g)(2)(i), ACLR argues that it is "entitled to recover the 'costs incurred in the performance of the work terminated,'" as follows:  (1) Personnel Costs - $1,33,2021.45 (for the two audits); (2) Managing Principal Costs - $654,064; (3) General and Administrative (G&A) Costs: $505,569.23; (4) Office Lease Costs - $295,775.80;  and (5) Loan Interest Costs - $176,426.46.  *See* Pl. Br. at 10-14.  Citing 48 C.F.R. § 52.249-2(g)(2)(iii), ACLR claims $304,885.03 in Reasonable Profit.  *See* Pl. Br. at 14. Citing 48 C.F.R. § 52.249-2(g)(3)(i), ACLR claims Settlement Fees, including legal fees incurred in its litigating its claims, totaling $2,001,874.78, plus CDA interest.  *See* Pl. Br. at 16-18.

It is the termination for convenience clause in the GSA Contract that governs -FAR § 52.212-4(l), not FAR § 52.249-2(g).  *Krygoski*, 94 F.3d at 1544;  *see also JKB Solution*, 150 Fed. Cl. at 256; *Praecomm,*, 78 Fed. Cl. at 11; *see* Opinion at 4.  ACLR has utterly **failed to establish a legal or contractual basis for its claimed termination for convenience damages**, and is not entitled to judgment as a matter of law.  *See Novartis*, 271 F.3d at 1046 (citing *Celotex*, 477 U.S. at 223) (emphasis added).

**B.**     <u>**ACLR Fails To Provide Relevant Evidence To Support Its Claims**</u>

Even assuming, for argument's sake, that ACLR had invoked the correct termination for convenience clause in its motion, which it did not, ACLR's claim for termination damage still fails because ACLR has submitted no relevant documentation or evidence that would support

any recovery under FAR § 52.212-4(l), the contract provision that governs its termination for convenience claims.

1.      **ACLR Fails To Demonstrate The First Prong Of FAR § 52.212-4(l): "Percentage Of The Contract Price Reflecting The Percentage Of The Work Performed"**

Pursuant to the first prong of FAR § 52.212-4(l), ACLR was required to demonstrate the "percentage of the *contract price* reflecting the percentage of the *work performed* prior to the *notice of termination*." *See* 48 C.F.R. § 52.212.-4(l) (emphasis added).  Breaking this down, ACLR was obligated to present evidence of: a contract price, the total work to be performed, the percentage of the work they actually completed, and the date of termination of the 2007 and 2010 audits.  Evidence of "work performed" would include contract "deliverables," *i.e.*, NAIRPS, RFIs, NIPS, reports, etc., as set forth in the PWS and SOW and their respective schedules of deliverables and appendices.  ECF No. 51-3 at 207-208 (A211-212) (PWS ¶ 1.8); ECF No. 51-5 at 119 (A504) (SOW Appendix B).  ACLR presented *none* of this, not so much as a single relevant document to show that it performed *any* work on the two audits, or what the "price" of those two audits were, or at what step in the audit process they were when terminated.

Instead, ACLR submitted over 1700 pages of exhibit documents including bank statements, payroll and W-2 summaries, GSA rate schedules, lease documents, loan documents, G&A cost summaries, attorney invoices, profit statements, cost summaries, and so on, *see* ECF No. 107 (Pl. Exs.1, A through N) - - none of which demonstrates the "percentage of the *contract price* reflecting the percentage of the *work performed* prior to the *notice of termination*." *See* 48 C.F.R. § 52.212.-4(l) (emphasis added).  ACLR has completely failed to meet its burden of proof.

20

Accordingly, the Court may reasonably find that, under the first prong of FAR § 52.212-4(l), based upon the evidence ACLR submitted (and notwithstanding that ACLR has not actually invoked this provision), ACLR is owed: $0.  In any event, ACLR is not entitled to summary judgment.

### 2.    ACLR Cannot Recover Under The Second Prong Of FAR § 52.212-4(l): "Reasonable Charges"

ACLR's claim for contract termination costs is not saved by the second, "reasonable charges," prong of FAR § 52.212.-4(l).  As we have demonstrated, it is the first, "percentage of the contract price reflecting the percentage of the work performed" prong that is controlling.  The second prong merely serves to capture "such costs as are not adequately reflected as a percentage of the work performed, and provided such costs could not have been reasonably avoided."  *See Red River*, 802 F. Supp. 2d at 661.  The bulk of the various "costs incurred in the performance of the work terminated" that ACLR is claiming, *e.g.*.personnel, managing principal, office lease, loan interest, and profit, *see* Pl. Br. at 10-14, would necessarily be captured in the first prong of FAR § 52.212-4(l).  *See Red River*, 802 F. Supp. 2d at 662 and n.17.

In short, ALCR's claim for termination costs must first be addressed through the "percentage of the contract price reflecting the percentage of the work performed" prong, as a starting point, before the "reasonable charges" prong can even be reached. The first prong cannot be ignored.  As this Court has explained,

> To allow [plaintiff] to escape the application of the termination for convenience clause [FAR § 52.212-4(l], which was incorporated by explicit reference into its contract with the [Government]. . . would be to deny the Government the benefit of its bargain. The Court will not do this.

*JKB Solution*, 150 Fed. Cl. at 256.

The "reasonable charges" prong of FAR § 52.212-4(l) is not a substitute for the first prong, nor is it a stand in for a FAR § 52.249-2(g) "cost reimbursement" methodology that ACLR might hope for.  ACLR has not invoked FAR § 52.212-4(l) and has presented no relevant first prong evidence.  Therefore, the "reasonable charges" prong of FAR § 52.212-4(l) cannot be reached, and ACLR fails to prove entitlement to any damages under that contract provision. *See JKB Solution*, 150 Fed. Cl. at 256; *Red River*, 802 F. Supp. 2d at 662 and n.17.

### C.   ACLR Fails To Demonstrate Its Charges Are Reasonable

Even assuming, for argument's sake that the Court could reach the second prong of FAR § 52.212-4(l), which it should not, given ACLR's total abandonment of the mandatory first prong analysis, ACLR fails to demonstrate entitlement to "reasonable charges" under the second prong.

To put things in perspective, in its amended complaint, for the two audits, ACLR claimed termination for convenience damages of "at least $5,923,754." *See* ECF No. 101 (Am. Comp. at 4).  In its summary judgment motion, ACLR claims termination for convenience damages of $5,260,282.61, not including $834,835,74 in CDA interest.  *See* Pl. Br. at 18-19.  This compares with the total amount of $3,389,711.98 that ACLR was actually paid in contingency fees for completing *seven audits*.  *See* Def. Ex. A at 2.  Indeed, the contingency fees paid to ACLR for a single, completed audit ranged from a low of $67,385.80 to a high of $1,146,284.29.  *Id*.  In other words, ACLR is claiming *termination for convenience* damages of over $5 million for two *incomplete* audits, that far exceeds the highest *contingency fee* it ever received for a *completed audit.  See*, *e.g.*, *White Buffalo Constr., Inc. v. United States*, 52 Fed. Cl. 1, 4 (2002) (termination for convenience damages should not exceed the contract price).

This Court has held that, "[i]n contrast with damages stemming from a breach of contract, the sum due a contractor after a termination for convenience is *significantly circumscribed. See Praecomm*, 78 Fed. Cl. at 12 (citing FAR § 52.212-4)(emphasis added).  ACLR's claimed termination for convenience "costs" fly in the fact of that dictum and are inherently unreasonable.  In addition, ACLR's specific costs are subject to dispute, as we demonstrate, below.

### 1.   Personnel Costs: 2007 Audit

FAR § 52.212-4(l) requires ACLR to "demonstrate to the satisfaction of the ordering activity using its *standard record keeping system*," documentation of its "reasonable charges," that "have resulted from the termination."  ACLR fails to meet this requirement.

ACLR claims entitlement to payroll costs of $408,462.83 for the 2007 audit.  *See* Pl. Br. at 10 (citing 48 C.F.R 52.249-2(g)(2)(i).  The period of performance for the 2007 audit was from approximately August 25, 2011 when CMS asked ACLR to draft a proposed audit plan, through November 17, 2011, when CMS began transmitting 2007 PDE records to ACLR, and ACLR began reviewing them, to November 30, 2011 when CMS "killed the review." *See* ECF No. 54-1 at 133 (SA 121); *id.* at 262-263 (SA 243-44); *id.* at 257 (SA238); ECF No. 54-2 at 21 (SA498), 124 (SA600).  Again, to put things in perspective, this single, claimed termination for convenience "payroll cost," $408,462.83, greatly exceeds the total contingency fees in *three* of the audits that ACLR actually completed and was paid – and is inherently unreasonable. *See* Def. Ex. A at 2; *see also White Buffalo*, 52 Fed. Cl. at 4; *Praecomm*, 78 Fed. Cl. at 12.

ACLR did not provide its general ledger or trial balance as support for its accounting system.  ACLR admits that, for its claimed labor hours, it "did not maintain time sheets that attributed work to a particular project."  *See* Pl. Br. at 15.  ACLR's claimed payroll costs are not

from its standard record keeping system, but are ginned up "summaries," *see* Pl. Ex. B, and a data dump of over 500 pages of year-end W-2s and payroll reports, *see* Pl. Ex. B-1, none of which link payroll to the 2007 audit. ACLR's "summaries" also reflect numerous entries that post-date November 30, 2011 after the audit was rescinded. *See* Pl. Ex. B. *See* FAR § 52.212-4(l) ("Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided").

The period of performance on the 2007 audit was an approximately *three month* period between August 25 (when CMS asked ACLR to propose an audit plan) November 17 (when CMS sent PDE data to ACLR) and November 30 (when the audit was rescinded) 2011, yet ACLR's W-2 and 401(k) records in Pl. Ex. B-1 broadly show wages, taxes, and withholdings, and investment income, for the *full year for 2011* for eight people, and also include records from January 2012 for four people, with no allowance for administrative time, time spent pursuing other contracts or clients, or allocation to any specific audit. *See* Pl. Ex. B-1 (A0066-0571). Indeed, to even begin to make sense of ACLR's 500 pages of W-2's and 401(k) records would require an audit in itself, which is *not* how the "simplified" process under FAR § 52.212-4(l) is supposed to work – *the contractor* is required to present clear records under its standard record keeping system, and the Government has no "right" to audit contractor records.

In short, ACLR's claim for personnel costs for the termination for convenience of the two-week 2007 audit reflect an *entire year's* worth of gross payroll records in 2011- - well before the audit started (August 25, November, 17, 2011), and after it was rescinded (November 30, 2011). *See* Pl. Ex. B-1. ACLR argues that, "under the terms of the Part D RAC," it was required to maintain key personnel throughout the base period of the contract and cites affidavit

of its CEO, Mr. Mucke, for that purpose.  *See* Pl. Br. at 10 (citing Pl. Ex. 1 (Mucke Affidavit)

(¶ 10)).  While, ACLR was required to maintain key personnel, *see* ECF No. 51-3 at A159-160,

ACLR has not demonstrated that this was not a cost solely attributable to the 2007 audit, or that

resulted from the termination of the 2007 audit.  Maintaining Key personnel would be a cost

allocable to all of audits that ACLR performed.  *See* Def. Ex. A at 4-5.  ACLR has not

demonstrated "to the satisfaction" of the Government "using its standard record keeping system"

that its claimed payroll costs are "reasonable" and have "resulted for the termination" of the

2007 audit.  *See* FAR § 52.212-4(l).  Moreover, ACLR fails to provide this Court with any

evidence supporting its claimed costs.

### 2.    <u>Managing Principal Costs</u>

ACLR next claims entitlement to managing principal costs of $654,064 for the work

allegedly performed by its CEO, Mr. Mucke, on the 2007 audit.  *See* Pl. Br. at 10-11 (citing 48

C.F.R 52.249-2(g)(2)(i)  and Pl. Ex. 1 (Mucke Affidavit)).  To put things in perspective, this

single, claimed "managing principal cost," $654,064, exceeds the total contingency fees in *four*

of the audits that ACLR actually completed and was paid – and is inherently unreasonable.  *See*

Def. Ex. A at 4; *see also White Buffalo*, 52 Fed. Cl. at 4; *Praecomm*, 78 Fed. Cl. at 12.

Specifically, Mr. Mucke claims to have worked "approximately 3,023 hours" on the 2007

audit, and states that his efforts were directed "solely" to that effort "during the base period of

the Part D RAC."  *See* Pl. Br. at 11 (citing Pl. Ex. 1 (Mucke affidavit).  *See* Pl. Ex. 1 (Mucke

affidavit) ¶ 18).  To put this in context, 3,000 hours is equivalent to 200 days of work, assuming

15 hours per day. Yet, in its motion, as reflected in the "cost" exhibits it submitted, *see* Pl. Exs.

A through N, ACLR has not provided any contract "deliverables" to corroborate that Mr. Mucke,

actually performed *any* work on the 2007 and 2010 audits.

Mr. Mucke admits he "did not specifically track his hours," but "estimated" the hours he worked.  He then multiplied the 3,023 estimated hours by his GSA schedule rate ($211.58 and $215.39) to arrive at the figure of $645,730 for his work on the 2007 audit.  *See* Pl. Br. at 11 (citing Pl. Ex. 1 (Mucke Affidavit) (¶¶ 18-20).

ACLR's claim for managing principal costs immediately fails because it is not supported by *any* contemporaneous documentation from ACLR's "standard record keeping system" as required by FAR § 52.212-4, but relies entirely upon the self-serving testimony of Mr. Mucke of the "estimated" hour he worked.  *See* Pl. Br. at 11, 15 (admitting that ACLR did not maintain "time sheets" to record the hours of its personnel"); *see also White Buffalo*, 52 Fed. Cl. at 5; *Appeal of ESCGov, Inc.*, ASBCA No. 58852, May 8, 2017, 17-1 BCA ¶ 36,772, 2017 WL 2603809 ("a contractor may not rely upon testimony alone to support its claim to charges resulting from a commercial items convenience termination; it must, at least, point to contemporaneous documentation supporting its claimed charge").

ACLR explains that Mr. Mucke is not an employee, and he did "not specifically track his hours worked on the contract because the contract was a contingency fee contract." *See* Pl. Br. at 11.  This explanation is hardly adequate, as Mr. Mucke is a CPA and ACLR is an accounting firm and is in the business of performing audits.

ACLR's use of the GSA rate schedule to calculate Mr. Mucke's "hourly rate" is also suspect, as it does not reflect direct labor costs actually incurred, even assuming he worked the incredible hours he claims.  The GSA rate is not equivalent to actual labor cost.  The GSA rate schedule reflects a "price," not a cost, and includes wages, benefits, overhead and profit.  *See,*

*e.g.*, Def. Ex. A (¶ 7).  ACLR has offered no evidence that it actually paid Mr. Mucke anything close to the amounts claimed as a cost.

In short, under the plain language of FAR § 52.212-4, ACLR was obligated to support its claimed costs with contemporaneous documentation from its "standard record keeping system." ACLR has not done so.  Where ACLR bears the burden of proving termination for convenience damages, the self-serving testimony of ACLR's principal, Mr. Mucke, as the sole evidence of those costs, is not sufficient.  *See, e.g.*, *Joseph Pickard's Sons Co. v. United States*, 532 F.2d 739, 742-744 (Ct. Cl. 1976) (holding that where the plaintiff failed to "demonstrate a justifiable inability to substantiate the amount of his resultant injury by direct and specific proof," the Court of Claims refused to countenance use of the relaxed, so-called "jury verdict" method of calculating damages); *see also Orlosky, Inc. v. United States*, 68 Fed. Cl. 296, 319 (2005) ("any failures of damage proof were not due to the inexactness of the situation, but, rather, plaintiff's own failure to produce reliable information.  Such failure cannot be used as a justification for 'lessening the burden of proof'") (citation omitted.);  *White Buffalo*, 52 Fed. Cl. at 5; *ESCGov,*, 2017 WL 2603809 at 13 ¶ 5.

### 3.    General And Administrative Costs

Next, ACLR claims $505,569.23 in G&A costs in connection with the 2007 audit.  *See* Pl. Br. at 11-12.  To put this in perspective, this single termination for convenience cost $505,569.23, exceeds the total contingency fees in *four* of the audits that ACLR actually completed and was paid – and is inherently unreasonable.  *See* Def. Ex. A at 2; *see also White Buffalo*, 52 Fed. Cl. at 4; *Praecomm*, 78 Fed. Cl. at 12.

Like its payroll claim, ACLR's claimed G&A costs are not from its standard record

27

keeping system, but are ginned up "summaries," *see* Pl. Ex. F, and a data dump of over 45 pages of "check registers," *see* Pl. Ex. A, and over 200 pages of "invoices", *see* Pl. Ex. F-1, none of which link the claimed G&A costs to the 2007 audit.  ACLR's G&A reflect numerous entries that post-date November 30, 2011 and into 2012 *after* the audit was rescinded.  *See* Pl. Ex. A at A0052, Pl. Ex. F at A1002.  *See* FAR § 52.212-4(l) ("Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided").  ACLR's "invoice" records, include a list of transactions, *see* Pl. Ex. F, with billings for "legal fees," *see* Pl. Ex. F (A1000) which elsewhere ACLR is separately claiming as attributable costs, *see* Pl. Br. at 16-18, raising the specter of double billing.  The invoices show $178,000 claimed for equipment and fixtures, *i.e.*, costs that would go to the general running of the business, and other projects.  *See* Pl. Ex. F (A1000).

In any event, as with its payroll claims, sorting out ACLR's data dump of "check registers," *see* Pl. Ex. A, and "invoices," *see* Pl. Ex. F-1, would require an audit in itself to untangle, which is not something the Government, or the Court for that matter, should be expected to do under the simplified procedures of FAR § 52.212-4(l).  It is ACLR that bears the burden of proving its specific termination for convenience damages with clear records from its standard record keeping system, and it has failed to meet that burden.  *See White Buffalo*, 52 Fed. Cl. at 5.

### 4.    Office Lease Costs

Next, ACLR claims $295,775.80 in office lease costs for the 2007 audit.  *See* Pl. Br. at 12.  On April 11, 2011, ACLR signed a five year lease for the Livonia, Michigan office (Livonia office) with a term from June 1, 2011 to October 31 2016.  *See* Pl. Br. at 12 (citing Pl. Ex. 1

(Mucke Affidavit) (¶¶ 21, 28)); Pl. Exs. D, D-1. ACLR's assertion that it executed the Livonia office lease for the "sole purpose" of obtaining additional space for its personnel "to work on" the 2007 audit, *see* Pl. Br. at 12, Pl. Ex. 1 (Mucke Affidavit) (¶ 24) is not supportable.  First, ACLR cannot demonstrate that at the time it signed the five-year lease, it reasonably expected the 2007 audit would require five years to perform.  Nor has ACLR demonstrated that the space it leased was reasonable for the needs of the 2007 audit.  Second, by the terms of the lease, the first 5 months were free, and then at a reduced rate for the following 10 months.  *See* Pl. Ex. D-1 at A0917 (¶ 1(g)).  *See id.*  The Livonia lease shows that for the first five months beginning on June 1, 2011 through November 1, 2011, the monthly base rental was $0.  *See* Pl. Ex. D-1 at A0917.  For the single month of November 1-30, 2011, which corresponds to the period when ACLR worked on the 2007 audit, *See* ECF No. 54-1 at 133 (SA 121); *id.* at 262-263 (SA 243-44); *id.* at 257 (SA238), the lease payment was $4,957.88.  *See* Pl. Ex. D-1 at A0917.  Consequently, the "lease cost" allocable to the 2007 audit would be negligible.

In addition, ACLR worked on some 20 different audits between approximately January 2014 to October 2015, during the pendency of the Livonia lease, and presumably while ACLR occupied that office during much of that period.  *See* Def. Ex. A at 4-5.  The five year Livonia lease *cannot* be solely attributed to the 2007 audit.  ACLR thus fails to meet its burden of demonstrating that $295,775.80 in office lease expenses is a reasonable charge it incurred for the termination for convenience of the 2007 audit.  *See* FAR 52.212-4(l).  Rather, it appears that ACLR is attempting to use the 2007 audit termination proposal to recoup costs related to a much longer lease period that did not correspond with the actual performance of the audit.

5.       **Loan Interest Costs**

ACLR next claims $176,426.46 in loan interest costs in connection with the 2007 audit.

*See* Pl. Br. at 13.  ACLR has no legal basis for this demand.  It is well established that this Court

"may not award interest on monetary claims against the Government unless specifically

authorized by statute or contract."  *See Servidone Construction Corp. v. United States*, 931 F.2d

860, 863 (Fed. Cir. 1991)(citations omitted).  While "[t]he CDA contains an explicit statutory

grant for the collection of interest on a recovery under a claim, . . . [it] has no separate provision

for recovery of interest on borrowings" (affirming the trial court's ruling that appellant

Servidone "cannot recover interest on borrowings").  *Id. see also*, *e.g.*, FAR § 31.205-20 (interest on

borrowings is not an allowable cost).  ACLR thus fails to meet its burden of demonstrating that

$176,426.46 in claimed interest cost is a reasonable charge it incurred for the termination for

convenience of the 2007 audit.  *See* FAR 52.212-4(l).

6.       **Reasonable Profit**

Citing 48 C.F.R. § 52.249-2(g)(iii), ACLR next claims "reasonable profits of

$304,885.03 on the costs incurred in performance of the work terminated" on the 2007 audit,

based upon a 15% profit rate.  *See* Pl. Br. at 14.  ACLR's claim to "reasonable profit" damages is

flawed for multiple reasons, not least of which is that ACLR is actually seeking anticipatory

profits, which are not recoverable in a termination for convenience action.  *See Praecomm*, 78

Fed. Cl. at 11 (citing *International Data*, 492 F.3d at 1323-1324).[5]

---

[5] Anticipatory profit generally means the profit a contractor would have earned on a
contract, had it not been cancelled.  *See*, *e.g.*, Uniform Commercial Code § 2-708(2).

First, FAR § 52.212-4(l), the provision that actually governs this action, contains no language for "reasonable profits," or "profits" of any kind. *See* 48 C.F.R. § 52.212-4(l). Moreover, even assuming, for argument's sake, that FAR § 52.249-2(g)(iii) applied to this action, which it does not, ACLR would still fail to prove entitlement to profit.

Under a Part 49 termination, which reimburses the contractor on an actual cost basis rather than a "percentage of the contract price" basis, the termination contracting officer "shall allow profit on preparations made and work done by the contractor for the terminated portion of the contract but not on the settlement expenses." 48 C.F.R. § 49.202(a).  That award is permitted by FAR § 52.249-2(g), which expressly permits in a Part 49 convenience termination "costs incurred in the performance of the work terminated," plus "[a] sum, as profit on subdivision (g)(2)i) of this clause . . . ."  48 C.F.R. § 52.249-2(g); *see also Krygoski*, 94 F.3d at 1540, 1544 (Pursuant to FAR § 52.249-2, "termination for convenience damages . . . include costs of performance prior to termination, *profits on that performance*, and termination costs") (emphasis added); *see also Best Foam Fabricators, Inc. v. United States*, 38 Fed. Cl. 627, 637 (1997) (FAR § 52.249-2 "limits the contractor's recovery to costs incurred prior to the termination, [and] a *reasonable profit on the work performed*") (emphasis added).

Nevertheless, even then, profits are not guaranteed under FAR 52.24 (g)(iii):  "If it appears that the Contractor would have sustained a loss on the entire contract had it been completed, the Contracting Officer  shall allow no profit under this subdivision (g)(2)(iii) and shall reduce the settlement to reflect the indicated rate of loss." FAR § 49.20.  Furthermore, "[a]nticipatory profits . . . are not recoverable."  *Best Foam Fabricators*, 38 Fed. Cl. at 637-638; *see also International Data*, 492 F.3d at 1323-1324.  Given the costs ACLR claimed it incurred,

31

when weighed against the fees it has earned on other audits, the only conclusion that can be drawn is that ACLR would not be entitled to any profit and would have had its claimed termination costs greatly reduced by application of the loss ratio.

Here, ACLR bases its claim for profits, not upon the "work performed," as indeed ACLR has presented *no evidence* it performed any work on the 2007 and 2010 audits (*see* ACLR's cost exhibits, Pl. Exs. A through N) - but upon the "costs" ACLR alleges it incurred "as described above" (in its motion), multiplied by a "profit rate of 15%." *See* Pl. Br. at 14. These "costs" include the entirety of its payroll, Livonia office lease, loan interest, G&A, and "settlement legal fee" expenses. *See* Pl. Br. at 14 (citing Pl. Ex. L). ACLR's claim for "profits," without any connection to "work performed" on the terminated audits, is fundamentally flawed. *Krygoski*,, 94 F.3d at 1540, 1544; *Best Foam Fabricators*, 38 Fed. Cl. at 637.

Nevertheless, ACLR speculates, "[g]iven the magnitude of *potential* improper payments that ACLR *could have* collected if CMS *would have allowed* ACLR to execute the Part D RAC, a profit 15% profit rate is completely reasonable." *See* Pl. Br. at 14 (emphasis added). In short, ACLR's claim for profit, based upon pure speculation - - is really a claim for anticipatory profits, which are not recoverable. *Best Foam Fabricators*, 38 Fed. Cl. at 637-638; *see also International Data*, 492 F.3d at 1323-1324.

ACLR's assertion of a 15% profit rate is not only speculative, it contravenes the FAR. In a termination for convenience under FAR §2.249, the profit rate is not determined by the contractor - - it is "determined by the [c]ontracting officer under FAR 49.202." *See* 48 C.F.R. § 52.249.2(g)(2)(iii).

ACLR appears to derive its 15% profit rate upon the contingency fees it earned, which

32

ranged between 7.5% to 20%.  See Pl. Br. at 14.  Under the task order, the contingency fee is the revenue that ACLR would receive following a successful recovery of overpayments.  Revenue is not the same as profit, which is the excess revenue minus costs.  Nevertheless, ACLR is claiming approximately $4 million in costs (excluding profit and CDA interest).  Simply to cover $4 million in costs, assuming a 15% contingency fee - - that is just to break even - - would require $26.6 million in recoveries ($4 million/15% = $26.6 million).  That is over four times the amount that has ever been recovered for a single audit.  See Def. Ex. A at 2.  For ACLR to receive a 15 % profit on top of covering its $4 million in claimed costs is a fantasy.  ACLR has not demonstrated that it would have made a profit on the 2007 audit, nor can it.

### 7.    Costs For 2010 Audit

ACLR claims $923,558.62 for the termination for convenience of the 2010 audit, based upon the number of hours its personnel allegedly worked on the audit, multiplied by each employee's GSA schedule rate.  See Pl. Br. at 15-16.  The claimed amount exceeds the contingency fees that ACLR received in *six* of the seven audits that ACLR actually completed and was paid.  See Def. Ex. A at 2.

Mr. Mucke "estimated" his staff worked 4,376 hours on the 2010 audit, and he arrived at this this estimate by "analyz[ing] over 1,958 email communications and 161,877 documents," that his employees allegedly compiled for the audit.  See Pl. Br. at 15-16.  ACLR did not submit any documents, other than Mr. Mucke's affidavit, to corroborate these assertions.

ACLR's claim for the 2010 audit costs is immediately questionable because it is not supported by *any* contemporaneous documentation from ACLR's "standard record keeping system" as required by FAR § 52.212-4.   It relies entirely upon the self-serving statements of

Mr. Mucke of the "estimated hours" his staff worked. *See* Pl. Br. at 15 (admitting that ACLR did not maintain "time sheets" to record the hours of its personnel); *see, e.g., Joseph Pickard's Sons*, 532 F.2d at 742-744; *see also Bath Iron Works Corp. v. United States*, 34 Fed. Cl. 218, 243-244 (1995) (finding that damages were uncertain due to the plaintiff's own failure to maintain records and present evidence within its control); *Orlosky*, 68 Fed. Cl. at 319; *White Buffalo*, 52 Fed. Cl. at 5; *ESCGov,*, 2017 WL 2603809 at 13 ¶ 5.

Furthermore, as with the ACLR's questionable managing principal cost claim, using the GSA schedule rates, instead of direct labor costs, is flawed because the GSA rate schedule reflects a "price," not a cost, and includes wages, benefits, overhead and profit. *See, e.g.*, Def. Ex. A (¶ 7).

### 8.   Settlement Fees

Next, citing 48 C.F.R. § 52.249-2(g)(3)(i), ACLR claims a total of $1,847,465.95 in legal fees "attributable to this lawsuit", and approximately $154,408.83 for ACLR's "internal work efforts" on its legal claims. *See* Pl. Br. at 16-18.  ACLR makes clear that these are costs incurred to litigate its legal claims that ACLR brought against the United States. *See, e.g.*, Pl. Br. at 17 ("Without this lawsuit, CMS would not have taken the position that there was a constructive termination for convenience . . .").

ACLR ignores that the cost to prosecute claims against the United States is not an allowable cost:

> Costs not covered elsewhere in this subsection are unallowable if incurred in connection with: (1) Defense against Federal Government claims or appeals or the *prosecution of claims or appeals against* the Federal Government.

*See* FAR § 31.205-47(f)(1) (emphasis added).

34

Furthermore, the Government must affirmatively waive its sovereign immunity from suit for a plaintiff to obtain attorney fees.  Absent a statute, such as the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, or an express contractual provision, the United States is not liable for attorney fees.  *See DMS Imaging, Inc. v. United States*, 123 Fed. Cl. 645, 661 (2015) (citing *Library of Cong. v. Shaw*, 478 U.S. 310, 314-315 (1986) ("This comports with the default 'American Rule' that each litigant bear its own legal costs absent a statute or express contractual language to the contrary") (citation omitted).  ACLR has not identified any applicable statutory or contractual requirement for the Government to pay its attorney fees and litigation costs, and its claim should be denied.

### 9.    CDA Interest

ACLR next claims $834,835.74 in CDA interest, based upon its alleged costs for the 2007 and 2010 audits through December 31, 2020.  *See* Pl. Br. at 18.  ACLR fails to prove entitlement to any CDA interest.

The CDA provides that "[i]nterest on an amount found due a contractor on a claim shall be paid to the contractor for the *period beginning with the date the contracting officer receives the contractor's claim*, pursuant to section 7103(a) of this title, until the date of payment of the claim." 41 U.S.C. § 7109(a)(1) (emphasis added). "[I]nterest is due a contractor on an underlying quantum claim starting from the time that the contractor first submitted a proper quantum claim to the contracting officer until the Government has paid the quantum claim." *J.M.T. Mach. Co. v. United States*, 826 F.2d 1042, 1045 n.1 (Fed. Cir. 1987).  Here, ACLR has improperly started its calculation of CDA at the time it incurred the claimed costs, not from the date it submitted a proper quantum claim to the Government.

35

Because ACLR has failed to prove its "underlying claim" for termination for convenience damages under FAR § 52.212-4(l), it is not entitled to CDA interest.  And even were ACLR to establish entitlement to costs, which it has not, the CDA interest clock commences upon submission of the claim.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiff's motion for summary judgment.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

s/ Martin F. Hockey
_____
MARTIN F. HOCKEY, JR.
Acting Director

s/ Joseph A. Pixley

OF COUNSEL:

_____
JOSEPH A. PIXLEY
Trial Attorney

ROBYN LITTMAN
Office of the General Counsel
U.S. Department of Health and Human Servs.
7500 Security Boulevard
Central Bldg. – Mailstop C2-05-23
Baltimore, MD 21244

Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-0843
Facsimile: (202) 307-0972

April 9, 2021

Attorneys for Defendant

36

**CERTIFICATE OF FILING**

I hereby certify that on the 9th day of April, 2021, a copy of the foregoing

"DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR

SUMMARY JUDGMENT" was filed electronically.  I understand that notice of this filing will

be sent to all parties by operation of the Court's electronic filing system.  Parties may access

this filing through the Court's system.


_____   s/Joseph A. Pixley   _____

37