EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ACLR, LLC, | ) |
|       Plaintiff, | ) ) ) |
|       v. | )   Nos. 15-767 & 16-309C )   (Judge Campbell-Smith) |
| THE UNITED STATES, | ) ) |
|       Defendant. | ) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Defendant, the United States, respectfully submits this response to the proposed findings of uncontroverted fact submitted by plaintiff ACLR, LLC (ACLR).

    1. In connection with the Plan Year ("PY") 2007 Duplicate Payment Audit, the Recovery Audit Services in Support of Medicare Part D Task Order ("Part D RAC") required ACLR to develop an infrastructure necessary to secure billions of prescription drug payment transactions. Exhibit 1 at ¶ 8, A0003.

RESPONSE: Denies. The source of this assertion is the affidavit statement ACLR's Managing Principal, Christopher Mucke. It is not stated in the GSA Contract GS-23F-0074W (GSA Contract), *see* ECF No. 70, task order HHSM-500-2011-00006G (task order), *see* ECF No. 51-3 at 152-154 (A156-157), or the performance work statement (PWS), *see* ECF No. 51-5 at 6 (A391). Nor is it demonstrated that ACLR's "infrastructure" was used solely "in connection with" the Plan Year (PY) 2007 Duplicate Payment Audit (2007 audit), as opposed to the 20 total audits that ACLR participated in. *See* Def. Ex. A at 4-5.

    2. The Part D RAC also required ACLR to develop and implement recovery audit processes, Part D RAC stakeholder communication processes, and project plans and implementation schedules. *Id*. at ¶ 9, A0003. All of these actions were necessary for the PY 2007 Duplicate Payment Audit. *Id*.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and does not cite to the GSA Contract, *see* ECF No. 70, the task order, *see* ECF No. 51-3 at 152-154

(A156-157), or the PWS, *see* ECF No. 51-5 at 6 (A391).  ACLR has not demonstrated that its "audit processes" were solely attributable to the 2007 audit), as opposed to the 20 total audits that ACLR participated in.  *See* Def. Ex. A at 4-5.

> 3. Under the terms of the Part D RAC, ACLR was required to maintain key personnel throughout the base period of the contract. *Id*. at ¶ 10, A0003.

RESPONSE: Qualified.  The source of assertion is the affidavit statement of Mr. Mucke. While ACLR was required to maintain key personnel, *see* ECF No. 51-3 at A159-160, this was not a cost solely attributable to the 2007 audit, or that resulted from that audit.  It would be a cost reflected in all of audits that ACLR participated in.  *See* Def. Ex. A at 4-5.

> 4. On January 31, 2012, CMS executed a contract modification that removed ACLR's requirement to maintain key personnel and required ACLR to conduct and recover improper payments using audit processes designed by a separate contractor during the Part D RAC base period. *Id*. at ¶ 11, A0003-A0004.

RESPONSE: Denies.  The source of assertion is the affidavit statement of Mr. Mucke and does not cite to the to the GSA Contract, *see* ECF No. 70, the task order, *see* ECF No. 51-3 at 152-154 (A156-157), or the PWS, *see* ECF No. 51-5 at 6 (A391).  In Modification 3 to the task order (*see* ECF No 51-5 at A513-A518), key personnel requirements were merely "waived until such time that the appeals period begins." *Id*. at (A514).

> 5. ACLR's payroll costs for the PY 2007 Duplicate Payment Audit totaled $408,462.83.  *Id.* at ¶¶ 12 and 13, A0004; Exhibit B, A0059-A0065; Exhibit B-1, A0066-0571.

RESPONSE: Denies. The period of performance for the 2007 audit was August 25, 2011 through November 17-30, 2011.  See ECF No. 54-1 at 133 (SA 121); *id*. at 262-263 (SA 243-44); *id*. at 257 (SA238); ECF 54-2 at 21 (SA498), 124 (SA600).  ACLR's claim for personnel costs for the termination for convenience of the two-week 2007 audit reflect an entire year's

2

worth of gross payroll records in 2011- - well before the audit started (November, 17, 2011), and after it was rescinded (November 30, 2011), and are grossly inflated. *See* Pl. Ex. B-1.

> 6. As the owner of ACLR, Chris Mucke was not an employee and did not take a salary despite working extensively on the Part D RAC. Exhibit 1 at ¶ 14, A0004.

RESPONSE: Qualified. The source of this assertion is the affidavit statement of Mr. Mucke. It is unknown to the Government whether Mr. Mucke paid himself a salary or not. Denies that Mr. Mucke "worked extensively." ACLR has produced no contemporaneous documentation from its standard record keeping system, as required by FAR § 52.212-4(l), to support that Mr. Mucke "worked" on the Part D RAC. *See* Pl. Exs. A through N (ACLR's "cost" exhibits).

> 7. Chris Mucke was the Project Director for ACLR as defined in the Part D RAC. *Id*. at ¶ 15, A0004.

RESPONSE: Qualified. The source of this information is the affidavit statement of Mr. Mucke, not the Part D Rac. Mr. Mucke was designated as the Project Director in the task order. *See* ECF 51-3 at A160.

> 8. During the base period of the Part D RAC, Chris Mucke's efforts were solely directed to executing the Part D RAC necessary to complete the PY 2007 Duplicate Payment Audit and he typically worked 15-18 hour days. *Id*. at ¶ 16, A0004.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke. ACLR has produced no contemporaneous documentation from its standard record keeping system, as required by FAR § 52.212-4(l), to support that Mr. Mucke "worked" on the Part D RAC or the 2007 audit, and if he did, the actual hours worked. *See* Pl. Exs. A through N (ACLR's "cost" exhibits).

> 9. Given that the Part D RAC was a contingency fee contract, Chris Mucke did not record the hours he worked during the base period of the Part D RAC. *Id*. at ¶ 17, A0004.

3

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke. Nothing in the Part D RAC directed Mr. Mucke, or any ACLR employee or officer to "not record the hours" he or she worked. It is questionable that a CPA like Mr. Mucke would not document his efforts on a project. ACLR has produced no contemporaneous documentation from its standard record keeping system, as required by FAR § 52.212-4(l), to support that Mr. Mucke "worked" on the Part D RAC or the 2007 audit. *See* Pl. Exs. A through N (ACLR's "cost" exhibits).

> 10. Chris Mucke devoted approximately 3,023 hours to the PY 2007 Duplicate Payment Audit effort in the base period. *Id*. at ¶ 18, A0004-A0005.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and is, admittedly, an "estimate" that is not based upon 2011 documentation. ACLR has produced no contemporaneous documentation from its standard record keeping system, as required by FAR § 52.212-4(l), to support that Mr. Mucke "worked" on the Part D RAC or the 2007 audit, and if he did, the actual hours worked. *See* Pl. Exs. A through N (ACLR's "cost" exhibits).

> 11. The value of Chris Mucke's efforts on the PY 2007 Duplicate Payment Audit total $645,730. *Id*. at ¶¶ 19-20; Exhibit C, A0572-A0575; Exhibit C-1, A0576-A0589.

RESPONSE: Denies. ACLR has produced no contemporaneous documentation from its standard record keeping system, as required by FAR § 52.212-4(l), to support that Mr. Mucke "worked" on the Part D RAC or the 2007 audit. In addition, Mr. Mucke's use of GSA Schedule rates, *see* Pl. Exs. C and C-1, is improper, and does not reflect actual labor costs. The GSA Schedule rate, *see* Pl. Ex. C-1 at A0583) is a "price," not a cost, and includes wages, benefits, overhead, and profit. *See* Def. Ex. A (¶ 7).

4

12. At the time of the award of the Part D RAC, ACLR maintained office space at 550 Forest Avenue, Suite 15-2, Plymouth, Michigan 48170 ("Plymouth Office") as that office did not have sufficient space for the additional personnel that ACLR would need to hire for the Part D RAC. Exhibit 1 at ¶ 21, A0005.

RESPONSE: Qualified. The source of this assertion is the affidavit statement of Mr. Mucke, and ACLR attached no contemporaneous records to support it.

13. The monthly lease payments for the Plymouth Office were $575 and the other office expense was monthly electricity payments averaging $100. *Id.* at ¶ 22, A0005.

RESPONSE: Qualified. The source of this assertion is the affidavit statement of Mr. Mucke, and ACLR attached no contemporaneous records to support it.

14. On April 11, 2011, ACLR executed a multiyear lease for expanded office space located at 38705 Seven Mile Road, Suite 460, Livonia, Michigan 48152 ("Livonia Office") with SMC Investors, LLC. *Id.* at ¶ 23, A0005; Exhibit D-1, A0595-A0964.

RESPONSE: Qualified. On April 11, 2011, ACLR executed a five-year lease for an office in Livonia, Michigan (Livonia office) with 6,102 square feet of office space, with a term of June 1, 2011 to October 31, 2016. Pl. Ex. D-1 at A0917.

15. The lease for the Livonia Office was executed for the sole purpose of obtaining additional space to house audit and key personnel to work on the PY 2007 Duplicate Payment Audit in accordance with the Part D RAC. Exhibit 1 at ¶ 24, A0005.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and ACLR attached no contemporaneous records to support it. During the lease term period from June 1, 2011 to October 31, 2016, ACLR worked on some 20 different audits. *See* Def. Ex. A at 4-5. The five year Livonia lease is not solely allocable to the 2007 audit.

16. The monthly lease and electricity payments for the Livonia Office averaged $9,200 and $1,300, respectively. *Id.* at ¶ 25, A0005.

5

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke. The Livonia lease shows that for the first five months beginning on June 1, 2011 through November 1, 2011, the monthly base rental was $0. *See* Pl. Ex. D-1 at A0917. For the single month of November 1-30, 2011, which corresponds to the period when ACLR worked on the 2007 audit, *See* ECF No. 54-1 at 133 (SA 121); *id*. at 262-263 (SA 243-44); *id*. at 257 (SA238), the lease payment was $4,957.88. *See* Pl. Ex. D-1 at A0917.

> 17. To mitigate costs associated with the Livonia Office, ACLR negotiated a sublease with WorkForce Software, Inc. on March 19, 2013 and ACLR moved in 2013 to a smaller office located in Suite 251 ("Livonia Office 2") of the same building. *Id*. at ¶ 26, A0006.

RESPONSE: Qualified. The lease amendment shows that, on or about April 1, 2013, ACLR moved into a smaller office that reduced the square footage from 6,102 (the Livonia office) down to 1,451 (Livonia office 2), with reduced monthly lease payments. *See* Pl. Ex. D-1 at A0952. This calls into question whether ACLR actually needed the larger Livonia office space in the first instance.

> 18. The monthly lease and electricity payments for the Livonia Office averaged $2,204 and $316, respectively. *Id*. at ¶ 27, A0006.

RESPONSE: Qualified. The lease amendment shows that, on or about April 1, 2013, ACLR moved into a smaller office that reduced the square footage from 6,102 (the Livonia office) down to 1,451 (Livonia office 2), with reduced monthly lease payments. *See* Pl. Ex. D-1 at A0952. This calls into question whether ACLR actually needed the larger Livonia office space in the first instance.

> 19. The Livonia Office lease expired on October 31, 2016 and ACLR moved in 2016 to a smaller office. *Id*. at ¶ 28, A0006.

6

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and ACLR attached no contemporaneous records to support it.

> 20. ACLR's office lease costs for its Livonia, Michigan office were $295,775.80. *Id.* at ¶ 29, A0006; Exhibit D, A0590-A0594; Exhibit D-1, A0595-A0964.

RESPONSE: Denies. The Livonia lease shows that for the first five months beginning on June 1, 2011 through November 1, 2011, the monthly base rental was $0. *See* Pl. Ex. D-1 at A0917. For the single month of November 1-30, 2011, which corresponds to the period when ACLR worked on the 2007 audit, *See* ECF No. 54-1 at 133 (SA 121); *id.* at 262-263 (SA 243-44); *id.* at 257 (SA238), the lease payment was $4,957.88. *See* Pl. Ex. D-1 at A0917.

> 21. On June 10, 2011, ACLR executed a business loan agreement with PNC Bank, National Association in the amount of $600,000 to fund ACLR's work under the Part D RAC. Exhibit 1 at ¶ 30, A0006; Exhibit E-2, A0976-A0997.

RESPONSE: Qualified. Loan interest costs are not recoverable. *See Servidone Construction Corp. v. United States*, 931 F.2d 860, 863 (Fed. Cir. 1991) (citations omitted). *See also, e.g.*, FAR § 31.205-20 (interest on borrowings is not an allowable cost).

> 22. This initial maturity date of June 13, 2013 for this loan was extended on June 7, 2013 due to ACLR's inability to make loan payments as a result of CMS's delays in executing the Part D RAC. Exhibit 1 at ¶ 31, A0006.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and no contemporaneous documents are provided regarding why the loan was extended. Loan interest costs are not recoverable. *See Servidone*, 931 F.2d 863. *See also, e.g.*, FAR § 31.205-20.

> 23. The funds derived from this loan were used solely to pay for items associated with completing all activities necessary to conduct the PY 2007 Duplicate Payment Audit. *Id.* at ¶ 32, A0006.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and no contemporaneous documents are provided clearly demonstrating the link between the loan

7

and any effort allegedly occurring on the 2007 audit. Loan interest costs are not recoverable. *See Servidone*, 931 F.2d 863. *See also*, *e.g.*, FAR § 31.205-20.

> 24. The final principal and interest payments for this loan were paid on August 24, 2018. *Id.* at ¶ 33, A0006.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and no contemporaneous documents are provided. Loan interest costs are not recoverable. *See Servidone*, 931 F.2d 863. *See also*, *e.g.*, FAR § 31.205-20.

> 25. ACLR's interest payments on this loan totaled $176,426.46. *Id.* at ¶ 34, A0007; Exhibit E, A0965-A0966; Exhibit E-1, A0967-A0975; Exhibit E-2, A0976-A0997.

RESPONSE: Qualified. Loan interest costs are not recoverable. *See Servidone*, 931 F.2d 863. *See also*, *e.g.*, FAR § 31.205-20.

> 26. In connection with the PY 2007 Duplicate Payment Audit, ACLR expended amounts associated with travel to CMS for training and project implementation, information technology, computer equipment, professional services, and other miscellaneous office expenses. Exhibit 1 at ¶ 35; A0007.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and no contemporaneous documents are provided demonstrating the costs were solely incurred for the 2007 audit. The period of performance for the 2007 audit was August 25, 2011 through November 17-30, 2011. *See* ECF No. 54-1 at 133 (SA 121); *id.* at 262-263 (SA 243-44); *id.* at 257 (SA238); ECF 54-2 at 21 (SA498), 124 (SA600). ACLR's claim for G&A costs for the termination for convenience of the two-week 2007 audit reflect an entire year's worth of expense records in 2011 and 2012- - well before the audit started (November, 17, 2011), and after it was rescinded (November 30, 2011), and are grossly inflated. The claimed G&A expenses cannot be solely attributable to the 2007 audit. *See* Pl. Exs A, F, F-1.

> 27. ACLR's general and administration costs for the PY 2007 Duplicate Payment Audit totaled $505,569.23. *Id.* at ¶ 36, A0007; Exhibit A, A0012-A0058; Exhibit F, A0998-A1002.

RESPONSE: Denies. The period of performance for the 2007 audit was August 25, 2011 through November 17-30, 2011. *See* ECF No. 54-1 at 133 (SA 121); *id.* at 262-263 (SA 243-44); *id.* at 257 (SA238); ECF 54-2 at 21 (SA498), 124 (SA600). ACLR's claim for G&A costs for the termination for convenience of the two-week 2007 audit reflect an entire year's worth of expense records in 2011 and 2012- - well before the audit started (August 25 through November, 17, 2011), and after it was rescinded (November 30, 2011), and are grossly inflated. The claimed G&A expenses cannot be solely attributable to the 2007 audit. *See* Pl. Exs A, F, F-1. Furthermore, ACLR's "invoice" records, include a list of transactions, *see* Pl. Ex. F, with billings for "legal fees," *see* Pl. Ex. F (A1309, A1312) which elsewhere ACLR is separately claiming as attributable costs, *see* Pl. Br. at 16-18, raising the specter of double billing. The invoices show $178,000 claimed for equipment and fixtures, *i.e.*, costs that would go to the general running of the business, and other projects. *See* Pl. Ex. F (A1271-1272, A1415-1421).

> 28. ACLR's reasonable profit for costs for the PY 2007 Duplicate Payment Audit is $304,885.03, based upon a 15% profit rate, which is significantly lower than ACLR's profit percentages earned from clients in previous years. Exhibit 1 at ¶ 51, A0010; Exhibit L, A1680-A1692.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and no contemporaneous documents are provided that would demonstrate the profit rate, the nature of the work performed and contractual relationship's associated with ACLR's historical clients, or that ACLR would have actually earned a profit on an audit that was terminated on November 30, 2011. *See* ECF No. 54-1 at 133 (SA 121); *id.* at 262-263 (SA 243-44); *id.* at 257 (SA238). Furthermore, ACLR's work on the 2007 audit was governed by the termination for convenience

9

clause in the GSA Contract, FAR 52.212-4(l), which does not expressly provide for "reasonable profit." *See* ECF 70-1 at 21 (SA778).

> 29. On December 9, 2011, CMS provided ACLR with its internal duplicate payment recovery audit process that was used as the basis for the PY 2010 duplicate payment audit. Exhibit 1 at ¶ 37, A0007.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and no contemporaneous documents are provided to support it. The basis for ACLR's performance of the Plan Year 2010 audit (2010 audit) was the SOW. *See* ECF No. 51-5 at 45 (A430).

> 30. CMS required that ACLR run reports, analyze data, provide feedback to CMS personnel, and conduct special studies designed to confirm the veracity of CMS's duplicate payment audit methodology during calendar years 2012 and 2013. *Id.* at ¶ 38, A0007.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and no contemporaneous documents are provided to support it. The basis for ACLR's performance of the Plan Year 2010 audit (2010 audit) was the SOW. *See* ECF No. 51-5 at 45 (A430).

> 31. On December 31, 2013, CMS executed a modification to ACLR's Part D RAC ("OY 1 SOW"). *Id.* at ¶ 39, A0007.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and no contract documents are provided to support it. The basis for ACLR's performance of the Plan Year 2010 audit (2010 audit) was the SOW. *See* ECF No. 51-5 at 45 (A430).

> 32. ACLR continued its work efforts on the PY 2010 Duplicate Payment Audit after the OY1 SOW was issued. *Id.* at ¶ 40, A0007.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and no contemporaneous documents are provided to support it. The basis for ACLR's performance of the Plan Year 2010 audit (2010 audit) was the SOW. *See* ECF No. 51-5 at 45 (A430).

33. ACLR was conducting additional audits for CMS while ACLR was performing the PY 2010 Duplicate Payment Audit. *Id.* at ¶ 41, A0007.

RESPONSE: Qualified. The source of this assertion is the affidavit statement of Mr. Mucke, and no contemporaneous documents are provided to support it. Admits that ACLR was conducting other audits simultaneously with the 2010 audit. *See* Def. Ex. A.

34. ACLR personnel worked approximately 4,376 hours on the PY 2010 duplicate payment audit. *Id.* at ¶¶ 42-43, A0008.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and is, admittedly, an "estimate." ACLR has produced no contemporaneous documentation from its standard record keeping system, as required by FAR § 52.212-4(l), to support the hours, if any, employees worked on the 2010 audit.

35. ACLR's costs for the termination for convenience of the PY10 Duplicate Payment Audit were $923,558.62. *Id.* at ¶ 44, A0008; Exhibit G, A1470-A1475.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and is, admittedly, an "estimate." ACLR has produced no contemporaneous documentation from its standard record keeping system, as required by FAR § 52.212-4(l), to support that its employees worked on the 2010. Furthermore, ACLR's use of the GSA Schedule rate, *see* Pl. Exs. C and C-1, is improper, and does not reflect actual labor costs. The GSA Schedule rate, *see* Pl. Ex. C-1 at A0583) is a "price," not a cost, and includes wages, benefits, overhead, and profit. *See* Def. Ex. A (¶ 7).

36. ACLR made multiple attempts to recover costs from CMS due to its actions related to the PY 2007 and 2010 duplicate payment audits. Exhibit 1 at ¶ 46, A0009.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and ACLR has produced no contemporaneous documentation from its standard record keeping

11

system, as required by FAR § 52.212-4(l), to support that ACLR made any attempt, let alone "multiple attempts" to recover costs on the 2007 and 2010 audits. *See* Pl. Exs. A through N. The fact that ACLR is claiming "costs" incurred for 2012, after the 2007 audit was terminated on November 30, 2011, demonstrates it did not. *See* Pl. Ex. B-1.

> 37. On April 26, 2012, CMS denied ACLR's request for equitable adjustment to recover base period expenditures on the grounds that "payments would be made only on a contingency fee basis" and that Section 5 specifically states "the recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments not recovered/collected." *Id.* at ¶ 47, A0009; Exhibit I, A1520-A1521.

RESPONSE: Qualified. The source of this assertion is the affidavit statement of Mr. Mucke, and ACLR has produced no contemporaneous documentation to support it. ACLR cites "Exhibit I," but this is not included with the exhibits it filed in support of its summary judgment motion. *See* ECF No. 107.

> 38. On June 15, 2015, CMS denied ACLR's claim for amounts associated with the PY 2007 and PY 2010 duplicate payment audits on the basis that there were "no provisions in the contract allowing CMS to reimburse ACLR's costs or otherwise pay ACLR for performing audit recovery work for CMS in any manner other than on a contingency fee basis." Exhibit 1 at ¶ 48, A0009; Exhibit J, A1522-A1530.

RESPONSE: Qualified. The source of this assertion is the affidavit statement of Mr. Mucke, and ACLR has produced no contemporaneous documentation to support it. ACLR cites "Exhibit J," but this is not included with the exhibits it filed in support of its summary judgment motion. *See* ECF No. 107.

> 39. ACLR would not have obtained any ability to recover costs associated with the CMS's actions directed towards the PY 2007 and 2010 Duplicate Payment Audits had it not filed a lawsuit against CMS. Exhibit 1 at ¶ 49, A0009.

RESPONSE: Defendant objects upon the ground that this paragraph is a conclusion of law and plaintiff's characterization of its case, not a statement of proposed fact.

> 40. Prior to the Court's March 23, 2020 Opinion and Order, ACLR paid its law firm $617,307.56 in connection with this lawsuit. *Id*. at ¶ 50, A0009-A0010; Exhibit K-1, A1535-A1679.

RESPONSE: Denies. Absent a statutory or contractual exception, which ACLR has not invoked, costs incurred in prosecuting a claim against the United States are not recoverable. *See* FAR § 31.205-47(f)(1). *See DMS Imaging, Inc. v. United States*, 123 Fed. Cl. 645, 661 (2015) (citing *Library of Cong. v. Shaw*, 478 U.S. 310 314-315 (1986) ("This comports with the default 'American Rule' that each litigant bear its own legal costs absent a statute or express contractual language to the contrary") (citation omitted). Additionally, ACLR fails to demonstrate that its legal fees claimed were solely incurred in connection with this lawsuit.

> 41. Prior to the Court's March 23, 2020 Opinion and Order, Chris Mucke and other ACLR personnel devoted approximately 5,481 hours to this lawsuit. The cost of those hours was $1,200,133.39 Exhibit 1 at ¶ 50, A0009-A0010; Exhibit K, A1531-A1534.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and is, admittedly, an "estimate" and appears to be unreasonable on its face. ACLR's use of GSA Schedule rate to determine labor hours, *see* Pl. Exs. C and C-1, is improper, and does not reflect actual labor costs. The GSA Schedule rate, *see* Pl. Ex. C-1 at A0583) is a "price," not a cost, and includes wages, benefits, overhead, and profit. *See* Def. Ex. A (¶ 7). Furthermore, absent a statutory or contractual exception, which ACLR has not invoked, costs incurred in prosecuting a claim against the United States are not recoverable. *See* FAR § 31.205-47(f)(1). *See DMS Imaging*, 123 Fed. Cl. at 661(citations omitted).

> 42. ACLR has paid its law firm $29,025 since this Court's March 23, 2020 Opinion and Order in an effort to recover ACLR's constructive termination for convenience costs and is continuing to incur legal expenses in this process. Exhibit 1 at ¶ 45, A0008-A0009; Exhibit H-1, A1483-A1519.

RESPONSE: Denies. Absent a statutory or contractual exception, which ACLR has not invoked, costs incurred in prosecuting a claim against the United States are not recoverable. *See* FAR § 31.205-47(f)(1). *See DMS Imaging*, 123 Fed. Cl. at 661 (citations omitted).

> 43. Since this Court's March 23, 2020 Opinion and Order, Chris Mucke and other ACLR personnel devoted 678 hours through December 31, 2020 to recover ACLR's constructive termination for convenience costs and is continuing to incur additional time and effort in this process. Exhibit 1 at ¶ 45, A0008-A0009; Exhibit H, A1476-A1482.

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and is, admittedly, an "estimate." Even if ACLR were able to substantiate the claimed time, ACLR's costs to prepare a settlement proposal using the wrong FAR termination clause would not be a reasonable charge resulting from the termination. ACLR's use of GSA Schedule rate to determine labor hours, *see* Pl. Exs. C and C-1, is improper, and does not reflect actual labor costs. The GSA Schedule rate, *see* Pl. Ex. C-1 at A0583) is a "price," not a cost, and includes wages, benefits, overhead, and profit. *See* Def. Ex. A (¶7). Furthermore, absent a statutory or contractual exception, which ACLR has not invoked, costs incurred in prosecuting a claim against the United States are not recoverable. *See* FAR § 31.205-47(f)(1). *See DMS Imaging*, 123 Fed. Cl. at 661(citations omitted).

> 44. The total cost of ACLR's hours from March 23, 2020 through December 31, 2020 to recover ACLR's constructive termination for convenience costs is $154,408.83. *Id.*

RESPONSE: Denies. The source of this assertion is the affidavit statement of Mr. Mucke, and is, admittedly, an "estimate." ACLR's use of GSA rate schedule to determine labor hours, *see*

14

Pl. Exs. C and C-1, is improper, and does not reflect actual labor costs. The GSA rate schedule, *see* Pl. Ex. C-1 at A0583) is a "price," not a cost, and includes wages, benefits, overhead, and profit. *See* Def. Ex. A (¶ 7). Furthermore, absent a statutory or contractual exception, which ACLR has not invoked, costs incurred in prosecuting a claim against the United States are not recoverable. *See* FAR § 31.205-47(f)(1). *See DMS Imaging*, 123 Fed. Cl. at 661(citations omitted).

> 45. Interest on costs arising from the PY 2007 and PY 2010 Duplicate Payment Audits through December 31, 2020 was estimated at $834,835.74. Exhibit 1 at ¶ 52, A0010; Exhibit M, A1693-A1711.

RESPONSE: Denies. ACLR has improperly started its calculation of CDA at the time it incurred the claimed costs, not from the date it submitted a proper quantum claim to the Government. ACLR has failed to prove its "underlying claim" for termination for convenience damages under FAR § 52.212-4(l), and therefore, it is not entitled to CDA interest.

> 46. The total costs and interest ACLR is seeking for the constructive termination for convenience of the PY 2007 and 2010 Duplicate Payment Audits through December 31, 2020 is $6,095,118.35. Exhibit 1 at ¶ 53, A0010; Exhibit N, A1712-A1713.

RESPONSE: Defendant objects upon the ground that this paragraph is a conclusion of law and plaintiff's characterization of its case, not a statement of proposed fact. ACLR has failed to prove its claim for termination for convenience damages under FAR § 52.212-4(l).

<div style="display: flex;">

<div>

OF COUNSEL:

ROBYN LITTMAN
Office of the General Counsel
U.S. Department of Health and Human Servs.
7500 Security Boulevard
Central Bldg. – Mailstop C2-05-23
Baltimore, MD 21244

April 9, 2021

</div>

<div>

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

s/ Martin F. Hockey, Jr.
_____
MARTIN F. HOCKEY, JR.
Acting Director

s/ Joseph A. Pixley
_____
JOSEPH A. PIXLEY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-0843
Facsimile: (202) 307-0972

Attorneys for Defendant

</div>

</div>

# CERTIFICATE OF FILING

I hereby certify that on the 9th day of April, 2021, a copy of the foregoing "DEFENDANT'S RESPONSE IN TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                               s/Joseph A. Pixley