**IN THE UNITED STATES COURT
OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ACLR, LLC** | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| **v.** | ) | **Nos. 15-767 and 16-309C** |
| | ) | (Judge Campbell-Smith) |
| **THE UNITED STATES** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**PLAINTIFF ACLR, LLC'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iii

INTRODUCTION...............................................................................................................1

ADDITIONAL RELEVANT FACTS.....................................................................................2

ARGUMENT......................................................................................................................6

    1.  FAR § 52.212-4(l) and FAR § 52.249-2……………………………………………6

    2.  Judgment Independent of the Motion………………………………..……………8

    3.  Reasonableness of ACLR's Costs………………………………………….……9

        A.  Standard Record Keeping System……………………………..…………....10

        B.  Estimates of Amounts Owing……………………………………..…..……11

        C.  Payroll Costs……………………..…………………………..…..……12

        D.  Managing Principal Costs……………..……………………..…..……13

        E.  Loan Interest……………………..…………………..……………...…14

        F.  Office Lease……………………..…………………..……..……14

        G.  Reasonable Profit………………..………………….…………..…...…15

    4.  PY 2010 Duplicate Payment Audit…………………………………..…16

    5.  Settlement Expenses………………………..….…………………...…16

        A.  Phase One Settlement Costs…………….......…….………….……17

        B.  ACLR Termination Settlement Costs……….…….…………….……19

    6.  Contract Disputes Act Interest…………………..…………………...… 20

CONCLUSION.................................................................................................................20

CERTIFICATE OF SERVICE...........................................................................................22

## **TABLE OF AUTHORITIES**

**Cases**                                                                          **Page(s)**

*Appeal of Campus Mgmt. Corp.*,
  ASBCA No. 59924, 17-1 B.C.A. (CCH) ¶ 36727 (Apr. 20, 2017) ........................................13

*Appeal of Dellew Corp.*,
  ASBCA No. 58538, 15-1 B.C.A. (CCH) ¶ 35975, 2015 WL 2256767 ............................7, 12

*Appeal of SWR, Inc.*,
  ASBCA No. 56708, 15-1 B.C.A. (CCH) ¶ 35832, 2014 WL 7084933 ..................................7

*Bluebonnet Sav. Bank, F.S.B. v. United States*,
  266 F.3d 1348 (Fed. Cir. 2001) ..........................................................................................11

*DeLong v. United States*,
  175 F. Supp. 169, 175 (Ct. Cl. 1959) ..................................................................................15

*Envirocare of Utah, Inc. v. United States*,
  44 Fed. Cl. 474 (1999) .........................................................................................................5

*Gevyn Constr. Co. v. United States*,
  827 F.2d 752 (Fed. Cir. 1987) ............................................................................................14

*Horn & Assocs., Inc. v. United States*,
  123 Fed. Cl. 728 (2015) ......................................................................................................12

*Lockheed Aircraft Corp. v. United States*,
  375 F.2d 786 (Ct. Cl. 1967) ................................................................................................15

*Maxima Corp. v. United States*,
  847 F.2d 1549 (Fed. Cir. 1988) ..........................................................................................18

*Perfect Form Mfg. LLC v. United States*,
  142 Fed. Cl. 778 (2019) ................................................................................................10, 11

*Red River Holdings, LLC v. U.S.*,
  802 F.Supp. 2d 648 (D.Md. 2011) ........................................................................................7

*Servidone Const. Corp. v. United States*,
  931 F.2d 860 (Fed. Cir. 1991) ............................................................................................14

*Torncello v. United States*,
  681 F.2d 756 (Ct. Cl. 1982) ..................................................................................................5

*White Buffalo Constr., Inc. v. United States*,
    52 Fed. Cl. 1 (2002) ........................................................................................................10, 11

**Statutes**

28 U.S.C. § 2516(a) ...........................................................................................................14

**Rules**

RCFC 56 ……………………………………………………………………………..…1

RCFC 56(f)(2) …………………………………………………………………………8

**Regulations**

42 C.F.R. § 423.329…………………………...………………………………...……………3

42 C.F.R. § 423.336…………………………………………………………...………………3

42 C.F.R. § 423.343………………………………………………………………...…………3

42 C.F.R. § 423.350…………………………………...…………………………………...………3

FAR § 12.403(a) …..………………………………………………..………...…7, 8

FAR § 12.403(d)(2) …………...………………………………………………...……9

FAR § 31.205-20…………………………………………………………………14

FAR § 31.205-42…………………...……………………………………..…………12

FAR § 31.205-42(b) …..………………………………………………………12

FAR § 31.205-42(g) …..………………...……………………………………19

FAR § 31.205-47(f)(1) …..…………………………………...…..…………………17

FAR § 49.201………...…..………………………………………………………9

FAR § 52.212-4………….....……...………………………………………..…………6, 8, 10

FAR § 52.212-4(l)………………………………………...…..…………………6, 7, 12

FAR § 52.249-2……………………………...……...……..………………6, 8

Pursuant to Rule 56 of the United States Court of Federal Claims, Plaintiff, ACLR, LLC respectfully submits its reply to Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment ("Response").

## INTRODUCTION

On March 23, 2020, the Court ruled that ACLR's contract was constructively terminated for the convenience of Defendant and required both ACLR and Defendant to submit additional evidence and argument to "enable the court to determine the amount of compensation to which plaintiff is entitled."  ECF 76 at 16.

Defendant once again attempts to deny fair compensation to ACLR by asking the Court to ignore its own ruling, adopt impractical and overly strict application of FAR Part 12 guidelines, and ignore precedent pertaining to costs and commercial item contracts.  FAR Part 12 allows for the consideration of FAR Part 49 as guidance in effecting a settlement. This premise is especially relevant to the matter at hand where the contract price was based solely on a "contingency fee" and where Defendant's Contracting Officer would only consider fairly compensating ACLR under the reasonable charges prong of FAR 52.212-4(l) if "ACLR agrees that the contract price for each audit is $0."  June 4, 2020 letter from Contracting Officer, Pl. Exhibit 2.[1]  The Contracting Officer then took the position  in her "Agency Final Decision on ACLR's Termination Settlement Proposal" that "[f]or both the 2007 and 2010 audits, arguably there is no contract price because the task order contemplated payment only on a contingency fee basis following recovery of overpayments."  October 7, 2020 letter from Contracting Officer at page 2, n.1, Pl. Exhibit 3.

---

[1] ACLR's Motion contained Exhibit 1.

## ADDITIONAL RELAVANT FACTS

ACLR includes these additional relevant facts in response to the factual assertions by Defendant.  In Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact, Defendant denies many of ACLR's proposed findings of uncontroverted facts simply because they are based upon Mr. Mucke's affidavit.  ECF 115-2.  However, in many instances, Defendant offers no evidence to contradict Mr. Mucke's affidavit.  Defendant also claims that ACLR's Exhibits I and J were not included within the exhibits ACLR filed in support of its Motion.  ECF 115-2 at ¶¶ 37 and 38.  ACLR Exhibit I is located at ECF 107-11 page 51-52 and Exhibit J is located at ECF 107-11 pages 53-61.

The Part D RAC Contract incorporated ACLR's proposed Performance Work Statement ("PWS") and a term of performance from January 13, 2011 to January 12, 2012. ECF 50-3 at A158.  It was not until February 1, 2012 through Modification 3 that ACLR could deviate from the PWS that allowed for waiving the key personnel requirement, eliminating risk sharing recoveries from contingency fee payment, and requiring all audit activities to be accomplished per a task order schedule.  ECF 57-3 at A854.  Between February 1, 2012 and December 31, 2013, task order modifications modified processes for performing Part D RAC audits and timelines, with no reference to the PWS. *Id.*  The PWS was not referenced again until deleted on December 31, 2013 by Modification 13 with the incorporation of the SOW.  *Id.*  The SOW had two phases from January 1 through December 31, 2014 and January 1 through December 31, 2015. ECF No. 51-5 at A430.

PWS and SOWs audit methodologies, processes, and ACLR work requirements were not comparable, as summarized below:[2]

| ACLR Requirements | PWS | SOW |
|---|---|---|
| | 2007 Audit | 2010 Audit |
| Develop IT Infrastructure | Y | Y |
| Hire Audit Teams (20-25 personnel) | Y | N |
| Develop Audit Methodology for the RAC | Y | N |
| Receive CMS Approval for Audit Issues | N | Y |
| Develop Stakeholder Communications | Y | N |
| Develop Reporting Requirements | Y | N |
| Develop Collection Protocols | Y | N |
| Research Legal Requirements for Collectability | Y | N |
| Conduct Audits | Y | Y |
| Perform Data Validation | Y | N |
| Collect Overpayments | Y | N |

The PWS audit tasks utilized in the PY 2007 Duplicate Payment Audit were distinctly different from the SOW audit tasks utilized in the PY 2010 Duplicate Payment Audit. Defendant's Response alleges that "the PWS, however, did not include timelines." ECF 115 at 11. PWS timelines were governed by the Code of Federal Regulations ("C.F.R."). Payments to Part D contractors were established at 42 C.F.R. §§ 423.329, 336 (2005). Payment adjustments, such as improper payment recoupments from which ACLR's contingency fees were calculated, were established at 42 C.F.R § 423.343 (2011). Similarly, appeal timelines during the PWS through July 21, 2014 were governed under 42 C.F.R. § 423.350 (2008). On July 22, 2014, appeals for the Part D RAC were governed under CMS-4159-F.

ACLR obtained the Government's approval for and completed seven audits set forth in methodologies and assigned processes identified in contract modifications and the SOWs, not the PWS. The 2007 Excluded Providers audit was approved in Modification 3. ECF 57-3 at A854.

---

[2] Upon deviation from the PWS in Modification 3, all processes were identified and separately attached to the task order for the next two years until incorporation of the SOW. These processes aligned specifically to the SOW Defendant was developing and defined specifically in the SOW and CMS-4159-F.

The 2008-2011 Excluded Providers audit was approved in Modification 6. *Id.* The remaining five audits were conducted under assigned processes in the SOW with a performance period that started on February 1, 2012 and finished on June 18, 2020. *Id.* at A854-55.

On May 15, 2020, ACLR submitted a cost-based settlement proposal stating that "ACLR was unable to mitigate any costs associated with the PWS contractual design and was not relieved of these requirements until PWS deviation was authorized in Modification 3 dated February 1, 2012. ACLR considers that 100 percent of ACLR's costs during the period of January 13, 2011 and January 31, 2012 as reasonable charges resulting from the termination of the 2007 Audit as this was the only audit conducted during the contracting period" and identified a net payment amount of $2,772,826.[3]  ECF 101-1 at page 2. Defendant acknowledged that its "concern has always been that this contract was awarded with the acceptance of the PWS, but the reality is that we never authorized the contractor to perform IAW the PWS." December 17, 2013 email from Theresa Schultz at page 2, Pl. Exhibit 4. For the 2010 duplicate payment audit, ACLR submitted a cost-based settlement proposal and identified a net payment amount of $1,063,380. ECF 101-1 at page 4.

On May 28, 2020, the Contracting Officer sent a response to the cost-based proposal requesting that ACLR revise its proposal to a "percentage of the contract price reflecting the percentage of work performed prior to the notice of termination." May 28, 2020 letter from Nicole Hoey, Pl. Exhibit 5. On May 28, 2020, ACLR requested the Contracting Officer confirm the understanding that the "'contract price' under our contingency fee contract to be the value of the

---

[3] Had the Contracting Officer properly issued the termination for convenience on November 30, 2011, ACLR would have submitted costs associated with the Part D RAC Contract through November 30, 2011. Since the termination for convenience was constructively and retroactively applied, the period between November 30, 2011 and January 31, 2012 is added as CMS required ACLR to maintain all contractual requirements until new processes aligning with the draft SOW were defined and incorporated into Modification 3.

audit… based on the contingency fee in effect at the time the audit was performed. The percentage of work performed would be taken from that value based on the terms and conditions of the contract in place at the time of the audit." May 28, 2020 email from Gil Mucke to Nicole Hoey, Pl. Exhibit 6.

On June 4, 2020, the Contracting Officer responded to ACLR and stated, "it is not clear how the value of each audit would be determined." Pl. Exhibit 2.  She further added **"[i]n light of the foregoing, if ACLR agrees that the contract price for each audit is $0, CMS will consider a revised proposal in which ACLR seeks all compensation for each audit under the 'reasonable charges' prong of the third sentence of FAR 52.212-4(l)."** *Id.* (emphasis added). ACLR did not commit to the Contracting Officer's proposal and on June 26, 2020 submitted a revised settlement proposal utilizing a percentage of contract price method for compensation and identified $6,833,719 for PY 2007 Duplicate Payment Audit and $1,503,143 for PY 2010 Duplicate Payment Audit.  ECF 101-2 at pages 5 and 8.  On October 7, 2020, the Contracting Officer stated in her "Agency Final Decision on ACLR's Termination Settlement Proposal" that "[f]or both the 2007 and 2010 audits, arguably there is no contract price because the task order contemplated payment only on a contingency fee basis following recovery of overpayments." Exhibit 3 at page 2, n.1.  The Court cannot support a contract that has a price of $0. "[A] party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void." *Torncello v. United States,* 231 Ct. Cl. 20, 681 F.2d 756, 760 (1982); *Envirocare of Utah, Inc. v. United States*, 44 Fed. Cl. 474, 481, *dismissed*, 217 F.3d 852 (Fed. Cir. 1999).

## ARGUMENT

### 1.   FAR § 52.212-4(l) and FAR § 52.249-2

Defendant's primary argument in response to the Motion is that ACLR completely ignores 48 C.F.R. § 52.212-4(l) and, therefore, cannot recover its "reasonable charges."  ECF 115 at 20-22.  Defendant's position is "ACLR's claim for termination costs must first be addressed through the 'percentage of the contract price reflecting the percentage of the work performed' prong as a starting point, before the 'reasonable charges' prong can even be reached. The first prong cannot be ignored."  *Id.* at 21.  Defendant disagrees with Defendant's Contracting Officer's statement to ACLR that "it is not clear how the value of each audit would be determined" and her request that "ACLR agree[] that the contract price for each audit is $0."  Pl. Exhibit 2.  It also ignores the Contracting Officer's statement that "[f]or both the 2007 and 2010 audits, arguably there is no contract price because the task order contemplated payment only on a contingency fee basis following recovery of overpayments" and that she proceeded to render a decision on the PY 2007 Duplicate Payment Audit on a cost basis.  Pl. Exhibit 3 at page 2, n.1.  This argument conveniently disregards the unambiguous language in FAR 52.212-4(1) which states that a contractor's recovery is the sum of the percentage of the contract price "plus" reasonable charges incurred.

As expressly stated in Part 12 of the FAR, the Contracting Officer and this Court are not limited to strict adherence when Part 49 does not conflict:

> *General.* The clause at 52.212-4 permits the Government to terminate a contract for commercial items either for the convenience of the Government or for cause. However, the paragraphs in 52.212-4 entitled "Termination for the Government's Convenience" and "Termination for Cause" contain concepts which differ from those contained in the termination clauses prescribed in part 49. Consequently, the requirements of part 49 do not apply when terminating contracts for commercial items and contracting officers shall follow the procedures in this section. *Contracting officers may continue to use part 49 as guidance to the extent that part 49 does not conflict with this section and the language of the termination paragraphs in 52.212-4.*

FAR § 12.403(a), 48 C.F.R. § 12.403(a) (emphasis added).  While Defendant relies on *Red River Holdings, LLC v. United States,* 802 F. Supp.2d 648 (D. Md. 2011), the court stated that a contractor whose contract has been terminated for the Government's convenience is entitled to "a payment as compensation for settlement costs or costs reasonably incurred in anticipation of contract performance, provided such costs are not adequately reflected as a percentage of the work performed, and provided such costs could not have been reasonably avoided." *Id.* at 663.  In *Appeal of SWR, Inc.*, ASBCA No. 56708, 15-1 B.C.A. (CCH) ¶ 35832 (Dec. 4, 2014), 2014 WL 7084933 ("*SWR"*), the Armed Services Board of Contract Appeals ("ABSCA") ruled that the "[t]he second prong of the third sentence of FAR 52.212-4(1) contains no language limiting or restricting compensation where a contract has been terminated to payment essentially for services rendered."  The ABSCA also held "[t]here is nothing in the language of FAR 52.212-4(1), or its authorizing statute, FASA, directing or suggesting deviation from the long-established rule of providing just or fair compensation to contractors who have had their contracts curtailed by the government under a convenience termination provision."  *SWR* was followed by *Appeal of Dellew Corp.*, ASBCA No. 58538, 15-1 B.C.A. (CCH) ¶ 35975 (May 1, 2015), 2015 WL 2256767 ("*Dellew*").  In *Dellew*, the ASBCA determined that *SWR* provided "three general categories of recovery available to a contractor terminated for convenience pursuant to FAR 52.212-4(1).  A commercial items contractor terminated for the government's convenience may recover: (1) The price of work performed under the contract prior to notice of termination, under the first prong of the termination clause; (2) settlement expenses, under the second prong of the termination clause; and (3) also under the second prong of the termination clause, costs resulting from the termination."

Recognizing the limits of FAR § 52.212-4, the lack of precedent on termination for convenience damages for contingency fee contracts, and the anticipated dispute over the percentage of the work that ACLR performed for the PY 2007 and PY 2010 Duplicate Payment Audits in the context of a contingency fee contract that was constructively terminated for the convenience of the Defendant, ACLR utilized the methodology of FAR § 52.249-2 to determine the costs associated with the terminations. ACLR believed this was the most reasonable and efficient approach to enable this Court to determine the amount of compensation to which ACLR is entitled and avoid a lengthy trial that would potentially require the resubmission of all the evidence previously offered by the parties on their initial motions for summary judgment as well as additional evidence.[4]

## 2.  **Judgment Independent of the Motion**

Defendant argues that ACLR's Motion is a "house of cards that must necessarily collapse" because ACLR allegedly ignores FAR § 52.212-4(l).  ECF 115 at 25.  Even if the Court agrees with the Defendant that "ACLR pays lip service to this clause, citing only once," this is not a basis to deny the Motion.  *Id.* at 19.  This Court can still grant ACLR's Motion pursuant to Court of Federal Claims Rule 56(f)(2), which provides that the Court can "grant the motion on grounds not raised by a party."  Thus, if the Court believes summary judgment in favor of ACLR is appropriate, it may grant summary judgment regardless of whether those grounds have been raised by ACLR. Moreover, as noted above, FAR § 12.403(a) specifically allows the Government to utilize FAR Part 49 to guide their adjudication of termination settlements.

---

[4] ACLR does not waive its right to present evidence at trial or in subsequent briefing of the percentage of the contract price.  Evidence would support that the contract price is determined as a percentage of the audit value.  According to Defendant, ACLR must present the "1,958 email communications and 161,877 documents" to the Court for consideration.  ECF 115 at 33.

Simply stated, Defendant hired ACLR to meet the statutory requirements for a Part D recovery auditor as required under the ACA, awarded the PWS, hired another contractor to develop a new statement of work (ECF 50-11 at ¶ 12), advised ACLR to not issue the NIP demand letters in November of 2011 (*Id.* at ¶35), and then never took the position that the PY 2007 Duplicate Payment Audit had been a constructive termination for convenience until August 3, 2018.  ECF 61 at 8 and 16.  As to the PY 2010 Duplicate Payment Audit, ACLR spent three years and conducted a special study to obtain approval of an audit protocol in accordance with the SOW. Then, due to industry complaints, Defendant attempted to change the protocol again and subsequently terminated the audit.  All the contracting officer had to do was work with ACLR to resolve concerns as articulated in FAR § 12.403(d)(2): "the parties must balance the Government's need to obtain sufficient documentation to support payment to the contractor against the goal of having a simple and expeditious settlement."   If the contracting officer followed the simple principles of FAR § 49.201, that a "settlement should compensate the contractor fairly for the work done" where the "primary objective is to negotiate a settlement by agreement" even "without agreeing on or segregating the particular elements of costs or profit comprising this amount," the parties may have agreed upon a settlement.  As this was not the case, ACLR continues to incur a significant fees and costs in pursuing its rights of fair compensation for the costs it has incurred.

### 3.  **Reasonableness of ACLR's Costs**

Defendant repeatedly argues that ACLR's calculation of amounts owing using the cost approach was "inherently unreasonable" on the basis that the amounts exceed "the highest contingency fee it ever received for a completed audit" and that there was a lack of appropriate documentation.  ECF 115 at 29 and 32.  The amount of contingency fee payments for completed audits should not be a barometer for ACLR's settlement costs for the duplicate payment audits.  In

this case, ACLR was the sole recovery auditor for the Part D RAC program and neither the PWS nor the SOW limited the recoveries available to ACLR.  The GAO Report concluded that in 2014, there was an estimated $1.9 billion in improper payments, including duplicate claims for the same service.  ECF 50-11 at ¶ 96.    ACLR was entitled to a contingency fee payment of at least 7.5% so for improper payments of $1.9 billion, ACLR could have recovered potentially recovered $142 million.  It should also be noted that the audits that ACLR was allowed to complete were under the SOWs, not the PWS and those audits were narrowed and constrained as much as possible by Defendant.  *See* ECF 57-3 at A854-53.  Defendant's reliance on *White Buffalo Constr., Inc. v. United States*, 52 Fed. Cl. 1 (2002) for the proposition that termination for convenience damages should not exceed the contract price is misplaced given the nature of ACLR's contract.  ECF 115 at 28.  Defendant's argument is also ironic given its Contracting Officer's position that the contract price was zero or undeterminable for the PY 2007 and PY 2010 Duplicate Payment Audit.

Although a contingency fee contract does not require the same real-time granular level of cost support to obtain payment as a "cost plus" contract, ACLR's Motion included supporting documentation in the form of invoices, payroll, time reports, and bank statements demonstrating payments by ACLR.    Nevertheless, Defendant criticizes ACLR's purported lack of "contemporaneous documentation."  ECF 115 at 32.  ACLR has properly supported its claim for costs under the PY 2007 and 2010 Duplicate Payment Audit.

## A.  Standard Record Keeping System

Defendant asserts that ACLR failed to provide documentation from its "standard record keeping system" as required by FAR § 52.212-4.  ECF 115 at 32.  ACLR has provided income statements, check registers, and other financial reports generated from its standard record keeping system, QuickBooks.  QuickBooks is a standard record keeping system that "maintain[s] and

analyze[s] a wealth of sensitive financial information." *Perfect Form Mfg. LLC v. United States*, 142 Fed. Cl. 778, 790 n.9 (2019).

### B.  Estimates of Amounts Owing

Defendant also disputes ACLR's cost estimates derived from the labor hours spent performing the PY 2007 Duplicate Payment Audit for its managing principal because they were based on the purported "self-serving testimony" of ACLR's managing principal, Christopher Mucke.  ECF 115 at 32.  To support this argument, Defendant relies on *White Buffalo Constr., Inc. v. United States,* 52 Fed. Cl. 1 (2002).  In *White Buffalo*, a construction contractor was attempting to recover termination costs based, in part, on testimony regarding the height of a restroom building that would have been more accurately obtained from construction plans used by the contractor to construct the building.  *Id.* at 5.  ACLR's contract contained no language requiring it to track the hours it spent performing audit work.  "The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation."  *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001).  Further, Defendant's termination of these audits was not a development ACLR could have reasonably foreseen nor has the Contracting Officer or Defendant proffered any other mechanism by which ACLR could prove its managing principal's work efforts.  The only remaining documentation that could reasonably support ACLR estimate of labor hours worked are the over 1,958 email communications and 161,877 documents analyzed to make these estimates.  To streamline the process, ACLR generated QuickBook time reports and subsequently reduced ACLR's initial estimates of labor hours worked in the performance of these audits to those hours reflected in the time reports.  In the end, the Court

may wish to consider the ruling in *Horn*, which determined that a recovery audit contractor, by estimating claim amounts using estimates of hours worked and standard hourly rates for a contract lacking a sum certain amount, was the best that it could accomplish and was done "with sincerity and without malicious intent or deviousness." *Horn & Assocs., Inc. v. United States*, 123 Fed. Cl. 728, 788 (2015).

### C. Payroll Costs

Defendant's primary argument against ACLR's payroll costs for the PY 2007 Duplicate Payment Audit is that ACLR should not be reimbursed for "an entire year's worth of gross payroll." ECF 115 at 30. Defendant's Contracting Officer did not dispute the reasonableness of ACLR's assertion of the time period associated with these costs. During 2011, ACLR personnel were developing secure systems, developing audit and payment calculation processes, communication documents, and training materials for Part D contractors that was all related to the PY 2007 Duplicate Payment Audit. ECF 107-1 at ¶¶ 1-2; ECF 107-3 at ¶¶ 8-9. ACLR's entire effort for 2011 under the PWS was dedicated to performing the duplicate payment audit as that was the only mechanism by which ACLR could be paid. Further, ACLR was contractually required to retain its key personnel until January 31, 2012 when Defendant eliminated the key personnel requirement in Modification 3 that allowed ACLR to terminate their employment. ECF 107-3 at ¶ 10. As outlined in *Dellew*:

> The second prong of FAR 52.212-4(l) also provides for recovery of termination-associated costs, which are those reasonable costs, other than settlement costs, which are incurred by a contractor as a result of the termination. "Contract terminations generally give rise to the incurrence of costs or the need for special treatment of costs that would not have arisen had the contract not been terminated." FAR 31.205-42. The FAR provides an explanation of types of costs that are generally allowable in a termination for convenience situation. See, e.g., FAR 31.205-42(b) ("costs which cannot be discontinued immediately after the effective date of termination [despite all reasonable efforts] are generally allowable.

Defendant's subsequent elimination of the key personnel requirement proves that ACLR was required to maintain those personnel until Defendant deemed them unnecessary.  To require a small business to pay payroll costs with no hope of compensation was an inappropriate act by Defendant and is inequitable, punitive, and vindictive.

Defendant also argues that ACLR makes no allowance for "time spent pursuing other contracts or clients."  ECF 115 at 30.  ACLR's personnel did not spend time pursuing other contracts or clients during the Part D RAC Contract and there is no evidence Defendant offers to the contrary.  Defendant also claims that "ACLR has not demonstrated that this was not a cost solely attributable to the 2007 audit" because key personnel "would be a cost allocable to all of audits that ACLR performed."  ECF 115 at 31.  Therein lies the glaring flaw of Defendant's argument - the PY 2007 Duplicate Payment Audit was the *only* audit conducted by ACLR under the PWS.  ACLR had no other audits to which the 2011 payroll costs could be allocated.  Appendix A to Exhibit A of Defendant's Response evidences that no other audit work was performed until June 1, 2012.  ECF 115-1.

### D.  Managing Principal Costs

In response to ACLR's managing principal's costs, Defendant's remaining argument pertains to the use of ACLR's GSA schedule rates for Mr. Mucke's rates as Mr. Mucke owned ACLR and was not an employee, whose payroll could be tracked through W-2s or payroll reports. ECF 115 at 31-33.  Defendant argues that a GSA rate "reflects a 'price,' not a cost, and includes wages, benefits, overhead and profit."  *Id.* at 32.  In *Appeal of Campus Mgmt. Corp*., ASBCA No. 59924, 17-1 B.C.A. (CCH) ¶ 36727 (Apr. 20, 2017), a termination settlement case at the Armed Services Board of Contract Appeals, a fully burdened GSA rate was deemed acceptable. Defendant also raises concerns regarding the inclusion of profit in these rates.  The Contracting

13

Officer's only concern regarding ACLR's profit request was the absence of "evidence supporting the reasonableness" and that the "the agency is unable to substantiate this rate."  Pl. Exhibit 3 at page 8.  As a GSA schedule contract, Defendant substantiated reasonable profit when it awarded the Part D RAC Contract to ACLR and its estimated managing principal costs were excluded from its calculation of reasonable profit.

### E.  Loan Interest

Citing *Servidone Construction Corp. v. United States*, 931 F.2d 860, 863 (Fed. Cir. 1991), Defendant argues that ACLR is not allowed loan interest on the "well established" doctrine that this Court "may not award interest on monetary claims against the Government unless specifically authorized by statute or contract."  ECF 115 at 36.  FAR § 31.205-20 prohibits, in part, the "interest on borrowings . . . paid in connection with preparing prospectuses, and costs of preparing and issuing stock rights."  ACLR's interest was paid on a loan obtained to pay for expenses incurred in performing the PY 2007 Duplicate Payment Audit, not for "preparing prospectuses" or "stock rights."  The interest requested here is a reimbursement of payments made to satisfy a loan, not interest made on a monetary claim made by ACLR to Defendant.  Moreover, "[a] contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." *Gevyn Constr. Co. v. United States*, 827 F.2d 752, 754 (Fed. Cir. 1987). In *Gevyn*, the court held, "[28 U.S.C. §] 2516(a) does not bar an interest award as part of an equitable adjustment under a fixed-price contract if the contractor has actually paid interest because of the government's delay in payment." *Id.* at 754.

### F.  Office Lease

Defendant asserts that "[t]he five year lease Livonia lease *cannot* be solely attributed to the 2007 audit" because "ACLR worked on some 20 different audits . . . during the pendency of the

Livonia lease." ECF 115 at 35.  Months before ACLR's execution of the Livonia office lease, Defendant informed ACLR that 100% of its time would be dedicated to conducting CMS audits and recovering overpayments.  The execution of the Livonia office lease was to meet the terms of its originally proposed PWS that contemplated "20 - 25 audit teams."  During the seven year course of the Part D RAC Contract, Defendant only permitted ACLR to perform three audits covering seven different time periods.  *See* ECF 50-11 at ¶ 98.  During that time, ACLR performed one audit in the Livonia office, three audits in the mitigated office space in the same building, and the remaining four audits in office space leased at a cost that was 8% of the cost of the Livonia lease. As outlined in *SWR*, the "incurrence of an obligation to pay is sufficient for purposed of recovery after a termination for convenience."  Moreover, while the Contracting Officer's initial decision acknowledged that ACLR took efforts to mitigate the costs of the Livonia office lease, the consequences of which required ACLR to remain in office space that was both too large and expensive as shown in ACLR's immediate departure upon lease expiration to a space more conducive to performing its contract.  *See Lockheed Aircraft Corp. v. United States,* 375 F.2d 786, 794-95 (Ct. Cl. 1967)*; DeLong v. United States,* 175 F. Supp. 169, 175 (Ct. Cl. 1959).

### G.  Reasonable Profit

In the final decision letter, the Contracting Officer's only concern regarding ACLR's request for profit, other than she had awarded no costs on which to apply it, was that she was "unable to substantiate" ACLR's 15% profit rate.  ACLR submits that its use of a 15% profit rate is reasonable.  The Contracting Officer agreed to apply a profit rate of 7.5% to ACLR's costs. ECF 101-3 at page 8.  Defendant now asserts that ACLR's profits are "anticipatory, which are not recoverable in a termination for convenience action.  ECF 115 at 38.  To the extent ACLR's profit

rate was anticipatory, it would have been based on the potential recoveries under the PY 2007 and 2010 Duplicate Payment Audits.  ACLR used an entirely different, but reasonable, calculation.

### 4.    PY 2010 Duplicate Payment Audit

Defendant's remaining argument with respect to the PY 2010 Duplicate Payment Audit that has not already been addressed pertains to the use of ACLR's "GSA schedule rates, instead of direct labor costs" because the GSA schedule "reflects a 'price,' not a cost, and includes wages, benefits, overhead and profit."  ECF 115 at 40.  Defendant's argument is inapplicable here.  ACLR's GSA schedule was awarded prior to the execution of the Part D RAC Contract.  ACLR's GSA schedule rates were awarded using a minimized cost structure that did not contemplate a lease as large as that contemplated with this contract.  Stated differently, the costs requested for reimbursement of ACLR's office lease are not reflected in ACLR's assignment of GSA rates for the PY 2010 Duplicate Payment Audit.  Defendant also raises concerns regarding the inclusion of profit in ACLR's GSA rates.  The Contracting Officer's only concern regarding ACLR's profit request was the absence of "evidence supporting the reasonableness" and that "the agency is unable to substantiate this rate."  Pl. Exhibit 3 at page 8.  As a GSA schedule contract, Defendant substantiated reasonable profit when it awarded the contract to ACLR and its estimated PY 2010 Duplicate Payment Audit costs have been excluded from its calculation of reasonable profit.

### 5.    Settlement Expenses

In its Motion, ACLR identified two distinct phases for the reimbursement of termination settlement fees.  The first phase pertained to fees associated with costs incurred in obtaining a retroactive termination for convenience determination, despite Defendant's failure to acknowledge such a position during discovery in this case.  The second phase pertained to the long settled notion

that charges arising from fees incurred for the preparation of termination settlement claims are recoverable.

In its Response, Defendant ignores ACLR's individual phases and, with what appears to be a modest hint of despair, begrudgingly states that it must "affirmatively waive its sovereign immunity from suit for a plaintiff to obtain attorney fees." ECF 115 at 41. ACLR is unclear as to why Defendant would conflate costs pertaining to ACLR's termination settlement claims with that of ACLR's request for the reimbursement of reasonable charges associated with obtaining a retroactive termination for convenience but notes that this was not the rationale employed by the Contracting Officer. On the contrary, the Contracting Officer acknowledged and addressed both phases separately.

### A.  Phase One Settlement Costs

These costs pertain to ACLR administrative and legal expenses related to filing and subsequent defense of the claim specifically related to the PY 2007 and PY 2010 Duplicate Payment Audits that were found to be a constructive termination for convenience. Defendant states "ACLR ignores that the cost to prosecute claims against the United States is not an allowable cost," but there would have been no such costs had the Contracting Officer timely issued a termination for convenience such that ACLR would have been able to depart the Part D RAC Contract in 2011 without being held hostage trying to recoup costs for Defendant's actions in preventing recoveries under the PWS. *See* ECF at 40. Additionally, ACLR does not ignore FAR § 31.205-47(f)(1) although notes that all parts of the Federal Acquisition Regulations are silent as to its application in the context of a retroactive termination for convenience that was never raised as a defense until ACLR had expended significant amounts in attorneys' fees.

In *Maxima Corp. v. United States*, 847 F.2d 1549, 1557 (Fed. Cir. 1988), the United States Court of Appeals for the Federal Circuit stated, "no decision has upheld retroactive application of a termination for convenience clause to a contract that had been fully performed in accordance with its terms." ACLR performed the Part D RAC Contract in accordance with its terms and had taken all steps necessary to complete its efforts until Defendant's termination of the audits outside of express contractual requirements. It was not until eight years after the PY 2007 Duplicate Payment Audit and four years after the PY 2010 Duplicate Payment Audit terminations that Defendant suggested to the Court that these audits had actually been terminated for convenience. As *Maxima* states, "what the government asserts as legal error is its compliance with the terms of the contract. We discern no legal error in this behavior. Indeed the government also required Maxima to comply with the contract. The need for mutual fair dealing is no less required in contracts to which the government is a party, than in any other commercial arrangement." *Id.* at 1556. While Maxima dealt with a contracting officer that did not know about the termination clause in the contract, the same can be argued here as there has never been a charge that as a result of a legal error ACLR failed to comply with the terms of the Part D RAC Contract.

While Defendant briefly touched on a termination for convenience during the initial motions for summary judgement in this case, ACLR was not able to discern the Contracting Officer's contemporaneous intent other than their testimony later provided as part of this proceeding. As to the PY 2010 Duplicate Payment Audit, Defendant's Contracting Officer expressed internally her belief that "the only option we have for this is to T4C the duplicate payment work" but a termination for convenience was never issued. May 2015 internal CMS email chain regarding Technical Direction Letter at page 2, Pl. Exhibit 7. Defendant's June 5, 2015 claim denial refused to make any payment for ACLR's costs as the Contracting Officer

expressly stated "[t]here are no provisions in the contract allowing CMS to reimburse ACLR's costs or otherwise pay ACLR for performing audit recovery work for CMS in any manner other than on a contingency fee basis."  ECF 107-11 at page 60.  Considering these barriers to obtaining any form of settlement relief from Defendant, it seems reasonable to conclude that ACLR's efforts to obtain this Court's ruling so that ACLR could prepare and present a claim to the Contracting Officer were "reasonably necessary."  See *Dellow;* FAR 31.205-42(g)

To imply sovereign immunity within a FAR section that does not address retroactive terminations for convenience would be to impose a harsh restriction to costs recoverable to a contractor in response to actions that are later determined by the Court to be retroactively applied. Additionally, to also require settlement costs related to retroactive termination for conveniences to only start as of the date of the Court's finding grants contracting officers the power to ignore contractual obligations in the hopes that contractors would not pursue justifiable claims against the Government.

### B.  ACLR Termination Settlement Costs

ACLR's proposed settlement expenses arising from this Court's ruling of retroactive terminations for convenience were limited to costs incurred by ACLR for legal expenses and ACLR's costs associated with finalizing a termination settlement.  ACLR is entitled to those costs which are not yet finalized given the ongoing proceedings.  Defendant does not offer any objection to these costs in its Response.  In the denial of legal costs associated with settlement expenses, the Contracting Officer stated that ACLR "did not identify or provide any documentation, such as legal bills, substantiating legal costs incurred in connection with preparing and presenting the settlement proposal."  Pl. Exhibit 3 at page 13.  ACLR does not dispute this finding as it had not

yet been billed and its request was based on estimated costs. ACLR has addressed this issue in its Motion.

The Contracting Officer's lone remaining deficiency regarding ACLR's calculation of administrative costs associated with settlement expenses pertained directly to ACLR's application of its GSA schedule rates noting "the prong of the termination clause through which ACLR seeks this compensation only obligates the government to compensate ACLR for its costs, not the price it would charge a customer for the services, the GSA rates are not sufficient documentation." Exhibit 3 at page 12. To eliminate a profit component, one can use the 15% profit rate employed in ACLR's reasonable profit cost approach methodology. *See supra* section 3.G.

### 6. Contract Disputes Act Interest

Defendant also asserts that "[b]ecause ACLR has failed to prove its 'underlying claim' for termination for convenience damages under FAR § 52.212-4(l), it is not entitled to CDA interest." ECF 115 at 41-42. ACLR has proven its settlement damages and is entitled to CDA interest. Where there is a constructive termination for convenience finding years after ACLR incurred significant costs, it is only proper for the CDA interest to accrue from the date of the constructive termination for convenience as ACLR was not in a position to submit a claim any earlier.

## CONCLUSION

There are no disputed issues of material facts and ACLR as a matter of law is entitled to summary judgment on its termination for convenience damages in the amount of $6,095,118.35 through December 31, 2020 and the additional costs ACLR has incurred since that time.

Dated: May 28, 2021

RESPECTFULLY SUBMITTED,

DAVID, BRODY &
DONDERSHINE, LLP


_____/s/_____

Thomas K. David
John A. Bonello
2100 Reston Parkway
Suite 370
Reston, VA 20191
Phone:  703-264-2220
Fax: 703-264-2226
tdavid@dbd-law.com
jbonello@dbd-law.com

Attorneys for Plaintiff ACLR, LLC

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 28th day of May 2021, I caused a copy of the foregoing document to be emailed via the ECF system to the following:

Joseph Pixley
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

_____/s/_____

Thomas K. David