# EXHIBIT 3

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop B3-30-03
Baltimore, Maryland 21244-1850



CENTERS FOR MEDICARE & MEDICAID SERVICES
OFFICE OF ACQUISITION
& GRANTS MANAGEMENT

**Office of Acquisition & Grants Management**

October 7, 2020

**To:** Gil Mucke

**Subject:** Agency Final Decision on ACLR's Termination Settlement Proposal

This letter is the Contracting Officer's final decision on the termination settlement proposal submitted by ACLR on June 26, 2020. The proposal followed CMS's May 6, 2020 guidance letter; ACLR's May 15, 2020 settlement proposal; CMS's May 28, 2020 request for proposal revision; and subsequent correspondence between the parties regarding CMS's request. On September 3, 2020, CMS provided its response to the June 26, 2020 proposal. CMS understands that ACLR does not wish to accept the settlement offer in CMS' response. Consequently, CMS believes the parties have reached an impasse, and the June 26, 2020 settlement proposal has ripened into a claim.

**Description of the Dispute**

The Court of Federal Claims' April 6, 2020 opinion and order in *ACLR, LLC v. United States*, Nos. 15-767C and 16-309C, held that CMS' termination of the PY07 Duplicate Payment Audit and PY10 Duplicate Payment Audit under task order GS-23F-0074W/ HHSM-500-2011-00006G effected constructive terminations for convenience. The Court's April 21, 2020 order contemplated that ACLR submit a termination for convenience proposal to CMS for evaluation and decision. The parties do not agree on the amount to which ACLR is entitled as a result of the terminations for convenience.

**Pertinent Contract Terms**

The termination for convenience clause FAR 52.212-4 (Mar. 2009) (Deviation Feb. 2007) included in ACLR's contract provides in relevant part:

> (l) *Termination for the Ordering Activity's convenience.* The ordering activity reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the ordering activity using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the ordering activity any right to audit the Contractor's records. The Contractor shall not be

1

paid for any work performed or costs incurred which reasonably could have been avoided.

**Factual Areas of Agreement and Disagreement**

The factual areas of agreement and disagreement are discussed below:

### I. 2007 Audit (PY07 Duplicate Payment Audit)

The first section of the June 26 proposal is entitled PY07 Duplicate Payment Audit Cost Calculation. Although the title of this section refers to "cost", CMS understands this section corresponds to the portion of FAR 52.212-4(l) that contemplates payment of "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination", a price-based calculation.

#### A. Contract Price[1]

ACLR has identified a contract price of $6,082,972 for the 2007 audit, calculated by "multiplying the net value of $81,106,299 by the 7.5% contingency fee rate identified in the initial task order to obtain an ACLR fee of $6,082,972." CMS understands that the $81.1 million amount represents potential overpayments ACLR maintains the agency would have recovered, had the audit been completed.

Because CMS did not receive any deliverables from ACLR for this audit, there is no internal documentation to substantiate the $81.1 million amount, which was never approved or otherwise communicated to the agency before the November 30, 2011 conference call in which CMS instructed ACLR not to proceed with the audit. Further, as explained below, the documentation submitted with the proposal is insufficient for CMS to substantiate that amount.

In CMS May 28, 2020 request for proposal revision, the agency requested that ACLR submit with the revised proposal any and all documentation it wishes the agency to consider. To that end, ACLR provided a hard drive with supporting documentation, and explained that PY07 Duplicate Payment PDE records were provided at file folder location PY07 DP Exhibits\Audit Cost Calculation. At the file location provided by ACLR, there were no files in the format in which PDE records are transferred (CSV or SAS). Rather, ACLR provided a Notepad file, which the agency reviewed to confirm whether it included copies of PDE records. Although the file did not include all field columns as the agency would have expected for PDE records, it included commas in between each field. As a result, CMS tried to use the existing formatting to determine whether full PDE records were included in the file.
CMS is simply unable to substantiate the $81.1 million amount from this Notepad file, in the absence of additional information that would have been included in the PDE records, an audit

---

[1] For both the 2007 and 2010 audits, arguably there is no contract price because the task order contemplated payment only on a contingency fee basis following recovery of overpayments.

2

methodology, and ACLR's rationale on each PDE record for each contract identified. The table listing active contracts for the 2007 plan year provided in Exhibit 07-01 to the proposal is similarly insufficient. Furthermore, that table appears to include risk sharing in the calculation of overpayments, but risk sharing should not be included in the approved calculation of overpayments.

The proposal states that ACLR "reviewed each individual PDE record identified in our initial PY07 Duplicate Payment Audit submission and applied assumptions derived from the PY10 Duplicate Payment audit results arising from similar transactions to eliminate any ambiguity regarding the valuation of the PY07 Duplicate Payment Audit." This statement is insufficient to allow CMS to substantiate that the $81.1 million amount represents potential overpayments the agency would have recovered, had the audit been completed.[2] Although the proposal states that ACLR conducted the 2007 audit similar to the audit described in its PY12-PY13 Duplicate Payments NAIRP submitted on July 16, 2015, Exhibit 07-12 does not substantiate the potential overpayments of $81.1 million should the 2007 audit had been completed. Furthermore, the methodology for the 2007 audit should have been provided for comparison. The PDE records provided for the PY 07 Duplicate Payment Audit as proof, did not have all of the same fields listed to identify the drug or various payment amounts as stated in Exhibit 07-12, nor other required fields. The documentation provided from ACLR brings additional questions of whether plan-to-plan (P2P) PDE records were removed from this audit and whether Long-Term Care (LTC) was removed. The documentation did not clearly illustrate the dosages of each prescription and whether the dosage changed, which would indicate it was not a duplicate payment. It was not indicated which PDE records show the same pharmacy ID for the original PDE record and the possible duplicate record. The PDE records provided did not show clearly labeled original PDE record versus duplicate PDE records, and how payment was calculated without all payment fields provided. At a minimum, the following fields should have been included:

- RPDID
- Duplicate Payment ID
- PTAP_DISP_STAT_CD
- PTAP_RX_CLAIM_NUM
- PTAP_RX_CARDHOLDER_ID
- PTAP_RX_SERV_REF_NUM
- PTAP_RX_DOS_DT
- PTAP_FILL_NUM
- PTAP_INS_CLAIM_NUM
- PTAP_MEDICARE_STAT
- PTAP_PATIENT_DOB
- PTAP_PATIENT_GENDER
- PTAP_BENE_AGE
- PTAP_FIPS_STATE_CD
- PTAP_FIPS_COUNTY_CD

---

[2] It is not clear what document constitutes the "initial PY07 Duplicate Payment Audit submission", as CMS did not receive any deliverables from ACLR for this audit.

3

- PTAP_SSA_STATE_CD
- PTAP_SSA_COUNTY_CD
- PTAP_ZIP_CD
- PTAP_COMPUND_CD
- PTAP_DAW_CD
- PTAP_QUANTITY_DISPENSED
- PTAP_DRUG_FORM_CD
- PTAP_DAYS_SUPPLY
- PTAP_COVERAGE_CD
- PTAP_NON_STAND_FMT_CD
- PTAP_PAID_DT
- PTAP_PRICE_EXCEPT_CD
- PTAP_COVERAGE_STAT_CD
- PTAP_PROD_SERVICE_ID
- PTAP_SRVC_PROVIDER_ID
- PTAP_SRVC_PROVIDER_ID_QUAL
- PTAP_PRESCRIBER_ID
- PTAP_PRESCRIBER_ID_QUAL
- PTAP_PROCESS_DT
- PTAP_CONTRACT_NUM
- PTAP_PBP_ID
- PTAP_CNTRT_OF_REC
- PTAP_PBP_OF_REC
- PTAP_P2P_RSN_CODE
- PTAP_ALT_SRVC_PROV_ID
- PTAP_ALT_SRVC_PROV_ID_QUAL
- PTAP_INGRDNT_COST_PD
- PTAP_DSPNSNG_FEE_PD
- PTAP_AMT_SALES_TAX
- PTAP_BELOW_OOP_THRHLD
- PTAP_ABOVE_OOP_THRHLD
- PTAP_PATIENT_PAY_AMT
- PTAP_OTHER_TROOP_AMT
- PTAP_LICS_AMT
- PTAP_PLRO_AMT
- PTAP_CVRD_D_PLAN_PAID
- PTAP_NON_CVRD_PLAN_PAID
- PTAP_REBATE_PASS_THRU
- PTAP_BENE_LINK_KEY
- PTAP_VAC_ADMIN_FEE
- PTAP_PRESC_ORIGIN
- PTAP_PRG_RECD_DT
- PTAP_ADJ_TS
- PTAP_GAP_DSCNT_AT

4

- PTAP_FRMLRY_CD
- PTAP_TOT_CVRD_DRG_ACC
- PTAP_TROOP_ACC
- PTAP_BRND_GNRC_CD
- PTAP_BGN_BNFT_PHASE
- PTAP_END_BNFT_PHASE
- PTAP_FRMLRY_TIER
- PTAP_CMS_GAP_DSCNT_AMT
- PTAP_GAP_DSCNT_OVRRD_CD

After careful review of documentation, none of the completed audits under ACLR's contract resulted in recoveries over $7 million, so it is unlikely this audit would have recovered over $81 million.

ACLR has not provided documentation to substantiate that the $81.1 million represented a duplicate payment that the agency might reasonably expect to recover following completion of the audit. The lack of documentation for the 2007 audit also prevents CMS from otherwise identifying a contract price, for purposes of applying FAR 52.212-4(l).

### B.     Percentage of Work Performed

ACLR has calculated its percentage of work performed for the 2007 audit as 91.7%. The proposal explains that "[t]he percentage of completion was determined as a factor of time required to comply with contractual requirements regarding the preparation, execution, and completion of the recovery audits." Accordingly, ACLR explained that it completed 320 days of a 349 day recovery audit cycle, or 91.7% of the cycle. As a threshold matter, CMS does not believe this is an appropriate method for calculating work performed, because ACLR would not have performed the same amount of work on each day of an audit cycle, and there is no specific time-frame for audits in the Performance Work Statement that governed the 2007 audit.

Additionally, the proposal explains that ACLR "reviewed specific time components related to developing a secured system to receive Part D payment data; developing recovery audit and payment calculation processes; and reviewing existing laws and regulations regarding Part D appeal requirements." CMS does not believe these activities were exclusive to the 2007 audit, but rather preparatory activities for any audit conducted under the contract. Thus, CMS does not believe it is appropriate to include them as part of the audit cycle.

CMS reviewed the documentation submitted with the proposal to determine whether it would otherwise substantiate a 91.7% completion amount. The proposal included documentation of a conference call held on November 30, 2011 with CMS program staff, CMS contracting staff, and ACLR. On that call, ACLR stated that it had just begun to receive the PY 2007 data needed (PDE records) in its system. Also on that call, ACLR explained it was having issues with the data received from CMS. Specifically, ACLR did not know the programming language and once it was programmed the only usable data in its system was from October 2007 and forward. Because PY 2007 ran from January 2007 through December 2007, CMS

5

does not believe that ACLR could have completed 91.7% of the PY 2007 audit with limited data.

During the call on November 30, 2011, ACLR was advised not to move forward with the notifications for the 2007 audit since the data had not been validated. Validation is a key part of the audit process that must be completed before any demand or notification of improper payment letters can be sent to plan sponsors. The Performance Work Statement for the 2007 audit explained that data audit commencement begins with plan sponsor notifications. Because these notifications were never provided' CMS does not believe it possible that 91.7% of the audit was completed.

Additionally, the proposal did not provide copies of documents generated during the audit, such as copies of draft or final demand letters. Rather, the proposal states that ACLR developed and submitted to CMS, initial duplicate payment process and demand letters for payment, and Part D calculations necessary to determine improper payment amounts. CMS reviewed Exhibits 07-6 and 07-7 provided in support of those activities, but Exhibit 07-6 does not provide the required methodology, only emails requesting ACLR's standard operating procedures (SOP) for audits of excluded providers and duplicate payments. Exhibit 07-7 does state that re-calculation of Risk Sharing was approved by CMS; while also indicating that CMS was trying to determine how to actually use it to calculate an improper payment for the Part D RAC program based on the information provided in the Participants guide. In 2012, CMS provided an approved payment calculation for the Part D RAC program that did not include any re-calculation of Risk Sharing because it is based on each individual beneficiary and the catastrophic phase that beneficiary is in during the time of a specific PDE record. The catastrophic phase changes throughout the plan year and is not a static measure.

The approved calculation for an Improper Payment is Direct Subsidy plus Low Income Cost Sharing (LICS) plus the Reinsurance Subsidy (RIS). There are two components to this calculation: LICS and the RIS. The LICS amount was adjusted by removing the total LICS amount associated with RAC identified, improperly submitted PDE records. The RIS is 80% of the Gross Drug Cost Above (GDCA), net of the reinsurance Direct and Indirect Remuneration (DIR). To determine the RIS component, the original reconciliation amount is adjusted by removing the impact of the GDCA and the Gross Drug Cost Below (GDCB) from the PDE records that are identified as improper. Using the adjusted amounts, the reconciliation amount is re-calculated. The DIR ratio is revised, which will also change the amount of the reinsurance DIR and the RIS. The difference between the higher original RIS and the lower adjusted RIS is the improper payment amount. The revised amounts for reinsurance and LICS are then added to the original risk-sharing amount (including in a column on the reconciliation file provided by CMS to determine the RAC-identified impact amount. **Risk sharing is not altered due to the RAC findings.** The difference between the Payment Year reconciliation final amounts, which include the original LICS, the original reinsurance and risk-sharing amounts, and the RAC's revised amounts (which include the revised LICS, revised reinsurance, and original risk-sharing amount) is the amount CMS has determined as an improper payment.

In summary, CMS could not identify sufficient information from the proposal to provide an accurate estimate of how much work had been completed at the time of termination. The

6

termination proposal did not provide sufficient information to clearly demonstrate that the audit was 91.7% complete, nor did the proposal provide sufficient information for CMS to determine an alternate audit completion percentage. Because the agency did not receive any deliverables from ACLR for this audit, it was likewise unable to substantiate the 91.7% completion rate from its own documentation.

### C. Review of Other Documentation

CMS reviewed the June 26, 2020 proposal, as well as the earlier May 15, 2020 proposal, to determine whether the agency could identify sufficient supporting documentation to compensate ACLR for the 2007 audit entirely under the "reasonable charges" prong of the third sentence of FAR 52.212-4(l). Although CMS does not believe that the clause primarily contemplates recovery on a cost basis, in the absence of sufficient documentation to support ACLR's price-based calculation, CMS has made a good faith effort to review the information submitted by ACLR as follows:

- Payroll and G&A: ACLR previously identified $989,876 for payroll and G&A in its May 15, 2020 proposal. CMS reviewed Exhibit B-1 to that proposal and cannot determine the basis for these expenses. The documentation submitted for payroll and G&A is not sufficient for CMS to support reimbursement for the proposed amount. A check register is not, by itself, sufficient documentation to demonstrate actual costs incurred. There were no ACLR accounting records to illustrate G&A costs incurred, nor are there timecards or summary information to the actual hours/costs incurred for payroll. For example, transaction 3297, Fed Soc Sec – Med Exp in the amount of $236.72 does not indicate who this is for, whether this was a weekly, monthly or yearly charge, etc. Based on the limited amount of information provided, CMS is unable to substantiate the payroll or G&A costs identified in Exhibit B-1.

- Managing Principal: ACLR previously identified $654,064 for managing principal costs in its May 15, 2020 proposal. CMS reviewed Exhibit B-2 to that proposal and cannot substantiate this amount. The proposal estimates hours worked after the fact, but does not include contemporaneous documentation to support those hours. Also, the proposal uses a GSA Schedule rate to calculate costs, but does not show that rate reflects the actual costs incurred. These issues are discussed in more detail in the "Administrative Costs" section below, in the discussion of the Phase Two Settlement Fees. Based on the limited amount of information pertaining to managing principal costs, CMS is unable to substantiate these costs.

- Loan Interest: ACLR previously identified $178,477 for loan interest. Because FAR 31.205-20 expressly references this type of interest as unallowable, CMS does not believe it is reasonable for CMS to reimburse ACLR for this amount.

- Office Lease: ACLR previously identified $258,987 for a multiyear office lease dated April 25, 2011, with a term June 1, 2011 through October 31, 2016. The supporting documentation does not confirm that ACLR entered into the office lease specifically to perform the 2007 audit, and it does not include lease

7

statements or contemporaneous proof of payments made. Thus, CMS is unable to substantiate these leasing costs.[3]

- Profit: ACLR previously identified $214,101 for profit, calculated at a rate of 15%. Absent evidence supporting the reasonableness of such a profit rate on any related contracts, the agency is unable to substantiate this rate. However, as explained above, CMS has not identified any substantiated costs to which profit rate may be applied.

- Interest: ACLR estimated $477,320 in interest under the Contract Disputes Act, commencing at the date of termination. However, as explained above, CMS has not identified any substantiated costs to which interest may be applied.

In sum, CMS was unable to identify sufficient documentation to support compensating ACLR for termination of the 2007 audit.

## II.   2010 Audit (PY10 Duplicate Payment Audit)

As above, CMS understands the second section of the June 26 proposal entitled PY10 Duplicate Payment Audit Cost Calculation corresponds to the portion of FAR 52.212- 4(l) that contemplates a price-based calculation.

### A.   Contract Price

ACLR has identified a contract price of $2,209,146 for this audit. To calculate this amount, ACLR "used the total improper payment amounts submitted to the Data Validation Contractor (DVC) on this audit. We then calculated an average appeal success rate identified in other complex reviews completed during the course of the Part D RAC contract period. This rate was then applied to the submitted improper payments, which yielded a reasonable net value."

CMS understands that ACLR began its calculation with $15,909,552, the total improper payment amount submitted to the DVC on December 24, 2014. It then reduced this amount by 16.1%, based on its estimate of appeals that would likely have been successful, to arrive at $13,348,114. The proposal, however, indicates that it applied contingency fee percentages to the $15.9 million amount, rather than the $13.3 million amount, to arrive at $2,209,146.

CMS does not concur with using data submitted to the DVC on December 24, 2014 to calculate the contract price for the 2010 audit. As a threshold matter, the DVC was not able to validate the data submitted by ACLR. Further, it appears ACLR did not review that data prior to submitting it to the DVC, to determine whether improper payments that were previously identified by ACLR, remained improper, following responses from plan sponsors. After receiving responses from plan sponsors, ACLR was to review and make a determination for each previously identified duplicate payment. If ACLR concluded the duplicate was still

---

[3] Even if ACLR had submitted documentation confirming that it entered into the lease to perform the 2007 audit, it is not clear what efforts ACLR made to reduce the cost of the lease, aside from finding WorkForce Software to mitigate some of the rental payments from April 1, 2013 through February 28, 2015.

improper, there should have been an indication of that, along with a reason for the determination. ACLR was to send the DVC those duplicate PDE records that it believed remained improper and the PDE records that were proper based on the supporting documentation provided by plans, the improper payment amounts for each plan's improper PDE records, along with the plan sponsors' responses, so the DVC could independently validate the determinations. If ACLR determined a PDE record was not a duplicate, it should have been identified and sent to the DVC for validation. Because ACLR did not analyze the responses from plan sponsors, but instead sent all duplicates to the DVC without making determinations, the DVC was not able to validate it.

Additionally, the DVC noted that a number of duplicate payments were for creams, ointments, eye drops and inhalers, which are frequently refilled and most likely legitimate. However, many duplicates identified by ACLR had previously been identified by the DVC as false positives; and plans often claimed that they legitimately refilled prescriptions due to prior authorization, which would need to be individually assessed. These examples demonstrate the data submitted by ACLR to the DVC is not a reliable indication of improper payments the agency would have recovered, had the audit been completed. Instead, CMS believes the $4 million amount estimated in the agency's May 6, 2014, Revised Duplicate Payment Decision Notice is an accurate estimate of the amount of improper payments the agency would have initially (prior to appeals) recovered. This notice revised the conditional approval of the Duplicate Payment proposal (including the 2010 audit) by changing the review type from automated to complex.

Further, CMS does not believe it is appropriate to use ACLR's estimate that 16.1% of appeals would likely have been successful. Based on data from ACLR's fully performed audits, CMS has calculated that ACLR overestimated improper payments by 41% on average. The agency subtracted the total of ACLR's estimated recoveries from its total actual recoveries, and divided that amount by the total estimated recoveries, to calculate an overestimation rate of 41%. Consequently, CMS believes that the total improper payment amount of $4 million should be reduced to $2,360,000.00. Applying the 15% contingency fee yields a contract price of $354,000.00 for the 2010 audit.

### B.     Percentage of Work Performed

ACLR has calculated its percentage of work performed for the 2010 audit as 59.2%. To arrive at this percentage, ACLR explained that completed 74 days out of 125 days on which it would have needed to perform work. Similar to the 2007 audit, CMS does not believe this is an appropriate method for calculating work performed, because ACLR would not have performed the same amount of work each day, and the contract did not set forth a 125-day audit cycle. Rather, CMS believes that the percentage of work performed should be calculated by considering the specific activities required of ACLR, and which of those activities were completed successfully.

This audit was approved as a complex audit in May 2014 for plan years (PYs) 2010, 2011, and 2012. CMS decided to start with PY 2010 as a pilot due to the complex nature of the audit. A complex audit consists of the following general workflow:

- Requests for Information (RFI)
- Validation by the DVC
- Notification of Improper Payments (NIPs)
- Appeals

CMS tasked the DVC with testing the methodology provided by ACLR to ensure that false positives were removed, prior to the RFIs going out to the plans. The DVC identified a large amount of errors. Based on the results of the DVC's testing, ACLR was directed to revise the RFI exception reports before sending to the plan sponsors for review. As documentation began to come in from plan sponsors, CMS received a significant amount of requests for extensions due to burden and time required to comply, and gave three extensions to plan sponsors until December 15, 2014. ACLR received the documentation and submitted it to the DVC for validation. However, after several meetings with the DVC and a review of a report generated by the DVC, CMS realized that ACLR did not analyze the supporting documentation from the 294 plans that responded to the initial RFI.

CMS terminated the 2010 audit on April 24, 2015 due to concerns regarding the methodology used to identify potentially improper PDE records contained in the July 8, 2014 RFI. The methodology used identified a large number of false positives. Due to the large number of PDE records identified in the RFI and the response time required, CMS determined it was not appropriate to proceed with the audit issue.

The following chart summarizes ACLR's role in the 2010 audit process and which portions were completed:

| Audit Step | Completion Status |
| --- | --- |
| ACLR submits findings to CMS and DVC for DVC review | Completed |
| DVC and RAC resolve any discrepancies (if unresolved CMS gives tiebreaking vote) | Completed |
| ACLR adjusts Notifications of Improper Payments (NIPs) and Exception Reports | Completed |
| ACLR sends out RFI to plans first to eliminate any additional false positive or inappropriate PDE records | Completed |
| ACLR reviews plan submissions | Not completed, based on DVC report |
| Following DVC validation of ACLR review, ACLR sends NIPs and Exception Reports to plans that have improper payments after RFI submission | Not completed due to termination |
| ACLR provides rebuttals on appeal (all levels 1, 2, and 3 when applicable) | Not completed due to termination |
| ACLR revises NIPs and Exception Reports based on appeal decisions | Not completed due to termination |

| Following DVC review and validation, ACLR makes adjustments and sends to CMS | Not completed due to termination |
|---|---|

Based on the process described in this chart, CMS estimates that ACLR completed 44.44% of the work for the 2010 audit.[4]

### B.   Government Calculation

Applying a 44.44% completion rate to the contract price of $354,000.00 yields $157,318. Thus, CMS believes that ACLR's proposal supports compensating ACLR $157,318 for termination of the 2010 audit.

## III.   Settlement Fees

The June 26 proposal includes a final section entitled Settlement Fees. CMS understands this section corresponds to the portion of FAR 52.212-4(l) that contemplates payment of "reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination."

This section includes two subsections, each discussed below.

### A.   Phase One

The first subsection, titled Phase One, addresses costs that "pertain to ACLR administrative and legal expenses related to the filing and subsequent defense of the claim related to the PY07 and PY10 Duplicate Payment Audits." The proposal seeks administrative expenses of $1,200,133, legal expenses of $635,128, and corresponding interest of $112,554, totaling $1,947,815. ACLR explains that, had the agency expressly terminated the two audits for convenience at that time the terminations occurred, ACLR would not have incurred these costs. As discussed below, the agency does not believe that ACLR's proposal supports reimbursement for Phase One costs.

First, costs incurred in connection with the prosecution of claims or appeals against the Federal Government are generally unallowable under FAR 31.205-47(f)(1). *See, e.g., Corners and Edges, Inc*, CBCA Nos. 693, 762, Sept. 23, 2008, 08-2 BCA ¶ 33,961 n.8 ("Appellant also argues that it incurred un-quantified 'executive time' and postage costs in establishing its claims. . . . Such litigation costs are unallowable.") (citing FAR 31.205-47(f)(1)).

Second, the Government must affirmatively waive its sovereign immunity from suit for attorney's fees. *DMS Imaging, Inc. v. United States*, 123 Fed. Cl. 645, 661 (2015) (citing *Library of Cong. v. Shaw*, 478 U.S. at 314-15, 106 S. Ct. 2957). "This comports with the default 'American Rule' that each litigant bear its own legal costs absent a statute or express contractual language to the contrary." *Id.* (citing *Alyeska Pipeline Serv. Co. v. Wilderness*

---

[4] CMS reviewed the SOW and determined that the SOW did not specify that the steps in the audit process were identified to have different weights. Therefore, CMS believes it is reasonable to make all steps of equal value, which yields a 44.44% percentage of completion.

11

*Soc'y,* 421 U.S.
240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). The proposal does not identify applicable statutory or contractual language under which CMS might be subject to suit for attorney's fees.
Thus, CMS does not believe that ACLR's proposal supports reimbursement for Phase One costs.

### B. Phase Two

The second subsection, titled Phase Two, addresses costs that "pertain to settlement expenses from the date of the court order to submission of this settlement proposal . . . ." These expenses total $134,271 and are grouped into three categories: administrative, legal, and accounting. Each category is addressed separately as follows:

#### 1. Administrative Costs

The proposal seeks administrative expenses of $112,471. Settlement expenses are generally allowable. *See Dream Mgmt., Inc.,* CBCA No. 5517, Apr. 10, 2017, 17-1 BCA ¶ 36,716 (citing FAR 31.205-42(g)). "However, a contractor may not rely upon testimony alone to support its claim to charges resulting from a commercial items convenience termination; it must, at least, point to contemporaneous documentation supporting the claimed charge." *ESCGov, Inc.,* ASBCA No. 58852, May 8, 2017, 17-1 BCA ¶ 36,772 (*citing SWR, Inc.,* ASBCA No. 56708,
Dec. 4, 2014, 15-1 BCA ¶ 35,832 at 175,230-31).

CMS reviewed Exhibit S-4 to the June 26 proposal, which was provided as support for the $112,471 amount. Exhibit S-4 does not provide any contemporaneous documentation substantiating this amount. For example, it does not appear to show hours recorded in a standard record keeping system. *See First Division Design, LLC,* ASBCA No. 60049, Nov. 13, 2018, 18-1 BCA ¶ 37,201. Nor does it show the actual costs incurred for the work. *See Campus Mgmt.*
*Corp.,* ASBCA No. 59924, April 20, 2017, 17-1 BCA ¶ 36,727.

CMS reviewed the remainder of the June 26 proposal for contemporaneous documentation substantiating the hours worked and actual administrative expenses incurred, but was unable to find any. Exhibit S-3 refers to "GSA Rate Schedules" for Mr. Chris Mucke and Mr. Gil Mucke, and the agency understands these to be the hourly rates specified in ACLR's GSA Federal Supply Schedule contract. However, there was nothing to suggest that these rates are identical to the costs actually incurred. Because the prong of the termination clause through which ACLR seeks this compensation only obligates the government to compensate ACLR for its costs, not the price it would charge a customer for the services, the GSA rates are not sufficient documentation. *See Campus Mgmt. Corp., supra.*

Due to the absence of sufficient documentation, CMS does not believe that ACLR's proposal supports reimbursement for administrative costs under Phase Two.

### 2. Legal Costs

The proposal seeks estimated legal fees of $19,300. "It is well established that the contractor 'bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of [its] loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation.'" *SWR, Inc., supra* (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed. Cir. 1987); *see also Dream Mgmt., Inc.*, CBCA No. 5517, Apr.10, 2017, 17-1 BCA ¶ 36,716.

The June 26 proposal did not identify or provide any documentation, such as legal bills, substantiating legal costs incurred in connection with preparing and presenting the settlement proposal. Nor was CMS able to locate any such documentation in its review. *See Dream Mgmt., Inc., supra* (finding that contractor failed to substantiate attorney fees where contractor "did not provide legal bills . . . or any other substantiating documentation"). For example, although the ledger at Exhibit S-2 identifies legal fees, the proposal did not include other documentation showing that those legal fees were incurred in connection with the settlement proposal at issue.

Due to the absence of sufficient documentation, CMS does not believe that ACLR's proposal supports reimbursement for legal costs under Phase Two.

### 3. Accounting Costs

The proposal seeks accountant costs of $2,500. The June 26 proposal did not specifically identify any documentation, such as invoices, to substantiate accounting costs incurred in connection with preparing and presenting the proposal. Nor was CMS able to locate any such documentation in its review. *See Dream Mgmt., Inc., supra* (finding that contractor failed to substantiate accountant or consultant fees where contractor "did not provide . . . consultant or accountant invoices, or any other substantiating documentation"). Due to the absence of sufficient documentation, CMS does not believe that ACLR's proposal supports reimbursement for accounting costs under Phase Two.

Finally, the proposal contemplates that additional Phase Two costs will be incurred up until the date the terminations are settled. CMS cannot agree to reimburse for such unsupported costs.

### **Contracting Officer's Decision and Rationale**

As explained above, ACLR is owed $157,318 for the terminations of the 2007 and 2010 audits, plus interest for the period beginning June 26, 2020 until the date of payment of the claim, calculated in accordance with 41 USC 7109. This excludes amounts CMS offered to ACLR for purposes of settlement only in the agency's September 3, 2020 response.

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal

is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number.

With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's—

(1) Small claim procedure for claims of $50,000 or less or, in the case of a small business concern (as defined in the Small Business Act and regulations under that Act), $150,000 or less; or

(2) Accelerated procedure for claims of $100,000 or less.

Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in 41 U.S.C. 7102(d), regarding Maritime Contracts) within 12 months of the date you receive this decision.

Thank you,

Nicole Hoey -S  *Digitally signed by Nicole Hoey -S Date: 2020.10.07 11:48:07 -04'00'*

Nicole Hoey
Contracting Officer