# IN THE UNITED STATES COURT
# OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **ACLR, LLC** | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| **v.** | ) | **Nos. 15-767** |
| | ) | (Judge Campbell-Smith) |
| **THE UNITED STATES** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## PLAINTIFF ACLR, LLC'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................iii

INTRODUCTION.......................................................................1

STATEMENT OF THE ISSUES………………………………………………2

COUNTER STATEMENT OF FACTS............................................................2

    1.    FAR 52.212-4(l) Did Not Apply as ACLR Provided Items to CMS……2

    2.    ACLR's Exhibits Are Evidence of the Costs Incurred by ACLR
        Resulting from the Constructive Termination for Convenience…….…2

        A.    Email Exhibits …………………………………………3

        B.    Technical Data Exhibits……………………………………..5

        C.    Computer File Directory Exhibits ……………………………..5

        D.    CMS Document Exhibits……………………………………6

        E.    Summary Cost Table Exhibits………………………..……6

        F.    ACLR Notes and Data Exhibits…………………………...……7

        G.    W-2 Exhibit……………………………………………8

        H.    Miscellaneous Exhibits……………………………………8

        I.    G&A Expenses……………………………………………9

ARGUMENT …………………………………………………………9

    1.    Standard of Review…………………………………………9

    2.    The Termination for Convenience of ACLR is Not Governed
        By FAR § 52.212-4(l) …………………………………………..10

    3.    Standard Record Keeping System Under FAR 52.212-4(l)…………...14

    4.    ACLR Maintained a Standard Record Keeping System………………...17

        A.    PY 2007 Duplicate Payment Audit Personnel Costs …………….20

B.       PY 2007 Duplicate Payment Audit Managing Principal Costs…...23

C.       PY 2010 Duplicate Payment Costs………………………………23

D.       PY 2007 Duplicate Payment General and Administrative Costs…25

E.       Loan Interest Costs …………………………………………………26

F.       Settlement Fees……………………………………………………..26

CONCLUSION.......................................................................................................29

CERTIFICATE OF SERVICE...............................................................................30

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)……………………………………………………………9,10
*Appeals of -- Campus Mgmt. Corp.,*
   ASBCA No. 59924, 17-1 B.C.A. (CCH) ¶ 36727 (Apr.  20, 2017)………………23
*Appeal of Escgov, Inc.,*
   ASBCA No. 58852, 17-1 B.C.A. (CCH) ¶ 36772 (May 8, 2017) …………………..17
*Appeal of -- First Div. Design, LLC,*
   ASBCA No. 60049, 18-1 B.C.A. (CCH) ¶ 37201 (Nov. 13, 2018) …………………16
*Appeal of Swr, Inc.,*
   ASBCA No. 56708, 15-1 B.C.A. (CCH) ¶ 35832 (Dec. 4, 2014) …………………..16
*Appeal of -- Trirad Techs. Inc.,*
   ASBCA No. 58855, 15-1 B.C.A. (CCH) ¶ 35898 (Feb. 23, 2015) ……………..…...15
*Bluebonnet Sav. Bank, F.S.B. v. United States,*
   266 F.3d 1348 (Fed. Cir. 2001) ………………………………………………...24
*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) …………………………………………………………....10
*Dream Mgmt., Inc. v. Dep't of Homeland Sec.,*
   CBCA 5571, 17-1 BCA ¶ 36,716 ………………………………...……………16, 17
*Gevyn Const. Corp. v. United States,*
   827 F.2d 752 (Fed. Cir. 1987)…………………………………………………26
*JKB Sols. & Servs., LLC v. United States,*
   18 F.4th 704 (Fed. Cir. 2021) ……………………………………1, 2, 11, 12, 13
*Lua v. United States,*
   843 F.3d 950 (Fed. Cir. 2016)……………………………………………………..27
*Millgard Corp. v. E.E. Cruz/Nab/Fronier-Kemper,*
   No. 99 CIV.2952 LBS, 2003 WL 22801519 (S.D.N.Y. Nov. 24, 2003)……………27
*Novartis Corp. v. Ben Venue Lab'ys, Inc.,*
   271 F.3d 1043 (Fed. Cir. 2001) …………………………………………………10
*Perfect Form Mfg. LLC v. United States,*
   142 Fed. Cl. 778 (2019)…………………………………………………………....15
*Stockton E. Water Dist. v. United States,*
   70 Fed. Cl. 515 (2006) ………………………………………………………...27
*United States v. Bakker,*
   925 F.2d 728 (4th Cir. 1991) …………………………………………..……..7
*Van Engers v. Perini Corp.,*
   No. CIV. A. 92-1982, 1993 WL 235911, at *1 (E.D. Pa. June 28, 1993) …………27
*Yant v. United States,*
   588 F.3d 1369 (Fed. Cir. 2009) …………………………………………………..10

iv

Statutes

Fed. R. Evid. 1006……………………………………………………………………6,7

Rules

RCFC 8(1) ………………………………………………………………………27
RCFC 56(a)………………………………………………………….............9

Regulations

48 C.F.R. § 12.403(d)(ii)(2) …………………………………...……………………14
48 C.F.R. § 49.102 ……………………………………………..……………11
48 C.F.R. § 49.102(a)(1)…………………………………………………………..2
48 C.F.R. § 49.201(a) ………………………………………………………13,14
48 C.F.R. § 52.212-4…………………………………………………...…10, 11
48 C.F.R. § 52.212-4(l) …………..……..………...…………..………1, 11, 12, 14, 20, 26
48 C.F.R. § 52.249-2(g)(2)(i)……………………………………………………26
48 C.F.R. § 52.249-2(g)(3)……………………………………………………28
48 C.F.R. § 52.249-2(g)(3)(i)……………………………………………………27

## IN THE UNITED STATES COURT
## OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **ACLR, LLC** | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **Nos. 15-767** |
| | ) | (Judge Campbell-Smith) |
| **THE UNITED STATES** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## ACLR, LLC'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff ACLR, LLC hereby opposes the United States' ("Defendant") Motion for Summary Judgment ("Motion") as follows:

## INTRODUCTION

Defendant seeks summary judgment based on the argument that ACLR "fails to present sufficient, relevant evidence to prove its termination for convenience costs based upon a standard record keeping system." ECF 168 at 8.[1] Defendant's Motion should be denied as ACLR has and will present sufficient, relevant evidence of its constructive termination for convenience costs at trial. Defendant's Motion should also be denied as Defendant's Motion is predicated on the applicability of 48 C.F.R. § 52.212-4(l) and the United States Federal Circuit's recent ruling in *JKB Solutions & Services, LLC v. United*

---

[1] ECF page number references are to the ECF pagination rather than the pagination of the actual filing.

*States*, 18 F.4th 704 (Fed. Cir. 2021) confirms that 48 C.F.R. § 52.212-4(l)[2] is not applicable to this case.

## STATEMENT OF THE ISSUES

Whether there is an absence of a genuine issue of material fact that would entitle Defendant to summary judgment.

## COUNTER STATEMENT OF FACTS

1.   FAR 52.212-4(l) Did Not Apply as ACLR Provided Items to CMS

ACLR's Part D RAC Contract, which was issued under its General Services Administration schedule contract ("GSA Schedule Contract"), required ACLR to provide specific services to CMS.  ECF 1 at 2.  ACLR did not provide "items" or goods to CMS under the Part D RAC Contract.  During the performance period of ACLR's Part D RAC Contract, CMS never issued a written termination for convenience notice to ACLR.  ECF 65 at 8.  When a government agency provides a termination for convenience notice to a contractor it is to be in writing and should advise the contractor of the regulatory basis for the action (i.e., the clause within the contract which serves as the predicate for the termination).  *See* 48 C.F.R. § 49.102(a)(1).

2.   ACLR's Exhibits Are Evidence of the Costs Incurred by ACLR Resulting from the Constructive Termination for Convenience

A common theme throughout the Motion is that many of ACLR's exhibits do not reference specific costs.  Besides the many exhibits that do reference costs, ACLR's other exhibits are evidence of the work that was done in 2011 and early 2012 as it related to the PY 2007 duplicate payment audit and of the work that was done from 2012 to 2015 as it

---

[2] Title 48 of the Code of Federal Regulations ("C.F.R.") is also referred to as the Federal Acquisition Regulations ("FAR").

related to the PY 2010 duplicate payment audit.  Defendant's position in this case is that "the period of the 2007 Duplicate Payment audit extended no longer than August 25, 2011 to November 30, 2011."  ECF 155 at 18; *see also* ECF 155 at 35.  How is ACLR to prove the work that was done on the PY 2007 and 2010 duplicate payment audits without contemporaneous documents from those time periods?  It is ironic that Defendant can contend that the work on the PY 2007 and 2010 duplicate payment audits was confined to a narrow time period and then attempt to preclude ACLR from offering contradictory evidence.

A.  Email Exhibits

ACLR will offer numerous emails into evidence to demonstrate the work that was done in connection with the PY 2007 and 2010 duplicate payment audits during the time period that costs are sought.  Nevertheless, Defendant takes issue with certain specific emails that ACLR will offer as exhibits.  Defendant claims that PX[3] 53 is an email consisting of a single line of text.  That is not true.  PX 53 is an email that contains an attachment which is titled "Part D RAC Monthly Progress Report .1211.pdf."  PX 53 at ACLR APP[4] 1.  PX 53 evidences that during the month of December 2011, ACLR had been directed by CMS to complete a request for equitable adjustment or claim and was calculating amounts identified, completing the demand letters for payment, and quantifying costs pertaining to the work that was done.  *Id.*

---

[3] PX is used in this Opposition as a reference to ACLR's exhibits.

[4] References to ACLR APP refer to ACLR's Appendix submitted with this Opposition.

Defendant contends that PX 360 is irrelevant.  ECF 168 at 15.  PX 360[5] evidences work done in connection with the PY 2010 duplicate payment audit.  As part of that audit, ACLR was to send emails to plan sponsors and email "undeliverables" occurred when the CMS contact listings were wrong.  For example, when a person left a company their email was discontinued.  Such an email would be returned as undeliverable.  In rare cases, the email might be rejected for security reasons such as being too large.  CMS's incorrect contact listings caused additional work for ACLR.

Defendant claims that PX 178 references an attachment "but the attachment was not included as part of PX 178 or any other exhibit."  ECF 168 at 15.  Similarly, with respect to PX 265, Defendant claims that PX 265 "purports to have an attachment, but the attachment was not included as part of PX 265 or any other exhibit."  *Id.*  When ACLR filed its Exhibit List on July 13, 2022, it also provided Defendant a flash drive that contained ACLR exhibits, including all attachments to those exhibits.  ECF 144.  If for some reason Defendant was unable to locate or open certain attachments to ACLR's exhibits, Defendant should have brought this to the attention of ACLR immediately rather than waiting until less than a month before trial and using potential missing attachments as a basis for its Motion.

PX 178 is a presentation that CMS directed ACLR to develop as part of the PY 2007 duplicate payment audit to give to plan sponsors on how ACLR was calculating amounts owing.  ACLR APP 6.  The presentation was never used.  PX 265 pertains to the

---

[5]The Motion and this Opposition make reference to many of ACLR's proposed trial exhibits.  Given the voluminous nature of the exhibits referenced and the size of the exhibits, it was not practical for ACLR to include all of its referenced proposed trial exhibits in an appendix to this Opposition.  To the extent the Court desires access to the referenced trial exhibits, ACLR requests a conference with the Court to discuss a mechanism for ACLR to share all of the referenced trial exhibits with the Court for its consideration.

PY 2010 duplicate payment audit as it notes the issues associated with correcting errors since entering a new PDE record was significantly easier than deleting an old PDE record. ACLR APP 17.

B.  Technical Data Exhibits

Defendant takes issue with a number of exhibits it describes as "Technical Data" on the basis that they do not "show charges or costs of any kind." ECF 168 at 16.  Each of these exhibits represent the work efforts engaged in by ACLR personnel in performance of the PY10 duplicate payment audit.  PX 272, 302-04, 308, 310, 312-313 were generated by ACLR personnel to assist CMS in its efforts to demonstrate the efficacy of the CMS duplicate payment protocol used in the PY 2010 duplicate payment audit and the remaining exhibits complained of by CMS in this category illustrate the work product generated by ACLR while conducting the PY 2010 duplicate payment audit.  PX 308 is a worksheet generated by ACLR personnel and submitted as a request for information to a plan sponsor in an effort to obtain evidentiary documentation necessary to demonstrate the veracity of the payment.  While ACLR did not track or otherwise assign costs to individual documents generated on CMS's behalf, these documents demonstrate the efforts of ACLR personnel and the requirements of its infrastructure to perform work for the PY 2010 duplicate payment audit.  Defendant makes the point that if PX 308 would be printed it would be 7,952 pages long.  ECF 16 at n.4.  This point underscores the extent of ACLR's work effort that went into preparing documents such as PX 308.

C.  Computer File Directory Exhibits

Defendant complains that ACLR's computer file directory exhibits do "not show charges or costs of any kind." ECF 168 at 16.  ACLR computer file directory exhibits are

screen prints taken of the results of a standard MS DOS program written to show file listings contained in ACLR's standard record keeping system.  In each instance, the exhibit contained a representative sample of the documents contained therein.  These exhibits were generated to demonstrate the magnitude of ACLR's work efforts on the PY 2007 and 2010 duplicate payment audit and to spare the Court from having to review hundreds of thousands of documents related to these work efforts.

### D.  CMS Document Exhibits

Defendant complains of ACLR's proffer of certain exhibits because they were prepared by CMS and do not "reflect charges or costs allocable to the 2007 and 2010 audits at issue."  ECF 168 at 17.  The exhibits proffered by ACLR that fall into this category outline the framework by which ACLR was contractually required to conduct the duplicate payment audits and its efforts to collect overpayments ACLR identified from plan sponsors.  PX 96, as noted by the Defendant, pertains to "debt collection in the context of Medicare financial management."  ECF 168 at 17.   In developing its overpayment collection processes, ACLR reviewed many documents including federal law, CMS promulgations, and the processes used in the Medicare Part A/B RAC program.  Since these documents were utilized by ACLR in connection with the PY 2007 and 2010 duplicate payment audits, they are admissible evidence of the magnitude of ACLR's work efforts.

### E.  Summary Cost Table Exhibits

Included in ACLR's exhibits are summary cost tables evidencing specific costs incurred based upon other cost documents and other cost tables estimating certain costs. *See* PX 426, 428, 433, 437, 440, 442, 443, and 454.  These summaries are admissible under

Fed. R. Evid. 1006.  "The purpose of Rule 1006 is to provide a practicable means of summarizing voluminous information." *United States v. Bakker*, 925 F.2d 728, 736 (4th Cir. 1991).  Additional ACLR exhibits include income statements and profit and loss statements.  PX 444, 446, 448, 450, and 452.

Defendant takes specific issue with PX 443, which is a summary of Mr. Mucke's hours and corresponding costs for his effort on the PY 2007 duplicate payment audit.  As the Managing Principal of ACLR and directly responsible for the management of the Part D RAC Contract and the recovery audit efforts, Mr. Mucke was intimately involved in every aspect of ensuring the successful completion of the PY 2007 duplicate payment audit.  Mr. Mucke was not part of ACLR's payroll and no payments were made by ACLR to him for his efforts on behalf of the PY 2007 duplicate payment audit.  PX 443 demonstrates the value as an hourly fee as determined by ACLR on the work efforts of Mr. Mucke, and the amount of such work efforts made by Mr. Mucke so a cost calculation can be made.

F.  ACLR Notes and Data Exhibits

Some of ACLR's exhibits consist of notes and data.  Defendant takes issue with these exhibits because it contends they do not reflect charges and costs.  ECF 168 at 18.  While the exhibits referenced by Defendant in this category do not specifically reference any cost, they support ACLR's cost claim because they demonstrate work that ACLR did on the PY 2007 and 2010 duplicate payment audits during the time period ACLR is seeking costs.  *See* PX 66, 87-90, 101, and 103.

### G.  W-2 Exhibit

PX 431 consists of W-2s for ACLR employees from 2011, which reflect part of the wage cost incurred for the PY 2007 Duplicate Payment audit.  Defendant complains that the names of the employees were redacted.  ECF 168 at 18.  Out of an abundance of caution for the privacy of these individuals, ACLR redacted the names on the W-2s as well as other identifying information.[6]  Defendant conveniently ignores PX 433 which correlates the W-2s to specific ACLR employees in calculating ACLR's payroll costs.  Moreover, ACLR's witnesses can testify as to the individuals associated with each of these W-2s as well as their efforts in connection with the PY 2007 Duplicate payment audit.

### H.  Miscellaneous Exhibits

Defendant's Motion references thirty-two exhibits that it claims do not "demonstrate work performed by ACLR."  ECF 168 at 18.  As a new program, the implementation of the Part D RAC beginning in 2011 required herculean efforts to design, implement, and execute all the requirements necessary to conduct the PY 2007 duplicate payment audit.  These thirty-two exhibits further demonstrate ACLR personnel work efforts on behalf of its PY 2007 and 2010 duplicate payment audits.  For example, PX 349 contains letters ACLR prepared and sent to plan sponsors who had submitted duplicate payments to CMS during the PY 2010 Duplicate Payment audit time period.   Another example is PX 390, which is ACLR's call log illustrating the additional communication efforts engaged in by ACLR personnel with plan sponsors in connection with its audits.  Defendant is simply wrong when it contends these exhibits do not demonstrate work ACLR performed on the PY 2007 and 2010 duplicate payment audits.

---

[6] Given Defendant's concern, ACLR has produced PX 431 to Defendant without the name redactions.

I.   G&A Expenses

PX 441 is a compilation of documents from ACLR's standard record keeping system that consists of invoices, receipts, credit card statements, and expense reports for ACLR personnel from 2011. Defendant states that PX 441 does not "reflect *any* costs incurred." ECF 168 at 19. Again, this is inaccurate. The general and administrative termination for convenience costs reflected on PX 442 and in 426 are supported by the documents in PX 441. Because PX 441 covers all of 2011, it includes charges that ACLR is not seeking to recover as costs in this matter such as Valentine's Day flowers, birthday lunches, sardines, and anniversary gifts.

In its Motion, Defendant references fourteen specific categories of charges reflected in PX 441. ACLR is not seeking reimbursement on eleven of those categories,[7] which Defendant could have determined through reference to PX 442 and 426 or in communications with ACLR. With respect to the three other categories, ACLR is seeking expenses for coffee in its offices and for payments made to two law firms in 2011. ACLR believes these are appropriate general and administrative costs.

**ARGUMENT**

1.   Standard of Review

The Court should grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A genuine issue of material fact is one that can change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[7] With respect to two of these charges, ACLR reviewed its submission and advised Defendant that certain charges totaling $356.93 had been inadvertently included and ACLR would not be pursuing general and administrative charges on these costs, but Defendant has referenced two of these in its Motion anyway. See email dated October 19, 2022 at ACLR APP 20.

247-48 (1986). In considering a motion for summary judgment, the Court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 242-43; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 249 (1986). The moving party "has the initial responsibility to identify the legal basis of its motion and of pointing to those portions of the record that it believes demonstrate the absence of a genuine issue of material fact." *Novartis Corp. v. Ben Venue Labs*., 271 F.3d 1043, 1046 (Fed. Cir. 2001) (citing *Celotex*, 477 U.S. at 323). Once the moving party has made the showing described above, the burden shifts to the nonmoving party "to designate specific facts showing that there is a genuine issue for trial." *Novartis*, 271 F.3d at 1046 (citing *Celotex*, 477 U.S. at 324). In considering a motion for summary judgment, "all justifiable inferences are to be drawn in the nonmovant's favor." *Yant v. United States*, 588 F.3d 1369, 1371 (Fed. Cir. 2009) (citing *Anderson*, 477 U.S. at 255).

2. The Termination for Convenience of ACLR is Not Governed By FAR § 52.212-4(l)

Defendant's reliance on FAR 52.212-4 to support a constructive termination of ACLR's task order is misplaced. It was not until Defendant filed its Reply in Support of its Cross-Motion for Summary Judgment on August 3, 2018 that CMS first claimed that ACLR's audit services were halted as a result of a post-facto constructive termination for convenience. ECF 61 at 16. In its Reply, Defendant did not state a specific regulatory predicate for its alleged constructive termination for convenience or provide any documentation that had been provided to ACLR concurrent with the cessation of the audit services. *See* ECF 61 at 16.

On December 19, 2018, ACLR responded to Defendant's newly asserted position of constructive termination for convenience.  ECF 65.  Therein, ACLR stated that the task order issued by CMS did not contain a termination for convenience clause and that 48 C.F.R. § 49.102 required that all terminations be presented to contractors in writing at the time performance was halted.  ECF 65 at 10.  In turn, on August 8, 2019, CMS asserted in its Supplemental Response Brief that ACLR's GSA Schedule Contract upon which the Part D RAC Contract was issued contained certain provisions which allegedly mandated the inclusion of 48 C.F.R. § 52.212-4 entitled "Contract Terms and Conditions – Commercial Items."  ECF 70 at 10.  Defendant contended that it had the right to terminate ACLR's task order pursuant to 48 C.F.R. § 52.212-4(l) (termination for convenience).  ECF 70 at 7.

The Court issued its unsealed Opinion and Order on April 6, 2020.  ECF 80.  In relevant part, the Court found that the clause set forth at 48 C.F.R. § 52.212-4(l) applied to the task order and the clause allowed CMS "to terminate the contract, or any portion of it, for its sole convenience." ECF 80 at 9.  Therein, the Court also found that ACLR was entitled to some level of compensation pursuant to the referenced termination clause.  ECF 80 at 16.  However, the recent decision in *JKB Sols. & Servs., LLC v. United States*, 18 F.4th 704, 710 (Fed. Cir. 2021) dictates that 48 C.F.R. § 52.212-4 cannot be applied to the matter at hand.

Subsequent to ACLR's most recent substantive filing with the Court (*See* ECF 119), the United States Court of Appeals for the Federal Circuit provided definitive guidance regarding the application of 48 C.F.R. § 52.212-4 "Contract Terms and Conditions – Commercial Items" to contracts for services such as ACLR's Part D RAC Contract with CMS. In *JKB Solutions & Services, LLC*, the Federal Circuit held that the clause relied

11

upon by CMS to obtain a constructive termination of ACLR's PY 2007 and 2010 duplicate payment audits only applies to contracts to supply commercial *items* to the government. *Id.* at 710. The Court went on to note that since JKB Solutions' contract required that *services* be provided to the government, 48 C.F.R. § 52.212-4(l) did not apply and was thus unenforceable. *Id.* at 711. Therefore, the Federal Circuit's holding is controlling of the matter at hand as it is undisputed that ACLR provided services to CMS, not items. Moreover, the Federal Circuit's ruling negates CMS's zealous desire to apply rigorous accounting standards to ACLR's bona fide standard record keeping system via a clause that only applies when "items" are being procured by the government.

Of note, the Federal Circuit stated:

> Here, the Claims Court erred by holding that JKB Solutions' contract contained an applicable termination for convenience clause. The Claims Court relied solely on the contract's incorporation of FAR 52.212-4 by reference. *JKB Sol'ns II*, 150 Fed. Cl. at 256. But, as explained below, FAR 52.212-4 governs the termination of commercial item contracts for the government's convenience, and it does not apply to service contracts, such as the contract at issue in this case. FAR 52.212-4 provides for the insertion of numerous contract terms and conditions "[a]s prescribed in [FAR] 12.301(b)(3)." FAR 52.212-4. FAR 12.301 implements 41 U.S.C. § 3307, which provides that the FAR "shall contain a list of contract clauses to be included in *contracts for the acquisition of commercial end items.*" 41 U.S.C. § 3307(e)(2)(B) (2012) (amended 2018) (emphasis added); *see* FAR 12.301 (2015). The statute constrains the list of contract clauses:
>
> To the maximum extent practicable, the list shall include only those contract clauses that are—
>
> (i)    required to implement provisions of law or executive orders applicable to acquisitions of commercial items or commercial components; or
>
> (ii)   determined to be consistent with standard commercial practice.
>
> 41 U.S.C. § 3307(e)(2)(B). FAR 12.301 contains substantially similar language limiting the list of contract clauses. *See* FAR 12.301(a). The regulation prescribes the insertion of "clauses," like FAR 52.212-4, "in

solicitations and contracts *for the acquisition of commercial items.*" FAR 12.301(b) (emphasis added). Because FAR 52.212-4 applies only to commercial item contracts and because, for purposes of this summary judgment motion, JKB Solutions' contract is not a commercial item contract, the Claims Court erred in relying on FAR 52.212-4 to supply an applicable termination for convenience clause.

The Claims Court rationalized its holding, finding that "nothing in the FAR limits the applicability of Section 52.212-4(*l*) to commercial item contracts." *JKB Sol'ns II*, 150 Fed. Cl. at 255–56. The government reiterates this reasoning on appeal. As previously noted, the text of FAR 52.212-4 and FAR 12.301 limit the applicability of the incorporated termination for convenience clause to commercial item contracts. The existence of other termination for convenience clauses in the FAR further supports our conclusion. For example, Part 52 of the FAR provides for the insertion of several termination for convenience clauses "[a]s prescribed" in FAR 49.502. *See* FAR 52.249-1 to 52.249-5 (2015). FAR 49.502 prescribes the insertion of FAR 52.249-4's "Termination for Convenience of the Government (Services) (Short Form)" clause in certain "contracts for services." FAR 49.502(c) (2015). Moreover, the FAR provides that the part to which FAR 49.502 belongs "does not apply to commercial item contracts awarded using part 12 procedures." FAR 49.002(a)(2) (2015). A different FAR provision, which references FAR 52.212-4, governs the termination policies of those contracts for the acquisition of commercial items. *Id.* (citing FAR 12.403 (2015)). The FAR's own distinction between termination for convenience clauses based on types of contracts confirms that FAR 52.212-4's termination for convenience clause does not apply to JKB Solutions' service contract.

*JKB Sols. & Servs.*, 18 F.4th at 710.

Consistent with the controlling precedent noted above, ACLR requests that CMS provide prompt and equitable compensation for the efforts ACLR expended and the costs it incurred under the PY 2007 and 2010 duplicate payment audits.  As stated previously, ACLR contends that its Part D RAC Contract efforts were not actually terminated for convenience by CMS (*See*, ECF 65, pgs. 14 – 16). Notwithstanding this position, if the Court holds that ALCR's task order was constructively terminated, the benchmarks set forth in 48 C.F.R. § 49.201(a), which applies to contracts for services, should serve as the basis for any required "fair compensation."

13

> Fair compensation is a matter of judgment and cannot be measured exactly. In a given case, various methods may be equally appropriate for arriving at fair compensation. The use of business judgment, as distinguished from strict accounting principles, is the heart of a settlement.

48 C.F.R. § 49.201(a).

      3.   <u>Standard Record Keeping System Under FAR 52.212-4(l)</u>.

Even if 48 C.F.R. § 52.212-4(l) is still applied to this case, it contains clear and objective guidelines that Defendant has continually ignored in connection with ACLR's claim. For example, the clause dictates that a contractor shall "not" be required to comply with cost accounting standards, contract cost principles, or be subject to an audit. *Id.* Defendant has requested the Court to void ACLR's request for compensation arguing that it fails to comply with certain contract costs principles and cost accounting standards. *See generally* ECF 168. Defendant disregards both the regulatory predicate for the clause and the level of consideration to be provided to a terminated contractor which states, "The parties must balance the Government's need to obtain sufficient documentation to support payment to the contractor against **the goal of having a simple and expeditious settlement**." 48 C.F.R. § 12.403(d)(ii)(2) (emphasis added).

48 C.F.R. § 52.212-4(1) does not expressly define what a standard record keeping system is. The Cambridge Dictionary defines record keeping as "the activity of organizing and storing all the documents, files, invoices, etc. relating to a company's or organization's activities." https://dictionary.cambridge.org/us/dictionary/english/record-keeping There are a myriad examples of standard record keeping systems. For example, according to Internal Revenue Service instructions for record keeping systems for small businesses: "You may choose any recordkeeping system suited to your business that clearly shows your income and expenses. Except in a few cases, the law does not require any special kind

14

of records. However, the business you are in affects the type of records you need to keep for federal tax purposes." https://www.irs.gov/businesses/small-businesses-self-employed/recordkeeping. The United States Department of Housing and Urban Development describes a record keeping system as "A systematic process which captures, organizes, and categorizes records to facilitate their preservation, retrieval, use, and disposition." www.hud.gov/sites/dfiles/OCHCO/documents/22281FULLADMH.pdf.

Email has evolved over time into a standard record keeping system when utilized through an email platform such as Outlook. Emails may be sent to multiple persons with attachments and email platforms maintain copies of emails in various folders, including sent boxes, inboxes, deleted emails, and designated subfolders. The United States Department of the Interior recognizes that emails are part of a record keeping system where they are maintained in a particular manner that is similar to the manner in which ACLR maintained its emails. https://www.doi.gov/ocio/policy-mgmt-support/information-and-records-management/email-question.

In *Perfect Form Mfg. LLC v. United States*, 142 Fed. Cl. 778 (2019), the Court recognized QuickBooks as a standard record keeping system for financial information. *Id.* at 790 n.9. In *Appeal of -- Trirad Techs. Inc.*, ASBCA No. 58855, 15-1 B.C.A. (CCH) ¶ 35898 (Feb. 23, 2015), the Board of Contract Appeals recognized that a standard record keeping system did not need a particular level of sophistication. "The termination for convenience clause specifically provides that a contractor may recover, 'reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination' (finding 3). We do not interpret the language 'using its standard record keeping system' so narrowly as to preclude

recovery if a contractor's 'standard record keeping system' is lacking sophistication

(finding 17 n.4). Indeed, in *SWR* we relied upon 'records other than the contractor's own

standard record keeping system, e.g., contemporaneous Army and SWR emails discussing

the Pineridge Farms site lease' when we allowed SWR to recover a $15,000 payment to

end a lease. *SWR, Inc.*, 2014 ASBCA LEXIS 412, at *104 n.4." *Id.*

In *Appeal of Swr, Inc.*, ASBCA No. 56708, 15-1 B.C.A. (CCH) ¶ 35832 (Dec. 4,

2014), the Board of Contract Appeals clarified that it would not narrowly interpret what

constitutes a standard record keeping system.

> Finally, the dissent suggests we impose a 'special evidentiary burden' on
> commercial item contractors barring them 'as a matter of law' from
> demonstrating their convenience termination claims with any evidence
> other than a 'contractor record.' Once again, we do no such thing here. In
> resolving this appeal, we examine and rely on, among other things, emails
> sent by the government, invoices generated by lessors, and bills of lading
> obtained by FES, none of which constitutes a 'contractor record.'

*Id.*

Defendant ignores the aforementioned authorities and instead relies primarily on

the Armed Services Board of Contract Appeals case *First Division Design, LLC*, 18-1 BCA

P 37201 (A.S.B.C.A.), ASBCA No. 60049, 2018 WL 6251067.  ACLR's evidence far

exceeds the information offered by First Division Design, LLC.  It would appear that in

*First Division Design, LLC*, the contractor failed to offer documentation to support its

claim for costs.  Here, ACLR is offering extensive documentation in support of the costs it

incurred as a result of the constructive termination for convenience.  Defendant also relies

on *Dream Mgmt., Inc. v. Dep't of Homeland Sec.*, CBCA 5571, 17-1 BCA ¶ 36,716 to

support its position but that reliance is misplaced.  The contract at issue in *Dream Mgmt.,*

*Inc.* was a time and materials contract not a contingency fee contract and the denial of costs

for setting up a line was based on a lack of "payroll records, canceled checks, or project documentation to support [Dream Management's] costs or hourly rates." *Id.*  Here, ACLR's exhibits include payroll records, bank statement, invoices, and project documentation to support its costs.  *See* PX 117-257, 259-425, 430-432, and 441.

Defendant also cites to *EScgov. Inc.*, ASBCA No. 58852, 17-1 BCA 36,772.  The Board in that case wrote "a contractor may not rely upon testimony alone to support its claim to charges resulting from a commercial items convenience termination; it must, at least, point to contemporaneous documentation supporting the claimed charge."  Here, ACLR's evidence contains contemporaneous documentation supporting its  charges – the very evidence Defendant argues cannot be used in this case.

### 4.   ACLR Maintained a Standard Record Keeping System

ACLR has a standard record keeping system and the exhibits to support its cost claim are from or derived from that standard record keeping system.  ACLR's standard record keeping system includes the use of Quickbooks, an accounting software package, to track costs; Microsoft File Explorer, which electronically stores vendor invoices, client work product, and archived communications data; Microsoft Outlook, which tracks company communications; external suppliers and various external file storage devices used to back up and secure company data to ensure against data loss; and paper files for employee and client contract information.  Declaration of Christopher Mucke Regarding ACLR, LLC's Standard Record Keeping System ("Mucke Dep.") at ¶ 2, ACLR APP 21.[8]
All of ACLR's work efforts on behalf of CMS in its execution of the Part D RAC Contract utilized specific components of ACLR's standard record keeping system.  *Id.* at ¶ 4.  The

---

[8] Mr. Mucke's Declaration was initial filed as part of ACLR's Notice of Summary of its Standard Record Keeping System.  ECF 167.

portion of ACLR's standard record keeping system used to track costs, accounting, and tax related information was Quickbooks. *Id.* at ¶ 5. Amounts paid or incurred by ACLR were individually inputted into Quickbooks and consisted of amounts paid for goods and services and are supported by vendor invoices (PX 441), receipts (PX 441), credit card statements (PX 441), payroll information (PX 432), and checks and EFT payment information included in bank statements (PX 430). Mucke Dec. at ¶ 5, ACLR APP 22.

ACLR's vendor invoices (PX441), receipts (PX441), credit card statements (PX441), and payroll (PX432) and bank statement (PX 430) records used to support cost, accounting, and tax related information tracked in Quickbooks are kept in an electronic format and stored in Microsoft File Explorer. Mucke Dec. at ¶ 6, ACLR APP 22. In addition to tracking amounts paid or incurred by ACLR, ACLR utilizes Quickbooks to generate a variety of reports for accounting and tax purposes, including, but not limited to, expense reports (PX 441), check registers, balance sheets, trial balances, income statements (PX 444, 446, 448, 450, and 452), and its general ledger. Mucke Dec. at ¶ 8, ACLR APP 22. PX 426, 433, 437, and 442 include check registers generated from Quickbooks and exported into Excel. *Id.* Individual payments outlined in each of these check registers are individually referenced and tracked in ACLR's bank statements (PX 430). Mucke Dec. at ¶ 8, ACLR APP 22.

ACLR contracted with Automatic Data Processing, Inc. ("ADP") to provide payroll services. *Id.* at ¶ 9. ADP payroll services included making payroll and expense reimbursement payments to ACLR employees, filing pertinent federal, state, and local payroll reports/returns, and generating W-2 and other tax information necessary for ACLR to comply with federal and state law (PX 431, 445, 447, 449, 451, and 453). Mucke Dec.

at ¶ 9, ACLR APP 23.    ADP was also responsible for maintaining employee records
pertaining to employee commencement/termination dates, pertinent personal information,
employee deduction information including 401k, insurance, garnishment, direct deposit
and pay records, and filing and paying federal, state, and local taxes on behalf of ACLR.
(PX 432).  Mucke Dec. at ¶ 9, ACLR APP 23.  The records generated through ADP were
kept and maintained within the Microsoft File Explorer portion of ACLR's standard record
keeping system.  Invoices and payroll reports generated by ADP as well as invoices and
related supporting documentation for all other vendors providing goods and services to
ACLR were kept and maintained in an electronic format in Microsoft File Explorer and on
external storage devices and at various external suppliers.  Mucke Dec. at ¶ 10, ACLR APP
23.

Work product, communications, and records supporting work efforts performed by
ACLR personnel and related stakeholders on behalf of the Part D RAC contract in the 2007
and 2010 duplicate payment audits were maintained on ACLR's standard recordkeeping
system - specifically, Microsoft Outlook, File Explorer, and external backup repositories
and suppliers (PX 1-3, 5-6, 9-93, 97, 103-105, 110-112, 114, 117-257, 259-425).  Mucke
Dec. at ¶ 11, ACLR APP 23.

Defendant wholly ignores Mr. Mucke's Declaration and still contends that ACLR
did not maintain a standard record keeping system.  Oddly Defendant fails to articulate
what would constitute a standard record keeping system with a similarly situated
government contractor other than tracking of all time and correlating that time to specific
isolated tasks in connection with a government contract regardless of the nature of the
contract – fixed fee, contingency, or otherwise.  Defendant's position would essentially

preclude all small business government contractors from recovering any costs under 48 C.F.R. § 52.212-4(1).  Contractors providing services or having provided services under fixed fee contracts would be at risk of not being able to recover costs under Defendant's interpretation of 48 C.F.R. § 52.212-4(1) if the contractors did not require each employee working on their contracts to track the time spent on the contracts and correlate that time to the specific task that each such employee was working on.  While Defendant may feel compelled to make this extreme argument in an effort to avoid making any payment of costs to ACLR in this case, Defendant's short sighted strategy creates significant risk for all small government contractors.  There will be a looming specter that Defendant will refuse to pay any costs to small government contractors in the event of a constructive termination for convenience unless the contractors used elaborate costly and burdensome time tracking systems.  This scenario is not what was intended under 48 C.F.R. § 52.212-4(1) as the clause specifically states that contractors shall not be required to comply with the cost principles that Defendant seeks to impose on ACLR.

Defendant makes specific challenges to ACLR's arguments and evidence relating to its personnel and managing principal costs, ACLR's general and administrative costs, loan interest costs, and settlement fees costs for the PY 2007 and 2010 duplicate payment audits.  ECF 168 at 33-40.  Each of these categories is addressed below.

A.  PY 2007 Duplicate Payment Audit Personnel Costs

ACLR needed to hire personnel to perform the work necessary for the PY 2007 duplicate payment audit.  During 2011, ACLR personnel were contractually required to participate in a kick-off meeting to inform CMS of its recovery audit approach, identify key personnel and organizational structure, provide preliminary project plans and

implementation schedules, outline reporting and communication formats, and coordinate information technology requirements and security protocols for infrastructure development to obtain and audit Part D payment data. PX 12 - 63.  During 2011, ACLR audit personnel reviewed Part D RAC industry feedback [PX 64-65], pertinent promulgations and administrative guidance [PX 67-74, 99], governmental reports and publications regarding Medicare payment and collection processes and improper payment findings and protocols [PX 91-96, 98, 100, and 115], and communicated with CMS on these efforts [PX 75-86].

ACLR personnel also reviewed Part D payment record layouts and administrative guidance [PX 102-109, 158], developed audit and payment calculation processes [PX 164-180], developed audit protocols [PX 87-90, 97, 101, 131-132, 135-152, and 155-157], and provided processes and audit issues to CMS and its contractor, Booz Allen Hamilton [PX 153-154, 159-163, 181-182].  ACLR personnel also developed communications for Part D stakeholders [PX 110-112, 117, and 133-134], conducted plan sponsor outreach [PX 113-114, 116, and 118-125], and developed the ACLR/Plan Sponsor website interface [PX 126-130] for the PY07 duplicate payment audit.

During 2011 for the PY 2007 duplicate payment audit, ACLR systems personnel were contractually required to develop systems and system protocols necessary to support the Part D RAC; ensure ACLR personnel interfaced with CMS systems in accordance with security protocols; and obtain an Authorization to Operate ("ATO") necessary for ACLR to retain, secure and audit Part D payment data. PX 183-256.  ACLR systems personnel developed initial systems security, risk assessment, and contingency plans [PX 183-188] as well as policies, procedures, and protocols as they pertained to systems security and

development, systems maintenance, and revision requirements necessary for supporting the Part D RAC and in accordance with CMS requirements [PX 189-203].

During 2011, ACLR systems personnel designed, purchased, installed, documented and maintained ACLR Part D RAC systems [PX 209-216, 426, 441-442] at a secured location [PX 204-208] and ensured that all ACLR personnel received access and training on pertinent CMS systems and data [PX 217-220].  ACLR systems personnel also developed technical documents, test scripts and plans, and procedures in preparation for CMS's systems assessment.  PX 221-229.  ACLR personnel engaged with CMS contractor system auditors during the assessment and reviewed and discussed findings with the auditors [PX 230-243] and reviewed draft and final ACLR Security Assessment reports [PX 244-245].  ACLR systems personnel developed a Plan of Action & Milestones to resolve assessment findings [PX 246], created and resolved change requests to address findings [PX 247-252], updated CMS's tracking system documenting resolution necessary for certification [PX 247-252], and eventually obtained ACLR's ATO on October 17, 2011 [PX 256].  All of ACLR's costs during the period of January 13, 2011 through January 31, 2012 were incurred as a result of the termination of the PY 2007 duplicate payment audit as this was the only audit conducted by ACLR during the 12-month base period of the Part D RAC Contract and many of those costs were directly related to the development and implementation of the PWS mandated infrastructure.  The PY 2007 duplicate payment audit was the only mechanism by which ACLR could be paid for its efforts.  ACLR was contractually required to retain its key personnel until January 31, 2012 when CMS eliminated the key personnel requirement through contract modification 0003 that allowed ACLR to terminate certain personnel.  ACLR paid its personnel $408,462.83 for their work

on the PY 2007 duplicate payment audit as reflected on their W-2s.  PX 431- 433.  Contrary to Defendant's argument, these payments to ACLR's personnel were not estimates – they were actual costs and ACLR should be allowed to recover these costs.

B.  PY 2007 Duplicate Payment Audit Managing Principal Costs

During the base period of the Part D RAC, Mr. Mucke's efforts were solely directed to executing the Part D RAC necessary to complete the PY 2007 duplicate payment audit. In these efforts, Mr. Mucke typically worked 15-18 hour days.  If Mr. Mucke had not devoted his time and attention to the PY 2007 duplicate payment audit, he would have devoted his time and attention to other business efforts that would have generated revenue for ACLR.  Mr. Mucke did not specifically track his hours worked on the Part D RAC Contract because it was a contingency fee contract and there was no need or requirement for him to track his hours.  Mr. Mucke worked approximately 3,023 hours on the PY 2007 duplicate payment audit.  Mr. Mucke's contracted GSA schedule hourly rate was $211.58 from January 2011 to June 16, 2011, and $215.39 from June 17, 2011 to January 31, 2012. PX 443.  A fully burdened GSA rate is acceptable to apply to Mr. Mucke's work on the PY 2007 duplicate payment audit.  *See Campus Mgmt. Corp.*, ASBCA No. 59924, 17-1 B.C.A. (CCH) ¶ 36727 (Apr. 20, 2017).  ACLR's estimated managing principal costs were excluded from its calculation of reasonable profit.  ACLR incurred $645,730 for Mr. Mucke's work on the PY 2007 duplicate payment audit.  PX 443.  ACLR should be allowed to recover these costs for Mr. Mucke's efforts.

C.  PY 2010 Duplicate Payment Costs

Contrary to Defendant's assertions, ACLR may use estimates to support its cost claims, especially where ACLR was to be paid under a contingency arrangement.  "The

23

ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001).   In connection with the PY 2010 duplicate payment audit, ACLR personnel prepared and exchanged thousands of email communications internally and with CMS.   ACLR personnel compiled, analyzed, and reviewed thousands of other documents for the PY 2010 duplicate payment audit.   ACLR personnel worked approximately 4,376 hours on the PY 2010 duplicate payment audit.   PX 454.   The GSA schedule hourly rate for ACLR personnel working on the PY 2010 duplicate payment audit were as follows:   Chris Mucke $215.39 from January 2012 – June 2012, $219.27 from July 2012 – June 2013, $223.21 from July 2013 – June 2014, $227.23 from July 2014 to April 2015; Gil Mucke $164.10 from January 2012 – June 2012, $167.06 from July 2012 - June 2013, $170.06 from July 2013 – June 2014, $173.12 from July 2014 to April 2015;   Jason Barnes $153.85 from January 2012 – June 2012, $156.62 from July 2012 – June 2013, $159.44 from July 2013 – June 2014, $162.31 from July 2014 to December 2014;   Bruce Dixon $153.85 from January 2012 – June 2012, $156.62 from July 2012 – June 2013, $159.44 from July 2013 – June 2014, $162.31 from July 2014 to April 2015;   Sean Donaghy $159.44 from January 2014 – June 2014, $162.31 from July 2014 to December 2014;   Thais Thompson $159.44 from January 2014 – June 2014, $162.31 from July 2014 to April 2025.   PX 454.   The costs requested for reimbursement of ACLR's office lease are not reflected in ACLR's calculation of GSA rates for the PY 2010 duplicate payment audit.   ACLR's estimated PY 2010 duplicate payment audit costs have been

excluded from its calculation of reasonable profit.   Accordingly, ACLR incurred approximately $923,558.62 in costs related to the PY 2010 duplicate payment audit.  PX 454.  ACLR should be allowed to recover these costs.

     D.  <u>PY 2007 Duplicate Payment General and Administrative Costs</u>

     ACLR seeks general and administrative costs in connection with the PY 2007 duplicate payment audit of $505,212.30.   Reflecting an apparent failure to understand ACLR's evidence, Defendant contends that PX 441 is ACLR's "proffered exhibit for G & A charges" and does not "reflect *any* costs incurred, reasonable or otherwise, with respect to the two audits."  ECF 168 at 37.  PX 441 is a compilation of documents from ACLR's standard record keeping system that consists of invoices, receipts, credit card statements, and expense reports for ACLR personnel from 2011.  PX 441 is but one exhibit evidencing ACLR's general and administrative expenses.  Given the nature of PX 441, ACLR is not seeking costs from Defendant for all invoices and receipts included within PX 441.  ACLR's primary exhibit detailing general and administrative expenses for the PY 2007 duplicate payment audit is PX 442.  ACLR APP 24.  PX 442 contains check registries generated from Quickbooks and exported into Excel and described all of ACLR's PY 2007 duplicate payment audit general and administrative costs.  *Id.*  Most of the charges in PX 442 can be directly correlated to supporting documentation in PX 441 with reference to the last two columns on the second through fourth pages of PX 442.[9]  *Id.*  Consequently, Defendant's argument that ACLR does not have admissible evidence to support its PY 2007 duplicate payment audits is not well founded and should be rejected.

---

[9] PX 442 was submitted to CMS as part of ACLR's costs submission.  Consequently, the references in the last two columns on the second through fourth pages of PX 442 reference "Exhibit 268" as that "Exhibit 268" was identified in connection with a prior submission but should currently be noted as PX 441.

E.   Loan Interest Costs

Defendant contends that the Court has already held that ACLR has no legal basis to demand loan interest costs.  ECF 168 at 38.  The Court's prior ruling on ACLR's Motion for Summary Judgment simply denied ACLR's Motion and Defendant did not cross move for summary judgment so procedurally the Court's prior ruling should not be construed as summary judgment in Defendant's favor on the recoverability of loan interest costs.  *See* ECF 125.

ACLR is entitled to loan interest payment costs of $176,426.46 in connection with the PY 2007 duplicate payment audit.  *See* 48 C.F.R. 52.249-2(g)(2)(i); "A contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." *Gevyn Constr. Co. v. United States*, 827 F.2d 752, 754 (Fed. Cir. 1987).  In *Gevyn*, the court held, "[28 U.S.C. §] 2516(a) does not bar an interest award as part of an equitable adjustment under a fixed-price contract if the contractor has actually paid interest because of the government's delay in payment." *Id.* at 754.

F.   Settlement Fees

Defendant contends that ACLR is not entitled to any settlement fees because ACLR's costs to prosecute its claims against Defendant are not an allowable cost and ACLR "made no effort to segregate" costs incurred for the preparation of its termination for convenience settlement proposal.  ECF 168 at 38-39.  ACLR is entitled to its costs in prosecuting its claim against Defendant because those costs resulted from the constructive termination for convenience.  ACLR is also entitled to the reasonable costs of settlement.  Those costs include "[a]ccounting, legal, clerical, and other expenses reasonably necessary

for the preparation of termination settlement proposals and supporting data."  48 C.F.R. §
52.249-2(g)(3)(i).

ACLR is entitled to recover its legal fees as well as its principal's time and effort
in this lawsuit that preceded the Court's March 23, 2020 Opinion and Order.  ECF 76.
CMS only raised the argument of a constructive termination for convenience in its briefings
to this Court on August 3, 2018 after ACLR filed its Partial Motion for Summary Judgment
on April 26, 2018.  ECF 61 at 16-17.

Prior to August 3, 2018, CMS had consistently taken the position that there was no
termination for convenience.  CMS never raised the affirmative defense of termination for
convenience in its Answer.[10]  *See* ECF 8.  During discovery, CMS never raised the
affirmative defense of termination for convenience and, in fact, testified that its actions in
connection with the PY 2007 and 2010 duplicate payment audits were not terminations for
convenience.  Theresa Ann Shultz, CMS's Director of the Division of Program Integrity
and Financial Management Contracts, was asked whether CMS had constructively
terminated ACLR's contract, and she testified "I don't believe we did, no."  Deposition of
Schultz at 10:8-14; 92:7-21, ACLR APP 28.  Given the barriers to ACLR in obtaining any
form of settlement relief from CMS, it is reasonable to conclude that ACLR's efforts to

---

[10] A termination for convenience defense would be an affirmative defense. *See Van Engers
v. Perini Corp.*, No. CIV. A. 92-1982, 1993 WL 235911, at *10 (E.D. Pa. June 28, 1993); *Millgard
Corp. v. E.E. Cruz/Nab/Fronier-Kemper*, No. 99 CIV.2952 LBS, 2003 WL 22801519, at *5
(S.D.N.Y. Nov. 24, 2003) (analyzing affirmative defense of termination for convenience).  "An
affirmative defense is an assertion raising new facts and arguments that, if proven, defeat the
plaintiff's claim even if the allegations in her complaint are true." *Lua v. United States*, 123 Fed.
Cl. 269, 275 (2015), *aff'd*, 843 F.3d 950 (Fed. Cir. 2016) (citations omitted).  United States Court
of Federal Claims Rule 8(c)(1) provides that "[i]n responding to a pleading, a party must
affirmatively state any avoidance or affirmative defense."  "The general rule is that affirmative
defenses are waived when not pleaded in the answer." *Stockton E. Water Dist. v. United States*, 70
Fed. Cl. 515, 528 (2006).

obtain this Court's ruling so that ACLR could prepare and present a claim to the Contracting Officer were "reasonably necessary." *See* 48 C.F.R. § 52.249-2(g)(3).

Without this lawsuit, CMS would not have taken the position that there was a constructive termination for convenience of the PY 2007 and 2010 duplicative payment audits and would not have been required to pay any settlement costs. Accordingly, ACLR's legal fees and time and effort were necessary precursors to obtaining the costs for the PY 2007 and 2010 duplicative payment audits. If ACLR is not allowed to recover these costs, it will not be fairly compensated for the costs it has incurred.

ACLR's costs in this lawsuit with respect to legal fees and time and effort are "reasonable costs of settlement of the work terminated." 48 C.F.R. § 52.249-2(g)(3). At trial, ACLR will present evidence of the legal fees and internal time effort spent on the preparation of ACLR's termination for convenience settlement proposals. After March 23, 2020, ACLR paid its law firm $114,351 in connection with settlement costs through July 2022. All time spent by Mr. Mucke and other ACLR personnel on post March 23, 2020 settlement costs was noted and tracked in ACLR's accounting system and reflected 1,255 hours through August 20, 2022. When those hours were then multiplied by their respective GSA schedule rates they totaled $294,430.96. To compensate ACLR for its costs and not the price it would charge a customer for the services, the GSA rates can be reduced by 15% to eliminate any profit component. This results in a total of $256,026.92 in post March 23, 2020 settlement costs attributable to ACLR personnel work as of August 20, 2022. Consequently, ACLR incurred $370,377.92 in post March 23, 2020 settlement costs

through August 20, 2022.[11]   ACLR should be allowed to pursue and recover these settlement fees.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.


Dated:  October 24, 2022

<div style="margin-left:50%">

DAVID, BRODY & DONDERSHINE, LLP


_____/s/_____
Thomas K. David
John A. Bonello
2100 Reston Parkway
Suite 370
Reston, VA 20191
Phone:  703-264-2220
Fax: 703-264-2226
tdavid@dbd-law.com
jbonello@dbd-law.com

Attorneys for Plaintiff ACLR, LLC

</div>

---

[11] This figure does not include attorneys' fees incurred but not yet paid.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of October 2022, I caused a copy of the

foregoing document to be emailed via the ECF system to the following:


Joseph Pixley
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044


_____/s/_____

Thomas K. David