DEFENDANT'S EXHIBIT A

Case 1:15-cv-00767-PEC   Document 54-1   Filed 05/25/18   Page 11 of 514

A000



DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services
Office of Acquisition and Grants Management
Division of Support Contracts
7500 Security Boulevard
Baltimore, Maryland 21244

DATE:     December 2, 2010

TO:       Selected FABS Schedule Holders

SUBJECT:  Request for Quote (RFQ) Recovery Audit Services in Support of Medicare Part D; CMS-RFQ-2011-110462

You are invited to submit a proposal/quotation in response to this RFQ.

The Centers for Medicare & Medicaid Services (CMS) intends to award a Firm-Fixed Price Contingency Fee Task Order for the subject work in accordance with the terms and conditions of your GSA FINANCIAL AND BUSINESS SOLUTIONS (FABS) Federal Supply Schedule and the terms and conditions in the attached Sample Task Order Terms and Conditions. The period of performance for the resulting task order shall a 12 month base period commencing at the date of award. The task order will also include four (4) 12-month option periods.

In order to receive a task order award resulting from this RFQ, your FABS schedule must include Contingency Fee Percentage pricing/ceiling.

Please be advised that this RFQ does not commit the Government to pay any cost for the preparation and submission of a quotation. In addition, the Contracting Officer is the only individual who can legally commit the Government to the expenditure of public funds in connection with this procurement. CMS anticipates making awards without discussions.

Thank you in advance for your interest.

Sincerely,


Debra Stidham
Contracting Officer


Attachments

(1) Attachment A: Statement of Objectives/Schedule of Deliverables
(2) Attachment B: Quotation Submission Instructions
(3) Attachment C: Evaluation Criteria for Award
(4) Attachment D: Draft Task Order Terms and Conditions
(5) Attachment E: Past Performance Questionnaire

Def Ex A 1

has taken or proposes to take to avoid, neutralize, or mitigate any resulting conflict of interest. The Government may, however, terminate for convenience if it deems such termination to be in the best interest of the Government.

(2) In the event that the Contractor was aware of facts required to be disclosed or the existence of an actual or potential organizational conflict of interest and did not disclose such facts or such conflict of interest to the Contracting Officer, the Contracting Officer may terminate for default.

(G) Remedies:  For breach of any of the above restrictions or for nondisclosure or misrepresentation of any facts required to be disclosed concerning this contract, including the existence of an actual or potential organizational conflict of interest at the time of or after award, the Government may terminate for default, and pursue such other remedies as may be permitted by law.

(H) Waiver:  In accordance with FAR 9.503, any request for waiver must be in writing, shall set forth the extent of the conflict, and requires approval by the agency head or a designee. Agency heads shall not delegate waiver authority below the level of head of a contracting activity.  The agency head or a designee may waive any general rule or procedure of this subpart by determining that its application in a particular situation would not be in the Government's interest.

(I) Subcontracts:  This Organizational Conflict of Interest clause shall flow down to all subcontractors unless an exemption is specifically approved by Contracting Officer, CMS.

## 16.   CONDITIONS FOR PERFORMANCE

In addition to the performance requirement of this contract as set forth under Performance Work Statement, the Contractor may be required to comply with the requirements of any revisions in legislation or regulations which may be enacted or implemented during the period of performance of this contract, and are directly applicable to the performance requirements of this contract.

In the event new legislation or regulations impacting the Contract require immediate implementation, the Contracting Officer shall issue a change order pursuant to FAR Clause 52.243-1, entitled Changes – Fixed-Price.

## 17.   CONFLICT OF INTEREST

The Contractor shall disclose any known or potential conflicts of interest, in accordance with FAR Part 9.5, for the purpose of meeting the requirements of this contract.  The Contractor agrees that if an actual or potential organizational conflict of interest is discovered after an award of a task order, the Contractor shall make full disclosure in writing to the Contracting Officer.  This disclosure shall include a description of actions

ACLRII00138

A001

December 14, 2010

Jessica Sanders
Contract Specialist
Centers for Medicare & Medicaid Services
Mail Stop C2-21-15
7500 Security Boulevard
Baltimore, MD 21244-1850

Re:   Volume I - Technical Proposal
      Recovery Audit Services in Support of Medicare Part D
      CMS-RFQ-2011-110462

Dear Ms. Sanders:

Please find enclosed the ACLR Technical Proposal for Recovery Audit Services in Medicare Part D. ACLR is staffed with highly qualified recovery audit professionals with experience in many types of improper payments and industries, including industry, government, and the Medicare Program Safeguard Contractor program. We offer a fresh perspective and stringent audit guidelines designed to maximize the identification and recovery of improper payments.

We believe that we offer the Centers for Medicare & Medicaid Services superior recovery audit services at a highly competitive rate. Numbered copies of our Technical Proposal have been included, as outlined in the Request for Quote, on each of the enclosed CDs. Each CD was examined for viruses. AVP Anti-Virus SBS Edition Version 8.5.449 was utilized to check each CD and we certify that they are virus free.

If you have any questions regarding this proposal or our team's capabilities, please contact me at 734-207-0404. Thank you for your consideration.

Very truly yours,

Christopher A. Mucke, CPA
Managing Principal

Def Ex A 3

ACLRII00170

A001

## CHAPTER 3 - TASK ORDER MANAGEMENT/STAFFING PLAN:

We recognize that developing and implementing a recovery audit program is challenging and our approach has been to develop a team derived from experienced recovery auditors and personnel experienced in Medicare Part D, its billing practices, benefit verification processes, and payment error tracking and resolution procedures. The team's recovery auditors are well trained in the management of large datasets and are intimately familiar with the internal control issues that give rise to improper payments. The team's Medicare Part D personnel are intimately familiar with all aspects of the integrated PDE submission process and have worked as pharmacy technicians and administrators and consultants to Plan Sponsor PDPs. We believe this initial team approach provides CMS with the experience needed to successfully implement a Medicare Part D recovery audit program. It is our practice to provide our clients with the most experienced personnel available and we are not in the habit of substituting less experienced personnel once a project is up and running; our key personnel will be assigned 100% to these recovery efforts throughout the duration of the project. In the event of employee attrition, CMS can rest assured knowing that we will replace lost personnel with comparably experienced and able personnel.

The key personnel selected for this project were chosen for their experience in their respective fields and their ability to implement national recovery audit programs and effectively lead and mentor assigned personnel. We anticipate that approved key personnel will be responsible for designing the project plan, implementation schedule, initial recovery audit processes and procedures; systems security plans, reporting methodologies, as well as all other program requirements during the implementation phase of this project. As the project progresses and we begin receiving data we anticipate immediately assigning experienced personnel to individual audits. These initial non-key personnel have already been identified and have committed to the project; they are discussed in greater detail under *Professional Experience & Qualification Summaries* below. As the project progresses we will locate and hire similarly capable personnel as necessary for full project implementation.

This chapter discusses our key personnel, our subcontractor teaming arrangement, anticipated contract execution, labor categories, and the professional qualifications of key and non-key personnel.

### 3.1   PROVIDING SKILLED PERSONNEL

ACLR has teamed with Allpro/Staffnet (Allpro) to meet the needs of the Medicare Part D recovery audit program. This pairing provides CMS with highly trained recovery audit specialists and a healthcare staffing service provider experienced at identifying and providing highly qualified Medicare and Medicare Part D personnel.

> ACLR: We are a firm employing recovery audit professionals with decades of varied and layered improper payment experience. ACLR professionals have extensive experience in

Def Ex A 4

### Exhibit 3-2 Labor Categories Continued

| GSA Title | Project Title | Roles & Responsibilities | Years of Experience | | |
|---|---|---|---|---|---|
| | | | Grad | Undergrad | HS |
| Junior Associate | PDP, PDE, & DIR Audit Support | Primarily responsible for conducting recovery audit activities and interacting with Plan Sponsors to resolve improper payment issues commensurate with their experience. Reports directly to audit management. | N/A | 0 | 4 |
| Admin. Assistant | PDP, PDE, & DIR Audit Support | Personnel will be primarily responsible for assisting audit team members in completing administrative tasks that may arise, documenting results of internal meetings, and generating monthly status reports for dissemination amongst team members and CMS. | N/A | N/A | N/A |

### 3.5 PROFESSIONAL EXPERIENCE & QUALIFICATIONS SUMMARIES

A summary of the ACLR Recovery Audit Team Members is provided in Exhibit 3-3 below. Copies of resumes all key personnel have been provided in Attachment B; and commitment letters are provided in Attachment C. All other non-key personnel have verbally committed to participate in this recovery audit. Any personnel listed on Exhibit 3-3 that are unavailable to participate in this contract will be replaced by personnel with commensurate experience and provided to CMS for review and approval.

### Exhibit 3-3 Professional Experience & Qualification Summaries

| Name | Key | Usage | Qualifications | IT Systems & Security | Insurance & Benefit Plans | Statutory & Regulatory Compliance | Data Analysis | Sampling & Modeling | Pharmacy Audits & Understanding | Medicare Part D Payment Structure & Systems | Medicare & Part D Understanding | Recovery Audit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Christopher Mucke, CPA | Y | 100% | In excess of 20 years national recovery audit experience, statutory & regulatory compliance, data analysis, sampling and modeling, and auditing including expert witness litigation support services in Medicare PSC program. | x | x | | x | x | x | x | x | |
| Jason Barnes | Y | 100% | Excess of 8 years recovery audit experience. An experienced audit team leader responsible for managing mulitple audit teams and recovery audits. Adept in statistical sampling design, project management, data analysis, and database development. Extensive experience in numerous financial accounting systems. | x | | | x | x | x | x | x | x |
| Bruce Dixon | Y | 100% | Extensive project management experience in DART, metric reporting, SAS 70, and claims repricing including coordination of benefits data from CMS for Plan Sponsor. | x | x | | | | x | x | x | |
| Deanna Minges | Y | 100% | In excess of 10 years billing experience with extensive knowledge of Medicare, Medicare Advantage, Medicare D, and Medicaid; including Home infusion, nursing, DMS, and pharmacy. | x | x | x | | | x | | x | |

NAME: Christopher Mucke, CPA

PROJECT ROLE: Project Director

EDUCATION: University of Tennessee; Chattanooga, TN
B.S. Accounting
Certified Public Accountant, Licensed in Maryland

EXPERIENCE:

*ACLR; Plymouth, MI; 2002-Present*
*Managing Principal*

- *Managing Principal responsible for the management of a multi-million dollar firm specializing in a wide range of business solutions from recovery and forensic auditing, accounting, regulatory compliance, and management consulting.*
- *Responsible for representing clients at trial in recovery audit appeals and providing litigation support services regarding Medicare Program Safeguard Contractor statistically sampled audits.*
- *Responsible for drafting legislation and testifying at legislative hearings in support of client lobbying efforts. Developed Sarbanes-Oxley compliant internal controls to assist clients in improper payment mitigation efforts and statistical sampling protocols in accordance with generally accepted statistical sampling priniciples.*
- *Assist accounting and sampling procedures and designed and implemented improper payment reduction processes for Fortune 10 client businesses.*
- *Contributor to industry white papers and frequent speaker for industry association on recovery audits, document management and statistical sampling.*

*BDO Seidman & PriceWaterhouseCoopers; Atlanta, GA; 1997-2002*
*Senior Manager, SW Practice Leader - Recovery Audits*

- *Responsible for building southeast recovery audit practice for multi-national accounting and consulting firms.*
- *Achieved recoveries of improper payments and cost mitigation in excess of $250 million for client businesses.*

*General Electric Company; Fort Myers, Florida; 1990-1997*
*Manager Recovery Audits*

- *Provided recovery auditing and accounting services to multiple industries including healthcare, manufacturing, construction, government contracting, distribution, financial services, retail, wholesale, transportation, and research & development.*
- *Developed and implemented initial statistical sampling protocols used by industry in recovery audits and achieved recoveries and cost reductions in excess of $250 million.*

Def Ex A 6

(d) Release such information unless such information has previously been released or otherwise made available to the public by the Government.

(2) In addition, the Contractor agrees that to the extent it receives or is given access to proprietary data, data protected by the Privacy Act of 1974 (5 U.S.C. 552a), or other confidential or privileged technical, business, or financial information under this contract, it shall treat such information in accordance with any restrictions imposed on such information.

(F) Disclosure after award:

(1) The Contractor agrees that, if changes, including additions, to the facts disclosed by it prior to award of this Contract, occur during the performance of this Contract, it shall make an immediate and full disclosure of such changes in writing to the Contracting Officer. Such disclosure shall include a description of any action which the Contractor has taken or proposes to take to avoid, neutralize, or mitigate any resulting conflict of interest. The Government may, however, terminate for convenience if it deems such termination to be in the best interest of the Government.

(2) In the event that the Contractor was aware of facts required to be disclosed or the existence of an actual or potential organizational conflict of interest and did not disclose such facts or such conflict of interest to the Contracting Officer, the Contracting Officer may terminate for default.

(G) Remedies: For breach of any of the above restrictions or for nondisclosure or misrepresentation of any facts required to be disclosed concerning this contract, including the existence of an actual or potential organizational conflict of interest at the time of or after award, the Government may terminate for default, and pursue such other remedies as may be permitted by law.

(H) Waiver: In accordance with FAR 9.503, any request for waiver must be in writing, shall set forth the extent of the conflict, and requires approval by the agency head or a designee. Agency heads shall not delegate waiver authority below the level of head of a contracting activity. The agency head or a designee may waive any general rule or procedure of this subpart by determining that its application in a particular situation would not be in the Government's interest.

(I) Subcontracts: This Organizational Conflict of Interest clause shall flow down to all subcontractors unless an exemption is specifically approved by Contracting Officer, CMS.

Def Ex A 7

"Alaska Native Corporation (ANC)" means any Regional Corporation, Village Corporation, Urban Corporation, or Group Corporation organized under the laws of the State of Alaska in accordance with the Alaska Native Claims Settlement Act, as amended (43 U.S.C. 1601, et seq.) and which is considered a minority and economically disadvantaged concern under the criteria at 43 U.S.C. 1626(e)(1). This definition also includes ANC direct and indirect subsidiary corporations, joint ventures, and partnerships that meet the requirements of 43 U.S.C. 1626(e)(2).

"Commercial item" means a product or service that satisfies the definition of commercial item in section 2.101 of the Federal Acquisition Regulation.

"Commercial plan" means a subcontracting plan (including goals) that covers the offeror's fiscal year and that applies to the entire production of commercial items sold by either the entire company or a portion thereof (e.g., division, plant, or product line).

"Electronic Subcontracting Reporting System (eSRS)" means the Governmentwide, electronic, web-based system for small business subcontracting program reporting. The eSRS is located at http://www.esrs.gov.

"Indian tribe" means any Indian tribe, band, group, pueblo, or community, including native villages and native groups (including corporations organized by Kenai, Juneau, Sitka, and Kodiak) as defined in the Alaska Native Claims Settlement Act (43 U.S.C.A. 1601 et seq.), that is recognized by the Federal Government as eligible for services from the Bureau of Indian Affairs in accordance with 25 U.S.C. 1452(c). This definition also includes Indian-owned economic enterprises that meet the requirements of 25 U.S.C. 1452(e).

"Individual contract plan" means a subcontracting plan that covers the entire contract period (including option periods), applies to a specific contract, and has goals that are based on the offeror's planned subcontracting in support of the specific contract, except that indirect costs incurred for common or joint purposes may be allocated on a prorated basis to the contract.

"Master plan" means a subcontracting plan that contains all the required elements of an individual contract plan, except goals, and may be incorporated into individual contract plans, provided the master plan has been approved.

"Subcontract" means any agreement (other than one involving an employer-employee relationship) entered into by a Federal Government prime Contractor or subcontractor calling for supplies or services required for performance of the contract or subcontract.

(c) Proposals submitted in response to this solicitation shall include a subcontracting plan that separately addresses subcontracting with small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns. If the offeror is submitting an individual contract plan, the plan must separately address subcontracting with small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns, with a separate part for the basic contract and separate parts for each option (if any). The plan shall be included in and made a part of the resultant contract. The subcontracting plan shall be negotiated within the time specified by the Contracting Officer. Failure to submit and negotiate a subcontracting plan shall make the offeror ineligible for award of a contract.

(d) The offeror's subcontracting plan shall include the following:

>   (1) Goals, expressed in terms of percentages of total planned subcontracting dollars, for the use of small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns as subcontractors. The offeror shall include all sub-contracts that contribute to contract performance, and may include a proportionate share of products and services that are normally allocated as indirect costs. In accordance with 43 U.S.C. 1626: